## West Virginia University Hospitals, Inc.

## Statements of Changes in Net Assets

| | Years ended December 31 | |
|---|---|---|
| | 2002 | 2001 |
| | *(In Thousands)* | |
| Unrestricted net assets: | | |
| Excess of revenues over expenses | $ 134 | $ 636 |
| Unrealized depreciation on investments | (12,984) | (6,262) |
| Capital donations | 308 | 793 |
| Transfers to West Virginia United Health System, Inc. | (207) | (1,360) |
| Decrease in unrestricted net assets | (12,749) | (6,193) |
| Temporarily restricted net assets: | | |
| Change in temporarily restricted assets held by the WVU Foundation, net | 779 | (567) |
| Increase (decrease) in temporarily restricted net assets | 779 | (567) |
| Permanently restricted net assets: | | |
| Change in permanently restricted assets held by the WVU Foundation, net | (65) | (125) |
| Decrease in permanently restricted net assets | (65) | (125) |
| Decrease in net assets | (12,035) | (6,885) |
| Net assets, beginning of year | 261,752 | 268,637 |
| Net assets, end of year | $ 249,717 | $ 261,752 |

*See accompanying notes.*

# West Virginia University Hospitals, Inc.

## Statements of Cash Flows

|  | Years ended December 31 | |
|---|---|---|
|  | 2002 | 2001 |
|  | (In Thousands) | |
| **Cash flows from operating activities** | | |
| Decrease in net assets | $  (12,035) | $  (6,885) |
| Adjustments to reconcile change in net assets to net cash provided by operating activities: | | |
| Change in restricted assets held by WVU Foundation | (714) | 692 |
| Depreciation and amortization | 19,455 | 16,813 |
| Net realized and unrealized losses on investments, including other than temporary losses | 24,503 | 16,937 |
| Provision for bad debts | 16,629 | 14,581 |
| Contributions for fixed assets | (308) | (793) |
| Transfers to West Virginia United Health System, Inc. | 207 | 1,360 |
| Changes in operating assets and liabilities: | | |
| Patient accounts receivables | (18,575) | (20,880) |
| Other receivables | 5,616 | (5,846) |
| Estimated amounts due from third party payors | (3,677) | (3,332) |
| Inventories | (97) | (16) |
| Prepaid expenses | 104 | (594) |
| Other assets | 273 | (1,249) |
| Accounts payable | 2,350 | 1,219 |
| Accrued wages and fringe benefits | 469 | 2,048 |
| Accrued interest payable | (19) | (3) |
| Deferred revenue | 199 | 31 |
| Self-insurance liability | (315) | 1,557 |
| Net cash provided by operating activities | 34,065 | 15,640 |
| | | |
| **Cash flows from investing activities** | | |
| Acquisition of plant and equipment, net of disposals | (30,169) | (17,080) |
| (Increase) decrease in assets whose use is limited, net | (4,842) | 11,903 |
| Net cash used in investing activities | (35,011) | (5,177) |
| | | |
| **Cash flows from financing activities** | | |
| Repayment of long-term obligations | (4,524) | (4,289) |
| Repayment of line of credit | (2,000) | (3,000) |
| Proceeds from line of credit | - | 2,000 |
| Proceeds from Series 2002 Bonds | 10,000 | - |
| Contributions for fixed assets | 308 | 793 |
| Transfers to West Virginia United Health System, Inc. | (207) | (1,360) |
| Net cash provided by (used in) financing activities | 3,577 | (5,856) |
| | | |
| Increase in cash | 2,631 | 4,607 |
| Cash at beginning of year | 925 | (3,682) |
| Cash at end of year | $  3,556 | $  925 |

*See accompanying notes.*

West Virginia University Hospitals, Inc.

Notes to Financial Statements

December 31, 2002

## 1. Organization

In 1960, West Virginia University (the University) commenced operations of a tertiary care teaching hospital as a component of the Medical Center of the University. In 1984, the West Virginia legislature adopted legislation which authorized separation of the hospital operations from the University and establishment of a separate corporate entity. The West Virginia University Hospitals, Inc. (the Hospital) was incorporated as a nonstock, not-for-profit corporation and, by an agreement of transfer and lease dated July 1, 1984, assumed the operation of and responsibility for the Hospital. The 440-bed hospital, located in Morgantown, West Virginia, serves as a major statewide and regional health care referral center and provides the principal clinical education and research site for the University.

As part of the transfer agreement with the Board of Trustees and the University, the Hospital is required to provide a minimum of $4,000,000 per year in education expense for the interns and residents and an annual clinical teaching subsidy of not less than $6,000,000. Management believes both requirements have been exceeded for 2002 and 2001.

In December 1996, the Hospital entered into an agreement to affiliate with United Hospital Center, Inc. (UHC). The hospitals received certificate of need approval from the State of West Virginia's Health Care Cost Review Authority on April 15, 1997. As of April 16, 1997, the West Virginia United Health System, Inc. (the System) became operational. The System is the sole corporate member of the Hospital and UHC and has certain authority over each hospital, including the authority to elect each hospital's governing board.

On October 1, 1998, the Hospital acquired certain assets and liabilities from Psychiatric Institute of West Virginia, Inc. (PIWV) for $14,616,000. The purchase price exceeded the fair value of the net assets acquired by approximately $2,900,000. The excess of the purchase price over the fair value of the net assets acquired has been recorded as goodwill and was being amortized over 20 years. In 2002, the Hospital accelerated the amortization of the balance over a remaining three-year period. The effect of the acceleration was additional amortization expense of approximately $700,000.

## 2. Significant Accounting Policies

### Cash and Cash Equivalents

Cash and cash equivalents consist of cash on deposit and investments with maturities of three months or less. The market value of the cash and cash equivalents approximates cost.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

**2. Significant Accounting Policies (continued)**

The Hospital has cash deposits and short-term investments with various banks and financial institutions consisting principally of demand deposits and repurchase agreements. The total amount of cash on deposit in these banks exceeds the federally insured limits at December 31, 2002.

**Inventories**

Inventories are stated at the lower of first-in, first-out cost or market.

**Investments**

Investments in equity securities with readily determinable fair values and all investments in debt securities are classified as nontrading and are recorded at fair value in the balance sheet. Investment income, including realized gains and losses determined by the weighted-average method and other than temporary losses, is included in excess of revenues over expenses. Unrealized gains and losses on investments, excluding other than temporary losses, are excluded from excess of revenues over expenses and are recorded as an other change in unrestricted net assets.

The Hospital continually reviews nontrading investments for impairment conditions that indicate that an other than temporary decline in market value has occurred. In conducting this review, numerous factors are considered which, individually or in combination, indicate that a decline is other than temporary and that a reduction of the carrying value is required. These factors include specific information pertaining to an individual company or a particular industry and general market conditions that reflect prospects for the economy as a whole. Based on this review, other than temporary losses of approximately $4,800,000 and $3,632,000 were recorded in 2002 and 2001, respectively.

Assets whose use is limited includes assets held by a trustee under indenture agreements and designated assets set aside by the Board of Directors for future capital improvements, debt payments, and malpractice insurance payments over which the Board retains control and may at its discretion subsequently use for other purposes.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

**2. Significant Accounting Policies (continued)**

**Property, Plant, and Equipment**

Property, plant, and equipment are carried at cost or fair market value at the date of gift for donated capital. The Hospital provides for depreciation of plant and equipment on a straight-line method at rates designed to amortize the cost of these assets over their estimated useful lives.

**Self-Insurance Liability**

The self-insurance liability represents estimated medical malpractice claims and includes estimates of the ultimate costs for both reported claims and claims incurred but not reported. The Hospital records a provision for estimated medical malpractice claims based upon actuarially determined amounts. The Hospital makes deposits to a revocable trust fund consistent with actuarial determinations.

**Net Patient Service Revenue**

Patient accounts receivable and net patient service revenue are primarily derived from patients who reside in the West Virginia, Western Pennsylvania, and Western Maryland geographic area. Net patient service revenue is reported at established rates in the period in which services are provided. The majority of the Hospital's services are rendered to patients under Medicare, Blue Cross, Public Employees Insurance Agency (PEIA), and both West Virginia and Pennsylvania Medicaid programs. Services provided under these programs are reimbursed based on a combination of historical costs, prospectively determined rates, and a percentage of customary charges. The amounts received under these programs are less than the established hospital rates and the differences are reported as contractual allowances to arrive at net patient service revenue. Amounts received under these programs are subject to review and final determination by program intermediaries or their agents. At December 31, 2002, the Hospital believes that a reasonable provision has been made in the accompanying financial statements for anticipated adjustments.

Pursuant to the provisions of the West Virginia Code, the West Virginia Health Care Authority (HCA) has been empowered to regulate the Hospital's billing rates from nongovernmental payors through limitation orders compiled from budgets and rate schedules submitted by the Hospital on a periodic basis.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

**2. Significant Accounting Policies (continued)**

Net revenues from the Medicare and Medicaid programs accounted for approximately 31% and 19%, respectively, of the Hospital's net patient service revenue for the year ended December 31, 2002 and 32% and 19%, respectively, for the year ended December 31, 2001. Laws and regulations governing the Medicare and Medicaid programs are extremely complex and subject to interpretation. As a result, there is at least a reasonable possibility that recorded estimates will change by material amounts in the near term. Compliance with such laws and regulations can be subject to future government review and interpretation as well as significant regulatory action including fines, penalties, and exclusion from the Medicare and Medicaid programs. The Hospital believes that it is in compliance with all applicable laws and regulations and is not aware of any pending or threatened investigations involving allegations of potential wrongdoing that would be material to the financial statements. While no such regulatory inquiries have been made, compliance with such laws and regulations can be subject to future government review and interpretation, as well as significant regulatory action, including fines, penalties, and exclusion from the Medicare and Medicaid programs.

Significant concentrations of net patient accounts receivable at December 31, 2002 and 2001, respectively, include Medicare—21% and 22%, and Medicaid—23% and 19%, Blue Cross—11% and 10% and Commercial Insurance—17% and 14%.

**Charity Care**

The Hospital provides care to patients who meet certain criteria under its charity care policy without charge or at amounts less than its established rates. Because the Hospital does not pursue collection of amounts determined to qualify as charity care, they are not reported as revenue.

**Income Taxes**

The Hospital has received a determination from the Internal Revenue Service that it is exempt from federal income taxes under Section 501(a) of the Internal Revenue Code by reason of being an organization described in Section 501(c)(3). Section 501(c)(3) includes among others, those organizations operated exclusively for charitable purposes. The Hospital is exempt from state income taxes under applicable state statutes.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

**2. Significant Accounting Policies (continued)**

**Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Asset Impairment**

In 2002, the Hospital adopted Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* (the Statement). The Hospital considers whether indicators of impairment are present and performs the required recoverability test as prescribed by the Statement. Write-downs due to impairment are charged to operations at the time the impairment is identified.

**Excess of Revenues Over Expenses**

The statement of operations and changes in net assets includes excess of revenues over expenses as a performance indicator. Included in excess of revenues over expenses are all changes in unrestricted net assets other than contributions for the purchase of property and equipment and unrealized gains and losses on investments, excluding other than temporary losses.

**Operating Activities and Nonoperating Losses**

Only those activities directly associated with the furtherance of the Hospital's primary mission are considered to be operating activities. Other activities that result in gains or losses are considered to be nonoperating income (loss). Nonoperating income (loss) includes interest and other earnings or losses on investments and gains and losses on the sale of fixed assets.

**Reclassifications**

Certain reclassifications have been made to the 2001 financial statements to conform to the current year financial statement presentation. Such reclassifications did not affect excess of revenues over expenses or net assets.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

**2. Significant Accounting Policies (continued)**

**Restricted Assets Held by West Virginia University Foundation**

The West Virginia University Foundation, Inc. (the WVU Foundation) holds cash and securities which are available for the Hospital's purposes, subject to donor restrictions. Temporarily restricted net assets are those whose use has been limited by donors to a specific time period or purpose, primarily for capital expenditures. Permanently restricted net assets have been restricted by donors to be maintained in perpetuity. The Hospital records assets or expenses, as appropriate, along with corresponding revenue or donated capital, as funds are transferred to the Hospital and expended according to the donor's intended purposes.

**3. Net Patient Service Revenue**

The Hospital maintains records to identify and monitor the level of charity care it provides. These records include the amount of charges forgone for services furnished under its charity care policy. Charity care and contractual allowances, in thousands, for the years ended December 31, 2002 and 2001 are as follows:

|  | 2002 | 2001 |
|---|---|---|
| Gross patient service revenues | $ 483,260 | $ 405,636 |
| Less:   Provision for contractual allowances | (191,699) | (145,978) |
|          Charity care | (12,654) | (11,473) |
| Add: Other adjustments and settlements | 13,647 | 10,831 |
| Net patient service revenue | $ 292,554 | $ 259,016 |

In 1991, the legislature of the State of West Virginia approved a disproportionate share plan. The Hospital is currently being paid under an amendment to the program, which was implemented June 1, 1993. This plan reimburses hospitals in the state that provide Medicaid services and meet other eligibility criteria. Under the disproportionate share program, the Hospital received $8,970,848 and $7,750,709 in 2002 and 2001, respectively, included in other adjustments and settlements in the table above. Also included in other adjustments and settlements in 2002 and 2001 are increases of approximately $4,676,000 and $2,337,000, respectively, related to the changes in the estimated amounts due to/from third party payors.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

**3. Net Patient Service Revenue (continued)**

In 1995, the State of West Virginia Disproportionate Share Hospital State Plan was amended to provide for a settlement process among participating hospitals. However, the State has not completed a settlement process for any of the years since the date of the plan amendment. Currently, the Bureau for Medical Services of the State of West Virginia Department of Health and Human Resources (the Bureau) is in process of contracting with a third party vendor to assist with the audit settlement process for the Disproportionate Share Hospital State Plan. The Bureau has not yet finalized the disproportionate share (DSH) settlement process with the Centers for Medicare & Medicare Services. The laws and regulations governing the DSH settlement process are complex, involving statistical data from all participating hospitals, and subject to interpretation. Accordingly, the Hospital is not able to estimate the possible loss that could arise upon completion of the DSH settlement process. The results of the resolution of the settlement process could materially impact the Hospital's future results of operations or cash flows in a particular period.

Effective June 1, 1993, the legislature of the State of West Virginia enacted a broad-based health care related tax. This tax is based upon net patient service revenue of the Hospital. The Hospital incurred approximately $6,125,000 and $5,889,000 in 2002 and 2001, respectively, related to this tax. This expense is included in the supplies and purchased services category in the statements of operations and changes in unrestricted net assets.

**4. Assets Whose Use Is Limited**

The fair value of assets whose use is limited, in thousands, at December 31, 2002 and 2001 are as follows:

|  | 2002 | 2001 |
|---|---|---|
| Board-designated funds: |  |  |
| Funded depreciation: |  |  |
| Cash and short-term investments | $  7,731 | $  4,810 |
| U.S. Government, corporate, and other obligations | 47,136 | 47,592 |
| Common stock | 42,664 | 55,455 |
|  | 97,531 | 107,857 |
| Debt repayment fund: |  |  |
| Cash and short-term investments | 3,482 | 4,674 |
| U.S. Government, corporate, and other obligations | 35,948 | 32,837 |
| Common stock | 31,724 | 43,612 |
|  | 71,154 | 81,123 |

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

**4. Assets Whose Use Is Limited (continued)**

|  | 2002 | 2001 |
|---|---|---|
| Malpractice self-insurance trust fund: |  |  |
| Cash and short-term investments | 507 | 679 |
| U.S. Government, corporate, and other obligations | 5,238 | 5,304 |
| Common stock | 4,775 | 6,148 |
|  | 10,520 | 12,131 |
| Funds held by bond trustee: |  |  |
| Cash and short-term investments | 5,107 | 2,154 |
| U.S. Government obligations | 5,453 | 6,160 |
|  | 10,560 | 8,314 |
| Less funds that are required to satisfy current obligations | (6,864) | (5,701) |
|  | $ 182,901 | $   203,724 |

Investment income and net realized and unrealized gains (losses) from assets whose use is limited and cash, in thousands, are comprised of the following for the years ended December 31, 2002 and 2001:

|  | 2002 | 2001 |
|---|---|---|
| Nonoperating (losses) gains: |  |  |
| Net investment income | $    6,291 | $   7,030 |
| Net realized losses and other than temporary losses of $4,800 in 2002 and $3,632 in 2001 | (11,519) | (10,675) |
| Loss on disposal of equipment | (63) | (79) |
|  | (5,291) | (3,724) |
| Other changes in net assets: |  |  |
| Unrealized depreciation on investments | (12,984) | (6,262) |
|  | $ (18,275) | $  (9,986) |

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

**5. Property, Plant, and Equipment**

Property, plant, and equipment and the related accumulated depreciation, in thousands, consist of the following at December 31:

|  | 2002 | 2001 |
|---|---|---|
| Land and land improvements | $ 7,513 | $ 6,580 |
| Buildings | 85,544 | 82,652 |
| Equipment | 189,093 | 170,473 |
| Leasehold improvements | 943 | 937 |
|  | 283,093 | 260,642 |
| Less accumulated depreciation | 172,141 | 155,961 |
|  | 110,952 | 104,681 |
| Construction in progress | 8,153 | 2,754 |
| Plant and equipment, net | $ 119,105 | $ 107,435 |

In 2001, the Hospital constructed the West Virginia Eye Institute on its campus. A portion of the building's cost, $2.7 million, was funded by grants from the federal government through West Virginia University. The portion of the building funded by the grants is being used by the University for research and is recorded by the University as a capital leased asset in their financial statements. The Hospital has legal title to the building and leases the research space to the University over a 50-year lease period. The federal government retains an interest in the property and approximately 33% of the funds from disposition of the property.

**6. Long-Term Obligations**

On July 10, 2002, the West Virginia Hospital Finance Authority issued $10,000,000 of Series 2002 B-1 Bonds on behalf of the Hospital for the acquisition of certain capital improvements, including equipment. The Series 2002 Bonds have a variable interest rate, adjusted weekly. The Serial Bonds of the 2002 issue have annual maturities beginning July 1, 2003 through July 1, 2009. The overall financing is structured in a manner that, as principal and interest are due, the Hospital will draw upon an irrevocable letter of credit with an expiration date of July 10, 2009 from Branch Banking and Trust Company (Bank) to meet such payments. Repayments of the draw for principal and interest are made to the Bank based upon terms of the letter of credit, which requires payment immediately. Payments under a remarketing tender advance are not payable until 366 days after a draw. The Series 2002 Bonds pay interest monthly.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

**6. Long-Term Obligations (continued)**

On April 1, 1985, the County Commission of Monongalia County, acting in its official capacity, issued $92,415,000 of Hospital Revenue Bonds on behalf of the Hospital to finance the construction of the Hospital. On October 1, 1986, the West Virginia Hospital Finance Authority (the Authority) issued $116,545,000 of Series 1986 Bonds on behalf of the Hospital to refinance the 1985 Bonds and to provide additional financing for the project. On September 15, 1993, the Authority issued $72,935,000 of Series 1993 Bonds on behalf of the Hospital to refinance and defease $86,280,000 of the 1986 Bonds. The Series 1993 Bonds have interest rates between 2.60% and 5.55% per annum. The Serial Bonds of the 1993 issue have annual maturities through 2007. The Term Bonds of the 1993 issue have maturities of June 1, 2010, 2011, 2013, and 2016. On October 15, 1998, the Authority issued $44,345,000 of Series 1998 Bonds on behalf of the Hospital to refinance and defease the remaining portion of the 1986 Bonds. The Series 1998 Bonds have interest rates between 3.75% and 5% per annum. The Serial Bonds of the 1998 issue have annual maturities beginning 2002 through 2013. The Term Bonds of the 1998 issue have maturities of June 1, 2015, 2018, and 2022.

The Series 1993 and 1998 Bonds pay interest semiannually on June 1 and December 1. Principal payments for the 1993 and 1998 bonds are due June 1. The bonds are secured by notes from the Hospital to the Authority. Under the terms of the notes, the Hospital is obligated to make payments to the bond trustee in amounts sufficient to pay principal and interest on the bonds.

The notes also require the Hospital to pledge, to the extent required, its available revenues with the exception of any grants, gifts, bequests, contributions, or donations specifically restricted by the donor. The Hospital purchased an insurance policy which guarantees the payment of the Series 1993 and 1998 Bonds in the event of default by the Hospital. The restrictive covenants of the Series 1993 and 1998 Bonds and the notes include, among other covenants, minimum coverages of insurance, net revenue requirements, average annual debt service requirements, limitations on additional debt, and annual reporting requirements.

Total interest paid on all long-term obligations for the years ended December 31, 2002 and 2001 was approximately $5,240,000 and $5,336,000, respectively.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

### 6. Long-Term Obligations (continued)

The future maturities, in thousands, of all long-term obligations are as follows:

|  | Hospital Bonds 1993 | Hospital Bonds 1998 | Hospital Bonds 2002 | Total |
|---|---|---|---|---|
| 2003 | $ 2.910 | $ 1.390 | $ 1,400 | $ 5,700 |
| 2004 | 3.050 | 1.445 | 1,400 | 5,895 |
| 2005 | 3.195 | 1.500 | 1,400 | 6,095 |
| 2006 | 3.360 | 1.560 | 1,400 | 6,320 |
| 2007 | 3.525 | 1.625 | 1,400 | 6,550 |
| Thereafter | 41.410 | 35.485 | 3,000 | 79,895 |
|  | 57.450 | 43.005 | 10,000 | 110,455 |
| Less amounts representing unamortized bond discount | 907 | 357 | - | 1,264 |
|  | 56,543 | 42,648 | 10,000 | 109,191 |
| Less current portion | 2,910 | 1,390 | 1,400 | 5,700 |
| Long-term obligations | $ 53,633 | $ 41,258 | $ 8,600 | $ 103,491 |

The Hospital also has an available unsecured line of credit of $5,000,000 that accrues interest at 3.75%. There have been no amounts drawn as of December 31, 2002.

### 7. Employee Benefit Plans

The Hospital participates in various defined contribution plans which cover substantially all the Hospital's full-time employees. Employees are eligible to contribute, and the Hospital will match a percentage of their base pay up to a limit depending on the employee's years of service. Both employee and employer contributions are 100% vested upon entry into the plan.

Approximately 2% of the Hospital's employees continue to be paid by the State of West Virginia. Those employees also participate in a defined contribution pension plan for state employees. The Hospital reimburses the state for all costs of these employees, including salaries and wages, pension expense, and other related fringe benefits.

For the years ended December 31, 2002 and 2001, the Hospital's share of the defined contribution plans' costs for Hospital full-time employees and Hospital employees paid by the State of West Virginia was approximately $3,112,000 and $2,843,000, respectively.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

## 8. Leases

The Hospital has entered into various lease agreements for office space and equipment. Rent expense is approximately $2,334,000 and $2,003,000 for the years ended December 31, 2002 and 2001, respectively.

Future minimum lease payments under noncancelable operating leases, in thousands, are as follows:

| | | |
|---|---|---|
| 2003 | $ | 2,089 |
| 2004 | | 2,045 |
| 2005 | | 2,009 |
| 2006 | | 1,822 |
| 2007 | | 1,895 |
| | $ | 9,860 |

## 9. Insurance

The Hospital maintains a self-insurance program for professional liability and general liability. The program covers all Hospital facilities with respect to claims occurring on or after October 1, 1986. The program also covers losses above $1,000,000 per occurrence (the State's indemnification limit) on hospital-based physicians and residents. Prior to December 21, 1998, the program purchased occurrence excess insurance above amounts retained of $2,000,000 per occurrence/$6,000,000 annual aggregate. Effective December 21, 1998, the self-insured retention limits increased to $2,000,000 per occurrence/$7,500,000 annual aggregate, with the annual aggregate limit shared between the Hospital and UHC. For the period of January 21, 2002 through January 21, 2003, excess coverage was purchased from AIG on a claims-made basis above retention limits of $5,000,000 per claim/$12,000,000 annual aggregate (shared with UHC). Beginning January 21, 2003, the Hospital is fully self-insured for all claims.

The estimated liability for self-insurance discounted at 5% and 6% in 2002 and 2001, respectively, includes an estimate of the ultimate costs for claims reported to the Hospital, as well as incidents that may have occurred but not been reported. Such incidents may or may not result in the assertion of additional claims. The liability for self-insurance is determined using statistical analyses by consulting actuaries and represents management's best estimate of the ultimate cost of all incidents, including loss adjustment expenses.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

**9. Insurance (continued)**

While the ultimate amount of claims incurred is dependent on future developments, in management's opinion, recorded reserves are adequate to cover the future payment of claims. However, it is reasonably possible that recorded reserves may change in the near term and may not be adequate to cover the future payment of claims. Adjustments, if any, to estimates recorded resulting from ultimate claim payments are reflected in operations in the periods in which such adjustments are known.

**10. Contingencies**

The Hospital is involved in litigation, malpractice claims and regulatory investigations arising in the normal course of business. Several of these cases involve potential significant amounts for which legal counsel is unable to render an opinion on the outcome or potential damages at the present time. In the opinion of management, resolution of those matters is not expected to have a material adverse effect on the financial position of the Hospital. However, depending on the amount and timing of such resolution, an unfavorable resolution of some or all of these matters could materially affect the Hospital's future results of operations or cash flows in a particular period.

**11. Commitments**

On April 1, 1988, the Hospital and the West Virginia University Medical Corporation (Medcorp), d/b/a University Health Associates (UHA) (a wholly owned nonprofit corporation of the University), entered into an Operating Credit Agreement (the Agreement). Medcorp operates the Physician Office Center (the Facility), which is located on the Hospital's campus. In order to finance the Facility, the West Virginia Hospital Finance Authority has issued $23,500,000 of tax-exempt Hospital Revenue Bonds. The Agreement requires the Hospital "to loan or otherwise make funds available to Medcorp to the extent that the revenues of Medcorp are not sufficient to pay the operating expenses thereof during the period following completion of the Facility until the payment of the Bonds in full." To date, the Hospital has not been required to advance any funds on behalf of Medcorp relating to the Agreement.

In May 1997, AHS entered into three loan agreements with Huntington National Bank with a combined principal amount of approximately $3,100,000, payable in monthly installments at fixed interest rates ranging from 6.98% to 7.73%. AHS' obligation to repay two of these loans is fully guaranteed by the Hospital. In October 2001, AHS refinanced the outstanding balances of the three loan agreements ($1,496,000) with Wesbanco Bank at a fixed rate of 6.5%. The Hospital has guaranteed two of the fixed rate notes. Outstanding amounts guaranteed by the Hospital at December 31, 2002 and 2001 are approximately $863,000 and $1,067,000, respectively.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

### 12. Related Party Transactions

The Hospital entered into an agreement with UHA to form a health care provider network named Integrated Provider Network, Inc. (IPN), which began operations on January 1, 1995. The IPN subsequently entered into a provider relationship with The Health Plan of the Upper Ohio Valley, Inc. (The Health Plan). The Hospital is at risk, along with UHA, for any deficiencies incurred by the IPN. As of December 31, 2002 and 2001, the Hospital has a receivable of approximately $1,100,000 and $869,000, respectively, from the IPN for risk-sharing and withholds receivable.

The Hospital performs certain information technology and other services on behalf of UHA. The Hospital has a note receivable from UHA, which relates to outstanding amounts due to the Hospital for services performed from 1996 through 2000. The note bears interest at 7.5% and is payable to the Hospital in monthly installments. The remaining balance of the note receivable of approximately $302,000 is included in other receivables at December 31, 2002. Also included in other receivables at December 31, 2002 and 2001 is approximately $484,000 and $459,000, respectively, related to these services performed in the years ended December 31, 2002 and 2001, respectively.

All of the operating expenses of the System are allocated to the Hospital and other members of the System in accordance with the System's fund allocation policy. The Hospital's allocation of the System's expenses was approximately $2,140,000 and $1,660,000 for the years ended December 31, 2002 and 2001, respectively. The Hospital also serves as a processor for certain cash disbursements of the System. Included in receivables, net at December 31, 2002 and 2001 is approximately $195,000 and $122,000, respectively, related to these services.

The Hospital performs certain laboratory services on behalf of Allied Health Services, Inc. (AHS), an entity affiliated through common ownership. Included in other long-term assets at December 31, 2002 and 2001 is $1,307,000 related to laboratory services sold to AHS in 1998 and 1999. On April 1, 2000, the outstanding amount due from AHS was converted into a note receivable. The note is expected to be paid to the Hospital over seven years with the first three years consisting of interest-only payments. Interest is being charged at the applicable federal rate per annum, 3.16% at December 31, 2002. Also included in receivables, net at December 31, 2002 is approximately $1,283,000 related to these services performed in the year ended December 31, 2002.

The Hospital pays the University for certain expenses such as state employee salaries, intern and resident costs, medical director payments and rents. Total payments of approximately $23,500,000 and $23,100,000 were made to the University in 2002 and 2001, respectively.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

**12. Related Party Transactions (continued)**

The Hospital holds an excess liability insurance policy through January 21, 2002 with Healthnet Insurance Company (Healthnet), who in turn has reinsured with an insurance carrier, for which the Hospital recorded premium expense of approximately $280,000 for the year ended December 31, 2001. The Hospital is a charter member of Healthnet (along with Charleston Area Medical Center) and two directors of the Hospital are on the Board of Directors of Healthnet.

**13. Functional Expenses**

The Hospital provides general health care services to residents within its geographic location. Expenses related to providing these services are as follows, in thousands, for the years ended December 31:

|  | 2002 | 2001 |
|---|---|---|
| Health care services | $ 261,853 | $ 235,565 |
| General and administrative | 34,026 | 25,894 |
|  | $ 295,879 | $ 261,459 |

**14. Fair Value of Financial Instruments**

The following methods and assumptions were used in estimating the fair value disclosures for financial instruments:

*Cash and cash equivalents*: The carrying amount approximates fair value.

*Assets whose use is limited:* The fair value of assets whose use is limited is based on quoted market prices.

*Long-term obligations:* The fair value of fixed rate debt is estimated using quoted market prices or discounted cash flow analyses, based on the Hospital's incremental borrowing rate for debt instruments with comparable maturities. The carrying amounts of variable rate obligations approximate fair value.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

**14. Fair Value of Financial Instruments (continued)**

The carrying amounts and the fair values of the Hospital's financial instruments, in thousands, are as follows:

| | December 31 | | | |
| | 2002 | | 2001 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
|---|---|---|---|---|
| Cash and cash equivalents | $  3,556 | $  3,556 | $     925 | $     925 |
| Assets whose use is limited: | | | | |
| Board-designated funds | 97,531 | 97,531 | 107,857 | 107,857 |
| Debt repayment fund | 71,154 | 71,154 | 81,123 | 81,123 |
| Malpractice self-insurance trust | 10,520 | 10,520 | 12,131 | 12,131 |
| Trustee-held funds | 10,560 | 10,560 | 8,314 | 8,314 |
| Long-term debt: | | | | |
| Series 2002 Bonds | 10,000 | 10,000 | - | - |
| Series 1998 Bonds | 42,648 | 44,446 | 43,960 | 43,394 |
| Series 1993 Bonds | 56,543 | 58,647 | 59,219 | 61,176 |

# APPENDIX C

## DEFINITIONS OF CERTAIN TERMS
## AND SUMMARIES OF PRINCIPAL DOCUMENTS

## APPENDIX C

## DEFINITIONS OF CERTAIN TERMS AND
## SUMMARY OF PRINCIPAL DOCUMENTS

*Certain material features of the Master Indenture, the Bond Indenture and the Loan Agreement are discussed below in connection with the issuance of the 2003 Bonds (as used in this Appendix, the "2003 Bonds"). The discussion does not purport to be complete and is subject in all respects to the provisions of, and is qualified in its entirety by, reference to the Master Indenture, the Bond Indenture and the Loan Agreement.*

### DEFINITIONS OF CERTAIN TERMS

*As used in this Preliminary Official Statement, the following terms, unless the context requires otherwise, will have the meaning as set forth below. Any capitalized terms not defined below will have the same meaning as set forth in the Master Indenture, the Bond Indenture and the Loan Agreement, copies of which can be obtained by contacting the Bond Trustee.*

Act

"Act" means the West Virginia Hospital Finance Authority Act, Article 29B of Chapter 16 of the Code of West Virginia, 1931, as amended, as heretofore and hereafter amended or supplemented.

Additional Payments

"Additional Payments" means the payments so designated and required to be made by the Borrower pursuant to Section 3.2 of the Loan Agreement.

Additional Master Notes

"Additional Master Notes" means the additional Notes authorized to be issued by the Borrower pursuant to the Master Indenture.

Alternate Bank Rate

"Alternate Bank Rate" means, with respect to any Bank Bond, such interest rate or sequence of rates (which may be stated as a formula and may be determined by reference to a specified index or indices) as is specified in the Substitute Liquidity Agreement or Substitute Liquidity Facility then in effect pursuant to which such Bank Bond was purchased.

Applicable Percentage

"Applicable Percentage" means, on any date of determination, the percentage determined as set forth below based on the prevailing rating of the 2003 Bonds of such Series in effect at the close of business on the Business Day immediately preceding such date of determination:

C-1

| Prevailing Rating | Applicable Percentage |
|---|---|
| AAA/Aaa | 150% |
| AA/Aa | 165% |
| A/A | 175% |
| BBB/Baa | 200% |
| Below BBB/Baa | 265% |

For purposes of this definition, the "Prevailing Rating" of the 2003 Bonds of such Series shall be:

      (i)     AAA/Aaa, if such 2003 Bonds have a rating of AAA by S&P or Fitch and Aaa by Moody's, or the equivalent of such rating by a substitute rating agency or agencies selected as provided below;

      (ii)    if not AAA/Aaa, then AA/Aa if such 2003 Bonds have a rating of AA- or better by S&P or Fitch and Aa3 or better by Moody's or the equivalent of such rating by a substitute rating agency or agencies selected as provided below;

      (iii)   if not AAA/Aaa or AA/Aa, then A/A if such 2003 Bonds have a rating of A- or better by S&P or Fitch and A3 or better by Moody's or the equivalent of such rating by a substitute rating agency or agencies selected as provided below;

      (iv)   if not AAA/Aaa, AA/Aa or A/A, then BBB/Baa if such 2003 Bonds have a rating of BBB- or better by S&P or Fitch and Baa3 or better from Moody's or the equivalent of such rating by a substitute rating agency or agencies selected as provided below; and

      (v)    if not AAA/Aaa, AA/Aa, A/A or BBB/Baa, then below BBB/Baa, whether or not such 2003 Bonds are rated by any rating agency.

If (x) such 2003 Bonds are rated by a rating agency other than S&P, Fitch or Moody's and (y) the Borrower has delivered to the Bond Trustee an instrument designating such rating agency to replace S&P, Fitch or Moody's, or any of them, then for purposes of the definition of "Prevailing Rating" S&P, Fitch or Moody's, or any of them, will be deemed to have been replaced in accordance with such instrument; provided, however, that such instrument shall be accompanied by the consent of the Remarketing Agent. For purposes of this definition, the term "rating agency" shall mean a nationally recognized statistical rating organization (as that term is used in the rules and regulations of the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended) and S&P's, Moody's, and Fitch's rating categories of AAA, AA-, A- and BBB- and Aaa, Aaa3, A3 and Baa3, respectively, refer to and include the respective rating categories correlative thereto if either or both of such rating agencies have changed or modified their generic rating categories or if such other rating agency uses different generic rating categories.

Auction Rate Period

     "Auction Rate Period" means initially the period of time commencing on the Closing Date and ending on a Fixed Rate Conversion Date or a Weekly Rate Conversion Date.

Auction Mode

     "Auction Mode" means the Mode during which 2003 ARC Bonds bear interest at the Auction Rate.

Authority

     "Authority" means the West Virginia Hospital Finance Authority, a body corporate and governmental instrumentality of the State of West Virginia, and its successors and assigns.

BMA Municipal Index

     "BMA Municipal Index" means The Bond Market Association Municipal Swap Index as of the most recent date for which such index was published or such other weekly, high-grade index comprised of seven-day, tax-exempt Weekly Rate demand notes produced by Municipal Market Data, Inc., or its successor, or as otherwise designated by The Bond Market Association; provided, however, that, if such index is no longer produced by Municipal Market Data, Inc. or its successor, then "BMA Municipal Index" shall mean such other reasonably comparable index selected by the Borrower and approved by the Bond Insurer.

Bond Counsel

     "Bond Counsel" means legal counsel of recognized national standing in the field of obligations the interest on which is excluded from gross income for federal income tax purposes, selected by the Borrower, acceptable to the Authority, and not objected to by the Bond Trustee or the Credit Facility Provider.

Borrower

     "Borrower" means West Virginia University Hospitals, Inc., a nonprofit corporation duly organized and existing under the laws of the State of West Virginia, and any permitted successor to such Borrower.

Business Day

     "Business Day" means a day that is not a Saturday, Sunday or legal holiday on which banking institutions in the State of West Virginia, the State of New York or in any state in which the office of any Credit Facility Provider, the Remarketing Agent, the Tender Agent, the Auction Agent (if any), the Market Agent (if any), the Broker-Dealer (if any) or the Bond Trustee is located are authorized to remain closed or a day on which the New York Stock Exchange is

closed; and with respect to any 2003 ARC Bonds in the Auction Mode each April 14, April 15, December 30 and December 31.

Capitalized Interest Fund

"Capitalized Interest Fund" means the fund established under and to be used as set forth in Section 3.04 of the Bond Indenture.

Code

"Code" means the Internal Revenue Code of 1986, as amended, or any successor statute thereto, and any regulations promulgated.

Collateral Document

"Collateral Document" means any written instrument other than the Loan Agreement, the Master Indenture, the Supplemental Indenture, the Bond Indenture and the 2003 Notes, whereby any property or interest or rights in property of any kind is granted, pledged, conveyed, assigned or transferred to the Authority or Bond Trustee, or both, as security for payment of the 2003 Bonds or performance by the Borrower of its obligations under the Master Documents and the Obligations.

Credit Facility

"Credit Facility" means a letter of credit, including, if applicable, a confirming letter of credit, Insurance Policy or similar Credit Facility (other than one issued by the Borrower or any affiliate of the Borrower) issued by a commercial bank, savings institution, bond insurer or other financial institution, the senior unsecured debt securities or securities secured by guarantees of the Provider of which are rated at least "AA" (or the equivalent) by one or more of the Rating Agencies.

Credit Facility Provider

"Credit Facility Provider" means the Bond Insurer, the Liquidity Facility Provider and the commercial bank, savings institution, Bond Insurer or other financial institution issuing either a Credit Facility or a Reserve Fund Credit Facility.

Electronic Means

"Electronic Means" means telecopy, telegraph, telex, facsimile transmission, email transmission or other similar electronic means of communication, including a telephonic communication confirmed by writing or written transmission.

Eligible Bonds

"Eligible Bonds" means any 2003 Bonds other than 2003 Bonds owned by, for the account of, or on behalf of, the Authority or the Borrower.

Eligible Moneys

"Eligible Moneys" means (a) moneys (i) paid or deposited by the Borrower to or with the Bond Trustee, (ii) continuously held in any fund, account or subaccount established which is subject to the lien of the Bond Indenture and in which no other moneys which are not Eligible Moneys are held and (iii) which have so been on deposit with the Bond Trustee for at least 367 days from their receipt by the Bond Trustee, during and prior to which period no petition by or against the Authority, the Borrower or any "affiliate" thereof (as defined in Title 11 of the United States Code) to which such moneys are attributable under any bankruptcy or similar law now or hereafter in effect shall have been filed and no bankruptcy or similar proceeding otherwise initiated (unless such petition or proceeding shall have been dismissed and such dismissal be final and not subject to appeal), together with investment earnings on such moneys; (b) moneys received by the Bond Trustee pursuant to the Liquidity Facility which are held in any fund, account or subaccount established in which no other moneys which are not Eligible Moneys are held, together with investment earnings on such moneys; (c) proceeds from the remarketing of any 2003 Bonds pursuant to the provisions of the Bond Indenture to any person other than the Authority, the Borrower, or any "affiliate" thereof (as defined in Title 11 of the United States Code); (d) proceeds from the issuance and sale of refunding bonds, together with the investment earnings on such proceeds, if there is delivered to the Bond Trustee at the time of issuance and sale of such bonds an opinion of nationally recognized bankruptcy counsel acceptable to the Bond Trustee, the Bond Insurer and each Rating Agency then maintaining a rating on the 2003 ARC Bonds bearing interest at a Weekly Rate (which opinion may assume that no Bondholders are "insiders" within the meaning of Title 11 of the United States Code) to the effect that the use of such proceeds and investment earnings to pay the principal of, premium, if any, or interest on the 2003 Bonds would not be avoidable as preferential payments under Section 547 of the United States Bankruptcy Code recoverable under Section 550 of the United States Bankruptcy Code should the Authority, the Borrower, or any "affiliate" thereof (as defined in Title 11 of the United States Code) become a debtor in a proceeding commenced; and (e) moneys which are derived from any other source, together with the investment earnings on such moneys, if the Bond Trustee has received an unqualified opinion of nationally recognized bankruptcy counsel acceptable to the Bond Trustee, the Bond Insurer and each Rating Agency then maintaining a rating on the 2003 ARC Bonds bearing interest at a Weekly Rate (which opinion may assume that no Bondholders are "insiders" within the meaning of Title 11 of the United States Code) to the effect that payment of such amounts to bondholders would not be avoidable as preferential payments under Section 547 of the United States Bankruptcy Code recoverable under Section 550 of the United States Bankruptcy Code should the Authority, the Borrower, or any "affiliate" thereof (as defined in Title 11 of the United States Code) become a debtor in a proceeding commenced; provided that such proceeds, moneys or income shall not be deemed to be Eligible Moneys or available for payment of the 2003 Bonds if, among other things, an injunction, restraining order or stay is in effect preventing such proceeds, moneys or income from being applied to make such payment.  For the purposes of this definition, the term "moneys" shall include cash and any investment securities including, without limitation, Government Obligations.

Escrow Deposit Agreements

"Escrow Deposit Agreements" means, collectively, the 1993 Escrow Deposit Agreement and the 2002 Escrow Deposit Agreement.

Escrow Fund

"Escrow Fund" means the escrow deposit trust fund created in the Escrow Deposit Agreements.

Event of Default

"Event of Default" means any of the events specified in Section 7.01 of the Bond Indenture.

Facilities or Hospital Facilities

"Facilities" or "Hospital Facilities" means all buildings, land and equipment used in operations of the Borrower.

Favorable Opinion of Bond Counsel

"Favorable Opinion of Bond Counsel" means, with respect to any action the occurrence of which requires such an opinion, an unqualified Opinion of Counsel, which shall be Bond Counsel, to the effect that such action is permitted under the Bond Indenture and will not, in and of itself, result in the inclusion of interest on the 2003 Bonds in gross income for federal income tax purposes (subject to the inclusion of any exceptions contained in the opinion delivered upon original issuance of the 2003 Bonds).

Fitch

"Fitch" means Fitch Ratings, a corporation organized and existing under the laws of the State of New York, its successors and their assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Borrower by notice to the Authority, the Credit Facility Provider and the Bond Trustee.

Fixed Rate

"Fixed Rate" means the interest rate on the 2003 ARC Bonds determined pursuant to Section 2.08 of the Bond Indenture and the rate of interest on the 2003 A Bonds established in Section 2.05 of the Bond Indenture.

Fixed Rate Bonds

"Fixed Rate Bonds" means the 2003 A Bonds and the 2003 ARC Bonds during the Fixed Rate Mode.

Fixed Rate Conversion Date

"Fixed Rate Conversion Date" means the date on which a series of 2003 ARC Bonds are converted to bear interest at a Fixed Rate.

Fixed Rate Mode

"Fixed Rate Mode" means the Mode during which a Series of 2003 Bonds bears interest at a Fixed Rate.

Holder or Bondholder

"Holder" or "Bondholder," when used with respect to a 2003 Bond, means the Person in whose name such 2003 Bond is registered.

Initial Swap Agreement

"Initial Swap Agreement" means the Interest Rate Swap Agreement, dated the date thereof, between the Borrower and the Swap Provider.

Interest Payment Date

"Interest Payment Date" means (1) (a) with respect to 2003 ARC Bonds in the Weekly Rate Mode, the first Business Day of each calendar month occurring after the Weekly Rate Conversion Date with respect thereto, and (b) for any Bank Bond, the Bond Purchase Date and the Bond Sale Date therefor and the first Business Day of each calendar month which occurs between such dates, (2) with respect to 2003 ARC Bonds converted to the Fixed Rate Mode, the first December 1 or June 1 following the month in which the conversion to the Fixed Rate Mode occurs and each December 1 and June 1 thereafter; (3) with respect to 2003 ARC Bonds in the Auction Mode, the Business Day immediately following the last day of the Initial Period and the Business Day immediately following the last day of each subsequent Auction Period; (4) the Fixed Rate Conversion Date; (5) with respect to the 2003 A Bonds, December 1, 2003 and each December 1 and June 1 thereafter; and (6) the respective Maturity Dates of the 2003 Bonds.

Interest Period

"Interest Period" means the period of time that an interest rate remains in effect, which period:

   (1) with respect to any Series of 2003 ARC Bonds in an Auction Mode, shall be the Auction Rate Period; and

C-7

(2)     with respect to any Series of 2003 ARC Bonds in a Weekly Rate Mode, shall be the Weekly Rate Period; and

(3)     with respect to any 2003 A Bonds, shall be from August 1, 2003 until the maturity thereof;

(4)     with respect to a series of 2003 ARC Bonds  in a Fixed Rate Mode, shall be the period from the Fixed Rate Conversion Date with respect thereto until the final maturity thereof..

Investment Securities

"Investment Securities" means investments in any of the following:

(1)     Cash (insured at all times by the Federal Deposit Insurance Borrower),

(2)     Obligations of, or obligations guaranteed as to principal and interest by, the U.S. or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the U.S. including:

> -U.S. treasury obligations
> -All direct or fully guaranteed obligations
> -Farmers Home Administration
> -General Services Administration
> -Guaranteed Title XI financing
> -Government National Mortgage Association (GNMA)
> -State and Local Government Series

(3)     Obligations of Government – Sponsored Agencies that are not backed by the full faith and credit of the U.S. Government:

> -Federal Home Loan Mortgage Corp. (FHLMC) Debt obligations
> -Farm Credit System (formerly: Federal Land Banks, Federal Intermediate
>   Credit Banks, and Banks for Cooperatives)
> -Federal Home Loan Banks (FHL Banks)
> -Federal National Mortgage Association (FNMA) Debt obligations
> -Financing Corp. (FICO) Debt obligations
> -Resolution Funding Corp. (REFCORP) Debt obligations
> -U.S. Agency for International Development (U.S. A.I.D) Guaranteed
>   notes

(4)     Obligations of any of the following federal agencies which obligations represent the full faith and credit of the United States of America, including:

-Export-Import Bank
-Rural Economic Community Development Administration
-U.S. Maritime Administration
-Small Business Administration
-U.S. Department of Housing & Urban Development (PHAs)
-Federal Housing Administration
-Federal Financing Bank

(5)    Direct obligations of any of the following federal agencies which obligations are not fully guaranteed by the full faith and credit of the United States of America:

-Senior debt obligations issued by the Federal National Mortgage Association (FNMA) or Federal Home Loan Mortgage Corporation (FHLMC).
-Obligations of the Resolution Funding Borrower (REFCORP).
-Senior debt obligations of the Federal Home Loan Bank System.
-Senior debt obligations of other Government Sponsored Agencies approved by the Bond Insurer.

(6)    U.S. dollar denominated deposit accounts, federal funds and bankers' acceptances with domestic commercial banks which have a rating on their short term certificates of deposit at the time of purchase of "P-1" by Moody's and "A-1" or "A-1+" by S&P and maturing not more than 360 calendar days after the date of purchase. (Ratings on holding companies are not considered as the rating of the bank);

(7)    Commercial paper which is rated at the time of purchase in the single highest classification, "P- 1" by Moody's and "A-1+" by S&P and which matures not more than 270 calendar days after the date of purchase;

(8)    Investments in a money market fund rated at the time of purchase "AAAm" or "AAAm-G" or better by S&P;

(9)    Pre-refunded Municipal Obligations defined as follows: any bonds or other obligations of any state of the United States of America or of any agency, instrumentality or local governmental unit of any such state which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(A)    which are rated at the time of purchase, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of Moody's or S&P or any successors thereto; or

(B)    (i) which are fully secured as to principal and interest and redemption premium, if any, by an escrow consisting only of cash or obligations described in paragraph (2) above, which escrow may be applied only to the payment of such

principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (ii) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate;

(10)    Municipal obligations rated at the time of purchase "Aaa/AAA" or general obligations of States with a rating of "A2/A" or higher by both Moody's and S&P;

(11)    Investment agreements approved in writing by the Bond Insurer (supported by appropriate opinions of counsel); and

(12)    Other forms of investments (including repurchase agreements) approved in writing by the Bond Insurer.

Liquidity Facility

"Liquidity Facility" means the obligation of the Bank to provide funds for the purpose of purchasing Tendered Bonds which Liquidity Facility may be in the form of a line of credit, bond purchase agreement or letter of credit approved by the Bond Insurer, which approval shall not be unreasonably withheld.

Liquidity Facility Failure Purchase Date

"Liquidity Facility Failure Purchase Date" means the first Interest Payment Date which is at least 90 days subsequent to the date on which a Special Default or Liquidity Facility Event of Default occurred.

Liquidity Substitution Date

"Liquidity Substitution Date" means the day on which a Substitute Liquidity Facility becomes effective.

Loan

"Loan" means the Loan made by the Authority to the Borrower of the proceeds of the 2003 Bonds and the obligations of the Borrower to repay as evidenced by the 2003-1A Note with respect to the 2003 A Bonds, the 2003-1B Note with respect to the 2003 B Bonds, the 2003-1C Note with respect to the 2003 C Bonds and the 2003-1D Note with respect to the 2003 D Bonds.

Loan Agreement

"Loan Agreement" means that certain loan agreement, dated as of August 1, 2003, between the Authority and the Borrower, as originally executed and as it may from time to time

be supplemented, modified or amended in accordance with the terms thereof and of the Bond Indenture.

Loan Default Event

"Loan Default Event" means any of the events specified in Section 6.1 of the Loan Agreement.

Loan Repayments

"Loan Repayments" means the payments so designated and required to be made by the Borrower pursuant to Section 3.1 of the Loan Agreement.

Mandatory Tender Date

"Mandatory Tender Date" means any date on which a Holder of a 2003 ARC Bond is required to tender any 2003 ARC Bond for purchase in accordance with Sections 11.03, 11.04, 11.05, 11.06 or 11.08 of the Bond Indenture.

Master Documents

"Master Documents" means the Master Indenture, all Supplemental Indentures, the 2003 Notes, all Notes heretofore or hereafter issued, and the Loan Agreement.

Master Indenture

"Master Indenture" means the Amended and Restated Master Trust Indenture, dated as of August 1, 2003, as amended and supplemented, between the Borrower and The Bank of New York, as master trustee.

Master Trustee

"Master Trustee" means The Bank of New York, or any successor as trustee under the Master Indenture.

Maturity Date

"Maturity Date" means June 1, 2016 with respect to the 2003 B Bonds, June 1, 2033 with respect to the 2003 C Bonds and the 2003 D Bonds and the respective Maturity Date set forth in Section 2.05 of the Bond Indenture with respect to the 2003 A Bonds, or with respect to any series of 2003 ARC Bonds upon conversion to the Fixed Rate Mode, such maturities determined pursuant to Section 4.11 of the Bond Indenture.

Maximum Rate

"Maximum Rate" means the lesser of 15% per annum and the maximum interest rate permitted by law.

Mode

"Mode" means, as the context may require, the Auction Mode, the Fixed Rate Mode or the Weekly Mode.

Moody's

"Moody's" means Moody's Investors Service, Inc., a corporation organized and existing under the laws of the State of Delaware, its successors and their assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Borrower by notice to the Authority, the Credit Facility Provider and the Bond Trustee.

New Money Portion

"New Money Portion" has the meaning set forth in the preambles of the Bond Indenture and as further described in the Loan Agreement.

Officer's Certificate

"Officer's Certificate" means a certificate signed by the chief executive officer or the chief financial officer of the Borrower or other Person duly appointed to act on behalf of the Borrower.

Opinion of Counsel

"Opinion of Counsel" means a written opinion of counsel (who may be counsel for the Borrower) selected by the Borrower and acceptable to the Authority and not objected to by the Bond Trustee and the Credit Facility Provider. If and to the extent required by the provisions of Section 1.02 of the Bond Indenture, each Opinion of Counsel shall include the statements provided for in Section 1.02 of the Bond Indenture.

Optional Redemption Account

"Optional Redemption Account" means the account by that name within the Redemption Fund established pursuant to Section 5.04 of the Bond Indenture.

Optional Tender Date

"Optional Tender Date" means the date specified by a Bondholder in a Tender Notice for purchase of any 2003 ARC Bond during a Weekly Rate Period in accordance with Section 11.02 of the Bond Indenture.

Optionally Tendered Bonds

"Optionally Tendered Bonds" means the 2003 ARC Bonds tendered or deemed tendered for purchase on an Optional Tender Date.

Outstanding

"Outstanding," when used as of any particular time with reference to 2003 Bonds, means (subject to the provisions of Section 12.09 of the Bond Indenture) all 2003 Bonds theretofore, or thereupon being, authenticated and delivered by the Bond Trustee under the Bond Indenture except: (1) 2003 Bonds theretofore cancelled by the Bond Trustee or surrendered to the Bond Trustee for cancellation; (2) 2003 Bonds with respect to which all liability of the Authority shall have been discharged in accordance with Section 10.02 of the Bond Indenture, including 2003 Bonds (or portions of 2003 Bonds) referred to in Section 12.10 of the Bond Indenture; and (3) 2003 Bonds for the transfer or exchange of or in lieu of or in substitution for which other 2003 Bonds shall have been authenticated and delivered by the Bond Trustee pursuant to the Bond Indenture.

Principal Fund

"Principal Fund" means the fund by that name established pursuant to Section 5.03 of the Bond Indenture.

Principal Payment Date

"Principal Payment Date" means, with respect to a 2003 Bond, the date on which principal of such 2003 Bond becomes due and payable, either by maturity, redemption, acceleration or otherwise.

Project

"Project" means the Refunding Portion and the New Money Portion.

Project Fund

"Project Fund" means the fund by that name established pursuant to Section 3.04 of the Bond Indenture from which the cost of the New Money Portion is to be paid.

Proposed Fixed Rate Conversion Date

"Proposed Fixed Rate Conversion Date" means the date indicated in the written notice of the Borrower given pursuant to Section 2.11 of the Bond Indenture on which the Borrower intends to effect a conversion of the interest rate on a series of 2003 ARC Bonds to the Fixed Rate.

Purchase Price

"Purchase Price" means an amount equal to the principal amount of any 2003 ARC Bonds purchased on a Conversion Date, plus accrued interest thereon, if any, to the Conversion Date.

<u>Rate Determination Date</u>

"Rate Determination Date," when used with respect to 2003 ARC Bonds, means the date on which the interest rate(s) with respect to the 2003 ARC Bonds shall be determined, which, (i) in the case of the Fixed Rate Mode, shall be a date determined by the Remarketing Agent which shall be at least one Business Day prior to the Fixed Rate Conversion Date; and (ii) in the case of Auction Rate Securities, shall be the Auction Date; and (iii) in the case of the Weekly Rate Mode shall be each Wednesday.

<u>Rate Period</u>

"Rate Period" means a Fixed Rate Period, Auction Rate Period or Weekly Rate Period.

<u>Rating Agencies</u>

"Rating Agencies" means S&P, Moody's and Fitch.

<u>Rebate Fund</u>

"Rebate Fund" means the fund by that name established pursuant to Section 5.5.06 of the Bond Indenture.

<u>Record Date</u>

"Record Date" means (i) with respect to 2003 ARC Bonds in the Auction Mode, the day (whether or not a Business Day) immediately preceding each Interest Payment Date, (ii) with respect to 2003 Bonds in a Fixed Rate Mode, the 15th day (whether or not a Business Day) of the month immediately preceding each Interest Payment Date, and (iii) with respect to 2003 ARC Bonds in the Weekly Rate Mode, the Business Day immediately preceding an Interest Payment Date.

<u>Redemption Price</u>

"Redemption Price" means, with respect to any 2003 Bond (or portion thereof), the price to be paid upon redemption as set forth in Article IV of the Bond Indenture.

<u>Reimbursement Agreement</u>

"Reimbursement Agreement" means any agreement between the Borrower and a Credit Facility Provider pursuant to which a Credit Facility, as amended, supplemented or extended from time to time in accordance with the provisions thereof.

<u>Remarketing Agent</u>

"Remarketing Agent" means, initially UBS Financial Services, Inc., and any successor remarketing agent appointed by the Borrower in accordance with Section 4.12 of the Bond Indenture and not objected to by the Authority or the Bond Insurer.

Remarketing Agreement

"Remarketing Agreement" means that certain remarketing agreement between the Borrower and the Remarketing Agent, as such agreement may from time to time be amended and supplemented, to remarket the 2003 ARC Bonds delivered or deemed to be delivered for purchase by the Holders thereof.

Remarketing Proceeds Account

"Remarketing Proceeds Account" means the account by that name within the Bond Purchase Fund established pursuant to Section 4.09 of the Bond Indenture.

Reserve Fund Credit Facility

"Reserve Fund Credit Facility" means a  letter of credit, including, if applicable, a confirming letter of credit, Insurance Policy or similar Credit Facility (other than one issued by the Borrower or any affiliate of the Borrower) issued by a commercial bank, savings institution, Bond Insurer or other financial institution, the senior unsecured debt securities or securities secured by guarantees of the Provider of which are rated at least "AA" (or the equivalent) by one or more of the Rating Agencies, which, by its terms, shall secure the amount required to be deposited to the credit of the Debt Service Reserve Fund as permitted by Section 5.05 of the Bond Indenture.

Revenues

"Revenues" means all amounts received by the Authority or the Bond Trustee for the account of the Authority pursuant or with respect to the Loan Agreement and the Notes, including, without limiting the generality of the foregoing, Loan Repayments (including both timely and delinquent payments, any late charges, and whether paid from any source), and other income and receipts, in each case derived by or for the account of the Authority or the Bond Trustee, from the Borrower including without limitation all interest, profits or other income derived from the investment of amounts in any fund or account established pursuant to the Bond Indenture, but not including any administrative fees or expenses or any moneys required to be deposited in the Rebate Fund or the Bond Purchase Fund.

S&P

"S&P" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., a corporation organized and existing under the laws of the state of its organization, its successors and their assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Borrower by notice to the Authority, the Credit Facility Provider and the Bond Trustee.

Series

"Series," when used with respect to the 2003 Bonds, means all the 2003 Bonds designated as being of the same series, authenticated and delivered in a simultaneous transaction, and any 2003 Bonds thereafter authenticated and delivered upon a transfer or exchange or in lieu of or in substitution for such 2003 Bonds as herein provided.

Special Default

"Special Default" means each "default" or "event of default," if any, under the initial Liquidity Facility Agreement or a Substitute Liquidity Agreement the consequence of which is that the obligation of the Bank to provide funds for the purchase of Tendered Bonds is either suspended or terminated without prior notice to Bondholders.

Special Record Date

"Special Record Date" means the date established by the Bond Trustee pursuant to Section 2.04(c) of the Bond Indenture as a record date for the payment of defaulted interest on the 2003 Bonds.

Special Redemption Account

"Special Redemption Account" means the account by that name within the Redemption Fund established pursuant to Section 5.04 of the Bond Indenture.

Supplemental Bond Indenture

"Supplemental Bond Indenture" means any indenture hereafter duly authorized and entered into between the Authority and the Bond Trustee, supplementing, modifying or amending the Bond Indenture; but only if and to the extent that such Supplemental Bond Indenture is specifically authorized.

Supplemental Indenture

"Supplemental Indenture" means any supplemental master trust indenture issued pursuant to the Master Indenture, including the Supplemental Indenture 2003-1.

Supplemental Indenture 2003-1

"Supplemental Indenture 2003-1" means the Supplemental Master Trust Indenture 2003-1, between the Borrower and the Master Trustee pursuant to which the 2003 Notes are issued.

Supplemental Indenture 2003-2

"Supplemental Indenture 2003-2" means the Supplemental Master Trust Indenture 2003-2, between the Borrower and the Master Trustee to provide for certain covenants and agreements with the Bond Insurer.

Supplemental Indenture 2003-3

"Supplemental Indenture 2003-3" means the Supplemental Master Trust Indenture 2003-3, between the Borrower and the Master Trustee relating to the Interest Rate Agreement.

Substitute Bank

"Substitute Bank" means one or more commercial banks, trust companies or financial institutions obligated under any Substitute Liquidity Agreement and acceptable to the Bond Insurer.

Substitute Liquidity Agreement

"Substitute Liquidity Agreement" means any agreement (other than the initial Liquidity Facility Agreement) between a Borrower and any Substitute Bank (which agreement shall be satisfactory in form and substance to the Bond Insurer) as it may from time to time be amended or supplemented, pursuant to which a Substitute Liquidity Facility shall be in effect.

Substitute Liquidity Facility

"Substitute Liquidity Facility" means a Liquidity Facility acceptable to the Bond Insurer provided by a Substitute Bank other than the Bank providing the Liquidity Facility on or prior to the Liquidity Substitution Date; however, none of the following shall be deemed a Substitute Liquidity Facility:  (i) a change in the Liquidity Facility Agreement pursuant to which the Liquidity Facility is issued; (ii) a change in the number of days of interest or interest rate covered by the Liquidity Facility; and (iii) a renewal of the term of the existing Liquidity Facility if, in the case of such renewal, there is delivered to the Bond Trustee, the Bond Insurer and the Remarketing Agent an opinion of counsel for the Bank or the Substitute Bank regarding the enforceability of such Liquidity Facility in substantially the form delivered to the Bond Trustee upon execution and delivery of the initial Liquidity Facility Agreement.

Swap Provider

"Swap Provider" shall mean the counterparty to the Borrower pursuant to any Interest Rate Agreement and shall mean UBS AG with respect to the Initial Interest Rate Agreement.

Tax Compliance Certificate

"Tax Compliance Certificate" means the Tax Compliance Certificate of the Authority and the Borrower, each dated the Closing Date and included in the transcript of which the Bond Indenture is a part.

Tender Agent

"Tender Agent" means the tender agent appointed in accordance with Section 11.01 of the Bond Indenture.

Trust Estate

"Trust Estate" has the meaning set forth in the preambles of the Bond Indenture.

Unassigned Rights

"Unassigned Rights" means the rights of the Authority to indemnification, payment and reimbursement of its fees and expenses, receive notices and grant approvals, consents and waivers.

Underwriter

"Underwriter" means UBS Financial Services, Inc.

Weekly Mode

"Weekly Mode" means the Mode during which a series of 2003 ARC Bonds bear interest at the Weekly Rate Period.

Weekly Rate

"Weekly Rate" means, with respect to the then effective Weekly Rate Period, the lowest interest rate which, in the judgment of the Remarketing Agent, would enable a series of 2003 ARC Bonds to be remarketed at the principal amount thereof, plus accrued interest thereon, if any, on the Weekly Rate Adjustment Date with respect thereto (or, if the Remarketing Agent for any reason fails to determine such rate, the rate determined in accordance with the provisions set forth in the Bond Indenture).

Weekly Rate Adjustment Date

"Weekly Rate Adjustment Date" means the first day of each Weekly Rate Period.

Weekly Rate Conversion Date

"Weekly Rate Conversion Date" means a date on which a series of the 2003 ARC Bonds begins to bear interest at a Weekly Rate for any Weekly Rate Period which succeeds an Auction Rate Period.

Weekly Rate Period

"Weekly Rate Period" means any Weekly Rate Period from and commencing on Wednesday of any calendar week and including ending on the Tuesday of the next calendar week; provided, however, that any Weekly Rate Period which does not follow another Weekly Rate Period shall commence on the Weekly Rate Conversion Date with respect thereto and end on the first or second Tuesday thereafter, at the discretion of the Remarketing Agent in order to most efficiently effect the conversion, and any Weekly Rate Period which is not followed by another Weekly Rate Period shall commence on the last or second to last Wednesday of a

calendar month, at the discretion of the Remarketing Agent in order to most efficiently effect the conversion, and end on the day preceding the first Business Day of the next calendar month.

1993 Bonds to Be Refunded

"1993 Bonds to Be Refunded" means the 1993 Bonds.

1993 Escrow Agent

"1993 Escrow Agent" means The Bank of New York.

1993 Escrow Deposit Agreement

"1993 Escrow Deposit Agreement" means the Escrow Deposit Agreement, dated as of August 1, 2003, by and between the Authority and the 1993 Escrow Agent, relating to the payment of interest on and the redemption price of the 1993 Bonds to be Refunded.

2002 Bonds to Be Refunded

"2002 Bonds to Be Refunded" means the 2002 Bonds.

2002 Escrow Agent

"2002 Escrow Agent" means United Bank, Inc.

2003 Bonds

"2003 Bonds" means, collectively, the 2003 A Bonds and the 2003 ARC Bonds.

2003 A Bonds

"2003 A Bonds" means the West Virginia Hospital Finance Authority Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series A, authorized by, and at any time Outstanding pursuant to, the Bond Indenture.

2003 B Bonds

"2003 B Bonds" means the West Virginia Hospital Finance Authority Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series B Auction Rate Certificates (ARCs [SM]), authorized by, and at any time Outstanding pursuant to, the Bond Indenture.

2003 C Bonds

"2003 C Bonds" means the West Virginia Hospital Finance Authority Hospital Refunding and Improvement Revenue Bonds (West Virginia University Hospitals, Inc.) 2003

Series C Auction Rate Certificates (ARCs [SM]), authorized by, and at any time Outstanding pursuant to, the Bond Indenture.

<u>2003 D Bonds</u>

"2003 D Bonds" means the West Virginia Hospital Finance Authority Hospital Improvement Revenue Bonds (West Virginia University Hospitals, Inc.) 2003 Series D Auction Rate Certificates (ARCs [SM]), authorized by, and at any time Outstanding pursuant to, the Bond Indenture

<u>2003 ARC Bonds</u>

"2003 ARC Bonds" means, collectively, the 2003 B Bonds, the 2003 C Bonds and the 2003 D Bonds.

<u>2002 Escrow Agent</u>

"2002 Escrow Agent" means United Bank, Inc.

<u>2002 Escrow Deposit Agreement</u>

"2002 Escrow Deposit Agreement" means the Escrow Deposit Agreement, dated as of August 1, 2003, by and between the Authority and the 2002 Escrow Agent, relating to the payment of interest on and the redemption price of the 2002 Bonds to be Refunded.

<u>2003-1A Note</u>

"2003-1A Note" means the 2003-1A Note issued by the Borrower in a principal amount equal to the principal amount of the 2003 A Bonds pursuant to Supplemental Indenture 2003-1, which Note evidences and secures the obligations of the Borrower with respect to the 2003 A Bonds under the Loan Agreement.

<u>2003-1B Note</u>

"2003-1B Note" means the 2003-1B Note issued by the Borrower in a principal amount equal to the principal amount of the 2003 B Bonds pursuant to Supplemental Indenture 2003-1, which Note evidences and secures the obligations of the Borrower with respect to the 2003 B Bonds under the Loan Agreement.

<u>2003-1C Note</u>

"2003-1C Note" means the 2003-1C Note issued by the Borrower in a principal amount equal to the principal amount of the 2003 C Bonds pursuant to Supplemental Indenture 2003-1, which Note evidences and secures the obligations of the Borrower with respect to the 2003 C Bonds under the Loan Agreement.

<u>2003-1D Note</u>

"2003-1D Note" means the 2003-1D Note issued by the Borrower in a principal amount equal to the principal amount of the 2003 D Bonds pursuant to Supplemental Indenture 2003-1, which Note evidences and secures the obligations of the Borrower with respect to the 2003 D Bonds under the Loan Agreement.

<u>2003 Notes</u>

"2003 Notes" means collectively the 2003-1A Note, the 2003-1B Note, the 2003-1C Note and the 2003-1D Note.

## THE MASTER INDENTURE

*The following is a summary of certain provisions of the Master Indenture. Reference is made to the Master Indenture for the detailed provisions thereof.*

### Authorization and Issuance of Obligations

Obligations may be issued under the Master Indenture to (a) evidence Indebtedness, (b) evidence any repayment obligation under an Interest Rate Agreement, or (c) evidence a reimbursement obligation arising as a result of the issuance of a surety bond or other instrument guaranteeing or in effect guaranteeing any payments under an Interest Rate Agreement, as provided in Section 209 of the Master Indenture. So long as the requirements for the incurrence of Indebtedness imposed by the Master Indenture are met, the total principal amount of Obligations, the number of Obligations and the series of Obligations that may be created under the Master Indenture is not limited except as is set forth in the Master Indenture the Supplemental Master Indenture providing for the issuance of such Obligations. No obligations may be issued unless the provisions of the Master Indenture are followed.

### Covenants of the Obligated Group

*Payment of Principal, Premium and Interest.* Each Member unconditionally and irrevocably (subject to the right of such Member to cease its status as a Member of the Obligated Group pursuant to the terms and conditions of Section 405 of the Master Indenture), jointly and severally covenants that it will promptly pay the principal of, premium, if any, and interest on every Obligation issued under the Master Indenture at the place, on the dates and in the manner provided in the Master Indenture and in said Obligations according to the true intent and meaning thereof. Notwithstanding any schedule of payments upon the Obligations set forth in the Master Indenture or in the Obligations, each Member unconditionally and irrevocably (subject to the right of such Member to cease its status as a Member of the Obligated Group pursuant to the terms and conditions of Section 405 of the Master Indenture), jointly and severally agrees to make payments upon each Obligation and be liable therefor at the times and in the amounts (including principal, interest and premium, if any) equal to the amounts to be paid as interest, principal at maturity or by mandatory sinking fund redemption, or premium, if any, upon any Related Bonds from time to time Outstanding.

*Liens on Property.* No Lien on Property of any Member securing Indebtedness shall be classified a Permitted Encumbrance (as provided in clause (b) of the definition of Permitted Encumbrance), and therefore be permitted unless: (a) such Lien secures Non-Recourse Indebtedness; or (b)(i) after giving effect to such Lien and all other Liens classified as Permitted Encumbrances under this subsection (b)(i), the Book Value or, at the option of the Obligated Group Agent, the Current Value of the Property of the Obligated Group which is Encumbered is not more than 15% of the value of all of the Property of the Obligated Group (calculated on the same basis as the value of the Encumbered Property) and (ii) the conditions described in Section 415(A) of the Master Indenture are met for allowing the incurrence of one dollar of additional Funded Indebtedness.

C-22

*Insurance.*    Each Member will maintain insurance (or self-insure if the Insurance Consultant or Insurance Consultants determines that such self-insurance meets the standards set forth in the Master Indenture and is prudent under the circumstance) with respect to its Property, the operation thereof and its business against such casualties, contingencies and risks (including but not limited to public liability and employee dishonesty) and in amounts not less than is customary in the case of corporations engaged in the same or similar activities and similarly situated and as is adequate to protect its Property and operations. The Obligated Group Agent will annually review the insurance (including self-insurance) each Member maintains as to whether such insurance is customary and adequate. In addition, the Obligated Group Agent shall at least once every three fiscal years (commencing with its fiscal year beginning January 1, 2004) cause a certificate of an Insurance Consultant or Insurance Consultants to be delivered to the Master Trustee which indicates that the insurance then being maintained by the Members is customary in the case of corporations engaged in the same or similar activities and similarly situated and is adequate to protect the Obligated Group's Property and operations. The Obligated Group Agent shall cause copies of its review, or the certificates of the Insurance Consultant or Insurance Consultants, as the case may be, to be delivered promptly to the Master Trustee, to each Related Bond Trustee and to each Related Issuer.

*Rates and Charges.*    Each Member covenants and agrees to operate all of its Facilities on a revenue producing basis and to charge such fees and rates for its Facilities and services and to exercise such skill and diligence as to provide income from its Property together with other available funds sufficient to pay promptly all payments of principal and interest on its Indebtedness, all expenses of operation, maintenance and repair of its Property and all other payments required to be made by under the Master Indenture, to the extent permitted by law. Each Member further covenants and agrees that it will from time to time as often as necessary and to the extent permitted by law, revise its rates, fees and charges in such manner as may be necessary or proper to comply with the provisions of this Section.

The Members covenant and agree that they will cause the accountants certifying the report referred to in Section 414(A) of the Master Indenture to calculate the Historical Debt Service Coverage Ratio of the Obligated Group for the fiscal year covered by such report and to deliver a copy of such calculation to the Persons to whom such report is required to be delivered under such Section 414 of the Master Indenture.

If in any fiscal year the Historical Debt Service Coverage Ratio of the Obligated Group is less than 1.10:1, the Master Trustee shall require the Obligated Group at its expense to retain a Consultant to make recommendations with respect to the rates, fees and charges of the Members and the Obligated Group's methods of operation and other factors affecting its financial condition in order to increase the Historical Debt Service Coverage Ratio to at least 1.10:1.

A copy of the Consultant's report and recommendations, if any, shall be filed with each Member, the Master Trustee, each Related Bond Trustee and each Related Issuer. Each Member shall follow each recommendation of the Consultant applicable to it and permitted by law. This Section shall not be construed to prohibit any Member from serving indigent patients to the extent required for such Member to continue its qualification as a Tax-Exempt Organization or from serving any other class or classes of patients without charge or at reduced rates so long as such service does not prevent the Obligated Group from satisfying the other requirements of this Section.

The foregoing provisions notwithstanding, if in any fiscal year the Historical Debt Service Coverage Ratio is less than 1.10:1, the Master Trustee shall not require the Obligated Group to retain a Consultant to make such recommendations if: (a) there is filed with the Master Trustee (who shall provide a copy to each Related Bond Trustee and Related Issuer) a written report addressed to them of a Consultant (which Consultant and report, including, without limitation, the scope, form, substance and other aspects of such report, are acceptable to the Master Trustee) which contains an opinion of such Consultant that applicable laws or regulations have prevented the Obligated Group from generating Income Available for Debt Service during such fiscal year in an amount sufficient to equal or exceed 110% of its Debt Service Requirement and such report is accompanied by a concurring opinion of Independent Counsel (which Counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) as to any conclusions of law supporting the opinion of such Consultant; (b) the report of such Consultant indicates that the rates charged by the Obligated Group are such that, in the opinion of the Consultant, the Obligated Group has generated the maximum amount of Revenues reasonably practicable given such laws or regulations; and (c) the Historical Debt Service Coverage Ratio of the Obligated Group for such fiscal year was no less than 1.00:1. The Obligated Group shall not be required to cause the Consultant's report referred to in the preceding sentence to be prepared more frequently than once every two fiscal years if at the end of the first of such two fiscal years the Obligated Group provides to the Master Trustee (who shall provide a copy to each Related Bond Trustee and Related Issuer) an opinion of Independent Counsel (which Counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) to the effect that the applicable laws and regulations underlying the Consultant's report delivered in respect of the previous fiscal year have not changed in any material way.

*Permitted Indebtedness.* Neither the Obligated Group nor any Member may incur any Indebtedness (whether or not incurred through the issuance of Obligations) other than as set forth in (A) through (M) belwo:

(A) Funded Indebtedness, if prior to incurrence thereof or, if such Funded Indebtedness was incurred in accordance with another subsection of Section 415 of the Master Indenture and any Member wishes to have such Funded Indebtedness classified as having been issued under this subsection (A), prior to such classification, there is delivered to the Master Trustee:

(i) An Officer's Certificate from the Obligated Group Agent (which Officer's Certificate, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) stating that the Funded Indebtedness Ratio of the Obligated Group, after giving effect to the incurrence of such Indebtedness and to the application of the proceeds thereof, does not exceed 0.67:1; or

(ii) An Officer's Certificate from the Obligated Group Agent (which Officer's Certificate, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) stating that the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group for the most recent fiscal year preceding the date of delivery of the report for which

combined financial statements reported upon by independent certified public accountants are available was not less than 1.25:1; or

(iii)    (a) An Officer's Certificate from the Obligated Group Agent (which Officer's Certificate, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) stating that the Historical Debt Service Coverage Ratio of the Obligated Group for the fiscal year next preceding the incurrence of such Funded Indebtedness for which combined financial statements reported upon by independent certified public accountants are available was not less than 1.10:1; and (b) (1) a written Consultant's report (which report, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) to the effect that the Projected Debt Service Coverage Ratio of the Obligated Group for each of the next two succeeding fiscal years or, if such Indebtedness is being incurred in connection with the financing of Facilities, the two fiscal years succeeding the projected completion date of such Facilities, is not less than 1.10:1, or (2) an Officer's Certificate from the Obligated Group Agent in a form acceptable to the Master Trustee to the effect that the Projected Debt Service Coverage Ratio of the Obligated Group for each of the next two succeeding fiscal years or, if such Indebtedness is being incurred in connection with the financing of Facilities, the two fiscal years succeeding the projected completion date of such Facilities, is not less than 1.20:1, provided that either of such reports shall include forecast balance sheets, statements of revenues and expenses and statements of cash flows for each of such two fiscal years and a statement of the relevant assumptions upon which such forecasted statements are based, which financial statements must indicate that sufficient revenues and cash flow could be generated to pay the operating expenses of the Obligated Group's proposed and existing Facilities and the debt service on the Obligated Group's other existing Indebtedness during such two fiscal years; provided that the requirements of the foregoing subsection (iii)(a) or (b), as the case may be, shall be deemed satisfied if (x) there is delivered to the Master Trustee the report of a Consultant (which report, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee and which contains the information required by the proviso to subsection (iii)(b) in the case of projections) which contains an opinion of such Consultant that applicable laws or regulations have prevented or will prevent the Obligated Group from generating the amount of Income Available for Debt Service required to be generated by subsection (iii)(a) or (b), as the case may be, as a prerequisite to the issuance of Funded Indebtedness, and, if requested by the Master Trustee, such report is accompanied by a concurring opinion of Independent Counsel (which Counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) as to any conclusions of law supporting the opinion of such Consultant, (y) the report of the Consultant indicates that the rates charged or to be charged by the Obligated Group are or will be such that, in the opinion of such Consultant, the Obligated Group has generated or will generate the maximum amount of Revenues reasonably practicable given such laws or regulations, and (z) the Historical Maximum

Annual Debt Service Coverage Ratio of the Obligated Group and the Projected Debt Service Coverage Ratio of the Obligated Group referred to in the applicable subsection are at least 1.00:1.

(B)     Completion Funded Indebtedness, without limitation.

(C)     Funded Indebtedness for the purpose of refunding (whether in advance or otherwise, including, without limitation, refunding through the issuance of Cross-over Refunding Indebtedness) any Outstanding Funded Indebtedness.

(D)     Short-Term Indebtedness (other than Short-Term Indebtedness incurred in accordance with subsection (E) below) in a total principal amount which at the time incurred does not, together with the principal amount of all other such Short-Term Indebtedness of the Obligated Group then Outstanding under this subsection (D) and the principal payable on all Funded Indebtedness during the next succeeding 12 months, excluding such principal to the extent that amounts are on deposit in an irrevocable escrow and such amounts (including, where appropriate, the earnings or other increments to accrue thereon) are required to be applied to pay such principal and such amounts so required to be applied are sufficient to pay such principal, exceed 25% of the Revenues of the Obligated Group for the most recent fiscal year for which combined financial statements reported upon by independent certified public accountants are available; provided, however, that for a period of 20 consecutive calendar days in each fiscal year the total amount of such Short-Term Indebtedness of the Obligated Group Outstanding under this subsection (D) shall be not more than 5% of the Revenues of the Obligated Group during the preceding fiscal year plus such additional amount as the Obligated Group Agent certifies in an Officer's Certificate is (a) attributable to Short-Term Indebtedness incurred to offset a temporary delay in the receipt of funds due from third party payors and (b) in the minimum amount reasonably practicable taking into account such delay.  For the purposes of this subsection (D), Short-Term Indebtedness shall not include overdrafts to banks to the extent there are immediately available funds of the Obligated Group sufficient to pay such overdrafts and such overdrafts are incurred and corrected in the normal course of business.

(E)     Short-Term Indebtedness if:

(i)     There is in effect at the time the Short-Term Indebtedness provided for by this subsection (E) is incurred a binding commitment (including, without limitation, letters or lines of credit or insurance) which may be subject only to commercially reasonable contingencies, by a financial institution generally regarded as responsible, which commitment and institution are acceptable to the Master Trustee and each Related Issuer, to provide financing sufficient to pay such Short-Term Indebtedness at its maturity; and

(ii)     The conditions described in subsection (A) above are met with respect to such Short-Term Indebtedness when it is assumed that such Short-Term Indebtedness is Funded Indebtedness maturing over 30 years from the date of issuance of the Short-Term Indebtedness, bears interest on the unpaid principal

balance at the Projected Rate and is payable on a level annual debt service basis over a 30-year period.

(F)   Non-Recourse Indebtedness, without limitation.

(G)   Balloon Indebtedness if:

(i)(a)  there is in effect at the time such Balloon Indebtedness is incurred a binding commitment (including, without limitation, letters or lines of credit) which may be subject only to commercially reasonable contingencies by a financial institution generally regarded as responsible, which commitment and institution are acceptable to the Master Trustee and each Related Issuer, to provide financing sufficient to pay the principal amount of such Balloon Indebtedness coming due in each consecutive 12 month period in which 25% or more of the original principal amount of such Balloon Indebtedness comes due; and

(b)   the conditions set forth in subsection (A) above are met with respect to such Balloon Indebtedness when the assumptions set forth in subsection (E)(ii) above are made with respect to the portion of such Balloon Indebtedness becoming due during each such 12 month period; or

(ii)(a)  a Member establishes in an Officer's Certificate filed with the Master Trustee an amortization schedule for such Balloon Indebtedness, which amortization schedule shall provide for payments of principal and interest for each fiscal year that are not less than the amounts required to make any actual payments required to be made in such fiscal year by the terms of such Balloon Indebtedness;

(b) such Member agrees in such Officer's Certificate to deposit for each fiscal year with a bank or trust company (pursuant to an agreement between such Member and such bank or trust company, which agreement shall be satisfactory in form and substance to the Master Trustee) the amount of principal shown on such amortization schedule net of any amount of principal actually paid on such Balloon Indebtedness during such fiscal year (other than from amounts on deposit with such bank or trust company) which deposit shall be made prior to any such required actual payment during such fiscal year if the amounts so on deposit are intended to be the source of such actual payments; and

(c) the conditions described in subsection (A) above are met with respect to such Balloon Indebtedness when it is assumed that such Balloon Indebtedness is actually payable in accordance with such amortization schedule.

(H)   Put Indebtedness if the conditions set forth in subsection (A) above are met with respect to such Put Indebtedness when it is assumed that such Put Indebtedness bears interest at the Projected Rate and is payable on a level annual debt service basis over a 30-year period commencing with the next succeeding Put Date.

(I)     Guaranties by any Member of the payment by another Person of a sum certain; provided that the conditions set forth herein are satisfied if it is assumed that the Indebtedness guaranteed is Funded Indebtedness of such Member.   In making the calculation required by this subsection (I) the Obligated Group's Income Available for Debt Service shall not be deemed to include any Revenues of the Primary Obligor and the debt service payable with respect to the Indebtedness guaranteed shall be calculated in accordance with the assumptions contained in the Master Indenture.

(J)     Liabilities for contributions to self-insurance or shared or pooled-risk insurance programs required or permitted to be maintained under the Master Indenture.

(K)     Commitment Indebtedness, without limitation.

(L)     Indebtedness consisting of accounts payable incurred in the ordinary course of business or other Indebtedness not incurred or assumed primarily to assure the repayment of money borrowed or credit extended which Indebtedness is incurred in the ordinary course of business.

(M)     Indebtedness the principal amount of which at the time incurred, together with the aggregate principal amount of all other Indebtedness then Outstanding which was issued pursuant to the provisions of this subsection (M) and which has not been subsequently reclassified as having been issued under subsection (A), (E), (G) or (H), does not exceed 10% of the Revenues of the Obligated Group for the latest preceding fiscal year for which combined financial statements reported upon by independent certified public accountants are available.

(N)     Indebtedness incurred in connection with a sale of accounts receivable with or without recourse on commercially reasonable terms by any Member consisting of an obligation to repurchase all or a portion of such accounts receivable upon certain conditions, provided that the principal amount of such Indebtedness permitted hereby shall not exceed the aggregate face amount of such accounts receivable.

(O)     Subordinated Indebtedness, without limitation.

**Merger, Consolidation, Sale or Conveyance**

Each Member agrees that it will not merge into, or consolidate with, one or more corporations that are not Members, or allow one or more of such non-Member corporations to merge into it, or sell or convey all or substantially all of its Property to any Person who is not a Member, unless:

(ii)     Any successor corporation to such Member (including, without limitation, any purchaser of all or substantially all the Property of such Member) is a corporation organized and existing under the laws of the United States of America or a state thereof and shall execute and deliver to the Master Trustee an appropriate instrument, satisfactory to the Master Trustee, containing the agreement of such successor corporation to assume, jointly and severally, the due and punctual payment of the principal of, premium, if any, and interest on all Obligations according to their tenor and

C-28

the due and punctual performance and observance of all the covenants and conditions of the Master Indenture to be kept and performed by such Member;

(iii)    Immediately after such merger or consolidation, or such sale or conveyance, no Member would be in default in the performance or observance of any covenant or condition of any Related Loan Document or the Master Indenture;

(iv)    Immediately after such merger or consolidation, or such sale or conveyance, the condition described in Section 418(b)(i) of the Master Indenture would be met for the creation of a Lien on Property and the condition described in Section 415(A) of the Master Indenture would be met for the incurrence of one dollar of additional Funded Indebtedness, assuming that any Indebtedness of any successor or acquiring corporation is Indebtedness of such Member and that the Revenues and Expenses of the Member for such most recent fiscal year include the Revenues and Expenses of such other corporation; and

(v)    If all amounts due or to become due on all Related Bonds have not been fully paid to the holders thereof or fully provided for, there shall be delivered to the Master Trustee an opinion of nationally recognized municipal bond counsel (which counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) to the effect that under then existing law, the consummation of such merger, consolidation, sale or conveyance, whether or not contemplated on the original date of delivery of such Related Bonds, would not adversely affect the validity of such Related Bonds or the exemption otherwise available from federal income taxation of interest payable on such Related Bonds.

(b)    In case of any such consolidation, merger, sale or conveyance and upon any such assumption by the successor corporation, such successor corporation shall succeed to and be substituted for its predecessor, with the same effect as if it had been named herein as such Member. Any successor corporation to such Member thereupon may cause to be signed and may issue in its own name Obligations under the Master Indenture and the predecessor corporation shall be released from its obligations under the Master Indenture and under any Obligations, if such predecessor corporation shall have conveyed all Property owned by it (or all such Property shall be deemed conveyed by operation of law) to such successor corporation. All Obligations so issued by such successor corporation under the Master Indenture shall in all respects have the same legal rank and benefit under the Master Indenture as Obligations theretofore or thereafter issued in accordance with the terms of the Master Indenture as though all of such Obligations had been issued under the Master Indenture by such prior Member without any such consolidation, merger, sale or conveyance having occurred.

(c)    In case of any such consolidation, merger, sale or conveyance such changes in phraseology and form (but not in substance) may be made in Obligations thereafter to be issued as may be appropriate.

The Master Trustee may rely upon an opinion of Independent Counsel as conclusive evidence that any such consolidation, merger, sale or conveyance, and any such assumption, complies with the provisions of Section 413 of the Master Indenture and that it is proper for the

Master Trustee under the provisions of Article VII and Section 413 of the Master Indenture to join in the execution of any instrument required to be executed and delivered by Section 413 of the Master Indenture.

### Entrance Into the Obligated Group

Any Person may become a Member of the Obligated Group if:

(A)    Such Person is a corporation;

(B)    Such Person executes and delivers to the Master Trustee a Supplemental Master Indenture acceptable to the Master Trustee which shall be executed by the Master Trustee and each then current Member, containing (i) the agreement of such Person (a) to become a Member of the Obligated Group and thereby to become subject to compliance with all provisions of the Master Indenture and (b) unconditionally and irrevocably (subject to the right of such Person to cease its status as a Member of the Obligated Group pursuant to the terms and conditions of Section 405 of the Master Indenture) to jointly and severally make payments upon each Obligation at the times and in the amounts provided in each such Obligation and (ii) representations and warranties by such Person substantially similar to those set forth in Section 403 of the Master Indenture (other than those contained in Section 403(d) if such Person is not a Tax-Exempt Organization), but with such modifications as are acceptable to the Master Trustee;

(C)    The Obligated Group Agent shall, by appropriate action of its Governing Body, have approved the admission of such Person to the Obligated Group and each of the Members shall have taken such action, if any, required to approve the admission of such Person to the Obligated Group;

(D)    The Master Trustee shall have received (1) a certificate of the Obligated Group Agent which demonstrates that, immediately upon such Person becoming a Member of the Obligated Group (a) the Members would not, as a result of such transaction, be in default in the performance or observance of any covenant or condition to be performed or observed by them under the Master Indenture, and (b) the Obligated Group could meet the conditions described in Section 415(A) of the Master Indenture for the incurrence of one dollar of additional Funded Indebtedness, (2) an opinion of Independent Counsel to the effect that (x) the instrument described in paragraph (B) above has been duly authorized, executed and delivered and constitutes a legal, valid and binding agreement of such Person, enforceable in accordance with its terms, subject to customary exceptions for bankruptcy, insolvency, fraudulent conveyance, and other laws generally affecting enforcement of creditors' rights and application of general principles of equity and to the exceptions set forth in *Exhibit B* to the Master Indenture and (y) the addition of such Person to the Obligated Group will not adversely affect the status as a Tax-Exempt Organization of any Member which otherwise has such status, (3) either a certificate of the Obligated Group Agent demonstrating that all amounts due or to become due on all Related Bonds have been paid to the holders thereof and provision for such payment has been made in such manner as to have resulted in the defeasance of all

Related Bond Indentures, or an opinion of nationally recognized municipal bond counsel (which counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee), to the effect that under then existing law the consummation of such transaction, whether or not contemplated on the date of delivery of any such Related Bond, would not adversely affect the validity of any Related Bond or any exemption from federal income taxation of interest payable on such Related Bond otherwise entitled to such exemption; provided that in making the calculation called for by subsection (D)(l)(b) above, (i) there shall be excluded from Revenues any Revenues generated by Property of such Person transferred or otherwise disposed of by such Person since the beginning of the fiscal year during which such Person's entry into the Obligated Group occurs and (ii) there shall be excluded from Expenses any Expenses related to Property of such Person transferred or otherwise disposed of by such Person since the beginning of the fiscal year during which such Person's entry into the Obligated Group occurs and (4) certified copies of the actions of the Obligated Group Agent and each of the Members described in subsection (C) above; and

(E)     *Exhibit C* to the Master Indenture is amended to add such Person as a Member.

Each successor, assignee, surviving, resulting or transferee corporation of a Member must agree to become, and satisfy the above-described conditions to becoming, a Member of the Obligated Group prior to any such succession, assignment or other change in such Member's corporate status.

**Cessation of Status as a Member of the Obligated Group**

Each Member covenants that it will not take any action, corporate or otherwise, which would cause it or any successor thereto into which it is merged or consolidated to cease to be a Member of the Obligated Group under the terms of the Master Indenture, unless:

(A)     the Member proposing to withdraw from the Obligated Group is not a party to any Outstanding Obligation securing Related Loan Documents with respect to Related Bonds which remain Outstanding;

(B)     prior to cessation of such status, there is delivered to the Master Trustee an opinion of nationally recognized municipal bond counsel (which opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) to the effect that, under then existing law, the cessation by the Member of its status as a Member will not adversely affect the validity of any Related Bond or any exemption from federal income taxation of interest payable thereon to which such Bond would otherwise be entitled;

(C)     when it is assumed that such cessation results in a transfer of Property owned by the Member proposing to cease such status to a Person who is not a Member of the Obligated Group, the conditions precedent to such a transfer to an unrelated entity set forth in Section 417 of the Master Indenture have been complied with;

(D)    prior to and immediately after such cessation, no event of default exists under the Master Indenture and no event shall have occurred which with the passage of time or the giving of notice, or both, would become such an event of default;

(E)    prior to such cessation there is delivered to the Master Trustee an opinion of Independent Counsel (which Counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) to the effect that the cessation by such Member of its status as a Member will not adversely affect the status as a Tax-Exempt Organization of any Member which otherwise has such status; and

(F)    prior to cessation of such status, each Member of the Obligated Group consents in writing to the withdrawal by such Member.

Upon such cessation in accordance with the foregoing provisions, *Exhibit C* of the Master Indenture shall be amended to delete therefrom the name of such Person.

**Sale, Lease or Other Disposition of Property**.

Each Member agrees that it will not, in any fiscal year, sell, lease or otherwise dispose (including, without limitation, any involuntary disposition) of Property which, together with all other Property transferred by Members exceeds the greater of $5,000,000 or 5% of the total value of the Property of the Obligated Group (calculated on the basis of the Book Value of the assets shown on the assets side of the balance sheet in the combined financial statements of the Obligated Group for the fiscal year next preceding the date of such sale, lease or other disposition for which combined financial statements of the Obligated Group reported on by independent certified public accountants are available or, if the Obligated Group Agent so elects, on the basis of Current Value), except for transfers or other dispositions in the ordinary course of business and except for transfers, sales or other dispositions of Property:

(A)    In return for other Property of equal or greater value and usefulness;

(B)    To any Person, if prior to such sale, lease or other disposition there is delivered to the Master Trustee an Officer's Certificate of a Member stating that, in the judgment of the signer, such Property has, or within the next succeeding 24 calendar months is reasonably expected to, become inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable or unnecessary and the sale, lease or other disposition thereof will not impair the structural soundness, efficiency or economic value of the remaining Property;

(C)    To another Member;

(D)    Upon fair and reasonable terms no less favorable to the Member than the Member would obtain in a comparable arm's-length transaction, if following such transfer the proceeds received by the transferor are applied to acquire Property or to repay the principal of Funded Indebtedness of any Member;

(E)     To any Person, if such Property consists solely of assets which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with their use for payment on the Obligations;

(F)     To any Person, if such transfer consists solely of cash and such transfer will not exceed 10% of Net Patient Service Revenues in any fiscal year; or

(G)     To any Person upon delivery to the Master Trustee of an Officer's Certificate of a Member (i) certifying that during the fiscal year immediately preceding the proposed disposition for which financial statements have been reported upon by independent certified public accountants, (a) the Historical Maximum Annual Debt Service Coverage Ratio of the Obligated Group, taking into account such disposition, would not have been less than 2.00:1 or (b) if the Historical Maximum Annual Debt Service Coverage Ratio is less than 2.00:1, the Historical Annual Maximum Debt Service Coverage Ratio would not have been reduced by more than 10% and (ii) demonstrating that, after taking into account such disposition, the conditions described in Section 415(A) of the Master Indenture are met for allowing the incurrence of one dollar of additional Funded Indebtedness.

The foregoing provisions of this Section notwithstanding, each Member further agrees that it will not sell, lease, donate or otherwise dispose of Property (a) which could reasonably be expected at the time of such sale, lease, donation or disposition to result in a reduction of the Historical Maximum Annual Debt Service Coverage Ratio for the Obligated Group such that the Master Trustee could or would be obligated to require the Obligated Group to retain a Consultant pursuant to Section 409 of the Master Indenture, or (b) if a Consultant has been retained in the circumstances described in Section 409 of the Master Indenture, such action, in the opinion of such Consultant, will have an adverse effect on the Income Available for Debt Service of the Obligated Group.  The parties to the Master Indenture agree that except as otherwise permitted by the Master Indenture (including, without limitation, transfers to other Members and other transfers permitted as described under this Section) and except as otherwise required by law, it will not enter into any transaction, including, without limitation, the purchase, sale, exchange or transfer of Property, the rendering of any service, the making of any loan, the extension of any credit or any other transaction, with any Affiliate except pursuant to the reasonable requirements of such Member's activities and upon fair and reasonable terms no less favorable to it than would obtain in a comparable arm's-length transaction with a person not an Affiliate.

**Events of Default**.

Each of the following events is an "event of default" under the Master Indenture:

(A)     failure of the Obligated Group to pay any installment of interest or principal, or any premium, on any Obligation when the same shall become due and payable, whether at maturity, upon any date fixed for prepayment or redemption by acceleration or otherwise and the continuance of such failure for five days; or

(B)     failure of any Member to comply with, observe or perform any of the covenants, conditions, agreements or provisions hereof and to remedy such default within

30 days after written notice thereof to such Member and the Obligated Group Agent from the Master Trustee or the holders of at least 25% in aggregate principal amount of the Outstanding Obligations; provided, that if such default cannot with due diligence and dispatch be cured within 30 days but can be cured, the failure of the Member to remedy such default within such 30-day period shall not constitute a default under the Master Indenture if the Member shall immediately upon receipt of such notice commence with due diligence and dispatch the curing of such default and, having so commenced the curing of such default, shall thereafter prosecute and complete the same with due diligence and dispatch; or

(C)     any representation or warranty made by any Member herein or in any statement or certificate furnished to the Master Trustee or the purchaser of any Obligation in connection with the sale of any Obligation or furnished by any Member pursuant hereto proves untrue in any material respect as of the date of the issuance or making thereof and shall not be corrected or brought into compliance within 30 days after written notice thereof to the Obligated Group Agent by the Master Trustee or the holders of at least 25% in aggregate principal amount of the Outstanding Obligations; or

(D)     default in the payment of the principal of, premium, if any, or interest on any Indebtedness for borrowed money (other than Non-Recourse Indebtedness) of any Member, including, without limitation, any Indebtedness created by any Related Loan Document, within 5 days from the date the same shall become due, or an event of default as defined in any mortgage, indenture, loan agreement or other instrument under or pursuant to which there was issued or incurred, or by which there is secured, any such Indebtedness (including any Obligation) of any Member, and which default in payment or event of default entitles the holder thereof to declare or, in the case of any Obligation, to request that the Master Trustee declare, such Indebtedness due and payable prior to the date on which it would otherwise become due and payable; provided, however, that if such Indebtedness is not evidenced by an Obligation or issued, incurred or secured by or under a Related Loan Document, a default in payment shall not constitute an "event of default" under the Master Indenture unless the unpaid principal amount of such Indebtedness, together with the unpaid principal amount of all other Indebtedness so in default, exceeds 5% of the unrestricted net assets of the Obligated Group as shown on or derived from the then latest available audited combined financial statements of the Obligated Group; or

(E)     any judgment, writ or warrant of attachment or of any similar process shall be entered or filed against any Member or against any Property of any Member and remains unvacated, unpaid, unbonded, unstayed or uncontested in good faith for a period of 30 days; provided, however, that none of the foregoing shall constitute an event of default unless the amount of such judgment, writ, warrant of attachment or similar process, together with the amount of all other such judgments, writs, warrants or similar processes so unvacated, unpaid, unbonded, unstayed or uncontested, exceeds 5% of the unrestricted net assets of the Obligated Group as shown on or derived from the then latest available audited combined financial statements of the Obligated Group; or

C-34

(F)    any Member admits insolvency or bankruptcy or its inability to pay its debts as they mature, or is generally not paying its debts as such debts become due, or makes an assignment for the benefit of creditors or applies for or consents to the appointment of a trustee, custodian or receiver for such Member, or for the major part of its Property; or

(G)    a trustee, custodian or receiver is appointed for any Member or for the major part of its Property and is not discharged within 30 days after such appointment; or

(H)    bankruptcy, dissolution, reorganization, arrangement, insolvency or liquidation proceedings, proceedings under Title 11 of the United States Code, as amended, or other proceedings for relief under any bankruptcy law or similar law for the relief of debtors are instituted by or against any Member (other than bankruptcy or similar proceedings instituted by any Member against third parties), and if instituted against any Member are allowed against such Member or are consented to or are not dismissed, stayed or otherwise nullified within 60 days after such institution; or

(I)    payment of any installment of interest or principal, or any premium, on any Related Bond shall not be made when the same shall become due and payable under the provisions of any Related Bond Indenture.

**Acceleration**

If an event of default under the Master Indenture has occurred and is continuing, the Master Trustee may, and if requested by either the holders of not less than 25% in aggregate principal amount of Outstanding Obligations or the holder of any Accelerable Instrument under which Accelerable Instrument an event of default exists (which event of default permits the holder thereof to request that the Master Trustee declare such Indebtedness evidenced by an Obligation due and payable prior to the date on which it would otherwise become due and payable), shall, by notice in writing delivered to the Obligated Group Agent, declare the entire principal amount of all Obligations then Outstanding under the Master Indenture and the interest accrued thereon immediately due and payable, and the entire principal and such interest shall thereupon become immediately due and payable, subject, however, to the provisions of Section 511 hereof with respect to waivers of events of default.

**Remedies; Rights of Obligation Holders**

Upon the occurrence and continuance of any event of default, the Master Trustee may pursue any available remedy including a suit, action or proceeding at law or in equity to enforce the payment of the principal of, premium, if any, and interest on the Obligations Outstanding under the Master Indenture and any other sums due under the Master Indenture and may collect such sums in the manner provided by law out of the Property of any Member wherever situated.

If an event of default shall have occurred, and if it shall have been requested so to do by either the holders of 25% or more in aggregate principal amount of Obligations Outstanding or the holder of an Accelerable Instrument upon whose request pursuant to Section 503 of the Master Indenture the Master Trustee has accelerated the Obligations and if it shall have been indemnified as provided in Section 601(k) of the Master Indenture, the Master Trustee shall be

obligated to exercise such one or more of the rights and powers conferred by this Section as the Master Trustee shall deem most expedient in the interests of the holders of Obligations; provided, however, that the Master Trustee shall have the right to decline to comply with any such request if the Master Trustee shall be advised by counsel (who may be its own counsel) that the action so requested may not lawfully be taken or the Master Trustee in good faith shall determine that such action would be unjustly prejudicial to the holders of Obligations not parties to such request.

No remedy by the terms of the Master Indenture conferred upon or reserved to the Master Trustee (or to the holders of Obligations) is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given to the Master Trustee or to the holders of Obligations issued under the Master Indenture, now or hereafter existing at law or in equity or by statute.

No delay or omission to exercise any right or power accruing upon any default or event of default shall impair any such right or power or shall be construed to be a waiver of any such default or event of default, or acquiescence therein; and every such right and power may be exercised from time to time and as often as may be deemed expedient.

No waiver of any default or event of default under the Master Indenture, whether by the Master Trustee or by the holders of Obligations, shall extend to or shall affect any subsequent default or event of default or shall impair any rights or remedies consequent thereon.


### Supplements and Amendments to the Master Indenture

Subject to the limitations set forth in Section 702 of the Master Indenture, the Members and the Master Trustee may, without the consent of, or notice to, any of the Obligation holders, amend or supplement the Master Indenture, for any one or more of the following purposes:

(A)     To cure any ambiguity or defective provision in or omission from the Master Indenture in such manner as is not inconsistent with and does not impair the security of the Master Indenture or adversely affect the holder of any Obligation;

(B)     To grant to or confer upon the Master Trustee for the benefit of the Obligation holders any additional rights, remedies, powers or authority that may lawfully be granted to or conferred upon the Obligation holders and the Master Trustee, or either of them, to add to the covenants of the Members for the benefit of the Obligation holders or to surrender any right or power conferred under the Master Indenture upon any Member;

(C)     To assign and pledge under the Master Indenture any revenues, properties or collateral;

(D)     To evidence the succession of another corporation to the agreements of a Member or the Master Trustee, or the successor of any thereof under the Master Indenture;

(E)    To permit the qualification of the Master Indenture under the Trust Indenture Act of 1939, as then amended, or under any similar federal statute hereafter in effect or to permit the qualification of any Obligations for sale under the securities laws of any state of the United States;

(F)    To provide for the refunding or advance refunding of any Obligation;

(G)    To provide for the issuance of Obligations;

(H)    To reflect the addition to or withdrawal of a Member from the Obligated Group;

(I)    To provide for the issuance of Obligations with original issue discount, provided such issuance would not materially adversely affect the holders of Outstanding Obligations;

(J)    To permit an Obligation to be secured by security which is not extended to all Obligation holders;

(K)    To permit the issuance of Obligations which are not in the form of a promissory note; and

(L)    To make any other change which, in the opinion of the Master Trustee, does not materially adversely affect the holders of any of the Obligations and, in the opinion of each Related Bond Trustee, does not materially adversely affect the holders of the Related Bonds with respect to which it acts as trustee, including, without limitation, any modification, amendment or supplement to the Master Indenture or any indenture supplemental hereto in such a manner as to establish or maintain exemption of interest on any Related Bonds under a Related Bond Indenture from federal income taxation under applicable provisions of the Code.

Any Supplemental Master Indenture providing for the issuance of Obligations shall set forth the date thereof, the date or dates upon which principal of, premium, if any, and interest on such Obligations shall be payable, the other terms and conditions of such Obligations, the form of such Obligations and the conditions precedent to the delivery of such Obligations which shall include, among other things:

(ii)    delivery to the Master Trustee of all materials required to be delivered as a condition precedent to the incurrence of the Indebtedness evidenced by such Obligations;

(iii)    delivery to the Master Trustee of an opinion of Independent Counsel acceptable to the Master Trustee to the effect that all requirements and conditions to the issuance of such Obligations, if any, set forth in the Master Indenture and in the Supplemental Master Indenture have been complied with and satisfied; and

(iv)    delivery to the Master Trustee of an opinion of Independent Counsel acceptable to the Master Trustee to the effect that registration of such Obligations under

the Securities Act of 1933, as amended, is not required, or, if such registration is required, that the Obligated Group has complied with all applicable provisions of said Act.

If at any time the Obligated Group Agent shall request the Master Trustee to enter into any Supplemental Master Indenture pursuant to subsection (L) above, the Master Trustee shall cause notice of the proposed execution of such Supplemental Master Indenture to be given to each Rating Agency then maintaining a rating on any Obligations or Related Bonds, in the manner provided in Section 1004 of the Master Indenture at least 15 days prior to the execution of such Supplemental Master Indenture, which notice shall include a copy of the proposed Supplemental Master Indenture. If at any time the Obligated Group Agent shall request the Master Trustee to enter into any Supplemental Master Indenture pursuant to which an Obligation is issued in connection with an Interest Rate Agreement, the Master Trustee shall cause notice of the execution of such Supplemental Master Indenture to be given to each Rating Agency then maintaining a rating on any Obligation or Related Bonds, in the manner provided in Section 1004 of the Master Indenture immediately succeeding the execution of such Supplemental Master Indenture, which notice shall include a copy of the Supplemental Master Indenture.

### Supplemental Master Indentures Requiring Consent of Obligation Holders.

In addition to Supplemental Master Indentures covered by Section 701 of the Master Indenture (as described above) and subject to the terms and provisions contained in this Section, and not otherwise, the holders of not less than 51% in aggregate principal amount of the Obligations which are Outstanding under the Master Indenture at the time of the execution of such Supplemental Master Indenture shall have the right, from time to time, anything contained in the Master Indenture to the contrary notwithstanding, to consent to and approve the execution by the Members and the Master Trustee of such Supplemental Master Indentures as shall be deemed necessary and desirable by the Members for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the Master Indenture or in any Supplemental Master Indenture; provided, however, that nothing contained in this Section or in Section 701 of the Master Indenture shall permit, or be construed as permitting, (a) an extension of the stated maturity or reduction in the principal amount of or reduction in the rate or extension of the time of paying of interest on or reduction of any premium payable on the redemption of, any Obligation, without the consent of the holder of such Obligation, (b) a reduction in the aforesaid aggregate principal amount of Obligations the holders of which are required to consent to any such Supplemental Master Indenture or any such amending or supplementing instruments, without the consent of the holders of all the Obligations at the time Outstanding which would be affected by the action to be taken, or (c) modification of the rights, duties or immunities of the Master Trustee, without the written consent of the Master Trustee.

If at any time the Obligated Group Agent shall request the Master Trustee to enter into any such Supplemental Master Indenture for any of the purposes describe in the preceding paragraph, the Master Trustee shall, upon being satisfactorily indemnified with respect to expenses, cause notice of the proposed execution of such Supplemental Master Indenture to be mailed by first class mail postage prepaid to each holder of an Obligation. Such notice shall briefly set forth the nature of the proposed Supplemental Master Indenture and shall state that copies thereof are on file at the principal corporate trust office of the Master Trustee for

inspection by all Obligation holders.  The Master Trustee shall not, however, be subject to any liability to any Obligation holder by reason of its failure to mail such notice, and any such failure shall not affect the validity of such Supplemental Master Indenture when consented to and approved as provided in this Section.  If the holders of not less than 51% in aggregate principal amount of the Obligations which are Outstanding under the Master Indenture at the time of the execution of any such Supplemental Master Indenture shall have consented to and approved the execution thereof as provided, in this Section no holder of any Obligation shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Master Trustee or the Members from executing the same or from taking any action pursuant to the provisions thereof.  Upon the execution of any such Supplemental Master Indenture as in this Section permitted and provided, the Master Indenture shall be and be deemed to be modified and amended in accordance therewith.

For the purpose of obtaining the foregoing consents, the determination of who is deemed the holder of an Obligation held by a Related Bond Trustee shall be made in the manner provided in Section 512 of the Master Indenture.

# THE INDENTURE

*The following is a summary of certain provisions of the Bond Indenture. Reference is made to the Master Indenture for the detailed provisions thereof.*

## Indenture Constitutes Contract

The Bond Indenture constitutes a continuing agreement with the Holders from time to time of the 2003 Bonds and the Credit Facility Providers as their respective interests may appear to secure the full payment of the principal of and premium (if any) and interest on all the 2003 Bonds, and the payment of all other amounts due under the Bond Indenture, subject to the covenants, provisions and conditions herein contained.

## Initial Interest Rates; Change of Mode

(A)    The first Interest Rate Period for the 2003 ARC Bonds shall be in the Auction Mode and the Initial Interest Rate shall be (i) 3.8095% for the 2003 B Bonds, (ii) 4.2455% for the 2003 C Bonds, and (iii) 3.2500% for the 2003 D Bonds, payable from the date of issuance thereof.

(B)    A series of 2003 ARC Bonds in the Auction Mode may be changed to the Fixed Rate Mode or the Weekly Rate Mode at the times and in the manner hereinafter provided. All 2003 Bonds of any Series must be in the same Mode and shall bear interest at the same interest rate.  The Fixed Rate Mode for a Series of 2003 Bonds shall be in effect until the Maturity Date of such Series of 2003 Bonds, and may not be changed to any other Mode.

(C)    Defaulted Interest with respect to any 2003 Bond shall cease to be payable to the holder of such 2003 Bond on the relevant Record Date and shall be payable to the holder in whose name such Bond is registered at the close of business on the Special Record Date for the payment of such Defaulted Interest, which Special Record Date shall be fixed in the following manner. The Borrower shall notify the Bond Trustee and the Bond Insurer in writing of the amount of Defaulted Interest proposed to be paid on each 2003 Bond and the date of the proposed payment (which date shall be such as will enable the Bond Trustee to comply with the second sentence hereafter), and shall deposit with the Bond Trustee at the time of such notice an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Bond Trustee for such deposit prior to the date of the proposed payment.  Money deposited with the Bond Trustee shall be held in trust for the benefit of the Holders of the 2003 Bonds entitled to such Defaulted Interest as provided in this Section.  Following receipt of such funds the Bond Trustee shall fix a Special Record Date for the payment of such Defaulted Interest which shall be not more than 15 nor less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Bond Trustee of the notice of the proposed payment.  The Bond Trustee shall promptly notify the Borrower of such Special Record Date and, in the name and at the expense of the Borrower, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date

C-40

therefor to be mailed, first-class postage prepaid, not less than 10 days prior to such Special Record Date, to each holder of a 2003 Bond at the address of such holder as it appears on the Bond Register.

(D)     Each series of 2003 ARC Bonds shall bear interest at Auction Rates established for Auction Periods until a Weekly Rate Conversion Date, or Fixed Rate Conversion Date with respect to such series of 2003 ARC Bonds. During a Weekly Rate Period, a series of the 2003 ARC Bonds which have been so converted shall bear interest at the lesser of (i) the Interest Coverage Rate or (ii) the Weekly Rate. During an Auction Rate Period the 2003 ARC Bonds in the Auction Mode shall bear interest at the Auction Rate. During the Fixed Rate Period, a series of the 2003 ARC Bonds which have been so converted shall bear interest at the Fixed Rate. Each Bank Bond shall bear interest at the Bank Rate. At no time shall the 2003 ARC Bonds (including Bank Bonds and Bonds bearing interest at the Failed Tender Rate pursuant to Section 11.08 of the Bond Indenture) bear interest at a rate higher than the Maximum Interest Rate.

(E) No Weekly Rate Period shall be established which would cause the Interest Coverage Period of the Liquidity Facility to be less than the requirements of Section 6.11(B) of the Bond Indenture. No interest rate on a Bond entitled to the benefit of a Liquidity Facility shall be established which exceeds the Interest Coverage Rate.

**Funds; Disposition of Revenues**

Issuance of the 2003 Bonds.   At any time after the execution of the Bond Indenture, the Authority shall execute, by physical or facsimile signature, and the Trustee shall authenticate and, upon Request of the Authority, deliver the 2003 Bonds for each series in the aggregate principal amount of such series set forth in Section 2.01 of the Bond Indenture.

Application of Proceeds of the 2003 Bonds.   The moneys from time to time on deposit in the Funds and Accounts specified below (except for the Escrow Fund, the Bond Purchase Fund and the Rebate Fund) are subject to a lien and charge in favor of the owners of the 2003 Bonds until expended for the purposes for which such Funds and Accounts are created.

The proceeds (net of discount, if any) received from the sale of the 2003 Bonds shall be deposited in trust with the Bond Trustee. The Authority hereby instructs The Bank of New York, as trustee for the 1993 Bonds to Be Refunded, and as agent for the 2002 Escrow Agent as trustee for the 2002 Bonds to Be Refunded, to transfer to the Bond Trustee the following amounts from the following funds and accounts held for the benefit of the 1993 Bonds to be Refunded: Bond Fund--$1,462,191.01, and Debt Service Reserve Fund--$5,851,000.08; and the 2002 Escrow Agent has agreed to transfer the sum of $609.69 from the Bond Fund for the 2002 Bonds to Be Refunded to the Bond Trustee (collectively with the proceeds mentioned above, the "Closing Deposit").

The Bond Trustee shall allocate and deposit the amount of the Closing Deposit as follows:

(A)     Deposit $56,039,043.39 with the 1993 Escrow Agent for deposit to the credit of the 1993 Escrow Fund created pursuant to the 1993 Escrow Deposit Agreement

(B)     Deposit $8,706,027.40 with the 2002 Escrow Agent for deposit to the credit of the 2002 Escrow Fund created pursuant to the 2002 Escrow Deposit Agreement.

(C)     Deposit $475,000.00 to the credit of the Costs of Issuance Fund established under and to be used as set forth in Section 3.03 of the Bond Indenture.

(D)     Deposit $71,275,748.17 to the credit of the Project Fund established under and to be used as set forth in Section 3.04 of the Bond Indenture.

(E)     Deposit $6,261,815.67 to the credit of the Capitalized Interest Fund established under and to be used as set forth in Section 3.04 of the Bond Indenture.

(F)     Transfer the sum of $4,681,149.55 by wire transfer to the Bond Insurer in payment for the premium for the issuance of the Insurance Policy.

Establishment and Application of Costs of Issuance Fund.  The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Costs of Issuance Fund."  The moneys in the Costs of Issuance Fund shall be used and withdrawn by the Bond Trustee to pay the Costs of Issuance upon Requisition of the Borrower stating the Person to whom payment is to be made, the amount to be paid, the purpose for which the obligation was incurred and that such payment is a proper charge against said fund.  On March 4, 2004, or upon the earlier Request of the Borrower, amounts, if any, remaining in the Costs of Issuance Fund shall be transferred to the Project Fund and the Costs of Issuance Fund shall thereafter be closed.

Establishment and Application of Project Fund.

(A)     The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Project Fund."  Within the Project Fund the Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Capitalized Interest Fund."  The moneys in the Project Fund shall be used and withdrawn by the Bond Trustee to pay the costs of the acquisition and construction of the New Money Portion upon receipt of requisitions of the Borrower therefor, and the moneys in the Capitalized Interest Fund shall be used and withdrawn by the Trustee to pay capitalized interest on the 2003 C Bonds and the 2003 D Bonds.  A portion of the moneys deposited in the Project Fund will be expended immediately to reimburse the Borrower for the cost of capital expenditures previously made.  Any funds remaining in the Capitalized Interest Fund after November 1, 2005 shall be transferred to the Project Fund and used for the purposes of the Project Fund.

(B)     Before any payment from the Project Fund shall be made, the Borrower shall file or cause to be filed with the Bond Trustee a Requisition stating (i) the item number of such payment; (ii) the name of the Person to whom each such payment is due, which may be the Borrower in the case of reimbursement for Project costs theretofore paid by the Borrower; (iii) the respective amounts to be paid; (iv) the purpose by general classification for which each obligation to be paid was incurred; (v) that obligations in the stated amounts have been incurred by the Borrower and are presently due and payable and that each item thereof is a proper charge

against the Project Fund and has not been previously paid from the Project Fund; and (vi) that there has not been filed with or served upon the Borrower any notice of claim of lien, or attachment upon, or claim affecting the right to receive payment of, any of the amounts payable to any of the persons named in such Requisition, that has not been released or will not be released simultaneously with the payment of such obligation, other than materialmen's or mechanics' liens accruing by mere operation of law.

Upon receipt of a Requisition, the Bond Trustee shall pay the amount set forth in such Requisition as directed by the terms thereof out of the Project Fund. The Bond Trustee shall rely fully on any such Requisition delivered pursuant to Section 3.04 of the Bond Indenture and shall not be required to make any investigation in connection therewith. The Bond Trustee shall not make any such payment if it has received any written notice of claim of lien, attachment upon, or claim affecting the right to receive payment of, any of the monies to be so paid, that has not been released or will not be released simultaneously with such payment.

(C)   When the Project shall have been completed, there shall be delivered to the Bond Trustee a Certificate of the Borrower stating the fact and date of such completion and stating that all of the costs thereof have been determined and paid (or that all of such costs have been paid less specified claims that are subject to dispute and for which a retention in the Project Fund is to be maintained in the full amount of such claims until such dispute is resolved).  Upon the receipt of such Certificate, the Bond Trustee shall, as directed by said Certificate, transfer any remaining balance in such Project Fund, less the amount of any such retention, to the Optional Redemption Account and applied to the optional redemption of 2003 Bonds.  Upon such transfer, the Project Fund shall be closed.

Interest Fund.

(A)   The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Interest Fund."  Moneys in the Interest Fund shall be held, disbursed, allocated and applied by the Bond Trustee only as provided in the Bond Indenture.

(B)   The Bond Trustee shall deposit the following Revenues in the Interest Fund when and as such Revenues are received:

(i)   the interest component of all Loan Repayments, including the interest component of all cash prepayments of Loan Repayments made pursuant to Section 3.1 of the Loan Agreement;

(ii)   all interest, profits and other income received from the investment of moneys in the Interest Fund; and

(iii)   any other Revenues not required to be deposited in any other fund or account established pursuant to the Bond Indenture.

(C)   All amounts in the Interest Fund shall be used and withdrawn by the Bond Trustee, on a pro rata basis, solely for the purpose of paying the interest on the 2003 Bonds as

C-43

the same becomes due and payable (including accrued interest on any 2003 Bonds purchased or redeemed prior to maturity pursuant to the Bond Indenture).

Principal Fund.

(A)     The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Principal Fund." The Bond Trustee shall establish, maintain and hold in trust within the Principal Fund a separate Mandatory Sinking Account. Moneys in the Principal Fund shall be held, disbursed, allocated and applied by the Bond Trustee only as provided in the Bond Indenture.

(B)     The Bond Trustee shall deposit the following Revenues in the Principal Fund when and as such Revenues are received:

(i)     the principal component of all Loan Repayments, but excluding the principal component of all cash prepayments of Loan Repayments made pursuant to Section 3.4 of the Loan Agreement, which shall be deposited in the Redemption Fund; and

(ii)     all interest, profits and other income received from the investment of moneys in the Principal Fund.

(C)     All amounts in the Principal Fund shall be used and withdrawn by the Bond Trustee solely to redeem the 2003 Bonds, or pay the 2003 Bonds at maturity, as provided herein.

(D)     On each Mandatory Sinking Account Payment date, the Bond Trustee shall apply the Mandatory Sinking Account Payment required on that date to the redemption (or payment at maturity, as the case may be) of 2003 Bonds, in the amounts and upon the notice and in the manner provided in Article IV; provided that, at any time prior to giving such notice of such redemption, the Bond Trustee shall, upon direction of the Borrower, apply such moneys to the purchase of 2003 Bonds at public or private sale, as and when and at such prices (including brokerage and other charges, but excluding accrued interest, which is payable from the Interest Fund) as the Borrower may direct, except that the purchase price (excluding accrued interest) shall not exceed the par amount of such 2003 Bonds. If, during the twelve-month period immediately preceding said Mandatory Sinking Account Payment date, the Bond Trustee has purchased 2003 Bonds with moneys in the Principal Fund, or, during said period and prior to giving said notice of redemption, the Borrower has deposited 2003 Bonds with the Bond Trustee, or 2003 Bonds were at any time purchased or redeemed by the Bond Trustee from the Redemption Fund and allocable to said Mandatory Sinking Account Payment, such 2003 Bonds so purchased or deposited or redeemed shall be applied, to the extent of the full principal amount thereof, to reduce said Mandatory Sinking Account Payment. All 2003 Bonds purchased or deposited pursuant to this subsection shall be cancelled and destroyed by the Bond Trustee to or upon the order of the Borrower. All 2003 Bonds purchased from the Principal Fund or deposited by the Borrower with the Bond Trustee shall be allocated first to the next succeeding Mandatory

C-44

Sinking Account Payment, then to the remaining Mandatory Sinking Account Payments as selected by the Borrower.

        Redemption Fund.

        (A)    The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Redemption Fund". The Bond Trustee shall establish, maintain and hold in trust within the Redemption Fund a separate Optional Redemption Account and a separate Special Redemption Account.

        (B)    The Bond Trustee shall deposit the following Revenues in the Optional Redemption Account when and as such Revenues are received:

        (i)    except as provided in subsection (C) of this Section, the principal component of all cash prepayments of Loan Repayments made pursuant to Section 3.4(a) of the Loan Agreement; and

        (ii)    all interest, profits and other income received from the investment of moneys in the Optional Redemption Account.

        (C)    The Bond Trustee shall deposit the following Revenues in the Special Redemption Account when and as such Revenues are received:

        (i)    the principal component of all cash prepayments of Loan Repayments made pursuant to Section 3.1 of the Loan Agreement which are specified in a Certificate of the Borrower to have been derived from insurance or condemnation proceeds received with respect to the facilities of the Borrower; and

        (ii)    all interest, profits and other income received from the investment of moneys in the Special Redemption Account.

        (D)    All amounts deposited in the Optional Redemption Account and in the Special Redemption Account shall be used and withdrawn by the Bond Trustee solely for the purpose of redeeming 2003 Bonds, in the manner and upon the terms and conditions specified in Article IV, at the next succeeding date of redemption for which notice has not been given and at the Redemption Prices then applicable to redemptions from the Optional Redemption Account and the Special Redemption Account, respectively; provided that in the case of the Optional Redemption Account in lieu of redemption at such next succeeding date of redemption, or in combination therewith, amounts in such account may be transferred to the Principal Fund and credited against Loan Repayments in order of their due date as set forth in a Request of the Borrower. All 2003 Bonds redeemed from the Redemption Fund shall be allocated to applicable Mandatory Sinking Account Payments in inverse order of their payment dates.

**Pledge and Assignment**

        (A)    Subject only to the provisions of the Bond Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein, all of the

Revenues and any other amounts (including proceeds of the sale of 2003 Bonds) held in any fund or account established pursuant to the Bond Indenture (other than the Bond Purchase Fund and the Rebate Fund) are hereby pledged to secure the payment of the principal of and premium, if any, and interest on the 2003 Bonds, in accordance with their terms and the provisions of the Bond Indenture. Said pledge shall constitute a lien on and security interest in such assets and shall attach, be perfected and be valid and binding from and after delivery by the Bond Trustee of the 2003 Bonds, without any physical delivery thereof or further act.

(B)     The Authority hereby transfers in trust, grants a security interest in and assigns to the Bond Trustee, for the benefit of the Holders from time to time of the 2003 Bonds, all of the Revenues and other assets pledged in subsection (A) of this Section and all of the right, title and interest of the Authority in the Loan Agreement (except for (i) the right to receive any Additional Payments to the extent payable to the Authority under the Loan Agreement, (ii) any rights of the Authority to indemnification and rights of inspection and consent, and (iii) the obligation of the Borrower to make deposits pursuant to the Tax Compliance Certificate). The Bond Trustee shall be entitled to and shall collect and receive all of the Revenues, and any Revenues collected or received by the Authority shall be deemed to be held, and to have been collected or received, by the Authority as the agent of the Bond Trustee and shall forthwith be paid by the Authority to the Bond Trustee. Subject to the provisions of Section 7.06 of the Bond Indenture with respect to the control of remedial proceedings by the Bond Insurer, the Bond Trustee also shall be entitled to and shall take all steps, actions and proceedings reasonably necessary in its judgment to enforce, either jointly with the Authority or separately, all of the rights of the Authority that have been assigned to the Bond Trustee and all of the obligations of the Borrower under the Loan Agreement other than for those items excepted in the parenthetical contained in the first sentence of this subsection. All Revenues deposited with the Bond Trustee shall be held, disbursed, allocated and applied by the Bond Trustee only as provided in the Bond Indenture. To the extent that the Bond Indenture confers any rights, remedy or claim under or by reason of the Bond Indenture, to the Bond Insurer and the Credit Facility Provider, such Person is hereby explicitly recognized as a third party beneficiary, so long as such Person is not in default under the Insurance Policy in the case of the Bond Insurer and the Reserve Fund Credit Facility in the case of the Credit Facility Provider.

(C)     If on the first Business Day prior to the day of any month in which a Loan Repayment is required to be made, the Bond Trustee has not received the full amount of such Loan Repayment, the Bond Trustee shall immediately notify the Authority, the Borrower, the Bond Insurer and the Credit Facility Provider of such insufficiency by Electronic Means and confirm such notification as soon as possible thereafter by written notice.

(D)     The Bond Trustee acknowledges and agrees to apply the payments made by the Counterparty (or any successor thereto or guarantor thereof) pursuant to the Interest Rate Agreement to the payment of principal of and interest on the 2003 B and the 2003 C Bonds immediately upon the receipt thereof.

**Debt Service Reserve Fund**

(A)     The Trustee shall establish and maintain so long as any of the 2003 Bonds are outstanding a separate account to be known as the "Debt Service Reserve Fund" (hereinafter

the "Debt Service Reserve Fund"); provided, however that funding of such Debt Service Reserve Fund shall only be required pursuant to the provisions of Section 3.8 of the Loan Agreement.

(B)     There shall be deposited to the credit of the Debt Service Reserve amounts paid by the Borrower pursuant to Section 3.8 of the Loan Agreement to establish, maintain or restore the Debt Service Reserve Fund.

(C)     If the balance in the Debt Service Reserve Fund on any Interest Payment Date is less than the Reserve Fund Requirement, the Trustee shall give notice to the Borrower, and the Borrower is required by Section 3.8 of the Loan Agreement to restore such deficiency.

(D)     If the balance in the Debt Service Reserve Fund on any Interest Payment Date is greater than the Debt Service Reserve Fund Requirement, the Trustee shall transfer the excess (i) before the Completion Date, to the Project Fund and (ii) after the Completion Date, to the Interest Fund.

(E)     When the balances in the Interest Fund, Mandatory Sinking Account in the Principal Fund and Debt Service Reserve Fund are sufficient to pay the principal of and interest on the 2003 Bonds then outstanding to their final maturity or earlier optional redemption date, the Trustee shall transfer the balance in the Debt Service Reserve Fund to the Interest Fund and Mandatory Sinking Account in the Principal Fund, as appropriate, to be held for the payment of such principal of and interest on the 2003 Bonds.  Anything hereinabove to the contrary notwithstanding, if the amount set forth above in this clause (E) is provided so that the moneys in the Debt Service Reserve Fund are not necessary, such moneys may be transferred as instructed by the Borrower.

(F)     Notwithstanding anything else in Section 5.07 of the Bond Indenture to the contrary, the Borrower is only required to fund and maintain the Debt Service Reserve Fund to the extent required by Section 3.8 of the Loan Agreement.

**Determination of Interest Rate**

Initial Interest Rates; Change of Mode

(A)     The first Interest Rate Period for the 2003 ARC Bonds shall be in the Auction Mode and the Initial Interest Rate shall be (i) 3.8095% for the 2003 B Bonds, (ii) 4.2455% for the 2003 C Bonds, and (iii) 3.2500% for the 2003 D Bonds, payable from the date of issuance thereof.

(B)     A series of 2003 ARC Bonds in the Auction Mode may be changed to the Fixed Rate Mode or the Weekly Rate Mode at the times and in the manner hereinafter provided. All 2003 Bonds of any Series must be in the same Mode and shall bear interest at the same interest rate.  The Fixed Rate Mode for a Series of 2003 Bonds shall be in effect until the Maturity Date of such Series of 2003 Bonds, and may not be changed to any other Mode.

(C)     Defaulted Interest with respect to any 2003 Bond shall cease to be payable to the holder of such 2003 Bond on the relevant Record Date and shall be payable to the holder in whose name such Bond is registered at the close of business on the Special Record Date for

the payment of such Defaulted Interest, which Special Record Date shall be fixed in the following manner. The Borrower shall notify the Bond Trustee and the Bond Insurer in writing of the amount of Defaulted Interest proposed to be paid on each 2003 Bond and the date of the proposed payment (which date shall be such as will enable the Bond Trustee to comply with the second sentence hereafter), and shall deposit with the Bond Trustee at the time of such notice an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Bond Trustee for such deposit prior to the date of the proposed payment. Money deposited with the Bond Trustee shall be held in trust for the benefit of the Holders of the 2003 Bonds entitled to such Defaulted Interest as provided in this Section. Following receipt of such funds the Bond Trustee shall fix a Special Record Date for the payment of such Defaulted Interest which shall be not more than 15 nor less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Bond Trustee of the notice of the proposed payment. The Bond Trustee shall promptly notify the Borrower of such Special Record Date and, in the name and at the expense of the Borrower, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage prepaid, not less than 10 days prior to such Special Record Date, to each holder of a 2003 Bond at the address of such holder as it appears on the Bond Register.

(D)     Each series of 2003 ARC Bonds shall bear interest at Auction Rates established for Auction Periods until a Weekly Rate Conversion Date, or Fixed Rate Conversion Date with respect to such series of 2003 ARC Bonds. During a Weekly Rate Period, a series of the 2003 ARC Bonds which have been so converted shall bear interest at the lesser of (i) the Interest Coverage Rate or (ii) the Weekly Rate. During an Auction Rate Period the 2003 ARC Bonds in the Auction Mode shall bear interest at the Auction Rate. During the Fixed Rate Period, a series of the 2003 ARC Bonds which have been so converted shall bear interest at the Fixed Rate. Each Bank Bond shall bear interest at the Bank Rate. At no time shall the 2003 ARC Bonds (including Bank Bonds and Bonds bearing interest at the Failed Tender Rate pursuant to Section 11.08 of the Bond Indenture) bear interest at a rate higher than the Maximum Interest Rate.

(E) No Weekly Rate Period shall be established which would cause the Interest Coverage Period of the Liquidity Facility to be less than the requirements of Section 6.11(B) of the Bond Indenture. No interest rate on a Bond entitled to the benefit of a Liquidity Facility shall be established which exceeds the Interest Coverage Rate.

<u>Subsequent Interest Rates; Rate Periods.</u>

The 2003 ARC Bonds shall bear interest at Auction Rates established for Auction Periods until the Fixed Rate Conversion Date or the Weekly Rate Conversion Date, as the case may be, for a series of 2003 ARC Bonds.

Notwithstanding the foregoing, if during any period that the 2003 ARC Bonds are in an Auction Rate Period:

(i)     the ownership of the 2003 ARC Bonds is no longer maintained in book-entry form by the Depository, the rate of interest on the 2003 ARC Bonds for any

Auction Period commencing after the delivery of certificates representing 2003 ARC Bonds pursuant to Section 2.07 of the Bond Indenture, shall equal the Maximum Auction Rate on the Business Day immediately preceding the first day of such Auction Period; or

(ii)    if a Payment Default occurs, Auctions will be suspended and the Auction Rate for the Auction Period commencing on or after such Payment Default and for each Auction Period thereafter to and including the Auction Period, if any, during which, or commencing less than the Applicable Number of Business Days after, such Payment Default is cured will equal the Default Rate.

Redemption and Interest Rates for Converting 2003 ARC Bonds to Fixed Rate. Prior to the conversion of any of the 2003 ARC Bonds to a Fixed Rate, the Remarketing Agent shall deliver to the Bond Trustee, the Bond Insurer and the Liquidity Provider, and the Borrower a certificate which includes a schedule specifying the principal amount of converted 2003 ARC Bonds which will mature on June 1 of the years specified in such schedule and the interest rate payable on the converted 2003 ARC Bonds of each such maturity and a schedule specifying the principal amount of converted 2003 ARC Bonds maturing June 1 of the years specified in such schedule to be called for mandatory Bond Sinking Fund redemption on June 1 of the years specified in such schedule.  In determining the principal maturities, Mandatory Sinking Fund Account redemption payments and interest rates for converted 2003 ARC Bonds, the Remarketing Agent shall use the following guidelines.

Notice of redemption of 2003 Bonds shall be given by the Bond Trustee, at the expense of the Borrower.

Failure by the Bond Trustee to mail notice of redemption pursuant to Section 4.03 of the Bond Indenture, to the Credit Facility Provider, the Rating Agencies then rating the 2003 Bonds or to any one or more of the Holders of any 2003 Bonds designated for redemption shall not affect the sufficiency of the proceedings for redemption with respect to the Holders to whom such notice was mailed.

With respect to notice of any optional redemption of the 2003 Bonds, unless moneys sufficient to pay the redemption price of the 2003 Bonds to be redeemed shall have been received by the Bond Trustee prior to the giving of that notice, the notice shall state that the redemption shall be conditional upon the receipt of such moneys by the Bond Trustee on or prior to the date fixed for the redemption and the satisfaction of other conditions required in the Bond Indenture.  If such moneys shall not have been so received, the notice shall be of no force and effect, the 2003 Bonds shall not be redeemed pursuant thereto and the Bond Trustee shall give notice, in the manner in which notice of redemption was given, that such moneys were not received.

Any notice given pursuant to Section 4.03 of the Bond Indenture, may be rescinded by written notice given to the Bond Trustee by the Authority with the consent of the Borrower no later than 5 Business Days prior to the date specified for redemption.  The Bond Trustee shall give notice of such rescission, as soon thereafter as practicable, in the same manner, to the same persons, as notice of such redemption was given pursuant to Section 4.03 of the Bond Indenture.

**Redemption and Tender**

The 2003 Bonds are subject to redemption and tender as set forth in the forepart of the Preliminary Official Statement.

<u>General Provisions Relating to the Tender</u>

Bond Purchase Fund.  The Bond Trustee shall establish and maintain, so long as any 2003 ARC Bonds are outstanding and are in the Weekly Mode, a separate fund to be known as the "Bond Purchase Fund —West Virginia University Hospitals" (the "Bond Purchase Fund"). There shall be established three separate segregated accounts within the Bond Purchase Fund to be known as the "Remarketing Proceeds Account," the "Liquidity Facility Account" and the "Eligible Moneys Account."  Amounts on deposit in each such account shall not be commingled with any other moneys.  There shall be deposited into the Bond Purchase Fund from time to time the following:

(i) the moneys received upon the remarketing of Tendered Bonds to any Person pursuant to the Remarketing Agreement (other than Tendered Bonds sold to the Borrower or any "affiliate" thereof (as defined in Title 11 of the United States Code) to be deposited in the Remarketing Proceeds Account;

(ii) the moneys received from the underwriter or purchaser, other than the Authority, the Borrower or any "affiliate" thereof (as defined in Title 11 of the United States Code), of Tendered Bonds upon the conversion of the interest rate thereon to a Fixed Rate to be deposited in the Remarketing Proceeds Account;

(iii) moneys obtained by the Bond Trustee pursuant to the Liquidity Facility then in effect to be applied to pay the purchase price of Tendered Bonds to be deposited into the Liquidity Facility Account; and

(iv) other Eligible Moneys to the extent that moneys obtained pursuant to (i),(ii) and (iii) above are insufficient on any day to pay the purchase price of Tendered Bonds to be deposited in the Eligible Moneys Account.

(A) On any Optional Tender Date or Mandatory Tender Date, the Bond Trustee shall transfer on the Bond Register ownership of all of the 2003 ARC Bonds tendered or required to be tendered to the name of the purchaser thereof, including without limitation, registration of Bank Bonds.  Unless otherwise directed by the Bank, the Bond Trustee shall take such actions as are necessary to cause the Bond Trustee, as custodian for the Bank, to be reflected as the beneficial owner of Bank Bonds in the records of DTC, including, if requested by the Bank, the assignment of separate CUSIP numbers for such Bank Bonds.  Subject to Section 2.07 of the Bond Indenture, on any Bond Sale Date, the Bond Trustee shall transfer on the Bond Register ownership of all Bank Bonds remarketed on such Bond Sale Date to the name of the purchaser thereof.  From and after such dates interest on such 2003 ARC Bonds shall be payable solely to such purchaser, its transferees or the successors thereto.  Any holder of an Optionally Tendered Bond required to tender such 2003 ARC Bond for purchase on an Optional Tender Date with respect to such 2003 ARC Bond and any holder of a Mandatorily Tendered Bond required to tender such 2003 ARC Bond for purchase on a Mandatory Tender Date with respect to such

C-50

2003 ARC Bond shall be entitled solely to payment of the Tender Price or Repurchase Price, as the case may be, for such 2003 ARC Bonds and shall not be entitled to the payment of any principal thereon or any interest accrued thereon on or after such Optional or Mandatory Tender Date provided that the Tender Price or Repurchase Price, as the case may be, has been deposited with the Bond Trustee. Any such 2003 ARC Bond deemed to be tendered shall no longer be considered to be an Outstanding 2003 ARC Bond.

(B) Moneys in the Remarketing Proceeds Account, the Liquidity Facility Account and the Eligible Moneys Account shall be applied in the order referred to above and shall be held exclusively in trust for the payment of the purchase price of Tendered Bonds; provided, however under no circumstances shall proceeds of a loan or drawing made pursuant to the Liquidity Facility be used to purchase Bank Bonds, Borrower Bonds or Bonds bearing interest at an Auction Rate or a Fixed Rate. Moneys obtained by the Bond Trustee pursuant to the Liquidity Facility in excess of the amount needed for the payment of the purchase price of Tendered Bonds shall be promptly paid to the Bank. In the event any Tendered Bonds shall not be presented for purchase and moneys to pay the purchase price of such Tendered Bonds are held in the Bond Purchase Fund, such moneys on deposit in the Bond Purchase Fund shall be invested only in United States Government Obligations with a term not exceeding the earlier of 30 days from the date of investment of such moneys or the date or dates that moneys therefrom are anticipated to be required. Amounts held to pay the purchase price for more than four years shall be applied in the same manner as provided under Section 10.04 of the Bond Indenture with respect to unclaimed payments of principal and interest.

(C) The Tender Agent shall deposit all moneys delivered to it for the purchase of 2003 ARC Bonds of the affected series into the Remarketing Proceeds Account and shall hold all such moneys in trust for the exclusive benefit of the Person that shall have so delivered such moneys until such 2003 ARC Bonds purchased with such moneys shall have been delivered to it for the account of such Person and, thereafter, for the benefit of the Holders tendering such 2003 ARC Bonds.

(D) The Tender Agent shall deposit all moneys delivered to it from a payment by or on behalf of the Borrower for the purchase of a series of 2003 ARC Bonds into the Borrower Purchase Account and shall hold all such moneys in trust for the exclusive benefit of the Borrower until such 2003 ARC Bonds purchased with such moneys shall have been delivered to or for the account of the Borrower and, after such delivery, the Tender Agent shall hold such funds exclusively for the benefit of the Holders tendering such 2003 ARC Bonds.

(E) Moneys in the Remarketing Proceeds Account and the Borrower Purchase Account shall not be commingled with other funds held by the Tender Agent and shall remain uninvested. Neither the Authority nor the Borrower shall have any right, title or interest in or to any moneys held in the Bond Purchase Fund, except as provided in subsection (B) of this Section.

Payment of Purchase Price. At or before close of business New York City time on the applicable Conversion Date and upon receipt by the Tender Agent of the aggregate Purchase Price of the tendered 2003 ARC Bonds, the Tender Agent shall pay the Purchase Price of such 2003 ARC Bonds to the Holders by bank wire transfer in immediately available funds.

Tender Agent shall pay the Purchase Price from the following accounts and in the following order of priority:  (1) the Remarketing Proceeds Account to the extent funds are available therein and (2) the Borrower Purchase Account. If at close of business New York City time on any Fixed Rate Conversion Date any balance remains in the Borrower Purchase Account in excess of any unsatisfied purchase obligation, such excess shall be promptly returned to the Borrower.

        Inadequate Funds for Tenders. If the funds available for purchases of 2003 ARC Bonds pursuant to Article IV are inadequate for the purchase of all 2003 ARC Bonds tendered on any Fixed Rate Conversion Date, no purchase shall be consummated and the Tender Agent shall, after any applicable grace period, (i) return all tendered 2003 ARC Bonds to the Holders thereof, (ii) return all moneys deposited in the Remarketing Proceeds Account to the Remarketing Agent for return to the Persons providing such moneys, and (iii) return all moneys deposited in the Borrower Purchase Account to the Borrower.

        Delivery of 2003 ARC Bonds by Tendering Bondholders; Undelivered 2003 ARC Bonds Deemed Purchased.  All 2003 ARC Bonds to be purchased on any date shall be required to be delivered to the principal corporate office of the Tender Agent at or before 12:00 Noon New York City time on such Fixed Rate Conversion Date.  If the Holder of any 2003 ARC Bond (or portion thereof) that is subject to purchase pursuant to Article IV fails to deliver such 2003 ARC Bond to the Tender Agent for purchase on the Conversion Date, and if the Tender Agent is in receipt of the Purchase Price therefor, such 2003 ARC Bond (or portion thereof) shall nevertheless be deemed tendered and purchased on the day fixed for purchase thereof and ownership of such 2003 ARC Bond (or portion thereof) shall be transferred to the purchaser thereof.  Any Holder who fails to deliver such 2003 ARC Bond for purchase shall have no further rights except the right to receive the Purchase Price thereof upon presentation and surrender of said Bond to the Tender Agent.  The Tender Agent shall, as to any tendered 2003 ARC Bonds that have not been delivered to it:  (i) promptly notify the Remarketing Agent of such nondelivery; and (ii) instruct the Bond Trustee to place a stop transfer against an appropriate amount of 2003 ARC Bonds registered in the name of such Holder(s) on the bond registration books.  The Bond Trustee shall place such stop(s) commencing with the lowest serial number Bond registered in the name of such Holder(s) until stop transfers have been placed against an appropriate amount of 2003 ARC Bonds until the appropriate tendered 2003A Bonds are delivered to the Tender Agent who shall deliver such 2003 ARC Bonds to the Bond Trustee.  Upon such delivery, the Bond Trustee shall make any necessary adjustments to the bond registration books.

        Delivery of 2003 ARC Bonds to Purchasers. As long as a series of the 2003 ARC Bonds are held under the book-entry system of DTC, all tenders and deliveries of such series of 2003 ARC Bonds will be accomplished under the procedures of DTC.  Otherwise, on the Conversion Date, the Tender Agent shall direct the Bond Trustee to execute and deliver all 2003 ARC Bonds purchased on any  Conversion Date as follows: (i) 2003 ARC Bonds purchased and remarketed by the Remarketing Agent shall be registered and made available to the Remarketing Agent by 1:30 p.m. New York City time in accordance with the instructions of the Remarketing Agent and (ii) 2003 ARC Bonds purchased with amounts paid by or on behalf of the Borrower shall be registered and made available in the name of or as directed in writing by the Borrower on or before 1:30 p.m. New York City time.

No Purchases or Sales After Payment Default.  Anything in the Bond Indenture to the contrary notwithstanding, if there shall have occurred and be continuing an Event of Default as described in Section 7.01(a) of the Bond Indenture, then the Remarketing Agent shall not remarket any 2003 ARC Bonds.

No Remarketing to the Authority or the Borrower.  The Remarketing Agent shall not remarket any 2003 ARC Bonds to the Authority, the Borrower, or any affiliate or guarantor of the Borrower.

Tax Covenants.  The Authority agrees that it shall at all times do and perform all acts and things required by law and to require the Borrower at all times to do and perform all acts and things required by law and the Bond Indenture that are necessary or desirable in order to assure that interest paid on the 2003 Bonds will be excluded from gross income for purposes of federal income tax purposes and shall neither take action nor permit any other person to take any action that would result in such interest not being excluded from gross income for federal income tax purposes.  Without limiting the generality of the foregoing, the Authority agrees to comply with the provisions of the Tax Compliance Certificate.

**Other Covenants**

Punctual Payment.  The Authority shall punctually cause to be paid the principal of, Redemption Price, if any, and interest on the 2003 Bonds, in strict conformity with the terms of the 2003 Bonds and of the Bond Indenture, according to the true intent and meaning thereof, but only out of Revenues and other assets pledged for such payment as provided in the Bond Indenture.

Extension of Payment of 2003 Bonds.  The Authority shall not directly or indirectly extend or assent to the extension of the maturity of any of the 2003 Bonds or the time of payment of any claims for interest by the purchase or funding of such 2003 Bonds or claims for interest or by any other arrangement and in case the maturity of any of the 2003 Bonds or the time of payment of any such claims for interest shall be extended, such 2003 Bonds or claims for interest shall not be entitled, in case of any default, to the benefits of the Bond Indenture, except subject to the prior payment in full of the principal of all of the 2003 Bonds then Outstanding and of all claims for interest thereon that shall not have been so extended.

Against Encumbrances.  The Authority shall not create, or permit the creation of, any pledge, lien, charge or other encumbrance upon the Revenues and other assets pledged or assigned under the Bond Indenture while any of the 2003 Bonds are Outstanding, except the pledge and assignment created by the Bond Indenture.  Subject to this limitation, the Authority expressly reserves the right to enter into one or more other indentures for any of its corporate purposes, including other programs under the Act, and reserves the right to issue other obligations for such purposes.

Accounting Records and Financial Statements.

(A)     The Bond Trustee shall at all times keep, or cause to be kept, proper books of record and account, prepared in accordance with the Bond Trustee's accounting practices for

books of record and account relating to similar trust accounts, in which complete and accurate entries shall be made of all transactions relating to the proceeds of 2003 Bonds, the Revenues, the Loan Agreement and all funds and accounts established pursuant to the Bond Indenture. Such books of record and account shall be available for inspection by the Authority, the Borrower, the Bond Insurer, the Credit Facility Provider (if any) and any Bondholder, or his agent or representative duly authorized in writing, at reasonable hours and under reasonable circumstances.

      (B)    The Bond Trustee shall file and furnish on or before the 15th day of each month to the Authority, the Bond Insurer, the Borrower, the Credit Facility Provider (if any) and each Bondholder who shall have filed his or her name and address with the Bond Trustee for such purpose a complete financial statement (which need not be audited) covering receipts, disbursements, allocation and application of Revenues and any other moneys (including proceeds of 2003 Bonds) in any of the funds and accounts established pursuant to the Bond Indenture for the preceding month; provided, that the Bond Trustee shall not be required to deliver an accounting for any fund or account that (1) has a balance of $0.00 and (2) has not had any activity since the last reporting date.

<u>Enforcement and Amendment of Loan Agreement</u>.

      (A)    Subject to the provisions of Section 7.06 of the Bond Indenture with respect to the control of remedial proceedings by the Bond Insurer, the Bond Trustee shall promptly collect all amounts due from the Borrower pursuant to the Loan Agreement, shall perform all duties imposed upon it pursuant to the Loan Agreement and shall diligently enforce, and take all steps, actions and proceedings reasonably necessary for the enforcement of all of the rights of the Authority assigned to it and all of the obligations of the Borrower relating thereto.

      (B)    The Authority may amend, modify or terminate any of the terms of the Loan Agreement, or consent to any such amendment, modification or termination, with the written consent of the Bond Insurer, but without the consent of any other Interested Party or the owners of the 2003 Bonds.

      <u>Further Assurances</u>.  The Authority will make, execute and deliver any and all such further indentures, instruments and assurances as may be reasonably necessary or proper to carry out the intention or to facilitate the performance of the Bond Indenture and for the better assuring and confirming unto the Holders of the 2003 Bonds of the rights and benefits provided in the Bond Indenture.

**Events of Default**

      <u>Events of Default</u>.  Any one or more of the following events shall be Events of Default:

      (A)    default in the due and punctual payment of the principal or Redemption Price of any 2003 Bond when and as the same shall become due and payable;

      (B)    default in the due and punctual payment of any installment of interest on any 2003 Bond when and as the same shall become due and payable;

(C)    default by the Authority in the observance of any of the other covenants, agreements or conditions on its part in the Bond Indenture or in the 2003 Bonds contained, if such default shall have continued for a period of 60 days after written notice thereof, specifying such default and requiring the same to be remedied, shall have been given to the Authority by the Bond Trustee, or to the Authority and the Bond Trustee by the Bond Insurer or the Holders of not less than 25% in aggregate principal amount of the 2003 Bonds at the time Outstanding;

(D)    a Loan Default Event;

(E)    receipt by the Trustee of notice from the Credit Facility Provider that an Event of Default (as defined in the Reimbursement Agreement) has occurred under a Reimbursement Agreement and requesting acceleration of the 2003 Bonds pursuant to Section 7.02 of the Bond Indenture;

(F)    an "event of default" as defined in Section 5.02 of the Master Indenture; or

(G)    a default by the Authority with respect to any payment obligations or in the observance of any of the other covenants, agreements or conditions.

**Acceleration of Maturities**

During the continuance of an Event of Default described in Section 7.01 (A), (B), (C) or (D) of the Bond Indenture, unless the principal of all the 2003 Bonds shall have already become due and payable, the Bond Trustee upon the written direction of the Bond Insurer or the Holders of not less than 66-2/3% in aggregate principal amount of the 2003 Bonds at the time Outstanding with the consent of the Bond Insurer, or upon the occurrence of an Event of Default described in Section 7.01(E) of the Bond Indenture, the Bond Trustee shall, promptly upon such occurrence, by notice in writing to the Authority, the Borrower, Bond Insurer and the Credit Facility Provider (if any) declare the principal of all the 2003 Bonds then Outstanding and the interest accrued thereon, to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, anything in the Bond Indenture or in the 2003 Bonds contained to the contrary notwithstanding.   The Bond Insurer is not obligated to pay the principal and interest on the 2003 Bonds upon the acceleration of their maturities except if the Bond Insurer directs or consents to such acceleration.   Should any acceleration occur without the consent of the Bond Insurer, the Bond Insurer is obligated to pay only on the original maturity schedule.

The preceding paragraph, however, is subject to the condition that if, at any time after the principal of the 2003 Bonds shall have been so declared due and payable, and before any judgment or decree for the payment of the moneys due shall have been obtained or entered as hereinafter provided, there shall have been deposited with the Bond Trustee a sum sufficient to pay all the principal of the 2003 Bonds matured prior to such declaration and all matured installments of interest upon all the 2003 Bonds, with interest on such overdue installments of principal as provided in the Loan Agreement, and the reasonable fees and expenses of the Bond Trustee, including reasonable fees and expenses of its attorneys, all amounts due the Bond Insurer and any and all other defaults known to the Bond Trustee (other than in the payment of principal of and interest on the 2003 Bonds due and payable solely by reason of such declaration) shall have been made good or cured to the satisfaction of the Bond Trustee and the Bond Insurer

or provision deemed by the Bond Trustee and the Bond Insurer to be adequate shall have been made therefor, then, and in every such case, the Bond Trustee or the Holders of at least a majority in aggregate principal amount of the 2003 Bonds then Outstanding, with the written consent of the Bond Insurer, by written notice to the Authority and to the Bond Trustee, may, on behalf of the Holders of all the 2003 Bonds, rescind and annul such declaration and its consequences and waive such default; but no such rescission and annulment shall extend to or shall affect any subsequent default, or shall impair or exhaust any right or power consequent thereon.

When the Bond Trustee incurs expenses or renders services after the occurrence of an act of bankruptcy with respect to the Authority or the Borrower, such expenses and the compensation for such services are intended to constitute expenses of administration under any federal or state bankruptcy, insolvency, arrangement, moratorium, reorganization or other debtor relief law.

**Institution of Legal Proceedings by Bond Trustee**

Subject to the provisions of Section 7.06 in the Bond Indenture, if an Event of Default shall occur and be continuing, the Bond Trustee in its discretion may, and upon the written request of the Bond Insurer and upon being indemnified to its satisfaction therefor shall proceed to protect or enforce its rights or the rights of the Holders of 2003 Bonds under the Bond Indenture and the Loan Agreement by any means permitted by law.

**Application of Revenues and Other Funds After Default**

If an Event of Default shall occur and be continuing, all Revenues and any other funds then held or thereafter received by the Bond Trustee under any of the provisions of the Bond Indenture (other than payments received from the Credit Facility Provider and moneys required to be deposited in the Rebate Fund and subject to the requirements of Section 12.10 of the Bond Indenture relating to the use of moneys held for particular 2003 Bonds) shall be applied by the Bond Trustee as follows and in the following order:

(A)     To the payment of any expenses necessary in the opinion of the Bond Trustee to protect the interests of the Holders of the 2003 Bonds and payment of reasonable charges and expenses of the Bond Trustee (including reasonable fees and disbursements of its counsel) incurred in and about the performance of its powers and duties under the Bond Indenture;

(B)     To the payment of the principal or Redemption Price of and interest then due on the 2003 Bonds (upon presentation of the 2003 Bonds to be paid, and stamping thereon of the payment if only partially paid, or surrender thereof if fully paid) subject to the provisions of the Bond Indenture (including Section 6.02 of the Bond Indenture), as follows:

(1)     Unless the principal of all of the 2003 Bonds shall have become or have been declared due and payable,

First:   To the payment to the Persons entitled thereto of all installments of interest then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment or installments maturing on the same date, then to the payment thereof ratably,

according to the amounts due thereon, to the persons entitled thereto, without any discrimination or preference; and

    Second: To the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of any 2003 Bonds that shall have become due, whether at maturity or by call for redemption, with interest on the overdue principal at the rate borne by the respective 2003 Bonds, and, if the amount available shall not be sufficient to pay in full all the 2003 Bonds, together with such interest, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date to the persons entitled thereto, without any discrimination or preference.

    (2) If the principal of all of the 2003 Bonds shall have become or have been declared due and payable, to the payment of the principal and interest then due and unpaid upon the 2003 Bonds, with interest on the overdue principal at the rate borne by the 2003 Bonds, and if the amount available shall not be sufficient to pay in full the whole amount so due and unpaid, then to the payment thereof ratably, without preference or priority of principal over interest, or of interest over principal, or of any installment of interest over any other installment of interest, or of any 2003 Bond over any other Bond, according to the amounts due respectively for principal and interest, to the persons entitled thereto without any discrimination or preference.

**Bond Trustee to Represent Bondholders**

    The Bond Trustee is hereby irrevocably appointed (and the successive respective Holders of the 2003 Bonds, by taking and holding the same, shall be conclusively deemed to have so appointed the Bond Trustee) as trustee and true and lawful attorney-in-fact of the Holders of the 2003 Bonds for the purpose of exercising and prosecuting on their behalf such rights and remedies as may be available to such Holders under the provisions of the 2003 Bonds, the Bond Indenture, the Loan Agreement and applicable provisions of any other law. Upon the occurrence and continuance of an Event of Default or other occasion giving rise to a right in the Bond Trustee to represent the Bondholders, subject to the right of the Bond Insurer to direct and continue all enforcement proceedings, the Bond Trustee in its discretion may, and upon the written request of the Holders of not less than 25% in aggregate principal amount of the 2003 Bonds then Outstanding, and upon being indemnified to its satisfaction therefor, shall, proceed to protect or enforce its rights or the rights of such Holders and the Credit Facility Provider by such appropriate action, suit, mandamus or other proceedings as it shall deem most effectual to protect and enforce any such right, at law or in equity, either for the specific performance of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or for the enforcement of any other appropriate legal or equitable right or remedy vested in the Bond Trustee, in the Credit Facility Provider, or in such Holders and the Credit Facility Provider under the Bond Indenture, the Loan Agreement, the Act or any other law; and upon instituting such proceeding, the Bond Trustee shall be entitled, as a matter of right, to the appointment of a receiver of the Revenues and other assets pledged under the Bond Indenture, pending such proceedings. All rights of action under the Bond Indenture or the 2003 Bonds or otherwise may be prosecuted and enforced by the Bond Trustee without the possession of any of the 2003

Bonds or the production thereof in any proceeding relating thereto, and any such suit, action or proceeding instituted by the Bond Trustee shall be brought in the name of the Bond Trustee for the benefit and protection of all the Holders of such 2003 Bonds, subject to the provisions of the Bond Indenture (including Section 6.02 of the Bond Indenture).

**Bond Insurer's Direction of Proceedings**

Anything in the Bond Indenture to the contrary notwithstanding, the Bond Insurer has the right to direct the method of conducting all remedial proceedings taken by the Bond Trustee, provided that such direction shall be in accordance with law and the provisions of the Bond Indenture.

**Limitation on Bondholders' Right to Sue**

No Holder of any 2003 Bond shall have the right to institute any suit, action or proceeding at law or in equity, for the protection or enforcement of any right or remedy under the Bond Indenture, the Loan Agreement or any other applicable law with respect to such 2003 Bond, unless (1) such Holder shall have given to the Bond Trustee written notice of the occurrence of an Event of Default; (2) the Holders of not less than 25% in aggregate principal amount of the 2003 Bonds then Outstanding shall have made written request upon the Bond Trustee to exercise the powers hereinbefore granted or to institute such suit, action or proceeding in its own name; (3) such Holder or said Holders shall have tendered to the Bond Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request; and (4) the Bond Trustee shall have refused or omitted to comply with such request for a period of 60 days after such written request shall have been received by, and said tender of indemnity shall have been made to, the Bond Trustee. The above provisions shall not apply as long as the Bond Insurer is not in default under the Insurance Policy.

Such notification, request, tender of indemnity and refusal or omission are hereby declared, in every case, to be conditions precedent to the exercise by any Holder of 2003 Bonds of any remedy or under law; it being understood and intended that no one or more Holders of 2003 Bonds shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Bond Indenture or the rights of any other Holders of 2003 Bonds, or to enforce any right under the Bond Indenture, the Loan Agreement or other applicable law with respect to the 2003 Bonds, except in the manner herein provided, and that all proceedings at law or in equity to enforce any such right shall be instituted, had and maintained in the manner herein provided and for the benefit and protection of all Holders of the Outstanding 2003 Bonds, subject to the provisions of the Bond Indenture.

**Remedies Not Exclusive**

No remedy herein conferred upon or reserved to the Bond Trustee, the Bond Insurer or the Credit Facility Provider (if any) or to the Holders of the 2003 Bonds is intended to be exclusive of any other remedy or remedies, and each and every such remedy, to the extent permitted by law, shall be cumulative and in addition to any other remedy given or now or hereafter existing at law or in equity or otherwise.

**No Waiver of Default**

No delay or omission of the Bond Trustee, the Bond Insurer, the Credit Facility Provider (if any) or of any Holder of the 2003 Bonds to exercise any right or power arising upon the occurrence of any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein.

**Notice to Bondholders of Default**

The Bond Trustee shall promptly give written notice by first class mail to the Bondholders, the Bond Insurer and the Credit Facility Provider (if any) of the occurrence of an Event of Default, if the Bond Trustee has actual knowledge of such Event of Default.

**Amendments Permitted**

(A)     The Bond Indenture may be modified or amended from time to time and at any time by an indenture or indentures supplemental thereto, which the Authority and the Bond Trustee may enter into when the written consent of the Bond Insurer and the Credit Facility Provider (if any) shall have been filed with the Bond Trustee.  No such modification or amendment shall (1) extend the maturity of any 2003 Bond, or reduce the amount of principal thereof, or change the method of computing the rate of interest thereon, or extend the time of payment of interest thereon, or extend the time of payment or reduce the amount of any Mandatory Sinking Account Payment, or reduce any premium payable upon the redemption thereof, without the consent of the Holder of each Bond so affected, or (2) permit the creation of any lien on the Revenues and other assets pledged under the Bond Indenture prior to or on a parity with the lien created by the Bond Indenture, or deprive the Holders of the 2003 Bonds of the lien created by the Bond Indenture on such Revenues and other assets (except as expressly provided in the Bond Indenture), without the consent of the Holders of all of the 2003 Bonds then Outstanding, or (3) modify any of the rights or obligations of the Bond Trustee.

(B)     The Bond Indenture may also be modified or amended from time to time and at any time by an indenture or indentures supplemental hereto, which the Authority and the Bond Trustee may enter into without the consent of any Interested Parties except the Bond Insurer, including, without limitation, for any one or more of the following purposes:

(1)     to add to the covenants and agreements of the Authority in the Bond Indenture contained other covenants and agreements thereafter to be observed, to pledge or assign additional security for the 2003 Bonds (or any portion thereof), or to surrender any right or power herein reserved to or conferred upon the Authority;

(2)     to make such provisions for the purpose of curing any ambiguity, inconsistency or omission, or of curing or correcting any defective provision, contained in the Bond Indenture, or in regard to matters or questions arising under the Bond Indenture, as the Authority may deem necessary or desirable and not inconsistent with the Bond Indenture;

(3)     to modify, amend or supplement the Bond Indenture in such manner as to permit the qualification hereof under the Trust Indenture Act of 1939, as amended, or the 2003 Bonds under the Securities Act of 1933, as amended, or any similar federal statute hereafter in effect, and to add such other terms, conditions and provisions as may be permitted by said act or similar federal statute;

(4)     to make the 2003 Bonds eligible for deposit with any securities depository;

(5)     to obtain a rating on the 2003 Bonds;

(6)     to conform to the terms and provisions of any Credit Facility.

The Bond Trustee shall give notice of any such modification or amendment to each Rating Agency then rating the 2003 Bonds provided the Bond Trustee shall incur no liability for failure to do so.

(C)     The Bond Trustee may in its discretion, but shall not be obligated to, enter into any such Supplemental Bond Indenture authorized by subsections (A) or (B) of this Section that materially adversely affects the Bond Trustee's own rights, duties or immunities under the Bond Indenture or otherwise.

**Discharge of Bond Indenture**

The 2003 Bonds may be paid by the Authority in any of the following ways, provided that the Authority also pays or causes to be paid any other sums payable by the Authority:

(A)     by paying or causing to be paid the principal or Redemption Price of and interest on the 2003 Bonds, as and when the same become due and payable (from funds other than moneys paid pursuant to the Insurance Policy;

(B)     by depositing with the Bond Trustee, in trust, at or before maturity, money or securities in the necessary amount (as provided in Section 10.03 of the Bond Indenture) to pay or redeem all 2003 Bonds then Outstanding (from funds other than moneys paid pursuant to the Insurance Policy; or

(C)     by delivering to the Bond Trustee, for cancellation by it, all 2003 Bonds the Outstanding.

If the Authority shall also pay or cause to be paid all other sums payable by the Authority and no amounts are owing to the Bond Insurer or the Credit Facility Provider, if any, then and in that case, upon receipt by the Bond Trustee and the Bond Insurer or Credit Facility Provider (if any) of (i) an Opinion or Opinions of Counsel to the effect that the obligations under the Bond Indenture and the 2003 Bonds have been discharged and (ii) written evidence from each Rating Agency then rating the 2003 Bonds that defeasance will not result in the reduction of

such ratings), the Bond Indenture and the pledge of Revenues and other assets made under the Bond Indenture and all covenants, agreements and other obligations of the Authority under the Bond Indenture shall cease, terminate, become void and be completely discharged and satisfied, and the 2003 Bonds will no longer be deemed to be outstanding under the Bond Indenture.

**Escheat**

Notwithstanding any provisions of the Bond Indenture, any moneys held by the Bond Trustee in trust for the payment of Redemption Price or the principal of, or interest on, any 2003 Bonds and remaining unclaimed for two years (or, if less, one day before such moneys would escheat to the State of West Virginia under then applicable West Virginia law) after the due date will be repaid to the Borrower.

**Rights of Insurer**

Bond Insurer. Notwithstanding anything in the Bond Indenture to the contrary, in the event that the principal and/or interest due on the 2003 Bonds shall be paid by the Bond Insurer pursuant to the Insurance Policy, the 2003 Bonds shall remain Outstanding for all purposes, not be defeased or otherwise satisfied and not be considered paid by the Borrower, and the assignment and pledge of the Trust Estate and all covenants, agreements and other obligations of the Borrower to the registered owners shall continue to exist and shall run to the benefit of the Bond Insurer, and the Bond Insurer shall be subrogated to the rights of such registered owners.

When Refunding is Not Permitted. None of the 2003 Bonds outstanding may be refunded as aforesaid nor may the Bond Indenture be discharged if under any circumstances such refunding would result in the loss of any exemption for purposes of federal income taxation to which interest on such 2003 Bonds would otherwise be entitled. As a condition precedent to the refunding of any 2003 Bonds outstanding, the Bond Trustee and the Bond Insurer shall receive an Opinion of Bond Counsel to the effect that such 2003 Bonds would not, by reason of such refunding, be made subject to additional federal income taxation to which such interest would not otherwise be subject and that the conditions precedent to the defeasance of such 2003 Bonds have been satisfied.

Furthermore, if a refunding is accomplished prior to the Fixed Rate Conversion Date, (i) such moneys shall be invested only in Government Obligations with maturity dates on or prior to the next Auction Rate Adjustment Date for the 2003 ARC Bonds of the affected series, such 2003 ARC Bonds shall be redeemed on or prior to such Auction Rate Adjustment Date, and such 2003 ARC Bonds which have been advance refunded prior to maturity shall no longer be subject to any optional or mandatory tender or (ii) the Bond Trustee and the Bond Insurer shall have received written evidence from each Rating Agency then rating such 2003 ARC Bonds that the ratings borne by such Bonds immediately prior to such refunding will not be withdrawn or reduced by reason of such refunding.

Restructuring of Defeasance Escrow. Notwithstanding anything to the contrary herein, upon the provision for payment of the Bonds or a portion thereof as specified in Article X, the optional redemption provisions of Section 5.01 of the Bond Indenture allowing such 2003

Bonds to be called prior to maturity upon proper notice (notwithstanding provision for the payment of such 2003 Bonds having been made through a date  after the first optional redemption date provided for in Section 5.01 of the Bond Indenture) shall remain available to the Borrower unless, in connection with making the deposits referred to in Article X, the Borrower shall have irrevocably elected to waive any future right to call the Bonds or portions thereof for redemption prior to maturity. No such redemption or restructuring shall occur, however, unless the Borrower shall deliver on behalf of the Authority to the Bond Trustee (a) Government Obligations and/or cash sufficient to discharge such 2003 Bonds (or portion thereof) on the redemption or maturity date or dates selected, (b) an opinion of an independent certified public accountant verifying that such Government Obligations, together with the expected earnings thereon, and/or cash will be sufficient to provide for the payment of such 2003 Bonds to the redemption or maturity dates, and (c) an Opinion of Bond Counsel to the effect that such earlier redemption or restructuring will not result in the loss of any exemption for purposes of federal income taxation to which interest on the Bonds would otherwise be entitled.  The Borrower shall also provide the opinions referred to in clause (b) and (c) in the preceding sentence to the Bond Insurer.  The Bond Trustee will give written notice of any such redemption or restructuring to the owners of the 2003 Bonds affected thereby.

**Money Held for Particular 2003 Bonds**

The money held by the Bond Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular 2003 Bonds (or portions of 2003 Bonds in the case of registered 2003 Bonds redeemed in part only) shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Holders of the 2003 Bonds entitled thereto, subject, however, to the provisions of Section 10.04 of the Bond Indenture.

## THE LOAN AGREEMENT

*The following is a summary of certain provisions of the Loan Agreement. Reference is made to the Loan Agreement for the detailed provisions thereof.*

### Loan of Proceeds; Payments of Principal, Premium and Interest

The Borrower agrees to pay, or cause to be paid, "Loan Repayments" in an amount sufficient to enable the Bond Trustee to make the transfers and deposits required at the times and in the amounts required for deposit to the Funds and Accounts under the Bond Indenture. Each Loan Repayment shall be made in immediately available funds. The Borrower agrees to make payments, or cause payments to be made, at the times and in the amounts required to be paid as principal or Redemption Price of and interest on the 2003 Bonds from time to time Outstanding under the Bond Indenture and other amounts required to be paid under the Bond Indenture (including but not limited to amounts necessary to establish, maintain and restore the Debt Service Reserve Fund to the Debt Service Reserve Fund Requirement as more particularly provided in Section 3.8 of the Loan Agreement), as the same shall become due whether at maturity, upon redemption, by declaration of acceleration or otherwise.

Except as otherwise expressly provided herein, all amounts payable by the Borrower to the Authority shall be paid to the Bond Trustee or other parties entitled thereto as assignee of the Authority, and the Loan Agreement and all right, title and interest of the Authority in any such payments are hereby assigned and pledged to the Bond Trustee so long as any 2003 Bonds remain Outstanding.

The Borrower has issued and delivered the 2003 Notes under the Master Indenture to evidence and secure its obligations under the Loan Agreement.

### Additional Payments

In addition to Loan Repayments, the Borrower shall also pay to the Authority, the Bond Trustee, the Tender Agent, the Insurer, the Credit Facility Provider (if any), the Remarketing Agent (if any), the Auction Agent (if any), the Market Agent (if any) and the Broker-Dealer (if any), as the case may be, "Additional Payments," as follows:

(a)     All taxes and assessments of any type or character charged to the Authority or to the Bond Trustee affecting the amount available to the Authority or the Bond Trustee from payments to be received or in any way arising due to the transactions contemplated hereby (including taxes and assessments assessed or levied by any public agency or governmental authority of whatsoever character having power to levy taxes or assessments) but excluding franchise taxes based upon the capital and/or income of the Bond Trustee and taxes based upon or measured by the net income of the Bond Trustee; provided, however, that the Borrower shall have the right to protest any such taxes or assessments and to require the Authority or the Bond Trustee, at the Borrower's expense, to protest and contest any such taxes or assessments levied upon them and that the Borrower shall have the right to withhold payment of any such taxes or assessments

pending disposition of any such protest or contest unless such withholding, protest or contest would adversely affect the rights or interests of the Authority or the Bond Trustee;

(b)     All reasonable fees, charges, expenses and indemnities of the Interested Parties as and when the same become due and payable;

(c)     The reasonable fees and expenses of such accountants, consultants, attorneys and other experts, if any, as may be engaged by the Authority or the Bond Trustee to prepare audits, financial statements, reports, opinions or provide such other services required under the Loan Agreement or the Bond Indenture;

(d)     An annual fee of the Authority as set forth in the Fee Schedule and Cost Allocations stated in the Legislative Rule filed in the Office of the Secretary of State of the State of West Virginia on May 29, 1991, as amended only through the date of delivery of the 2003 Bonds; and

(e)     All other reasonable and necessary fees and expenses attributable to the 2003 Bonds or the Loan Agreement, including without limitation all payments required pursuant to the Tax Compliance Certificate.

Such Additional Payments shall be billed to the Borrower by each of the Interested Parties to the extent that fees and expenses are not paid from sources other than the Borrower.

The Additional Payments shall not be secured under the Master Indenture, and non-payment of any Additional Payments shall not constitute an event of default or under any other document relating to the 2003 Bonds; provided that, in no event shall the foregoing modify, limit or restrict in any manner the ability of any of the Interested Parties to recover the Additional Payments from the Borrower. Though required to be maintained as described herein, no payments with respect to the Interest Rate Agreement are the obligations of the Authority.

**Credits for Payments**

The Borrower shall receive credit against its payments required under Section 3.1 of the Loan Agreement, in addition to any credits resulting from payment or repayment from other sources, as follows:

(a)     On installments of interest in an amount equal to moneys deposited in the Interest Fund, which amounts are available to pay interest on the 2003 Bonds, to the extent such amounts have not previously been credited against such payments;

(b)     On installments of principal in an amount equal to moneys deposited in the Principal Fund, which amounts are available to pay principal of the 2003 Bonds, to the extent such amounts have not previously been credited against such payments;

(c)     On installments of principal and interest in an amount equal to the principal amount of 2003 Bonds for the payment at maturity or redemption of which sufficient amounts (as determined by Section 10.03 of the Bond Indenture) in cash or Investment Securities described in clause (1) of the definition thereof are on deposit as provided in the Bond Indenture to the extent such amounts have not previously been credited against such payments, and the interest on such 2003 Bonds from and after the date fixed for payment at maturity or redemption thereof.  Such credits shall be made against the installments of principal and interest which would have been used, but for such call for redemption, to pay principal of and interest on such 2003 Bonds when due; and

(d)     On installments of principal and interest in an amount equal to the principal amount of 2003 Bonds acquired by the Borrower and surrendered to the Bond Trustee for cancellation or purchased by the Bond Trustee on behalf of the Borrower and canceled, and the interest on such 2003 Bonds from and after the date interest thereon has been paid prior to cancellation.  Such credits shall be made against the installments of principal and interest which would have been used, but for such cancellation, to pay principal of and interest on such 2003 Bonds when due.

**Prepayment**

(a)     The Borrower shall have the right, so long as all amounts which have become due have been paid, at any time or from time to time to prepay all or any part of the Loan Repayments, and the Bond Trustee shall accept such prepayments when the same are tendered.  Prepayments may be made by payments of cash, deposit of Investment Securities described in clause (1) of the definition thereof or surrender of 2003 Bonds.  All such prepayments (and the additional payment of the applicable redemption premium) shall be deposited upon receipt in the Optional Redemption Account (or in such other Bond Trustee escrow account as may be specified by the Borrower) and, at the request of and as determined by the Borrower, credited against payments due or used for the redemption or purchase of 2003 Bonds in the manner and subject to the terms and conditions set forth in the Bond Indenture.

(b)     The Borrower shall also have the right at any time or from time to time to prepay all or any part of the Loan Repayments from moneys derived from condemnation awards or the proceeds of hazard insurance relating to the facilities of the Borrower, and the Bond Trustee shall accept such prepayments when the same are tendered.  Notwithstanding any such prepayment or surrender of 2003 Bonds, as long as any 2003 Bonds remain Outstanding or any Additional Payments required to be made remain unpaid, the Borrower shall not be relieved of its obligations.

**Payment of Purchase Price of 2003 Bonds**

With the consent of the Bond Insurer, the Borrower agrees that it shall pay to the Tender Agent all amounts necessary for the purchase of 2003 ARC Bonds and not deposited with the Tender Agent by the Remarketing Agent from the proceeds of the sale of such 2003 ARC Bonds.  Each such payment by the Borrower to the Tender Agent pursuant to this Section

shall be in immediately available funds and paid to the Tender Agent at its principal corporate trust office by 2:00 p.m. New York City time on each date upon which a payment is to be made pursuant to Section 4.11(B) of the Bond Indenture.

(b)     If the 2003 ARC Bonds are converted to bear interest at a Fixed Rate pursuant to the Bond Indenture, the obligations of the Borrower pursuant to Section 3.5 of the Loan Agreement with respect to such Series shall be terminated following change to the Fixed Rate Mode.

**Obligations Unconditional**

The obligations of the Borrower are absolute and unconditional, notwithstanding any other provision of the Loan Agreement or the Bond Indenture.  Until the Loan Agreement is terminated and all payments are made, the Borrower:

(a)     will pay all amounts required without abatement, deduction or setoff except as otherwise expressly provided in the Loan Agreement;

(b)     will not suspend or discontinue any payments due for any reason whatsoever, including, without limitation, any right of setoff or counterclaim;

(c)     will perform and observe all its other agreements contained in the Loan Agreement; and

(d)     except as provided herein, will not terminate the Loan Agreement for any cause, including, without limiting the generality of the foregoing, damage, destruction or condemnation of the facilities financed with the proceeds of the 2003 Bonds or any part thereof, commercial frustration of purpose, any change in the tax or other laws of the United States of America or of the State of West Virginia, or any political subdivision of either thereof or any failure of the Authority to perform and observe any agreement, whether express or implied, or any duty, liability or obligation arising out of or connected with the Loan Agreement.  Nothing contained in this Section shall be construed to release the Authority from the performance of any of the agreements on its part contained herein, and in the event the Authority should fail to perform any such agreement on its part, the Borrower may institute such action against the Authority as the Borrower may deem necessary to compel performance.

The rights of the Bond Trustee or any party or parties on behalf of whom the Bond Trustee is acting shall not be subject to any defense, setoff, counterclaim or recoupment whatsoever, whether arising out of any breach of any duty or obligation of the Authority or the Bond Trustee owing to the Borrower, or by reason of any other indebtedness or liability at any time owing by the Authority or the Bond Trustee to the Borrower.

**Debt Service Reserve Fund**

(1)     If, at the end of any fiscal year, any of the following events occurs, the Borrower shall fund the Debt Service Reserve Fund for the 2003 Bonds held by the Bond Trustee in an amount equal to the Debt Service Reserve Fund Requirement.

(a)     The Obligated Group's Debt Service Coverage Ratio is less than 2.0 and Days of Operating Expenses are less than 175;

(b)     The Cushion Ratio for the Obligated Group is less than 1.75; or

(c)     The Obligated Group's Unrestricted Cash and Investments is less than 90 Days of Operating Expenses.

(2)     If the Debt Service Reserve Fund is required to be funded under subsection (1) above, the Borrower shall, commencing on the first day of the of the month next ensuing after the determination that funding is required has been, remit $1/12^{th}$ of the Debt Service Reserve Fund Requirement to the Bond Trustee for deposit in the Debt Service Reserve Fund each month for twelve consecutive months.

(3)     The Debt Service Reserve Fund shall be terminated at the end of any fiscal year, and the funds returned to the Borrower immediately upon the Borrower's delivery of an Officers Certificate to the Bond Insurer and the Bond Trustee to the effect that: (a) the Borrower is not in default under the 2003 Loan Agreement, and (b) each of the following conditions are met:  (i) (A) the Obligated Group's Debt Service Coverage Ratio is 2.0 or greater, or, (B) if the Obligated Group's Debt Service Coverage Ratio is below 2.0, the Obligated Group's Days of Operating Expenses are greater than 175; (ii) the Cushion Ratio for the Obligated Group is 1.75 or greater; and (iii) Unrestricted Cash and Investments exceed 90 days of Operating Expenses.

(4) Capitalized terms used in this Section, but not otherwise defined in the Loan Agreement or the Bond Indenture shall have the meaning given such terms in the Supplemental Indenture.

**Interest Rate Agreement**

The Authority and the Borrower acknowledge and agree that (i) the Borrower has entered into the Interest Rate Agreement (as defined in the Bond Indenture ) in order to manage its interest rate risk relating to the 2003 ARC Bonds and in order to comply with certain provisions of the Code and the Tax Compliance Certificate, (ii) all payments of every description and the obligation to post or deposit collateral under the Interest Rate Agreement shall be the exclusive responsibility of the Borrower, and (iii) such obligations shall not be payable under the Loan Agreement, but rather under the Interest Rate Agreement.  The right to receive payments from the Swap Provider under the Interest Rate Agreement shall be exclusive property of the Borrower.  The Authority shall have no obligation for any payments or deposits of collateral or any property right in the receipts under the Interest Rate Agreement.  In furtherance of its obligations to comply with the Tax Compliance Certificate, the Borrower agrees that it will take

such actions as shall be necessary to maintain the Interest Rate Agreement in full force and effect unless the Borrower causes to be delivered to the Bond Trustee an Opinion of Bond Counsel indicating that any changes in the Interest Rate Agreement, including its termination, would not, in and of itself, cause the interest paid on the 2003 ARC Bonds to not be excluded from gross income for purposes of federal income tax purposes.

**Events of Default**

Each of the following events shall constitute and be referred to herein as a "Loan Default Event":

(a)     Failure by the Borrower to pay in full any payment required, except any Additional Payments required, whether at maturity, upon a date fixed for prepayment, by declaration, upon tender of the 2003 Bonds (other than 2003 ARC Bonds in the Auction Mode) for purchase pursuant to the Bond Indenture, or otherwise pursuant to the terms hereof or thereof;

(b)     If any material representation or warranty made by the Borrower herein or made by the Borrower in any document, instrument or certificate furnished to the Bond Trustee or the Authority in connection with the issuance of the 2003 Bonds shall at any time prove to have been incorrect in any respect as of the time made;

(c)     If the Borrower shall fail to observe or perform any other covenant, condition, agreement or provision in the Loan Agreement on its part to be observed or performed, or shall breach any warranty by the Borrower herein contained, for a period of 60 days after written notice, specifying such failure or breach and requesting that it be remedied, has been given to the Borrower by the Authority or the Bond Trustee; except that, if such failure or breach cannot be remedied within such sixty-day period and if the Borrower has taken all action reasonably possible to remedy such failure or breach within such sixty-day period, such failure or breach shall not become a Loan Default Event for so long as the Borrower shall diligently proceed to remedy such failure or breach in accordance with and subject to any directions or limitations of time established by the Bond Trustee; or

(d)     Any Event of Default as defined in and under the Bond Indenture.

**Remedies on Default**

If a Loan Default Event shall occur, then, and in each and every such case during the continuance of such Loan Default Event, the Bond Trustee on behalf of the Authority, but subject to the limitations in the Bond Indenture, including those relating to acceleration of principal of the 2003 Bonds and the requirement for control of remedies by the Bond Insurer, as to the enforcement of remedies, may take such action as it deems necessary or appropriate to collect amounts due, to enforce performance and observance of any obligation or agreement of the Borrower or to protect the interests securing the same, and may, without limiting the generality of the foregoing:

(a)     Exercise any or all rights and remedies given hereby or available or given by or available under any other instrument of any kind securing the Borrower's performance;

(b)     By written notice to the Borrower declare all Loan Repayments and Additional Payments to be immediately due and payable under the Loan Agreement, whereupon the same shall become immediately due and payable; and

(c)     Take other acts or steps as may be available under the Bond Indenture, as the registered owner of the 2003 Notes under the Master Indenture, or at law or in equity to collect the payment required then due, whether on the stated due date or by declaration of acceleration or otherwise, for damages or for specific performance or otherwise to enforce performance and observance of any obligation, agreement or covenant of the Borrower, subject, however, to the provisions of the Act.

**Covenants**

Under the Loan Agreement, the Borrower has made the following representations, among others:

Prohibited Uses.  No portion of the proceeds of the 2003 Bonds will be used to finance or refinance any facility, place or building used or to be used primarily for sectarian instruction or study or as a place for devotional activities or religious worship.

Nonliability of the Authority.  The Authority shall not be obligated to pay the principal of, premium, if any, and interest on the 2003 Bonds, except from payments received and under the 2003 Notes and other Revenues.  Neither the faith and credit nor the taxing power of the State of West Virginia or any political subdivision thereof is pledged to the payment of the principal of, premium or interest on the 2003 Bonds.

The Borrower hereby acknowledges that the Authority's sole source of moneys to repay the 2003 Bonds will be the payments made by the Borrower, under the 2003 Notes and other Revenues, together with amounts on deposit in, and investment income on, certain funds and accounts held by the Bond Trustee under the Bond Indenture, and hereby agrees that if the payments to be made shall ever prove insufficient to pay all principal of, premium, if any, and interest on the 2003 Bonds as the same shall become due (whether by maturity, redemption, acceleration or otherwise), then upon notice from the Bond Trustee, the Borrower shall pay such amounts as are required from time to time to prevent any deficiency or default in the payment of such principal, premium or interest, including, but not limited to, any deficiency caused by acts, omissions, nonfeasance or malfeasance on the part of the Bond Trustee, the Borrower, the Authority or any third party.

Expenses.  The Borrower covenants and agrees to pay and to indemnify the Authority and the Bond Trustee against all costs and charges, including reasonable fees of attorneys, accountants, consultants and other experts, incurred in good faith and arising out of or in connection with the transactions contemplated hereby and by the Bond Indenture.

Tax Covenant.  The Borrower covenants and agrees that it will at all times do and perform all acts and things permitted by law and the Loan Agreement which are necessary or desirable in order to assure that interest paid on the 2003 Bonds will be excluded from gross income of the holders of the 2003 Bonds for federal income tax purposes and will take no action that would result in such interest not being excluded from gross income for federal income taxes. Without limiting the generality of the foregoing, the Borrower agrees to comply with the provisions of the Tax Compliance Certificate.  This covenant shall survive payment in full or defeasance of the 2003 Bonds.

Indemnification, Immunity and Contribution.  (a) To the extent permitted by law, the Borrower releases the Authority and the Bond Trustee from and agrees that the Authority and the Bond Trustee shall not be liable for, and agrees to indemnify and hold the Authority and the Bond Trustee harmless from, any liability for, or expense (including but not limited to reasonable attorneys' fees) resulting from, or any loss or damage that may be occasioned by any cause whatsoever pertaining to the issuance, sale and delivery of the 2003 Bonds, the acceptance or administration of the trusts established pursuant to the Bond Indenture or the actions taken or to be taken by the Authority or the Bond Trustee under the Loan Agreement or the Bond Indenture, except the gross negligence or willful misconduct of the Authority or the Bond Trustee.  The parties intend that no general obligation or liability or charge against the general credit of the Authority shall occur by reason of making the Loan Agreement, the issuance of the 2003 Bonds or performing any act required of it by the Loan Agreement.  Nevertheless, if the Authority shall incur any such pecuniary liability, then in such event the Borrower shall indemnify and hold the Authority harmless by reason thereof, to the extent permitted by law, as provided herein, unless such liability results from the gross negligence or willful misconduct of the Authority.

(b)     No provision in the Loan Agreement or any obligation imposed upon the Authority, nor the breach of those provisions or obligations, will constitute or give rise to or impose upon the Authority a pecuniary liability or a charge upon its general credit or taxing power, if any.  No board member, employee, officer, director or agent of the Authority will be personally liable with respect to the Loan Agreement, the 2003 Bonds or any of the documents related thereto.

(c)     The Borrower will pay and will indemnify, defend and hold the Authority and the Bond Trustee, including any person at any time serving as a director, office, employee, agent or consultant of the Authority or the Bond Trustee or any person who controls the Authority or the Bond Trustee within the meaning of the Securities Act of 1933, as amended (collectively, the "Indemnified Parties") harmless from and against all claims, liabilities, losses, damages, costs, expenses (including reasonable attorneys' fees), suits and judgments of any kind arising out of:

(1)     injury to or death of any person or damage to property in or upon any Hospital Facilities or the occupation, use, possession or condition of the Hospital Facilities or relating to the foregoing;

(2)     any violation of any law, ordinance or regulation affecting the Hospital Facilities or the ownership, occupation, use, possession or condition of the Hospital Facilities;

(3)     the issuance and sale of the 2003 Bonds, including the Official Statement used in connection with such sale;

(4)     the execution and delivery of the Loan Agreement, the Bond Indenture, the Tax Compliance Certificate, the Bond Purchase Agreement or of any document required or in furtherance of the transactions contemplated by them; or

(5)     the performance of any act required of any indemnitee under this Section or under any provision of the Loan Agreement, the Bond Indenture, the Tax Compliance Certificate, the Official Statement or the Bond Purchase Agreement or of any document required or in furtherance of the transactions contemplated by them.

(d)     An Indemnified Party will promptly, upon receipt of notice of the existence of a claim or the commencement of a proceeding regarding which indemnity under this Section may be sought, notify the Borrower in writing.  If a proceeding is commenced against the Indemnified Party, the Borrower may participate in the proceeding and, to the extent it elects to do so, may assume the defense with counsel satisfactory to the Indemnified Party.  If, however, the Indemnified Party is advised in an Opinion of Counsel that there may be legal defenses available to it which are different from or in addition to those available to the Borrower, or if the Borrower fails to assume the defense of proceeding or to employ counsel for that purpose within a reasonable time after notice of commencement of the proceeding, the Borrower will not be entitled to assume the defense of the proceeding on behalf of the Indemnified Party, but will be responsible for the reasonable fees, costs and expenses of the Indemnified Party in conducting its defense.

(e)     No covenant or agreement contained in the Loan Agreement will be deemed to be the covenant or agreement of any board member, officer, attorney, agent or employee of the Authority or the Borrower in an individual capacity.  No recourse will be had for any payment or any claim against any officer, board member, agent, attorney or employee of the Authority or the Borrower past, present, or future, or its successors or assigns, either directly or through the Authority, or any successor corporation, whether by virtue of any constitutional provision, statute or rule of law, or by the enforcement of any assessment or penalty, or otherwise, all liability of such board members, officers, agents, attorneys or employees being released as a condition of and as a consideration for the execution and delivery of the Loan Agreement.

(f)     In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in this Section is for any reason held to be unavailable to the Indemnified Party, the Borrower shall contribute to the aggregate losses, liabilities, claims, damages and expenses of the nature contemplated by said indemnity agreement incurred by the Indemnified Party in such proportion as is appropriate to reflect the relative fault of the Borrower in connection with the claim or the commencement of a proceeding regarding which indemnity under this Section may be sought; provided, however, that no person guilty of fraudulent misrepresentation shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

(g)     The indemnifications set forth herein shall survive the termination of the Bond Indenture and/or the resignation or removal of the Bond Trustee.

Right to Cause Conversion.  The Borrower, with the advance written approval of the Bond Insurer, shall have the right, by notification by Electronic Means to the Interested Parties, to convert the 2003 ARC Bonds to the Fixed Rate Mode or the Weekly Mode.  The Borrower shall designate the proposed Conversion Date, which shall not be less than 30 days after the giving of such notice and shall provide Borrower Funds as required by Section 4.12(A) of the Bond Indenture.  The Borrower shall have the right to rescind the conversion by notice by Electronic Means to the Interested Parties not less than 10 days prior to the proposed Conversion Date.

Liquidity Facility.  The Borrower covenants and agrees that, except as otherwise provided in Section 6.12 of the Bond Indenture, at all times while any 2003 Bonds bear interest at the Weekly Rate ("Weekly Rate Bonds"), the Borrower will maintain a Liquidity Facility in full force and effect in an amount not less than the principal amount of the Weekly Rate Bonds outstanding which bear interest at the Weekly Rate, plus an amount equal to interest thereon at the Interest Coverage Rate for the maximum number of days between scheduled Interest Payment Dates plus such additional number of days then required by each Rating Agency then maintaining a rating on the Weekly Rate Bonds.  In addition, the Borrower covenants and agrees that all times while any Weekly Rate Bonds are outstanding, if the short term rating of the Bank shall be lowered by Moody's below the top short term rating category assigned by such rating agency (without giving effect to numeric or other qualifiers), then the Borrower, unless otherwise consented to in writing by the Bond Insurer, shall use its best efforts to obtain a Substitute Liquidity Facility within 90 days of the rating on the Bank being lowered.

Bond Trustee as Tender Agent.  The Authority hereby agrees to appoint the Bond Trustee to act as Tender Agent in connection with tenders of the Weekly Rate Bonds pursuant to Article XI of the Bond Indenture.  The Bond Trustee shall act as Tender Agent for the Borrower and shall not be deemed to be purchasing Weekly Rate Bonds for its own account.  The Bond Trustee shall act as Tender Agent only upon the terms and conditions set forth in Articles VIII and Article XI of the Bond Indenture.  It is understood and agreed by the Authority and the Borrower that the Authority shall obtain the Bond Trustee's agreement to act as Tender Agent and that the Borrower shall be the beneficiary of such agreement.  It is further recognized that provision for such Tender Agent will also benefit the holders of Weekly Rate Bonds, the Bank and the Bond Insurer.  Consequently, it is agreed that the Authority shall obtain the Bond

Trustee's agreement that its obligations as Tender Agent shall be enforceable by (a) the Authority, (b) the Borrower, (c) the holders of Weekly Rate Bonds, (d) the Bank or (e) the Bond Insurer, as the case may be.

Continuing Disclosure. The Borrower covenants to comply with and carry out all of the provisions of the Continuing Disclosure Agreement with respect to the 2003 Bonds that complies with the provisions of Rule 15c2-12 promulgated by the Securities and Exchange Commission (as amended from time to time, the "Rule"), in form and substance satisfactory to the Participating Underwriters (as defined in the Rule). Notwithstanding any other provision of the Loan Agreement, failure of the Borrower to enter into and comply with such Continuing Disclosure Agreement shall not be considered a Loan Default Event; however, the Authority may take such actions as may be necessary or desirable, including seeking specific performance by court order, to cause the Borrower to comply with its obligations under this Section.

Project. (a) Hospital Facilities. A portion of the proceeds of the 2003 Bonds will be used to finance or reimburse the costs of the Project. The Hospital Facilities which are included in the Project are described on Exhibit A to the Loan Agreement. The Borrower may modify the list of assets that constitute the Project by removing assets and adding assets if all of the following conditions are met:

    (1)    the assets added constitute "hospital facilities" as defined in the Act;

    (2)    the assets are within the description of assets in the notice of public hearing published July 24, 2003, and are located at the addresses set forth in the notice, or the Borrower delivers to the Bond Trustee an Opinion of Bond Counsel that any deviation will not adversely affect the exclusion of the interest on the 2003 Bonds from the gross income of the recipients thereof;

    (3)    the representation relating to the average economic life of the assets constituting the Project in Section 5.60 of the Tax Compliance Certificate remain correct following the substitution or the Borrower delivers to the Bond Trustee an Opinion of Bond Counsel that any deviation will not adversely affect the exclusion of the interest on the 2003 Bonds from the gross income of the recipients thereof; and

    (4)    the Borrower must deliver an Officer's Certificate to the Bond Trustee:

        (a)    listing the assets removed and the assets added,

        (b)    certifying that the statements in (1), (2) and (3) above are true with respect to the removals and additions, and

        (c)    demonstrating the calculation of the test described in the Tax Compliance Certificate.

The Authority makes no warranty, either express or implied, and offers no assurances that the Project is suitable for the Borrower's purposes or needs or that the proceeds derived from the sale of the 2003 Bonds are sufficient for all the purposes for which they are being issued.

(b) The Project.  The Borrower may request disbursements from the Project Fund to pay the costs of the Project.  The Borrower must (a) acquire and construct the Hospital Facilities constituting a portion of the Project with all reasonable dispatch and in accordance with all applicable building, zoning, planning, environmental, certificate of need and other similar governmental regulations; (b) pay all costs of the Project from funds made available under the Loan Agreement or otherwise; and (c) enforce the provisions of any contract, agreement, obligation, bond or other performance security with respect to the Project.

For those Hospital Facilities constituting a portion of the Project, the Borrower must deliver to the Bond Trustee the disbursement request required by Section 3.04(B) of the Bond Indenture, and either (a) if required by law, a certificate of need for the Hospital Facilities for which disbursement is requested; (b) a certificate of the West Virginia Health Care Authority to the effect that a certificate of need is not required for the asset or (c) an Officer's Certificate to the effect that a certificate of need is not required for the asset.  If the disbursement request is accompanied by either item (b) or (c), the Borrower must also demonstrate in an Officer's Certificate that the requirements of Section 20 of Article 29A of Chapter 16 of the West Virginia Code, 1931, have been met, relating to consultation with the West Virginia Health Care Authority for projects for which a certificate of need is not necessary.

If the money in the Project Fund is not sufficient to pay all costs of the Project, subject to the provisions of Section 5.10(a) of the Loan Agreement relating to modifications to the Project, the Borrower must, nonetheless, complete the Project in order to fulfill the public purposes of the Act and must pay all costs of the completion from its own funds.  The Borrower will not be entitled to any reimbursement for the completion costs from the Authority or the Bond Trustee; nor will it be entitled to any abatement, diminution or postponement of the Loan Repayments.

(c) Completion Date.  The Completion Date of the Hospital Facilities portion of the Project must be evidenced to the Authority and the Bond Trustee by an Officer's Certificate (attached as Exhibit B to the Loan Agreement) stating:

(1)     the date on which the Hospital Facilities portion of the Project was substantially complete;

(2)     that all other Hospital Facilities necessary in connection with the Hospital Facilities portion of the Project have been acquired and constructed;

(3)     that the Hospital Facilities portion of the Project has been completed in such a manner as to conform with all zoning, planning, building, environmental, certificate of need and other similar governmental regulations to the extent that the same are applicable to the Project or any portion thereof; and

C-74

(4)    that all costs of the Hospital Facilities portion of the Project then due and payable have been paid.

Covenants as to Existence and Maintenance of Properties.  The Borrower will maintain its corporate existence and its properties to the extent required by the Master Indenture.

Consolidation, Merger, Sale or Conveyance.  The Borrower will not consolidate or merge with or sell or convey all or substantially all of its assets to another entity except as permitted by the provisions of the Master Indenture.

Preservation of Exempt Status.  The Borrower agrees that:  (a) it will neither perform nor fail to perform any acts, enter into any agreements, carry on or permit to be carried on any activities in its Hospital Facilities, or permit its Hospital Facilities to be used in or for, any trade or business, that adversely affects the basis for the exemption under Code Section 501(a); (b) it will not permit to be used, directly or indirectly, the Hospital Facilities or any of its facilities or any other property in any trade or business, the conduct of which would adversely affect the basis for the exemption under Code Section 501(a); and (c) it will neither perform nor fail to perform any acts, enter into any agreements, carry on or permit to be carried on any activities in its Hospital Facilities that would adversely affect the exclusion from gross income of interest on the 2003 Bonds.

Nondiscrimination.   The Borrower shall assure that all Hospital Facilities financed or refinanced pursuant to the Loan Agreement and through the proceeds of the 2003 Bonds will be open to all, regardless of race, religion, sex or creed, and that all contractors and subcontractors engaged in the construction of Hospital Facilities shall provide an equal opportunity for employment without discrimination as to race, religion, sex or creed.

Code Prohibition.  The Borrower represents that none of the proceeds of the Bonds to be Refunded were used and none of the proceeds of the 2003 Bonds will be used to provide any airplane, skybox or other private luxury box, or health club facility not substantially related to the exempt purposes of the Borrower; any facility primarily used for gambling; or any store the principal business of which is the sale of alcoholic beverages for consumption off premises.

Other Uses of Proceeds.  As required by the Authority as a condition to making the Loan to the Borrower as part of the Authority's governmental program, the Borrower hereby covenants that it will not, and it will not permit any company affiliated with it over which it has control to, purchase any bonds issued by the Authority as part of its governmental program in an amount related to the amount of the Loan to Borrower by the Authority.

## SUMMARY OF AGREEMENT WITH BOND INSURER

*The following is a summary of certain provisions of Supplemental Master Trust Indenture 2003-1, relating to the 2003 Bonds.  All such summary statements do not purport to be complete and are subject and qualified in their entirety by reference to the Supplement.*

In connection with the issuance of the bond insurance policy (the "Policy"), Financial Security Assurance Inc. (the "Bond Insurer") required that the Corporation and the Obligated Group agree to comply with certain covenants (the "Insurance Covenants"). The Insurance Covenants are contained in the Supplement.

The Insurance Covenants will apply only so long as (i) the 2003 Bonds are outstanding and (ii) the Bond Insurer is not in default of its obligations under the Policy. *In addition, the Insurance Covenants can be amended, waived, modified and enforced exclusively by the Bond Insurer and any such amendment, waiver, modification or enforcement does not require the consent or participation of the holders of the 2003 Bonds. Consequently, there can be no assurance that the Insurance Covenants will be in effect at any time.*

### Security for 2003 Bonds

*Gross Receipts Pledge.* As security for its obligation to make payments on the 2003 Notes under the 2003 Loan Agreement, the Corporation, by the Supplement, grants the Authority a security interest in all Gross Receipts of the Corporation (the "Gross Receipts Pledge") for the benefit of the holders of the 2003 Notes, on a parity with the security interest granted to the Authority as the holder of the Corporation's Series 4 Note, dated as of October 15, 1998, for the benefit of the holders of the 1998 Bonds Outstanding; provided that the existence of such security interest shall not prevent the expenditure, deposit or commingling of Gross Receipts by the Corporation so long as all required payments under the 2003 Loan Agreement are made when due. Without limiting the generality of the foregoing, this security interest shall apply to all Gross Receipts, whether now existing or hereafter coming into existence and whether now owned or held or hereafter acquired by the Corporation. If any payment required by the 2003 Loan Agreement is not made when due, any Gross Receipts subject to this security interest which are then on hand and any such Gross Receipts thereafter received, shall not be commingled or deposited, but shall immediately, or upon receipt, be transferred to the Bond Trustee for deposit in the Bond Fund to the extent needed to make the amount on deposit in the Bond Fund at least equal to the requirements of the Bond Fund.

If the 1998 Bonds are no longer Outstanding under the Master Indenture, the Gross Receipts Pledge for the 2003 Notes shall be terminated if, at the end of any fiscal year: (a) the Corporation is not in default under the 2003 Loan Agreement, and (b) each of the following conditions are met: (i) (A) the Obligated Group's Debt Service Coverage Ratio is 2.0 or greater, or, (B) if the Obligated Group's Debt Service Coverage Ratio is less than 2.0, the Obligated Group's Days of Operating Expenses are greater than 175; (ii) the Cushion Ratio for the Obligated Group is 1.75 or greater; and (iii) Unrestricted Cash and Investments exceed 90 Days of Operating Expenses.

The Gross Receipts Pledge will be re-instituted if, at the end of any fiscal year, any of the following occurs: (a) the Obligated Group's Debt Service Coverage Ratio is less than 2.0, and Days of Operating Expenses are less than 175; (b) the Cushion Ratio for the Obligated Group is less than 1.75; or (c) the Obligated Group's Unrestricted Cash and Investments falls below 90 Days of Operating Expenses.

*Springing Debt Service Reserve Fund*

(1)     If, at the end of any fiscal year, any of the following events occurs, the Corporation shall fund a Debt Service Reserve Fund for the 2003 Bonds with the Bond Trustee in an amount equal to the Reserve Fund Requirement (as defined in subsection (2) below):

(a)     The Obligated Group's Debt Service Coverage Ratio is less than 2.0 and Days of Operating Expenses are less than 175;

(b)     The Cushion Ratio for the Obligated Group is less than 1.75; or

(c)     The Obligated Group's Unrestricted Cash and Investments is less than 90 Days of Operating Expenses.

(2)     The Reserve Fund Requirement shall equal the **lesser of** (a) 10% of the principal amount of 2003 Bonds Outstanding; (b) the Maximum Annual Debt Service Requirement on the 2003 Bonds; or (c) 125% of average annual debt service on the 2003 Bonds.  For 2003 Bonds with a variable rate of interest, the interest rate assumption for purposes of establishing the Reserve Fund Requirement shall be equal to the **greater of** the average variable rate for the preceding fiscal year and The Bond Buyer Revenue Bond Index at the time such funding is required, plus 50 basis points.

(3)     If the Debt Service Reserve Fund is required to be funded under subsection (1) above, the Corporation shall, commencing on the first day of the month next ensuing after the determination that funding is required, remit 1/12th of the Reserve Fund Requirement to the Bond Trustee for deposit in the Debt Service Reserve Fund for the 2003 Bonds each month for twelve consecutive months.

(4)     The Debt Service Reserve Fund shall be terminated at the end of any fiscal year, and the funds returned to the Corporation, if:  (a) the Corporation is not in default under the 2003 Loan Agreement, and (b) each of the following conditions are met: (i)(A) the Obligated Group's Debt Service Coverage Ratio is 2.0 or greater, or, (B) if the Obligated Group's Debt Service Coverage Ratio is below 2.0, the Obligated Group's Days of Operating Expenses are greater than 175; (ii) the Cushion Ratio for the Obligated Group is 1.75 or greater; and (iii) Unrestricted Cash and Investments exceed 90 days of Operating Expenses.

### Permitted Encumbrances

In order to be a Permitted Encumbrance, those liens and encumbrances described in paragraphs (u), (w) and (x) of the definition thereof in the Master Indenture must meet the conditions described in Section 415(A) of the Master Indenture for the incurrence of $1.00 of additional Funded Indebtedness at the time the Lien is granted.

### Rate Covenant

Any Consultant retained under Section 409 of the Master Indenture, and the scope of such Consultant's engagement, shall be reasonably acceptable to Bond Insurer.

A copy of the Consultant's report and recommendations shall be delivered to Bond Insurer simultaneously with delivery to the Members of the Obligated Group, the Master Trustee, each Related Bond Trustee and each Related Issuer. Upon reasonable request, the Bond Insurer shall be entitled to consult with the Consultant, attend the Consultant's briefings with the Corporation or any Member of the Obligated Group, and receive all interim reports of the Consultant.

Calculations of the Obligated Group's Historical Debt Service Coverage Ratio pursuant to Sections 409 and 414(A) of the Master Indenture shall be performed annually, at the end of each fiscal year, based on: (a) unaudited annual financial statements when available, but no later than 45 days after fiscal year-end; and (b) audited annual financial statements when available, but no later than 120 days after fiscal year-end.

The Obligated Group's failure to maintain a Debt Service Coverage Ratio of at least 1.0 at the end of any fiscal year, shall constitute an Event of Default under the Supplement regardless of whether the Obligated Group retains the Consultant and follows its recommendations.

### Liquidity Covenant

The Corporation covenants that it will maintain Unrestricted Cash and Investments equal to at least 80 Days of Operating Expenses (the "Liquidity Covenant").

If the Corporation fails to maintain the Liquidity Covenant, it shall retain a Consultant. The Consultant, and the scope of the Consultant's engagement, shall be reasonably acceptable to Bond Insurer. A copy of the Consultant's report and recommendations shall be simultaneously filed with each Member of the Obligated Group, the Bond Insurer, the Master Trustee, each Related Bond Trustee, and each Related Issuer. Upon reasonable request, the Bond Insurer shall be entitled to consult with the Consultant, attend the Consultant's briefings with the Corporation or any Member of the Obligated Group, and receive all interim reports of the Consultant.

The Corporation and each Member of the Obligated Group shall follow each recommendation of the Consultant applicable to it, to the extent permitted by law.

Failure to (a) retain a Consultant as required by this Section, (b) implement the recommendations of such Consultant to the extent permitted by law, or (c) maintain Unrestricted Cash and Investments equal to at least 60 Days of Operating Expenses shall constitute an Event of Default under the Master Indenture.

Calculations of the Liquidity Covenant shall be performed annually, at the end of each fiscal year, based on: (a) unaudited annual financial statements when available, but no later than 45 days after fiscal year-end; and (b) audited annual financial statements when available, but no later than 120 days after fiscal year-end.

**Total Debt to Capitalization Ratio**

The Corporation covenants that it will not incur any Indebtedness under the Master Indenture unless there is delivered to the Master Trustee:

(1)    an Officer's Certificate from the Obligated Group Agent (which Officer's Certificate, including without limitation, the scope, form, substance and other aspects thereof is acceptable to the Master Trustee) stating that the Funded Indebtedness Ratio of the Obligated Group, after giving effect to the incurrence of such Indebtedness and to the application of the proceeds thereof, does not exceed 0.67:1; and

(2)    an Officer's Certificate certifying that: (a) the Members of the Obligated Group are in compliance with the provisions of the Master Indenture as of the date of incurrence of such Indebtedness, and (b) the Funded Indebtedness Ratio of the Obligated Group, taking into account all Indebtedness which will be Outstanding immediately following the incurrence of the proposed Indebtedness, for the most recent fiscal year for which audited Obligated Group financial statements are available, does not exceed 0.67:1.

**Covenants Regarding West Virginia United Health System, Inc. and United Health Center, Inc.**

The Corporation, West Virginia United Health System, Inc. (the "Parent") and United Health System, Inc. ("UHC") agree that the Parent will continue to be the sole corporate member of UHC and UHC will continue to operate acute care hospital facilities in the vicinity of Clarksburg, West Virginia.

The Corporation agrees that it will not incur any obligation to pay Indebtedness used to fund the acquisition and construction of hospital facilities (as defined in the Act) for UHC, unless UHC becomes a Member of the Obligated Group under the Master Indenture and either of the following tests are met:

(1)    after subtracting the amount of equity the Corporation and UHC expect to contribute to the acquisition and construction of such hospital facilities (the "Project"), from the combined value of Unrestricted Cash and Investments available upon the issuance of such Indebtedness, combined Cash and Unrestricted Investments of the

Corporation and UHC shall be equal to or greater than 165 Days of Operating Expenses, and for the fiscal year prior to the issuance of the Indebtedness, the Corporation and UHC have a combined Projected Debt Service Coverage Ratio of at least 2.0; <u>or</u>

(2)     the combined value of Cash and Unrestricted Investment (after subtracting equity to be used for the Project), is at least equal to 175 Days of Operating Expenses, and for the fiscal year prior to the issuance of the Indebtedness, the Corporation and UHC have a combined Projected Debt Service Coverage Ratio of 1.75, and the Group Agent provides an Officer's Certificate that for the fiscal year in which the Indebtedness is issued Projected Debt Service Coverage Ratio is expected to be at least 1.85, and for the fiscal year following issuance of the Indebtedness, the Projected Debt Service Coverage Ratio is expected to be at least 2.0.

### Consolidation, Mergers and Conveyances

No consolidation, merger or conveyance shall be permitted under Section 413, unless the Obligated Group Agent provides the Officer's Certificate required by Section 417(G) of the Master Indenture.

### Admission and Withdrawal from the Obligated Group

In addition to satisfying the requirements of Section 404 or Section 405 of the Master Indenture, as the case may be, no Member may be admitted to, or withdraw from, the Obligated Group, unless, immediately following such admission or withdrawal, the Obligated Group, meets the tests described in Section 413 of the Master Indenture.

### Insurance

Insurance shall be maintained by the Corporation and each Member of the Obligated Group in accordance with the prevailing industry practice as to carriers, deductibles and coverage.  Compliance with industry practice shall be subject to confirmation as part of a bi-annual review by an independent insurance Consultant (the "Insurance Consultant"); provided that, in the event the Corporation or any Member of the Obligated Group is self-insured, review shall be conducted annually by the Insurance Consultant.  No Member of the Obligated Group shall self-insure against casualty losses to any real or personal property owned, leased or used by it, including Property, Plant and Equipment; provided, however, reasonable deductibles approved by the Insurance Consultant shall be permitted.

### Restrictions on Interest Rate Agreements

Members of the Obligated Group may enter into Interest Rate Agreements without the prior written consent of the Bond Insurer, if the following conditions are met:

(1)     the Interest Rate Agreement must be entered into as a hedge against then Outstanding Indebtedness or as a means of achieving forward refundings or assets held at

the time of the execution of the Interest Rate Agreement (including swaps or reverse swaps);

(2)     the Interest Rate Agreement shall not contain any leverage element or multiplier component unless there is a matching hedge arrangement which effectively off-sets the exposure from any such element or component;

(3)     unless the obligation of the Obligated Group is insured, the net settlement, breakage, or other termination amount of uninsured Interest Rate Agreement then in effect and the Interest Rate Agreement to be executed, determined at the time of execution and delivery of the Interest Rate Agreement to be executed may not result in Unrestricted Cash and Investments being less than the Liquidity Covenant;

(4)     the Interest Rate Agreement provider (the "Swap Provider") counterparty, or its guarantor, must have a rating of at least "A" or "A2;" and

(5)     there shall be no events of default where the Swap Provider is the defaulting party or termination events wherein the Swap Provider is the affected party which result in an immediate early termination of the Interest Rate Agreement.

**APPENDIX D**

**FORM OF MUNICIPAL BOND INSURANCE POLICY**

(This page intentionally left blank.)



**FINANCIAL
SECURITY
ASSURANCE®**

# MUNICIPAL BOND
# INSURANCE POLICY

ISSUER:

BONDS:

Policy No.:    -N

Effective Date:

Premium:

FINANCIAL SECURITY ASSURANCE INC. ("Financial Security"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY agrees to pay to the trustee (the "Trustee") or paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the Bonds, for the benefit of the Owners or, at the election of Financial Security, directly to each Owner, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which Financial Security shall have received Notice of Nonpayment, Financial Security will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by Financial Security, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in Financial Security. A Notice of Nonpayment will be deemed received on a given Business Day if it is received prior to 1:00 p.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by Financial Security is incomplete, it shall be deemed not to have been received by Financial Security for purposes of the preceding sentence and Financial Security shall promptly so advise the Trustee, Paying Agent or Owner, as appropriate, who may submit an amended Notice of Nonpayment. Upon disbursement in respect of a Bond, Financial Security shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by Financial Security hereunder. Payment by Financial Security to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of Financial Security under this Policy.

Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless Financial Security shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the stated date for payment of interest. "Nonpayment" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds to the Trustee or, if there is no Trustee, to the Paying Agent for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer which has been recovered from such Owner pursuant to the

Page 2 of 2
Policy No. LN:

United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to Financial Security which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

Financial Security may appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy by giving written notice to the Trustee and the Paying Agent specifying the name and notice address of the Insurer's Fiscal Agent. From and after the date of receipt of such notice by the Trustee and the Paying Agent, (a) copies of all notices required to be delivered to Financial Security pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to Financial Security and shall not be deemed received until received by both and (b) all payments required to be made by Financial Security under this Policy may be made directly by Financial Security or by the Insurer's Fiscal Agent on behalf of Financial Security. The Insurer's Fiscal Agent is the agent of Financial Security only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of Financial Security to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, Financial Security agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to Financial Security to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy sets forth in full the undertaking of Financial Security, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto. Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be canceled or revoked. THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, FINANCIAL SECURITY ASSURANCE INC. has caused this Policy to be executed on its behalf by its Authorized Officer.

[Countersignature]                                  FINANCIAL SECURITY ASSURANCE INC.

By _____              By _____
                                                              Authorized Officer

A subsidiary of Financial Security Assurance Holdings Ltd.                (212) 826-0100
350 Park Avenue, New York, N.Y.  10022-6022

Form 500NY (5/90)

**APPENDIX E**

**SUMMARY OF CERTAIN PROVISIONS RELATING TO AUCTION AND
SETTLEMENT PROCEDURE FOR THE ARCS BONDS**

APPENDIX E

**SUMMARY OF CERTAIN PROVISIONS RELATING TO AUCTION AND SETTLEMENT PROCEDURES FOR THE ARCs BONDS**

ARTICLE I

DEFINITIONS

SECTION 1.01.  <u>Definition</u>.  In addition to the words and terms elsewhere defined in the Bond Indenture, the following words and terms as used in this Appendix E and elsewhere in the Bond Indenture shall have the following meanings with respect to the ARCs Bonds in an Auction Mode unless the context or use indicates another or different meaning or intent:

"'AA' Financial Commercial Paper Rate" means, on any date of determination, (a) for Auction Periods of 35 days or less, the interest equivalent of commercial paper having a maturity of 30 days, (b) for Auction Periods greater than 35 days and less than 75 days, the interest equivalent of commercial paper having a maturity of 60 days, (c) for Auction Periods greater than 75 days and less than 105 days, the interest equivalent of commercial paper having a maturity of 90 days; as each such rate is published on the Business Day prior to such date by the Board of Governors of the Federal Reserve System on its World Wide Web site http://www.federalreserve.gov/releases/cp/histrates.txt, or any successor publication ("H.15(519)") under the caption "AA financial." In the event that such publication has not been published in a timely manner, the "AA" Financial Commercial Paper Rate shall be calculated by the Market Agent, and shall be the bond equivalent yield of the arithmetic mean of the offered rates as of 11:00 A.M., New York City time, on the determination date of three leading dealers of U.S. dollar commercial paper in The City of New York (which may include the Market Agent) selected by the Market Agent, for U.S. dollar commercial paper having a maturity of 30, 60 or 90 days, as applicable, placed for financial Authoritys whose bond rating is "AA" or the equivalent, from a nationally recognized securities rating agency; provided, however, that if the dealers selected as aforesaid by the Market Agent are not quoting as mentioned in this sentence (and if the Market Agent, in its discretion, determines that such quotations can not be obtained from any three leading dealers of U.S. dollar commercial paper in the City of New York) such rate shall be the same rate as in effect for the immediately preceding Auction Period.  For purposes of this definition, the "interest equivalent" of a rate stated on a discount basis (a "discount rate") for commercial paper of a given day's maturity shall be equal to the product of (A) 100 times (B) the discount rate times (C) the quotient (rounded upwards to the next higher one-thousandth (.001) of 1%) of (x) 365 divided by (y) the difference between (1) 360 and (2) the product of the discount rate (expressed in decimals) times the applicable number of days in which such commercial paper matures.

"After-Tax Equivalent Rate" means, on any date of determination, the interest rate per annum equal to the product of:

(i)      the "AA" Financial Commercial Paper Rate on such date; and

(ii)     1.00 minus the Statutory Corporate Tax Rate on such date

E-1

"All-Hold Rate" means, on any date of determination, the interest rate per annum equal to 90% (as such percentage may be adjusted pursuant to Section 2.07 of this Appendix E) of the lesser on such date of:

      (a)     the After-Tax Equivalent Rate on such date; or

      (b)     the Kenny Index on such date;

rounded to the nearest one thousandth (.001) of 1%; provided that in no event shall the All-Hold Rate be more than the Maximum Auction Rate or less than zero.

"Applicable Rate" has the meaning assigned to such term in Section 2.08 of this Appendix E.

"Applicable Number of Business Days" means the greater of two Business Days or one Business Day plus the number of Business Days by which the Auction Date precedes the first day of the next succeeding Auction Period.

"Applicable Percentage" means, on any date of determination, the percentage determined (as such percentage may be adjusted pursuant to Section 2.07 of this Appendix E) based on the lower of the prevailing credit ratings on the ARCs Bonds in effect at the close of business on the Business Day immediately preceding such date, as set forth below:

| Moody's | S & P | Applicable Percentage |
|---|---|---|
| "Aaa" | AAA | 175% |
| "Aa3" to "Aa1" | "AA-" to "AA+" | 175% |
| "A3" to "A1" | "A-" to "A+" | 175% |
| "Baa3" to "Baa1" | "BBB-" to "BBB+" | 200% |
| Below "Baa3" | Below "BBB-" | 265% |

provided, that, in the event that the ARCs Bonds are not rated by any nationally recognized securities rating agency, the Applicable Percentage shall be 265%, and, provided further, that if a Payment Default shall have occurred and be continuing, the Applicable Percentage shall be 265%. For purposes of this definition, Moody's Investors Service, Inc.'s rating categories of "Aaa," "Aa," "A" and "Baa," and Standard & Poor's, a division of the McGraw-Hill Companies, Inc.'s rating categories of "AAA," "AA," "A," and "BBB" refer to and include the respective rating categories correlative thereto if either or both of such rating agencies have changed or modified their generic rating categories or if Moody's Investors Service, Inc. or Standard & Poor's, a division of the McGraw-Hill Companies, Inc. no longer rates the ARCs Bonds and have been replaced.  If the ARCs Bonds are not rated by a Rating Agency, the requirement of a rating by such Rating Agency shall be disregarded.  If the ratings for the ARCs Bonds are split between two or more of the foregoing categories, the lowest rating will determine the Applicable Percentage.

"Auction" means each periodic implementation of the Auction Procedures.

E-2

"Auction Agreement" means the Auction Agreement, dated as of August 1, 2003, relating to the ARCs Bonds between the Bond Trustee and the Auction Agent, and any similar agreement with a successor Auction Agent, in each case as from time to time amended or supplemented.

"Auction Agent" means any person appointed as such pursuant to Article III of this Appendix E.

"Auction Date" means with respect to the 2003 B Bonds October 8, 2003; with respect to the 2003 C Bonds October 15, 2003; and with respect to the 2003 D Bonds October 22, 2003, and thereafter, the Business Day immediately preceding the first day of each Auction Period, other than:

- each Auction Period commencing after the ownership of the ARCs Bonds is no longer maintained in book entry form by the Depository;

- each Auction Period commencing after the occurrence and during the continuance of a Payment Default; or

- any Auction Period commencing less than the Applicable Number of Business Days after the cure or waiver of a Payment Default.

Notwithstanding the foregoing, the Auction Date for one or more Auction Periods may be changed pursuant to Section 2.08 of this Appendix E.

"Auction Period" means (a) the Initial Period and (b) each successive 35 day period thereafter, commencing on a Thursday (or the Business Day following the last day of the prior Auction Period, if the prior Auction Period does not end on a Wednesday) and ending on (and including) a Wednesday (unless such Wednesday is not followed by a Business Day, in which case such Auction Period will end on the next succeeding day that is followed by a Business Day), as the same may be changed pursuant to Section 2.08 of this Appendix E.

"Auction Procedures" means the procedures set forth in Section 2.01 of this Appendix E.

"Auction Rate" means the rate of interest per annum on any Auction Date that results from the implementation of the Auction Procedures, and determined as described in Section 2.01 of this Appendix E.

"Available Bond" has the meaning assigned to such term in Section 2.01(c)(i)(A) of this Appendix E.

"Bid" has the meaning assigned to such term in Section 2.01(a)(i) of this Appendix E.

"Bidder" has the meaning assigned to such term in Section 2.01(a)(i) of this Appendix E.

"Broker-Dealer" means UBS Financial Services, Inc. or any other broker or dealer (each as defined in the Securities Exchange Act), commercial bank or other entity permitted by law to perform the functions required of a Broker-Dealer set forth in the Auction Procedures that (i) is a

Participant (or an affiliate of a Participant), (ii) that has been selected by the Institution with the approval of the Market Agent and (iii) has entered into a Broker-Dealer Agreement that remains effective.

"Broker-Dealer Agreement" means (a) the Broker-Dealer Agreement, dated as of August 1, 2003, between the Auction Agent and UBS Financial Services, Inc. and (b) each other agreement between the Auction Agent and a Broker-Dealer pursuant to which the Broker-Dealer agrees to participate in Auctions as set forth in the Auction Procedures, in each case as from time to time amended or supplemented.

"Broker-Dealer Fee" means the fee to be paid to the Broker-Dealers for the services rendered by them under the Broker-Dealer Agreement.

"Change of Preference Law" means, with respect to any Holder of ARCs Bonds, any amendment to the Code or other statute enacted by the Congress of the United States or any temporary, proposed or final regulation promulgated by the United States Treasury, after the Closing Date which (i) changes or would change any deduction, credit or other allowance allowable in computing liability for any federal tax with respect to, or (ii) imposes or would impose or reduces or would reduce or increases or would increase any federal tax (including, but not limited to, preference or excise taxes) upon, any interest earned by any holder of bonds the interest on which is excluded from federal gross income under Section 103 of the Code.

"Commission" means the Securities and Exchange Commission.

"Default Rate" on any date of determination means the interest rate per annum equal to the lesser of (i) the Applicable Percentage of the Kenny Index or (ii) the Maximum Interest Rate.

"Depository" means DTC or another recognized securities depository selected by the Authority, which maintains a book-entry system for the ARCs Bonds.

"Existing Holder" means (a) with respect to and for the purpose of dealing with the Auction Agent in connection with an Auction, a Person who is a Broker-Dealer listed in the Existing Holder Registry at the close of business on the Business Day immediately preceding the Auction Date for such Auction and (b) with respect to and for the purpose of dealing with the Broker-Dealer in connection with an Auction, a Person who is a qualified owner of ARCs Bonds.

"Existing Holder Registry" means the register maintained by the Auction Agent pursuant to Section 2.02(a)(i) of the Auction Agreement.

"Hold Order" has the meaning set forth in Section 2.01(a)(i) of this Appendix E.

"Kenny Index" means the applicable index most recently made available by Kenny S&P Evaluation Services ("Kenny") or any successor thereto (the "Indexing Agent") based upon 30-day yield evaluations at par of securities, the interest on which is excluded from gross income for federal income tax purposes under the Code, of not less than five "Intermediate Grade" component issuers selected by the Indexing Agent which shall include, without limitation, issuers of general obligation bonds. The specific issuers included among the component issuers may be

changed from time to time by the Indexing Agent in its discretion. The securities on which the Kenny Index is based shall not include any securities the interest on which is subject to a "minimum tax" or similar tax under the Code, unless all such securities are subject to such tax. In the event that Kenny no longer publishes an index satisfying the above definition of the Kenny Index or the Market Agent reasonably concludes that the Kenny Index will not be announced in a timely manner, then the Market Agent shall announce a rate based upon the same criteria used by Kenny to determine the Kenny Index and the rate announced by the Market Agent for each Auction Date thereafter shall be used in lieu of the Kenny Index for each Auction Date.

"Market Agent" means the market agent or market agents appointed pursuant to Article III of this Appendix E, and its or their successors or assigns.

"Market Agent Agreement" means the Market Agent Agreement, dated as of August 1, 2003, relating to the ARCs Bonds between the Bond Trustee and the Market Agent, and any similar agreement with a successor Market Agent, in each case as from time to time amended or supplemented.

"Maximum Auction Rate" means on any date of determination, the interest rate per annum equal to the lesser of:

(a)     the Applicable Percentage of the higher of (i) the After-Tax Equivalent Rate on such date or (ii) the Kenny Index on such date; or

(b)     the Maximum Interest Rate;

rounded to the nearest one thousandth (.001) of 1%.

"Order" has the meaning assigned to such term in Section 2.01(a) of this Appendix E.

"Participant" means a member or participant in the Depository.

"Payment Default" means the occurrence of an Event of Default under the Bond Indenture consisting of a failure to pay (i) installment of interest payable on the ARCs Bonds when due and payable or (ii) any principal or premium, if any, payable on any of the ARCs Bonds when the same shall become due and payable, either at maturity, by proceeding for redemption or upon acceleration, or otherwise, which, in either case, is followed by the failure of the Bond Insurer to make, in accordance with the Insurance Policy, due and punctual payments described in (i) or (ii), if so required by the Insurance Policy.

"Potential Holder" means, any Person (including an Existing Holder that is (a) a Broker-Dealer when dealing with the Auction Agent and (b) a potential beneficial owner when dealing with a Broker-Dealer) who may be interested in acquiring ARCs Bonds (or, in the case of an Existing Holder thereof, an additional principal amount of ARCs Bonds).

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Sell Order" has the meaning assigned to such term in Section 2.01(a) of this Appendix E.

"State" means the State of West Virginia.

"Statutory Corporate Tax Rate" means, as of any date of determination, the highest tax rate bracket (expressed in decimals) now or hereafter applicable in each taxable year on the taxable income of every Institution as set forth in Section 11 of the Code or any successor section without regard to any minimum additional tax provision or provisions, regarding changes in rates during a taxable year.

"Submission Deadline" means 1:00 P.M., New York City time, on such Auction Date or any other time on any Auction Date by which Broker-Dealers are required to submit Orders to the Auction Agent as specified by the Auction Agent from time to time.

"Submitted Bid" has the meaning assigned to such term in Section 2.01(c)(i) of this Appendix E.

"Submitted Hold Order" has the meaning assigned to such term in Section 2.01(c)(i) of this Appendix E.

"Submitted Order" has the meaning assigned to such term in Section 2.01(c)(i) of this Appendix E.

"Submitted Sell Order" has the meaning assigned to such term in Section 2.01(c)(i) of this Appendix E.

"Sufficient Clearing Bids" has the meaning assigned to such term in Section 2.01(c)(i)(B) of this Appendix E.

"Winning Bid Rate" has the meaning assigned to such term in Section 2.01(c)(i)(C) of this Appendix E.

ARTICLE II

AUCTION PROCEDURES

SECTION 2.01.  Auction Procedures.  Auctions shall be conducted on each Auction Date (other than the Auction Date immediately preceding (i) each Auction Period commencing after the ownership of the ARCs Bonds is no longer maintained in book-entry form by the Depository; (ii) each Auction Period commencing after the occurrence and during the continuance of a Payment Default; or (iii) any Auction Period commencing less than the Applicable Number of Business Days after the cure of a Payment Default).  If there is an Auction Agent on such Auction Date, Auctions shall be conducted in the following manner:

(a)  Orders by Existing Holders and Potential Holders.

(i)  Prior to the Submission Deadline on each Auction Date:

(A)  each Existing Holder of ARCs Bonds may submit to a Broker-Dealer

E-6

information as to:

(I)  the principal amount of Outstanding ARCs Bonds, if any, held by such Existing Holder which such Existing Holder desires to continue to hold without regard to the Auction Rate for the next succeeding Auction Period;

(II)  the principal amount of Outstanding ARCs Bonds, if any, which such Existing Holder offers to sell if the Auction Rate for the next succeeding Auction Period shall be less than the rate per annum specified by such Existing Holder; and/or

(III)  the principal amount of Outstanding ARCs Bonds, if any, held by such Existing Holder which such Existing Holder offers to sell without regard to the Auction Rate for the next succeeding Auction Period; and

(B)  one or more Broker-Dealers may contact Potential Holders to determine the principal amount of ARCs Bonds which each such Potential Holder offers to purchase if the Auction Rate for the next succeeding Auction Period shall not be less than the rate per annum specified by such Potential Holder.

The communication to a Broker-Dealer of information referred to in clause (A)(I), (A)(II), (A)(III) or (B) of this paragraph (i) is hereinafter referred to as an "Order" and collectively as "Orders" and each Existing Holder and each Potential Holder placing an Order is hereinafter referred to as a "Bidder" and collectively as "Bidders"; an Order containing the information referred to in (x) clause (A) (I) of this paragraph (i) is hereinafter referred to as a "Hold Order" and collectively as "Hold Orders," (y) clause (A)(II) or (B) of this paragraph (i) is hereinafter referred to as a "Bid" and collectively as "Bids" and (z) clause (A)(III) of this paragraph (i) is hereinafter referred to as a "Sell Order" and collectively as "Sell Orders."

(ii) (A)  Subject to the provisions of subsection (b) of this Section 2.01, a Bid by an Existing Holder shall constitute an irrevocable offer to sell:

(I)  the principal amount of Outstanding ARCs Bonds specified in such Bid if the Auction Rate determined as provided in this Section 2.01 shall be less than the rate specified in such Bid; or

(II)  such principal amount or a lesser principal amount of Outstanding ARCs Bonds to be determined as set forth in clause (D) of paragraph (i) of subsection (d) of this Section 2.01, if the Auction Rate determined as provided in this Section 2.01 shall be equal to the rate specified in such Bid; or

(III)  such principal amount or a lesser principal amount of Outstanding ARCs Bonds to be determined as set forth in clause (C) of paragraph (ii) of subsection (d) of this

E-7

Section 2.01 if the rate specified shall be higher than the Maximum Interest Rate and Sufficient Clearing Bids have not been made.

(B)  Subject to the provisions of subsection (b) of this Section 2.01, a Sell Order by an Existing Holder shall constitute an irrevocable offer to sell:

(I)  the principal amount of Outstanding ARCs Bonds specified in such Sell Order; or

(II)  such principal amount or a lesser principal amount of Outstanding ARCs Bonds as set forth in clause (C) of paragraph (ii) of subsection (d) of this Section 2.01 if Sufficient Clearing Bids have not been made.

(C)  Subject to the provisions of subsection (b) of this Section 2.01, a Bid by a Potential Holder shall constitute an irrevocable offer to purchase:

(I)  the principal amount of Outstanding ARCs Bonds specified in such Bid if the Auction Rate determined as provided in this Section 2.01 shall be higher than the rate specified in such Bid; or

(II)  such principal amount or a lesser principal amount of Outstanding ARCs Bonds as set forth in clause (E) of paragraph (i) of subsection (d) of this Section 2.01 if the Auction Rate determined as provided in this Section 2.01 shall be equal to the rate specified in such Bid.

(b)  Submissions by Broker-Dealers to the Auction Agent.

(i)  Each Broker-Dealer shall submit in writing to the Auction Agent prior to the Submission Deadline on each Auction Date all Orders obtained by such Broker-Dealer and shall specify with respect to each such Order:

(A)  the name of the Bidder placing such Order;

(B)  the aggregate principal amount of ARCs Bonds that are the subject of such Order;

(C)  to the extent that such Bidder is an Existing Holder:

(I)  the principal amount of ARCs Bonds, if any, subject to any Hold Order placed by such Existing Holder;

(II)  the principal amount of ARCs Bonds, if any, subject to any Bid placed by such Existing Holder and the rate specified in such Bid; and

(III)  the principal amount of ARCs Bonds, if any, subject to any Sell Order placed by such Existing Holder; and

E-8

(D)  to the extent such Bidder is a Potential Holder, the rate and amount specified in such Potential Holder's Bid.

(ii)  If any rate specified in any Bid contains more than three figures to the right of the decimal point, the Auction Agent shall round such rate up to the next highest one thousandth (.001) of 1%.

(iii)  If an Order or Orders covering all Outstanding ARCs Bonds held by any Existing Holder is not submitted to the Auction Agent prior to the Submission Deadline, the Auction Agent shall deem a Hold Order to have been submitted on behalf of such Existing Holder covering the principal amount of Outstanding ARCs Bonds held by such Existing Holder and not subject to an Order submitted to the Auction Agent.

(iv)  None of the Authority, the Institution, the Bond Trustee nor the Auction Agent shall be responsible for any failure of a Broker-Dealer to submit an Order to the Auction Agent on behalf of any Existing Holder or Potential Holder.

(v)  If any Existing Holder submits through a Broker-Dealer to the Auction Agent one or more Orders covering in the aggregate more than the principal amount of Outstanding ARCs Bonds held by such Existing Holder, such Orders shall be considered valid as follows and in the following order of priority:

(A)  all Hold Orders shall be considered valid, but only up to and including in the aggregate the principal amount of ARCs Bonds held by such Existing Holder, and if the aggregate principal amount of ARCs Bonds subject to such Hold Orders exceeds the aggregate principal amount of ARCs Bonds held by such Existing Holder, the aggregate principal amount of ARCs Bonds subject to each such Hold Order shall be reduced pro rata to cover the aggregate principal amount of Outstanding ARCs Bonds held by such Existing Holder;

(B)  (I)  any Bid shall be considered valid up to and including the excess of the principal amount of Outstanding ARCs Bonds held by such Existing Holder over the aggregate principal amount of ARCs Bonds subject to any Hold Orders referred to in clause (A) of this paragraph (v);

(II)  subject to subclause (I) of this clause (B), if more than one Bid with the same rate is submitted on behalf of such Existing Holder and the aggregate principal amount of Outstanding ARCs Bonds subject to such Bids is greater than such excess, such Bids shall be considered valid up to and including the amount of such excess and the stated amount of ARCs Bonds subject to each Bid with the same rate shall be reduced pro rata to cover the stated amount of ARCs Bonds equal to such excess;

(III)  subject to subclause (I) and (II) of this clause (B), if more than one Bid with different rates is submitted on behalf of such Existing Holder, such Bids shall be considered

E-9

valid first in the ascending order of their respective rates until the highest rate is reached at which such excess exists and then at such rate up to and including the amount of such excess; and

(IV) in any such event, the aggregate principal amount of Outstanding ARCs Bonds, if any, subject to Bids not valid under this clause (B) shall be treated as the subject of a Bid by a Potential Holder at the rate therein specified; and

(C) all Sell Orders shall be considered valid up to and including the excess of the principal amount of Outstanding ARCs Bonds held by such Existing Holder over the aggregate principal amount of ARCs Bonds subject to valid Hold Orders referred to in clause (A) of this paragraph (v) and valid Bids referred to in clause (B) of this paragraph (v).

(vi)  If more than one Bid for ARCs Bonds is submitted on behalf of any Potential Holder, each Bid submitted shall be a separate Bid with the rate and principal amount therein specified.

(vii)  Any Bid or Sell Order submitted by an Existing Holder covering an aggregate principal amount of ARCs Bonds not equal to an Authorized Denomination therefor shall be rejected and shall be deemed a Hold Order. Any Bid submitted by a Potential Holder covering an aggregate principal amount of ARCs Bonds not equal to an Authorized Denomination therefor shall be rejected.

(viii)  Any Bid submitted by an Existing Holder or a Potential Holder specifying a rate lower than the All-Hold Rate shall be treated as a Bid specifying the All-Hold Rate and any such Bid shall be considered as valid and shall be selected in the ascending order of the respective rates in the Submitted Bids.

(ix)  An Existing Holder that offers to purchase additional ARCs Bonds is, for purposes of such offer, treated as a Potential Holder.

(x)  Any Bid specifying a rate higher than the Maximum Interest Rate will (a) be treated as a Sell Order if submitted by an Existing Holder and (b) not be accepted if submitted by a Potential Holder.

(c)      Determination of Sufficient Clearing Bids, Auction Rate and Winning Bid Rate.

(i)  Not earlier than the Submission Deadline on each Auction Date, the Auction Agent shall assemble all valid Orders submitted or deemed submitted to it by the Broker-Dealers (each such Order as submitted or deemed submitted by a Broker-Dealer being hereinafter referred to individually as a "Submitted Hold Order," a "Submitted Bid" or a "Submitted Sell Order," as the case may be, or as a "Submitted Order" and collectively as "Submitted Hold Orders, "Submitted Bids" or "Submitted Sell Orders," as the case may be, or as "Submitted Orders") and shall determine:

E-10

(A)  the excess of the total principal amount of Outstanding ARCs Bonds over the sum of the aggregate principal amount of Outstanding ARCs Bonds subject to Submitted Hold Orders (such excess being hereinafter referred to as the "Available Bond"); and

(B)  from such Submitted Orders whether:

(I)  the aggregate principal amount of Outstanding ARCs Bonds subject to Submitted Bids by Potential Holders specifying one or more rates equal to or lower than the Maximum Auction Rate;

exceeds or is equal to the sum of:

(II)  the aggregate principal amount of Outstanding ARCs Bonds subject to Submitted Bids by Existing Holders specifying one or more rates higher than the Maximum Interest Rate; and

(III)  the aggregate principal amount of Outstanding ARCs Bonds subject to Submitted Sell Orders.

(in the event such excess or such equality exists, other than because the sum of the principal amounts of ARCs Bonds in subclauses (II) and (III) above is zero because all of the Outstanding ARCs Bonds are subject to Submitted Hold Orders, such Submitted Bids in subclause (I) above being hereinafter referred to collectively as "Sufficient Clearing Bids"); and

(C)  if Sufficient Clearing Bids have been made, the lowest rate specified in such Submitted Bids (which shall be the "Winning Bid Rate") such that if:

(I)  (aa) each such Submitted Bid from Existing Holders specifying such lowest rate and (bb) all other Submitted Bids from Existing Holders specifying lower rates were rejected, thus entitling such Existing Holders to continue to hold the principal amount of ARCs Bonds subject to such Submitted Bids; and

(II)  (aa) each such Submitted Bid from Potential Holders specifying such lowest rate and (bb) all other Submitted Bids from Potential Holders specifying lower rates were accepted, the result would be that such Existing Holders described in subclause (I) above would continue to hold an aggregate principal amount of Outstanding ARCs Bonds which, when added to the aggregate principal amount of Outstanding ARCs Bonds to be purchased by such Potential Holders described in subclause (II) above, would equal not less than the Available Bond.

(ii)  Promptly after the Auction Agent has made the determinations pursuant to paragraph (i) of this subsection (c), the Auction Agent shall advise the Bond Trustee of the Maximum Auction Rate and the All-Hold Rate and the components thereof on the Auction Date and, based on such determinations, the Auction Rate for the next succeeding Auction Period as follows:

(A)  if Sufficient Clearing Bids have been made, that the Auction Rate for the next succeeding Auction Period shall be equal to the Winning Bid Rate so determined;

E-11

(B) if Sufficient Clearing Bids have not been made (other than because all of the Outstanding ARCs Bonds are subject to Submitted Hold Orders), that the Auction Rate for the next succeeding Auction Period shall be equal to the Maximum Auction Rate; or

(C) if all Outstanding ARCs Bonds are subject to Submitted Hold Orders, that the Auction Rate for the next succeeding Auction Period shall be equal to the All-Hold Rate.

(d)    Acceptance and Rejection of Submitted Bids and Submitted Sell Orders and Allocation of ARCs Bonds. Existing Holders shall continue to hold the principal amount of ARCs Bonds that are subject to Submitted Hold Orders, and, based on the determinations made pursuant to paragraph (i) of subsection (d) of this Section 2.01, Submitted Bids and Submitted Sell Orders shall be accepted or rejected and the Auction Agent shall take such other action as set forth below:

(i)    If Sufficient Clearing Bids have been made, all Submitted Sell Orders shall be accepted and, subject to the provisions of paragraph (iv) of this subsection (d), Submitted Bids shall be accepted or rejected as follows in the following order of priority and all other Submitted Bids shall be rejected:

(A) Existing Holders' Submitted Bids specifying any rate that is higher than the Winning Bid Rate shall be accepted, thus requiring each such Existing Holder to sell the aggregate principal amount of ARCs Bonds subject to such Submitted Bids;

(B) Existing Holders' Submitted Bids specifying any rate that is lower than the Winning Bid Rate shall be rejected, thus entitling each such Existing Holder to continue to hold the aggregate principal amount of ARCs Bonds subject to such Submitted Bids;

(C) Potential Holders' Submitted Bids specifying any rate that is lower than the Winning Bid Rate shall be accepted, thus requiring such Potential Holder to purchase the aggregate principal amount of ARCs Bonds subject to such Submitted Bids;

(D) Each Existing Holder's Submitted Bid specifying a rate that is equal to the Winning Bid Rate shall be rejected, thus entitling such Existing Holder to continue to hold the aggregate principal amount of ARCs Bonds subject to such Submitted Bid, unless the aggregate principal amount of Outstanding ARCs Bonds subject to all such Submitted Bids shall be greater than the principal amount of ARCs Bonds (the "remaining principal amount") equal to the excess of the Available Bond over the aggregate principal amount of ARCs Bonds subject to Submitted Bids described in clauses (B) and (C) of this paragraph (i), in which event such Submitted Bid of such Existing Holder shall be rejected in part, and such Existing Holder shall be entitled to continue to hold the principal amount of ARCs Bonds subject to such Submitted Bid, but only in an amount equal to the aggregate principal amount of ARCs Bonds obtained by multiplying the remaining principal amount by a fraction the numerator of which shall be the principal amount of Outstanding ARCs Bonds held by such Existing Holder subject to such Submitted Bid and the denominator of which shall be the sum of the principal amount of Outstanding ARCs Bonds subject to such Submitted Bids made by all such Existing Holders that specified a rate equal to the Winning Bid Rate; and

E-12

(E)  Each Potential Holder's Submitted Bid specifying a rate that is equal to the Winning Bid Rate shall be accepted but only in an amount equal to the principal amount of ARCs Bonds obtained by multiplying the excess of the aggregate principal amount of Available Bond over the aggregate principal amount of ARCs Bonds subject to Submitted Bids described in clauses (B), (C) and (D) of this paragraph (i) by a fraction the numerator of which shall be the aggregate principal amount of Outstanding ARCs Bonds subject to such Submitted Bid and the denominator of which shall be the sum of the principal amounts of Outstanding ARCs Bonds subject to Submitted Bids made by all such Potential Holders that specified a rate equal to the Winning Bid Rate.

(ii)  If Sufficient Clearing Bids have not been made (other than because all of the Outstanding ARCs Bonds are subject to Submitted Hold Orders), subject to the provisions of paragraph (iv) of this subsection (d), Submitted Orders shall be accepted or rejected as follows in the following order of priority and all other Submitted Bids shall be rejected:

(A)  Existing Holders' Submitted Bids specifying any rate that is equal to or lower than the Maximum Auction Rate shall be rejected, thus entitling such Existing Holders to continue to hold the aggregate principal amount of ARCs Bonds subject to such Submitted Bids;

(B)  Potential Holders' Submitted Bids specifying any rate that is equal to or lower than the Maximum Auction Rate shall be accepted, thus requiring each Potential Holder to purchase the aggregate principal amount of ARCs Bonds subject to such Submitted Bids; and

(C)  Each Existing Holder's Submitted Bid specifying any rate that is higher than the Maximum Auction Rate and the Submitted Sell Order of each Existing Holder shall be accepted, thus entitling each Existing Holder that submitted any such Submitted Bid or Submitted Sell Order to sell the ARCs Bonds subject to such Submitted Bid or Submitted Sell Order, but in both cases only in an amount equal to the aggregate principal amount of ARCs Bonds obtained by multiplying the aggregate principal amount of ARCs Bonds subject to Submitted Bids described in clause (B) of this paragraph (ii) by a fraction the numerator of which shall be the aggregate principal amount of Outstanding ARCs Bonds held by such Existing Holder subject to such Submitted Bid or Submitted Sell Order and the denominator of which shall be the aggregate principal amount of Outstanding ARCs Bonds subject to all such Submitted Bids and Submitted Sell Orders.

(iii)  If all Outstanding ARCs Bonds are subject to Submitted Hold Orders, all Submitted Bids shall be rejected.

(iv)  If, as a result of the procedures described in paragraph (i) or (ii) of this subsection (d), any Existing Holder would be entitled or required to sell, or any Potential Holder would be entitled or required to purchase, a principal amount of ARCs Bonds that is not equal to an Authorized Denomination therefor the Auction Agent shall, in such manner as it shall, in its sole discretion, determine, round up or down the principal amount of ARCs Bonds to be purchased or sold by any Existing Holder or Potential Holder so that the principal amount of ARCs Bonds purchased or sold by each Existing Holder or Potential Holder shall be equal to an Authorized

Denomination therefor, even if such allocation results in one or more of such Potential Holders not purchasing any ARCs Bonds.

(e) Based on the results of each Auction, the Auction Agent shall determine the aggregate principal amount of ARCs Bonds to be purchased and the aggregate principal amount of ARCs Bonds to be sold by Potential Holders and Existing Holders on whose behalf each Broker-Dealer submitted Bids or Sell Orders and, with respect to each Broker-Dealer, to the extent that such aggregate principal amount of ARCs Bonds to be sold differs from such aggregate principal amount of ARCs Bonds to be purchased, determine to which other Broker-Dealer or Broker-Dealers acting for one or more purchasers such Broker-Dealer shall deliver, or from which other Broker-Dealer or Broker-Dealers acting for one or more sellers such Broker-Dealer shall receive, as the case may be, ARCs Bonds.

SECTION 2.02.  Certain Orders Not Permitted.  Neither the Authority nor the Institution may submit an Order in any Auction.  The Auction Agent shall have no duty or liability in monitoring or enforcing compliance with this Section 2.02.

SECTION 2.03.  Payment of Service Charges; Notice of Payment Defaults and Cures.

(a)  The Institution shall pay to the Auction Agent, on behalf of the Holders of the ARCs Bonds, as Additional Payments under the Loan Agreement (i) when due, an amount equal to the Auction Agent Fee as calculated in the Auction Agreement and (ii) when due, an amount equal to the Broker-Dealer Fee as calculated in the Broker-Dealer Agreement.

(b)  By 12:30 P.M. New York City time on the Business Day immediately succeeding each Interest Payment Date, the Bond Trustee will determine if a Payment Default has occurred.  If a Payment Default has occurred, the Bond Trustee shall notify the Auction Agent and Broker-Dealer by 1:00 P.M. New York City time on said date.  If a Payment Default has been cured, the Bond Trustee shall so notify the Auction Agent and the Broker-Dealer by 5:00 P.M. New York City time on the day such Payment Default is cured.

SECTION 2.04.  Calculation of the Rates.  The Auction Agent shall calculate the Maximum Interest Rate, the Maximum Auction Rate, the All-Hold Rate, and the "'AA'" Financial Commercial Paper Rate on each Auction Date.  The determination by the Auction Agent of each of such rates will (in the absence of manifest error) be final and binding upon all Holders and upon all other parties.  If the ownership of the ARCs Bonds is no longer maintained in book-entry form by the Depository, the Bond Trustee shall calculate the Maximum Auction Rate on the Business Day immediately preceding the first day of each Auction Period commencing after the delivery of certificates representing the ARCs Bonds pursuant to Section 2.09 of the Bond Indenture.  If a

E-14

Payment Default shall have occurred, the Bond Trustee shall calculate the Default Rate on the first day of (i) each Auction Period commencing after the occurrence and during the continuance of such Payment Default and (ii) any Auction Period commencing less than the Applicable Number of Business Days after the cure of any Payment Default.

SECTION 2.05.  <u>Computation of Interest During Auction Rate Period</u>.  The amount of interest distributable to Holders of ARCs Bonds bearing interest at the Auction Rate in respect of each $50,000 in principal amount thereof for any Auction Period or part thereof shall be calculated by applying the Applicable Rate for such Auction Period or part thereof to the principal amount of $50,000, multiplying such product by the actual number of days in the Auction Period or part thereof concerned divided by 365, and truncating the resultant figure to the nearest one cent. Interest on the ARCs Bonds shall be computed by the Bond Trustee on the basis of a 365-day year for the number of days actually elapsed; and for any such calculation with respect to an Interest Payment Date occurring after January 1 of a leap year through December 31 of such leap year, such interest (for any day occurring during such period) shall also be computed on the basis of a 365-day year period.  In the event an Interest Payment Date occurs in any Auction Period on a date other than the first day of such Auction Period, the Bond Trustee, after confirming the calculation required above, shall calculate the portion of the Interest Amount payable on such Interest Payment Date and the portion payable on the next succeeding Interest Payment Date.  The Bond Trustee shall make the calculation required in this Section 2.05 not later than the close of business on each Auction Date.

SECTION 2.06.  <u>Notification of Rates, Amounts and Payment Dates</u>.

(a)  The Bond Trustee shall determine the aggregate amount of interest distributable on the next succeeding Interest Payment Date to the Holders of the ARCs Bonds.  So long as the ownership of the ARCs Bonds is maintained in book-entry form by the Depository, the Bond Trustee shall advise the Depository of each Record Date for the ARCs Bonds at least two Business Days prior thereto.

(b)  Promptly after the Date of Delivery and in any event at least 10 days prior to each Interest Payment Date thereafter, the Bond Trustee shall:

(i)  so long as no Payment Default has occurred and is continuing and the ownership of the ARCs Bonds is maintained in book-entry form by the Depository, confirm the Auction Agent's determination of the date of such next Interest Payment Date and notify the Auction Agent of any discrepancy therein; and

(ii)  advise the Depository, so long as the ownership of the ARCs Bonds is maintained in book-entry form by the Depository, of the Applicable Rate and the interest amount calculated in accordance with Section 2.05 above in respect of the next succeeding Interest Payment Date.

In the event that any day that is scheduled to be an Interest Payment Date shall be changed after the Bond Trustee shall have given the notice referred to in clause (i) of the preceding sentence, not later than 9:15 A.M., New York City time, on the Business Day next preceding the

earlier of the new Interest Payment Date or the old Interest Payment Date, the Bond Trustee shall, by such means as the Bond Trustee deems practicable, give notice of such change to the Auction Agent, so long as no Payment Default has occurred and is continuing and the ownership of the ARCs Bonds is maintained in book-entry form by the Depository.

SECTION 2.07.  Adjustment in Percentages.

(a)  The Market Agent shall adjust the percentage used in determining the All-Hold Rate, the Applicable Percentage used in determining the Maximum Auction Rate and the Applicable Percentage of the Kenny Index used in determining the Default Rate, if any such adjustment is necessary, in the judgment of the Market Agent, to reflect any Change of Preference Law such that ARCs Bonds paying the Maximum Auction Rate, ARC's paying the All-Hold Rate and ARCs Bonds paying the Default Rate shall have substantially equal market values before and after such Change of Preference Law.  Prior to any such adjustment, the Bond Trustee shall give notice thereof to any rating agency then rating the ARCs Bonds, and no such adjustment shall be made unless such adjustment will not adversely affect the rating on the ARCs Bonds.  In making any such adjustment, the Market Agent shall take the following factors, as in existence both before and after such Change of Preference Law, into account:

(i)  short-term taxable and tax-exempt market rates and indices of such short-term rates;

(ii)  the market supply and demand for short-term tax-exempt securities;

(iii)  yield curves for short-term and long-term tax-exempt securities or obligations having a credit rating that is comparable to the ARCs Bonds;

(iv)  general economic conditions; and

(v)  economic and financial factors present in the securities industry that may affect or that may be relevant to the ARCs Bonds.

(b)  The Market Agent shall effectuate an adjustment in the percentage used in determining the All-Hold Rate, the Applicable Percentage used in determining the Maximum Interest Rate and the percentage of the Kenny Index used to determine the Default Rate pursuant to subsection (a) of this Section 2.07 by delivering to the Institution, the Bond Trustee and the Auction Agent at least 10 days prior to the Auction Date on which the Market Agent desires to effect such change a favorable opinion of nationally recognized bond counsel to the effect that such adjustment is authorized by this Indenture, is permitted under State law and will not have an adverse effect on the exclusion of interest on the ARCs Bonds from gross income for federal income tax purposes authorizing the adjustment of the percentage used in determining the All-Hold Rate, the Applicable Percentage used in determining the Maximum Auction Rate and the Applicable Percentage of the Kenny Index used to determine the Default Rate, which shall be specified in such certificate.

SECTION 2.08.  Changes in Auction Periods or Auction Date.

(a) Changes in Auction Period or Periods.

      (i)  While any of the ARCs Bonds are Outstanding as ARCs Bonds, the Market Agent:

           (A)  in order to conform with then current market practice with respect to similar securities, shall; or

           (B)  in order to accommodate economic and financial factors that may affect or be relevant to the length of the Auction Period and the interest rate borne by the ARCs Bonds and with the written consent of the Institution, may change, from time to time, the length of one or more Auction Periods (an "Auction Period Adjustment"). The Institution shall not consent to such change in the length of the Auction Period, if such consent is required above, unless the Institution shall have received from the Market Agent not less than three days nor more than 20 days prior to the effective date of such change a written request for consent together with a certificate demonstrating the need for change in reliance on such factors. The Market Agent shall initiate the Auction Period Adjustment by giving written notice to the Bond Trustee, the Auction Agent, the Institution, and the Depository at least 10 days prior to the Auction Date for such Auction Period.

      (ii)  Any such changed Auction Period shall not be less than 7 days.

      (iii)  The Auction Period Adjustment shall not be allowed unless Sufficient Clearing Bids existed at both the Auction before the date on which the notice of the proposed change was given as provided in this Section 2.08 and the Auction immediately preceding the proposed change.

      (iv)  The Auction Period Adjustment shall take effect only if (A) the Bond Trustee and the Auction Agent receive, by 11:00 A.M. on the Business Day before the Auction Date for the first such Auction Period, a certificate from the Market Agent, authorizing the Auction Period Adjustment specified in such certificate and (B) Sufficient Clearing Bids exist at the Auction on the Auction Date for such first Auction Period. If the condition referred to in (A) above is not met, the Applicable Rate for the next Auction Period shall be determined pursuant to the Auction Procedures and the Auction Period shall be the Auction Period determined without reference to the proposed change. If the condition referred to in (A) is met but the condition referred to in (B) above is not met, the Applicable Rate for the next Auction Period shall be the Maximum Auction Rate and the Auction Period shall be the Auction Period determined without reference to the proposed change. In connection with any Auction Period Adjustment, the Auction Agent shall provide such further notice to such parties as is specified in the Auction Agent Agreement.

      (v)  If Auction Periods are changed as provided herein and if an Auction is scheduled to occur for the next Auction Period on a date that was reasonably expected to be a Business Day, but such Auction does not occur because such date is later not considered to be a Business Day, the Auction shall nevertheless be deemed to have occurred, and the applicable Auction Rate in effect for the next Auction Period will be the Auction Rate in effect for the preceding Auction Period and such Auction Period will generally be 35 days in duration, beginning on the calendar day following the date of the deemed Auction and ending on (and including) a Wednesday (unless

such Wednesday is not followed by a Business Day, in which case on the next succeeding Business Day). If the preceding Auction Period was other than generally 35 days in duration, the Auction Rate for the deemed Auction will instead be the rate of interest determined by the Market Agent on equivalently rated Auction securities with a comparable length of Auction period.

(b) <u>Changes in the Auction Date</u>. While any of the ARCs Bonds bear interest at the Auction Rate, the Market Agent:

(i) in order to conform with then current market practice with respect to similar securities, shall; or

(ii) in order to accommodate economic and financial factors that may affect or be relevant to the day of the week constituting an Auction Date and the interest rate borne on the ARCs Bonds and with the written consent of the Institution, may specify an earlier Auction Date (but in no event more than five Business Days earlier) than the Auction Date that would otherwise be determined in accordance with the definition of "Auction Date" with respect to one or more specified Auction Periods. The Institution shall not consent to such change in the Auction Date, if such consent is required in subparagraph (b)(ii) above, unless the Institution shall have received from the Market Agent not less than three days nor more than 20 days prior to the effective date of such change a written request for consent together within a certificate demonstrating the need for change in reliance on such factors. The Market Agent shall provide notice of any determination to specify an earlier Auction Date for one or more Auction Periods by means of a written notice delivered at least 10 days prior to the proposed changed Auction Date to the Bond Trustee, the Auction Agent, the Institution, and the Depository.

(c) In connection with any change described in this Section 2.08, the Auction Agent shall provide such further notice to such parties as is specified in Section 2.05 of the Auction Agreement.

(d) No change shall be made to the Auction Period or Auction Date unless the Bond Trustee shall give notice thereof to any rating agency then rating the ARCs Bonds, and no change shall be made unless such change will not adversely affect the rating on the ARCs Bonds.

SECTION 2.09. <u>Notices</u>. The Market Agent shall provide the Bond Trustee and, so long as no default under the Indenture has occurred and is continuing and the ownership of the ARCs Bonds is maintained in book-entry form by the Depository, the Auction Agent with notice of any change in the Maximum Interest Rate.

SECTION 2.10. <u>Notice of Payment Default</u>.

(a) If the Institution determines that a Payment Default has occurred the Institution shall promptly notify the Bond Trustee thereof.

E-18

(b) So long as the ownership of the ARCs Bonds is maintained in book-entry form by the Depository, upon the occurrence of a Payment Default the Bond Trustee shall immediately send a notice thereof to the Auction Agent and Market Agent by telecopy or similar means.

(c) So long as the ownership of the ARCs Bonds is maintained in book-entry form by the Depository, the Bond Trustee shall immediately send notice to the Auction Agent by telecopy or similar means if a Payment Default is cured.

ARTICLE III

AUCTION AGENT, MARKET AGENT AND BROKER-DEALERS

SECTION 3.01.  <u>Market Agent</u>.  The Bond Trustee shall enter into a Market Agent Agreement with UBS Financial Services, Inc., as the initial Market Agent.  The Market Agent shall serve as such under the terms and provisions of this Appendix E and of the Market Agent Agreement.  The Market Agent, including any successor appointed pursuant hereto, shall be a member of the National Association of Securities Dealers, Inc. having capitalization of at least $25,000,000, and be authorized by law to perform all the duties imposed upon it by the Bond Indenture and the Market Agent Agreement.  The Market Agent may be removed at any time by the Institution by an instrument signed by the Institution and filed with the Bond Trustee, the Auction Agent and the Market Agent, provided that such removal shall not take effect until the appointment of a successor Market Agent.  The Market Agent may resign upon 30 days' written notice delivered to the Institution, the Bond Insurer and the Bond Trustee.  The Institution shall use its best efforts to appoint a successor Market Agent that is a qualified institution, effective as of the effectiveness of any such resignation or removal.  Notwithstanding that the Market Agent is the agent of the Bond Trustee under the Market Agent Agreement, the Bond Trustee shall not be liable in any way for any action taken, suffered, or omitted, or for any error of judgment made by the Market Agent, whether in the performance of its duties under the Market Agent Agreement or otherwise.

SECTION 3.02.  <u>Auction Agent</u>.

(a) Deutsche Bank Trust Company Americas shall serve as the initial Auction Agent for the ARCs Bonds.  The Bond Trustee is hereby directed to enter into an agreement with the Auction Agent which shall provide as follows: The Auction Agent shall be (i) a bank or trust company duly organized under the laws of the United States of America or any state or territory thereof having its principal place of business in the Borough of Manhattan, The City of New York, and having a combined capital stock, surplus and undivided profits of at least $15,000,000 or (ii) a member of the National Association of Securities Dealers, Inc., having a capitalization of at least $15,000,000 and, in either case, authorized by law to perform all the duties imposed upon it hereunder and under the Auction Agreement.  The Auction Agent may resign and be discharged of the duties and obligations created by the Bond Indenture by giving at least 90 days' written notice to the Bond Insurer, the Institution, the Bond Trustee and the Market Agent (30 days' written notice if the Auction Agent has not been paid its fee for more than 30 days after such fee is due).  The Auction Agent may be removed at any time by the Institution by an instrument signed by the Institution and filed with the Bond Trustee, the Bond Insurer, the Auction Agent and the Market Agent upon at

least 90 days' notice; provided that, if required by the Market Agent, an agreement in substantially the form of the Auction Agreement shall be entered into with a successor Auction Agent.

(b)  In the event that the Auction Agent shall resign or be removed or dissolved, or if the property or affairs of the Auction Agent shall be taken under the control of any state or federal court or administrative body because of bankruptcy or insolvency, or for any other reason, the Institution shall appoint a successor as Auction Agent, and the Bond Trustee shall thereupon enter into an Auction Agreement with such successor.

(c)  The Auction Agent shall be acting as agent for the Bond Trustee in connection with Auctions.  In the absence of bad faith or negligence on its part, the Auction Agent shall not be liable for any action taken, suffered or omitted or for any error of judgment made by it in the performance of its duties under the Auction Agreement and shall not be liable for any error of judgment made in good faith unless the Auction Agent shall have been negligent in ascertaining (or failing to ascertain) the pertinent facts necessary to make such judgment.

SECTION 3.03. <u>Broker-Dealers</u>.     (a)     The Auction Agent shall enter into a Broker-Dealer Agreement with UBS Financial Services, Inc., as the initial Broker-Dealer.  The Market Agent may from time to time approve one or more additional persons to serve as Broker-Dealers under Broker-Dealer Agreements.

(b)     Any Broker-Dealer may be removed at any time by the Institution, but, so long as any ARCs Bonds are in the Auction Rate Period, there shall be at least one Broker-Dealer appointed and acting as such.

(This page intentionally left blank.)

**APPENDIX F**

**FORM OF BOND COUNSEL OPINION**

**APPENDIX F**

September 4, 2003

West Virginia Hospital Finance Authority
One Players Club Drive
Charleston, WV

West Virginia United Health System
1000 Technology Drive, Suite 2320
Fairmont, WV 26554

West Virginia University Hospitals, Inc.
Medical Center Drive
PO Box 8059
Morgantown, WV 26506

UBS Financial Services, Inc.
1285 Avenue of the Americas
New York, NY 10019

> $23,530,000 West Virginia Hospital Finance Authority Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series A
>
> $25,800,000 West Virginia Hospital Finance Authority Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series B Auction Rate Certificates (ARCs [SM])
>
> $44,650,000 West Virginia Hospital Finance Authority Hospital Revenue Refunding and Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series C Auction Rate Certificates (ARCs [SM])
>
> $45,750,000 West Virginia Hospital Finance Authority Hospital Revenue Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series D Auction Rate Certificates (ARCs [SM])

Ladies and Gentlemen:

We have served as bond counsel in connection with the issuance by the West Virginia Hospital Finance Authority (the "Authority") of its (i) $23,530,000 Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series A (the "2003 A Bonds"), (ii) $25,800,000 Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series B Auction Rate Certificates (ARCs [SM]) (the "2003 B Bonds"), (iii) $44,650,000 Hospital Revenue Refunding and Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series C Auction Rate Certificates (ARCs[sm]) (the "2003 C Bonds"), and (iv) $45,750,000

West Virginia Hospital Finance Authority
West Virginia United Health System
West Virginia University Hospital, Inc.
UBS Paine Webber Inc.
September 4, 2003
Page 2 of 5

Hospital Revenue Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series D Auction Rate Certificates (ARCs$^{(sm)}$) (the "2003 D Bonds," and, together with the 2003 A Bonds, the 2003 B Bonds and the 2003 C Bonds, sometimes hereinafter collectively referred to as the "2003 Bonds"). The 2003 Bonds will be issued pursuant to a Bond Trust Indenture, dated as of August 1, 2003 (the "Bond Indenture"), between the Authority and The Bank of New York, New York, New York, as Bond Trustee (the "Bond Trustee"). The proceeds of the 2003 Bonds will be loaned to West Virginia University Hospitals, Inc., a West Virginia non-profit corporation (the "Corporation"), pursuant to a Loan Agreement dated August 1, 2003, between the Authority and the Corporation (the "Loan Agreement"). The obligations of the Corporation under the Loan Agreement are evidenced by the 2003-1A Note, the 2003-1B Note, the 2003-1C Note and the 2003-1D Note (the "2003 Notes"), issued pursuant to an Amended and Restated Master Trust Indenture, dated as of August 1, 2003 (the "Master Trust Indenture"), between the Huntington National Bank, Inc. and the Corporation. We have examined the law and such certified proceedings and other papers as we deem necessary to render this opinion. We have also examined an unauthenticated specimen Bond.

The Authority is a body corporate and governmental instrumentality created and existing under the laws of the State of West Virginia (the "State), particularly Chapter 16, Article 29A, of the Code of West Virginia, 1931, as amended (the "Act"), for certain purposes set forth in the Act, including, inter alia, borrowing money and issuing bonds and other evidences of indebtedness to finance or refinance the costs of acquisition, construction, improvement and alteration of hospital facilities as defined in the Act. The 2003 Bonds are issued pursuant to the Act, and other applicable laws, and pursuant to a Resolution of the Authority adopted July 24, 2003 (the "Resolution"), authorizing the issuance of the 2003 Bonds. Proceeds of the 2003 Bonds are issued to (i) currently refund all outstanding West Virginia Hospital Finance Authority Hospital Revenue Refunding Bonds, West Virginia University Hospitals, Inc. Issue, Series 1993, and all outstanding West Virginia Hospital Finance Authority Weekly Rate Demand Refunding Revenue Bonds (West Virginia University Hospitals, Inc. Project) Series 2002 B-1; (ii) reimburse the costs of certain capital expenditures made, or to be made by the Corporation at its hospital facilities (as defined in the Act); and (iii) pay the costs of issuing the 2003 Bonds, including the premium for the issuance of the Insurance Policy by the Bond Insurer (collectively, the "Project").

The Authority and the Corporation have executed a Tax Compliance Certificate, dated as of the date hereof (the "Tax Certificate"), which, among other things, sets forth restrictions on the investment and expenditure of the 2003 Bonds proceeds and earnings thereon,

West Virginia Hospital Finance Authority
West Virginia United Health System
West Virginia University Hospital, Inc.
UBS Paine Webber Inc.
September 4, 2003
Page 3 of 5

to ensure that the requirements of the Internal Revenue Code of 1986, as amended, and regulations promulgated pursuant thereto (collectively, the "Code"), necessary to establish and maintain the excludability from gross income for federal income tax purposes of the interest on the 2003 Bonds, are and will continue to be met.

We have not been engaged or undertaken to review the accuracy, completeness or sufficiency of the Official Statement or other offering material relating to the 2003 Bonds (except to the extent, if any, stated in the Official Statement) and we express no opinion relating thereto.

As to questions of fact material to our opinion, we have relied upon the representations of the Authority and other entities contained in the herein-described documents and certifications furnished to us by or on behalf of the Authority, without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.      The Authority is a body corporate and governmental instrumentality of the State with power to adopt the Resolution, to execute and deliver the Bond Indenture, the Loan Agreement and the Tax Certificate and to perform the agreements on its part contained therein and to issue the 2003 Bonds.

2.      The Resolution, the Bond Indenture and the Loan Agreement have been duly adopted by the Authority, are each in full force and effect, and is valid and binding upon the Authority and assuming due authorization, execution and delivery of the Bond Indenture and the Loan Agreement by the other parties thereto, are enforceable against the Authority in accordance with their terms (except to the extent that the enforceability thereof may be limited by the operation of bankruptcy, insolvency and similar laws affecting rights and remedies of creditors).

3.      The Tax Certificate has been duly authorized, executed and delivered by the Authority and, assuming due authorization, execution and delivery by the other party thereto, constitute valid and binding agreements of the Authority, enforceable against the Authority in accordance with the respective terms thereof.

4.      The Bond Indenture creates the valid pledge which it purports to create of the Revenues (as defined in the Bond Indenture), and other funds and accounts pledged to the

West Virginia Hospital Finance Authority
West Virginia United Health System
West Virginia University Hospital, Inc.
UBS Paine Webber Inc.
September 4, 2003
Page 4 of 5
payment of the 2003 Bonds under the Resolution and the Bond Indenture subject to the terms thereof.

5.     The 2003 Bonds have been duly authorized, executed and delivered by the Authority and, assuming proper authentication, are valid and binding special obligations of the Authority, payable solely from the sources provided therefor in the Resolution and the Bond Indenture.

6.     In our opinion, based upon an analysis of existing laws, regulations, rulings and court decisions, and assuming, among other matters, the accuracy of certain representations and compliance with certain covenants, interest on the 2003 Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Code. We are of the further opinion that interest on the 2003 Bonds is not a specific preference item for purposes of the federal individual or corporate alternative minimum taxes, although such interest is included in adjusted current earnings when calculating corporate alternative minimum taxable income.

The Code imposes various restrictions, conditions and requirements relating to the exclusion from gross income for federal income tax purposes of interest on obligations such as the 2003 Bonds. The Authority and the Corporation have covenanted to comply with certain restrictions designed to insure that interest on the 2003 Bonds will not be included in federal gross income. Failure to comply with these covenants may result in interest on the 2003 Bonds being included in gross income for federal income tax purposes, possibly from the date of original issuance of the 2003 Bonds. We assume compliance with these covenants. We have not undertaken to determine (or to inform any person) whether any actions taken (or not taken) or events occurring (or not occurring) after the date of issuance of the 2003 Bonds may adversely affect the value of, or the tax status of interest on the 2003 Bonds.

Certain requirements and procedures contained or referred to in the Resolution, the Bond Indenture, the Loan Agreement and the Tax Certificate, and other relevant documents may be changed and certain actions may be taken or omitted under the circumstances and subject to the terms and conditions set forth in such documents. We express no opinion as to any Bond or the interest thereon if any such change occurs or action is taken or omitted upon the advice or approval of bond counsel other than this firm.

West Virginia Hospital Finance Authority
West Virginia United Health System
West Virginia University Hospital, Inc.
UBS Paine Webber Inc.
September 4, 2003
Page 5 of 5

       7.      Under the Act, the 2003 Bonds, and all interest and income thereon, shall be exempt from all taxation by the State of West Virginia and any county, municipality, political subdivision or agency thereof, except inheritance taxes.

       We have also relied upon the opinion of Robert L. Brandfass, as counsel to the Corporation, contained in the Transcript of closing documents relating to the issuance and sale of the 2003 Bonds, as to all matters concerning the due authorization, execution and delivery by, and the binding effect upon and enforceability against, the Corporation, of the Loan Agreement and the 2003 Notes and that the Corporation is a 501(c)(3) organization within the meaning of the Code.

       The rights of the holders of the 2003 Bonds and the enforceability of the 2003 Bonds, the Bond Indenture, the Loan Agreement and the Tax Certificate and the liens and pledges set forth therein may be subject to and limited by bankruptcy laws and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that the enforcement thereof may also be subject to general principles of equity and to the exercise of judicial discretion.

       Very truly yours,

       Spilman Thomas & Battle, PLLC

269490