# Exhibit B

**$25,800,000**
## WEST VIRGINIA HOSPITAL FINANCE AUTHORITY
## HOSPITAL REVENUE REFUNDING BONDS
## (WEST VIRGINIA UNIVERSITY HOSPITALS, INC.) 2003 SERIES B,
## AUCTION RATE CERTIFICATES (ARCs<sup>(SM)</sup>)

**$44,650,000**
## WEST VIRGINIA HOSPITAL FINANCE AUTHORITY
## HOSPITAL REVENUE REFUNDING AND IMPROVEMENT BONDS
## (WEST VIRGINIA UNIVERSITY HOSPITALS, INC.) 2003 SERIES C
## AUCTION RATE CERTIFICATES (ARCs<sup>(SM)</sup>)

**$45,750,000**
## WEST VIRGINIA HOSPITAL FINANCE AUTHORITY
## HOSPITAL REVENUE IMPROVEMENT BONDS
## (WEST VIRGINIA UNIVERSITY HOSPITALS, INC.) 2003 SERIES D
## AUCTION RATE CERTIFICATES (ARCs<sup>(SM)</sup>)

## PURCHASE CONTRACT

August 28, 2003

West Virginia Hospital Finance Authority
Charleston, West Virginia

Ladies and Gentlemen:

We, the undersigned, on our own behalf, and on behalf of Crews & Associates, Inc. and Ferris, Baker Watts, Incorporated, as representative of the underwriters (collectively, the "Underwriter"), hereby offer to enter into this Purchase Contract with you (the "Authority"), for the purchase by the Underwriter and sale by you of the Bonds specified below. This offer is made subject to acceptance by the Authority and approval by West Virginia University Hospitals, Inc., a West Virginia non-profit corporation (the "Corporation"), prior to 5:00 P.M., New York Time, on the date hereof, and upon such acceptance and approval, as evidenced by signatures in the spaces

CH-1188021v2

provided therefor below, this Purchase Contract shall be in full force and effect in accordance with its terms and shall be binding upon the Authority, the Underwriter and the Corporation. If this offer is not so accepted and approved, it is subject to withdrawal by the Underwriter upon written notice delivered to the Authority at any time prior to such acceptance and approval.

1.      Upon the terms and conditions and upon the basis of the representations set forth herein and in the Letter of Representation, dated the date hereof, and executed and delivered by the Corporation, which Letter of Representation is attached hereto as Exhibit A (the "Letter of Representation"), the Underwriter hereby agrees to purchase from the Authority and the Authority hereby agrees to sell to the Underwriter all (but not less than all) of the Authority's aggregate $116,200,000 Hospital Revenue Bonds (West Virginia University Hospitals, Inc.) Auction Rate Certificates (ARCs[sm]) (the "Bonds"), in three separate series, designated "2003 Series B Bonds," "2003 Series C Bonds" and "2003 Series D Bonds," to be dated their respective dates of delivery at an aggregate purchase price of $115,839,780 (representing par value less an underwriting discount of $360,220). The Bonds will mature in the principal amounts and bear interest at the rates as set forth on the cover page of the Official Statement referred to in Section 3 hereof. The Underwriter hereby further agrees to the terms of the Letter of Representation.

The Bonds shall be as described in, and shall be issued and secured under and pursuant to a Bond Trust Indenture, dated as of August 1, 2003 (the "Bond Indenture"), by and between the Authority and The Bank of New York, New York, New York (the "Bond Trustee"). In connection with the issuance of the Bonds, the Authority and the Corporation will enter into a Loan Agreement, to be dated as of August 1, 2003 (the "Loan Agreement"). Pursuant to the Loan Agreement, the Corporation is required to make payments to the Bond Trustee at such times and sufficient in amount to pay the principal of, redemption premium, if any, purchase price and interest on the Bonds (the "Corporation Payments").

The obligations of the Corporation under the Loan Agreement will be evidenced and secured by promissory notes 2003B-1, 2003 C-1 and 2003 D-1 to be issued (collectively, the "ARCs Notes") pursuant to an Amended and Restated Master Trust Indenture dated as of August 1, 2003 (the "Original Master Indenture"), as supplemented by Supplemental Master Trust Indenture No. 2003-1 ("Supplemental Master Trust Indenture No. 2003-1," and, together with the Original Master Indenture, sometimes hereinafter collectively referred to as the "Master Indenture"), between the Corporation and The Huntington National Bank, Columbus, Ohio, as master trustee (the "Master Trustee"). Under the Master Indenture, all Notes, including the ARCs Notes, are secured by a security interest in the Revenues (as defined in the Master Indenture).

The Bonds will be secured on a parity as to lien and source of payment with the Authority's (i) Hospital Refunding Revenue Bonds (West Virginia University Hospitals, Inc.) Series 1998 (the "1998 Bonds"), and (ii) Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series A (the "2003 A Bonds").

The scheduled payment of principal of and interest on the Bonds when due will be guaranteed under a bond insurance policy to be issued by Financial Security Assurance Inc. concurrently with the delivery of the Bonds.

The Underwriter agrees to make a bona fide public offering of the Bonds at the initial offering price as set forth above.

2.     The Underwriter hereby represents that it has been duly authorized to execute this Purchase Contract and to perform other functions, as herein set forth. Any authority, discretion or other power conferred upon the Underwriter under any of the provisions of this Purchase Contract shall be exercised by the Underwriter, and the payment for, acceptance of, and delivery and execution of any receipt for, the Bonds and any other instruments upon or in connection with the Closing (hereinafter defined) hereunder by the Underwriter shall be valid and sufficient for all purposes provided that any such action by the Underwriter shall not impose any obligation or liability upon it other than as may arise as expressly set forth in this Purchase Contract.

3.     The Authority and the Corporation by their acceptance and approval of this Purchase Contract ratify the use and distribution by the Underwriter prior to the date hereof of the preliminary official statement relating to the public offer, sale and distribution of the Bonds dated August 7, 2003 (including the cover page and all appendices thereto (the "Preliminary Official Statement"). The Authority has delivered or caused to be delivered to the Underwriter on the date hereof a form of the official statement relating to the Bonds dated the date hereof, marked to show changes from the Preliminary Official Statement, which the Authority deems final for purposes of Rule 15c2-12 promulgated under the Securities Exchange Act of 1934, as amended ("Rule 15c2-12"), except for information permitted to be omitted therefrom by Rule 15c2-12; provided, however, that the foregoing representation as to the finality of such form of official statement does not include a representation as to the finality of the statements and information contained therein concerning the Corporation and its affiliates. The Authority hereby agrees to deliver or cause to be delivered to the Underwriter promptly after acceptance hereof, copies of the final official statement, dated the date hereof, relating to the Bonds (including all information previously permitted to have been omitted by Rule 15c2-12 and any amendments or supplements thereto in connection with the offer, sale and distribution of the Bonds as have been approved by the Authority and the Underwriter) (the "Official Statement") approved on behalf of the Authority by its Chairman (or such other authorized officers as we shall have approved). By its approval of this Purchase Contract, the Corporation deems final, for the purposes of Rule 15c2-12, all information relating to the Corporation and its affiliates contained in the form of the Official Statement delivered to the Underwriter on this date. The Authority hereby authorizes the Corporation to, and the Corporation shall, cause to be delivered to the Underwriter, within seven (7) business days of the date hereof, definitive copies of the Official Statement in such quantity as the Underwriter shall request.

The Official Statement has been prepared pursuant to, and approved for distribution by, a resolution of the Authority and a resolution of the Corporation. The Authority authorizes the use of copies of the Official Statement, the Bond Indenture, the Master Indenture and the Loan Agreement in connection with the public offering and sale of the Bonds, and the Corporation by its approval hereof authorizes use of copies of the Official Statement, the Bond Indenture and

CH-1188021v2                      -3-

the Loan Agreement with the public offering and sale of the Bonds. The Bonds, the Bond Indenture, the Master Indenture, the Loan Agreement, the Official Statement, this Purchase Contract, the Letter of Representation, the Continuing Disclosure Agreement, the Escrow Deposit Agreement dated as of August 1, 2003 (the "1993 Escrow Agreement") between the Authority and The Bank of New York (successor-in-interest to One Valley Bank, National Association), as 1993 escrow agent, the Escrow Deposit Agreement dated as of August 1, 2003 (the "2002 Escrow Agreement") between the Authority and United Bank, Inc., as 2002 Escrow Agent, the Bond Insurance Policy and the Tax Compliance Certificate are hereinafter called the "Bond Documents."

      4.    The Authority represents to and agrees with the Underwriter that:

      (a)    the Authority is a body corporate and governmental instrumentality duly created and validly existing under the laws of the State of West Virginia, including particularly Article 29A of Chapter 16 of the Code of West Virginia, 1931, as amended, (the "Act") with power and authority to issue the Bonds under the Act;

      (b)    by official action of the Authority prior to or concurrently with the acceptance hereof, the Authority has duly authorized the distribution of the Preliminary Official Statement and approved the Official Statement and authorized its execution and distribution, and has duly authorized and approved the execution and delivery of, and the performance by the Authority of the obligations on its part contained in, the Bond Documents to which the Authority is a party (the "Authority Bond Documents") and the transaction contemplated thereby;

      (c)    the execution and delivery of the Authority Bond Documents, and compliance with the provisions on the Authority's part contained therein, will not conflict with or constitute a breach of or default under any law, administrative regulation, judgment, decree, loan agreement, indenture, bond, note, resolution, agreement or other instrument to which the Authority is a party or is otherwise subject, nor will any such execution, delivery, adoption or compliance result in the creation or imposition of any lien, charge or other security interest or encumbrance of any nature whatsoever upon any of the properties or assets of the Authority under the terms of any such law, administrative regulation, judgment, decree, loan agreement, indenture, bond, note, resolution, agreement or other instrument, except as provided in the Authority Bond Documents;

      (d)    the Authority is not in material breach of or default under any applicable law or administrative regulation of the State of West Virginia or the United States (except with respect to federal or state securities or Blue Sky laws in connection with the distribution of the Bonds by the Underwriter as to which the Authority makes no representations), or any applicable judgment or decree or any loan agreement, indenture, bond, note, resolution, agreement or other instrument to which the Authority is a party or is otherwise subject, and no event has occurred and is continuing which, with the passage of time or the giving of

notice, or both, would constitute a default or an event of default under any such instrument which breach or default would have a material adverse effect on the Bonds;

(e) there is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, governmental agency, public board or body, pending or, to the best of its knowledge, threatened against the Authority affecting the existence of the Authority or the titles of its officers to their respective offices or seeking to prohibit, restrain or enjoin the issuance, execution, sale or delivery of the Bonds or the collection by the Authority of revenues pledged or to be pledged to pay the principal of, and premium, if any, and interest on the Bonds, or the pledge thereof, or in any way contesting or affecting the validity or enforceability of the Authority Bond Documents, or contesting the powers of the Authority or its authority to issue, enter into, adopt or perform its obligations under any of the foregoing, or contesting in any way the completeness or accuracy of the Preliminary Official Statement or the Official Statement, or any amendment or supplement thereto, wherein an unfavorable decision, ruling or finding would materially adversely affect the validity or enforceability of the Authority Bond Documents;

(f) no consent, approval, authorization or other action by any governmental or regulatory authority having jurisdiction over the Authority that has not been obtained is or will be required for the issuance, execution, sale and delivery of the Bonds or the consummation by the Authority of the other transactions contemplated by Authority Bond Documents, except such as may be required under state securities or Blue Sky laws in connection with the distribution of the Bonds by the Underwriter;

(g) the Authority will furnish such information, execute such instruments and take such other action in cooperation with the Underwriter as the Underwriter may reasonably request in order (1) to qualify the Bonds for offer and sale under the Blue Sky or other securities laws and regulations of such states and other jurisdictions of the United States as the Underwriter may designate and (2) to determine the eligibility of the Bonds for investment under the laws of such states and other jurisdictions, and will use its best efforts to continue such qualification in effect so long as required for distribution of the Bonds; provided, however, that in no event shall the Authority be required to take any action which would subject it to general service of process in any jurisdiction in which it is not now so subject;

(h) if between the date of this Purchase Contract and the Closing Date the Authority is notified by the Corporation pursuant to Paragraph (q) of the Letter of Representation or, following the Closing Date if the Authority is notified by the Corporation pursuant to Paragraph (r) thereof, and is requested to amend, supplement or otherwise change the Official Statement, the Authority hereby directs the Corporation, and the Corporation hereby agrees, to amend or supplement the Official Statement, at the request of the Underwriter and in a form and in a manner approved by the Underwriter subject to the consent of the Authority, such consent not to be unreasonably withheld, provided all expenses thereby incurred will be paid by the Corporation; and

(i)     after the Closing, for so long as the Underwriter is obligated by Rule 15c2-12 to deliver final Official Statements to prospective purchasers, if any event relating to or affecting the Authority shall occur as a result of which it is necessary, in the opinion of counsel for the Underwriter, to amend or supplement the Official Statement in order to make the Official Statement not misleading in the light of the circumstances existing at the time it is delivered to a prospective purchaser, the Authority will inform the Underwriter of such event and cooperate in the preparation and furnishing to the Underwriter (at the expense of the Corporation for the duration of the underwriting period, which period shall not exceed 90 days from the Date of Closing, and thereafter at the expense of the Underwriter) a reasonable number of copies of an amendment of or supplement to the Official Statement (in form and substance satisfactory to counsel for the Underwriter and to Bond Counsel) which will amend or supplement the Official Statement so that it will not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances existing at the time the Official Statement is delivered to a prospective purchaser, not misleading. For the purposes of this paragraph and only for so long as required by this paragraph, the Authority will furnish such information with respect to itself as the Underwriter may from time to time reasonably request. The Underwriter hereby agrees that it will deposit or cause to be deposited with a nationally recognized municipal securities information repository a copy of the Official Statement at or prior to the time contemplated by Rule 15c2-12(b)(4).

The execution and delivery of this Purchase Contract by the Authority shall constitute a representation by the Authority to the Corporation and to the Underwriter that the representations and warranties contained in this Paragraph 4 are true as of the date hereof; provided that no member of the governing body of the Authority shall be individually liable for the breach of any representation or warranty made by the Authority in this Paragraph 4.

5.     The Underwriter's obligations under this Purchase Contract are and shall be subject to the receipt on or prior to the date of the Official Statement of a letter from Ernst & Young LLP, dated the date of delivery of the Bonds (the "Closing Date"), addressed to the Corporation and the Underwriter and in form and substance satisfactory to the Underwriter.

6.     At 10:00 o'clock A.M., New York time, on September 4, 2003, or at such other time, or on such earlier or later date as we mutually agree upon (such time being herein called the "Closing" and such date being herein called the "Closing Date"), the Authority will deliver or cause to be delivered to The Depository Trust Company, New York, New York, on behalf of the Underwriter, the Bonds (or shall otherwise be held by the Registrar in the event of a "FAST" closing). The Bonds shall be in the form of a single fully registered bond for each maturity, without coupons, registered in the name of Cede & Co., as nominee of The Depository Trust Company. The Bonds so delivered shall contain CUSIP identification numbers. All expenses of the issuance of such CUSIP identification numbers shall be paid by the Underwriter. The Underwriter will accept delivery of the Bonds and pay the purchase price thereof as set forth in Paragraph 1 hereof in immediately available funds payable to the order of the Bond Trustee for the account of the Authority. The Bonds will be made available for inspection by the Underwriter at the offices of The Depository Trust Company in New York, New York one business day prior to the Closing Date. If

CH-1188021v2                                                    -6-

required by the policies of DTC, the Authority also agrees that it shall deliver to The Depository Trust Company the letter of representation, in the form required by The Depository Trust Company (the "DTC Letter of Representation"), at the time required by The Depository Trust Company.

7.     The Underwriter hereby enters into this Purchase Contract in reliance upon the representations and warranties of the Authority contained herein and the representations and warranties of the Corporation contained in the Letter of Representation and in reliance upon the representations and warranties to be contained in the documents and instruments to be delivered on the Closing Date and upon the performance by the Authority, subject to the Corporation performing its duties hereunder, and by the Corporation of its respective obligations, hereunder and under the Letter of Representation. Accordingly, the Underwriter's obligations under this Purchase Contract to purchase, to accept delivery of and to pay for the Bonds shall be conditioned upon the performance by the Authority, subject to the Corporation performing its duties hereunder, and by the Corporation of its respective obligations to be performed hereunder and under the Letter of Representation and under such documents and instruments at or prior to the Closing Date, and shall also be subject to the following additional conditions:

     (a)     the representations and warranties of the Authority contained herein and the representations and warranties of the Corporation and its affiliates contained in the Letter of Representation shall be true, complete and correct on the date hereof and as of the Closing Date, as if made on and at the Closing Date;

     (b)     as of the Closing Date, Bond Documents shall be in full force and effect and shall be in the forms previously furnished to us except for such changes as may have been agreed to in writing by us; and there shall be in full force and effect such resolutions as, in the opinion of Spilman Thomas & Battle, PLLC, Charleston, West Virginia ("Bond Counsel"), shall be necessary in connection with the transactions contemplated hereby;

     (c)     the Underwriter shall have the right to cancel its obligations to purchase the Bonds if between the date hereof and the Closing Date, (i) legislation shall have been enacted by the Congress of the United States or the legislature of the State of West Virginia or shall have been reported out of committee of either body or be pending in a committee of either body, or shall have been recommended to the Congress of the United States or otherwise endorsed for passage (by press release, other form of notice or otherwise) by the President of the United States, the Treasury Department of the United States, the Internal Revenue Service or the Chairman or ranking minority member of the Committee on Finance of the United States Senate or the Committee on Ways and Means of the United States House of Representatives, or legislation shall have been proposed for consideration by either such Committee or by the staff of the Joint Committee on Taxation of the Congress of the United States, or legislation shall have been favorably reported for passage to either House of the Congress of the United States by a Committee of such House to which such legislation has been referred for consideration, or a decision shall have been rendered by a court of the United States or of the State of West Virginia or the United States Tax Court, or a ruling shall have been made or a regulation or temporary regulation shall have been proposed or made or any other release or announcement shall have been made by the

CH-1188021v2                                    -7-

Treasury Department of the United States or the Internal Revenue Service, with respect to federal or State of West Virginia taxation upon revenues or other income of the general character to be derived by the Authority or the Corporation or upon interest received on obligations of the general character of the Bonds, which in the reasonable judgment of the Underwriter, materially adversely affects the market for the Bonds, or (ii) there shall exist any event which, in the reasonable judgment of the Underwriter, either (a) makes untrue or incorrect in any material respect as of such time any statement or information contained in the Official Statement or (b) is not reflected in the Official Statement but should be reflected therein in order to make the statements and information contained therein not misleading, or (iii) in the reasonable judgment of the Underwriter, the market price or marketability of the Bonds or the ability of the Underwriter to enforce contracts for the sale of the Bonds shall have been materially adversely affected by an amendment of or a supplement to the Official Statement, notwithstanding the Underwriter's approval of such amendment or supplement prior to its distribution, or (iv) there shall have occurred any outbreak of hostilities or other national or international calamity or crisis, the effect of such outbreak, calamity or crisis on the financial markets of the United States being such as, in the reasonable judgment of the Underwriter, would make it impracticable for the Underwriter to market or enforce contracts for the sale of the Bonds, or (v) there shall be in force a general suspension of trading on the New York Stock Exchange or minimum or maximum prices for trading shall have been fixed and be in force, or maximum ranges for prices for securities shall have been required and be in force on the New York Stock Exchange, whether by virtue of a determination by that Exchange or by order of the Securities and Exchange Commission or any other governmental authority having jurisdiction, or (vi) a general banking moratorium shall have been declared by either federal, West Virginia or New York authorities having jurisdiction and be in force, or (vii) there shall be any material adverse change in the affairs of the Authority or the Corporation which, in the reasonable judgment of the Underwriter, affects materially and adversely the market price or the marketability of the Bonds or the ability of the Underwriter to enforce contracts for the sale of the Bonds, or (viii) there shall be established any new restriction on transactions in securities materially affecting the free market for securities (including the imposition of any limitation on interest rates) or the extension of credit by, or the charge to the net capital requirements of, underwriters established by the New York Stock Exchange, the Securities and Exchange Commission, any other federal or state agency or the Congress of the United States, or by Executive Order, or (ix) a decision of any federal or state court or a ruling or regulation (final, temporary or proposed) of the Securities and Exchange Commission or other governmental agency shall have been made or issued that would (A) make the Bonds or any securities of the Authority or of any similar body subject to the registration requirements of the Securities Act of 1933, as amended, or (B) require the qualification of an indenture in respect of the Bonds or any such securities under the Trust Indenture Act of 1939, as amended, or (x) there shall occur an adverse change in the credit ratings assigned by Moody's Investors Service, Inc. ("Moody's") or Standard & Poor's Rating Services, a division of the McGraw Hill Companies, Inc. ("S & P");

(d)    at or prior to the Closing Date, we shall receive the following documents, in each case satisfactory in form and substance to us and our counsel:

(1) the unqualified approving opinion, dated as of the Closing Date, of Bond Counsel, substantially in the form set forth in the Official Statement, accompanied by a supplementary opinion of Bond Counsel, dated as of the Closing Date, substantially in the form attached hereto as Exhibit B;

(2) the opinion of Bowles Rice McDavid Graff & Love, PLLC, Charleston, West Virginia, Counsel for the Authority, dated as of the Closing Date, substantially in the form attached hereto as Exhibit C;

(3) the opinion of Robert L. Brandfass, Esquire counsel to the Corporation, dated as of the Closing Date, substantially in the form attached hereto as Exhibit D;

(4) the opinion of Goodwin & Goodwin, LLP, counsel for the Underwriter, dated as of the Closing Date, substantially in the form attached hereto as Exhibit G;

(5) the opinion of Counsel for the Bond Trustee, dated as of the Closing Date, to the effect that (a) the Bond Trustee has the corporate trust authority to act as trustee, paying agent and bond registrar for and in connection with the Bonds and has requisite trust powers to carry out its duties under the Bond Indenture; and (b) the Bond Indenture has been duly and validly authorized, executed and delivered by the Bond Trustee, and assuming due authorization, execution and delivery thereof by the Authority, the Bond Indenture constitutes a valid and legally binding obligation of the Bond Trustee, enforceable in accordance with its terms, except to the extent that the enforceability and the binding effect (but not the validity) thereof may be limited by (i) bankruptcy, reorganization, insolvency, moratorium or other laws affecting creditors' rights generally, from time to time in effect and (ii) to general principles of equity;

(6) the opinion of Counsel for the Master Trustee, dated as of the Closing Date, to the effect that (a) the master Trustee has the corporate trust authority to act as master trustee for and in connection with the Bonds and has requisite trust powers to carry out its duties under the Master Indenture; and (b) the Master Indenture has been duly and validly authorized, executed and delivered by the Master Trustee, and assuming due authorization, execution and delivery thereof by the Authority, the Master Indenture constitutes a valid and legally binding obligation of the Bond Trustee, enforceable in accordance with its terms, except to the extent that the enforceability and the binding effect (but not the validity) thereof may be limited by (i) bankruptcy, reorganization, insolvency, moratorium or other laws affecting creditors' rights generally, from time to time in effect and (ii) to general principles of equity;

(7) a certificate or certificates, dated as of the Closing Date, signed by an authorized officer of the Authority and in form and substance satisfactory to us, to the effect that, (i) the Authority is a body corporate and governmental instrumentality of the State of

CH-1188021v2 -9-

West Virginia, duly created and validly existing under the laws of the State of West Virginia, with the lawful power and authority set forth in the Act to issue the Bonds under the Act, (ii) the Bonds have been duly authorized, executed, issued and delivered and constitute valid and binding limited obligations of the Authority of the character permitted to be issued by the Act, in conformity with, and entitled to the benefit and security of, the Bond Indenture, and (iii) to the best knowledge of the officer of the Authority executing said certificate, no litigation, proceeding, or investigation, at law or in equity, before or by any court, any governmental agency or any public board or body is pending or threatened (a) to restrain or enjoin the issuance or delivery of any of the Bonds or the collection by the Authority of revenues pledged under the Bond Indenture, (b) in any way contesting or affecting the authority of the Authority for the issuance of the Bonds or the validity of the Authority Bond Documents, or (c) in any way contesting the existence or powers of the Authority;

(8)     the Corporation's certificate signed by the Secretary, Treasurer or such other officer as is acceptable to the Underwriter, dated as of the Closing Date, to the effect that (a) since December 31, 2002, no material adverse change has occurred in the financial position or results of operations of the Corporation other than as set forth in the Official Statement; (b) other than material liabilities incurred in the ordinary course of its business, the Corporation has not, since December 31, 2002, incurred any material liability other than as set forth in or contemplated by the Official Statement; (c) no litigation, proceeding, or investigation, at law or in equity, before or by any court, any governmental agency, or any public board or body is pending or threatened (i) to restrain or enjoin the issuance or delivery of any of the Bonds or the collection of revenues pledged under the Bond Indenture, (ii) in any way contesting or affecting the authority for the issuance of the Bonds or the validity of the Bond Documents to which the Corporation is a party (the "Corporation Bond Documents"), or (iii) in any way contesting the corporate existence or powers of the Corporation; (d) no proceedings are pending or threatened (i) in any way contesting or affecting the status of the Corporation as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), or (ii) to subject any income (except for taxation of unrelated business income under Section 511 of the Code) of the Corporation to federal income taxation; (e) no event affecting the Corporation or any matter described in the Official Statement has occurred since the date of the Official Statement which either makes untrue or incorrect in any material respect as of the Closing Date any material statement or information contained in the Official Statement or is not reflected in the Official Statement but should be reflected therein in order to make the material statements and information therein not misleading; and (f) the representations and warranties of the Corporation contained in the Letter of Representation are true and correct in all material respects as of the Closing Date;

(9)     two executed copies of each of the Bond Documents;

(10)    a certificate of the Bond Trustee and the Master Trustee, respectively to the effect that all conditions precedent contained in the Bond Indenture and the Master Indenture, as applicable, for the issuance of the Bonds have been met, and, with respect to

the Bond Indenture, the Bonds are entitled to the benefit and security of the Bond Indenture, and, with respect to the Master Indenture, and the ARCs Notes are entitled to the benefit and security of the Master Indenture.

(11)     two definitive copies of the Official Statement, executed on behalf of the Corporation by the Chief Executive Officer of the Corporation and on behalf of the Authority by its Chairman;

(12)     a copy of the executed and effective Bond Insurance Policy insuring timely payment of the principal of and interest on the Bonds, such policy to be substantially in the form attached to the Official Statement as Appendix D (the "Bond Insurance Policy");

(13)     two copies of the resolution of the Authority, certified by the Secretary-Treasurer of the Authority, authorizing the execution and delivery of the Bonds, the Bond Indenture, the Loan Agreement, the Escrow Agreement and this Purchase Contract and authorizing the distribution of the Preliminary Official Statement and the execution and distribution of the Official Statement;

(14)     copies, certified by the Secretary or Assistant Secretary of the Board of Trustees of the Corporation to be true and correct copies, of the resolutions of the Board of Trustees of the Corporation authorizing certain officers of the Corporation to approve the Preliminary Official Statement and the distribution thereof, to approve the execution of its approval of and distribution of the Official Statement, to approve and authorize the execution and delivery of the Corporation Bond Documents, and its approval of this Purchase Contract, and to approve the transactions contemplated by the Corporation Bond Documents;

(15)     copies, certified by the Secretary of State of the State of West Virginia to be true and correct copies, of the Articles of Incorporation, including all amendments thereto through the Closing Date, of the Corporation together with a certificate of Good Standing of the Secretary of State of recent date for the Corporation;

(16)     copies, certified by the Secretary or Assistant Secretary of the Board of Directors of the Corporation of the By-Laws, including any amendments thereto through the Closing Date, of the Corporation;

(17)     a copy of the determination letter(s) of the Internal Revenue Service of the United States Department of the Treasury to the effect that the Corporation is exempt from federal income taxation pursuant to Section 501(a) of the Code as an organizations described in Section 501(c)(3) of the Code and is not a "private foundation" as defined under Section 509(a) of the Code;

(18)    evidence to the effect that the requirements of the Code have been satisfied by the filing of Internal Revenue Service Form 8038 entitled "Information Return for Private Activity Bond Issues";

(19)    evidence satisfactory to the Underwriter of the ratings on the Bonds of "Aaa" by Moody's and "AAA" by S & P, and evidence satisfactory to the Underwriter of an underlying rating on the Bonds by Moody's of "A1";

(20)    a copy of the verification report of independent accountants verifying the mathematical accuracy of (a) the mathematical computations of the adequacy of the maturing principal of and interest on the Escrow Deposit and the Cash Portion (as such terms are defined in the respective Escrow Agreements) to pay, when due, the advance refunding requirements and (b) the mathematical computations supporting the conclusion of Bond Counsel that the Bonds are not "arbitrage bonds" under the Code and the regulations promulgated thereunder.

(21)    certificates and opinions required by the Master Indenture for the issuance thereunder of the ARCs Notes;

(22)    certificates of insurance consultants, which may be the Corporation's insurance brokers or actuaries, satisfactory to the Underwriter, dated the date of the Closing, to the effect that the insurance coverage of the Corporation complies with the applicable requirements of the Master Indenture and the descriptions thereof set forth in the Official Statement; and

(23)    such additional legal opinions, consents, certificates, proceedings, instruments and other documents as we, counsel for the Underwriter or Bond Counsel may reasonably request to evidence compliance by the Authority and the Corporation with legal requirements, the truth and accuracy, as of the Closing Date, of the representations of the Authority herein and of the Corporation, in the Letter of Representation and the due performance or satisfaction by the Authority and the Corporation at or prior to such time of all agreements then to be performed and all conditions then to be satisfied by the Authority and the Corporation.

If either the Authority or the Corporation shall be unable to satisfy the conditions to the Underwriter's obligations contained in this Purchase Contract or if the Underwriter's obligations shall be terminated for any reason permitted herein, this Contract Purchase shall terminate and neither the Underwriter nor the Authority shall have any further obligation hereunder.

8.    All expenses and costs of the Authority incident to the performance of its obligations in connection with the authorization, issuance and sale of the Bonds to the Underwriter, including but not limited to the cost of printing of the Bonds (and full execution thereof), the Preliminary Official Statement, the Official Statement, fees of the rating agencies, and the fees and expenses of the counsel to the Bond Trustee, Bond Counsel, counsel to the Authority and counsel to the

Corporation, shall be paid by the Corporation. All expenses to be paid by the Corporation pursuant to this Purchase Contract may be paid from Bond proceeds to the extent permitted by the Bond Indenture and the Code. Except as indicated above, all out-of-pocket expenses of the Underwriter, including travel and other expenses and the fees and expenses of their counsel, shall be paid by the Underwriter.

9.      This Purchase Contract may be executed in any number of counterparts, each of which so executed and delivered shall constitute an original and all together shall constitute but one and the same instrument.

10.      Any notice or other communication to be given under this Purchase Contract may be given by delivering the same in writing as follows:

| | |
|---|---|
| Authority: | West Virginia Hospital Finance Authority<br>One Players Club Drive<br>Charleston, West Virginia 25311<br>Attention: Chairman |
| Corporation: | West Virginia University Hospitals, Inc.<br>Medical Center Drive<br>P.O. Box 8059<br>Morgantown, West Virginia 26506<br>Attention:      Chief Financial Officer |
| Underwriter: | UBS Financial Services Inc.<br>Municipal Securities Group<br>1285 Avenue of the Americas<br>New York, New York 10019-6028<br>Attention: Mr. Rondy Jennings |

The approval of the Underwriter when required hereunder or the determination of their satisfaction as to any document referred to herein shall be in writing signed by UBS Financial Services Inc. and delivered to you.

11.    This Purchase Contract is made solely for the benefit of the Authority, the Corporation and the Underwriter (including the successors or assigns of the Underwriter) and no other person, partnership, association or corporation shall acquire or have any right hereunder or by virtue hereof. All representations and agreements of the Authority in this Purchase Contract shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Underwriter and shall survive the delivery of and payment for the Bonds.  This Purchase Contract shall be governed by the laws of the State of West Virginia.

Please confirm that the foregoing correctly sets forth the agreement between us.

UBS FINANCIAL SERVICES INC., on behalf of itself and Crews & Associates, Inc., and Ferris, Baker Watts, Incorporated

By:  _____

Its:  _Managing Director_____

By:  _Barbara Olcuddy_____

Its:  _First Vice President_____

Accepted and Agreed to:

WEST VIRGINIA HOSPITAL FINANCE AUTHORITY

By:  _____
          Chairman

Approved:

WEST VIRGINIA UNIVERSITY HOSPITALS, INC.

By:  _____

Its  _____PRESIDENT_____

EXHIBIT A

LETTER OF REPRESENTATION

August 28, 2003

West Virginia Hospital Finance Authority
Charleston, West Virginia

UBS Financial Services Inc
New York, New York

Dear Ladies and Gentlemen:

The West Virginia Hospital Finance Authority (the "Authority") and West Virginia University Hospitals, Inc. (the "Corporation") propose to enter into a Loan Agreement dated as of August 1, 2003 (the "Loan Agreement"). Pursuant to a Purchase Contract dated August 28, 2003 (the "Purchase Contract") between UBS Financial Services Inc., on its own behalf and on behalf of Crews & Associates, Inc. and Ferris, Baker Watts, Incorporated (collectively, the "Underwriter") and the Authority, which Purchase Contract has been approved by the Corporation, the Authority proposes to sell to the Underwriter its (i) $25,800,000 Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series B Auction Rate Certificate (ARCs[sm]) (the "2003 B Bonds"), (ii) $44,650,000 Hospital Revenue Refunding and Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series C Auction Rate Certificate (ARCs[sm])(the "2003 C Bonds"), and (iii) $45,750,000 Hospital Revenue Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series D Auction Rate Certificate (ARCs[sm]) (the "2003 D Bonds," and, together with the 2003 B Bonds and the 2003 C Bonds, sometimes hereinafter collectively referred to as the "ARCs Bonds").

The ARCs Bonds will be issued and secured pursuant to a Bond Trust Indenture dated as of August 1, 2003 (the "Bond Indenture") between the Authority and The Bank of New York, as bond trustee (the "Bond Trustee"). Pursuant to the Loan Agreement, the Corporation is required to make payments at such times and sufficient in amount to pay the principal of, redemption premium, if any, and interest on the ARCs Bonds (the "Corporation Payments"). The ARCs Bonds and the security therefor are more fully described in the Official Statement of the Authority dated August 28, 2003 as the same may be amended as required by the Purchase Contract (the "Official Statement"). All capitalized words and terms herein shall have the meanings ascribed to such words and terms in the Bond Indenture and the Purchase Contract.

The obligations of the Corporation under the Loan Agreement will be evidenced and secured by promissory notes 2003-1B, 2003-1C and 2003-1D to be issued (collectively, the

A-1

"ARCs Notes") pursuant to an Amended and Restated Master Trust Indenture dated as of August 1, 2003 (the "Original Master Indenture"), as supplemented by Supplemental Master Trust Indenture No. 2003-1 ("Supplemental Master Trust Indenture No. 2003-1," and, together with the Original Master Indenture, sometimes hereinafter collectively referred to as the "Master Indenture"), between the Corporation and The Huntington National Bank, Columbus, Ohio, as master trustee (the "Master Trustee"). Under the Master Indenture, all ARCs Notes, including the 2003-1B Note, the 2003-1C Note and the 2003-1D Note, are secured by a security interest in the Gross Receipts of the Corporation (as defined in the Master Indenture).

In order to induce the Authority and the Underwriter to enter into the Purchase Contract and the Underwriter to make the offering and sale of the ARCs Bonds therein contemplated, the Corporation hereby represents, warrants and agrees with the Authority and the Underwriter as follows:

(a)     the Corporation has been duly organized and is validly existing as a non-profit corporation under the laws of the State of West Virginia and is in good standing under said laws;

(b)     the Corporation has full legal right, power and authority to execute and deliver the Bond Documents (as defined in the Purchase Contract) to which the Corporation is a party or which the Corporation has approved (the "Corporation Bond Documents") and to carry out and consummate all transactions contemplated thereby;

(c)     by official action of the Corporation prior to or concurrently with the execution hereof, the Corporation has duly approved and authorized the distribution of the Preliminary Official Statement dated August 7, 2003 (the "Preliminary Official Statement"), the execution and distribution of the Official Statement and any amendments or supplements thereto and duly approved the Purchase Contract;

(d)     the Corporation Bond Documents have been or will be on or prior to the Closing Date (as defined to in the Purchase Contract) duly and validly authorized, executed and delivered by the Corporation and do or will constitute valid, binding and enforceable agreements of the Corporation in accordance with their respective terms, except as the enforceability and the binding effect (but not the validity) thereof may be limited by (i) bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally, from time to time in effect and (ii) general principles of equity;

(e)     the Bond Indenture will create the legal, valid and binding pledge, lien and security interests in favor of the Bond Trustee, for the benefit of the holders of the ARCs Bonds, which it purports to create, free and clear of and from any and all liens and encumbrances, except as permitted therein;

(f)     the Corporation is a nonprofit corporation and is exempt from federal income taxation under Section 501(a) of the Internal Revenue Code of 1986, as amended (the "Code"), except for taxation of unrelated trade or business income under Section 513 of the Code, as an organization described in Section 501(c)(3) of the Code and is not a

"private foundation" as defined in Section 509(a) of the Code, and it is in compliance with the terms, conditions and limitations of such Code sections and the regulations promulgated thereunder to the extent necessary to maintain such status; and the Corporation has taken no action or failed to take any action which action or failure to act would jeopardize such status;

(g)     the Corporation is a nonprofit corporation organized and operated exclusively for charitable purposes, not for pecuniary profit, and no part of the net earnings of which inures to the benefit of any person, private stockholder or individual within the meaning of Section 3(a)(4) of the Securities Act of 1933;

(h)     to the best knowledge of the undersigned, the Corporation is not in any material way in breach of or default under (i) any applicable law or administrative regulation of the state in which it conducts business or the United States or any applicable judgment or decree or (ii) any loan agreement, indenture, bond, note, resolution, agreement or other instrument to which the Corporation is a party or is otherwise subject, and no event has occurred and is continuing which, with the passage of time or the giving of notice or both, would constitute an event of default under any such instrument, except as expressly set forth in the Official Statement; and neither the execution and delivery of the Corporation Bond Documents, nor the consummation of the transactions contemplated thereby or hereby, nor the fulfillment of or compliance with the terms and conditions thereof or hereof, or of the Bond Indenture or the ARCs Bonds conflict with or constitute a material breach of or a material default under (i) any applicable law, administrative regulation, judgment or decree, or (ii) the Articles of Incorporation or Bylaws of the Corporation, or (iii) any loan agreement, indenture, bond, note, resolution, agreement or instrument to which the Corporation or its affiliates is a party or is otherwise subject; nor will any such execution, delivery, adoption, fulfillment or compliance result in the creation or imposition of any lien, charge or other security interest or encumbrance of any nature whatsoever upon any of the property or assets of the Corporation (i) under the terms of any such law, administrative regulation, judgment or decree or (ii) any such loan agreement, indenture, bond, note, resolution, agreement or other instrument;

(i)     since December 31, 2002, the Corporation has not incurred any material liabilities, direct or contingent, nor has there been any material adverse change in the financial position, results of operation or condition, financial or otherwise, of the Corporation which is not described in the Official Statement, other than in the ordinary course of business;

(j)     all approvals, consents, authorizations, certifications and other orders of any governmental authority, board, agency or commission having jurisdiction, and all filings with any such entities, which would constitute a condition precedent to or would materially adversely affect the performance by the Corporation of its obligations under the Corporation Bond Documents or the consummation of the transactions contemplated thereby or hereby, have been duly obtained and remain currently in full force and effect except for such approvals, consents and orders as may be required under the Blue Sky or securities laws of any state in connection with the offering and sale of the ARCs Bonds;

A-3

(k)     the Corporation has substantially complied with all applicable requirements of the United States and the State of West Virginia (together with their respective agencies and instrumentalities) to conduct the business of the Corporation as it is presently being conducted;

(l)     the Corporation will furnish such information, execute such instruments and take such other action in cooperation with the Underwriter as the Underwriter may reasonably request in order (i) to qualify the ARCs Bonds for offer and sale under the Blue Sky or other securities laws and regulations of such states and other jurisdictions of the United States as the Underwriter may designate and (ii) to determine the eligibility of the ARCs Bonds for investment under the laws of such states and other jurisdictions, and will use its best efforts to continue such qualifications in effect so long as required for the distribution of the ARCs Bonds;

(m)     other than as described in the Official Statement, there is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, governmental agency, public board or body, pending or threatened against the Corporation, wherein an unfavorable decision, ruling or finding would materially adversely affect the validity or enforceability of the Bond Documents or would materially adversely affect the operations or financial condition of the Corporation;

(n)     between the date of this Letter of Representation and the Closing Date, the Corporation will not, without the prior written consent of the Underwriter, except as described in or contemplated by the Official Statement, incur any material liabilities, direct or contingent, other than in the ordinary course of business;

(o)     all approvals required for the issuance of the ARCs Bonds that are or will be required by West Virginia law, if any, have been obtained and are in effect;

(p)     as of the date hereof and the Closing Date, the Official Statement, as amended or supplemented pursuant to the Purchase Contract or this Letter of Representation, if applicable, does not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(q)     if between the date hereof and the Closing Date any event shall occur and be discovered which would cause the information contained in the Official Statement to contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, the Corporation shall forthwith notify the Authority and the Underwriter of such an event and if in the opinion of the Underwriter such event requires the preparation and publication of a supplement or amendment to the Official Statement, the Corporation will request the Authority to cooperate in the supplementing or amendment of the Official Statement in a manner approved by the Underwriter at the expense of the Corporation;

(r)     on or after the Closing Date, the Corporation will (i) not participate in the issuance of any amendment of or supplement to the Official Statement to which, after having been furnished with a copy, the Underwriter shall object in writing or which shall be disapproved by the Underwriter's counsel and (ii) if any event relating to or affecting the Authority, or the Corporation, or any matter described in the Official Statement shall occur as a result of which it is necessary, in the opinion of Counsel to the Underwriter or Bond Counsel, to amend or supplement the Official Statement in order to make the Official Statement not misleading in the light of the circumstances existing at the time it is delivered to a purchaser, forthwith notify the Authority and the Underwriter of such event and prepare and furnish to the Underwriter (at the expense of the Corporation for 90 days from the date of Closing, and thereafter at the expense of the Underwriter) a reasonable number of copies of an amendment of or supplement to the Official Statement (in form and substance satisfactory to counsel for the Underwriter and Bond Counsel) which will amend or supplement the Official Statement so that it will not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances existing at the time the Official Statement is delivered to a purchaser, not misleading; for the purposes of this section, the Corporation will furnish such information with respect to the Corporation as you may from time to time request;

(s)     the Corporation hereby authorizes the use of the Official Statement, including all amendments and supplements thereto, by the Underwriter in connection with the public offering and sale of the ARCs Bonds and ratifies and consents to the use by the Underwriter prior to the date hereof of the Preliminary Official Statement in connection with the public offering and sale of the ARCs Bonds;

(t)     with respect to the information contained under the caption "Selected Summary Financial Information for the Obligated Group" in Appendix A to the Official Statement (the "Interim Statement"), the Corporation represents and warrants: (i) the Interim Statement was prepared by the Corporation on the same accounting basis as the year end financial statements that will be audited after December 31, 2002; (ii) the Interim Statement presents fairly the financial condition of the Corporation; (iii) since December 31, 2002 there has been no material decrease in (1) net current assets, (2) net assets or (3) excess of revenues over expenses; and (iv) the Interim Statement includes all adjustments, consisting of normal recurring accruals, which the Corporation considers necessary for a fair presentation of the results of operations for the period shown in the Interim Statement;

(u)     the Corporation agrees to indemnify and hold harmless the Authority and the Underwriter (except to the extent that any such loss, claim, damage, liability or expense results from the negligence, bad faith or willful misconduct of the Underwriter or any member, officer, director, official employee or agent of the Underwriter) and each person, if any, who controls (as such term is defined in Section 15 of the Securities Act of 1933, as amended, and Section 20 of the Securities Exchange Act of 1934, as amended, collectively the "Securities Acts") the Authority or Underwriter (i) against any and all judgments, losses, claims, damages and liabilities arising out of any statement or information in the Preliminary Official Statement or the Official Statement, or any amendment or supplement thereto

A-5

(except for any statement made in the section entitled "Underwriting" or in the initial offering prices of the ARCs Bonds and, with respect to the Authority only, any statement made in the section entitled "THE AUTHORITY") alleged to be untrue or incorrect in any material respect or the omission or alleged omission therefrom of any statement or information required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading except insofar as any such untrue statement or omission was made in reliance on and in conformity with information furnished in writing to the Corporation by the Underwriter expressly for use therein; and (ii) to the extent of the aggregate amount paid in settlement of any litigation commenced or threatened arising from a claim based upon any such untrue statement or omission if such settlement is effected with the written consent of the Corporation; in case any claim shall be made or action brought against the Authority or the Underwriter or any controlling person (as aforesaid) based upon the Official Statement, or any amendment or supplement thereto, in respect of which indemnity may be sought against the Corporation, the Underwriter and the Authority shall promptly notify the Corporation in writing setting forth the particulars of such claim or action and the Corporation shall assume the defense thereof including the retaining of counsel and the payment of all expenses. Failure to so notify the Corporation shall not relieve it from any liability that it may have otherwise than on account of this Paragraph (u); except to the extent that such failure to notify has prejudiced the defense of the claim. The Authority, the Underwriter and any such controlling person shall have the right to retain separate counsel in any such action and to participate in the defense thereof, but the fees and expense of such counsel shall be at the expense of the Authority, the Underwriter or such controlling person unless the retaining of such counsel has been specifically authorized by the Corporation or the indemnified party shall have reasonably concluded that there may be a conflict of interest between the Corporation and the indemnified party in the conduct of the defense of such action;

(v)   in order to provide for just and equitable contribution in circumstances in which the indemnification provided for in Paragraph (u) is applicable but for any reason is held to be unavailable from the Corporation, the Corporation and the Underwriter shall contribute to the aggregate losses, claims, damages and liabilities (including any investigation, legal and other expenses incurred in connection with, and any amount paid in settlement of, any action, suit or proceeding or any claims asserted, but after deducting any contribution received by the Corporation from persons other than the Underwriter, such as the Authority or persons who control the Corporation within the meaning of the Securities Acts) to which the Corporation and the Underwriter may be subject in proportion so that the Underwriter is responsible for that portion represented by the percentage that the underwriting discount appearing under the heading "UNDERWRITING" in the Official Statement bears to the aggregate public offering price of the ARCs Bonds set forth on the cover page of the Official Statement and the Corporation is responsible for the balance; provided, however, that (i) in no case shall the Underwriter be responsible for any amount in excess of the underwriting discount applicable to the ARCs Bonds and (ii) no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act of 1933, as amended) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation; for purposes of this Paragraph (v) the Authority, the Underwriter and any such controlling person shall have the same rights to contribution as the

A-6

person controlled, and each person, if any, who controls the Corporation within the meaning of the Securities Acts shall have the same rights to contribution as the person controlled, subject in each case to clauses (i) and (ii) of this Paragraph (v). Any party entitled to contribution will, promptly after receipt of notice of commencement of any action, suit or proceeding against such party in respect of which a claim for contribution may be made against another party or parties under this Paragraph (v), notify such party or parties from whom contribution may be made against another party or parties from whom contribution may be sought, but the omission to so notify such party from whom contribution may be sought shall not relieve that party or parties from whom contribution may be sought from any other obligation it or they may have hereunder or otherwise than under this Paragraph (v) except to the extent that such failure to notify has prejudiced the defense of the claim; no party shall be liable for contribution with respect to any action or claim settled without its consent;

(w)     the Corporation hereby agrees to pay the expenses described in Paragraph 8 of the Purchase Contract, and to pay any expenses incurred in amending or supplementing the Official Statement pursuant to the Purchase Contract or this Letter of Representation; and

(x)     the form of Official Statement dated the date hereof, which has been delivered to the Underwriter on the date hereof, and has been marked to show changes from the Preliminary Official Statement, is final as of its date for purposes of Rule 15c2-12 (as defined in the Purchase Contract), except for information permitted to be omitted therefrom by Rule 15c2-12, provided, however, that the foregoing representation does not include a representation as to the finality of the statements and information contained in such form of Official Statement concerning the Authority.

The representations, warranties, agreements and indemnities contained herein shall survive the Closing Date under the Purchase Contract and any investigation made by or on behalf of the Authority or the Underwriter or any person who controls (as aforesaid) the Authority or the Underwriter of any matters described in or related to the transactions contemplated hereby and by the Purchase Contract and the Official Statement.

This Letter of Representation shall be binding upon and inure solely to the benefit of the Authority, the Underwriter and the Corporation and, to the extent set forth herein, persons controlling the Authority, the Underwriter or the Corporation, and their respective personal representatives, successors, and assigns, and no other person or firm shall acquire or have any right under or by virtue of this Letter of Representation. No recourse under or upon any obligation, covenant or agreement contained in this Letter of Representation shall be had against any officer or director of the Corporation as an individual, except as caused by an intentional misrepresentation or an intentional failure to disclose a material fact.

If the foregoing is in accordance with your understanding of the agreement between us kindly sign and return to the Corporation the enclosed duplicate of this Letter of Representation whereupon this will constitute a binding agreement among the Corporation, the Authority and the Underwriter in accordance with the terms hereof.

Very truly yours,

WEST VIRGINIA UNIVERSITY HOSPITALS, INC.

By:_____

Its: President

Accepted and confirmed as of
the date first above written.

UBS FINANCIAL SERVICES INC, on behalf of
itself and Crews and Associates, Inc. and Ferris,
Baker Watts, Incorporated

By:_____

Its:_____

WEST VIRGINIA HOSPITAL FINANCE AUTHORITY

By:_____
    Its Chairman

273253

A-8

If the foregoing is in accordance with your understanding of the agreement between us kindly sign and return to the Corporation the enclosed duplicate of this Letter of Representation whereupon this will constitute a binding agreement among the Corporation, the Authority and the Underwriter in accordance with the terms hereof.

Very truly yours,

WEST VIRGINIA UNIVERSITY HOSPITALS, INC.

By: _Ruw M<sup>c</sup>Clymonds_

Its: PRESIDENT

Accepted and confirmed as of
the date first above written.

UBS FINANCIAL SERVICES INC, on behalf of
itself and Crews and Associates, Inc. and Ferris,
Baker Watts, Incorporated

By: _____

Its: _Managing Director_

By: _Barbara Scuddy_

Its: _First Vice President_

WEST VIRGINIA HOSPITAL FINANCE AUTHORITY

By: _____

Chairman

EXHIBIT B

## FORM OF SUPPLEMENTAL OPINION
## OF BOND COUNSEL

September __. 2003

UBS Financial Services Inc.
New York, New York 10013

Ferris, Baker Watts, Incorporated
Charleston, WV 25301

Crews & Associates, Inc.
Little Rock, Arkansas 72201

West Virginia Hospital Finance Authority
Charleston, West Virginia

> Re: $25,800,000 Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series B Auction Rate Certificates (ARCs$^{(sm)}$) (the "2003 B Bonds")
> $44,650,000 Hospital Revenue Refunding and Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series C Auction Rate Certificates (ARCs$^{(sm)}$) (the "2003 C Bonds")
> $45,750,000 Hospital Revenue Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series D Auction Rate Certificates (ARCs$^{(sm)}$)

Ladies and Gentlemen:

We have acted as bond counsel in connection with the issuance and sale by the West Virginia Hospital Finance Authority (the "Authority") of its (i) $25,800,000 Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series B Auction Rate Certificate (ARCs$^{(sm)}$) (the "2003 B Bonds"), (ii) $44,650,000 Hospital Revenue Refunding and Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series C Auction Rate Certificate (ARCs$^{(sm)}$) (the "2003 C Bonds"), and (iii) $45,750,000 Hospital Revenue Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series D Auction Rate Certificate (ARCs$^{(sm)}$) (the "2003 D Bonds," and, together with the 2003 A Bonds, the 2003 B Bonds and the 2003 C Bonds, sometimes hereinafter collectively referred to as the "Bonds").

In our capacity as Bond Counsel, we are delivering an opinion of even date herewith concerning the legality of the Bonds and the exclusion of interest on the Bonds from gross income for federal income tax purposes (the "Bond Opinion"). We have examined the documents and instruments as described in the Bond Opinion, the Official Statement (as hereinafter defined) and such other matters as we have deemed necessary or appropriate to render this opinion. Words and terms used in this opinion shall have the meanings assigned to them in the Purchase Contract (the "Purchase Contract"), dated August 27, 2003, between the Authority and UBS Financial Services Inc, on behalf of itself and Crews and Associates, Inc., and Ferris, Baker Watts, Incorporated, as the underwriters (collectively, the "Underwriter") and approved by West Virginia University Hospitals, Inc. (the "Corporation").

Based on the foregoing, we are of the opinion that:

(i)      the Authority has duly authorized the distribution of the Preliminary Official Statement and has duly authorized the execution and approved the distribution of the Official Statement;

(ii)     no approval or other action is required by any governmental authority or agency in connection with the execution by the Authority of the Purchase Contract, the Bond Indenture, the Loan Agreement or the Official Statement which has not already been obtained or taken, except that the offer and sale of the Bonds in certain jurisdictions may be subject to the provisions of the securities or Blue Sky laws of such jurisdictions;

(iii)    the Purchase Contract has been duly authorized, executed and delivered by the Authority and, assuming due authorization, execution and delivery by the Underwriter and due and valid approval by the Corporation, constitutes a valid, binding and enforceable agreement of the Authority in accordance with its terms, except that the enforceability and the binding effect (but not the validity) thereof may be limited by (i) bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally, from time to time in effect and (ii) general principles of equity and judicial discretion;

(iv)     the Bond Indenture and the Loan Agreement have been duly authorized, executed and delivered by the Authority, and, assuming due authorization, execution and delivery of such documents by the other parties thereto, constitute the valid and binding agreements of the Authority enforceable in accordance with their terms, except that the enforceability and the binding effect (but not the validity) thereof may be limited by (i) bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights from time to time in effect and (ii) general principles of equity and judicial discretion;

(v)      the information and statements in the Official Statement under the headings, "INTRODUCTORY STATEMENT," "THE AUTHORITY," "THE 2003 BONDS," "FINANCING PLAN," "ADDITIONAL SECURITY FOR THE 2003 BONDS," and "TAX MATTERS," the Definitions of Certain Terms and Summary of Certain Provisions of the Principal Documents set forth in Appendix C to the Official Statement and Summary of Certain Provisions Relating to Auction and Settlement Procedures for the ARCs Bonds do

not contain any untrue statement of a material fact or omit to state a material fact necessary to make such statements, in light of the circumstances under which they were made, not misleading in any material respect;

(vi)    all recordings, registrations or filings of instruments to the extent necessary to perfect the rights of the holders of the Bonds, or required for the validity and enforceability thereof, including the Loan Agreement and the Bond Indenture and have been made and no recording, registration or filing of such instruments is required for such purposes at this time; and

(vii)    the Bonds are not subject to the registration requirements of the Securities Act of 1933, as amended, and the Bond Indenture is exempt from qualification as an indenture under the Trust Indenture Act of 1939, as amended.

This letter is furnished to you solely for your information, and for assistance to you in conducting and documenting your investigation in connection with the issuance of the Bonds and is solely for your benefit.

Respectfully submitted,

B-4

EXHIBIT C

## FORM OF OPINION
## OF COUNSEL FOR THE AUTHORITY

September __, 2003

UBS Financial Services Inc.
New York, New York 10013

Ferris, Baker Watts, Incorporated
Charleston, WV 25301

Crews & Associates, Inc.
Little Rock, Arkansas 72201

West Virginia Hospital Finance Authority
Charleston, West Virginia

> Re: $25,800,000 Hospital Revenue Refunding Bonds (West Virginia University
> Hospitals, Inc.) 2003 Series B Auction Rate Certificates (ARCs[(sm)]) (the
> "2003 B Bonds")
> $44,650,000 Hospital Revenue Refunding and Improvement Bonds (West
> Virginia University Hospitals, Inc.) 2003 Series C Auction Rate Certificates
> (ARCs[(sm)]) (the "2003 C Bonds")
> $45,750,000 Hospital Revenue Improvement Bonds (West Virginia
> University Hospitals, Inc.) 2003 Series D Auction Rate Certificates
> (ARCs[(sm)])

Ladies and Gentlemen:

We have acted as counsel to the West Virginia Hospital Finance Authority (the
"Authority"), and in such capacity we are familiar with (i) the By-Laws of the Authority, (ii) the
minutes of the meetings of the Authority and (iii) such other documents and matters of law as we
have deemed necessary in connection with the following. All capitalized terms used herein shall
have the meanings ascribed to such terms in the Purchase Contract, dated August 28, 2003, between
the Authority and the underwriters named therein.

Based upon the foregoing, we are of the opinion that:

(1)     The Authority is a body corporate and governmental instrumentality of the State of West Virginia duly created and validly existing under the laws of the State of West Virginia. The Authority has the power and authority to issue the Bonds under the Act.

(2)     The Authority Bond Documents have been duly authorized, executed and delivered by the Authority and, assuming due authorization, execution and delivery of such agreements by the other parties thereto (and approval by the Corporation in the case of the Purchase Contract), constitute valid and binding agreements of the Authority enforceable in accordance with their terms except as the enforceability and the binding effect (but not the validity) thereof may be limited by (i) bankruptcy, insolvency, moratorium, reorganization, and other similar laws affecting creditors' rights generally, from time to time in effect and (ii) general principles of equity and judicial discretion.

(3)     The information and statements in the Official Statement under the headings "THE AUTHORITY" and "LITIGATION" (as to the Authority) are true, correct and complete in all material respects.

(4)     To the best of my knowledge there is no action, suit, proceeding, or investigation at law or in equity before or by any court, public board or body, pending or to the best of my knowledge, threatened against the Authority, challenging the creation, existence or powers of the Authority or the title to his or her office of any officer thereof, the validity of the Authority Bond Documents, or the transactions contemplated thereby, or the collection of revenues pledged under the Bond Indenture or challenging the accuracy or completeness of the Preliminary Official Statement or the Official Statement or the validity of the transactions described therein.

(5)     The execution and delivery of the Authority Bond Documents and compliance with the provisions thereof, under the circumstances contemplated thereby, do not and will not conflict with the Act and do not and will not in any material respect conflict, to the best of my knowledge, with or constitute on the part of the Authority a breach of or default under any indenture, deed of trust, mortgage, agreement, or other instrument to which the Authority is a party, or conflict with, violate, or result in a breach of any existing law, public administrative rule or regulation, judgment, court order or consent decree to which the Authority is subject.

(6)     The distribution of the Preliminary Official Statement, dated August 7, 2003, relating to the Bonds has been duly authorized by the Authority. The form of the Official Statement, dated August 28, 2003, has been duly approved by the Authority and the use of the Official Statement by the Underwriter in connection with sales of the Bonds has been duly authorized.

Respectfully submitted,

EXHIBIT D

## FORM OF OPINION OF COUNSEL
## TO THE CORPORATION

September __, 2003

UBS Financial Services Inc.
New York, New York 10013

Ferris, Baker Watts, Incorporated
Charleston, WV 25301

Crews & Associates, Inc.
Little Rock, Arkansas 72201

West Virginia Hospital Finance Authority
Charleston, West Virginia

> Re:   $25,800,000 Hospital Revenue Refunding Bonds (West Virginia University
> Hospitals, Inc.) 2003 Series B Auction Rate Certificates (ARCs$^{(sm)}$) (the
> "2003 B Bonds")
> $44,650,000 Hospital Revenue Refunding and Improvement Bonds (West
> Virginia University Hospitals, Inc.) 2003 Series C Auction Rate Certificates
> (ARCs$^{(sm)}$) (the "2003 C Bonds")
> $45,750,000 Hospital Revenue Improvement Bonds (West Virginia
> University Hospitals, Inc.) 2003 Series D Auction Rate Certificates
> (ARCs$^{(sm)}$)

Ladies and Gentlemen:

As counsel for West Virginia University Hospitals, Inc. (the "Corporation") and its affiliates, in matters relating to the issuance by the West Virginia Hospital Finance Authority (the "Authority") of its (i) $25,800,000 Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series B Auction Rate Certificate (ARCs$^{(sm)}$) (the "2003 B Bonds"), (ii) $44,650,000 Hospital Revenue Refunding and Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series C Auction Rate Certificate (ARCs$^{(sm)}$) (the "2003 C Bonds"), and (iii) $45,750,000 Hospital Revenue Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series D Auction Rate Certificate (ARCs$^{(sm)}$) (the "2003 D Bonds," and, together with the 2003 A Bonds, the 2003 B Bonds and the 2003 C Bonds, sometimes hereinafter collectively referred to as the "Bonds"). I have examined originals, or certified copies or copies otherwise identified to my satisfaction, of such documents, records and other instruments as I have deemed necessary or

appropriate for the purposes of this opinion. All capitalized terms used herein shall have the meanings ascribed to such terms in the Purchase Contract.

Based on the foregoing and based upon my knowledge of all the contracts to which the Corporation is a party (the "Contracts") and as counsel to the Corporation, I am of the opinion that:

(i)     the Corporation has been duly organized and is validly existing as a nonprofit corporation in good standing under the laws of the State of West Virginia; the Corporation has the corporate power and authority (a) to conduct its business as described in the Official Statement and to own and operate its health care facilities, (b) to execute and deliver (and, in the case of the Purchase Contract and the Official Statement, approve) the Corporation Bond Documents, (c) to execute the Official Statement in order to signify its approval thereof and (d) to consummate the transactions contemplated by such instruments;

(ii)     the Corporation Bond Documents have been duly authorized, executed and delivered by the Corporation and, assuming due authorization, execution and delivery by the other parties thereto, constitute binding agreements of the Corporation enforceable in accordance with their terms, other than with respect to any limitations by reason of public policy considerations on the enforceability under certain circumstances of the Letter of Representation and except to the extent that enforceability and the binding effect (but not the validity) thereof may be limited by (A) applicable securities laws, bankruptcy reorganization, moratorium, insolvency or other laws affecting the enforcement of creditors' rights generally, from time to time in effect or (B) general principles of equity and judicial discretion;

(iii)     the Corporation has duly approved the Preliminary Official Statement and the Official Statement and has duly executed Official Statement; the Corporation has duly authorized the use by the Underwriter of the Preliminary Official Statement and the Official Statement in connection with sale of the Bonds;

(iv)     no approval or other action is required by any governmental authority or agency in connection with the execution by the Corporation of the Corporation Bond Documents or its approval of the Purchase Contract and the Official Statement, which has not already been obtained or taken, except that the offer and sale of the Bonds in certain jurisdictions may be subject to the provisions of the securities or Blue Sky laws of such jurisdictions;

(v)     the execution and delivery of the Corporation Bond Documents and the approval of the Purchase Contract and the Official Statement, and compliance with the provisions thereof under the circumstances contemplated thereby, do not and will not conflict with the Corporation's Articles of Incorporation or by-laws and do not and will not in any material respect constitute on the part of the Corporation a breach of or default under any indenture, deed of trust, mortgage, agreement, or other instrument of which such counsel has knowledge and to which the Corporation is a party, or, to such counsel's knowledge, do not materially conflict with, violate, or result in a breach of any existing law, public administrative rule or regulation, judgment, court order or consent decree to which the Corporation is subject;

(vi)     there is no action, suit, proceeding, or governmental investigation at law or in equity before or by any court, public board or body, pending or, to such counsel's knowledge, threatened against the Corporation or the affiliates (a) challenging the validity of any of the Bond Documents or the transactions contemplated thereby, or (b) the collection or application of revenues pledged under the Bond Indenture, or (c) challenging the accuracy or completeness of the Preliminary Official Statement or Official Statement or the validity of the transactions described therein, or (d) except as described in the Official Statement, wherein an unfavorable decision, rule or finding would have a materially adverse affect on the financial condition of the Corporation;

(vii)     the Corporation is exempt from federal income taxation (except for taxation of unrelated trade or business income under Section 511 of the Internal Revenue Code of 1986, as amended (the "Code")) under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code and is not a "private foundation" as defined in Section 509(a) of the Code, and, to the best of my knowledge, after due inquiry, the Corporation has not taken any action and has not failed to take any actions which action or failure to act would impair such status;

(viii)     no single Contract or combination of Contracts would (a) have an adverse effect on the exemption of the Corporation from federal income taxation under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code; (b) have an adverse effect on the status of the Corporation under Section 509(a) of the Code; or (c) have a material adverse effect on the financial condition of the Corporation;

(ix)     the information and statements in the Official Statement (a) with respect to the Corporation and its affiliates and the corporate power and authority of the Corporation and its affiliates to conduct their health care activities are true, correct and complete in all material respects and do not omit any information known to me, after due inquiry, which, in my opinion, should be included or referred to therein; and

(x)     (a) the Corporation has obtained all licenses, approvals and permits that are now required under federal, state and local laws to own and operate its facilities, which are material to such activities, (b) the Corporation has obtained all Certificates of Need, licenses, approvals and permits that are obtainable as of the date of such opinion under local laws to construct and acquire the 2003 Project (as defined in the Bond Indenture) and for the issuance of the Bonds and that we know of no reason why any remaining required licenses, approvals and permits should not be timely issued.

(xi)     The Master Indenture grants a security interest in the Revenues of the Obligated Group (including all accounts, assignable general intangibles and the proceeds thereof, all as defined in Article 9 of the West Virginia Uniform Commercial Code, as amended), which security interest has been perfected by filing pursuant to and under the West Virginia Uniform Commercial Code, as amended, and is prior to any other security interest which could be perfected by such filing, subject as to enforcement to any applicable bankruptcy, reorganization, insolvency, moratorium or other laws affecting creditors' rights generally from time to time in effect and to the availability of equitable remedies and the application or equitable principles generally and subject to the matters set forth in the Official Statement under the section entitled "Certain Bondholders' Risks-Risks

Related to Obligated Group Financings" and further subject to the limitations on security interests in the proceeds of such Revenues which are not kept in identifiable form or in separate deposit accounts and the other limitations on security interests contained in said Article 9.

(xii)    The ARCs Notes are exempt from the registration requirements of the Securities Act of 1933, as amended, so that registration of the ARCs Notes under that Act is not required. The Master Indenture is exempt from qualification as an indenture under the Trust Indenture Act of 1939, as amended.

(xiii)    All requirements and conditions to the issuance of the ARCs Notes set forth in the Master Indenture have been complied with and satisfied.

(xiv)    The Corporation has good and marketable fee simple title to its Property constituting real estate and good and sufficient title to its other Property free and clear of all liens and encumbrances except Permitted Encumbrances.

(xv)    No Liens exist on the Property of the Corporation, which constitutes personal property except Permitted Encumbrances.

(xvi)    The loan secured by the ARCs Notes does not violate any applicable usury laws. The ARCs Notes were issued for a purpose, which is not inconsistent with the charitable purposes of the Corporation.

In the course of my participation in the preparation of the Official Statement and my representation of the Corporation, and without having undertaken to determine independently the accuracy and completeness of the statements contained in the Official Statement nothing has come to my attention that would lead me to believe that the Official Statement (except for information under the caption "UNDERWRITING", as to which no view is expressed) contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

Respectfully submitted,

EXHIBIT E

## FORM OF OPINION OF COUNSEL
## TO THE UNDERWRITER

September __, 2003

UBS Financial Services Inc.
New York, New York 10013

Ferris, Baker Watts, Incorporated
Charleston, WV 25301

Crews & Associates, Inc.
Little Rock, Arkansas 72201

> Re:  $25,800,000 Hospital Revenue Refunding Bonds (West Virginia University
>       Hospitals, Inc.) 2003 Series B Auction Rate Certificates (ARCs$^{(sm)}$) (the
>       "2003 B Bonds")
>       $44,650,000 Hospital Revenue Refunding and Improvement Bonds (West
>       Virginia University Hospitals, Inc.) 2003 Series C Auction Rate Certificates
>       (ARCs$^{(sm)}$) (the "2003 C Bonds")
>       $45,750,000 Hospital Revenue Improvement Bonds (West Virginia
>       University Hospitals, Inc.) 2003 Series D Auction Rate Certificates
>       (ARCs$^{(sm)}$)

Ladies and Gentlemen:

We have acted as your counsel in connection with your purchase of the referenced bonds
(the "Bonds") pursuant to a Purchase Contract dated August 27, 2003 (the "Agreement")
between West Virginia Hospital Finance Authority (the "Authority") and you. Capitalized terms
not otherwise defined herein shall have the meanings assigned to them in the Agreement.

We are of the opinion under existing law that the Bonds are exempt from registration
under the Securities Act of 1933, as amended, and that the Indenture is exempt from
qualification under the Trust Indenture Act of 1939, as amended.

The Agreement has been duly authorized, executed and delivered by you, and (assuming
due authorization, execution and delivery by the other parties and that it is a binding agreement
of the other parties in accordance with its terms) constitutes a binding agreement in accordance
with its terms. The Continuing Disclosure Agreement complies as to form in all material
respects with the requirements of paragraph (b)(5) of the Rule.

E-1

We are not passing upon and do not assume any responsibility for the accuracy, completeness or fairness of any of the statements in the Official Statement and make no representation that we have independently verified the accuracy, completeness or fairness of any such statements. However, to assist you in your investigation concerning the Official Statement, we have reviewed certain documents and have participated in conferences in which the contents of the Official Statement and related matters were discussed. During the course of our work on this matter, no facts have come to our attention that cause us to believe that the Official Statement (except for any financial and statistical data and forecasts, numbers, estimates, assumptions and expressions of opinion, information concerning The Depository Trust Company and the book-entry system for the Bonds, all of which we expressly exclude from the scope of this sentence) contains as of the date hereof any untrue statement of a material fact or omits to state any material fact necessary to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

This letter is furnished by us solely for your benefit and may not be relied upon by any other person or entity. We disclaim any obligation to supplement this letter to reflect any facts or circumstances that may hereafter come to our attention or any changes in the law that may hereafter occur.

Very truly yours,

Goodwin & Goodwin, LLP