# Exhibit D

**NEW ISSUES:  Book-Entry Only**

| | | **Insured** | **Underlying** |
|---|---|---|---|
| **RATINGS:** | *S&P:* | *AAA* | *A+* |
| | *Moody's:* | *Aaa* | *A1* |
| | | **(See "RATINGS")** | |

*In the opinion of Spilman Thomas & Battle, PLLC ("Bond Counsel"), based upon an analysis of existing laws, regulations, rulings and court decisions, and assuming, among other matters, the accuracy of certain representations and compliance with certain covenants, interest on the 2005 Bonds is excludable from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code of 1986 (the "Code"). Bond Counsel is of the further opinion that interest on the 2005 Bonds is not a specific preference item for purposes of the federal individual or corporate alternative minimum taxes, although Bond Counsel observes that such interest is included in adjusted current earnings when calculating corporate alternative minimum taxable income. In addition, under the Act, the 2005 Bonds and all interest and income thereon shall be exempt from all taxation by the State of West Virginia and any county, municipality, political subdivision or agency thereof, except inheritance taxes. See "Tax Matters" herein for a description of certain provisions of the Code which may affect the tax treatment of interest on the 2005 Bonds for certain Bondowners.*

<h1 style="text-align:center">$60,000,000</h1>

# WEST VIRGINIA HOSPITAL FINANCE AUTHORITY
## Hospital Revenue Bonds
## (West Virginia University Hospitals, Inc.) 2005 Series
## Auction Rate Certificates (ARCs)^(SM)



## WEST VIRGINIA UNIVERSITY HOSPITALS

### consisting of

| **$ 30,525,000** | **$ 29,475,000** |
|---|---|
| **2005 Series A** | **2005 Series B** |

**Dated:** Date of Delivery                **Price:** 100%                **Due:** June 1, as shown on inside cover

The 2005 Bonds will be issued and secured under the Bond Indenture (the "Bond Indenture") between the West Virginia Hospital Finance Authority (the "Authority") and The Bank of New York, New York, New York, as bond trustee (the "Bond Trustee"). The 2005 Bonds, when issued, will be registered initially only in the name of Cede & Co., as registered owner and nominee of The Depository Trust Company, New York, New York ("DTC"). DTC will act as securities depository for the 2005 Bonds. Purchasers of the 2005 Bonds will not receive certificates representing their interests in the 2005 Bonds purchased. Ownership by the beneficial owners of the 2005 Bonds will be evidenced by book-entry only. Principal of, premium, if any, and interest on the 2005 Bonds will be paid by the Bond Trustee to DTC, which in turn will remit such principal, premium, if any, and interest payments to its participants for subsequent disbursement to the beneficial owners of 2005 Bonds. As long as Cede & Co. is the registered owner as nominee of DTC, payments on the 2005 Bonds will be made to such registered owner, and disbursement of such payments will be the responsibility of DTC and its participants. See "BOOK-ENTRY SYSTEM."

The 2005 Bonds will be initially issued as Auction Rate Certificates (ARCs^(SM)). The Bonds (sometimes referred to herein as the "2005 Bonds") are issuable in fully registered form without coupons initially in denominations of (i) $100,000 and $5,000 multiples in excess thereof, during any Weekly Rate Period, hereinafter defined, (ii) $25,000 and integral multiples thereof, during any Auction Rate Period, hereinafter defined, and (ii) $5,000 and any integral multiple thereof during any Fixed Rate Period.

The 2005 Bonds will bear interest from the date of initial delivery at a rate established prior to the issuance of the 2005 Bonds to and including (i) February 2, 2005, with respect to the 2005 A Bonds; and (ii) February 3, 2005, with respect to the 2005 B Bonds. Thereafter, for each Auction Period, the 2005 Bonds will bear interest at the Auction Rate determined pursuant to the Auction Procedures as described herein, payable as described (and subject to modification as provided) in APPENDIX G hereto. Prospective purchasers of the 2005 Bonds should carefully review the Auction Procedures, and should note that such procedures provide that (i) a Bid or Sell Order (as hereinafter defined) constitutes a commitment to purchase or sell 2005 Bonds based upon the results of an Auction (as hereinafter defined), (ii) Auctions may be conducted through telephone communications, (iii) settlement for purchases and sales will be made on the Business Day following an Auction, and (iv) Auctions may be suspended under certain circumstances as described herein. Beneficial interests in 2005 Bonds may be transferred only pursuant to a Bid or Sell Order placed in an Auction or to or through a Broker-Dealer (as hereinafter defined).

At any given time, a series of the 2005 Bonds may operate in any one (but not more than one) of the following Rate Periods: the Auction Rate Period, Weekly Rate Period or Fixed Rate Period. A series of the 2005 Bonds shall bear interest at the Auction Rates established for Auction Periods until a Weekly Rate Conversion Date or Fixed Rate Conversion Date. Subject to certain conditions described herein, 2005 Bonds operating in any one Rate Period may be converted to another Rate Period, and will be subject to mandatory tender. This Official Statement describes only 2005 Bonds operating in the Auction Rate Period. Supplemental disclosure materials will be made available to investors in connection with any conversion of 2005 Bonds to another Rate Period.

The 2005 Bonds are secured under the provisions of the Bond Indenture and the Master Indenture (as defined herein), and the 2005 Bonds are payable solely from revenues and other moneys derived by the Authority from payments made under the Loan Agreement (as described herein) between the Authority and the Obligated Group Agent, as described herein, and from the 2005-1A Note and the 2005-1B Note (as defined herein), respectively, issued by the Obligated Group, hereinafter defined, pursuant to the Master Indenture. The sources of payment of, and security for, the 2005 Bonds are more fully described in this Official Statement.

There are risks associated with the purchase of the 2005 Bonds. For a discussion of certain of these risks, see the caption "CERTAIN BONDHOLDERS' RISKS."

THE 2005 BONDS WILL BE SUBJECT TO MANDATORY TENDER AND REDEMPTION PRIOR TO MATURITY, AS DESCRIBED IN THIS OFFICIAL STATEMENT.

Payment of the principal of and interest on the 2005 Bonds when due will be insured by a municipal bond insurance policy to be issued by Ambac Assurance Corporation simultaneously with the delivery of the 2005 Bonds.

<p style="text-align:center"><em><strong>Ambac</strong></em></p>

BY VIRTUE OF THE OBLIGATIONS OF THE OBLIGATED GROUP UNDER THE MASTER INDENTURE, THE 2005 BONDS ARE ON PARITY WITH THE SERIES 1998 BONDS AND THE 2003 AUTHORITY BONDS, HEREINAFTER DEFINED, AS TO LIEN ON GROSS RECEIPTS, HEREINAFTER DEFINED, AND SOURCE OF PAYMENT.  THE 2005 BONDS ARE SPECIAL OBLIGATIONS OF THE AUTHORITY, PAYABLE SOLELY FROM AND SECURED BY A PLEDGE OF REVENUES AND FUNDS PROVIDED THEREFOR UNDER THE BOND INDENTURE. THE 2005 BONDS SHALL NOT CONSTITUTE A DEBT OR A PLEDGE OF THE FAITH AND CREDIT OR TAXING POWER OF THE STATE OF WEST VIRGINIA OR OF ANY COUNTY, MUNICIPALITY OR ANY OTHER POLITICAL SUBDIVISION OF THE STATE OF WEST VIRGINIA. THE AUTHORITY HAS NO TAXING POWER.

*The 2005 Bonds are offered when, as and if issued by the Authority and accepted by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of the legality of the 2005 Bonds by Spilman Thomas & Battle, PLLC, Charleston, West Virginia, Bond Counsel. Legal matters pertinent to the financing will be passed upon for the Obligated Group by its Counsel, Robert L. Brandfass, Esquire, Fairmont, West Virginia; for the Authority by its Counsel, Bowles Rice McDavid Graff & Love LLP, Charleston, West Virginia; and for the Underwriter by its Counsel, Goodwin & Goodwin, LLP, Charleston, West Virginia. It is expected that the 2005 Bonds will be available for book-entry delivery to DTC in New York New York on or about January 27, 2005.*

**UBS Financial Services Inc.**                                    **Ferris, Baker Watts, Incorporated**
Dated: January 26, 2005

**$60,000,000**
**WEST VIRGINIA HOSPITAL FINANCE AUTHORITY**
**Hospital Revenue Bonds**
**(West Virginia University Hospitals, Inc.) 2005 Series**
**Auction Rate Certificates (ARCs$^{(SM)}$)**

| | |
|---|---|
| **$ 30,525,000** | **$ 29,475,000** |
| **2005 Series A** | **2005 Series B** |
| **Initial Auction Period:  Seven-Day** | **Initial Auction Period:  Seven-Day** |
| **Last Day of Initial Auction Period: February 2, 2005** | **Last Day of Initial Auction Period: February 3, 2005** |
| **First Auction Date: February 2, 2005** | **First Auction Date: February 3, 2005** |
| **First Interest Payment Date:  February 3, 2005** | **First Interest Payment Date:  February 4, 2005** |
| **Auction Date Generally:  Wednesday** | **Auction Date Generally:  Thursday** |
| **Interest Payment Date Generally:  Thursday** | **Interest Payment Date Generally:  Friday** |
| **Due: June 1, 2035[1]** | **Due: June 1, 2030[1]** |
| **CUSIP:  956622 WH 3** | **CUSIP:  956622 WJ 9** |

---

[1] In the event any 2005 Bonds bear interest at the Auction Rate, if such June 1 is not an Interest Payment Date, the Due Date shall be the Interest Payment Date immediately preceding such June 1.

**IN CONNECTION WITH THIS OFFERING, THE UNDERWRITER MAY OVER-ALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE 2005 BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.**

No dealer, broker, salesperson or other person has been authorized by the Authority, the Obligated Group or the Underwriter to give any information or to make any representations with respect to the 2005 Bonds, other than those in this Official Statement, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, and there shall not be any sale of any 2005 Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information set forth herein has been obtained from the Authority, the Obligated Group, the Bond Insurer, and other sources that are believed to be reliable, but the Underwriter does not guarantee the accuracy or completeness of the information and the information is not to be construed as a representation by the Underwriter. Except as it relates to the Authority, the information contained herein is not to be construed as a representation by the Authority. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority, the Obligated Group or the Bond Insurer since the date hereof.

This Official Statement contains statements that are "forward-looking" as defined in the Private Securities Litigation Reform Act of 1995. When used in this Official Statement, the words "estimate," "intend" and "expect" and similar expressions are intended to identify forward-looking statements. Such statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in such forward-looking statements. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof.

The order and placement of information in this Official Statement, including the Appendices, do not represent a determination of relative materiality or importance, and this Official Statement, including the Appendices, must be considered in its entirety. The offering of the 2005 Bonds is made only by means of this entire Official Statement.

Other than with respect to information concerning Ambac Assurance Corporation ("Ambac") contained under the caption "Bond Insurance" and APPENDIX F- "Form of Municipal Bond Insurance Policy" herein, none of the information in this Official Statement has been supplied or verified by Ambac and Ambac makes no representation or warranty, express or implied, as to (i) the accuracy or completeness of such information; (ii) the validity of the 2005 Bonds; or (iii) the tax exempt status of the interest on the 2005 Bonds.

## TABLE OF CONTENTS

INTRODUCTORY STATEMENT .................................................................................................................................................................... 1
THE AUTHORITY ................................................................................................................................................................................................ 6
BOOK-ENTRY SYSTEM ..................................................................................................................................................................................... 7
THE 2005 BONDS ............................................................................................................................................................................................... 10
BOND INSURANCE ........................................................................................................................................................................................... 22
ADDITIONAL SECURITY FOR THE 2005 BONDS ................................................................................................................................... 25
FINANCING PLAN ............................................................................................................................................................................................ 27
ESTIMATED SOURCES AND USES OF FUNDS ........................................................................................................................................ 29
DEBT SERVICE REQUIREMENTS ................................................................................................................................................................ 30
THE OBLIGATED GROUP ............................................................................................................................................................................... 31
CERTAIN BONDHOLDERS' RISKS .............................................................................................................................................................. 31
UNDERWRITING ............................................................................................................................................................................................... 59
TAX MATTERS ................................................................................................................................................................................................... 60
RATINGS ............................................................................................................................................................................................................. 61
LEGAL MATTERS ............................................................................................................................................................................................. 61
LITIGATION ........................................................................................................................................................................................................ 62
FINANCIAL STATEMENTS ............................................................................................................................................................................ 62
FINANCIAL ADVISOR ..................................................................................................................................................................................... 62
VERIFICATION OF MATHEMATICAL COMPUTATIONS ...................................................................................................................... 62
CONTINUING DISCLOSURE .......................................................................................................................................................................... 63
MISCELLANEOUS ............................................................................................................................................................................................. 63

APPENDIX A – INFORMATION CONCERNING WEST VIRGINIA UNIVERSITY HOSPITALS, INC. .............................................. A-1
APPENDIX B – FINANCIAL STATEMENTS OF WEST VIRGINIA UNIVERSITY HOSPITALS, INC ............................................. B-1
APPENDIX C – FINANCIAL STATEMENTS OF THE CHARLES TOWN GENERAL HOSPITAL
   (d/b/a JEFFERSON MEMORIAL HOSPITAL) ............................................................................................................................................ C-1
APPENDIX D – FINANCIAL STATEMENTS OF GATEWAY REGIONAL HEALTH SYSTEM, INC. .............................................. D-1
APPENDIX E - DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS ................................... E-1
APPENDIX F - FORM OF MUNICIPAL BOND INSURANCE POLICY ................................................................................................. F-1
APPENDIX G– SUMMARY OF CERTAIN  PROVISIONS RELATING TO AUCTION AND SETTLEMENT PROCEDURES
   FOR THE 2005 BONDS ................................................................................................................................................................................. G-1
APPENDIX H - FORM OF BOND COUNSEL OPINION ............................................................................................................................ H-1
APPENDIX I – FORM OF CONTINUING DISCLOSURE AGREEMENT ............................................................................................... I-1

## OFFICIAL STATEMENT

**$30,525,000**
**WEST VIRGINIA HOSPITAL FINANCE AUTHORITY**
**Hospital Revenue Bonds**
**(West Virginia University Hospitals, Inc.) 2005 Series A**
**Auction Rate Certificates (ARCs$^{(SM)}$)**

**$29,475,000**
**WEST VIRGINIA HOSPITAL FINANCE AUTHORITY**
**Hospital Revenue Bonds**
**(West Virginia University Hospitals Inc.) 2005 Series B**
**Auction Rate Certificates (ARCs$^{(SM)}$)**

### INTRODUCTORY STATEMENT

The purpose of this Official Statement, including the cover page and the appendices hereto, is to set forth information in connection with the offering by the West Virginia Hospital Finance Authority (the "Authority") of its (i) $30,525,000 Hospital Revenue Bonds (West Virginia University Hospitals, Inc.) 2005 Series A Auction Rate Certificate (ARCs$^{(sm)}$) (the "2005 A Bonds") and (ii) 29,475,000 Hospital Revenue Bonds (West Virginia University Hospitals, Inc.) 2005 Series B Auction Rate Certificate (ARCs$^{(sm)}$) (the "2005 B Bonds," and, together with the 2005 A Bonds, sometimes hereinafter collectively referred to as the "2005 Bonds"). The 2005 Bonds will be issued pursuant to a Bond Indenture, dated as of January 1, 2005 (the "Bond Indenture"), between the Authority and The Bank of New York, New York, New York, as Bond Trustee (the "Bond Trustee").

The proceeds of the sale of the 2005 Bonds will be used, together with moneys released from funds and accounts under the hereinafter defined 1992 Bond Indenture, and the hereinafter defined 2002 Bond Indenture, as applicable, to (i) refinance by currently refunding all of the outstanding (a) Berkeley County Building Commission Hospital Revenue Bonds (City Hospital Project) Series 1992 (the "Series 1992 Bonds"), (b) West Virginia Hospital Finance Authority Variable Rate Demand Revenue Bonds (WVHA Pooled Loan Financing Program) 2002 Series C-1 (City Hospital, Inc. Project) (the "Series 2002 Bonds"), (c) Jefferson County Building Commission Hospital Revenue Bonds, Series 2003 (Jefferson Memorial Hospital) (the "Series 2003 Bonds"), and (d) a loan between Gateway Foundation, Inc. (which is the former name of the Foundation, hereinafter defined) and Merrill Lynch Business Financial Services Inc. ("Merrill Lynch") dated May 6, 2004 and a loan between City Hospital, Inc. and Merrill Lynch dated May 6, 2004 (collectively, the "Merrill Lynch Debt," and, together with the Series 1992 Bonds, the Series 2002 Bonds and the Series 2003 Bonds, hereinafter sometimes referred to as the "Debt to be Refinanced"); (ii) finance the acquisition, construction, renovation, improvement and equipping of hospital facilities to be owned by Members of the Obligated Group, reimburse the costs of certain capital expenditures made, or to be made by members of the Obligated Group at their respective hospital facilities (as defined in the Act), including capitalized interest, and (iii) pay the costs of issuing the 2005 Bonds, including the premium for the issuance of the Insurance Policy by the Bond Insurer (collectively, the "Project"). See "Financing Plan" herein.

The Series 1992 Bonds were issued in the aggregate principal amount of $23,640,000 pursuant to an Indenture of Trust, dated as of September 1, 1992 (the "1992 Bond Indenture"), by and between the Berkeley County Building Commission and Charleston National Bank (predecessor-in-interest to J.P. Morgan Trust Company, National Association) (the "1992 Bond Trustee"). Proceeds of the Series 1992 Bonds were used to acquire, construct and equip a new inpatient and ambulatory surgery facility, to expand the emergency, laboratory, cardiopulmonary, and physical therapy services, and renovate radiology, food services, the main lobby and other spaces at City Hospital, Inc. ("City").

The Series 2002 Bonds were issued in the aggregate principal amount of $4,925,000 pursuant to a Supplemental Trust Indenture by and between the Authority and United National Bank (now United Bank, Inc.), as trustee (the "2002 Bond Indenture"), and a Loan Agreement, dated January 1, 2002, by and between the Authority and City. Proceeds of the Series 2002 Bonds were used to acquire a hospital-wide information system, a security and fire alarm system and major equipment for City, such as an electrical surgical table, an echocardiography machine, a fluoroscopy unit, a CT unit upgrade, a radiology imaging transfer system and two portable x-ray units.

The Series 2003 Bonds were issued in the aggregate amount of $1,865,000 pursuant to an Indenture of Trust, dated February 25, 2003 (the "2003 Bond Indenture"), by and between the Jefferson County Building Commission and United Bank, Inc. (The "2003 Bond Trustee"). Proceeds of the Series 2003 Bonds were used to refinance certain prior indebtedness of The Charles Town General Hospital, d/b/a Jefferson Memorial Hospital and to finance certain improvements, equipment and renovations to Jefferson Memorial Hospital.

The Merrill Lynch Debt was incurred pursuant to (i) Loan Agreement No. 84A-07004, dated May 6, 2004, between Gateway Foundation (former name of City Hospital Foundation, Inc.) and Merrill Lynch Business Financial Services Inc. ("Merrill Lynch"), such loan being in the original principal amount of $2,900,000, and (ii) Loan Agreement No. 84A-07008, dated May 6, 2004, by and between City and Merrill Lynch in the original principal amount of $4,000,000. Proceeds of the Merrill Lynch Debt were used for the acquisition and upgrading of hospital equipment, the purchase of land for an outpatient urgent care center, and for the design, construction, expansion and renovation of buildings located on the campus of City.

The Members of the Obligated Group, hereinafter defined (except City Hospital Foundation, Inc.), are hospitals as defined in Article 29A, Chapter 16 of the Code of West Virginia, 1931, as amended (the "Act"), and the members of the Obligated Group are exempt from federal income tax under Section 501(a) of the Internal Revenue Code of 1986, as amended (the "Code"), as organizations described in Section 501(c)(3) of the Code. West Virginia University Hospitals, Inc. ("WVUH"), as Obligated Group Agent, will become a party to a Loan Agreement dated as of January 1, 2005 (the "Loan Agreement"), with the Authority, pursuant to which the Obligated Group Agent will deliver to the Authority concurrently with the delivery of the 2005 Bonds its promissory notes (the "Notes") evidencing the Obligated Group's joint and several obligation to make payments in amounts sufficient to pay the 2005 Bonds. The 2005 Bonds are payable solely from and are secured by a grant of a security interest in and an assignment and pledge to the Bond Trustee of (a) all right, title and interest of the Authority in

2

the Revenues, (b) all right, title and interest of the Authority in and to the Notes, respectively, assigned hereunder for the payment of the 2005 Bonds, (c) all right, title and interest of the Authority in and to the Loan Agreement (other than the right to indemnification, reimbursement and payment of its fees and expenses, to receive notices and to grant approvals, consents and waivers (the "Unassigned Rights"), (d) all right, title and interest of the Authority in and to the Supplemental Indenture 2005-2, and (e) any and all other property of every kind and nature from time to time hereafter, by delivery or by writing of any kind conveyed, pledged, assigned or transferred as and for additional security thereunder by the Authority or the Obligated Group or by anyone on their behalf to the Bond Trustee, including, without limitation, funds of the Obligated Group held by the Bond Trustee as security for the 2005 Bonds.

The Authority has previously issued (i) $23,530,000 Hospital Refunding Revenue Bonds (West Virginia University Hospitals, Inc.) 2003 Series A (the "2003 A Bonds"), (ii) $25,800,000 Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series B Auction Rate Certificate (ARCs[sm]) (the "2003 B Bonds"), (iii) $44,650,000 Hospital Revenue Refunding and Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series C Auction Rate Certificate (ARCs[sm]) (the "2003 C Bonds"), and (iv) $45,750,000 Hospital Revenue Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series D Auction Rate Certificate (ARCs[sm]) (the "2003 D Bonds," and, together with the 2003 A Bonds, the 2003 B Bonds and the 2003 C Bonds, sometimes hereinafter collectively referred to as the "2003 Authority Bonds"). The 2003 Authority Bonds were issued pursuant to a Bond Trust Indenture, dated as of August 1, 2003 (the "Bond Indenture"), between the Authority and The Bank of New York, New York, New York, as Bond Trustee (the "2003 Authority Bond Trustee").

Proceeds of the 2003 Authority Bonds were used to (i) currently refund all of those certain West Virginia Hospital Finance Authority Hospital Revenue Refunding Bonds, West Virginia University Hospitals, Inc. Issue, Series 1993, issued in the original aggregate principal amount of $72,935,000 and all of those certain West Virginia Hospital Finance Authority Weekly Rate Demand Refunding Revenue Bonds (West Virginia University Hospitals, Inc. Project) Series 2002 B-1; (ii) reimburse the costs of certain capital expenditures made by WVUH at its hospital facilities (as defined in the Act), and (iii) pay the costs of issuing the 2003 Bonds.

The Authority has also previously issued its Hospital Improvement and Refunding Revenue Bonds (West Virginia University Hospitals, Inc.) Series 1998 (the "Series 1998 Bonds"), pursuant to a Bond Trust Indenture, dated as of October 15, 1998, between the Authority and The Huntington National Bank, as bond trustee (the "1998 Bond Trustee"). Proceeds of the Series 1998 Bonds were used to (i) reimburse WVUH for costs incurred in connection with the acquisition of substantially all of the assets used or useful in the operation of the facility doing business as "Chestnut Ridge Hospital," in the City of Morgantown, West Virginia, the site thereof and certain equipment therein; (ii) acquire and install new hospital equipment; (iii) acquire, construct and equip a new facility for temporarily housing patients and family members and the site thereof; (iv) refinance the existing indebtedness incurred by WVUH in connection with the issuance of the Authority's Insured Hospital Revenue Bonds, West Virginia University Hospitals, Inc. Issue, Series 1986 (the "Series 1986 Bonds"), to accomplish the refunding of all outstanding Series 1986 Bonds; and (v) pay costs of issuing the Series 1998 Bonds.

BY VIRTUE OF THE OBLIGATIONS OF THE OBLIGATED GROUP UNDER THE MASTER INDENTURE, HEREINAFTER DEFINED, THE 2005 BONDS ARE ON A PARITY WITH THE 2003 AUTHORITY BONDS AND THE SERIES 1998 BONDS AS TO LIEN ON GROSS RECEIPTS, HEREINAFTER DEFINED, AND SOURCE OF PAYMENT.

As described above, the 2005 Bonds are special, limited obligations of the Authority payable from pledged Revenues held by the Bond Trustee under the Bond Indenture, including payments made by the Obligated Group pursuant to the Notes and the Loan Agreement. Payments on the Notes, in the aggregate, are required to be in an amount sufficient (1) to pay in full, when due, the aggregate principal of, premium, if any, and interest on the 2005 Bonds to their respective dates of maturity or earlier redemption, and (2) to pay certain expenses. The Notes will be the sixth and seventh notes issued under an Amended and Restated Master Trust Indenture, dated as of August 1, 2003 between WVUH and The Huntington National Bank, as Master Trustee (the "Master Trustee"), as supplemented by Supplemental Master Trust Indenture No. 2003-1 ("Supplemental Master Trust Indenture No. 2003-1"), dated as of August 1, 2003, and as further supplemented by Supplemental Master Trust Indenture No. 2005-1 ("Supplemental Master Trust Indenture No. 2005-1") and Supplemental Master Trust Indenture No. 2005-2 ("Supplemental Master Trust Indenture No. 2005-2") between WVUH and the Master Trustee (such Amended and Restated Master Trust Indenture, as supplemented, being herein referred to as the "Master Indenture").

The Notes will be on parity with (i) the 2003 Notes issued by WVUH in connection with the issuance of the 2003 Authority Bonds, and (ii) the Series 4 Note issued by WVUH, in connection with the issuance of the Series 1998 Bonds. The Series 4 Note was issued under a Master Trust Indenture, dated as of April 1, 1985, as supplemented (the "Prior Master Indenture"). WVUH's Series 1 Note, Series 2 Note and Series 3 Note issued under the Prior Master Indenture have been defeased and are no longer outstanding. WVUH's Series 4 Note, issued to evidence the Obligated Group's loan obligation in connection with the issuance of the Series 1998 Bonds remains Outstanding.

Except as provided below, the 2005 Bonds will not be payable from any other Notes issued under the Master Indenture or secured by the funds, accounts and subaccounts securing any Related Bonds, hereinafter defined, as described below.

On January 1, 2005, WVUH became the sole member of West Virginia University Hospitals East, Inc. ("WVUH-East"), a West Virginia nonprofit corporation which is the sole member of (i) City, (ii) The Charles Town General Hospital, d/b/a Jefferson Memorial Hospital ("Jefferson" and with City, the "Acquired Hospitals") and (iii) City Hospital Foundation, Inc. (the "Foundation," and collectively with the Acquired Hospitals, the "Acquired Corporations"), each a West Virginia nonprofit corporation.

The Master Indenture created an "Obligated Group" which to date includes WVUH, City, Jefferson and the Foundation. The Master Indenture permits other entities, upon compliance with certain conditions, to become Members of the Obligated Group and to issue Notes thereunder. Each Member of the Obligated Group will, subject to the right of such Member to withdraw from the Obligated Group under certain conditions, jointly and severally covenant to make any and all payments promptly on all Notes theretofore or thereafter issued under the Master Indenture,

4

including the Series 4 Note, the 2003 Notes and the Notes, according to the terms thereof. See Appendix E – "DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS" herein.

## WVUH, CITY, JEFFERSON AND THE FOUNDATION ARE THE ONLY MEMBERS OF THE OBLIGATED GROUP AND ARE THE ONLY ENTITIES THAT HAVE ANY LIABILITY FOR PURPOSES OF PAYMENT ON THE NOTES

Under the Master Trust Indenture, the Notes are general obligations of the Obligated Group and are secured by a security interest in the Gross Receipts of the Members of the Obligated Group, on parity with the security interest in the Gross Receipts of the Obligated Group granted to holders of the 2003 Notes and the Series 4 Note. The Notes are not secured by a mortgage or other lien on the physical assets of any member of the Obligated Group. The Master Indenture requires, however, that each Member of the Obligated Group agrees that it will not create or suffer to exist any Lien, other than certain Permitted Liens, upon any Property, as described below. See Appendix E – "DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS" herein.

Ambac Assuarance Corporation (the "Bond Insurer") has committed to issue, effective as of the date on which the 2005 Bonds are delivered, the Municipal Bond Insurance Policy, hereinafter defined, which unconditionally and irrevocably guarantees the scheduled payment of the principal of and interest on the 2005 Bonds, as the same become due and payable in accordance with their stated terms. The Municipal Bond Insurance Policy is non-cancelable for any reason. See the caption "Bond Insurance" herein and the specimen Municipal Bond Insurance Policy in Appendix F hereto.

In the Master Indenture, the Obligated Group covenants and agrees to operate all Facilities on a revenue producing basis and to comply with certain other business financial covenants. A more detailed description of the covenants is included in Appendix E – "DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS" herein.

The Members of the Obligated Group, upon compliance with the terms and conditions and for the purposes described herein, may issue additional Indebtedness under the Master Indenture.

Risks associated with the purchase of the 2005 Bonds are discussed herein under the caption "Certain Bondholders' Risks."

All capitalized terms in this Official Statement, unless otherwise defined or the context otherwise indicates, shall have the same meanings as in the Master Indenture, the Loan Agreement and the Bond Indenture. Certain of these definitions are summarized in Appendix E hereto.

The descriptions and summaries of various documents hereinafter set forth do not purport to be comprehensive or definitive, and reference is made to each document for the complete details of all terms and conditions. All statements herein are qualified in their entirety by reference to each such document. Copies of the Master Indenture, the Loan Agreement, the Continuing Disclosure Agreement, hereinafter defined, and the Bond Indenture are available in reasonable quantities upon request to the Authority.

5

## THE AUTHORITY

The West Virginia Hospital Finance Authority was established by the Act in 1984 as a body corporate and a governmental instrumentality of the State. The Authority commenced operations in 1985. The Authority is authorized by the Act to provide hospitals with appropriate means to maintain, expand, enlarge and establish health care, hospital and other related facilities and to provide hospitals with the ability to finance or refinance indebtedness pursuant to a hospital loan program as provided in the Act. The Authority's offices are located currently at One Players Club Drive, Charleston, West Virginia 25311, and its telephone number is (304) 558-0549.

The Authority is controlled, managed and operated by the West Virginia Hospital Finance Board (the "Board"). The Board is composed of seven members, including two ex-officio members, the Secretary of the State Department of Health and Human Resources and the Treasurer of the State. The remaining five members of the Board are appointed by the Governor with the advice and consent of the State Senate and serve terms of six years. Appointed Board members may be reappointed to serve additional terms. No more than three of the appointed Board members may, at any time, belong to the same political party. The Board annually elects one of its appointed members as Chairman and another as Vice Chairman and appoints a Secretary-Treasurer who need not be a member of the Board.

| Appointed Member | Occupation | Term Expires |
|---|---|---|
| James R. Christie, Chairman | Attorney | January 9, 2008 |
| Jack H. Hartley, Vice Chairman | Retired | January 9, 2007 |
| Jim Bowen | President of West Virginia Labor Federation, AFL-CIO | January 9, 2006 |
| Geraldine Roberts | Attorney | January 9, 2005* |
| David L. Williams | Registered Investment Advisor | January 9, 2009 |

*Serves until successor appointed.

Ex Officio Members

| | |
|---|---|
| Paul L. Nusbaum | Secretary, West Virginia Department of Health and Human Resources, and acting Director of the Division of Health (represented by Thomas B. Johnson) |
| Honorable John D. Perdue | State Treasurer (represented by Jerry Simpson) |

The Authority is empowered to employ officers, agents, employees and advisors, including an Executive Director of the Authority appointed by the Board. The Executive Director position is currently vacant. Sarah B. Hamrick serves as Secretary-Treasurer of the Board and Administrative Assistant of the Authority. Pursuant to the Act, the ex-officio members may be represented by deputies designated by them.

THE 2005 BONDS ARE SPECIAL, LIMITED OBLIGATIONS OF THE AUTHORITY PAYABLE FROM REVENUES PLEDGED TO THE BOND TRUSTEE UNDER THE BOND INDENTURE, INCLUDING PAYMENTS MADE BY THE OBLIGATED GROUP PURSUANT TO THE NOTES. THE 2005 BONDS DO NOT CONSTITUTE A DEBT OR A PLEDGE OF THE FAITH AND CREDIT OR TAXING POWER OF THE STATE OR OF ANY COUNTY, MUNICIPALITY OR ANY OTHER POLITICAL SUBDIVISION OF THE STATE, AND THE OWNERS THEREOF HAVE NO RIGHT TO HAVE TAXES LEVIED BY THE LEGISLATURE OR THE TAXING AUTHORITY OF ANY COUNTY, MUNICIPALITY OR ANY OTHER POLITICAL SUBDIVISION OF THE STATE FOR THE PAYMENT OF THE PRINCIPAL THEREOF OR INTEREST THEREON, BUT THE 2005 BONDS SHALL BE PAYABLE SOLELY FROM THE REVENUES AND FUNDS PLEDGED THEREFOR UNDER THE BOND INDENTURE. **THE AUTHORITY HAS NO TAXING POWER.**

The Authority's financial condition is not material to an investment in the 2005 Bonds and, accordingly, information regarding the Authority's financial condition is not being provided.

## BOOK-ENTRY SYSTEM

The information in this section has been provided by DTC and is not deemed to be a representation of the Authority, the Obligated Group, any of their Affiliates or the Underwriter. DTC will act as securities depository for the 2005 Bonds. The 2005 Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered 2005 Bond certificate will be issued for each maturity of the 2005 Bonds in the aggregate principal amount of such maturity, and all certificates will be deposited with DTC.

DTC is a limited-purpose trust company under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds securities that its participants ("Participants") deposit with DTC. DTC also facilitates the settlement among Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct Participants ("Direct Participants") include securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc., and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as securities brokers and dealers, banks, and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). The rules applicable to DTC and its Participants are on file with the Securities and Exchange Commission.

Purchase of the 2005 Bonds under the DTC system must be made by or through Direct Participants, who will receive a credit for the 2005 Bonds on DTC's records. The ownership interest of each actual purchaser of each 2005 Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchases, but Beneficial Owners are expected to receive written confirmations providing details of the transactions, as well as periodic statements of their holdings, from the Direct or Indirect Participants through which the Beneficial Owner entered into the transactions. Transfers of ownership interests in the 2005 Bonds are to be accomplished by entries made on the books of Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in 2005 Bonds, except in the event that use of book-entry system for the 2005 Bonds is discontinued.

To facilitate subsequent transfers, all 2005 Bonds deposited by Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. The deposit of 2005 Bonds with DTC and their registration in the name of Cede & Co. effect no change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the 2005 Bonds. DTC's records reflect only the identity of the Direct Participants to whose accounts such 2005 Bonds are credited, which may or may not be the Beneficial Owners. The Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and the other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Redemption notices shall be sent to Cede & Co. If less than all of the 2005 Bonds within a single maturity of an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed. Neither DTC nor Cede & Co. will consent or vote with respect to 2005 Bonds. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the 2005 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal (including sinking fund installments), redemption premium, if any, and interest payments on the 2005 Bonds will be made to DTC. DTC's practice is to credit Direct Participants' accounts on the payment date in accordance with their respective holdings shown on DTC's records unless DTC has reason to believe that it will not receive payments on the payment date. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form registered in "street name," and will be the responsibility of such Participants and not of DTC, the Authority, the Obligated Group, any of its Affiliates or the Bond Trustee, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to DTC is the responsibility of the Authority or the Bond Trustee, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

The Authority, the Bond Trustee and the Obligated Group or any of their Affiliates cannot and do not give any assurances that DTC, the Direct Participants or the Indirect Participants will distribute to the Beneficial Owners of the 2005 Bonds (1) payments of principal of or interest and premium, if any, on the 2005 Bonds, (2) confirmation of beneficial ownership interest in the 2005 Bonds, or (3) redemption or other notices sent to DTC or Cede & Co., its nominee, as the registered owner of the 2005 Bonds, or that they will do so on a timely basis, or that DTC, Direct Participants or Indirect Participants will serve and act in the manner described in this Official Statement. The current "rules" applicable to DTC are on file with the Securities and Exchange Commission, and the current "procedures" of DTC to be followed in dealing with Direct Participants are on file with DTC.

Neither the Authority, the Bond Trustee nor the Obligated Group or any of their Affiliates shall have any responsibility or obligation to any Direct Participant, Indirect Participant or any Beneficial Owner or any other person not shown on the registration books of the Bond Trustee as being a Bondholder with respect to the 2005 Bonds or to any Direct Participant, Indirect Participant, Beneficial Owner or any other person with respect to (1) the accuracy of any records maintained by DTC or any Participant; (2) the payment by DTC or any Participant of any amount due to any Beneficial Owner in respect of the principal amount or redemption price of or interest on the 2005 Bonds; (3) the delivery by DTC or any Participant of any notice to any Beneficial Owner which is required or permitted under the terms of the Bond Indenture to be given to Bondholders; or (4) the selection of the Beneficial Owners to receive payment in the event of any partial redemption of the 2005 Bonds.

## Discontinuation of Book-Entry System

DTC may determine to discontinue providing its service with respect to the 2005 Bonds at any time by giving reasonable notice to the Authority and the Bond Trustee. Upon the giving of such notice, the Book-Entry System for the 2005 Bonds will be discontinued unless a successor securities depository is appointed by the Authority. In addition, the Authority may discontinue the Book-Entry System for the 2005 Bonds at any time if it determines that continuation of the system is not in the best interests of the Authority.

In the event that the Book-Entry System for the 2005 Bonds is discontinued, the provisions set forth below would apply, subject to the further conditions set forth in the Bond Indenture.

**Delivery of Certificates; Registered Owners**. The 2005 Bond certificates in fully registered form will be delivered to such persons and in such maturities and principal amounts as may be designated by DTC. The ownership of the 2005 Bonds so delivered (and any 2005 Bonds thereafter delivered upon a transfer or exchange described below) shall be registered in the registration books to be kept by the Bond Trustee at its principal corporate trust office, and the Authority and the Bond Trustee shall be entitled to treat the registered owners of such 2005 Bonds, as their names appear in such registration books as of the appropriate dates, as the owners thereof for all purposes described herein and in the Bond Indenture.

**Payments**. The principal or redemption price of the 2005 Bonds shall be payable upon surrender thereof at the principal corporate trust office of the Bond Trustee. Interest shall be payable by check or draft mailed to the registered owners of the 2005 Bonds as shown on the

9

registration books kept by the Bond Trustee as of the close of business on the applicable record date described below.

**Record Dates**. The record date for interest due on the 2005 Bonds while in the Auction Mode shall be the day (whether or not a Business Day) immediately preceding each Interest Payment Date. With respect to any interest not paid when due ("Overdue Interest"), the Bond Trustee may establish a special interest payment date and a special record date with respect to such Overdue Interest, and shall mail notice of such dates to the registered owners of the 2005 Bonds not less than ten days prior to the special record date.

**Transfers and Exchanges**. So long as any of the 2005 Bonds remain outstanding, the Bond Trustee shall maintain at its principal corporate trust office a register for the registration and transfer of the 2005 Bonds (herein called the "Bond Register"), whereby such Bonds may be registered and may be presented for registration of transfer and for exchange as provided in this Indenture. Except as provided in the Bond Indenture, the Bond Trustee shall keep the Bond Register confidential, and access may only the Bond Trustee shall given to the Internal Revenue Service, other governmental entities for reasonable purpose, courts, in response to lawful process or others at the direction of the Authority or the Obligated Group.

The registration of transfer of each 2005 Bond shall be made only on the Bond Register, upon surrender thereof, together with a written instrument of transfer satisfactory to the Bond Trustee duly executed by the Owner or his duly authorized attorney or legal representative. In all cases of registration of transfer or exchange of 2005 Bonds, the Authority shall execute and the Bond Trustee shall authenticate and deliver a new 2005 Bond or new 2005 Bonds in the same aggregate principal amount, of the same maturity and interest rate, in the denomination of (i) $100,000 and $5,000 multiples in excess thereof, during any Weekly Rate Period, hereinafter defined, (ii) $25,000 and integral multiples thereof, during any Auction Rate Period, hereinafter defined, and (iii) $5,000 and any integral multiple thereof during any Fixed Rate Period.

The Bond Trustee shall not make any exchange or transfer of any 2005 Bonds after the date the same is selected by the Bond Trustee for redemption.

For every exchange or transfer of 2005 Bonds, the Bond Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the Person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer. Notwithstanding any other provision of this Indenture, the cost of preparing each new 2005 Bond upon each exchange or transfer, and any other expenses of the Authority or the Bond Trustee incurred in connection therewith (except any applicable tax, fee or other governmental charge) shall be paid by the Obligated Group.

## THE 2005 BONDS

### General

The 2005 Bonds will be dated as of the date of delivery thereof to the Underwriter; and will mature (unless previously called for redemption) on the dates, and will bear interest determined in

10

the manner as set forth on the inside front cover hereof. The 2005 Bonds are being issued for the purposes described herein under the heading "INTRODUCTORY STATEMENT" and "FINANCING PLAN." See also "ESTIMATED SOURCES AND USES OF FUNDS" below.

See APPENDICES E AND G hereto for the definitions of certain terms relating to 2005 Bonds and for additional information as to the operation of the Auction Rate Period.

The 2005 Bonds shall bear interest at a rate determined by the Underwriter on or about Closing until and including (i) with respect to the 2005 A Bonds, February 2, 2005, and (ii) with respect to the 2005 B Bonds, February 3, 2005 (each, the "Initial Period"), which rate will be the interest rate which will result in the 2005 Bonds being sold at a price of 100% of the principal amount thereof for such period. Thereafter, the 2005 Bonds shall bear interest at Auction Rates established for Auction Periods until a Weekly Rate Conversion Date or Fixed Rate Conversion Date. At no time shall the 2005 Bonds bear interest at a rate higher than the Maximum Interest Rate.

"Auction Rate" means the rate of interest to be borne by the 2005 Bonds during each Auction Period determined in accordance with the Auction Procedures, as hereinafter defined, described in APPENDIX G hereto; provided, however:

(i) that if the Auction Agent shall have failed to calculate, or for any reason fails to timely provide, the Auction Rate for any Auction Period (including, without limitation the circumstances where there is no Auction Agent or no Broker-Dealer), the Auction Rate for such Auction Period shall be the Maximum Rate;

(ii) that if there occurs an Event of Default under the Bond Indenture consisting of a failure to pay (A) any installment of interest payable on the 2005 Bonds when due and payable or (B) any principal or premium, if any, payable on any of the 2005 Bonds when the same shall become due and payable, either at maturity, by proceeding for redemption or upon acceleration, which, in any such case, is followed by the failure of the Bond Insurer to make, in accordance with the Insurance Policy, due and punctual payments described in (A) or (B), if so required by the Insurance Policy (a "Payment Default"), Auctions will be suspended and the Auction Rate for the Auction Period commencing on or after the Payment Default and for each Auction Period thereafter to and including the Auction Period, if any, during which, or commencing less than the greater of two Business Days or one Business Day plus the number of Business Days by which the Auction Date precedes the first day of the next succeeding Auction Period (the "Applicable Number of Business Days") after, such Payment Default is cured, shall be the Default Rate;

(iii) that, in the event of a failed conversion of 2005 Bonds to a Weekly Rate Period or a Fixed Rate Period or in the event of a failure to change the length of the current Auction Period as provided in the Bond Indenture due to the lack of Sufficient Clearing Bids at the Auction on the Auction Date for the first new Auction Period, the Auction Rate for the next Auction Period shall be the Maximum Rate, and the Auction Period shall be the same length as the prior Auction Period;

11

(iv)     that if the 2005 Bonds are not rated, or the 2005 Bonds are no longer maintained in book-entry only form by the Securities Depository, then the 2005 Bonds will bear interest at the Maximum Rate.

In no event may the Auction Rate exceed the Maximum Interest Rate.

"Auction Date" means, with respect to any series of 2005 Bonds, during any period in which the Auction Procedures are not suspended in accordance with the provisions of the Auction Procedures, the Business Day next preceding each Interest Payment Date for such Bonds (whether or not an Auction shall be conducted on such date); provided, however, that the last Auction Date with respect to a series of 2005 Bonds shall be the earlier of (a) the Business Day next preceding the Interest Payment Date next preceding the Conversion Date for such series of 2005 Bonds and (b) the Business Day next preceding the Interest Payment Date next preceding the final maturity date for a series of 2005 Bonds. The first Auction Date for the 2005 A Bonds shall be February 2, 2005.  The first Auction Date for the 2005 B Bonds shall be February 3, 2005.

"Auction Period" means (A), with respect to the 2005 A Bonds, (i) for 2005 A Bonds in a seven-day mode, a period of generally seven days beginning on a Thursday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Wednesday) and ending on the Wednesday thereafter (unless such Wednesday is not followed by a Business Day, in which case ending on the next succeeding day which is followed by a Business Day), and (ii) in a 35-day mode, a period of generally 35 days beginning on a Thursday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Wednesday) and ending on the fifth Wednesday thereafter (unless such Wednesday is not followed by a Business Day, in which case ending on the next succeeding day which is followed by a Business Day; and (B) with respect to the 2005 B Bonds (i) for 2005 B Bonds in a seven-day mode, a period of generally seven days beginning on a Friday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Thursday) and ending on the Thursday thereafter (unless such Thursday is not followed by a Business Day, in which case ending on the next succeeding day which is followed by a Business Day), and (ii) in a 35-day mode, a period of generally 35 days beginning on a Friday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Thursday) and ending on the fifth Thursday thereafter (unless such Thursday is not followed by a Business Day, in which case ending on the next succeeding day which is followed by a Business Day).

The 2005 Bonds will be dated the date of initial delivery and will be issued as fully registered bonds of each series without coupons and in denominations of $25,000 or any integral multiple thereof.  Fully registered bonds are interchangeable for other fully registered bonds of the same series in Authorized Denominations upon terms and conditions provided in the Bond Indenture.  Interest shall be calculated on the basis of (i) a 360-day year of twelve 30-day months during the Fixed Rate Mode, (ii) a 360-day year for the number of days actually elapsed during an Auction Mode and (iii) a 365/366-day year for the number of days elapsed during a Weekly Mode.  Any such interest not so punctually paid or duly provided for shall forthwith cease to be payable to the Bondholder on such Record Date and shall be paid to the person in whose name the Bond is registered at the close of business on a Special Record Date for the payment of such defaulted interest to be fixed by the Bond Trustee, notice whereof being given by Electronic Means to the Bondholders not less 10 days prior to such Special Record Date.

12

The initial Interest Payment Date for the 2005 Bonds will be (i) with respect to the 2005 A Bonds, February 3, 2005, and (ii) with respect to the 2005 B Bonds, February 4, 2005. Thereafter, the Interest Payment Dates for the 2005 Bonds during an Auction Rate Period will be (i) the Business Day immediately following each Auction Period, (ii) each Mandatory Tender Date, (iii) any date on which 2005 Bonds are redeemed pursuant to the provisions of the Bond Indenture and (iv) the Maturity Date.

Upon the issuance of the 2005 Bonds, The Depository Trust Company, New York, New York ("DTC") will act as securities depository for the 2005 Bonds. The 2005 Bonds will be registered in the Book-Entry System (described herein) maintained by DTC. Payment of principal, premium, if any, and interest on the 2005 Bonds will be made to the beneficial owners of the 2005 Bonds as described under "BOOK-ENTRY SYSTEM" above. The information under the heading "THE 2005 BONDS" is subject in its entirety to the provisions described above under "BOOK-ENTRY SYSTEM" while the 2005 Bonds are in the Book-Entry System. If the Book-Entry System is discontinued, the provisions of the next two succeeding paragraphs would be applicable.

Principal and premium, if any, on the 2005 Bonds shall be payable (i) upon presentation at the designated corporate trust office of the Bond Trustee in New York, New York, or such other office as may be designated by the Bond Trustee in a notice to the owners of the 2005 Bonds), or the office of any successor Bond Trustee, or at the office of any alternate Paying Agent, if any, named in any such 2005 Bond or (ii) as to any registered owner of $1,000,000 or more in aggregate principal amount of 2005 Bond as of the close of business of the Bond Trustee on the Record Date for a particular principal payment date and who has presented its 2005 Bond on or prior to the payment date, by wire transfer of funds to such wire transfer address within the continental United States as such registered owner shall have furnished to the Bond Trustee in writing on or prior to the payment date and upon compliance with the reasonable requirements of the Bond Trustee with respect to such wire transfers as are necessary to comply with any applicable provisions of the Uniform Commercial Code of the State of West Virginia, as amended. Interest payments on a 2005 Bond (other than with respect to Defaulted Interest) shall be made to the registered owner thereof appearing on the Bond Register as of the close of business of the Bond Registrar on the Record Date during a Auction Rate Period by check or draft of the Bond Trustee mailed on the Interest Payment Date to such registered owner at the address of such owner as it appears on the Bond Register or at such other address furnished in writing by such registered owner to the Bond Trustee or to any owner of $1,000,000 or more in aggregate principal amount of 2005 Bonds as of the close of business of the Bond Trustee on the Record Date for a particular Interest Payment Date, by wire transfer sent on the Interest Payment Date, to such owner.

Defaulted Interest with respect to any 2005 Bond shall cease to be payable to the holder of such 2005 Bond on the relevant Record Date and shall be payable to the holder in whose name such 2005 Bond is registered at the close of business on the Special Record Date for the payment of such Defaulted Interest, which Special Record Date shall be fixed in the following manner. The Obligated Group shall notify the Bond Trustee and the Bond Insurer in writing of the amount of Defaulted Interest proposed to be paid on each 2005 Bond and the date of the proposed payment (which date shall be such as will enable the Bond Trustee to comply with the second sentence hereafter), and shall deposit with the Bond Trustee at the time of such notice an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest

13

or shall make arrangements satisfactory to the Bond Trustee for such deposit prior to the date of the proposed payment. Money deposited with the Bond Trustee shall be held in trust for the benefit of the holders of the 2005 Bonds entitled to such Defaulted Interest as provided. Following receipt of such funds the Bond Trustee shall fix a Special Record Date for the payment of such Defaulted Interest which shall be not more than 15 nor less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Bond Trustee of the notice of the proposed payment. The Bond Trustee shall promptly notify the Obligated Group of such Special Record Date and, in the name and at the expense of the Obligated Group, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage prepaid, not less than 10 days prior to such Special Record Date, to each holder of a 2005 Bond at the address of such holder as it appears on the Bond Register.

## Auction Agent

The Bond Indenture provides that when 2005 Bonds bear interest at the Auction Rate, the Bond Trustee shall, at the direction of the Obligated Group, appoint an Auction Agent. The Bond Trustee and the Auction Agent will enter into an Auction Agreement, which will provide, among other things, that the Auction Agent will determine the Auction Rate for each Auction in accordance with the Auction Procedures. The Bond Trustee will enter into the Auction Agreement initially with Deutsche Bank Trust Company Americas, as agent for the Bond Trustee, which agent shall perform the duties of Auction Agent with respect to the 2005 Bonds. See APPENDIX G for additional information on the Auction Procedures.

## Auction Date

An Auction to determine the interest rate with respect to 2005 Bonds for the next succeeding Auction Period will be held on each Auction Date. The first Auction Date with respect to the 2005 Bonds will be (i) with respect to the 2005 A Bonds, February 2, 2005, and (ii) with respect to the 2005 B Bonds, February 3, 2005.

## Order Procedures for Existing Owners and Potential Owners

The procedure for submitting orders prior to the Submission Deadline on each Auction Date is described in APPENDIX G, as are the particulars with regard to the determination of the Auction Rate and the allocation of 2005 Bonds bearing interest at Auction Rates (collectively, the "Auction Procedures").

## Amendment of Auction Procedures

The provisions of the Bond Indenture concerning the Auction Procedures, including, without limitation, the definition of Maximum Rate, may be amended by obtaining the consent of the Bond Insurer and owners of all Outstanding Bonds bearing interest at an Auction Rate. If on the first Auction Date occurring at least 20 days after the date on which the Bond Trustee mailed notice of such amendment to the registered owners of the Outstanding Bonds bearing interest at an Auction Rate, (i) the Auction Rate for the 2005 Bonds is determined on such date is the Winning Bid Rate and (ii) there is delivered to the Issuer and the Bond Trustee an Opinion of Bond Counsel to the effect that such amendment will not adversely affect the validity of the 2005

14

Bonds or any exemption from federal income taxation to which interest on the 2005 Bonds would otherwise be entitled, the proposed amendment shall be deemed to have been consented to by the owners of all Outstanding Bonds bearing interest at an Auction Rate.

Changes to the Auction Periods and Auction Dates and certain changes to the Applicable Percentages do not require the amendment of the Auction Procedures or any Bondholder consents. See "Changes in Auction Periods or Auction Date" and "Adjustment of Percentages" in APPENDIX G hereto.

### Special Considerations Relating to 2005 Bonds Bearing Interest at Auction Rates

Auctions will be suspended and the Auction Rate for the Auction Period commencing on or after the Payment Default and for each Auction Period thereafter to and including the Auction Period, if any, during which, or commencing less than the greater of two Business Days or one Business Day plus the number of Business Days by which the Auction Date precedes the first day of the next succeeding Auction Period (the "Applicable Number of Business Days") after, such Payment Default is cured, shall be the Default Rate.

UBS Financial Services Inc. will act as the initial Broker-Dealer for the 2005 Bonds.

The Bond Indenture provides that the Auction Agent may resign from its duties as Auction Agent by giving at least 90 days notice or 30 days notice, if it has not been compensated for its services for more that 30 days after such fee is due, to the Obligated Group, the Bond Insurer, the Market Agent and the Bond Trustee. The Broker-Dealer Agreement provides that the Broker-Dealer thereunder may resign upon twenty-one business days notice, and does not require, as a condition to the effectiveness of such resignation, that a replacement Broker-Dealer be in place. For any Auction Period during which there is no duly appointed Auction Agent, or during which there is no duly appointed Broker-Dealer, it will not be possible to hold Auctions, with the result that the interest rate on the Auction Bonds will be the No Auction Rate.

The Broker-Dealer Agreement will provide that a Broker-Dealer may submit an Order in Auctions for its own account. If a Broker-Dealer submits an Order for its own account in any Auction, it might have an advantage over other Bidders in that it would have knowledge of orders placed through it in that Auction; such Broker-Dealer, however, would not have knowledge of Orders submitted by other Broker-Dealers (if any) in that Auction. As a result of bidding by a Broker-Dealer in an Auction, the Auction Rate may be lower than the rate that would have prevailed had the Broker-Dealer not bid. A Broker-Dealer may also bid in an Auction in order to prevent what would otherwise be (a) a failed Auction, (b) an "all-hold" Auction, or (c) the implementation of an Auction Rate that the Broker-Dealer believes, in its sole judgment, does not reflect the market for such securities at the time of the Auction. In the Broker-Dealer Agreement, all Broker-Dealers will agree to handle customer orders in accordance with their respective duties under applicable securities laws and rules.

According to published news reports, the Securities and Exchange Commission (the "Commission") has requested information from a number of broker-dealers regarding certain of their practices in connection with auction rate securities, such as the practices described in the preceding paragraph. The Broker-Dealer has advised the Authority that it, as a participant in the auction rate securities markets, has received a letter from the Commission requesting that it

15

voluntarily conduct an investigation regarding certain of its practices and procedures in connection with those markets. The Broker-Dealer is cooperating with the Commission in providing the requested information. No assurance can be given as to whether the results of this process will affect the market for the 2005 Bonds or the auctions therefor.

UBS Financial Services Inc. has advised the Obligated Group that it intends initially to make a market for the 2005 Bonds between Auctions; however, UBS Financial Services Inc. is not obligated to make such markets, and no assurance can be given that secondary markets therefor will develop.

During an Auction Period, so long as the ownership of the 2005 Bonds is maintained in book-entry form by the Securities Depository, an Existing Holder or a Beneficial Owner may sell, transfer or otherwise dispose of an 2005 Bond only pursuant to a Bid or Sell Order in accordance with the Auction Procedures or to or through a Broker-Dealer, provided that (i) in the case of all transfers other than pursuant to Auctions such Existing Holder or its Broker-Dealer or its Participant advises the Auction Agent of such transfer and (ii) a sale, transfer or other disposition of 2005 Bonds from a customer of a Broker-Dealer who is listed on the records of that Broker-Dealer as the holder of such 2005 Bonds to that Broker-Dealer or another customer of that Broker-Dealer shall not be deemed to be a sale, transfer or other disposition for purposes of this paragraph if such Broker-Dealer remains the Existing Holder of the 2005 Bonds so sold, transferred or disposed of immediately after such sale, transfer or disposition.

## Fixed Rate Conversion at Option of the Obligated Group

At the option of the Obligated Group, a series of 2005 Bonds bearing interest at the Auction Rate may be converted to bear interest at the Fixed Rate as hereinafter provided. The Fixed Rate Conversion Date shall be in the case of a conversion from an Auction Rate Period, the second regularly scheduled Interest Payment Date following the final Auction Date.

Not less than seven (7) Business Days prior to the date on which the Bond Trustee's Agent or the Bond Trustee is required to notify the Bondholders of the conversion pursuant to the next succeeding paragraph, the Obligated Group shall give written notice of the conversion to the Issuer, the Bond Trustee, the Bond Trustee's Agent, if any, the Remarketing Agent, if any, the Bank, if any, the Bond Insurer, if any, the Auction Agent, if any, and the Broker-Dealer, if any, setting forth the series of 2005 Bonds subject to such conversion and the Proposed Fixed Rate Conversion Date. Together with such notice, the Obligated Group shall file with the Bond Insurer, the Bond Trustee and the Bond Trustee's Agent, if any,

(i)     a certificate of the Remarketing Agent setting forth the maturities, mandatory sinking fund schedule and interest on the 2005 Bonds to be converted to Fixed Rates, and

(ii)    an Opinion of Bond Counsel to the effect that the conversion of the 2005 Bonds to the Fixed Rate, including the assignment of maturity dates and sinking fund payment dates pursuant to the Bond Indenture, will not adversely affect the validity of the 2005 Bonds or any exemption from federal income taxation to which interest on the 2005 Bonds would otherwise be entitled. No conversion to the Fixed Rate shall occur unless the Obligated Group shall also file with the Bond Insurer, the Bond Trustee and the Bond

16

Trustee's Agent, if any, an Opinion of Bond Counsel of the type referred to in the preceding sentence dated the Fixed Rate Conversion Date.

The Bond Trustee shall mail a notice of the proposed conversion to the holders of all 2005 Bonds to be converted not less than twenty (20) days prior to the Proposed Fixed Rate Conversion Date, which notice shall include: (i) the Proposed Fixed Rate Conversion Date, (ii) a statement that the 2005 Bonds to be converted will be subject to mandatory tender for purchase on the Proposed Fixed Rate Conversion Date, (iii) a statement that the owners will have no right to retain such 2005 Bonds and (iv) a description of the consequences of a failed conversion.

The Obligated Group may revoke its election to effect a conversion of the interest rate on any 2005 Bonds to a Fixed Rate by giving written notice of such revocation to the Bond Trustee, the Bond Trustee's Agent, the Remarketing Agent, the Bank (if any), the Bond Insurer, the Auction Agent, and the Broker-Dealer at any time prior to the setting of the Fixed Rate by the Remarketing Agent.

On the proposed Fixed Rate Conversion Date applicable to the 2005 Bonds to be converted, such 2005 Bonds to be converted shall be subject to mandatory tender at a purchase price equal to 100% of the principal amount thereof, plus accrued interest. The purchase price of the 2005 Bonds so tendered is payable solely from the proceeds of the remarketing of such 2005 Bonds. In the event that the conditions of a conversion are not satisfied, including the failure to remarket all applicable 2005 Bonds on the mandatory tender date, the 2005 Bonds will not be subject mandatory tender, will be returned to their owners, and will bear interest during the Auction Period commencing on such failed conversion date at the Maximum Rate for an Auction Period of seven days.

## Weekly Rate Conversion from Auction Rate Periods at Option of Obligated Group Agent

At the option of the Obligated Group Agent, the 2005 Bonds may be converted from an Auction Rate Period to a Weekly Rate Period:

(i)     The Weekly Rate Conversion Date shall be the second regularly scheduled Interest Payment Date following the final Auction Date.

(ii)     The Obligated Group shall give written notice of any such conversion to the Bond Insurer, the Bond Trustee, the Auction Agent, and the Broker-Dealer not less than seven (7) Business Days prior to the date on which the Bond Trustee is required to notify the Bondholders of the conversion pursuant to (iii) below. Such notice shall specify the series of 2005 Bonds subject to such conversion and the Weekly Rate Conversion Date and the Weekly Rate Period to which the conversion will be made. Such notice shall be accompanied by (a) a written statement from the Remarketing Agent, addressed to the Bond Trustee, to the effect that the Remarketing Agent has determined that, in its judgment, a change to a Weekly Rate from the Auction Rate would result in the lowest aggregate cost, taking into account interest and any other then determinable fees and expenses, being payable with respect to the 2005 Bonds during the twelve month period commencing with the Weekly Rate Conversion Date, or (b) an Opinion of Bond Counsel to the effect that such statement is not required for the continued validity and

17

enforceability of the 2005 Bonds in accordance with their terms. Together with such notice, the Obligated Group shall file with the Bond Insurer and the Bond Trustee an Opinion of Bond Counsel to the effect that the conversion of the 2005 Bonds to the Weekly Rate will not adversely affect the validity of the 2005 Bonds or any exemption from federal income taxation to which interest on the 2005 Bonds would otherwise be entitled. No change to a Weekly Rate shall become effective unless the Obligated Group shall also file, with the Bond Insurer and the Bond Trustee, an Opinion of Bond Counsel of the type referred to in the preceding sentence dated the Weekly Rate Conversion Date.

(iii)  Not less than twenty (20) days prior to the Weekly Rate Conversion Date, the Bond Trustee shall mail a written notice of the conversion to the holders of all 2005 Bonds to be converted, specifying the Weekly Rate Conversion Date or Flexible Rate Conversion Date, that the 2005 Bonds to be converted will be subject to mandatory purchase on the Conversion Date, and that the owners will have no right to retain their 2005 Bonds and describing the consequences of a failed conversion.

(iv)  Unless waived by the Bond Insurer, the Obligated Group shall cause a Liquidity Facility meeting the requirements of the Bond Indenture to be in effect or shall certify that no Liquidity Facility is required pursuant to the provisions of the Bond Indenture.

(v)  The Obligated Group may revoke its election to effect a conversion of the interest rate on any 2005 Bonds from the Auction Rate by giving written notice of such revocation to the Bond Trustee, the Bond Trustee's Agent, if any, the Remarketing Agent, the Bond Insurer, the Auction Agent, and the Broker-Dealer at any time prior to the setting of the Weekly Rate or Flexible Rate by the Remarketing Agent.

On any proposed Weekly Rate Conversion Date applicable to the 2005 Bonds to be converted, such 2005 Bonds to be converted shall be subject to mandatory tender at a purchase price equal to 100% of the principal amount thereof, plus accrued interest. The purchase price of the 2005 Bonds so tendered is payable solely from the proceeds of the remarketing of such 2005 Bonds. In the event that the conditions of a conversion are not satisfied, including the failure to remarket all applicable 2005 Bonds on the mandatory tender date, the 2005 Bonds will not be subject to mandatory tender, will be returned to their owners and will bear interest during the Auction Period commencing on such failed conversion date at the Maximum Rate for an Auction Period of seven days.

## Redemption and Tender

### General

The 2005 Bonds will be subject to redemption prior to maturity as described below.

(A)  Optional Redemption of 2005 Bonds in the Fixed Rate Mode; Optional Redemption of 2005 Bonds. The 2005 Bonds converted to the Fixed Rate Mode are subject to redemption in whole on any date or in part on any Business Day (and if in part, in such order of maturity as the Obligated Group shall specify and within a maturity by lot or by such other method as the Paying Agent, if any, determines to be fair and reasonable and in Authorized

18

Denominations) at the Redemption Prices, together with accrued interest, if any, to the redemption dates all as set forth as follows:

| LENGTH OF INTEREST PERIOD | COMMENCEMENT OF REDEMPTION PERIOD | REDEMPTION PRICE |
| --- | --- | --- |
| Greater than or equal to 15 years | Tenth anniversary of the commencement of Interest Period | 100% or such alternate redemption price up to a maximum of 101% ("Alternate Redemption Price") provided that a Favorable Opinion of Bond Counsel is delivered with respect to the establishment of such Alternate Redemption Price |
| Less than 15 years and greater than or equal to 10 years | Seventh anniversary of the commencement of Interest Period | 100% or such alternate redemption price up to a maximum of 101% ("Alternate Redemption Price") provided that a Favorable Opinion of Bond Counsel is delivered with respect to the establishment of such Alternate Redemption Price |
| Less than 10 years and greater than or equal to 5 years | Third anniversary of the commencement of Interest Period | 100% or such alternate redemption price up to a maximum of 101% ("Alternate Redemption Price") provided that a Favorable Opinion of Bond Counsel is delivered with respect to the establishment of such Alternate Redemption Price |
| Less than 5 years | 2005 Bonds not subject to optional redemption | |

The Authority, with the consent of the Obligated Group, in connection with a change to the Fixed Rate Mode, may waive or otherwise alter its rights to direct the redemption of any such

19

2005 Bond so changed at any time without premium; provided that notice describing the waiver or alteration shall be submitted to the Paying Agent (if any), the Trustee and the Remarketing Agent, together with a Favorable Opinion of Bond Counsel, addressed to them.

(B)     Optional Redemption of 2005 Bonds in the Auction Mode or the Weekly Mode.  2005 Bonds in either the Auction Mode or the Weekly Mode are subject to redemption prior to their respective stated Maturity Dates, at the option of the Authority with the consent of the Obligated Group, in whole or in part on any Interest Payment Date at a Redemption Price equal to the principal amount of 2005 Bonds called for redemption, without premium, together with accrued interest, if any, to the redemption date.

(C)     Optional Redemption From Insurance and Condemnation Proceeds.  The 2005 Bonds are also subject to redemption prior to their respective stated Maturity Dates, at the option of the Authority with the consent of the Obligated Group, as a whole on any date or in part on any Interest Payment Date, from moneys required to be deposited in the Special Redemption Account pursuant to the Loan Agreement, at a Redemption Price equal to the principal amount called for redemption, plus accrued interest, if any, to the date fixed for redemption, without premium.

(D)     Sinking Fund Redemption.  The 2005 A Bonds and the 2005 B Bonds are also subject to redemption prior to their stated Maturity Date, in part, from Mandatory Sinking Account Payments deposited in the Principal Fund pursuant to Section 5.03 on June 1 of each of the years set forth below (unless such June 1 is not an interest payment date in which event the redemption date is the next preceding interest payment date), in the principal amounts set forth below, together with interest accrued thereon to the date fixed for redemption, without premium.

**2005 Series A Bonds Maturing June 1, 2035**

| Maturity Date | Amount | Maturity Date | Amount |
|---|---|---|---|
| 6/1/17 | $ 550,000 | 6/1/26 | $ 775,000 |
| 6/1/18 | 500,000 | 6/1/27 | 575,000 |
| 6/1/19 | 550,000 | 6/1/28 | 700,000 |
| 6/1/20 | 575,000 | 6/1/29 | 750,000 |
| 6/1/21 | 725,000 | 6/1/30 | 725,000 |
| 6/1/22 | 450,000 | 6/1/31 | 750,000 |
| 6/1/23 | 625,000 | 6/1/32 | 775,000 |
| 6/1/24 | 650,000 | 6/1/33 | 775,000 |
| 6/1/25 | 625,000 | 6/1/34 | 9,575,000 |
|  |  | 6/1/35 | 9,875,000 |

## 2005 Series B Bonds Maturing June 1, 2030

| Maturity Date | Amount | Maturity Date | Amount |
|---|---|---|---|
| 6/1/05 | $ 250,000 | 6/1/18 | $1,100,000 |
| 6/1/06 | 725,000 | 6/1/19 | 1,175,000 |
| 6/1/07 | 775,000 | 6/1/20 | 1,200,000 |
| 6/1/08 | 775,000 | 6/1/21 | 1,275,000 |
| 6/1/09 | 800,000 | 6/1/22 | 1,325,000 |
| 6/1/10 | 850,000 | 6/1/23 | 1,350,000 |
| 6/1/11 | 875,000 | 6/1/24 | 1,400,000 |
| 6/1/12 | 900,000 | 6/1/25 | 1,450,000 |
| 6/1/13 | 950,000 | 6/1/26 | 1,500,000 |
| 6/1/14 | 975,000 | 6/1/27 | 1,575,000 |
| 6/1/15 | 1,025,000 | 6/1/28 | 1,625,000 |
| 6/1/16 | 1,050,000 | 6/1/29 | 1,700,000 |
| 6/1/17 | 1,100,000 | 6/1/30 | 1,750,000 |

(E) In lieu of redeeming 2005 Bonds of any Series pursuant to the Bond Indenture, the Bond Trustee may, at the request of the Obligated Group, use such funds otherwise available thereunder for redemption of 2005 Bonds to purchase 2005 Bonds of such Series in the open market at a price not exceeding the redemption price then applicable thereunder, such 2005 Bonds to be delivered to the Bond Trustee for the purpose of cancellation. It is understood that in the case of any such redemption or purchase of 2005 Bonds, the Issuer shall receive credit against its required Mandatory Sinking Fund Payment for such Series of 2005 Bonds in the same manner as would be applicable if such 2005 Bonds were optionally redeemed. Purchases pursuant to this paragraph shall be made first from Bank Bonds and thereafter from 2005 Bonds of such Series with Rate Periods and Maturity Dates selected by the Obligated Group Agent. Purchases made pursuant to this paragraph shall be made with Eligible Moneys unless the purchase is of a 2005 Bond then bearing interest at the Alternative Bank Rate, a Weekly Rate, a Fixed Rate or an Auction Rate.

(F) Any 2005 Bonds which are Bank Bonds or Obligated Group Bonds are subject to redemption in whole or in part (in an Authorized Denomination) prior to Maturity at the direction of the Obligated Group Agent out of amounts prepaid on the 2005-1A or the 2005-1B Note, as the case may be, and deposited in the Redemption Fund, in whole or in part (and if in part, in an Authorized Denomination) on any Business Day while such 2005 Bonds are Bank Bonds or Obligated Group Bonds at a redemption price equal to 100% of the principal amount thereof plus accrued interest, if any, to the redemption date.

(G) Any 2005 Bonds, which are Bank Bonds, shall be subject to mandatory redemption on the dates and in the amounts specified in the Liquidity Facility Agreement in connection with a Bank Bond Redemption Event (as defined in the Liquidity Facility Agreement). Such redemption shall be at a price equal to the principal amount thereof plus accrued interest thereon to the redemption date and without premium. Bank Bonds shall be redeemed pursuant to the provisions of this paragraph without any notice from or direction by the Obligated Group.

### Selection of 2005 Bonds to be Redeemed.

Whenever provision is made for the redemption of less than all of the 2005 Bonds of a Series or any given portion thereof, the Bond Trustee shall select the 2005 Bonds of such Series to be redeemed, in the authorized denominations, by lot, in any manner which the Bond Trustee in its sole discretion shall deem appropriate and fair. The Bond Trustee shall promptly notify the Authority and the Obligated Group in writing of any redemption of the 2005 Bonds or portions thereof so selected for redemption. The selection of 2005 Bonds shall be at such time as determined by the Bond Trustee. The foregoing notwithstanding, the Obligated Group may select the Series of 2005 Bonds to be redeemed.

### Notice of Call for Redemption

Notice of redemption shall be mailed by first-class mail by the Bond Trustee, not less than 30 days prior to the date fixed for redemption, the Auction Agent, the Credit Facility Provider, the Rating Agencies then rating the 2005 Bonds and to the respective Holders of any 2005 Bonds designated for redemption at their addresses appearing on the bond registration books of the Bond Trustee. Each notice of redemption shall state the date of such notice, the date of delivery and Series designation of the 2005 Bonds, the date fixed for redemption, the Redemption Price, the place or places of redemption (including the name and appropriate address or addresses of the Trustee), the CUSIP number (if any) of the 2005 Bonds, to be redeemed and, in the case of 2005 Bonds to be redeemed in part only, the portion of the principal amount thereof to be redeemed. Each such notice shall also state that on said date there will become due and payable on each of said 2005 Bonds the Redemption Price thereof or of said specified portion of the principal amount thereof in the case of a 2005 Bond to be redeemed in part only, together with interest accrued thereon to the date fixed for redemption, and that from and after such date, interest on such 2005 Bond shall cease to accrue, and shall require that such 2005 Bonds be then surrendered at the address or addresses of the Bond Trustee specified in the redemption notice.

## BOND INSURANCE

### Payment Pursuant to Financial Guaranty Insurance Policy

Ambac Assurance, hereinafter defined, has made a commitment to issue a financial guaranty insurance policy (the "Financial Guaranty Insurance Policy") relating to the 2005 Bonds effective as of the date of issuance of the 2005 Bonds. Under the terms of the Financial Guaranty Insurance Policy, Ambac Assurance will pay to The Bank of New York, in New York, New York or any successor thereto (the "Insurance Trustee") that portion of the principal of and interest on the 2005 Bonds which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor (as such terms are defined in the Financial Guaranty Insurance Policy). Ambac Assurance will make such payments to the Insurance Trustee on the later of the date on which such principal and interest becomes Due for Payment or within one business day following the date on which Ambac Assurance shall have received notice of Nonpayment from the Trustee/Paying Agent/Bond Registrar. The insurance will extend for the term of the 2005 Bonds and, once issued, cannot be canceled by Ambac Assurance.

22

The Financial Guaranty Insurance Policy will insure payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. If the 2005 Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding 2005 Bonds, Ambac Assurance will remain obligated to pay principal of and interest on outstanding 2005 Bonds on the originally scheduled interest and principal payment dates including mandatory sinking fund redemption dates. In the event of any acceleration of the principal of the 2005 Bonds, the insured payments will be made at such times and in such amounts as would have been made had there not been acceleration.

In the event the Bond Trustee has notice that any payment of principal of or interest on an 2005 Bonds which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such registered owner will be entitled to payment from Ambac Assurance to the extent of such recovery if sufficient funds are not otherwise available.

The Financial Guaranty Insurance Policy does not insure any risk other than Nonpayment, as defined in the Policy. Specifically, the Financial Guaranty Insurance Policy does not cover:

1. payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity.

2. payment of any redemption, prepayment or acceleration premium.

3. nonpayment of principal or interest caused by the insolvency or negligence of any Bond Trustee, Paying Agent or Bond Registrar, if any.

If it becomes necessary to call upon the Financial Guaranty Insurance Policy, payment of principal requires surrender of 2005 Bonds to the Insurance Trustee together with an appropriate instrument of assignment so as to permit ownership of such 2005 Bonds to be registered in the name of Ambac Assurance to the extent of the payment under the Financial Guaranty Insurance Policy. Payment of interest pursuant to the Financial Guaranty Insurance Policy requires proof of Holder entitlement to interest payments and an appropriate assignment of the Holder's right to payment to Ambac Assurance.

Upon payment of the insurance benefits, Ambac Assurance will become the owner of the 2005 Bonds, appurtenant coupon, if any, or right to payment of principal or interest on such 2005 Bonds and will be fully subrogated to the surrendering Holder's rights to payment.

The Financial Guaranty Insurance Policy does not insure against loss relating to payments made in connection with the sale of 2005 Bonds at Auctions or losses suffered as a result of a Holder's inability to sell 2005 Bonds.

The Financial Guaranty Insurance Policy does not insure against loss relating to payments of the purchase price of 2005 Bonds upon tender by a registered owner thereof or any preferential transfer relating to payments of the purchase price of 2005 Bonds upon tender by a registered owner thereof.

**Ambac Assurance Corporation**

Ambac Assurance Corporation ("Ambac Assurance") is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin and licensed to do business in 50 states, the District of Columbia, the Territory of Guam, the Commonwealth of Puerto Rico and the U.S. Virgin Islands, with admitted assets of approximately \$8,069,000,000 (unaudited) and statutory capital of approximately \$5,015,000,000 (unaudited) as of September 30, 2004. Statutory capital consists of Ambac Assurance's policyholders' surplus and statutory contingency reserve. Standard & Poor's Credit

Markets Services, a Division of The McGraw-Hill Companies, Moody's Investors Service and Fitch Ratings have each assigned a triple-A financial strength rating to Ambac Assurance.

Ambac Assurance has obtained a ruling from the Internal Revenue Service to the effect that the insuring of a 2005 Bond by Ambac Assurance will not affect the treatment for federal income tax purposes of interest on such 2005 Bonds and that insurance proceeds representing maturing interest paid by Ambac Assurance under policy provisions substantially identical to those contained in its financial guaranty insurance policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the Obligor of the 2005 Bonds.

Ambac Assurance makes no representation regarding the 2005 Bonds or the advisability of investing in the 2005 Bonds and makes no representation regarding, nor has it participated in the preparation of, the Official Statement other than the information supplied by Ambac Assurance and presented under the heading "BOND INSURANCE".

**Available Information**

The parent company of Ambac Assurance, Ambac Financial Group, Inc. (the "Company"), is subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and in accordance therewith files reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 450 Fifth Street, N.W., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including the Company. These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc. (the "NYSE"), 20 Broad Street, New York, New York 10005.

Copies of Ambac Assurance's financial statements prepared in accordance with statutory accounting standards are available from Ambac Assurance. The address of Ambac Assurance's administrative offices and its telephone number are One State Street Plaza, 19th Floor, New York, New York 10004 and (212) 668-0340.

**Incorporation of Certain Documents by Reference**

The following documents filed by the Company with the SEC (File No. 1-10777) are incorporated by reference in this Official Statement:

1. The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2003 and filed on March 15, 2004;

2. The Company's Current Report on Form 8-K dated April 21, 2004 and filed on April 22, 2004;

3. The Company's Quarterly Report on Form 10-Q for the fiscal quarterly period ended March 31, 2004 and filed on May 10, 2004;

4. The Company's Current Report on Form 8-K dated July 21, 2004 and filed on July 22, 2004;

5. The Company's Quarterly Report on Form 10-Q for the fiscal quarterly period ended June 30, 2004 and filed on August 9, 2004;

6. The Company's Current Report on Form 8-K dated August 19, 2004 and filed on August 20, 2004;

7. The Company's Current Report on Form 8-K dated October 20, 2004 and filed on October 20, 2004; and

8. The Company's Quarterly Report on Form 10-Q for the fiscal quarterly period ended September 30, 2004 and filed on November 9, 2004; and

9. The Company's Current Report on Form 8-K dated November 12, 2004 and filed on November 12, 2004.

All documents subsequently filed by the Company pursuant to the requirements of the Exchange Act after the date of this Official Statement will be available for inspection in the same manner as described above in "Available Information".

## ADDITIONAL SECURITY FOR THE 2005 BONDS

The 2005 Bonds are special, limited obligations of the Authority payable solely from and secured by a pledge of Revenues and funds provided therefor under the Bond Indenture. The 2005 Bonds shall not constitute a debt or a pledge of the faith and credit or taxing power of the State of West Virginia or of any county, municipality or any other political subdivision of the State of West Virginia, and the owners thereof shall have no right to have taxes levied by the legislature or the taxing authority of any county, municipality or any other political subdivision of the State of West Virginia for the payment of the principal thereof or interest thereon, but the 2005 Bonds shall be payable solely from the Revenues and funds pledged therefor under the Bond Indenture. **The Authority has no taxing power**.

25

***General***.  The 2005 Bonds are limited obligations of the Authority payable from Revenues held by the Bond Trustee under the Bond Indenture and from payments made by the Obligated Group on the Notes.  The Notes are the sixth and seventh notes issued under the Master Indenture and obligate the Obligated Group to make payments which, in the aggregate, must be in an amount sufficient (1) to pay in full, when due, the aggregate principal of, premium, if any, and interest on the 2005 Bonds to their respective dates of maturity or earlier redemption, and (2) to pay related expenses.

***The Notes***.  The Notes are general obligations of the Members of the Obligated Group. WVUH, City, Jefferson and the Foundation are currently the only Members of the Obligated Group.  The Master Indenture permits other entities, under certain conditions, to become Members of the Obligated Group under the Master Indenture and to issue Notes thereunder.  Each Member of the Obligated Group will, subject to the right of such Member to withdraw from the Obligated Group under certain circumstances, jointly and severally covenant promptly to make any and all payments on all Notes theretofore or thereafter issued under the Master Indenture, including the Notes, the 2003 Notes and the Series 4 Note, according to the terms thereof.  See Appendix E – "DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS" herein. The Notes will be on parity with the 2003 Notes issued by WVUH in connection with the issuance of the 2003 Authority Bonds and the Series 4 Note issued by WVUH in connection with the issuance of the Series 1998 Bonds.  WVUH's Series 1 Note, Series 2 Note and Series 3 Note have been defeased and are no longer outstanding.

***Limitations on Liens***.  Each Member of the Obligated Group agrees that it will not create, or permit to be created or remain and, at their cost and expense, promptly discharge or terminate all Liens on its Property or any part thereof which are not Permitted Encumbrances.  See Appendix E – "DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS" herein.

***Debt Service Reserve Fund***.– The Debt Service Reserve Fund shall not be funded initially.  Under certain circumstances, the Obligated Group will be required to fund the Debt Service Reserve Fund at the Debt Service Reserve Fund Requirement.  See Appendix E – "DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS" herein.

***Additional Covenants of the Obligated Group***.  Pursuant to the Master Indenture, the Members of the Obligated Group have agreed with the Master Trustee to subject themselves to certain operational and financial restrictions contained therein.  See Appendix E – "DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS" herein.

***Additional Indebtedness***.  The members of the Obligated Group, upon compliance with the terms and conditions and for the purposes described in Appendix E – "DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS" herein, may issue additional Indebtedness.

***Other Long-Term Indebtedness of the Obligated Group***.  Following the refunding of the Debt to be Refinanced as described under "FINANCING PLAN" below, there shall remain

outstanding $40,170,000 of the Series 1998 Bonds and $136,685,000 of the 2003 Authority Bonds. As of September 30, 2004, Jefferson had $1,157,623 of capital lease obligations outstanding.

## FINANCING PLAN

The proceeds of the sale of the 2005 Bonds will be loaned to the Obligated Group pursuant to the Loan Agreement and used, together with moneys released from funds and accounts under the 1993 Bond Indenture, the 2002 Bond Indenture and the 2003 Bond Indenture, respectively, to (i) refinance by currently refunding all of the outstanding (a) Series 1992 Bonds, (b) Series 2002 Bonds and (c) Series 2003 Bonds, (ii) refinance the Merrill Lynch Debt; (iii) finance the acquisition, construction, renovation, improvement and equipping of hospital facilities to be owned by Members of the Obligated Group, reimburse the costs of certain capital expenditures made, or to be made by Members of the Obligated Group at their respective hospital facilities (as defined in the Act), including capitalized interest, and (iv) pay the costs of issuing the 2005 Bonds, including the premium for the issuance of the Insurance Policy by the Bond Insurer (collectively, the "Project").

A portion of the proceeds of the 2005 Bonds, together with moneys released from funds and accounts under the 1992 Bond Indenture, will be deposited with J.P. Morgan Trust Company, National Association (successor-in-interest to Charleston National Bank), as escrow agent (the "1992 Escrow Agent"), pursuant to an Escrow Agreement, dated as of January 1, 2005 (the "1992 Escrow Agreement"), between the Berkeley County Building Commission and the 1992 Escrow Agent. Such moneys will be deposited in the escrow fund (the "1992 Escrow Fund") created pursuant to the 1992 Escrow Agreement and used to purchase Government Obligations (as defined in the 1992 Bond Indenture), the principal of and interest on which will be sufficient to redeem the Series 1992 Bonds on February 17, 2005.

A portion of the proceeds of the 2005 Bonds, together with moneys released from funds and accounts under the 2002 Bond Indenture, will be deposited with United Bank, Inc. as escrow agent (the "2002 Escrow Agent"), pursuant to an Escrow Agreement, dated as of January 1, 2005 (the "2002 Escrow Agreement"), between the Authority and the 2002 Escrow Agent. Such moneys will be deposited in the escrow fund (the "2002 Escrow Fund") created pursuant to the 2002 Escrow Agreement and used to purchase Government Obligations (as defined in the 2002 Bond Indenture), the principal of and interest on which will be sufficient to redeem the Series 2002 Bonds on March 2, 2005.

A portion of the proceeds of the 2005 Bonds, together with moneys released from funds and accounts under the 2003 Bond Indenture, will be deposited with United Bank, Inc. as escrow agent (the "2003 Escrow Agent"), pursuant to an Escrow Agreement, dated as of January 1, 2005 (the "2003 Escrow Agreement"), between the Jefferson County Building Commission and the 2003 Escrow Agent. Such moneys will be deposited in the escrow fund (the "2003 Escrow Fund") created pursuant to the 2003 Escrow Agreement and used to purchase Government Obligations (as defined in the 2003 Bond Indenture), the principal of and interest on which will be sufficient to redeem the Series 2003 Bonds on February 22, 2005.

Upon such deposit of moneys in the respective Escrow Funds the purchase of Government Obligations permitted by the respective Bond Indentures, and compliance with other provisions of

27

the 1992 Bond Indenture, the respective Indentures and the Master Indenture, as applicable, the Series 1993 Bonds, the Series 2002 Bonds and the Series 2003 Bonds will be deemed paid, the 1992 Bond Indenture, the 2002 Bond Indenture, the 2003 Bond Indenture will be discharged and the lien, estates and security interest granted by the 1992 Bond Indenture, the 2002 Bond Indenture, the 2003 Bond Indenture, respectively, will cease with respect to the Series 1993 Bonds, the Series 2002 Bonds and the Series 2003 Bonds.

A portion of the proceeds of the 2005 Bonds in an amount which will be equal to the principal of and interest due on the Merrill Lynch Debt will be paid to Merrill Lynch on the date of issuance of the 2005 Bonds. Upon payment of the principal and interest outstanding on the Merrill Lynch Debt and the compliance with other provisions applicable to the Merrill Lynch Debt, the Merrill Lynch Debt will be paid and discharged and the liens, estate and security interest relating to the Merrill Lynch Debt will be released.

BY VIRTUE OF THE OBLIGATIONS OF THE OBLIGATED GROUP UNDER THE MASTER INDENTURE, THE 2005 BONDS WILL BE ON PARITY AS TO LIEN UPON GROSS RECEIPTS AND SOURCE OF PAYMENT WITH THE 2003 AUTHORITY BONDS AND THE SERIES 1998 BONDS.

The Obligated Group expects to enter into an interest rate swap agreement (the "2005 Swap Agreement") with the Swap Provider to hedge a portion of the Obligated Group's interest rate exposure on the Notes (which reflect the obligations to make payments on the 2005 Bonds). No payments will be due under the 2005 Swap Agreement until the first Interest Payment Date, which is expected to be February 4, 2005. The 2005 Swap Agreement provides that the Obligated Group will pay the Swap Provider interest semi-annually, commencing June 1, 2005, with respect to a portion of the 2005 B Bonds at a fixed rate, and that the Swap Provider will pay the Obligated Group a variable payment which is expected to approximately equal the variable rate payment on a portion of the 2005 B Bonds, respectively, every seven days (which may be adjusted in the event the Auction Period is adjusted). The obligations of the Obligated Group under the 2005 Swap Agreement, which payments will be insured by the Bond Insurer, including the payment of a termination amount (if necessary, and if such amount is insured by the insurer of the Swap Agreement) will be an Obligation issued pursuant to the Master Indenture, evidenced by the Obligated Group's 2005-1C Note, issued under the Master Indenture, and will be secured on a parity basis with the Notes. Should the 2005 Swap Agreement terminate prior to maturity, the Obligated Group may owe a payment to the Bond Insurer, and such amount, which cannot currently be calculated, may be material. The obligation to pay a termination amount arising out of a termination not directed by the insurer of the Swap Agreement is reflected in the Obligated Group's 2005-1D Note, issued under the Master Indenture. The 2005-1D Note is subordinate to the Notes and other Obligations on parity therewith. Neither the 2005-1C Note nor the 2005-1D Note constitute Indebtedness under the Master Indenture.

The Swap Provider has no obligation to make payments directly to the holders of the 2005 Bonds or to the Bond Trustee; the holders of the 2005 Bonds have no contractual or other claims against the Swap Provider for payment of the 2005 Bonds; and the Obligated Group will be obligated to make all payments of principal of, premium, if any, and interest on the 2005 Bonds pursuant to the Loan Agreement and the Bond Indenture.

The Swap Provider will be Merrill Lynch Capital Services, Inc..

See "CERTAIN BONDHOLDERS' RISKS" herein.

## ESTIMATED SOURCES AND USES OF FUNDS

The proceeds of the sale of the 2005 Bonds, together with moneys released from funds from the 1992 Bond Indenture the 2002 Bond Indenture and the 2003 Bond Indenture, respectively, and will be used as follows:

| | |
|---|---|
| Sources of Funds | |
| 2005 Bonds | $60,000,000 |
| Funds on Hand | 2,965,734 |
| | $62,965,734 |
| Uses of Funds | |
| Deposit to Project Funds(1) | $31,465,734 |
| Defeasance of Outstanding Bonds and Loans | 27,135,242 |
| Capitalized Interest | 1,634,147 |
| Issuance Expenses(2) | 2,730,611 |
| | $ 62,965,734 |

(1) Includes acquisition, construction, renovation, improvement and equipping of hospital facilities to be owned by Members of the Obligated Group and reimbursement to Members of the Obligated Group of previously incurred capital expenditures.

(2) Includes fees and expenses of financial advisor, accountants, bond counsel, Obligated Group counsel, Authority counsel, Bond Trustee and Master Trustee, rating agencies, Underwriters' discount, bond insurance premium, printing and miscellaneous expenses.

## DEBT SERVICE REQUIREMENTS

The following table sets forth, for each year ending June 1, the total principal or sinking fund and interest requirements with respect to the 2005 Bonds, the 2003 Authority Bonds and the Series 1998 Bonds.

| June 1 | Principal of 2005 Bonds | Interest on 2005 Bonds (1)(2) | Total Debt Service on 2005 Bonds | Total Debt Service on Series 1998 and 2003 Authority Bonds (1) | Aggregate Total |
|---|---|---|---|---|---|
| 2005 | 250,000 | 703,593 | 953,593 | 7,253,334 | 8,206,927 |
| 2006 | 725,000 | 2,033,759 | 2,758,759 | 11,869,653 | 14,628,412 |
| 2007 | 775,000 | 2,007,879 | 2,782,879 | 11,537,878 | 14,320,757 |
| 2008 | 775,000 | 1,980,274 | 2,755,274 | 11,866,793 | 14,622,066 |
| 2009 | 800,000 | 1,952,568 | 2,752,568 | 11,437,784 | 14,190,352 |
| 2010 | 850,000 | 1,923,948 | 2,773,948 | 11,790,219 | 14,564,167 |
| 2011 | 875,000 | 1,893,603 | 2,768,603 | 11,683,950 | 14,452,552 |
| 2012 | 900,000 | 1,862,445 | 2,762,445 | 11,704,478 | 14,466,923 |
| 2013 | 950,000 | 1,830,374 | 2,780,374 | 11,693,752 | 14,474,126 |
| 2014 | 975,000 | 1,796,376 | 2,771,376 | 11,538,064 | 14,309,440 |
| 2015 | 1,025,000 | 1,761,565 | 2,786,565 | 11,861,515 | 14,648,080 |
| 2016 | 1,050,000 | 1,725,129 | 2,775,129 | 11,529,601 | 14,304,730 |
| 2017 | 1,650,000 | 1,687,780 | 3,337,780 | 8,666,217 | 12,003,997 |
| 2018 | 1,600,000 | 1,630,831 | 3,230,831 | 8,724,784 | 11,955,614 |
| 2019 | 1,725,000 | 1,575,304 | 3,300,304 | 8,703,664 | 12,003,968 |
| 2020 | 1,775,000 | 1,515,514 | 3,290,514 | 8,700,122 | 11,990,636 |
| 2021 | 2,000,000 | 1,453,998 | 3,453,998 | 8,573,265 | 12,027,264 |
| 2022 | 1,775,000 | 1,384,968 | 3,159,968 | 8,862,090 | 12,022,058 |
| 2023 | 1,975,000 | 1,323,251 | 3,298,251 | 8,698,204 | 11,996,454 |
| 2024 | 2,050,000 | 1,254,832 | 3,304,832 | 8,681,088 | 11,985,920 |
| 2025 | 2,075,000 | 1,183,874 | 3,258,874 | 8,731,641 | 11,990,516 |
| 2026 | 2,275,000 | 1,111,802 | 3,386,802 | 8,608,664 | 11,995,466 |
| 2027 | 2,150,000 | 1,033,029 | 3,183,029 | 8,825,547 | 12,008,576 |
| 2028 | 2,325,000 | 958,318 | 3,283,318 | 8,719,147 | 12,002,465 |
| 2029 | 2,450,000 | 877,718 | 3,327,718 | 8,711,580 | 12,039,298 |
| 2030 | 2,475,000 | 792,753 | 3,267,753 | 8,747,739 | 12,015,492 |
| 2031 | 750,000 | 706,875 | 1,456,875 | 8,751,223 | 10,208,098 |
| 2032 | 775,000 | 682,500 | 1,457,500 | 8,754,033 | 10,211,533 |
| 2033 | 775,000 | 657,313 | 1,432,313 | 8,780,120 | 10,212,432 |
| 2034 | 9,575,000 | 632,125 | 10,207,125 | - | 10,207,125 |
| 2035 | 9,875,000 | 320,938 | 10,195,938 | - | 10,195,938 |
| Totals | 60,000,000 | 42,255,234 | 102,255,234 | 284,006,149 | 386,261,382 |

(1) Interest on the variable rate debt assumed at an average auction rate of 3.25% per annum. (2) Interest on the swapped portion of the 2005 Bonds assumed at a rate of 3.653% per annum, compared to the rate of 3.399% per annum provided for in the Swap Agreement.

## THE OBLIGATED GROUP

WVUH is incorporated in the State of West Virginia as a nonprofit corporation and is exempt from federal income taxation under Section 501(c)(3) of the Code. WVUH is a controlled member of West Virginia United Health System, Inc. (the "System"), which is currently comprised of WVUH, United Hospital Center, Inc. ("UHC"), Allied Health Services, Inc., United Physicians Care, Inc., and HPN Services, Inc. Additional information with respect to WVUH, City, Jefferson and the Foundation is contained in Appendix A.

On January 1, 2005, WVUH became the sole member of WVUH-East, Inc. which is the sole member of City, Jefferson and the Foundation, each a West Virginia nonprofit corporation and 501(c)(3) organization.

**WVUH, CITY, JEFFERSON AND THE FOUNDATION ARE THE ONLY MEMBERS OF THE OBLIGATED GROUP FOR PURPOSES OF PAYMENT ON THE NOTES, THE 2003 NOTES AND THE SERIES 4 NOTE. NEITHER THE SYSTEM NOR ANY OF ITS OTHER AFFILIATES HAS ANY OBLIGATION TO PAY DEBT SERVICE ON THE NOTES. SEE "INTRODUCTORY STATEMENT" HEREIN.**

## CERTAIN BONDHOLDERS' RISKS

### Introduction

The following section describes certain risk factors affecting the payment of and security for the 2005 Bonds. The following discussion is not meant to be an exhaustive list of the risks associated with the purchase of any 2005 Bonds and does not necessarily reflect the relative importance of the various risks. Potential investors are advised to consider the following special factors along with all other information described elsewhere or incorporated by reference in this Official Statement, including the Appendices hereto, in evaluating the 2005 Bonds.

### Concerning Limited Obligations of the Authority

The 2005 Bonds are limited obligations of the Authority, and are payable solely from the sources described under "BOND INSURANCE" and "ADDITIONAL SECURITY FOR THE 2005 BONDS" herein, which include payments by the Obligated Group under the Loan Agreement and payments made by any Member of the Obligated Group under the Notes, and certain funds held by the Bond Trustee under the Bond Indenture. No feasibility study was performed by or on behalf of the Obligated Group in connection with the issuance of the 2005 Bonds. No representation can be made or assurance given that the Obligated Group will generate sufficient Gross Receipts to meet its obligations under the Loan Agreement and the Notes. The ability of the Obligated Group to meet such obligations could be adversely affected by future events, conditions and circumstances that are not predictable, including, but not limited to, those described below.

The discussion herein of investment considerations and risks to the Bondholders is not intended to be dispositive, comprehensive or definitive, but rather is meant to summarize certain matters, which could affect payment on the 2005 Bonds. Other sections of this Official Statement, as cited herein, should be referred to for a more detailed description of risks described

31

in this section, which descriptions are qualified by reference to any documents discussed therein. This discussion of risk factors is not, and is not intended to be, exhaustive.

## Concerning the Auctions Rate Certificates

So long as they are Auctions Rate Certificates, the beneficial owner of a 2005 Bond may sell, transfer or dispose of a 2005 Bond only pursuant to a Bid or Sell Order in accordance with the Auction Procedures or through a Broker-Dealer for the applicable series of 2005 Bonds. See "APPENDIX G – AUCTION AND SETTLEMENT PROCEDURES – Description of Auction." The ability to sell an Auction Rate Security in an Auction may be adversely affected if there are not sufficient buyers willing to purchase all of the Auctions Rate Certificates at an interest rate equal to or less than the Maximum Rate. The Broker-Dealer has advised the Issuer that it intends to make a market in the Auctions Rate Certificates of a series of 2005 Bonds between Auctions; however, the Broker-Dealer is not obligated to make such market, and no assurance can be given that secondary markets therefor will develop.

## Interest Rate Swap Risk

As with most marketable securities, the 2005 Swap Agreement is subject to "mark-to-market" valuations. The 2005 Swap Agreement may, at any time, have a negative value to the Obligated Group. The Bond Insurer will issue an insurance policy to guarantee to the Swap Provider the payments to be made by the Obligated Group pursuant to the 2005 Swap Agreement. The Swap Provider may terminate the 2005 Swap Agreement upon nonpayment by the Obligated Group and the Bond Insurer, or in the event rating agencies withdraw or downgrade the rating of the Bond Insurer, unless the Obligated Group provides substitute credit support acceptable to the Swap Provider. The Obligated Group may terminate the 2005 Swap Agreement at any time. If either the Swap Provider or the Obligated Group terminates the 2005 Swap Agreement during a negative value situation, the Obligated Group may be subject to a termination payment to the Bond Insurer, and such payment may be material.

## Concerning the Financing Documents

The 2005 Bonds are payable by the Authority solely from the related Trust Estate. Enforcement of remedies under the Bond Indenture, the Master Indenture, the Loan Agreement and the Note for any series may be limited or restricted by laws relating to bankruptcy and rights of creditors and by application of general principles of equity applicable to the availability of specific performance or other equitable relief and may be substantially delayed in the event of litigation or statutory remedy procedures. The enforcement of the pledge under the Master Indenture of the Obligated Group's Gross Receipts may be limited by a number of factors, including the absence of an express provision permitting assignment of payments due to Members of the Obligated Group under Medicare or Medicaid programs and contracts between Members of the Obligated Group and other third-party payors. In the event of any default by the Members of the Obligated Group under the Master Indenture, the Master Trustee may not be able to require Medicare, Medicaid or other intermediaries to make payments directly to the Master Trustee. Under current law, such pledge may be further limited by the following: (i) statutory liens; (ii) rights arising in favor of the United States or any agency thereof; (iii) present or future prohibitions against assignment contained in any federal statutes or regulations; (iv) constructive trusts, equitable liens or other rights imposed or conferred by any state or federal court in the

exercise of its equitable jurisdiction; (v) federal bankruptcy laws affecting assignments of revenue earned after any institution of bankruptcy proceedings by or against Members of the Obligated Group; (vi) rights of third parties in revenues of the Members of the Obligated Group converted to cash and not in possession of the Master Trustee (or a depository on behalf of the Master Trustee); and (vii) the requirement that appropriate financing or continuation statements or similar notices be filed in accordance with the Uniform Commercial Code as from time to time in effect, or other applicable laws of the State of West Virginia.

Under the Bankruptcy Code and state fraudulent conveyance statutes, an obligation may be declared void if (a) the obligation has been incurred (within one year of the filing of a petition under the Bankruptcy Code) without receipt of fair consideration or of reasonably equivalent value by the obligor, or (b) the obligor was insolvent at the time the obligation was incurred or the incurrence of such obligation renders the obligor insolvent, as defined in the Bankruptcy Code or in the applicable state statute. It is possible that the obligation of any Member of the Obligated Group to make payments on obligations of another Member under the cross-guaranty provisions of the Master Indenture, or the joint and several obligation of each Member of the Obligated Group to pay all amounts due under the Notes, may be avoided in the event of bankruptcy of a Member of the Obligated Group from which payment is requested or in an action brought pursuant to the applicable state fraudulent conveyance statute.

The joint and several obligations described herein of the Members of the Obligated Group to make payments of debt service on the Notes issued pursuant to and under the Master Indenture may not be enforceable to the extent (1) enforceability may be limited by applicable bankruptcy, moratorium, reorganization, fraudulent conveyance or similar laws affecting the enforcement of creditors' rights and by general equitable principles or (2) such payments (a) are requested to be made with respect to payments on any Note which is issued for a purpose that is not consistent with the charitable purposes of the Member of the Obligated Group from which such payment is requested or which is issued for the benefit of any entity other than a tax-exempt organization; (b) are requested to be made from any money or assets which are donor restricted or which are subject to a direct or express trust which does not permit the use of such money or assets for such payment; (c) would result in the cessation or discontinuation of any material portion of the health-care or related services previously provided by such Member of the Obligated Group; or (d) are requested to be made pursuant to any loan violating applicable usury laws. The extent to which the money or assets of any present or future Member of the Obligated Group falls within the categories referred to above cannot be determined and could be substantial.

Members of the Obligated Group may not be required to make any payment of any Notes, or portion thereof, the proceeds of which were not lent or otherwise disbursed to such Member of the Obligated Group to the extent that such payment would render such Member insolvent or would conflict with, would not be permitted by, or would be subject to recovery for the benefit of other creditors of such member under applicable laws. There is no clear precedent in the law as to whether payments by a Member of the Obligated Group pursuant to the Master Indenture or the Notes may be voided by a trustee in bankruptcy in the event of a bankruptcy of such Member of the Obligated Group or by third party creditors in an action brought pursuant to State fraudulent conveyances statutes. Under the United States Bankruptcy Code, a trustee in bankruptcy and, under State fraudulent conveyances statutes, a creditor of a related guarantor, may avoid any obligation incurred by a related guarantor, if, among other bases therefor, (a)(i)

33

the guarantor has not received fair consideration or reasonably equivalent value in exchange for the guaranty and (ii) the guaranty renders the guarantor insolvent, as defined in the United States Bankruptcy Code or State fraudulent conveyances statutes, or (b) the guarantor is undercapitalized or intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they become due.

Application by courts of the test of "insolvency," "reasonably equivalent value" and "fair consideration" has resulted in a conflicting body of case law. It is possible that, in any action to force a Member of the Obligated Group to make a payment pursuant to the Master Indenture or the Notes, a court might not enforce such payment obligation in the event it is determined that the Member of the Obligated Group is analogous to a guarantor of the debt of the Member who directly benefited from the borrowing and that sufficient consideration for the Member's guaranty obligation was not received and that the incurrence of such obligation has rendered or will render the Member insolvent or such Member of the Obligated Group is or will thereby become undercapitalized.

Each Note is secured on parity with the other Notes and all other Obligations issued under the Master Indenture. See "APPENDIX E – DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS - EVENTS OF DEFAULT AND REMEDIES". Further, an Event of Default under the Master Indenture or a Loan Default under the related Loan Agreement constitutes an Event of Default under each Bond Indenture. See "APPENDIX E – DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS - EVENTS OF DEFAULT AND REMEDIES".

**Concerning the Obligated Group's Operations**

Future revenues and expenses of the Obligated Group are subject to, among other things, the demand for the services provided by the Obligated Group, the capabilities and continued support of the management of the Obligated Group, the ability of management to recruit new physicians and other personnel and to maintain the support of the present medical staff and other personnel, economic developments and population trends in the service area, competition, rates, costs, third-party reimbursement programs, the availability of gifts and contributions from donors and of federal and state loans and grants, the effect of changes in accreditation standards or governmental regulations, the availability of adequate malpractice insurance coverage, and the ability of management to control expenses during periods of inflation and to increase room charges and other fees charged while maintaining the amount and quality of health services delivered. The regulatory and market factors discussed below may have an adverse effect on the financial condition of the Obligated Group. In particular, the following factors, among others, may have an adverse effect on the financial condition of the Obligated Group to an extent that cannot be determined at this time.

Upon the issuance of the 2005 Bonds, WVUH, City, Jefferson and the Foundation are the only Members of the Obligated Group under the Master Indenture. The Master Indenture permits the addition of other Members, and the withdrawal of current Members if certain conditions are met.

34

**Government Programs—The Medicaid and Medicare Programs**

Medicare and Medicaid are the commonly used names for hospital reimbursement or payment programs governed by certain provisions of the federal Social Security Act. Medicare is an exclusively federal program and Medicaid is jointly funded by federal and state government. Medicare provides certain health care benefits to beneficiaries who are 65 years of age or older or disabled, or qualify for the End Stage Renal Disease Program. Medicaid is designed to pay providers for care given to the medically indigent, is funded by federal and state appropriations, and is administered by the various states. Hospital benefits are available under each participating state's Medicaid program, within prescribed limits, to persons meeting certain minimum income or other eligibility requirements including children, the aged, the blind and/or disabled.

Health care providers have been and will be affected significantly by changes in the last several years in federal health care laws and regulations, particularly those pertaining to Medicare and Medicaid. The purpose of much of the recent statutory and regulatory activity has been to reduce the rate of increase in health care costs, particularly costs paid under the Medicare and Medicaid programs. Diverse and complex mechanisms to limit the amount of money paid to health care providers under both the Medicare and Medicaid programs have been enacted, and have caused severe reductions in reimbursement from the Medicare program.

The payment systems, which were once designed to reimburse a hospital's full costs, have been altered to pay set amounts determined in advance through what are known as prospective payment systems (PPS). Moreover, in the Medicare Prescription Drug Improvement and Modernization Act signed into law on December 8, 2003 ("the MMA") Congress has encouraged the growth of managed care organizations as part of the payment scheme, as well as the use of market-based pricing mechanisms, all in an effort to control the growth on federal health care expenditures.

The following is a summary of the Medicare and Medicaid programs and certain risk factors related thereto.

### Medicare

General. Approximately 30.6% of the total inpatient discharges of WVUH for the fiscal year ended December 31, 2003 were derived from Medicare, approximately 47% of the total inpatient discharges of City for the fiscal year ended December 31, 2003 were derived from Medicare and approximately 44.7% of the total inpatient discharges of Jefferson for the fiscal year ended September 30, 2004 were derived from Medicare. Medicare pays acute care hospitals for most services provided to inpatients under a payment system known as the "Prospective Payment System" or "PPS," pursuant to which hospitals are paid for services based on predetermined rates. Separate PPS payments are made for inpatient operating costs and in patient capital costs. Such payments are not based upon a hospital's cost of providing service. See Appendix A for a discussion of the Medicare payments received by WVUH, City and Jefferson.

Medicare Inpatient Disproportionate Share (DSH). WVUH, City and Jefferson receive DSH payments, respectively, through the Medicare DRG reimbursement methodology. The Medicare DSH adjustment provision under section 1886 (d) (5) (f) of the act was enacted by

section 9105 of the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985 and became effective for discharges occurring on or after May 1, 1986. The primary method is for a hospital to qualify based on a complex statutory formula that results in the DSH patient percentage. The DSH patient percentage is equal to the sum of the percentage of Medicare inpatient days attributable to patients eligible for both Medicare part A and Supplemental Security Income (SSI), and the percentage of total inpatient days attributable to patients eligible for Medicaid but not Medicare part A. Adding the results of two computations and expressing that sum as a percentage determine a hospital's DSH patient percentage. WVUH's current DSH percentage is 46.36%, City's current DSH percentage is 28.89% and Jefferson's current DSH percentage is 5.25%.

Inpatient Operating Costs. Acute care hospitals that participate in Medicare are paid on the basis of PPS, on a per-discharge basis at fixed rates based on the Diagnosis Related Group ("DRG") to which each Medicare patient is assigned. The DRG is determined by the diagnoses, procedures and other factors for each Medicare patient. The amount to be paid for each DRG is established prospectively by The Centers for Medicare and Medicaid Services ("CMS") (formerly, The Health Care Financing Administration), an agency of the United States Department of Health and Human Services ("HHS"), and is not, with certain exceptions, related to a hospital's actual costs or variations in service or length of stay. For certain Medicare beneficiaries who have unusually long or costly hospital stays ("outliers"), CMS will provide additional payments above those specified for the DRG.

PPS payments are adjusted annually using an inflation index, based on the cost of providing health care services. In the past few years, the Medicare annual increases have been less than the applicable rate of inflation. Under the MMA, for federal fiscal years 2005 through 2007, a hospital will receive a full inflation update if it agrees to submit data in certain quality indicators to CMS. If such data is not submitted, a hospital will receive the inflation index minus 0.4 percentage points. There is no assurance that future updates in the PPS payments will keep pace with the increases in the cost of providing hospital services.

To the extent a hospital discharges a patient classified within one of 29 specified DRGs to a post-acute care setting such as skilled nursing facilities (SNFs) or home health agencies (HHAs), such discharges are treated as transfers, and the hospital receives a reduced DRG payment. It is possible that this post-acute care transfer policy could be extended to more DRGs in the future, thus potentially reducing hospital DRG revenue.

If a hospital incurs costs in treating Medicare inpatients, which exceed the DRG level of reimbursement plus any outlier payments, such hospital will experience a loss from such services, which will have to be made up from other revenue sources. Other third party payors have begun implementing their own limitations on reimbursement payable to hospitals to avoid such "cost-shifting."

36

Inpatient Capital Costs. Medicare payments for capital costs (e.g., depreciation, interest, taxes and similar expenses for plant and equipment), are based upon a PPS system similar to the inpatient operating cost PPS. A separate per-case standardized amount is paid for capital costs, adjusted to take into account certain hospital characteristics and weighted by DRG. As of October 1, 2001, capital costs are reimbursed exclusively on the basis of a standard federal rate (based upon average national costs of capital), subject to certain adjustments specific to the hospital (such as for disproportionate share, indirect medical education and outlier cases).

There can be no assurance that the prospective payment for capital costs will be sufficient to cover the actual capital-related costs of WVUH, City or Jefferson allocable to Medicare patient stays or to provide adequate flexibility in meeting their respective future capital needs.

Cost of Outpatient Services. Beginning August 1, 2000, CMS implemented PPS for hospital outpatient services ("Outpatient PPS"), certain Part B services furnished to hospital inpatients that have no Part A coverage, and partial hospitalization services furnished by community mental health centers. All services paid under the new Outpatient PPS are classified into groups called Ambulatory Payment Classifications or "APCs." Services in each APC are similar clinically and in terms of the resources they require. A payment rate is established for each APC. Depending on the services provided, hospitals may be paid for more than one APC for an encounter. CMS will make additional payment adjustments under Outpatient PPS, including (i) "outlier" payments for services where the hospital's cost exceeds 2.6 times the APC rate for that service; and (ii) limited pass-through payments for certain drugs and medical devices.

The Balanced Budget Act of 1997 ("BBA") also changed the way beneficiaries' coinsurance is determined for the services included under the Outpatient PPS. Prior to Outpatient PPS, a beneficiary's coinsurance for outpatient services was 20% of the hospital's charges. Under Outpatient PPS, a coinsurance amount was calculated for each APC based on 20 percent of the national median charge for services in the APC. Initially, the coinsurance amount for an APC was not to change until such time as the amount becomes 20 percent of the total APC payment. Congress later accelerated the reduction in beneficiary copayment responsibility so that in 2005, the maximum copayment amount is 50% of the APC amount; in 2005, the rate is reduced to 45%; and in 2006 and years beyond, the rate goes down so that it cannot exceed 40% of the APC payment rate.

Physician Payments. Reimbursement for certain physician services is based on a Medicare fee schedule based on a "resource-based relative value scale" ("RBRVS"). The RBRVS fee schedule establishes payment amounts for all physician services, including services provided by most hospital employed physicians and non-physician practitioners, and is subject to annual updates.

Mental Health Services. Part A of the Medicare Program pays providers of mental health services for inpatient services. Coverage of inpatient mental health services is limited to 190 days of inpatient psychiatric hospital services during a beneficiary's lifetime, with certain limitations. Payments are made in an amount equal to the lesser of the billed charges or allowed reasonable direct and indirect costs (including depreciation, interest and overhead, if applicable) for the inpatient mental health services provided to Medicare beneficiaries. Medicare payments

37

for inpatient mental health services are subject to limitation based on a target rate ceiling (which is tied to an inflation index and determined annually for each psychiatric hospital) for the rate of increase in the provider's operating costs for inpatient services. The target rate ceiling does not apply to capital-related costs.

The BBA established another Tax Equity and Fiscal Responsibility Act ("TEFRA") target ceiling for inpatient psychiatric services, which applies the lower of the hospital specific TEFRA rate or the 75th percentile of the national rate for psychiatric facilities. In addition, Medicare now limits the capital payment for inpatient psychiatric units and hospitals to 85% of their actual Medicare capital cost.

While CMS proposed a new Prospective Payment System ("PPS") for inpatient psychiatric services, which was to be implemented on April 1, 2004, it has been delayed based on provider comments. It is anticipated that a modified final rule may be implemented by April 1, 2005. There can be no assurance that the new Medicare psychiatric PPS payments will be sufficient to cover all of the actual costs in providing inpatient psychiatric hospital services.

Skilled Nursing Facility Services. Medicare Part A covers nursing services furnished by or under the supervision of a registered professional nurse, as well as physical, occupational, and speech therapy, provided by skilled nursing facilities ("SNFs") that are certified for participation in the Medicare program. Medicare coverage of SNF services is available only if the patient is hospitalized for at least three days, the need for SNF services is related to the reason for the hospitalization, and the patient is admitted to the SNF within 30 days following discharge from a hospital. Medicare coverage of SNF services is limited to 100 days per calendar year. The patient must pay a deductible and coinsurance amounts for the twenty-first and each of the remaining days of covered care per year.

Medicare pays for SNF services on a case-mix adjusted per diem PPS for SNFs for all routine, ancillary and capital-related costs. The federal per diem rate is determined according to which Resource Utilization Group ("RUG") the resident is assigned. For FY 2005, Medicare payment rates under the SNF PPS increased by a full inflation factor plus 3.26 percent in addition to temporary payment increases required by 1999 and 2000 legislation until such time as case mix refinements are made. There is no assurance that future updates in the SNF PPS payment rates will keep pace with increases in costs in providing SNF services.

SNFs are also required to perform consolidated billing for services provided to their residents. Under the 1998 consolidated billing requirement, a SNF was required to submit Medicare claims to its fiscal intermediary ("Fiscal Intermediary") for all the Part A and certain Part B services that its residents received, with the exception of excluded services as specified. The consolidated billing requirement essentially conferred on the SNF itself the Medicare billing responsibility for the entire package of care that its residents received, with the exception of those specifically excluded services. As a result of statutory changes, effective January 1, 2001, SNFs were relieved from the consolidated billing requirement except with respect to items and services furnished to residents during a Part A covered stay and therapy services furnished during a Part A and Part B covered stays.

38

It is unclear at this time how these changes in the SNF PPS will affect the WVUH, City or Jefferson.

Medical Education.  Medicare pays for costs associated with both direct and indirect medical education (including salaries of residents and teachers and other overhead costs directly attributable to approved medical education programs for training residents, nurses and allied health professionals).   Payment for the costs of indirect medical education is made as an adjustment to federal rates for capital-related costs.  The indirect medical education adjustment is based on a ratio of hospital's number of residents to its daily census.  For federal fiscal years 2003 and 2004 WVUH's adjustment factor was set at .3493 and .3642 respectively, City's adjustment factor was set at .0141122 and .0153610, respectively, and Jefferson's adjustment factor was set at .25660 and .28969, respectively.  For federal fiscal year 2005, their respective adjustment factors will be .3493, .0161969 and .269966.  Direct costs of approved education programs are excluded from the definition of operating costs and accordingly are not included in the calculation of PPS for inpatient hospital services.  Payment for direct medical education is made on a "pass-through" basis based on a formula that reflects base year resident costs adjusted by inflation and the number of current-year reimbursable resident positions. WVUH's direct medical education payments of $4,349,000 and $4,614,000, respectively, were reimbursed in federal fiscal years 2003 and 2004.  City's direct medical education payments of $111,800 and 137,800, respectively, were reimbursed in federal fiscal years 2003 and 2004.  Jefferson's direct medical education payments of $130,029 and $128,160, respectively, were reimbursed in federal fiscal years 2003 and 2004.  There can be no assurance that payments to WVUH, City and Jefferson for providing medical education will be adequate to cover the costs attributable to medical education programs for training residents, nurses, and allied health professionals.

Outpatient Renal Dialysis Reimbursement. Renal dialysis services are reimbursed on the basis of prospective reimbursement, though different rates are paid for hospital-based and free-standing facilities, and are adjusted for geographic differences in labor costs.  The composite rate is the same regardless of whether the treatment is furnished in the facility or in the patient's home to encourage home dialysis, and must be accepted by the facility as payment in full for covered outpatient dialysis.

Rehabilitation Facilities.   The Balanced Budget Act of 1999 and the SCHIP Benefits Improvement and Protection Act of 2000 authorized the implementation of a per discharge prospective payment system (PPS) for Inpatient Rehab Facilities (IRF).  The IRF PPS will utilize information gathered from a patient assessment instrument to classify patients into distinct groups based upon clinical characteristics and expected resource needs.  Separate payments are calculated for each group.

Hospice Reimbursement.  Hospice services are reimbursed on a cost-based prospective payment method, subject to a "cap" amount.  CMS establishes daily payment amounts, which are adjusted to reflect local differences in wages, to reimburse four categories of covered hospice care: routine home care; continuous home care; inpatient respite care; and general inpatient care. By statute, the amount paid to the hospice program was less than the market basket increase for fiscal years 1997 through 2002.  Effective April 1, 2001, however, hospice rates increased by 5 percent for the remainder of 2002.  For fiscal year 2005, the increase was equal to the full inflation factor.  There is no way to predict whether future updates will keep pace with the costs

39

of providing hospice care. Hospice programs are required to submit cost data for each federal fiscal year beginning on or after October 1, 1998.

Home Health Agencies. Medicare Part A covers certain "part-time" or "intermittent" skilled nursing and therapy, as well as medical social services and home health aide services, provided by home health agencies ("HHAs") to individuals in their places of residence. To qualify for home health care, a Medicare beneficiary must be confined to the home, under the care of a physician, receiving services under a plan of care established and periodically reviewed by a physician, be in need of skilled nursing care on an intermittent basis, or physical therapy or speech-language pathology, or have a continuing need for occupational therapy.

Beginning October 1, 2000, all services covered under the Medicare home health benefit, including routine and certain non-routine medical supplies, began to be paid on a "per episode" basis. For each 60 day episode of care, the HHA receives a set amount, depending on the patient's condition, so long as at least five visits are rendered. The payment for each episode is based on a national standardized amount that is adjusted by a case mix factor (based on the severity of the patient's condition) and the area wage index. For the last three quarters of calendar year 2005, the inflation update factor is 2.5 percent; for 2005 and 2006, the update factor will be the inflation factor minus 0.8 percentage points.

There is no limit on the number of 60-day episodes per fiscal year. The payment will cover one individual for 60 days regardless of the number of visits actually furnished, unless one of two "intervening events" occurs: (1) a voluntary transfer by the patient to an unrelated HHA; or (2) a discharge because the patient's plan of care goals were met, followed by a readmission to the same HHA. In both of these instances, a partial-episode payment (PEP) will be made. If the patient experiences a significant change in condition (SCIC), SCIC payments will be made in lieu of a single episode payment.

Each episode payment will be based on the standardized amount adjusted by a case mix factor. The case mix factor is based on the patient's outcome and assessment information set (OASIS) and on a prediction of whether the patient will require at least 8 hours (defined as 10 visits) of therapy.

If a patient receives four or fewer visits, the HHA will be paid on a per-visit basis, receiving a low utilization payment adjustment (LUPA) instead of an episode payment.

Medicare Conditions of Participation. Hospitals must comply with standards called "Conditions of Participation" in order to be eligible for Medicare and Medicaid reimbursement. CMS is responsible for ensuring that hospitals meet these regulatory Conditions of Participation.

Under the Medicare rules, hospitals accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") are deemed to meet the Conditions of Participation. However, CMS may request that the state agency responsible for approving hospitals on behalf of CMS, conduct a "sample validation survey" of a hospital to determine whether it is complying with the Conditions of Participation. Failure to maintain JCAHO accreditation or to otherwise comply with the Conditions of Participation could have a materially adverse affect on the

continued participation in the Medicare and Medicaid programs, and ultimately, the revenues of WVUH, City and Jefferson.

Medicare Audits. Medicare certified hospitals are subject to audits and retroactive audit adjustments with respect to reimbursement claimed under the Medicare program. Medicare regulations also provide for withholding Medicare payments in certain circumstances. Any such withholding with respect to WVUH, City or Jefferson could have a material adverse effect on the ability of the Obligated Group to generate funds sufficient to pay the debt service on the 2005 Bonds or on the overall financial condition of the Members of the Obligated Group. In addition, contracts between hospitals and third-party payors often have contractual audit, setoff and withhold language that may cause substantial, retroactive adjustments. Such contractual provisions also could have a materially adverse effect on the financial condition of the Obligated Group. The Obligated Group is not aware of any situation in which a Medicare payment is being, or may in the future be, withheld, whereby any such withholding would materially affect the financial condition or results of operations of the members of the Obligated Group .

Medicare requires that certain financial information be reported on a periodic basis, and with respect to certain types of classifications of information, penalties are imposed for inaccurate reports. As these requirements are numerous, technical and complex, there can be no assurance that WVUH, City or Jefferson will avoid incurring such penalties in the future. These penalties may be material and adverse and could include criminal or civil liability for making false claims and/or exclusion from participation in the federal healthcare programs. Under certain circumstances, payments made may be determined to have been made as a consequence of improper claims subject to the federal False Claims Act or other federal statutes, subjecting the provider to civil or criminal sanctions. The United States Department of Justice has instituted a number of national investigations, including in the State of West Virginia, involving proceedings under the federal False Claims Act relating to allegedly improper billing practices by hospitals. These actions have resulted in substantial settlement amounts being paid in certain cases.

CMS recently initiated an audit of aggressive pricing strategies related to outlier payments at one of the nation's largest hospital chains ("the chain"). Outlier payments are made for cases with higher than average costs. Such audit is designed to determine whether outlier payments to the hospitals were paid in accordance with Medicare regulations, and is focused on the charge data used by the hospitals to calculate their outlier reimbursements, and whether the charge data was inflated to increase reimbursement. The Office of the Inspector General of HHS ("OIG") and the Department of Justice have also initiated probes into the potentially abusive billing practices of the chain.

Following the initiation of the above noted audit, CMS issued Program Memoranda to its fiscal intermediaries directing them to analyze outlier payments and to identify other hospitals across the country with high outlier payments. CMS has indicated that hospitals found to have engaged in strategies to obtain excessive outlier payments will be referred to the CMS Program Integrity Unit for further investigation and, where appropriate, to the OIG. In light of the amounts at issue, and the publicity surrounding these audits, there can be no assurance that a member of the Obligated Group will not become a subject of an audit with respect to its outlier

41

payments, or that such an audit will not have a material adverse impact such member or the Obligated Group as a whole.

On July 31, 2003, CMS issued a new outlier payment rule changing the way it reimburses hospitals for outlier payments. The rule makes three major changes in the way outlier payments are calculated by: allowing Medicare to use more recent data to calculate outlier payments by using tentative settlement cost reports, rather than final settlement costs reports; eliminating the use of statewide average ratio of cost to charges for hospitals with very low computed costs to charge ratios and requiring hospitals to receive their actual cost-to-charge ratio; and allowing CMS to recover overpayments if the actual costs of a case, as reflected in the settled cost report are less than the provider claimed.

Respective management of the Members of the Obligated Group do not anticipate that Medicare audits or cost report settlements for the Medicare program will materially adversely affect the future financial condition or results of operations of the Obligated Group; however, in light of the complexity of the regulations relating to the Medicare program, and the threat of ongoing compliance programs as described above, there can be no assurance that significant difficulties will not develop in the future.

**Medicaid and PEIA**

Medicaid is the federal/state program, created under the Social Security Act, by which hospitals receive reimbursement for services provided to eligible infants, children, adolescents and indigent adults. The Medicaid program is administered in West Virginia by the West Virginia Department of Health and Human Resources. The State Public Employees Insurance Agency ("PEIA") provides hospital, surgical, group major medical, prescription drug, group life and accidental death and dismemberment coverage for approximately 219,000 West Virginia public sector employees, including public school teachers, and their dependents. Approximately 30.9% of the total inpatient discharges of WVUH for the fiscal year ended December 31, 2003 were derived from Medicaid and PEIA, approximately 20% of the total inpatient discharges of City for the fiscal year ended December 31, 2003 were derived from Medicaid and PEIA and approximately 15.1% of the total inpatient discharges of Jefferson for the fiscal year ended September 30, 2003 were derived from Medicaid and PEIA.

Payments made to health care providers under the Medicaid and PEIA programs are subject to change as a result of federal or state legislative and administrative actions, including changes in the methods for calculating payments, the amount of payments that will be made for covered services and the types of services that will be covered under the programs. Such changes have occurred in the past and may be expected to occur in the future, particularly in response to federal and state budgetary constraints.

Medicaid and PEIA pay hospitals based on a prospective payment system, using diagnosis-related groups, for inpatient services. Medicaid pays hospitals on the basis of a fee schedule for outpatient services. PEIA pays hospitals on the basis of a resource-based relative value scale for most outpatient services and a discount from billed charges for others.

West Virginia charges health care providers a tax on revenues derived from health care services which ranges from 1.75% to 5.5% depending on the source of revenues. The

42

authorizing legislation currently imposes a tax of 2.5% upon the inpatient service revenues of inpatient hospitals. The tax receipts received are used to fund a portion of the State's share of Medicaid reimbursement.

In relation to any state health care programs (PEIA, Medicaid, and Workers' Compensation), the State has the power to develop a plan or plans by which it can unilaterally establish payment levels. Moreover, PEIA, Medicaid and Workers' Compensation have, from time to time, studied a comprehensive managed care system. PEIA enrollees may elect coverage through a preferred provider benefit plan or through external managed care organizations. Medicaid is implementing managed care plans in stages throughout the State. In the respective service areas of the Members of the Obligated Group, Medicaid managed care programs are not well established.

Federal cuts to Medicaid were an important provision of the BBA. Many of the factors associated with efforts to reduce Medicare costs discussed above (including fraud and abuse initiatives, reduced DRG and other payments and the trend toward risk based managed care) also apply to the Medicaid system. The impact of these federal cuts on WVUH, City and Jefferson cannot be determined at this time, but any reduction in federal Medicaid spending may produce further reductions in state programs and could have a material adverse effect on the financial condition of the Obligated Group.

## West Virginia Rate Regulation

The West Virginia Health Care Authority (the "WVHCA") is responsible for reviewing and approving rate increases for West Virginia hospitals, upon which rates to nongovernmental payors are based. The WVHCA is also responsible for approving discount contracts between West Virginia hospitals and managed care organizations and other nongovernmental payors. A hospital may not revise its approved revenue limits without first filing a written request regarding such revision with the WVHCA and obtaining its approval. Refusal by the WVHCA to approve revenue limits and, accordingly, rates at requested levels could adversely affect the revenues of the Members of the Obligated Group. Unapproved rate increases, unjustified overages in revenues, unjustified overages in contractual allowances, unapproved discounts, and unjustified underages in non-supervisory wages are subject to penalties by the WVHCA, which may be in the form of a payment to third-party payors and purchasers or a reduction in a hospital's future rates. Consequently, penalties imposed by the WVHCA could adversely affect the revenues of the Members of the Obligated Group.

The existing rate methodology is primarily cost-based. A benchmark system has also been implemented to provide some regulatory relief to hospitals. WVHCA's benchmark system is a streamlined application process for hospitals to obtain increases in their average nongovernmental rates.   WVHCA calculates the benchmarks on an annual basis.   The benchmarked variables are adjusted inpatient cost per discharge and adjusted average inpatient charge per discharge. Adjustments in an eligible hospital's charges are determined by a hospital's ranking in its peer group. There are two peer groups: those with over 100 beds and those with 100 or fewer beds. Eligible hospitals are allowed an annual increase in average nongovernmental inpatient and outpatient charges from 2% to a maximum of 7%.

**Managed Care**

WVUH, City and Jefferson each contract with several third party payors. For the fiscal year ended December 31, 2003 non-governmental third party payors accounted for approximately 30.1% of the total inpatient discharges of WVUH. For fiscal year ended December 31, 2003, non-government third party payors accounted for approximately 31% of the total inpatient discharges of City. For fiscal year ended September 30, 2004, non-government third party payors accounted for approximately 38.6% of the inpatient discharges of Jefferson. See "CERTAIN BONDHOLDERS' RISKS - West Virginia Rate Regulation" above.

The majority of third party payments to the hospitals are made under preferred provider organization ("PPOs") agreements. In many markets, though not yet in West Virginia, managed care plans, primarily health insuring corporations ("HICs"), also known as health maintenance organizations ("HMOs") have largely replaced indemnity insurance as the prime source of nongovernmental payment for hospital services. Under a PPO arrangement, there generally are financial incentives for subscribers to use only those hospitals or providers which contract with the PPO. Under most HIC/HMO plans, private payers limit coverage to those services provided by selected hospitals. With this contracting authority, private payers, including health plans and HICs/HMOs, may direct patients away from nonselected hospitals by denying coverage for services provided by them.

Some HICs/HMOs mandate a "capitation" payment method under which hospitals are paid a predetermined periodic rate for each enrollee in the HIC/HMO who is "assigned" to, or otherwise directed to receive care at, a particular hospital. In a capitation payment system, the hospital assumes an insurance risk for the cost and scope of care given to such enrollees. In some cases, the capitated payment covers total patient care provided, including physician charges. HMOs/HICs also sometimes use other forms of risk-transfer, such as basing payment on a percentage of the subscriber's premium. If payment under an HMO/HIC contract is insufficient to meet the hospital's costs of care, the financial condition of the hospital could erode rapidly and significantly. Often, contracts are enforceable for a stated term, regardless of hospital losses. Further, HMO/HIC contracts are statutorily required to contain a requirement that the hospital care for enrollees for a certain period of time regardless of whether the HMO/HIC has funds to make payment to the hospital. Moreover, statutory requirements also prohibit hospitals from "balance billing" subscribers, even in the circumstance of an insolvency of an HMO/HIC. Contractual requirements sometimes extend balance billing restrictions and continuity of care obligations to PPOs.

Most PPOs and HICs/HMOs currently pay hospitals on a discounted fee-for-service basis or on a discounted fixed rate per day of care. The hospitals have entered into contractual arrangements with PPO, HIC/HMO, and traditional insurers pursuant to which they agree to perform certain health care services for eligible participants at discounted rates. Revenues received under such contracts are expected to be sufficient to cover the variable cost of the services provided.

Mountain State Blue Cross and Blue Shield ("MSBCBS") is the largest non-governmental third party payor in West Virginia. For the fiscal year ended December 31, 2003 Blue Cross represented 14.3% of City's total hospital revenues and 9.9% of WVUH's revenues. For the fiscal year ended September 30, 2004 Blue Cross represented 15.2% of Jefferson revenues.

MSBCBS enters into participating hospital agreements ("PHA") with hospitals that provide for payment by MSBCBS on a DRG basis for inpatient services and as a percentage of billed charges for outpatients covered by MSBCBS. Currently, the hospital's contract with MSBCBS provides for payment based on a DRG basis for inpatient services and a percent to charge basis for and outpatient services. Also, at this time, the hospitals are negotiating with MSBCBS to enter into a contract for Medicare patients. Revenues under all MSBCBS contracts are expected to be sufficient to cover the variable cost of the services provided.

Increasingly, physician practice groups and independent practice associations have become a part of the process of negotiating payment rates to hospitals. This involvement has taken many forms, but typically increases the competition for limited payment resources from HMOs/HICs, PPOs and other third party payors.

In regions where managed care is becoming prevalent, hospitals must be capable of attracting and maintaining managed care business, often on a regional basis. To do so, regional coverage and aggressive pricing may be required. However, it is also essential that contracting hospitals be able to provide the contracted services without significant operating losses, which may require innovative cost containment efforts. There is no assurance that WVUH, City and Jefferson will maintain their current managed care contracts or obtain other similar contracts in the future. Failure to obtain or maintain contracts could have the effect of materially reducing their respective market share, their patient base and gross revenues. Conversely, participation may maintain or increase the patient base, but could result in materially lower net income to such hospitals if they are unable to promptly and adequately contain its costs.

As a consequence of such factors, the effect of managed care on the Obligated Group's future financial condition is difficult to predict and may be different in the future than that reflected in the historical financial information included herein.

**Regulatory and Contractual Matters**

Legislation. During recent federal fiscal years, several bills were introduced in Congress, which proposed significant reforms to the nation's health care payment system, including but not limited to, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the BBA and modifications thereto. Any legislative changes may reduce the payments for, and/or utilization of, health care services. At this time, it is not possible to predict what legislative proposals will be made, whether or when any federal health care legislation will be adopted or the impact of any such future legislation on health care providers, including WVUH, City and Jefferson. Depending on the program eventually adopted, the impact on the financial condition or results of operations of the WVUH, City or Jefferson could be material and could be positive or negative.

Although the trend of federal Medicare legislation and regulations favors the replacement of cost-based, provider-specific reimbursement with prospectively determined national payment rates, which are periodically adjusted for inflation estimates, the effect of this trend on the Obligated Group's revenues cannot be precisely determined at this time. The net effect, however, could be lower revenues that would have a material adverse affect on the future financial condition or results of operations of WVUH, City or Jefferson.

Legislation also may be introduced from time to time in the West Virginia legislature relating to the operations and reimbursement of health care providers, including hospitals. No precise determination can be made at this time whether the bills that have been or may be introduced or the regulations which have been or may be proposed for the purpose of containment of costs, or otherwise affecting hospital revenues or increasing the competition among hospitals, will be enacted or, if enacted, whether and to what degree such legislation will affect the future financial condition or results of operations of WVUH, City or Jefferson or their respective ability to make future capital expenditures.

Anti-Fraud and Abuse Laws. The federal Anti-Kickback law (the "Anti-Kickback Law") makes it a felony to knowingly and willfully offer, pay, solicit or receive remuneration, directly or indirectly, in order to induce business that is reimbursable under any federal health care program. Violation of these provisions may result in imprisonment for up to five years and fines of up to $25,000 for each act. The Office of Inspector General ("OIG") of HHS has the authority to impose civil assessments and fines and to exclude hospitals engaged in prohibited activities from the Medicare, Medicaid, TRICARE (a health care program providing benefits to dependents of members of the uniformed services), and other federal health care programs for not less than five years. In addition to certain statutory exceptions to the Anti-Kickback Law, the OIG has promulgated a number of regulatory "safe harbors" under the Anti-Kickback Law designed to protect certain payment and business practices. A party may seek an advisory opinion to determine whether an actual or proposed arrangement meets a particular safe harbor; however the failure of a party to seek an advisory opinion may not be introduced into evidence to prove that the party intended to violate the provisions of the statute. Failure to comply with a statutory exception or regulatory safe harbor does not mean that an arrangement is unlawful but may increase the likelihood of challenge.

HIPAA created a new program operated jointly by HHS and the U.S. Attorney General to coordinate federal, state and local law enforcement with respect to fraud and abuse including the Anti-Kickback Law. HIPAA also provides for minimum periods of exclusion from a federal health care program for fraud related to federal health care programs, provides for intermediate sanctions and expands the scope of civil monetary penalties. The BBA expanded the authority of HHS to exclude persons from federal health care programs, increased certain civil and monetary penalties for violations of the Anti-Kickback Law and added a new monetary penalty for persons who contract with a provider that the person knows or should know is excluded from the federal healthcare programs. Finally, actions which violate the Anti-Kickback Law or similar laws may also involve liability under the federal Civil False Claims Act which prohibits the knowing presentation of a false, fictitious or fraudulent claim for payment to the U.S. government. Actions under the Civil False Claims Act may be brought by the U.S. Attorney General or as a qui tam action brought by a private individual in the name of the government.

The management of WVUH, City and Jefferson believe that each is in compliance with the Anti-Kickback Law; because, however, of the breadth of the Anti-Kickback Law and the narrowness of the safe harbor regulations, there can be no assurance that regulatory authorities will not take a contrary position or that WVUH, City or Jefferson will not be found to have violated the Anti-Kickback Law.

On March 13, 2004, the state legislature adopted the Insurance Fraud Prevention Act which prohibits the knowing and willful submission of a materially false statement in support of

a claim for payment pursuant to a policy of insurance. A party violating the terms of the Act is guilty of a crime punishable by a fine of up to $10,000 and imprisonment of up to ten years as well as possible suspension of state licensure. The management of WVUH, City and Jefferson each believe they are in compliance with the Insurance Fraud Prevent Act.

Stark Law. Another federal law known as the "Stark Law" prohibits a physician who has a financial relationship, or whose immediate family has a financial relationship, with entities (including hospitals) providing "designated health services" from referring federal healthcare program patients to such entities for the furnishing of such designated health services with limited exceptions. Stark Law designated health services include physical therapy services, occupational therapy services, radiology or other diagnostic services (including MRIs, CT scans and ultrasound procedures), durable medical equipment, radiation therapy services, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices, home health services, outpatient prescription drugs, inpatient and outpatient hospital services and clinical laboratory services. The Stark Law also prohibits the entity receiving the referral from filing a claim or billing for the services arising out of the prohibited referral. The prohibition applies regardless of the reasons for the financial relationship and the referral; that is, unlike the federal Anti-Kickback Law, no finding of intent to violate the Stark Law is required. Sanctions for violation of the Stark Law include denial (or refund) of payment for the services provided to the patient referred in violation of the prohibition, a civil penalty of up to $15,000 for a service arising out of the prohibited referral, exclusion from the federal healthcare programs, and a civil penalty of up to $100,000 against parties that enter into a scheme to circumvent the Stark Law's prohibition. Under an emerging legal theory, knowing violations of the Stark Law may also serve as the basis for liability under the False Claims Act. The types of financial arrangements between a physician and an entity that trigger the self-referral prohibitions of the Stark Law are broad, and include ownership and investment interests and compensation arrangements.

Final regulations implementing the portions of the Stark Law applicable to clinical laboratory services ("Stark I") were issued in August, 1995. On January 4, 2001, CMS issued Phase I final regulations, implementing the Stark Law's application to designated health services (sometimes referred to as "Phase I" of the "Stark II Regulations"). The rules delineated in Phase I of the Stark II Regulations became effective on January 4, 2002. Phase 1 of the Stark II Regulations include additional guidance regarding CMS's interpretation of the Stark Law. Phase II of the Stark II Regulations were published in the Federal Register on March 26, 2004 ("Phase II of the Stark II Regulation"). The rules delineated in Phase II of the Stark II Regulation became effective on July 24, 2004. Certain of the interpretations set forth in Phase II of the Stark II Regulations could require that certain existing physician relationships be modified.

WVUH, City and Jefferson each believe it is in compliance with Phase I and Phase II of the Stark II regulations. However, given the recent issuance of Phase II of the Stark II Regulations, and the scarcity of case law on the subject, there can be no assurance that regulatory authorities will not take the position or that their respective contracts with Physicians do not conform to Phase II of the Stark II Regulations and that certain of their contracts with Physicians may need to be amended to comply with Phase II of the Stark II Regulations. Exclusion from federal healthcare programs would have a material adverse effect on the future operations and financial condition of WVUH, City or Jefferson, as would any significant penalties, demands for refund or denials of payment.

47

False Claims Laws. There are principally three federal statutes which address the issue of "false claims." First, the Civil False Claims Act imposes civil liability (including substantial monetary penalties and damages) on any person or corporation which (1) knowingly presents or cause to be presented a false or fraudulent claim for payment to the United States government; (2) knowingly makes, uses, or causes to be made or used a false record or statement to obtain payment; or (3) engages in a conspiracy to defraud the federal government by getting a false or fraudulent claim allowed or paid. Specific intent to defraud the federal government is not required to act with knowledge. This statute authorizes private persons to file qui tam actions on behalf of the United States.

In addition to the Civil False Claims Act, the Civil Monetary Penalties Law authorizes the imposition of substantial civil money penalties against an entity which engages in activities including, but not limited to, (1) knowingly presenting or causing to be presented, a claim for services not provided as claimed or which is otherwise false or fraudulent in any way; (2) knowingly giving or causing to be given false or misleading information reasonably expected to influence the decision to discharge a patient; (3) offering or giving remuneration to any beneficiary of a federal health care program likely to influence the receipt of reimbursable items or services; (4) arranging for reimbursable services with an entity which is excluded from participation from a federal health care program; (5) knowingly or willfully soliciting or receiving remuneration for a referral of a federal health care program beneficiary; or (6) using a payment intended for a federal health care program beneficiary for another use. The Secretary of Health and Human Services, acting through the OIG, also has both mandatory and permissive authority to exclude individuals and entities from participation in federal health care programs pursuant to this statute.

Finally, it is a criminal federal healthcare fraud offense to: (1) knowingly and willfully execute or attempt to execute any scheme to defraud any healthcare benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations or promises, any money or property owned or controlled by any healthcare benefit program. Penalties for a violation of this federal law include fines and/or imprisonment, and a forfeiture of any property derived from proceeds traceable to the offense.

Physician Contracting and Relations. The Members of the Obligated Group have entered into a variety of relationships with physicians. Many of these relationships may be of material importance to the operations of the facilities and, in an increasingly complex legal and regulatory environment, these relationships pose a variety of legal or business risks. Increasingly, the focus of these relationships is a physician practice group or independent practice association that concentrates a large number of physicians in a limited number of contracting organizations. This increases the importance of these contracts and increases the risk of the loss of one or more such contracts.

The primary relationship between a hospital and physicians who practice in it is through the hospital's organized medical staff. Medical staff bylaws, rules, and policies establish the criteria and procedures by which a physician may have his or her privileges or membership curtailed, denied or revoked. Physicians who are denied medical staff membership or certain clinical privileges, or who have such membership or privileges curtailed, denied or revoked often file legal actions against hospitals and medical staffs. Such actions may include a wide variety of claims, some of which could result in substantial uninsured damages to a hospital. In addition,

48

failure of the hospital governing body to adequately oversee the conduct of its medical staff may result in hospital liability to third parties. All hospitals, including WVUH, City and Jefferson are subject to such risks.

Certain contracts between hospitals and physicians might be void or voidable if challenged by one of its participants in situations where a hospital exercises certain aspects of control over a physician's practice or where the physician is in a position to refer patients to the hospital. The validity of such agreements and the materiality of their loss is dependent on factual circumstances and on the relative position of the parties at a particular time. Consequently, the outcome cannot be determined with precision in advance of a dispute or controversy with respect to the relationship. The Obligated Group is not aware of specific, related controversies that it believes would lead to the loss of a contractual relationship with physicians which would be material with respect to the operation or financial condition of the Obligated Group.

Physician Recruitment. The Internal Revenue Service ("IRS") and HHS have issued various pronouncements that could limit physician recruiting and retention arrangements. In an IRS General Counsel Memorandum concerning hospital-physician joint ventures, the IRS ruled that tax-exempt hospitals that provide recruiting and retention incentives to physicians risk loss of tax-exempt status unless the incentives are necessary to obtain an overriding public benefit; improvement of a charitable hospital's financial condition does not necessarily constitute such a purpose. The IRS has also issued guidelines for its agents to follow in conducting audits that emphasize these restrictions, and has established special audit teams and procedures to ensure compliance. The OIG has taken the position that any arrangement between a federal healthcare program-certified facility and a physician that is intended to encourage the physician to refer patients may violate the federal Anti-Kickback Law unless a regulatory exception applies. While the OIG has promulgated a practitioner recruitment safe harbor to the Anti-Kickback Law, the safe harbor is limited to practice recruitment in areas that are health professional shortage areas and to the recruitment of new physicians who are relocating their practices and would not permit retention arrangements of any kind. Likewise, the Stark Law and Phase II of the Stark II Regulations permit certain physician recruitment and physician retention arrangements under certain limited circumstances. Management of WVUH, City and Jefferson believe that their respective physician recruitment programs are in material compliance with IRS policies, Anti-Kickback Law or the Stark Law and do not anticipate any adverse impact on the ability of WVUH, City or Jefferson to recruit and retain physicians. However, given the complexity of IRS guidance, the broad prohibitions of the Anti-Kickback Law and Stark Law, and the inconsistencies among them, there can be no assurance that regulatory authorities may not take a contrary position with respect to the physician recruitment and retention activities of WVUH, City or Jefferson. See "CERTAIN BONDHOLDERS' RISKS - Malpractice Lawsuits and Malpractice Insurance" for a discussion of certain developments in West Virginia that could affect the recruitment of physicians by WVUH, City or Jefferson.

Emergency Medical Treatment and Active Labor Act. In response to concerns regarding inappropriate hospital transfers of emergency patients based on the patient's inability to pay for the services provided, Congress enacted the Emergency Medical Treatment and Active Labor Act in 1986. This so-called "anti-dumping" law imposes certain requirements on hospitals prior to transferring a patient to another facility. Failure to comply with the law can result in exclusion from the Medicare and/or Medicaid programs or termination of the provider agreement as well as civil penalties. Failure of WVUH, City or Jefferson to meet their respective responsibilities

under the Emergency Medical Treatment and Active Labor Act could adversely affect their future financial condition or results of operations.

Peer Review Organizations. Peer Review Organizations were created by the 1982 amendments to the Social Security Act, and all institutional health care providers which participate in the Medicare program are subject to review by Peer Review Organizations. Peer Review Organization activities include (i) preadmission review on selected elective admissions, (ii) review of admissions which occur within seven days of a discharge from a general hospital, (iii) review of certain transfers of patients from one hospital to another, (iv) review of validity of DRG classifications of patients, (v) review of admissions and services to determine medical necessity and (vi) review of admissions and services to determine whether quality of care meets professionally recognized standards. Peer Review Organizations have the authority to recommend to the Secretary of Health and Human Services that a provider which is in substantial noncompliance with the medical necessity and quality of care standards of a Peer Review Organization or has grossly and flagrantly violated an obligation to render quality care be excluded from participation in the Medicare program or be required to reimburse the federal government for certain payments previously made to the provider under the Medicare program. The activities of Peer Review Organizations and other public and private agencies relating to review of utilization of healthcare services may have the effect of causing physicians who practice at WVUH, City or Jefferson to reduce the number of patient admissions and to monitor more closely the amount of services and procedures ordered for their patients.

HIPAA Administrative Simplification.

The Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") required the Secretary of HHS to establish standards for electronic health care administrative and financial transactions and national identifiers for healthcare providers, health plans, and health care clearinghouses. HIPAA addresses the security and privacy of patient health information. Adoption of these standards is intended to improve the efficiency and effectiveness of the nation's health care system by encouraging the widespread use of electronic data interchange in healthcare. The total impact and costs of HIPAA to the Obligated Group cannot be determined at this time. Healthcare industry analysts, however, predict that the costs associated with the implementation of HIPAA will be substantial, with a study commissioned by the American Hospital Association placing the costs at $22.5 billion over a five year period. Healthcare entities likely will incur both capital and operational expenses to meet the considerable requirements of HIPAA.

A significant portion of the costs associated with achieving compliance with HIPAA stems from the operational expenses of the implementation of and continued compliance with the privacy standards. For example, HIPAA requires healthcare providers to enact policies and procedures (i) to ensure that patient health information is securely maintained, (ii) to enable them to provide patients with detailed information explaining precisely how their medical information will be maintained, used and disclosed, and (iii) to respond to patients' permissible requests for an "accounting" of the disclosure made of their medical information for purposes unrelated to treatment, payment or healthcare operations. In addition, healthcare providers will be required to ensure by means of a written agreement that certain of their business associates who may receive or may have access to patient health information maintain the confidentiality of such health information.

50

Other capital and operational costs that most healthcare providers are expected to incur as a result of the requirements contained in the other standard sets include the costs for (i) purchasing and installing software that has the capability to transmit healthcare data to insurers and payors in a new, uniform standard format, (ii) developing disaster recovery plans for the unexpected loss or destruction of health information, and (iii) implementing policies and procedures, as well as the potential purchase of new software systems, to maintain data security in accordance with a security plan governing such issues as access, authorization and data authentication.

The final rules for the Standards for Privacy of Individually Identifiable Health Information were published on December 28, 2000 and amended on May 31, 2002 and August 14, 2002. Each member of the Obligated Group has appointed a privacy officer, has implemented privacy policies and procedures and believes that it is in compliance with the HIPAA Privacy Rule.

The final rules for the National Standards for Electronic Transactions were published on August 17, 2000 and revised in February 2003. They became effective October 16, 2004. Each member of the Obligated Group believes it was fully compliant on the October 16, 2004 deadline.

On February 20, 2003, HHS finalized rules for security standards applicable to electronic health information systems. The security rules address the issues of information security, improper access to and alteration of electronic health information systems. Healthcare providers will have until April 20, 2005 to comply. Currently, each member of the Obligated Group has appointed a security officer and developed a plan to be fully compliant by the April 20, 2005 deadline.

If HHS determines that a healthcare entity is not in compliance with HIPAA after the effective date of a set of standards, that entity faces potentially severe civil monetary penalties, as well as criminal penalties for any willful unauthorized disclosure of protected health information. Each member of the Obligated Group has undertaken steps to address HIPAA's requirements and it believes that it is compliant with the HIPAA Privacy Rule and will be compliant with the other HIPAA rules and standards by their respective deadlines.

## Certain Accreditations

WVUH, City and Jefferson are each subject to periodic review by the JCAHO, and the various federal, state and local agencies created by the National Health Planning and Resources Development Act of 1974. From time to time, accrediting bodies may review their accreditations of each and recommend certain actions or impose conditions on an existing accreditation. Management of WVUH, City and Jefferson, respectively, do not expect any such review to require actions or impose conditions that could not be satisfied or to adversely affect the continuing accreditation of WVUH, City or Jefferson. No assurance can be given as to the effect on future operations of existing laws, regulations and standards for certification or accreditation or of any future changes in such laws, regulations and standards.

**West Virginia Certificate of Need Law**

West Virginia maintains "certificate of need" legislation to control the levels and types of capital expenditures undertaken and new services provided by health care facilities in West Virginia, including WVUH, City and Jefferson. Approval may be necessary in order for certain major capital expenditures to be made or new services to be offered. No assurance can be given as to WVUH's, City's or Jefferson's ability to obtain "certificate of need" approval of projects for the maintenance of appropriate facilities, services, technology and quality of care necessary to remain competitive in their respective service areas. The WVHCA is the designated agency for certificate of need review. WVUH received the certificate of need required for the expenditure of the proceeds of the 2005 Bonds.

**Future Legislation**

Legislation is periodically introduced in the United States Congress and in the West Virginia Legislature which could result in limitations on hospital revenues, reimbursement, costs or charges or which could require an increase in the quantity of indigent care required to maintain charitable status.

A number of additional legislative proposals concerning health care have been introduced in Congress in the past and may be introduced in the future. The effect of any such proposals, if enacted, cannot be determined at this time.

In addition to legislative proposals previously discussed herein, other legislative proposals which could have an adverse effect on the Obligated Group include: (a) any changes in the taxation of nonprofit corporations or in the scope of their exemption from income or property taxes; (b) limitations on the amount or availability of tax-exempt financing for corporations described under Section 501(c)(3) of the Code; and (c) regulatory limitations affecting the ability of the Members of the Obligated Group to undertake capital projects or develop new services. Each member of the Obligated Group currently pays real estate taxes on those of its facilities (or portions of facilities), which are not used for its tax-exempt activities.

Legislative bodies have considered legislation concerning the charity care standards that non-profit, charitable hospitals must meet to maintain their federal income tax-exempt status under the Code and legislation mandating that nonprofit, charitable hospitals have an open-door policy toward Medicare and Medicaid patients and offer, in a non-discriminatory manner, qualified charity care and community benefits. Excise tax penalties on nonprofit, charitable hospitals that violate these charity care and community benefit requirements could be imposed or their tax-exempt status under the Code could be revoked. The scope and effect of legislation, if any, which may be adopted at the federal or state levels with respect to charity care of non-profit hospitals cannot be predicted. Any such legislation or similar legislation, if enacted, could have the effect of subjecting a portion of the income of the Members of the Obligated Group to federal or state income taxes or to other tax penalties and adversely affect the ability of the Obligated Group to generate revenues sufficient to meet its obligations and to pay the debt service on the 2005 Bonds and its other obligations.

52

**Malpractice Lawsuits and Malpractice Insurance**

Although the number of malpractice lawsuits filed against physicians and hospitals in West Virginia has stabilized in recent years, the dollar amounts of patient damage recoveries still remain potentially significant. The ability of, and the cost to the Obligated Group to insure or otherwise protect itself against malpractice claims may adversely affect its future results of operations or financial condition. For further information, see "LITIGATION" in Appendix A hereto.

The ability of health care providers to obtain malpractice insurance in West Virginia, like most of the rest of the United States, has significantly deteriorated. Beginning in the fall of 2000, the West Virginia State Medical Association publicly expressed concerns about the affordability and availability of medical malpractice insurance in West Virginia. Efforts were made by the Medical Association during the 2001 regular legislative session to address those concerns, but no action was taken by the Legislature during the regular session. In the 2002 legislative session a comprehensive package of tort reform legislation was passed and signed into law. With certain limited exceptions, the legislation lowers the existing $1,000,000 cap on awards for pain and suffering and other intangible losses to $250,000 per occurrence, regardless of the number of plaintiffs and defendants. Lawsuits filed as a result of good faith care for an emergency condition provided at designated trauma centers are subject to a $500,000 total cap on damages, exclusive of interest. The legislation eliminated the rule where any defendant who is greater than 25% at fault can be required to pay the entire verdict (joint liability) and replaced it with individual defendant liability equal to their percentage of fault (several liability). In addition, collateral sources, which include both private and governmental payors of medical and hospital expenses, will be offset from the verdict before final judgment is entered. The legislation also strengthens the required qualifications for expert witnesses, raises the required level of proof for the so called "Loss of Chance" theory of recovery and, in those cases of where non-employed physicians maintain $1,000,000 in malpractice insurance, it eliminates the doctrine of "ostensible agency" whereby hospitals were often held responsible for the acts of such physicians. These tort reforms apply to all causes of action that are filed on or after July 1, 2003.

**Antitrust**

Enforcement of the antitrust laws against health care providers is becoming more common, and antitrust liability may arise in a wide variety of circumstances, including medical staff privilege disputes, third-party contracting, physician relations, and joint venture, merger, affiliation and acquisition activities. In some respects, the application of the federal and state antitrust laws to health care is still evolving, and enforcement activity by federal and state agencies appears to be increasing. Violation of the antitrust laws could subject a hospital to criminal and civil enforcement by federal and state agencies, as well as by private litigants. At various times, members of the Obligated Group may be subject to an investigation by a governmental agency charged with the enforcement of the antitrust laws, or may be subject to administrative or judicial action by a federal or state agency or a private party. The most common areas of potential liability are joint activities among providers with respect to payor contracting, medical staff credentialing, and use of a hospital's local market power for entry into related health care businesses. From time to time, Members of the Obligated Group may be involved in joint contracting activity with other hospitals or providers. The precise degree to which this or similar joint contracting activities may expose a Member of the Obligated Group to

antitrust risk from governmental or private sources is dependent on a myriad of factual matters, which may change from time to time. A May 19, 2004 decision of the West Virginia Supreme Court of Appeals held that a public or quasi-public hospital may not enter into exclusive contracts with medical service providers who have staff privileges at the hospital that have the effect of completely excluding other physicians from the use of the hospital's medical facilities. The Obligated Group does not believe that the effect of the decision will be material to the Obligated Group. A United States Supreme Court decision now allows physicians who are subject to adverse peer review proceedings to file federal antitrust actions against hospitals and seek treble damages. Hospitals regularly have disputes regarding credentialing and peer review, and therefore may be subject to liability in this area. In addition, hospitals occasionally indemnify medical staff members who are involved in such credentialing or peer review activities, and may also be liable with respect to such indemnity. Recent court decisions have also established private causes of action against hospitals which use their local market power to promote ancillary health care business in which they have an interest. Such activities may result in monetary liability for the participating hospitals under certain circumstances where a competitor suffers business damage. Government or private parties are entitled to challenge joint ventures that may injure competition. Liability in any of these or other antitrust areas of liability may be substantial, depending on the facts and circumstances of each case.

**Non-Profit Hospital Class Action Litigation**

Since June 2004, uninsured patients have filed more than 40 putative class action lawsuits against nonprofit hospitals and hospital systems in approximately 43 states. The lawsuits allege that the defendants provide an insufficient amount of charity healthcare, that they overcharge patients who are uninsured, and that they use improper debt collection methods when uninsured patients fail to pay their medical bills. Counsel for plaintiffs sought to consolidate the majority of the cases in a single multidistrict proceeding, but the federal Judicial Panel on Multidistrict Litigation rejected that request on October 20, 2004. No class has been certified in any of the suits, and it is unclear as of the date of this Official Statement whether any of the lawsuits will be successful. No Member of the Obligated Group has been named in any of the suits. If any Members of the Obligated Group are subsequently named in a similar action, it is unclear what effect such a suit would have on the financial condition of the Obligated Group.

**Environmental Laws and Regulations**

Health care providers are subject to a wide variety of federal, state and local environmental and occupational health and safety laws and regulations which address, among other things, hospital operations and facilities and properties owned or operated by hospitals. Among the myriad types of such regulatory requirements faced by hospitals are (a) air and water quality control requirements, (b) waste management requirements, (c) specific regulatory requirements applicable to asbestos, polychlorinated biphenyls and radioactive substances, (d) requirements for providing notice to employees and members of the public about hazardous materials handled by or located at the hospital, and (e) requirements for training employees in the proper handling and management of hazardous materials and wastes.

In its role as an owner and operator of properties or facilities, Members of the Obligated Group may be subject to liability for investigating and remedying any hazardous substances that may be present on or have migrated off of its property or facilities. Typical hospital operations

54

include, but are not limited to, in various combinations, the handling, use, storage, transportation, disposal and discharge of hazardous, infectious, toxic, radioactive, flammable and other hazardous materials, wastes, pollutants or contaminants.  As such, hospital operations are particularly susceptible to the practical, financial and legal risks associated with compliance with such laws and regulations.  Such risks may result from damage to individuals, property or the environment and include an interruption of operations, an increase in operating costs, legal liability, damages, injunctions or fines and investigations, administrative proceedings, penalties or other governmental agency actions.  WVUH, City and Jefferson each expect to continue to encounter such risks in the future, and exposure to such risks could materially adversely affect their respective future financial condition or results of operations.

Management of WVUH, City and Jefferson is not aware of any pending or threatened claim, investigation or enforcement action regarding environmental issues involving them which, if determined adversely, would have a material adverse effect on their respective future financial condition or results of operations.

The Bond Trustee may decline to enforce the Bond Indenture if the Bond Trustee has not been indemnified to its satisfaction, in accordance with the Bond Indenture, for all liabilities it may incur as a consequence thereof.  Such liabilities may include, but are not limited to, costs associated with complying with environmental laws and regulations.

**Fair Labor Standards Act**

On April 23, 2004, the United States Department of Labor (the "DOL") issued regulations to the Fair Labor Standards Act making sweeping changes in the area of overtime-exempt employees (the "FLSA Regulations").  The FLSA Regulations offer guidance and clarification on: (a) deductions that may be made to an employee's salary without jeopardizing the employee's overtime-exempt status and steps an employer may take to remedy improper deductions; (b) factors to be considered by the DOL to determine if an actual practice of making deductions exists; (c) application of the exemption for executive employees; (d) application of the exemption for administrative employees, including the types of decisions deemed to entail the exercise of "independent judgment and discretion" and a list of "generally" exempt administrative positions; (e) application of the exemption for professional employees; and (f) application of the exemption for highly compensated employees and for computer professionals. The increased minimum salary level for exempt employees contained in FLSA Regulations may result in the re-classification of some exempt employees of WVUH, City, Jefferson or the Foundation to non-exempt status, but each does not believe that FLSA Regulations will have a material impact on their respective costs of operation.

**Enforcement of Remedies; Risks of Bankruptcy**

The obligations of the Obligated Group under the Master Indenture and the 2005 Notes are secured by a pledge of the Gross Receipts (as defined in the Master Indenture) of the Obligated Group and any future Member of the Obligated Group. Enforcement of the remedies mentioned in Appendix E "DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS" may be limited or delayed in the event of application of federal bankruptcy laws or other laws affecting creditor's rights and may be substantially delayed and

subject to judicial discretion in the event of litigation or the required use of statutory remedial procedures.

If a Member of the Obligated Group were to file a petition for relief under the current Federal Bankruptcy Code, the filing would operate as an automatic stay of the commencement or continuation of any judicial or other proceeding against such member and its property. If the bankruptcy court so ordered, the member's property, including its accounts receivable and proceeds thereof, could be used for the benefit of the member of the Obligated Group despite the claims of its creditors.

In a case under the current Federal Bankruptcy Code, the affected Member could file a plan of reorganization. The plan is the vehicle for satisfying, and provides for the comprehensive treatment of, all claims against such Member, and could result in the modification of rights of creditors generally, or the rights of any class of creditors, secured or unsecured. To confirm a plan of reorganization, of those who vote, more than one-half in number and two-thirds in amount of each impaired class of claims must vote in favor of a plan. If these levels of votes are attained, those voting against the plan or not voting at all are nonetheless bound by the terms thereof. Other than as provided in the confirmed plan, all claims and interests are discharged and extinguished. If less than all the impaired classes accept the plan, the plan may nevertheless be confirmed by the bankruptcy court, and the dissenting claims and interests bound thereby. For this to occur, one of the impaired classes must vote to accept the plan and the court must determine that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the nonconsenting class. A plan is fair and equitable if no class receives more than that to which it is entitled. The Bankruptcy Code establishes different fair and equitable tests for secured claims, unsecured claims and interest holders. To be confirmed, the bankruptcy court must determine that a plan, among other conditions, is in the best interest of creditors, feasible and accepted by all classes of creditors and interest holders as specified above or, if not so accepted, be in compliance with certain other requirements summarized above.

## Nationwide Nursing Shortage

Healthcare providers depend on qualified nurses to provide quality service to patients. There is currently a nationwide shortage of qualified nurses that also exists in West Virginia. This shortage and the more stressful working conditions it creates for those remaining in the profession are increasingly viewed as a threat to patient safety and may trigger the adoption of state and federal laws and regulations intended to reduce that risk. In its 2005 legislative session, the West Virginia Legislature adopted the Nurse Overtime and Patient Safety Act (the "Overtime Act") which includes requirements and limitations on mandatory nurse overtime in hospitals, prohibiting hospitals from mandating a nurse to accept an assignment of overtime unless (a) there is an unforeseen emergent situation that jeopardizes patient safety, (b) the nurse is fulfilling pre-scheduled on-call time, or (c) the overtime assignment is required for the completion of a procedure. The Overtime Act also requires that any nurse who works 12 consecutive hours be allowed 8 hours of off-duty time immediately following completion of the shift and that (other than for the exceptions noted in the preceding sentence) no nurse shall work for more than 16 hours in any 24-hour period. WVUH, City and Jefferson do not believe the Overtime Act will adversely affect their respective operations.

In response to the shortage of qualified nurses, health care providers have increased and could continue to increase wages and benefits to recruit or retain nurses and have had to hire expensive contract nurses. The shortage could also limit the operations of healthcare providers by limiting the number of patient beds available. WVUH, City and Jefferson currently employ an adequate number and type of nurses at their facilities. However, in response to the shortage, each has increased and is likely to have to continue to increase wages and benefits to recruit and retain nurses. WVUH, City or Jefferson may also need to engage expensive contract nurses until permanent staff nurses can be hired to replace any departing nurses.

## Other Risk Factors

The following general factors could have a material adverse effect on the level of reimbursement received by the Obligated Group:

Increased Costs Without a Comparable Increase in Revenue. Cost increases could result from, among other factors: increases in the salaries, wages and fringe benefits of Obligated Group employees, increases in costs associated with advances in medical technology or with inflation and increases in costs of operating the facilities of the Obligated Group. The Medicare and Medicaid programs are subject to statutory and regulatory changes and there are substantial areas subject to administrative rulings, interpretations, discretion, governmental funding restrictions and requirements of more stringent utilization review and other similar matters which may significantly reduce payments under either or both of such programs. Of course, should cost increases attributable to the above-mentioned or any other reasons be accompanied by revenues not increasing or falling as a result of statutory or regulatory changes in Medicare or Medicaid, the financial condition and results of operations of the Obligated Group would be materially adversely affected.

Limits on or Reductions in the Level of Support for Medicare and Medicaid. Future actions by the federal government for Medicare and the federal and state governments for Medicaid limiting or reducing the total amounts of funds available for either or both of these programs could lower the amount of reimbursement available to the Obligated Group.

Renewal of Accreditation or Medicare Certification or Licensure. WVUH, City and Jefferson have each received a three year accreditation from JCAHO. See Appendix A. Management does not expect to encounter and, in the past, has not encountered, any meaningful difficulty in renewing this accreditation, but no assurance can be given that future renewals will be granted. Any failure to obtain such a renewal or any loss of the certification of WVUH, City or Jefferson as a Medicare provider would have a material adverse effect on the financial condition and results of operations of the Obligated Group. WVUH, City and Jefferson are each licensed by the Department of Human Resources of the State of West Virginia, and any failure to obtain renewal of its respective license or loss of such license would have a material adverse effect on the financial condition and results of operations of the Obligated Group. On a regular basis, health care facilities, including the Members of the Obligated Group, are subject to numerous legal, regulatory, professional and private licensing, certification and accreditation requirements. These include, but are not limited to, requirements relating to Medicare and Medicaid participation and payment, state licensing agencies, private payors, JCAHO and other accrediting bodies. Renewal and continuance of certain of these licenses, certifications and accreditations are based on inspections, surveys, audits, investigations or other reviews, some of

which may require or include affirmative action or response by the Obligated Group. These activities generally are conducted in the normal course of business of health care facilities. Nevertheless, an adverse result could result in a loss or reduction in either WVUH's, City's or Jefferson's scope of licensure, certification or accreditation, or could reduce the payment received or require repayment of amounts previously remitted.

Additional Risk Factors. In the future, the following factors, among others, may adversely affect the operation and revenues of health care facilities, including those of the Obligated Group, to an extent that cannot be determined at this time:

(a)     Approximately 965 of WVUH's 3,630 employees are currently unionized. On February 12, 2003, WVUH and the Laborers' International Union of North America, Local 814, entered into a collective bargaining agreement that will remain in effect until December 31, 2005. On January 9, 2003, WVUH and the Security, Police and Fire Professionals of America, Local 502, entered into a collective bargaining agreement that will remain into effect until January 8, 2006. Although management knows of no pending employee strikes and other adverse labor actions that could result in increased expenses or substantial reductions in revenue without corresponding decreases in costs, such an action could arise in the future and could have such an effect. See Appendix A.

(b)     The reduced need for hospitalization or other services arising from future medical and scientific advances;

(c)     The inability to attract and retain adequate nursing and other skilled personnel;

(d)     Increased competition in the future from other hospitals or other types of health care providers, including health maintenance organizations or alternative delivery systems, that would offer comparable health care services to the population that the Obligated Group presently serves and that could result in decreased usage of the facilities operated by the Obligated Group;

(e)     A decline in the population, a change in the age composition of the population, increased unemployment, or a decline in the economic condition of the service area which would increase the proportion of patients who are unable to fully pay for the cost of their care;

(f)     Efforts by insurers and governmental agencies to limit the costs of hospital services and to reduce the utilization of hospital facilities by such means as preventive medicine, improved occupational health and safety and outpatient care;

(g)     Cost and availability of medical malpractice insurance in the State of West Virginia;

(h)     Cost and availability of insurance, such as fire, automobile, and general comprehensive liability, that hospitals and other health care facilities of a similar size and type generally carry;

(i)     Un-reimbursed increases in utility costs in the future due to an energy shortage or other factors;

(j)     Imposition of wage and price controls for the health care industry;

(k)   Developments or events affecting the federal or state exemption of the income of the Obligated Group from taxation or the adoption of federal or state legislation adversely affecting the Obligated Group or its revenue producing capability or adversely affecting the exemption of property owned by the Obligated Group from state and local property taxation or the ability of its members to utilize tax-exempt financing;

(l)   A reduction in the amounts of grants and contributions that the Obligated Group receives from various sources, or the elimination of such grants and contributions;

(m)   The occurrence of natural disasters, including floods, tornadoes and earthquakes, which may damage the facilities of the Obligated Group, interrupt utility service to the facilities, or otherwise impair the operation of the facilities of the Obligated Group and the generation of revenue from some or all of its facilities;

(n)   Any increase in the quantity or cost of indigent care provided which is mandated by law or required due to increased needs of the community in order to maintain the charitable status of the members of the Obligated Group; and

(o)   Increases in cost of providing health care relating to illnesses or diseases, such as Acquired Immune Deficiency Syndrome or related illnesses, which are not matched by increases in revenue from Medicare, Medicaid, Blue Cross/Blue Shield, commercial insurers or other sources sufficient to cover such increases in cost.

## Maintenance of Exempt Status

The exclusion of interest on the 2005 Bonds from the gross income of the recipients thereof for federal income tax purposes depends upon the maintenance by the Members of the Obligated Group of their respective status as exempt organizations described in Section 501(c)(3) of the Code. To maintain such status, the Members of the Obligated Group must each conduct its respective operations in a manner consistent with current and future IRS regulations and rulings governing exempt organizations and their operations and activities. Although each Member of the Obligated group has covenanted to maintain its respective status as an exempt organization, its failure to do so would likely have a material adverse effect on the Obligated Group and could result in the inclusion of interest on the 2005 Bonds in gross income of the owners thereof for federal income tax purposes retroactive to the date of issuance.

In certain circumstances, the loss of the exclusion of interest on the 2005 Bonds from gross income of the owners thereof for federal income tax purposes could be retroactive to the date of issuance of the 2005 Bonds. The tax liability of the owners of the 2005 Bonds for failure to include interest on the 2005 Bonds in their gross income may extend to years for which interest was received on the 2005 Bonds, or some portion thereof, and for which the relevant statute of limitations has not yet run.

## UNDERWRITING

The 2005 Bonds are being purchased by UBS Financial Services Inc. and Ferris, Baker Watts, Incorporated (collectively, the "Underwriter"). The Underwriter has agreed to purchase the 2005 Bonds at an aggregate purchase price of $59,715,000 (which represents the aggregate

principal amount of the 2005 Bonds, less a $285,000 underwriting discount). The bond purchase agreement for the 2005 Bonds provides that the Underwriter will purchase all the 2005 Bonds if any of the 2005 Bonds are purchased, and the Obligated Group agrees, among other things, to indemnify the Underwriter and the Authority against losses, claims, damages and liabilities arising out of any incorrect statement or information contained in or information omitted from this Official Statement pertaining to the Institution and other matters.

## TAX MATTERS

In the opinion of Spilman Thomas & Battle, PLLC ("Bond Counsel"), based upon an analysis of existing laws, regulations, rulings and court decisions, and assuming, among other matters, the accuracy of certain representations and compliance with certain covenants, interest on the 2005 Bonds is excludable from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code of 1986 (the "Code"). Bond Counsel is of the further opinion that interest on the 2005 Bonds is not a specific preference item for purposes of the federal individual or corporate alternative minimum taxes, although Bond Counsel observes that such interest is included in adjusted current earnings when calculating corporate alternative minimum taxable income. A complete copy of the proposed form of opinion of Bond Counsel is set forth in Appendix H hereto.

The Code imposes various restrictions, conditions and requirements relating to the exclusion from gross income for federal income tax purposes of interest on obligations such as the 2005 Bonds. The Authority has covenanted to comply with certain restrictions designed to insure that interest on the 2005 Bonds will not be included in federal gross income. Failure to comply with these covenants may result in interest on the 2005 Bonds being included in gross income for federal income tax purposes, possibly from the date of original issuance of the 2005 Bonds. The opinion of Bond Counsel assumes compliance with these covenants. Bond Counsel has not undertaken to determine (or to inform any person) whether any actions taken (or not taken) or events occurring (or not occurring) after the date of issuance of the 2005 Bonds may adversely affect the value of, or the tax status of interest on, the 2005 Bonds. Further, no assurance can be given that pending or future legislation or amendments to the Code, if enacted into law, or any proposed legislation or amendments to the Code, will not adversely affect the value of, or the tax status of interest on, the 2005 Bonds. Prospective purchasers of 2005 Bonds are urged to consult their own tax advisors with respect to proposals to restructure the federal income tax.

Certain requirements and procedures contained or referred to in the Bond Indenture, the Tax Certificate, and other relevant documents may be changed and certain actions (including, without limitation, defeasance of the 2005 Bonds) may be taken or omitted under the circumstances and subject to the terms and conditions set forth in such documents. Bond Counsel expresses no opinion as to any 2005 Bond or the interest thereon if any such change occurs or action is taken or omitted upon the advice or approval of bond counsel other than Spilman Thomas & Battle, PLLC.

Although Bond Counsel is of the opinion that interest on the 2005 Bonds is excludable from gross income for federal income tax purposes, the ownership or disposition of, or the accrual or receipt of interest on, the 2005 Bonds may otherwise affect a Beneficial Owner's

federal liability. The nature and extent of these other tax consequences will depend upon the particular tax status of the Beneficial Owner or the Beneficial Owner's other items of income or deduction. Bond Counsel expresses no opinion regarding any such other tax consequences.

Under the Act, the 2005 Bonds, and all interest and income thereon, shall be exempt from all taxation by the State of West Virginia and any county, municipality, political subdivision or agency thereof, except inheritance taxes.

In addition, no assurance can be given that any future legislation, including amendments to the Code, if enacted into law, or changes in interpretation of the Code, will not cause interest on the 2005 Bonds to be subject, directly or indirectly, to federal income taxation, or otherwise prevent Beneficial Owners from realizing the full current benefit of the tax status of such interest. Prospective purchasers of the 2005 Bonds should consult their own tax advisors regarding any pending or proposed tax legislation. Further, no assurance can be given that the introduction or enactment of any such future legislation, or any action of the Internal Revenue Service (the "IRS"), including but not limited to regulation, ruling, or selection of the 2005 Bonds for audit examination, or the course or result of any IRS examination of the 2005 Bonds, or obligations which present similar tax issues, will not affect the market price for the 2005 Bonds.

## RATINGS

The 2005 Bonds have been given a rating of "AAA" by Standard & Poor's Rating Services, a division of the McGraw Hill Companies, Inc., ("S&P") and a rating of "Aaa" by Moody's Investors Service, Inc. ("Moody's"), respectively, on the basis of the issuance of the Municipal Bond Insurance Policy. In addition, S&P has assigned an underlying rating of A+ to the 2005 Bonds and Moody's Investors Service Inc. has assigned an underlying rating of "A1" to the 2005 Bonds. Any explanation of the significance of such ratings may only be obtained from the rating agencies as follows: Standard & Poor's Rating Services, a division of the McGraw Hill Companies, Inc., 55 Water Street, New York, New York 10041, (212) 438-2124; Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007, (212) 553-0300. There is no assurance that the ratings mentioned above will remain unchanged for any given period of time or that they may not be lowered or withdrawn entirely if, in the judgment of the rating agency originally establishing the rating, circumstances so warrant. Any downward change in or withdrawal of such rating may have an adverse effect on the market price of the 2005 Bonds.

## LEGAL MATTERS

Legal matters incident to the authorization, issuance and validity of the 2005 Bonds are subject to the approving opinion of Spilman Battle & Thomas PLLC, Charleston, West Virginia, Bond Counsel. The proposed form of Bond Counsel's opinion is appended hereto as Appendix H.

Certain legal matters will be passed on for the Obligated Group by Robert L Brandfass, Esq., Fairmont, West Virginia, for the Authority by Bowles Rice McDavid Graff & Love LLP, Charleston, West Virginia, and for the Underwriter by Goodwin & Goodwin, LLP, Charleston, West Virginia.

## LITIGATION

There is no pending or threatened litigation seeking to restrain or enjoin the issuance, sale, or delivery of the 2005 Bonds, or in any way contesting or affecting the validity of the 2005 Bonds or any proceedings of the Authority taken with respect to the issuance or sale thereof, or in any way questioning or affecting the validity or enforceability of the Loan Agreement or the Bond Indenture, the use of the 2005 Bonds proceeds or the existence of the Authority.

## FINANCIAL STATEMENTS

The financial statements of WVUH as of December 31, 2003 and December 31, 2002, and for the years then ended appearing in Appendix B to this Official Statement have been audited by WVUH's independent auditors, as stated in their report appearing therein. The financial statements of Gateway Regional Health System, Inc. (comprised of City and the Foundation) as of December 31, 2003 and December 31, 2002, and for the years then ended appearing in Appendix C to this Official Statement have been audited by Gateway Regional Health System's independent auditors, as stated in their report appearing therein. The financial statements of The Charles Town General Hospital, d/b/a Jefferson Memorial Hospital as of September 30, 2004 and September 30, 2003, and for the years then ended appearing in Appendix D to this Official Statement have been audited by Jefferson's independent auditors, as stated in their report appearing therein.

The Obligated Group believes, as of the date hereof, that there has been no material adverse change in the financial condition of WVUH and Gateway Regional Health System, Inc. since December 31, 2003 and Charles Town General Hospital, d/b/a Jefferson Memorial Hospital since September 30, 2004, which are the most recent fiscal years for which audited financial statements are available.

There can be no assurance that the financial results achieved in the future will be similar to historical results. Such future results will vary from historical results, and actual variations may be material. The historical operating results of the members of the Obligated Group contained in this Official Statement cannot be taken as a representation that the Obligated Group will be able to generate sufficient revenues in the future to pay debt service on the 2005 Bonds.

## FINANCIAL ADVISOR

Shattuck Hammond Partners LLC (New York, New York) has served as Financial Advisor to WVUHS and WVUH on matters related to the structuring and negotiations related to the 2005 Bonds.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Chris D. Berens, CPA, P.C. an independent certified public accountants, will (a) verify the mathematical accuracy of the arithmetical computation of the cash flow provided by the 1992 Escrow Fund, the 2002 Escrow Fund and the 2003 Escrow Fund; and (b) verify that the projected income and principal of the Government Obligations and any cash deposited into the 1992 Escrow Fund, the 2002 Escrow Fund and the 2003 Escrow Fund is adequate to pay the principal of, interest and redemption premium, if any, on the Series 1993 Bonds, the Series 2002 Bonds and the Series

62

2003 Bonds designated for redemption. Such computations were based solely upon assumptions and information supplied by the Underwriter on behalf of the Authority. Chris D. Berens, CPA, P.C. has restricted its procedures to examining the arithmetical accuracy of certain computations and has not made any study or evaluation of the assumptions and information upon which the computations are based, and, accordingly, has not expressed an opinion on the data used, the reasonableness of the assumptions, or the achievability of the forecasted outcome.

## CONTINUING DISCLOSURE

The Obligated Group Agent will enter into a Continuing Disclosure Agreement (the "Continuing Disclosure Agreement") in connection with the issuance and sale of the 2005 Bonds to provide certain financial and operating data concerning its affairs on a continuing basis for owners of the 2005 Bonds. No financial or operating data concerning the Authority will be provided on a continuing basis, and the Authority assumes and will have no liability to the owners of either the 2005 Bonds (or the owner of any beneficial interest therein) or any other person with respect to any of the information provided by the Obligated Group Agent pursuant to the Continuing Disclosure Agreement. The form of the Continuing Disclosure Agreement is included as "APPENDIX I – FORM OF CONTINUING DISCLOSURE AGREEMENT"

## MISCELLANEOUS

The references herein to the Act, the Master Indenture, the Bond Indenture, the Notes, the Loan Agreement, the 2005 Bonds, and other materials are brief descriptions of certain provisions thereof. Such references do not purport to be comprehensive, and for full and complete statements of such provisions reference is made to such instruments, documents and other materials, copies of which are on file at the Corporate Trust Office of the Bond Trustee.

The information contained in this Official Statement has been compiled or prepared from information obtained from the Obligated Group, the Authority, and official and other sources deemed to be reliable and, while not guaranteed as to completeness or accuracy, is believed to be correct as of the date of this Official Statement. Any statements involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact. Any estimates or assumptions in this Official Statement have been made on the basis of the best information available and are believed to be correct and reliable, but no representations whatsoever are made that such estimates or assumptions are correct and will be realized.

The execution and distribution of this Official Statement have been duly authorized by the
Authority.

## WEST VIRGINIA HOSPITAL FINANCE AUTHORITY

By: /s/ James R. Christie
Chairman

**Approved:**

**WEST VIRGINIA UNIVERSITY HOSPITALS, INC.,
as Obligated Group Agent**

By: Bruce McClymonds __
President

**APPENDIX A**

**INFORMATION CONCERNING WEST VIRGINIA UNIVERSITY HOSPITALS, INC.**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# APPENDIX A

Information Concerning

# West Virginia University Hospitals, Inc.

The information contained herein as Appendix A to this Official Statement
has been obtained from the West Virginia University Hospitals, Inc. and
other sources believed to be reliable.

## **TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................................................................................. A-1

PART I:  WEST VIRGINIA UNITED HEALTH SYSTEM, INC. ........................................................................................................ A-1
   General ............................................................................................................................................................................................. A-1
   Governance ...................................................................................................................................................................................... A-2
   Management ..................................................................................................................................................................................... A-2

PART II:  WEST VIRGINIA UNIVERSITY HOSPITALS, INC. ....................................................................................................... A-3
   General Background ........................................................................................................................................................................ A-4
   Addition of West Virginia University Hospitals-East ..................................................................................................................... A-5
   Governance ...................................................................................................................................................................................... A-6
   Conflicts of Interest ........................................................................................................................................................................ A-6
   Management ..................................................................................................................................................................................... A-7
   Description of Services .................................................................................................................................................................... A-8
   Market Share and Competition ..................................................................................................................................................... A-10
   Primary and Secondary Service Areas ........................................................................................................................................ A-10
   Population ...................................................................................................................................................................................... A-12
   Medical Services and Staff ........................................................................................................................................................... A-12
   Active and Consulting Staff .......................................................................................................................................................... A-13
   Personnel and Employee Relations .............................................................................................................................................. A-14
   Licenses and Accreditations ......................................................................................................................................................... A-14
   Insurance ....................................................................................................................................................................................... A-14
   Related Party Transactions ........................................................................................................................................................... A-15
   Contingencies ............................................................................................................................................................................... A-15
   Educational Programs ................................................................................................................................................................... A-15
   Utilization Statistics ..................................................................................................................................................................... A-16
   Sources of Revenues ..................................................................................................................................................................... A-17

PART III:  WEST VIRGINIA UNIVERSITY HOSPITALS-EAST .................................................................................................... A-17
   General ........................................................................................................................................................................................... A-18
   Description of Services .................................................................................................................................................................. A-19
   Primary and Secondary Service Areas ........................................................................................................................................ A-19
   Population ...................................................................................................................................................................................... A-21
   Medical Services and Staff ........................................................................................................................................................... A-21
   Licenses and Accreditations ......................................................................................................................................................... A-23
   Utilization Statistics ..................................................................................................................................................................... A-24
   Outpatient Service Statistics ........................................................................................................................................................ A-25

PART IV:  SELECTED SUMMARY FINANCIAL INFORMATION FORt THE OBLIGATED GROUP ............................................ A-26

PART V: MANAGEMENT DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS  ..................................................... A-30
   West Virginia University Hospitals, Inc. ...................................................................................................................................... A-30
   General and Historical .................................................................................................................................................................. A-30
   Results of Operations – January 1, 2002 - December 31, 2003 .................................................................................................... A-30
   Recent Results of Operations – January 1, 2004 – September 30, 2004 ....................................................................................... A-31
   Strategic Affiliations / Shared Services ........................................................................................................................................ A-32
   Operating Plan and Strategic Initiatives ....................................................................................................................................... A-32
   Patient Satisfaction ....................................................................................................................................................................... A-32
   Cost and Clinical Quality .............................................................................................................................................................. A-33
   Future Focus .................................................................................................................................................................................. A-33
   Litigation ....................................................................................................................................................................................... A-33
   City Hospital, Inc. ......................................................................................................................................................................... A-33
   Jefferson Memorial Hospital ......................................................................................................................................................... A-34

PART VI: NON-OBLIGATED HEALTH SYSTEM PARTICIPANTS ............................................................................................... A-34
   Non-Obligated Participants ........................................................................................................................................................... A-34
   Selected Statistical Information Regarding Non-Obligated Participants ....................................................................................... A-35

Capitalized terms used, but not defined, in this Appendix A are defined in the forepart of this Official Statement and in Appendix E to this Official Statement.

This Appendix contains information concerning West Virginia United Health System, Inc. (the "System" or "WVUHS") and certain of its participants that comprise the Obligated Group, all of which are tax-exempt charitable organizations described in Internal Revenue Code Section 501(c)(3). The members of the Obligated Group are West Virginia University Hospitals, Inc. ("WVUH" or "Hospital"), City Hospital, Inc. ("City Hospital"), Charles Town General Hospital, d/b/a Jefferson Memorial Hospital ("Jefferson" or "Jefferson Memorial Hospital"), and City Hospital Foundation, Inc. ("CHF"). WVUH accounted for 65.4 percent of the total operating revenues of the System during the twelve months ended December 31, 2003, and 67.6 percent of the total assets of the System as of December 31, 2003.

Effective January 1, 2005, Gateway Regional Health System, Inc., of which City Hospital, Inc., is the hospital operating company and Jefferson Regional Health System, Inc., of which Jefferson is the hospital operating company, merged to form West Virginia University Hospitals-East, Inc. ("WVUH-E" or "WVUH-East"), of which WVUH is the sole corporate member. See Part II – "WEST VIRGINIA UNIVERSITY HOSPITAL, INC. – Addition of West Virginia University Hospitals- East, Inc." herein.

Part I of this Appendix A presents information concerning the System; Parts II and III provide information for the Obligated Group; Parts IV and V provide, respectively, selected summary financial information for WVUH and a discussion and analysis of results of the operations of the members of the Obligated Group; and Part VI presents information for certain participants in the System that are not members of the Obligated Group and for those entities as a whole.

This Appendix does not purport to identify or discuss each of the participants in the System or all of the entities that are taken into account in the presentation of consolidated financial information for the System.

The Obligated Group will deliver its Master Notes to secure repayment of the Series 2005 Bonds.

**WVUH, CITY HOSPITAL, JEFFERSON MEMORIAL HOSPITAL AND CHF ARE THE ONLY MEMBERS OF THE OBLIGATED GROUP AND ARE THE ONLY ENTITIES THAT HAVE ANY LIABILITY UNDER THE MASTER TRUST INDENTURE WITH RESPECT TO ANY OF THE MASTER NOTES.**

# PART I

## WEST VIRGINIA UNITED HEALTH SYSTEM, INC.

### General

West Virginia United Health System, Inc. is a West Virginia non-profit corporation with offices in West Virginia. WVUHS is the parent corporation for a health care system that operates hospitals and other health care facilities and engages in other health care related activities.

Effective April 15, 1997, WVUH, pursuant to an Affiliation Agreement, became an affiliate of the System. The System is the sole member of WVUH and of United Hospital Center, Inc. ("UHC"). The System was formed to assist WVUH and UHC to fulfill their charitable and academic missions in a changing health care environment. The mission of the System is to serve as a regional integrated delivery system, which provides the full range of both inpatient and outpatient health care service to the residents of West Virginia, western Maryland, and southwestern Pennsylvania assess and improve their health. In meeting this mission in its defined service area, WVUH and UHC play a significant role in improving the general health care of the community. The strategic plan of WVUHS states the intent to build a regional health care delivery system in its service area, while offering a variety of options for providers who want to participate. The System maintains a demonstrated commitment to assist rural communities in preserving and improving the health care available to the patients it serves. In recognition of the critical role WVUHS plays in the economics of the communities it serves, WVUHS's mission also includes the objective to operate in a financially responsible manner.

The System has all powers available to a corporation under West Virginia law. The Affiliation Agreement and the articles of incorporation and bylaws of WVUHS, WVUH and UHC empower the System to, among other things, elect and remove any member of the governing boards of WVUH, UHC and/or their subsidiaries, approve amendments to their articles of incorporation and by-laws, approve any mergers, direct capital contributions to the System, approve all budgets, direct inter-company fund transfers, approve non-budgeted acquisitions, purchases, sales or other asset dispositions in excess of $1,000,000, and to approve the incurrence of material debt and key affiliations between System members and third parties.

## Governance

The System is governed by a voting board of 21 members. Eleven of the voting members are designated as "university representatives" and ten are "community representatives." Seven of the "university representatives" are appointed by the Governor of West Virginia from names submitted by WVUH, subject to confirmation by the West Virginia Senate. The remaining four "university representatives" are ex officio members associated with WVUH and/or West Virginia University ("WVU"). The ten "community representatives" are appointed by UHC.

### Officers and Members of the Board of Directors

#### Officers of the Board of Directors

| Name | Primary Affiliation | Office | Expiration |
|------|---------------------|--------|------------|
| David C. Hardesty, Jr. | President, West Virginia University | Chair | Indefinite |
| J. Cecil Jarvis | Attorney, McNeer, Highland, McMunn & Varner | Vice Chair | March 2007 |
| Robert D'Alessandri, MD | Vice President, Health Science Center; Dean, WVU School of Medicine | Secretary | Indefinite |
| James Jeffrey | Retired, Southern Equipment Company | Treasurer | October 2008 |
| J. Thomas Jones[1] | President & CEO, WVUHS | Pres/CEO | Indefinite |

#### Members of the Board of Directors*

| Name | Primary Affiliation | Expiration |
|------|---------------------|------------|
| Barbara J. Anderson | Retired, Harrison County Teacher | March 2005 |
| Sr. Anne Francis Bartus, DMin | Directress, Jacob's Well House of Prayer | March 2005 |
| Phil Bostic | Bus. Mgr/Sec-Tres., Maintenance Workers of Local Union #1182 | October 2010 |
| James Bryant, MD | Ear, Nose & Throat Associates of Clarksburg, Inc. | March 2009 |
| Sister Joel Patrice Christy | Director, Sacred Heart Day Care Center | October 2006 |
| Cordell A. DeLaPena, MD | Pathologist, UHC Pathology Dept | March 2007 |
| John P. Keeley | President, Ground Breakers, Inc. | October 2010 |
| Robert E. Kittle | Consultant, Harrison Cty Bd of Education | March 2009 |
| Douglas Leech | President & CEO, Centra Bank | Indefinite |
| Judge Robert Maxwell | United States District Judge, US District Court | October 2006 |
| Betty Puskar | Philanthropist | October 2008 |
| W. Marston Becker | Chairman & CEO, Trenwick Group | October 2010 |

* There are currently five vacancies
[1] Nonvoting member

## Management

The responsibility for the operations of WVUHS is delegated by its Board of Directors to the President/Chief Executive Officer, J. Thomas Jones. Selected biographical information is provided below for Mr. Jones and for other principal members of the Administrative Staff.

A-2

J. Thomas Jones, President/Chief Executive Officer, age 55. J. Thomas Jones was appointed as President and Chief Executive Officer effective July 1, 2002. Prior to his current position with the System, Mr. Jones was Chief Executive Officer of the Genesis Hospital System, Huntington, WV (2000-2002), Executive Director/CEO of St. Mary's Hospital, Huntington, WV (1990-2000), and Chief Operations Officer of Wheeling Hospital, Wheeling, WV (1973-1990). Mr. Jones is a Diplomat with the American College of Hospital Administrators, past Chairman of the West Virginia Hospital Association, and West Virginia Delegate to the American Hospital Association Region III Policy Board. Mr. Jones earned his Bachelor of Science degree from West Virginia University and his Masters in Hospital Administration from the University of Minnesota.

Robert I. Brandfass, Vice President and General Counsel, age 44. Robert Brandfass serves as Vice President and General Counsel of West Virginia University Hospitals, Inc. as well as General Counsel of West Virginia United Health System, Inc. He was previously a partner in the law firm of Kay, Casto, Chaney, Love & Wise, Charleston, West Virginia. Mr. Brandfass was a member of the law firm's Management Committee and Chair of the law firm's eleven-member Health Care Practice Group, which provided legal representation to health care providers. Mr. Brandfass is a member of the West Virginia State Bar Association, the American Health Lawyers Association and the Association of Corporate Counsel. Mr. Brandfass earned his J.D. degree from the Case Western Reserve University School of Law and graduated Cum Laude with an A.B. in Politics and Government from Ripon College.

Jeffery G. Gibson, Vice President of Health Services Development, age 44. Jeff Gibson is Vice President of Health Services Development for West Virginia United Health System. Prior to joining WVUHS, Mr. Gibson was Corporate Director of Planning and Marketing for Baptist Health System, an eleven-hospital integrated delivery system based in Birmingham, Alabama. Mr. Gibson is also currently an adjunct faculty member of West Virginia University's College of Business and Economics, and an adjunct Professor of Marketing and Health Care Administration, at Birmingham-Southern College. Mr. Gibson earned a Bachelor of Science in Health Care Management in 1981 (summa cum laude) at the University of Alabama. He earned a Master's Degree in Public Health Care Policy and Administration from the University of Alabama-Birmingham in 1986.

John J. Yeager, Vice President and Chief Financial Officer, age 56. John Yeager is Vice President and Chief Financial Officer of West Virginia United Health System. Mr. Yeager has over 25 years of experience in hospitals and managed care operations. Mr. Yeager was the Chief Financial Officer for the Health Plan from 1996 to 2004, which is a non-profit managed care organization with over 100,000 members. Prior to this, he was employed with Wheeling Hospital and served as the Associate Administrator/Chief Financial Officer. Mr. Yeager also served as the Nursing Home/Dialysis Administrator and CEO of a hospital being managed by Wheeling Hospital. Mr. Yeager earned a Bachelor of Science in Business Administration from West Liberty State College and a Masters in Business Administration from Wheeling Jesuit College. Mr. Yeager is a member of the West Virginia Society of CPA's and the Healthcare Financial Management Association.

## PART II

## WEST VIRGINIA UNIVERSITY HOSPITALS, INC.

West Virginia University Hospitals, Inc. is a West Virginia not-for-profit corporation that is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), and exempt from federal income taxation under Section 501(a) of the Code (a "Section 501(c)(3) Organization").

**WVUH, CITY HOSPITAL, JEFFERSON AND CHF ARE THE ONLY MEMBERS OF THE OBLIGATED GROUP WITH RESPECT TO THE SERIES 2005 BONDS, AS DEFINED IN THE OFFICIAL STATEMENT. NEITHER THE SYSTEM NOR UNITED HOSPITAL CENTER, INC. HAS ANY OBLIGATION TO PAY DEBT SERVICE ON THE SERIES 2005 BONDS.**

**General Background**

In 1960, West Virginia University ("WVU" or "University"), located in Morgantown, West Virginia, commenced operations of a tertiary care teaching hospital as a component of the medical center of the University. In 1984, the West Virginia Legislature adopted legislation which authorized separation of the hospital operations from the University and the establishment of a separate corporate entity. West Virginia University Hospitals, Inc. was incorporated as a non-stock, not-for-profit corporation and, by an agreement of transfer and lease dated July 1, 1984, assumed the operation of and responsibility for the Hospital. The existing 500,000 square foot, 380-bed hospital serves as a major statewide and regional health care referral center and provides the principal clinical education and research site for West Virginia University. The terms of the agreement of transfer and lease require the Hospital to provide a minimum of $4,000,000 per year in education expense for the interns and residents and an annual clinical teaching subsidy of not less than $6,000,000.

The Hospital's original facility, constructed in 1960, is now the Health Sciences Building and serves as the central academic teaching facility of the Robert C. Byrd Health Sciences Center of the West Virginia University. Ownership of this facility resides with the State of West Virginia. In 1986, West Virginia University Hospitals, Inc. began construction of its current facility, Ruby Memorial Hospital, a 10-story, 500,000 square foot facility which began operation in 1988. The Ruby Memorial Hospital is a tertiary care referral center and serves as the principal clinical education and research site for the West Virginia University School of Medicine. As part of its 380-bed complement and within its existing contiguous facility, the Hospital operates the 92-bed WVU Children's Hospital which attracts skilled clinicians and significant financial support and includes a 30-bed newborn intensive care unit. The Jon Michael Moore Trauma Center, which is also part of the Ruby Memorial Hospital, is the only nationally certified Level I trauma center in West Virginia and serves a significant geographic area.

On September 30, 1998, the Hospital purchased the assets of Chestnut Ridge Hospital, a predominantly inpatient 70-bed psychiatric hospital built in 1987 and located adjacent to Ruby Memorial Hospital. Chestnut Ridge Hospital is operated as a department of the Hospital and has been home to the West Virginia University's Department of Behavioral Medicine and Psychiatry. A portion of the proceeds from the WVUH Series 1998 Bonds were used to reimburse the Hospital for the acquisition of the assets of Chestnut Ridge Hospital.

In July 1998, the Hospital constructed the Family House, a 26-unit housing facility for adult patients and their families. Family House has direct access to the Hospital and fills a critical need for patients who require bone-marrow transplant and chemotherapy, for patients of Mary Babb Randolph Cancer Center, and for families of patients being treated at the trauma center.

In September 2003, the Hospital completed a strategic plan and subsequent bond financing for the purpose of expanding facilities. This clinical expansion project includes the addition of 58 medical and surgical beds, 10 adult intensive care beds, 4 pediatric intensive care beds, 2 outpatient operating rooms, and 4 inpatient operating rooms. The majority of the construction associated with the 2003 project will be completed by October 2005. Additional facility components are expected to be completed in early 2006.

The following table details WVUH's staffed bed complement as of September 30, 2004.

| Service | Staffed Beds | Beds Under Construction | Staff Beds Upon Project Completion |
|---|---|---|---|
| Medical & Surgical | 218 | 58 | 276 |
| Intensive Care | 40 | 10 | 50 |
| Pediatrics | 32 | 0 | 32 |
| Pediatrics ICU | 10 | 4 | 14 |
| Newborn ICU | 30 | 0 | 30 |
| Obstetrics/Gynecology | 20 | 0 | 20 |
| Skilled Nursing Unit | 20 | 0 | 20 |
| **Total** | 370 | 72 | 442 |
| Chestnut Ridge (Psych) | 69 | 0 | 69 |
| **Total** | 439 | 72 | 511 |

In addition to the Hospital's facilities, the campus of the Robert C. Byrd Health Sciences Center of the West Virginia University consists of the following:

Mary Babb Randolph Cancer Center, the only comprehensive center for cancer care, prevention and research located in the state of West Virginia.

Health Sciences Building, containing over one million square feet of classroom, laboratory, and office space and housing the West Virginia University's schools of medicine, dentistry, pharmacy and nursing.

Physician Office Center, a four-story facility of approximately 126,000 square feet which is the primary practice setting for the West Virginia University School of Medicine.

## Addition of West Virginia University Hospitals-East

Pursuant to the Merger Agreement, which has been approved by all parties and has received Certificate of Need approval, on January 1, 2005 Jefferson Regional Health System, Inc. ("JRHS") and Gateway Regional Health System, Inc. ("GRHS") will merge and form West Virginia University Hospitals-East, Inc. ("WVUH-E" or "WVUH-East"). WVUH-E will be the sole corporate member or shareholder of WVUH-East's predecessor corporations' (GRHS and JRHS) subsidiaries, including the two hospital operating companies, City Hospital, Inc. and The Charles Town General Hospital d/b/a Jefferson Memorial Hospital. The boards of directors of the three entities - WVUH-East, City Hospital, Inc. and The Charles Town General Hospital will have the same membership. WVUH will be the sole voting corporate member of WVUH-East.

The addition of WVUH-East in the Eastern Panhandle will generate many positive benefits. The addition allows WVUH to expand its geographic reach into West Virginia's fastest growing population area. Through clinical program development and synergies, there exists significant opportunity to keep patients within the State and curb outmigration of patients to facilities in Maryland and Virginia. A number of operating efficiencies can be garnered between WVUH and WVUH-East with respect to capital management, managed care contracting, and supply chain management. Lastly, the WVU School of Medicine has a

A-5

significant presence in the Eastern Panhandle and has commenced construction of a $6 million teaching facility on the City Hospital campus. A WVUH relationship would compliment the development and growth of this campus.

**Governance**

The seventeen member board of directors of WVUH (the "Board of Directors") consists of nine ex officio members, including the president of the Hospital and certain officers of the University, a representative elected at large by the Hospital employees and seven private directors appointed by the System. The directors continue to serve until their successors are appointed.

As of September 2004, the Board of Directors of the WVUH consisted of the following persons:

**System Appointees**

| Name | Occupation | Group Represented | Term Expiration |
|---|---|---|---|
| Walter Washington | Attorney | - | May 2010 |
| Terry Sammons | Attorney/Business Consultant | The Elderly | May 2010 |
| Sister Joel Patrice Christy | Educator | Lower Income Consumers | May 2010 |
| J. Robert Gwynne* | Attorney | Small Business | May 2006 |
| James Jeffrey | Retired, President, Mine Equip. Co. | Small Business | May 2008 |
| Diane Parker | Business Manager Local 814 | Organized Labor | May 2008 |
| David J. Laurie | UMWA | Organized Labor | May 2006 |

\* Charter member

**West Virginia University**
**(Ex officio)**

| | |
|---|---|
| David C. Hardesty, J | University President |
| Dr. Robert D'Alessandri | VP Health Sciences |
| E. Jane Martin, Ph.D. | Dean of Nursing |
| Gary Rogers | VP Administration and Finance |
| Michael Hurst, M.D. | Chief of Staff |
| Bruce Sparks | Representative of the University Board of Trustees |
| J. Michael Mullen, Ph.D. | Chancellor, Higher Education Policy Commission |
| Dr. John Prescott | Dean of the School of Medicine |

**West Virginia University Hospitals**

| | |
|---|---|
| Bruce McClymonds (ex officio) | President, West Virginia University Hospitals |
| James Juristy | Employee Representative, West Virginian University Hospitals |

**Conflicts of Interest**

The Board has adopted a conflict of interest policy that governs transactions between members of the Board and WVUH. Management believes that the transactions and relationships are on terms that are consistent with arm's length, fair market value arrangements between unaffiliated parties. Management does not believe the objectivity of the Board is compromised in any way.

**Management**

The responsibility for the operations of WVUH is delegated by the Board of Directors to the President Bruce McClymonds. Selected biographical information is listed below for Mr. McClymonds and for other principal members of the Administrative Staff.

Bruce McClymonds, President, age 48. Bruce McClymonds is the President of West Virginia University Hospitals, Inc. Prior to his appointment, Mr. McClymonds served as the Hospital's chief financial officer from 1989 to December 1994 and as the Hospital's chief operating officer during 1995 and 1996. He is responsible for all aspects of the Hospital's operations and plays a significant role in strategic plan development and implementation. He has also played a critical role in the organization's various managed care activities. Prior to moving to WVUH, Mr. McClymonds spent nine years in the healthcare specialty group of Price Waterhouse's Pittsburgh office. He also served as the chief financial officer of a community hospital in the Pittsburgh area. Mr. McClymonds received his Bachelors of Science Degree in Accounting from Grove City College and is a certified public accountant. Mr. McClymonds serves as a lecturer in the Masters of Public Administration Program at West Virginia University.

Dorothy Oakes, RN, MSN, Vice President and Chief Nursing Executive, age 50. Dorothy Oakes assumed the role of Vice President and Chief Nurse Executive, West Virginia University Hospitals, and Administrator of West Virginia University Children's Hospital on February 3, 2003. Prior to her arrival in West Virginia, she was employed at WakeMed in Raleigh, N.C. for 28 years, during which time she served in various senior management positions. Ms. Oakes is also Director, Clinical Services, in the School of Nursing at West Virginia University. She earned her Masters in Science of Nursing from Duke University, and a Bachelors in Science of Nursing from the University of North Carolina.

Stephen L. Tancin, Vice President for Ancillary & Support Services, age 48. Stephen Tancin joined West Virginia University Hospitals in 1984 and has held the following positions in his tenure at the Hospital: Director of Cardiology, Director of Clinical & Anatomical Laboratories and Executive Director of for-profit and non-profit subsidiaries, Vice President for Support Services, Vice President for Ancillary and Support Services. Mr. Tancin earned his Masters Degree in Healthcare Administration form the Graduate School of Public Health, University of Pittsburgh and he received his Bachelors of Science Degree in Biology from Lehigh University.

David C. Salsberry, Vice President of Finance and Chief Financial Officer, age 43. David Salsberry joined West Virginia University Hospitals in April 2001 after working as the Vice President of Finance and Chief Financial Officer at the West Virginia United Health System since January 1998. From September 1992 through December 1997, he held the position of Vice President of Finance and Chief Financial Officer at United Hospital Center. From 1987 through 1992, he has held other positions including Assistant Vice President of Finance, Director, Marketing and Planning, and Market Analyst. He is a member of the Health Care Financial Management Association and the West Virginia Society of Certified Public Accountants. Mr. Salsberry received a Masters of Public Administration from Kent State University in Kent, Ohio in 1987 and a Bachelor of Science from West Liberty State College, West Liberty, West Virginia in 1983 and is a certified public accountant.

Gary Murdock, Vice President of Planning and Marketing, age 41. Gary Murdock is the Vice President of Planning and Marketing for West Virginia University Hospitals, Inc. His current duties include oversight of strategic planning, internal and external communication, identification and implementation of program development initiatives, and marketing of WVUH, University Health Associates and the Schools of the WVU Health Sciences Center. From 1992 to 2000, he held several different positions at WVUH, including Financial Analyst, Programming Analyst, Director of Health Information Management and Vice President for Program Development. Mr. Murdock graduated from WVU in 1985 with a Bachelor's degree in Industrial Engineering. After working in the textile industry for several years, he returned to WVU for graduate studies and became a teaching fellow in the School of Engineering. In 1992, Mr. Murdock joined WVUH in the finance area.

Michael T. Balassone, Vice President and Chief Information Officer, age 53. Michael Balassone joined West Virginia University Hospitals in 2001. Prior to joining WVUH, Mr. Balassone held the position of Vice President and Chief Information Officer at the University of Maryland Medical System (Baltimore) from 1996-2000. Mr. Balassone received a Bachelor of Science degree in Business with a concentration in Information Systems from the University of Baltimore.

Kevin A. Halbritter, MD, Vice President of Medical Staff Affairs, age 45. Kevin Halbritter assumed the role as Vice President of Medical Staff Affairs at West Virginia University Hospitals, Inc. on December 1, 1998. Dr. Halbritter also serves as Medical Director for the Medical Access Referral System (MARS), WVU Referral Office and the WVU Healthline. In addition, Dr. Halbritter is an active member of the WVU/UHA Medical Staff and holds a faculty appointment in the Department of Internal Medicine. Dr. Halbritter received his Bachelor's degree and Medical degree from West Virginia University.

Cindy Klein, Vice President of Human Resources, age 40. Cindy Klein is Vice President of Human Resources at West Virginia University Hospitals after previously holding the positions of Director of Cardiology from 1993 to 1997 and Patient Advocate from 1989 to 1993. Mrs. Klein earned her Masters Degree in Public Administration, Certificate in Healthcare Administration and Bachelor of Science from West Virginia University.

John H. Yoder, FACHE, Chief Operating Officer, age 54. John Yoder joined West Virginia University Hospitals, Inc. in his current position in July, 2004. His current duties include the management and coordination of WVUH's day to day operations including all clinical and ancillary services, information technology and human resources. Prior to this current appointment, Mr. Yoder's 25 year career has included service as the Chief Operating Officer for 3 other health systems with hospitals ranging in size from 250 to 800 acute beds. He is a Fellow in the American College of Healthcare Administrators. Mr. Yoder earned a Masters in Health Administration from the Medical College of Virginia, Virginia Commonwealth University and a Bachelor of Science in Psychology from Old Dominion University.

Robert L. Brandfass, Vice President and General Counsel, age 44. See page A-3.

**Description of Services**

WVUH currently provides clinical specialty services for inpatients and outpatients, which include:

**Tertiary Services**

| | |
|---|---|
| Cardiology and Cardiac Surgery: | Adult and pediatric services including angioplasty with stent placement, atrial septal defect, ventricular septal defect, CABG, bidirectional glenn shunt, aortic balloon insertion, aortagraphy, athrectomy, cardioversion, multi vessel PTCA, ablation, pulmonary angiography, Tec athrectomy, and rotoblation. |
| Oncology: | Services including breast care, blood and bond marrow transplantation, comprehensive clinical oncology research, cytogenetics laboratory, tobacco research center, Gamma Knife, and adult and pediatric primary and secondary oncology services. |
| Obstetrics: | High-risk pregnancy service, reproductive services – including IVF, genetic screening and counseling, and ultrasonography. |
| Pediatric: | WVUH Children's Hospital with services including Klingberg Center for Child Development, neonatal intensive care unit, pediatric intensive care unit, and neonatal and pediatric transport. |

Other:               Jon Michael Moore Trauma Center (Level I), regional medical command center, and transplant services.

## Primary and Secondary Services

Cardiology:          Cardiac catheterization, cardiac rehabilitation, pacemaker insertion, echocardiography, electrophysiological stimulus studies, stress echocardiography, holter monitoring, stress testing, thallium stress testing, and ECGs.

Diagnostic:          CT scanner, MRI, PET scanner, ultrasound, nuclear medicine, lab/pathology, EMG, EEG and sleep lab.

Geriatric:           Alzheimer's diagnosis and assessment, geriatric assessment, emergency geriatric, geriatric acute care, and respite care.

Obstetrics           Birthing/LDRP rooms, gynecological surgical services, newborn nursery, and boarder baby
and Gynecology:      services.

Oncology:            In addition to the services discussed above, services include inpatient acute care, hospice, radiation therapy, outpatient chemotherapy, radioactive implants, gammaknife, mammography screening and diagnosis.

Surgical Services:   Inpatient and outpatient surgical services (adult and pediatric) in dentistry, endocrinology, gastroenterology, general surgery, neurosurgery, obstetrics/gynecology, ophthalmology, orthopedics, otolaryngology, plastic and reconstructive surgery, thoracic and vascular surgery, trauma, and lithotripsy.

Rehabilitation:      Physical rehabilitation inpatient unit, outpatient rehabilitation services including physical therapy, occupational therapy, cardiac rehabilitation, speech therapy, and occupational health services.

Outreach Clinics:    Specialty outreach clinics including behavioral medicine, cardiology (adult and pediatric), dermatology, family medicine, gastroenterology, endocrinology, nephrology, neurology, obstetrics and gynecology, oncology, ophthalmology, otolaryngology, rheumatology, neurosurgery, orthopedics, radiation therapy, surgery, and urology.

Other:               Epilepsy monitoring unit, arthritis treatment center, diabetes screening and treatment, emergency department, hemodialysis, HIV-AIDS services, long term care including skilled nursing care, and pain management.

## Preventative and Outreach

Community            Cancer screening including skin, prostate, and breast, cancer information services (with
Outreach:            NCI), health facility transportation (to/from), annual health fair, health information center, health screening, televised reports with popular "Dr. Bob" personality, nutrition programs, patient education center, TB clinics.

Support Services:    WV Drug Information Center, oncology programs for public health.

Other:               Mountaineer Doctor TeleVision (MDTV), Doctors on Call, WVU Healthline, WV CONSULT, Medical Access Referral System (MARS), infectious disease surveillance hotline, and social work services.

A-9

**Market Share and Competition**

In addition to WVUH, the major teaching hospitals of the West Virginia School of Medicine are the Charleston Area Medical Center in Charleston and the Ohio Valley Medical Center in Wheeling, West Virginia. Due to the geographic distance of both hospitals from Morgantown (167 miles and 90 miles, respectively), neither hospital's primary service area overlaps with that of WVUH.

WVUH competes more directly for secondary care admissions with area West Virginia community hospitals: Monongalia General Hospital in Morgantown, United Hospital Center in Clarksburg, Fairmont General Hospital in Fairmont, Stonewall Jackson Hospital in Weston, Grafton City Hospital in Grafton and St. Joseph's Hospital in Buckhannon.

WVUH is the dominant provider in its service area, accounting for the majority of area admissions.

## West Virginia University Hospitals, Inc.
## Statistics by Competitor

| Hospital | Miles from WVUH | Staffed Beds | Inpatient Admissions(1) | Outpatient Visits | Births |
|---|---|---|---|---|---|
| **WVUH** | - | 431 | 17,767 | 434,569 | 1,412 |
| United Hospital Center | 45 | 369 | 15,419 | 352,676 | 796 |
| Stonewall Jackson | 65 | 70 | 3,453 | 71,247 | 227 |
| Grafton City | 27 | 101 | 1,303 | 25,093 | - |
| St. Joseph | 64 | 95 | 3,270 | 46,616 | 433 |
| Fairmont General | 25 | 199 | 6,885 | 171,283 | 486 |
| Monongalia General | 2 | 175 | 8,616 | 119,553 | 604 |

Source: AHA data as of 2002 and WVUH records

(1) Includes acute and behavioral medicine admissions

**Primary and Secondary Service Areas**

The Hospital defines its primary service area for inpatient services as the eleven counties of Monongalia, Marion, Harrison, Preston, Wetzel, Doddridge, Taylor, Tucker and Upshur in West Virginia and Greene and Fayette counties in Pennsylvania; the secondary service area for the Hospital includes Randolph, Lewis, Barbour, Gilmer, Webster, Pendleton and Mineral counties in West Virginia and Garrett county in Maryland. The map below shows WVUH's primary and secondary service areas.

**West Virginia University Hospitals, Inc. Service Area Breakdown**



| 1 - WVU Hospitals | 10 - Garrett Memorial Hospital |
| 2 - Monongalia General Hospital | 11 - Wetzel County Hospital |
| 3 - Fairmont General Hospital | 12 - Broaddus Hospital |
| 4 - United Hospital Center | 13 - Greene County Memorial Hospital |
| 5 - Preston Memorial Hospital | 14 - Brownsville Hospital |
| 6 - Grafton City Hospital | 15 - Highlands Hospital |
| 7 - Stonewall Jackson Memorial Hospital | 16 - Uniontown Hospital |
| 8 - St. Joseph's Hospital | 17 - Potomac Valley Hospital |
| 9 - Davis Memorial Hospital | 18 - Webster County Memorial Hospital |

**Service Area Discharges and Market Share by Hospital Competitor**

| Total Primary Service Area | Discharges | Market Share |
|---|---|---|
| WVUH | 13,141 | 27.5% |
| United Hospital Center | 13,751 | 28.7% |
| Monongalia General Hospital | 7,705 | 16.0% |
| Fairmont General Hospital | 6,344 | 13.3% |

| Total Secondary Service Area | | |
|---|---|---|
| WVUH | 2,198 | 13.1% |
| United Hospital Center | 1,972 | 11.8% |
| Monongalia General Hospital | 642 | 3.8% |
| Fairmont General Hospital | 105 | 0.6% |

Source: WVHCA data as of 2003

A-11

**Population**

The following table shows the historical population in the primary and secondary service areas.

### Service Area Population Growth by Year

| | 2000 | 2001 (Est.) | 2002 (Est.) | 2003 (Est.) |
|---|---|---|---|---|
| **Primary Service Area:** | | | | |
| WV Counties | 308,360 | 307,725 | 308,737 | 310,199 |
| Fayette and Greene Counties, PA | 189,316 | 187,691 | 187,162 | 186,519 |
| Subtotal | 497,676 | 495,416 | 495,899 | 496,718 |
| **Secondary Service Area:** | | | | |
| WV Counties | 112,891 | 112,509 | 112,668 | 112,925 |
| Garrett County, MD | 29,846 | 29,803 | 29,934 | 30,049 |
| Subtotal | 142,737 | 142,312 | 142,602 | 142,974 |
| **Total** | 640,413 | 637,728 | 638,501 | 639,692 |

Source: U.S. Census Bureau

**Medical Services and Staff**

As of September 2004, the entire WVUH medical staff consisted of 485 members. Members of the medical staff are assigned to either the Active or Consulting Staff categories. Active Staff appointments are limited to those faculty members who use the Hospital as their principal place of practice. Appointees to the Active Staff may admit and attend patients, may vote and hold office, shall serve on Medical Staff committees as requested and shall be required to attend at least half of all Service Committee and Medical Staff meetings. Consulting Staff appointments are extended to these faculty members who use the Hospital regularly. Appointees to the Consulting Staff may admit and attend to patients, shall serve on Medical Staff Committees as requested and shall be expected, but not required, to attend all service, committee and Medical Staff meetings. Consulting Staff shall not be eligible to vote or hold office. The size and categories of the medical staff are as follows:

| Category | Number |
|---|---|
| Active | 360 |
| Consulting | 125 |
| **Total** | **485** |

Source: WVUH Records, as of September 2004

The Hospital has a closed medical staff (with certain exceptions) limited to the faculty of the West Virginia University School of Medicine who also comprise the physician employees of West Virginia University Medical Corporation. WVU Medical Corporation was created expressly for the benefit of the School of Medicine. The physicians providing the services of the Medical Corporation all have faculty appointments at the School of Medicine, and it is a condition of the School of Medicine appointment that faculty members provide clinical services through the WVU Medical Corporation.

The following table summarizes by specialty the members of the Active and Consulting Staff of the Hospital as of September 2004.

**Active and Consulting Staff**

| Department | Active Physicians | Consulting Physicians | Total Physicians | Percent Board Certified | Average Age |
|---|---|---|---|---|---|
| Anesthesiology | 23 | 3 | 26 | 70% | 45 |
| Behavioral Med/Psychiatry | 21 | 1 | 22 | 81 | 50 |
| Dentistry | 36 | 29 | 65 | - | 54 |
| Dentistry-Oral Surgery | 6 | 6 | 12 | - | 50 |
| Emergency Medicine | 14 | 7 | 21 | 79 | 42 |
| Family Medicine | 19 | 17 | 36 | 95 | 46 |
| Medicine | 66 | 6 | 72 | 95 | 47 |
| Neurology | 11 | 0 | 11 | 91 | 49 |
| Neurosurgery | 11 | 3 | 14 | 82 | 53 |
| Obstetrics/Gynecology | 13 | 10 | 23 | 69 | 48 |
| Occupational Medicine | 5 | 0 | 5 | 100 | 47 |
| Ophthalmology | 15 | 7 | 22 | 67 | 46 |
| Orthopedics | 8 | 12 | 20 | 88 | 48 |
| Otolaryngology | 8 | 8 | 16 | 100 | 55 |
| Pathology | 11 | 1 | 12 | 64 | 51 |
| Pediatrics | 39 | 9 | 48 | 87 | 43 |
| Radiology | 21 | 2 | 23 | 90 | 51 |
| Surgery | 30 | 2 | 32 | 91 | 48 |
| Urology | 3 | 2 | 5 | 100 | 52 |
| **Total** | **360** | **125** | **485** | **86%** | **48** |

Source: WVUH records as of September 2004

A-13

In fiscal year 2003, the top twenty physicians accounted for less than 31% of the total admissions, as is detailed in the following table:

### Twenty Most Active Physicians

| Specialty | Admissions(1) | Percent |
|---|---|---|
| Pediatrics | 419 | 2.1% |
| Behavioral Medicine | 413 | 2.0 |
| Surgery | 403 | 2.0 |
| Obstetrics & Gynecology | 395 | 1.9 |
| Medicine | 392 | 1.9 |
| Pediatrics | 367 | 1.8 |
| Pediatrics | 350 | 1.7 |
| Surgery | 345 | 1.7 |
| Pediatrics | 308 | 1.5 |
| Medicine | 296 | 1.5 |
| Obstetrics & Gynecology | 288 | 1.4 |
| Behavioral Medicine | 284 | 1.4 |
| Behavioral Medicine | 267 | 1.3 |
| Medicine | 263 | 1.3 |
| Medicine | 261 | 1.3 |
| Medicine | 249 | 1.2 |
| Orthopedics | 248 | 1.2 |
| Medicine | 239 | 1.1 |
| Orthopedics | 224 | 1.1 |
| Medicine | 220 | 1.1 |
| **Total for Top 20 Physicians** | 6231 | 30.7% |
| **Total** | **20,304** | **100.0%** |

Source:  WVUH records as of September 2004

(1)  Includes acute care, newborns, skilled nursing, and behavioral medicine admissions.

**Personnel and Employee Relations**

As of September 2004, WVUH employed 2,958 FTEs (excluding residents).  Of these FTEs, 870.5 were registered nurses and 72.7 were licensed practical nurses.  Certain of the Hospital's support staff, comprising less than 25% of the total FTEs, are represented by a collective bargaining unit.

**Licenses and Accreditations**

The Hospital was last accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") in September 2003 for a three-year period.  The Hospital is licensed by the West Virginia Department of Health and Human Resources and is approved for participation in the Medicare and Medicaid programs.  Memberships include Premier, Inc., the West Virginia Hospital Association and the American Hospital Association.

**Insurance**

For professional and general liability losses, the Hospital is self-insured through a bona fide program of self-insurance.  Funding levels are reviewed on an annual basis by an independent actuary.

**Related Party Transactions**

The Hospital held, up to January 21, 2003, an excess liability insurance policy with Healthnet Insurance Company, who in turn reinsured with an insurance carrier. As an original shareholder (along with Charleston Area Medical Center) of Healthnet Insurance Company, WVUH originally appointed two individuals to be members of the Board of Directors of Healthnet Insurance Company. WVUH transferred its shares in Healthnet Insurance Company to WVUH's parent company, West Virginia United Health System, Inc. on September 11, 1997.

WVUH entered into an agreement with University Health Associates ("UHA") to form a healthcare provider network named Integrated Provider Network, Inc. ("IPN"). The IPN subsequently entered into a provider relationship with The Health Plan of the Upper Ohio Valley, Inc. ("The Health Plan"). As of December 31, 2003, WVUH is liable, along with UHA, for any deficiencies incurred by the IPN which began operations January 1, 1995.

**Contingencies**

WVUH is not a guarantor of the West Virginia University Medical Corporation Issue, Series 1992 Bonds, currently outstanding in the amount of $19,125,000. WVUH does have an obligation under an operating credit agreement, contingent on certain circumstances, to assume the Sublease on all assets of the West Virginia University Medical Corporation ("Medical Corporation") and replace the Medical Corporation as obligor under the West Virginia University Medical Corporation's Series 1992 Bonds and Notes.

**Educational Programs**

The Hospital is responsible for providing educational and clinical facilities for the University's schools of health, science, dentistry and medicine.

Graduate Medical and Dental Education. Graduate medical and dental education for residents is offered in twenty-five major specialty and subspecialty areas. A total of 308 positions are currently filled at the Medical School campus in Morgantown.

Allied Health Programs. The Hospital provides clinical training for the Exercise Physiology, Community Medicine, Medical Technology, Occupational Therapy and Physical Therapy programs. The number of students enrolled in these programs is 506. WVUH is a certificate-granting hospital for the radiologic technology programs of Radiography, Nuclear Medicine, Radiation Therapy and Ultrasound for 41 students. The Hospital also supports the various programs associated with the Schools of Medicine, Nursing, Dentistry and Pharmacy.

Continuing Education. The Hospital, as a major teaching facility, fulfills its obligations to its staff and area professionals by its activities in continuing medical education. WVUH sponsors continuous lectures, seminars and conferences conducted by the medical staff or visiting lectures. In addition, continuing education programs for the nursing staff, administrative staff and support personnel are conducted throughout the year on a variety of relevant topics.

**Utilization Statistics**

The following tables show, for the years indicated, certain operating statistics for the Hospital:

|  | Fiscal Year Ending December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
|  | **2001** | **2002** | **2003** | **2003** | **2004** |
| Total Licensed Beds | 440 | 450 | 522 | 522 | 522 |
| Total Staffed Beds | 411 | 431 | 433 | 430 | 439 |
| Discharges (1) | 22,142 | 23,782 | 24,979 | 18,780 | 19,400 |
| Births | 1,316 | 1,082 | 1,283 | 1,238 | 1,213 |
| Patient Days | 124,729 | 131,605 | 128,643 | 125,157 | 133,365 |
| Acute Average Length of Stay | 5.84 | 5.85 | 5.47 | 5.51 | 5.46 |
| Surgical Operations |  |  |  |  |  |
| Inpatient | 6,488 | 7,802 | 7,429 | 5,722 | 5,679 |
| Outpatient | 8,937 | 10,189 | 10,262 | 7,833 | 7,999 |
| Total | 15,425 | 17,991 | 17,691 | 13,555 | 13,678 |
| Outpatient Visits |  |  |  |  |  |
| Emergency Room | 36,841 | 35,860 | 36,192 | 26,953 | 28,123 |
| Other | 378,821 | 398,752 | 403,019 | 302,351 | 325,619 |
| Total | 415,662 | 434,612 | 439,211 | 329,304 | 353,742 |

(1)  Includes acute care, observation, skilled nursing unit, and behavioral medicine discharges.  Excludes births.

**Sources of Revenues**

WVUH's gross patient charges result from healthcare services provided to its patient population. Third-party payors, including health maintenance organizations ("HMOs"), insurance companies, employers, preferred provider organizations ("PPOs") under managed care programs, the federal government under the Medicare program and federal and state governments under Medicaid programs, reimburse the Hospital for services rendered to their patients. WVUH historically has enjoyed good relationships with third-party payors. In 2003, managed care/commercial payers, including Blue Cross, accounted for 27.3% of WVUH's total gross patient charges. The sources of payment for services provided by the Hospital and the percentage of gross patient charges from each of these sources during the fiscal years ended December 31, 2001, 2002, 2003 and for the nine months ended September 30, 2003 and 2004 are shown below:

### Percentage of Gross Patient Charges by Payor

|  | Fiscal Year Ending December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
|  | **2001** | **2002** | **2003** | **2003** | **2004** |
| Medicare | 34.6% | 32.3% | 33.0% | 32.8% | 32.6% |
| Medicaid | 23.6 | 25.0 | 24.9 | 24.2 | 22.7 |
| Other Government | 9.4 | 9.7 | 10.3 | 8.8 | 10.5 |
| Blue Cross | 7.7 | 9.3 | 9.9 | 10.2 | 10.0 |
| Managed Care/Commercial | 18.9 | 18.5 | 17.4 | 19.7 | 19.6 |
| Self-Pay | 5.8 | 5.2 | 4.5 | 4.3 | 4.6 |
| **Total** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Medicare payments for inpatient hospital stays are generally based upon a fixed rate per case for each eligible patient, and the payment amounts depend upon the patient's diagnosis and treatment. In addition, Medicare reimburses WVUH for certain defined "pass-through" costs. Those include costs directly associated with medical education programs and organ acquisition expenses. The Medicaid program applies principles similar to those of the Medicare program, and the states make fixed payments for each eligible discharge. See the discussion under "BONDHOLDERS' RISKS – FEDERAL LAWS AND REGULATIONS; Medicare and Medicaid Programs; General; Medicare; Medicaid" in the forepart of this Official Statement.

Many employers that indirectly bear the costs of medical care for their employees, as well as many health insurers and health benefit plans, have instituted coverage restrictions that limit the type of medical services covered and the providers whose services will be paid. Many third-party payors and employers have instituted pre-admission screening and utilization review programs to promote ambulatory care and early discharge, and to reduce the use of ancillary tests and services. Some are also creating economic incentives for their insured employees to reduce costs by requiring second opinions, outpatient testing, preventative health programs and economic incentives for choosing certain providers by limiting payment for non-approved provider services.

### PART III
### WEST VIRGINIA UNIVERSITY HOSPITALS – EAST

WVUH-East is a West Virginia not-for-profit corporation. City Hospital and Jefferson Memorial Hospital are the two (2) hospital operating companies within WVUH-East.

## General

### City Hospital

In 1905, City Hospital, located in Martinsburg, West Virginia, was founded by Dr. T. K. Oates in a residence property at the corner of Burke Street and Maple Avenue in Martinsburg. In 1939, the Hospital was incorporated as a non-profit, non-sectarian community hospital operated and managed by a volunteer Board of Trustees. Once it became apparent that it was impossible to improve the City Hospital facility at its original location, the Board of Trustees purchased a 37-acre site at the edge of Martinsburg for the purpose of building a new hospital. In 1972, a four-story structure opened. Five years later in 1977, City Hospital and King Daughters Hospital, also located in Martinsburg, merged to improve the delivery of quality health care services to the community. Construction of an additional four floors and first floor expansion began in 1980. This project was completed in 1982, increasing City Hospital's total licensed beds to 260.

In 1984, the Gateway Regional Health System, Inc. ("Gateway") was established in response to the area's changing health care environment. The purpose of the corporate restructuring was to separate various non-acute health care services and functions from City Hospital in order to add services not organizationally feasible within the traditional hospital setting. Under Gateway, City Hospital remained a 501(c)(3) not-for-profit subsidiary operated by a volunteer community Board of Trustees. Gateway Healthcare Properties, Inc., a 501(c)(4), Gateway Health Services, a 501 (c)(3), not-for-profit entity and Gateway Health Enterprises, a for-profit entity, were established along with the Gateway Foundation (now, City Hospital Foundation, Inc.) ("CHF"), a 501(c)(3) not-for-profit tax exempt foundation. CHF was created to raise funds, develop programs, manage financial assets and act in a philanthropic capacity for all of Gateway affiliates.

Along with Gateway, came expansion. In 1985, the Medical Arts Center, a physician office building, opened on the City Hospital campus. Then in 1992, a second major expansion to City Hospital was initiated to add a new surgical wing, expand the emergency department, provide a new main entrance, expand the lobby area, and consolidate all outpatient services to a convenient location on the first floor. The $9.5 million project was completed in 1994. In October 1999, following a capital campaign that raised $1.2 million, the Dorothy A. McCormack Cancer Treatment & Rehabilitation Center and the City Hospital Wellness Center opened on the City Hospital campus. This $4 million project offered the residents of the Eastern Panhandle a comprehensive regional center for cancer treatment, rehabilitation and wellness services.

Today, City Hospital continues its mission to serve as a recognized leader in the provision of high quality, cost-effective health and wellness services. As a 260-bed, acute care, community hospital, City Hospital supports a primary service area of over 140,000 people in Berkeley, Morgan and Jefferson Counties. The dedicated professionals of City Hospital as well as the entire Regional Health System share a commitment to ensuring the best possible care for the residents of the Eastern Panhandle. On the City Hospital campus, a two acre portion has been set aside to the West Virginia University School of Medicine for the construction of educational facilities which will allow for the further development of the Medical school in the eastern panhandle. Funding for the construction is partially provided by the federal government.

### Charles Town General Hospital, d/b/a Jefferson Memorial Hospital

In December 1904, Jefferson Memorial Hospital (a.k.a. Charles Town General Hospital) was founded by Dr. Richard Edmunston Venning when he converted the second story of his home, located at 111 West Washington Street in Charles Town, West Virginia into a five-bedroom clinic with one bath, an operating room, and a sterilizing room. In 1912, this small hospital became a joint stock company, which subsequently failed. The failure of the joint stock company resulted in alternative management for the hospital and in March of 1917 the public assumed control of Charles Town General Hospital as a not-for-profit institution with a volunteer Board of Directors. The hospital had expanded to 21 beds by the 1930's, but was becoming too small to keep providing first-rate, quality acute care to the growing population.

By the 1940's Charles Town General Hospital was in need of a new, more modern health care facility, and the community rallied to provide continued quality healthcare to the residents of Jefferson County. A new 48-bed hospital opened in Ranson in October of 1948 and served the area for the next 27 years. In 1975, a third hospital, now renamed Jefferson Memorial Hospital, was built. This modern 96-bed hospital would once again address the growing population of Jefferson County until the 1980's when in 1983 a third story would be added increasing the total number of licensed beds to 114.

In 1999, the Jefferson Regional Health System, Inc was formed. Under this system Jefferson Memorial Hospital remained a 501(c)(3) not-for-profit acute care hospital operated by a volunteer Board of Directors. In addition to the not-for-profit entities of the system a for-profit group called Jefferson Health Enterprises was established.

In 1999, the Jefferson Health Care Foundation 501(c)(3), a not-for-profit tax-exempt philanthropic foundation was founded with a mission to aid, strengthen, support and benefit the services and goals of Jefferson Memorial Hospital and its affiliates.

Today, over 100 years later, Jefferson Memorial continues its mission to offer accessible, high quality, cost effective health care in a safe and caring manner to all residents of Jefferson County. This 114-licensed acute care hospital remains the only hospital located in Jefferson County with a population of approximately 48,000. The total tri-county service area including City Hospital located in Berkeley County and War Memorial in Morgan County has a population of approximately 148,000 residents. Jefferson Memorial's dedicated staff of over 400 remains committed to a bond that was formed over 100 years ago between town, physician and hospital to provide quality health care to the residents of Jefferson County and the surrounding area.

Jefferson Memorial Hospital has a teaching relationship with West Virginia University Medical School.

### City Hospital Foundation, Inc.

City Hospital Foundation, Inc., a 501(c)(3) organization, is also part of WVUH-East and a member of the Obligated Group that was created primarily to raise funds by acting in the philanthropic capacity for all of the Gateway affiliates. CHF also currently owns and manages real estate used for health care purposes and has accumulated an investment portfolio valued at $14.7 million as of December 31, 2003.

### Description of Services

### City Hospital

City Hospital provides a comprehensive range of services for acute care patients. Each program and service line is complemented by auxiliary support for a wide array of therapeutic care. City Hospital also provides many specialty programs that address inpatient, outpatient and community needs. The following paragraphs highlight the major services provided by City Hospital.

- General medical/surgical. Inpatient and outpatient surgical services (adult and pediatric) in dentistry, endocrinology, gastroenterology, general surgery, neurosurgery, obstetrics/gynecology, ophthalmology, orthopedics, otolaryngology, plastic and reconstructive surgery, thoracic and vascular surgery, trauma and lithotripsy.

- Obstetrics. Birthing/LDRP rooms, gynecological surgical services, newborn nursery, including Mother and Baby Program.

- Psychiatric care . Psychiatric consultation – liaison services, psychiatric emergency services, and psychiatric outpatient services.

A-19

- Skilled nursing care. Licensed long-term care nursing facility within the hospital.

- Diagnostic. CT scanner, MRI, digital mammography, ultrasound, nuclear medicine, lab/pathology, EMG, EEG, diagnostic radioisotope, sleep lab and single photon emission computerized tomography (SPECT).

- Rehabilitation. Physical rehabilitation inpatient unit, outpatient rehabilitation services including physical therapy, occupational therapy, cardiac rehabilitation and speech therapy.

- Cardiology services. Cardiac rehabilitation, echocardiography, electrophysiological stimulus studies, stress echocardiography, holter monitoring, stress testing, thallium stress testing, and ECG's.

- Oncology services. Inpatient acute care, hospice, radiation therapy, outpatient chemotherapy, radioactive implants, mammography screening and diagnosis.

- Community Outreach. Health fair, health screenings, nutrition programs, patient education center, support groups, tobacco treatment/cessation program and women's health center/services, Dr. Dean Ornish Program for reversing heart disease, CPR/BCLS courses, 1-Doc, lifeline, mall walkers, sibling classes and speakers bureau.

**Jefferson Memorial Hospital**

Jefferson Memorial Hospital is a full service, freestanding community hospital providing primary and secondary services, including the following:   (1) cardiology - cardiopulmonary rehabilitation, echocardiography, holter monitoring, stress testing, and ECGs; (2) diagnostic - CT scanner, MRI, ultrasound, lab/pathology, EEG, polysomnography and MSLT (Multiple Sleep Latency Testing), pulmonary function testing, arterial blood gas analysis; (3) obstetrics - labor and delivery and newborn nursery; (4) oncology - inpatient acute care, hospice, outpatient chemotherapy, radioactive implants, mammography screening and diagnosis; (5) general medicine and surgical services - inpatient and outpatient surgical services (adult and pediatric) in endocrinology, general medicine, gastroenterology, general surgery, neurosurgery, obstetrics/gynecology, ophthalmology, orthopedics, and urology; and (6) rehabilitation - skilled nursing and rehab unit, outpatient rehabilitation services including physical therapy, occupational therapy, cardiopulmonary rehabilitation, speech therapy and occupational health services.

**Service Area Discharges and Market Share**

The following table shoes the service area discharges (including newborn discharges) and market share for City Hospital and Jefferson memorial Hospital for fiscal year 2003.

| Total Primary Service Area | Discharges | Market Share |
|---|---|---|
| City Hospital | 7,404 | 38.4% |
| Jefferson Memorial Hospital | 2,322 | 12.0 |
| Other WV Hospitals | 915 | 4.7 |
| Out of State Hospitals | 8,655 | 44.9 |
| Total | 19,296 | 100.0% |

Source: WVHCA data

More than 95% of the inpatient discharges for both City Hospital and Jefferson Memorial Hospital come from their respective Primary Service Areas.

**Population**

The following table shows the historical population in the primary service areas of City Hospital and Jefferson Memorial Hospital.

## Service Area Population Growth by Year

|                  | 2000    | 2001 (Est.) | 2002 (Est.) | 2003 (Est.) |
|------------------|---------|-------------|-------------|-------------|
| Jefferson County | 42,190  | 43,411      | 44,885      | 46,270      |
| Berkeley County  | 75,905  | 78,680      | 81,401      | 85,272      |
| Morgan County    | 14,943  | 15,223      | 15,311      | 15,514      |
| **Total**        | 133,038 | 137,314     | 141,597     | 147,056     |

Source: U.S. Census Bureau

**Medical Services and Staff**

**City Hospital**

As of September 2004, the active/consulting/courtesy staff of City Hospital consisted of 119 members, plus 25 allied health professionals. Members of the medical staff are assigned to either the active/consulting/courtesy staff categories. Appointees to the active staff may admit and attend patients, may vote and hold office, shall serve on medical staff committees as requested and shall be required to attend at least half of all department and medical staff meetings. Consulting staff appointees may admit up to 12 patients per year, may perform unlimited number of out-patient procedures and are not required to attend meetings. They are not allowed to vote or hold office but may attend meetings at the invitation of a staff member. Courtesy staff members may not admit but may provide medical consultation at the request of an active staff member. They may not vote or hold office but may attend meetings at the invitation of a staff member. The size and category of the medical staff are as follows:

| Category            | Number |
|---------------------|--------|
| Active              | 87     |
| Consulting/Courtesy | 32     |
| **Total**           | **119**|

Source: City Hospital as of September 2004

City Hospital has a teaching relationship with West Virginia University Medical students and family practice residents are preceptored by medical staff with teaching appointments. Unless special care need requires, all staff must be board certified within five years of finishing a residency program.

The following table summarizes by specialty the members of the active, consulting and courtesy staff of City Hospital as of September 2004.

A-21

| Department | Active Physicians | Consulting/ Courtesy Physicians | Total Physicians | Percent Board Certified | Average Age |
|---|---|---|---|---|---|
| Anesthesiology | 3 | 0 | 3 | 100% | 44 |
| Cardiology | 0 | 8 | 8 | 100 | 46 |
| Dermatology | 0 | 4 | 4 | 100 | 43 |
| Diagnostic Radiology | 3 | 0 | 3 | 100 | 43 |
| Emergency Medicine | 8 | 3 | 11 | 73 | 42 |
| Endocrinology | 1 | 0 | 1 | 100 | 55 |
| Family Practice | 4 | 5 | 9 | 89 | 52 |
| Gastroenterology | 0 | 1 | 1 | 100 | 45 |
| General Dentistry | 1 | 0 | 1 | 0 | 58 |
| General Surgery | 4 | 0 | 4 | 75 | 55 |
| Hematology Oncology | 2 | 0 | 2 | 100 | 56 |
| Internal Medicine | 16 | 0 | 16 | 81 | 45 |
| Nephrology | 2 | 4 | 6 | 83 | 51 |
| Neurology | 2 | 0 | 2 | 100 | 51 |
| Neurosurgery | 0 | 2 | 2 | 100 | 44 |
| OB/GYN | 4 | 0 | 4 | 100 | 59 |
| Occupational Medicine | 0 | 2 | 2 | 100 | 54 |
| Ophthalmology | 3 | 0 | 3 | 66 | 54 |
| Oral Surgery | 3 | 0 | 3 | 100 | 43 |
| Orthopedic Surgery | 5 | 0 | 5 | 80 | 44 |
| Otolaryngology | 2 | 0 | 2 | 50 | 58 |
| Pathology | 2 | 0 | 2 | 100 | 66 |
| Pediatrics | 6 | 0 | 6 | 50 | 46 |
| Physical Medicine & Rehab | 1 | 0 | 1 | 100 | 41 |
| Podiatry | 6 | 1 | 7 | 86 | 44 |
| Psychiatry | 3 | 2 | 5 | 80 | 55 |
| Pulmonology | 1 | 0 | 1 | 100 | 52 |
| Radiation Oncology | 1 | 0 | 1 | 100 | 55 |
| Rheumatology | 1 | 0 | 1 | 100 | 43 |
| Urology | 2 | 0 | 2 | 100 | 59 |
| **Total** | **87** | **32** | **119** | **89%** | **50** |

Source: City Hospital as of September 2004

## Jefferson Memorial Hospital

As of September 2004, Jefferson Memorial Hospital's Medical Staff consisted of a total 59 Active, Consulting and Resident staff. Plus a total of seven affiliate staff. Members of the medical staff are assigned to the Active Medical Staff with subcategories as Attending, Consulting and Fellow or Resident Physician Staff. Within these three subcategories there are 28 Attending Staff Members, 20 Consulting Staff Members and 11 Residents.

Appointees to the Attending Medical Staff are entitled to admit and attend patients and perform procedures as authorized with the privileges granted. They shall pay the medical staff dues and be eligible to vote at medical staff meetings and any committee, department or service meetings in which they are members. They may hold office of the medical staff, and serve as any committee, department or service chairs. These staff members are required to attend at least fifty (50) percent of all Medical Staff meetings and Committee meetings per year.

Consulting Medical Staff appointees are entitled to consult and perform specified procedures as authorized by the clinical privileges granted. They need to pay Active Medical Staff dues and serve on committees, but may not hold the position of Chair, nor can they vote at the Medical Staff meetings. There are no requirements for attendance at Medical Staff or Committee meetings.

A-22

The Fellow or Resident Staff are graduates from a World Health Organization approved medical school or dental schools, and who are in good standing as postgraduate physician in an Accreditation Committee on Graduate Medical Education approved training program in affiliation with Jefferson Memorial Hospital.

The following table summarizes by specialty the members of the active, consulting and courtesy staff of Jefferson Memorial Hospital as of September 2004.

| Department | Active Physicians | Consulting Physicians | Percent Board Certified | Average Age |
|---|---|---|---|---|
| Dentistry-Oral Surgery | 0 | 4 | 75% | 42 |
| Emergency Medicine | 5 | 1 | 100 | 49 |
| Family Medicine | 7 | 2 | 89 | 48 |
| Internal Medicine | 5 | 7 | 100 | 42 |
| Neurology | 0 | 1 | 0 | 43 |
| Neurosurgery | 1 | 0 | 0 | 56 |
| Obstetrics/Gynecology | 1 | 0 | 100 | 54 |
| Ophthalmology | 1 | 1 | 100 | 43 |
| Orthopedics | 2 | 0 | 50 | 45 |
| Otolaryngology | 1 | 0 | 100 | 55 |
| Pathology | 0 | 1 | 100 | 64 |
| Pediatrics | 1 | 0 | 100 | 45 |
| Radiology | 1 | 3 | 100 | 57 |
| Surgery | 2 | 0 | 50 | 54 |
| Urology | 1 | 0 | 100 | 58 |
| **Total** | **28** | **20** | **88%** | **50** |

Source: Jefferson Memorial Hospital as of September 2004

**Licenses and Accreditations**

**City Hospital**

In August 2002, City Hospital was accredited by the JCAHO for a three-year period. The Hospital is licensed by the West Virginia Department of Health and Human Resources and is approved for participation in the Medicare and Medicaid programs. Memberships include the West Virginia Hospital Association and the American Hospital Association.

**Jefferson Memorial Hospital**

Jefferson Memorial Hospital was last accredited by JCAHO in June 2003 for a three-year period. Jefferson Memorial Hospital is licensed by the West Virginia Department of Health and Human Resources and is approved for participation in the Medicare and Medicaid programs. Memberships include Premier, Inc., the West Virginia Hospital Association and the American Hospital Association.

**Utilization Statistics**

The following tables show, for the years indicated, certain operating statistics for City Hospital and Jefferson Memorial Hospital:

**City Hospital**
**Utilization Statistics**

|  | Fiscal Year Ending December 31, | | | Nine Months Ending September 30, | |
|---|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 | 2004 |
| Total Licensed Beds | 260 | 260 | 260 | 260 | 260 |
| Total Staffed Beds | 154 | 154 | 144 | 144 | 144 |
| Discharges (1) | 7,273 | 7,140 | 7,404 | 5,509 | 5,601 |
| Patient Days (2) | 39,726 | 37,378 | 37,820 | 28,167 | 28,015 |
| Births | 878 | 897 | 861 | 619 | 653 |
| Acute Average Length of Stay | 4.87 | 4.65 | 4.58 | 4.60 | 4.48 |
| Surgical Operations (3) |  |  |  |  |  |
| Inpatient | 2,485 | 2,707 | 2,547 | 1,681 | 1,732 |
| Outpatient | 4,708 | 5,920 | 6,518 | 5,050 | 5,109 |
| Total | 7,193 | 8,627 | 9,065 | 6,731 | 6,841 |
| Outpatient Visits |  |  |  |  |  |
| Emergency Room | 33,752 | 30,659 | 36,399 | 26,585 | 27,860 |
| Other | 90,218 | 96,520 | 97,376 | 72,776 | 77,725 |
| Total | 123,970 | 127,179 | 133,775 | 99,361 | 105,585 |

(1) Excludes births, excludes observation
(2) Includes newborns, excludes observation
(3) Includes endoscopy, excludes lithotripsy

### Jefferson Memorial Hospital
### Utilization Statistics

|  | Fiscal Year Ending September 30, | | |
|---|---|---|---|
|  | 2002 | 2003 | 2004 |
| Total Licensed Beds | 114 | 114 | 114 |
| Total Staffed Beds | 60 | 60 | 60 |
| Discharges | 2,603 | 2,460 | 2,276 |
| Patient Days[1] | 9,323 | 9,234 | 8,474 |
| Births | 202 | 228 | 264 |
| Acute Average Length of Stay | 3.08 | 3.25 | 3.13 |
| Surgical Operations | | | |
| Inpatient | 517 | 655 | 561 |
| Outpatient | 1,836 | 2,050 | 2,324 |
| Total | 2,353 | 2,705 | 2,885 |
| Outpatient Visits | | | |
| Emergency Room | 20,234 | 19,858 | 19,812 |
| Other | 31,512 | 31,772 | 36,971 |
| Total | 51,746 | 51,630 | 56,783 |

(1) Excludes outpatient observation

## Outpatient Service Statistics

The sources of payment for services provided by City Hospital and Jefferson Memorial Hospital and the percentage of gross patient charges from each of these sources during the fiscal years ended December 31, 2001, 2002 and 2003 are shown below:

### City Hospital
### Percentage of Gross Patient Charges by Payor

|  | Fiscal Year Ending December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 | 2004 |
| Medicare | 41.6% | 41.7% | 40.5% | 40.4% | 41.1% |
| Medicaid | 12.1 | 11.3 | 12.7 | 12.5 | 13.1 |
| Other Government | 6.6 | 7.1 | 6.9 | 7.0 | 6.8 |
| Blue Cross | 12.5 | 13.5 | 14.3 | 14.4 | 15.2 |
| Managed Care/Commercial | 21.2 | 19.7 | 18.8 | 18.7 | 16.5 |
| Self-Pay | 6.0 | 6.7 | 6.8 | 7.0 | 7.3 |
| **Total** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

A-25

**Jefferson Memorial Hospital**
**Percentage of Gross Patient Charges by Payor**

|  | Fiscal Year Ending September 30, | | |
|---|---|---|---|
|  | **2002** | **2003** | **2004** |
| Medicare | 34.5% | 36.4% | 34.3% |
| Medicaid | 11.3 | 11.4 | 10.9 |
| Other Government | 6.7 | 6.8 | 7.7 |
| Blue Cross | 14.4 | 15.2 | 14.4 |
| Managed Care/Commercial | 24.5 | 22.2 | 24.7 |
| Self-Pay | 8.6 | 8.0 | 8.0 |
| **Total** | 100.0% | 100.0% | 100.0% |

# PART IV
## SELECTED SUMMARY FINANCIAL INFORMATION FOR THE OBLIGATED GROUP

WVUH, City Hospital, Jefferson and CHF are the sole members of the Obligated Group. WVUH accounted for 65.4 percent of the total operating revenues and 67.6 percent of the total assets of the System for the fiscal year ending December 31, 2003. See the financial information described below in Appendices B, C and D for more information regarding the relative financial size and strength of the Obligated Group.

The following selected financial data for the fiscal years ended December 31, 2003, 2002 and 2001, for WVUH and City Hospital and for the fiscal years ended September 30, 2004, 2003 and 2002 for Jefferson, are derived from the audited financial statements of WVUH, City Hospital and Jefferson. The financial data for the nine months ended September 30, 2004 and 2003 are derived from unaudited financial statements of WVUH and City Hospital. The unaudited financial information includes all adjustments, consisting of normal recurring accruals, which WVUH and City Hospital consider necessary for a fair presentation of the financial position and the results of operations for these periods. Operating results for the nine months ended September 30, 2004 for WVUH and City Hospital are not necessarily indicative of the results that may be expected for the entire fiscal year ending December 31, 2004. The data should be read in conjunction with the financial information and related notes included herein as Appendix B.

**West Virginia University Hospitals, Inc.**
**Condensed Statements of Operations**
**($ in Thousands)**

|  | Fiscal Year Ended December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 | 2004 |
| Net patient service revenue | $259,016 | $292,554 | $324,265 | $240,074 | $299,222 |
| Other revenue | 6,803 | 8,750 | 9,716 | 6,190 | 7,411 |
| Total revenues | 265,819 | 301,304 | 333,981 | 246,264 | 306,633 |
| Salaries and wages | 96,692 | 104,293 | 115,940 | 96,810 | 105,719 |
| Employee benefits | 23,680 | 25,800 | 30,230 | 22,322 | 25,063 |
| Supplies and purchased services | 104,218 | 124,414 | 136,430 | 90,192 | 128,765 |
| Depreciation and amortization | 16,813 | 19,455 | 21,878 | 16,049 | 15,891 |
| Provision for bad debts | 14,581 | 16,629 | 18,743 | 12,241 | 15,435 |
| Interest | 5,475 | 5,288 | 5,120 | 3,783 | 3,072 |
| Total expenses | 261,459 | 295,879 | 328,341 | 241,397 | 293,945 |
| Income from operations | 4,360 | 5,425 | 5,640 | 4,867 | 12,688 |
| Non-operating (losses) gains-principally investment income and net realized (losses) gains and other than temporary losses | (3,724) | (5,291) | 4,216 | 2,327 | 13,959 |
| Excess of revenues over expenses | $636 | $134 | $9,856 | $7,194 | $26,647 |

**Condensed Balance Sheets**
**($ in Thousands)**

|  | As of December 31, | | | As of September 30, | |
|---|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 | 2004 |
| Assets |  |  |  |  |  |
| Cash and cash equivalents | $    925 | $   3,556 | $   4,572 | $ 10,192 | $   10,588 |
| Net patient accounts receivable | 50,200 | 52,146 | 53,150 | 52,353 | 60,437 |
| Other receivables | 13,539 | 7,923 | 8,497 | 6,220 | 5,530 |
| Other current assets | 15,501 | 20,334 | 19,721 | 14,960 | 18,346 |
| Total current assets | 80,165 | 83,959 | 85,940 | 83,725 | 94,901 |
| Assets whose use is limited | 203,724 | 182,901 | 274,781 | 266,789 | 283,504 |
| Net property, plant and equipment | 107,435 | 119,105 | 132,749 | 125,640 | 137,684 |
| Restricted assets held by the WVU Foundation | 2,242 | 2,956 | 3,292 | 3,210 | 4,241 |
| Other assets | 8,920 | 7,690 | 10,256 | 10,987 | 9,555 |
| Total assets | $402,486 | $396,611 | $507,018 | $490,351 | $529,885 |
| Liabilities and net assets |  |  |  |  |  |
| Total current liabilities | $33,207 | $36,412 | $37,406 | $ 33,761 | $44,477 |
| Long-term portion of bonds and notes payable | 99,238 | 103,491 | 177,358 | 177,385 | 172,732 |
| Long-term portion of self-insurance liability | 8,289 | 6,991 | 9,466 | 8,906 | 13,428 |
| Derivative financial instruments | - | - | 2,972 | - | 3,974 |
| Unrestricted net assets | 259,510 | 246,761 | 276,524 | 267,089 | 291,033 |
| Temporarily / permanently restricted net assets | 2,242 | 2,956 | 3,292 | 3,210 | 4,241 |
| Total net assets | 261,752 | 249,717 | 279,816 | 270,299 | 295,274 |
| Total liabilities and net assets | $402,486 | $396,611 | $507,018 | $490,351 | $529,885 |

A-27

### Gateway Regional Health Systems, Inc.
### Consolidated Condensed Statements of Operations
### ($ in Thousands)

|  | Fiscal Year Ended December 31, | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 | 2004 |
| Net patient service revenue | $69,616 | $71,596 | $78,265 | $57,452 | $64,175 |
| Other revenue | 1,164 | 1,542 | 1,514 | 1,887 | 1,670 |
| Total revenues | 70,780 | 73,138 | 79,779 | 59,339 | 65,845 |
| Salaries and wages | 27,891 | 29,272 | 29,929 | 22,075 | 25,375 |
| Employee benefits | 8,534 | 8,737 | 10,665 | 7,464 | 7,558 |
| Supplies and purchased services | 24,926 | 25,955 | 26,114 | 20,147 | 21,069 |
| Depreciation and amortization | 4,136 | 4,330 | 4,145 | 3,299 | 3,337 |
| Provision for bad debts | 6,317 | 6,177 | 6,559 | 4,731 | 5,919 |
| Interest | 1,453 | 1,513 | 1,412 | 1,084 | 1,010 |
| Total expenses | 73,257 | 75,984 | 78,825 | 58,800 | 64,268 |
| Income from operations | (2,476) | (2,846) | 954 | 539 | 1,577 |
| Non-operating (losses) gains-principally investment income and net realized (losses) gains and other than temporary losses | 641 | 517 | 1,913 | 1,085 | 2,081 |
| Excess of revenues over expenses | $(1,836) | $(2,329) | $2,867 | $1,624 | $3,658 |

### Consolidated Condensed Balance Sheets
### ($ in Thousands)

|  | As of December 31, | | | As of September 30, | |
|---|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2003 | 2004 |
| **Assets** | | | | | |
| Cash and cash equivalents | $ 1,811 | $ 4,143 | $ 4,779 | $ 6,503 | $ 5,258 |
| Net patient accounts receivable | 12,528 | 10,934 | 10,453 | 9,676 | 10,676 |
| Other receivables | 102 | 156 | 197 | 143 | 497 |
| Other current assets | 4,882 | 5,922 | 5,839 | 4,822 | 5,023 |
| Total current assets | 19,323 | 21,155 | 21,269 | 21,144 | 21,454 |
| Assets whose use is limited | 31,320 | 31,366 | 36,032 | 34,847 | 38,114 |
| Net property, plant and equipment | 28,907 | 27,159 | 26,566 | 25,615 | 28,413 |
| Other assets | 1,266 | 1,319 | 596 | 642 | 1,087 |
| Total assets | $80,815 | $80,999 | $84,462 | $82,248 | $89,068 |
| **Liabilities and net assets** | | | | | |
| Total current liabilities | $10,560 | $11,670 | $11,457 | 10,758 | $9,932 |
| Long-term portion of bonds and notes payable | 17,694 | 20,832 | 18,997 | 19,830 | 21,770 |
| Long-term portion of self-insurance liability | 2,985 | 2,694 | 2,570 | 2,694 | 2,570 |
| Other | 810 | 607 | 234 | 314 | 337 |
| Unrestricted net assets | 48,766 | 45,196 | 51,204 | 48,652 | 54,459 |
| Temporarily / permanently restricted net assets | - | - | - | - | - |
| Total net assets | 48,766 | 45,196 | 51,204 | 48,652 | 54,459 |
| Total liabilities and net assets | $80,815 | $80,999 | $84,462 | $82,248 | $89,068 |

**Jefferson Memorial Hospital**
**Condensed Statements of Operations**
**($ in Thousands)**

**Fiscal Year Ended September 30,**

| | 2002 | 2003 | 2004 |
|---|---|---|---|
| Net patient service revenue | $32,182 | $32,376 | $34,737 |
| Other revenue | 255 | 274 | 254 |
| Total revenues | 32,438 | 32,649 | 34,992 |
| | | | |
| Salaries and wages | 13,805 | 14,930 | 14,784 |
| Payroll Taxes and benefits | 3,072 | 3,326 | 3,536 |
| Supplies and other expenses | 10,933 | 11,961 | 11,395 |
| Depreciation and amortization | 1,132 | 978 | 884 |
| Provision for bad debts | 2,348 | 2,519 | 4,278 |
| Interest | 308 | 261 | 283 |
| Total expenses | 31,597 | 33,976 | 35,158 |
| Income from operations | 841 | (1,327) | (167) |
| | | | |
| Non-operating (losses) gains-principally investment income and net realized (losses) gains and other than temporary losses | 226 | 185 | 176 |
| | | | |
| Excess of revenues over expenses | $1,067 | $(1,142) | $9 |

**Condensed Balance Sheets**
**($ in Thousands)**

**As of September 30,**

| | 2002 | 2003 | 2004 |
|---|---|---|---|
| Assets | | | |
| Cash and cash equivalents | $ 325 | $ 916 | $484 |
| Net patient accounts receivable | 6,646 | 7,337 | 7,197 |
| Other receivables | 155 | 155 | 155 |
| Other current assets | 937 | 785 | 794 |
| Total current assets | 8,063 | 9,193 | 8,619 |
| | | | |
| Assets whose use is limited | 235 | 365 | 323 |
| Net property, plant and equipment | 5,866 | 6,053 | 6,038 |
| Other assets | 3,448 | 3,724 | 3,899 |
| Total Assets | $17,612 | $19,335 | $18,889 |
| Liabilities and net assets | | | |
| Total current liabilities | $ 5,479 | $ 6,181 | $5,401 |
| Long-term portion of bonds and notes payable | 369 | 2,314 | 2,456 |
| | | | |
| Unrestricted net assets | 8,081 | 6,917 | 7,124 |
| Temporarily / permanently restricted net assets | 3,682 | 3,923 | 3,907 |
| Total net assets | 11,764 | 10,839 | 11,032 |
| Total liabilities and net assets | $17,612 | $19,335 | $18,889 |

## PART V

## MANAGEMENT 'S DISCUSSION AND ANALYSIS OF
## RESULTS OF OPERATIONS

### I.     West Virginia University Hospitals, Inc.

**General and Historical**

WVUH's statement of values emphasizes the importance of patients as the first priority, quality of care, commitment to education and research and the importance of every member of the team. The Hospital's statement of values also focuses on being cost-effective, improving the health of the people in the State and being receptive to change that enhances success. Network and system development are priorities for the organization as well as supporting strategic initiatives.

Over the years, WVUH has experienced continual growth and has strategically invested in new facilities, programs, and services which have included: Ruby Memorial Hospital (1986); Physician Office Center (1990); Mary Babb Randolph Cancer Center (1990); Mountainview Regional Rehabilitation Center (1991); Blood and Marrow Transplant Program (1992); Ruby Day Surgery Center (1995); formation of West Virginia United Health System (1996); PET Scanner (1996); Chestnut Ridge Hospital (1998); Emergency Services Expansion (2003); gamma knife (2003); observation bed expansion (2004); and Cheat Lake Physician Services (2004).

**Results of Operations – January 1, 2001 – December 31, 2003**

Total revenue for 2003 was $334.0 million, up 10.8% from 2002 and 25.6% from 2001.  Net patient service revenue generated from patient care activities, which comprised approximately 97.1% of total revenue in 2003, was $324.3 million, up 10.8% from 2002 and 25.2% from 2001.  Patient volumes for WVUH as represented by inpatient discharges, including outpatient observations, have increased significantly over the past two years, up 4.7% in 2003 from 2002 and 12.5% from 2001.  Inpatient and outpatient surgeries increased dramatically during 2002 by 16.6% and reduced slightly in 2003 by 1.7%. Total adjusted patient discharges increased by 6.0% from 2002 to 2003 while adjusted days decreased by 2.4% reflecting improved operating efficiency.

Not unlike the balance of the healthcare industry, the management of the organization's cost structure is an ongoing challenge.  Management is focused on the recruitment and retention of qualified staff in many clinical areas in order to meet the demands of growing volumes, particularly in such areas as nursing, respiratory therapy, pharmacy, and radiology.  These efforts are often associated with increasing salary costs and the concurrent pressures on employee benefits.  Staying current with innovations and advances in medicine and technology also present challenges to management.  WVUH strives to utilize the most advanced drugs, implants and other technical advances available while managing the total cost of delivering care under limited payment structures.

Total operating expenses (before interest and depreciation) were $301.3 million in 2003, an increase of 11.1% from 2002 and 26% from 2001.  Salaries, wages and employee benefits in 2003, which accounted for approximately 48.5% of total operating expenses (before interest and depreciation) increased 12.3% over 2002 and 21.4% over 2001.  Costs of supplies and purchased services grew 9.7% from 2002 to 2003 and 30.9% from 2001 to 2003.  Growth in inpatient discharges, newborn deliveries, and outpatient surgeries were significant factors in the increase in cost of supplies and purchased services.   Medical supplies and pharmaceutical cost increases continue to be a challenge as new technologies and new drugs contribute heavily to growth in expenses. Pharmacy costs were limited in 2003 to an increase of 0.6% (on an adjusted patient day basis) due to the acquisition of drugs through the 340B program.  Supply costs on an adjusted patient day basis increased in 2003 from 2002 by 16.1%.

The provision for bad debts increased from $16.6 million in 2002 to $18.7 million in 2003. While a significant dollar increase, it is important to understand that the provision for uncollectible accounts grew primarily as a result of WVUH's growth in patient volumes. When viewed as a percentage of net patient service revenue, this provision increased modestly, from 5.7% in 2002 to 5.8% in 2003. Thus, this change does not reflect any fundamental change or deterioration in payor mix or collection performance.

Operating income before interest, depreciation and amortization increased from 2001 to 2003, up $2.5 million over 2002 and $6.0 million over 2001. This operating improvement is largely attributable to revenue growth, which more than offset the upward pressure on expenses.

Depreciation and amortization expense, both non-cash items, totaled $16.8 million in 2001, $19.5 million in 2002, and $21.9 million in 2003. These increases reflected capital investments made over the past several years, which have resulted in an average age of plant of approximately 8.6 years. Interest expense totaled $5.1 million in 2003, slightly down from $5.3 million in 2002 and $5.5 million in 2001.

Income from operations, which is considered by management to be the best indicator of the financial performance of continuing operations, was $5.6 million for 2003, compared to $5.4 million in 2002 and $4.4 million in 2001. The slight improvement in operating performance from 2001 to 2003 was largely attributable to volume and revenue growth at WVUH during the past two years.

With positive operating performance over the three-year period ended December 31, 2003 coupled with improving investment returns, the WVUH's total net assets increased by $11.2 million over that period. In 2003, a $2.5 million loss on early extinguishments of debt was recorded. Another major factor influencing the change in net assets is the change in market value of investments. Non-operating (losses) gains, representing primarily investment income, realized (losses) gains and other-than-temporary losses, totaled ($3.7) million in 2001, ($5.3) million in 2002, and $6.7 million in 2003. Unrealized appreciation (depreciation) on investments were $22.9 million in 2003, ($13.0) million in 2002, and ($6.3) million in 2001. At December 31, 2003, investment funds were allocated 51.2% to equities, 42.4% to fixed income, 4.5% to alternative investments (includes hedge funds, real assets, private equity, and fixed income alternative investments) , and 1.9% to cash and equivalents. Performance of the total fund was 17.62% compared to a balanced fund index of 18.22% for the year. Performance for the three-year period was 0.05% and for the five-year period was 2.24%.

During 2003, WVUH approved a proposal from the West Virginia University Foundation to jointly manage investment funds. The proposal enables the hospital to access the investment leadership of the foundation while allowing investment policy flexibility to meet the long-term investment objectives for hospital funds. Further, the hospital is able to maintain a separately managed portfolio while reducing investment fees where the use of common managers is consistent with investment objectives. Access to alternative investments is also available under a revised asset allocation.

### Recent Results of Operations – January 1, 2004 – September 30, 2004

For the nine-month period ended September 30, 2004, acute inpatient discharges are 11.1% above levels in fiscal year 2003 and total acute care days are above fiscal year 2003 by 13.2%. On an adjusted basis, total adjusted discharges are up 2,054 or 10.5% from September (YTD) 2003 while adjusted patient days are up 8,208 or 6.6%. The total average daily census for all services (including skilled nursing, psychiatric, observation, and newborn) was 4.4% above September 2003. Observation census has reduced significantly from 19.6 patients per day to 14.9 patients per day due to improved turnaround time in the new observation unit. While inpatient surgery cases (excluding endoscopy) decreased slightly (43 cases and 0.8%) compared to September 2003, outpatient cases are up by 166 or 2.1%. Endoscopy cases are up 1,011 and 66% in 2004. In addition, WVUH has experienced increases in volumes in cardiac catherization, observation, rehabilitation, diagnostic radiology, CT scan, and laboratory procedures compared to the same period last year.

WVUH's net patient services revenue increased 24.6%, or $59.1 million for the nine-month period, compared to the same period last year. This increase is due largely to the utilization increases described above and due to approximately $25.7 million increase in Medicaid payments under the Upper Payment Limit program. Total operating expenses have increased by 21.8% and $52.5 million from the same period last year due to increases in utilization, professional fees, medical/surgical supply costs, employee costs, West Virginia University School of Medicine support, and insurance costs.

Income from operations has increased by 161% when compared to the same period in 2003 generating an operating margin of 4.1% through September 30, 2004. The total margin is 8.7% and up from 2003's year-to-date margin of 2.9% due to improved operating performance and realized investment earnings. Through September 2004, WVUH experienced unrealized investment losses of ($11.6) million as compared to a $13.3 million unrealized gain during the same period in 2003. WVUH continues to transition to new investments as it refines its asset allocation and funds commitments in alternative investments as a result of changes approved by the investment committee.

**Strategic Affiliations/Shared Services**

The Hospital participates in certain shared service programs with other area healthcare providers. These programs have increased coordination among individual providers and have promoted quality healthcare services in a cost effective manner to the residents of the market area. These shared services include: a joint cardiac surgery program, an outpatient rehabilitation program (Morgantown Physical Therapy) and a rehabilitation hospital (HealthSouth Mountainview Rehabilitation Hospital) with Monongalia General Hospital. WVUH and Monongalia General Hospital each own a 35% interest in Morgantown Physical Therapy Associates (with the former sole owner thereof owning 22% interest and St. Joseph's Hospital in Buckhannon owning 8%). Finally, WVUH and Monongalia General Hospital each own a 10% interest in the HealthSouth Mountainview Rehabilitation Hospital; HealthSouth owns the remaining 80% interest in the rehabilitation hospital.

**Operating Plan and Strategic Initiatives**

The operating plan and strategic initiatives for WVUH reflect (1) a continuing focus on performance improvement, (2) the ongoing effort to change the nature of the Hospital organization in terms of its role as an employer, (3) the Hospital's position as a key member of the System, and (4) a continuing integration within the Robert C. Byrd Health Sciences Center of West Virginia University (HSC), particularly as it relates to the Health and Sciences Center planning process. Senior management of the Hospital has determined that the long term success of WVUH as a health care provider will be determined by how well it performs against the following three measures; patient satisfaction, clinical quality, and cost. To this end, the Hospital has established a number of Operating and Strategic Initiatives with respect to (1) facility expansion and improvement and capacity management, (2) program development in cardiology, cancer, neurosciences, orthopedics, and emergency services, (3) clinical quality improvement, (4) system integration, (5) recruitment and retention, (6) patient satisfaction, (7) financial management, (8) risk management and patient safety, (9) information technology, and (10) technology management.

**Patient Satisfaction**

The Hospital assesses patient satisfaction in a variety of ways including comprehensive written surveys, patient interviews, and departmentally based surveys. Overall, 93% of all patients surveyed recommend WVUH to their family and friends. The management team continues to involve staff in assessing and improving patient satisfaction through staff review of survey results, patient satisfaction committee, and unit recognition to honor improvements.

**Cost and Clinical Quality**

While the Hospital's operating costs per patient are competitive with other tertiary providers in the region, the leadership believes that management of cost and quality must be integrated into performance improvement process. The challenge to staff, leadership, and medical staff is to constantly identify ways in which the Hospital's performance can be improved.

The Hospital continues to foster a partnership with the medical staff through joint planning and operating activities. To this end, the Hospital and medical staff are implementing a service line management approach to coordinate care in a number of specific multi-disciplinary services lines including heart, cancer, endoscopy, women/children and trauma services. The Hospital is also participating on a System level to strengthen and grow heart and cancer "signature services", and to regionally and seamlessly coordinate the care provided to any patient of the System. The Hospital continues to grow its clinical information capabilities by monitoring clinical quality indicators including outcome assessments, key indicators, protocols, practice guidelines and care maps. In addition, service quality measures have been established to monitor wait times, dietary and housekeeping service, admission and discharge process, response times and patient scheduling.

**Future Focus**

WVUH's leadership has established several key strategic initiatives centered on the goal of providing unquestioned clinical and service quality at a competitive cost. At the core of these initiatives is the goal to empower staff to focus on delivering the best care to patients. The strategic initiatives are focused in the following areas:

a.  Patient satisfaction;
b.  Employee satisfaction;
c.  Quality and patient safety;
d.  Financial performance;
e.  Growing the business;
f.  Clinical information systems.

The leadership of the Hospital has established specific objectives in these areas and is working actively with employees and medical staff to continue to develop the business, strengthen the culture, improve organizational performance, and continue to enhance the organization through System development.

**Litigation**

WVUH maintains a self-insurance program for professional liability and general liability. At any given time, WVUH has a number of lawsuits pending against it (i) alleging professional liability; or (ii) involving claims which are unrelated to professional liability. Based upon the nature of the aforesaid claims and given WVUH's self-insurance program and excess liability coverage, WVUH management believes that if such pending suits were decided unfavorably to WVUH, there would be no material adverse affect on its financial condition.

In addition, to the knowledge of WVUH management, there are no suits threatened against WVUH which could have a material adverse affect on its financial condition.

## II.    City Hospital, Inc.

Total revenue for 2003 was $79.8 million, up 9% from 2002 and 13% from 2001. Net patient service revenue generated from patient care activities, which comprised approximately 98% of total revenue in 2003, was $78.3 million, up 9% from 2002 and 12% from 2001. Discharges increased over the three year period, though it dipped slightly in 2002. Discharges in 2003 grew 4% from 2002 and 2% from 2001. Average

A-33

length of stay has continued to decline from 4.87 days in 2001 to 4.58 days in 2003. Total surgeries has grown 26% since 2001, the majority of the growth stemming from outpatient surgeries: inpatient surgeries grew by 2% while outpatient surgeries grew by 38% over the three year period.

Total operating expenses (before interest and depreciation) was $73.3 million in 2003, an increase of 4% from 2002 and 8% from 2001. Salaries, wages and employee benefits in 2003, which accounted for approximately 55% of total operating expenses (before interest and depreciation) increased 7% from 2002 and 11% from 2001.

Income from operations, including interest and depreciation costs, turned positive in 2003 to $0.9 million, up from a loss of $2.8 million in 2002 and a loss of $2.5 million in 2001. For the recent 9 month period, income from operations has tripled the same 9-month period of the previous year; income from operations for 9-months fiscal 2004 was $1.6 million, up 193% from the same period in fiscal 2003.

### III.    Jefferson Memorial Hospital

Total revenue for 2004 was $35.0 million, up 7% from 2003 and 8% from 2002. Net patient service revenue generated from patient care activities, which comprised approximately 99% of total revenue in 2004, was $34.7 million, up 7% from 2003 and 8% from 2002. Discharges declined over the three year period: discharges in 2004 declined 2% from 2003 and 13% from 2002. Total surgeries grew 23% since 2002, the majority of the growth stemming from outpatient surgeries: inpatient surgeries grew by 9% while outpatient surgeries grew by 27% over the three year period.

Total operating expenses (before interest and depreciation) was $34.0 million in 2004, an increase of 4% from 2003 and 13% from 2002. Salaries, wages and employee benefits in 2004, which accounted for approximately 43% of total operating expenses (before interest and depreciation) decreased 1% from 2003 and 7% from 2002.

Income from operations, including interest and depreciation costs, was near break-even in 2004 with a $0.07 million loss, up from a loss of $1.3 million in 2003 and down from a gain of $0.8 million in 2002.

### PART VI

### NON-OBLIGATED SYSTEM PARTICIPANTS

This part of Appendix A presents information concerning participants of the System that are not members of the Obligated Group. *The only participants of the System that have any liability with respect to the Series 2005 Bonds are West Virginia University Hospitals, Inc., City Hospital, Jefferson Memorial Hospital and CHF, as the only members of the Obligated Group.*

**Non-Obligated Participants**

United Hospital Center, Inc. ("UHC"). UHC is a nonprofit community hospital located in Clarksburg, West Virginia, offering a full range of general acute care, outpatient care, psychiatric care, and skilled nursing care services primarily to the residents of Harrison County and North Central West Virginia. UHC also functions as a major referral center in North Central West Virginia's health care system. In January 1996, UHC formed Maplewood Communities Inc. ("Maplewood"), a nonprofit organization that provides a senior living community in Harrison County as part of a network of health care services to provide a continuum of care to the community. Maplewood consists of 84 independent living units, 44 assisted living units, and a common support area. In July 1996, UHC purchased all of the outstanding stock of The Heritage, Inc. ("The Heritage"), a long-term care facility. The principal operations of The Heritage provide intermediate nursing care services to residents of North Central West Virginia.

UHC has filed a Certificate of Need application with the West Virginia Health Care Authority for a replacement hospital. The new facility would be located with convenient access to Interstate 79, and would contain 318 private rooms, 56 short-stay rooms and 740,000 square feet of total capacity. Total cost of this facility is currently estimated at approximately $280 million, to be funded through a combination of debt, equity and fundraising. The Health Care Authority issued a decision granting the Certificate of Need (CON) on October 24, 2003. This decision was appealed by Fairmont General Hospital and upheld by a state administrative law judge on May 3, 2004. That decision was also appealed by Fairmont General Hospital to the Circuit Court of Marion County. On November 24, 2004, Judge Fox of the Circuit Court of Marion County issued an order reversing the decision of the Health Care Authority. United Hospital Center is reviewing its options. UHC believes an appeal to the West Virginia Supreme Court has merit. The West Virginia Supreme Court is the final level of appeal available under the CON regulations. UHC is also able to refile a CON application as the regulation, which was the basis for the court's reversal, has since been amended and would no longer provide a basis to deny a certificate of need. No assurance can be provided at this time as to the outcome of a possible appeal to the West Virginia Supreme Court or a new CON application process nor the timing or amount of any future debt associated with the replacement hospital project.

Allied Health Services, Inc. ("Allied").   Allied is a for-profit corporation incorporated in the State of West Virginia. Allied is engaged in the business of brokering laboratory services and holding real estate for hospital purposes. The Child Development Center, which promotes the advancement of area children in the Morgantown, West Virginia area, and a retail pharmacy were moved from Allied to WVUH in 2004 to enhance operating efficiencies.

United Physicians Care, Inc. ("UPC").   UPC is a nonprofit corporation that operates several family practice clinics in north central West Virginia and western Maryland.

Health Partners Network Services ("HPN").   HPN is a taxable not-for-profit joint venture with participating physicians having a 50% equity interest.

**Selected Statistical Information Regarding Non-Obligated Participants**

The aggregate unrestricted revenues of the non-obligated participants in the System were $180.8 million in 2003 (excluding the effects of intercompany eliminations), representing approximately 34.6 percent of the System's aggregate revenues. Including non-operating gains, the non-obligated System participants generated $6.5 million excess of revenues over expenses during 2003. As of December 31, 2003, the non-obligated participants had total assets of $248 million (excluding the effects of intercompany eliminations), or 32.4 percent of the System's total assets.

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX B**

**FINANCIAL STATEMENTS OF WEST VIRGINIA UNIVERSITY HOSPITALS, INC.**

[THIS PAGE INTENTIONALLY LEFT BLANK]

AUDITED FINANCIAL STATEMENTS

West Virginia University Hospitals, Inc.

Years ended December 31, 2003 and 2002
with Report of Independent Auditors

West Virginia University Hospitals, Inc.

Audited Financial Statements

Years ended December 31, 2003 and 2002

## Contents

Report of Independent Auditors ................................................................................................. 1

Audited Financial Statements

Balance Sheets ........................................................................................................................... 2
Statements of Operations and Changes in Unrestricted Net Assets ........................................... 4
Statements of Changes in Net Assets ........................................................................................ 5
Statements of Cash Flows .......................................................................................................... 6
Notes to Financial Statements .................................................................................................... 7

**Ξ‖ ERNST & YOUNG**

■  Ernst & Young LLP
   109 Gne Mai Place
   Pittsburgh, PA 15222

■ Phone: (412) 644-7800
  www.ey.com

## Report of Independent Auditors

Board of Directors
West Virginia University Hospitals, Inc.

We have audited the accompanying balance sheets of West Virginia University Hospitals, Inc., a controlled member of West Virginia United Health System, Inc., as of December 31, 2003 and 2002, and the related statements of operations and changes in net assets and cash flows for the years then ended. These financial statements are the responsibility of the Hospital's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of West Virginia University Hospitals, Inc. at December 31, 2003 and 2002, and the results of its operations, changes in net assets, and cash flows for the years then ended in conformity with accounting principles generally accepted in the United States.

*Ernst + Young LLP*

April 5, 2004

1

# West Virginia University Hospitals, Inc.

## Balance Sheets

|  | December 31 | | |
|---|---:|---|---:|
|  | **2003** | | 2002 |
|  | *(In Thousands)* | | |
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | **$ 4,572** | $ | 3,556 |
| Patient accounts receivable (net of allowance for doubtful | | | |
| accounts:  2003—$16,402; 2002—$14,225) | **53,150** | | 52,146 |
| Other receivables | **8,497** | | 7,923 |
| Inventories | **5,486** | | 3,055 |
| Prepaid expenses | **1,353** | | 1,237 |
| Estimated amounts due from third party payors | **6,343** | | 9,178 |
| Assets whose use is limited required to satisfy current | | | |
| obligations | **6,539** | | 6,864 |
| Total current assets | **85,940** | | 83,959 |
| | | | |
| Assets whose use is limited: | | | |
| Board-designated funds: | | | |
| Funded depreciation | **112,895** | | 97,531 |
| Debt repayment fund | **83,662** | | 71,154 |
| Malpractice self-insurance trust fund | **12,190** | | 10,520 |
| Funds held by bond trustee | **72,573** | | 10,560 |
| Less funds that are required to satisfy current | | | |
| obligations | **(6,539)** | | (6,864) |
| | **274,781** | | 182,901 |
| | | | |
| Goodwill (net of accumulated amortization: 2002—$1,350) | **-** | | 1,707 |
| Property, plant, and equipment, net | **132,749** | | 119,105 |
| Restricted assets held by the WVU Foundation | **3,292** | | 2,956 |
| Other assets | **10,256** | | 5,983 |
| | **$ 507,018** | $ | 396,611 |

2

|  | December 31 | |
|---|---|---|
|  | **2003** | 2002 |
|  | *(In Thousands)* | |
| **Liabilities and net assets** | | |
| Current liabilities: | | |
| Accounts payable | **$ 16,634** | $ 16,092 |
| Accrued wages and fringe benefits | **13,450** | 11,018 |
| Current portion of bonds payable | **4,490** | 5,700 |
| Current portion of self-insurance liability | **2,049** | 2,564 |
| Accrued interest payable | **372** | 426 |
| Deferred liabilities | **411** | 612 |
| Total current liabilities | **37,406** | 36,412 |
| | | |
| Long-term obligations: | | |
| Bonds payable (net of unamortized bond premium and | | |
| discount: 2003—$503; 2002—$1,264) | **177,358** | 103,491 |
| Self-insurance liability | **9,466** | 6,991 |
| Derivative financial instruments | **2,972** | - |
| | **189,796** | 110,482 |
| | | |
| Net assets: | | |
| Unrestricted | **276,524** | 246,761 |
| Temporarily restricted | **2,795** | 2,478 |
| Permanently restricted | **497** | 478 |
| Total net assets | **279,816** | 249,717 |

|  |  |  |
|---|---|---|
| **$ 507,018** | $ | 396,611 |

*See accompanying notes.*

3

# West Virginia University Hospitals, Inc.

## Statements of Operations and Changes in Unrestricted Net Assets

|  | Years ended December 31 | |
|---|---|---|
|  | 2003 | 2002 |
|  | (In Thousands) | |
| **Unrestricted revenues, gains, and other support** | | |
| Net patient service revenue | $ 324,265 | $ 292,554 |
| Other revenue | 9,716 | 8,750 |
| Total revenues | 333,981 | 301,304 |
| **Expenses** | | |
| Salaries and wages | 115,940 | 104,293 |
| Employee benefits | 30,230 | 25,800 |
| Supplies and purchased services | 136,430 | 124,414 |
| Depreciation and amortization | 21,878 | 19,455 |
| Provision for bad debts | 18,743 | 16,629 |
| Interest | 5,120 | 5,288 |
| Total expenses | 328,341 | 295,879 |
| Income from operations | 5,640 | 5,425 |
| Nonoperating gains (losses): | | |
| Investment income and net realized gains (losses) and other than temporary losses of $522 in 2003 and $4,800 in 2002 | 6,775 | (5,228) |
| Loss on early extinguishment of debt | (2,482) | - |
| Other | (77) | (63) |
| Excess of revenues over expenses | 9,856 | 134 |
| Other changes in unrestricted net assets: | | |
| Unrealized appreciation (depreciation) on investments | 22,876 | (12,984) |
| Change in fair value of derivatives | (2,972) | - |
| Capital donations | 486 | 308 |
| Transfers to West Virginia United Health System, Inc. | (483) | (207) |
| Increase (decrease) in unrestricted net assets | 29,763 | (12,749) |
| Unrestricted net assets, beginning of year | 246,761 | 259,510 |
| Unrestricted net assets, end of year | $ 276,524 | $ 246,761 |

*See accompanying notes.*

West Virginia University Hospitals, Inc.

Statements of Changes in Net Assets

|  | Years ended December 31 | |
|---|---|---|
|  | 2003 | 2002 |
|  | (In Thousands) | |
| Unrestricted net assets: |  |  |
| Excess of revenues over expenses | $ 9,856 | $ 134 |
| Unrealized appreciation (depreciation) on investments | 22,876 | (12,984) |
| Change in fair value of derivatives | (2,972) | - |
| Capital donations | 486 | 308 |
| Transfers to West Virginia United Health System, Inc. | (483) | (207) |
| Increase (decrease) in unrestricted net assets | 29,763 | (12,749) |
| Temporarily restricted net assets: |  |  |
| Change in temporarily restricted assets held by the |  |  |
| WVU Foundation, net | 317 | 779 |
| Increase in temporarily restricted net assets | 317 | 779 |
| Permanently restricted net assets: |  |  |
| Change in permanently restricted assets held by the |  |  |
| WVU Foundation, net | 19 | (65) |
| Increase (decrease) in permanently restricted net assets | 19 | (65) |
| Increase (decrease) in net assets | 30,099 | (12,035) |
| Net assets, beginning of year | 249,717 | 261,752 |
| Net assets, end of year | $ 279,816 | $ 249,717 |

*See accompanying notes.*

5

# West Virginia University Hospitals, Inc.

## Statements of Cash Flows

|  | Years ended December 31 | |
|---|---|---|
|  | 2003 | 2002 |
|  | *(In Thousands)* | |
| **Cash flows from operating activities** | | |
| Increase (decrease) in net assets | $      30,099 | $      (12,035) |
| Adjustments to reconcile change in net assets to net cash | | |
|   provided by operating activities: | | |
|     Change in restricted assets held by WVU Foundation | (336) | (714) |
|     Net realized and unrealized (gains) losses on investments, | | |
|       including other than temporary losses | (23,052) | 24,503 |
|     Change in fair value of derivatives | 2,972 | - |
|     Loss on disposal of plant and equipment | 77 | 63 |
|     Loss on early extinguishment of debt | 2,482 | - |
|     Depreciation and amortization | 21,878 | 19,455 |
|     Provision for bad debts | 18,743 | 16,629 |
|     Contributions for fixed assets | (486) | (308) |
|     Transfers to West Virginia United Health System, Inc. | 483 | 207 |
|     Changes in operating assets and liabilities: | | |
|       Patient accounts receivables | (19,747) | (18,575) |
|       Other receivables | (574) | 5,616 |
|       Estimated amounts due from third party payors | 2,835 | (3,677) |
|       Inventories | (2,431) | (97) |
|       Prepaid expenses | (116) | 104 |
|       Other assets | (3,511) | 273 |
|       Accounts payable | 542 | 2,350 |
|       Accrued wages and fringe benefits | 2,432 | 469 |
|       Accrued interest payable | (54) | (19) |
|       Deferred liabilities | (201) | 199 |
|       Self-insurance liability | 1,960 | (315) |
| Net cash provided by operating activities | 33,995 | 34,128 |
| | | |
| **Cash flows from investing activities** | | |
| Acquisition of plant and equipment, net of disposals | (33,747) | (30,232) |
| Increase in assets whose use is limited, net | (68,503) | (4,842) |
| Net cash used in investing activities | (102,250) | (35,074) |
| | | |
| **Cash flows from financing activities** | | |
| Repayment of long-term obligations | (5,700) | (4,524) |
| Defeasance of Series 2002 and 1993 Bonds | (64,762) | - |
| Repayment of line of credit | - | (2,000) |
| Proceeds from Series 2003 Bonds, net | 139,730 | - |
| Proceeds from Series 2002 Bonds | - | 10,000 |
| Contributions for fixed assets | 486 | 308 |
| Transfers to West Virginia United Health System, Inc. | (483) | (207) |
| Net cash provided by financing activities | 69,271 | 3,577 |
| | | |
| Increase in cash | 1,016 | 2,631 |
| Cash at beginning of year | 3,556 | 925 |
| Cash at end of year | $      4,572 | $      3,556 |

*See accompanying notes.*

West Virginia University Hospitals, Inc.

Notes to Financial Statements

Years ended December 31, 2003 and 2002

## 1. Organization

In 1960, West Virginia University (the University) commenced operations of a tertiary care teaching hospital as a component of the Medical Center of the University. In 1984, the West Virginia legislature adopted legislation which authorized separation of the hospital operations from the University and establishment of a separate corporate entity. The West Virginia University Hospitals, Inc. (the Hospital or WVUH) was incorporated as a nonstock, not-for-profit corporation and, by an agreement of transfer and lease dated July 1, 1984, assumed the operation of and responsibility for the Hospital. The 440-bed hospital, located in Morgantown, West Virginia, serves as a major statewide and regional health care referral center and provides the principal clinical education and research site for the University.

As part of the transfer agreement with the Board of Trustees and the University, the Hospital is required to provide a minimum of $4,000,000 per year in education expense for the interns and residents and an annual clinical teaching subsidy of not less than $6,000,000. Management believes both requirements have been exceeded for 2003 and 2002.

In December 1996, the Hospital entered into an agreement to affiliate with United Hospital Center, Inc. (UHC). The hospitals received certificate of need approval from the State of West Virginia's Health Care Cost Review Authority on April 15, 1997. As of April 16, 1997, the West Virginia United Health System, Inc. (the System) became operational. The System is the sole corporate member of the Hospital and UHC and has certain authority over each hospital, including the authority to elect each hospital's governing board.

On October 1, 1998, the Hospital acquired certain assets and liabilities from Psychiatric Institute of West Virginia, Inc. (PIWV) for $14,616,000. The purchase price exceeded the fair value of the net assets acquired by approximately $2,900,000. The excess of the purchase price over the fair value of the net assets acquired was recorded as goodwill and was being amortized over 20 years. In 2002, the Hospital accelerated the amortization of the balance and recorded additional amortization expense of $700,000. In 2003, the remaining goodwill balance of $1,707,000 was written off and is included in depreciation and amortization expense on the statement of operations and changes in unrestricted net assets.

## 2. Significant Accounting Policies

### Cash and Cash Equivalents

Cash and cash equivalents consist of cash on deposit and investments with maturities of three months or less. The market value of the cash and cash equivalents approximates cost.

7

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

## 2. Significant Accounting Policies (continued)

The Hospital has cash deposits and short-term investments with various banks and financial institutions consisting principally of demand deposits and repurchase agreements. The total amount of cash on deposit in these banks exceeds the federally insured limits at December 31, 2003.

### Inventories

Inventories are stated at the lower of first-in, first-out cost or market. The Hospital changed its inventory capitalization policy to count and capitalize operating room, radiology, and Cardiac Catheterization lab supplies approximating $2,300,000 at December 31, 2003. Similar supplies were expensed in prior years.

### Investments

Investments in equity securities with readily determinable fair values and all investments in debt securities are classified as nontrading and are recorded at fair value in the balance sheet. Investment income, including realized gains and losses determined by the weighted-average method and other than temporary losses, is included in excess of revenues over expenses. Unrealized gains and losses on investments, excluding other than temporary losses, are excluded from excess of revenues over expenses and are recorded as an other change in unrestricted net assets.

The Hospital continually reviews nontrading investments for impairment conditions that indicate that an other than temporary decline in market value has occurred. In conducting this review, numerous factors are considered which, individually or in combination, indicate that a decline is other than temporary and that a reduction of the carrying value is required. These factors include specific information pertaining to an individual company or a particular industry and general market conditions that reflect prospects for the economy as a whole. Based on this review, other than temporary losses of approximately $522,000 and $4,800,000 were recorded in 2003 and 2002, respectively.

Assets whose use is limited includes assets held by a trustee under indenture agreements and designated assets set aside by the Board of Directors for future capital improvements, debt payments, and malpractice insurance payments over which the Board retains control and may at its discretion subsequently use for other purposes.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

## 2. Significant Accounting Policies (continued)

### Property, Plant, and Equipment

Property, plant, and equipment are carried at cost or fair market value at the date of gift for donated capital. The Hospital provides for depreciation of plant and equipment on a straight-line method at rates designed to amortize the cost of these assets over their estimated useful lives.

### Self-Insurance Liability

The self-insurance liability represents estimated medical malpractice settlements and includes estimates of the ultimate costs for both reported claims and claims incurred but not reported. The Hospital records a provision for estimated medical malpractice settlements based upon actuarially determined amounts. The Hospital makes deposits to a revocable trust fund consistent with actuarial determinations.

### Net Patient Service Revenue

Patient accounts receivable and net patient service revenue are primarily derived from patients who reside in the West Virginia, Western Pennsylvania, and Western Maryland geographic area. Net patient service revenue is reported at established rates in the period in which services are provided. The majority of the Hospital's services are rendered to patients under Medicare, Blue Cross, Public Employees Insurance Agency (PEIA), and both West Virginia and Pennsylvania Medicaid programs. Services provided under these programs are reimbursed based on a combination of historical costs, prospectively determined rates, and a percentage of customary charges. The amounts received under these programs are less than the established hospital rates and the differences are reported as contractual allowances to arrive at net patient service revenue. Amounts received under these programs are subject to review and final determination by program intermediaries or their agents. The Hospital believes that a reasonable provision has been made in the accompanying financial statements for anticipated adjustments.

Pursuant to the provisions of the West Virginia Code, the West Virginia Health Care Authority (HCA) has been empowered to regulate the Hospital's billing rates from nongovernmental payors through limitation orders compiled from budgets and rate schedules submitted by the Hospital on a periodic basis.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

## 2. Significant Accounting Policies (continued)

Net revenues from the Medicare and Medicaid programs accounted for approximately 29% and 16%, respectively, of the Hospital's net patient service revenue for the year ended December 31, 2003 and 30% and 20%, respectively, for the year ended December 31, 2002. Laws and regulations governing the Medicare and Medicaid programs are extremely complex and subject to interpretation. As a result, there is at least a reasonable possibility that recorded estimates will change by material amounts in the near term. The Hospital believes that it is in compliance with all applicable laws and regulations and is not aware of any pending or threatened investigations involving allegations of potential wrongdoing that would be material to the financial statements. While no such regulatory inquiries have been made, compliance with such laws and regulations can be subject to future government review and interpretation, as well as significant regulatory action, including fines, penalties, and exclusion from the Medicare and Medicaid programs.

Significant concentrations of net patient accounts receivable at December 31, 2003 and 2002, respectively, include Medicare—19% and 19%, Medicaid—19% and 24%, Blue Cross—10% and 10%, and Commercial Insurance—11% and 11%.

The Hospital performs an evaluation of the collectibility of net revenues recorded and records an allowance for doubtful accounts based on probability of collection.

### Charity Care

The Hospital provides care to patients who meet certain criteria under its charity care policy without charge or at amounts less than its established rates. Because the Hospital does not pursue collection of amounts determined to qualify as charity care, they are not reported in net patient service revenue.

### Income Taxes

The Hospital has received a determination from the Internal Revenue Service that it is exempt from federal income taxes under Section 501(a) of the Internal Revenue Code by reason of being an organization described in Section 501(c)(3). Section 501(c)(3) includes among others, those organizations operated exclusively for charitable purposes. The Hospital is exempt from state income taxes under applicable state statutes.

10

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

### 2. Significant Accounting Policies (continued)

**Derivatives**

The Hospital utilizes derivative financial instruments to reduce interest rate risks. The Hospital does not hold or issue derivative financial instruments for trading purposes. The Hospital follows the provisions of SOP 02-2, *Accounting for Derivative Instruments and Hedging Activities by Not-for-Profit Health Care Organizations,* and the Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities* (SFAS 133). These statements establish accounting and reporting standards for derivative instruments and hedging activities. They require that an entity recognize all derivatives as either assets or liabilities and measure those instruments at fair value. The changes in the fair value of the Hospital's derivative instruments are recorded as changes in net assets as they qualify for hedge accounting.

**Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Asset Impairment**

The Hospital follows Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* (the Statement). The Hospital considers whether indicators of impairment are present and performs the required recoverability test as prescribed by the Statement. Write-downs due to impairment are charged to operations at the time the impairment is identified.

**Excess of Revenues Over Expenses**

The statement of operations and changes in net assets includes excess of revenues over expenses as a performance indicator. Included in excess of revenues over expenses are all changes in unrestricted net assets other than contributions for the purchase of property and equipment, transfers to the System, and unrealized gains and losses on investments, excluding other than temporary losses.

11

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

## 2. Significant Accounting Policies (continued)

### Operating Activities and Nonoperating Losses

Only those activities directly associated with the furtherance of the Hospital's primary mission are considered to be operating activities. Other activities that result in gains or losses are considered to be nonoperating income (loss). Nonoperating income (loss) includes interest and other earnings or losses on investments and gains and losses on the sale of fixed assets.

### Restricted Assets Held by West Virginia University Foundation

The West Virginia University Foundation, Inc. (the WVU Foundation) holds cash and securities which are available for the Hospital's purposes, subject to donor restrictions. Temporarily restricted net assets are those whose use has been limited by donors to a specific time period or purpose, primarily for capital expenditures. Permanently restricted net assets have been restricted by donors to be maintained in perpetuity.

The Hospital records assets or expenses, as appropriate, along with corresponding revenue or donated capital, as funds are transferred to the Hospital and expended according to the donor's intended purposes.

## 3. Net Patient Service Revenue

The Hospital maintains records to identify and monitor the level of charity care it provides. These records include the amount of charges forgone for services furnished under its charity care policy. Charity care and contractual allowances, in thousands, for the years ended December 31, 2003 and 2002 are as follows:

|  | 2003 | 2002 |
|---|---|---|
| Gross patient service revenues | $ 550,674 | $ 483,260 |
| Less: Provision for contractual allowances | (224,553) | (191,699) |
| Charity care | (13,525) | (12,654) |
| Add: Other adjustments and settlements | 11,669 | 13,647 |
| Net patient service revenue | $ 324,265 | $ 292,554 |

In 1991, the legislature of the State of West Virginia approved a disproportionate share plan. The Hospital is currently being paid under an amendment to the program, which was implemented June 1, 1993. This plan reimburses hospitals in the state that provide Medicaid services and meet

12

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

### 3. Net Patient Service Revenue (continued)

other eligibility criteria. Under the disproportionate share program, the Hospital received $9,148,000 and $8,971,000 in 2003 and 2002, respectively, included in other adjustments and settlements in the table above. Also included in other adjustments and settlements in 2003 and 2002 are increases of approximately $2,521,000 and $4,676,000, respectively, related to the changes in the estimated amounts due to/from third party payors.

The State of West Virginia Disproportionate Share Hospital State Plan was amended to provide for a settlement process among participating hospitals. The state has not completed the settlement process for the years subsequent to 1996. The Bureau for Medical Services of the State of West Virginia Department of Health and Human Resources has contracted with a third party vendor to assist with the audit settlement process for the Disproportionate Share Hospital (DSH) State Plan. The laws and regulations governing the DSH settlement process are complex, involving statistical data from all participating hospitals, and subject to interpretation. Accordingly, the Hospital is not able to estimate the possible loss or gain that could arise upon completion of the DSH settlement process for the remaining years. The results of the resolution of the settlement process could materially impact the Hospital's future results of operations or cash flows in a particular period.

Effective June 1, 1993, the legislature of the State of West Virginia enacted a broad-based health care related tax. This tax is based upon net patient service revenue of the Hospital. The Hospital incurred approximately $7,035,000 and $6,125,000 in 2003 and 2002, respectively, related to this tax. This expense is included in the supplies and purchased services category in the statements of operations and changes in unrestricted net assets.

### 4. Assets Whose Use Is Limited

The Hospital signed an agreement with the WVU Foundation, an affiliate of the West Virginia University, to manage the investments of the Hospital effective January 1, 2003. On that date, the Hospital transferred its investment holdings from the Bank of New York to State Street, the custodian of WVU Foundation's investment portfolio. During 2003, most of the Hospital's holdings were liquidated and moved into commingled funds with WVU Foundation. The investment income and realized and unrealized losses are allocated to the Hospital based upon its relative ownership of each fund.

As of December 31, 2003, the fair value of the assets whose use is limited managed by WVU Foundation is invested 2% in cash and cash equivalents, 50% in equities, 43% in fixed income including corporate bonds and United States Treasuries, and 5% in alternative investments,

13

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

#### 4. Assets Whose Use Is Limited (continued)

including hedge funds and real estate. As of December 31, 2002, the fair value of assets whose use is limited, which was held by the Bank of New York, was invested 6% in cash equivalents, 44% in equities, and 50% in fixed income investments.

Investment income and net realized and unrealized gains (losses) from assets whose use is limited, cash, and derivatives, in thousands, are comprised of the following for the years ended December 31, 2003 and 2002:

|  | 2003 | 2002 |
|---|---|---|
| Nonoperating (losses) gains: |  |  |
| Net investment income | $ 6,599 | $ 6,291 |
| Net realized gains and losses and other than temporary losses of $522 in 2003 and $4,800 in 2002 | 176 | (11,519) |
|  | 6,775 | (5,228) |
| Other changes in net assets: |  |  |
| Unrealized appreciation (depreciation) on investments | 22,876 | (12,984) |
| Changes in fair value of derivatives | (2,972) | - |
|  | $ 26,679 | $ (18,212) |

The following table summarizes the fair value (in thousands) of securities included in assets whose use is limited by board-designation and trustee-held that have gross unrealized losses (the amount by which historical cost exceeds the fair value) as of December 31, 2003. These declines in value are determined to be temporary by the Hospital. The schedule further segregates the securities that have been in a gross unrealized loss position as of December 31, 2003, for less than 12 months and those for 12 months or more. The gross unrealized losses of less than 12 months of $(778,000), representing a modest decline in fair value below cost are reflective of current market fluctuations. Investment advisors expect recovery in the short-term future. These individual investments have projected recoveries in value in 2004. The gross unrealized losses of twelve months or longer of $(121,000), representing a decline of 7% below cost, are reflective of

14

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

### 4. Assets Whose Use Is Limited (continued)

current market conditions with projected recoveries of the underlying securities in 2004. The decline in values is determined by management to be temporary, and unrealized losses have not been reclassified to realized as of December 31, 2003.

| Description of Securities | Less than 12 Months | | 12 Months or Longer | | Total | |
|---|---|---|---|---|---|---|
| | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| | *(In Thousands)* | | | | | |
| Fixed income | $ 22,547 | $ (483) | $ - | $ - | $ 22,547 | $ (483) |
| Inflation index bond fund | 4,228 | (295) | - | - | 4,228 | (295) |
| Total fixed income funds | 26,775 | (778) | - | - | 26,775 | (778) |
| Common stock funds | - | - | 1,454 | (121) | 1,454 | (121) |
| Total temporarily impaired securities | $ 26,775 | $ (778) | $ 1,454 | $ (121) | $ 28,229 | $ (899) |

### 5. Property, Plant, and Equipment

Property, plant, and equipment and the related accumulated depreciation, in thousands, consist of the following at December 31:

| | 2003 | 2002 |
|---|---|---|
| Land and land improvements | $ 11,521 | $ 7,513 |
| Buildings | 92,639 | 85,544 |
| Equipment | 202,403 | 189,093 |
| Leasehold improvements | 891 | 943 |
| | 307,454 | 283,093 |
| Less accumulated depreciation | 187,175 | 172,141 |
| | 120,279 | 110,952 |
| Construction in progress | 12,470 | 8,153 |
| Plant and equipment, net | $ 132,749 | $ 119,105 |

15

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

### 5. Property, Plant, and Equipment (continued)

In 2001, the Hospital constructed the West Virginia Eye Institute on its campus. A portion of the building's cost, $2.7 million, was funded by grants from the federal government through West Virginia University. The portion of the building funded by the grants is being used by the University for research and is recorded by the University as a capital leased asset in their statements. The Hospital has legal title to the building and leases the research space to the University over a 50-year lease period. The federal government retains an interest in the property and approximately 33% of the funds from disposition of the property.

### 6. Long-Term Obligations

On April 1, 1985, the County Commission of Monongalia County, acting in its official capacity, issued $92,415,000 of Hospital Revenue Bonds on behalf of the Hospital to finance the construction of the Hospital. On October 1, 1986, the West Virginia Hospital Finance Authority (the Authority) issued $116,545,000 of Series 1986 Bonds on behalf of the Hospital to refinance the 1985 Bonds and to provide additional financing for the project. On September 15, 1993, the Authority issued $72,935,000 of Series 1993 Bonds on behalf of the Hospital to refinance and defease $86,280,000 of the 1986 Bonds. On October 15, 1998, the Authority issued $44,345,000 of Series 1998 Bonds on behalf of the Hospital to refinance and defease the remaining portion of the 1986 Bonds. The Series 1998 Bonds have fixed interest rates between 3.75% and 5% per annum. The Serial Bonds of the 1998 issue have annual maturities beginning 2002 through 2013. The Term Bonds of the 1998 issue have maturities of June 1, 2015, 2018, and 2022. On July 10, 2002, the West Virginia Hospital Finance Authority issued $10,000,000 of Series 2002 B-1 Bonds on behalf of the Hospital for the acquisition of certain capital improvements, including equipment.

On August 1, 2003, the Authority issued $139,730,000 of Series A, B, C, and D 2003 Bonds on behalf of the Hospital to refinance the 1993 and 2002 Bonds and to provide financing for new construction. The Series A serial bonds of the 2003 issue have fixed interest rate between 3.0% and 3.5% and have annual maturities beginning 2004 through 2010. The Series B, C, and D term bonds of the 2003 issue are auction rate certificates. Series B matures on June 1, 2016. Series C and D mature on June 1, 2033. Total construction costs are expected to be approximately $73,000,000.

16

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

## 6. Long-Term Obligations (continued)

In connection with the Series 2003 B and C Bonds, the Hospital entered into two ISDA master agreements with UBS Financial Services, Inc. (UBS) on August 20, 2003 in order to hedge the LIBOR component of the interest rate on the auction rate bonds. The agreements comprise an interest rate cash flow swap in which the Hospital pays a fixed interest rate to UBS and receives 70% of LIBOR from UBS. The Series B agreement has a notional value of $25,800,000 and terminates on June 1, 2016. The Series C agreement has a notional value of $44,650,000 and terminates on June 1, 2033. Both swaps qualify for hedge accounting treatment under SFAS 133. The Hospital has recorded the fair value of the swaps in the balance sheet and changes in fair value in the statement of changes in net assets. The fair value of the swaps is approximately $(2,900,000) at December 31, 2003 and is recorded as a liability on the consolidated balance sheets. The fair value is approximately $(5,300,000) at March 31, 2004.

The 1993 and 2002 bonds were redeemed on October 1, 2003 and October 4, 2003, respectively. A loss on the early extinguishment of the 1993 and 2002 bonds of approximately $2,482,000 was recorded primarily relating to call premiums and the write-off of deferred financing costs. The amount is recorded in nonoperating gains (losses) in the statement of operations and changes in unrestricted net assets.

The Series 1998 Bonds pay interest semiannually on June 1 and December 1. The Series 2003 Bonds pay interest monthly. Principal payments for the 1998 and 2003 bonds are due June 1. The bonds are secured by notes from the Hospital to the Authority. Under the terms of the notes, the Hospital is obligated to make payments to the bond trustee in amounts sufficient to pay principal and interest on the bonds.

The notes also require the Hospital to pledge, to the extent required, its available revenues with the exception of any grants, gifts, bequests, contributions, or donations specifically restricted by the donor. The Hospital purchased an insurance policy which guarantees the payment of the Series 1998 and 2003 Bonds in the event of default by the Hospital. The restrictive covenants of the Series 1998 and 2003 Bonds and the notes include, among other covenants, minimum coverages of insurance, net revenue requirements, average annual debt service requirements, limitations on additional debt, and annual reporting requirements.

Total interest paid on all long-term obligations for the years ended December 31, 2003 and 2002 was approximately $5,321,000 and $5,240,000, respectively. Approximately $273,000 of interest costs were capitalized during the year ended December 31, 2003 related to the clinical expansion project.

17

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

## 6. Long-Term Obligations (continued)

Future maturities, in thousands, of all long-term obligations are as follows:

|  | Hospital Bonds 1998 | Hospital Bonds 2003 | Total |
|---|---|---|---|
| 2004 | $    1,445 | $    3,045 | $    4,490 |
| 2005 | 1,500 | 3,045 | 4,545 |
| 2006 | 1,560 | 3,260 | 4,820 |
| 2007 | 1,625 | 3,285 | 4,910 |
| 2008 | 1,690 | 3,525 | 5,215 |
| Thereafter | 33,795 | 123,570 | 157,365 |
|  | 41,615 | 139,730 | 181,345 |
| Amounts representing unamortized bond discount and premium | (336) | 839 | 503 |
|  | 41,279 | 140,569 | 181,848 |
| Less current portion | 1,445 | 3,045 | 4,490 |
| Long-term obligations | $  39,834 | $ 137,524 | $ 177,358 |

The Hospital also has an available unsecured line of credit of $5,000,000 that accrues interest at 3.75%. There have been no amounts drawn as of December 31, 2003.

## 7. Employee Benefit Plans

The Hospital participates in various defined contribution plans which cover substantially all the Hospital's full-time employees. Employees are eligible to contribute, and the Hospital will match a percentage of their base pay up to a limit depending on the employee's years of service. Both employee and employer contributions are 100% vested upon entry into the plan.

Approximately 2% of the Hospital's employees continue to be paid by the State of West Virginia. Those employees also participate in a defined contribution pension plan for state employees. The Hospital reimburses the state for all costs of these employees, including salaries and wages, pension expense, and other related fringe benefits.

For the years ended December 31, 2003 and 2002, the Hospital's share of the defined contribution plans' costs for Hospital full-time employees and Hospital employees paid by the State of West Virginia was approximately $3,541,000 and $3,113,000, respectively.

18

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

## 8. Leases

The Hospital has entered into various lease agreements for office space and equipment. Rent expense is approximately $2,209,000 and $2,334,000 for the years ended December 31, 2003 and 2002, respectively.

Future minimum lease payments under noncancelable operating leases, in thousands, are as follows:

| | | |
|---|---|---|
| 2004 | $ | 2,276 |
| 2005 | | 2,280 |
| 2006 | | 2,320 |
| 2007 | | 2,359 |
| 2008 | | 2,395 |
| | $ | 11,630 |

## 9. Insurance

The Hospital maintains a self-insurance program for professional liability and general liability. The program covers all Hospital facilities with respect to claims occurring on or after October 1, 1986. The program also covers losses above $1,000,000 per occurrence (the state's indemnification limit) on hospital-based physicians and residents. Prior to December 21, 1998, the program purchased occurrence excess insurance above amounts retained of $2,000,000 per occurrence/$6,000,000 annual aggregate. Effective December 21, 1998, the self-insured retention limits increased to $2,000,000 per occurrence/$7,500,000 annual aggregate, with the annual aggregate limit shared between the Hospital and UHC. For the period of January 21, 2002 through January 21, 2003, excess coverage was purchased from AIG on a claims-made basis above retention limits of $5,000,000 per claim/$12,000,000 annual aggregate (shared with UHC). Beginning January 21, 2003, the Hospital is fully self-insured for all claims.

The estimated liability for self-insurance discounted at 5% in 2003 and 2002 includes an estimate of the ultimate costs for claims reported to the Hospital, as well as incidents that may have occurred but not been reported. Such incidents may or may not result in the assertion of additional claims. The liability for self-insurance is determined using statistical analyses by consulting actuaries and represents management's best estimate of the ultimate cost of all incidents, including loss adjustment expenses.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

### 9. Insurance (continued)

While the ultimate amount of claims incurred is dependent on future developments, in management's opinion, recorded reserves are adequate to cover the future payment of claims. However, it is reasonably possible that recorded reserves may change in the near term. Adjustments, if any, to estimates recorded resulting from ultimate claim payments are reflected in operations in the periods in which such adjustments are known.

### 10. Contingencies

The Hospital is involved in litigation, malpractice claims and regulatory investigations arising in the normal course of business. Several of these cases involve potential significant amounts for which legal counsel is unable to render an opinion on the outcome or potential damages at the present time. In the opinion of management, resolution of those matters is not expected to have a material adverse effect on the financial position of the Hospital. However, depending on the amount and timing of such resolution, an unfavorable resolution of some or all of these matters could materially affect the Hospital's future results of operations or cash flows in a particular period.

### 11. Commitments

On April 1, 1988, the Hospital and the West Virginia University Medical Corporation (Medcorp), d/b/a University Health Associates (UHA) (a wholly owned nonprofit corporation of the University), entered into an Operating Credit Agreement (the Agreement). Medcorp operates the Physician Office Center (the Facility), which is located on the Hospital's campus. In order to finance the Facility, the West Virginia Hospital Finance Authority has issued $23,500,000 of tax-exempt Hospital Revenue Bonds. The Agreement requires the Hospital "to loan or otherwise make funds available to Medcorp to the extent that the revenues of Medcorp are not sufficient to pay the operating expenses thereof during the period following completion of the Facility until the payment of the Bonds in full." To date, the Hospital has not been required to advance any funds on behalf of Medcorp relating to the Agreement.

In October 2001, Allied Health Services, Inc. (AHS), an entity affiliated through common ownership, refinanced three loan agreements ($1,496,000) with WesBanco Bank. The Hospital has guaranteed two of the fixed rate notes. Outstanding amounts guaranteed by the Hospital at December 31, 2003 and 2002 are approximately $642,000 and $863,000, respectively.

20

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

## 12. Related Party Transactions

The Hospital entered into an agreement with UHA to form a health care provider network named Integrated Provider Network, Inc. (IPN), which began operations on January 1, 1995. The IPN subsequently entered into a provider relationship with The Health Plan of the Upper Ohio Valley, Inc. (The Health Plan). The Hospital is at risk, along with UHA, for any deficiencies incurred by the IPN. As of December 31, 2003 and 2002, the Hospital has a receivable of approximately $1,396,000 and $1,100,000, respectively, from the IPN for risk sharing and withholds receivable.

The Hospital performs certain information technology and other services on behalf of UHA. Included in other receivables at December 31, 2003 and 2002 is approximately $175,000 and $484,000, respectively, related to these services performed in the years ended December 31, 2003 and 2002, respectively.

All of the operating expenses of the System are allocated to the Hospital and other members of the System in accordance with the System's fund allocation policy. The Hospital's allocation of the System's expenses was approximately $1,983,000 and $2,136,000 for the years ended December 31, 2003 and 2002, respectively. The Hospital also serves as a processor for certain cash disbursements of the System. Included in receivables, net at December 31, 2003 and 2002 is approximately $122,000 and $195,000, respectively, related to these services.

The Hospital performs certain laboratory services on behalf of AHS. On April 1, 2000, the outstanding balance of laboratory services sold to AHS in 1998 and 1999 totaling $1,307,000 was converted into a note receivable. The note is expected to be paid to the Hospital over seven years with the first three years consisting of interest-only payments. Interest is being charged at the applicable federal rate per annum, 2.71% at December 31, 2003. The outstanding balance on the note as of December 31, 2003 and 2002 was $1,084,000 and $1,307,000, respectively. Also included in other receivables at December 31, 2003 and 2002 were $1,382,000 and $1,284,000, respectively, due from AHS for salaries and lab services.

The Hospital pays the University for certain expenses such as state employee salaries, intern and resident costs, medical director payments and rents. Total payments of approximately $26,889,000 and $23,514,000 were made to the University in 2003 and 2002, respectively.

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

## 12. Related Party Transactions (continued)

The Hospital, Charleston Area Medical Center, and Cabell Huntington Hospital are members of HealthNet, Inc. (HNET). Each member's ownership percentage is 33-1/3%. HNET is a West Virginia nonprofit corporation, which the Internal Revenue Service has determined is recognized as exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code. HNET is an aeromedical transport service company. Members are required to support HNET to the extent that expenses exceed revenues. For the years ended December 31, 2003 and 2002, HNET revenues exceeded expenses by approximately $602,000 and $615,000, respectively. The excess is distributed to the members during the following fiscal year. HNET also reimburses the Hospital for operating expenses incurred on its behalf.

## 13. Functional Expenses

The Hospital provides general health care services to residents within its geographic location. Expenses related to providing these services are as follows, in thousands, for the years ended December 31:

|                            | 2003      | 2002      |
|----------------------------|-----------|-----------|
| Health care services       | $ 287,736 | $ 261,853 |
| General and administrative | 40,605    | 34,026    |
|                            | $ 328,341 | $ 295,879 |

## 14. Fair Value of Financial Instruments

The following methods and assumptions were used in estimating the fair value disclosures for financial instruments:

*Cash and cash equivalents*: The carrying amount approximates fair value.

*Assets whose use is limited:* The fair value of assets whose use is limited is based on quoted market prices.

*Long-term obligations:* The fair value of fixed rate debt is estimated using quoted market prices or discounted cash flow analyses, based on the Hospital's incremental borrowing rate for debt instruments with comparable maturities. The carrying amounts of variable rate obligations approximate fair value.

22

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

## 14. Fair Value of Financial Instruments (continued)

The carrying amounts and the fair values of the Hospital's financial instruments, in thousands, are as follows:

|  | December 31 | | | |
|  | 2003 | | 2002 | |
|  | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
|---|---|---|---|---|
| Cash and cash equivalents | $ 4,572 | $ 4,572 | $ 3,556 | $ 3,556 |
| Assets whose use is limited: |  |  |  |  |
| Board-designated funds | 112,895 | 112,895 | 97,531 | 97,531 |
| Debt repayment fund | 83,662 | 83,662 | 71,154 | 71,154 |
| Malpractice self-insurance trust | 12,190 | 12,190 | 10,520 | 10,520 |
| Trustee-held funds | 72,573 | 72,573 | 10,560 | 10,560 |
| Long-term debt: |  |  |  |  |
| Series 2003 Bonds | 140,569 | 140,896 | - | - |
| Series 2002 Bonds | - | - | 10,000 | 10,000 |
| Series 1998 Bonds | 41,279 | 43,041 | 42,648 | 44,446 |
| Series 1993 Bonds | - | - | 56,543 | 58,647 |

## 15. Affiliations

In 2004, WVUH announced that it is currently in negotiations to affiliate with two West Virginia hospitals in the eastern part of the state. Management does not anticipate making any significant capital outlays as part of these affiliations. The two hospitals are in a positive net asset position at December 31, 2003. WVUH would be the sole corporate member of the two hospitals.

23

[THIS PAGE INTENTIONALLY LEFT BLANK]

West Virginia University Hospitals, Inc.

Notes to Financial Statements (continued)

## 14. Fair Value of Financial Instruments (continued)

The carrying amounts and the fair values of the Hospital's financial instruments, in thousands, are as follows:

|  | December 31 | | | |
|---|---|---|---|---|
|  | 2003 | | 2002 | |
|  | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Cash and cash equivalents | $ 4,572 | $ 4,572 | $ 3,556 | $ 3,556 |
| Assets whose use is limited: | | | | |
| Board-designated funds | 112,895 | 112,895 | 97,531 | 97,531 |
| Debt repayment fund | 83,662 | 83,662 | 71,154 | 71,154 |
| Malpractice self-insurance trust | 12,190 | 12,190 | 10,520 | 10,520 |
| Trustee-held funds | 72,573 | 72,573 | 10,560 | 10,560 |
| Long-term debt: | | | | |
| Series 2003 Bonds | 140,569 | 140,896 | - | - |
| Series 2002 Bonds | - | - | 10,000 | 10,000 |
| Series 1998 Bonds | 41,279 | 43,041 | 42,648 | 44,446 |
| Series 1993 Bonds | - | - | 56,543 | 58,647 |

## 15. Affiliations

In 2004, WVUH announced that it is currently in negotiations to affiliate with two West Virginia hospitals in the eastern part of the state. Management does not anticipate making any significant capital outlays as part of these affiliations. The two hospitals are in a positive net asset position at December 31, 2003. WVUH would be the sole corporate member of the two hospitals.

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX C**

**FINANCIAL STATEMENTS OF THE CHARLES TOWN GENERAL HOSPITAL
(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

[THIS PAGE INTENTIONALLY LEFT BLANK]