# THE CHARLES TOWN GENERAL HOSPITAL
## (d/b/a Jefferson Memorial Hospital)

*Financial Report*

*September 30, 2004*



# CONTENTS

| | |
|---|---:|
| INDEPENDENT AUDITOR'S REPORT | 1 |
| **FINANCIAL STATEMENTS** | |
| Balance sheets | 2 |
| Statements of operations | 3 |
| Statements of changes in net assets | 4 |
| Statements of cash flows | 5 |
| Notes to financial statements | 6 - 16 |



**INDEPENDENT AUDITOR'S REPORT**

The Board of Directors
The Charles Town General Hospital
   (d\b\a Jefferson Memorial Hospital)
Ranson, West Virginia

We have audited the accompanying balance sheets of The Charles Town General Hospital d/b/a Jefferson Memorial Hospital as of September 30, 2004 and 2003, and the related statements of operations, changes in net assets and cash flows for the years then ended. These financial statements are the responsibility of the Hospital's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of The Charles Town General Hospital d/b/a Jefferson Memorial Hospital as of September 30, 2004 and 2003, and the results of its operations, changes in net assets, and cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 20 to the financial statements, effective January 1, 2005, the Hospital, through its parent, Jefferson Regional Health System, Inc., merged with Gateway Regional Health System, Inc. to form West Virginia University Hospitals - East, Inc., a nonprofit organization.

**ARNETT & FOSTER, P.L.L.C.**

*arnett + Foster, P.L.L.C.*

Charleston, West Virginia
December 9, 2004, except for Note 20,
as to which the date is January 1, 2005

Innovation With Results

AF Center • 101 Washington Street, East • P.O. Box 2629 • Charleston, West Virginia 25329
304/346-0441 • 800/642-3601
www.afnetwork.com

**CHARLES TOWN GENERAL HOSPITAL**
  **(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

**BALANCE SHEETS**
**September 30, 2004 and 2003**

| ASSETS | 2004 | 2003 |
|---|---|---|
| **Current Assets** | | |
| Cash and cash equivalents | $ 484,005 | $ 915,876 |
| Patient accounts receivable, net allowance for doubtful accounts of $8,874,000 in 2004 and $6,861,000 in 2003 | 7,196,715 | 7,337,319 |
| Inventories | 151,790 | 137,620 |
| Due from related parties | 154,597 | 154,597 |
| Prepaid expenses and other assets | 263,147 | 408,144 |
| Estimated third-party payor settlements | 378,592 | 239,309 |
| **Total current assets** | 8,628,846 | 9,192,865 |
| **Assets Limited as to Use** | 323,477 | 364,632 |
| **Beneficial Interest in Perpetual Trusts** | 3,832,559 | 3,655,650 |
| **Property and Equipment, net** | 6,038,199 | 6,053,498 |
| **Other assets** | | |
| Debt issue costs, net of amortization of $3,759 in 2004 and $1,385 in 2003 | 66,245 | 68,389 |
| **Total assets** | $ 18,889,326 | $ 19,335,034 |
| **LIABILITIES AND NET ASSETS** | | |
| **Current Liabilities** | | |
| Notes payable | $ 1,391,422 | $ 1,402,470 |
| Current maturities of long-term obligations | 431,769 | 331,730 |
| Accounts payable | 2,141,672 | 2,408,550 |
| Employee compensation and payroll taxes payable | 1,100,443 | 1,708,718 |
| Accrued expenses and other current liabilities | 336,054 | 329,930 |
| **Total current liabilities** | 5,401,360 | 6,181,398 |
| **Long-Term Obligations, net of current maturities** | 2,456,341 | 2,314,430 |
| **Total liabilities** | 7,857,701 | 8,495,828 |
| **Net Assets** | | |
| Unrestricted | 7,124,416 | 7,116,031 |
| Permanently restricted | 3,907,209 | 3,723,175 |
| **Total net assets** | 11,031,625 | 10,839,206 |
| **Total liabilities and net assets** | $ 18,889,326 | $ 19,335,034 |

See Notes to Financial Statements

**CHARLES TOWN GENERAL HOSPITAL**
   **(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

**STATEMENTS OF OPERATIONS**
**Years Ended September 30, 2004 and 2003**

|                                                    | 2004          | 2003            |
|----------------------------------------------------|---------------|-----------------|
| **Revenues**                                       |               |                 |
| Net patient service revenue                        | $ 34,737,310  | $ 32,375,568    |
| Other operating revenue                            | 254,281       | 273,809         |
| **Total revenues**                                 | 34,991,591    | 32,649,377      |
| **Expenses**                                       |               |                 |
| Salaries and wages                                 | 14,783,820    | 14,930,023      |
| Payroll taxes and benefits                         | 3,535,613     | 3,326,418       |
| Supplies and other expenses                        | 11,394,948    | 11,961,397      |
| Interest                                           | 282,957       | 260,904         |
| Depreciation and amortization                      | 883,511       | 978,241         |
| Provision for bad debts                            | 4,277,649     | 2,519,396       |
| **Total expenses**                                 | 35,158,498    | 33,976,379      |
| **Operating income (loss)**                        | (166,907)     | (1,327,002)     |
| **Other income**                                   |               |                 |
| Investment income                                  | 1,394         | 2,350           |
| Contributions and income from trusts               | 174,690       | 202,815         |
| Rental income (expense)                            | (332)         | (20,151)        |
| **Total other income**                             | 175,752       | 185,014         |
| **Excess (deficiency) of revenues over expenses**  | $ 8,845       | $ (1,141,988)   |

**CHARLES TOWN GENERAL HOSPITAL**
 **(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

**STATEMENTS OF CHANGES IN NET ASSETS**
**Years Ended September 30, 2004 and 2003**

| | Unrestricted Net Assets | Permanently Restricted Net Assets | Total |
|---|---|---|---|
| Net assets, September 30, 2002 | $ 8,258,391 | $ 3,505,324 | $ 11,763,715 |
| Excess (deficiency) of revenues over expenses | (1,141,988) | - | (1,141,988) |
| Change in unrealized gains and losses on other than trading securities | (372) | - | (372) |
| Increase in beneficial interest in perpetual trust | - | 207,959 | 207,959 |
| Net realized and unrealized gains and losses on long-term investments | - | 9,892 | 9,892 |
| Increase (decrease) in net assets | (1,142,360) | 217,851 | (924,509) |
| Net assets, September 30, 2003 | $ 7,116,031 | $ 3,723,175 | $ 10,839,206 |
| Excess of revenues over expenses | 8,845 | - | 8,845 |
| Change in unrealized gains and losses on other than trading securities | (460) | - | (460) |
| Increase in beneficial interest in perpetual trust | - | 176,909 | 176,909 |
| Net realized and unrealized gains and losses on long-term investments | - | 7,125 | 7,125 |
| Increase in net assets | 8,385 | 184,034 | 192,419 |
| Net assets, September 30, 2004 | $ 7,124,416 | $ 3,907,209 | $ 11,031,625 |

**CHARLES TOWN GENERAL HOSPITAL**
   **(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

**STATEMENTS OF CASH FLOWS**
**Years Ended September 30, 2004 and 2003**

|  | 2004 | 2003 |
|---|---|---|
| **Cash Flows From Operating Activities** | | |
| Change in net assets | $ 192,419 | $ (924,509) |
| Adjustments to reconcile change in net assets to net cash | | |
| provided by (used in) operating activities: | | |
| Depreciation and amortization | 883,511 | 978,241 |
| Net unrealized (gain) loss on other than trading securities | (5,419) | (8,200) |
| Increase in beneficial interest in perpetual trusts | (176,909) | (207,959) |
| Provision for bad debts | 4,277,649 | 2,519,396 |
| Change in assets and liabilities: | | |
| (Increase) decrease in patient accounts receivable | (4,137,045) | (3,210,467) |
| (Increase) decrease in inventories | (14,170) | 50,621 |
| (Increase) decrease in prepaid expenses and other assets | 147,141 | 195,347 |
| (Increase) decrease in estimated third-party payor settlements | (139,283) | (162,277) |
| Increase (decrease) in accounts payable and | | |
| accrued expenses | (869,029) | 2,038,041 |
| | | |
| **Net cash provided by operating activities** | 158,865 | 1,268,234 |
| | | |
| **Cash Flows From Investing Activities** | | |
| Purchase of property and equipment | (337,957) | (644,797) |
| Proceeds from sale of property and equipment | 101,061 | - |
| Purchase of investments in assets limited as to use | (124,155) | (121,874) |
| Sale of investments in assets limited as to use | 170,729 | - |
| | | |
| **Net cash provided by (used in) investing activities** | (190,322) | (766,671) |
| | | |
| **Cash Flows From Financing Activities** | | |
| Net borrowings on revolving credit arrangements | (11,048) | (10,150) |
| Proceeds from issuance of debt | 368,572 | 1,865,000 |
| Principal payments on capital lease obligations | (294,368) | (241,125) |
| Principal payments on long-term obligations | (463,570) | (1,524,323) |
| | | |
| **Net cash provided by (used in) financing activities** | (400,414) | 89,402 |
| | | |
| **Increase (decrease) in cash and cash equivalents** | (431,871) | 590,965 |
| | | |
| **Cash and cash equivalents** | | |
| Beginning | 915,876 | 324,911 |
| | | |
| Ending | $ 484,005 | $ 915,876 |
| | | |
| **Supplemental Disclosure of Cash Flow Information** | | |
| Cash payments for interest | $ 264,751 | $ 258,592 |
| | | |
| **Supplemental Schedule of Noncash Investing and** | | |
| **Financing Activities** | | |
| Capital lease obligations incurred for purchase of equipment | $ 631,316 | $ 520,533 |

**CHARLES TOWN GENERAL HOSPITAL
  (d/b/a JEFFERSON MEMORIAL HOSPITAL)**

## NOTES TO FINANCIAL STATEMENTS

### Note 1.    Nature of Operations and Significant Accounting Policies

**Nature of operations:**   The Charles Town General Hospital (d/b/a Jefferson Memorial Hospital) (the Hospital) is a not-for-profit acute care hospital.   The Hospital was established to provide health care services to residents of the Eastern Panhandle of West Virginia and the surrounding areas.

The Hospital has various related parties, as more fully described in Note 18, that are under the control of Jefferson Regional Health System, Inc. (JRHS), the Hospital's parent.   JRHS is the sole voting member of the Hospital.

#### A summary of significant accounting policies is as follows:

**Use of estimates:**   The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.  Significant estimates used in preparing these financial statements include those assumed in determining the allowance for doubtful accounts and estimated third party payor settlements.  It is at least reasonably possible that the significant estimates used will change within the next year.

**Basis of presentation:**   Net assets and revenues, gains and losses are classified based on donor imposed restrictions.   Accordingly, net assets of the Hospital and changes therein are classified and reported as follows:

**Unrestricted -** Resources over which the Board of Directors has discretionary control.

**Temporarily restricted -** Resources subject to donor-imposed restrictions which will be satisfied by actions of the Hospital or passage of time.   There were no temporarily restricted net assets as of September 30, 2004 and 2003.

**Permanently restricted -** Resources subject to a donor-imposed restrictions that they be maintained permanently by the Hospital or for which perpetual trusts have been established.   The donors of these resources permit the Hospital to use all or part of the income earned, excluding capital appreciation, on related investments, for unrestricted purposes.

**Donor restricted gifts:**   Unconditional promises to give cash and other assets to the Hospital are reported at fair value at the date the promise is received.   Conditional promises to give and indications of intentions to give are reported at fair value at the date the gift is received.   The gifts are reported either temporarily or permanently restricted support if they are received with donor stipulations that limit the use of the donated assets.   When a donor restriction expires, that is, when a stipulated time restriction ends or purpose restriction is accomplished, temporarily restricted net assets are reclassified as unrestricted net assets and reported in the statement of operations as net assets released from restrictions.   Donor restricted contributions whose restrictions are met within the same year as received are reported as unrestricted contributions in the accompanying financial statements.

**Cash and cash equivalents:**   For purposes of reporting the statement of cash flows, the Hospital considers all cash accounts, which are not subject to withdrawal restrictions or penalties, and all highly liquid debt instruments purchased with original maturities of three months or less to be cash equivalents.

**Patient accounts receivable:**   Patient accounts receivable are carried at the original charge less an estimate made for doubtful or uncollectible accounts.   The allowance is based upon a review of the outstanding balances aged by financial class.   Management uses collection percentages based upon historical collection experience to determine collectibility.   Management also reviews troubled, aged

**CHARLES TOWN GENERAL HOSPITAL
(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

## NOTES TO FINANCIAL STATEMENTS

accounts to determine collection potential. Patient accounts receivables are written off when deemed uncollectible. Recoveries of accounts previously written off are recorded as a reduction to bad debt expense when received. Interest is not charged on patient accounts receivable.

**Inventories:** Inventories, which consists principally of supplies, are stated at latest invoice cost, which approximates lower of cost (first-in, first-out method) or market.

**Assets limited as to use:** Assets limited as to use include assets set aside by the Board of Directors for specified purposes, over which the Board retains control and, may at its discretion, subsequently use for other purposes and assets held by trustees under indenture agreements.

**Property and equipment:** Property and equipment acquisitions are recorded at cost. Depreciation is provided over the estimated useful lives of the assets and is computed by the straight-line method. Equipment under capital leases is amortized on the straight-line method over the shorter period of the lease term or the estimated useful life of the equipment. Such amortization is included in depreciation and amortization in the financial statements. Expenditures for repairs and maintenance are charged to expense as incurred. When assets are retired or otherwise disposed of, the cost and related accumulated depreciation are removed from the accounts and any resulting gain or loss is reflected in income for the period.

Gifts of long-lived assets such as land, buildings, and equipment are reported at fair value and are presented as unrestricted support, and are excluded from the excess (deficiency) of revenues over expenses unless explicit donor stipulations specify how the donated assets must be used. Gifts of long-lived assets with explicit restrictions that specify how the assets are to be used and gifts of cash or other assets that must be used to acquire long-lived assets are reported as restricted support. Absent explicit donor stipulations about how long those long-lived assets must be maintained, the Hospital reports expirations of donor restrictions when the donated or acquired long-lived assets are placed in service.

**Beneficial interest in perpetual trusts:** The Hospital is the beneficiary of several trusts, the assets which are not in the possession of the Hospital. Net realized gains and losses and investment income in these trusts are reported as income based on the various donor gifts to the trusts which restrict distribution from the trusts to interest and dividend income. The carrying value of these assets is equal to the market value of the underlying trust assets, (which approximates the present value of the future cash flows to be derived from these trust accounts).

**Statement of operations:** For purposes of display, transactions deemed by management to be ongoing, major or central to the provision of healthcare services are reported as revenues and expenses. Peripheral or incidental transactions are reported as nonoperating gains and losses.

**Net patient service revenue:** Net patient service revenue is reported at the estimated net realizable amounts from patients, third-party payors, and others for services rendered, including estimated retroactive adjustments under reimbursement agreements with third-party payors. Retroactive adjustments are considered in the recognition of revenue on an estimated basis in the period the related services are rendered, and such amounts are adjusted in future periods as adjustments become known or as years are no longer subject to such audits, reviews, and investigations.

Revenue from the Medicare and Medicaid programs accounted for approximately 34 percent and 11 percent, respectively, of the Hospital's net patient revenue for the year ended September 30, 2004. Revenue from the Medicare and Medicaid programs accounted for approximately 37 percent and 11 percent, respectively, of the Hospital's net patient revenue for the year ended September 30, 2003. Laws and regulations governing the Medicare and Medicaid programs are extremely complex and subject to interpretation. As a result, there is at least a reasonable possibility that recorded estimates will change by a material amount in the near term.

**CHARLES TOWN GENERAL HOSPITAL**
  **(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

## NOTES TO FINANCIAL STATEMENTS

**Charity care:** The Hospital provides care to patients, who meet certain criteria under its charity care policy, without charge or at amounts less than its established rates. Because the Hospital does not pursue collection of amounts determined to qualify as charity care, they are not reported as net patient service revenue.

**Excess (deficiency) of revenues over expenses:** The statement of operations includes excess (deficiency) of revenues over expenses. Changes in unrestricted net assets which are excluded from excess (deficiency) of revenues over expenses, consistent with industry practice, include unrealized gains and losses on investments other than trading securities, permanent transfers of assets to and from affiliates for other than goods and services, and contributions of long-lived assets (including assets acquired using contributions which by donor restriction were to be used for the purposes of acquiring such assets).

**Debt issue costs:** Costs incurred in issuing debt are being amortized on the straight line method over the life of the debt which approximate the interest method.

**Investments:** Investments in equity securities with readily determinable fair values and all investments in debt securities are measured at fair value in the balance sheet. Investment income or loss (including realized gains and losses on investments, interest and dividends) is included in the excess of revenues over expenses unless the income or loss is restricted by donor or law. Unrealized gains and losses on investments are excluded from the excess of revenues over expenses unless the investments are trading securities.

**Income taxes:** The Hospital is exempt from Federal and state income taxes under Section 501(c)(3) of the Internal Revenue Code and similar state statutes relating to not-for-profit organizations.

### Note 2.   Cash Concentrations

At September 30, 2004, the Hospital had $1,025,927 on deposit with two financial institutions. Of this amount, $924,108 would not be covered by Federal deposit insurance.

### Note 3.   Concentrations of Credit Risk

The Hospital is located in the Eastern Panhandle of West Virginia. The Hospital grants credit without collateral to its patients, most of whom are local residents and are insured under third-party payor agreements. The mix of net receivables from patients and third-party payors is as follows as of September 30, 2004 and 2003:

|                          | 2004 | 2003 |
|--------------------------|------|------|
| Medicare                 | 15%  | 15%  |
| Medicaid                 | 4%   | 4%   |
| Other third-party payors | 61%  | 61%  |
| Private pay              | 20%  | 20%  |
|                          | 100% | 100% |

### Note 4.   Assets Limited as to Use

Assets limited as to use that are required for obligations classified as current liabilities are reported in current assets (none at September 30, 2004 and 2003). The composition of assets limited as to use at September 30, 2004 and 2003, is set forth in the following table. Investments are stated at fair value.

**CHARLES TOWN GENERAL HOSPITAL**
**(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

### NOTES TO FINANCIAL STATEMENTS

|  | 2004 | | 2003 |
|---|---|---|---|
| By Board for funding of depreciation: | | | |
| Cash and short-term investments | $ 177,078 | $ | 155,137 |
| Mutual fund (core fixed income fund) | 20,945 | | 20,879 |
| Mutual funds (U.S. Government securities) | 19,959 | | 20,245 |
| | 217,982 | | 196,261 |
| Sinking fund required under indenture, held by trustee: | | | |
| U.S. Treasury obligations | 2,694 | | 3,109 |
| Cash and cash equivalents | 28,150 | | 97,737 |
| | 30,844 | | 100,846 |
| By donor for endowments, held by trustee: | | | |
| Cash and cash equivalents | 25,444 | | 21,461 |
| Mortgage backed securities | 4,414 | | 5,987 |
| Common stocks | 44,793 | | 40,077 |
| | 74,651 | | 67,525 |
| Total assets limited as to use | $ 323,477 | $ | 364,632 |

The Endowment Fund holds common stock in a variety of industries. No significant industry concentrations exist as of September 30, 2004.

Investment income and gains (loss) for assets limited as to use, cash equivalents, and other investments are comprised of the following for the years ending September 30, 2004 and 2003:

|  | 2004 | | 2003 |
|---|---|---|---|
| Income: | | | |
| Interest income | $ 132 | $ | 357 |
| Dividends | 1,262 | | 1,993 |
| | $ 1,394 | | 2,350 |
| Other changes in unrestricted net assets: | | | |
| Unrealized gains (losses) on other than trading securities | $ (460) | $ | (372) |

### Note 5.  Investment in Markglen, Inc.

Markglen, Inc. d/b/a Shenandoah Health Village Center owns and operates a 78 bed nursing facility located in Charles Town, West Virginia. The facility was constructed in 1998 as a replacement facility for space rented from the Hospital by Shenandoah Home, Inc., which housed a 48 bed nursing care unit. Shenandoah Home, Inc. was entitled to a 40% interest in Shenandoah Health Village, which it contributed to the Hospital. The ownership percentage was subsequently increased to 50% upon finalization of the partnership agreement.

The carrying value of the investment at September 30, 2004, is $0 because there is no readily determinable fair market value and the Company has deficit capital. The Hospital has no obligation to fund any working capital deficits.

**CHARLES TOWN GENERAL HOSPITAL**
  **(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

## NOTES TO FINANCIAL STATEMENTS

### Note 6.   Property and Equipment

A summary of the components of property and equipment at September 30, 2004 and 2003, is as follows:

|  | 2004 | 2003 |
|---|---|---|
| Land | $ 337,440 | $ 337,440 |
| Land improvements | 234,907 | 234,907 |
| Building | 7,209,305 | 7,204,582 |
| Equipment | 12,586,444 | 11,725,329 |
|  | 20,368,096 | 19,502,258 |
| Less accumulated depreciation and amortization | 14,329,897 | 13,448,760 |
|  | $ 6,038,199 | $ 6,053,498 |
| Capital lease assets included in property and equipment are as follows: |  |  |
| Equipment | $ 2,202,000 | 1,680,684 |
| Less accumulated amortization | 937,014 | 686,244 |
|  | $ 1,264,986 | $ 994,440 |

### Note 7.   Notes Payable

Notes payable at September 30, 2004 and 2003, consist of the following:

|  | 2004 | 2003 |
|---|---|---|
| Bank, line of credit | $ 1,391,422 | $ 1,402,470 |

The line of credit at September 30, 2004 has a variable interest rate (which was 5.5% at September 30, 2004) and is secured by bank accounts, accounts receivable and all property owned by the Hospital. The unused line of credit at September 30, 2004 was $360,191.  The line of credit expires October 22, 2005.

### Note 8.   Long-Term Obligations

A summary of long-term obligations at September 30, 2004 and 2003, follows:

|  | 2004 | 2003 |
|---|---|---|
| Note payable individual, 7.0%, due in monthly installments of $608 through February 2006, secured by equipment with a net book value of approximately $2,300,000 | $ 9,768 | $ 15,623 |
| Mortgage payable, bank, 5.21%, due in monthly installments of $14,938, with balance due on February 25, 2018, secured by certain real estate, bank accounts, accounts receivable, furniture, fixtures and equipment, net book value of collateral of approximately $13,100,000 | 1,720,719 | 1,807,871 |
| Capital lease obligations, interest rates ranging from 2.70% to 12.54% and monthly payments ranging from $300 to $8,800 through 2009, secured by equipment with a net book value of approximately $1,265,000 | 1,157,623 | 822,666 |
|  | 2,888,110 | 2,646,160 |
| Less current maturities | 431,769 | 331,730 |
| Long-term obligations | $ 2,456,341 | $ 2,314,430 |

**CHARLES TOWN GENERAL HOSPITAL**
  **(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

## NOTES TO FINANCIAL STATEMENTS

Aggregate maturities of long-term obligations at September 30, 2004, are as follows:

|  | Long-Term Debt | Capital Lease Obligations |
|---|---|---|
| 2005 | $ 98,633 | $ 396,074 |
| 2006 | 99,641 | 345,220 |
| 2007 | 101,862 | 268,260 |
| 2008 | 107,298 | 198,365 |
| 2009 | 113,024 | 101,802 |
| Thereafter | 1,210,030 | - |
| Total minimum lease payments | $ 1,730,488 | 1,309,721 |
| Less amount representing interest |  | 152,098 |
| Present value of net minimum lease payments |  | $ 1,157,623 |

Under the terms of the mortgage loan agreement, the Hospital is required to maintain certain deposits with a trustee. Such deposits are included with assets limited as to use. The loan agreement also places limits on the incurrence of additional borrowings and requires that the Hospital satisfy certain measures of financial performance as long as the loan is outstanding.

### Note 9. Estimated Third-Party Payor Settlements

Intermediary receivables/(payables) consist of amounts due from/to the Medicare and Medicaid programs. These estimated settlements by program are as follows:

|  | 2004 | 2003 |
|---|---|---|
| Medicare cost report settlements | $ 228,592 | $ 164,309 |
| Medicaid disproportionate share (DSH) | 150,000 | 75,000 |
| Net intermediary receivable (payable) | $ 378,592 | $ 239,309 |

In 1995, the State of West Virginia Disproportionate Share Hospital State Plan was amended to provide for a settlement process among participating hospitals. The State has compiled the information for the years from 1997-1999 to begin the settlement process. Currently, the Bureau for Medical Services of the State of West Virginia Department of Health and Human Resources (the Bureau) is in the process of contracting with a third-party vendor to assist with the audit settlement process for the Disproportionate Share Hospital State Plan for years after 1999. The laws and regulations governing the DSH settlement process are complex, involving statistical data from all participating hospitals, and subject to interpretation. Accordingly, the Hospital is not able to estimate the possible loss, if any, that could arise upon completion of the DSH settlement process. Based upon the information obtained by the State, there is no significant potential liability known at this time.

### Note 10. Permanently Restricted Net Assets

The following is a summary of permanently restricted net assets:

|  | 2004 | 2003 |
|---|---|---|
| Beneficial Interest in Perpetual Trusts: |  |  |
| Elsie Bogardus Murphy Trust - Income restricted for |  |  |
| charitable purposes | $ 70,944 | $ 79,112 |
| McCormick Trust - Income restricted for charitable purposes | 2,456,472 | 2,332,771 |
| Louisa Tabb Hall Trust - Income restricted for charitable purposes | 568,230 | 535,290 |

**CHARLES TOWN GENERAL HOSPITAL**
  **(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

## NOTES TO FINANCIAL STATEMENTS

| | | |
|---|---:|---:|
| Louise C. Briscoe Trust - Income restricted for patient care | 329,373 | 308,486 |
| Humphrey Keys Hospital Fund Trust - Income restricted for patient care | 49,128 | 48,210 |
| Rouss Charity Fund - Income restricted for patient care | 290,801 | 285,191 |
| Patty A. Mitchell Hospital Fund Trust - Income restricted for patient care | 67,610 | 66,590 |
| Total beneficial interest in perpetual trusts | 3,832,558 | 3,655,650 |
| Endowment Fund of which income is expendable to support general operations | 74,651 | 67,525 |
| Permanently restricted net assets | $ 3,907,209 | $ 3,723,175 |

### Note 11. Trust Beneficiary

The Hospital is the beneficiary of the W. Baker Hall Memorial Trust established on behalf of Jefferson Memorial Hospital, through the Greater Kanawha Valley Foundation (the Foundation). The income earned on the trust assets is distributed annually to the Hospital. The principal amount of the trust is under the control of the Foundation and they have the power to redirect the assets of the trust. The value of the trust as of September 30, 2004 and 2003, that is allocated to the Hospital was approximately $1,061,000 and $924,000, respectively, and has not been recorded in the statement of net assets due to control of the assets by the Foundation. Total income received from the trust in 2004 and 2003 was $54,847 and $53,610, respectively, and is recorded in the statement of operations.

### Note 12. Net Patient Service Revenue

The Hospital has agreements with third-party payors that provide for payments to the Hospital at amounts different from its established rates. A summary of the payment arrangements follows:

- **Medicare**

  Inpatient acute care services rendered to Medicare program beneficiaries are paid at prospectively determined rates per discharge. These rates vary according to a patient classification system that is based on clinical, diagnostic and other factors including regional wage variations.

  Effective August 1, 2000, Medicare hospital outpatient services are paid on a prospective payment system (PPS) based upon Ambulatory Payment Classifications (APC's). The APC payment system was phased-in over three years. During the phase in, the Hospital received a blended payment of the APC's and the previous cost based methodology. The outpatient PPS phase was completed on September 30, 2003. The outpatient payment amounts are adjusted for regional wage differences and additional payments may be made for high cost and new technology procedures.

  The Hospital is reimbursed for cost reimbursable items at a tentative rate with final settlement determined after submission of annual cost reports by the Hospital and audits thereof by the Medicare fiscal intermediary. The Hospital's classification of patients under the Medicare program and the appropriateness of their admission are subject to an independent review by a peer review organization. The Hospital's Medicare cost reports have been audited, by the Medicare fiscal intermediary, through 2001.

**CHARLES TOWN GENERAL HOSPITAL**
**(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

**NOTES TO FINANCIAL STATEMENTS**

- **Medicaid**

    Inpatient services rendered to Medicaid program beneficiaries prior to January 1996, were reimbursed under a cost reimbursement methodology. The Hospital is reimbursed at a tentative rate with final settlement determined after submission of annual cost reports by the Hospital and audits thereof by the state Medicaid fiscal intermediary. The Hospital's Medicaid cost reports have been audited, by the Medicaid fiscal intermediary, through 1996. Inpatient services rendered after January 1, 1996 are reimbursed based on prospectively determined rates per discharge. Medicaid outpatient services are reimbursed based upon predetermined fee schedules at substantially discounted amounts.

- **Commercial Insurance Carriers**

    The Hospital also entered into payment agreements with certain commercial insurance carriers. The basis for payment to the Hospital under these agreements includes various discounts from established charges.

- **West Virginia Health Care Authority**

    The Legislature of the State of West Virginia has created the Health Care Authority to regulate the Hospital's gross patient revenue based on limitation orders compiled from rate schedules and budgets submitted by the Hospital on a periodic basis. If a hospital's charges are held to be excessive or unreasonable, the Health Care Authority may require rebates to consumers or adjustments to subsequent year revenue limits.

A summary of gross and net patient service revenue for all payors for the years ended September 30, 2004 and 2003, follows:

|  | **2004** | 2003 |
|---|---|---|
| Gross patient revenue | **$ 58,489,624** | $ 52,920,780 |
| Less: Provision for contractual adjustments | **(22,704,860)** | (19,996,539) |
| Charity care | **(1,047,454)** | (548,673) |
| Net patient service revenue | **$ 34,737,310** | $ 32,375,568 |

The Hospital qualifies as a disproportionate share hospital for Medicaid. This designation entitles the Hospital to disproportionate share payments from Medicaid. Additional income recorded in 2004 and 2003, as a result of being classified as a disproportionate share provider, is $323,581 and $313,196, respectively. The amount is recorded as a reduction of contractual adjustments.

As disclosed in Note 9 in the accompanying financial statements, the Hospital has recorded amounts for cost report settlements with Medicare and Medicaid. The 2004 net patient service revenue increased approximately $100,000 as a result of tentative settlements at amounts different than originally estimated.

**Note 13.  Pension Plan**

The Hospital has a defined contribution pension plan that covers substantially all employees. The Hospital contributes two percent of each eligible employees salary. Total expense under the plan for the years ended September 30, 2004 and 2003, was $216,000 and $198,000, respectively.

**CHARLES TOWN GENERAL HOSPITAL**
  **(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

## NOTES TO FINANCIAL STATEMENTS

### Note 14. Lease Commitments and Rental Expense

The Hospital leases real property and equipment under operating lease agreements expiring at various dates through July 2005. Total rent expense for all operating leases for the years ended September 30, 2004 and 2003, was $967,635 and $652,920, respectively.

The following is a schedule, by year, of future minimum lease payments under operating leases as of September 30, 2004, that have initial or remaining lease terms in excess of one year:

| | |
|---|---|
| 2005 | $ 307,707 |
| 2006 | 269,028 |
| 2007 | 187,250 |
| 2008 | 32,841 |
| 2009 | - |
| | $ 796,826 |

### Note 15. Health Insurance Plan

The Hospital is partially self-funded with respect to employee health insurance claims and their health insurance coverage. To protect itself against extraordinary claims of its employees, the Hospital has purchased stop-loss insurance. The Hospital's cost is limited annually to $80,000 per covered life. The Hospital uses a third-party claims administrator to process its claims. Amounts payable under this plan at September 30, 2004 and 2003, for actual claims and claims incurred but not reported was approximately $324,000 for both years respectively.

Total expense for health insurance for the years ended September 30, 2004 and 2003, was approximately $1,940,000 and $1,630,000, respectively.

### Note 16. Functional Expenses

The Hospital provides general health care services to residents within its geographic location. Expenses related to providing these services are as follows:

| | 2004 | 2003 |
|---|---|---|
| Health care services | $ 21,283,318 | $ 19,706,300 |
| General and administrative | 13,875,180 | 14,270,079 |
| | $ 35,158,498 | $ 33,976,379 |

### Note 17. Medical Malpractice Insurance and Contingency

The Hospital is covered by professional liability insurance on a claims-made basis. For the years ended September 30, 2004 and 2003, per claim coverage was $1,000,000 with $3,000,000 aggregate.

The Hospital is a defendant in various lawsuits wherein various amounts are claimed. In the opinion of management and legal counsel, the likelihood of an unfavorable outcome in excess of insurance coverage is remote and the judgments, if unfavorable, would not have a material adverse effect on the Hospital's financial statements.

**CHARLES TOWN GENERAL HOSPITAL**
 **(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

## NOTES TO FINANCIAL STATEMENTS

### Note 18. Related Parties

The Hospital has several related parties, including a medical corporation (Jefferson Urgent Care, LLC), a for profit subsidiary (Jefferson Health Enterprises, Inc., a subsidiary of the Hospital), and a foundation for fundraising (Jefferson Health Care Foundation, Inc.).

Jefferson Urgent Care, LLC is 50 percent owned by Jefferson Health Enterprises, Inc., which is managed and controlled by Medical Management Solutions. The Hospital has advanced funds of $8,624 to Jefferson Urgent Care, LLC. The Hospital has elected not to consolidate Jefferson Urgent Care, LLC due to the immaterial nature of its 50 percent equity and lack of control of the entity.

During 2003, Jefferson Urgent Care entered into a loan agreement for $100,000. The Hospital guaranteed the debt which has not been reflected in the accompanying balance sheets due to the immateriality of the amounts involved. However, if Urgent Care were to default on the loan, the Hospital would be responsible for the outstanding loan balance which at September 30, 2004 was approximately $52,000.

Jefferson Health Enterprises, Inc. is a wholly owned subsidiary of the Hospital. Jefferson Health Enterprises owns 100% of Heritage Pharmacy, Inc. Jefferson Health Enterprises is a for profit entity with a December fiscal year. Through September 30, 2004, the Hospital advanced funds of $145,973 to Jefferson Health Enterprises, Inc. for start-up activities. Due to the immateriality of the Company's net assets and operations, the Company's financial statements were not consolidated with the Hospital.

Jefferson Health Care Foundation, Inc. is a foundation set up for the benefit of the Hospital. The Foundation had minimal activity. The Hospital has elected not to consolidate the Foundation due to the immateriality of the net assets and operations in fiscal years 2004 and 2003. Total assets of the Foundation were $80,717 at September 30, 2004 and consist of cash and cash equivalents. The Foundation had no liabilities at September 30, 2004.

Following is a summary of amounts due from related parties as a result of the aforementioned transactions as of September 30, 2004 and 2003:

|  | 2004 | 2003 |
|---|---|---|
| Jefferson Health Enterprises, Inc. | $ 145,973 | $ 145,973 |
| Jefferson Urgent Care, LLC | 8,624 | 8,624 |
|  | $ 154,597 | $ 154,597 |

### Note 19. Health Care Legislation and Regulation

The health care industry is subject to numerous laws and regulations of Federal, state and local governments. Recently, government activity has increased with respect to investigations and allegations concerning possible violations of various statutes and regulations by health care providers. Compliance with such laws and regulations can be subject to future government review and interpretation as well as regulatory actions unknown or unasserted at this time. Management believes that the Hospital is in compliance with fraud and abuse as well as other applicable government laws and regulations. If the Hospital is found in violation of these laws, the Hospital could be subject to substantial monetary fines, civil and criminal penalties and exclusion from participation in the Medicare and Medicaid programs.

**CHARLES TOWN GENERAL HOSPITAL**
  **(d/b/a JEFFERSON MEMORIAL HOSPITAL)**

## NOTES TO FINANCIAL STATEMENTS

### Note 20. Merger and Affiliate

Effective January 1, 2005 the Hospital, through its parent organization, Jefferson Regional Health System, Inc., (JRHS) merged with Gateway Regional Health Systems, Inc. (GRHS) to form West Virginia University Hospitals – East, Inc. (WVUH-E), a nonprofit corporation. As a result of the merger, the separate corporate existence of Jefferson Regional Health System, Inc. and GRHS will cease. West Virginia University Hospitals, Inc. (WVUH) shall be the sole voting corporate member of WVUH-E, with all of the voting rights prescribed by law. With respect to WVUH-E, WVUH shall possess all of the powers granted to a member of a nonprofit corporation under the West Virginia Nonprofit Corporation Act. The membership interests of JRHS shall not be converted and shall terminate and cease to exist upon the effective date of the merger. No current member of JRHS shall have any rights or interest as a member in WVUH-E.

The Hospital and GRHS will remain the holder of all of their applicable licenses, shall be responsible for maintaining appropriate accreditation, shall exercise authority with regard to credentialing, shall review the quality of care furnished at their facilities, shall be responsible for the continued operation of the hospitals and related operations, and shall retain all corporate power and authority under law and its Articles of Incorporation and Bylaws which are not specifically granted to WVUH.

All rights, privileges, immunities, powers, franchises and authority; all property, real and personal, tangible and intangible, of every kind and description; and all obligations and liabilities of the Hospital and GRHS shall be taken by and deemed transferred to and vested in WVUH-E by operation of law.

The purpose of the merger is to improve the health and well-being of the citizens of the Eastern Panhandle of West Virginia through the provision of a complete, coordinated continuum of cost-effective, quality healthcare services and related education activities by numerous means, including the development of resources for new programs and services, by working with community organizations for the delivery and availability of preventive care in the region, and through the evaluation of facility expansion, renovation and relocation options. The parties accept the merger to enhance the parties' ability to fulfill their charitable missions by enhancing and expanding medical access and availability of services to the indigent, uninsured, underinsured, Medicare and Medicaid populations in the Eastern Panhandle.

## APPENDIX D

## FINANCIAL STATEMENTS OF GATEWAY REGIONAL HEALTH SYSTEM, INC.

[THIS PAGE INTENTIONALLY LEFT BLANK]

# GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES

*Consolidated*
*Financial Report*

*December 31, 2003*



# CONTENTS

INDEPENDENT AUDITOR'S REPORT                                           1

FINANCIAL STATEMENTS

    Consolidated balance sheets                                   2

    Consolidated statements of operations                         3

    Consolidated statements of changes in net assets              4

    Consolidated statements of cash flows                         5

    Notes to financial statements                            6 - 19

SCHEDULES

    Consolidating Schedule - Balance Sheet Information       20 - 23

    Consolidating Schedule - Statement of Operations and
        Changes in Net Assets                                24 - 25



**INDEPENDENT AUDITOR'S REPORT**

To the Board of Trustees
Gateway Regional Health System, Inc.
    and subsidiaries
Martinsburg, West Virginia

We have audited the accompanying consolidated balance sheets of Gateway Regional Health System, Inc. and subsidiaries as of December 31, 2003 and 2002, and the related consolidated statements of operations, changes in net assets and cash flows for the years then ended. These financial statements are the responsibility of the System's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Gateway Regional Health System, Inc. and subsidiaries as of December 31, 2003 and 2002, and the results of their operations, changes in their net assets and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

Our audit was made for the purpose of forming an opinion on the basic consolidated financial statements taken as a whole. The consolidating information as listed in the table of contents is presented for purposes of additional analysis of the basic consolidated financial statements rather than to present the financial position, results of operations, changes in net assets and cash flows of the individual companies. The consolidating information has been subjected to the auditing procedures applied in the audits of the basic consolidated financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic consolidated financial statements taken as a whole.

**ARNETT & FOSTER, P.L.L.C.**

*arnett + foster, P.L.L.C.*

Charleston, West Virginia
March 26, 2004

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**
**December 31, 2003 and 2002**

| ASSETS | 2003 | 2002 |
|---|---:|---:|
| **Current Assets** | | |
| Cash and cash equivalents | $ 4,778,843 | $ 4,143,069 |
| Patient accounts receivable, net of allowance for doubtful | | |
| accounts of $15,017,000 in 2003 and $15,925,000 in 2002 | 10,453,433 | 10,933,730 |
| Pledges receivable, current portion | - | 5,833 |
| Other receivables | 197,451 | 150,572 |
| Inventories | 1,059,117 | 973,658 |
| Prepaid expenses and other current assets | 1,204,130 | 1,396,012 |
| Estimated third-party payor settlements | 452,194 | 413,477 |
| Assets limited as to use | 3,123,396 | 3,138,782 |
| **Total current assets** | 21,268,564 | 21,155,133 |
| **Assets Limited As to Use, net of current portion** | 36,031,738 | 31,366,265 |
| **Property and Equipment, net** | 26,565,792 | 27,158,928 |
| **Other Assets** | | |
| Pledges receivable, net of current portion | - | 750,000 |
| Other receivables, net of current portion | - | 21,349 |
| Deferred bond issuance costs, net | 394,629 | 420,471 |
| Investments in joint ventures | 200,981 | 126,886 |
| **Total other assets** | 595,610 | 1,318,706 |
| **Total assets** | $ 84,461,704 | $ 80,999,032 |
| **LIABILITIES AND NET ASSETS** | | |
| **Current Liabilities** | | |
| Note payable | $ 1,200,192 | $ 2,940,308 |
| Current maturities of long-term obligations | 1,876,906 | 1,829,172 |
| Accounts payable | 3,573,494 | 2,481,129 |
| Accrued expenses and payroll withholdings | 4,526,723 | 4,269,339 |
| Malpractice liability, current portion | 280,000 | 150,000 |
| **Total current liabilities** | 11,457,315 | 11,669,948 |
| **Long-Term Obligations, net of current maturities** | 18,996,972 | 20,832,227 |
| **Other Long-Term Liabilities** | 233,764 | 607,443 |
| **Malpractice Liability, net of current portion** | 2,570,000 | 2,693,570 |
| **Total liabilities** | 33,258,051 | 35,803,188 |
| **Net Assets, Unrestricted** | 51,203,653 | 45,195,844 |
| **Total liabilities and net assets** | $ 84,461,704 | $ 80,999,032 |

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**Years Ended December 31, 2003 and 2002**

|                                                | 2003 | 2002 |
|------------------------------------------------|------------------:|------------------:|
| **Revenues**                                   |                  |                  |
| Net patient service revenue                    | $ 78,264,720     | $ 71,595,777     |
| Rental income                                  | 375,647          | 380,950          |
| Other revenue                                  | 1,138,267        | 1,161,146        |
| **Total revenues**                             | 79,778,634       | 73,137,873       |
| **Operating Expenses**                         |                  |                  |
| Salaries and wages                             | 29,929,401       | 29,272,297       |
| Payroll taxes and benefits                     | 10,665,365       | 8,736,604        |
| Professional fees and contracted services      | 6,445,774        | 6,116,198        |
| Supplies and equipment rentals                 | 13,128,680       | 12,863,700       |
| Maintenance and utilities                      | 2,694,384        | 2,838,874        |
| Interest                                       | 1,412,097        | 1,513,149        |
| Insurance                                      | 1,090,680        | 771,701          |
| Depreciation and amortization                  | 4,144,650        | 4,329,737        |
| Provision for bad debts                        | 6,558,745        | 6,176,675        |
| Other                                          | 2,754,949        | 3,364,685        |
| **Total expenses**                             | 78,824,725       | 75,983,620       |
| **Operating income (loss)**                    | 953,909          | (2,845,747)      |
| **Other Income (expenses)**                    |                  |                  |
| Investment income                              | 1,741,933        | 409,873          |
| Unrestricted gifts and bequests                | 221,539          | 171,511          |
| Loss on disposal of assets                     | (50,426)         | (64,154)         |
| **Total other income**                         | 1,913,046        | 517,230          |
| **Excess (deficiency) of revenues over expenses** | 2,866,955     | (2,328,517)      |
| Change in net unrealized gains (losses) on other than trading securities | 3,140,854 | (1,241,403) |
| **Increase (decrease) in unrestricted net assets** | $ 6,007,809   | $ (3,569,920)    |

See Notes to Consolidated Financial Statements

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CHANGES IN NET ASSETS**
**Years Ended December 31, 2003 and 2002**

|  | 2003 | 2002 |
|---|---|---|
| **Unrestricted net assets, beginning of year** | $ 45,195,844 | $ 48,765,764 |
| Increase (decrease) in unrestricted net assets | 6,007,809 | (3,569,920) |
| **Unrestricted net assets, end of year** | $ 51,203,653 | $ 45,195,844 |

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**Years Ended December 31, 2003 and 2002**

|  | 2003 | 2002 |
|---|---|---|
| **Cash Flows From Operating Activities** | | |
| Change in net assets | $ 6,007,809 | $ (3,569,920) |
| Adjustments to reconcile changes in net assets | | |
| to net cash provided by operating activities: | | |
| Amortization of bond discount | 40,542 | 41,637 |
| Depreciation and amortization | 4,133,410 | 4,329,737 |
| Net realized and unrealized gains and losses on | | |
| investments, other than trading | (3,570,005) | 2,252,411 |
| Provision for bad debts | 6,558,745 | 6,176,675 |
| Net realizable loss on sale/disposal of fixed assets | 55,323 | 64,154 |
| Noncash accrued interest income | 8,093 | - |
| Net change in accrued interest receivable - | | |
| board designated investments | (42,903) | (152,780) |
| Change in assets and liabilities: | | |
| (Increase) decrease in patient accounts receivable | (6,078,448) | (4,582,216) |
| (Increase) decrease in pledges and other receivables | 730,303 | 22,686 |
| (Increase) decrease in inventories | (85,459) | (55,149) |
| (Increase) decrease in prepaid expenses and other | | |
| current assets | 191,882 | (629,234) |
| Increase (decrease) in accounts payable and | | |
| accrued expenses | 1,349,749 | 151,480 |
| (Increase) decrease in estimated third-party payor | | |
| settlements | (38,717) | 341,565 |
| Increase (decrease) in malpractice liability | 6,430 | (291,195) |
| Net cash provided by operating activities | 9,266,754 | 4,099,851 |
| **Cash Flows From Investing Activities** | | |
| Purchase of property and equipment | (3,569,755) | (2,626,059) |
| Proceeds from sales, maturities of investments and | | |
| principal payments on mortgage investments | 12,548,950 | 14,711,012 |
| Purchase of investments | (16,157,874) | (15,848,670) |
| Net change in board designated assets limited as to use | 2,115,878 | (1,927,693) |
| Net cash used in investing activities | (5,062,801) | (5,691,410) |
| **Cash Flows From Financing Activities** | | |
| Principal payments on long-term obligations | (1,828,063) | (2,810,634) |
| Proceeds from issuance of long-term obligations | - | 4,925,000 |
| Net borrowings (payments) on line of credit | (1,740,116) | 1,940,308 |
| Debt issue costs incurred | - | (23,263) |
| Net cash provided by (used in) financing activities | (3,568,179) | 4,031,411 |
| Net increase (decrease) in cash | | |
| and cash equivalents | 635,774 | 2,439,852 |
| **Cash and Cash Equivalents** | | |
| Beginning of year | 4,143,069 | 1,703,217 |
| End of year | $ 4,778,843 | $ 4,143,069 |
| **Supplemental Disclosures of Cash Flow Information** | | |
| Cash payments for interest | $ 1,444,733 | $ 1,417,991 |

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

## NOTES TO FINANCIAL STATEMENTS

### Note 1.  Nature of Operations and Significant Accounting Policies

**Nature of operations:**   The Gateway Regional Health System, Inc. (the System) is a nonstock, nonproprietary membership corporation.   The System is the sole member of City Hospital, Inc. (the Hospital), Gateway Health Enterprises Corporation (Health Enterprises), Gateway Foundation, Inc. (the Foundation), Gateway Healthcare Properties, Inc. (Healthcare Properties) and Gateway Health Services Corporation (Health Services), collectively referred to as the Corporations.

The System provides financial support and management assistance to the Hospital, Healthcare Properties, Health Services and the Foundation.

The Hospital provides acute inpatient, long-term care and outpatient services to citizens of Berkeley County, West Virginia and surrounding communities.

Health Enterprises is a for-profit corporation that supports affiliates in performance of their functions through joint ventures that operate other healthcare related entities.

The Foundation supports the System by conducting educational activities, owns and operates medical buildings and fund raising activities.

Healthcare Properties holds title to certain System property, collects income therefrom and turns over the entire amount, thereof, less expenses, to Gateway Foundation, Inc.

Health Services supports affiliates in performance of their functions and operates medical practices.

### A summary of significant accounting policies is as follows:

**Basis of consolidation:**   The accompanying consolidated financial statements include the accounts of the System and its subsidiaries.   All significant intercompany transactions and balances have been eliminated in consolidation.

**Use of estimates:**   The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements.   Estimates also affect the reported amounts of revenues and expenses during the reporting period.   Actual results could differ from those estimates. Significant estimates used in preparing these financial statements include those assumed in determining the allowance for uncollectible accounts, estimated third-party payor settlements and the accruals for malpractice and health insurance liabilities.   It is at least reasonably possible that the significant estimates used will change within the next year.

**Cash and cash equivalents:**   For purposes of presenting the statement of cash flows, the System considers all cash accounts, which are not subject to withdrawal restrictions or penalties, and all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents excluding amounts classified as assets limited as to use by board designation and other arrangements under trust agreements.

**Patient accounts receivable:**   Patient accounts receivable are carried at the original charge less an estimate made for doubtful or uncollectible accounts.   The allowance is based upon a review of the outstanding balances aged by financial class.   Management uses collection percentages based upon historical collection experience to determine collectibility.   Management also reviews troubled, aged accounts to determine collection potential.   Patient accounts receivable are written off when deemed uncollectible.   Recoveries of accounts previously written off are recorded as a reduction to bad debt expense when received.   Interest is not charged on patient accounts receivable.

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

## NOTES TO FINANCIAL STATEMENTS

**Inventories:** Inventories are stated at latest invoice cost, which approximates lower of cost (first-in, first-out method) or market.

**Assets limited as to use:** Assets limited as to use primarily include assets held to comply with requirements of indenture agreements and amounts set aside by the Board of Trustees. Amounts required to meet current liabilities are reclassified as current assets in the balance sheets at December 31, 2003 and 2002.

**Investments:** Investments in equity securities with readily determinable fair values and all investments in debt securities are measured at fair value in the balance sheet. Investment income or loss (including realized gains and losses on investments, interest and dividends) is included in the excess of expenses over revenues unless the income or loss is restricted by donor or law. Unrealized gains and losses on investments are excluded from the excess of revenues over expenses unless the investments are trading securities.

The System's investments in other organizations are accounted for under the cost and equity methods of accounting based on the System's level of ownership and influence in the operations of its investment. Under the cost method, dividends are recognized as income during the period. Under the equity method, dividends reduce the investment while allocated earnings or losses increase or decrease the investment and are recognized as income or losses during the period.

**Property and equipment:** Property and equipment is stated on the basis of cost. Donated assets are recorded at fair market value at the date of contribution. Depreciation is provided over the estimated useful lives of the respective assets by the straight-line method.

**Deferred bond issuance costs:** Deferred bond issuance costs are amortized over the remaining life of the bonds using the straight-line method which approximates the interest method.

**Net assets:** Unrestricted net assets are those assets presently available for use by the System at the discretion of the Board of Directors.

Temporarily restricted net assets (none at December 31, 2003 and 2002) are those assets which have been contributed with donor imposed time or purpose restrictions. When a stipulated time restriction expires or purpose restriction is accomplished, temporarily restricted net assets are reclassified to unrestricted net assets and reported in the statement of activities as net assets released from restrictions.

Permanently restricted net assets (none at December 31, 2003 and 2002) are resources subject to donor imposed restrictions that they be maintained permanently by the System.

Donor restrictions expiring entirely in the year of contribution are reported as unrestricted.

**Excess (deficiency) of revenues over expenses:** The statement of operations includes *excess (deficiency) of revenues over expenses*. Changes in unrestricted net assets which are excluded from *excess (deficiency) of revenues over expenses*, consistent with industry practice, included unrealized gains and losses on investments other than trading securities, permanent transfers of assets to and from affiliates for other than goods and services and contributions of long-lived assets (including assets acquired using contributions which by donor restriction were to be used for the purposes of acquiring such assets).

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**NOTES TO FINANCIAL STATEMENTS**

**Net patient service revenue:**  Net patient service revenue is reported at the estimated net realizable amounts from patients, third-party payors and others for services rendered, including estimated retroactive adjustments under reimbursement agreements with third-party payors. Retroactive adjustments are accrued on an estimated basis in the period the related services are rendered and adjusted in future periods as final settlements are determined.

Revenue from the Medicare and Medicaid programs accounted for approximately 32 percent and 8 percent, respectively, of the System's net patient revenue for the year ended 2003.  Laws and regulations governing the Medicare and Medicaid programs are extremely complex and subject to interpretation. As a result, there is at least a reasonable possibility that recorded estimates will change by a material amount in the near term.

**Charity care:**  The Hospital and Healthcare Services provide care to patients, who meet certain criteria under its charity care policy, without charge or at amounts less than its established rates.  Because the Hospital and Healthcare Services do not pursue collection of amounts determined to qualify as charity care, they are not reported as net patient service revenue in the System's financial statements.

**Donor-restricted gifts:**  Unconditional promises to give cash and other assets to the System are reported at fair value at the date the promise is received.  Conditional promises to give and indications of intentions to give are reported at fair value at the date the gift is received.  The gifts are reported as either temporarily or permanently restricted support if they are received with donor stipulations that limit the use of the donated assets.  When a donor restriction expires, that is, when a stipulated time restriction ends or purpose restriction is accomplished, temporarily restricted net assets are reclassified as unrestricted net assets and reported in the statement of operations as net assets released from restrictions.  Donor-restricted contributions whose restrictions are met within the same year as received are reported as unrestricted contributions in the accompanying financial statements.

Unconditional promises to give that are expected to be collected within one year are recorded at net realizable value.  Unconditional promises to give that are expected to be collected in future years are recorded at the present value of their estimated future cash flows.  The discounts on those amounts are computed using risk-free interest rates applicable to the years in which the promises are received.  Amortization of the discounts is included in contribution revenue.  Conditional promises to give are not included as support until the conditions are substantially met.

**Estimated Malpractice Costs:**  The provision for estimated medical malpractice costs includes estimates of the ultimate costs for both reported claims and claims incurred but not reported.

**Income taxes:**  The System, except for Health Enterprises, is exempt from Federal and state income taxes under Section 501(c)(3) of the Internal Revenue Code and similar state statutes relating to not-for-profit organizations.  Health Enterprises is subject to Federal and state income taxes.

**Reclassifications:**  Certain items in the financial statements for the year ended December 31, 2002, have been reclassified to be consistent with the classifications used for the year ended December 31, 2003.

**Note 2.  Cash Concentrations**

At December 31, 2003, the System had $5,584,048 on deposit with two financial institutions.  Of this amount $4,329,906 is secured by the financial institution's pledge of securities or is covered by Federal Deposit Insurance and $1,254,142 is not secured.

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**NOTES TO FINANCIAL STATEMENTS**

**Note 3.  Investments**

Assets Limited as to Use:

The composition of assets limited as to use at December 31, 2003 and 2002, is set forth in the following table.  Investments are stated at fair value.

|  | 2003 | 2002 |
|---|---|---|
| By board designation for funded depreciation: | | |
| Cash and cash equivalents | $ 770,705 | $ 2,614,998 |
| Certificates of deposit | 2,757,569 | 2,243,545 |
| U.S. Government securities | 10,943,214 | 7,083,108 |
| Corporate bonds | 325,026 | 4,202,231 |
| Common stocks | 12,253,033 | 7,616,986 |
| Interest receivable | 160,799 | 146,102 |
| | 27,210,346 | 23,906,970 |
| By indenture agreement - held by Trustee: | | |
| Cash and cash equivalents | 1,632,510 | 1,489,308 |
| U.S. Government securities | 2,424,737 | 2,478,354 |
| Interest receivable | 41,773 | 41,854 |
| | 4,099,020 | 4,009,516 |
| Under malpractice and general liability funding arrangements: | | |
| Cash and cash equivalents | 411,823 | 772,600 |
| U.S. Government securities | 4,271,133 | 3,372,608 |
| Common stock | 780,890 | 525,704 |
| Interest receivable | 54,538 | 49,586 |
| | 5,518,384 | 4,720,498 |
| By Board designation of the retirement of debt: | | |
| Cash and cash equivalents | 30,225 | 84,211 |
| Common stocks | 2,297,159 | 1,783,852 |
| | 2,327,384 | 1,868,063 |
| Total assets limited as to use | 39,155,134 | 34,505,047 |
| Less assets limited as to use that are required for current liabilities | 3,123,396 | 3,138,782 |
| Noncurrent assets limited as to use | $ 36,031,738 | $ 31,366,265 |
| Other investments: | | |
| Other investments, stated at fair value include: Available-for-sale | | |
| Investments on equity method | $ 200,981 | $ 126,886 |

The System holds common stocks in a variety of industries.  At December 31, 2003, no significant industry concentrations exist.

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**NOTES TO FINANCIAL STATEMENTS**

Investment income and gains for assets limited as to use, cash equivalents and other investments are comprised of the following for the years ended December 31, 2003 and 2002:

|  | 2003 | 2002 |
|---|---|---|
| Investment income included in revenues: |  |  |
| Interest income and dividends earned | $ 1,311,907 | $ 1,419,455 |
| Realized gains (losses) on sales of securities | (17,749) | (1,231,927) |
| Equity income (loss) on investments | 447,775 | 222,215 |
|  | $ 1,741,933 | $ 409,743 |
| Other changes in unrestricted net assets: |  |  |
| Unrealized gains (losses) on other than |  |  |
| trading securities | $ 3,140,854 | $ (1,241,403) |

The System owns 50% interest in Berkeley Haven Limited Partnership and in Canterbury of Shepherdstown Limited Partnerships. These partnerships own and operate intermediate care nursing centers in Martinsburg and Shepherdstown, West Virginia. The System also owns a 10% interest in Ambergris, LLC, a management company, and a 50% interest in Gateway Home Care, a durable medical equipment company. The System records these investments under the equity method of accounting. The System recognized income of $447,775 and $222,215 from these investments during the years ended December 31, 2003 and 2002, respectively.

Condensed, combined financial information for these entities for the year ended December 31, 2003 is as follows:

| | |
|---|---|
| Current assets | $ 1,956,765 |
| Property and equipment, net | 2,927,350 |
| Other assets | 87,130 |
| **Total assets** | $ 4,971,245 |
| Current liabilities | $ 1,956,138 |
| Long-term debt | 3,162,629 |
| Equity (deficit) | (147,522) |
| **Total liabilities and equity** | $ 4,971,245 |
| Revenues | $ 10,420,225 |
| Expenses | 9,468,442 |
| **Net income** | $ 951,783 |
| **System's share of earnings** | $ 447,775 |

The carrying value of the System's investments accounted for on an equity basis at December 31, 2003 is as follows:

| | |
|---|---|
| Investment in management company and durable medical equipment company | $ 200,981 |
| Investment in nursing home partnerships | (233,764) |
| | $ (32,783) |

The System's investment in nursing home partnerships has been recorded as a liability in accounts payable in the accompanying financial statements due to its guarantee of debt as discussed in Note 7. The investment in the management company and durable medical equipment company is reflected as investment in joint ventures.

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**NOTES TO FINANCIAL STATEMENTS**

**Note 4. Property and Equipment**

A summary of the components of property and equipment at December 31, 2003 and 2002, follows:

|  | 2003 | 2002 |
|---|---|---|
| Land | $ 265,336 | $ 265,336 |
| Land improvements | 1,512,124 | 1,512,124 |
| Buildings and improvements | 23,998,830 | 23,793,092 |
| Fixed equipment | 17,505,359 | 17,199,605 |
| Major movable | 30,838,265 | 31,789,167 |
| Minor movable | 990,285 | 970,496 |
| Leasehold improvements | 28,418 | 21,168 |
|  | 75,138,617 | 75,550,988 |
| Less accumulated depreciation and amortization | 49,289,366 | 48,773,350 |
|  | 25,849,251 | 26,777,638 |
| Construction in progress | 716,541 | 381,290 |
| Property and equipment, net | $ 26,565,792 | $ 27,158,928 |

The System capitalizes interest cost incurred on funds used to construct property and equipment. The capitalized interest is recorded as part of the asset to which it relates and amortized over the asset's estimated useful life. There was no interest cost capitalized for the years ended December 31, 2003 or 2002.

**Note 5. Estimated Third-Party Payor Settlements**

The Hospital maintains accounts due from (to) third-party payors which consist of amounts receivable (payable) to Medicare and Medicaid programs for settlement of current and prior year cost reports, as well as amounts due from the Medicaid program under the disproportionate share program. These estimated settlements by program at December 31, 2003 and 2002, are as follows:

|  | 2003 | 2002 |
|---|---|---|
| Medicare | $ 300,000 | $ 200,000 |
| Medicaid | (50,000) | (50,000) |
| Medicaid disproportionate share | 202,194 | 263,477 |
| Total | $ 452,194 | $ 413,477 |

In 1995, the State of West Virginia Disproportionate Share Hospital State Plan was amended to provide for a settlement process among participating hospitals. However, the State has not completed a settlement process for any of the years since the date of the plan amendment. Currently, the Bureau for Medical Services of the State of West Virginia Department of Health and Human Resources (the Bureau) is in process of contracting with a third-party vendor to assist with the audit settlement process for the disproportionate Share Hospital State Plan. The Bureau has not yet finalized the disproportionate share (DSH) settlement process with the Centers for Medicare and Medicaid Services. The laws and regulations governing the DSH settlement process are complex, involving statistical data from all participating hospitals, and subject to interpretation. Accordingly, City Hospital is not able to estimate the possible loss, if any, that could arise upon completion of the DSH settlement process. An unfavorable settlement could materially impact City Hospital's future results of operations or cash flows in a particular period.

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**NOTES TO FINANCIAL STATEMENTS**

**Note 6.  Note Payable**

Notes payable at December 31, 2003 and 2002 consists of the following:

|  | 2003 | 2002 |
|---|---|---|
| Investment firm, line of credit, due on demand, floating interest rate | $ - | $ 940,308 |
| Investment firm, line of credit, due on demand, floating interest rate | 1,200,192 | 2,000,000 |
|  | $ 1,200,192 | $ 2,940,308 |

The lines of credit at December 31, 2003 have variable interest rates and are secured by assets limited as to use.  The unused lines of credit at December 31, 2003 was $3,299,808.

**Note 7.  Debt Guarantee**

On November 18, 1998, the System entered into a loan modification agreement with Canterbury of Shepherdstown Limited Partnership (of which the System is a 50% partner), Huntington National Bank and Glenmark Associates, Inc. to guarantee the payment of the note on behalf of Canterbury of Shepherdstown Limited Partnership.  At December 31, 2003, the balance outstanding on this loan was approximately $1,684,607.

**Note 8.  Long-Term Obligations and Bond Indebtedness Contingency**

|  | 2003 | 2002 |
|---|---|---|
| Revenue Bonds, funded in quarterly installments of approximately $463,000, due March 2022, net of discount, terms below | $ 16,622,628 | $ 17,362,086 |
| U.S. Department of Commerce - Economic Development Administration, mortgage note payable in monthly installments of $6,570, including interest at 4.25%, due December 2010, secured by substantially all Hospital assets | 311,250 | 374,313 |
| West Virginia Hospital Finance Authority Variable Rate Demand Revenue Bonds, 2002 Series C-1 Bonds, annual principal payments of $985,000 beginning in 2003 through January, 2007, including interest at prime rate, maturing January 2007, secured by substantially all Hospital assets | 3,940,000 | 4,925,000 |
|  | 20,873,878 | 22,661,399 |
| Less current maturities | 1,876,906 | 1,829,172 |
| Long-term obligations | $ 18,996,972 | $ 20,832,227 |

**Revenue Bonds:**

On September 24, 1992, the Berkeley County Building Commission of West Virginia (the Commission) issued $23,640,000 of Hospital Revenue Bonds (the 1992 Bonds), dated September 1, 1992.  The 1992 Bonds were assumed by the Hospital to refund the Commission's 1979 Hospital Revenue Bonds (the 1979 Bonds), finance the costs of certain capital improvements, provide a debt service reserve fund and pay certain costs of issuance of the 1992 Bonds.  The 1992 Bonds are secured by the Hospital's lease agreement to the Commission in the amount of the bonds payable.  The lease agreement is secured by

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**NOTES TO FINANCIAL STATEMENTS**

net revenues and pledged assets of the Hospital which include land, building and equipment. Pursuant to the Master Trust Indenture dated September 1, 1992, the Foundation, along with the Hospital, is a part of the obligated group (Obligated Group) with respect to the future payment of the 1992 Bonds. The 1992 Bonds mature and bear interest as follows:

| Due November 1 | Principal Amount | Interest Rate |
| --- | --- | --- |
| 2004 | 825,000 | 6.5% |
| 2005 | 880,000 | 6.5% |
| 2006 | 935,000 | 6.5% |
| 2007 | 1,000,000 | 6.5% |
| 2008 | 1,065,000 | 6.5% |
| Term bonds due: | | |
| November 1, 2009 | 1,135,000 | 6.5% |
| November 1, 2022 | 11,170,000 | 6.5% |
| | 17,010,000 | |
| Less discount | 387,372 | |
| Revenue bonds, net of discount | $ 16,622,628 | |

The Hospital funds the Bonds quarterly with the Trustee making principal payments annually and the interest payments semi-annually. The portion of the Revenue Bonds (Series 1992) which mature in 2009 bears interest at 6.5% payable quarterly and has a mandatory sinking fund redemption requirement beginning in 2004. The portion of the Revenue Bonds (Series 1992) which mature in 2022 bears interest at 6.5% payable semi-annually and has a mandatory sinking fund redemption requirement beginning in 2010.

The Master Trust Indenture (the Indenture) for the 1992 Bonds places restrictions on future borrowings and the leasing and disposition of certain assets. Additionally, the Indenture requires that charges and fee rates be maintained at a level which will produce consolidated net income available for debt service, as defined in the Indenture, in an amount not less than 110% of the consolidated maximum annual debt service requirement on all consolidated covered debt, as defined in the Indenture. At December 31, 2003, the Obligated Group is in compliance with such requirements.

The mortgage note payable is secured by substantially all tangible personal property of the Hospital and is subordinated to the holders of the 1992 Bonds.

**Revenue Bonds WVHFA:** On January 1, 2002, the Hospital entered into a Bond Agreement with the West Virginia Hospital Finance Authority (WVHFA) whereby the Hospital borrowed $4,925,000. In connection with this borrowing, the Hospital entered into an irrevocable direct pay letter of credit with Huntington National Bank at an annual fee of 1 percent of the outstanding loan balance. The letter of credit is scheduled to mature January 2008.

The Bond resolution requires the Hospital to maintain a Debt Service Fund equal to 10% of the outstanding Bonds. The amount on deposit in the Debt Service Fund is $495,000 at December 31, 2003, and is reflected in the accompanying balance sheets as assets limited as to use. The Bond Resolution also contains various other restrictive covenants.

At December 31, 2003, the Debt Service Fund is collateralized by pledges of securities by Bank of America where the funds have been invested by the trustee.

The Bond indenture requires the Hospital to satisfy certain measures of financial performance. The Hospital was in compliance at December 31, 2003.

The Bonds have a variable rate of interest at the bank's prime rate, which at December 31, 2003 was 1.4%.

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**NOTES TO FINANCIAL STATEMENTS**

Aggregate maturities of long-term obligations and capital lease obligations at December 31, 2003, are as follows:

|  | Long-term Obligations |
|---|---|
| 2004 | $ 1,876,906 |
| 2005 | 1,934,805 |
| 2006 | 1,992,830 |
| 2007 | 2,060,986 |
| 2008 | 1,090,723 |
| Thereafter | 12,305,000 |
|  | 21,261,250 |
| Less:  Discount on revenue bonds | 387,372 |
|  | $ 20,873,878 |

**Bonded Indebtness Contingency:** The Hospital's bonds, which were issued through WVHFA, have been reviewed by the Internal Revenue Service, who have preliminarily determined that the bonds did not meet the criteria for tax exempt financing. Management and legal counsel are exploring various options, including an appeal of the determination and/or refunding the existing bonds with a new tax-exempt issue. Management and legal counsel have not yet determined the financial implications, if any, of a final determination that interest on the bonds is taxable or of refinancing the bonds. However, management and legal counsel believe that neither option will have a material financial impact on the Hospital.

**Note 9. Net Patient Service Revenue**

The System, through the Hospital, has agreements with third-party payors that provide for payments to the System at amounts different from its established rates. A summary of the payment arrangements with major third-party payors follows:

- **Medicare**

    Inpatient acute care services and inpatient long-term care services, rendered to Medicare program beneficiaries, are paid at prospectively determined rates per discharge and rates per day, respectively. These rates vary according to a patient classification system that is based on clinical, diagnostic and other factors. Inpatient non-acute services are paid based on a cost reimbursement methodology.

    For Medicare services rendered prior to August 1, 2000, the Hospital was reimbursed for cost reimbursable items at a tentative rate with final settlement determined after submission of annual cost reports by the Hospital and audits thereof by the Medicare fiscal intermediary. The Hospital's classification of patients under the Medicare program and the appropriateness of their admission are subject to an independent review by a peer review organization. The Hospital's Medicare cost reports have been settled by the Medicare fiscal intermediary, through December 31, 1999.

    Effective August 1, 2000, Medicare hospital outpatient services are to be paid on a prospective payment system (PPS) based upon Ambulatory Payment Classifications (APCs). The APC payment system will be phased-in over three years. During this phase-in period, the Hospital will receive a blended payment of the APC's and the previous cost based methodology. The outpatient payment amounts are adjusted for regional wage difference and additional payments may be made for high cost and new technology procedures.

- **Medicaid**

    Inpatient services rendered to Medicaid program beneficiaries in January 1996 or thereafter are reimbursed based on prospectively determined rates per discharge. Medicaid outpatient services are

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**NOTES TO FINANCIAL STATEMENTS**

reimbursed based upon the lesser of the Hospital's charge or predetermined fee schedule amounts. Inpatient services prior to January 1996 were reimbursed under a cost reimbursement methodology. The Hospital was reimbursed at a tentative rate with final settlement determined after submission of annual cost reports by the Hospital and audit thereof by the Medicaid fiscal intermediary. The Hospital's Medicaid cost reports have been audited by the Medicaid fiscal intermediary through 1996.

- **Commercial Insurance Carriers**

  The Hospital also entered into payment agreements with certain commercial insurance carriers.  The basis for payment to the Hospital under these agreements includes various discounts from established charges.

- **West Virginia Health Care Authority**

  The Legislature of the State of West Virginia has created the Health Care Authority to regulate hospital's gross patient revenue based on limitation orders compiled from rate schedules and budgets submitted by the hospitals on a periodic basis.  If a hospital's charges are held to be excessive or unreasonable, the Health Care Authority may require rebates to consumers or adjustments to subsequent year revenue limits.

Revenue from the Medicare and Medicaid programs accounted for approximately 32 percent and 8 percent, respectively, of the Hospital's net patient revenue for the year ended December 31, 2003, and 35 percent and 7 percent, respectively, of the Hospital's net patient revenue for the year ended December 31, 2002.  Laws and regulations governing the Medicare and Medicaid programs are extremely complex and subject to interpretation.  As a result, there is at least a reasonable possibility that recorded estimates will change by a material amount in the near term.  The 2003 net patient service revenue increased approximately $11,000 due to removal of allowances previously estimated that are no longer necessary as a result of final settlements and years that are no longer subject to audits, reviews, and investigations.

The Hospital also has entered into payment agreements with certain commercial insurance carriers, health maintenance organizations, and preferred provider organizations.  The basis for payment to the Hospital under these agreements includes prospectively determined rates per discharge, discounts from established charges, and prospectively determined daily rates.

A summary of gross and net patient service revenue for all Hospital payors for the years ended December 31, 2003 and 2002, follows:

|  | **2003** | 2002 |
|---|---|---|
| Gross patient service revenue | **$128,451,243** | $110,254,445 |
| Less provision for: |  |  |
| Contractual adjustments | **(48,655,083)** | (37,481,119) |
| Charity care | **(1,531,440)** | (1,177,549) |
| Net patient service revenue | **$ 78,264,720** | $ 71,595,777 |

The Hospital qualifies as a disproportionate share hospital for Medicaid.  As a result, of qualifying for this designation, the Hospital is entitled to supplemental Medicaid payments.  Included in net patient revenues are Medicaid disproportionate share revenues of $808,766 and $1,053,909 for 2003 and 2002, respectively.

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**NOTES TO FINANCIAL STATEMENTS**

**Note 10.  Pledges Receivable**

Pledges receivable at December 31, 2002, consist of the following unconditional promises to give:

| | | |
|---|---|---|
| Capital campaign | $ | 755,833 |
| Less:  allowance | | - |
| Net pledges receivable | $ | 755,833 |
| Amounts due in: | | |
| Less than one year | $ | 5,833 |
| One to five years | | 750,000 |
| | $ | 755,833 |

**Note 11.  Rental Income**

The System has in operation the Dorothy McCormack Cancer Treatment Center.  At December 31, 2003, approximately 75% of the building is leased under operating lease agreements with lease terms ranging from 3 to 10 years.  A summary, of the rental income for the next five years is as follows:

| Year Ending December 31 | | Amount |
|---|---|---|
| 2004 | $ | 282,788 |
| 2005 | | 260,889 |
| 2006 | | 234,435 |
| 2007 | | 234,435 |
| 2008 | | 234,435 |
| Total | $ | 1,246,982 |

**Note 12.  Pension Plan**

Defined Benefit Plan

The Hospital has a noncontributory defined benefit pension plan covering substantially all its employees, which provides for the payment of contributions for participants to an insurance company under group contracts.  The retirement plans provide benefits based on years of credited service.  The Hospital's policy is to make contributions to the plan in amounts, as actuarially determined, sufficient to fund benefits.

Effective April 30, 2002, the plan was amended to freeze benefit accruals.  No new participants will be able to enter the plan after that date.

The actuarially computed prepaid benefit cost includes the following components:

| | 2003 | 2002 |
|---|---|---|
| **Change in projected benefit obligation:** | | |
| Benefit obligation at beginning of year | $ 14,578,024 | $ 13,981,720 |
| Service cost | 1,945 | 237,009 |
| Curtailment gain | - | (5,995,292) |
| Settlement | (1,778,063) | - |
| Interest cost | 794,231 | 868,112 |
| Actuarial loss/(gain) | (562,019) | 6,479,251 |
| Benefits paid | (162,173) | (992,776) |
| Administration expenses paid | (1,966) | - |
| Benefit obligation at end of year | $ 12,869,979 | $ 14,578,024 |

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

### NOTES TO FINANCIAL STATEMENTS

|                                                | 2003 |  | 2002 |
|------------------------------------------------|------|--|------|
| **Change in plan assets**                      |      |  |      |
| Fair value of plan assets at beginning of year | $ 9,570,945 | $ | 9,964,359 |
| Actual return on plan assets                   | 1,314,109 |  | (504,141) |
| Employer contributions                         | 1,000,000 |  | 1,103,503 |
| Benefits paid                                  | (162,173) |  | (992,776) |
| Settlement                                     | (1,778,063) |  | - |
| Administration expenses paid                   | (1,966) |  | - |
| Fair value of plan assets at end of year       | $ 9,942,852 | $ | 9,570,945 |
| **Funded Status**                              |      |  |      |
| Funded Status                                  | $ (2,927,127) | $ | (5,007,079) |
| Unrecognized transition obligation/(asset)     | - |  | (60,341) |
| Unrecognized prior service cost                | - |  | - |
| Unrecognized net actuarial loss/(gain)         | 3,267,942 |  | 5,883,232 |
| Prepaid benefit cost                           | $ 340,815 | $ | 815,812 |

Weighted average assumptions used in the accounting for net periodic pension costs and benefit obligations were:

|                                | 2003 | 2002 |
|--------------------------------|------|------|
| Discount rate                  | 5.75% | 5.50% |
| Expected return on plan assets | 7.00% | 7.00% |
| Rate of compensation increase  | - | 3.50% |

The actuarially computed net periodic pension costs included the following components:

|                                                | 2003 |  | 2002 |
|------------------------------------------------|------|--|------|
| Service cost                                   | $ 1,945 | $ | 237,009 |
| Interest cost                                  | 794,231 |  | 868,112 |
| Expected return on plan assets                 | (669,030) |  | (727,368) |
| Amortization of transition obligation/(asset)  | (60,341) |  | (60,343) |
| Amortization of prior service cost             | - |  | (7,780) |
| Recognized net actuarial loss/(gain)           | 956,707 |  | 603,386 |
| Curtailment gain                               | - |  | (147,807) |
| Settlement loss                                | 451,485 |  | - |
| Net periodic benefit cost                      | $ 1,474,997 | $ | 765,209 |

#### Defined Contribution Plan

The Hospital has a defined contribution 401(k) retirement plan covering substantially all of its employees. The plan has two components consisting of a salary reduction portion and a discretionary contribution portion. The salary reduction component allows eligible employees to contribute, as a salary deferral, to the plan. The discretionary contribution portion of the plan allows for additional contributions of eligible wages subject to certain limitations and restrictions. For the years ended December 31, 2003 and 2002 the Hospital has accrued $703,312 and $676,500, respectively, in contributions payable to the Plan.

### Note 13. General and Professional Liability Coverage, Contingencies and Subsequent Event

The System has established a self-insurance plan for the purpose of providing professional and general liability insurance. Professional insurance consultants have been retained to determine funding requirements. The amounts funded have been placed in self-insurance trust accounts that is being administered by a trustee. The self-insurance trust account is reported in assets limited as to use in the

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

## NOTES TO FINANCIAL STATEMENTS

accompanying balance sheets. This self-insurance program provides coverage of up to $3,000,000 per occurrence and $6,000,000 per annual aggregate through October 31, 2003 and $9,000,000 per annual aggregate after that date. The System maintains commercial excess insurance of $10,000,000. Losses in excess of the $13,000,000 per occurrence limit and $16,000,000 through October 31, 2003 and $19,000,000, after that date, annual aggregate limits would be the responsibility of the System.

The System has entered into a medical malpractice professional liability insurance policy. Due to the insurance carrier not being licensed in West Virginia, the System is not, for its excess coverage, protected by an insurance guaranty fund or other solvency protection arrangement of the State of West Virginia if the carrier is unable to fulfill its contractual obligation under the policy.

The System is involved in litigation arising in the ordinary course of business. Claims alleging malpractice have been asserted against the System and are currently in various stages of litigation. It is the opinion of management, however, that estimated malpractice costs accrued at December 31, 2003 and 2002, respectively, are adequate to provide for potential losses resulting from pending or threatened litigation as well as claims arising from unknown incidents from services provided to patients that may be asserted. The System has retained independent actuaries to estimate the ultimate costs, if any, of the settlement of such claims.

### Note 14. Advertising Costs

The System's policy is to expense advertising costs as they are incurred. Total advertising expenses for the years ended December 31, 2003 and 2002, were approximately $123,835 and $160,100, respectively.

### Note 15. Functional Expenses

The System provides general health care services to residents within its geographic location. Expenses related to providing these services are as follows:

|                            | 2003          | 2002          |
|----------------------------|---------------|---------------|
| Healthcare services        | $ 54,160,612  | $ 45,877,134  |
| General and administrative | 24,632,149    | 30,071,472    |
| Fund raising               | 31,964        | 35,014        |
| Total                      | $ 78,824,725  | $ 75,983,620  |

### Note 16. Concentrations of Credit Risk

The Hospital and Health Services are located in Martinsburg, West Virginia. They grant credit without collateral to their patients, many of whom are local residents and are insured under third-party payor agreements. The mix of net receivables from the third-party payors and patients are as follows:

|                          | 2003 | 2002 |
|--------------------------|------|------|
| Medicare                 | 22%  | 16%  |
| Medicaid                 | 4%   | 5%   |
| Commercial               | 24%  | 28%  |
| Other third-party payors | 20%  | 28%  |
| Private pay              | 30%  | 23%  |
|                          | 100% | 100% |

**GATEWAY REGIONAL HEALTH SYSTEM, INC. AND SUBSIDIARIES**

**NOTES TO FINANCIAL STATEMENTS**

**Note 17. Lease Commitments and Total Rental Expense**

The System, leases various equipment under operating leases, with various expiring dates through April 2006. Total rental expense in 2003 and 2002 for all operating leases was approximately $952,385 and $866,621, respectively.

The following is a schedule by year of future minimum lease payments under operating leases as of December 31, 2003, that have initial or remaining lease terms in excess of one year.

| Year ending December 31, | |
|---|---|
| 2004 | $ 378,158 |
| 2005 | 228,063 |
| 2006 | 97,972 |
| 2007 | 89,350 |
| 2008 | 33,008 |
| | $ 826,551 |

**Note 18. Health Care Legislation and Regulation**

The health care industry is subject to numerous laws and regulations of Federal, state and local governments. Recently, government activity has increased with respect to investigations and allegations concerning possible violations of various statutes and regulations by healthcare providers. Compliance with such laws and regulations can be subject to future government review and interpretation as well as regulatory actions unknown or unasserted at this time. Management believes that the Hospital is in compliance with fraud and abuse as well as other applicable government laws and regulations. If the Hospital is found in violation of these laws, the Hospital could be subject to substantial monetary fines, civil and criminal penalties and exclusion from participation in the Medicare and Medicaid programs.

**Note 19. Affiliation**

As a result of the many challenges facing community hospitals, the Board of Directors has entered into discussions with a larger health system to explore the benefits of an affiliation. The Board of Directors and management believe there could be benefits to the System from such an affiliation. These benefits include, but are not limited to greater access to capital, increased access to physician services and greater purchasing power. It is possible that such an affiliation could be consummated in 2004 if the Board of Directors and Management determine it is in the best interest of the System.

**Note 20. Subsequent Event – Acquisition of Medical Practice**

The system has entered into an agreement in 2004 for the purchase of assets of a medical clinic for $842,000. This purchase will allow for the operation of an urgent care center at two locations in Berkeley County, West Virginia.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX E

**DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS**

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX E**

## DEFINITIONS OF CERTAIN TERMS AND
## SUMMARY OF PRINCIPAL DOCUMENTS

*Certain material features of the Master Indenture, the Bond Indenture and the Loan Agreement are discussed below in connection with the issuance of the 2005 Bonds (as used in this Appendix, the "2005 Bonds"). The discussion does not purport to be complete and is subject in all respects to the provisions of, and is qualified in its entirety by, reference to the Master Indenture, the Bond Indenture and the Loan Agreement.*

### DEFINITIONS OF CERTAIN TERMS

*As used in this Preliminary Official Statement, the following terms, unless the context requires otherwise, will have the meaning as set forth below. Any capitalized terms not defined below will have the same meaning as set forth in the Master Indenture, the Bond Indenture and the Loan Agreement, copies of which can be obtained by contacting the Bond Trustee.*

### Act

"Act" means the West Virginia Hospital Finance Authority Act, Article 29B of Chapter 16 of the Code of West Virginia, 1931, as amended, as heretofore and hereafter amended or supplemented.

### Acquisition Expense

"Acquisition Expense" has the meaning set forth in the preambles of the Bond Indenture and as also described in the Escrow Agreements.

### Additional Payments

"Additional Payments" means the payments so designated and required to be made by the Obligated Group pursuant to Section 3.2 of the Loan Agreement.

### Additional Master Notes

"Additional Master Notes" means the additional Notes authorized to be issued by the Obligated Group Agent pursuant to the Master Indenture.

### Alternate Bank Rate

"Alternate Bank Rate" means, with respect to any Bank Bond, such interest rate or sequence of rates (which may be stated as a formula and may be determined by reference to a specified index or indices) as is specified in the Substitute Liquidity Agreement or Substitute Liquidity Facility then in effect pursuant to which such Bank Bond was purchased.

## Auction Rate Adjustment Date

"Auction Rate Adjustment Date" means the first day of each Auction Rate Period.

## Auction Rate Period

"Auction Rate Period" means with respect to a Series of 2005 Bonds initially the period of time commencing on the Closing Date and ending on a Conversion Date for such Bonds and thereafter means any period of time commencing on an Auction Rate Conversion Date for such Bonds and ending on a Fixed Rate Conversion Date or a Weekly Rate Conversion Date.

## Auction Mode

"Auction Mode" means the Mode during which a Series of 2005 Bonds bear interest at the Auction Rate.

## Authority

"Authority" means the West Virginia Hospital Finance Authority, a body corporate and governmental instrumentality of the State of West Virginia, and its successors and assigns.

## Authorized Denomination

"Authorized Denomination" means (i) during any Weekly Rate Period, $100,000 and $5,000 multiples in excess thereof, (ii) during any Auction Rate Period, $25,000 and integral multiples thereof and (iii) during any Fixed Rate Period, $5,000 and integral multiples thereof.

## Bank

"Bank" means the Initial Bank for the period during which the initial Liquidity Facility and initial Liquidity Facility Agreement are in effect, and thereafter shall mean the Substitute Bank then obligated under the Substitute Liquidity Facility and Substitute Liquidity Agreement at the time in effect, all of which must be acceptable to the Bond Insurer.

## Bank Bonds

"Bank Bonds" means Tendered Bonds purchased with moneys drawn under the Liquidity Facility pursuant to Article XI and owned by or pledged to or for the benefit of the Bank or its permitted assignees in accordance with the Liquidity Facility Agreement or the Custody Agreement, if any, until such Bonds are remarketed by the Remarketing Agent pursuant to the Remarketing Agreement or such Bonds lose their characterization as Bank Bonds pursuant to the Liquidity Facility Agreement.

## Bank Rate

"Bank Rate" means (a) when the Initial Liquidity Facility is in effect under the initial Liquidity Facility Agreement, the Bank Rate described in the initial Liquidity Facility

Agreement and (b) when any Substitute Liquidity Facility is in effect, the then current Alternate Bank Rate. The foregoing notwithstanding at no time shall the Bank Rate be higher than the Maximum Interest Rate.

## BMA Municipal Index

"BMA Municipal Index" means The Bond Market Association Municipal Swap Index as of the most recent date for which such index was published or such other weekly, high-grade index comprised of seven-day, tax-exempt Weekly Rate demand notes produced by Municipal Market Data, Inc., or its successor, or as otherwise designated by The Bond Market Association; provided, however, that, if such index is no longer produced by Municipal Market Data, Inc. or its successor, then "BMA Municipal Index" shall mean such other reasonably comparable index selected by the Obligated Group Agent and approved by the Bond Insurer.

## Bond Counsel

"Bond Counsel" means legal counsel of recognized national standing in the field of obligations, the interest on which is excluded from gross income for federal income tax purposes, selected by the Obligated Group Agent, acceptable to the Authority, and not objected to by the Bond Trustee or the Credit Facility Provider.

## Business Day

"Business Day" means a day that is not a Saturday, Sunday or legal holiday on which banking institutions in the State of West Virginia, the State of New York or in any state in which the office of any Credit Facility Provider, the Remarketing Agent, the Tender Agent, the Auction Agent (if any), the Broker-Dealer (if any) or the Bond Trustee is located are authorized to remain closed or a day on which the New York Stock Exchange is closed.

## Code

"Code" means the Internal Revenue Code of 1986, as amended, or any successor statute thereto, and any regulations promulgated thereunder.

## Collateral Document

"Collateral Document" means any written instrument other than the Loan Agreement, the Master Indenture, Supplemental Indenture 2005-2, the Bond Indenture and the 2005 Notes, whereby any property or interest or rights in property of any kind is granted, pledged, conveyed, assigned or transferred to the Authority or Bond Trustee, or both, as security for payment of the 2005 Bonds or performance by the Obligated Group of its obligations under the Master Documents and the Obligations.

## Credit Facility

"Credit Facility" means a letter of credit, including, if applicable, a confirming letter of credit, Insurance Policy or similar Credit Facility (other than one issued by the Obligated Group or any affiliate of a member of the Obligated Group) issued by a commercial bank, savings institution, bond insurer or other financial institution, the senior unsecured debt securities or securities secured by guarantees of the Provider of which are rated at least "AA" (or the equivalent) by one or more of the Rating Agencies.

## Credit Facility Provider

"Credit Facility Provider" means the Bond Insurer, the Liquidity Facility Provider and the commercial bank, savings institution, Bond Insurer or other financial institution issuing a Credit Facility.

## Electronic Means

"Electronic Means" means telecopy, telegraph, telex, facsimile transmission, email transmission or other similar electronic means of communication, including a telephonic communication confirmed by writing or written transmission.

## Eligible Bonds

"Eligible Bonds" means any 2005 Bonds other than 2005 Bonds owned by, for the account of, or on behalf of, the Authority or the Obligated Group.

## Eligible Moneys

"Eligible Moneys" means (a) moneys (i) paid or deposited by the Obligated Group to or with the Bond Trustee, (ii) continuously held in any fund, account or subaccount established which is subject to the lien of the Bond Indenture and in which no other moneys which are not Eligible Moneys are held and (iii) which have so been on deposit with the Bond Trustee for at least 367 days from their receipt by the Bond Trustee, during and prior to which period no petition by or against the Authority, any member of the Obligated Group or any "affiliate" thereof (as defined in Title 11 of the United States Code) to which such moneys are attributable under any bankruptcy or similar law now or hereafter in effect shall have been filed and no bankruptcy or similar proceeding otherwise initiated (unless such petition or proceeding shall have been dismissed and such dismissal be final and not subject to appeal), together with investment earnings on such moneys; (b) moneys received by the Bond Trustee pursuant to the Liquidity Facility which are held in any fund, account or subaccount established in which no other moneys which are not Eligible Moneys are held, together with investment earnings on such moneys; (c) proceeds from the remarketing of any 2005 Bonds pursuant to the provisions of the Bond Indenture to any person other than the Authority, any member of the Obligated Group, or any "affiliate" thereof (as defined in Title 11 of the United States Code); (d) proceeds from the issuance and sale of refunding bonds, together with the investment earnings on such proceeds, if there is delivered to the Bond Trustee at the time of issuance and sale of such bonds an opinion of nationally recognized bankruptcy counsel acceptable to the Bond Trustee, the Bond Insurer

E-4

and each Rating Agency then maintaining a rating on a Series of 2005 Bonds bearing interest at a Weekly Rate (which opinion may assume that no Bondholders are "insiders" within the meaning of Title 11 of the United States Code) to the effect that the use of such proceeds and investment earnings to pay the principal of, premium, if any, or interest on the 2005 Bonds would not be avoidable as preferential payments under Section 547 of the United States Bankruptcy Code recoverable under Section 550 of the United States Bankruptcy Code should the Authority, any member of the Obligated Group, or any "affiliate" thereof (as defined in Title 11 of the United States Code) become a debtor in a proceeding commenced; and (e) moneys which are derived from any other source, together with the investment earnings on such moneys, if the Bond Trustee has received an unqualified opinion of nationally recognized bankruptcy counsel acceptable to the Bond Trustee, the Bond Insurer and each Rating Agency then maintaining a rating on a Series of 2005 Bonds bearing interest at a Weekly Rate (which opinion may assume that no Bondholders are "insiders" within the meaning of Title 11 of the United States Code) to the effect that payment of such amounts to bondholders would not be avoidable as preferential payments under Section 547 of the United States Bankruptcy Code recoverable under Section 550 of the United States Bankruptcy Code should the Authority, any member of the Obligated Group, or any "affiliate" thereof (as defined in Title 11 of the United States Code) become a debtor in a proceeding commenced; provided that such proceeds, moneys or income shall not be deemed to be Eligible Moneys or available for payment of the 2005 Bonds if, among other things, an injunction, restraining order or stay is in effect preventing such proceeds, moneys or income from being applied to make such payment. For the purposes of this definition, the term "moneys" shall include cash and any investment securities including, without limitation, Government Obligations.

## Escrow Agreements

"Escrow Agreements" means, collectively, the 1992 Escrow Agreement, the 2002 Escrow Agreement and the 2003 Escrow Agreement.

## Escrow Funds

"Escrow Funds" means, collectively, the 1992 Escrow Fund created in the 1992 Escrow Agreement, the 2002 Escrow Fund created in the 2002 and 2003 Escrow Agreement, and the 2003 Escrow Fund created in the 2002 and 2003 Escrow Agreement.

## Event of Default

"Event of Default" means any of the events specified in Section 7.01 of the Bond Indenture.

## Facilities or Hospital Facilities

"Facilities" or "Hospital Facilities" means all buildings, land and equipment used in operations of any member of the Obligated Group that is a hospital.

Failed Tender Rate

"Failed Tender Rate" means a rate equal to the sum of the BMA Municipal Index plus 300 basis points, provided that in no event shall the Failed Tender Rate exceed the Maximum Interest Rate.

Favorable Opinion of Bond Counsel

"Favorable Opinion of Bond Counsel" means, with respect to any action the occurrence of which requires such an opinion, an unqualified Opinion of Counsel, which shall be Bond Counsel, to the effect that such action is permitted under the Bond Indenture and will not, in and of itself, result in the inclusion of interest on the 2005 Bonds in gross income for federal income tax purposes (subject to the inclusion of any exceptions contained in the opinion delivered upon original issuance of the 2005 Bonds).

Fitch

"Fitch" means Fitch Ratings, a corporation organized and existing under the laws of the State of New York, its successors and their assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Obligated Group Agent by notice to the Authority, the Credit Facility Provider and the Bond Trustee.

Fixed Rate

"Fixed Rate" means the interest rate on a Series of 2005 Bonds determined pursuant to Section 2.08 of the Bond Indenture.

Fixed Rate Bonds

"Fixed Rate Bonds" means any series of the 2005 Bonds during the Fixed Rate Mode.

Fixed Rate Conversion Date

"Fixed Rate Conversion Date" means the date on which a Series of 2005 Bonds are converted to bear interest at a Fixed Rate.

Fixed Rate Mode

"Fixed Rate Mode" means the Mode during which a Series of 2005 Bonds bears interest at a Fixed Rate.

Gross Receipts

"Gross Receipts" means all receipts, revenues, income and other moneys received by or on behalf of any one or more Members of the Obligated Group, including, but without limiting

the generality of the foregoing, revenues derived from the ownership or operation of Property, including insurance and condemnation proceeds with respect to Property or any portion thereof, and all rights to receive the same, whether in the form of accounts, Accounts Receivable, contract rights or other rights, and the proceeds of such rights, and whether now owned or held or hereafter coming into existence; provided, however, that gifts, grants, bequests, donations and contributions heretofore or hereafter made and designated or specified by the granting authority, donor or maker thereof as being for specified purposes (other than payment of debt service on Indebtedness) and the income derived therefrom to the extent required by such designation or specification shall be excluded from Gross Receipts.

## Holder or Bondholder or Owner

"Holder" or "Bondholder," or "Owner" when used with respect to a 2005 Bond, means the Person in whose name such 2005 Bond is registered.

## Initial Swap Agreement

"Initial Swap Agreement" means the Interest Rate Agreement, dated the date thereof, between the Obligated Group Agent and the Swap Provider.

## Interest Payment Date

"Interest Payment Date" means (1) (a) with respect to a Series of 2005 Bonds in the Weekly Mode, the first Business Day of each calendar month occurring after the Weekly Rate Conversion Date with respect thereto, and (b) for any Bank Bond, the Bond Purchase Date and the Bond Sale Date therefor and the first Business Day of each calendar month which occurs between such dates, (2) with respect to a Series of 2005 Bonds converted to the Fixed Rate Mode, the first December 1 or June 1 following the month in which the conversion to the Fixed Rate Mode occurs and each December 1 and June 1 thereafter; (3) with respect to a Series of 2005 Bonds in the Auction Mode, the Business Day immediately following the last day of the Initial Period and the Business Day immediately following the last day of each subsequent Auction Period; provided, however, that if at any time the Broker-Dealers for any 2005 Bonds shall certify in writing to the Authority, the Bond Trustee and the Obligated Group Agent that, in their judgment, general market practice with respect to the payment of interest on instruments comparable to the Series of 2005 Bonds bearing interest at Auction Rates for a seven-day Auction Period would permit the scheduled Interest Payment Dates during a seven-day Auction Period to be the first Business Day of the month immediately succeeding such Auction Period, then interest shall be payable on the Series of 2005 Bonds bearing interest at Auction Rates for a seven-day Auction Period on the first Business Day of the month immediately succeeding such Auction Period; (4) the Fixed Rate Conversion Date; and (5) the respective Maturity Dates of the 2005 Bonds.

## Interest Period

"Interest Period" means the period of time that an interest rate remains in effect, which period:

(1)    with respect to any Series of 2005 Bonds in an Auction Mode, shall be the Auction Rate Period; and

(2)    with respect to any Series of 2005 Bonds in a Weekly Mode, shall be the Weekly Rate Period; and

(3)    with respect to a Series of 2005 Bonds in a Fixed Rate Mode, shall be the period from the Fixed Rate Conversion Date with respect thereto until the maturity thereof.

Investment Securities

"Investment Securities" means investments in any of the following:

(1)    Cash (insured at all times by the Federal Deposit Insurance Corporation),

(2)    Obligations of, or obligations guaranteed as to principal and interest by, the U.S. or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the U.S. including:

        -U.S. treasury obligations
        -All direct or fully guaranteed obligations
        -Farmers Home Administration
        -General Services Administration
        -Guaranteed Title XI financing
        -Government National Mortgage Association (GNMA)
        -State and Local Government Series from the United States Department of Treasury, Bureau of Public Debt

(3)    Obligations of Government – Sponsored Agencies that are not backed by the full faith and credit of the U.S. Government:

        -Federal Home Loan Mortgage Corp. (FHLMC) Debt obligations
        -Farm Credit System (formerly: Federal Land Banks, Federal Intermediate Credit Banks, and Banks for Cooperatives)
        -Federal Home Loan Banks (FHL Banks)
        -Federal National Mortgage Association (FNMA) Debt obligations
        -Financing Corp. (FICO) Debt obligations
        -Resolution Funding Corp. (REFCORP) Debt obligations
        -U.S. Agency for International Development (U.S. A.I.D) Guaranteed notes

(4)    Obligations of any of the following federal agencies which obligations represent the full faith and credit of the United States of America, including:

-Export-Import Bank
-Rural Economic Community Development Administration
-U.S. Maritime Administration
-Small Business Administration
-U.S. Department of Housing & Urban Development (PHAs)
-Federal Housing Administration
-Federal Financing Bank

(5)     Direct obligations of any of the following federal agencies which obligations are not fully guaranteed by the full faith and credit of the United States of America:

> -Senior debt obligations issued by the Federal National Mortgage Association (FNMA) or Federal Home Loan Mortgage Corporation (FHLMC).
> -Obligations of the Resolution Funding Corporation (REFCORP).
> -Senior debt obligations of the Federal Home Loan Bank System.
> -Senior debt obligations of other Government Sponsored Agencies approved by the Bond Insurer.

(6)     U.S. dollar denominated deposit accounts, federal funds and bankers' acceptances with domestic commercial banks which have a rating on their short term certificates of deposit at the time of purchase of "P-1" by Moody's and "A-1" or "A-1+" by S&P and maturing not more than 360 calendar days after the date of purchase. (Ratings on holding companies are not considered as the rating of the bank);

(7)     Commercial paper which is rated at the time of purchase in the single highest classification, "P- 1" by Moody's and "A-1+" by S&P and which matures not more than 270 calendar days after the date of purchase;

(8)     Investments in a money market fund rated at the time of purchase "AAAm" or "AAAm-G" or better by S&P;

(9)     Pre-refunded Municipal Obligations defined as follows: any bonds or other obligations of any state of the United States of America or of any agency, instrumentality or local governmental unit of any such state which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(A)     which are rated at the time of purchase, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of Moody's or S&P or any successors thereto; or

(B)     (i) which are fully secured as to principal and interest and redemption premium, if any, by an escrow consisting only of cash or obligations described in paragraph (2) above, which escrow may be applied only to the payment of such

principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (ii) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate;

(10) Municipal obligations rated at the time of purchase "Aaa/AAA" or general obligations of States with a rating of "A2/A" or higher by both Moody's and S&P;

## Liquidity Agreement Default

"Liquidity Agreement Default" means each "default" or "event of default," if any, under the initial Liquidity Facility or a Substitute Liquidity Facility the consequence of which is that the Bank may require a mandatory tender of a Series of 2005 Bonds pursuant to Section 11.05 of the Bond Indenture.

## Liquidity Facility

"Liquidity Facility" means the obligation of the Bank to provide funds for the purpose of purchasing Tendered Bonds which Liquidity Facility may be in the form of a line of credit, bond purchase agreement or letter of credit approved by the Bond Insurer, which approval shall not be unreasonably withheld.

## Liquidity Facility Agreement

"Liquidity Facility Agreement" means, initially, the line of credit agreement, bond purchase agreement or letter of credit agreement pursuant to which the Initial Bank agrees to issue the Initial Liquidity Facility as such agreement may from time to time be amended or supplemented, and thereafter means the agreement pursuant to which the Substitute Bank agrees to issue any Substitute Liquidity Facility at the time in effect, as such agreement may from time to time be amended or supplemented, which agreement must be acceptable to the Bond Insurer.

## Liquidity Facility Cancellation Date

"Liquidity Facility Cancellation Date" has the meaning attributed to it in Section 6.12(b) of the Bond Indenture.

## Liquidity Facility Failure Purchase Date

"Liquidity Facility Failure Purchase Date" means the first Interest Payment Date which is at least 90 days subsequent to the date on which a Special Default or Liquidity Facility Event of Default occurred.

Liquidity Substitution Date

"Liquidity Substitution Date" means the day on which a Substitute Liquidity Facility becomes effective.

Loan

"Loan" means the loan made by the Authority to the Obligated Group of the proceeds of the 2005 Bonds and the obligations of the Obligated Group to repay as evidenced by the 2005-1A Note with respect to the 2005 A Bonds and the 2005-1B Note with respect to the 2005 B Bonds.

Loan Agreement

"Loan Agreement" means that certain Loan Agreement, dated as of January 1, 2005, between the Authority and the Obligated Group Agent, as originally executed and as it may from time to time be supplemented, modified or amended in accordance with the terms thereof and of the Bond Indenture.

Loan Default Event

"Loan Default Event" means any of the events specified in Section 6.1 of the Loan Agreement.

Loan Repayments

"Loan Repayments" means the payments so designated and required to be made by the Obligated Group pursuant to Section 3.1 of the Loan Agreement.

Mandatory Tender Date

"Mandatory Tender Date" means any date on which a Holder of a 2005 Bond is required to tender any 2005 Bond for purchase in accordance with Sections 11.03, 11.04, 11.05, 11.06 or 11.08 of the Bond Indenture.

Master Documents

"Master Documents" means the Master Indenture, all Supplemental Indentures, the 2005 Notes, all Notes heretofore or hereafter issued, and the Loan Agreement.

Master Indenture

"Master Indenture" means the Amended and Restated Master Trust Indenture, dated as of August 1, 2003, as amended and supplemented, between the Obligated Group and Huntington National Bank, as Master Trustee.

## Master Trustee

"Master Trustee" means Huntington National Bank, or any successor as trustee under the Master Indenture.

## Maturity Date

"Maturity Date" means June 1, 2035 with respect to the 2005 A Bonds and June 1, 2030 with respect to the 2005 B Bonds, or with respect to any series of 2005 Bonds upon conversion to the Fixed Rate Mode, such maturities determined pursuant to Section 4.11 of the Bond Indenture, provided however that while any 2005 Bonds bear interest at the Auction Rate, if such June 1 is not an Interest Payment Date, the Maturity Date shall be the Interest Payment Date immediately preceding such June 1.

## Maximum Rate

"Maximum Rate" means (i) with respect to all 2005 Bonds other than Bank Bonds, the lesser of 15% per annum and the maximum interest rate permitted by law, and (ii) with respect to Bank Bonds, the lesser of 25% per annum and the maximum interest rate permitted by law.

## Mode

"Mode" means, as the context may require, the Auction Mode, the Fixed Rate Mode or the Weekly Mode.

## Moody's

"Moody's" means Moody's Investors Service, Inc., a corporation organized and existing under the laws of the State of Delaware, its successors and their assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Obligated Group Agent by notice to the Authority, the Credit Facility Provider and the Bond Trustee.

## New Money Portion

"New Money Portion" has the meaning set forth in the preambles of the Bond Indenture and as further described in the Loan Agreement.

## Obligated Group Agent

"Obligated Group Agent" means West Virginia University Hospitals, Inc., a nonprofit corporation duly organized and existing under the laws of the State of West Virginia, and, and, any permitted successor to WVUH or any of the Acquired Corporations as Obligated Group Agent.

## Obligated Group Bonds

"Obligated Group Bonds" means 2005 Bonds owned by or held for the benefit of the Obligated Group.

## Obligated Group Purchase Account

"Obligated Group Purchase Account" means the account by that name within the Bond Purchase Fund established pursuant to Section 4.09 of the Bond Indenture.

## Officer's Certificate

"Officer's Certificate" means a certificate signed by the chief executive officer or the chief financial officer of the Obligated Group Agent or other Person duly appointed to act on behalf of the Obligated Group Agent.

## Opinion of Counsel

"Opinion of Counsel" means a written opinion of counsel (who may be counsel for the Obligated Group) selected by the Obligated Group and acceptable to the Authority and not objected to by the Bond Trustee and the Credit Facility Provider. If and to the extent required by the provisions of Section 1.02 of the Bond Indenture, each Opinion of Counsel shall include the statements provided for in Section 1.02 of the Bond Indenture.

## Optional Redemption Account

"Optional Redemption Account" means the account by that name within the Redemption Fund established pursuant to Section 5.04 of the Bond Indenture.

## Optional Tender Date

"Optional Tender Date" means the date specified by a Bondholder in a Tender Notice for purchase of any 2005 Bond during a Weekly Rate Period in accordance with Section 11.02 of the Bond Indenture.

## Optionally Tendered Bonds

"Optionally Tendered Bonds" means the 2005 Bonds tendered or deemed tendered for purchase on an Optional Tender Date.

## Outstanding

"Outstanding," when used as of any particular time with reference to 2005 Bonds, means (subject to the provisions of Section 12.09 of the Bond Indenture) all 2005 Bonds theretofore, or thereupon being, authenticated and delivered by the Bond Trustee under the Bond Indenture except: (1) 2005 Bonds theretofore cancelled by the Bond Trustee or surrendered to the Bond Trustee for cancellation; (2) 2005 Bonds with respect to which all liability of the Authority shall

have been discharged in accordance with Section 10.02 of the Bond Indenture, including 2005 Bonds (or portions of 2005 Bonds) referred to in Section 12.10 of the Bond Indenture; and (3) 2005 Bonds for the transfer or exchange of or in lieu of or in substitution for which other 2005 Bonds shall have been authenticated and delivered by the Bond Trustee pursuant to the Bond Indenture.

## Principal Fund

"Principal Fund" means the fund by that name established pursuant to Section 5.03 of the Bond Indenture.

## Principal Payment Date

"Principal Payment Date" means, with respect to a 2005 Bond, the date on which principal of such 2005 Bond becomes due and payable, either by maturity, redemption, acceleration or otherwise.

## Project

"Project" means the Acquisition Expense and the New Money Portion.

## Project Fund

"Project Fund" means the fund by that name established pursuant to Section 3.04 of the Bond Indenture from which the cost of the New Money Portion is to be paid.

## Property

"Property" means any and all rights, titles and interests in and to any and all property, whether real or personal, tangible (including cash) or intangible, wherever situated and whether now owned or hereafter acquired.

## Property, Plant and Equipment

"Property, Plant and Equipment" means all Property of each Member which is classified as property, plant and equipment under generally accepted accounting principles.

## Proposed Fixed Rate Conversion Date

"Proposed Fixed Rate Conversion Date" means the date indicated in the written notice of the Obligated Group Agent given pursuant to Section 2.11 of the Bond Indenture on which the Obligated Group Agent intends to effect a conversion of the interest rate on a series of 2005 Bonds to the Fixed Rate.

## Purchase Price

"Purchase Price" means an amount equal to the principal amount of any 2005 Bonds purchased on a Conversion Date, plus accrued interest thereon, if any, to the Conversion Date.

### Rate Determination Date

"Rate Determination Date," when used with respect to a Series of 2005 Bonds, means the date on which the interest rate(s) with respect to such Series of 2005 Bonds shall be determined, which, (i) in the case of the Fixed Rate Mode, shall be a date determined by the Remarketing Agent which shall be at least one Business Day prior to the Fixed Rate Conversion Date; and (ii) in the case of Auction Rate Securities, shall be the Auction Date; and (iii) in the case of the Weekly Mode shall be each Wednesday.

### Rate Period

"Rate Period" means a Fixed Rate Period, Auction Rate Period or Weekly Rate Period.

### Rating Agencies

"Rating Agencies" means S&P, Moody's and Fitch.

### Rebate Fund

"Rebate Fund" means the fund by that name established pursuant to Section 5.5.06 of the Bond Indenture.

### Record Date

"Record Date" means (i) with respect to a Series of 2005 Bonds in the Auction Mode, the first Business Day immediately preceding each Interest Payment Date, (ii) with respect to a Series of 2005 Bonds in a Fixed Rate Mode, the 15th day (whether or not a Business Day) of the month immediately preceding each Interest Payment Date, and (iii) with respect to a Series of 2005 Bonds in the Weekly Mode, the Business Day immediately preceding an Interest Payment Date.

### Redemption Price

"Redemption Price" means, with respect to any 2005 Bond (or portion thereof), the price to be paid upon redemption as set forth in Article IV of the Bond Indenture.

### Reimbursement Agreement

"Reimbursement Agreement" means any agreement between the Obligated Group Agent and a Credit Facility Provider pursuant to which a Credit Facility, as amended, supplemented or extended from time to time in accordance with the provisions thereof.

## Remarketing Agent

"Remarketing Agent" means, initially UBS Financial Services, Inc., and any successor remarketing agent appointed by the Obligated Group Agent in accordance with Section 4.11 of the Bond Indenture and not objected to by the Authority or the Bond Insurer.

## Remarketing Agreement

"Remarketing Agreement" means that certain remarketing agreement between the Obligated Group Agent and the Remarketing Agent, as such agreement may from time to time be amended and supplemented, to remarket a Series of 2005 Bonds delivered or deemed to be delivered for purchase by the Holders thereof.

## Remarketing Proceeds Account

"Remarketing Proceeds Account" means the account by that name within the Bond Purchase Fund established pursuant to Section 4.09 of the Bond Indenture.

## Revenues

"Revenues" means all amounts received by the Authority or the Bond Trustee for the account of the Authority pursuant or with respect to the Loan Agreement and the 2005 Notes, including, without limiting the generality of the foregoing, Loan Repayments (including both timely and delinquent payments, any late charges, and whether paid from any source), and other income and receipts, in each case derived by or for the account of the Authority or the Bond Trustee, from the Obligated Group including without limitation all interest, profits or other income derived from the investment of amounts in any fund or account established pursuant to the Bond Indenture, but not including any administrative fees or expenses or any moneys required to be deposited in the Rebate Fund or the Bond Purchase Fund.

## S&P

"S&P" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., a corporation organized and existing under the laws of the state of its organization, its successors and their assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Obligated Group Agent by notice to the Authority, the Credit Facility Provider and the Bond Trustee.

## Series

"Series," or "series" when used with respect to the 2005 Bonds, means all the 2005 Bonds designated as being of the same series, authenticated and delivered in a simultaneous transaction, and any 2005 Bonds thereafter authenticated and delivered upon a transfer or exchange or in lieu of or in substitution for such 2005 Bonds.

## Special Default

"Special Default" means each "default" or "event of default," if any, under the initial Liquidity Facility Agreement or a Substitute Liquidity Agreement the consequence of which is that the obligation of the Bank to provide funds for the purchase of Tendered Bonds is either suspended or terminated without prior notice to Bondholders.

## Special Record Date

"Special Record Date" means the date established by the Bond Trustee pursuant to Section 2.04(c) of the Bond Indenture as a record date for the payment of defaulted interest on the 2005 Bonds.

## Special Redemption Account

"Special Redemption Account" means the account by that name within the Redemption Fund established pursuant to Section 5.04 of the Bond Indenture.

## Supplemental Bond Indenture

"Supplemental Bond Indenture" means any indenture hereafter duly authorized and entered into between the Authority and the Bond Trustee, supplementing, modifying or amending the Bond Indenture; but only if and to the extent that such Supplemental Bond Indenture is specifically authorized.

## Supplemental Indenture 2005-2

"Supplemental Indenture 2005-2" means the Supplemental Master Trust Indenture 2005-2, dated as of the date hereof, between the Obligated Group Agent and the Master Trustee (a) pursuant to which the 2005 Notes are issued; (b) to provide for certain covenants and agreements with the Bond Insurer; and (c) relating to the Interest Rate Agreement.

## Supplemental Indenture

"Supplemental Indenture" means any supplemental master trust indenture issued pursuant to the Master Indenture, including Supplemental Indenture 2005-2.

## Substitute Bank

"Substitute Bank" means one or more commercial banks, trust companies or financial institutions obligated under any Substitute Liquidity Agreement and acceptable to the Bond Insurer.

## Substitute Liquidity Agreement

"Substitute Liquidity Agreement" means any agreement (other than the initial Liquidity Facility Agreement) between the Obligated Group Agent and any Substitute Bank (which

agreement shall be satisfactory in form and substance to the Bond Insurer) as it may from time to time be amended or supplemented, pursuant to which a Substitute Liquidity Facility shall be in effect.

## Substitute Liquidity Facility

"Substitute Liquidity Facility" means a Liquidity Facility acceptable to the Bond Insurer provided by a Substitute Bank other than the Bank providing the Liquidity Facility on or prior to the Liquidity Substitution Date; however, none of the following shall be deemed a Substitute Liquidity Facility: (i) a change in the Liquidity Facility Agreement pursuant to which the Liquidity Facility is issued; (ii) a change in the number of days of interest or interest rate covered by the Liquidity Facility; and (iii) a renewal of the term of the existing Liquidity Facility if, in the case of such renewal, there is delivered to the Bond Trustee, the Bond Insurer and the Remarketing Agent an opinion of counsel for the Bank or the Substitute Bank regarding the enforceability of such Liquidity Facility in substantially the form delivered to the Bond Trustee upon execution and delivery of the initial Liquidity Facility Agreement.

## Swap Provider

"Swap Provider" shall mean the counterparty to the Obligated Group pursuant to any Interest Rate Agreement and shall mean Merrill Lynch Capital Services, Inc. with respect to the Initial Swap Agreement.

## Tax Compliance Certificate

"Tax Compliance Certificate" means the Tax Compliance Certificate of the Authority and the Obligated Group Agent, each dated the Closing Date and included in the transcript of which the Bond Indenture is a part.

## Tender Agent

"Tender Agent" means the tender agent appointed in accordance with Section 11.01 of the Bond Indenture.

## Trust Estate

"Trust Estate" has the meaning set forth in the preambles of the Bond Indenture.

## Unassigned Rights

"Unassigned Rights" means the rights of the Authority to indemnification, payment and reimbursement of its fees and expenses, receive notices and grant approvals, consents and waivers.

## Weekly Mode

"Weekly Mode" means the Mode during which a series of 2005 Bonds bear interest at the Weekly Rate Period.

## Weekly Rate

"Weekly Rate" means, with respect to the then effective Weekly Rate Period, the lowest interest rate which, in the judgment of the Remarketing Agent, would enable a series of 2005 Bonds to be remarketed at the principal amount thereof, plus accrued interest thereon, if any, on the Weekly Rate Adjustment Date with respect thereto (or, if the Remarketing Agent for any reason fails to determine such rate, the rate determined in accordance with the provisions set forth in the Bond Indenture).

## Weekly Rate Adjustment Date

"Weekly Rate Adjustment Date" means the first day of each Weekly Rate Period.

## Weekly Rate Conversion Date

"Weekly Rate Conversion Date" means a date on which a series of the 2005 Bonds begins to bear interest at a Weekly Rate for any Weekly Rate Period which succeeds an Auction Rate Period.

## Weekly Rate Period

"Weekly Rate Period" means any Weekly Rate Period from and commencing on Wednesday of any calendar week and including and ending on the Tuesday of the next calendar week; provided, however, that any Weekly Rate Period which does not follow another Weekly Rate Period shall commence on the Weekly Rate Conversion Date with respect thereto and end on the first or second Tuesday thereafter, at the discretion of the Remarketing Agent in order to most efficiently effect the conversion, and any Weekly Rate Period which is not followed by another Weekly Rate Period shall commence on the last or second to last Wednesday of a calendar month, at the discretion of the Remarketing Agent in order to most efficiently effect the conversion, and end on the day preceding the first Business Day of the next calendar month.

## 1992 Escrow Fund

"1992 Escrow Fund" means the escrow deposit trust fund created in the 1992 Escrow Agreement relating to the payment of interest on and the redemption price of the 1992 Bonds.

## 1992 Escrow Agent

"1992 Escrow Agent" means J.P. Morgan Trust Company, National Association, successor to Charleston National Bank.

### 1992 Escrow Agreement

"1992 Escrow Agreement" means the Escrow Agreement dated as of January 1, 2005, by and between the Authority and the 1992 Escrow Agent relating to the payment of interest on and the redemption price of the 1992 Bonds.

### 2002 Escrow Fund

"2002 Escrow Fund" means the escrow deposit trust fund created in the 2002 and 2003 Escrow Agreement relating to the payment of interest on and the redemption price of the 2002 Bonds.

### 2002 and 2003 Escrow Agent

"2002 and 2003 Escrow Agent" means United Bank, Inc, successor to United National Bank.

### 2002 and 2003 Escrow Agreement

"2002 and 2003 Escrow Agreement" means the Escrow Agreement dated as of January 1, 2005, by and between the Authority and the 2002 and 2003 Escrow Agent relating to the payment of interest on and the redemption price of the 2002 Bonds and the 2003 Bonds.

### 2003 Escrow Fund

"2003 Escrow Fund" means the escrow deposit trust fund created in the 2003 Escrow Agreement relating to the payment of interest on and the redemption price of the 2003 Bonds.

### 2005 Bonds

"2005 Bonds" means, collectively, the 2005 A Bonds and the 2005 B Bonds.

### 2005 A Bonds

"2005 A Bonds" means the West Virginia Hospital Finance Authority Hospital Revenue Bonds (West Virginia University Hospitals, Inc.) 2005 Series A Auction Rate Certificates (ARCs [SM]), authorized by, and at any time Outstanding pursuant to, the Bond Indenture.

### 2005 B Bonds

"2005 B Bonds" means the West Virginia Hospital Finance Authority Hospital Revenue Bonds (West Virginia University Hospitals, Inc.) 2005 Series B Auction Rate Certificates (ARCs [SM]), authorized by, and at any time Outstanding pursuant to, the Bond Indenture.

2005-1A Note

"2005-1A Note" means the 2005-1A Note issued by the Obligated Group in a principal amount equal to the principal amount of the 2005 A Bonds pursuant to Supplemental Indenture 2005-2, which Note evidences and secures the obligations of the Obligated Group with respect to the 2005 A Bonds under the Loan Agreement.

2005-1B Note

"2005-1B Note" means the 2005-1B Note issued by the Obligated Group in a principal amount equal to the principal amount of the 2005 B Bonds pursuant to Supplemental Indenture 2005-2, which Note evidences and secures the obligations of the Obligated Group with respect to the 2005 B Bonds under the Loan Agreement

2005 Notes

"2005 Notes" means collectively the 2005-1A Note and the 2005-1B Note.

## THE MASTER INDENTURE

*The following is a summary of certain provisions of the Master Indenture. Reference is made to the Master Indenture for the detailed provisions thereof.*

### Authorization and Issuance of Obligations

Obligations may be issued under the Master Indenture to (a) evidence Indebtedness, (b) evidence any repayment obligation under an Interest Rate Agreement, or (c) evidence a reimbursement obligation arising as a result of the issuance of a surety bond or other instrument guaranteeing or in effect guaranteeing any payments under an Interest Rate Agreement, as provided in Section 209 of the Master Indenture. So long as the requirements for the incurrence of Indebtedness imposed by the Master Indenture are met, the total principal amount of Obligations, the number of Obligations and the series of Obligations that may be created under the Master Indenture is not limited except as is set forth in the Master Indenture the Supplemental Master Indenture providing for the issuance of such Obligations. No obligations may be issued unless the provisions of the Master Indenture are followed.

### Covenants of the Obligated Group

*Payment of Principal, Premium and Interest.* Each Member unconditionally and irrevocably (subject to the right of such Member to cease its status as a Member of the Obligated Group pursuant to the terms and conditions of Section 405 of the Master Indenture), jointly and severally covenants that it will promptly pay the principal of, premium, if any, and interest on every Obligation issued under the Master Indenture at the place, on the dates and in the manner provided in the Master Indenture and in said Obligations according to the true intent and meaning thereof. Notwithstanding any schedule of payments upon the Obligations set forth in the Master Indenture or in the Obligations, each Member unconditionally and irrevocably

(subject to the right of such Member to cease its status as a Member of the Obligated Group pursuant to the terms and conditions of Section 405 of the Master Indenture), jointly and severally agrees to make payments upon each Obligation and be liable therefor at the times and in the amounts (including principal, interest and premium, if any) equal to the amounts to be paid as interest, principal at maturity or by mandatory sinking fund redemption, or premium, if any, upon any Related Bonds from time to time Outstanding.

*Liens on Property.* No Lien on Property of any Member securing Indebtedness shall be classified a Permitted Encumbrance (as provided in clause (b) of the definition of Permitted Encumbrance), and therefore be permitted unless: (a) such Lien secures Non-Recourse Indebtedness; or (b)(i) after giving effect to such Lien and all other Liens classified as Permitted Encumbrances under this subsection (b)(i), the Book Value or, at the option of the Obligated Group Agent, the Current Value of the Property of the Obligated Group which is Encumbered is not more than 15% of the value of all of the Property of the Obligated Group (calculated on the same basis as the value of the Encumbered Property) and (ii) the conditions described in Section 415(A) of the Master Indenture are met for allowing the incurrence of one dollar of additional Funded Indebtedness.

*Insurance.* Each Member will maintain insurance (or self-insure if the Insurance Consultant or Insurance Consultants determines that such self-insurance meets the standards set forth in the Master Indenture and is prudent under the circumstance) with respect to its Property, the operation thereof and its business against such casualties, contingencies and risks (including but not limited to public liability and employee dishonesty) and in amounts not less than is customary in the case of corporations engaged in the same or similar activities and similarly situated and as is adequate to protect its Property and operations. The Obligated Group Agent will annually review the insurance (including self-insurance) each Member maintains as to whether such insurance is customary and adequate. In addition, the Obligated Group Agent shall at least once every three fiscal years (commencing with its fiscal year beginning January 1, 2004) cause a certificate of an Insurance Consultant or Insurance Consultants to be delivered to the Master Trustee which indicates that the insurance then being maintained by the Members is customary in the case of corporations engaged in the same or similar activities and similarly situated and is adequate to protect the Obligated Group's Property and operations. The Obligated Group Agent shall cause copies of its review, or the certificates of the Insurance Consultant or Insurance Consultants, as the case may be, to be delivered promptly to the Master Trustee, to each Related Bond Trustee and to each Related Issuer.

*Rates and Charges.* Each Member covenants and agrees to operate all of its Facilities on a revenue producing basis and to charge such fees and rates for its Facilities and services and to exercise such skill and diligence as to provide income from its Property together with other available funds sufficient to pay promptly all payments of principal and interest on its Indebtedness, all expenses of operation, maintenance and repair of its Property and all other payments required to be made by under the Master Indenture, to the extent permitted by law. Each Member further covenants and agrees that it will from time to time as often as necessary and to the extent permitted by law, revise its rates, fees and charges in such manner as may be necessary or proper to comply with the provisions of this Section.

The Members covenant and agree that they will cause the accountants certifying the report referred to in Section 414(A) of the Master Indenture to calculate the Historical Debt Service Coverage Ratio of the Obligated Group for the fiscal year covered by such report and to deliver a copy of such calculation to the Persons to whom such report is required to be delivered under such Section 414 of the Master Indenture.

If in any fiscal year the Historical Debt Service Coverage Ratio of the Obligated Group is less than 1.10:1, the Master Trustee shall require the Obligated Group at its expense to retain a Consultant to make recommendations with respect to the rates, fees and charges of the Members and the Obligated Group's methods of operation and other factors affecting its financial condition in order to increase the Historical Debt Service Coverage Ratio to at least 1.10:1.

A copy of the Consultant's report and recommendations, if any, shall be filed with each Member, the Master Trustee, each Related Bond Trustee and each Related Issuer. Each Member shall follow each recommendation of the Consultant applicable to it and permitted by law. This Section shall not be construed to prohibit any Member from serving indigent patients to the extent required for such Member to continue its qualification as a Tax-Exempt Organization or from serving any other class or classes of patients without charge or at reduced rates so long as such service does not prevent the Obligated Group from satisfying the other requirements of this Section.

The foregoing provisions notwithstanding, if in any fiscal year the Historical Debt Service Coverage Ratio is less than 1.10:1, the Master Trustee shall not require the Obligated Group to retain a Consultant to make such recommendations if: (a) there is filed with the Master Trustee (who shall provide a copy to each Related Bond Trustee and Related Issuer) a written report addressed to them of a Consultant (which Consultant and report, including, without limitation, the scope, form, substance and other aspects of such report, are acceptable to the Master Trustee) which contains an opinion of such Consultant that applicable laws or regulations have prevented the Obligated Group from generating Income Available for Debt Service during such fiscal year in an amount sufficient to equal or exceed 110% of its Debt Service Requirement and such report is accompanied by a concurring opinion of Independent Counsel (which Counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) as to any conclusions of law supporting the opinion of such Consultant; (b) the report of such Consultant indicates that the rates charged by the Obligated Group are such that, in the opinion of the Consultant, the Obligated Group has generated the maximum amount of Revenues reasonably practicable given such laws or regulations; and (c) the Historical Debt Service Coverage Ratio of the Obligated Group for such fiscal year was no less than 1.00:1. The Obligated Group shall not be required to cause the Consultant's report referred to in the preceding sentence to be prepared more frequently than once every two fiscal years if at the end of the first of such two fiscal years the Obligated Group provides to the Master Trustee (who shall provide a copy to each Related Bond Trustee and Related Issuer) an opinion of Independent Counsel (which Counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) to the effect that the applicable laws and regulations underlying the Consultant's report delivered in respect of the previous fiscal year have not changed in any material way.

*Permitted Indebtedness.* Neither the Obligated Group nor any Member may incur any Indebtedness (whether or not incurred through the issuance of Obligations) other than as set forth in (A) through (M) below:

(A)     Funded Indebtedness, if prior to incurrence thereof or, if such Funded Indebtedness was incurred in accordance with another subsection of Section 415 of the Master Indenture and any Member wishes to have such Funded Indebtedness classified as having been issued under this subsection (A), prior to such classification, there is delivered to the Master Trustee:

(i)     An Officer's Certificate from the Obligated Group Agent (which Officer's Certificate, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) stating that the Funded Indebtedness Ratio of the Obligated Group, after giving effect to the incurrence of such Indebtedness and to the application of the proceeds thereof, does not exceed 0.67:1; or

(ii)     An Officer's Certificate from the Obligated Group Agent (which Officer's Certificate, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) stating that the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group for the most recent fiscal year preceding the date of delivery of the report for which combined financial statements reported upon by independent certified public accountants are available was not less than 1.25:1; or

(iii)     (a) An Officer's Certificate from the Obligated Group Agent (which Officer's Certificate, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) stating that the Historical Debt Service Coverage Ratio of the Obligated Group for the fiscal year next preceding the incurrence of such Funded Indebtedness for which combined financial statements reported upon by independent certified public accountants are available was not less than 1.10:1; and (b) (1) a written Consultant's report (which report, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) to the effect that the Projected Debt Service Coverage Ratio of the Obligated Group for each of the next two succeeding fiscal years or, if such Indebtedness is being incurred in connection with the financing of Facilities, the two fiscal years succeeding the projected completion date of such Facilities, is not less than 1.10:1, or (2) an Officer's Certificate from the Obligated Group Agent in a form acceptable to the Master Trustee to the effect that the Projected Debt Service Coverage Ratio of the Obligated Group for each of the next two succeeding fiscal years or, if such Indebtedness is being incurred in connection with the financing of Facilities, the two fiscal years succeeding the projected completion date of such Facilities, is not less than 1.20:1, provided that either of such reports shall include forecast balance sheets, statements of revenues and expenses and statements of cash flows for each of such two fiscal years and a statement of the relevant assumptions upon which such forecasted statements are based, which financial statements must indicate that sufficient revenues and cash flow could be generated to pay the operating expenses of the Obligated Group's proposed and existing Facilities and the debt service on the Obligated Group's other existing Indebtedness during such two fiscal years; provided that the requirements of the

foregoing subsection (iii)(a) or (b), as the case may be, shall be deemed satisfied if (x) there is delivered to the Master Trustee the report of a Consultant (which report, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee and which contains the information required by the proviso to subsection (iii)(b) in the case of projections) which contains an opinion of such Consultant that applicable laws or regulations have prevented or will prevent the Obligated Group from generating the amount of Income Available for Debt Service required to be generated by subsection (iii)(a) or (b), as the case may be, as a prerequisite to the issuance of Funded Indebtedness, and, if requested by the Master Trustee, such report is accompanied by a concurring opinion of Independent Counsel (which Counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) as to any conclusions of law supporting the opinion of such Consultant, (y) the report of the Consultant indicates that the rates charged or to be charged by the Obligated Group are or will be such that, in the opinion of such Consultant, the Obligated Group has generated or will generate the maximum amount of Revenues reasonably practicable given such laws or regulations, and (z) the Historical Maximum Annual Debt Service Coverage Ratio of the Obligated Group and the Projected Debt Service Coverage Ratio of the Obligated Group referred to in the applicable subsection are at least 1.00:1.

(B)     Completion Funded Indebtedness, without limitation.

(C)     Funded Indebtedness for the purpose of refunding (whether in advance or otherwise, including, without limitation, refunding through the issuance of Cross-over Refunding Indebtedness) any Outstanding Funded Indebtedness.

(D)     Short-Term Indebtedness (other than Short-Term Indebtedness incurred in accordance with subsection (E) below) in a total principal amount which at the time incurred does not, together with the principal amount of all other such Short-Term Indebtedness of the Obligated Group then Outstanding under this subsection (D) and the principal payable on all Funded Indebtedness during the next succeeding 12 months, excluding such principal to the extent that amounts are on deposit in an irrevocable escrow and such amounts (including, where appropriate, the earnings or other increments to accrue thereon) are required to be applied to pay such principal and such amounts so required to be applied are sufficient to pay such principal, exceed 25% of the Revenues of the Obligated Group for the most recent fiscal year for which combined financial statements reported upon by independent certified public accountants are available; provided, however, that for a period of 20 consecutive calendar days in each fiscal year the total amount of such Short-Term Indebtedness of the Obligated Group Outstanding under this subsection (D) shall be not more than 5% of the Revenues of the Obligated Group during the preceding fiscal year plus such additional amount as the Obligated Group Agent certifies in an Officer's Certificate is (a) attributable to Short-Term Indebtedness incurred to offset a temporary delay in the receipt of funds due from third party payors and (b) in the minimum amount reasonably practicable taking into account such delay.  For the purposes of this subsection (D), Short-Term Indebtedness shall not

include overdrafts to banks to the extent there are immediately available funds of the Obligated Group sufficient to pay such overdrafts and such overdrafts are incurred and corrected in the normal course of business.

(E)    Short-Term Indebtedness if:

(i)    There is in effect at the time the Short-Term Indebtedness provided for by this subsection (E) is incurred a binding commitment (including, without limitation, letters or lines of credit or insurance) which may be subject only to commercially reasonable contingencies, by a financial institution generally regarded as responsible, which commitment and institution are acceptable to the Master Trustee and each Related Issuer, to provide financing sufficient to pay such Short-Term Indebtedness at its maturity; and

(ii)    The conditions described in subsection (A) above are met with respect to such Short-Term Indebtedness when it is assumed that such Short-Term Indebtedness is Funded Indebtedness maturing over 30 years from the date of issuance of the Short-Term Indebtedness, bears interest on the unpaid principal balance at the Projected Rate and is payable on a level annual debt service basis over a 30-year period.

(F)    Non-Recourse Indebtedness, without limitation.

(G)    Balloon Indebtedness if:

(i)(a)  there is in effect at the time such Balloon Indebtedness is incurred a binding commitment (including, without limitation, letters or lines of credit) which may be subject only to commercially reasonable contingencies by a financial institution generally regarded as responsible, which commitment and institution are acceptable to the Master Trustee and each Related Issuer, to provide financing sufficient to pay the principal amount of such Balloon Indebtedness coming due in each consecutive 12 month period in which 25% or more of the original principal amount of such Balloon Indebtedness comes due; and

(b)    the conditions set forth in subsection (A) above are met with respect to such Balloon Indebtedness when the assumptions set forth in subsection (E)(ii) above are made with respect to the portion of such Balloon Indebtedness becoming due during each such 12 month period; or

(ii)(a)  a Member establishes in an Officer's Certificate filed with the Master Trustee an amortization schedule for such Balloon Indebtedness, which amortization schedule shall provide for payments of principal and interest for each fiscal year that are not less than the amounts required to make any actual payments required to be made in such fiscal year by the terms of such Balloon Indebtedness;

(b) such Member agrees in such Officer's Certificate to deposit for each fiscal year with a bank or trust company (pursuant to an agreement between such Member and such bank or trust company, which agreement shall be satisfactory in form and substance to the Master Trustee) the amount of principal shown on such amortization schedule net of any amount of principal actually paid on such Balloon Indebtedness during such fiscal year (other than from amounts on deposit with such bank or trust company) which deposit shall be made prior to any such required actual payment during such fiscal year if the amounts so on deposit are intended to be the source of such actual payments; and

(c) the conditions described in subsection (A) above are met with respect to such Balloon Indebtedness when it is assumed that such Balloon Indebtedness is actually payable in accordance with such amortization schedule.

(H)    Put Indebtedness if the conditions set forth in subsection (A) above are met with respect to such Put Indebtedness when it is assumed that such Put Indebtedness bears interest at the Projected Rate and is payable on a level annual debt service basis over a 30-year period commencing with the next succeeding Put Date.

(I)    Guaranties by any Member of the payment by another Person of a sum certain; provided that the conditions set forth in the Master Indenture are satisfied if it is assumed that the Indebtedness guaranteed is Funded Indebtedness of such Member. In making the calculation required by this subsection (I) the Obligated Group's Income Available for Debt Service shall not be deemed to include any Revenues of the Primary Obligor and the debt service payable with respect to the Indebtedness guaranteed shall be calculated in accordance with the assumptions contained in the Master Indenture.

(J)    Liabilities for contributions to self-insurance or shared or pooled-risk insurance programs required or permitted to be maintained under the Master Indenture.

(K)    Commitment Indebtedness, without limitation.

(L)    Indebtedness consisting of accounts payable incurred in the ordinary course of business or other Indebtedness not incurred or assumed primarily to assure the repayment of money borrowed or credit extended which Indebtedness is incurred in the ordinary course of business.

(M)    Indebtedness the principal amount of which at the time incurred, together with the aggregate principal amount of all other Indebtedness then Outstanding which was issued pursuant to the provisions of this subsection (M) and which has not been subsequently reclassified as having been issued under subsection (A), (E), (G) or (H), does not exceed 10% of the Revenues of the Obligated Group for the latest preceding fiscal year for which combined financial statements reported upon by independent certified public accountants are available.

(N)    Indebtedness incurred in connection with a sale of accounts receivable with or without recourse on commercially reasonable terms by any Member consisting of an obligation to repurchase all or a portion of such accounts receivable upon certain

E-27

conditions, provided that the principal amount of such Indebtedness permitted by the Master Indenture shall not exceed the aggregate face amount of such accounts receivable.

(O)     Subordinated Indebtedness, without limitation.

## Merger, Consolidation, Sale or Conveyance

Each Member agrees that it will not merge into, or consolidate with, one or more corporations that are not Members, or allow one or more of such non-Member corporations to merge into it, or sell or convey all or substantially all of its Property to any Person who is not a Member, unless:

(ii)     Any successor corporation to such Member (including, without limitation, any purchaser of all or substantially all the Property of such Member) is a corporation organized and existing under the laws of the United States of America or a state thereof and shall execute and deliver to the Master Trustee an appropriate instrument, satisfactory to the Master Trustee, containing the agreement of such successor corporation to assume, jointly and severally, the due and punctual payment of the principal of, premium, if any, and interest on all Obligations according to their tenor and the due and punctual performance and observance of all the covenants and conditions of the Master Indenture to be kept and performed by such Member;

(iii)    Immediately after such merger or consolidation, or such sale or conveyance, no Member would be in default in the performance or observance of any covenant or condition of any Related Loan Document or the Master Indenture;

(iv)    Immediately after such merger or consolidation, or such sale or conveyance, the condition described in Section 418(b)(i) of the Master Indenture would be met for the creation of a Lien on Property and the condition described in Section 415(A) of the Master Indenture would be met for the incurrence of one dollar of additional Funded Indebtedness, assuming that any Indebtedness of any successor or acquiring corporation is Indebtedness of such Member and that the Revenues and Expenses of the Member for such most recent fiscal year include the Revenues and Expenses of such other corporation; and

(v)     If all amounts due or to become due on all Related Bonds have not been fully paid to the holders thereof or fully provided for, there shall be delivered to the Master Trustee an opinion of nationally recognized municipal bond counsel (which counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) to the effect that under then existing law, the consummation of such merger, consolidation, sale or conveyance, whether or not contemplated on the original date of delivery of such Related Bonds, would not adversely affect the validity of such Related Bonds or the exemption otherwise available from federal income taxation of interest payable on such Related Bonds.

(b)     In case of any such consolidation, merger, sale or conveyance and upon any such assumption by the successor corporation, such successor corporation shall succeed to and be substituted for its predecessor, with the same effect as if it had been named in the Master

E-28

Indenture as such Member. Any successor corporation to such Member thereupon may cause to be signed and may issue in its own name Obligations under the Master Indenture and the predecessor corporation shall be released from its obligations under the Master Indenture and under any Obligations, if such predecessor corporation shall have conveyed all Property owned by it (or all such Property shall be deemed conveyed by operation of law) to such successor corporation. All Obligations so issued by such successor corporation under the Master Indenture shall in all respects have the same legal rank and benefit under the Master Indenture as Obligations theretofore or thereafter issued in accordance with the terms of the Master Indenture as though all of such Obligations had been issued under the Master Indenture by such prior Member without any such consolidation, merger, sale or conveyance having occurred.

(c)      In case of any such consolidation, merger, sale or conveyance such changes in phraseology and form (but not in substance) may be made in Obligations thereafter to be issued as may be appropriate.

The Master Trustee may rely upon an opinion of Independent Counsel as conclusive evidence that any such consolidation, merger, sale or conveyance, and any such assumption, complies with the provisions of Section 413 of the Master Indenture and that it is proper for the Master Trustee under the provisions of Article VII and Section 413 of the Master Indenture to join in the execution of any instrument required to be executed and delivered by Section 413 of the Master Indenture.

### Entrance Into the Obligated Group

Any Person may become a Member of the Obligated Group if:

(A)      Such Person is a corporation;

(B)      Such Person executes and delivers to the Master Trustee a Supplemental Master Indenture acceptable to the Master Trustee which shall be executed by the Master Trustee and each then current Member, containing (i) the agreement of such Person (a) to become a Member of the Obligated Group and thereby to become subject to compliance with all provisions of the Master Indenture and (b) unconditionally and irrevocably (subject to the right of such Person to cease its status as a Member of the Obligated Group pursuant to the terms and conditions of Section 405 of the Master Indenture) to jointly and severally make payments upon each Obligation at the times and in the amounts provided in each such Obligation and (ii) representations and warranties by such Person substantially similar to those set forth in Section 403 of the Master Indenture (other than those contained in Section 403(d) if such Person is not a Tax-Exempt Organization), but with such modifications as are acceptable to the Master Trustee;

(C)      The Obligated Group Agent shall, by appropriate action of its Governing Body, have approved the admission of such Person to the Obligated Group and each of the Members shall have taken such action, if any, required to approve the admission of such Person to the Obligated Group;

(D)      The Master Trustee shall have received (1) a certificate of the Obligated Group Agent which demonstrates that, immediately upon such Person becoming a

E-29

Member of the Obligated Group (a) the Members would not, as a result of such transaction, be in default in the performance or observance of any covenant or condition to be performed or observed by them under the Master Indenture, and (b) the Obligated Group could meet the conditions described in Section 415(A) of the Master Indenture for the incurrence of one dollar of additional Funded Indebtedness, (2) an opinion of Independent Counsel to the effect that (x) the instrument described in paragraph (B) above has been duly authorized, executed and delivered and constitutes a legal, valid and binding agreement of such Person, enforceable in accordance with its terms, subject to customary exceptions for bankruptcy, insolvency, fraudulent conveyance, and other laws generally affecting enforcement of creditors' rights and application of general principles of equity and to the exceptions set forth in *Exhibit B* to the Master Indenture and (y) the addition of such Person to the Obligated Group will not adversely affect the status as a Tax-Exempt Organization of any Member which otherwise has such status, (3) either a certificate of the Obligated Group Agent demonstrating that all amounts due or to become due on all Related Bonds have been paid to the holders thereof and provision for such payment has been made in such manner as to have resulted in the defeasance of all Related Bond Indentures, or an opinion of nationally recognized municipal bond counsel (which counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee), to the effect that under then existing law the consummation of such transaction, whether or not contemplated on the date of delivery of any such Related Bond, would not adversely affect the validity of any Related Bond or any exemption from federal income taxation of interest payable on such Related Bond otherwise entitled to such exemption; provided that in making the calculation called for by subsection (D)(l)(b) above, (i) there shall be excluded from Revenues any Revenues generated by Property of such Person transferred or otherwise disposed of by such Person since the beginning of the fiscal year during which such Person's entry into the Obligated Group occurs and (ii) there shall be excluded from Expenses any Expenses related to Property of such Person transferred or otherwise disposed of by such Person since the beginning of the fiscal year during which such Person's entry into the Obligated Group occurs and (4) certified copies of the actions of the Obligated Group Agent and each of the Members described in subsection (C) above; and

(E)     *Exhibit C* to the Master Indenture is amended to add such Person as a Member.

Each successor, assignee, surviving, resulting or transferee corporation of a Member must agree to become, and satisfy the above-described conditions to becoming, a Member of the Obligated Group prior to any such succession, assignment or other change in such Member's corporate status.

### Cessation of Status as a Member of the Obligated Group

Each Member covenants that it will not take any action, corporate or otherwise, which would cause it or any successor thereto into which it is merged or consolidated to cease to be a Member of the Obligated Group under the terms of the Master Indenture, unless:

(A)     the Member proposing to withdraw from the Obligated Group is not a party to any Outstanding Obligation securing Related Loan Documents with respect to Related Bonds which remain Outstanding;

(B)     prior to cessation of such status, there is delivered to the Master Trustee an opinion of nationally recognized municipal bond counsel (which opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) to the effect that, under then existing law, the cessation by the Member of its status as a Member will not adversely affect the validity of any Related Bond or any exemption from federal income taxation of interest payable thereon to which such Bond would otherwise be entitled;

(C)     when it is assumed that such cessation results in a transfer of Property owned by the Member proposing to cease such status to a Person who is not a Member of the Obligated Group, the conditions precedent to such a transfer to an unrelated entity set forth in Section 417 of the Master Indenture have been complied with;

(D)     prior to and immediately after such cessation, no event of default exists under the Master Indenture and no event shall have occurred which with the passage of time or the giving of notice, or both, would become such an event of default;

(E)     prior to such cessation there is delivered to the Master Trustee an opinion of Independent Counsel (which Counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) to the effect that the cessation by such Member of its status as a Member will not adversely affect the status as a Tax-Exempt Organization of any Member which otherwise has such status; and

(F)     prior to cessation of such status, each Member of the Obligated Group consents in writing to the withdrawal by such Member.

Upon such cessation in accordance with the foregoing provisions, *Exhibit C* of the Master Indenture shall be amended to delete therefrom the name of such Person.

## Sale, Lease or Other Disposition of Property.

Each Member agrees that it will not, in any fiscal year, sell, lease or otherwise dispose (including, without limitation, any involuntary disposition) of Property which, together with all other Property transferred by Members exceeds the greater of $5,000,000 or 5% of the total value of the Property of the Obligated Group (calculated on the basis of the Book Value of the assets shown on the assets side of the balance sheet in the combined financial statements of the Obligated Group for the fiscal year next preceding the date of such sale, lease or other disposition for which combined financial statements of the Obligated Group reported on by independent certified public accountants are available or, if the Obligated Group Agent so elects, on the basis of Current Value), except for transfers or other dispositions in the ordinary course of business and except for transfers, sales or other dispositions of Property:

(A)     In return for other Property of equal or greater value and usefulness;

(B)     To any Person, if prior to such sale, lease or other disposition there is delivered to the Master Trustee an Officer's Certificate of a Member stating that, in the judgment of the signer, such Property has, or within the next succeeding 24 calendar months is reasonably expected to, become inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable or unnecessary and the sale, lease or other disposition thereof will not impair the structural soundness, efficiency or economic value of the remaining Property;

(C)     To another Member;

(D)     Upon fair and reasonable terms no less favorable to the Member than the Member would obtain in a comparable arm's-length transaction, if following such transfer the proceeds received by the transferor are applied to acquire Property or to repay the principal of Funded Indebtedness of any Member;

(E)     To any Person, if such Property consists solely of assets which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with their use for payment on the Obligations;

(F)     To any Person, if such transfer consists solely of cash and such transfer will not exceed 10% of Net Patient Service Revenues in any fiscal year; or

(G)     To any Person upon delivery to the Master Trustee of an Officer's Certificate of a Member (i) certifying that during the fiscal year immediately preceding the proposed disposition for which financial statements have been reported upon by independent certified public accountants, (a) the Historical Maximum Annual Debt Service Coverage Ratio of the Obligated Group, taking into account such disposition, would not have been less than 2.00:1 or (b) if the Historical Maximum Annual Debt Service Coverage Ratio is less than 2.00:1, the Historical Annual Maximum Debt Service Coverage Ratio would not have been reduced by more than 10% and (ii) demonstrating that, after taking into account such disposition, the conditions described in Section 415(A) of the Master Indenture are met for allowing the incurrence of one dollar of additional Funded Indebtedness.

The foregoing provisions of this Section notwithstanding, each Member further agrees that it will not sell, lease, donate or otherwise dispose of Property (a) which could reasonably be expected at the time of such sale, lease, donation or disposition to result in a reduction of the Historical Maximum Annual Debt Service Coverage Ratio for the Obligated Group such that the Master Trustee could or would be obligated to require the Obligated Group to retain a Consultant pursuant to Section 409 of the Master Indenture, or (b) if a Consultant has been retained in the circumstances described in Section 409 of the Master Indenture, such action, in the opinion of such Consultant, will have an adverse effect on the Income Available for Debt Service of the Obligated Group. The parties to the Master Indenture agree that except as otherwise permitted by the Master Indenture (including, without limitation, transfers to other Members and other transfers permitted as described under this Section) and except as otherwise required by law, it

will not enter into any transaction, including, without limitation, the purchase, sale, exchange or transfer of Property, the rendering of any service, the making of any loan, the extension of any credit or any other transaction, with any Affiliate except pursuant to the reasonable requirements of such Member's activities and upon fair and reasonable terms no less favorable to it than would obtain in a comparable arm's-length transaction with a person not an Affiliate.

## Events of Default.

Each of the following events is an "event of default" under the Master Indenture:

(A)     failure of the Obligated Group to pay any installment of interest or principal, or any premium, on any Obligation when the same shall become due and payable, whether at maturity, upon any date fixed for prepayment or redemption by acceleration or otherwise and the continuance of such failure for five days; or

(B)     failure of any Member to comply with, observe or perform any of the covenants, conditions, agreements or provisions hereof and to remedy such default within 30 days after written notice thereof to such Member and the Obligated Group Agent from the Master Trustee or the holders of at least 25% in aggregate principal amount of the Outstanding Obligations; provided, that if such default cannot with due diligence and dispatch be cured within 30 days but can be cured, the failure of the Member to remedy such default within such 30-day period shall not constitute a default under the Master Indenture if the Member shall immediately upon receipt of such notice commence with due diligence and dispatch the curing of such default and, having so commenced the curing of such default, shall thereafter prosecute and complete the same with due diligence and dispatch; or

(C)     any representation or warranty made by any Member in the Master Indenture or in any statement or certificate furnished to the Master Trustee or the purchaser of any Obligation in connection with the sale of any Obligation or furnished by any Member pursuant hereto proves untrue in any material respect as of the date of the issuance or making thereof and shall not be corrected or brought into compliance within 30 days after written notice thereof to the Obligated Group Agent by the Master Trustee or the holders of at least 25% in aggregate principal amount of the Outstanding Obligations; or

(D)     default in the payment of the principal of, premium, if any, or interest on any Indebtedness for borrowed money (other than Non-Recourse Indebtedness) of any Member, including, without limitation, any Indebtedness created by any Related Loan Document, within 5 days from the date the same shall become due, or an event of default as defined in any mortgage, indenture, loan agreement or other instrument under or pursuant to which there was issued or incurred, or by which there is secured, any such Indebtedness (including any Obligation) of any Member, and which default in payment or event of default entitles the holder thereof to declare or, in the case of any Obligation, to request that the Master Trustee declare, such Indebtedness due and payable prior to the date on which it would otherwise become due and payable; provided, however, that if such Indebtedness is not evidenced by an Obligation or issued, incurred or secured by or

E-33

under a Related Loan Document, a default in payment shall not constitute an "event of default" under the Master Indenture unless the unpaid principal amount of such Indebtedness, together with the unpaid principal amount of all other Indebtedness so in default, exceeds 5% of the unrestricted net assets of the Obligated Group as shown on or derived from the then latest available audited combined financial statements of the Obligated Group; or

(E)     any judgment, writ or warrant of attachment or of any similar process shall be entered or filed against any Member or against any Property of any Member and remains unvacated, unpaid, unbonded, unstayed or uncontested in good faith for a period of 30 days; provided, however, that none of the foregoing shall constitute an event of default unless the amount of such judgment, writ, warrant of attachment or similar process, together with the amount of all other such judgments, writs, warrants or similar processes so unvacated, unpaid, unbonded, unstayed or uncontested, exceeds 5% of the unrestricted net assets of the Obligated Group as shown on or derived from the then latest available audited combined financial statements of the Obligated Group; or

(F)     any Member admits insolvency or bankruptcy or its inability to pay its debts as they mature, or is generally not paying its debts as such debts become due, or makes an assignment for the benefit of creditors or applies for or consents to the appointment of a trustee, custodian or receiver for such Member, or for the major part of its Property; or

(G)     a trustee, custodian or receiver is appointed for any Member or for the major part of its Property and is not discharged within 30 days after such appointment; or

(H)     bankruptcy, dissolution, reorganization, arrangement, insolvency or liquidation proceedings, proceedings under Title 11 of the United States Code, as amended, or other proceedings for relief under any bankruptcy law or similar law for the relief of debtors are instituted by or against any Member (other than bankruptcy or similar proceedings instituted by any Member against third parties), and if instituted against any Member are allowed against such Member or are consented to or are not dismissed, stayed or otherwise nullified within 60 days after such institution; or

(I)     payment of any installment of interest or principal, or any premium, on any Related Bond shall not be made when the same shall become due and payable under the provisions of any Related Bond Indenture.

### Acceleration

If an event of default under the Master Indenture has occurred and is continuing, the Master Trustee may, and if requested by either the holders of not less than 25% in aggregate principal amount of Outstanding Obligations or the holder of any Accelerable Instrument under which Accelerable Instrument an event of default exists (which event of default permits the holder thereof to request that the Master Trustee declare such Indebtedness evidenced by an Obligation due and payable prior to the date on which it would otherwise become due and payable), shall, by notice in writing delivered to the Obligated Group Agent, declare the entire principal amount of all Obligations then Outstanding under the Master Indenture and the interest

E-34

accrued thereon immediately due and payable, and the entire principal and such interest shall thereupon become immediately due and payable, subject, however, to the provisions of Section 511 hereof with respect to waivers of events of default.

## Remedies; Rights of Obligation Holders

Upon the occurrence and continuance of any event of default, the Master Trustee may pursue any available remedy including a suit, action or proceeding at law or in equity to enforce the payment of the principal of, premium, if any, and interest on the Obligations Outstanding under the Master Indenture and any other sums due under the Master Indenture and may collect such sums in the manner provided by law out of the Property of any Member wherever situated.

If an event of default shall have occurred, and if it shall have been requested so to do by either the holders of 25% or more in aggregate principal amount of Obligations Outstanding or the holder of an Accelerable Instrument upon whose request pursuant to Section 503 of the Master Indenture the Master Trustee has accelerated the Obligations and if it shall have been indemnified as provided in Section 601(k) of the Master Indenture, the Master Trustee shall be obligated to exercise such one or more of the rights and powers conferred by this Section as the Master Trustee shall deem most expedient in the interests of the holders of Obligations; provided, however, that the Master Trustee shall have the right to decline to comply with any such request if the Master Trustee shall be advised by counsel (who may be its own counsel) that the action so requested may not lawfully be taken or the Master Trustee in good faith shall determine that such action would be unjustly prejudicial to the holders of Obligations not parties to such request.

No remedy by the terms of the Master Indenture conferred upon or reserved to the Master Trustee (or to the holders of Obligations) is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given to the Master Trustee or to the holders of Obligations issued under the Master Indenture, now or hereafter existing at law or in equity or by statute.

No delay or omission to exercise any right or power accruing upon any default or event of default shall impair any such right or power or shall be construed to be a waiver of any such default or event of default, or acquiescence therein; and every such right and power may be exercised from time to time and as often as may be deemed expedient.

No waiver of any default or event of default under the Master Indenture, whether by the Master Trustee or by the holders of Obligations, shall extend to or shall affect any subsequent default or event of default or shall impair any rights or remedies consequent thereon.

## Supplements and Amendments to the Master Indenture

Subject to the limitations set forth in Section 702 of the Master Indenture, the Members and the Master Trustee may, without the consent of, or notice to, any of the Obligation holders, amend or supplement the Master Indenture, for any one or more of the following purposes:

(A) To cure any ambiguity or defective provision in or omission from the Master Indenture in such manner as is not inconsistent with and does not impair the security of the Master Indenture or adversely affect the holder of any Obligation;

(B)     To grant to or confer upon the Master Trustee for the benefit of the Obligation holders any additional rights, remedies, powers or authority that may lawfully be granted to or conferred upon the Obligation holders and the Master Trustee, or either of them, to add to the covenants of the Members for the benefit of the Obligation holders or to surrender any right or power conferred under the Master Indenture upon any Member;

(C)     To assign and pledge under the Master Indenture any revenues, properties or collateral;

(D)     To evidence the succession of another corporation to the agreements of a Member or the Master Trustee, or the successor of any thereof under the Master Indenture;

(E)     To permit the qualification of the Master Indenture under the Trust Indenture Act of 1939, as then amended, or under any similar federal statute hereafter in effect or to permit the qualification of any Obligations for sale under the securities laws of any state of the United States;

(F)     To provide for the refunding or advance refunding of any Obligation;

(G)     To provide for the issuance of Obligations;

(H)     To reflect the addition to or withdrawal of a Member from the Obligated Group;

(I)     To provide for the issuance of Obligations with original issue discount, provided such issuance would not materially adversely affect the holders of Outstanding Obligations;

(J)     To permit an Obligation to be secured by security which is not extended to all Obligation holders;

(K)     To permit the issuance of Obligations which are not in the form of a promissory note; and

(L)     To make any other change which, in the opinion of the Master Trustee, does not materially adversely affect the holders of any of the Obligations and, in the opinion of each Related Bond Trustee, does not materially adversely affect the holders of the Related Bonds with respect to which it acts as trustee, including, without limitation, any modification, amendment or supplement to the Master Indenture or any indenture supplemental hereto in such a manner as to establish or maintain exemption of interest on any Related Bonds under a Related Bond Indenture from federal income taxation under applicable provisions of the Code.

Any Supplemental Master Indenture providing for the issuance of Obligations shall set forth the date thereof, the date or dates upon which principal of, premium, if any, and interest on such Obligations shall be payable, the other terms and conditions of such Obligations, the form

E-36

of such Obligations and the conditions precedent to the delivery of such Obligations which shall include, among other things:

(ii)     delivery to the Master Trustee of all materials required to be delivered as a condition precedent to the incurrence of the Indebtedness evidenced by such Obligations;

(iii)     delivery to the Master Trustee of an opinion of Independent Counsel acceptable to the Master Trustee to the effect that all requirements and conditions to the issuance of such Obligations, if any, set forth in the Master Indenture and in the Supplemental Master Indenture have been complied with and satisfied; and

(iv)     delivery to the Master Trustee of an opinion of Independent Counsel acceptable to the Master Trustee to the effect that registration of such Obligations under the Securities Act of 1933, as amended, is not required, or, if such registration is required, that the Obligated Group has complied with all applicable provisions of said Act.

If at any time the Obligated Group Agent shall request the Master Trustee to enter into any Supplemental Master Indenture pursuant to subsection (L) above, the Master Trustee shall cause notice of the proposed execution of such Supplemental Master Indenture to be given to each Rating Agency then maintaining a rating on any Obligations or Related Bonds, in the manner provided in Section 1004 of the Master Indenture at least 15 days prior to the execution of such Supplemental Master Indenture, which notice shall include a copy of the proposed Supplemental Master Indenture. If at any time the Obligated Group Agent shall request the Master Trustee to enter into any Supplemental Master Indenture pursuant to which an Obligation is issued in connection with an Interest Rate Agreement, the Master Trustee shall cause notice of the execution of such Supplemental Master Indenture to be given to each Rating Agency then maintaining a rating on any Obligation or Related Bonds, in the manner provided in Section 1004 of the Master Indenture immediately succeeding the execution of such Supplemental Master Indenture, which notice shall include a copy of the Supplemental Master Indenture.

**Supplemental Master Indentures Requiring Consent of Obligation Holders**.

In addition to Supplemental Master Indentures covered by Section 701 of the Master Indenture (as described above) and subject to the terms and provisions contained in this Section, and not otherwise, the holders of not less than 51% in aggregate principal amount of the Obligations which are Outstanding under the Master Indenture at the time of the execution of such Supplemental Master Indenture shall have the right, from time to time, anything contained in the Master Indenture to the contrary notwithstanding, to consent to and approve the execution by the Members and the Master Trustee of such Supplemental Master Indentures as shall be deemed necessary and desirable by the Members for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the Master Indenture or in any Supplemental Master Indenture; provided, however, that nothing contained in this Section or in Section 701 of the Master Indenture shall permit, or be construed as permitting, (a) an extension of the stated maturity or reduction in the principal amount of or reduction in the rate or extension of the time of paying of interest on or reduction of any premium payable on the redemption of, any Obligation, without the consent of the holder of such Obligation, (b) a reduction in the aforesaid aggregate principal amount of Obligations the holders of which are required to consent to any such Supplemental Master Indenture or any such

amending or supplementing instruments, without the consent of the holders of all the Obligations at the time Outstanding which would be affected by the action to be taken, or (c) modification of the rights, duties or immunities of the Master Trustee, without the written consent of the Master Trustee.

If at any time the Obligated Group Agent shall request the Master Trustee to enter into any such Supplemental Master Indenture for any of the purposes describe in the preceding paragraph, the Master Trustee shall, upon being satisfactorily indemnified with respect to expenses, cause notice of the proposed execution of such Supplemental Master Indenture to be mailed by first class mail postage prepaid to each holder of an Obligation. Such notice shall briefly set forth the nature of the proposed Supplemental Master Indenture and shall state that copies thereof are on file at the principal corporate trust office of the Master Trustee for inspection by all Obligation holders. The Master Trustee shall not, however, be subject to any liability to any Obligation holder by reason of its failure to mail such notice, and any such failure shall not affect the validity of such Supplemental Master Indenture when consented to and approved as provided in this Section. If the holders of not less than 51% in aggregate principal amount of the Obligations which are Outstanding under the Master Indenture at the time of the execution of any such Supplemental Master Indenture shall have consented to and approved the execution thereof as provided, in this Section no holder of any Obligation shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Master Trustee or the Members from executing the same or from taking any action pursuant to the provisions thereof. Upon the execution of any such Supplemental Master Indenture as in this Section permitted and provided, the Master Indenture shall be and be deemed to be modified and amended in accordance therewith.

For the purpose of obtaining the foregoing consents, the determination of who is deemed the holder of an Obligation held by a Related Bond Trustee shall be made in the manner provided in Section 512 of the Master Indenture.

## THE BOND INDENTURE

*The following is a summary of certain provisions of the Bond Indenture. Reference is made to the Bond Indenture for the detailed provisions thereof.*

### Indenture Constitutes Contract

The Bond Indenture constitutes a continuing agreement with the Holders from time to time of the 2005 Bonds and the Credit Facility Providers as their respective interests may appear to secure the full payment of the principal of and premium (if any) and interest on all the 2005 Bonds, and the payment of all other amounts due under the Bond Indenture, subject to the covenants, provisions and conditions contained in the Bond Indenture.

### Initial Interest Rates; Change of Mode

(A)     Each Series of 2005 Bonds initially shall be in the Auction Mode and shall bear interest at the Auction Rates established for 7-day Auction Periods.

(B)     A series of 2005 Bonds in the Auction Mode may be changed to the Fixed Rate Mode or the Weekly Mode at the times and in the manner hereinafter provided.  All 2005 Bonds of any Series must be in the same Mode and shall bear interest at the same interest rate. The Fixed Rate Mode for a Series of 2005 Bonds shall be in effect until the Maturity Date of such series of 2005 Bonds, and may not be changed to any other Mode.

(C)     Defaulted Interest with respect to any 2005 Bond shall cease to be payable to the holder of such 2005 Bond on the relevant Record Date and shall be payable to the holder in whose name such Bond is registered at the close of business on the Special Record Date for the payment of such Defaulted Interest, which Special Record Date shall be fixed in the following manner.  The Obligated Group Agent shall notify the Bond Trustee and the Bond Insurer in writing of the amount of Defaulted Interest proposed to be paid on each 2005 Bond and the date of the proposed payment (which date shall be such as will enable the Bond Trustee to comply with the second sentence hereafter), and shall deposit with the Bond Trustee at the time of such notice an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Bond Trustee for such deposit prior to the date of the proposed payment.  Money deposited with the Bond Trustee shall be held in trust for the benefit of the Holders of the 2005 Bonds entitled to such Defaulted Interest as provided in this Section.  Following receipt of such funds the Bond Trustee shall fix a Special Record Date for the payment of such Defaulted Interest which shall be not more than 15 nor less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Bond Trustee of the notice of the proposed payment.  The Bond Trustee shall promptly notify the Obligated Group Agent of such Special Record Date and, in the name and at the expense of the Obligated Group, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage prepaid, not less than 10 days prior to such Special Record Date, to each holder of a 2005 Bond at the address of such holder as it appears on the Bond Register.

(D)     Each series of 2005 Bonds shall bear interest at Auction Rates established for Auction Periods until a Weekly Rate Conversion Date, or Fixed Rate Conversion Date with respect to such series of 2005 Bonds.  During a Weekly Rate Period, a series of the 2005 Bonds that have been so converted shall bear interest at the lesser of (i) the Interest Coverage Rate or (ii) the Weekly Rate.  During an Auction Rate Period a series of 2005 Bonds in the Auction Mode shall bear interest at the Auction Rate.  During the Fixed Rate Period, a series of the 2005 Bonds that have been so converted shall bear interest at the Fixed Rate.  Each Bank Bond shall bear interest at the Bank Rate.  At no time shall the 2005 Bonds (including Bank Bonds and Bonds bearing interest at the Failed Tender Rate pursuant to Section 11.08 of the Bond Indenture) bear interest at a rate higher than the Maximum Interest Rate.

(E) No Weekly Rate Period shall be established which would cause the Interest Coverage Period of the Liquidity Facility to be less than the requirements of Section 6.11(B) of the Bond Indenture.  No interest rate on a Bond entitled to the benefit of a Liquidity Facility shall be established which exceeds the Interest Coverage Rate.

**Funds; Disposition of Revenues**

Issuance of the 2005 Bonds.  At any time after the execution of the Bond Indenture, the Authority shall execute, by physical or facsimile signature, and the Trustee shall

authenticate and, upon Request of the Authority, deliver the 2005 Bonds for each series in the aggregate principal amount of such series set forth in Section 2.01 of the Bond Indenture.

Application of Proceeds of the 2005 Bonds. The moneys from time to time on deposit in the Funds and Accounts specified below (except for the Escrow Fund, the Bond Purchase Fund and the Rebate Fund) are subject to a lien and charge in favor of the owners of the 2005 Bonds until expended for the purposes for which such Funds and Accounts are created.

The proceeds (net of discount, if any) received from the sale of the 2005 Bonds shall be deposited in trust with the Bond Trustee. The Authority instructs the Bond Trustee, as agent for the 1992 Escrow Agent as trustee for the 1992 Bonds (which are a portion of the Debt to be Refinanced), and as agent for the 2002 and 2003 Escrow Agent as trustee for the 2002 Bonds (which are a portion of the Debt to be Refinanced), to deposit the following amounts from the following funds and accounts held for the benefit of the respective portions of the Debt to be Refinanced: (i) with respect to the 1992 Bonds, the amount of $2,472,725.96 from the Debt Service Reserve Fund for the 1992 Bonds, which the 1992 Escrow Agent has agreed to transfer; and (ii) with respect to the 2002 Bonds, the amount of $493,008.42 from the Debt Service Reserve Fund for the 2002 Bonds, which the 2002 and 2003 Escrow Agent has agreed to transfer (collectively with the proceeds mentioned above, the "Closing Deposit").

The Bond Trustee shall allocate and deposit the amount of the Closing Deposit as follows:

(A)     Deposit $16,494,762.92 with the 1992 Escrow Agent for deposit to the credit of the 1992 Escrow Fund created pursuant to the 1992 Escrow Agreement.

(B)     Deposit $2,016,956.16 with the 2002 and 2003 Escrow Agent for deposit to the credit of the 2002 Escrow Fund created pursuant to the 2002 and 2003 Escrow Agreement.

(C)     Deposit $1,723,522.76 with the 2002 and 2003 Escrow Agent for deposit to the credit of the 2003 Escrow Fund created pursuant to the 2002 and 2003 Escrow Agreement.

(D)     Deposit $313,104.16 to the credit of the Costs of Issuance Fund established under and to be used as set forth in Section 3.03 of the Bond Indenture.

(E)     Deposit $31,465,734.38 to the credit of the Project Fund established under and to be used as set forth in Section 3.04 of the Bond Indenture.

(F)     Deposit $1,634,147.40 to the credit of the Capitalized Interest Fund established under and to be used as set forth in Section 3.04 of the Bond Indenture.

(G)     Transfer the sum of $2,132,506.60 by wire transfer to the Bond Insurer in payment for the premium for the issuance of the Insurance Policy.

(H)     Transfer the sum of $6,900,000.00 by wire transfer to Merrill Lynch in payment of the Merrill Lynch Debt.

Establishment and Application of Costs of Issuance Fund. The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Costs of Issuance Fund." The moneys in the Costs of Issuance Fund shall be used and withdrawn by the Bond Trustee to pay the Costs of Issuance upon Requisition of the Obligated Group Agent stating the Person to whom payment is to be made, the amount to be paid, the purpose for which the obligation was incurred and that such payment is a proper charge against said fund. On September 1, 2005, or upon the earlier Request of the Obligated Group Agent, amounts, if any, remaining in the Costs of Issuance Fund shall be transferred to the Project Fund and the Costs of Issuance Fund shall thereafter be closed.

### Establishment and Application of Project Fund.

(A)     The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Project Fund." Within the Project Fund the Bond Trustee shall establish, hold and maintain in trust a separate fund designated as the "Capitalized Interest Fund." The moneys in the Project Fund shall be used and withdrawn by the Bond Trustee to pay the costs of the acquisition and construction of the New Money Portion upon receipt of requisitions of the Obligated Group Agent therefor, and the moneys in the Capitalized Interest Fund shall be used and withdrawn by the Bond Trustee to pay capitalized interest on the 2005 Bonds. A portion of the moneys deposited in the Project Fund will be expended immediately to reimburse the Obligated Group Agent for the cost of capital expenditures previously made. Any funds remaining in the Capitalized Interest Fund after December 1, 2006 shall be transferred to the Project Fund and used for the purposes of the Project Fund.

(B)     Before any payment from the Project Fund shall be made, the Obligated Group Agent shall file or cause to be filed with the Bond Trustee a Requisition stating (i) the item number of such payment; (ii) the name of the Person to whom each such payment is due, which may be a member of the Obligated Group in the case of reimbursement for Project costs theretofore paid by such member of the Obligated Group; (iii) the respective amounts to be paid; (iv) the purpose by general classification for which each obligation to be paid was incurred; (v) that obligations in the stated amounts have been incurred by the member of the Obligated Group and are presently due and payable and that each item thereof is a proper charge against the Project Fund and has not been previously paid from the Project Fund; and (vi) that there has not been filed with or served upon the Obligated Group any notice of claim of lien, or attachment upon, or claim affecting the right to receive payment of, any of the amounts payable to any of the persons named in such Requisition, that has not been released or will not be released simultaneously with the payment of such obligation, other than materialmen's or mechanics' liens accruing by mere operation of law.

Upon receipt of a Requisition, the Bond Trustee shall pay the amount set forth in such Requisition as directed by the terms thereof out of the Project Fund. The Bond Trustee shall rely fully on any such Requisition delivered pursuant to Section 3.04 of the Bond Indenture and shall not be required to make any investigation in connection therewith. The Bond Trustee shall not make any such payment if it has received any written notice of claim of lien, attachment

upon, or claim affecting the right to receive payment of, any of the monies to be so paid, that has not been released or will not be released simultaneously with such payment.

(C)    When the Project shall have been completed, there shall be delivered to the Bond Trustee a Certificate of the Obligated Group Agent stating the fact and date of such completion and stating that all of the costs thereof have been determined and paid (or that all of such costs have been paid less specified claims that are subject to dispute and for which a retention in the Project Fund is to be maintained in the full amount of such claims until such dispute is resolved). Upon the receipt of such Certificate, the Bond Trustee shall, as directed by said Certificate, transfer any remaining balance in such Project Fund, less the amount of any such retention, to the Optional Redemption Account and applied to the optional redemption of 2005 Bonds. Upon such transfer, the Project Fund shall be closed.

Interest Fund.

(A)    The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Interest Fund." Moneys in the Interest Fund shall be held, disbursed, allocated and applied by the Bond Trustee only as provided in the Bond Indenture.

(B)    The Bond Trustee shall deposit the following Revenues in the Interest Fund when and as such Revenues are received:

   (i)    the interest component of all Loan Repayments, including the interest component of all cash prepayments of Loan Repayments made pursuant to Section 3.1 of the Loan Agreement;

   (ii)    all interest, profits and other income received from the investment of moneys in the Interest Fund;

   (iii)    all payments made by the Counterparty to the Interest Rate Agreement; and

   (iv)    any other Revenues not required to be deposited in any other fund or account established pursuant to the Bond Indenture.

(C)    The Trustee shall withdraw from the Debt Service Reserve Fund the amounts necessary to pay interest on the 2005 Bonds in the event the amounts on deposit in the Interest Fund on an Interest Payment Date are insufficient to pay such interest in full.

(D)    All amounts in the Interest Fund shall be used and withdrawn by the Bond Trustee, on a pro rata basis, solely for the purpose of paying the interest on the 2005 Bonds as the same becomes due and payable (including accrued interest on any 2005 Bonds purchased or redeemed prior to maturity pursuant to the Bond Indenture).

Principal Fund.

(A)     The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Principal Fund." The Bond Trustee shall establish, maintain and hold in trust within the Principal Fund a separate Mandatory Sinking Account. Moneys in the Principal Fund shall be held, disbursed, allocated and applied by the Bond Trustee only as provided in the Bond Indenture.

(B)     The Bond Trustee shall deposit the following Revenues in the Principal Fund when and as such Revenues are received:

(i)     the principal component of all Loan Repayments, but excluding the principal component of all cash prepayments of Loan Repayments made pursuant to Section 3.4 of the Loan Agreement, which shall be deposited in the Redemption Fund; and

(ii)     all interest, profits and other income received from the investment of moneys in the Principal Fund.

(C)     All amounts in the Principal Fund shall be used and withdrawn by the Bond Trustee solely to redeem the 2005 Bonds, or pay the 2005 Bonds at maturity, as provided in the Bond Indenture.

(D)     On each Mandatory Sinking Account Payment date, the Bond Trustee shall apply the Mandatory Sinking Account Payment required on that date to the redemption (or payment at maturity, as the case may be) of 2005 Bonds, in the amounts and upon the notice and in the manner provided in Article IV; provided that, at any time prior to giving such notice of such redemption, the Bond Trustee shall, upon direction of the Obligated Group Agent, apply such moneys to the purchase of 2005 Bonds at public or private sale, as and when and at such prices (including brokerage and other charges, but excluding accrued interest, which is payable from the Interest Fund) as the Obligated Group Agent may direct, except that the purchase price (excluding accrued interest) shall not exceed the par amount of such 2005 Bonds. If, during the twelve-month period immediately preceding said Mandatory Sinking Account Payment date, the Bond Trustee has purchased 2005 Bonds with moneys in the Principal Fund, or, during said period and prior to giving said notice of redemption, the Obligated Group Agent has deposited 2005 Bonds with the Bond Trustee, or 2005 Bonds were at any time purchased or redeemed by the Bond Trustee from the Redemption Fund and allocable to said Mandatory Sinking Account Payment, such 2005 Bonds so purchased or deposited or redeemed shall be applied, to the extent of the full principal amount thereof, to reduce said Mandatory Sinking Account Payment. All 2005 Bonds purchased or deposited pursuant to this subsection shall be cancelled and destroyed by the Bond Trustee to or upon the order of the Obligated Group Agent. All 2005 Bonds purchased from the Principal Fund or deposited by the Obligated Group Agent with the Bond Trustee shall be allocated first to the next succeeding Mandatory Sinking Account Payment, then to the remaining Mandatory Sinking Account Payments as selected by the Obligated Group Agent.

Redemption Fund.

(A) The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Redemption Fund". The Bond Trustee shall establish, maintain and hold in trust within the Redemption Fund a separate Optional Redemption Account and a separate Special Redemption Account.

(B) The Bond Trustee shall deposit the following Revenues in the Optional Redemption Account when and as such Revenues are received:

(i) except as provided in subsection (C) of this Section, the principal component of all cash prepayments of Loan Repayments made pursuant to Section 3.4(a) of the Loan Agreement; and

(ii) all interest, profits and other income received from the investment of moneys in the Optional Redemption Account.

(C) The Bond Trustee shall deposit the following Revenues in the Special Redemption Account when and as such Revenues are received:

(i) the principal component of all cash prepayments of Loan Repayments made pursuant to Section 3.1 of the Loan Agreement which are specified in a Certificate of the Obligated Group Agent to have been derived from insurance or condemnation proceeds received with respect to the facilities of a member of the Obligated Group; and

(ii) all interest, profits and other income received from the investment of moneys in the Special Redemption Account.

(D) All amounts deposited in the Optional Redemption Account and in the Special Redemption Account shall be used and withdrawn by the Bond Trustee solely for the purpose of redeeming 2005 Bonds, in the manner and upon the terms and conditions specified in Article IV, at the next succeeding date of redemption for which notice has not been given and at the Redemption Prices then applicable to redemptions from the Optional Redemption Account and the Special Redemption Account, respectively; provided that in the case of the Optional Redemption Account in lieu of redemption at such next succeeding date of redemption, or in combination therewith, amounts in such account may be transferred to the Principal Fund and credited against Loan Repayments in order of their due date as set forth in a Request of the Obligated Group Agent. All 2005 Bonds redeemed from the Redemption Fund shall be allocated to applicable Mandatory Sinking Account Payments in inverse order of their payment dates.

## Pledge and Assignment

(A) Subject only to the provisions of the Bond Indenture permitting the application thereof for the purposes and on the terms and conditions set forth in the Bond Indenture, all of the Revenues and any other amounts (including proceeds of the sale of 2005 Bonds) held in any fund or account established pursuant to the Bond Indenture (other than the

Bond Purchase Fund and the Rebate Fund) are pledged to secure the payment of the principal of and premium, if any, and interest on the 2005 Bonds, in accordance with their terms and the provisions of the Bond Indenture. Said pledge shall constitute a lien on and security interest in such assets and shall attach, be perfected and be valid and binding from and after delivery by the Bond Trustee of the 2005 Bonds, without any physical delivery thereof or further act.

(B)     The Authority transfers in trust, grants a security interest in and assigns to the Bond Trustee, for the benefit of the Holders from time to time of the 2005 Bonds, all of the Revenues and other assets pledged in subsection (A) of this Section and all of the right, title and interest of the Authority in the Loan Agreement (except for (i) the right to receive any Additional Payments to the extent payable to the Authority under the Loan Agreement, (ii) any rights of the Authority to indemnification and rights of inspection and consent, and (iii) the obligation of the Obligated Group to make deposits pursuant to the Tax Compliance Certificate). The Bond Trustee shall be entitled to and shall collect and receive all of the Revenues, and any Revenues collected or received by the Authority shall be deemed to be held, and to have been collected or received, by the Authority as the agent of the Bond Trustee and shall forthwith be paid by the Authority to the Bond Trustee. Subject to the provisions of Section 7.06 of the Bond Indenture with respect to the control of remedial proceedings by the Bond Insurer, the Bond Trustee also shall be entitled to and shall take all steps, actions and proceedings reasonably necessary in its judgment to enforce, either jointly with the Authority or separately, all of the rights of the Authority that have been assigned to the Bond Trustee and all of the obligations of the Obligated Group under the Loan Agreement other than for those items excepted in the parenthetical contained in the first sentence of this subsection. All Revenues deposited with the Bond Trustee shall be held, disbursed, allocated and applied by the Bond Trustee only as provided in the Bond Indenture. To the extent that the Bond Indenture confers any rights, remedy or claim under or by reason of the Bond Indenture, to the Bond Insurer and the Credit Facility Provider, such Person is explicitly recognized as a third party beneficiary, so long as such Person is not in default under the Insurance Policy in the case of the Bond Insurer.

(C)     If on the first Business Day prior to the day of any month in which a Loan Repayment is required to be made, the Bond Trustee has not received the full amount of such Loan Repayment, the Bond Trustee shall immediately notify the Authority, the Obligated Group Agent, the Bond Insurer and the Credit Facility Provider of such insufficiency by Electronic Means and confirm such notification as soon as possible thereafter by written notice.

(D)     The Bond Trustee agrees to immediately deposit to the appropriate funds and accounts created the payments made by the Counterparty (or any successor thereto or guarantor thereof) pursuant to the Interest Rate Agreement.

## Debt Service Reserve Fund

(A)     The Trustee shall establish and maintain so long as any of the 2005 Bonds are outstanding a separate account to be known as the "Debt Service Reserve Fund" (hereinafter the "Debt Service Reserve Fund"); provided, however that funding of such Debt Service Reserve Fund shall only be required pursuant to the provisions of Section 3.8 of the Loan Agreement.

(B)     There shall be deposited to the credit of the Debt Service Reserve Fund amounts paid by the Obligated Group pursuant to Section 3.8 of the Loan Agreement to establish, maintain or restore the Debt Service Reserve Fund.

(C)     If the balance in the Debt Service Reserve Fund on any Interest Payment Date is less than the Debt Service Reserve Fund Requirement, the Trustee shall give notice to the Obligated Group Agent, and the Obligated Group Agent is required by Section 3.8 of the Loan Agreement to restore such deficiency.

(D)     If the balance in the Debt Service Reserve Fund on any Interest Payment Date is greater than the Debt Service Reserve Fund Requirement, the Trustee shall transfer the excess (i) before the Completion Date, to the Project Fund and (ii) after the Completion Date, to the Interest Fund.

(E)     When the balances in the Interest Fund, Mandatory Sinking Account in the Principal Fund and Debt Service Reserve Fund are sufficient to pay the principal of and interest on the 2005 Bonds then outstanding to their final maturity or earlier optional redemption date, the Trustee shall transfer the balance in the Debt Service Reserve Fund to the Interest Fund and Mandatory Sinking Account in the Principal Fund, as appropriate, to be held for the payment of such principal of and interest on the 2005 Bonds.  Anything hereinabove to the contrary notwithstanding, if the amount set forth above in this clause (E) is provided so that the moneys in the Debt Service Reserve Fund are not necessary, such moneys may be transferred as instructed by the Obligated Group Agent.

(F)     Notwithstanding anything else in Section 5.07 of the Bond Indenture to the contrary, the Obligated Group Agent is only required to fund and maintain the Debt Service Reserve Fund to the extent required by Section 3.8 of the Loan Agreement.

## Determination of Interest Rate

### Initial Interest Rates; Change of Mode

(A)     Each Series of 2005 Bonds initially shall be in the Auction Mode and shall bear interest at the Auction Rates established for 7-day Auction Periods.

(B)     A series of 2005 Bonds in the Auction Mode may be changed to the Fixed Rate Mode or the Weekly Mode at the times and in the manner hereinafter provided.  All 2005 Bonds of any Series must be in the same Mode and shall bear interest at the same interest rate. The Fixed Rate Mode for a Series of 2005 Bonds shall be in effect until the Maturity Date of such series of 2005 Bonds, and may not be changed to any other Mode.

(C)     Defaulted Interest with respect to any 2005 Bond shall cease to be payable to the holder of such 2005 Bond on the relevant Record Date and shall be payable to the holder in whose name such Bond is registered at the close of business on the Special Record Date for the payment of such Defaulted Interest, which Special Record Date shall be fixed in the following manner. The Obligated Group Agent shall notify the Bond Trustee and the Bond Insurer in writing of the amount of Defaulted Interest proposed to be paid on each 2005 Bond and the date of the proposed payment (which date shall be such as will enable the Bond Trustee

to comply with the second sentence hereafter), and shall deposit with the Bond Trustee at the time of such notice an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Bond Trustee for such deposit prior to the date of the proposed payment. Money deposited with the Bond Trustee shall be held in trust for the benefit of the Holders of the 2005 Bonds entitled to such Defaulted Interest. Following receipt of such funds the Bond Trustee shall fix a Special Record Date for the payment of such Defaulted Interest which shall be not more than 15 nor less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Bond Trustee of the notice of the proposed payment. The Bond Trustee shall promptly notify the Obligated Group Agent of such Special Record Date and, in the name and at the expense of the Obligated Group, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage prepaid, not less than 10 days prior to such Special Record Date, to each holder of a 2005 Bond at the address of such holder as it appears on the Bond Register.

(D) Each series of 2005 Bonds shall bear interest at Auction Rates established for Auction Periods until a Weekly Rate Conversion Date, or Fixed Rate Conversion Date with respect to such series of 2005 Bonds. During a Weekly Rate Period, a series of the 2005 Bonds that have been so converted shall bear interest at the lesser of (i) the Interest Coverage Rate or (ii) the Weekly Rate. During an Auction Rate Period a series of 2005 Bonds in the Auction Mode shall bear interest at the Auction Rate. During the Fixed Rate Period, a series of the 2005 Bonds that have been so converted shall bear interest at the Fixed Rate. Each Bank Bond shall bear interest at the Bank Rate. At no time shall the 2005 Bonds (including Bank Bonds and Bonds bearing interest at the Failed Tender Rate pursuant to Section 11.08 of the Bond Indenture) bear interest at a rate higher than the Maximum Interest Rate.

(E) No Weekly Rate Period shall be established which would cause the Interest Coverage Period of the Liquidity Facility to be less than the requirements of Section 6.11(B) of the Bond Indenture. No interest rate on a Bond entitled to the benefit of a Liquidity Facility shall be established which exceeds the Interest Coverage Rate.

Subsequent Interest Rates; Rate Periods.

The 2005 Bonds shall bear interest at Auction Rates established for Auction Periods until the Fixed Rate Conversion Date or the Weekly Rate Conversion Date, as the case may be, for a series of 2005 Bonds.

Notwithstanding the foregoing, if during any period that a Series of 2005 Bonds is in an Auction Rate Period:

(i) the ownership of such 2005 Bonds is no longer maintained in book-entry form by the Depository, the rate of interest on such 2005 Bonds for any Auction Period commencing after the delivery of certificates representing such 2005 Bonds pursuant to Section 2.07 of the Bond Indenture, shall equal the Maximum Rate on the Business Day immediately preceding the first day of such Auction Period; or

(ii) if a Payment Default occurs, Auctions will be suspended and the Auction Rate for the Auction Period commencing on or after such Payment Default and for each

E-47

Auction Period thereafter to and including the Auction Period, if any, during which, or commencing less than the Applicable Number of Business Days after, such Payment Default is cured will equal the Default Rate.

Maturities, Sinking Fund Redemption and Interest Rates Upon Conversion of a Series of 2005 Bonds to Fixed Rate. Prior to the conversion of a series of 2005 Bonds to a Fixed Rate, the Remarketing Agent shall deliver to the Bond Trustee, the Bond Insurer and the Liquidity Provider, and the Obligated Group a certificate which includes a schedule specifying the principal amount of converted 2005 Bonds which will mature on June 1 of the years specified in such schedule and the interest rate payable on the converted 2005 Bonds of each such maturity and a schedule specifying the principal amount of converted 2005 Bonds maturing June 1 of the years specified in such schedule to be called for mandatory Bond Sinking Fund redemption on June 1 of the years specified in such schedule. In determining the principal maturities, Mandatory Sinking Fund Account redemption payments and interest rates for converted 2005 Bonds, the Remarketing Agent shall use the following guidelines:

(i) The Remarketing Agent shall allocate the converted 2005 Bonds between serial bonds and term bonds in such manner as shall produce the lowest aggregate interest payable with respect to the converted 2005 Bonds; and

(ii) The Remarketing Agent shall set the interest rate on each converted 2005 Bond of a particular Maturity at the lowest interest rate that will enable such 2005 Bond upon conversion to be remarketed at par (plus any accrued interest) taking into account the Maturity Date of such 2005 Bond and Mandatory Sinking Fund payments to be made with respect to converted 2005 Bonds and Maturity Date. The foregoing notwithstanding, another method for providing for payment of principal on the 2005 Bonds after the Fixed Rate Conversion Date may be established by the Bond Trustee if there is delivered to the Bond Trustee and the Bond Insurer by the Obligated Group Agent an Opinion of Bond Counsel to the effect that utilization of such other method will not adversely affect the validity of any 2005 Bonds or any exclusion from federal income taxation to which the interest on the 2005 Bonds would otherwise be entitled.

(iii) Notwithstanding the foregoing, any change in the principal amount of converted 2005 Bonds either maturing or being called for mandatory redemption from the schedule of mandatory redemption for such series upon initial issuance is subject to the approval of the Bond Insurer.

**Redemption and Tender**

The 2005 Bonds are subject to redemption and tender as set forth in the forepart of the Preliminary Official Statement.

General Provisions Relating to the Tender Bond Purchase Fund.

(A) The Bond Trustee shall establish and maintain, so long as a Series of 2005 Bonds are outstanding and are in the Weekly Mode, a separate fund to be known as the "Bond Purchase Fund —West Virginia University Hospitals" (the "Bond Purchase Fund"). There shall be established three separate segregated accounts within the Bond Purchase Fund to be known as the "Remarketing Proceeds Account," the "Liquidity Facility Account" and the "Eligible

Moneys Account." Amounts on deposit in each such account shall not be commingled with any other moneys. There shall be deposited into the Bond Purchase Fund from time to time the following:

(i) the moneys received upon the remarketing of Tendered Bonds to any Person pursuant to the Remarketing Agreement (other than Tendered Bonds sold to the Obligated Group Agent or any "affiliate" thereof (as defined in Title 11 of the United States Code) to be deposited in the Remarketing Proceeds Account;

(ii) the moneys received from the underwriter or purchaser, other than the Authority, the Obligated Group Agent or any "affiliate" thereof (as defined in Title 11 of the United States Code), of Tendered Bonds upon the conversion of the interest rate thereon to a Fixed Rate to be deposited in the Remarketing Proceeds Account;

(iii) moneys obtained by the Bond Trustee pursuant to the Liquidity Facility then in effect to be applied to pay the purchase price of Tendered Bonds to be deposited into the Liquidity Facility Account; and

(iv) other Eligible Moneys to the extent that moneys obtained pursuant to (i), (ii) and (iii) above are insufficient on any day to pay the purchase price of Tendered Bonds to be deposited in the Eligible Moneys Account.

(B) On any Optional Tender Date or Mandatory Tender Date, the Bond Trustee shall transfer on the Bond Register ownership of all of the 2005 Bonds tendered or required to be tendered to the name of the purchaser thereof, including without limitation, registration of Bank Bonds. Unless otherwise directed by the Bank, the Bond Trustee shall take such actions as are necessary to cause the Bond Trustee, as custodian for the Bank, to be reflected as the beneficial owner of Bank Bonds in the records of DTC, including, if requested by the Bank, the assignment of separate CUSIP numbers for such Bank Bonds. Subject to Section 2.07 of the Bond Indenture, on any Bond Sale Date, the Bond Trustee shall transfer on the Bond Register ownership of all Bank Bonds remarketed on such Bond Sale Date to the name of the purchaser thereof. From and after such dates interest on such 2005 Bonds shall be payable solely to such purchaser, its transferees or the successors thereto. Any holder of an Optionally Tendered Bond required to tender such 2005 Bond for purchase on an Optional Tender Date with respect to such 2005 Bond and any holder of a Mandatorily Tendered Bond required to tender such 2005 Bond for purchase on a Mandatory Tender Date with respect to such 2005 Bond shall be entitled solely to payment of the Tender Price or Repurchase Price, as the case may be, for such 2005 Bonds and shall not be entitled to the payment of any principal thereon or any interest accrued thereon on or after such Optional or Mandatory Tender Date provided that the Tender Price or Repurchase Price, as the case may be, has been deposited with the Bond Trustee. Any such 2005 Bond deemed to be tendered shall no longer be considered to be an Outstanding 2005 Bond.

(C) Moneys in the Remarketing Proceeds Account, the Liquidity Facility Account and the Eligible Moneys Account shall be applied in the order referred to above and shall be held exclusively in trust for the payment of the purchase price of Tendered Bonds; provided, however under no circumstances shall proceeds of a loan or drawing made pursuant to the Liquidity

Facility be used to purchase Bank Bonds, Obligated Group Bonds or Bonds bearing interest at an Auction Rate or a Fixed Rate. Moneys obtained by the Bond Trustee pursuant to the Liquidity Facility in excess of the amount needed for the payment of the purchase price of Tendered Bonds shall be promptly paid to the Bank. In the event any Tendered Bonds shall not be presented for purchase and moneys to pay the purchase price of such Tendered Bonds are held in the Bond Purchase Fund, such moneys on deposit in the Bond Purchase Fund shall be invested only in United States Government Obligations with a term not exceeding the earlier of 30 days from the date of investment of such moneys or the date or dates that moneys therefrom are anticipated to be required. Amounts held to pay the purchase price for more than four years shall be applied in the same manner as provided under Section 10.04 of  the Bond Indenture with respect to unclaimed payments of principal and interest.

(D) The Tender Agent shall deposit all moneys delivered to it for the purchase of 2005 Bonds of the affected series into the Remarketing Proceeds Account and shall hold all such moneys in trust for the exclusive benefit of the Person that shall have so delivered such moneys until such 2005 Bonds purchased with such moneys shall have been delivered to it for the account of such Person and, thereafter, for the benefit of the Holders tendering such 2005 Bonds.

(E) The Tender Agent shall deposit all moneys delivered to it from a payment by or on behalf of the Obligated Group for the purchase of a series of 2005 Bonds into the Obligated Group Purchase Account and shall hold all such moneys in trust for the exclusive benefit of the Obligated Group until such 2005 Bonds purchased with such moneys shall have been delivered to or for the account of the Obligated Group and, after such delivery, the Tender Agent shall hold such funds exclusively for the benefit of the Holders tendering such 2005 Bonds.

(F) Moneys in the Remarketing Proceeds Account and the Obligated Group Purchase Account shall not be commingled with other funds held by the Tender Agent and shall remain uninvested. Neither the Authority nor the Obligated Group shall have any right, title or interest in or to any moneys held in the Bond Purchase Fund, except as provided in subsection (B) of this Section.

(G) Payment of Purchase Price. At or before close of business New York City time on the applicable Conversion Date and upon receipt by the Tender Agent of the aggregate Purchase Price of the tendered 2005 Bonds, the Tender Agent shall pay the Purchase Price of such 2005 Bonds to the Holders by bank wire transfer in immediately available funds. Tender Agent shall pay the Purchase Price from the following accounts and in the following order of priority: (1) the Remarketing Proceeds Account to the extent funds are available therein and (2) the Obligated Group Purchase Account. If at close of business New York City time on any Fixed Rate Conversion Date any balance remains in the Obligated Group Purchase Account in excess of any unsatisfied purchase obligation, such excess shall be promptly returned to the Obligated Group Agent.

(H) Inadequate Funds for Tenders. If the funds available for purchases of 2005 Bonds pursuant to Article IV are inadequate for the purchase of all 2005 Bonds tendered on any Fixed Rate Conversion Date, no purchase shall be consummated and the Tender Agent shall, after any applicable grace period, (i) return all tendered 2005 Bonds to the Holders thereof, (ii) return all moneys deposited in the Remarketing Proceeds Account to the Remarketing Agent

for return to the Persons providing such moneys, and (iii) return all moneys deposited in the Obligated Group Purchase Account to the Obligated Group Agent.

(I) Delivery of 2005 Bonds by Tendering Bondholders; Undelivered 2005 Bonds Deemed Purchased. All 2005 Bonds to be purchased on any date shall be required to be delivered to the principal corporate office of the Tender Agent at or before 12:00 Noon New York City time on such Fixed Rate Conversion Date. If the Holder of any 2005 Bond (or portion thereof) that is subject to purchase pursuant to Article IV fails to deliver such 2005 Bond to the Tender Agent for purchase on the Conversion Date, and if the Tender Agent is in receipt of the Purchase Price therefor, such 2005 Bond (or portion thereof) shall nevertheless be deemed tendered and purchased on the day fixed for purchase thereof and ownership of such 2005 Bond (or portion thereof) shall be transferred to the purchaser thereof as provided in subsection (J) below. Any Holder who fails to deliver such 2005 Bond for purchase shall have no further rights except the right to receive the Purchase Price thereof upon presentation and surrender of said Bond to the Tender Agent. The Tender Agent shall, as to any tendered 2005 Bonds that have not been delivered to it: (i) promptly notify the Remarketing Agent of such nondelivery; and (ii) instruct the Bond Trustee to place a stop transfer against an appropriate amount of 2005 Bonds registered in the name of such Holder(s) on the bond registration books. The Bond Trustee shall place such stop(s) commencing with the lowest serial number Bond registered in the name of such Holder(s) until stop transfers have been placed against an appropriate amount of 2005 Bonds until the appropriate tendered 2005 Bonds are delivered to the Tender Agent who shall deliver such 2005 Bonds to the Bond Trustee. Upon such delivery, the Bond Trustee shall make any necessary adjustments to the bond registration books.

(J) Delivery of 2005 Bonds to Purchasers. As long as a series of the 2005 Bonds are held under the book-entry system of DTC, all tenders and deliveries of such series of 2005 Bonds will be accomplished under the procedures of DTC. Otherwise, on the Conversion Date, the Tender Agent shall direct the Bond Trustee to execute and deliver all 2005 Bonds purchased on any Conversion Date as follows: (i) 2005 Bonds purchased and remarketed by the Remarketing Agent shall be registered and made available to the Remarketing Agent by 1:30 p.m. New York City time in accordance with the instructions of the Remarketing Agent and (ii) 2005 Bonds purchased with amounts paid by or on behalf of the Obligated Group shall be registered and made available in the name of or as directed in writing by the Obligated Group Agent on or before 1:30 p.m. New York City time.

(K) No Purchases or Sales After Payment Default. Anything in the Bond Indenture to the contrary notwithstanding, if there shall have occurred and be continuing an Event of Default as described in Section 7.01(a) of the Bond Indenture, then the Remarketing Agent shall not remarket any 2005 Bonds in the event the Bond Insurer has defaulted under the Bond Insurance Policy.

(L) No Remarketing to the Authority or the Obligated Group. The Remarketing Agent shall not remarket any 2005 Bonds to the Authority, any member of the Obligated Group, or any affiliate or guarantor of a member of the Obligated Group.

**Other Covenants**

Punctual Payment. The Authority shall punctually cause to be paid the principal of, Redemption Price, if any, and interest on the 2003 Bonds, in strict conformity with the terms of the 2005 Bonds and of the Bond Indenture, according to the true intent and meaning thereof, but only out of Revenues and other assets pledged for such payment as provided in the Bond Indenture.

Extension of Payment of 2005 Bonds. The Authority shall not directly or indirectly extend or assent to the extension of the maturity of any of the 2005 Bonds or the time of payment of any claims for interest by the purchase or funding of such 2005 Bonds or claims for interest or by any other arrangement and in case the maturity of any of the 2005 Bonds or the time of payment of any such claims for interest shall be extended, such 2005 Bonds or claims for interest shall not be entitled, in case of any default, to the benefits of the Bond Indenture, except subject to the prior payment in full of the principal of all of the 2005 Bonds then Outstanding and of all claims for interest thereon that shall not have been so extended.

Against Encumbrances. The Authority shall not create, or permit the creation of, any pledge, lien, charge or other encumbrance upon the Revenues and other assets pledged or assigned under the Bond Indenture while any of the 2005 Bonds are Outstanding, except the pledge and assignment created by the Bond Indenture. Subject to this limitation, the Authority expressly reserves the right to enter into one or more other indentures for any of its corporate purposes, including other programs under the Act, and reserves the right to issue other obligations for such purposes.

Accounting Records and Financial Statements.

(A) The Bond Trustee shall at all times keep, or cause to be kept, proper books of record and account, prepared in accordance with the Bond Trustee's accounting practices for books of record and account relating to similar trust accounts, in which complete and accurate entries shall be made of all transactions relating to the proceeds of 2005 Bonds, the Revenues, the Loan Agreement and all funds and accounts established pursuant to the Bond Indenture. Such books of record and account shall be available for inspection by the Authority, the Obligated Group Agent, the Bond Insurer, the Credit Facility Provider  (if any) and any Bondholder, or his agent or representative duly authorized in writing, at reasonable hours and under reasonable circumstances.

(B) The Bond Trustee shall file and furnish on or before the 15th day of each month to the Authority, the Bond Insurer, the Obligated Group Agent, the Credit Facility Provider (if any) and each Bondholder who shall have filed his or her name and address with the Bond Trustee for such purpose a complete financial statement (which need not be audited) covering receipts, disbursements, allocation and application of Revenues and any other moneys (including proceeds of 2005 Bonds) in any of the funds and accounts established pursuant to the Bond Indenture for the preceding month; provided, that the Bond Trustee shall not be required to deliver an accounting for any fund or account that (1) has a balance of $0.00 and (2) has not had any activity since the last reporting date.

Enforcement and Amendment of Loan Agreement.

(A)     Subject to the provisions of Section 7.06 of the Bond Indenture with respect to the control of remedial proceedings by the Bond Insurer, the Bond Trustee shall promptly collect all amounts due from the Obligated Group pursuant to the Loan Agreement, shall comply with all terms of the Loan Agreement applicable to it and shall diligently enforce, and take all steps, actions and proceedings reasonably necessary for the enforcement of all of the rights of the Authority assigned to it and all of the obligations of the Obligated Group relating thereto.

(B)     The Authority may amend, modify or terminate any of the terms of the Loan Agreement, or consent to any such amendment, modification or termination, with the written consent of the Bond Insurer, but without the consent of any other Interested Party or the owners of the 2005 Bonds.

Further Assurances.     The Authority will make, execute and deliver any and all such further indentures, instruments and assurances as may be reasonably necessary or proper to carry out the intention or to facilitate the performance of the Bond Indenture and for the better assuring and confirming unto the Holders of the 2005 Bonds of the rights and benefits provided in the Bond Indenture.

**Events of Default**

Events of Default.     Any one or more of the following events shall be Events of Default:

(A)     default in the due and punctual payment of the principal or Redemption Price of any 2005 Bond when and as the same shall become due and payable;

(B)     default in the due and punctual payment of any installment of interest on any 2005 Bond when and as the same shall become due and payable;

(C)     default by the Authority in the observance of any of the other covenants, agreements or conditions on its part in the Bond Indenture or in the 2005 Bonds contained, if such default shall have continued for a period of 60 days after written notice thereof, specifying such default and requiring the same to be remedied, shall have been given to the Authority by the Bond Trustee, or to the Authority and the Bond Trustee by the Bond Insurer or the Holders of not less than 25% in aggregate principal amount of the 2005 Bonds at the time Outstanding;

(D)     a Loan Default Event;

(E)     receipt by the Trustee of notice from the Credit Facility Provider that an Event of Default (as defined in the Reimbursement Agreement) has occurred under a Reimbursement Agreement and requesting acceleration of the 2005 Bonds pursuant to Section 7.02 of the Bond Indenture;

(F)     an "event of default" as defined in Section 5.02 of the Master Indenture; or

E-53

(G)     a default by the Authority with respect to any payment obligations or in the observance of any of the other covenants, agreements or conditions.

## Acceleration of Maturities

During the continuance of an Event of Default described in Section 7.01 (A), (B), (C) or (D) of the Bond Indenture, unless the principal of all the 2005 Bonds shall have already become due and payable, the Bond Trustee upon the written direction of the Bond Insurer or the Holders of not less than 66-2/3% in aggregate principal amount of the 2005 Bonds at the time Outstanding with the consent of the Bond Insurer, or upon the occurrence of an Event of Default described in Section 7.01(E) of the Bond Indenture, the Bond Trustee shall, promptly upon such occurrence, by notice in writing to the Authority, the Obligated Group Agent, Bond Insurer and the Credit Facility Provider (if any) declare the principal of all the 2005 Bonds then Outstanding and the interest accrued thereon, to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, anything in the Bond Indenture or in the 2005 Bonds contained to the contrary notwithstanding.

The preceding paragraph, however, is subject to the condition that if, at any time after the principal of the 2005 Bonds shall have been so declared due and payable, and before any judgment or decree for the payment of the moneys due shall have been obtained or entered as hereinafter provided, there shall have been deposited with the Bond Trustee a sum sufficient to pay all the principal of the 2005 Bonds matured prior to such declaration and all matured installments of interest upon all the 2005 Bonds, with interest on such overdue installments of principal as provided in the Loan Agreement, and the reasonable fees and expenses of the Bond Trustee, including reasonable fees and expenses of its attorneys, all amounts due the Bond Insurer and any and all other defaults known to the Bond Trustee (other than in the payment of principal of and interest on the 2005 Bonds due and payable solely by reason of such declaration) shall have been made good or cured to the satisfaction of the Bond Trustee and the Bond Insurer or provision deemed by the Bond Trustee and the Bond Insurer to be adequate shall have been made therefor, then, and in every such case, the Bond Insurer or the Holders of at least a majority in aggregate principal amount of the 2005 Bonds then Outstanding, with the written consent of the Bond Insurer, by written notice to the Authority and to the Bond Trustee, may, on behalf of the Holders of all the 2005 Bonds, rescind and annul such declaration and its consequences and waive such default; but no such rescission and annulment shall extend to or shall affect any subsequent default, or shall impair or exhaust any right or power consequent thereon.

When the Bond Trustee incurs expenses or renders services after the occurrence of an act of bankruptcy with respect to the Authority or any member of Obligated Group, such expenses and the compensation for such services are intended to constitute expenses of administration under any federal or state bankruptcy, insolvency, arrangement, moratorium, reorganization or other debtor relief law.

## Institution of Legal Proceedings by Bond Trustee

Subject to the provisions of Section 7.06 in the Bond Indenture, if an Event of Default shall occur and be continuing, the Bond Trustee in its discretion may, and upon the written request of the Bond Insurer and upon being indemnified to its satisfaction therefor shall proceed to protect or enforce its rights or the rights of the Holders of 2005 Bonds under the Bond Indenture and the Loan Agreement by any means permitted by law.

## Application of Revenues and Other Funds After Default

If an Event of Default shall occur and be continuing, all Revenues and any other funds then held or thereafter received by the Bond Trustee under any of the provisions of the Bond Indenture (other than payments received from the Credit Facility Provider and moneys required to be deposited in the Rebate Fund and subject to the requirements of Section 12.10 of the Bond Indenture relating to the use of moneys held for particular 2005 Bonds) shall be applied by the Bond Trustee as follows and in the following order:

(A)     To the payment of any reasonable charges and expenses of the Bond Trustee (including reasonable fees and disbursements of its counsel) incurred in and about the performance of its powers and duties under the Bond Indenture;

(B)     To the payment of the principal or Redemption Price of and interest then due on the 2005 Bonds (upon presentation of the 2005 Bonds to be paid, and stamping thereon of the payment if only partially paid, or surrender thereof if fully paid) subject to the provisions of the Bond Indenture (including Section 6.02 of the Bond Indenture), as follows:

(1)     Unless the principal of all of the 2005 Bonds shall have become or have been declared due and payable,

First:   To the payment to the Persons entitled thereto of all installments of interest then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment or installments maturing on the same date, then to the payment thereof ratably, according to the amounts due thereon, to the persons entitled thereto, without any discrimination or preference; and

Second:   To the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of any 2005 Bonds that shall have become due, whether at maturity or by call for redemption, with interest on the overdue principal at the rate borne by the respective 2005 Bonds, and, if the amount available shall not be sufficient to pay in full all the 2005 Bonds, together with such interest, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date to the persons entitled thereto, without any discrimination or preference.

(2)  If the principal of all of the 2005 Bonds shall have become or have been declared due and payable, to the payment of the principal and interest then due and unpaid upon the 2005 Bonds, with interest on the overdue principal at the rate borne by the 2005 Bonds, and if the amount available shall not be sufficient to pay in full the whole amount so due and unpaid, then to the payment thereof ratably, without preference or priority of principal over interest, or of interest over principal, or of any installment of interest over any other installment of interest, or of any 2005 Bond over any other Bond, according to the amounts due respectively for principal and interest, to the persons entitled thereto without any discrimination or preference.

E-55

**Bond Trustee to Represent Bondholders**

The Bond Trustee is irrevocably appointed (and the successive respective Holders of the 2005 Bonds, by taking and holding the same, shall be conclusively deemed to have so appointed the Bond Trustee) as trustee and true and lawful attorney-in-fact of the Holders of the 2005 Bonds for the purpose of exercising and prosecuting on their behalf such rights and remedies as may be available to such Holders under the provisions of the 2005 Bonds, the Bond Indenture, the Loan Agreement  and applicable provisions of any other law.   Upon the occurrence and continuance of an Event of Default or other occasion giving rise to a right in the Bond Trustee to represent the Bondholders, subject to the right of the Bond Insurer to direct and continue all enforcement proceedings, the Bond Trustee in its discretion may, and upon the written request of the Holders of not less than 25% in aggregate principal amount of the 2005 Bonds then Outstanding, and upon being indemnified to its satisfaction therefor, shall, proceed to protect or enforce its rights or the rights of such Holders and the Credit Facility Provider by such appropriate action, suit, mandamus or other proceedings as it shall deem most effectual to protect and enforce any such right, at law or in equity, either for the specific performance of any covenant or agreement contained in the Bond Indenture, or in aid of the execution of any power granted, or for the enforcement of any other appropriate legal or equitable right or remedy vested in the Bond Trustee, in the Credit Facility Provider, or in such Holders and the Credit Facility Provider under the Bond Indenture, the Loan Agreement, the Act or any other law; and upon instituting such proceeding, the Bond Trustee shall be entitled, as a matter of right, to the appointment of a receiver of the Revenues and other assets pledged under the Bond Indenture, pending such proceedings.  All rights of action under the Bond Indenture or the 2005 Bonds or otherwise may be prosecuted and enforced by the Bond Trustee without the possession of any of the 2005 Bonds or the production thereof in any proceeding relating thereto, and any such suit, action or proceeding instituted by the Bond Trustee shall be brought in the name of the Bond Trustee for the benefit and protection of all the Holders of such 2005 Bonds, subject to the provisions of the Bond Indenture (including Section 6.02 of the Bond Indenture).

**Bond Insurer's Direction of Proceedings**

Anything in the Bond Indenture to the contrary notwithstanding, the Bond Insurer has the right to direct the method of conducting all remedial proceedings taken by the Bond Trustee, provided that such direction shall be in accordance with law and the provisions of the Bond Indenture.

**Limitation on Bondholders' Right to Sue**

No Holder of any 2005 Bond shall have the right to institute any suit, action or proceeding at law or in equity, for the protection or enforcement of any right or remedy under the Bond Indenture, the Loan Agreement or any other applicable law with respect to such 2005 Bond, unless (1) such Holder shall have given to the Bond Trustee written notice of the occurrence of an Event of Default; (2) the Holders of not less than 25% in aggregate principal amount of the 2005 Bonds then Outstanding shall have made written request upon the Bond Trustee to exercise the powers hereinbefore granted or to institute such suit, action or proceeding in its own name; (3) such Holder or said Holders shall have tendered to the Bond Trustee

reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request; and (4) the Bond Trustee shall have refused or omitted to comply with such request for a period of 60 days after such written request shall have been received by, and said tender of indemnity shall have been made to, the Bond Trustee. The above provisions shall not apply as long as the Bond Insurer is not in default under the Insurance Policy.

Such notification, request, tender of indemnity and refusal or omission are declared, in every case, to be conditions precedent to the exercise by any Holder of 2005 Bonds of any remedy or under law; it being understood and intended that no one or more Holders of 2005 Bonds shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Bond Indenture or the rights of any other Holders of 2005 Bonds, or to enforce any right under the Bond Indenture, the Loan Agreement or other applicable law with respect to the 2005 Bonds, except in the manner provided, and that all proceedings at law or in equity to enforce any such right shall be instituted, had and maintained in the manner provided and for the benefit and protection of all Holders of the Outstanding 2005 Bonds, subject to the provisions of the Bond Indenture.

### Remedies Not Exclusive

No remedy conferred upon or reserved to the Bond Trustee, the Bond Insurer or the Credit Facility Provider (if any) or to the Holders of the 2005 Bonds is intended to be exclusive of any other remedy or remedies, and each and every such remedy, to the extent permitted by law, shall be cumulative and in addition to any other remedy given or now or hereafter existing at law or in equity or otherwise.

### No Waiver of Default

No delay or omission of the Bond Trustee, the Bond Insurer, the Credit Facility Provider (if any) or of any Holder of the 2005 Bonds to exercise any right or power arising upon the occurrence of any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein.

### Notice to Bondholders of Default

The Bond Trustee shall promptly give written notice by first class mail to the Bondholders, the Bond Insurer and the Credit Facility Provider (if any) of the occurrence of an Event of Default, if the Bond Trustee has actual knowledge of such Event of Default.

### Amendments Permitted

(A)     The Bond Indenture may be modified or amended from time to time and at any time by an indenture or indentures supplemental thereto, which the Authority and the Bond Trustee may enter into when the written consent of the Bond Insurer and the Credit Facility Provider (if any) shall have been filed with the Bond Trustee. No such modification or amendment shall (1) extend the maturity of any 2005 Bond, or reduce the amount of principal thereof, or change the method of computing the rate of interest thereon, or extend the time of payment of interest thereon, or extend the time of payment or reduce the amount of any

Mandatory Sinking Account Payment, or reduce any premium payable upon the redemption thereof, without the consent of the Holder of each Bond so affected, or (2) permit the creation of any lien on the Revenues and other assets pledged under the Bond Indenture prior to or on a parity with the lien created by the Bond Indenture, or deprive the Holders of the 2005 Bonds of the lien created by the Bond Indenture on such Revenues and other assets (except as expressly provided in the Bond Indenture), without the consent of the Holders of all of the 2005 Bonds then Outstanding, or (3) modify any of the rights or obligations of the Bond Trustee.

(B)     The Bond Indenture may also be modified or amended from time to time and at any time by an indenture or indentures supplemental hereto, which the Authority and the Bond Trustee may enter into without the consent of any Interested Parties except the Bond Insurer, including, without limitation, for any one or more of the following purposes:

(1)     to add to the covenants and agreements of the Authority in the Bond Indenture contained other covenants and agreements thereafter to be observed, to pledge or assign additional security for the 2005 Bonds (or any portion thereof), or to surrender any right or power reserved to or conferred upon the Authority;

(2)     to make such provisions for the purpose of curing any ambiguity, inconsistency or omission, or of curing or correcting any defective provision, contained in the Bond Indenture, or in regard to matters or questions arising under the Bond Indenture, as the Authority may deem necessary or desirable and not inconsistent with the Bond Indenture;

(3)     to modify, amend or supplement the Bond Indenture in such manner as to permit the qualification hereof under the Trust Indenture Act of 1939, as amended, or the 2005 Bonds under the Securities Act of 1933, as amended, or any similar federal statute hereafter in effect, and to add such other terms, conditions and provisions as may be permitted by said act or similar federal statute;

(4)     to make the 2005 Bonds eligible for deposit with any securities depository;

(5)     to obtain a rating on the 2005 Bonds;

(6)     to conform to the terms and provisions of any Credit Facility.

The Bond Trustee shall give notice of any such modification or amendment to each Rating Agency then rating the 2005 Bonds provided the Bond Trustee shall incur no liability for failure to do so.

(C)     The Bond Trustee may in its discretion, but shall not be obligated to, enter into any such Supplemental Bond Indenture authorized by subsections (A) or (B) of this Section that materially adversely affects the Bond Trustee's own rights, duties or immunities under the Bond Indenture or otherwise.

## Discharge of Bond Indenture

The 2005 Bonds may be paid by the Authority in any of the following ways, provided that the Authority also pays or causes to be paid any other sums payable by the Authority:

(A) by paying or causing to be paid the principal or Redemption Price of and interest on the 2005 Bonds, as and when the same become due and payable (from funds other than moneys paid pursuant to the Insurance Policy);

(B) by depositing with the Bond Trustee, in trust, at or before maturity, money or securities in the necessary amount (as provided in Section 10.03 of the Bond Indenture) to pay or redeem all 2005 Bonds then Outstanding (from funds other than moneys paid pursuant to the Insurance Policy); or

(C) by delivering to the Bond Trustee, for cancellation by it, all 2005 Bonds then Outstanding.

If the Authority shall also pay or cause to be paid all other sums payable by the Authority and no amounts are owing to the Bond Insurer or the Credit Facility Provider, if any, then and in that case, upon receipt by the Bond Trustee and the Bond Insurer or Credit Facility Provider (if any) of (i) an Opinion or Opinions of Counsel to the effect that the obligations under the Bond Indenture and the 2005 Bonds have been discharged and (ii) written evidence from each Rating Agency then rating the 2005 Bonds that defeasance will not result in the reduction of such ratings), the Bond Indenture and the pledge of Revenues and other assets made under the Bond Indenture and all covenants, agreements and other obligations of the Authority under the Bond Indenture shall cease, terminate, become void and be completely discharged and satisfied, and the 2005 Bonds will no longer be deemed to be outstanding under the Bond Indenture.

## Escheat

Notwithstanding any provisions of the Bond Indenture, any moneys held by the Bond Trustee in trust for the payment of Redemption Price or the principal of, or interest on, any 2005 Bonds and remaining unclaimed for two years (or, if less, one day before such moneys would escheat to the State of West Virginia under then applicable West Virginia law) after the due date will be repaid to the Obligated Group.

## Rights of Insurer

Bond Insurer. Notwithstanding anything in the Bond Indenture to the contrary, in the event that the principal and/or interest due on the 2005 Bonds shall be paid by the Bond Insurer pursuant to the Insurance Policy, the 2005 Bonds shall remain Outstanding for all purposes, not be defeased or otherwise satisfied and not be considered paid by the Obligated Group, and the assignment and pledge of the Trust Estate and all covenants, agreements and other obligations of the Obligated Group to the registered owners shall continue to exist and shall run to the benefit of the Bond Insurer, and the Bond Insurer shall be subrogated to the rights of such registered owners.

When Refunding is Not Permitted. None of the 2005 Bonds outstanding may be refunded as aforesaid nor may the Bond Indenture be discharged if under any circumstances such refunding would result in the loss of any exclusion for purposes of federal income taxation to which interest on such 2005 Bonds would otherwise be entitled. As a condition precedent to the refunding of any 2005 Bonds outstanding, the Bond Trustee and the Bond Insurer shall receive an Opinion of Bond Counsel to the effect that such 2005 Bonds would not, by reason of such refunding, be made subject to additional federal income taxation to which such interest would not otherwise be subject and that the conditions precedent to the defeasance of such 2005 Bonds have been satisfied.

Furthermore, if a refunding is accomplished prior to the Fixed Rate Conversion Date, (i) such moneys shall be invested only in Government Obligations with maturity dates on or prior to the next Auction Rate Adjustment Date for the 2005 Bonds of the affected series, such 2005 Bonds shall be redeemed on or prior to such Auction Rate Adjustment Date, and such 2005 Bonds which have been advance refunded prior to maturity shall no longer be subject to any optional or mandatory tender or (ii) the Bond Trustee and the Bond Insurer shall have received written evidence from each Rating Agency then rating such 2005 Bonds that the ratings borne by such Bonds immediately prior to such refunding will not be withdrawn or reduced by reason of such refunding.

Restructuring of Defeasance Escrow. Notwithstanding anything to the contrary, upon the provision for payment of the Bonds or a portion thereof as specified in Article X, the optional redemption provisions of Section 4.01 of the Bond Indenture allowing such 2005 Bonds to be called prior to maturity upon proper notice (notwithstanding provision for the payment of such 2005 Bonds having been made through a date after the first optional redemption date provided for in Section 4.01 of the Bond Indenture) shall remain available to the Obligated Group unless, in connection with making the deposits referred to in Article X, the Obligated Group shall have irrevocably elected to waive any future right to call the Bonds or portions thereof for redemption prior to maturity. No such redemption or restructuring shall occur, however, unless the Obligated Group Agent shall deliver on behalf of the Authority to the Bond Trustee (a) Government Obligations and/or cash sufficient to discharge such 2005 Bonds (or portion thereof) on the redemption or maturity date or dates selected, (b) an opinion of an independent certified public accountant verifying that such Government Obligations, together with the expected earnings thereon, and/or cash will be sufficient to provide for the payment of such 2005 Bonds to the redemption or maturity dates, and (c) an Opinion of Bond Counsel to the effect that such earlier redemption or restructuring will not result in the loss of any exclusion for purposes of federal income taxation to which interest on the Bonds would otherwise be entitled. The Obligated Group Agent shall also provide the opinions referred to in clause (b) and (c) in the preceding sentence to the Bond Insurer. The Bond Trustee will give written notice of any such redemption or restructuring to the owners of the 2005 Bonds affected thereby.

## Money Held for Particular 2005 Bonds

The money held by the Bond Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular 2005 Bonds (or portions of 2005 Bonds in the case of registered 2005 Bonds redeemed in part only) shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Holders of the

2005 Bonds entitled thereto, subject, however, to the provisions of Section 10.04 of the Bond Indenture.

## THE LOAN AGREEMENT

*The following is a summary of certain provisions of the Loan Agreement. Reference is made to the Loan Agreement for the detailed provisions thereof.*

### Loan of Proceeds; Payments of Principal, Premium and Interest

In consideration of the Loan to the Obligated Group, the Obligated Group Agent agrees to pay, or cause to be paid, "Loan Repayments" in an amount sufficient to enable the Bond Trustee to make the transfers and deposits required at the times and in the amounts required for deposit to the Funds and Accounts under the Bond Indenture. Each Loan Repayment shall be made in immediately available funds. The Obligated Group Agent agrees to make payments, or cause payments to be made, at the times and in the amounts required to be paid as principal or Redemption Price of and interest on the 2005 Bonds from time to time Outstanding under the Bond Indenture and other amounts required to be paid under the Bond Indenture (including but not limited to amounts necessary to establish, maintain and restore the Debt Service Reserve Fund to the Debt Service Reserve Fund Requirement as more particularly provided in Section 3.8 of the Loan Agreement), as the same shall become due whether at maturity, upon redemption, by declaration of acceleration or otherwise.

Except as otherwise expressly provided in the Loan Agreement, all amounts payable by the Obligated Group to the Authority shall be paid to the Bond Trustee or other parties entitled thereto as assignee of the Authority, and the Loan Agreement and all right, title and interest of the Authority in any such payments are assigned and pledged to the Bond Trustee so long as any 2005 Bonds remain Outstanding.

The Obligated Group Agent has issued and delivered the 2005 Notes under the Master Indenture to evidence and secure its obligations under the Loan Agreement.

### Additional Payments

In addition to Loan Repayments, the Obligated Group shall also pay to the Authority, the Bond Trustee, the Tender Agent, the Insurer, the Credit Facility Provider (if any), the Remarketing Agent (if any), the Auction Agent (if any) and the Broker-Dealer (if any), as the case may be, "Additional Payments," as follows:

(a)     All taxes and assessments of any type or character charged to the Authority or to the Bond Trustee affecting the amount available to the Authority or the Bond Trustee from payments to be received or in any way arising due to the transactions contemplated by the Loan Agreement (including taxes and assessments assessed or levied by any public agency or governmental authority of whatsoever character having power to levy taxes or assessments) but excluding franchise taxes based upon the capital and/or income of the Bond Trustee and taxes based upon or measured by the net income of the

Bond Trustee; provided, however, that the Obligated Group shall have the right to protest any such taxes or assessments and to require the Authority or the Bond Trustee, at the Obligated Group's expense, to protest and contest any such taxes or assessments levied upon them and that the Obligated Group Agent shall have the right to withhold payment of any such taxes or assessments pending disposition of any such protest or contest unless such withholding, protest or contest would adversely affect the rights or interests of the Authority or the Bond Trustee;

(b) All reasonable fees, charges, expenses and indemnities of the Interested Parties as and when the same become due and payable;

(c) The reasonable fees and expenses of such accountants, consultants, attorneys and other experts, if any, as may be engaged by the Authority or the Bond Trustee to prepare audits, financial statements, reports, opinions or provide such other services required under the Loan Agreement or the Bond Indenture;

(d) An annual fee of the Authority as set forth in the Fee Schedule and Cost Allocations stated in the Legislative Rule filed in the Office of the Secretary of State of the State of West Virginia on May 29, 1991, as amended only through the date of delivery of the 2005 Bonds; and

(e) All other reasonable and necessary fees and expenses attributable to the 2005 Bonds or the Loan Agreement, including without limitation all payments required pursuant to the Tax Compliance Certificate.

Such Additional Payments shall be billed to the Obligated Group by each of the Interested Parties to the extent that fees and expenses are not paid from sources other than the Obligated Group.

The Additional Payments shall not be secured under the Master Indenture, and non-payment of any Additional Payments shall not constitute an event of default or under any other document relating to the 2005 Bonds; provided that, in no event shall the foregoing modify, limit or restrict in any manner the ability of any of the Interested Parties to recover the Additional Payments from the Obligated Group. Though required to be maintained as described, no payments with respect to the Interest Rate Agreement are the obligations of the Authority.

## Credits for Payments

The Obligated Group shall receive credit against its payments required under Section 3.1 of the Loan Agreement, in addition to any credits resulting from payment or repayment from other sources, as follows:

(a) On installments of interest in an amount equal to moneys deposited in the Interest Fund, which amounts are available to pay interest on the 2005 Bonds, to the extent such amounts have not previously been credited against such payments;

(b)     On installments of principal in an amount equal to moneys deposited in the Principal Fund, which amounts are available to pay principal of the 2005 Bonds, to the extent such amounts have not previously been credited against such payments;

(c)     On installments of principal and interest in an amount equal to the principal amount of 2005 Bonds for the payment at maturity or redemption of which sufficient amounts (as determined by Section 10.03 of the Bond Indenture) in cash or Investment Securities described in clause (1) of the definition thereof are on deposit as provided in the Bond Indenture to the extent such amounts have not previously been credited against such payments, and the interest on such 2005 Bonds from and after the date fixed for payment at maturity or redemption thereof.  Such credits shall be made against the installments of principal and interest which would have been used, but for such call for redemption, to pay principal of and interest on such 2005 Bonds when due; and

(d)     On installments of principal and interest in an amount equal to the principal amount of 2005 Bonds acquired by the Obligated Group Agent and surrendered to the Bond Trustee for cancellation or purchased by the Bond Trustee on behalf of the Obligated Group and canceled, and the interest on such 2005 Bonds from and after the date interest thereon has been paid prior to cancellation.  Such credits shall be made against the installments of principal and interest which would have been used, but for such cancellation, to pay principal of and interest on such 2005 Bonds when due.

**Prepayment**

(a)     The Obligated Group shall have the right, so long as all amounts which have become due have been paid, at any time or from time to time to prepay all or any part of the Loan Repayments, and the Bond Trustee shall accept such prepayments when the same are tendered.  Prepayments may be made by payments of cash, deposit of Investment Securities described in clause (1) of the definition thereof or surrender of 2005 Bonds.  All such prepayments (and the additional payment of the applicable redemption premium) shall be deposited upon receipt in the Optional Redemption Account (or in such other Bond Trustee escrow account as may be specified by the Obligated Group Agent) and, at the request of and as determined by the Obligated Group Agent, credited against payments due or used for the redemption or purchase of 2005 Bonds in the manner and subject to the terms and conditions set forth in the Bond Indenture.

(b)     The Obligated Group shall also have the right at any time or from time to time to prepay all or any part of the Loan Repayments from moneys derived from condemnation awards or the proceeds of hazard insurance relating to the facilities of the Obligated Group, and the Bond Trustee shall accept such prepayments when the same are tendered.  Notwithstanding any such prepayment or surrender of 2005 Bonds, as long as any 2005 Bonds remain Outstanding or any Additional Payments required to be made remain unpaid, the Obligated Group shall not be relieved of its obligations.

**Payment of Purchase Price of 2005 Bonds**

(a) With the consent of the Bond Insurer, the Obligated Group agrees that it shall pay to the Tender Agent all amounts necessary for the purchase of 2005 Bonds and not deposited with the Tender Agent by the Remarketing Agent from the proceeds of the sale of such 2005 Bonds. Each such payment by the Obligated Group to the Tender Agent pursuant to this Section shall be in immediately available funds and paid to the Tender Agent at its principal corporate trust office by 2:00 p.m. New York City time on each date upon which a payment is to be made pursuant to Section 4.11(B) of the Bond Indenture.

(b)     If the 2005 Bonds are converted to bear interest at a Fixed Rate pursuant to the Bond Indenture, the obligations of the Obligated Group pursuant to Section 3.5 of the Loan Agreement with respect to such Series shall be terminated following change to the Fixed Rate Mode.

**Obligations Unconditional**

The obligations of the Obligated Group are absolute and unconditional, notwithstanding any other provision of the Loan Agreement or the Bond Indenture. Until the Loan Agreement is terminated and all payments are made, the Obligated Group:

(a)     will pay all amounts required without abatement, deduction or setoff except as otherwise expressly provided in the Loan Agreement;

(b)     will not suspend or discontinue any payments due for any reason whatsoever, including, without limitation, any right of setoff or counterclaim;

(c)     will perform and observe all its other agreements contained in the Loan Agreement; and

(d)     except as provided in the Loan Agreement, will not terminate the Loan Agreement for any cause, including, without limiting the generality of the foregoing, damage, destruction or condemnation of the facilities financed with the proceeds of the 2005 Bonds or any part thereof, commercial frustration of purpose, any change in the tax or other laws of the United States of America or of the State of West Virginia, or any political subdivision of either thereof or any failure of the Authority to perform and observe any agreement, whether express or implied, or any duty, liability or obligation arising out of or connected with the Loan Agreement. Nothing contained in Section 3.6 of the Loan Agreement shall be construed to release the Authority from the performance of any of the agreements on its part contained in the Loan Agreement, and in the event the Authority should fail to perform any such agreement on its part, the Obligated Group may institute such action against the Authority as the Obligated Group Agent may deem necessary to compel performance.

The rights of the Bond Trustee or any party or parties on behalf of whom the Bond Trustee is acting shall not be subject to any defense, setoff, counterclaim or recoupment

whatsoever, whether arising out of any breach of any duty or obligation of the Authority or the Bond Trustee owing to the Obligated Group, or by reason of any other indebtedness or liability at any time owing by the Authority or the Bond Trustee to the Obligated Group.

## Debt Service Reserve Fund

(1)     If, at the end of any fiscal year, any of the following events occurs, the Obligated Group shall fund the Debt Service Reserve Fund for the 2005 Bonds held by the Bond Trustee in an amount equal to the Debt Service Reserve Fund Requirement.

(a)     The Obligated Group's Debt Service Coverage Ratio is less than 2.0 and Days of Operating Expenses are less than 175;

(b)     The Cushion Ratio for the Obligated Group is less than 1.75; or

(c)     The Obligated Group's Unrestricted Cash and Investments is less than 90 Days of Operating Expenses.

.

(2)     If the Debt Service Reserve Fund is required to be funded under subsection (1) above, the Obligated Group shall, commencing on the first day of the month next ensuing after the determination that funding is required has been, remit the Debt Service Reserve Fund Requirement to the Bond Trustee for deposit in the Debt Service Reserve Fund within 30 days.

(3)     The Debt Service Reserve Fund shall be terminated at the end of any fiscal year, and the funds returned to the Obligated Group immediately upon the Obligated Group Agent's delivery of an Officers Certificate to the Bond Insurer and the Bond Trustee to the effect that: (a) the Obligated Group is not in default under the 2005 Loan Agreement, and (b) each of the following conditions are met: (i) (A) the Obligated Group's Debt Service Coverage Ratio is 2.0 or greater, or, (B) if the Obligated Group's Debt Service Coverage Ratio is below 2.0, the Obligated Group's Days of Operating Expenses are greater than 175; (ii) the Cushion Ratio for the Obligated Group is 1.75 or greater; and (iii) Unrestricted Cash and Investments exceed 90 days of Operating Expenses.

(4) Capitalized terms used in this Section, but not otherwise defined in the Loan Agreement or the Bond Indenture shall have the meaning given such terms in Supplemental Indenture 2005-2.

## Interest Rate Agreement

The Authority and the Obligated Group acknowledge and agree that (i) the Obligated Group Agent has entered into the Interest Rate Agreement (as defined in the Bond Indenture) in order to manage its interest rate risk relating to the 2005 B Bonds and in order to comply with certain provisions of the Code and the Tax Compliance Certificate, (ii) all payments of every description and the obligation to post or deposit collateral under the Interest Rate Agreement shall be the exclusive responsibility of the Obligated Group Agent, and (iii) such

obligations shall not be payable under the Loan Agreement, but rather under the Interest Rate Agreement.  The right to receive payments from the Swap Provider under the Interest Rate Agreement shall be exclusive property of the Obligated Group.  The Authority shall have no obligation for any payments or deposits of collateral or any property right in the receipts under the Interest Rate Agreement.    In furtherance of its obligations to comply with the Tax Compliance Certificate, the Obligated Group Agent agrees that it will take such actions as shall be necessary to maintain the Interest Rate Agreement in full force and effect unless the Obligated Group Agent causes to be delivered to the Bond Trustee an Opinion of Bond Counsel indicating that any changes in the Interest Rate Agreement, including its termination, would not, in and of itself, cause the interest paid on the 2005 Bonds to not be excluded from gross income for purposes of federal income tax purposes.

**Events of Default**

Each of the following events shall constitute and be referred to as a "Loan Default Event":

(a)    Failure by the Obligated Group to pay in full any payment required, except any Additional Payments required, whether at maturity, upon a date fixed for prepayment, by declaration, upon tender of the 2005 Bonds (other than 2005 Bonds in the Auction Mode) for purchase pursuant to the Bond Indenture, or otherwise pursuant to the terms thereof;

(b)    If any material representation or warranty made by the Obligated Group or made by the Obligated Group Agent in any document, instrument or certificate furnished to the Bond Trustee or the Authority in connection with the issuance of the 2005 Bonds shall at any time prove to have been incorrect in any respect as of the time made;

(c)    If the Obligated Group shall fail to observe or perform any other covenant, condition, agreement or provision in the Loan Agreement on its part to be observed or performed, or shall breach any warranty by the Obligated Group, for a period of 60 days after written notice, specifying such failure or breach and requesting that it be remedied, has been given to the Obligated Group Agent by the Authority or the Bond Trustee; except that, if such failure or breach cannot be remedied within such sixty-day period and if the Obligated Group has taken all action reasonably possible to remedy such failure or breach within such sixty-day period, such failure or breach shall not become a Loan Default Event for so long as the Obligated Group shall diligently proceed to remedy such failure or breach in accordance with and subject to any directions or limitations of time established by the Bond Trustee; or

(d)    Any Event of Default as defined in and under the Bond Indenture.

**Remedies on Default**

If a Loan Default Event shall occur, then, and in each and every such case during the continuance of such Loan Default Event, the Bond Trustee on behalf of the Authority, but

subject to the limitations in the Bond Indenture, including those relating to acceleration of principal of the 2005 Bonds and the requirement for control of remedies by the Bond Insurer, as to the enforcement of remedies, may take such action as it deems necessary or appropriate to collect amounts due, to enforce performance and observance of any obligation or agreement of the Obligated Group or to protect the interests securing the same, and may, without limiting the generality of the foregoing:

      (a)      Exercise any or all rights and remedies given by the Loan Agreement or available, or given by or available under any other instrument of any kind securing the Obligated Group's performance;

      (b)      By written notice to the Obligated Group Agent declare all Loan Repayments and Additional Payments to be immediately due and payable under the Loan Agreement, whereupon the same shall become immediately due and payable; and

      (c)      Take other acts or steps as may be available under the Bond Indenture, as the registered owner of the 2005 Notes under the Master Indenture, or at law or in equity to collect the payment required then due, whether on the stated due date or by declaration of acceleration or otherwise, for damages or for specific performance or otherwise to enforce performance and observance of any obligation, agreement or covenant of the Obligated Group, subject, however, to the provisions of the Act.

## Covenants

Under the Loan Agreement, the Obligated Group has made the following representations, among others:

Prohibited Uses. No portion of the proceeds of the 2005 Bonds will be used to finance or refinance any facility, place or building used or to be used primarily for sectarian instruction or study or as a place for devotional activities or religious worship.

Nonliability of the Authority. The Authority shall not be obligated to pay the principal of, premium, if any, and interest on the 2005 Bonds, except from payments received and under the 2005 Notes and other Revenues. Neither the faith and credit nor the taxing power of the State of West Virginia or any political subdivision thereof is pledged to the payment of the principal of, premium or interest on the 2005 Bonds.

The Obligated Group Agent acknowledges that the Authority's sole source of moneys to repay the 2005 Bonds will be the payments made by the Obligated Group, under the 2005 Notes and other Revenues, together with amounts on deposit in, and investment income on, certain funds and accounts held by the Bond Trustee under the Bond Indenture, and agrees that if the payments to be made shall ever prove insufficient to pay all principal of, premium, if any, and interest on the 2005 Bonds as the same shall become due (whether by maturity, redemption, acceleration or otherwise), then upon notice from the Bond Trustee, the Obligated Group shall pay such amounts as are required from time to time to prevent any deficiency or default in the payment of such principal, premium or interest, including, but not limited to, any deficiency

caused by acts, omissions, nonfeasance or malfeasance on the part of the Bond Trustee, the Obligated Group, the Authority or any third party.

Expenses. The Obligated Group covenants and agrees to pay and to indemnify the Authority and the Bond Trustee against all costs and charges, including reasonable fees of attorneys, accountants, consultants and other experts, incurred in good faith and arising out of or in connection with the transactions contemplated by the Loan Agreement and by the Bond Indenture.

Tax Covenant. The Obligated Group covenants and agrees that it will at all times do and perform all acts and things permitted by law and the Loan Agreement which are necessary or desirable in order to assure that interest paid on the 2005 Bonds will be excluded from gross income of the holders of the 2005 Bonds for federal income tax purposes and will take no action that would result in such interest not being excluded from gross income for federal income taxes. Without limiting the generality of the foregoing, the Obligated Group agrees to comply with the provisions of the Tax Compliance Certificate. This covenant shall survive payment in full or defeasance of the 2005 Bonds.

Indemnification, Immunity and Contribution. (a) To the extent permitted by law, the Obligated Group releases the Authority and the Bond Trustee from and agrees that the Authority and the Bond Trustee shall not be liable for, and agrees to indemnify and hold the Authority and the Bond Trustee harmless from, any liability for, or expense (including but not limited to reasonable attorneys' fees) resulting from, or any loss or damage that may be occasioned by any cause whatsoever pertaining to the issuance, sale and delivery of the 2005 Bonds, the acceptance or administration of the trusts established pursuant to the Bond Indenture or the actions taken or to be taken by the Authority or the Bond Trustee under the Loan Agreement or the Bond Indenture, except the gross negligence or willful misconduct of the Authority or the Bond Trustee. The parties intend that no general obligation or liability or charge against the general credit of the Authority shall occur by reason of making the Loan Agreement, the issuance of the 2005 Bonds or performing any act required of it by the Loan Agreement. Nevertheless, if the Authority shall incur any such pecuniary liability, then in such event the Obligated Group shall indemnify and hold the Authority harmless by reason thereof, to the extent permitted by law, as provided in the Loan Agreement, unless such liability results from the gross negligence or willful misconduct of the Authority.

(b)     No provision in the Loan Agreement or any obligation imposed upon the Authority, nor the breach of those provisions or obligations, will constitute or give rise to or impose upon the Authority a pecuniary liability or a charge upon its general credit or taxing power, if any. No board member, employee, officer, director or agent of the Authority will be personally liable with respect to the Loan Agreement, the 2005 Bonds or any of the documents related thereto.

(c)     The Obligated Group will pay and will indemnify, defend and hold the Authority and the Bond Trustee, including any person at any time serving as a director, office, employee, agent or consultant of the Authority or the Bond Trustee or any person who controls the Authority or the Bond Trustee within the meaning of the Securities Act of 1933, as amended

E-68

(collectively, the "Indemnified Parties") harmless from and against all claims, liabilities, losses, damages, costs, expenses (including reasonable attorneys' fees), suits and judgments of any kind arising out of:

> (1) injury to or death of any person or damage to property in or upon any Hospital Facilities or the occupation, use, possession or condition of the Hospital Facilities or relating to the foregoing;

> (2) any violation of any law, ordinance or regulation affecting the Hospital Facilities or the ownership, occupation, use, possession or condition of the Hospital Facilities;

> (3) the issuance and sale of the 2005 Bonds, including the Official Statement used in connection with such sale;

> (4) the execution and delivery of the Loan Agreement, the Bond Indenture, the Tax Compliance Certificate, the Bond Purchase Agreement or of any document required or in furtherance of the transactions contemplated by them; or

> (5) the performance of any act required of any indemnitee under this Section or under any provision of the Loan Agreement, the Bond Indenture, the Tax Compliance Certificate, the Official Statement or the Bond Purchase Agreement or of any document required or in furtherance of the transactions contemplated by them.

(d) An Indemnified Party will promptly, upon receipt of notice of the existence of a claim or the commencement of a proceeding regarding which indemnity under this Section may be sought, notify the Obligated Group Agent in writing. If a proceeding is commenced against the Indemnified Party, the Obligated Group Agent may participate in the proceeding and, to the extent it elects to do so, may assume the defense with counsel satisfactory to the Indemnified Party. If, however, the Indemnified Party is advised in an Opinion of Counsel that there may be legal defenses available to it which are different from or in addition to those available to the Obligated Group, or if the Obligated Group Agent fails to assume the defense of proceeding or to employ counsel for that purpose within a reasonable time after notice of commencement of the proceeding, the Obligated Group will not be entitled to assume the defense of the proceeding on behalf of the Indemnified Party, but will be responsible for the reasonable fees, costs and expenses of the Indemnified Party in conducting its defense.

(e) No covenant or agreement contained in the Loan Agreement will be deemed to be the covenant or agreement of any board member, officer, attorney, agent or employee of the Authority or the Obligated Group in an individual capacity. No recourse will be had for any payment or any claim against any officer, board member, agent, attorney or employee of the Authority or the Obligated Group past, present, or future, or its successors or assigns, either directly or through the Authority, or any successor corporation, whether by virtue of any constitutional provision, statute or rule of law, or by the enforcement of any assessment or

penalty, or otherwise, all liability of such board members, officers, agents, attorneys or employees being released as a condition of and as a consideration for the execution and delivery of the Loan Agreement.

(f)    In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in this Section is for any reason held to be unavailable to the Indemnified Party, the Obligated Group shall contribute to the aggregate losses, liabilities, claims, damages and expenses of the nature contemplated by said indemnity agreement incurred by the Indemnified Party in such proportion as is appropriate to reflect the relative fault of the Obligated Group in connection with the claim or the commencement of a proceeding regarding which indemnity under this Section may be sought; provided, however, that no person guilty of fraudulent misrepresentation shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

(g)    The indemnifications shall survive the termination of the Bond Indenture and/or the resignation or removal of the Bond Trustee.

Right to Cause Conversion.  The Obligated Group Agent, with the advance written approval of the Bond Insurer, shall have the right, by notification by Electronic Means to the Interested Parties, to convert the 2005 Bonds to the Fixed Rate Mode or the Weekly Mode. The Obligated Group Agent shall designate the proposed Conversion Date, which shall not be less than 30 days after the giving of such notice and shall provide Obligated Group Agent Funds as required by Section 4.12(A) of the Bond Indenture.  The Obligated Group Agent shall have the right to rescind the conversion by notice by Electronic Means to the Interested Parties not less than 10 days prior to the proposed Conversion Date.

Liquidity Facility.  The Obligated Group covenants and agrees that, except as otherwise provided in Section 6.12 of the Bond Indenture, at all times while any 2005 Bonds bear interest at the Weekly Rate ("Weekly Rate Bonds"), the Obligated Group will maintain a Liquidity Facility in full force and effect in an amount not less than the principal amount of the Weekly Rate Bonds outstanding which bear interest at the Weekly Rate, plus an amount equal to interest thereon at the Interest Coverage Rate for the maximum number of days between scheduled Interest Payment Dates plus such additional number of days then required by each Rating Agency then maintaining a rating on the Weekly Rate Bonds.  In addition, the Obligated Group covenants and agrees that all times while any Weekly Rate Bonds are outstanding, if the short term rating of the Bank shall be lowered by Moody's below the top short term rating category assigned by such rating agency (without giving effect to numeric or other qualifiers), then the Obligated Group, unless otherwise consented to in writing by the Bond Insurer, shall use its best efforts to obtain a Substitute Liquidity Facility within 90 days of the rating on the Bank being lowered.

Bond Trustee as Tender Agent.  The Authority agrees to appoint the Bond Trustee to act as Tender Agent in connection with tenders of the Weekly Rate Bonds pursuant to Article XI of the Bond Indenture.  The Bond Trustee shall act as Tender Agent for the Obligated Group and shall not be deemed to be purchasing Weekly Rate Bonds for its own account.  The Bond Trustee shall act as Tender Agent only upon the terms and conditions set forth in Articles VIII

and Article XI of the Bond Indenture.  It is understood and agreed by the Authority and the Obligated Group that the Authority shall obtain the Bond Trustee's agreement to act as Tender Agent and that the Obligated Group shall be the beneficiary of such agreement.  It is further recognized that provision for such Tender Agent will also benefit the holders of Weekly Rate Bonds, the Bank and the Bond Insurer.  Consequently, it is agreed that the Authority shall obtain the Bond Trustee's agreement that its obligations as Tender Agent shall be enforceable by (a) the Authority, (b) the Obligated Group Agent, (c) the holders of Weekly Rate Bonds, (d) the Bank or (e) the Bond Insurer, as the case may be.

Continuing Disclosure.  The Obligated Group covenants to comply with and carry out all of the provisions of the Continuing Disclosure Agreement with respect to the 2005 Bonds that complies with the provisions of Rule 15c2-12 promulgated by the Securities and Exchange Commission (as amended from time to time, the "Rule"), in form and substance satisfactory to the Participating Underwriters (as defined in the Rule).  Notwithstanding any other provision of the Loan Agreement, failure of the Obligated Group Agent to enter into and comply with such Continuing Disclosure Agreement shall not be considered a Loan Default Event; however, the Authority may take such actions as may be necessary or desirable, including seeking specific performance by court order, to cause the Obligated Group Agent to comply with its obligations under this Section.

Project.  (a) Hospital Facilities.  A portion of the proceeds of the 2005 Bonds will be used to finance or reimburse the costs of the Project.  The Hospital Facilities which are included in the Project are described on Exhibit A to the Loan Agreement.  The Obligated Group Agent may modify the list of assets that constitute the Project by removing assets and adding assets if all of the following conditions are met:

> (1)    the assets added constitute "hospital facilities" as defined in the Act;
>
> (2)    the assets are within the description of assets in the notice of public hearing published December 8, 2004, and are located at the addresses set forth in the notice, or the Obligated Group Agent delivers to the Bond Trustee an Opinion of Bond Counsel that any deviation will not adversely affect the exclusion of the interest on the 2005 Bonds from the gross income of the recipients thereof;
>
> (3)    the representation relating to the average economic life of the assets constituting the Project in Section 5.60 of the Tax Compliance Certificate remain correct following the substitution or the Obligated Group Agent delivers to the Bond Trustee an Opinion of Bond Counsel that any deviation will not adversely affect the exclusion of the interest on the 2005 Bonds from the gross income of the recipients thereof; and
>
> (4)    the Obligated Group Agent must deliver an Officer's Certificate to the Bond Trustee:
>
> > (a)    listing the assets removed and the assets added,

          (b)     certifying that the statements in (1), (2) and (3) above are true with respect to the removals and additions, and

          (c)     demonstrating the calculation of the test described in the Tax Compliance Certificate.

The Authority makes no warranty, either express or implied, and offers no assurances that the Project is suitable for the Obligated Group's purposes or needs or that the proceeds derived from the sale of the 2005 Bonds are sufficient for all the purposes for which they are being issued.

(b) The Project. The Obligated Group Agent may request disbursements from the Project Fund to pay the costs of the Project. The Obligated Group Agent must (a) acquire and construct the Hospital Facilities constituting a portion of the Project with all reasonable dispatch and in accordance with all applicable building, zoning, planning, environmental, certificate of need and other similar governmental regulations; (b) pay all costs of the Project from funds made available under the Loan Agreement or otherwise; and (c) enforce the provisions of any contract, agreement, obligation, bond or other performance security with respect to the Project.

For those Hospital Facilities constituting a portion of the Project, the Obligated Group Agent must deliver to the Bond Trustee the disbursement request required by Section 3.04(B) of the Bond Indenture, and either (a) if required by law, a certificate of need for the Hospital Facilities for which disbursement is requested; (b) a certificate of the West Virginia Health Care Authority to the effect that a certificate of need is not required for the asset or (c) an Officer's Certificate to the effect that a certificate of need is not required for the asset. If the disbursement request is accompanied by either item (b) or (c), the Obligated Group Agent must also demonstrate in an Officer's Certificate that the requirements of Section 20 of Article 29A of Chapter 16 of the West Virginia Code, 1931, have been met, relating to consultation with the West Virginia Health Care Authority for projects for which a certificate of need is not necessary.

If the money in the Project Fund is not sufficient to pay all costs of the Project, subject to the provisions of Section 5.10(a) of the Loan Agreement relating to modifications to the Project, the Obligated Group must, nonetheless, complete the Project in order to fulfill the public purposes of the Act and must pay all costs of the completion from its own funds. The Obligated Group will not be entitled to any reimbursement for the completion costs from the Authority or the Bond Trustee; nor will it be entitled to any abatement, diminution or postponement of the Loan Repayments.

(c) Completion Date. The Completion Date of the Hospital Facilities' portion of the Project must be evidenced to the Authority and the Bond Trustee by an Officer's Certificate (attached as Exhibit B to the Loan Agreement) stating:

          (1)     the date on which the Hospital Facilities portion of the Project was substantially complete;

(2)     that all other Hospital Facilities necessary in connection with the Hospital Facilities portion of the Project have been acquired and constructed;

(3)     that the Hospital Facilities portion of the Project has been completed in such a manner as to conform with all zoning, planning, building, environmental, certificate of need and other similar governmental regulations to the extent that the same are applicable to the Project or any portion thereof; and

(4)     that all costs of the Hospital Facilities portion of the Project then due and payable have been paid.

Covenants as to Existence and Maintenance of Properties.  Each member of the Obligated Group will maintain its corporate existence and its properties to the extent required by the Master Indenture.

Consolidation, Merger, Sale or Conveyance.  No member of the Obligated Group will consolidate or merge with or sell or convey all or substantially all of its assets to another entity except as permitted by the provisions of the Master Indenture.

Preservation of Exempt Status.  Each member of the Obligated Group agrees that: (a) it will neither perform nor fail to perform any acts, enter into any agreements, carry on or permit to be carried on any activities in its Hospital Facilities, or permit its Hospital Facilities to be used in or for, any trade or business, that adversely affects the basis for the exemption under Code Section 501(a), nor allow either of the Acquired Hospitals to do so; (b) it will not permit to be used, directly or indirectly, the Hospital Facilities or any of its facilities or any other property in any trade or business, the conduct of which would adversely affect the basis for the exemption under Code Section 501(a), nor allow either of the Acquired Hospitals to do so; and (c) it will neither perform nor fail to perform any acts, enter into any agreements, carry on or permit to be carried on any activities in its Hospital Facilities that would adversely affect the exclusion from gross income of interest on the 2005 Bonds, nor allow either of the Acquired Hospitals to do so.

Nondiscrimination.  The Obligated Group Agent shall assure that all Hospital Facilities financed or refinanced pursuant to the Loan Agreement and through the proceeds of the 2005 Bonds will be open to all, regardless of race, religion, sex or creed, and that all contractors and subcontractors engaged in the construction of Hospital Facilities shall provide an equal opportunity for employment without discrimination as to race, religion, sex or creed.

Code Prohibition.  The Obligated Group Agent  represents that none of the proceeds of the Bonds to be Refunded were used and none of the proceeds of the 2005 Bonds will be used to provide any airplane, skybox or other private luxury box, or health club facility not substantially related to the exempt purposes of the members of the Obligated Group; any facility primarily used for gambling; or any store the principal business of which is the sale of alcoholic beverages for consumption off premises.

Other Uses of Proceeds. As required by the Authority as a condition to making the Loan to the Obligated Group as part of the Authority's governmental program, the Obligated Group Agent covenants that it will not, and it will not permit any company affiliated with it over which it has control to, purchase any bonds issued by the Authority as part of its governmental program in an amount related to the amount of the Loan to the Obligated Group by the Authority.

## SUMMARY OF AGREEMENT WITH BOND INSURER

*The following is a summary of certain provisions of Supplemental Master Trust Indenture 2005-2 (the "Supplement"), relating to the 2005 Bonds. All such summary statements do not purport to be complete and are subject and qualified in their entirety by reference to the Supplement.*

In connection with the issuance of the financial guaranty insurance policy (the "Policy"), by Ambac Assurance Corporation (the "Bond Insurer"), the Bond Insurer required that the Obligated Group agree to comply with certain covenants (the "Insurance Covenants"). The Insurance Covenants are contained in the Supplement.

The Insurance Covenants will apply only so long as (i) the 2005 Bonds are outstanding and (ii) the Bond Insurer is not in default of its obligations under the Policy. ***In addition, the Insurance Covenants can be amended, waived, modified and enforced exclusively by the Bond Insurer and any such amendment, waiver, modification or enforcement does not require the consent or participation of the holders of the 2005 Bonds. Consequently, there can be no assurance that the Insurance Covenants will be in effect at any time.***

### Definitions

"Accounts" shall mean, collectively, all accounts (as defined in the UCC), accounts receivable, other receivables, contracts, contractual rights, tax refunds or other obligations or indebtedness owing to any Member of the Obligated Group of any kind or description, secured or unsecured, now or hereafter existing, whether or not arising out of or in connection with the payment for goods sold or leased, for services rendered, whether or not earned by performance, and all sums of money or other proceeds due or not earned by performance, and all sums of money or other proceeds due or becoming due thereon, together with all rights now or hereafter existing under guarantees and collateral security therefore and under leases and other contracts securing, guaranteeing or otherwise relating to any of the foregoing, including without limitation (a) all rights to receive any performance or any payments in money or in kind; (b) all right, title and interest in and to the goods, services or other property that give rise to or that secure any of the foregoing, and insurance policies and proceeds thereof relating thereto; (c) all rights as an unpaid seller of goods and services including, without limitation, all rights or stoppage in transit, replevin, reclamation and resale; (d) all rights to receive any Medicare/Medicaid Receivables or any other federal programs or state and local governmental programs providing for the payment of or reimbursement for services rendered, and private insurance program (including, without limitation, Blue Cross and prepaid health organizations, including health maintenance organizations and preferred provider organizations), in each case only to the extent permitted

under applicable law; (e) reversionary interest in pension and profit-sharing plans, and reversionary, beneficial and residual interest in trusts, credits with and any other claims against any Person; and (f) all ledger sheets, files, records and documents relating to any of the foregoing, including all computer records, programs, storage media and computer software used or required in connection therewith.

"Adjusted Operating Revenues" shall mean total operating and non-operating revenues, excluding net unrealized gains (losses) on the valuation of investments, but including payments of swap-related termination fees from a swap counterparty. Net unrealized derivative contract gains (losses) shall also be excluded from this calculation.

"Bank Accounts" shall mean all deposit accounts and shall include, without limitation, all checking, investment or deposit accounts (general or specific, time or demand, provisional or final) at any time maintained by any Member of the Obligated Group, including without limitation M/M Accounts, and all moneys, securities, instruments, and general intangibles deposited or held therein; provided, that Contributions on deposit or deposited therein and designated or specified by the granting authority, donor or maker thereof as being for specified purposes (other than payment of debt service on Indebtedness) and the income derived therefrom to the extent required by such designation or specification shall be excluded from Bank Accounts.

"Book Value," when used with respect to Property, Plant and Equipment of a Member, means the value of such Property, Plant and Equipment net of accumulated depreciation and amortization, as reflected in the most recent audited financial statements of such Member which have been prepared in accordance with generally accepted accounting principles, and, when used with respect to Property, Plant and Equipment of all Members, means the aggregate of the values of such Property, Plant and Equipment net of accumulated depreciation and amortization, as reflected in the most recent audited combined financial statements of the Obligated Group prepared in accordance with generally accepted accounting principles, provided that such aggregate shall be calculated in such a manner that no portion of the value of any Property, Plant and Equipment of any Member is included more than once.

"Capitalization" shall mean the sum of consolidated Indebtedness and unrestricted net assets of the Obligated Group less all obligations due from Affiliates that are not Members of the Obligated Group.

"Change in Control" shall mean the occurrence of one or both of the following events:

(a) The Governing Body of any Member of the Obligated Group grants to any Person the right to appoint members of the Governing Body; or

(b) A majority of the members of the Governing Body of any Member of the Obligated Group is employed or controlled by or affiliated with any one Person.

"Contract Rights" shall mean all rights of any Member of the Obligated Group in and to contracts to which the Member of the Obligated Group is now or shall become a party pursuant to which the Member of the Obligated Group has the right to perform medical and/or management services and receive payment, reimbursement, insurance proceeds or any other form or manner of compensation, including without limitation, the Medicare and Medicaid reimbursement agreements to which the Member of the Obligated Group is a party and any and all other agreements and/or arrangements between the Member of the Obligated Group and a governmental or quasi-governmental entity pursuant to which the Member of the Obligated Group provides such healthcare service and receives any form of payment, and any other agreements pursuant to which the Member of the Obligated Group provides healthcare services on a reimbursed, capitated or other form of payment arrangement.

"Days of Unrestricted Cash on Hand" shall mean the ratio of (i) Unrestricted Cash and Investments of the Obligated Group, as shown on the financial statements for the fiscal year, to (ii) the quotient of total Expenses of the Obligated Group, as shown on such financial statements, divided by 365. Testing at the six-month interval shall use six-month interim numbers (instead of "financial statements for such fiscal year") and will be divided by 182 instead of 365.

"Depository Institution" shall mean any financial Institution that enters into a depository agreement with a Member of the Obligated Group and the Master Trustee.

"Funded Indebtedness Ratio" means the ratio consisting of (i) a numerator equal to the amount determined by dividing the Obligated Group's total Indebtedness by the Obligated Group's total Capitalization (as reflected in or derived from the most recent audited combined financial statements of the Obligated Group prepared in accordance with generally accepted accounting principles and without including any item more than once) and (ii) a denominator of one.

"General Intangible" shall mean the right to use all general intangibles (as such term is defined in Section 9-106 of the UCC) of the Member of the Obligated Group, including, without limitation, trademarks, copyrights, patents, contracts, licenses, and franchises, trade names, computer programs and other computer software, inventions, designs, trade secrets, goodwill, proprietary rights, customer lists, supplier contacts, sale orders, correspondence and advertising materials.

"Income Available for Debt Service" shall mean the excess of Revenues over Expenses determined in accordance with Generally Accepted Accounting Principles, provided, however, that no determination thereof shall take into account any extraordinary gains or losses, unrealized gains or losses resulting from the periodic valuation of investments, interest rate swap agreements, or similar agreements. Income Available for Debt Service shall, however, include "other-than-temporary" impairment losses recorded pursuant to FAS 115.

"Medicaid" shall mean the Medicaid program as established pursuant to the Social Security Act (42 U.S.C. §1395 *et. seq.*) and related statutes, and any successor, replacement or related program.

"Medicare/Medicaid Receivables" shall mean all accounts and other rights to payment now or at any time hereafter owing, and all reimbursements now or hereafter due, whether directly or indirectly through and intermediary, from the Center for Medicare and Medicaid Services, the United States Department of Health and Human Services, and other governmental authority, or any other Person in connection with Medicare and Medicaid, the Civilian Health and Medical Program of the Uniform Services and the Civilian Health and Medical Program of the Veterans' Administration.

"M/M Account" shall mean a deposit account with a Depository Institution to which all payments with respect to Medicare/Medicaid Receivables are remitted.

"Related Rights" shall mean all chattel paper, documents and/or instruments relating to the Accounts, the General Intangibles, the Gross Receipts, the Contract Rights, and the Bank Accounts and all rights now or hereafter existing in and to all security agreements, leases and other contracts securing or otherwise relating to the Accounts, the Gross Receipts, the Contract Rights or the General Intangibles or any such chattel papers, documents and/or instruments.

"Restricted Accounts" shall mean collectively, those accounts designated as Restricted Accounts in each of the Depository Agreements.

"Synthetic Debt" shall mean eight times (8x) the maximum annual synthetic lease payment in connection with an off-balance sheet lease for the purpose of acquiring or financing a capital asset.

"UCC" shall mean the Uniform Commercial Code in effect from time to time in the State of West Virginia.

## Amendments to Master Indenture Defined Terms

In addition to the definitions above, the Supplement amended the following definitions in Section 101 of the Master Indenture with respect to the 2005 Notes:

"Expenses" shall mean, for any period, the aggregate of all expenses calculated under generally accepted accounting principles, including, without limitation, any taxes, incurred by the Person or group of Persons involved during such period, minus (i) interest on Funded Indebtedness, (ii) depreciation and amortization, (iii) extraordinary losses as defined under generally accepted accounting principles, (iv) losses resulting from the extinguishment or refunding of indebtedness or from the sale, exchange or other disposition of capital assets other than in the ordinary course of business, (v) losses resulting from any write-down, reappraisal, revaluation or impairment of capital assets (including, without limitation, intangibles), (vi) any unrealized loss resulting from or relating to changes in the value, including "other than temporary" declines in value, of investment securities or Interest Rate Agreements; and (vii) if such calculation is being made with respect to the Obligated Group, excluding any such expenses attributable to transactions between any Member and any other Member.

"Funded Indebtedness" shall have the meaning set forth in the Master Indenture, but shall also include all Short-Term Indebtedness and the current portion of Long Term Indebtedness.

"Indebtedness" on a consolidated basis when referring to Indebtedness of the Obligated Group, shall mean (i) all obligations of the Obligated Group for borrowed money or with respect to deposits or advances of any kind; (ii) all obligations of the Obligated Group evidenced by bonds, debentures, notes or similar instruments; (iii) all obligations of the Obligated Group upon which interest charges are customarily paid; (iv) all obligations of the Obligated Group under conditional sale or other title retention agreements relating to property acquired by the Obligated Group; (v) all obligations of the Obligated Group in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (vi) all Indebtedness of others secured by (or for which the holder of the Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on Property owned or acquired by the Obligated Group, whether or not the Indebtedness secured thereby has been assumed; (vii) all Guarantees by the Obligated Group of Indebtedness of others, excluding operating lease payment guarantees; (viii) all Capitalized Leases of the Obligated Group; (ix) all obligations, contingent or otherwise of the Obligated Group as an account party in respect to letters of credit and letters of guaranty; (x) all obligations, contingent or otherwise, of the Obligated Group in respect of bankers' acceptances; (xi) the short-term portion of Long-Term Indebtedness; and (xii) Short-Term Indebtedness. The Indebtedness of the Obligated Group shall include the Indebtedness of any other Person (including any partnership in which the Obligated Group or any Member thereof is a general partner) to the extent the Obligated Group is liable therefore as a result of the Obligated Group's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that the Obligated Group is not liable therefore. With the exception of synthetic or other equipment leases, Indebtedness shall include capital leases that are off balance sheet, synthetic or similar leases for the purpose of acquiring or financing a capital asset, and shall be valued at 8.00 times the annual lease payment.

"Projected Rate" shall mean the greater of the actual variable rate for the preceding 12-month period or the 30-year Revenue Bond Index.

### Gross Receipts Pledge

For so long as the 2005 Bonds are Outstanding (regardless of whether the Bond Insurer is in default under the Bond Insurance Policy), as security for its obligation to make payments on the 2005 Notes, the Swap Note and other Obligations heretofore or hereafter issued under the Master Indenture on a parity with the Series 2005 Notes and the Swap Note, the Obligated Group, by the Supplemental, pledges, assigns, conveys, transfers, grants and ratifies to the Master Trustee a first priority security interest in, general lien upon and the right of set-off against the following described personal property of the Members of the Obligated Group, whether now owned or existing or hereafter acquired or arising and where ever located, and Section 301 of Supplemental Indenture 2003-1 to the Master Indenture was thereby amended and restated to reflect such pledge:  (1)  All of each Member's Gross Receipts, Accounts, Bank Accounts, General Intangibles, Contract Rights and all Related Rights; (2) Except as specifically provided in the Master Indenture, all moneys and securities held from time to time by the Master Trustee under the Master Indenture, including, without limitation, moneys and securities held in the funds and accounts established under the Master Indenture; and (3) All proceeds, cash proceeds, cash equivalents, products, replacements, additions and improvements to substitutions for, and accessions of any and all property described in subsections (1) and (2) above.

### Springing Debt Service Reserve Fund.

(1)     If, at the end of any fiscal year, any of the following events occurs, the Obligated Group shall fund a Debt Service Reserve Fund for the 2005 Bonds with the Bond Trustee in an amount equal to the Reserve Fund Requirement (as defined in subsection (2) below):

       (a)     The Obligated Group's Debt Service Coverage Ratio is less than 2.0 and Days of Unrestricted Cash on Hand are less than 175;

       (b)     The Cushion Ratio for the Obligated Group is less than 1.75; or

       (c)     The Obligated Group's Days of Unrestricted Cash on Hand is less than 90.

(2)     The Reserve Fund Requirement shall equal the **lesser of** (a) 10% of the principal amount of 2005 Bonds Outstanding; (b) the Maximum Annual Debt Service Requirement on the 2005 Bonds; or (c) 125% of average annual debt service on the 2005 Bonds.  For 2005 Bonds with a variable rate of interest, the interest rate assumption for purposes of establishing the Reserve Fund Requirement shall be equal to the **greater of** the average variable rate for the preceding fiscal year and The Bond Buyer Revenue Bond Index at the time such funding is required, plus 50 basis points.

(3)     If the Debt Service Reserve Fund is required to be funded under subsection (1) above, the Obligated Group shall fund such Debt Service Reserve Fund in thirty (30) days.

(4)      The Debt Service Reserve Fund shall be terminated at the end of any fiscal year, and the funds returned to the Obligated Group, if: (a) the Obligated Group is not in default under the 2005 Loan Agreement, and (b) each of the following conditions are met: (i) (A) the Obligated Group's Debt Service Coverage Ratio is 2.0 or greater, or, (B) if the Obligated Group's Debt Service Coverage Ratio is below 2.0, the Obligated Group's Days of Unrestricted Cash on Hand are greater than 175; (ii) the Cushion Ratio for the Obligated Group is 1.75 or greater; and (iii) Days of Unrestricted Cash on Hand exceeds 90.

### Permitted Encumbrances

Permitted Encumbrances under Section 418(b)(i) of the Master Indenture shall be limited to the following:

> after giving effect to such Lien and all other Liens classified as Permitted Encumbrances under this subsection (b)(i), those liens and encumbrances described in paragraphs (u), (w) and (x) of the definition of Permitted Encumbrances, the Book Value or, at the option of the Obligated Group Agent, the Current Value of the Property, Plant and Equipment of the Obligated Group which is Encumbered, together with any collateral posted by the Obligated Group as security for its obligation to make early termination payments under any Interest Rate Agreement is not more than 20% of the Book Value of all of all Property, Plant and Equipment of the Obligated Group, and no more than 15% of the Book Value of all Property, Plant and Equipment of the Obligated Group excluding any collateral posted by the Obligated Group as security for its obligation to make early termination payments under any Interest Rate Agreement (in each case calculated on the same basis as the value of the Encumbered Property); and

### Change in Control

Each Member of the Obligated Group shall preserve its corporate existence and, unless it receives the prior written consent of the Bond Insurer, shall continue to deliver essentially the same health care services it currently delivers; provided, however, that nothing herein contained shall be construed to obligate such Member to retain, preserve or keep in effect the rights, licenses or qualifications no longer used or, in the reasonable judgment of its Governing Body, useful in the conduct of its business. So long as the Policy is in effect and the Bond Insurer is not in default thereunder, there shall not, without the Bond Insurer's prior written consent, be a Change in Control of any Member of the Obligated Group.

### Total Debt to Capitalization Ratio

The Funded Indebtedness Ratio of the Obligated Group will never be greater than 0.67:1. Compliance with such covenant shall be tested as required by Section 306 of the Supplement and at the end of each fiscal year, based on audited annual financial statements when available (but no later than 120 days after fiscal year-end). If the Funded Indebtedness Ratio is greater than 0.67:1 as a result of factors other than the incurrence of Indebtedness, then such event shall not

constitute an event of default under the Master Indenture if, by the end of the next succeeding fiscal year, the Funded Indebtedness Ratio is not more than 0.67:1

**Covenants Regarding United Hospital Center, Inc.**

(1)     The Obligated Group, West Virginia United Health System, Inc. (the "Parent"), and United Hospital Center, Inc. ("UHC") agree that the Parent will continue to be the sole corporate member of UHC and UHC will continue to operate acute care hospital facilities in the vicinity of Clarksburg, West Virginia.   The Parent and UHC agree to use the Bond Insurer as credit enhancer for any bonds that may be issued for the purpose of funding the costs of acquisition and construction of UHC's replacement facility, on the terms set forth in the Bond Insurer's forward commitment, to be delivered on or before January 7, 2005.

(2)     The Obligated Group agrees that it will not incur any obligation to pay Indebtedness used to fund the acquisition and construction of hospital facilities (as defined in the Act) for UHC, unless UHC becomes a Member of the Obligated Group, **and** the Obligated Group meets one of the following two tests:

> (a)     The Obligated Group shall have (i) a combined 165 Days of Unrestricted Cash on Hand (net of equity contributions) and (ii) a combined Historical Pro Forma Debt Service Coverage Ratio of at least 2.0 times; or

> (b)     The Obligated Group shall have (i) a combined 175 Days of Unrestricted Cash on Hand (net of equity contributions) and (ii) a combined Historical Pro Forma Debt Service Coverage Ratio of 1.75 times, and (iii) provides an Officer's Certificate that for the fiscal year in which the Indebtedness is issued, a combined Projected Debt Service Coverage Ratio of at least 1.85, and for the fiscal year following UHC's debt issuance, a combined Projected Debt Service Coverage Ratio of 2.0 times.

(3)     A Springing Debt Service Reserve Fund shall be incorporated into the UHC transaction, and, therefore, the total debt issued for UHC's replacement facility shall not exceed $188,000,000

**Permitted Indebtedness**

For purposes of the 2005 Notes, the Supplement amended and restated Subsection 415(A)(iii) of the Master Indenture to read as follows:

> (a) An Officer's Certificate from the Obligated Group Agent (which Officer's Certificate, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) stating that the Historical Debt Service Coverage Ratio of the Obligated Group for the fiscal year next preceding the incurrence of such Funded Indebtedness for which combined financial statements reported upon by independent certified public accountants are available was not less than 1.10:1; and (b) (1) a written Consultant's report (which

report, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) to the effect that the Projected Debt Service Coverage Ratio of the Obligated Group for each of the next two succeeding fiscal years or, if such Indebtedness is being incurred in connection with the financing of Facilities, the two fiscal years succeeding the projected completion date of such Facilities, is not less than 1.10:1, or (2) an Officer's Certificate from the Obligated Group Agent in a form acceptable to the Master Trustee to the effect that the Projected Debt Service Coverage Ratio of the Obligated Group for each of the next two succeeding fiscal years or, if such Indebtedness is being incurred in connection with the financing of Facilities, the two fiscal years succeeding the projected completion date of such Facilities, is not less than 1.20:1, provided that either of such reports shall include forecast balance sheets, statements of revenues and expenses and statements of cash flows for each of such two fiscal years and a statement of the relevant assumptions upon which such forecasted statements are based, which financial statements must indicate that sufficient revenues and cash flow could be generated to pay the operating expenses of the Obligated Group's proposed and existing Facilities and the debt service on the Obligated Group's other existing Indebtedness during such two fiscal years.

### Unrestricted Cash and Investments Transfers and Loans to Entities Outside the Obligated Group

A Member of the Obligated Group may not dispose of, transfer or loan to any Person not a Member of the Obligated Group or invest in other than marketable or liquid securities (each, a "Disposition") any Unrestricted Cash or Investments unless (i) the aggregate of such Dispositions in the fiscal year does not exceed 10% of the Unrestricted Cash or Investments; (ii) the Days of Unrestricted Cash on Hand at least equals 90, each of (i) and (ii) calculated as of the date of the Disposition, after giving effect to the Disposition and based on the most recent audited financial statements available; (iii) no Event of Default or Event of Restriction has occurred and is continuing. Section 417 of the Original Master Indenture is hereby amended to conform to the foregoing.

### Covenants of Supplemental Indenture 2003-1

Except as otherwise modified or amended in the Supplement, the Bond Insurer shall be entitled to all of the benefits of the covenants contained in Article III of Supplemental Indenture 2003-1 to the Master Indenture, as if set forth fully in the Supplement, and regardless of whether the 2003-1 Supplemental Indenture remains in effect.

### Additional Amendments to the Master Indenture

For purposes of the 2005 Notes, the Supplement made the following amendment to the Master Indenture:

(1)     Subsection 415(D) of the Master Indentures was amended and restated to add a new provision, as follows:

> Notwithstanding any other provision of this subsection (D), Short-Term Indebtedness shall be limited to the **lesser of**, 25% of Revenues of the Obligated Group, or 20% of Unrestricted Cash and Investments of the Obligated Group.

(2)     Subsection 415(M) of the Master Indenture was amended and restated to substitute "5%" for "10%."

(3)     Section 415 of the Master Indenture was amended and restated to add a new paragraph, as the last paragraph of Section 415, as follows:

> Notwithstanding any other provision of this Section 415, the combined Indebtedness incurred under subsections (E), (F), (M) or (O) of this Section 415 shall not exceed 25% of Revenues of the Obligated Group, as of the date of calculation.

(4)     Paragraph (u) of the definition of Permitted Encumbrances was amended and restated to read as follows:

> (u)     Liens on accounts receivable (including, but not limited to, those Liens arising as a result of the sale of such accounts receivable, with or without recourse, on commercially reasonable terms), provided that the principal mount of Indebtedness secured by such Lien does not exceed 15% of the total net accounts receivable;

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX F**

**FORM OF MUNICIPAL BOND INSURANCE POLICY**

[THIS PAGE INTENTIONALLY LEFT BLANK]

# Ambac

## Financial Guaranty Insurance Policy

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

Obligor:

Policy Number:

Obligations:

Premium:

Ambac Assurance Corporation (Ambac), a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

Secretary

Effective Date:

Authorized Representative

THE BANK OF NEW YORK acknowledges that it has agreed
to perform the duties of Insurance Trustee under this Policy.

Form No.: 2B-0012 (1/01)

Authorized Officer of Insurance Trustee

F-1

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX G**

**SUMMARY OF CERTAIN  PROVISIONS RELATING
TO AUCTION AND SETTLEMENT PROCEDURES
FOR THE 2005 BONDS**

TABLE OF CONTENTS

Page

### ARTICLE I  DEFINITIONS

### ARTICLE II  AUCTION PROCEDURES

Section 201. Orders by Existing Owners and Potential Owners ................................................ G-4

Section 202. Submission of Orders by Broker-Dealers to Auction Agent ................................ G-6

Section 203. Determination of Auction Rate ............................................................................ G-8

Section 204. Allocation of Bonds ............................................................................................. G-9

Section 205. Notice of Auction Rate ....................................................................................... G-11

Section 206. Auction Index...................................................................................................... G-12

Section 207. Miscellaneous Provisions Regarding Auctions ................................................. G-12

Section 208. Changes in Auction Period or Auction Date....................................................... G-13

### ARTICLE III  AUCTION AGENT

Section 301. Auction Agent..................................................................................................... G-14

Section 302. Qualifications of Auction Agent; Resignation; Removal ................................... G-15

## ARTICLE I
## DEFINITIONS

In addition to the words and terms elsewhere defined in this Bond Indenture, the following words and terms as used in this Exhibit and elsewhere in this Bond Indenture shall have the following meanings with respect to the 2005 Bonds of each series in an Auction Rate Period unless the context or use indicates another or different meaning or intent:

"*Agent Member*" means a member of, or participant in, the Securities Depository who will act on behalf of a Bidder.

"*All Hold Rate*" means, as of any Auction Date, 90% of the Auction Index in effect on such Auction Date.

"*Auction*" means each periodic implementation of the Auction Procedures.

"*Auction Agent*" means the auctioneer appointed in accordance with Section 301 or 302 of this Exhibit, and shall initially be Deutsche Bank Trust Company Americas.

"*Auction Agreement*" means an agreement between the Auction Agent and the Bond Trustee pursuant to which the Auction Agent agrees to follow the Auction Procedures, as such agreement may from time to time be amended or supplemented.

"*Auction Date*" means, with respect to any series of 2005 Bonds, during any period in which the Auction Procedures are not suspended in accordance with the provisions hereof, 2005 Bonds, the Business Day next preceding each Interest Payment Date for such Bonds (whether or not an Auction shall be conducted on such date); provided, however, that the last Auction Date with respect to a series of 2005 Bonds shall be the earlier of (a) the Business Day next preceding the Interest Payment Date next preceding the Conversion Date for such series of 2005 Bonds and (b) the Business Day next preceding the Interest Payment Date next preceding the final maturity date for a series of 2005 Bonds. The first Auction Date for the 2005 A Bonds shall be February 2, 2005. The first Auction Date for the 2005 B Bonds shall be February 3, 2005.

"*Auction Index*" shall have the meaning specified in Section 206 of this Exhibit.

"*Auction Period*" means for a series of 2005 Bonds in a seven-day mode, (i) (a) with respect to the 2005 A Bonds, a period of generally seven days beginning on a Thursday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Wednesday) and ending on the Wednesday thereafter (unless such Wednesday is not followed by a Business Day, in which case ending on the next succeeding day which is followed by a Business Day), and (b) with respect to the 2005 B Bonds, a period of generally seven days beginning on a Friday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Thursday) and ending on the Thursday thereafter (unless such Thursday is not followed by a Business Day, in which case ending on the next succeeding day which is followed by a Business Day), and (ii) in a 35-day mode, a period of generally 35 days beginning on a Thursday (or the day following the last day of the prior Auction Period if the

prior Auction Period does not end on a Wednesday) and ending on the fifth Wednesday thereafter (unless such Wednesday is not followed by a Business Day, in which case ending on the next succeeding day which is followed by a Business Day.

"*Auction Procedures*" means the procedures for conducting Auctions for 2005 Bonds during an Auction Rate Period set forth in this Exhibit.

"*Auction Rate*" means for each series of 2005 Bonds bearing interest at an Auction Rate for each Auction Period, (i) if Sufficient Clearing Bids exist, the Winning Bid Rate; provided, however, if all of the 2005 Bonds of such series are the subject of Submitted Hold Orders, the All Hold Rate and (ii) if Sufficient Clearing Bids do not exist, the Maximum Interest Rate.

"*Auction Rate Conversion Date*" means with respect to any series of 2005 Bonds, the date on which the 2005 Bonds of such series convert from a Rate Period other than an Auction Rate Period and begin to bear interest at an Auction Rate.

"*Available Bonds*" means for each series of 2005 Bonds bearing interest at an Auction Rate on each Auction Date the aggregate principal amount of 2005 Bonds that are not the subject of Submitted Hold Orders.

"*Bid*" has the meaning specified in subsection (a) of Section 201 of this Exhibit.

"*Bidder*" means each Existing Owner and Potential Owner who places an Order.

"*BMA Municipal Index*" means The Bond Market Association Municipal Swap Index as of the most recent date for which such index was published or such other weekly, high-grade index comprised of seven-day, tax-exempt variable rate demand notes produced by Municipal Market Data, Inc., or its successor, or as otherwise designated by The Bond Market Association; provided, however, that, if such index is no longer produced by Municipal Market Data, Inc. or its successor, then "BMA Municipal Index" shall mean such other reasonably comparable index selected by the Authority and approved by the Bond Insurer and all Broker-Dealers.

"*Broker-Dealer*" means any entity or entities that is permitted by law to perform the function required of a Broker-Dealer described in this Exhibit, that is a member of, or a direct participant in, the Securities Depository, that has been selected by the Obligated Group Agent, with the consent of the Authority and that is a party to a Broker-Dealer Agreement with the Auction Agent.

"*Broker-Dealer Agreement*" means an agreement among the Auction Agent, the Obligated Group Agent and a Broker-Dealer pursuant to which such Broker-Dealer agrees to follow the Auction Procedures, as such agreement may from to time be amended or supplemented.

"*Existing Owner*" means (a) with respect to and for the purpose of dealing with the Auction Agent in connection with an Auction, a Person who is a Broker-Dealer listed in the "Existing Holder Registry" maintained by the Auction Agent pursuant to the Auction Agreement, at the close of business on the Business Day immediately preceding such Auction

and (b) with respect to and for the purpose of dealing with a Broker-Dealer in connection with an Auction, a Person who is a beneficial owner of 2005 Bonds for such Auction.

"*Hold Order*" shall have the meaning specified in subsection (a) of Section 201 of this Exhibit.

"*Order*" means a Hold Order, Bid or Sell Order.

"*Potential Owner*" means any Person, including any Existing Owner, who may be interested in acquiring a beneficial interest in the 2005 Bonds in addition to the 2005 Bonds currently owned by such Person, if any.

"*Principal Office*" means, with respect to the Auction Agent, the office thereof designated in writing to the Authority, the Obligated Group Agent, the Bond Trustee and each Broker-Dealer.

"*Securities Depository*" means The Depository Trust Company and its successors and assigns or any other securities depository selected by the Authority which agrees to follow the procedures required to be followed by such securities depository in connection with the 2005 Bonds.

"*Sell Order*" shall have the meaning specified in subsection (a) of Section 201 of this Exhibit.

"*Special Auction Period*" means any period of not less than seven nor more than 364 days (other than a 7-day or 35-day Auction Period) which begins on an Interest Payment Date and ends on a Tuesday unless such Tuesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day.

"*Submission Deadline*" means 1:00 p.m., New York City time, on each Auction Date for a series of 2005 Bonds bearing interest at an Auction Rate not in a daily Auction Period and 11:00 a.m., New York City time, on each Auction Date for a series of 2005 Bonds bearing interest at an Auction Rate in a daily Auction Period, or such other time on such date as shall be specified from time to time by the Auction Agent pursuant to the Auction Agreement as the time by which Broker-Dealers are required to submit Orders to the Auction Agent.

"*Submitted Bid*" has the meaning specified in subsection (b) of Section 203 of this Exhibit.

"*Submitted Hold Order*" shall have the meaning specified in subsection (b) of Section 203 of this Exhibit.

"*Submitted Order*" shall have the meaning specified in subsection (b) of Section 203 of this Exhibit.

"*Submitted Sell Order*" shall have the meaning specified in subsection (b) of Section 203 of this Exhibit.

"*Sufficient Clearing Bids*" means, with respect to a series of 2005 Bonds bearing interest at an Auction Rate, an Auction for which the aggregate principal amount of 2005 Bonds of such series that are the subject of Submitted Bids by Potential Owners specifying one or more rates not higher than the Maximum Interest Rate is not less than the aggregate principal amount of 2005 Bonds of such series that are the subject of Submitted Sell Orders and of Submitted Bids by Existing Owners specifying rates higher than the Maximum Interest Rate.

"*Winning Bid Rate*" means, with respect to a series of 2005 Bonds bearing interest at an Auction Rate, the lowest rate specified in any Submitted Bid for such series of 2005 Bonds which if selected by the Auction Agent as the Auction Rate for such series of 2005 Bonds would cause the aggregate principal amount of 2005 Bonds of such series that are the subject of Submitted Bids specifying a rate not greater than such rate to be not less than the aggregate principal amount of Available Bonds.

## ARTICLE II
## AUCTION PROCEDURES

*Section 201.   Orders by Existing Owners and Potential Owners.*   (a)   Prior to the Submission Deadline on each Auction Date:

(i)  each Existing Owner may submit to a Broker-Dealer, in writing or by such other method as shall be reasonably acceptable to such Broker-Dealer, information as to:

(A)     the principal amount of Outstanding Bonds, if any, held by such Existing Owner which such Existing Owner irrevocably commits to continue to hold for the next succeeding Auction Period without regard to the rate determined by the Auction Procedures for such Auction Period,

(B)     the principal amount of Outstanding Bonds, if any, held by such Existing Owner which such Existing Owner irrevocably commits to continue to hold for the next succeeding Auction Period if the rate determined by the Auction Procedures for such Auction Period shall not be less than the rate per annum then specified by such Existing Owner (and which such Existing Owner irrevocably offers to sell on the next succeeding Interest Payment Date (or the same day in the case of a daily Auction Period) if the rate determined by the Auction Procedures for the next succeeding Auction Period shall be less than the rate per annum then specified by such Existing Owner), and/or

(C)     the principal amount of Outstanding Bonds, if any, held by such Existing Owner which such Existing Owner irrevocably offers to sell on the next succeeding Interest Payment Date (or on the same day in the case of a daily Auction Period) without regard to the rate determined by the Auction Procedures for the next succeeding Auction Period; and

(ii)  for the purpose of implementing the Auctions and thereby to achieve the lowest possible interest rate on the Bonds, the Broker-Dealers shall contact Potential Owners, including Persons that are Existing Owners, to determine the principal amount of Bonds,

if any, which each such Potential Owner irrevocably offers to purchase if the rate determined by the Auction Procedures for the next succeeding Auction Period is not less than the rate per annum then specified by such Potential Owner.

For the purposes hereof, an Order containing the information referred to in clause (i)(A) of this subsection (a) is herein referred to as a "*Hold Order*", an Order containing the information referred to in clause (i)(B) or (ii) of this subsection (a) is herein referred to as a "*Bid*", and an Order containing the information referred to in clause (i)(C) of this subsection (a) is herein referred to as a "Sell Order."

(b) (i) A Bid by an Existing Owner shall constitute an irrevocable offer to sell:

(A)     the principal amount of Outstanding Bonds specified in such Bid if the rate determined by the Auction Procedures on such Auction Date shall be less than the rate specified therein; or

(B)     such principal amount or a lesser principal amount of Bonds to be determined as set forth in subsection (a)(v) of Section 204 hereof if the rate determined by the Auction Procedures on such Auction Date shall be equal to such specified rate; or

(C)     a lesser principal amount of Bonds to be determined as set forth in subsection (b)(iv) of Section 204 hereof if such specified rate shall be higher than the Maximum Interest Rate and Sufficient Clearing Bids do not exist

(ii) A Sell Order by an Existing Owner shall constitute an irrevocable offer to sell:

(A)     the principal amount of Bonds specified in such Sell Order; or

(B)     such principal amount or a lesser principal amount of Bonds as set forth in subsection (b)(iv) of Section 204 hereof if Sufficient Clearing Bids do not exist.

(iii) A Bid by a Potential Owner shall constitute an irrevocable offer to purchase:

(A)     the principal amount of Bonds specified in such Bid if the rate determined by the Auction Procedures on such Auction Date shall be higher than the rate specified therein; or

(B)     such principal amount or a lesser principal amount of Bonds as set forth in subsection (a)(vi) of Section 204 hereof if the rate determined by the Auction Procedures on such Auction Date shall be equal to such specified rate.

(c)     Anything herein to the contrary notwithstanding:

(i) for purposes of any Auction, any Order which specifies Bonds to be held, purchased or sold in a principal amount which is not $25,000 or an integral multiple thereof shall be rounded down to the nearest $25,000, and the Auction Agent shall conduct the Auction Procedures as if such Order had been submitted in such lower amount;

(ii) for purposes of any Auction, any portion of an Order of an Existing Owner which relates to a Bond which has been called for redemption on or prior to the Interest Payment Date next succeeding such Auction shall be invalid with respect to such portion and the Auction Agent shall conduct the Auction Procedures as if such portion of such Order had not been submitted;

(iii) for purposes of any Auction, no portion of a Bond which has been called for redemption on or prior to the Interest Payment Date next succeeding such Auction shall be included in the calculation of Available Bonds for such Auction; and

(iv) the Auction Procedures shall be suspended during the period commencing on the date of the Auction Agent's receipt of written notice from the Bond Trustee or the Authority of the occurrence of an Event of Default resulting from a failure to pay principal, premium or interest on any Bond when due (provided, however, that for purposes of this provision only payment by the Bond Insurer shall be deemed to cure such Event of Default and no suspension of the Auction Procedures shall occur), but shall resume two Business Days after the date on which the Auction Agent receives notice from the Bond Trustee that such Event of Default has been waived or cured, with the next Auction to occur on the next regularly scheduled Auction Date occurring thereafter.

*Section 202. Submission of Orders by Broker-Dealers to Auction Agent.*

(a) Each Broker-Dealer shall submit to the Auction Agent in writing or by such other method as shall be reasonably acceptable to the Auction Agent, including such electronic communication acceptable to the parties, prior to the Submission Deadline on each Auction Date, all Orders obtained by such Broker-Dealer and specifying (in writing, if requested) with respect to each Order:

(i) the name of the Bidder placing such Order;

(ii) the aggregate principal amount of Bonds of each series that are the subject of such Order;

(iii) to the extent that such Bidder is an Existing Owner:

(A) the principal amount of Bonds of each series, if any, subject to any Hold Order placed by such Existing Owner;

(B) the principal amount of Bonds of each series, if any, subject to any Bid placed by such Existing Owner and the rate specified in such Bid; and

(C) the principal amount of each series, if any, subject to any Sell Order placed by such Existing Owner; and

(iv) to the extent such Bidder is a Potential Owner, the rate specified in such Bid.

(b)     If any rate specified in any Bid contains more than three figures to the right of the decimal point, the Auction Agent shall round such rate up to the next highest one thousandth of one percent (0.001%).

(c)     If an Order or Orders covering all of the Bonds of a particular series held by an Existing Owner is not submitted to the Auction Agent prior to the Submission Deadline, the Auction Agent shall deem a Hold Order to have been submitted on behalf of such Existing Owner covering the principal amount of Bonds of such series held by such Existing Owner and not subject to Orders submitted to the Auction Agent; provided, however, that if there is a conversion from one Auction Period to another Auction Period and Orders have not been submitted to the Auction Agent prior to the Submission Deadline covering the aggregate principal amount of Bonds of the series to be converted held by such Existing Owner, the Auction Agent shall deem a Sell Order to have been submitted on behalf of such Existing Owner covering the principal amount of Outstanding Bonds of such series to be converted held by such Existing Owner not subject to Orders submitted to the Auction Agent.

(d)     If one or more Orders covering in the aggregate more than the principal amount of Outstanding Bonds of a series held by any Existing Owner are submitted to the Auction Agent, such Orders shall be considered valid as follows:

(i) all Hold Orders shall be considered Hold Orders, but only up to and including in the aggregate the principal amount of Bonds of such series held by such Existing Owner;

(ii) (A)     any Bid of an Existing Owner shall be considered valid as a Bid of an Existing Owner up to and including the excess of the principal amount of Bonds of a series held by such Existing Owner over the principal amount of the Bonds of such series subject to Hold Orders referred to in clause (i) above;

(B)     subject to clause (A) above, all Bids of an Existing Owner with the same rate shall be aggregated and considered a single Bid of an Existing Owner up to and including the excess of the principal amount of Bonds of such series held by such Existing Owner over the principal amount of Bonds of such series held by such Existing Owner subject to Hold Orders referred to in clause (i) above;

(C)     subject to clause (A) above, if more than one Bid for Bonds of such series with different rates is submitted on behalf of such Existing Owner, such Bids shall be considered Bids of an Existing Owner in the ascending order of their respective rates up to the amount of the excess of the principal amount of Outstanding Bonds of such series held by such Existing Owner over the principal amount of Bonds of such series held by such Existing Owner subject to Hold Orders referred to in clause (i) above; and

(D)     the principal amount, if any, of Bonds of such series subject to Bids not considered to be Bids of an Existing Owner under this clause (ii) shall be treated as the subject of a Bid by a Potential Owner; and

(iii) all Sell Orders shall be considered Sell Orders, but only up to and including a principal amount of Bonds of such series equal to the excess of the principal amount of Bonds of such series held by such Existing Owner over the sum of the principal amount

of the Bonds of such series considered to be subject to Hold Orders pursuant to clause (i) above and the principal amount of Bonds of such series considered to be subject to Bids of such Existing Owner pursuant to clause (ii) above.

(e) If more than one Bid is submitted on behalf of any Potential Owner, each Bid submitted with the same rate shall be aggregated and considered a single Bid and each Bid submitted with a different rate shall be considered a separate Bid with the rate and the principal amount of Bonds of such series specified therein.

(f) Neither the Obligated Group Agent, the Authority, the Bond Trustee nor the Auction Agent shall be responsible for the failure of any Broker-Dealer to submit an Order to the Auction Agent on behalf of any Existing Owner or Potential Owner.

*Section 203. Determination of Auction Rate.* (a) Not later than 9:30 a.m., New York City time, on each Auction Date for each series of Bonds, the Auction Agent shall advise the Broker-Dealers and the Bond Trustee by telephone or other electronic communication acceptable to the parties of the All Hold Rate and the Auction Index for the Bonds.

(b) Promptly after the Submission Deadline on each Auction Date for each series of Bonds, the Auction Agent shall assemble all Orders submitted or deemed submitted to it by the Broker-Dealers (each such Order as submitted or deemed submitted by a Broker-Dealer being hereinafter referred to as a "*Submitted Hold Order*," a "*Submitted Bid*" or a "*Submitted Sell Order*," as the case may be, and collectively as a "*Submitted Order*") and shall determine (i) the Available Bonds, (ii) whether there are Sufficient Clearing Bids, and (iii) the Auction Rate.

(c) Promptly after the Auction Agent has made the determinations pursuant to subsection (b) above the Auction Agent shall advise the Bond Trustee by telephone (promptly confirmed in writing), telex or facsimile transmission or other electronic communication acceptable to the parties of the Auction Rate for the next succeeding Auction Period and the Bond Trustee shall promptly notify DTC of such Auction Rate.

(d) In the event the Auction Agent shall fail to calculate or, for any reason, fails to provide the Auction Rate for any Auction Period, (i) if the preceding Auction Period was a period of 35 days or less, the new Auction Period shall be the same as the preceding Auction Period and the Auction Rate for the new Auction Period shall be the same as the Auction Rate for the preceding Auction Period, and (ii) if the preceding Auction Period was a period of greater than 35 days, the preceding Auction Period shall be extended to the next Wednesday (or if such Wednesday is not followed by a Business Day then to the next succeeding day which is followed by a Business Day) and the Auction Rate in effect for the preceding Auction Period will continue in effect for the Auction Period as so extended. In the event the Auction Period is extended as set forth in clause (ii) of the preceding sentence, an Auction shall be held on the last Business Day of the Auction Period as so extended to take effect for an Auction Period beginning on the Business Day immediately following the last day of the Auction Period as extended which Auction Period will end on the date it would otherwise have ended on had the prior Auction Period not been extended.

(e)      In the event of a failed conversion of Bonds of any series from an Auction Period to a Weekly Rate Period or in the event of a failure to change the length of the current Auction Period due to the lack of Sufficient Clearing Bids at the Auction on the Auction Date for the first new Auction Period, the Auction Rate for the next Auction Period shall be the Maximum Interest Rate and the Auction Period shall be a seven-day Auction Period for such series.

(f)      If the Bonds are no longer maintained in book-entry only form by the Securities Depository or there is no Auction Agent or Broker-Dealer, then the Auction Rate for the Bonds will be the Maximum Rate.

Section 204.  Allocation of Bonds.

(a)      In the event of Sufficient Clearing Bids for a  series of Bonds, subject to the further provisions of subsections (c) and (d) below, Submitted Orders for such  series shall be accepted or rejected as follows in the following order of priority:

(i)      the Submitted Hold Order of each Existing Owner shall be accepted, thus requiring each such Existing Owner to continue to hold the Bonds that are the subject of such Submitted Hold Order;

(ii)      the Submitted Sell Order of each Existing Owner shall be accepted and the Submitted Bid of each Existing Owner specifying any rate that is higher than the Winning Bid Rate shall be rejected, thus requiring each such Existing Owner to sell the Bonds that are the subject of such Submitted Sell Order or Submitted Bid;

(iii)      the Submitted Bid of each Existing Owner specifying any rate that is lower than the Winning Bid Rate shall be accepted, thus requiring each such Existing Owner to continue to hold the Bonds that are the subject of such Submitted Bid;

(iv)      the Submitted Bid of each Potential Owner specifying any rate that is lower than the Winning Bid Rate shall be accepted, thus requiring each such Potential Owner to purchase the Bonds that are the subject of such Submitted Bid;

(v)      the Submitted Bid of each Existing Owner specifying a rate that is equal to the Winning Bid Rate shall be accepted, thus requiring each such Existing Owner to continue to hold the Bonds that are the subject of such Submitted Bid, but only up to and including the principal amount of Bonds obtained by multiplying (A) the aggregate principal amount of Outstanding Bonds which are not the subject of Submitted Hold Orders described in clause (i) above or of Submitted Bids described in clause (iii) or (iv) above by (B) a fraction the numerator of which shall be the principal amount of Outstanding Bonds held by such Existing Owner subject to such Submitted Bid and the denominator of which shall be the aggregate principal amount of Outstanding Bonds subject to such Submitted Bids made by all such Existing Owners that specified a rate equal to the Winning Bid Rate, and the remainder, if any, of such Submitted Bid shall be rejected, thus requiring each such Existing Owner to sell any excess amount of Bonds;

(vi)      the Submitted Bid of each Potential Owner specifying a rate that is equal to the Winning Bid Rate shall be accepted, thus requiring each such Potential Owner to

purchase the Bonds that are the subject of such Submitted Bid, but only in an amount equal to the principal amount of Bonds obtained by multiplying (A) the aggregate principal amount of Outstanding Bonds which are not the subject of Submitted Hold Orders described in clause (i) above or of Submitted Bids described in clause (iii), (iv) or (v) above by (B) a fraction the numerator of which shall be the principal amount of Outstanding Bonds subject to such Submitted Bid and the denominator of which shall be the sum of the aggregate principal amount of Outstanding Bonds subject to such Submitted Bids made by all such Potential Owners that specified a rate equal to the Winning Bid Rate, and the remainder of such Submitted Bid shall be rejected; and

(vii) the Submitted Bid of each Potential Owner specifying any rate that is higher than the Winning Bid Rate shall be rejected.

(b)   In the event there are not Sufficient Clearing Bids for a series of Bonds, subject to the further provisions of subsections (c) and (d) below, Submitted Orders shall be accepted or rejected as follows in the following order of priority:

(i)   the Submitted Hold Order of each Existing Owner shall be accepted, thus requiring each such Existing Owner to continue to hold the Bonds that are the subject of such Submitted Hold Order;

(ii) the Submitted Bid of each Existing Owner specifying any rate that is not higher than the Maximum Interest Rate shall be accepted, thus requiring each such Existing Owner to continue to hold the Bonds that are the subject of such Submitted Bid;

(iii) the Submitted Bid of each Potential Owner specifying any rate that is not higher than the Maximum Interest Rate shall be accepted, thus requiring each such Potential Owner to purchase the Bonds that are the subject of such Submitted Bid;

(iv)   the Submitted Sell Orders of each Existing Owner shall be accepted as Submitted Sell Orders and the Submitted Bids of each Existing Owner specifying any rate that is higher than the Maximum Interest Rate shall be deemed to be and shall be accepted as Submitted Sell Orders, in both cases only up to and including the principal amount of Bonds obtained by multiplying (A) the aggregate principal amount of Bonds subject to Submitted Bids described in clause (iii) of this subsection (b) by (B) a fraction the numerator of which shall be the principal amount of Outstanding Bonds held by such Existing Owner subject to such Submitted Sell Order or such Submitted Bid deemed to be a Submitted Sell Order and the denominator of which shall be the principal amount of Outstanding Bonds subject to all such Submitted Sell Orders and such Submitted Bids deemed to be Submitted Sell Orders, and the remainder of each such Submitted Sell Order or Submitted Bid shall be deemed to be and shall be accepted as a Hold Order and each such Existing Owner shall be required to continue to hold such excess amount of Bonds; and

(v) the Submitted Bid of each Potential Owner specifying any rate that is higher than the Maximum Interest Rate shall be rejected.

(c)     If, as a result of the procedures described in subsection (a) or (b) above, any Existing Owner or Potential Owner would be required to purchase or sell an aggregate principal amount of Bonds which is not an integral multiple of $25,000 on any Auction Date, the Auction Agent shall by lot, in such manner as it shall determine in its sole discretion, round up or down the principal amount of Bonds to be purchased or sold by any Existing Owner or Potential Owner on such Auction Date so that the aggregate principal amount of Bonds purchased or sold by each Existing Owner or Potential Owner on such Auction Date shall be an integral multiple of $25,000, even if such allocation results in one or more of such Existing Owners or Potential Owners not purchasing or selling any Bonds on such Auction Date.

(d)     If, as a result of the procedures described in subsection (a) above, any Potential Owner would be required to purchase less than $25,000 in principal amount of Bonds on any Auction Date, the Auction Agent shall by lot, in such manner as it shall determine in its sole discretion, allocate Bonds for purchase among Potential Owners so that the principal amount of Bonds purchased on such Auction Date by any Potential Owner shall be an integral multiple of $25,000, even if such allocation results in one or more of such Potential Owners not purchasing Bonds on such Auction Date.

*Section 205. Notice of Auction Rate.* (a) On each Auction Date, the Auction Agent shall notify by telephone or other telecommunication device or other electronic means acceptable to the parties or in writing each Broker-Dealer that participated in the Auction held on such Auction Date of the following with respect to each  series of Bonds for which an Auction was held on such Auction Date:

(i)  the Auction Rate determined on such Auction Date for the succeeding Auction Period;

(ii)  whether Sufficient Clearing Bids existed for the determination of the Winning Bid Rate;

(iii)  if such Broker-Dealer submitted a Bid or a Sell Order on behalf of an Existing Owner, whether such Bid or Sell Order was accepted or rejected and the principal amount of Bonds, if any, to be sold by such Existing Owner;

(iv)  if such Broker-Dealer submitted a Bid on behalf of a Potential Owner, whether such Bid was accepted or rejected and the principal amount of Bonds, if any, to be purchased by such Potential Owner;

(v)  if the aggregate principal amount of the Bonds to be sold by all Existing Owners on whose behalf such Broker-Dealer submitted Bids or Sell Orders is different from the aggregate principal amount of Bonds to be purchased by all Potential Owners on whose behalf such Broker-Dealer submitted a Bid, the name or names of one or more Broker-Dealers (and the Agent Member, if any, of each such other Broker-Dealer) and the principal amount of Bonds to be (A) purchased from one or more Existing Owners on whose behalf such other Broker-Dealers submitted Bids or Sell Orders or (B) sold to one or more Potential Owners on whose behalf such Broker-Dealer submitted Bids; and

(vi)  the immediately succeeding Auction Date.

(b)     On each Auction Date with respect to each series of Bonds for which an Auction was held on such Auction Date, each Broker-Dealer that submitted an Order on behalf of any Existing Owner or Potential Owner shall: (i) advise each Existing Owner and Potential Owner on whose behalf such Broker-Dealer submitted an Order as to (A) the Auction Rate determined on such Auction Date, (B) whether any Bid or Sell Order submitted on behalf of each such Owner was accepted or rejected and (C) the immediately succeeding Auction Date; (ii) instruct each Potential Owner on whose behalf such Broker-Dealer submitted a Bid that was accepted, in whole or in part, to instruct such Existing Owner's Agent Member to pay to such Broker-Dealer (or its Agent Member) through the Securities Depository the amount necessary to purchase the principal amount of Bonds to be purchased pursuant to such Bid (including, with respect to the Bonds in a daily Auction Period, accrued interest if the purchase date is not an Interest Payment Date for such Bond) against receipt of such Bonds; and (iii) instruct each Existing Owner on whose behalf such Broker-Dealer submitted a Sell Order that was accepted or a Bid that was rejected, in whole or in part, to instruct such Existing Owner's Agent Member to deliver to such Broker-Dealer (or its Agent Member) through the Securities Depository the principal amount of Bonds to be sold pursuant to such Bid or Sell Order against payment therefor.

*Section 206. Auction Index.* (a) The Auction Index on any Auction Date shall be the BMA Municipal Index on such date. If such rate is unavailable, the Auction Index shall be an index or rate agreed to by all Broker-Dealers and consented to by the Obligated  Group Agent, the Authority and the Bond Insurer.

(b)     If for any reason on any Auction Date the Auction Index shall not be determined as hereinabove provided in this Section, the Auction Index shall be the Auction Index for the Auction Period ending on such Auction Date.

(c)     The determination of the Auction Index as provided herein shall be conclusive and binding upon the Authority, the Obligated Group , the Bond Trustee, the Broker-Dealers, the Auction Agent and the Owners of the Bonds.

*Section 207. Miscellaneous Provisions Regarding Auctions.*

(a)     In this Exhibit, each reference to the purchase, sale or holding of "Bonds" shall refer to beneficial interests in Bonds, unless the context clearly requires otherwise.

(b)     During an Auction Rate Period, the provisions of the Bond Indenture and the definitions contained therein and this Exhibit concerning the Auction Procedures and the definitions contained herein, including without limitation the definitions of Interest Payment Date, All Hold Rate, Auction Index and Auction Rate, may be amended pursuant to Section 902 of the Bond Indenture by obtaining the consent of the Bond Insurer and the owners of all Outstanding Bonds bearing interest at an Auction Rate for a  series of Bonds affected by such changes as follows.  If on the first Auction Date occurring at least 20 days after the date on which the Bond Trustee mailed notice of such proposed amendment to the registered owners of the Outstanding Bonds as required by Section 902, (i) the Auction Rate for a  series which is determined on such date is the Winning Bid Rate and (ii) there is delivered to the Authority and the Bond Trustee an Opinion of Bond Counsel to the effect that such amendment will not adversely affect the validity of the Bonds or any exclusion from federal income tax to which the

interest on the Bonds would otherwise be entitled, the proposed amendment shall be deemed to have been consented to by the owners of all affected Outstanding Bonds bearing interest at an Auction Rate series.

(c)     If the Securities Depository notifies the Authority that it is unwilling or unable to continue as owner of the Bonds or if at any time the Securities Depository shall no longer be registered or in good standing under the Securities Exchange Act of 1934, as amended, or other applicable statute or regulation and a successor to the Securities Depository is not appointed by the Authority within 90 days after the Authority receives notice or becomes aware of such condition, as the case may be, the Authority shall execute and the Bond Trustee shall authenticate and deliver certificates representing the Bonds. Such Bonds shall be registered in such names and Authorized Denominations as the Securities Depository, pursuant to instructions from the Agent Members or otherwise, shall instruct the Authority and the Bond Trustee. During an Auction Rate Period, so long as the ownership of the Bonds is maintained in book-entry form by the Securities Depository, an Existing Owner or a beneficial owner may sell, transfer or otherwise dispose of a Bond only pursuant to a Bid or Sell Order in accordance with the Auction Procedures or to or through a Broker-Dealer; provided that (i) in the case of all transfers other than pursuant to Auctions such Existing Owner or its Broker-Dealer or its Agent Member advises the Auction Agent of such transfer and (ii) a sale, transfer or other disposition of Bonds from a customer of a Broker-Dealer who is listed on the records of that Broker-Dealer as the holder of such Bonds to that Broker-Dealer or another customer of that Broker-Dealer shall not be deemed to be a sale, transfer or other disposition for purposes of this Section 207 if such Broker-Dealer remains the Existing Owner of the Bonds so sold, transferred or disposed of immediately after such sale, transfer or disposition.

*Section 208.  Changes in Auction Period or Auction Date.*

(a)     Changes in Auction Period.

(i) During any Auction Rate Period, the Obligated Group Agent, with the consent of the Authority may, from time to time on the last Interest Payment Date of the Auction Period, change the length of the Auction Period with respect to Bonds of any series among seven days, 35 days and Special Auction Periods in order to accommodate economic and financial factors that may affect or be relevant to the length of the Auction Period and the interest rate borne by such Bonds. The Obligated Group Agent shall initiate the change in the length of the Auction Period by giving written notice to the Authority, the Bond Trustee, the Bond Insurer, the Auction Agent, the Broker-Dealer and the Securities Depository that the Auction Period will change if the conditions described herein are satisfied and the proposed effective date of the change, at least 10 Business Days prior to the Auction Date for such Auction Period.

(ii) Any such changed Auction Period shall be for a period of seven days, 35 days or a Special Auction Period and shall be for all of the Bonds of a series in an Auction Rate Period.

(iii) The change in the length of the Auction Period for any series shall not be allowed unless Sufficient Clearing Bids existed at both the Auction before the date on

which the notice of the proposed change was given as provided in this subsection (a) and the Auction immediately preceding the proposed change.

(iv)  The change in length of the Auction Period for any series shall take effect only if (A) the Bond Trustee and the Auction Agent receive, by 11:00 a.m., New York City time, on the Business Day before the Auction Date for the first such Auction Period, a certificate from the Authority consenting to the change in the length of the Auction Period specified in such certificate and (B) Sufficient Clearing Bids exist at the Auction on the Auction Date for such first Auction Period. For purposes of the Auction for such first Auction Period only, each Existing Owner shall be deemed to have submitted Sell Orders with respect to all of its Bonds except to the extent such Existing Owner submits an Order with respect to such Bonds. If the condition referred to in (A) above is not met, the Auction Rate for the next Auction Period shall be determined pursuant to the Auction Procedures and the Auction Period shall be the Auction Period determined without reference to the proposed change. If the condition referred to in (A) above is met but the condition referred to in (B) above is not met, the Auction Rate for the next Auction Period shall be the Maximum Interest Rate and the Auction Period shall be a seven-day Auction Period.

(b)     Changes in Auction Date. During any Auction Rate Period, the Auction Agent, with the written consent of the Authority, may specify an earlier Auction Date for any series (but in no event more than five Business Days earlier) than the Auction Date that would otherwise be determined in accordance with the definition of "Auction Date" in order to conform with then current market practice with respect to similar securities or to accommodate economic and financial factors that may affect or be relevant to the day of the week constituting an Auction Date and the interest rate borne on the Bonds. The Auction Agent shall provide notice of its determination to specify an earlier Auction Date for an Auction Period by means of a written notice delivered at least 45 days prior to the proposed changed Auction Date to the Bond Trustee, the Obligated Group Agent, the Authority, the Broker-Dealers and the Securities Depository.

## ARTICLE III
## AUCTION AGENT

Section 301. Auction Agent. (a)  The Auction Agent shall be appointed by the Bond Trustee, at the written direction of the Obligated Group Agent, to perform the functions specified herein. The Auction Agent shall designate its Principal Office and signify its acceptance of the duties and obligations imposed upon it hereunder by a written instrument delivered to the Authority, the Bond Trustee, the Bond Insurer, the Obligated Group Agent and each Broker-Dealer which shall set forth such procedural and other matters relating to the implementation of the Auction Procedures as shall be satisfactory to the Authority and the Bond Trustee.

(b)     Subject to any applicable governmental restrictions, the Auction Agent may be or become the owner of or trade in Bonds with the same rights as if such entity were not the Auction Agent.

*Section 302. Qualifications of Auction Agent; Resignation; Removal.* The Auction Agent shall be (a) a bank or trust company organized under the laws of the United States or any state or territory thereof having a combined capital stock, surplus and undivided profits of at least $30,000,000, or (b) a member of NASD having a capitalization of at least $30,000,000 and, in either case, authorized by law to perform all the duties imposed upon it by this Bond Indenture and a member of or a participant in, the Securities Depository. The Auction Agent may at any time resign and be discharged of the duties and obligations created by this Bond Indenture by giving at least ninety (90) days notice to the Authority, the Obligated Group Agent, the Bond Insurer and the Bond Trustee. The Auction Agent may be removed (i) at any time by the Obligated Group Agent or (ii) by the Bond Insurer for failure to perform the duties of the Auction Agent hereunder by written notice, delivered to the Auction Agent, the Authority, the Bond Insurer, the Obligated Group Agent and the Bond Trustee. Upon any such resignation or removal, the Bond Trustee, at the direction of the Obligated Group Agent, shall appoint a successor Auction Agent acceptable to the Bond Insurer and meeting the requirements of this Section. In the event of the resignation or removal of the Auction Agent, the Auction Agent shall pay over, assign and deliver any moneys and Bonds held by it in such capacity to its successor. The Auction Agent shall continue to perform its duties hereunder until its successor has been appointed by the Bond Trustee. In the event that the Auction Agent has not been compensated for its services, the Auction Agent may resign by giving thirty (30) days' notice to the Authority, the Obligated Group Agent and the Bond Trustee even if a successor Auction Agent has not been appointed.

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX H**

**FORM OF BOND COUNSEL OPINION**

[THIS PAGE INTENTIONALLY LEFT BLANK]

**Appendix H**

**[Form of Bond Counsel Opinion]**

January 27, 2005

West Virginia Hospital Finance Authority
One Players Club Drive
Charleston, WV 25311

West Virginia University Hospitals, Inc.
Medical Center Drive
PO Box 8059
Morgantown, WV 26506

UBS Financial Services Inc.
1285 Avenue of the Americas
New York, NY 10019

> $30,525,000 West Virginia Hospital Finance Authority
> Hospital Revenue Bonds (West Virginia University Hospitals, Inc.)
> 2005 Series A Auction Rate Certificates (ARCs $^{(SM)}$)
>
> $29,475,000 West Virginia Hospital Finance Authority
> Hospital Revenue Bonds (West Virginia University Hospitals, Inc.)
> 2005 Series B Auction Rate Certificates (ARCs $^{(SM)}$)

Ladies and Gentlemen:

We have served as bond counsel in connection with the issuance by the West Virginia Hospital Finance Authority (the "Authority") of its (i) $30,525,000 Hospital Revenue Bonds (West Virginia University Hospitals, Inc.) 2005 Series A Auction Rate Certificates (ARCs$^{(SM)}$) (the "2005 A Bonds"), and (ii) $29,475,000 Hospital Revenue Bonds (West Virginia University Hospitals, Inc.) 2005 Series B Auction Rate Certificates (ARCs$^{(SM)}$) (the "2005 B Bonds," and, together with the 2005 A Bonds, sometimes hereinafter collectively referred to as the "2005 Bonds"). The 2005 Bonds will be issued pursuant to a Bond Indenture, dated as of January 1, 2005 (the "Bond Indenture"), between the Authority and The Bank of New York, New York, New York, as Bond Trustee (the "Bond Trustee"). The proceeds of the 2005 Bonds will be loaned to the Obligated Group pursuant to a Loan Agreement dated August 1, 2005 (the "Loan Agreement"), between the Authority and West Virginia University Hospitals, Inc., a West Virginia nonprofit corporation (the "Corporation"), as Obligated Group Agent. The obligations of the Obligated Group under the Loan Agreement are evidenced by the 2005-1A Note and the 2005-1B

West Virginia Hospital Finance Authority
West Virginia University Hospitals, Inc.
UBS Financial Services Inc.
January 27, 2005
Page 2 of 5

Note, issued pursuant to an Amended and Restated Master Trust Indenture, dated as of August 1, 2003, as supplemented and amended (the "Master Trust Indenture"), between the Huntington National Bank, Inc. and the Corporation. The Corporation serves as Obligated Group Agent for the Obligated Group under the terms of the Master Trust Indenture. As of the date hereof, the Corporation, City Hospital, Inc., a West Virginia nonprofit corporation, City Hospital Foundation, Inc., a West Virginia nonprofit corporation, and The Charles Town General Hospital d/b/a Jefferson Memorial Hospital, a West Virginia nonprofit corporation are the Members of the Obligated Group. New Members may join or current Members may withdraw from the Obligated Group under the terms and conditions set forth in the Master Trust Indenture.

We have examined the law and such certified proceedings and other papers as we deem necessary to render this opinion. We have also examined an unauthenticated specimen Bond.

The Authority is a body corporate and governmental instrumentality created and existing under the laws of the State of West Virginia (the "State), particularly Chapter 16, Article 29A, of the Code of West Virginia, 1931, as amended (the "Act"), for certain purposes set forth in the Act, including, inter alia, borrowing money and issuing bonds and other evidences of indebtedness to finance or refinance the costs of acquisition, construction, improvement and alteration of hospital facilities as defined in the Act. The 2005 Bonds are issued pursuant to the Act, and other applicable laws, and pursuant to a Resolution of the Authority adopted December 15, 2004, as ratified and affirmed on January 17, 2005 (the "Resolution"), authorizing the issuance of the 2005 Bonds. Proceeds of the 2005 Bonds are issued to (i) currently refund all of the outstanding (a) Berkeley County Building Commission Hospital Revenue Bonds (City Hospital Project) Series 1992, (b) West Virginia Hospital Finance Authority Variable Rate Demand Revenue Bonds (WVHA Pooled Loan Financing Program) 2002 Series C-1 (City Hospital, Inc. Project), (c) Jefferson County Building Commission Hospital Revenue Bonds, Series 2003 (Jefferson Memorial Hospital), (ii) refinance the outstanding loans between (a) Gateway Foundation, Inc. (now City Hospital Foundation, Inc.) and Merrill Lynch Business Financial Services, Inc. ("Merrill Lynch"), dated May 6, 2004, and (b) City Hospital, Inc. and Merrill Lynch dated May 6, 2004, (iii) pay the costs of acquisition, construction, renovation, improvement and equipping of hospital facilities (as defined in the Act) to be owned by Members of the Obligated Group, reimburse certain capital expenditures made or to be made by Members of the Obligated Group at their respective hospital facilities (as defined in the Act), including capitalized interest, and (iv) pay the costs of issuing the 2005 Bonds, including the premium for the issuance of the Insurance Policy by the Bond Insurer (collectively, the "Project").

West Virginia Hospital Finance Authority
West Virginia University Hospitals, Inc.
UBS Financial Services Inc.
January 27, 2005
Page 3 of 5

        The Authority and the Corporation have executed a Tax Compliance Certificate, dated as of the date hereof (the "Tax Certificate"), which, among other things, sets forth restrictions on the investment and expenditure of the 2005 Bonds proceeds and earnings thereon, to ensure that the requirements of the Internal Revenue Code of 1986, as amended, and regulations promulgated pursuant thereto (collectively, the "Code"), necessary to establish and maintain the excludability from gross income for federal income tax purposes of the interest on the 2005 Bonds, are and will continue to be met.

        We have not been engaged or undertaken to review the accuracy, completeness or sufficiency of the Official Statement or other offering material relating to the 2005 Bonds (except to the extent, if any, stated in the Official Statement) and we express no opinion relating thereto.

        As to questions of fact material to our opinion, we have relied upon the representations of the Authority and other entities contained in the herein-described documents and certifications furnished to us by or on behalf of the Authority, without undertaking to verify the same by independent investigation.

        Based upon the foregoing, we are of the opinion, under existing law, as follows:

        1.      The Authority is a body corporate and governmental instrumentality of the State with power to adopt the Resolution, to execute and deliver the Bond Indenture, the Loan Agreement and the Tax Certificate and to perform the agreements on its part contained therein and to issue the 2005 Bonds.

        2.      The Resolution, the Bond Indenture and the Loan Agreement have been duly adopted or authorized by the Authority, are each in full force and effect, and are valid and binding upon the Authority and assuming due authorization, execution and delivery of the Bond Indenture and the Loan Agreement by the other parties thereto, are enforceable against the Authority in accordance with their terms (except to the extent that the enforceability thereof may be limited by the operation of bankruptcy, insolvency and similar laws affecting rights and remedies of creditors).

        3.      The Tax Certificate has been duly authorized, executed and delivered by the Authority and, assuming due authorization, execution and delivery by the other party thereto, constitute valid and binding agreements of the Authority, enforceable against the Authority in accordance with the respective terms thereof.

West Virginia Hospital Finance Authority
West Virginia University Hospitals, Inc.
UBS Financial Services Inc.
January 27, 2005
Page 4 of 5

      4.     The Bond Indenture creates the valid pledge which it purports to create of the Revenues (as defined in the Bond Indenture), and other funds and accounts pledged to the payment of the 2005 Bonds under the Resolution and the Bond Indenture subject to the terms thereof.

      5.     The 2005 Bonds have been duly authorized, executed and delivered by the Authority and, assuming proper authentication, are valid and binding special obligations of the Authority, payable solely from the sources provided therefor in the Resolution and the Bond Indenture.

      6.     In our opinion, based upon an analysis of existing laws, regulations, rulings and court decisions, and assuming, among other matters, the accuracy of certain representations and compliance with certain covenants, interest on the 2005 Bonds is excludable from gross income for federal income tax purposes under Section 103 of the Code. We are of the further opinion that interest on the 2005 Bonds is not a specific preference item for purposes of the federal individual or corporate alternative minimum taxes, although such interest is included in adjusted current earnings when calculating corporate alternative minimum taxable income.

      The Code imposes various restrictions, conditions and requirements relating to the exclusion from gross income for federal income tax purposes of interest on obligations such as the 2005 Bonds. The Authority and the Corporation have covenanted to comply with certain restrictions designed to ensure that interest on the 2005 Bonds will not be included in federal gross income. Failure to comply with these covenants may result in interest on the 2005 Bonds being includable in gross income for federal income tax purposes, possibly from the date of original issuance of the 2005 Bonds. We assume compliance with these covenants. We have not undertaken to determine (or to inform any person) whether any actions taken (or not taken) or events occurring (or not occurring) after the date of issuance of the 2005 Bonds may adversely affect the value of, or the tax status of interest on the 2005 Bonds.

      Certain requirements and procedures contained or referred to in the Resolution, the Bond Indenture, the Loan Agreement and the Tax Certificate, and other relevant documents may be changed and certain actions may be taken or omitted under the circumstances and subject to the terms and conditions set forth in such documents. We express no opinion as to any Bond or the interest thereon if any such change occurs or action is taken or omitted upon the advice or approval of bond counsel other than this firm.

West Virginia Hospital Finance Authority
West Virginia University Hospitals, Inc.
UBS Financial Services Inc.
January 27, 2005
Page 5 of 5

   7.  Under the Act, the 2005 Bonds, and all interest and income thereon, shall be exempt from all taxation by the State of West Virginia and any county, municipality, political subdivision or agency thereof, except inheritance taxes.

   We have also relied upon the opinion of Robert L. Brandfass, as counsel to the Corporation, contained in the Transcript of closing documents relating to the issuance and sale of the 2005 Bonds, as to all matters concerning the due authorization, execution and delivery by, and the binding effect upon and enforceability against, the Obligated Group, of the Loan Agreement and the 2005 Notes, that each member of the Obligated Group is a 501(c)(3) organization within the meaning of the Code, and all other matters set forth therein.

   The rights of the holders of the 2005 Bonds and the enforceability of the 2005 Bonds, the Bond Indenture, the Loan Agreement and the Tax Certificate and the liens and pledges set forth therein may be subject to and limited by bankruptcy laws and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that the enforcement thereof may also be subject to general principles of equity and to the exercise of judicial discretion.

       Very truly yours,


       Spilman Thomas & Battle, PLLC

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX I**

**FORM OF CONTINUING DISCLOSURE AGREEMENT**

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX I

## FORM OF CONTINUING DISCLOSURE AGREEMENT

This Continuing Disclosure Agreement (the "Agreement") dated as of January 1, 2005, from West Virginia University Hospitals, Inc. (the "Obligated Group Agent") to UBS Financial Services, Inc. and Ferris, Baker & Watts, Incorporated, as the initial purchasers (the "Purchasers") of the connection with the offering by the West Virginia Hospital Finance Authority (the "Authority") of its (i) $30,525,000 Hospital Revenue Bonds (West Virginia University Hospitals, Inc.) 2005 Series A Auction Rate Certificate (ARCs$^{(sm)}$) (the "2005 A Bonds") and (ii) $29,475,000 Hospital Revenue Bonds (West Virginia University Hospitals, Inc.) 2005 Series B Auction Rate Certificate (ARCs$^{(sm)}$) (the "2005 B Bonds," and, together with the 2005 A Bonds, sometimes hereinafter collectively referred to as the "2005 Bonds")of the 2005 Bonds which are being issued by the Obligated Group Agent is executed and delivered in connection with the issuance of the 2005 Bonds.  Capitalized terms used in this Agreement shall have the respective meanings specified above or in Article IV hereof.  The Obligated Group Agent certifies as follows:

## ARTICLE I

## The Undertaking

Section 1.1.  Purpose.  This Agreement shall constitute a written undertaking for the benefit of the holders of the 2005 Bonds, and is being executed and delivered solely to assist the Purchasers in complying with subsection (b)(5) of the Rule, as hereinafter defined.

Section 1.2.  Annual Financial Information.  (a) The Obligated Group Agent shall provide Annual Financial Information, including without limitation (i) Audited Financial Statements, with respect to each fiscal year of each Member of the Obligated Group, commencing with the fiscal year ending December 31, 2005, no later than 180 days after the end of its fiscal year, to each NRMSIR and the SID, and (ii) to each NRMSIR and the SID unaudited quarterly operating results relating to each Member of the Obligated Group not later than 60 days following the quarters ending March 31, June 30 and September 30.

(b)    The Obligated Group Agent shall provide in a timely manner, notice of any failure of the Obligated Group Agent to provide the Annual Financial Information by the date specified in subsection (a) above to (i) either the MSRB or each NRMSIR, and (ii) the SID.

Section 1.3.  Material Event Notices.  (a) If a Material Event occurs, the Obligated Group Agent shall provide, in a timely manner, notice of each Material Event to (i) either the MSRB or each NRMSIR, (ii) the SID, and (iii) the Purchasers;

(b) Any such notice of a defeasance of 2005 Bonds shall state whether the 2005 Bonds have been escrowed to maturity or to an earlier redemption date and the date(s) of such maturity or redemption.

Section 1.4.   Additional Disclosure Obligation.   The Obligated Group Agent acknowledges and understands that other state and federal laws, including but not limited to the Securities Act of 1933 and Rule 10b-5 promulgated under the Securities Exchange Act of 1934, may apply to the Obligated Group Agent and that, under some circumstances, additional disclosures or other action in addition to those required by this Agreement may be required to enable the Obligated Group Agent to fully discharge all of its duties and obligations under such laws.  The Obligated Group Agent agrees to voluntarily comply with the requirements of Rule 15(c)(2)(12).

Section 1.5.   Additional Information.   Nothing in this Agreement shall be deemed to prevent the Obligated Group Agent from disseminating any other information, using the means of dissemination set forth in this Agreement or any other means of communication, or including any other information in any Annual Financial Information or notice of Material Event hereunder, in addition to that, which is required by this Agreement.  If the Obligated Group Agent chooses to do so, the Obligated Group Agent shall have no obligation under this Agreement to update such additional information or include it in any future Annual Financial Information or notice of a Material Event hereunder, in addition to that which is required by this Agreement.

Section 1.6.   No Previous Non-Compliance.   The Obligated Group Agent represents on behalf of itself and the other members of the Obligated Group that since January 1, 2000, each Member of the Obligated Group has not failed to comply in any material respect with any previous undertaking in a written contract or agreement, as entered into by such Member, specified in paragraph (b)(5)(i) of the Rule.

Section 1.7.   Filing with Municipal Advisory Council.   Any filing under this Agreement may be made solely by transmitting such filing to the Texas Municipal Advisory Council (the "MAC") as provided at http://www.disclosureusa.org unless the United States Securities and Exchange Commission has withdrawn the interpretive advice in its letter to the MAC dated September 7, 2004.

## ARTICLE II

## Operating Rules

Section 2.1.   Reference to Other Documents.   It shall be sufficient for purposes of this Agreement if the Obligated Group Agent provides Annual Financial Information by specific reference to documents (i) either (1) provided to each NRMSIR existing at the time of such reference and the SID or (2) filed with the SEC, or (ii) if such document is an Official Statement, available from MSRB.

Section 2.2.   Submission of Information.   Annual Financial Information may be provided in one document or multiple documents, and at one time or in part from time to time.

Section 2.3. <u>Transmission of Information and Notices</u>. Unless otherwise required by law, the Obligated Group Agent shall employ such methods of information and notice transmission, as it shall so determine.

Section 2.4. <u>Fiscal Year</u>. The Obligated Group's respective current fiscal years is the twelve-month period ending on December 31. The Obligated Group Agent shall promptly notify (i) each NRMSIR, (ii) the SID and (iii) the Purchasers of each change in the fiscal year of any Member of the Obligated Group.

## ARTICLE III

### Effective Date, Termination, Amendment and Enforcement

Section 3.1. <u>Effective Date; Termination</u>. (a) This Agreement shall be effective upon the issuance of the 2005 Bonds.

(b) The Obligated Group Agent's obligations under this Agreement shall terminate upon a legal defeasance, prior redemption or payment in full of all of the 2005 Bonds.

(c) This Agreement, or any provision hereof, shall be null and void in the event that the Obligated Group Agent (1) delivers to the Purchasers an opinion of Counsel, addressed to the Obligated Group Agent and the Purchasers, to the effect that those portions of the Rule which require this Agreement, or such provision, as the case may be, do not or no longer apply to the 2005 Bonds, whether because such portions of the Rule are invalid, have been repealed, or otherwise, as shall be specified in such opinion, and (2) delivers copies of such opinion to each NRMSIR and the SID.

Section 3.2. <u>Amendment</u>. (a) This Agreement may be amended, by written agreement of the parties, without the consent of the holders of the 2005 Bonds, if all of the following renditions are satisfied: (1) such amendment is made in connection with a change in circumstances that arises from a change in legal (including regulatory) requirements, a change in law (including rules or regulations) or in interpretations thereof, or a change in the identity, nature or status of the Obligated Group Agent or the type of business conducted thereby, (2) this Agreement as so amended would have complied with the requirements of the Rule as of the date of this Agreement, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances, (3) the Obligated Group Agent shall have delivered to the Purchasers an opinion of Counsel, addressed to the Obligated Group Agent and the Purchasers, to the same effect as set forth in clause (2) above, (4) the Obligated Group Agent shall have delivered to the Purchasers an opinion of Counsel or a determination by a person, in each case unaffiliated with the Obligated Group Agent (such as bond counsel or the Purchasers) and acceptable to the Obligated Group Agent, addressed to the Obligated Group Agent and the Purchasers, to the effect that the amendment does not materially impair the interest of the holders of the 2005 Bonds, and (5) the Obligated Group Agent shall have delivered copies of such opinion(s) and amendment to each NRMSIR and the SID.

(b) This Agreement may be amended, by written agreement of the parties, without the consent of the holders of the 2005 Bonds, if all of the following conditions are satisfied: (1) an amendment to the Rule is adopted, or a new or modified official interpretation of the Rule is issued, after the effective date of this Agreement which is applicable to this Agreement (2) the Obligated Group Agent shall have delivered to the Purchasers an opinion of Counsel, addressed to the Obligated Group Agent and the Purchasers, to the effect that performance by the Obligated Group Agent and Purchasers under this Agreement as so amended will not result in a violation of the Rule and that in the opinion of Counsel such change will not materially impair the owners of the 2005 Bonds, and (3) the Obligated Group Agent shall have delivered copies of such opinion and amendment to each NRMSIR and the SID.

(c) To the extent any amendment to this Agreement results in a change in the type of financial information or operating data provided pursuant to this Agreement, the first Annual Financial Information provided thereafter shall include a narrative explanation of the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

(d) If an amendment is made pursuant to Section 3.2(a) hereof to the accounting principles to be followed by the Obligated Group Agent in preparing its financial statements, the Annual Financial Information for the fiscal year in which the change is made shall provide written explanation of such change or changes.

Section 3.3. Benefit; Third-Party Beneficiaries Enforcement. (a) The provisions of this Agreement shall constitute a contract with and inure solely to the benefit of the holders from time to time of the 2005 Bonds, except that beneficial owners of the 2005 Bonds shall be third-party beneficiaries of this Agreement and shall be deemed to be holders of the 2005 Bonds for purposes of Section 3.3(b) hereof. The provisions of this Agreement shall create no rights in any person or entity except as provided in this subsection (a).

(b) The obligations of the Obligated Group Agent to comply with the provisions of this Agreement shall be enforceable (i) in the case of enforcement of obligations to provide Annual Financial Information and Material Event notices, by any holder of Outstanding Bonds, or by the Purchasers on behalf of the holders of Outstanding Bonds, or (ii) in the case of challenges to the adequacy of the Annual Financial Information so provided, by the Purchasers on behalf of the holders of Outstanding Bonds; provided, however, that the Purchasers shall not be required to take any enforcement action except at the direction of the Holders of not less than 25% in aggregate principal amount of the 2005 Bonds at the time Outstanding who shall have provided the Purchasers with adequate security and indemnity. The Holders' and Purchasers' rights to enforce the provisions of this Agreement shall be limited solely to a right by action in mandamus or for specific performance, to compel performance of the Obligated Group Agent's obligations under this Agreement.

(c) Any failure by the Obligated Group Agent or the Purchasers to perform in accordance with this Agreement shall not constitute a default or an Event of Default under the resolution, the Bond Indenture or the 2005 Bonds, and the rights and remedies provided by the

resolution or the 2005 Bonds upon the occurrence of a default or an Event of Default shall not apply to any such failure.

(d) This Agreement shall be construed and interpreted in accordance with the laws of the State of West Virginia, and any suits and actions arising out of this Agreement shall be instituted in a court of competent jurisdiction in the State; provided, however, that to the extent this Agreement addresses matters of federal securities laws, including the rule, this Agreement shall be construed in accordance with such federal securities laws and official interpretations thereof.

## ARTICLE IV

### Definitions

Section 4.1. Definitions. The following items used in this Agreement shall have the following respective meanings:

(1) "Annual Financial Information" means, collectively, (i) the Audited Financial Statements of each Member of the Obligated Group, (ii) the quarterly unaudited financial information described in Section 1.2 of this Agreement, and (iii) the information regarding amendments to this Agreement required pursuant to Sections 3.2 (c) and (d) of this Agreement. Annual Financial Information, except that described in (ii) above, shall include Audited Financial Statements, if available, or Unaudited Financial Statements.

(2) "Audited Financial Statements" means the annual financial statements, if any, of the Obligated Group Agent, audited by such auditor as shall then be required or permitted by State law. Audited Financial Statements shall be prepared in accordance with GAAP. Audited Financial Statements, for purposes of this definition, shall also be deemed to mean any special purpose financial statements, audited by such auditor as shall then be required or permitted by State law, that are prepared specifically for the 2005 Bonds, provided, that such special purpose financial statements shall be prepared in accordance with generally accepted auditing standards.

(3) "Counsel" means Spilman Battle & Thomas PLLC, Charleston, West Virginia, or other nationally recognized bond counsel or counsel expert in federal securities law.

(4) "GAAP" means generally accepted accounting principles as prescribed from time to time for governmental units by the Governmental Accounting Standards Board, the Financial Accounting Standards Board, or any successor to the duties and responsibilities of either of them.

(5) "Material Event" means any of the following events with respect to the 2005 Bonds, whether relating to the Obligated Group Agent or otherwise, if material:

      (i)     principal and interest Payment delinquencies;
      (ii)    non-payment related defaults;
      (iii)   unscheduled draws on debt service reserves reflecting financial difficulties;
      (iv)   unscheduled draws on credit enhancement reflecting financial difficulties;

    (v)     substitution of credit or liquidity providers, or their failure to perform;
    (vi)    adverse tax opinions or events affecting the tax-exempt status of the
            security;
    (vii)   modifications of rights of security holders;
    (viii)  bond calls;
    (ix)    defeasances;
    (x)     release, substitution, or sale of property securing repayment of the
            securities; and
    (xi)    rating changes.

        (6)     "MSRB" means the Municipal Securities Rulemaking Board established pursuant
to Section 15B(b)(1) of the Securities Exchange Act of 1934.

        (7)     "NRMSIR" means, at any time, a then existing nationally recognized municipal
securities information repository, as recognized from time to time by the SEC for the purposes
referred to in the Rule.   The NRMSIRs as of the date of this Agreement and the filing
information relating to such NRMSIRs are set forth in Exhibit A hereto.

        (8)     "Official Statement" means "final official statement", as defined in paragraph
(f)(3) of the Rule.

        (9)     "Rule" means Rule 15c2-12 promulgated by the SEC under the Securities
Exchange Act of 1934 (17 CFR Part 240, § 240.15c2-12), as in effect on the date of this
Agreement, including any official interpretations thereof issued either before or after the
effective date of this Agreement which are applicable to this Agreement.

        (10)    "SEC" means the United States Securities and Exchange Obligated Group Agent.

        (11)    "SID" means, at any time, a then-existing state information depository, if any, as
operated or designated as such by or on behalf of the Obligated Group Agent for the purposes
referred to in the rule.  As of the date of this Agreement, there is no SID.

        (12)    "Unaudited Financial Statements" means the same as Audited Financial
Statements, except that they shall not have been audited.

## ARTICLE V

### Miscellaneous

        Section 5.1.  Counterparts.  This Agreement may be executed in several counterparts,
each of which shall be an original and all of which shall constitute but one and the same
instrument.

        Section 5.2.  Severability.  If any one or more sections, clauses, sentences or parts hereof
shall for any reason be questioned in any court of competent jurisdiction and shall be adjudged
unconstitutional or invalid, such judgment shall not affect, impair or invalidate the remaining

provisions hereof or thereof, or the 2005 Bonds, but shall be confined to the specific sections, clauses, sentences and parts so adjudged.

IN WITNESS WHEREOF, the Obligated Group Agent has caused this Agreement to be executed by its duly authorized representative, all as of the date first above written.

West Virginia University Hospitals, Inc., as Obligated Group Agent

By: _____

Its: _____

## EXHIBIT A

Filing information relating to the Nationally Recognized Municipal Securities Information
Repositories approved by the Securities and Exchange Obligated Group Agent (subject to
change):

Bloomberg Municipal Repository
P.O. Box 840
Princeton, NJ 08542-0840
Internet address:
MUNIS@bloomberg.com
Phone:  (609) 279-3225
Fax:  (609) 279-5962

Thomson NRMSIR
Attn:  Municipal Disclosure
395 Hudson Street, 3rd Floor
New York, NY 10014
Phone (212) 807-5001 or (800) 689-8466
Fax:  (212) 989-2078
E-mail:  Disclosure@tfn.com

DPC Data Inc.
One Executive Drive
Fort Lee, NJ 07024
Phone:  (201) 346-0701
Fax:  (201) 947-0107
E-mail:  nrmsir@dpcdata.com

Standard & Poor's J.J. Kenny Repository
55 Water Street, 45th Floor
New York, NY 10041
Phone:  (212) 438-4595
Fax:  (212) 438-3075

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]