# Exhibit E

**DAC Bond**

NEW ISSUES:  Book-Entry Only

RATINGS: (See "RATINGS" herein)

*In the opinion of Spilman Thomas & Battle, PLLC ("Bond Counsel"), based upon an analysis of existing laws, regulations, rulings and court decisions, and assuming, among other matters, the accuracy of certain representations and compliance with certain covenants, interest on the 2006 Bonds is excludable from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code of 1986 (the "Code"). Bond Counsel is of the further opinion that interest on the 2006 Bonds is not a specific preference item for purposes of the federal individual or corporate alternative minimum taxes, although Bond Counsel observes that such interest is included in adjusted current earnings when calculating corporate alternative minimum taxable income. In addition, under the Act, the 2006 Bonds and all interest and income thereon shall be exempt from all taxation by the State of West Virginia and any county, municipality, political subdivision or agency thereof except inheritance taxes. See "TAX MATTERS" herein for a description of certain provisions of the Code which may affect the tax treatment of interest on the 2006 Bonds for certain Bondowners.*

**$231,635,000**

## WEST VIRGINIA HOSPITAL FINANCE AUTHORITY

**West Virginia United Health System Obligated Group**

**Hospital Revenue Bonds**

W West Virginia
V United Health System

**(United Hospital Center, Inc. Project)**

$78,610,000 2006 Series A (Fixed Rate Bonds)

$46,150,000 2006 Series B (Auction Rate Certificates (ARCs$^{(SM)}$)

$46,500,000 2006 Series C (Auction Rate Certificates (ARCs$^{(SM)}$)

$60,375,000 2006 Series D (Auction Rate Certificates (ARCs$^{(SM)}$)

Dated:  Date of Issuance                    Price: As shown on the inside cover                    Due:  June 1, as shown herein

The 2006 Bonds will be issued and secured under the Bond Indenture (the "Bond Indenture") between the West Virginia Hospital Finance Authority (the "Authority") and The Bank of New York, New York, New York, as bond trustee (the "Bond Trustee"). The 2006 Bonds, when issued, will be registered initially only in the name of Cede & Co., as registered owner and nominee of The Depository Trust Company, New York, New York ("DTC"). DTC will act as securities depository for the 2006 Bonds. Purchasers of the 2006 Bonds will not receive certificates representing their interests in the 2006 Bonds purchased. Ownership by the beneficial owners of the 2006 Bonds will be evidenced by book-entry only. Principal of, premium, if any, and interest on the 2006 Bonds will be paid by the Bond Trustee to DTC, which in turn will remit such principal, premium, if any, and interest payments to its participants for subsequent disbursement to the beneficial owners of 2006 Bonds. As long as Cede & Co. is the registered owner as nominee of DTC, payments on the 2006 Bonds will be made to such registered owner, and disbursement of such payments will be the responsibility of DTC and its participants. See "THE 2006 BONDS - Book-Entry System."

The 2006 Series A Bonds will be initially issued as fixed rate bonds. The 2006 Series B Bonds, 2006 Series C Bonds and 2006 Series D Bonds will be initially issued as Auction Rate Certificates (ARCs$^{(SM)}$). The 2006 Bonds are issuable in fully registered form without coupons initially, with respect to the Auction Rate Certificates, in denominations of (i) $100,000 and $5,000 multiples in excess thereof, during any Daily Rate Period or Weekly Rate Period, hereinafter defined, (ii) $25,000 and integral multiples thereof, during any Auction Rate Period, hereinafter defined, and (iii) $5,000 and any integral multiple thereof during any Fixed Rate Period; and with respect to the 2006 A Bonds, in denominations of $5,000 and any integral multiple thereof.

BY VIRTUE OF THE OBLIGATIONS OF THE OBLIGATED GROUP UNDER THE MASTER INDENTURE, THE 2006 BONDS ARE ON PARITY WITH THE 1998 AUTHORITY BONDS, THE 2005 AUTHORITY BONDS AND THE 2006 AUTHORITY BONDS, HEREINAFTER DEFINED, AS TO LIEN ON GROSS RECEIPTS, HEREINAFTER DEFINED, AND SOURCE OF PAYMENT. THE 2006 BONDS ARE SPECIAL OBLIGATIONS OF THE AUTHORITY, PAYABLE SOLELY FROM AND SECURED BY A PLEDGE OF REVENUES AND FUNDS PROVIDED THEREFOR UNDER THE BOND INDENTURE. THE 2006 BONDS SHALL NOT CONSTITUTE A DEBT OR A PLEDGE OF THE FAITH AND CREDIT OR TAXING POWER OF THE STATE OF WEST VIRGINIA OR OF ANY COUNTY, MUNICIPALITY OR ANY OTHER POLITICAL SUBDIVISION OF THE STATE OF WEST VIRGINIA. THE AUTHORITY HAS NO TAXING POWER.

Interest on the 2006 A Bonds will be payable semi-annually on June 1 and December 1 of each year, commencing December 1, 2006. The Auction Rate Certificates will bear interest from the date of initial delivery at a rate established prior to the issuance of the Auction Rate Certificates to and including the Initial Interest Payment Date (as herein defined). Thereafter, for each Auction Period, the Auction Rate Certificates will bear interest at the Auction Rate determined pursuant to the Auction Procedures as described herein, payable as described (and subject to modification as provided) in APPENDIX E – "PROVISIONS RELATING TO AUCTION AND SETTLEMENT PROCEDURES FOR THE AUCTION RATE CERTIFICATES" hereto. Prospective purchasers of the Auction Rate Certificates should carefully review the Auction Procedures, and should note that such procedures provide that (i) a Bid or Sell Order (as hereinafter defined) constitutes a commitment to purchase or sell Auction Rate Certificates based upon the results of an Auction (as hereinafter defined), (ii) Auctions may be conducted through telephone communications, (iii) settlement for purchases and sales will be made on the Business Day following an Auction, and (iv) Auctions may be suspended under certain circumstances as described herein. Beneficial interests in Auction Rate Certificates may be transferred only pursuant to a Bid or Sell Order placed in an Auction or to or through a Broker-Dealer (as herein defined).

At any given time, a series of the Auction Rate Certificates may operate in any one (but not more than one) of the following Rate Periods: the Auction Rate Period, Daily Rate Period, Weekly Rate Period or Fixed Rate Period. A series of the Auction Rate Certificates shall bear interest at the Auction Rates established for Auction Periods until a Daily Rate Conversion Date, Weekly Rate Conversion Date or Fixed Rate Conversion Date. Subject to certain conditions described herein, Auction Rate Certificates operating in any one Rate Period (other than the Fixed Rate Period) may be converted to another Rate Period, and will be subject to mandatory tender. This Official Statement describes only Auction Rate Certificates operating in the Auction Rate Period. Supplemental disclosure materials will be made available to investors in connection with any conversion of Auction Rate Certificates to another Rate Period.

The 2006 Bonds are secured under the provisions of the Bond Indenture and the Master Indenture (as defined herein), and the 2006 Bonds are payable solely from revenues and other moneys derived by the Authority from payments made under the Loan Agreement (as described herein) between the Authority and the Obligated Group Agent, as described herein, and from the 2006-1A Note, 2006-1B Note, 2006-1C Note and the 2006-1D Note (as herein defined), respectively, issued by the Obligated Group, as herein defined, pursuant to the Master Indenture. The sources of payment of, and security for, the 2006 Bonds are more fully described in this Official Statement.

There are risks associated with the purchase of the 2006 Bonds. For a discussion of certain of these risks, see the caption "CERTAIN BONDHOLDERS RISKS."

THE 2006 BONDS WILL BE SUBJECT TO MANDATORY TENDER AND REDEMPTION PRIOR TO MATURITY, AS DESCRIBED IN THIS OFFICIAL STATEMENT

Payment of the principal of and interest on the 2006 Bonds when due will be insured by a municipal bond insurance policy to be issued by Ambac Assurance Corporation simultaneously with the delivery of the 2006 Bonds.

***Ambac***

*The 2006 Bonds are offered when, as and if issued by the Authority and accepted by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of the legality of the 2006 Bonds by Spilman Thomas & Battle, PLLC, Charleston, West Virginia, Bond Counsel. Legal matters pertinent to the financing will be passed upon for the Obligated Group by its Counsel, Robert L. Brandfass, Esquire, Fairmont, West Virginia; for the Authority by its Counsel, Bowles Rice McDavid Graff & Love LLP Charleston, West Virginia; and for the Underwriter by its Counsel, Steptoe & Johnson PLLC, Charleston, West Virginia. It is expected that the 2006 Bonds will be available for book-entry delivery to DTC in New York, New York on or about June 8, 2006.*

**UBS Investment Bank**                                                      **Ferris, Baker Watts, Incorporated**

Dated: May 31, 2006

$231,635,000
## WEST VIRGINIA HOSPITAL FINANCE AUTHORITY
### WEST VIRGINIA UNITED HEALTH SYSTEM OBLIGATED GROUP
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project)**
consisting of:

$78,610,000
Series 2006 A
(Fixed Rate Bonds)

### SERIAL BONDS

| Due (June 1) | Principal Amount | Coupon | Yield | CUSIP |
|---|---|---|---|---|
| 2015 | $ 1,480,000 | 5.000 % | 4.160% | 956622WN0 |
| 2016 | 1,550,000 | 5.000 | 4.220 | 956622WP5 |
| 2017 | 1,630,000 | 4.000 | 4.300 | 956622WQ3 |
| 2018 | 1,695,000 | 5.000 | 4.380 | 956622WR1 |
| 2019 | 1,780,000 | 5.000 | 4.430 | 956622WS9 |
| 2020 | 1,870,000 | 5.000 | 4.470 | 956622WT7 |

### TERM BONDS

| Due (June 1) | Principal Amount | Coupon | Yield | CUSIP |
|---|---|---|---|---|
| 2022 | $ 4,020,000 | 5.000 % | 4.530 % | 956622WU4 |
| 2024 | 4,435,000 | 5.000 | 4.570 | 956622WV2 |
| 2026 | 4,875,000 | 4.500 | 4.680 | 956622WW0 |
| 2031 | 14,320,000 | 4.750 | 4.780 | 956622WX8 |
| 2034 | 10,300,000 | 4.500 | 4.790 | 956622WY6 |
| 2037 | 11,825,000 | 5.125 | 4.620 | 956622WZ3 |
| 2041 | 18,830,000 | 5.250 | 4.650 | 956622XA7 |

| $46,150,000 | $46,500,000 | $60,375,000 |
|---|---|---|
| Series 2006 B | Series 2006 C | Series 2006 D |
| (Auction Rate Certificates (ARCs(SM))) | (Auction Rate Certificates (ARCs (SM))) | (Auction Rate Certificates (ARCs (SM))) |

### PRICE: 100%

| Series | Initial Auction Date | Auction Day Generally | Initial Interest Payment Date | Interest Payment Date Generally | Length of Initial Period | Final Maturity Date | CUSIP |
|---|---|---|---|---|---|---|---|
| 2006B | 6/19/2006 | Every Monday | 6/20/2006 | Tuesday | 7 Days | 6/1/2041 | 956622WK6 |
| 2006C | 6/20/2006 | Every Tuesday | 6/21/2006 | Wednesday | 7 Days | 6/1/2041 | 956622WL4 |
| 2006D | 6/22/2006 | Every Thursday | 6/23/2006 | Friday | 7 Days | 6/1/2041 | 956622WM2 |

The Auction Rate Certificates will bear interest from their original delivery date to the initial Interest Payment Date set forth above at the applicable rate for the respective series established by the Underwriter prior to the original delivery date. Thereafter, subject to conversion of the Interest Rate Period to a different Interest Rate Period, each series of the Auction Rate Certificates will bear interest at the applicable Auction Rate determined for the respective Auction Periods in accordance with the Auction Procedures described in APPENDIX E. Interest will be payable on the Initial Interest Payment Date set forth above and thereafter on the Business Day following the end of each Auction Period for the respective series of Auction Rate Certificates.

UBS Securities LLC will be the Broker-Dealer for each series of Auction Rate Certificates, and Ferris, Baker Watts, Incorporated will be a Broker-Dealer for the 2006 Series C and 2006 Series D Auction Rate Certificates. Deutsche Bank Trust Company Americas will serve as the Auction Agent.

In the event any 2006 Bonds bear interest at the Auction Rate, if such June 1 is not an Interest Payment Date, the Maturity Date shall be the Interest Payment Date immediately preceding such June 1.

NO BROKER, DEALER, SALESMAN OR OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS OFFICIAL STATEMENT IN CONNECTION WITH THE OFFERING MADE HEREBY AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE AUTHORITY, THE OBLIGATED GROUP OR THE UNDERWRITERS. NEITHER THE DELIVERY OF THIS OFFICIAL STATEMENT NOR ANY SALE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE AUTHORITY OR THE OBLIGATED GROUP SINCE THE DATE HEREOF. THIS OFFICIAL STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY, NOR SHALL THERE BE ANY SALE OF THE 2006 BONDS IN ANY JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE. THE AUTHORITY NEITHER HAS NOR ASSUMES ANY RESPONSIBILITY AS TO THE ACCURACY OF THE INFORMATION IN THIS OFFICIAL STATEMENT, (OTHER THAN THAT UNDER THE HEADINGS "INTRODUCTORY STATEMENT" (TO THE EXTENT IT CONTAINS INFORMATION PERTAINING TO THE AUTHORITY), "NO LITIGATION" (TO THE EXTENT IT CONTAINS INFORMATION PERTAINING TO THE AUTHORITY), AND "THE AUTHORITY," ALL OF WHICH HAS BEEN FURNISHED BY OTHERS.

THE UNDERWRITERS HAVE PROVIDED THE FOLLOWING SENTENCE FOR INCLUSION IN THIS OFFICIAL STATEMENT: THE UNDERWRITERS HAVE REVIEWED THE INFORMATION IN THIS OFFICIAL STATEMENT IN ACCORDANCE WITH, AND AS PART OF, THEIR RESPECTIVE RESPONSIBILITIES TO INVESTORS UNDER THE FEDERAL SECURITIES LAWS AS APPLIED TO THE FACTS AND CIRCUMSTANCES OF THIS TRANSACTION, BUT THE UNDERWRITERS DO NOT GUARANTEE THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.

CERTAIN STATEMENTS CONTAINED IN THIS OFFICIAL STATEMENT REFLECT NOT HISTORICAL FACTS BUT FORECASTS AND "FORWARD-LOOKING STATEMENTS." IN THIS RESPECT, THE WORDS "ESTIMATE," "PROJECT," "ANTICIPATE," "EXPECT," "INTEND," "BELIEVE" AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. ALL PROJECTIONS, FORECASTS, ASSUMPTIONS, EXPRESSIONS OF OPINIONS, ESTIMATES AND OTHER FORWARD-LOOKING STATEMENTS ARE EXPRESSLY QUALIFIED IN THEIR ENTIRETY BY THE CAUTIONARY STATEMENTS S ET FORTH IN THIS OFFICIAL STATEMENT.

THE 2006 BONDS HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR WITH ANY STATE SECURITIES COMMISSION.

IN CONNECTION WITH THE OFFERING OF THE 2006 BONDS, THE UNDERWRITERS MAY OVER ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE 2006 BONDS OFFERED HEREBY AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

OTHER THAN WITH RESPECT TO INFORMATION CONCERNING AMBAC ASSURANCE CORPORATION ("AMBAC") CONTAINED UNDER THE CAPTION "BOND INSURANCE" AND **APPENDIX D- "FORM OF BOND INSURANCE POLICY"** HEREIN, NONE OF THE INFORMATION IN THIS OFFICIAL STATEMENT HAS BEEN SUPPLIED OR VERIFIED BY AMBAC AND AMBAC MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO (I) THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION; (II) THE VALIDITY OF THE 2006 BONDS; OR (III) THE TAX EXEMPT STATUS OF THE INTEREST ON THE 2006 BONDS.

## TABLE OF CONTENTS

INTRODUCTORY STATEMENT .............................................................. 1

THE AUTHORITY ....................................................................... 6

THE PROJECT ......................................................................... 8

THE 2006 BONDS ...................................................................... 8

SECURITY FOR THE 2006 BONDS ......................................................... 31

BOND INSURANCE ...................................................................... 32

PLAN OF FINANCE ..................................................................... 35

ESTIMATED SOURCES AND USES OF FUNDS ................................................. 36

DEBT SERVICE REQUIREMENTS ........................................................... 37

THE OBLIGATED GROUP ................................................................. 38

CERTAIN BONDHOLDERS' RISKS .......................................................... 38

NO LITIGATION ....................................................................... 68

UNDERWRITING ........................................................................ 68

TAX MATTERS ......................................................................... 69

RATINGS ............................................................................. 71

LEGAL MATTERS ....................................................................... 72

FINANCIAL STATEMENTS ................................................................ 72

FINANCIAL ADVISOR ................................................................... 72

CONTINUING DISCLOSURE ............................................................... 73

MISCELLANEOUS ....................................................................... 73

APPENDIX A –  INFORMATION CONCERNING THE SYSTEM AND THE OBLIGATED GROUP ........  A-1
APPENDIX B –  FINANCIAL STATEMENTS OF WEST VIRGINIA UNITED HEALTH SYSTEM, INC. .....  B-1
APPENDIX C –  DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS .  C-1
APPENDIX D –  FORM OF BOND INSURANCE POLICY ..........................................  D-1
APPENDIX E–  PROVISIONS RELATING TO AUCTION AND SETTLEMENT PROCEDURES  FOR THE
              AUCTION RATE CERTIFICATES  .............................................. E-1
APPENDIX F –  FORM OF BOND COUNSEL OPINION ...........................................  F-1
APPENDIX G –  FORM OF CONTINUING DISCLOSURE AGREEMENT ...........................  G-1

**OFFICIAL STATEMENT**
**relating to**

**$231,635,000**
**WEST VIRGINIA HOSPITAL FINANCE AUTHORITY**
**West Virginia United Health System Obligated Group**
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project)**

**$78,610,000 2006 Series A (Fixed Rate Bonds)**
**$46,150,000 2006 Series B (Auction Rate Certificates (ARCs[sm]))**
**$46,500,000 2006 Series C (Auction Rate Certificates (ARCs[sm]))**
**$60,375,000 2006 Series D (Auction Rate Certificates (ARCs[sm]))**

**INTRODUCTORY STATEMENT**

**Purpose of this Official Statement**. The purpose of this Official Statement, including the cover page and the appendices hereto, is to set forth information in connection with the offering by the West Virginia Hospital Finance Authority (the "Authority") of its (i) $78,610,000 West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series A (the "2006 A Bonds"), (ii) $46,150,000 West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series B Auction Rate Certificates (ARCs[sm]) (the "2006 B Bonds"), (iii) $46,500,000 West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series C Auction Rate Certificates (ARCs[sm]) (the "2006 C Bonds"), and (iv) $60,375,000 West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series D Auction Rate Certificates (ARCs[sm]) (the "2006 D Bonds," and together with the 2006 B Bonds and the 2006 C Bonds, sometimes herein referred to as the "Auction Rate Certificates" or "ARCs," and collectively with the 2006 A Bonds, the 2006 B Bonds and the 2006 C Bonds sometimes herein collectively referred to as the "2006 Bonds"). The 2006 Bonds will be issued pursuant to a Bond Indenture, dated as of June 1, 2006 (the "Bond Indenture"), between the Authority and The Bank of New York, New York, New York, as Bond Trustee (the "Bond Trustee"). The Authority is a public body corporate and governmental instrumentality of the State of West Virginia. Certain capitalized terms used herein are defined in **APPENDIX C - "DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS."**

**Use of Proceeds**. The proceeds of the sale of the 2006 Bonds will be used, together with an approximately $45 million contribution to be made by certain Members of the Obligated Group (as hereinafter defined) to (i) finance the acquisition, construction and equipping of a new hospital facility for United Hospital Center, Inc., a West Virginia nonprofit corporation ("UHC"), to be located in the City of Bridgeport, Harrison County, West Virginia, consisting of approximately 650,000 square feet, with a total of 318 beds, including 217 medical and surgical beds, 28 intensive care beds, 20 pediatric beds, 21 OB/GYN beds and 32 skilled nursing beds; (ii) pay interest on the 2006 Bonds for a period

1

of approximately 36 months; and (iii) pay costs of issuing the 2006 Bonds, including the cost of a financial guaranty insurance policy. See "**THE PROJECT**" and "**PLAN OF FINANCE**" herein.

**The Obligated Group**. The Members of the Obligated Group, hereinafter defined are, or will be, on the date of delivery of the 2006 Bonds (i) West Virginia University Hospitals, Inc. ("WVUH"), (ii) UHC, (iii) City Hospital, Inc. ("City"), (iv) The Charles Town General Hospital, d/b/a Jefferson Memorial Hospital ("Jefferson") and (v) City Hospital Foundation, Inc. (the "Foundation"). All of the Members of the Obligated Group are West Virginia nonprofit corporations, are exempt from federal income tax under Section 501(a) of the Internal Revenue Code of 1986, as amended (the "Code") as organizations described in Section 501(c)(3) of the Code, and, except for the Foundation, are "hospitals" as defined in Article 29A, Chapter 16 of the Code of West Virginia, 1931, as amended (the "Act"). In connection with the issuance and delivery of the 2006 Bonds, WVUH, as Obligated Group Agent (the "Obligated Group Agent"), will become a party to a Loan Agreement dated as of June 1, 2006 (the "Loan Agreement"), with the Authority, pursuant to which the Obligated Group Agent will deliver to the Authority concurrently with the delivery of the 2006 Bonds, its promissory notes (the "Notes") evidencing the Obligated Group's joint and several obligation to make payments in amounts sufficient to pay the 2006 Bonds. The 2006 Bonds are payable solely from and are secured by a grant of a security interest in and an assignment and pledge to the Bond Trustee of (a) all right, title and interest of the Authority in the Revenues, (b) all right, title and interest of the Authority in and to the Notes assigned hereunder for the payment of the 2006 Bonds, (c) all right, title and interest of the Authority in and to the Loan Agreement (other than the right to indemnification, reimbursement and payment of its fees and expenses, to receive notices and to grant approvals, consents and waivers (the "Unassigned Rights")), and (d) any and all other property of every kind and nature from time to time hereafter, by delivery or by writing of any kind conveyed, pledged, assigned or transferred as and for additional security thereunder by the Authority or the Obligated Group or by anyone on their behalf to the Bond Trustee, including, without limitation, funds of the Obligated Group held by the Bond Trustee as security for the 2006 Bonds.

**West Virginia United Health System, Inc.** The West Virginia United Health System, Inc. (the "System") is a West Virginia non-profit corporation with facilities in West Virginia. The System is not a Member of the Obligated Group. The System is the parent corporation for a health care system that operates hospitals and other health care facilities and engages in other health care related activities. The System is the sole member of WVUH and UHC. The System was formed to assist WVUH and UHC to fulfill their charitable and academic missions in a changing health care environment. The mission of the System is to serve as a regional integrated delivery system, which provides the full range of both inpatient and outpatient health care service to the residents of West Virginia, western Maryland, and southwestern Pennsylvania. In meeting this mission in its defined service area, WVUH and UHC play a significant role in improving the general health care of the community. The strategic plan of the System states an intent to build a regional health care delivery system in its service area, while offering a variety of options for providers who want to participate. The System maintains a demonstrated commitment to assist rural communities in preserving and improving the health care available to the patients it serves. In recognition of the critical role the System plays in the economics of the communities it serves, the System's mission also includes the objective to operate in a financially responsible manner.

2

On January 1, 2005, WVUH became the sole member of West Virginia University Hospitals East, Inc. ("WVUHE"), a West Virginia nonprofit corporation which is the sole member of (i) City, (ii) Jefferson (City and Jefferson sometimes collectively referred to herein as the "Acquired Hospitals"), and (iii) the Foundation (the Foundation and the Acquired Hospitals sometimes collectively referred to herein as "Acquired Corporations"), each a West Virginia nonprofit corporation.

The System has all powers available to a corporation under West Virginia law. The System's Affiliation Agreement dated December 19, 1996, and the articles of incorporation and bylaws of the System, WVUH and UHC empower the System to, among other things, elect and remove any member of the governing boards of WVUH, UHC and/or their subsidiaries, approve amendments to their articles of incorporation and by-laws, approve any mergers, direct capital contributions to the System, approve all budgets, direct inter-company fund transfers, approve non-budgeted acquisitions, purchases, sales or other asset dispositions in excess of $1,000,000, and to approve the incurrence of material debt and key affiliations between System members and third parties. For additional information regarding the System, see **APPENDIX A - "INFORMATION CONCERNING THE SYSTEM AND THE OBLIGATED GROUP**."

**Outstanding Obligations; Parity Notes**. The Authority has previously issued its (i) $30,525,000 Hospital Revenue Bonds (West Virginia University Hospitals, Inc.) 2005 Series A, Auction Rate Certificates (ARCs$^{(sm)}$) (the "2005 A Bonds"), and (ii) $29,475,000 Hospital Revenue Bonds (West Virginia University Hospitals, Inc.) 2005 Series B, Auction Rate Certificates (ARCs$^{(sm)}$) (the "2005 B Bonds" and together with the 2005 A Bonds, sometimes hereinafter collectively referred to as the "2005 Authority Bonds"). The 2005 Authority Bonds were issued pursuant to a Bond Trust Indenture, dated as of January 1, 2005 (the "Bond Indenture"), between the Authority and The Bank of New York, New York, New York, as Bond Trustee (the "2005 Authority Bonds Trustee").

Proceeds of the 2005 Authority Bonds were used to refinance by currently refunding all of the outstanding (a) $23,640,000 Berkeley County Building Commission Hospital Revenue Bonds (City Hospital Project) Series 1992 (the "Series 1992 Bonds"), (b) $4,925,000 West Virginia Hospital Finance Authority Variable Rate Demand Revenue Bonds (WVHA Pooled Loan Financing Program) 2002 Series C -1 (City Hospital, Inc. Project) (the "Series 2002 Bonds"), (c) $1,865,000 Jefferson County Building Commission Hospital Revenue Bonds, Series 2003 (Jefferson Memorial Hospital) (the "Series 2003 Bonds"), (d) a loan between Gateway Foundation, Inc. (which is the former name of the Foundation), and Merrill Lynch Business Financial Services, Inc. ("Merrill Lynch") dated May 6, 2004 and (e) a loan between City Hospital, Inc. and Merrill Lynch dated May 6, 2004 (collectively, the "Merrill Lynch Debt").

The Authority has also previously issued its (i) $23,530,000 Hospital Refunding Revenue Bonds (West Virginia University Hospitals, Inc.) 2003 Series A (the "2003 A Bonds"), (ii) $25,800,000 Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series B Auction Rate Certificate (ARCs$^{(sm)}$) (the "2003 B Bonds"), (iii) $44,650,000 Hospital Revenue Refunding and Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series C Auction Rate Certificate (ARCs$^{(sm)}$) (the "2003 C Bonds"), and (iv) $45,750,000 Hospital Revenue Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series D Auction Rate Certificate (ARCs$^{(sm)}$) (the "2003 D

3

Bonds," and, together with the 2003 A Bonds, the 2003 B Bonds and the 2003 C Bonds, sometimes hereinafter collectively referred to as the "2003 Authority Bonds"). The 2003 Authority Bonds were issued pursuant to a Bond Trust Indenture, dated as of August 1, 2003 (the "2003 Bond Indenture"), between the Authority and The Bank of New York, New York, New York, as Bond Trustee (the "2003 Authority Bonds Trustee").

Proceeds of the 2003 Authority Bonds were used to (i) currently refund all of those certain West Virginia Hospital Finance Authority Hospital Revenue Refunding Bonds, West Virginia University Hospitals, Inc. Issue, Series 1993, issued in the original aggregate principal amount of $72,935,000 and all of those certain West Virginia Hospital Finance Authority Weekly Rate Demand Refunding Revenue Bonds (West Virginia University Hospitals, Inc. Project) Series 2002 B-1; (ii) reimburse the costs of certain capital expenditures made by WVUH at its hospital facilities (as defined in the Act), and (iii) pay costs of issuing the 2003 Authority Bonds.

The Authority has also previously issued its $44,345,000 Hospital Improvement and Refunding Revenue Bonds (West Virginia University Hospitals, Inc.) Series 1998 (the "1998 Authority Bonds"), pursuant to a Bond Trust Indenture dated as of October 15, 1998 (the "1998 Bond Indenture"), between the Authority and The Huntington National Bank, as bond trustee (the "1998 Bonds Trustee"). Proceeds of the 1998 Authority Bonds were used to (i) reimburse WVUH for costs incurred in connection with the acquisition of substantially all of the assets used or useful in the operation of the facility doing business as "Chestnut Ridge Hospital," in the City of Morgantown, West Virginia, the site thereof and certain equipment therein; (ii) acquire and install new hospital equipment; (iii) acquire, construct and equip a new facility for temporarily housing patients and family members and the site thereof; (iv) refinance the existing indebtedness incurred by WVUH in connection with the issuance of the Authority's Insured Hospital Revenue Bonds, West Virginia University Hospitals, Inc. Issue, Series 1986 (the "Series 1986 Bonds"), to accomplish the refunding of all outstanding Series 1986 Bonds; and (v) pay costs of issuing the Series 1998 Authority Bonds.

**BY VIRTUE OF THE OBLIGATIONS OF THE OBLIGATED GROUP UNDER THE MASTER INDENTURE, HEREINAFTER DEFINED, THE 2006 BONDS ARE ON A PARITY WITH THE 2005 AUTHORITY BONDS, THE 2003 AUTHORITY BONDS AND THE 1998 AUTHORITY BONDS AS TO LIEN ON GROSS RECEIPTS, HEREINAFTER DEFINED, AND SOURCE OF PAYMENT.**

**Security for 2006 Bonds**. As described above, the 2006 Bonds are special, limited obligations of the Authority, payable from pledged Revenues held by the Bond Trustee under the Bond Indenture, including payments made by the Obligated Group pursuant to the Notes and the Loan Agreement. Payments on the Notes, in the aggregate, are required to be in an amount sufficient (1) to pay in full, when due, the aggregate principal of, premium, if any, and interest on the 2006 Bonds to their respective dates of maturity or earlier redemption, and (2) to pay certain expenses. The Notes will be the eighth, ninth, tenth and eleventh notes issued under an Amended and Restated Master Trust Indenture, dated as of August 1, 2003 between WVUH and The Huntington National Bank, as Master Trustee (the "Master Trustee"), as supplemented by Supplemental Master Trust Indenture No. 2003-1 ("Supplemental Master Trust Indenture No. 2003-1"), dated as of August 1, 2003, and as further

4

supplemented by Supplemental Master Trust Indenture No. 2005-1 ("Supplemental Master Trust Indenture No. 2005-1), dated as of January 1, 2005, and as further supplemented by Supplemental Master Trust Indenture No. 2006-1 ("Supplemental Master Trust Indenture No. 2006-1"), and Supplemental Master Trust Indenture No. 2006-2 ("Supplemental Master Trust Indenture No. 2006-2"), between WVUH and the Master Trustee (such Amended and Restated Master Trust Indenture, as supplemented, being herein referred to as the "Master Indenture").

**The Notes will be on parity with (i) the 2005 Notes issued by WVUH in connection with the issuance of the 2005 Authority Bonds, (ii) the 2003 Notes issued by WVUH in connection with the issuance of the 2003 Authority Bonds, and (ii) the Series 4 Note issued by WVUH, in connection with the issuance of the Series 1998 Authority Bonds. The Series 4 Note was issued under a Master Trust Indenture, dated as of April 1, 1985, as supplemented (the "Prior Master Indenture"). WVUH's Series 1 Note, Series 2 Note and Series 3 Note issued under the Prior Master Indenture have been defeased and are no longer outstanding. WVUH's Series 4 Note, issued to evidence the Obligated Group's loan obligation in connection with the issuance of the Series 1998 Bonds, remains Outstanding.**

Except as provided below, the 2006 Bonds will not be payable from any other Notes issued under the Master Indenture or secured by the funds, accounts and subaccounts securing any Related Bonds, hereinafter defined, as described below.

The Master Indenture created an "Obligated Group" which to date includes WVUH, City, Jefferson and the Foundation and, upon or prior to delivery of the 2006 Bonds, will also include UHC. The Master Indenture permits other entities, upon compliance with certain conditions, to become Members of the Obligated Group and to issue Notes thereunder. Each Member of the Obligated Group will, subject to the right of such Member to withdraw from the Obligated Group under certain conditions, jointly and severally covenant to make any and all payments promptly on all Notes theretofore or thereafter issued under the Master Indenture, including the Series 4 Note, the 2003 Notes, the 2005 Notes and the Notes, according to the terms thereof. See **APPENDIX C**.

**WVUH, UHC, CITY, JEFFERSON and THE FOUNDATION are or will be on the date of delivery of the 2006 Bonds, the only members of the Obligated Group and are the only entities that have any liability for purposes of payment on the notes.**

Under the Master Trust Indenture, the Notes are general obligations of the Obligated Group and are secured by a security interest in the Gross Receipts of the Members of the Obligated Group, on parity with the security interest in the Gross Receipts of the Obligated Group granted to holders of the 2005 Notes, the 2003 Notes and the Series 4 Note. The Notes are not secured by a mortgage or other lien on the physical assets of any member of the Obligated Group. The Master Indenture requires, however, that each Member of the Obligated Group agrees that it will not create or suffer to exist any Lien, other than certain Permitted Liens, upon any Property, as described below. See **APPENDIX C**.

Ambac Assurance Corporation (the "Bond Insurer") has committed to issue, effective as of the date on which the 2006 Bonds are delivered, the Municipal Bond Insurance Policy, hereinafter defined,

which unconditionally and irrevocably guarantees the scheduled payment of the principal of and interest on the 2006 Bonds, as the same become due and payable in accordance with their stated terms. The Municipal Bond Insurance Policy is non-cancelable for any reason. See the caption "Bond Insurance" herein and the specimen Municipal Bond Insurance Policy in **APPENDIX D - "FORM OF BOND INSURANCE POLICY."**

In the Master Indenture, the Obligated Group covenants and agrees to operate all Facilities on a revenue producing basis and to comply with certain other business financial covenants. A more detailed description of the covenants is included in **APPENDIX C**.

The Members of the Obligated Group, upon compliance with the terms and conditions and for the purposes described herein, may issue additional Indebtedness under the Master Indenture.

**General**. Risks associated with the purchase of the 2006 Bonds are discussed herein under the caption "Certain Bondholders' Risks."

All capitalized terms in this Official Statement, unless otherwise defined or the context otherwise indicates, shall have the same meanings as in the Master Indenture, the Loan Agreement and the Bond Indenture. Certain of these definitions are summarized in **APPENDIX C**.

The descriptions and summaries of various documents hereinafter set forth do not purport to be comprehensive or definitive, and reference is made to each document for the complete details of all terms and conditions. All statements herein are qualified in their entirety by reference to each such document. Copies of the Master Indenture, the Loan Agreement, the Continuing Disclosure Agreement, hereinafter defined, and the Bond Indenture are available in reasonable quantities upon request to the Authority.

## THE AUTHORITY

The West Virginia Hospital Finance Authority was established by the Act in 1984 as a body corporate and a governmental instrumentality of the State. The Authority commenced operations in 1985. The Authority is authorized by the Act to provide hospitals with appropriate means to maintain, expand, enlarge and establish health care, hospital and other related facilities and to provide hospitals with the ability to finance or refinance indebtedness pursuant to a hospital loan program as provided in the Act. The Authority's offices are located currently at One Players Club Drive, Charleston, West Virginia 25311, and its telephone number is (304) 558-0549.

The Authority is controlled, managed and operated by the West Virginia Hospital Finance Board (the "Board"). The Board is composed of seven members, including two ex-officio members, the Secretary of the State Department of Health and Human Resources and the Treasurer of the State. The remaining five members of the Board are appointed by the Governor with the advice and consent of the State Senate and serve terms of six years. Appointed Board members may be reappointed to serve additional terms. No more than three of the appointed Board members may, at any time, belong to the

same political party. The Board annually elects one of its appointed members as Chairman and another as Vice Chairman and appoints a Secretary-Treasurer who need not be a member of the Board.

| Appointed Members | Occupation | Term Expires |
|---|---|---|
| James R. Christie, Chairman | Attorney | January 9, 2008 |
| Jack H. Hartley, Vice Chairman | Retired | January 9, 2007 |
| Darwin Snyder | President of North Central West Virginia Building and Construction Trades Council AFL-CIO | January 9, 2012 |
| Geraldine Roberts | Attorney | January 9, 2005* |
| David L. Williams | Registered Investment Advisor | January 9, 2009 |

*Serves until successor appointed.

Ex Officio Members

| | |
|---|---|
| Martha Walker | Secretary, West Virginia Department of Health and Human Resources, and acting Director of the Division of Health (represented by Tara L. Buckner) |
| Honorable John D. Perdue | State Treasurer (represented by Paul Hill) |

Secretary-Treasurer
Sarah Hamrick                                                                                  Elected by Board

The Authority is empowered to employ officers, agents, employees and advisors, including an Executive Director of the Authority appointed by the Board. The Executive Director position is currently vacant. Sarah B. Hamrick serves as Secretary-Treasurer of the Board and Administrative Assistant of the Authority. Pursuant to the Act, the ex-officio members may be represented by deputies designated by them.

The 2006 Bonds are special, limited obligations of the Authority payable from Revenues pledged to the Bond Trustee under the Bond Indenture, including payments made by the obligated group pursuant to the Notes. The 2006 Bonds do not constitute a debt or a pledge of the faith and credit or taxing power of the State or of any county, municipality or any other political subdivision of the State, and the owners thereof have no right to have taxes levied by the legislature or the taxing authority of any county, municipality or any other political subdivision of the State for the payment of the principal

7

thereof or interest thereon, but the 2006 Bonds shall be payable solely from the revenues and funds pledged therefor under the Bond Indenture. **The Authority has no taxing power.**

The Authority's financial condition is not material to an investment in the 2006 Bonds and, accordingly, information regarding the Authority's financial condition is not being provided.

## THE PROJECT

The Project consists of the acquisition, construction and equipping of a new state of the art hospital to replace the existing UHC hospital (the "Replacement Facility") on approximately 125 acres located at the intersection of Jerry Dove Drive and Interstate I-79 in Bridgeport, Harrison County, West Virginia. The Replacement Facility will be approximately 650,000 square feet. The Replacement Facility is expected to have approximately 318 beds, including 217 medical and surgical beds, 28 intensive care beds, 20 pediatric beds, 21 OB/GYN beds and 32 skilled nursing beds and 12 new surgical suites. The Replacement Facility will have greatly enhanced outpatient capabilities that include over two dozen treatment areas in the emergency room, a redesigned diagnostic imaging department, a designated observation unit, and 40 same day surgery rooms. The Replacement Facility will also have a modern outpatient oncology center with a separate entrance. Development of the proposed Replacement Facility along Interstate 79 will enhance the geographic accessibility to health care services for a majority of UHC's service area residents. The site of the proposed Replacement Facility will also provide ample opportunity for future growth. Construction of the Replacement Facility is expected to begin during the Summer of 2006 and be substantially complete during the Fall of 2009. See "The Project" in **APPENDIX A**.

## THE 2006 BONDS

*General.* This Official Statement describes the terms of the 2006 Bonds only at such times as the Auction Rate Certificates (the 2006 B, 2006 C and 2006 D Bonds) bear interest at Auction Rates. As described herein, WVUH, as Obligated Group Agent, may elect to convert the Auction Rate Certificates of a Series to other interest modes as provided in the Bond Indenture. It is currently anticipated that if any Auction Rate Certificates are converted to bear interest on a different basis, such as a Daily Rate, Weekly Rate or Fixed Rate, a remarketing memorandum or remarketing circular will be distributed describing the terms of such Auction Rate Certificates during the newly designated Interest Rate Period.

The 2006 Bonds will be dated their date of issuance and will bear interest from their dated date at the rates and will mature, subject to prior redemption as described below, as set forth on the inside cover of this Official Statement. Interest on the 2006 Bonds will be payable on each Interest Payment Date at the rates per annum determined as hereinafter described, provided that the interest rate borne by the Auction Rate Certificates cannot exceed the lesser of 12% per annum or the Maximum Lawful Rate (each, the "Maximum Auction Rate").

8

The principal of and any premium on the 2006 Bonds will be payable at the Designated Corporate Trust Office of the Bond Trustee in New York, New York, upon presentation and surrender of such 2006 Bonds.

The 2006 Bonds will be issued as follows:

(i)     the 2006 A Bonds will be issued as fixed rate bonds and will bear interest at the rates set forth on the inside front cover hereof; and

(ii)     the 2006 B Bonds, 2006 C Bonds, and 2006 D Bonds (collectively, the "Auction Rate Certificates" or "ARCs") will bear interest initially at Auction Rates established for seven-day Auction Periods until a Conversion (if ever) to an Auction Period of a different length or to a Daily Interest Rate Period, a Weekly Interest Rate Period or a Fixed Rate Period.

Auction Rate Certificates in any Mode (other than the Fixed Rate Mode) may, from time to time, be converted to any other Mode, and 2006 Bonds in either the Daily Mode or Weekly Mode may be converted to Auction Rate Certificates or Fixed Rate Certificates at the direction of the Obligated Group Agent in accordance with the procedures set forth in the Bond Indenture and **APPENDIX E - "PROVISIONS RELATING TO AUCTION AND SETTLEMENT PROCEDURES FOR AUCTION RATE CERTIFICATES."** The 2006 A Bonds are issued as fixed rate bonds and may not be converted to a Daily Mode, Weekly Mode or to Auction Rate Certificates.

So long as the 2006 Bonds are in the book-entry-only system through the facilities of The Depository Trust Company ("DTC") and its securities depository nominee is the owner thereof, payments of principal of, redemption premium, if any, and interest on the 2006 Bonds will be made in accordance with existing agreements between the Bond Trustee and DTC. See "**THE 2006 BONDS - Book Entry System**" herein.

Interest on the 2006 A Bonds will be calculated by the Trustee on the basis of a 360-day year consisting of twelve 30-day months. Interest on the Auction Rate Certificates shall be calculated by the Trustee on the basis of a 365-day year for the number of days actually elapsed; except that for any such calculation with respect to an Interest Payment Date occurring after January 1 of a leap year through December 31 of such leap year, such interest (for any occurring during such period) shall be computed on the basis of a 366-day year period.

**Auction Rate Certificates; General**. The 2006 B Bonds, 2006 C Bonds and 2006 D Bonds will be issued initially as Auction Rate Certificates in the aggregate principal amounts of $46,150,000, $46,500,000 and $60,375,000, respectively; will be issuable only in fully registered form without coupons in denominations, while they are Auction Rate Certificates, of $25,000 or any integral multiple thereof, subject to the book-entry procedures described herein; will be dated the date of their initial authentication and delivery; and will mature, subject to prior redemption as described below, on the applicable maturity date set forth on the inside cover of this Official Statement. The Auction Rates for the Auction Period beginning on the Closing Date will be determined by the Underwriters for the Auction Rate Certificates. Thereafter, the Auction Rate applicable to Auction Rate Certificates will be

9

determined by the Auction Agent for successive Auction Periods, initially seven-day periods, by implementation of the Auction Procedures summarized in **APPENDIX E**.

While the Auction Rate Certificates are book-entry bonds, as described below, payment of the principal and the purchase price on mandatory tender of, premium, if any, and interest on such Auction Rate Certificates will be made by wire transfer to Cede & Co. or such other nominee as may be requested by an authorized representative of DTC. The interest on the Auction Rate Certificates will be payable on the Business Day immediately following each Auction Period for such Auction Rate Certificates (an "ARC Interest Payment Date"). In the event the Auction Rate Certificates are no longer book-entry bonds, principal and interest on such Auction Rate Certificates will be payable by check mailed on the date due by the Bond Trustee to the registered owners of such Auction Rate Certificates as of the Record Date for Auction Rate Certificates, except that in the case of such a Holder of $1,000,000 or more in aggregate principal amount of such Bonds, upon the written request of such Holder to the Bond Trustee made prior to the Record Date for Auction Rate Certificates, specifying the account or accounts to which such payment shall be made, such interest payments shall be made by wire transfer of immediately available funds on the applicable Payment Date following such Record Date for Auction Rate Certificates. The "Record Date" for Auction Rate Certificates will be the second Business Day next preceding each ARC Interest Payment Date.

**Applicable ARC Rate.** Except for the Auction Period beginning on the Closing Date, each Series of the Auction Rate Certificates will, except in certain cases, bear interest at rates (the "Applicable ARCs Rate") established pursuant to the Auction Procedures described in **APPENDIX E**. An "ARC Interest Period" begins on and includes an ARC Interest Payment Date and ends on but excludes the next succeeding ARC Interest Payment Date; the first ARC Interest Period commences on the date of original delivery of each series of Auction Rate Certificates. The Applicable ARC Rate will not exceed the Maximum Rate. Interest on the Auction Rate Certificates will be computed on the basis of a 365 or 366-day year for the actual number of days elapsed during the applicable ARC Interest Period. In certain circumstances, however, the Auction Procedures may be canceled or suspended. For example, the Auction Agent will suspend the Auction Procedures upon the occurrence of a default by the Authority in the payment of the principal of or interest on the Auction Rate Certificates that is not cured by the Bond Insurer. The Applicable ARC Rate for each Auction Period for the Auction Rate Certificates commencing after the occurrence of such default, unless such default is cured or waived at least two Business Days prior to commencement of any subsequent Auction Period, will be 15% per annum (the "Non-Payment Rate"); provided that in no event is the Non-Payment Rate permitted to be more than the Maximum Lawful Rate.

The Auction Agent Agreement requires that no further Auctions be held if the ownership of the Auction Rate Certificates is no longer maintained in a book-entry-only system. See **APPENDIX E**. The Bond Indenture provides that if the ownership of the Auction Rate Certificates is no longer maintained in a book-entry-only system, the Applicable ARC Rate for any ARC Interest Period commencing after the delivery of certificates representing the Auction Rate Certificates is to equal the ARC Maximum Rate.

10

**Changes in Auction Period**. From time to time and on any ARC Interest Payment Date, the Obligated Group Agent may change the length of the Auction Period with the consent of the Auction Agent and the related Broker-Dealer between 7 days, 28 days, 35 days and Special Auction Periods in order to accommodate economic and financial factors that may affect or be relevant to the length of the Auction Period and the interest rate borne by a Series of the Auction Rate Certificates. The Obligated Group Agent will initiate the change in the length of the Auction Period by giving written notice to the Bond Trustee, the Authority, the Bond Insurer, the Auction Agent, the relevant Broker-Dealers and the Securities Depository of the effective date of the change at least three Business Days prior to the Auction Date for such Auction Period. No change in the length of or the day of commencement of the Auction Period will be allowed unless Sufficient Clearing Bids exist at the Auction immediately preceding the proposed change, and, in the discretion of the applicable Broker-Dealers, at the Auction before the date on which the notice of the proposed change was given. See **APPENDIX E**.

**Auction Agent for Auction Rate Certificates**. The Trustee and Deutsche Bank Trust Company Americas (the "Auction Agent") will enter into an Auction Agency Agreement with respect to the Auction Rate Certificates under which the Auction Agent will determine the ARCs Rate for each Auction in accordance with the Auction Procedures and will perform the duties of Auction Agent with respect to the Auction Rate Certificates. See **APPENDIX E** for additional information regarding the Auction Procedures.

**Order Procedures for Existing Owners and Potential Owners of Auction Rate Certificates.** The procedure for submitting orders prior to the Submission Deadline on each Auction Date is described in **APPENDIX E**, as are the particulars with regard to the determination of the ARCs Rate and the allocation of Auction Rate Certificates bearing interest at ARCs Rates. The Auction Procedures applicable to the Auction Rate Certificates are described in **APPENDIX E**.

**Certain Changes in Auction Dates; Adjustment of Percentages**. The calculation of the All-Hold Rate for the Auction Rate Certificates of a Series may be changed by the Broker-Dealer for such Series as described in **APPENDIX E**. Changes to the ARCs Auction Dates do not require the amendment of the Auction Procedures (except in certain circumstances) or the consent of any Owner of Auction Rate Certificates. See "**Changes in Auction Periods or Auction Dates**" and "**Adjustment of Percentages**" in **APPENDIX E**.

**Broker-Dealer for Auction Rate Certificates**. The Auction Agent will enter into a Broker-Dealer Agreement (i) for the 2006 Series B, 2006 Series C and 2006 Series D Bonds with UBS Securities LLC, as the initial broker-dealer for the 2006 Series B, 2006 Series C and 2006 Series D Bonds, and (ii) for the 2006 Series C and 2006 Series D Bonds, with Ferris, Baker Watts, Incorporated, as the initial broker-dealer for the 2006 Series C and 2006 Series D Bonds. The Obligated Group Agent may from time to time approve one or more additional entities to serve as broker-dealers under broker-dealer agreements. Any broker-dealer may be removed at any time by the Obligated Group Agent, but there shall, at all times, be at least one broker-dealer for the Auction Rate Certificates of each Series appointed and acting as such.

11

### Special Considerations Relating to Auction Rate Certificates.

Reference in the discussion under this caption to any Broker-Dealer may include, to the extent applicable, any broker-dealer affiliate of such Broker-Dealer.

**Bidding by Initial Broker-Dealers**. Each Broker-Dealer is permitted, but not obligated, to submit Orders in Auctions for its own account either as a Bidder or a Seller and routinely does so in the auction rate securities market in its sole discretion. If a Broker-Dealer submits an Order for its own account, it would have an advantage over other Bidders because such Broker-Dealer would have knowledge of some or all of the other Orders placed through such Broker-Dealer in that Auction and, thus, could determine the rate and size of its Order so as to ensure that its Order is likely to be accepted in the Auction and that the Auction is likely to clear at a particular rate. For this reason, and because each Broker-Dealer is appointed and paid by the Authority to serve as a Broker-Dealer in the Auction, a Broker-Dealer's interests in conducting an Auction may differ from those of Existing Holders and Potential Holders who participate in Auctions. *See* "Broker-Dealer Fees." A Broker-Dealer would not have knowledge of Orders submitted to the Auction Agent by any other firm that is, or may in the future be, appointed to accept Orders pursuant to a Broker-Dealer Agreement.

Each Broker-Dealer may routinely place one or more Bids in an Auction for its own account to acquire ARCs for its inventory, to prevent an "auction failure event" (*i.e.*, an event where there are insufficient clearing Bids, which would result in the Auction Rate being set at the Maximum Rate) or an Auction from clearing at a rate that such Broker-Dealer believes does not reflect the market for the ARCs. Each Broker-Dealer may place such Bids even after obtaining knowledge of some or all of the other Orders submitted through it. When bidding for its own account, each Broker-Dealer may bid inside the range of rates that it posts in its "Price Talk" or outside that range if such Broker-Dealer believes that the fair market value of the ARCs is outside of "Price Talk". *See* "Price Talk."

A Broker-Dealer also may routinely encourage bidding by others in Auctions, including to prevent an auction failure event or an Auction from clearing at a rate that the Broker-Dealer believes does not reflect the market for the ARCs. A Broker-Dealer may routinely encourage such Bids even after obtaining knowledge of some or all of the other Orders submitted through it.

Bids by any Broker-Dealer are likely to affect (i) the Auction Rate - including preventing the Auction Rate from being set at the Maximum Rate or otherwise causing Bidders to receive a higher or lower rate than they might have received had such Broker-Dealer not bid and (ii) the allocation of ARCs being auctioned — including displacing some Bidders who may have their Bids rejected or receive fewer ARCs than they would have received if such Broker-Dealer had not bid. Because of these practices, the fact that an Auction clears successfully does not mean that an investment in the ARCs involves no significant liquidity or credit risk. No Broker-Dealer is obligated to continue to place such Bids in any particular Auction to prevent an Auction from failing or clearing at a rate such Broker-Dealer believes does not reflect the market for the ARCs. Investors should not assume that any Broker-Dealer will do so or that "auction failure events" will not occur.

In any particular Auction, if all outstanding ARCs are the subject of Submitted Hold Orders, the Auction Rate for the next succeeding distribution period will be the All Hold Rate (such a situation is

12

called an "All Hold Auction"). When an All Hold Auction is likely, a Broker-Dealer may, but is not obligated to, advise Existing Holders of that fact, which might facilitate the submission of Bids by Existing Holders that would avoid the occurrence of an All Hold Auction. If a Broker-Dealer holds any ARCs for its own account on an Auction Date, such Broker-Dealer will submit a Sell Order into the Auction with respect to such ARCs. If such a Broker-Dealer (or any other existing Holder) submits a Sell Order into the Auction, such Auction will not be an All Hold Auction. Such Broker-Dealer may, but is not obligated to, submit Bids in that same Auction, as set forth above.

**Broker-Dealer Fees.** Each Broker-Dealer has been appointed by the issuers of various auction rate securities to serve as a dealer in the auctions for those securities and is paid by the issuers for its services. Specifically, each Broker-Dealer receives auction broker-dealer fees from such issuers at an agreed-upon annual rate that is applied to the principal amount of securities sold or successfully placed through such Broker-Dealer. Each Broker-Dealer will receive auction broker-dealer fees from the Authority with respect to the ARCs sold or successfully placed through such Broker-Dealer in Auctions. As a result, a Broker-Dealer's interests in conducting Auctions may differ from those of investors who participate in Auctions. Each Broker-Dealer may share a portion of such fees with other broker-dealers that submit Orders through such Broker-Dealer that are filled in the Auction.

**"Price Talk."** Before the start of an Auction, each Broker-Dealer may, in its discretion, make available to Existing Holders and Potential Holders such Broker-Dealer's good faith judgment of the range of likely clearing rates for the Auction based on market and other information. This is known as "Price Talk." Price Talk is not a guarantee that the Auction Rate established through the Auction will be an Auction Rate within the Price Talk, and Existing Holders and Potential Holders are free to use it or ignore it. A Broker-Dealer may occasionally update and change the Price Talk based on changes in issuer credit quality or macroeconomic factors that are likely to result in a change in interest rate levels, such as an announcement by the Federal Reserve Board of a change in the Federal Funds rate or an announcement by the Bureau of Labor Statistics of unemployment numbers.

**"All-or-Nothing" Bids.** None of the Broker-Dealers accepts "all-or-nothing" Bids (*i.e.*, Bids whereby the Bidder proposes to reject an allocation smaller than the entire quantity bid) or any other type of Bid that allows the Bidder to avoid auction procedures that require the *pro rata* allocation of ARCs when there are not sufficient sell orders to fill all Bids at the clearing rate.

**No Assurances Regarding Auction Outcomes.** None of the Broker-Dealers provides any assurance as to the outcome of any Auction. Nor does any Broker-Dealer provide any assurance that any Bid will be accepted or that the Auction will clear at a rate that a Bidder considers acceptable. Bids may be rejected or may be only partially filled, and the rate on any ARCs purchased or retained may be lower than the Bidder expected.

**Deadlines/Auction Periods.** Each particular Auction has a formal time deadline by which all Bids must be submitted by each Broker-Dealer to the Auction Agent. This deadline is called the "Auction Submission Deadline." To provide sufficient time to process and submit customer Bids to the Auction Agent before the Auction Submission Deadline, each Broker-Dealer imposes an earlier deadline — called the "Internal Submission Deadline" — by which Bidders must submit Bids to such

13

Broker-Dealer. The Internal Submission Deadline is subject to change by such Broker-Dealer. A Broker-Dealer may allow for correction of clerical errors after the Internal Submission Deadline and prior to the Auction Submission Deadline. A Broker-Dealer may submit Bids for its own account at any time until the Auction Submission Deadline. Some auction agents allow for the correction of clerical errors for a specified period of time after the Auction Submission Deadline.

**No Liquidity Facility.** The ARCs are not supported by a liquidity facility.

**Existing Holder's Ability to Resell Auction Rate Securities May Be Limited.** Existing Holders will be able to sell the ARCs in an Auction only if there are Bidders willing to purchase all the ARCs offered for sale in the Auction. If sufficient clearing Bids have not been made, Existing Holders that have submitted Sell Orders will not be able to sell in the Auction all, and may not be able to sell any, of the ARCs subject to such submitted Sell Orders. As discussed above (*see* "Bidding by Initial Broker-Dealers"), a Broker-Dealer may submit a Bid in an Auction to keep it from failing, but it is not obligated to do so. There may not always be enough Bidders to prevent an Auction from failing in the absence of a Broker-Dealer bidding in the Auction for its own account. Therefore, "auction failure events" are possible, especially if the security for the Series 2006 Bonds were to deteriorate, if a market disruption were to occur or if, for any reason, each Broker-Dealer were unable or unwilling to bid.

Between Auctions, there can be no assurance that a secondary market for the ARCs will develop or, if it does develop, that it will provide Existing Holders the ability to resell the ARCs in the secondary market on the terms or at the times desired by an Existing Holder. Each Broker-Dealer may, in its own discretion, decide to buy or sell the ARCs in the secondary market for its own account to or from investors at any time and at any price, including at prices equivalent to, below, or above the par value of the ARCs. However, no Broker-Dealer is obligated to make a market in the ARCs, and any Broker-Dealer may discontinue trading in the ARCs without notice for any reason at any time. Existing Holders who resell between Auctions may receive less than par value, depending on market conditions.

The ability to resell the ARCs will depend on various factors affecting the market for the ARCs, including news relating to the Authority, the attractiveness of alternative investments, the perceived risk of owning the ARCs (whether related to credit, liquidity or any other risk), the tax or accounting treatment accorded the ARCs, reactions of market participants to regulatory actions (such as those described in "Securities and Exchange Commission Inquiries," *below*) or press reports, financial reporting cycles and market conditions generally. Demand for the ARCs may change without warning, and declines in demand may be short-lived or continue for longer periods.

**Resignation of the Auction Agent Under the Auction Agent Agreement or the Broker-Dealer Under the Broker-Dealer Agreement Could Impact the Ability to Hold Auctions.** The Auction Agent Agreement provides that the Auction Agent may resign from its duties as Auction Agent by giving at least 30 days' notice to the Trustee, the Authority, and each Broker-Dealer and does not require, as a condition to the effectiveness of such resignation, that a replacement Auction Agent be in place if its fee has not been paid. The Auction Agent may terminate this Agreement if, after notifying the Trustee, the Insurer and the Authority that it has not received payment of any Auction Agent Fee due it in accordance with the terms hereof, the Auction Agent does not receive such payment within 30

14

days. Any resignation or termination of the Auction Agent, other than as described in the immediately preceding sentence, shall not become effective until a Successor Auction Agent has been appointed and such Successor Auction Agent has accepted such position; provided, however, that the Auction Agent may petition a court of competent jurisdiction for a replacement. Each Broker-Dealer Agreement provides that the Broker-Dealer thereunder may resign upon 30 days' notice and does not require, as a condition to the effectiveness of such resignation, that a replacement Broker-Dealer be in place. For any Auction Period during which there is no duly appointed Auction Agent, or during which there is no duly appointed Broker-Dealer, it will not be possible to hold Auctions, with the result that the interest rate on the ARCs will be the Maximum Rate.

**Securities and Exchange Commission Inquiries**. Each of the Broker-Dealers has advised the Authority that it and various other firms that participate in the auction rate securities market received letters from the Securities and Exchange Commission ("SEC") staff in May of 2004 requesting information about their respective practices and procedures in the auction rate securities market. Pursuant to these requests, each Broker-Dealer and other firms provided information to the SEC staff. On May 31, 2006, the SEC announced that a number of firms who were active participants in the auction rate securities market settled allegations against them by agreeing to be censured, to pay in the aggregate approximately $13 million in penalties and to agree to certain undertakings. No action was taken by the SEC against UBS Securities LLC or Ferris, Baker Watts, Incorporated, and neither is aware of any ongoing inquiries on this matter related to UBS Securities LLC or Ferris Baker Watts, Incorporated .

Each of the firms that participated in the SEC settlement settled charges with the SEC that the firms had managed auctions for auction rate securities in which they participated in ways that were not adequately disclosed or that did not conform to disclosed auction procedures. As part of the settlement, each of the firms that participated in the SEC settlement agreed to pay civil money penalties of $1.5 million, respectively. In addition, each of the firms that participated in the SEC settlement, without admitting or denying the SEC's allegations, agreed to be censured, to cease and desist from violating certain provisions of the securities laws, to provide to customers written descriptions of their material auction practices and procedures, and to implement procedures reasonably designed to detect and prevent any failures by the firms to conduct the auction process in accordance with disclosed procedures. No assurances are given as to how the settlement may affect the market for auction rate securities.

**Conversions of the Auction Rate Certificates to Other Interest Rate Periods**. The Obligated Group Agent may elect to convert all of the Auction Rate Certificates of a Series from one type of Interest Rate Period (other than from a Fixed Rate Period) to another type of Interest Rate Period as follows:

**Notices by the Obligated Group Agent**. The Obligated Group Agent shall give written notice of any proposed conversion to the Trustee not fewer than seven Business Days prior to the date the notice to affected Owners must be given of the proposed conversion.

15

**Notices by Trustee.** Upon receipt of notice from the Obligated Group Agent, the Trustee shall promptly give written notice of the proposed conversion to the Tender Agent, the Auction Agent, the Broker-Dealer, and any rating service that has notified the Trustee in writing that it has established a rating for the Auction Rate Certificates, as applicable (there is no Remarketing Agent or Liquidity Provider for the Auction Rate Certificates while such bonds are Auction Rate Certificates). The Trustee shall give notice (which may be combined, where applicable, with any required mandatory tender notice) by first class mail of the proposed conversion to the affected Owners of Auction Rate Certificates, as applicable, not less than 10 days before the proposed Conversion Date. Such notice shall state:

> (i) the proposed Conversion Date and the proposed Interest Rate Period to be effective on such date;
>
> (ii) that the Auction Rate Certificates will be subject to mandatory tender for purchase on the Conversion Date;
>
> (iii) the conditions, if any, to the conversion, and the consequences of such conditions not being fulfilled; and
>
> (iv) if the Auction Rate Certificates are in certificated form, information with respect to required delivery of the Auction Rate Certificates and payment of the purchase price.

**Conditions to Conversion.** No conversion of Interest Rate Periods will become effective unless:

If the conversion is from a Weekly Rate Period or a Daily Rate Period, the Trustee has received, prior to the date on which notice of conversion is required to be given to Owners, written confirmation from the Remarketing Agent that it has not established and will not establish any Interest Rate Periods for the Auction Rate Certificates extending beyond the day before the Conversion Date, and the Trustee and the Authority have been provided, no later than one day before the Conversion Date, with a Favorable Opinion of Bond Counsel relating to the Auction Rate Certificates; and

If the conversion is to a Daily Rate Period or a Weekly Rate Period, (A) the Obligated Group Agent shall have appointed one of the initial Broker-Dealers or another underwriting firm to act as the Remarketing Agent for the Auction Rate Certificates of the Series being converted, and (B) the Obligated Group Agent shall have furnished to the Trustee an executed Remarketing Agreement whereby the Remarketing Agent agrees to perform the duties of the Remarketing Agent under the Indenture; and

If the conversion is to an Auction Rate Interest Period, (A) the Obligated Group Agent shall have appointed an Auction Agent and a Broker-Dealer and (B) the Obligated Group Agent shall have furnished to the Trustee an Auction Agency Agreement and a Broker-Dealer Agreement in substantially the forms initially executed in connection with the issuance of the Auction Rate Certificates; and

16

If the conversion is to a Fixed Rate Period, the Obligated Group Agent shall notify the Trustee, in writing, of its election to effect such a conversion, specifying in the notice the Conversion Date on which the Fixed Rate Period is to commence, and delivering with such notice a firm underwriting or purchase contract from a recognized firm of bond underwriters or recognized institutional investors, which can be the Remarketing Agent, to underwrite or purchase all of the Auction Rate Certificates at a price of 100% of the principal amount thereof at an agreed upon interest rate which such underwriter or institutional investor certifies is the lowest rate that will permit the Auction Rate Certificates to be sold at par on the first day of the Fixed Rate Period and containing a mandatory sinking fund redemption schedule prepared in accordance with the Bond Indenture. Upon receipt by the Trustee of such notice from the Obligated Group Agent, the Trustee shall promptly cause the same information contained in such notice to be delivered to the Tender Agent, the Remarketing Agent, the Liquidity Provider and any rating service that has notified the Trustee in writing that it has established a rating for the Auction Rate Certificates.

No conversion shall occur unless the Conversion Date is a date on which the Auction Rate Certificates being converted could be redeemed without premium pursuant to the optional redemption provisions of the Indenture.

**Failure of Conditions to Conversion.** In the event any condition precedent to a conversion is not fulfilled, (i) the Conversion shall not occur, (ii) the mandatory tender shall not occur, (iii) any affected Auction Rate Certificates shall continue to be Auction Rate Certificates and shall continue to be payable at the Applicable ARCs Rate for the balance of the ARCs Interest Period then applicable thereto (without regard to the attempted conversion) and shall bear interest for the next succeeding ARCs Interest Period at (1) the Applicable ARCs Rate determined in accordance with the Auction Rate Certificates Provisions if the Obligated Group Agent withdraws notice of the exercise of its option to effect conversion and the next succeeding Auction Date occurs more than two Business Days after the Business Day on which the Trustee receives notice of withdrawal of the conversion from the Obligated Group Agent or (2) the Maximum Rate determined by the Auction Agent as provided in the Auction Rate Certificates Provisions in all other cases, and (iv) any other affected Auction Rate Certificates shall continue in then existing Interest Rate Period with the length of the interest period and the interest rate being determined in accordance with the Bond Indenture. Notice of withdrawal of a conversion notice shall be given by the Obligated Group Agent to the Authority, the Trustee, the Remarketing Agent, the Tender Agent, the Liquidity Provider (there is no Remarketing Agent or Liquidity Provider for the Auction Rate Certificates during an ARCs Interest Period) and the Auction Agent (in the case of conversion of Auction Rate Certificates) by telephone, promptly confirmed in writing, and shall thereafter be promptly given to the owners of such Auction Rate Certificates by the Trustee by first-class mail. No failure or cancellation of conversion pursuant to the foregoing provisions shall constitute an Event of Default.

**Terms Upon Conversion.** Auction Rate Certificates in an Interest Rate Period other than an ARCs Interest Period shall have interest rate, redemption, and other terms as set forth in the Bond Indenture. This Official Statement does not describe many of those terms and is not intended to be used in connection with any offer to sell Auction Rate Certificates in any such other Interest Rate Period unless supplemented to describe such terms for such other Interest Rate Period.

17

**No Optional Tenders of ARCs; Sales on Interest Payment Dates**. Auction Rate Certificates are not subject to optional tender. The ability of Owners of Auction Rate Certificates to sell Auction Rate Certificates at par on an Interest Payment Date is subject to the procedures described in **APPENDIX E**. No assurance can be given that any sale will be consummated.

**Conversions from the Applicable ARCs Rate to Other Interest Rate Periods and Mandatory Tender for Purchase**. The Obligated Group Agent may elect to convert the Auction Rate Certificates to a different Interest Rate Period effective as of an ARC Interest Payment Date. Upon such Conversion, the former Auction Rate Certificates may accrue interest based on a Daily Rate Period, a Weekly Rate Period or a Fixed Rate Period. In order to effect such Conversion, the Obligated Group Agent is required to provide a written direction to the Authority, the Bond Trustee, the Auction Agent and each Broker-Dealer of its election to convert the Auction Rate Certificates to another Interest Rate Period. The Bond Trustee is required to provide notice of any such Conversion to the holders of the Auction Rate Certificates not fewer than 30 days prior to the proposed effective date of the Conversion. The Auction Rate Certificates will be subject to mandatory tender for purchase on the proposed effective date of a different Interest Rate Period, subject to the terms of the Bond Indenture. The tender price will be equal to the principal amount of Auction Rate Certificates tendered for purchase, without premium, plus accrued interest from the immediately preceding Interest Payment Date to the date of such tender. In the case of any failed Conversion of Auction Rate Certificates, no mandatory purchase will apply, and the Auction Rate Certificates will remain Auction Rate Certificates and will bear interest at the ARC Maximum Rate for the immediately ensuing ARC Interest Period. See **"THE 2006 BONDS – Tender and Purchase of Auction Rate Certificates – Mandatory Tenders Upon Conversion"** herein.

The Obligated Group Agent may rescind its election to effect a Conversion of the interest rate on any Auction Rate Certificates by written notice of such rescission to the Authority, the Bond Trustee, the Bond Insurer, the Auction Agent and the relevant Broker-Dealer on or prior to 10:00 a.m., New York City time, on the second Business Day preceding the effective date of any such Conversion, to the effect that the Obligated Group Agent, on behalf of the Authority, elects to rescind its election to make such Conversion. If such rescission of election is made, the Auction Rate Certificates shall continue to bear interest at the ARC Interest Period in effect immediately prior to the proposed Conversion, commencing on the date which would have been the effective date of the Conversion.

Unless the Bond Insurer directs otherwise, a Series of Auction Rate Certificates will be converted to a Fixed Rate Period to maturity if for any reason the Auction Rate for a series of Auction Rate Certificates is the ARC Maximum Rate or the Non-Payment Rate for 60 consecutive days.

18

**Auction Date**.  An Auction to determine the interest rate with respect to Auction Rate Bonds for the next succeeding Auction Period will be held on each Auction Date.  The first Auction Date will be:

> 2006 Series B Bonds  - June 19, 2006
> 2006 Series C Bonds  - June 20, 2006
> 2006 Series D Bonds  - June 22, 2006

**Book Entry System**.  The Depository Trust Company ("DTC"), New York, New York, will act as securities depository for the 2006 Bonds.  The 2006 Bonds will be issued as fully registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC.  One fully registered 2006 Bond certificate will be issued for each maturity of the 2006 Bonds in the aggregate principal amount of such maturity, and will be deposited with DTC.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934.  DTC holds and provides asset servicing for over 2 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments from over 85 countries that DTC's participants ("Direct Participants") deposit with DTC.  DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts.  This eliminates the need for physical movement of securities certificates.  Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations.  DTC is a wholly owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC").  DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Government Securities Clearing Corporation, MBS Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, GSCC, MBSCC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LIE, and the National Association of Securities Dealers, Inc.  Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants").  DTC has Standard & Poor's highest rating: AAA.  The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission.

Purchases of 2006 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the 2006 Bonds on DTC's records.  The ownership interest of each actual purchaser of each 2006 Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records.  Beneficial Owners will not receive written confirmation from DTC of their purchase.  Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect

19

Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the 2006 Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in 2006 Bonds, except in the event that use of the book-entry system for the 2006 Bonds is discontinued.

All tenders (optional or mandatory) of 2006 Bonds and delivery of and payment for such tendered bonds will be effected through the DTC system by or through the Beneficial Owner's Direct or Indirect Participant.

Beneficial Owners of the 2006 Bonds may wish to take certain steps to augment the transmissions to them of notices of significant events with respect to the 2006 Bonds, such as redemptions, tenders, defaults and proposed amendments to the principal financing documents. Beneficial Owners of the 2006 Bonds may wish to ascertain that the nominee holding the 2006 Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners, or in the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

To facilitate subsequent transfers, all 2006 Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of 2006 Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the 2006 Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such 2006 Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the 2006 Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. (or any other DTC nominee) will consent or vote with respect to 2006 Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the 2006 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

20

Principal and interest payments on the 2006 Bonds will be made to Cede & Co, or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the Bond Trustee, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Bond Trustee, the Obligated Group or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC is the responsibility of the Authority or the Bond Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

A Beneficial Owner shall give notice to elect to have its Daily Rate Bonds purchased or tendered, through its Participant to the Tender Agent, and shall effect delivery of such Daily Rate Bonds by causing the Direct Participant to transfer the Participant's interest in the Daily Rate Bonds, on DTC's records, to the Tender Agent. The requirement for physical delivery of Daily Rate Bonds in connection with an optional tender or a mandatory purchase will be deemed satisfied when the ownership rights in the Daily Rate Bonds are transferred by Direct Participants on DTC's records and followed by a book-entry credit of tendered Daily Rate Bonds to the Tender Agent's DTC account

DTC may discontinue providing its services as securities depository with respect to the 2006 Bonds at any time by giving reasonable notice to the Authority or the Bond Trustee. Under such circumstances, in the event that a successor securities depository is not obtained, 2006 Bond certificates are required to be printed and delivered.

The Obligated Group Agent, with the consent of the Authority and the Bond Trustee, may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository). In that event, 2006 Bond certificates will be printed and delivered.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Authority, the Obligated Group and the Underwriters believe to be reliable, but neither the Authority, the Obligated Group nor the Underwriters take any responsibility for the accuracy thereof.

The Authority, the Bond Trustee and the Obligated Group cannot and do not give any assurances that Direct Participants or Indirect Participants will distribute to the Beneficial Owners of the 2006 Bonds, (i) payments of principal of, or interest and premium, if any, on the 2006 Bonds, (ii) confirmation of their ownership interests in the 2006 Bonds or (iii) redemption or other notices sent to DTC or Cede & Co., its nominee, as the registered owner of the 2006 Bonds, or that they will do so on a timely basis or that DTC, Direct Participants or Indirect Participants will serve and act in the manner described in this Official Statement.

21

NEITHER THE AUTHORITY, THE MEMBERS OF THE OBLIGATED GROUP NOR THE BOND TRUSTEE WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO THE DIRECT PARTICIPANTS, THE INDIRECT PARTICIPANTS OR THE BENEFICIAL OWNERS WITH RESPECT TO (1) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY DIRECT PARTICIPANT OR ANY INDIRECT PARTICIPANT; (2) THE PAYMENT BY ANY DIRECT PARTICIPANT OR ANY INDIRECT PARTICIPANT OF ANY AMOUNT DUE TO ANY BENEFICIAL OWNER IN RESPECT OF THE PRINCIPAL AMOUNT OR REDEMPTION PRICE OF OR INTEREST ON THE SERIES 2005 BONDS; (3) THE DELIVERY BY ANY DIRECT PARTICIPANT OR ANY INDIRECT PARTICIPANT OF ANY NOTICE TO ANY BENEFICIAL OWNER THAT IS REQUIRED OR PERMITTED TO BE GIVEN TO HOLDERS UNDER THE TERMS OF THE APPLICABLE TRUST AGREEMENT; (4) THE SELECTION OF THE BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE 2006 BONDS; OR (5) ANY CONSENT GIVEN OR OTHER ACTION TAKEN BY DTC AS HOLDER.

Transfers and Exchanges. So long as any of the 2006 Bonds remain outstanding, the Bond Trustee shall maintain at its principal corporate trust office a register for the registration and transfer of the 2006 Bonds (herein called the "Bond Register"), whereby such Bonds may be registered and may be presented for registration of transfer and for exchange as provided in this Indenture. Except as provided in the Bond Indenture, the Bond Trustee shall keep the Bond Register confidential, and access may only the Bond Trustee shall given to the Internal Revenue Service, other governmental entities for reasonable purpose, courts, in response to lawful process or others at the direction of the Authority or the Obligated Group.

The registration of transfer of each 2006 Bond shall be made only on the Bond Register, upon surrender thereof, together with a written instrument of transfer satisfactory to the Bond Trustee duly executed by the Owner or his duly authorized attorney or legal representative. In all cases of registration of transfer or exchange of 2006 Bonds, the Authority shall execute and the Bond Trustee shall authenticate and deliver a new 2006 Bond or new 2006 Bonds in the same aggregate principal amount, of the same maturity and interest rate, in the denomination of (i) $100,000 and $5,000 multiples in excess thereof, during any Daily Rate Period or Weekly Rate Period, hereinafter defined, (ii) $25,000 and integral multiples thereof, during any Auction Rate Period, hereinafter defined, and (iii) $5,000 and any integral multiple thereof during any Fixed Rate Period, and with respect to the 2006 A Bonds, which are issued as fixed rate bonds.

The Bond Trustee shall not make any exchange or transfer of any 2006 Bonds after the date the same is selected by the Bond Trustee for redemption.

For every exchange or transfer of 2006 Bonds, the Bond Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the Person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer. Notwithstanding any other provision of this Indenture, the cost of preparing each new 2006 Bond upon each exchange or transfer, and any other expenses of the Authority or the Bond Trustee incurred in

22

connection therewith (except any applicable tax, fee or other governmental charge) shall be paid by the Obligated Group.

**Record Dates.**

The following Record Dates apply to the 2006 Bonds:

| 2006 A Bonds and Auction Rate Certificates in a Fixed Rate Mode | - | The 15th day (whether or not a Business Day) of the month immediately preceding each interest payment date |
|---|---|---|
| Auction Rate Certificates in the Auction Mode | - | The applicable number of Business Days immediately preceding each Interest Payment Date |
| Auction Rate Certificates in Weekly Mode | - | The Business Day immediately preceding an Interest Payment Date |
| Auction Rate Certificates in Daily Mode | - | The last Business Day of each calendar month, or in the case of the last Interest Payment Date in respect of a Series of Auction Rate Bonds in the Daily Mode, the Business Day immediately preceding such Interest Payment Date |

**Redemption and Tender of 2006 Bonds.**

General. The 2006 Bonds will be subject to redemption prior to maturity as described below.

(A)     Optional Redemption of 2006 A Bonds. The 2006 A Bonds are subject to optional redemption by the Issuer, at the direction of the Obligated Group Agent, on and after June 1, 2016, in whole on any date or in part on any Interest Payment Date (and, if in part, the Obligated Group Agent shall select the maturities of the Bonds to be redeemed in such order of maturity as the Obligated Group Agent shall specify and within a maturity by lot or by such other method as the Bond Trustee determines in its sole discretion to be fair and reasonable and in denominations of $5,000 and integral multiples thereof) at the redemption price of 100% of the principal amount thereof, together with accrued interest, if any, to the date fixed for redemption.

(B)     Optional Redemption of ARCs in the Fixed Rate Mode. A series of the Auction Rate Certificates converted to the Fixed Rate Mode is subject to redemption in whole on any date or in part

23

on any Business Day (and if in part, in such order of maturity as the Obligated Group Agent shall specify and within a maturity by lot or by such other method as the Bond Trustee determines to be fair and reasonable and in Authorized Denominations) at the Redemption Prices together with accrued interest, if any, to the redemption dates all as set forth as follows:

| LENGTH OF INTEREST PERIOD | COMMENCEMENT OF REDEMPTION PERIOD | REDEMPTION PRICE |
|---|---|---|
| Greater than or equal to 11 years | Tenth anniversary of the commencement of Interest Period | 100% |
| Less than 11 years and greater than or equal to 8 years | Seventh anniversary of the commencement of Interest Period | 100% |
| Less than 8 years and greater than or equal to 5 years | Fifth anniversary of the commencement of Interest Period and thereafter | 100% |
| Less than 5 years | Auction Rate Certificates not subject to optional redemption | -- |

The Authority with the consent of the Obligated Group Agent, in connection with a change to the Fixed Rate Mode, may alter its rights to direct the redemption of any such Auction Rate Certificate; provided that notice describing the alteration shall be submitted to the Bond Trustee and the Remarketing Agent, together with a Favorable Opinion of Bond Counsel, addressed to them.

(C)     Optional Redemption of Auction Rate Certificates in the Auction Mode, Daily Mode or Weeky Mode. A series of Auction Rate Certificates in either the Auction Mode, the Daily Mode or the Weekly Mode is subject to redemption prior to their respective stated Maturity Dates (but only from Eligible Moneys in the case of a series of Auction Rate Certificates in a Daily or Weekly Mode when a Liquidity Facility is in effect), at the option of the Authority with the consent of the Obligated Group Agent, in whole or in part on any Interest Payment Date (if in the Auction Mode) or any Business Day (if in the Daily Mode or Weekly Mode) at a Redemption Price equal to the principal amount of such series of Auction Rate Certificates called for redemption, without premium, together with accrued interest, if any, to the redemption date; provided, however, in the event of a partial redemption of a series of Auction Rate Certificates bearing interest at an Auction Rate, (i) the aggregate principal amount of such Auction Rate Certificates to be redeemed is at least $100,000, (ii) the aggregate principal amount of the Auction Rate Certificates not to be redeemed are in an Authorized Denomination for such Bonds, and (iii) the aggregate principal amount of Auction Rate Certificates of such series bearing interest at an Auction Rate that will remain outstanding after such redemption is at least $10,000,000, unless a lesser principal amount is consented to by the applicable Broker-Dealers.

24

(D)     Optional Redemption of 2006 Bonds From Insurance and Condemnation Proceeds. The 2006 Bonds are also subject to redemption prior to their respective stated Maturity Dates, at the option of the Authority with the consent of the Obligated Group Agent, as a whole on any date or in part on any Interest Payment Date, from moneys required to be deposited in the Special Redemption Account pursuant to the Loan Agreement, at a Redemption Price equal to the principal amount called for redemption, plus accrued interest, if any, to the date fixed for redemption, without premium.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

25

(E)     Sinking Fund Redemption of 2006 Bonds.  The 2006 Bonds are also subject to redemption prior to their stated Maturity Date, in part, from Mandatory Sinking Account Payments deposited in the Principal Fund on June 1 of each of the years set forth below, (provided that while a series of the 2006 Bonds bear interest at an Auction Rate, if such June 1 is not an Interest Payment Date, the redemption shall occur on the Interest Payment Date immediately preceding such June 1) in the principal amounts set forth below, together with interest accrued thereon to the date fixed for redemption, without premium.

### 2006 Series A Term Bonds Maturing June 1, 2022

| Date (June 1) | Amount |
| --- | --- |
| 2021 | $1,960,000 |
| 2022 | 2,060,000* |

### 2006 Series A Term Bonds Maturing June 1, 2024

| Date (June 1) | Amount |
| --- | --- |
| 2023 | $2,165,000 |
| 2024 | 2,270,000* |

### 2006 Series A Term Bonds Maturing June 1, 2026

| Date (June 1) | Amount |
| --- | --- |
| 2025 | $2,385,000 |
| 2026 | 2,490,000* |

### 2006 Series A Term Bonds Maturing June 1, 2031

| Date (June 1) | Amount |
| --- | --- |
| 2027 | $2,605,000 |
| 2028 | 2,730,000 |
| 2029 | 2,855,000 |
| 2030 | 2,995,000 |
| 2031 | 3,135,000* |

*Maturity

26

### 2006 Series A Term Bonds Maturing June 1, 2034

| Date (June 1) | Amount |
|---|---|
| 2032 | $3,285,000 |
| 2033 | 3,430,000 |
| 2034 | 3,585,000* |

### 2006 Series A Term Bonds Maturing June 1, 2037

| Date (June 1) | Amount |
|---|---|
| 2035 | $3,745,000 |
| 2036 | 3,940,000 |
| 2037 | 4,140,000* |

### 2006 Series A Term Bonds Maturing June 1, 2041

| Date (June 1) | Amount |
|---|---|
| 2038 | $4,355,000 |
| 2039 | 4,580,000 |
| 2040 | 4,820,000 |
| 2041 | 5,075,000* |

### 2006 Series B Bonds Maturing June 1, 2041

| Date (June 1) | Amount | Date (June 1) | Amount |
|---|---|---|---|
| 2010 | $2,825,000 | 2026 | $ 600,000 |
| 2011 | 2,450,000 | 2027 | 1,300,000 |
| 2012 | 3,075,000 | 2028 | 700,000 |
| 2013 | 2,975,000 | 2029 | 650,000 |
| 2014 | 3,325,000 | 2030 | 700,000 |
| 2015 | 2,050,000 | 2031 | 775,000 |
| 2016 | 1,450,000 | 2032 | 1,625,000 |
| 2017 | 2,475,000 | 2033 | 900,000 |
| 2018 | 2,300,000 | 2034 | 925,000 |
| 2019 | 2,425,000 | 2035 | 925,000 |
| 2020 | 450,000 | 2036 | 1,025,000 |
| 2021 | 1,000,000 | 2037 | 900,000 |
| 2022 | 525,000 | 2038 | 2,425,000 |
| 2023 | 550,000 | 2039 | 1,225,000 |
| 2024 | 550,000 | 2040 | 1,200,000 |
| 2025 | 550,000 | 2041 | 1,300,000* |

*Maturity

27

## 2006 Series C Bonds Maturing June 1, 2041

| Date (June 1) | Amount | Date (June 1) | Amount |
|---|---|---|---|
| 2010 | $ 525,000 | 2026 | $1,125,000 |
| 2011 | 1,050,000 | 2027 | 1,175,000 |
| 2012 | 575,000 | 2028 | 1,250,000 |
| 2013 | 825,000 | 2029 | 1,325,000 |
| 2014 | 650,000 | 2030 | 1,400,000 |
| 2015 | 675,000 | 2031 | 1,450,000 |
| 2016 | 1,400,000 | 2032 | 1,550,000 |
| 2017 | 500,000 | 2033 | 3,550,000 |
| 2018 | 800,000 | 2034 | 1,675,000 |
| 2019 | 800,000 | 2035 | 1,800,000 |
| 2020 | 850,000 | 2036 | 1,875,000 |
| 2021 | 825,000 | 2037 | 2,025,000 |
| 2022 | 1,950,000 | 2038 | 2,075,000 |
| 2023 | 975,000 | 2039 | 5,050,000 |
| 2024 | 1,075,000 | 2040, | 2,300,000 |
| 2025 | 1,050,000 | 2041 | 2,350,000* |

## 2006 Series D Bonds Maturing June 1, 2041

| Date (June 1) | Amount | Date (June 1) | Amount |
|---|---|---|---|
| 2020 | $2,125,000 | 2031 | $3,150,000 |
| 2021 | 1,775,000 | 2032 | 2,425,000 |
| 2022 | 1,275,000 | 2033 | 1,375,000 |
| 2023 | 2,375,000 | 2034 | 3,475,000 |
| 2024 | 2,450,000 | 2035 | 3,600,000 |
| 2025 | 2,625,000 | 2036 | 3,675,000 |
| 2026 | 2,675,000 | 2037 | 3,925,000 |
| 2027 | 2,100,000 | 2038 | 2,625,000 |
| 2028 | 2,825,000 | 2039 | 1,150,000 |
| 2029 | 3,000,000 | 2040 | 4,250,000 |
| 2030 | 3,075,000 | 2041 | 4,425,000* |

*Maturity

28

(F)     In lieu of redeeming 2006 Bonds of any series pursuant to this Section 4.01, the Bond Trustee may, at the request of the Obligated Group Agent, use such funds otherwise available for redemption of 2006 Bonds to purchase 2006 Bonds of such series in the open market at a price not exceeding the redemption price then applicable under the Bond Indenture, such 2006 Bonds to be delivered to the Bond Trustee for the purpose of cancellation. It is understood that in the case of any such redemption or purchase of 2006 Bonds, the Authority shall receive credit against its required Mandatory Sinking Fund Payment for such series of 2006 Bonds in the same manner as would be applicable if such 2006 Bonds were optionally redeemed. Purchases pursuant to this paragraph shall be made first from Bank Bonds and thereafter from 2006 Bonds of such series with Rate Periods and Maturity Dates selected by the Obligated Group Agent. Purchases made pursuant to this paragraph shall be made with Eligible Moneys unless the purchase is of a 2006 Bond then bearing interest at the Bank Rate, a Fixed Rate or an Auction Rate.

(G)     Any 2006 Bonds which are Bank Bonds or Obligated Group Bonds are subject to redemption in whole or in part (in an Authorized Denomination) prior to maturity at the direction of the Obligated Group Agent out of amounts prepaid on the 2006 Notes and deposited in the Redemption Fund, in whole or in part (and if in part, in an Authorized Denomination) on any Business Day while such 2006 Bonds are Bank Bonds or Obligated Group Bonds at a redemption price equal to 100% of the principal amount thereof plus accrued interest, if any, to the redemption date.

(H)     Any 2006 Bonds that are Bank Bonds shall be subject to mandatory redemption on the dates and in the amounts specified in the Liquidity Facility Agreement in connection with a Bank Bond Redemption Event (as defined in the Liquidity Facility Agreement). Such redemption shall be at a price equal to the principal amount thereof plus accrued interest thereon to the redemption date and without premium. Bank Bonds shall be redeemed pursuant to the provisions of this paragraph without any notice from or direction by the Obligated Group Agent.

**Selection of 2006 Bonds for Redemption**. Subject to the provisions of the Bond Indenture relating to use of a Security Depository, whenever provision is made in the Bond Indenture for the redemption of less than all of the 2006 Bonds of a Series or any given portion thereof, the Bond Trustee shall select the 2006 Bonds of such Series to be redeemed, in Authorized Denominations, by lot, in any manner which the Bond Trustee in its sole discretion shall deem appropriate and fair. The Bond Trustee shall promptly notify the Authority and the Obligated Group Agent in writing of any redemption of the 2006 Bonds or portions thereof so selected for redemption. The selection of 2006 Bonds shall be at such time as determined by the Bond Trustee. The foregoing notwithstanding, the Obligated Group Agent may select the Series of 2006 Bonds to be redeemed.

**Notice of Redemption**. Notice of redemption shall be mailed by first-class mail by the Bond Trustee, not less than 30 days prior to the date fixed for redemption with respect to a series of 2006 Bonds bearing interest at the Fixed Rate or Auction Rate and not less than 15 days prior to the date fixed for redemption with respect to a series of 2006 Bonds bearing interest at a Daily Rate, Weekly Rate or Fixed Rate to the Auction Agent, the Credit Facility Provider, the Rating Agencies then rating the 2006 Bonds and to the respective Holders of any 2006 Bonds designated for redemption at their addresses appearing on the bond registration books of the Bond Trustee. Each notice of redemption shall state the

29

date of such notice, the date of delivery and Series designation of the 2006 Bonds, the date fixed for redemption, the Redemption Price, the place or places of redemption (including the name and appropriate address or addresses of the Bond Trustee), the CUSIP number (if any) of the 2006 Bonds to be redeemed and, in the case of 2006 Bonds to be redeemed in part only, the portion of the principal amount thereof to be redeemed. Each such notice shall also state that on said date there will become due and payable on each of said 2006 Bonds the Redemption Price thereof or of said specified portion of the principal amount thereof in the case of a 2006 Bond to be redeemed in part only, together with interest accrued thereon to the date fixed for redemption, and that from and after such date, interest on such 2006 Bond shall cease to accrue, and shall require that such 2006 Bonds be then surrendered at the address or addresses of the Bond Trustee specified in the redemption notice. The Bond Trustee shall also provided notice of any optional redemption of 2006 Bonds to the Remarketing Agent and the Broker-Dealer by Electronic Means.

The Bond Trustee, at the expense of the Obligated Group, shall give notice of redemption of 2006 Bonds.

Failure by the Bond Trustee to mail notice of redemption pursuant to the previous paragraphs to the Credit Facility Provider, the Rating Agencies then rating the 2006 Bonds or to any one or more of the Holders of any 2006 Bonds designated for redemption shall not affect the sufficiency of the proceedings for redemption with respect to the Holders to whom such notice was mailed.

With respect to notice of any optional redemption of the 2006 Bonds, unless moneys sufficient to pay the redemption price of the 2006 Bonds to be redeemed shall have been received by the Bond Trustee prior to the giving of that notice, the notice shall state that the redemption shall be conditional upon the receipt of such moneys by the Bond Trustee on or prior to the date fixed for the redemption and the satisfaction of other conditions required in this Bond Indenture. If such moneys shall not have been so received, the notice shall be of no force and effect, the 2006 Bonds shall not be redeemed pursuant thereto and the Bond Trustee shall give notice, in the manner in which notice of redemption was given, that such moneys were not received.

Any notice given pursuant to preceding paragraphs may be rescinded by written notice given to the Bond Trustee by the Authority with the consent of the Obligated Group Agent no later than 5 Business Days prior to the date specified for redemption. The Bond Trustee shall give notice of such rescission, as soon thereafter as practicable, in the same manner, to the same persons, as notice of such redemption was given pursuant to the preceding paragraph.

30

## SECURITY FOR THE 2006 BONDS

**THE 2006 BONDS ARE SPECIAL, LIMITED OBLIGATIONS OF THE AUTHORITY PAYABLE SOLELY FROM AND SECURED BY A PLEDGE OF REVENUES AND FUNDS PROVIDED THEREFOR UNDER THE BOND INDENTURE. THE 2006 BONDS SHALL NOT CONSTITUTE A DEBT OR A PLEDGE OF THE FAITH AND CREDIT OR TAXING POWER OF THE STATE OF WEST VIRGINIA OR OF ANY COUNTY, MUNICIPALITY OR ANY OTHER POLITICAL SUBDIVISION OF THE STATE OF WEST VIRGINIA, AND THE OWNERS THEREOF SHALL HAVE NO RIGHT TO HAVE TAXES LEVIED BY THE LEGISLATURE OR THE TAXING AUTHORITY OF ANY COUNTY, MUNICIPALITY OR ANY OTHER POLITICAL SUBDIVISION OF THE STATE OF WEST VIRGINIA FOR THE PAYMENT OF THE PRINCIPAL THEREOF OR INTEREST THEREON, BUT THE 2006 BONDS SHALL BE PAYABLE SOLELY FROM THE REVENUES AND FUNDS PLEDGED THEREFOR UNDER THE BOND INDENTURE. THE AUTHORITY HAS NO TAXING POWER.**

**General**. The 2006 Bonds are limited obligations of the Authority payable from Revenues held by the Bond Trustee under the Bond Indenture and from payments made by the Obligated Group on the Notes. The Notes are the eighth, ninth and tenth notes issued under the Master Indenture and obligate the Obligated Group to make payments which, in the aggregate, must be in an amount sufficient (1) to pay in full, when due, the aggregate principal of, premium, if any, and interest on the 2006 Bonds to their respective dates of maturity or earlier redemption, and (2) to pay related expenses.

**The Notes**. The Notes are general obligations of the Members of the Obligated Group. WVUH, City, Jefferson and the Foundation are currently the only Members of the Obligated Group. On Delivery Date of the 2006 Bonds, UHC will become a Member of the Obligated Group. The Master Indenture permits other entities, under certain conditions, to become Members of the Obligated Group under the Master Indenture and to issue Notes thereunder. Each Member of the Obligated Group will, subject to the right of such Member to withdraw from the Obligated Group under certain circumstances, jointly and severally covenant promptly to make any and all payments on all Notes theretofore or thereafter issued under the Master Indenture, including the Notes, the 2005 Notes, the 2003 Notes and the Series 4 Note, according to the terms thereof. See **APPENDIX C**. The Notes will be on parity with the 2005 Notes issued by WVUH in connection with the issuance of the 2005 Authority Bonds, the 2003 Notes issued by WVUH in connection with the issuance of the 2003 Authority Bonds and the Series 4 Note issued by WVUH in connection with the issuance of the 1998 Authority Bonds. WVUH-Series 1 Note, Series 2 Note and Series 3 Note have been defeased and are no longer outstanding.

**Limitations on Liens**. Each Member of the Obligated Group agrees that it will not create, or permit to be created or remain and, at their cost and expense, promptly discharge or terminate all Liens on its Property or any part thereof which are not Permitted Encumbrances. See **APPENDIX C**.

**Debt Service Reserve Fund**. The Debt Service Reserve Fund shall not be funded initially. Under certain circumstances, the Obligated Group will be required to fund the Debt Service Reserve Fund at the Debt Service Reserve Fund Requirement. See **APPENDIX C**.

31

**Additional Covenants of the Obligated Group**. Pursuant to the Master Indenture, the Members of the Obligated Group have agreed with the Master Trustee to subject themselves to certain operational and financial restrictions contained therein. See **APPENDIX C**.

**Additional Indebtedness**. The members of the Obligated Group, upon compliance with the terms and conditions and for the purposes described in **APPENDIX C**, may issue additional Indebtedness.

**Other Long-Term Indebtedness of the Obligated Group**. Following issuance of the 2006 Bonds as described under "**PLAN OF FINANCE**" below, there will remain outstanding $59,025,000 of the 2005 Authority Bonds, $130,380,000 of the 2003 Authority Bonds and $37,110,000 of the 1998 Authority Bonds. As of March 31, 2006, the Members of the Obligated Group had approximately $5,664,000 of miscellaneous subordinate long-term debt obligations outstanding.

## BOND INSURANCE

**Payment Pursuant to Financial Guaranty Insurance Policy**. Ambac Assurance has made a commitment to issue a financial guaranty insurance policy (the "Financial Guaranty Insurance Policy") relating to the 2006 Bonds effective as of the date of Issuance of the 2006 Bonds. Under the terms of the Financial Guaranty Insurance Policy, Ambac Assurance will pay to The Bank of New York, in New York, New York or any successor thereto (the "Insurance Trustee") that portion of the principal of and interest on the 2006 Bonds which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor (as such terms are defined in the Financial Guaranty Insurance Policy). Ambac Assurance will make such payments to the Insurance Trustee on the later of the date on which such principal and interest becomes Due for Payment or within one business day following the date on which Ambac Assurance shall have received notice of Nonpayment from the Trustee/Paying Agent/Bond Registrar. The insurance will extend for the term of the 2006 Bonds and, once issued, cannot be canceled by Ambac Assurance.

The Financial Guaranty Insurance Policy will insure payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. If the 2006 Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding 2006 Bonds, Ambac Assurance will remain obligated to pay principal of and interest on outstanding 2006 Bonds on the originally scheduled interest and principal payment dates including mandatory sinking fund redemption dates. In the event of any acceleration of the principal of the 2006 Bonds, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration.

In the event the Trustee has notice that any payment of principal of or interest on a 2006 Bond which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such registered owner will be entitled to payment from Ambac Assurance to the extent of such recovery if sufficient funds are not otherwise available.

32

The Financial Guaranty Insurance Policy does **not** insure any risk other than Nonpayment, as defined in the Policy. Specifically, the Financial Guaranty Insurance Policy does **not** cover:

1.     payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity.

2.     payment of any redemption, prepayment or acceleration premium.

3.     nonpayment of principal or interest caused by the insolvency or negligence of any Trustee, Paying Agent or Bond Registrar, if any.

If it becomes necessary to call upon the Financial Guaranty Insurance Policy, payment of principal requires surrender of 2006 Bonds to the Insurance Trustee together with an appropriate instrument of assignment so as to permit ownership of such 2006 Bonds to be registered in the name of Ambac Assurance to the extent of the payment under the Financial Guaranty Insurance Policy. Payment of interest pursuant to the Financial Guaranty Insurance Policy requires proof of Holder entitlement to interest payments and an appropriate assignment of the Holder's right to payment to Ambac Assurance.

Upon payment of the insurance benefits, Ambac Assurance will become the owner of the 2006 Bonds, appurtenant coupon, if any, or right to payment of principal or interest on such 2006 Bonds and will be fully subrogated to the surrendering Holder's rights to payment.

The Financial Guaranty Insurance Policy does not insure against loss relating to payments made in connection with the sale of Auction Rate Certificates at Auctions or losses suffered as a result of a Holder's inability to sell Auction Rate Certificates.

The Financial Guaranty Insurance Policy does not insure against loss relating to payments of the purchase price of variable rate obligations upon tender by a registered owner thereof or any preferential transfer relating to payments of the purchase price of variable rate obligations upon tender by a registered owner thereof.

**Ambac Assurance Corporation**.  Ambac Assurance Corporation ("Ambac Assurance") is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin and licensed to do business in 50 states, the District of Columbia, the Territory of Guam, the Commonwealth of Puerto Rico and the U.S. Virgin Islands, with admitted assets of approximately  $9,417,000,000 (unaudited) and  statutory capital of approximately $5,879,000,000 (unaudited) as of March 31, 2006.  Statutory capital consists of Ambac Assurance's policyholders' surplus and statutory contingency reserve. Standard & Poor's Credit Markets Services, a Division of The McGraw-Hill Companies, Moody's Investors Service and Fitch Ratings have each assigned a triple-A financial strength rating to Ambac Assurance.

Ambac Assurance has obtained a ruling from the Internal Revenue Service to the effect that the insuring of an obligation by Ambac Assurance will not affect the treatment for federal income tax

33

purposes of interest on such obligation and that insurance proceeds representing maturing interest paid by Ambac Assurance under policy provisions substantially identical to those contained in its financial guaranty insurance policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the Obligor of the obligations.

Ambac Assurance makes no representation regarding the 2006 Bonds or the advisability of investing in the 2006 Bonds and makes no representation regarding, nor has it participated in the preparation of, the Official Statement other than the information supplied by Ambac Assurance and presented under the heading "BOND INSURANCE".

**Available Information**. The parent company of Ambac Assurance, Ambac Financial Group, Inc. (the "Company"), is subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and in accordance therewith files reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including the Company . These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc. (the "NYSE"), 20 Broad Street, New York, New York 10005.

Copies of Ambac Assurance's financial statements prepared in accordance with statutory accounting standards are available from Ambac Assurance. The address of Ambac Assurance's administrative offices and its telephone number are One State Street Plaza, 19th Floor, New York, New York 10004 and (212) 668-0340.

**Incorporation of Certain Documents by Reference.** The following documents filed by the Company with the SEC (File No. 1-10777) are incorporated by reference in this Official Statement:

1.      The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2005 and filed on March 13, 2006;

2.      The Company's Current Report on Form 8-K dated and filed on April 26, 2006; and

3.      The Company's Quarterly Report on Form 10-Q for the fiscal quarterly period ended March 31, 2006 and filed on May 10, 2006.

All documents subsequently filed by the Company pursuant to the requirements of the Exchange Act after the date of this Official Statement will be available for inspection in the same manner as described above in "Available Information".

34

## PLAN OF FINANCE

The proceeds of the sale of the 2006 Bonds will be used, together with an approximately $45 million equity contribution to be made by certain Members of the Obligated Group to (i) finance the acquisition, construction and equipping of a new hospital facility for UHC to be located in the City of Bridgeport, Harrison County, West Virginia, consisting of approximately 650,000 square feet, with a total of 318 beds, including 217 medical and surgical beds, 20 pediatric beds, 21 OB/GYN beds and 32 skilled nursing beds; (ii) pay interest on the 2006 Bonds for a period of approximately 36 months; and (iii) pay costs of issuing the 2006 Bonds, including cost of a financial guaranty insurance policy. Construction of the Replacement Facility is expected to begin during the Summer of 2006 and be substantially complete during the Fall of 2009. See "The Project" in **APPENDIX A**.

## BY VIRTUE OF THE OBLIGATIONS OF THE OBLIGATED GROUP UNDER THE MASTER INDENTURE, THE 2006 BONDS WILL BE ON PARITY AS TO LIEN UPON GROSS RECEIPTS AND SOURCE OF PAYMENT WITH THE 2005 AUTHORITY BONDS, THE 2003 AUTHORITY BONDS AND THE 1998 AUTHORITY BONDS.

The Obligated Group has entered into an interest rate swap agreement (the "2006 Swap Agreement") with UBS AG (the "Swap Provider") to hedge a portion of the Obligated Group's interest rate exposure on the 2006-1B Note and the 2006-1C Note (which reflect the obligations to make payments on the 2006 B Bonds and the 2006 C Bonds, respectively). No payments will be due under the 2006 Swap Agreement until the first payment, on August 1, 2006. The 2006 Swap Agreement provides that the Obligated Group will pay the Swap Provider a fixed payment semi-annually, commencing December 1, 2006, with respect to the principal amount of the 2006 B Bonds and the 2006 C Bonds, respectively and that the Swap Provider will pay the Obligated Group a variable payment monthly which is expected to approximately equal the variable rate payment owing on such 2006 B Bonds and 2006 C Bonds. The obligations of the Obligated Group under the 2006 Swap Agreement, which payments will be insured by the Bond Insurer, including the obligation to pay the amounts regularly coming due and any termination payment (if necessary, and if such amount is insured by the insurer of the Swap Agreement)(other than a Voluntary Termination Payment, as defined in the 2006 Swap Agreement) will be an Obligation issued pursuant to the Master Indenture, evidenced by the Obligated Group's 2006-1E Note (with respect to 2006 B Bonds) and the Obligated Group's 2006-1G Note (with respect to the 2006 C Bonds), and therefore will be secured on a parity basis with the Notes and all other Obligations issued under the Master Indenture (other than Subordinated Notes). Should the 2006 Swap Agreement terminate prior to maturity, the Obligated Group may owe a payment to the Swap Provider, and such amount, which cannot currently be calculated, may be material. The Obligated Group's obligations to make any Voluntary Termination Payments are evidenced by the Obligated Group's 2006-1F Subordinated Note (with respect to the 2006 B Bonds) and the Obligated Group's 2006-1H Subordinated Note (with respect to the 2006 C Bonds), issued under the Master Indenture. The 2006-1F Subordinated Note and the 2006-1H Subordinated Note are subordinate to the Notes, the 2006-1E Note, the 2006-1G Note and all other Obligations issued under the Master Indenture (other than Subordinated Notes). The 2006-1E, 2006-1F, 2006-1G and 2006-1H Notes do not constitute indebtedness under the Master Indenture.

The Swap Provider has no obligation to make payments directly to the holders of the 2006 Bonds or to the Bond Trustee; the holders of the 2006 Bonds have no contractual or other claims against the Swap Provider for payment of the 2006 Bonds and the Obligated Group will be obligated to make all payments of principal of, premium, if any, and interest on the 2006 Bonds pursuant to the Loan Agreement and the Bond Indenture.

See **"CERTAIN BONDHOLDERS' RISKS"** herein.

## ESTIMATED SOURCES AND USES OF FUNDS

The proceeds of the sale of the 2006 Bonds, together with an equity contribution to be made by certain Members of the Obligated Group will be used as follows:

**Sources of Funds**

| | |
|---|---|
| Par amount of 2006 Bonds | $231,635,000 |
| Equity contribution | 45,000,000 |
| Premium | 1,426,762 |
| | **$278,061,762** |

**Uses of Funds**

| | |
|---|---|
| Deposit to Project Fund | $185,939,108 |
| Equipment purchases [3] | 45,000,000 |
| Capitalized interest [2] | 39,089,404 |
| Issuance expenses [1] | 8,033,250 |
| | **$278,061,762** |

(1)    Includes fees and expenses of financial advisor, accountants, bond counsel, Obligated Group counsel, Authority counsel, Bond Trustee and Master Trustee, rating agencies, Underwriters' discount, bond insurance premium, printing and miscellaneous expenses.

(2)    Net of estimated interest earnings during construction period.

(3)    A portion of the equity contribution will be used to purchase equipment for the replacement hospital.

## DEBT SERVICE REQUIREMENTS

The following table sets forth, for each year ending June 1, the total principal or sinking fund and interest requirements with respect to the 2006 Bonds, the 2005 Authority Bonds, the 2003 Authority Bonds and the 1998 Authority Bonds.

| June 1 | Principal of Series 2006 Bonds | Interest on Series 2006 Bonds [1][2] | Existing Debt Service[3] | Debt Service - Other Indebtedness[4] | Aggregate Total |
|---|---|---|---|---|---|
| 2007 |  | $ 9,629,141 | $ 14,320,757 | $ 4,566,132 | $ 28,516,030 |
| 2008 |  | 9,820,088 | 14,622,066 | 1,790,737 | 26,232,891 |
| 2009 |  | 9,820,088 | 14,190,352 | 503,147 | 24,513,587 |
| 2010 | $ 3,350,000 | 9,820,088 | 14,564,167 | 411,126 | 28,145,381 |
| 2011 | 3,500,000 | 9,686,943 | 14,452,552 | 157,304 | 27,796,799 |
| 2012 | 3,650,000 | 9,547,691 | 14,466,923 | 161,633 | 27,826,247 |
| 2013 | 3,800,000 | 9,402,622 | 14,474,126 | 32,698 | 27,709,446 |
| 2014 | 3,975,000 | 9,251,526 | 14,309,440 |  | 27,535,966 |
| 2015 | 4,205,000 | 9,093,534 | 14,648,080 |  | 27,946,614 |
| 2016 | 4,400,000 | 8,911,157 | 14,304,730 |  | 27,615,887 |
| 2017 | 4,605,000 | 8,720,108 | 12,003,997 |  | 25,329,105 |
| 2018 | 4,795,000 | 8,536,658 | 11,955,614 |  | 25,287,272 |
| 2019 | 5,005,000 | 8,328,608 | 12,003,968 |  | 25,337,576 |
| 2020 | 5,295,000 | 8,111,346 | 11,990,636 |  | 25,396,982 |
| 2021 | 5,560,000 | 7,886,302 | 12,027,263 |  | 25,473,565 |
| 2022 | 5,810,000 | 7,649,049 | 12,022,058 |  | 25,481,107 |
| 2023 | 6,065,000 | 7,399,414 | 11,996,454 |  | 25,460,868 |
| 2024 | 6,345,000 | 7,141,277 | 11,985,920 |  | 25,472,197 |
| 2025 | 6,610,000 | 6,871,078 | 11,990,516 |  | 25,471,594 |
| 2026 | 6,890,000 | 6,601,492 | 11,995,466 |  | 25,486,958 |
| 2027 | 7,180,000 | 6,320,321 | 12,008,576 |  | 25,508,897 |
| 2028 | 7,505,000 | 6,019,237 | 12,002,465 |  | 25,526,702 |
| 2029 | 7,830,000 | 5,705,847 | 12,039,298 |  | 25,575,145 |
| 2030 | 8,170,000 | 5,378,944 | 12,015,492 |  | 25,564,436 |
| 2031 | 8,510,000 | 5,037,594 | 10,208,098 |  | 23,755,692 |
| 2032 | 8,885,000 | 4,681,804 | 10,211,533 |  | 23,778,337 |
| 2033 | 9,255,000 | 4,316,546 | 10,212,432 |  | 23,783,978 |
| 2034 | 9,660,000 | 3,932,940 | 10,207,125 |  | 23,800,065 |
| 2035 | 10,070,000 | 3,537,598 | 10,195,938 |  | 23,803,536 |
| 2036 | 10,515,000 | 3,101,963 |  |  | 13,616,963 |
| 2037 | 10,990,000 | 2,646,552 |  |  | 13,636,552 |
| 2038 | 11,480,000 | 2,170,481 |  |  | 13,650,481 |
| 2039 | 12,005,000 | 1,664,157 |  |  | 13,669,157 |
| 2040 | 12,570,000 | 1,130,001 |  |  | 13,700,001 |
| 2041 | 13,150,000 | 577,960 |  |  | 13,727,960 |
| Totals | $231,635,000 | $228,450,154 | $363,426,042 | $7,622,777 | $831,133,973 |

(1)   Interest on the variable rate debt assumed at an average auction rate of 3.75% per annum.
(2)   Interest on the swapped portion of the Series 2006 Bonds assumed at a rate of 3.9699% per annum for Series 2006 B Bonds and 3.9990% per annum for Series 2006 C Bonds.
(3)   Interest on the variable rate debt assumed at an average auction rate of 3.25% per annum.
(4)   Consists of equipment loans, capital leases, and lines of credit.

## THE OBLIGATED GROUP

The Members of the Obligated Group are, or will be, on the date of delivery of the 2006 Bonds, WVUH, UHC, City, Jefferson and the Foundation. WVUH is incorporated in the State of West Virginia as a nonprofit corporation and is exempt from federal income taxation under Section 501(c)(3) of the Code. UHC is a controlled member of West Virginia United Health System, Inc. (the "System"), which is currently comprised of WVUH, UHC, City, Jefferson, the Foundation, Allied Health Services, Inc., United Physicians Care, Inc., and HPN Services, Inc. Additional information with respect to WVUH and UHC is contained in **APPENDIX A - "INFORMATION CONCERNING THE SYSTEM AND THE OBLIGATED GROUP"** hereto.

On January 1, 2005, WVUH became the sole member of WVUH-East, Inc. which is the sole member of City, Jefferson and the Foundation, each a West Virginia nonprofit corporation and 501(c)(3) organization.

**WVUH, UHC, CITY, JEFFERSON AND THE FOUNDATION ARE OR WILL BE ON THE DATE OF DELIVERY OF THE 2006 BONDS, THE ONLY MEMBERS OF THE OBLIGATED GROUP FOR PURPOSES OF PAYMENT ON THE NOTES, THE 2005 NOTES, THE 2003 NOTES AND THE SERIES 4 NOTE. NEITHER THE SYSTEM NOR ANY OF ITS OTHER AFFILIATES HAS ANY OBLIGATION TO PAY DEBT SERVICE ON THE NOTES. SEE "INTRODUCTORY STATEMENT" HEREIN.**

## CERTAIN BONDHOLDERS' RISKS

**Introduction**. The following section describes certain risk factors affecting the payment of and security for the 2006 Bonds. The following discussion is not meant to be an exhaustive list of the risks associated with the purchase of any 2006 Bonds and does not necessarily reflect the relative importance of the various risks. Potential investors are advised to consider the following special factors along with all other information described elsewhere or incorporated by reference in this Official Statement, including the Appendices hereto, in evaluating the 2006 Bonds.

**Concerning Limited Obligations of the Authority**. The 2006 Bonds are limited obligations of the Authority, and are payable solely from the sources described under "**BOND INSURANCE**" and "**SECURITY FOR THE 2006 BONDS**" herein, which include payments by the Obligated Group under the Loan Agreement and payments made by any Member of the Obligated Group under the Notes, and certain funds held by the Bond Trustee under the Bond Indenture. **No feasibility study was performed by or on behalf of the Obligated Group in connection with the issuance of the 2006 Bonds**. No representation can be made or assurance given that the Obligated Group will generate sufficient Gross Receipts to meet its obligations under the Loan Agreement and the Notes. The ability of the Obligated Group to meet such obligations could be adversely affected by future events, conditions and circumstances that are not predictable, including, but not limited to, those described below.

The discussion herein of investment considerations and risks to the Bondholders is not intended to be dispositive, comprehensive or definitive, but rather is meant to summarize certain matters, which could affect payment on the 2006 Bonds. Other sections of this Official Statement, as cited herein, should be referred to for a more detailed description of risks described in this section, which descriptions are qualified by reference to any documents discussed therein. This discussion of risk factors is not, and is not intended to be, exhaustive.

**Concerning the Auction Rate Certificates.** So long as they are in the Auction Mode, the beneficial owner of Auction Rate Certificates may sell, transfer or dispose of Auction Rate Certificates only pursuant to a Bid or Sell Order in accordance with the Auction Procedures or through a Broker-Dealer for the Auction Rate Certificates. See **APPENDIX E.** The ability to sell an ARCs in an Auction may be adversely affected if there are not sufficient buyers willing to purchase all of the ARCs at an interest rate equal to or less than the Maximum Rate. The Broker-Dealer has advised the Issuer that it intends to make a market in the Auction Rate Certificates between Auctions; however, the Broker-Dealer is not obligated to make such market, and no assurance can be given that secondary markets therefor will develop.

**Interest Rate Swap Risk.** As with most marketable securities, the 2006 Swap Agreement is subject to "mark-to-market" valuations. The 2006 Swap Agreement may, at any time, have a negative value to the Obligated Group. The Bond Insurer will issue an insurance policy to guarantee to the Swap Provider the payments to be made by the Obligated Group pursuant to the 2006 Swap Agreement. The Swap Provider may terminate the 2006 Swap Agreement upon nonpayment by the Obligated Group and the Bond Insurer or, under certain circumstances, in the event rating agencies withdraw or downgrade the rating of the Bond Insurer or the Obligated Group, unless the Obligated Group provides substitute credit support acceptable to the Swap Provider. The Obligated Group may terminate the 2006 Swap Agreement at any time. If either the Swap Provider or the Obligated Group terminates the 2006 Swap Agreement during a negative value situation, the Obligated Group may be subject to a termination payment to the Swap Provider, and such payment may be material.

**Concerning the Financing Documents.** The 2006 Bonds are payable by the Authority solely from the related Trust Estate. Enforcement of remedies under the Bond Indenture, the Master Indenture, the Loan Agreement and the Note for any series may be limited or restricted by laws relating to bankruptcy and rights of creditors and by application of general principles of equity applicable to the availability of specific performance or other equitable relief and may be substantially delayed in the event of litigation or statutory remedy procedures. The enforcement of the pledge of the Obligated Group's Gross Receipts under the Master Indenture may be limited by a number of factors, including the absence of an express provision permitting assignment of payments due to Members of the Obligated Group under Medicare or Medicaid programs and contracts between Members of the Obligated Group and other third-party payors. In the event of any default by the Members of the Obligated Group under the Master Indenture, the Master Trustee may not be able to require Medicare, Medicaid or other intermediaries to make payments directly to the Master Trustee. Under current law, such pledge may be further limited by the following: (i) statutory liens; (ii) rights arising in favor of the United States or any agency thereof; (iii) present or future prohibitions against assignment contained in any federal statutes or regulations; (iv)

39

constructive trusts, equitable liens or other rights imposed or conferred by any state or federal court in the exercise of its equitable jurisdiction; (v) federal bankruptcy laws affecting assignments of revenue earned after any institution of bankruptcy proceedings by or against Members of the Obligated Group; (vi) rights of third parties in revenues of the Members of the Obligated Group converted to cash and not in possession of the Master Trustee (or a depository on behalf of the Master Trustee); and (vii) the requirement that appropriate financing or continuation statements or similar notices be filed in accordance with the Uniform Commercial Code as from time to time in effect, or other applicable laws of the State of West Virginia.

Under the Bankruptcy Code and state fraudulent conveyance statutes, an obligation may be declared void if (a) the obligation has been incurred (within one year of the filing of a petition under the Bankruptcy Code) without receipt of fair consideration or of reasonably equivalent value by the obligor, or (b) the obligor was insolvent at the time the obligation was incurred or the incurrence of such obligation renders the obligor insolvent, as defined in the Bankruptcy Code or in the applicable state statute. It is possible that the obligation of any Member of the Obligated Group to make payments on obligations of another Member under the cross-guaranty provisions of the Master Indenture, or the joint and several obligation of each Member of the Obligated Group to pay all amounts due under the Notes, may be avoided in the event of bankruptcy of a Member of the Obligated Group from which payment is requested or in an action brought pursuant to the applicable state fraudulent conveyance statute.

The joint and several obligations described herein of the Members of the Obligated Group to make payments of debt service on the Notes issued pursuant to and under the Master Indenture may not be enforceable to the extent (1) enforceability may be limited by applicable bankruptcy, moratorium, reorganization, fraudulent conveyance or similar laws affecting the enforcement of creditors' rights and by general equitable principles or (2) such payments (a) are requested to be made with respect to payments on any Note which is issued for a purpose that is not consistent with the charitable purposes of the Member of the Obligated Group from which such payment is requested or which is issued for the benefit of any entity other than a tax-exempt organization; (b) are requested to be made from any money or assets which are donor restricted or which are subject to a direct or express trust which does not permit the use of such money or assets for such payment; (c) would result in the cessation or discontinuation of any material portion of the health-care or related services previously provided by such Member of the Obligated Group; or (d) are requested to be made pursuant to any loan violating applicable usury laws. The extent to which the money or assets of any present or future Member of the Obligated Group falls within the categories referred to above cannot be determined and could be substantial.

Members of the Obligated Group may not be required to make any payment of any Notes, or portion thereof, the proceeds of which were not loaned or otherwise disbursed to such Member of the Obligated Group to the extent that such payment would render such Member insolvent or would conflict with, would not be permitted by, or would be subject to recovery for the benefit of other creditors of such member under applicable laws. There is no clear precedent in the law as to whether payments by a Member of the Obligated Group pursuant to the Master Indenture or the Notes may be voided by a trustee in bankruptcy in the event of a bankruptcy of such Member of the

40

Obligated Group or by third party creditors in an action brought pursuant to State fraudulent conveyances statutes. Under the United States Bankruptcy Code, a trustee in bankruptcy and, under State fraudulent conveyances statutes, a creditor of a related guarantor, may avoid any obligation incurred by a related guarantor, if, among other bases therefor, (a)(i) the guarantor has not received fair consideration or reasonably equivalent value in exchange for the guaranty and (ii) the guaranty renders the guarantor insolvent, as defined in the United States Bankruptcy Code or State fraudulent conveyances statutes, or (b) the guarantor is undercapitalized or intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they become due.

Application by courts of the test of "insolvency," "reasonably equivalent value" and "fair consideration" has resulted in a conflicting body of case law. It is possible that, in any action to force a Member of the Obligated Group to make a payment pursuant to the Master Indenture or the Notes, a court might not enforce such payment obligation in the event it is determined that the Member of the Obligated Group is analogous to a guarantor of the debt of the Member who directly benefitted from the borrowing and that sufficient consideration for the Member's guaranty obligation was not received and that the incurrence of such obligation has rendered or will render the Member insolvent or such Member of the Obligated Group is or will thereby become undercapitalized.

Each Note is secured on parity with the other Notes and all other Obligations issued under the Master Indenture. See **APPENDIX C**. Further, an Event of Default under the Master Indenture or a Loan Default under the related Loan Agreement constitutes an Event of Default under each Bond Indenture. See **APPENDIX C**.

**Concerning the Obligated Group's Operations.** Future revenues and expenses of the Obligated Group are subject to, among other things, the demand for the services provided by the Obligated Group, the capabilities and continued support of the management of the Obligated Group, the ability of management to recruit new physicians and other personnel and to maintain the support of the present medical staff and other personnel, economic developments and population trends in the service area, competition, rates, costs, third-party reimbursement programs, the availability of gifts and contributions from donors and of federal and state loans and grants, the effect of changes in accreditation standards or governmental regulations, the availability of adequate malpractice insurance coverage, and the ability of management to control expenses during periods of inflation and to increase room charges and other fees charged while maintaining the amount and quality of health services delivered. The regulatory and market factors discussed below may have an adverse effect on the financial condition of the Obligated Group. In particular, the following factors, among others, may have an adverse effect on the financial condition of the Obligated Group to an extent that cannot be determined at this time.

Upon the issuance of the 2006 Bonds, WVUH, UHC, City, Jefferson and the Foundation are the only Members of the Obligated Group under the Master Indenture. The Master Indenture permits the addition of other Members, and the withdrawal of current Members if certain conditions are met.

41

**Construction Risks.** There are certain risks inherent in any construction project, including delays, problems with contractors, and cost overruns. It is anticipated that the construction contracts for the Project will not be guaranteed maximum price contracts. It is further anticipated that a general construction manager (Centex Construction, Inc.) will be engaged for the Project. Approximately 15 individual construction contracts will be sequenced, competitively bid, analyzed and awarded. Current construction cost estimates include allowances for inflation and construction contingencies, but no assurance can be given that these allowances will be sufficient.

**Government Programs -The Medicaid and Medicare Programs.** Medicare and Medicaid are the commonly used names for hospital reimbursement or payment programs governed by certain provisions of the federal Social Security Act. Medicare is an exclusively federal program and Medicaid is jointly funded by federal and state government. Medicare provides certain health care benefits to beneficiaries who are 65 years of age or older or disabled, or qualify for the End Stage Renal Disease Program. Medicaid is designed to pay providers for care given to the medically indigent, is funded by federal and state appropriations, and is administered by the various states. Hospital benefits are available under each participating state's Medicaid program, within prescribed limits, to persons meeting certain minimum income or other eligibility requirements including children, the aged, the blind and/or disabled.

Laws and regulations governing the Medicare and Medicaid programs are extremely complex and subject to interpretation. As a result, there is at least a reasonable possibility that recorded estimated settlements will change by material amounts in the near term. Compliance with such laws and regulations can be subject to future government review and interpretation as well as significant regulatory action, including fines, penalties, and exclusion from Medicare and Medicaid programs. Management of the Members of the Obligated Group believe that they are in compliance with all applicable laws and regulations and are not aware of any pending or threatened investigations involving allegations of potential wrongdoing that would be material to the financial condition of the Obligated Group. While no such regulatory inquiries have been made, compliance with such laws and regulations can be subject to future government review and interpretation, as well as significant regulatory action, including fines, penalties, and exclusion from the Medicare and Medicaid programs.

Health care providers have been and will be affected significantly by changes in the last several years in federal health care laws and regulations, particularly those pertaining to Medicare and Medicaid. The purpose of much of the recent statutory and regulatory activity has been to reduce the rate of increase in reimbursement of health care costs, particularly costs paid under the Medicare and Medicaid programs. Diverse and complex mechanisms to limit the amount of money paid to health care providers under both the Medicare and Medicaid programs have been enacted, and have caused severe reductions in reimbursement from the Medicare program.

The payment systems, which were once designed to reimburse a hospital's full costs, have been altered to pay set amounts determined in advance through what are known as prospective payment systems (PPS). Moreover, in the Medicare Prescription Drug Improvement and Modernization Act signed into law on December 8, 2003 ("the MMA") Congress has encouraged

42

the growth of managed care organizations as part of the payment scheme, as well as the use of market-based pricing mechanisms, all in an effort to control the growth on federal health care expenditures.

The following is a summary of the Medicare and Medicaid programs and certain risk factors related thereto.

### Medicare.

**General.**  Approximately 52% of the total inpatient discharges of UHC for the fiscal year ended December 31, 2005, 32% of the total inpatient discharges of WVUH for the fiscal year ended December 31, 2005, 40% of the total inpatient discharges of City for the fiscal year ended December 31, 2005, and 44% of the total inpatient discharges of Jefferson for the fiscal year ended December 31, 2005 were derived from Medicare.  Medicare pays acute care hospitals for most services provided to inpatients under a payment system known as the "Prospective Payment System" or "PPS," pursuant to which hospitals are paid for services based on predetermined rates.  Separate PPS payments are made for inpatient operating costs and in patient capital costs.  Such payments are not based upon a hospital's cost of providing service.  Jefferson has been designated as a "Critical Access Hospital" ("CAH") by Medicare.  Medicare pays critical access hospitals for inpatient services 101% of their reasonable costs.  In addition, the statute provides that Medicare will pay the compensation expenses for physicians and mid-level practitioners who are on call to furnish emergency department services even if they are not at the hospital.  Medicare does not cover these costs for individuals who are furnishing services elsewhere or simultaneously on call for another facility.  See **APPENDIX A** for a discussion of the Medicare payments received by UHC, WVUH, City and Jefferson.

**Medicare Inpatient Disproportionate Share (DSH).**  UHC, WVUH, City and Jefferson receive DSH payments, respectively, through the Medicare DRG reimbursement methodology.  The Medicare DSH adjustment provision under section 1886 (d) (5) (f) of the act was enacted by section 9105 of the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985 and became effective for discharges occurring on or after May 1, 1986.  The primary method is for a hospital to qualify based on a complex statutory formula that results in the DSH patient percentage.  The DSH patient percentage is equal to the sum of the percentage of Medicare inpatient days attributable to patients eligible for both Medicare part A and Supplemental Security Income (SSI), and the percentage of total inpatient days attributable to patients eligible for Medicaid but not Medicare part A.  Adding the results of two computations and expressing that sum as a percentage determine a hospital's DSH patient percentage.  UHC's current DSH percentage is approximately 24%; WVUH's current DSH percentage is approximately 40.5%; City's current DSH percentage is approximately 28.8%; and Jefferson's current DSH percentage is approximately 28.0%.

**Inpatient Operating Costs.**  Acute care hospitals that participate in Medicare are paid on the basis of PPS, on a per-discharge basis at fixed rates based on the Diagnosis Related Group ("DRG") to which each Medicare patient is assigned.  The DRG is determined by the diagnoses, procedures and other factors for each Medicare patient.  The amount to be paid for each DRG is established prospectively by The Centers for Medicare and Medicaid Services ("CMS") (formerly,

43

The Health Care Financing Administration), an agency of the United States Department of Health and Human Services ("HHS"), and is not, with certain exceptions, related to a hospital's actual costs or variations in service or length of stay. For certain Medicare beneficiaries who have unusually long or costly hospital stays ("outliers"), CMS will provide additional payments above those specified for the DRG.

PPS payments are adjusted annually using an inflation index, based on the cost of providing health care services. In the past few years, the Medicare annual increases have been less than the applicable rate of inflation. Under the MMA, for federal fiscal years 2006 through 2007, a hospital will receive a full inflation update if it agrees to submit data in certain quality indicators to CMS. If such data is not submitted, a hospital will receive the inflation index minus 0.4 percentage points. There is no assurance that future updates in the PPS payments will keep pace with the increases in the cost of providing hospital services.

To the extent a hospital discharges a patient classified within one of 29 specified DRGs to a post-acute care setting such as skilled nursing facilities (SNFs) or home health agencies (HHAs), such discharges are treated as transfers, and the hospital receives a reduced DRG payment. It is possible that this post-acute care transfer policy could be extended to more DRGs in the future, thus potentially reducing hospital DRG revenue.

If a hospital incurs costs in treating Medicare inpatients, which exceed the DRG level of reimbursement plus any outlier payments, such hospital will experience a loss from such services, which will have to be made up from other revenue sources. Other third party payors have begun implementing their own limitations on reimbursement payable to hospitals to avoid such "cost-shifting."

**Inpatient Capital Costs**. Medicare payments for capital costs (e.g., depreciation, interest, taxes and similar expenses for plant and equipment), are based upon a PPS system similar to the inpatient operating cost PPS. A separate per-case standardized amount is paid for capital costs, adjusted to take into account certain hospital characteristics and weighted by DRG. As of October 1, 2001, capital costs are reimbursed exclusively on the basis of a standard federal rate (based upon average national costs of capital), subject to certain adjustments specific to the hospital (such as for disproportionate share, indirect medical education and outlier cases).

There can be no assurance that the prospective payment for capital costs will be sufficient to cover the actual capital-related costs of UHC, WVUH, City or Jefferson allocable to Medicare patient stays or to provide adequate flexibility in meeting their respective future capital needs.

**Cost of Outpatient Services**. Beginning August 1, 2000, CMS implemented PPS for hospital outpatient services ("Outpatient PPS"), certain Part B services furnished to hospital inpatients that have no Part A coverage, and partial hospitalization services furnished by community mental health centers. All services paid under the new Outpatient PPS are classified into groups called Ambulatory Payment Classifications or "APCs." Services in each APC are similar clinically and in terms of the resources they require. A payment rate is established for each APC. Depending

44

on the services provided, hospitals may be paid for more than one APC for an encounter. CMS will make additional payment adjustments under Outpatient PPS, including (i) "outlier" payments for services where the hospital's cost exceeds 2.6 times the APC rate for that service; and (ii) limited pass-through payments for certain drugs and medical devices.

The Balanced Budget Act of 1997 ("BBA") also changed the way beneficiaries' coinsurance is determined for the services included under the Outpatient PPS. Prior to Outpatient PPS, a beneficiary's coinsurance for outpatient services was 20% of the hospital's charges. Under Outpatient PPS, a coinsurance amount was calculated for each APC based on 20 percent of the national median charge for services in the APC. Initially, the coinsurance amount for an APC was not to change until such time as the amount becomes 20 percent of the total APC payment. Congress later accelerated the reduction in beneficiary copayment responsibility so that in 2004, the maximum copayment amount is 50% of the APC amount; in 2005, the rate is reduced to 45%; and in 2006 and years beyond, the rate goes down so that it cannot exceed 40% of the APC payment rate.

**Physician Payments**. Reimbursement for certain physician services is based on a Medicare fee schedule based on a "resource-based relative value scale" ("RBRVS"). The RBRVS fee schedule establishes payment amounts for all physician services, including services provided by most hospital employed physicians and non-physician practitioners, and is subject to annual updates.

**Mental Health Services**. Part A of the Medicare Program pays providers of mental health services for inpatient services. Coverage of inpatient mental health services is limited to 190 days of inpatient psychiatric hospital services during a beneficiary's lifetime, with certain limitations. Payments are made in an amount equal to the lesser of the billed charges or allowed reasonable direct and indirect costs (including depreciation, interest and overhead, if applicable) for the inpatient mental health services provided to Medicare beneficiaries. Medicare payments for inpatient mental health services are subject to limitation based on a target rate ceiling (which is tied to an inflation index and determined annually for each psychiatric hospital) for the rate of increase in the provider's operating costs for inpatient services. The target rate ceiling does not apply to capital-related costs.

The BBA established another Tax Equity and Fiscal Responsibility Act ("TEFRA") target ceiling for inpatient psychiatric services, which applies the lower of the hospital specific TEFRA rate or the 75th percentile of the national rate for psychiatric facilities. In addition, Medicare now limits the capital payment for inpatient psychiatric units and hospitals to 85% of their actual Medicare capital cost.

CMS implemented a new Prospective Payment System ("PPS") for inpatient psychiatric services on January 1, 2005. There can be no assurance that the new Medicare psychiatric PPS payments will be sufficient to cover all of the actual costs in providing inpatient psychiatric hospital services.

45

**Skilled Nursing Facility Services**. Medicare Part A covers nursing services furnished by or under the supervision of a registered professional nurse, as well as physical, occupational, and speech therapy, provided by skilled nursing facilities ("SNFs") that are certified for participation in the Medicare program. Medicare coverage of SNF services is available only if the patient is hospitalized for at least three days, the need for SNF services is related to the reason for the hospitalization, and the patient is admitted to the SNF within 30 days following discharge from a hospital. Medicare coverage of SNF services is limited to 100 days per calendar year. The patient must pay a deductible and coinsurance amounts for the twenty-first and each of the remaining days of covered care per year.

Medicare pays for SNF services on a case-mix adjusted per diem PPS for SNFs for all routine, ancillary and capital-related costs. The federal per diem rate is determined according to which Resource Utilization Group ("RUG") the resident is assigned. For FY 2006, Medicare expanded the number RUG categories from 44 to 53 and adjusted the payment rates under the SNF PPS system. Since the implementation of the SNF PPS payment system, Medicare has consistently increased the base payment rates by an inflation factor. However, there is no assurance that future updates in the SNF PPS payment rates will keep pace with increases in costs in providing SNF services.

SNFs are also required to perform consolidated billing for services provided to their residents. Under the 1998 consolidated billing requirement, a SNF was required to submit Medicare claims to its fiscal intermediary ("Fiscal Intermediary") for all the Part A and certain Part B services that its residents received, with the exception of excluded services as specified. The consolidated billing requirement essentially conferred on the SNF itself the Medicare billing responsibility for the entire package of care that its residents received, with the exception of those specifically excluded services. Operating revenue from SNF patients is less than 2% of the total operating revenue of the Obligated Group.

**Medical Education.** Medicare pays for costs associated with both direct and indirect medical education (including salaries of residents and teachers and other overhead costs directly attributable to approved medical education programs for training residents, nurses and allied health professionals). Payment for the costs of indirect medical education is made as an adjustment to federal rates for capital-related costs. The indirect medical education adjustment is based on a ratio of hospital's number of residents to its daily census. For federal fiscal years 2005 and 2006, UHC's adjustment factor was set at approximately 3.4% and 3.4%; WVUH's adjustment factor was set at approximately 3.4% and 3.2%, respectively; City's adjustment factor was set at approximately 1.6% and 1.5%, respectively; and Jefferson's adjustment factor was set at approximately 3.3% (2005 only - there is no adjustment factor in 2006 for Jefferson due to conversions to CAH status.). For federal fiscal year 2007, their respective adjustment factors will be approximately 3.4% (UHC), 3.1% (WVUH) and 1.5% (City). Direct costs of approved education programs are excluded from the definition of operating costs and accordingly are not included in the calculation of PPS for inpatient hospital services. Payment for direct medical education is made on a "pass-through" basis based on a formula that reflects base year resident costs adjusted by inflation and the number of current-year reimbursable resident positions. UHC's direct medical education payments of approximately

46

$850,000 were reimbursed in federal fiscal years 2004 and 2005. WVUH's direct medical education payments of $4,841,000 and $5,000,000, respectively, were reimbursed in federal fiscal years 2004 and 2005. City's direct medical education payments of $143,200 and $112,800, respectively, were reimbursed in federal fiscal years 2004 and 2005. Jefferson's direct medical education payments of $126,600 and $121,000, respectively, were reimbursed in federal fiscal years 2004 and 2005. There can be no assurance that payments to UHC, WVUH, City and Jefferson for providing medical education will be adequate to cover the costs attributable to medical education programs for training residents, nurses, and allied health professionals.

**Outpatient Renal Dialysis Reimbursement**. Renal dialysis services are reimbursed on the basis of prospective reimbursement, though different rates are paid for hospital-based and free-standing facilities, and are adjusted for geographic differences in labor costs. The composite rate is the same regardless of whether the treatment is furnished in the facility or in the patient's home to encourage home dialysis, and must be accepted by the facility as payment in full for covered outpatient dialysis.

**Rehabilitation Facilities**.  The Balanced Budget Act of 1999 and the SCHIP Benefits Improvement and Protection Act of 2000 authorized the implementation of a per discharge prospective payment system (PPS) for Inpatient Rehab Facilities (IRF).  The IRF PPS will utilize information gathered from a patient assessment instrument to classify patients into distinct groups based upon clinical characteristics and expected resource needs.  Separate payments are calculated for each group.

**Hospice Reimbursement**.  Hospice services are reimbursed on a cost-based prospective payment method, subject to a "cap" amount.  CMS establishes daily payment amounts, which are adjusted to reflect local differences in wages, to reimburse four categories of covered hospice care: routine home care; continuous home care; inpatient respite care; and general inpatient care.  CMS has increased payment for Hospice services in 2004, 2005 and 2006 at a rate that has approximated the full market basket index (3%-3.5%).  There is no way to predict whether future updates will keep pace with the costs of providing hospice care.  Hospice programs are required to submit cost data for each federal fiscal year beginning on or after October 1, 1998.

**Home Health Agencies.**  Medicare Part A covers certain "part-time" or "intermittent" skilled nursing and therapy, as well as medical social services and home health aide services, provided by home health agencies ("HHAs") to individuals in their places of residence. To qualify for home health care, a Medicare beneficiary must be confined to the home, under the care of a physician, receiving services under a plan of care established and periodically reviewed by a physician, be in need of skilled nursing care on an intermittent basis, or physical therapy or speech-language pathology, or have a continuing need for occupational therapy.

Beginning October 1, 2000, all services covered under the Medicare home health benefit, including routine and certain non-routine medical supplies, began to be paid on a "per episode" basis. For each 60 day episode of care, the HHA receives a set amount, depending on the patient's condition, so long as at least five visits are rendered.  The payment for each episode is based on a

47

national standardized amount that is adjusted by a case mix factor (based on the severity of the patient's condition) and the area wage index. CMS has increased payment for home health services in 2004, 2005 and 2006 at a rate that has approximated the full market basket inflation index (3% to 3.5%). There is no way to predict whether future updates will keep pace with the costs of providing home health services.

There is no limit on the number of 60-day episodes per fiscal year. The payment will cover one individual for 60 days regardless of the number of visits actually furnished, unless one of two "intervening events" occurs: (1) a voluntary transfer by the patient to an unrelated HHA; or (2) a discharge because the patient's plan of care goals were met, followed by a readmission to the same HHA. In both of these instances, a partial-episode payment (PEP) will be made. If the patient experiences a significant change in condition (SCIC), SCIC payments will be made in lieu of a single episode payment.

Each episode payment will be based on the standardized amount adjusted by a case mix factor. The case mix factor is based on the patient's outcome and assessment information set (OASIS) and on a prediction of whether the patient will require at least 8 hours (defined as 10 visits) of therapy.

If a patient receives four or fewer visits, the HHA will be paid on a per-visit basis, receiving a low utilization payment adjustment (LUPA) instead of an episode payment.

**Medicare Conditions of Participation**. Hospitals must comply with standards called "Conditions of Participation" in order to be eligible for Medicare and Medicaid reimbursement. CMS is responsible for ensuring that hospitals meet these regulatory Conditions of Participation.

Under the Medicare rules, hospitals accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") are deemed to meet the Conditions of Participation. However, CMS may request that the state agency responsible for approving hospitals on behalf of CMS, conduct a "sample validation survey" of a hospital to determine whether it is complying with the Conditions of Participation. Failure to maintain JCAHO accreditation or to otherwise comply with the Conditions of Participation could have a materially adverse affect on the continued participation in the Medicare and Medicaid programs, and ultimately, the revenues of UHC, WVUH, City and Jefferson.

**Medicare Audits**. Medicare certified hospitals are subject to audits and retroactive audit adjustments with respect to reimbursement claimed under the Medicare program. Medicare regulations also provide for withholding Medicare payments in certain circumstances. Any such withholding with respect to UHC, WVUH, City or Jefferson could have a material adverse effect on the ability of the Obligated Group to generate funds sufficient to pay the debt service on the 2006 Bonds or on the overall financial condition of the Members of the Obligated Group. In addition, contracts between hospitals and third-party payors often have contractual audit, setoff and withhold language that may cause substantial, retroactive adjustments. Such contractual provisions also could have a materially adverse effect on the financial condition of the Obligated Group. The Obligated

48

Group is not aware of any situation in which a Medicare payment is being, or may in the future be, withheld, whereby any such withholding would materially affect the financial condition or results of operations of the members of the Obligated Group.

Medicare requires that certain financial information be reported on a periodic basis, and with respect to certain types of classifications of information, penalties are imposed for inaccurate reports. As these requirements are numerous, technical and complex, there can be no assurance that WVUH, City or Jefferson will avoid incurring such penalties in the future. These penalties may be material and adverse and could include criminal or civil liability for making false claims and/or exclusion from participation in the federal healthcare programs. Under certain circumstances, payments made may be determined to have been made as a consequence of improper claims subject to the federal False Claims Act or other federal statutes, subjecting the provider to civil or criminal sanctions. The United States Department of Justice has instituted a number of national investigations, including in the State of West Virginia, involving proceedings under the federal False Claims Act relating to allegedly improper billing practices by hospitals. These actions have resulted in substantial settlement amounts being paid in certain cases.

CMS recently initiated an audit of aggressive pricing strategies related to outlier payments at one of the nation's largest hospital chains ("the chain"). Outlier payments are made for cases with higher than average costs. Such audit is designed to determine whether outlier payments to the hospitals were paid in accordance with Medicare regulations, and is focused on the charge data used by the hospitals to calculate their outlier reimbursements, and whether the charge data was inflated to increase reimbursement. The Office of the Inspector General of HHS ("OIG") and the Department of Justice have also initiated probes into the potentially abusive billing practices of the chain.

Following the initiation of the above noted audit, CMS issued Program Memoranda to its fiscal intermediaries directing them to analyze outlier payments and to identify other hospitals across the country with high outlier payments. CMS has indicated that hospitals found to have engaged in strategies to obtain excessive outlier payments will be referred to the CMS Program Integrity Unit for further investigation and, where appropriate, to the OIG. In light of the amounts at issue, and the publicity surrounding these audits, there can be no assurance that a member of the Obligated Group will not become a subject of an audit with respect to its outlier payments, or that such an audit will not have a material adverse impact such Member of the Obligated Group as a whole.

On July 31, 2003, CMS issued a new outlier payment rule changing the way it reimburses hospitals for outlier payments. The rule makes three major changes in the way outlier payments are calculated by: allowing Medicare to use more recent data to calculate outlier payments by using tentative settlement cost reports, rather than final settlement costs reports; eliminating the use of statewide average ratio of cost to charges for hospitals with very low computed costs to charge ratios and requiring hospitals to receive their actual cost-to-charge ratio; and allowing CMS to recover overpayments if the actual costs of a case, as reflected in the settled cost report are less than the provider claimed.

Respective management of the Members of the Obligated Group do not anticipate that Medicare audits or cost report settlements for the Medicare program will materially adversely affect the future financial condition or results of operations of the Obligated Group; however, in light of the complexity of the regulations relating to the Medicare program, and the threat of ongoing compliance programs as described above, there can be no assurance that significant difficulties will not develop in the future.

**Medicaid and PEIA.**   Medicaid is the federal/state program, created under the Social Security Act, by which hospitals receive reimbursement for services provided to eligible infants, children, adolescents and indigent adults. The Medicaid program is administered in West Virginia by the West Virginia Department of Health and Human Resources. The State Public Employees Insurance Agency ("PEIA") provides hospital, surgical, group major medical, prescription drug, group life and accidental death and dismemberment coverage for approximately 215,000 West Virginia public sector employees, including public school teachers, and their dependents. Approximately 23% of the total inpatient discharges of UHC for the fiscal year ended December 31, 2005, 31.85% of the total inpatient discharges of WVUH for the fiscal year ended December 31, 2005, 22.07% of the total inpatient discharges of City for the fiscal year ended December 31, 2005, and 19.35% of the total inpatient discharges of Jefferson for the fiscal year ended December 31, 2005, were derived from Medicaid and PEIA.

Payments made to health care providers under the Medicaid and PEIA programs are subject to change as a result of federal or state legislative and administrative actions, including changes in the methods for calculating payments, the amount of payments that will be made for covered services and the types of services that will be covered under the programs.  Such changes have occurred in the past and may be expected to occur in the future, particularly in response to federal and state budgetary constraints.

Medicaid and PEIA pay hospitals based on a prospective payment system, using diagnosis-related groups, for inpatient services.  Medicaid pays hospitals on the basis of a fee schedule for outpatient services.  PEIA pays hospitals on the basis of a resource-based relative value scale for most outpatient services and a discount from billed charges for others.

West Virginia charges health care providers a tax on revenues derived from health care services which ranges from 1.75% to 5.5% depending on the source of revenues.  The authorizing legislation currently imposes a tax of 2.5% upon the inpatient service revenues of inpatient hospitals. The tax receipts received are used to fund a portion of the State's share of Medicaid reimbursement.

In relation to any state health care programs (PEIA, Medicaid, and Workers' Compensation), the State has the power to develop a plan or plans by which it can unilaterally establish payment levels.

Moreover, PEIA, Medicaid and Workers' Compensation have, from time to time, studied a comprehensive managed care system.  PEIA enrollees may elect coverage through a preferred provider benefit plan or through external managed care organizations.  Medicaid is implementing

managed care plans in stages throughout the State. In the respective service areas of the Members of the Obligated Group, Medicaid managed care programs are not well established.

Federal cuts to Medicaid were an important provision of the BBA. Many of the factors associated with efforts to reduce Medicare costs discussed above (including fraud and abuse initiatives, reduced DRG and other payments and the trend toward risk based managed care) also apply to the Medicaid system. The impact of these federal cuts on UHC, WVUH, City and Jefferson cannot be determined at this time, but any reduction in federal Medicaid spending may produce further reductions in state programs and could have a material adverse effect on the financial condition of the Obligated Group.

**Blue Cross and Blue Shield.** Mountain State Blue Cross and Blue Shield ("MSBCBS") enters into participating hospital agreements ("PHAs") with hospitals which provide for payment by MSBCBS as a percentage of billed charges for patients covered by MSBCBS. WVUH's three-year contract with MSBCBS expired on May 1, 2006, but was extended until May 31, 2006, pursuant to an amendment to the PHA. At this time WVUH is negotiating with MSBCBS to enter into a new contract wherein the first year of the contact will remain revenue neutral and the remaining years of the contract will be subject to increases as outlined within the contract. No assurance can be given that a new PHA will be as favorable to WVUH as the existing PHA or that WVUH will continue to maintain a PHA with MSBCBS. If no such PHA is entered into and no further extension of the existing PHA is agreed to, on June 1, 2006, WVUH will be classified as an out-of-network facility for Blue Cross policyholders. Likewise, no assurance can be given that UHC, City or Jefferson will be able to obtain, maintain or renew PHA's with MSBCBS or other payors on acceptable terms in the future. Failure to obtain, maintain or renew such contracts could have the effect of reducing their respective market share, patient base and gross revenues.

**West Virginia Rate Regulation.** The West Virginia Health Care Authority (the "WVHCA") is responsible for reviewing and approving rate increases for West Virginia hospitals, upon which rates to nongovernmental payors are based. The WVHCA is also responsible for approving discount contracts between West Virginia hospitals and managed care organizations and other nongovernmental payors. A hospital may not revise its approved revenue limits without first filing a written request regarding such revision with the WVHCA and obtaining its approval. Refusal by the WVHCA to approve revenue limits and, accordingly, rates at requested levels could adversely affect the revenues of the Members of the Obligated Group. Unapproved rate increases, unjustified overages in revenues, unjustified overages in contractual allowances, unapproved discounts, and unjustified underages in non-supervisory wages are subject to penalties by the WVHCA, which may be in the form of a payment to third-party payors and purchasers or a reduction in a hospital's future rates. Consequently, penalties imposed by the WVHCA could adversely affect the revenues of the Members of the Obligated Group.

The existing rate methodology is primarily cost-based. A benchmark system has also been implemented to provide some regulatory relief to hospitals. WVHCA's benchmark system is a streamlined application process for hospitals to obtain increases in their average nongovernmental rates. WVHCA calculates the benchmarks on an annual basis. The benchmarked variables are

adjusted inpatient cost per discharge and adjusted average inpatient charge per discharge. Adjustments in an eligible hospital's charges are determined by a hospital's ranking in its peer group. There are two peer groups: those with over 100 beds and those with 100 or fewer beds. Eligible hospitals are allowed an annual increase in average nongovernmental inpatient and outpatient charges from 2.5% to a maximum of 7.5%.

**Managed Care.** UHC, WVUH, City and Jefferson each contract with several third party payors. For the fiscal year ended December 31, 2005, non-governmental third party payors accounted for approximately 18% of the total inpatient discharges of UHC, 26.6% of the total inpatient discharges of WVUH, 30.15% of the total inpatient discharges of City, and 25.35% of the total inpatient discharges of Jefferson. See "**CERTAIN BONDHOLDERS' RISKS - West Virginia Rate Regulation**" above.

The majority of third party payments to the hospitals are made under preferred provider organization ("PPOs") agreements. In many markets, though not yet in West Virginia, managed care plans, primarily health insuring corporations ("HICs"), also known as health maintenance organizations ("HMOs") have largely replaced indemnity insurance as the prime source of nongovernmental payment for hospital services. Under a PPO arrangement, there generally are financial incentives for subscribers to use only those hospitals or providers which contract with the PPO. Under most HIC/HMO plans, private payers limit coverage to those services provided by selected hospitals. With this contracting authority, private payers, including health plans and HICs/HMOs, may direct patients away from nonselected hospitals by denying coverage for services provided by them.

Some HICs/HMOs mandate a "capitation" payment method under which hospitals are paid a predetermined periodic rate for each enrollee in the HIC/HMO who is "assigned" to, or otherwise directed to receive care at, a particular hospital. In a capitation payment system, the hospital assumes an insurance risk for the cost and scope of care given to such enrollees. In some cases, the capitated payment covers total patient care provided, including physician charges. HMOs/HICs also sometimes use other forms of risk-transfer, such as basing payment on a percentage of the subscriber's premium. If payment under an HMO/HIC contract is insufficient to meet the hospital's costs of care, the financial condition of the hospital could erode rapidly and significantly. Often, contracts are enforceable for a stated term, regardless of hospital losses. Further, HMO/HIC contracts are statutorily required to contain a requirement that the hospital care for enrollees for a certain period of time regardless of whether the HMO/HIC has funds to make payment to the hospital. Moreover, statutory requirements also prohibit hospitals from "balance billing" subscribers, even in the circumstance of an insolvency of an HMO/HIC. Contractual requirements sometimes extend balance billing restrictions and continuity of care obligations to PPOs.

Most PPOs and HICs/HMOs currently pay hospitals on a discounted fee-for-service basis or on a discounted fixed rate per day of care. The hospitals have entered into contractual arrangements with PPO, HMO/HIC, and traditional insurers pursuant to which they agree to perform certain health care services for eligible participants at discounted rates. Revenues received under such contracts are expected to be sufficient to cover the variable cost of the services provided.

Mountain State Blue Cross and Blue Shield is the largest non-governmental third party payor in West Virginia. For the fiscal year ended December 31, 2005, Mountain State Blue Cross and Blue Shield represented approximately 10.0% of UHC's total hospital revenues, 10.4% of WVUH's total hospital revenues, 17.0% of the City's total hospital revenues and 15.8% of Jefferson revenues. See "**CERTAIN BONDHOLDERS' RISKS - Blue Cross and Blue Shield**" above.

Increasingly, physician practice groups and independent practice associations have become a part of the process of negotiating payment rates to hospitals. This involvement has taken many forms, but typically increases the competition for limited payment resources from HMOs/HICs, PPOs and other third party payors.

In regions where managed care is becoming prevalent, hospitals must be capable of attracting and maintaining managed care business, often on a regional basis. To do so, regional coverage and aggressive pricing may be required. However, it is also essential that contracting hospitals be able to provide the contracted services without significant operating losses, which may require innovative cost containment efforts. There is no assurance that UHC, WVUH, City and Jefferson will maintain their current managed care contracts or obtain other similar contracts in the future. Failure to obtain or maintain contracts could have the effect of materially reducing their respective market share, their patient base and gross revenues. Conversely, participation may maintain or increase the patient base, but could result in materially lower net income to such hospitals if they are unable to promptly and adequately contain its costs.

As a consequence of such factors, the effect of managed care on the Obligated Group's future financial condition is difficult to predict and may be different in the future than that reflected in the historical financial information included herein.

**Regulatory and Contractual Matters.**

**Legislation.** During recent federal fiscal years, several bills were introduced in Congress, which proposed significant reforms to the nation's health care payment system, including but not limited to, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the BBA and modifications thereto. Any legislative changes may reduce the payments for, and/or utilization of, health care services. At this time, it is not possible to predict what legislative proposals will be made, whether or when any federal health care legislation will be adopted or the impact of any such future legislation on health care providers, including WVUH, City and Jefferson. Depending on the program eventually adopted, the impact on the financial condition or results of operations of the WVUH, City or Jefferson could be material and could be positive or negative.

Although the trend of federal Medicare legislation and regulations favors the replacement of cost-based, provider-specific reimbursement with prospectively determined national payment rates, which are periodically adjusted for inflation estimates, the effect of this trend on the Obligated Group's revenues cannot be precisely determined at this time. The net effect, however, could be lower revenues that would have a material adverse affect on the future financial condition or results of operations of WVUH, UHC, City or Jefferson.

53

Legislation also may be introduced from time to time in the West Virginia legislature relating to the operations and reimbursement of health care providers, including hospitals. No precise determination can be made at this time whether the bills that have been or may be introduced or the regulations which have been or may be proposed for the purpose of containment of costs, or otherwise affecting hospital revenues or increasing the competition among hospitals, will be enacted or, if enacted, whether and to what degree such legislation will affect the future financial condition or results of operations of WVUH, City or Jefferson or their respective ability to make future capital expenditures.

**Anti-Fraud and Abuse Laws.** The federal Anti-Kickback law (the "Anti-Kickback Law") makes it a felony to knowingly and willfully offer, pay, solicit or receive remuneration, directly or indirectly, in order to induce business that is reimbursable under any federal health care program. Violation of these provisions may result in imprisonment for up to five years and fines of up to $25,000 for each act. The Office of Inspector General ("OIG") of HHS has the authority to impose civil assessments and fines and to exclude hospitals engaged in prohibited activities from the Medicare, Medicaid, TRICARE (a health care program providing benefits to dependents of members of the uniformed services), and other federal health care programs for not less than five years. In addition to certain statutory exceptions to the Anti-Kickback Law, the OIG has promulgated a number of regulatory "safe harbors" under the Anti-Kickback Law designed to protect certain payment and business practices. A party may seek an advisory opinion to determine whether an actual or proposed arrangement meets a particular safe harbor; however the failure of a party to seek an advisory opinion may not be introduced into evidence to prove that the party intended to violate the provisions of the statute. Failure to comply with a statutory exception or regulatory safe harbor does not mean that an arrangement is unlawful but may increase the likelihood of challenge.

HIPAA created a new program operated jointly by HHS and the U.S. Attorney General to coordinate federal, state and local law enforcement with respect to fraud and abuse including the Anti-Kickback Law. HIPAA also provides for minimum periods of exclusion from a federal health care program for fraud related to federal health care programs, provides for intermediate sanctions and expands the scope of civil monetary penalties. The BBA expanded the authority of HHS to exclude persons from federal health care programs, increased certain civil and monetary penalties for violations of the Anti-Kickback Law and added a new monetary penalty for persons who contract with a provider that the person knows or should know is excluded from the federal healthcare programs. Finally, actions which violate the Anti-Kickback Law or similar laws may also involve liability under the federal Civil False Claims Act which prohibits the knowing presentation of a false, fictitious or fraudulent claim for payment to the U.S. government. Actions under the Civil False Claims Act may be brought by the U.S. Attorney General or as a qui tam action brought by a private individual in the name of the government.

The management of UHC, WVUH, City and Jefferson believe that each is in compliance with the Anti-Kickback Law; because, however, of the breadth of the Anti-Kickback Law and the narrowness of the safe harbor regulations, there can be no assurance that regulatory authorities will not take a contrary position or that UHC, WVUH, City or Jefferson will not be found to have violated the Anti-Kickback Law.

54

On March 13, 2004, the state legislature adopted the Insurance Fraud Prevention Act which prohibits the knowing and willful submission of a materially false statement in support of a claim for payment pursuant to a policy of insurance. A party violating the terms of the Act is guilty of a crime punishable by a fine of up to $10,000 and imprisonment of up to ten years as well as possible suspension of state licensure. The management of UHC, WVUH, City and Jefferson each believe they are in compliance with the Insurance Fraud Prevent Act.

**Stark Law**. Another federal law known as the "Stark Law" prohibits a physician who has a financial relationship, or whose immediate family has a financial relationship, with entities (including hospitals) providing "designated health services" from referring federal healthcare program patients to such entities for the furnishing of such designated health services with limited exceptions. Stark Law designated health services include physical therapy services, occupational therapy services, radiology or other diagnostic services (including MRIs, CT scans and ultrasound procedures), durable medical equipment, radiation therapy services, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices, home health services, outpatient prescription drugs, inpatient and outpatient hospital services and clinical laboratory services. The Stark Law also prohibits the entity receiving the referral from filing a claim or billing for the services arising out of the prohibited referral. The prohibition applies regardless of the reasons for the financial relationship and the referral; that is, unlike the federal Anti-Kickback Law, no finding of intent to violate the Stark Law is required. Sanctions for violation of the Stark Law include denial (or refund) of payment for the services provided to the patient referred in violation of the prohibition, a civil penalty of up to $15,000 for a service arising out of the prohibited referral, exclusion from the federal healthcare programs, and a civil penalty of up to $100,000 against parties that enter into a scheme to circumvent the Stark Law's prohibition. Under an emerging legal theory, knowing violations of the Stark Law may also serve as the basis for liability under the False Claims Act. The types of financial arrangements between a physician and an entity that trigger the self-referral prohibitions of the Stark Law are broad, and include ownership and investment interests and compensation arrangements.

Final regulations implementing the portions of the Stark Law applicable to clinical laboratory services ("Stark I") were issued in August, 1995. On January 4, 2001, CMS issued Phase I final regulations, implementing the Stark Law's application to designated health services (sometimes referred to as "Phase I" of the "Stark II Regulations"). The rules delineated in Phase I of the Stark II Regulations became effective on January 4, 2002. Phase I of the Stark II Regulations include additional guidance regarding CMS's interpretation of the Stark Law. Phase II of the Stark II Regulations were published in the Federal Register on March 26, 2004 ("Phase II of the Stark II Regulation"). The rules delineated in Phase II of the Stark II Regulation became effective on July 24, 2004. Certain of the interpretations set forth in Phase II of the Stark II Regulations could require that certain existing physician relationships be modified.

UHC, WVUH, City and Jefferson each believe it is in compliance with Phase I and Phase II of the Stark II regulations. However, given the recent issuance of Phase II of the Stark II Regulations, and the scarcity of case law on the subject, there can be no assurance that regulatory authorities will not take the position or that their respective contracts with physicians or immediate

55

family members do not conform to Phase II of the Stark II Regulations and that certain of their contracts with physicians or immediate family members may need to be amended to comply with Phase II of the Stark II Regulations. Exclusion from federal healthcare programs would have a material adverse effect on the future operations and financial condition of UHC, WVUH, City or Jefferson, as would any significant penalties, demands for refund or denials of payment.

**False Claims Laws**. There are principally three federal statutes which address the issue of "false claims." First, the Civil False Claims Act imposes civil liability (including substantial monetary penalties and damages) on any person or corporation which (1) knowingly presents or cause to be presented a false or fraudulent claim for payment to the United States government; (2) knowingly makes, uses, or causes to be made or used a false record or statement to obtain payment; or (3) engages in a conspiracy to defraud the federal government by getting a false or fraudulent claim allowed or paid. Specific intent to defraud the federal government is not required to act with knowledge. This statute authorizes private persons to file qui tam actions on behalf of the United States.

In addition to the Civil False Claims Act, the Civil Monetary Penalties Law authorizes the imposition of substantial civil money penalties against an entity which engages in activities including, but not limited to, (1) knowingly presenting or causing to be presented, a claim for services not provided as claimed or which is otherwise false or fraudulent in any way; (2) knowingly giving or causing to be given false or misleading information reasonably expected to influence the decision to discharge a patient; (3) offering or giving remuneration to any beneficiary of a federal health care program likely to influence the receipt of reimbursable items or services; (4) arranging for reimbursable services with an entity which is excluded from participation from a federal health care program; (5) knowingly or willfully soliciting or receiving remuneration for a referral of a federal health care program beneficiary; or (6) using a payment intended for a federal health care program beneficiary for another use. The Secretary of HHS, acting through the OIG, also has both mandatory and permissive authority to exclude individuals and entities from participation in federal health care programs pursuant to this statute.

Finally, it is a criminal federal healthcare fraud offense to: (1) knowingly and willfully execute or attempt to execute any scheme to defraud any healthcare benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations or promises, any money or property owned or controlled by any healthcare benefit program. Penalties for a violation of this federal law include fines and/or imprisonment, and a forfeiture of any property derived from proceeds traceable to the offense.

**Physician Contracting and Relations**. The Members of the Obligated Group have entered into a variety of relationships with physicians. Many of these relationships may be of material importance to the operations of the facilities and, in an increasingly complex legal and regulatory environment, these relationships pose a variety of legal or business risks. Increasingly, the focus of these relationships is a physician practice group or independent practice association that concentrates a large number of physicians in a limited number of contracting organizations. This

increases the importance of these contracts and increases the risk of the loss of one or more such contracts.

The primary relationship between a hospital and physicians who practice in it is through the hospital's organized medical staff. Medical staff bylaws, rules, and policies establish the criteria and procedures by which a physician may have his or her privileges or membership curtailed, denied or revoked. Physicians who are denied medical staff membership or certain clinical privileges, or who have such membership or privileges curtailed, denied or revoked often file legal actions against hospitals and medical staffs. Such actions may include a wide variety of claims, some of which could result in substantial uninsured damages to a hospital. In addition, failure of the hospital governing body to adequately oversee the conduct of its medical staff may result in hospital liability to third parties. All hospitals, including UHC, WVUH, City and Jefferson are subject to such risks.

Certain contracts between hospitals and physicians might be void or voidable if challenged by one of its participants in situations where a hospital exercises certain aspects of control over a physician's practice or where the physician is in a position to refer patients to the hospital. The validity of such agreements and the materiality of their loss is dependent on factual circumstances and on the relative position of the parties at a particular time. Consequently, the outcome cannot be determined with precision in advance of a dispute or controversy with respect to the relationship. The Obligated Group is not aware of specific, related controversies that it believes would lead to the loss of a contractual relationship with physicians which would be material with respect to the operation or financial condition of the Obligated Group.

**Physician Recruitment**. The Internal Revenue Service ("IRS") and HHS have issued various pronouncements that could limit physician recruiting and retention arrangements. In an IRS General Counsel Memorandum concerning hospital-physician joint ventures, the IRS ruled that tax-exempt hospitals that provide recruiting and retention incentives to physicians risk loss of tax-exempt status unless the incentives are necessary to obtain an overriding public benefit; improvement of a charitable hospital's financial condition does not necessarily constitute such a purpose. The IRS has also issued guidelines for its agents to follow in conducting audits that emphasize these restrictions, and has established special audit teams and procedures to ensure compliance. The OIG has taken the position that any arrangement between a federal healthcare program-certified facility and a physician that is intended to encourage the physician to refer patients may violate the federal Anti-Kickback Law unless a regulatory exception applies. While the OIG has promulgated a practitioner recruitment safe harbor to the Anti-Kickback Law, the safe harbor is limited to practice recruitment in areas that are health professional shortage areas and to the recruitment of new physicians who are relocating their practices and would not permit retention arrangements of any kind. Likewise, the Stark Law and Phase II of the Stark II Regulations permit certain physician recruitment and physician retention arrangements under certain limited circumstances. Management of UHC, WVUH, City and Jefferson believe that their respective physician recruitment programs are in material compliance with IRS policies, Anti-Kickback Law or the Stark Law and do not anticipate any adverse impact on the ability of UHC, WVUH, City or Jefferson to recruit and retain physicians. However, given the complexity of IRS guidance, the broad prohibitions of the Anti-Kickback Law and Stark Law, and the inconsistencies among them,

there can be no assurance that regulatory authorities may not take a contrary position with respect to the physician recruitment and retention activities of UHC, WVUH, City or Jefferson. See "CERTAIN BONDHOLDERS' RISKS - Malpractice Lawsuits and Malpractice Insurance" for a discussion of certain developments in West Virginia that could affect the recruitment of physicians by UHC, WVUH, City or Jefferson.

**Emergency Medical Treatment and Active Labor Act.** In response to concerns regarding inappropriate hospital transfers of emergency patients based on the patient's inability to pay for the services provided, Congress enacted the Emergency Medical Treatment and Active Labor Act in 1986. This so-called "anti-dumping" law imposes certain requirements on hospitals prior to transferring a patient to another facility. Failure to comply with the law can result in exclusion from the Medicare and/or Medicaid programs or termination of the provider agreement as well as civil penalties. Failure of WVUH, City or Jefferson to meet their respective responsibilities under the Emergency Medical Treatment and Active Labor Act could adversely affect their future financial condition or results of operations.

**Peer Review Organizations.** Peer Review Organizations were created by the 1982 amendments to the Social Security Act, and all institutional health care providers which participate in the Medicare program are subject to review by Peer Review Organizations. Peer Review Organization activities include (i) preadmission review on selected elective admissions, (ii) review of admissions which occur within seven days of a discharge from a general hospital, (iii) review of certain transfers of patients from one hospital to another, (iv) review of validity of DRG classifications of patients, (v) review of admissions and services to determine medical necessity and (vi) review of admissions and services to determine whether quality of care meets professionally recognized standards. Peer Review Organizations have the authority to recommend to the Secretary of Health and Human Services that a provider which is in substantial noncompliance with the medical necessity and quality of care standards of a Peer Review Organization or has grossly and flagrantly violated an obligation to render quality care be excluded from participation in the Medicare program or be required to reimburse the federal government for certain payments previously made to the provider under the Medicare program. The activities of Peer Review Organizations and other public and private agencies relating to review of utilization of healthcare services may have the effect of causing physicians who practice at WVUH, City or Jefferson to reduce the number of patient admissions and to monitor more closely the amount of services and procedures ordered for their patients.

**HIPAA Administrative Simplification.** The Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") required the Secretary of HHS to establish standards for electronic health care administrative and financial transactions and national identifiers for healthcare providers, health plans, and health care clearinghouses. HIPAA addresses the security and privacy of patient health information. Adoption of these standards is intended to improve the efficiency and effectiveness of the nation's health care system by encouraging the widespread use of electronic data interchange in healthcare. The total impact and costs of HIPAA to the Obligated Group cannot be determined at this time. Healthcare industry analysts, however, predict that the costs associated with the implementation of HIPAA will be

58

substantial, with a study commissioned by the American Hospital Association placing the costs at $22.5 billion over a five year period. Healthcare entities likely will incur both capital and operational expenses to meet the considerable requirements of HIPAA.

A significant portion of the costs associated with achieving compliance with HIPAA stems from the operational expenses of the implementation of and continued compliance with the privacy standards. For example, HIPAA requires healthcare providers to enact policies and procedures (i) to ensure that patient health information is securely maintained, (ii) to enable them to provide patients with detailed information explaining precisely how their medical information will be maintained, used and disclosed, and (iii) to respond to patients' permissible requests for an "accounting" of the disclosure made of their medical information for purposes unrelated to treatment, payment or healthcare operations. In addition, healthcare providers will be required to ensure by means of a written agreement that certain of their business associates who may receive or may have access to patient health information maintain the confidentiality of such health information.

Other capital and operational costs that most healthcare providers are expected to incur as a result of the requirements contained in the other standard sets include the costs for (i) purchasing and installing software that has the capability to transmit healthcare data to insurers and payors in a new, uniform standard format, (ii) developing disaster recovery plans for the unexpected loss or destruction of health information, and (iii) implementing policies and procedures, as well as the potential purchase of new software systems, to maintain data security in accordance with a security plan governing such issues as access, authorization and data authentication.

The final rules for the Standards for Privacy of Individually Identifiable Health Information were published on December 28, 2000 and amended on May 31, 2002 and August 14, 2002. Each member of the Obligated Group has appointed a privacy officer, has implemented privacy policies and procedures and believes that it is in compliance with the HIPAA Privacy Rule.

The final rules for the National Standards for Electronic Transactions were published on August 17, 2000 and revised in February 2003. They became effective October 16, 2004. Each member of the Obligated Group believes it was fully compliant on the October 16, 2004 deadline.

On February 20, 2003, HHS finalized rules for security standards applicable to electronic health information systems. The security rules address the issues of information security, improper access to and alteration of electronic health information systems. Healthcare providers will have until April 20, 2005 to comply. Each member of the Obligated Group has appointed a security officer and has implemented a plan for compliance and believes it is in compliance with the HIPAA Security Rule by the April 20, 2005 deadline.

If HHS determines that a healthcare entity is not in compliance with HIPAA after the effective date of a set of standards, that entity faces potentially severe civil monetary penalties, as well as criminal penalties for any willful unauthorized disclosure of protected health information. Each member of the Obligated Group has undertaken steps to address HIPAA's requirements and

it believes that it is compliant with the HIPAA Privacy Rule and the other HIPAA rules and standards, or will be, by their respective deadlines.

**Certain Accreditations.** UHC, WVUH, City and Jefferson are each subject to periodic review by the JCAHO, and the various federal, state and local agencies created by the National Health Planning and Resources Development Act of 1974. From time to time, accrediting bodies may review their accreditations of each and recommend certain actions or impose conditions on an existing accreditation. Management of UHC, WVUH, City and Jefferson, respectively, do not expect any such review to require actions or impose conditions that could not be satisfied or that would adversely affect the continuing accreditation of UHC, WVUH, City or Jefferson. No assurance can be given as to the effect on future operations of existing laws, regulations and standards for certification or accreditation or of any future changes in such laws, regulations and standards.

**West Virginia Certificate of Need Law.** West Virginia maintains "certificate of need" legislation to control the levels and types of capital expenditures undertaken and new services provided by health care facilities in West Virginia, including UHC, WVUH, City and Jefferson. Approval may be necessary in order for certain major capital expenditures to be made or new services to be offered. No assurance can be given as to UHC, WVUH's, City's or Jefferson's ability to obtain "certificate of need" approval of projects for the maintenance of appropriate facilities, services, technology and quality of care necessary to remain competitive in their respective service areas. The WVHCA is the designated agency for certificate of need review. UHC has received the certificate of need required for the expenditure of the proceeds of the 2006 Bonds.

**Future Legislation.** Legislation is periodically introduced in the United States Congress and in the West Virginia Legislature which could result in limitations on hospital revenues, reimbursement, costs or charges or which could require an increase in the quantity of indigent care required to maintain charitable status.

A number of additional legislative proposals concerning health care have been introduced in Congress in the past and may be introduced in the future. The effect of any such proposals, if enacted, cannot be determined at this time.

In addition to legislative proposals previously discussed herein, other legislative proposals which could have an adverse effect on the Obligated Group include: (a) any changes in the taxation of nonprofit corporations or in the scope of their exemption from income or property taxes; (b) limitations on the amount or availability of tax-exempt financing for corporations described under Section 501(c)(3) of the Code; and (c) regulatory limitations affecting the ability of the Members of the Obligated Group to undertake capital projects or develop new services. Each member of the Obligated Group currently pays real estate taxes on those of its facilities (or portions of facilities), which are not used for its tax-exempt activities.

Legislative bodies have considered legislation concerning the charity care standards that non-profit, charitable hospitals must meet to maintain their federal income tax-exempt status under

the Code and legislation mandating that nonprofit, charitable hospitals have an open-door policy toward Medicare and Medicaid patients and offer, in a non-discriminatory manner, qualified charity care and community benefits. Excise tax penalties on nonprofit, charitable hospitals that violate these charity care and community benefit requirements could be imposed or their tax-exempt status under the Code could be revoked. The scope and effect of legislation, if any, which may be adopted at the federal or state levels with respect to charity care of non-profit hospitals cannot be predicted. Any such legislation or similar legislation, if enacted, could have the effect of subjecting a portion of the income of the Members of the Obligated Group to federal or state income taxes or to other tax penalties and adversely affect the ability of the Obligated Group to generate revenues sufficient to meet its obligations and to pay the debt service on the 2006 Bonds and its other obligations.

**Malpractice Lawsuits and Malpractice Insurance**. Although the number of malpractice lawsuits filed against physicians and hospitals in West Virginia has stabilized in recent years, the dollar amounts of patient damage recoveries still remain potentially significant. The ability of, and the cost to the Obligated Group to insure or otherwise protect itself against malpractice claims may adversely affect its future results of operations or financial condition. For further information, see **"LITIGATION" in APPENDIX A - "INFORMATION CONCERNING THE SYSTEM AND THE OBLIGATED GROUP"** hereto.

The ability of health care providers to obtain malpractice insurance in West Virginia, like most of the rest of the United States, has significantly deteriorated. Beginning in the fall of 2000, the West Virginia State Medical Association publicly expressed concerns about the affordability and availability of medical malpractice insurance in West Virginia. Efforts were made by the Medical Association during the 2001 regular legislative session to address those concerns, but no action was taken by the Legislature during the regular session. In the 2002 legislative session a comprehensive package of tort reform legislation was passed and signed into law. With certain limited exceptions, the legislation lowers the existing $1,000,000 cap on awards for pain and suffering and other intangible losses to $250,000 per occurrence, regardless of the number of plaintiffs and defendants. Lawsuits filed as a result of good faith care for an emergency condition provided at designated trauma centers are subject to a $500,000 total cap on damages, exclusive of interest. The legislation eliminated the rule where any defendant who is greater than 25% at fault can be required to pay the entire verdict (joint liability) and replaced it with individual defendant liability equal to their percentage of fault (several liability). In addition, collateral sources, which include both private and governmental payors of medical and hospital expenses, will be offset from the verdict before final judgment is entered. The legislation also strengthens the required qualifications for expert witnesses, raises the required level of proof for the so called "Loss of Chance" theory of recovery and, in those cases of where non-employed physicians maintain $1,000,000 in malpractice insurance, it eliminates the doctrine of "ostensible agency" whereby hospitals were often held responsible for the acts of such physicians. These tort reforms apply to all causes of action that are filed on or after July 1, 2003.

**Antitrust**. Enforcement of the antitrust laws against health care providers is becoming more common, and antitrust liability may arise in a wide variety of circumstances, including medical staff privilege disputes, third-party contracting, physician relations, and joint venture, merger, affiliation

61

and acquisition activities. In some respects, the application of the federal and state antitrust laws to health care is still evolving, and enforcement activity by federal and state agencies appears to be increasing. Violation of the antitrust laws could subject a hospital to criminal and civil enforcement by federal and state agencies, as well as by private litigants. At various times, members of the Obligated Group may be subject to an investigation by a governmental agency charged with the enforcement of the antitrust laws, or may be subject to administrative or judicial action by a federal or state agency or a private party. The most common areas of potential liability are joint activities among providers with respect to payor contracting, medical staff credentialing, and use of a hospital's local market power for entry into related health care businesses. From time to time, Members of the Obligated Group may be involved in joint contracting activity with other hospitals or providers. The precise degree to which this or similar joint contracting activities may expose a Member of the Obligated Group to antitrust risk from governmental or private sources is dependent on a myriad of factual matters, which may change from time to time. A May 19, 2004 decision of the West Virginia Supreme Court of Appeals held that a public or quasi-public hospital may not enter into exclusive contracts with medical service providers who have staff privileges at the hospital that have the effect of completely excluding other physicians from the use of the hospital's medical facilities. The Obligated Group does not believe that the effect of the decision will be material to the Obligated Group. A United States Supreme Court decision now allows physicians who are subject to adverse peer review proceedings to file federal antitrust actions against hospitals and seek treble damages. Hospitals regularly have disputes regarding credentialing and peer review, and therefore may be subject to liability in this area. In addition, hospitals occasionally indemnify medical staff members who are involved in such credentialing or peer review activities, and may also be liable with respect to such indemnity. Recent court decisions have also established private causes of action against hospitals which use their local market power to promote ancillary health care business in which they have an interest. Such activities may result in monetary liability for the participating hospitals under certain circumstances where a competitor suffers business damage. Government or private parties are entitled to challenge joint ventures that may injure competition. Liability in any of these or other antitrust areas of liability may be substantial, depending on the facts and circumstances of each case.

**Non-Profit Hospital Class Action Litigation**. Since June, 2004, uninsured patients have filed more than 40 putative class action lawsuits against nonprofit hospitals and hospital systems in approximately 17 states. The lawsuits allege that the defendants provide an insufficient amount of charity healthcare, that they overcharge patients who are uninsured, and that they use improper debt collection methods when uninsured patients fail to pay their medical bills. Counsel for plaintiffs sought to consolidate the majority of the cases in a single multidistrict proceeding, but the federal Judicial Panel on Multidistrict Litigation rejected that request on October 20, 2004. No class has been certified in any of the suits, and it is unclear as of the date of this Official Statement whether any of the lawsuits will be successful. No Member of the Obligated Group has been named in any of the suits. If any Members of the Obligated Group are subsequently named in a similar action, it is unclear what effect such a suit would have on the financial condition of the Obligated Group.

62

**Environmental Laws and Regulations.** Health care providers are subject to a wide variety of federal, state and local environmental and occupational health and safety laws and regulations which address, among other things, hospital operations and facilities and properties owned or operated by hospitals. Among the myriad types of such regulatory requirements faced by hospitals are (a) air and water quality control requirements, (b) waste management requirements, (c) specific regulatory requirements applicable to asbestos, polychlorinated biphenyls and radioactive substances, (d) requirements for providing notice to employees and members of the public about hazardous materials handled by or located at the hospital, and (e) requirements for training employees in the proper handling and management of hazardous materials and wastes.

In its role as an owner and operator of properties or facilities, Members of the Obligated Group may be subject to liability for investigating and remedying any hazardous substances that may be present on or have migrated off of its property or facilities. Typical hospital operations include, but are not limited to, in various combinations, the handling, use, storage, transportation, disposal and discharge of hazardous, infectious, toxic, radioactive, flammable and other hazardous materials, wastes, pollutants or contaminants. As such, hospital operations are particularly susceptible to the practical, financial and legal risks associated with compliance with such laws and regulations. Such risks may result from damage to individuals, property or the environment and include an interruption of operations, an increase in operating costs, legal liability, damages, injunctions or fines and investigations, administrative proceedings, penalties or other governmental agency actions. UHC, WVUH, City and Jefferson each expect to continue to encounter such risks in the future, and exposure to such risks could materially adversely affect their respective future financial condition or results of operations.

Management of UHC, WVUH, City and Jefferson is not aware of any pending or threatened claim, investigation or enforcement action regarding environmental issues involving them which, if determined adversely, would have a material adverse effect on their respective future financial condition or results of operations.

The Bond Trustee may decline to enforce the Bond Indenture if the Bond Trustee has not been indemnified to its satisfaction, in accordance with the Bond Indenture, for all liabilities it may incur as a consequence thereof. Such liabilities may include, but are not limited to, costs associated with complying with environmental laws and regulations.

**Fair Labor Standards Act.** On April 23, 2004, the United States Department of Labor (the "DOL") issued regulations to the Fair Labor Standards Act making sweeping changes in the area of overtime-exempt employees (the "FLSA Regulations"). The FLSA Regulations offer guidance and clarification on: (a) deductions that may be made to an employee's salary without jeopardizing the employee's overtime-exempt status and steps an employer may take to remedy improper deductions; (b) factors to be considered by the DOL to determine if an actual practice of making deductions exists; (c) application of the exemption for executive employees; (d) application of the exemption for administrative employees, including the types of decisions deemed to entail the exercise of "independent judgment and discretion" and a list of "generally" exempt administrative

positions; (e) application of the exemption for professional employees; and (f) application of the exemption for highly compensated employees and for computer professionals. The increased minimum salary level for exempt employees contained in FLSA Regulations may result in the reclassification of some exempt employees of UHC, WVUH, City or Jefferson to non-exempt status, but each does not believe that FLSA Regulations will have a material impact on their respective costs of operation.

**Enforcement of Remedies; Risks of Bankruptcy.** The obligations of the Obligated Group under the Master Indenture and the 2006 Notes are secured by a pledge of the Gross Receipts (as defined in the Master Indenture) of the Obligated Group and any future Member of the Obligated Group. Enforcement of the remedies mentioned in **APPENDIX C - "DEFINITIONS OF CERTAIN TERMS AND SUMMARIES OF PRINCIPAL DOCUMENTS"** hereto may be limited or delayed in the event of application of federal bankruptcy laws or other laws affecting creditor's rights and may be substantially delayed and subject to judicial discretion in the event of litigation or the required use of statutory remedial procedures.

If a Member of the Obligated Group were to file a petition for relief under the current Federal Bankruptcy Code, the filing would operate as an automatic stay of the commencement or continuation of any judicial or other proceeding against such member and its property. If the bankruptcy court so ordered, the member's property, including its accounts receivable and proceeds thereof, could be used for the benefit of the Member of the Obligated Group despite the claims of its creditors.

In a case under the current Federal Bankruptcy Code, the affected Member could file a plan of reorganization. The plan is the vehicle for satisfying, and provides for the comprehensive treatment of, all claims against such Member, and could result in the modification of rights of creditors generally, or the rights of any class of creditors, secured or unsecured. To confirm a plan of reorganization, of those who vote, more than one-half in number and two-thirds in amount of each impaired class of claims must vote in favor of a plan. If these levels of votes are attained, those voting against the plan or not voting at all are nonetheless bound by the terms thereof. Other than as provided in the confirmed plan, all claims and interests are discharged and extinguished. If less than all the impaired classes accept the plan, the plan may nevertheless be confirmed by the bankruptcy court, and the dissenting claims and interests bound thereby. For this to occur, one of the impaired classes must vote to accept the plan and the court must determine that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the nonconsenting class. A plan is fair and equitable if no class receives more than that to which it is entitled. The Bankruptcy Code establishes different fair and equitable tests for secured claims, unsecured claims and interest holders. To be confirmed, the bankruptcy court must determine that a plan, among other conditions, is in the best interest of creditors, feasible and accepted by all classes of creditors and interest holders as specified above or, if not so accepted, be in compliance with certain other requirements summarized above.

**Nationwide Nursing Shortage**. Healthcare providers depend on qualified nurses to provide quality service to patients. There is currently a nationwide shortage of qualified nurses that also

exists in West Virginia. This shortage and the more stressful working conditions it creates for those remaining in the profession are increasingly viewed as a threat to patient safety and may trigger the adoption of state and federal laws and regulations intended to reduce that risk. In its 2004 legislative session, the West Virginia Legislature adopted the Nurse Overtime and Patient Safety Act (the "Overtime Act") which includes requirements and limitations on mandatory nurse overtime in hospitals, prohibiting hospitals from mandating a nurse to accept an assignment of overtime unless (a) there is an unforeseen emergent situation that jeopardizes patient safety, (b) the nurse is fulfilling pre-scheduled on-call time, or (c) the overtime assignment is required for the completion of a procedure. The Overtime Act also requires that any nurse who works 12 consecutive hours be allowed 8 hours of off-duty time immediately following completion of the shift and that (other than for the exceptions noted in the preceding sentence) no nurse shall work for more than 16 hours in any 24-hour period. UHC, WVUH, City and Jefferson do not believe the Overtime Act will adversely affect their respective operations.

In response to the shortage of qualified nurses, health care providers have increased and could continue to increase wages and benefits to recruit or retain nurses and have had to hire expensive contract nurses. The shortage could also limit the operations of healthcare providers by limiting the number of patient beds available. UHC, WVUH, City and Jefferson currently employ an adequate number and type of nurses at their facilities. However, in response to the shortage, each has increased and is likely to have to continue to increase wages and benefits to recruit and retain nurses. UHC, WVUH, City or Jefferson may also need to engage expensive contract nurses until permanent staff nurses can be hired to replace any departing nurses.

**Other Risk Factors.** The following general factors could have a material adverse effect on the level of reimbursement received by the Obligated Group:

**Increased Costs Without a Comparable Increase in Revenue.** Cost increases could result from, among other factors: increases in the salaries, wages and fringe benefits of Obligated Group employees, increases in costs associated with advances in medical technology or with inflation and increases in costs of operating the facilities of the Obligated Group. The Medicare and Medicaid programs are subject to statutory and regulatory changes and there are substantial areas subject to administrative rulings, interpretations, discretion, governmental funding restrictions and requirements of more stringent utilization review and other similar matters which may significantly reduce payments under either or both of such programs. Of course, should cost increases attributable to the above-mentioned or any other reasons be accompanied by revenues not increasing or falling as a result of statutory or regulatory changes in Medicare or Medicaid, the financial condition and results of operations of the Obligated Group would be materially adversely affected.

**Limits on or Reductions in the Level of Support for Medicare and Medicaid.** Future actions by the federal government for Medicare and the federal and state governments for Medicaid limiting or reducing the total amounts of funds available for either or both of these programs could lower the amount of reimbursement available to the Obligated Group.

65

**Renewal of Accreditation or Medicare Certification or Licensure**. UHC, WVUH, City and Jefferson have each received a three year accreditation from JCAHO. See **APPENDIX A - "INFORMATION CONCERNING THE SYSTEM AND THE OBLIGATED GROUP"** hereto. Management does not expect to encounter and, in the past, has not encountered, any meaningful difficulty in renewing this accreditation, but no assurance can be given that future renewals will be granted. Any failure to obtain such a renewal or any loss of the certification of UHC, WVUH, City or Jefferson as a Medicare provider would have a material adverse effect on the financial condition and results of operations of the Obligated Group. UHC, WVUH, City and Jefferson are each licensed by the Department of Human Resources of the State of West Virginia, and any failure to obtain renewal of its respective license or loss of such license would have a material adverse effect on the financial condition and results of operations of the Obligated Group. On a regular basis, health care facilities, including the Members of the Obligated Group, are subject to numerous legal, regulatory, professional and private licensing, certification and accreditation requirements. These include, but are not limited to, requirements relating to Medicare and Medicaid participation and payment, state licensing agencies, private payors, JCAHO and other accrediting bodies. Renewal and continuance of certain of these licenses, certifications and accreditations are based on inspections, surveys, audits, investigations or other reviews, some of which may require or include affirmative action or response by the Obligated Group. These activities generally are conducted in the normal course of business of health care facilities. Nevertheless, an adverse result could result in a loss or reduction in either UHC, WVUH's, City's or Jefferson's scope of licensure, certification or accreditation, or could reduce the payment received or require repayment of amounts previously remitted.

**Additional Risk Factors**. In the future, the following factors, among others, may adversely affect the operation and revenues of health care facilities, including those of the Obligated Group, to an extent that cannot be determined at this time:

(a)    Less than 13% of the Obligated Group's full-time-equivalent employees are currently unionized. On November 7, 2004, WVUH and District 199, Health Care and Social Service Union SEIU-AFL-CIO entered into a collective bargaining agreement that will remain in effect until November 7, 2007. Although management knows of no pending employee strikes and other adverse labor actions that could result in increased expenses or substantial reductions in revenue without corresponding decreases in costs, such an action could arise in the future and could have such an effect. See **APPENDIX A - "INFORMATION CONCERNING THE SYSTEM AND THE OBLIGATED GROUP"** hereto.

(b)    The reduced need for hospitalization or other services arising from future medical and scientific advances;

(c)    A substantial number of the Obligated Group's leading admitting physicians may, in the future, decide to use other hospitals;

(d)    The inability to attract and retain adequate nursing and other skilled personnel;

(e)     Increased competition in the future from other hospitals or other types of health care providers, including health maintenance organizations or alternative delivery systems, that would offer comparable health care services to the population that the Obligated Group presently serves and that could result in decreased usage of the facilities operated by the Obligated Group;

(f)     A decline in the population, a change in the age composition of the population, increased unemployment, or a decline in the economic condition of the service area which would increase the proportion of patients who are unable to fully pay for the cost of their care;

(g)     Efforts by insurers and governmental agencies to limit the costs of hospital services and to reduce the utilization of hospital facilities by such means as preventive medicine, improved occupational health and safety and outpatient care;

(h)     Cost and availability of medical malpractice insurance in the State of West Virginia;

(i)     Cost and availability of insurance, such as fire, automobile, and general comprehensive liability, that hospitals and other health care facilities of a similar size and type generally carry;

(j)     Un-reimbursed increases in utility or other fuel costs in the future due to an energy shortage or other factors;

(k)     Imposition of wage and price controls for the health care industry;

(l)     Developments or events affecting the federal or state exemption of the income of the Obligated Group from taxation or the adoption of federal or state legislation adversely affecting the Obligated Group or its revenue producing capability or adversely affecting the exemption of property owned by the Obligated Group from state and local property taxation or the ability of its members to utilize tax-exempt financing;

(m)     A reduction in the amounts of grants and contributions that the Obligated Group receives from various sources, or the elimination of such grants and contributions;

(n)     The occurrence of natural disasters, including floods, tornadoes and earthquakes, which may damage the facilities of the Obligated Group, interrupt utility service to the facilities, or otherwise impair the operation of the facilities of the Obligated Group and the generation of revenue from some or all of its facilities;

(o)     Any increase in the quantity or cost of indigent care provided which is mandated by law or required due to increased needs of the community in order to maintain the charitable status of the members of the Obligated Group; and

(p)     Increases in cost of providing health care relating to illnesses or diseases, such as Acquired Immune Deficiency Syndrome or related illnesses, which are not matched by increases

67

in revenue from Medicare, Medicaid, Blue Cross/Blue Shield, commercial insurers or other sources sufficient to cover such increases in cost.

**Maintenance of Exempt Status.** The exclusion of interest on the 2006 Bonds from the gross income of the recipients thereof for federal income tax purposes depends upon the maintenance by the Members of the Obligated Group of their respective status as exempt organizations described in Section 501(c)(3) of the Code. To maintain such status, the Members of the Obligated Group must each conduct its respective operations in a manner consistent with current and future IRS regulations and rulings governing exempt organizations and their operations and activities. Although each Member of the Obligated group has covenanted to maintain its respective status as an exempt organization, its failure to do so would likely have a material adverse effect on the Obligated Group and could result in the inclusion of interest on the 2006 Bonds in gross income of the owners thereof for federal income tax purposes retroactive to the date of issuance.

In certain circumstances, the loss of the exclusion of interest on the 2006 Bonds from gross income of the owners thereof for federal income tax purposes could be retroactive to the date of issuance of the 2006 Bonds. The tax liability of the owners of the 2006 Bonds for failure to include interest on the 2006 Bonds in their gross income may extend to years for which interest was received on the 2006 Bonds, or some portion thereof, and for which the relevant statute of limitations has not yet run.

## NO LITIGATION

There is no pending or threatened litigation seeking to restrain or enjoin the issuance, sale, or delivery of the 2006 Bonds, or in any way contesting or affecting the validity of the 2006 Bonds or any proceedings of the Authority taken with respect to the issuance or sale thereof, or in any way questioning or affecting the validity or enforceability of the Loan Agreement or the Bond Indenture, the use of the Series 2006 Bond proceeds or the existence of the Authority.

## UNDERWRITING

The 2006 Bonds are being purchased by UBS Securities LLC (the "Underwriter"), on behalf of itself and Ferris, Baker Watts, Incorporated. The Underwriter has agreed to purchase the 2006 Bonds at an aggregate purchase price of $232,366,399 (which represents the aggregate principal amount of the 2006 Bonds, plus a net premium of $1,426,762, less a $695,362 underwriting discount). The bond purchase agreement for the 2006 Bonds provides that the Underwriter will purchase all the 2006 Bonds if any of the 2006 Bonds are purchased, and the Obligated Group agrees, among other things, to indemnify the Underwriter and the Authority against losses, claims, damages and liabilities arising out of any incorrect statement or information contained in or information omitted from this Official Statement pertaining to the Institution and other matters.

## TAX MATTERS

**Tax Exemption of 2006 Bonds.** In the opinion of Spilman Thomas & Battle, PLLC ("Bond Counsel"), based upon an analysis of existing laws, regulations, rulings and court decisions, and assuming, among other matters, the accuracy of certain representations and compliance with certain covenants, interest on the 2006 Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code of 1986 (the "Code"). Bond Counsel is of the further opinion that interest on the 2006 Bonds is not a specific preference item for purposes of the federal individual or corporate alternative minimum taxes, although Bond Counsel observes that such interest is included in adjusted current earnings when calculating corporate alternative minimum taxable income. A complete copy of the proposed form of opinion of Bond Counsel is set forth in **APPENDIX F - "FORM OF BOND COUNSEL OPINION."**

The Code imposes various restrictions, conditions and requirements relating to the exclusion from gross income for federal income tax purposes of interest on obligations such as the 2006 Bonds. The Authority and Obligated Group Agent have covenanted to comply with certain restrictions designed to insure that interest on the 2006 Bonds will not be included in federal gross income. Failure to comply with these covenants may result in interest on the 2006 Bonds being included in gross income for federal income tax purposes, possibly from the date of original issuance of the 2006 Bonds. The opinion of Bond Counsel assumes accuracy of these representations and compliance with these covenants. Bond Counsel has not undertaken to determine (or to inform any person) whether any actions taken (or not taken) or events occurring (or not occurring) after the date of issuance of the 2006 Bonds may adversely affect the value of, or the tax status of interest on, the 2006 Bonds.

Further, no assurance can be given that pending or future legislation or amendments to the Code, if enacted into law, or any proposed legislation or amendments to the Code, will not adversely affect the value of, or the tax status of interest on, the 2006 Bonds. Prospective purchasers of 2006 Bonds are urged to consult their own tax advisors with respect to proposals to restructure the federal income tax.

Certain requirements and procedures contained or referred to in the Indenture, the Tax Certificate, and other relevant documents may be changed and certain actions (including, without limitation, defeasance of the 2006 Bonds) may be taken or omitted under the circumstances and subject to the terms and conditions set forth in such documents. Bond Counsel expresses no opinion as to any Bond or the interest thereon if any such change occurs or action is taken or omitted upon the advice or approval of bond counsel other than Spilman Thomas & Battle, PLLC.

Although Bond Counsel is of the opinion that interest on the 2006 Bonds is excluded from gross income for federal income tax purposes, the ownership or disposition of, or the accrual or receipt of interest on, the 2006 Bonds may otherwise affect an owner's federal liability. The nature and extent of these other tax consequences will depend upon the particular tax status of the owner or the owner's other items of income or deduction. Bond Counsel expresses no opinion regarding any such other tax consequences.

69

Except as described above, Bond Counsel will express no other opinion with respect to any other federal, State or local tax consequences under present law, or proposed legislation, resulting from the receipt or accrual of interest on, or the acquisition or disposition of, the 2006 Bonds. Prospective purchases of the 2006 Bonds should be aware that the ownership of tax-exempt obligations such as the 2006 Bonds may result in collateral federal tax consequences to, among others, financial institutions, life insurance companies, property and casualty insurance companies, S corporations with subchapter C earnings and profits, certain foreign corporations doing business in the United States, individual recipients of Social Security or Railroad Retirement benefits, individuals otherwise qualifying for the earned income tax credit, owners of an interest in a financial asset securitization investment trust, and taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry, or who have paid or incurred certain expenses allocable to, tax-exempt obligations. Prospective purchasers should consult their own tax advisors as to the applicability of these consequences to their particular circumstances.

In addition, no assurance can be given that any future legislation, including amendments to the Code, if enacted into law, or changes in interpretation of the Code, will not cause interest on the 2006 Bonds to be subject, directly or indirectly, to federal income taxation, or otherwise prevent bond owners from realizing the full current benefit of the tax status of such interest. Prospective purchasers of the 2006 Bonds should consult their own tax advisors regarding any pending or proposed tax legislation. Further, no assurance can be given that the introduction or enactment of any such future legislation, or any action of the Internal Revenue Service (the "IRS"), including but not limited to regulation, ruling, or selection of the 2006 Bonds for audit examination, or the course or result of any IRS examination of the 2006 Bonds, or obligations which present similar tax issues, will not affect the market price for the 2006 Bonds.

The opinion of Bond Counsel is based on current legal authority, covers certain matters not directly addressed by such authorities, and represents Bond Counsel's judgment as to proper treatment of the 2006 Bonds for federal income tax purposes. It is not binding on the Internal Revenue Service or the courts. Furthermore, Bond Counsel cannot give and has not given any opinion or assurance about the future activities of the Authority, or about the effect of future changes in the Code, the applicable regulations, the interpretation thereof or the enforcement thereof by the IRS. The Authority and Obligated Group Agent have covenanted, however, to comply with the requirements of the Code.

Bond Counsel's engagement with respect to the 2006 Bonds ends with the issuance of the 2006 Bonds, and, unless separately engaged, Bond Counsel is not obligated to defend the Authority of the owners of the 2006 Bonds regarding the tax-exempt status of the 2006 Bonds in the event of an audit examination by the IRS. Under current procedures, parties other than the Authority and its appointed counsel, including the owners, would have little, if any, right to participate in the audit examination process. Moreover, because achieving judicial review in connection with an audit examination of tax-exempt 2006 Bonds is difficult, obtaining an independent review of IRS positions with which the Authority legitimately disagrees, may not be practicable. Any action of the IRS, including but not limited to selection of the 2006 Bonds for audit, or the course or result of such audit, or an audit of 2006 Bonds presenting similar tax issues may affect the market price

for, or the marketability of, the 2006 Bonds, and may cause the Authority or the owners of the 2006 Bonds to incur significant expense.

**Original Issue Discount.** To the extent the issue price of any maturity of the 2006 Bonds is less than the amount to be paid at maturity of such 2006 Bonds (excluding amounts stated to be interest and payable at least annually over the term of such 2006 Bonds), the difference constitutes "original issue discount," the accrual of which, to the extent properly allocable to each owner thereof, is treated as interest on the 2006 Bonds which is excluded from gross income for federal income tax purposes. For this purpose, the issue price of a particular maturity of the 2006 Bonds is the first price at which a substantial amount of such maturity of the 2006 Bonds is sold to the public (excluding bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers). The original issue discount with respect to any maturity of the 2006 Bonds accrues daily over the term to maturity of such 2006 Bonds on the basis of a constant interest rate compounded semiannually (with straight-line interpolations between compounding dates). The accruing original issue discount is added to the adjusted basis of such 2006 Bonds to determine taxable gain or loss upon disposition (including sale, redemption, or payment on maturity) of such 2006 Bonds. Beneficial Owners of the 2006 Bonds should consult their own tax advisors with respect to the tax consequences of ownership of 2006 Bonds with original issue discount, including the treatment of purchasers who do not purchase such 2006 Bonds in the original offering to the public at the first price at which a substantial amount of such 2006 Bonds is sold to the public.

**Original Issue Premium.** 2006 Bonds purchased, whether at original issuance or otherwise, for an amount greater than their principal amount payable at maturity (or, in some cases, at their earlier call date) ("Premium 2006 Bonds") will be treated as having amortizable bond premium. No deduction is allowable for the amortizable bond premium in the case of 2006 Bonds, like the Premium 2006 Bonds, the interest on which is excluded from gross income for federal income tax purposes. However, the amount of tax exempt interest received, and a purchaser's basis in a Premium Bond, will be reduced by the amount of amortizable bond premium properly allocable to such purchaser. Owners of Premium 2006 Bonds should consult their own tax advisors with respect to the proper treatment of amortizable bond premium in their particular circumstances.

**State Law.** Under the Act, the 2006 Bonds, and all interest and income thereon shall be exempt from all taxation by the State of West Virginia and any county, municipality, political subdivision or agency thereof, except for inheritance taxes.

## RATINGS

The 2006 Bonds have been given a rating of "AAA" by Standard & Poor's Rating Services, a division of the McGraw Hill Companies, Inc., ("S&P") and a rating of "Aaa" by Moody's Investors Service, Inc. ("Moody's"), respectively, on the basis of the issuance of the Municipal Bond Insurance Policy. In addition, S&P has assigned an underlying rating of "A+" to the 2006 Bonds and Moody's Investors Service, Inc. has assigned an underlying rating of "A2" to the 2006 Bonds. Any explanation of the significance of such ratings may only be obtained from the rating agencies

71

as follows: Standard & Poor's Rating Services, a division of the McGraw Hill Companies, Inc., 55 Water Street, New York, New York 10041, (212) 438-2124; Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007, (212) 553-0300. There is no assurance that the ratings mentioned above will remain unchanged for any given period of time or that they may not be lowered or withdrawn entirely if, in the judgment of the rating agency originally establishing the rating, circumstances so warrant. Any downward change in or withdrawal of such rating may have an adverse effect on the market price of the 2006 Bonds.

## LEGAL MATTERS

Legal matters incident to the authorization, issuance and validity of the 2006 Bonds are subject to the approving opinion of Spilman Battle & Thomas PLLC, Charleston, West Virginia, Bond Counsel. The proposed form of Bond Counsel's opinion is appended hereto as **APPENDIX F - "FORM OF BOND COUNSEL OPINION"** hereto.

Certain legal matters will be passed on for the Obligated Group by Robert L Brandfass, Esq., Fairmont, West Virginia, for the Authority by Bowles Rice McDavid Graff & Love LLP, Charleston, West Virginia, and for the Underwriter by Steptoe & Johnson PLLC, Charleston, West Virginia.

## FINANCIAL STATEMENTS

The consolidated financial statements of WVUHS as of December 31, 2005 and appearing in **APPENDIX B - "FINANCIAL STATEMENTS OF WEST VIRGINIA UNITED HEALTH SYSTEM, INC."** to this Official Statement have been audited by WVUHS's independent auditors, as stated in their report, with reference to other auditors, appearing therein. The management of WVUHS believes, as of the date hereof, that there has been no material adverse change in the financial condition of WVUHS since December 31, 2005, which is the most recent fiscal year for which audited consolidated financial statements are available.

There can be no assurance that the financial results achieved in the future will be similar to historical results. Such future results will vary from historical results, and actual variations may be material. The historical operating results of the members of the Obligated Group contained in this Official Statement cannot be taken as a representation that the Obligated Group will be able to generate sufficient revenues in the future to pay debt service on the 2006 Bonds.

## FINANCIAL ADVISOR

Shattuck Hammond Partners LLC (New York, New York) has served as Financial Advisor to WVUHS on matters related to the structuring and negotiations related to the Series 2006 Bonds.

## CONTINUING DISCLOSURE

The Obligated Group Agent will enter into a Continuing Disclosure Agreement (the "Continuing Disclosure Agreement") in connection with the issuance and sale of the 2006 Bonds to provide certain financial and operating data concerning its affairs on a continuing basis for owners of the 2006 Bonds. No financial or operating data concerning the Authority will be provided on a continuing basis, and the Authority assumes and will have no liability to the owners of either the 2006 Bonds (or the owner of any beneficial interest therein) or any other person with respect to any of the information provided by the Obligated Group Agent pursuant to the Continuing Disclosure Agreement. The form of the Continuing Disclosure Agreement is included as **APPENDIX G – "FORM OF CONTINUING DISCLOSURE AGREEMENT"** hereto.

## MISCELLANEOUS

The references herein to the Act, the Master Indenture, the Bond Indenture, the Notes, the Loan Agreement, the 2006 Bonds, and other materials are brief descriptions of certain provisions thereof. Such references do not purport to be comprehensive, and for full and complete statements of such provisions reference is made to such instruments, documents and other materials, copies of which are on file at the Corporate Trust Office of the Bond Trustee. '

The information contained in this Official Statement has been compiled or prepared from information obtained from the Obligated Group, the Authority, and official and other sources deemed to be reliable and, while not guaranteed as to completeness or accuracy, is believed to be correct as of the date of this Official Statement. Any statements involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact. Any estimates or assumptions in this Official Statement have been made on the basis of the best information available and are believed to be correct and reliable, but no representations whatsoever are made that such estimates or assumptions are correct and will be realized.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

The execution and distribution of this Official Statement have been duly authorized by the Authority.

**WEST VIRGINIA HOSPITAL FINANCE AUTHORITY**

By: /s/ James R. Christie _____
Its Chairman

**Approved:**

**WEST VIRGINIA UNIVERSITY HOSPITALS, INC., as Obligated Group Agent**

By: /s/ Bruce McClymonds _____
Its President

S-1

**APPENDIX A**

Information Concerning

# West Virginia United Health System, Inc.

The information contained herein as Appendix A to this Official Statement has
been obtained from the West Virginia United Health System, Inc. and other
sources believed to be reliable.

# **TABLE OF CONTENTS**

Page

WEST VIRGINIA UNITED HEALTH SYSTEM, INC. .................................................................................................... A-1
    General ............................................................................................................................................................................ A-1
    Governance ..................................................................................................................................................................... A-3
    Conflicts of Interest ........................................................................................................................................................ A-3
    Management .................................................................................................................................................................... A-3
    Hospital Facilities and Services ...................................................................................................................................... A-4
    Service Area and Competition ........................................................................................................................................ A-5
    Utilization Statistics ....................................................................................................................................................... A-7
    Personnel and Employee Relations ................................................................................................................................. A-7
    Licenses and Accreditations ........................................................................................................................................... A-7
    Insurance ........................................................................................................................................................................ A-7
    Related Party Transactions .............................................................................................................................................. A-8
    Contingencies ................................................................................................................................................................. A-8
    Educational Programs ..................................................................................................................................................... A-8
    Litigation ........................................................................................................................................................................ A-8

WEST VIRGINIA UNIVERSITY HOSPITALS, INC. ..................................................................................................... A-9
    General Background ........................................................................................................................................................ A-9
    Addition of West Virginia University Hospitals-East ..................................................................................................... A-10
    Management .................................................................................................................................................................... A-11
    Medical Staff .................................................................................................................................................................. A-12
    Utilization Statistics ....................................................................................................................................................... A-13
    Sources of Revenues ....................................................................................................................................................... A-14
    WVUH-East .................................................................................................................................................................... A-14
    City Hospital ................................................................................................................................................................... A-15
    Jefferson Memorial ......................................................................................................................................................... A-15

UNITED HOSPITAL CENTER, INC. ............................................................................................................................. A-16
    General Background ........................................................................................................................................................ A-16
    The Project ...................................................................................................................................................................... A-16
    Management .................................................................................................................................................................... A-18
    Medical Services and Staff .............................................................................................................................................. A-20
    Utilization Statistics ....................................................................................................................................................... A-21
    Sources of Revenues ....................................................................................................................................................... A-21

SELECTED SUMMARY FINANCIAL INFORMATION FOR THE SYSTEM AND THE OBLIGATED GROUP .............. A-22
    Actural and Pro Forma Historical Debt Service Coverage .............................................................................................. A-25

MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS ................................................... A-25
    General and Historical .................................................................................................................................................... A-25
    Results of Operations – January 1, 2003 - December 31, 2005 ...................................................................................... A-26
    Recent Results of Operations – January 1, 2006 – March 31, 2006 ................................................................................ A-27
    Future Strategy ............................................................................................................................................................... A-27

NON-OBLIGATED SYSTEM PARTICIPANTS .............................................................................................................. A-27
    Non-Obligated Participants ............................................................................................................................................. A-28

Capitalized terms used, but not defined, in this Appendix A are defined in the forepart of this Official
Statement and in Appendix C to this Official Statement.

This Appendix contains information concerning West Virginia United Health System, Inc. (the "System" or "WVUHS") and certain of its subsidiaries that comprise the Obligated Group, all of which are tax-exempt charitable organizations described in Internal Revenue Code Section 501(c)(3)(a "Section 501(c)(3) Organization"). The members of the Obligated Group are West Virginia University Hospitals, Inc. ("WVUH"), United Hospital Center, Inc. ("UHC"), City Hospital, Inc. ("City Hospital"), Charles Town General Hospital, d/b/a Jefferson Memorial Hospital. ("Jefferson" or "Jefferson Memorial") and City Hospital Foundation, Inc. ("CHF"). The Obligated Group collectively accounted for 95.9 percent of the total operating revenues of the System during the twelve months ended December 31, 2005, and 94.6 percent of the total assets of the System as of December 31, 2005.

On January 1, 2005, Gateway Regional Health System, Inc. ("Gateway"), of which City Hospital, was the hospital operating company, and Jefferson Regional Health System, Inc. ("JRHS"), of which Jefferson was the hospital operating company, merged to form West Virginia University Hospitals-East, Inc. ("WVUH-E" or "WVUH-East"), of which WVUH is the sole corporate member. See "WEST VIRGINIA UNIVERSITY HOSPITALS, INC. – "Addition of West Virginia University Hospitals- East, Inc." herein.

This Appendix does not purport to identify or discuss each of the subsidiaries in the System or all of the entities that are taken into account in the presentation of consolidated financial information for the System.

The Obligated Group will deliver its Master Notes to secure repayment of the Series 2006 Bonds.

**WVUH, UHC, CITY HOSPITAL, JEFFERSON AND CHF ARE THE ONLY MEMBERS OF THE OBLIGATED GROUP WITH RESPECT TO THE SERIES 2006 BONDS, AS DEFINED IN THE OFFICIAL STATEMENT. THE SYSTEM HAS NO OBLIGATION TO PAY DEBT SERVICE ON THE SERIES 2006 BONDS.**

## WEST VIRGINIA UNITED HEALTH SYSTEM, INC.

### General

The System is a West Virginia non-profit corporation with facilities in West Virginia. WVUHS is the parent corporation for a health care system that operates hospitals and other health care facilities and engages in other health care related activities.

The System is the sole member of WVUH and UHC. The System was formed to assist WVUH and UHC to fulfill their charitable and academic missions in a changing health care environment. The mission of the System is to serve as a regional integrated delivery system, which provides the full range of both inpatient and outpatient health care service to the residents of West Virginia, western Maryland, and southwestern Pennsylvania. In meeting this mission in its defined service area, WVUH and UHC play a significant role in improving the general health care of the community. The strategic plan of WVUHS states an intent to build a regional health care delivery system in its service area, while offering a variety of options for providers who want to participate. The System maintains a demonstrated commitment to assist rural communities in preserving and improving the health care available to the patients it serves. In recognition of the critical role WVUHS plays in the economics of the communities it serves, WVUHS' mission also includes the objective to operate in a financially responsible manner.

The System has all powers available to a corporation under West Virginia law. The System's Affiliation Agreement and the articles of incorporation and bylaws of WVUHS, WVUH and UHC empower the System to, among other things, elect and remove any member of the governing boards of WVUH, UHC and/or their subsidiaries, approve amendments to their articles of incorporation and by-laws, approve any mergers, direct capital contributions to the System, approve all budgets, direct inter-company fund transfers, approve non-budgeted acquisitions, purchases, sales or other asset dispositions in excess of $1,000,000, and to approve the incurrence of material debt and key affiliations between System members and third parties.

The following is an organizational chart indicating the entities that make up WVUHS and the Obligated Group.



= Member of Obligated Group

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**Governance**

The System is governed by a voting board of 21 members. Eleven of the voting members are designated as "university representatives" and ten are "community representatives." Seven of the "university representatives" are appointed by the Governor of West Virginia from names submitted by WVUH, subject to confirmation by the West Virginia Senate. The remaining four "university representatives" are ex officio members associated with WVUH and/or West Virginia University ("WVU" or the "University"). The ten "community representatives" are appointed by UHC.

### Officers and Members of the Board of Directors

#### Officers of the Board of Directors

| Name | Primary Affiliation | Office | Expiration |
|---|---|---|---|
| David C. Hardesty, Jr. | President, West Virginia University | Chair | Ex-Officio |
| J. Cecil Jarvis | Attorney, McNeer, Highland, McMunn & Varner | Vice Chair | March 2007 |
| Robert D'Alessandri, MD | Vice President, Health Science Center | Secretary | Ex-Officio |
| James Jeffrey | Retired, Southern Equipment Company | Treasurer | October 2008 |
| J. Thomas Jones[1] | President & CEO, WVUHS | Pres/CEO | Ex-Officio |

#### Members of the Board of Directors*

| Name | Primary Affiliation | Expiration |
|---|---|---|
| Barbara J. Anderson | Retired, Harrison County Teacher | May 2011 |
| Sr. Anne Francis Bartus, DMin | Directress, Jacob's Well House of Prayer | May 2011 |
| Phil Bostic | Bus. Mgr/Sec-Tres., Maintenance Workers of Local Union #1182 | October 2010 |
| James Bryant, MD | Ear, Nose & Throat Associates of Clarksburg, Inc. | March 2009 |
| Sister Joel Patrice Christy | Director, Sacred Heart Day Care Center | October 2006 |
| Eric Radcliff, MD | United Hospital Center | March 2007 |
| John P. Keeley | President, Ground Breakers, Inc. | October 2010 |
| Robert E. Kittle | Consultant, Harrison Cty Bd of Education | March 2009 |
| Mark Nesselroad | Glenmark Holding, LLC | Ex-Officio |
| Judge Robert Maxwell | United States District Judge, US District Court | October 2006 |
| John Prescott, MD | Dean, WVU School of Medicine | Ex-Officio |
| James Hutzler, DDS | Retired Dentist | January 2011 |
| Betty Puskar | Philanthropist | October 2008 |
| W. Marston Becker | Chairman, West Virginia Media Holdings, LLC | October 2010 |

* There are currently three vacancies
[1] Nonvoting member

**Conflicts of Interest**

The respective Boards of Directors of the System and each of the members of the Obligated Group have each adopted conflict of interest policies that govern transactions between members of the respective Boards and the applicable entities. Management believes that the transactions and relationships are on terms that are consistent with arm's length, fair market value arrangements between unaffiliated parties. Management does not believe the objectivity of any of the respective Boards is compromised in any way.

**Management**

The responsibility for the operations of WVUHS is delegated by its Board of Directors to the President/Chief Executive Officer, J. Thomas Jones. Selected biographical information is provided below for Mr. Jones and for other principal members of the Administrative Staff.

J. Thomas Jones, President/Chief Executive Officer, age 56. J. Thomas Jones was appointed as President and Chief Executive Officer effective July 1, 2002. Prior to his current position with the System, Mr. Jones was Chief Executive Officer of the Genesis Hospital System, Huntington, WV (2000-2002), Executive Director/CEO of St. Mary's Hospital, Huntington, WV (1990-2000), and Chief Operations Officer of Wheeling Hospital, Wheeling, WV (1973-1990). Mr. Jones is a Diplomat with the American College of Hospital Administrators, past Chairman of the West Virginia Hospital Association, and West Virginia Delegate to the American Hospital Association Region III Policy Board. Mr. Jones earned his Bachelor of Science degree from West Virginia University and his Masters in Hospital Administration from the University of Minnesota.

Robert L. Brandfass, Vice President and General Counsel, age 45. Robert Brandfass serves as Vice President and General Counsel of WVUH as well as General Counsel of the System. He was previously a partner in the law firm of Kay, Casto, Chaney, Love & Wise, Charleston, West Virginia. Mr. Brandfass was a member of the law firm's Management Committee and Chair of the law firm's eleven-member Health Care Practice Group, which provided legal representation to health care providers. Mr. Brandfass is a member of the West Virginia State Bar Association, the American Health Lawyers Association and the Association of Corporate Counsel. Mr. Brandfass earned his J.D. degree from the Case Western Reserve University School of Law and graduated Cum Laude with an A.B. in Politics and Government from Ripon College.

Jeffery G. Gibson, Vice President of Health Services Development, age 45. Jeff Gibson is Vice President of Health Services Development for the System. Prior to joining WVUHS, Mr. Gibson was Corporate Director of Planning and Marketing for Baptist Health' System, an eleven-hospital integrated delivery system based in Birmingham, Alabama. Mr. Gibson is also currently an adjunct faculty member of West Virginia University's College of Business and Economics, and an adjunct Professor of Marketing and Health Care Administration, at Birmingham-Southern College. Mr. Gibson earned a Bachelor of Science in Health Care Management in 1981 (summa cum laude) at the University of Alabama. He earned a Master's Degree in Public Health Care Policy and Administration from the University of Alabama-Birmingham in 1986.

John J. Yeager, Vice President and Chief Financial Officer, age 57. John Yeager is Vice President and Chief Financial Officer of the System. Mr. Yeager has over 25 years of experience in hospitals and managed care operations. Mr. Yeager was the Chief Financial Officer for the Health Plan from 1996 to 2004, which is a non-profit managed care organization with over 100,000 members. Prior to this, he was employed with Wheeling Hospital and served as the Associate Administrator/Chief Financial Officer. Mr. Yeager also served as the Nursing Home/Dialysis Administrator and CEO of a hospital being managed by Wheeling Hospital. Mr. Yeager earned a Bachelor of Science in Business Administration from West Liberty State College and a Masters in Business Administration from Wheeling Jesuit College. Mr. Yeager is a member of the West Virginia Society of CPA's and the Healthcare Financial Management Association.

**Hospital Facilities and Services**

The System is mainly comprised of four hospitals: WVUH, UHC, City Hospital, and Jefferson Memorial. WVUH is a major academic teaching center located in Morgantown, WV and serves as the tertiary and quaternary referral center for the northern portion of West Virginia. WVUH currently has 522 licensed beds and provides high acuity services including cardiac surgery, neurosurgery, orthopedic surgery, thoracic and vascular surgery, high risk obstetrics, blood and bone marrow transplantation, gamma knife, neonatal intensive care, pediatric intensive care, and Level I Trauma. UHC is a large community hospital located in Clarksburg, WV with 375 licensed beds. UHC provides a wide range of primary and secondary services in cardiology, geriatric services, obstetrics/gynecology, oncology, surgical services, diagnostic services, psychiatric services, and rehabilitation services. City Hospital is a small community healthcare provider located in Martinsburg, WV with 260 licensed beds. Jefferson Memorial is a critical access hospital located in Ranson, WV with 45 licensed beds.

**Service Area and Competition**

The System defines its primary service area for inpatient services as the counties of Monongalia, Marion, Harrison, Preston, Doddridge, Taylor, Tucker, Upshur, Berkeley, Wetzel and Jefferson in West Virginia and Greene and Fayette counties in Pennsylvania. The secondary service area for the System includes Randolph, Lewis, Barbour, Gilmer, Webster, Pendleton and Mineral counties in West Virginia and Garrett county in Maryland.

WVUHS is the dominant provider in its service area, accounting for the majority of admissions. Other major teaching hospitals in the region are Charleston Area Medical Center in Charleston, West Virginia, the Ohio Valley Medical Center in Wheeling, West Virginia and the University of Pittsburgh Medical Center in Pittsburgh, Pennsylvania. Due to the geographic distance of these hospitals from Morgantown (167 miles, 90 miles and 75 miles, respectively), none are considered a major competitor of WVUHS.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Competitors in WVUHS' service area include the community hospitals outlined below.

### West Virginia United Health System, Inc.
### Statistics by Competitor

| Hospital | Location | Staffed Beds | Admissions |
|---|---|---|---|
| **WVUHS** | **4 locations** | **947** | **51,063** |
| Stonewall Jackson | Weston, WV | 70 | 3,350 |
| Grafton City | Grafton, WV | 101 | 1,250 |
| St. Joseph's | Buckhannon, WV | 69 | 2,097 |
| Fairmont General | Fairmont, WV | 167 | 6,706 |
| Monongalia General | Morgantown, WV | 175 | 8,525 |

Source: 2006 AHA Guide

### West Virginia United Health System, Inc. Service Area



WVUHS Facilities and Competitors

**Hospital**

① West Virginia University Hospitals

② United Hospital Center

③ City Hospital

④ Jefferson Hospital

⑤ Stonewall Jackson

⑥ Grafton City

⑦ St. Joseph

⑧ Fairmont General

⑨ Monongalia General

## Utilization Statistics

The following tables show, for the years indicated, certain operating statistics for WVUHS:

|  | Fiscal Year Ending December 31, | | | Three Months Ended March 31, | |
|  | **2003** | **2004** | **$2005^{(2)}$** | **2005** | **2006** |
|---|---|---|---|---|---|
| Total Licensed Beds | 897 | 897 | 1,216 | 1,271 | 1,216 |
| Total Staffed Beds | 751 | 751 | 947 | 955 | 947 |
| Discharges [1] | 42,655 | 43,629 | 55,392 | 13,937 | 14,146 |
| Births | 2,135 | 2,494 | 3,444 | 725 | 769 |
| Patient Days [1] | 209,496 | 214,042 | 259,424 | 66,777 | 68,192 |
| Surgical Operations |  |  |  |  |  |
| Inpatient | 11,571 | 11,873 | 14,436 | 3,574 | 3,804 |
| Outpatient | 18,620 | 20,017 | 29,066 | 7,093 | 7,554 |
| Total | 30,191 | 31,890 | 43,502 | 10,667 | 11,358 |
| Outpatient Visits |  |  |  |  |  |
| Emergency Room | 77,340 | 77,005 | 136,138 | 33,825 | 34,702 |
| Other | 716,484 | 771,256 | 950,430 | 232,765 | 258,675 |
| Total | 793,824 | 848,261 | 1,086,568 | 266,590 | 293,377 |

Source: WVUHS records.

(1) Includes acute care, observation, skilled nursing unit, and behavioral medicine discharges. Excludes births.

(2) WVUH-East acquisition in 2005 accounts for the majority of the increase in the 2005 data.

## Personnel and Employee Relations

As of December 2005, the members of the Obligated Group employed 5,706 FTEs (excluding residents). Of these FTEs, over 1,500 were registered nurses and over 150 were licensed practical nurses. Certain of the Obligated Group member's support staff, comprising less than 13% of the total FTEs, are represented by a collective bargaining unit.

## Licenses and Accreditations

Each member of the Obligated Group, except CHF, is currently accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"). Each member of the Obligated Group, except CHF, is licensed by the West Virginia Department of Health and Human Resources and is approved for participation in the Medicare and Medicaid programs. Memberships include Premier, Inc., the West Virginia Hospital Association and the American Hospital Association.

## Insurance

The System provides its own professional and general liability insurance. Each member of the Obligated Group is separately insured through a bona fide program of self-insurance or liability insurance and or a combination of the two for professional and general liability losses. Funding levels for the self-insured programs of the members of the Obligated Group are reviewed on an annual basis by an independent actuary.

**Related Party Transactions**

The following two paragraphs provide selected related party transaction information for WVUHS and its subsidiaries.

WVUH held, up to January 21, 2003, an excess liability insurance policy with Healthnet Insurance Company, who in turn reinsured with an insurance carrier. As an original shareholder (along with Charleston Area Medical Center) of Healthnet Insurance Company, WVUH originally appointed two individuals to be members of the Board of Directors of Healthnet Insurance Company. WVUH transferred its shares in Healthnet Insurance Company to WVUHS on September 11, 1997.

WVUH entered into an agreement with University Health Associates ("UHA") to form a healthcare provider network named Integrated Provider Network, Inc. ("IPN"). The IPN subsequently entered into a provider relationship with The Health Plan of the Upper Ohio Valley, Inc. ("The Health Plan"). As of December 31, 2005, WVUH is liable, along with UHA, for any deficiencies incurred by the IPN which began operations January 1, 1995. IPN has provided notice to The Health Plan that it will terminate the provider relationship effective July 1, 2006.

**Contingencies**

No member of the Obligated Group is a guarantor of the West Virginia University Medical Corporation Issue, Series 1992 Bonds, currently outstanding in the amount of $18,718,613. However, WVUH does have an obligation under an operating credit agreement, contingent on certain circumstances, to assume the Sublease on all assets of the West Virginia University Medical Corporation and replace the West Virginia University Medical Corporation as obligor under the West Virginia University Medical Corporation's Series 1992 Bonds and Notes.

**Educational Programs**

WVUHS is responsible for providing educational and clinical facilities primarily for the University's Schools of Health, Science, Dentistry and Medicine.

Graduate Medical and Dental Education. Graduate medical and dental education for residents is offered in twenty-five major specialty and subspecialty areas. A total of 325 positions are currently filled at the Medical School campus in Morgantown and at WVUH-East.

Allied Health Programs. WVUH provides clinical training for the Exercise Physiology, Community Medicine, Medical Technology, Occupational Therapy and Physical Therapy programs. The number of students enrolled in these programs is 506. WVUH is a certificate-granting hospital for the radiologic technology programs of Radiography, Nuclear Medicine, Radiation Therapy and Ultrasound. UHC is a certified-granting hospital for the radiologic technology programs of Radiography and Ultrasound. WVUH also supports the various programs associated with the Schools of Medicine, Nursing, Dentistry and Pharmacy.

Continuing Education. WVUH, as a major teaching facility, fulfills its obligations to its staff and area professionals by its activities in continuing medical education. WVUH sponsors continuous lectures, seminars and conferences conducted by the medical staff or visiting lecturers. In addition, continuing education programs for the nursing staff, administrative staff and support personnel are conducted throughout the year on a variety of relevant topics.

**Litigation**

At any given time, the Obligated Group has a number of lawsuits pending against it (i) alleging professional liability; or (ii) involving claims which are unrelated to professional liability. Based upon the

nature of the aforesaid claims and given the Obligated Group's self-insurance program and excess liability coverage, WVUHS management believes that if such pending suits were decided unfavorably to WVUHS, there would be no material adverse affect on its financial condition.

In addition, to the knowledge of WVUHS management, there are no suits threatened against WVUHS which could have a material adverse affect on its financial condition or which challenge the issuance of the Bonds.

## WEST VIRGINIA UNIVERSITY HOSPITALS, INC.

WVUH is a West Virginia not-for-profit corporation that is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), and is exempt from federal income taxation (as a Section 501(c)(3) Organization).

### General Background

In 1960, the University, located in Morgantown, West Virginia, commenced operations of a tertiary care teaching hospital, now known as Ruby Memorial Hospital, as a component of the medical center of the University. In 1984, the West Virginia Legislature adopted enabling legislation which authorized separation of the hospital operations from the University and the establishment of a separate corporate entity. WVUH was incorporated as a non-stock, not-for-profit corporation and, by an agreement of transfer and lease dated July 1, 1984, assumed the operation of and responsibility for the University's teaching hospital. Ruby Memorial Hospital serves as a major statewide and regional health care referral center and provides the principal clinical education and research site for the University. The terms of the enabling legislation require WVUH to provide a minimum of $4,000,000 per year in education expense for the interns and residents and an annual clinical teaching subsidy of not less than $6,000,000.

WVUH's original facility, constructed in 1960, is now the Health Sciences Building and serves as the central academic teaching facility of the Robert C. Byrd Health Sciences Center of the University. Ownership of this facility resides with the State of West Virginia. In 1986, WVUH began construction of its current facility, Ruby Memorial Hospital, a 10-story, 500,000 square foot facility which began operation in 1988. The Ruby Memorial Hospital is a tertiary care referral center and serves as the principal clinical education and research site for the West Virginia University School of Medicine. As part of its 552-bed complement and within its existing contiguous facility, WVUH operates the 92-bed WVU Children's Hospital which attracts skilled clinicians and significant financial support and includes a 30-bed newborn intensive care unit. The Jon Michael Moore Trauma Center, which is also part of the Ruby Memorial Hospital, is the only nationally certified Level I trauma center in West Virginia and serves a significant geographic area.

On September 30, 1998, WVUH purchased the assets of Chestnut Ridge Hospital, a predominantly inpatient 70-bed psychiatric hospital built in 1987 and located adjacent to Ruby Memorial Hospital. Chestnut Ridge Hospital is operated as a department of WVUH and has been home to the University's Department of Behavioral Medicine and Psychiatry. A portion of the proceeds from the WVUH Series 1998 Bonds were used to reimburse the WVUH for the acquisition of the assets of Chestnut Ridge Hospital.

In July 1998, WVUH constructed the Family House, a 26-unit housing facility for adult patients and their families. Family House has direct access to Ruby Memorial Hospital and fills a critical need for patients who require bone-marrow transplant and chemotherapy, for patients of Mary Babb Randolph Cancer Center, and for families of patients being treated at the trauma center.

In September 2003, WVUH completed a strategic plan and subsequent bond financing for the purpose of expanding facilities. This clinical expansion project originally included the addition of 58 medical and surgical beds, 10 adult intensive care beds, 4 pediatric intensive care beds, 2 outpatient operating rooms, and 4 inpatient operating rooms. Of the 58 medical and surgical beds in the original plan, 32 were intended to be

constructed as a long term acute care hospital (LTACH). Due to LTACH reimbursement changes, management decided not to construct the unit and shelled the space for future use in a different service line. The majority of the construction associated with the 2003 project has been completed and the remaining beds under construction are expected to be completed by December 2006.

The following table details WVUH's staffed bed complement:

| Service | Staffed Beds | Beds Under Construction | Staff Beds Upon Project Completion |
|---|---|---|---|
| Medical and surgical | 209 | 18 | 227 |
| Intensive care | 46 | 5 | 51 |
| Bone marrow transplant | 12 | 0 | 12 |
| Pediatrics | 27 | 0 | 27 |
| Pediatrics ICU | 19 | 0 | 19 |
| Neonatal ICU | 30 | 0 | 30 |
| Obstetrics/gynecology | 22 | 0 | 22 |
| Skilled nursing unit | 20 | 0 | 20 |
| **Total** | **385** | **23** | **408** |
| Chestnut Ridge (Psych) | 70 | 0 | 70 |
| **Total** | **455** | **23** | **478** |

Note: Statistics for WVUH only, does not include data of WVUH-East facilities.

In addition to the Hospital's facilities, the campus of the Robert C. Byrd Health Sciences Center of the West Virginia University consists of the following:

Mary Babb Randolph Cancer Center, the only comprehensive center for cancer care, prevention and research located in the state of West Virginia.

Health Sciences Building, containing over one million square feet of classroom, laboratory, and office space and housing the West Virginia University's schools of medicine, dentistry, pharmacy and nursing.

Physician Office Center, a four-story facility of approximately 126,000 square feet which is the primary practice setting for the West Virginia University School of Medicine.

## Addition of West Virginia University Hospitals-East

On January 1, 2005, JRHS and Gateway merged and formed WVUH-East. WVUH-East is the sole corporate member of City Hospital and Jefferson Memorial. The boards of directors of the three entities - WVUH-East, City Hospital and Jefferson Memorial have the same membership. WVUH is the sole voting corporate member of WVUH-East.

The addition of WVUH-East in West Virginia's Eastern Panhandle has generated many positive benefits. The addition has allowed WVUH to expand its geographic reach into West Virginia's fastest growing population area. Through clinical program development and synergies, there exists significant opportunity to keep patients within the State and curb outmigration of patients to facilities in Maryland and

Virginia. A number of operating efficiencies have been garnered between WVUH and WVUH-East with respect to capital management, managed care contracting, and supply chain management. Lastly, the WVU School of Medicine has a significant presence in the Eastern Panhandle and has recently completed construction of a $6 million teaching facility on the City Hospital campus. The WVUH relationship compliments the development and growth of the City Hospital campus.

## Management

The responsibility for the operations of WVUH is delegated by the Board of Directors to the President, Bruce McClymonds. Selected biographical information is listed below for Mr. McClymonds and for other principal members of the WVUH Administrative Staff.

Bruce McClymonds, President, age 50. Bruce McClymonds is the President of WVUH. Prior to his appointment, Mr. McClymonds served as WVUH's chief financial officer from 1989 to December 1994 and as WVUH's chief operating officer during 1995 and 1996. He is responsible for all aspects of WVUH'S operations and plays a significant role in strategic plan development and implementation. He has also played a critical role in the organization's various managed care activities. Prior to moving to WVUH, Mr. McClymonds spent nine years in the healthcare specialty group of Price Waterhouse's Pittsburgh office. He also served as the chief financial officer of a community hospital in the Pittsburgh area. Mr. McClymonds received his Bachelors of Science Degree in Accounting from Grove City College and is a certified public accountant. Mr. McClymonds serves as a lecturer in the Masters of Public Administration Program at West Virginia University.

Dorothy Oakes, RN, MSN, Vice President and Chief Nursing Executive, age 53. Dorothy Oakes assumed the role of WVUH's Vice President and Chief Nurse Executive, and Administrator of West Virginia University Children's Hospital on February 3, 2003. Prior to her arrival in West Virginia, she was employed at WakeMed in Raleigh, N.C. for 28 years, during which time she served in various senior management positions. Ms. Oakes is also Director, Clinical Services, for the School of Nursing at West Virginia University. She earned her Masters in Science of Nursing from Duke University, and a Bachelors in Science of Nursing from the University of North Carolina.

Stephen L. Tancin, Vice President for Ancillary & Support Services, age 50. Stephen Tancin joined WVUH in 1984 and has held the following positions in his tenure at WVUH: Director of Cardiology, Director of Clinical & Anatomical Laboratories and Executive Director of for-profit and non-profit subsidiaries, Vice President for Support Services, Vice President for Ancillary and Support Services. Mr. Tancin earned his Masters Degree in Healthcare Administration form the Graduate School of Public Health, University of Pittsburgh and he received his Bachelors of Science Degree in Biology from Lehigh University.

David C. Salsberry, Vice President of Finance and Chief Financial Officer, age 45. David Salsberry joined WVUH in April 2001 after working as the Vice President of Finance and Chief Financial Officer at the System since January 1998. From September 1992 through December 1997, he held the position of Vice President of Finance and Chief Financial Officer at UHC. From 1987 through 1992, he has held other positions including Assistant Vice President of Finance, Director, Marketing and Planning, and Market Analyst. He is a member of the Health Care Financial Management Association and the West Virginia Society of Certified Public Accountants. Mr. Salsberry received a Masters of Public Administration from Kent State University in Kent, Ohio in 1987 and a Bachelor of Science from West Liberty State College, West Liberty, West Virginia in 1983 and is a certified public accountant.

Gary Murdock, Vice President of Planning and Marketing, age 43. Gary Murdock is the Vice President of Planning and Marketing for WVUH. His current duties include oversight of strategic planning, internal and external communication, identification and implementation of program development initiatives, and marketing of WVUH, University Health Associates and the Schools of the WVU Health Sciences Center. From 1992 to 2000, he held several different positions at WVUH, including Financial Analyst, Programming Analyst, Director of Health Information Management and Vice President for Program Development. Mr.

A-11

Murdock graduated from WVU in 1985 with a Bachelor's degree in Industrial Engineering. After working in the textile industry for several years, he returned to WVU for graduate studies and became a teaching fellow in the School of Engineering. In 1992, Mr. Murdock joined WVUH in the finance area.

Michael T. Balassone, Vice President and Chief Information Officer, age 55. Michael Balassone joined WVUH in 2001. Prior to joining WVUH, Mr. Balassone held the position of Vice President and Chief Information Officer at the University of Maryland Medical System (Baltimore) from 1996 through 2000. Mr. Balassone received a Bachelor of Science degree in Business with a concentration in Information Systems from the University of Baltimore.

Kevin A. Halbritter, MD, Vice President of Medical Staff Affairs, age 47. Kevin Halbritter assumed the role as Vice President of Medical Staff Affairs at WVUH on December 1, 1998. Dr. Halbritter also serves as Medical Director for the Medical Access Referral System (MARS), WVU Referral Office and the WVU Healthline. In addition, Dr. Halbritter is an active member of the WVU/UHA Medical Staff and holds a faculty appointment in the Department of Internal Medicine. Dr. Halbritter received his Bachelor's degree and Medical degree from West Virginia University.

Cindy Klein, Vice President of Human Resources, age 42. Cindy Klein is Vice President of Human Resources at WVUH after previously holding the positions of Director of Cardiology from 1993 to 1997 and Patient Advocate from 1989 to 1993. Ms. Klein earned her Masters Degree in Public Administration, Certificate in Healthcare Administration and Bachelor of Science from West Virginia University.

Robert L. Brandfass, Vice President and General Counsel, age 45. See page A-3.

### Medical Staff

As of April 2006, the entire WVUH medical staff consisted of 460 members. Members of the medical staff are assigned to either the Active or Consulting Staff categories. Active Staff appointments are limited to those faculty members who use the WVUH facilities as their principal place of practice. Appointees to the Active Staff may admit and attend patients, may vote and hold office, serve on Medical Staff committees as requested and are required to attend at least half of all Service Committee and Medical Staff meetings. Consulting Staff appointments are extended to these faculty members who use WVUH's facilities regularly. Appointees to the Consulting Staff may admit and attend to patients, serve on Medical Staff Committees as requested and are expected, but not required, to attend all service, committee and Medical Staff meetings. Consulting Staff are not eligible to vote or hold office.

WVUH (with certain exceptions) has a closed medical staff limited to the faculty of the West Virginia University School of Medicine who also comprise the physician members of West Virginia University Medical Corporation. WVU Medical Corporation was created expressly for the benefit of the School of Medicine. The physicians providing the services of the WVU Medical Corporation all have faculty appointments at the School of Medicine, and it is a condition of the School of Medicine appointment that faculty members provide clinical services through the WVU Medical Corporation.

The following table summarizes by specialty the members of the Active and Consulting Staff of WVUH as of April 2006.

| Department | Active Physicians | Consulting Physicians | Total Physicians | Percent Board Certified | Average Age |
|---|---|---|---|---|---|
| Anesthesiology | 21 | 2 | 23 | 96% | 45 |
| Behavioral Med/Psychiatry | 22 | 0 | 22 | 82 | 51 |
| Dentistry | 33 | 25 | 58 | -- | 54 |
| Dentistry-Oral Surgery | 7 | 5 | 12 | 58 | 50 |
| Emergency Medicine | 21 | 3 | 24 | 67 | 41 |
| Family Medicine | 21 | 10 | 31 | 100 | 46 |
| Medicine | 65 | 7 | 72 | 88 | 49 |
| Neurology | 11 | 0 | 11 | 91 | 46 |
| Neurosurgery | 9 | 4 | 13 | 62 | 51 |
| Obstetrics/Gynecology | 11 | 6 | 17 | 94 | 48 |
| Occupational Medicine | 5 | 1 | 6 | 100 | 47 |
| Ophthalmology | 16 | 5 | 21 | 76 | 46 |
| Orthopedics | 8 | 11 | 19 | 95 | 50 |
| Otolaryngology | 9 | 7 | 16 | 94 | 55 |
| Pathology | 12 | 1 | 13 | 92 | 54 |
| Pediatrics | 39 | 6 | 45 | 91 | 44 |
| Radiology | 23 | 2 | 25 | 100 | 51 |
| Surgery | 25 | 2 | 27 | 96 | 47 |
| Urology | 4 | 1 | 5 | 100 | 51 |
| **Grand Total** | **362** | **98** | **460** | **88%** | **49** |

Source:  WVUH records as of April 2006.

Note: Statistics for WVUH only, does not include data of WVUH-East facilities.

## Utilization Statistics

The following tables show, for the years indicated, certain operating statistics for WVUH:

| | Fiscal Year Ending December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2005 | 2006 |
| Total Licensed Beds | 522 | 522 | 522 | 522 | 536 |
| Total Staffed Beds | 433 | 433 | 433 | 433 | 455 |
| Discharges [1] | 24,979 | 25,863 | 26,644 | 6,476 | 6,712 |
| Births | 1,283 | 1,583 | 1,372 | 241 | 250 |
| Patient Days [1] | 125,740 | 131,752 | 134,740 | 33,352 | 34,199 |
| Acute Average Length of Stay | 5.5 | 5.5 | 5.6 | 5.6 | 5.6 |
| Surgical Operations | | | | | |
| Inpatient | 7,429 | 7,504 | 7,527 | 1,835 | 1,898 |
| Outpatient | 10,262 | 10,444 | 10,530 | 2,594 | 2,736 |
| Total | 17,691 | 17,948 | 18,057 | 4,429 | 4,634 |
| Outpatient Visits | | | | | |
| Emergency Room | 36,192 | 37,282 | 37,404 | 9,142 | 9,692 |
| Other | 403,019 | 436,461 | 473,738 | 115,520 | 130,050 |
| Total | 439,211 | 473,743 | 511,142 | 124,662 | 139,742 |

Source:  WVUH records.

(1) Includes acute care, observation, skilled nursing unit, and behavioral medicine discharges.  Excludes births.

Note: Statistics for WVUH only, does not include data of WVUH–East facilities.

**Sources of Revenues**

WVUH's gross patient charges result from healthcare services provided to its patient population. Third-party payors, including health maintenance organizations ("HMOs"), insurance companies, employers, preferred provider organizations ("PPOs") under managed care programs, the federal government under the Medicare program and federal and state governments under Medicaid programs, reimburse the Hospital for services rendered to their patients. WVUH historically has enjoyed good relationships with third-party payors. In 2005, managed care/commercial payers, including Blue Cross, accounted for 28% of WVUH's total gross patient charges. The sources of payment for services provided by WVUH and the percentage of gross patient charges from each of these sources during the fiscal years ended December 31, 2003, 2004, 2005 and for the three months ended March 31, 2005 and 2006 are shown below:

**Percentage of Gross Patient Charges by Payor**

| | Fiscal Year Ending December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2005** | **2006** |
| Medicare | 33.0% | 33.2% | 33.3% | 33.9% | 32.7% |
| Medicaid | 24.9 | 22.9 | 23.2 | 22.7 | 24.8 |
| PEIA | 6.6 | 6.5 | 7.0 | 7.0 | 6.3 |
| Other Governmental Payors | 3.6 | 3.7 | 3.9 | 4.0 | 4.0 |
| Blue Cross | 9.9 | 9.9 | 10.4 | 9.9 | 11.2 |
| Managed Care/Commercial | 17.4 | 19.0 | 17.6 | 17.4 | 17.8 |
| Private-Pay | 4.5 | 4.7 | 4.6 | 5.0 | 3.2 |
| **Total** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Note: Statistics for WVUH only, does not include data of WVUH–East facilities.

Medicare payments for inpatient hospital stays are generally based upon a fixed rate per case for each eligible patient, and the payment amounts depend upon the patient's diagnosis and treatment. In addition, Medicare reimburses WVUH for certain defined "pass-through" costs. Those include costs directly associated with medical education programs and organ acquisition expenses. The Medicaid program applies principles similar to those of the Medicare program, and the State makes fixed payments for each eligible discharge. See the discussion under "BONDHOLDERS' RISKS – FEDERAL LAWS AND REGULATIONS; Medicare and Medicaid Programs; General; Medicare; Medicaid" in the forepart of this Official Statement.

Many employers that indirectly bear the costs of medical care for their employees, as well as many health insurers and health benefit plans, have instituted coverage restrictions that limit the type of medical services covered and the providers whose services will be paid. Many third-party payors and employers have instituted pre-admission screening and utilization review programs to promote ambulatory care and early discharge, and to reduce the use of ancillary tests and services. Some are also creating economic incentives for their insured employees to reduce costs by requiring second opinions, outpatient testing, preventative health programs and economic incentives for choosing certain providers by limiting payment for non-approved provider services.

**WVUH-East**

WVUH-East is a West Virginia not-for-profit corporation. City Hospital and Jefferson Memorial are the two (2) hospital operating companies within WVUH-East.

## City Hospital

In 1905, City Hospital, located in Martinsburg, West Virginia, was founded by Dr. T. K. Oates in a residence property at the corner of Burke Street and Maple Avenue in Martinsburg. In 1939, the Hospital was incorporated as a non-profit, non-sectarian community hospital operated and managed by a volunteer Board of Trustees. Once it became apparent that it was impossible to improve the City Hospital facility at its original location, the Board of Trustees purchased a 37-acre site at the edge of Martinsburg for the purpose of building a new hospital. In 1972, a four-story structure opened. Five years later in 1977, City Hospital and King's Daughters Hospital, also located in Martinsburg, merged. Construction of an additional four floors and first floor expansion to the City Hospital Facility began in 1980. This project was completed in 1982, increasing City Hospital's total licensed beds to 260.

In 1984, Gateway was established in response to the area's changing health care environment. The purpose of the corporate restructuring was to separate various non-acute health care services and functions from City Hospital in order to add services not organizationally feasible within the traditional hospital setting. Under Gateway, City Hospital remained a 501(c)(3) not-for-profit subsidiary operated by a volunteer community Board of Trustees. Gateway Healthcare Properties, Inc., a 501(c)(4), Gateway Health Services, a 501(c)(3), not-for-profit entity and Gateway Health Enterprises, a for-profit entity, were established along with the Gateway Foundation (now CHF), a 501(c)(3) not-for-profit tax exempt foundation. CHF was created to raise funds, develop programs, manage financial assets and act in a philanthropic capacity for all of Gateway affiliates.

Along with Gateway, came expansion. In 1985, the Medical Arts Center, a physician office building, opened on the City Hospital campus. Then in 1992, a second major expansion to City Hospital was initiated to add a new surgical wing, expand the emergency department, provide a new main entrance, expand the lobby area, and consolidate all outpatient services to a convenient location on the first floor. The $9.5 million project was completed in 1994. In October 1999, following a capital campaign that raised $1.2 million, the Dorothy A. McCormack Cancer Treatment & Rehabilitation Center and the City Hospital Wellness Center opened on the City Hospital campus. This $4 million project offered the residents of the Eastern Panhandle a comprehensive regional center for cancer treatment, rehabilitation and wellness services. On January 1, 2005, Gateway merged with JRHS to form WVUH–East of which WVUH is the sole corporate member.

Today, City Hospital continues its mission to serve as a recognized leader in the provision of high quality, cost-effective health and wellness services. As a 260-bed, acute care, community hospital, City Hospital supports a primary service area of over 140,000 people in Berkeley, Morgan and Jefferson Counties. The dedicated professionals of City Hospital share a commitment to ensuring the best possible care for the residents of West Virginia's Eastern Panhandle. On the City Hospital campus, a two acre portion has been set aside to the West Virginia University School of Medicine for the construction of educational facilities which will allow for the further development of the Medical school in the eastern panhandle. Funding for the construction is partially provided by the federal government.

## Jefferson Memorial

In December 1904, Jefferson Memorial was founded by Dr. Richard Edmunston Venning when he converted the second story of his home, located at 111 West Washington Street in Charles Town, West Virginia into a five-bedroom clinic with one bath, an operating room, and a sterilizing room. In 1912, this small hospital became a joint stock company, which subsequently failed. The failure of the joint stock company resulted in alternative management for the hospital and in March of 1917 the public assumed control of Charles Town General Hospital as a not-for-profit institution with a volunteer Board of Directors. The hospital had expanded to 21 beds by the 1930's, but was becoming too small to continue providing first-rate, quality acute care to the growing population.

By the 1940's Charles Town General Hospital was in need of a new, more modern health care facility, and the community rallied to provide continued quality healthcare to the residents of Jefferson

County.  A new 48-bed hospital opened in Ranson in October of 1948 and served the area for the next 27 years.  In 1975, a third hospital facility, now renamed Jefferson Memorial, was built.  This 96-bed hospital addressed the healthcare needs of the growing population of Jefferson County until 1983, when a third story was added increasing the total number of licensed beds to 114.

In 1999, JRHS was formed.  Under this system Jefferson Memorial remained a Section 501(c)(3) not-for-profit acute care hospital operating company operated by a volunteer Board of Directors. In addition to the not-for-profit entities of the system a for-profit entity called Jefferson Health Enterprises was established.

In 1999, the Jefferson Health Care Foundation, a Section 501(c)(3) not-for-profit tax-exempt philanthropic foundation, was founded with a mission to aid, strengthen, support and benefit the services and goals of Jefferson Memorial and its affiliates.  On January 1, 2005, JRHS merged with Gateway to form WVUH-East of which WVUH is the sole corporate member.

Today, over 100 years later, Jefferson Memorial continues its mission to offer accessible, high quality, cost effective health care in a safe and caring manner to all residents of Jefferson County.  It remains the only hospital located in Jefferson County, serving a population of approximately 48,000.  As of December 15, 2005, Jefferson Memorial became certified as a critical access hospital ("CAH") by the Centers for Medicare and Medicaid Services and the State of West Virginia.  Under the CAH designation, Jefferson Memorial became eligible for cost-based reimbursement from the Medicare and Medicaid programs.  As a CAH, Jefferson Memorial is limited to operating 25 acute care beds.

Jefferson's tri-county service area includes Berkeley County, West Virginia (also served by City Hospital) and in Morgan County West Virginia (also served by War Memorial Hospital), which has a population of approximately 148,000 residents.  Jefferson Memorial's dedicated staff of over 400 remains committed to a bond that was formed over 100 years ago between town, physician and hospital to provide quality health care to the residents of Jefferson County and the surrounding area.

Jefferson Memorial has a teaching relationship with West Virginia University Medical School.

### UNITED HOSPITAL CENTER, INC.

UHC is a West Virginia not-for-profit corporation, and is exempt from federal income taxation as an organization described in Section 501(c)(3) of the Internal Revenue Code.

### General Background

UHC was formed in 1970 as a result of a merger of two Clarksburg hospitals: St. Mary's Hospital which opened in 1901 and was owned and operated by the Sisters of St. Joseph of Wheeling, West Virginia, and Union Protestant Hospital which opened in 1898 and was owned and operated by the West Virginia United Methodist Conference. UHC is a community hospital offering a full range of general acute care, outpatient care, psychiatric care, and skilled nursing care primarily to the residents of Harrison County and North Central West Virginia.  UHC is the sole member of United Summit Center, a comprehensive community mental health care center, and is the primary benefactor of United Health Foundation, a nonprofit tax-exempt charitable foundation whose main purpose is to assist UHC in its mission.

### The Project

UHC has proposed to build a new state of the art, replacement hospital (the "Replacement Facility") on approximately 125 acres located at the intersection of Jerry Dove Drive and Interstate I-79 in Bridgeport, Harrison County, West Virginia. The Replacement Facility will be approximately 650,000 square feet.  The Replacement Facility is expected to have approximately 318 beds comprised of 217 medical surgical, 28 intensive care, 20 pediatrics, 21 obstetrics/gynecology, and 32 skilled nursing.  The Replacement Facility will

have greatly enhanced outpatient capabilities that include over two dozen treatment areas in the emergency room, a redesigned diagnostic imaging department, a designated observation unit, and 40 same day surgery rooms. The Replacement Facility will also have a modern outpatient oncology center with a separate entrance. Development of the proposed Replacement Facility along Interstate 79 will enhance the geographic accessibility to health care services for a majority of UHC's service area residents. The site of the proposed Replacement Facility will also provide ample opportunity for future growth.

The Replacement Facility will replace UHC's existing hospital. The design of the existing hospital and campus does not support the changes required to allow UHC to effectively and efficiently meet the needs of patients and physicians in the current and future health care environment. These deficiencies and design limitations cannot be overcome by renovation on site. The recognition of the need to develop a Replacement Facility evolved through a comprehensive facility planning analysis, and the Replacement Facility will fulfill the goal of UHC and WVUHS to ensure that high quality, modern, efficient health care services are available to residents of North Central West Virginia.

Prior to making the decision to pursue relocation and replacement, UHC undertook two separate architectural analyses to consider alternatives to resolve the facility deficiencies and limitations that had been identified. These architectural analyses considered renovation of UHC's existing physical plant as well as relocation and replacement of the facility as proposed in its application for a certificate of need. After extensive consideration and discussions with architects, UHC determined that renovation of its existing physical plant could only address some of the identified deficiencies and, as a result, would be only moderately effective in providing a facility to meet the needs of service area residents long-term. Moreover, a renovation project would not result in an efficiently configured and appropriately sized facility because it would be based on an infrastructure that is forty years old. Finally, UHC's existing location has poor road accessibility and is isolated from Harrison County's area of residential, commercial, and industrial growth.

In addition to realizing that renovation would only partially resolve its facility deficiencies, UHC also determined that the initial construction costs required for a major renovation project would be at least $100 million. When construction financing, equipment, and other related costs are considered, the total capital expenditure would be significantly greater. These initial costs would be followed by significant ongoing investment in future years to address the problems presented by maintaining the existing hospital structure that would be the core of the facility. Further investigation by UHC and its architects revealed that the construction cost of developing a Replacement Facility was only marginally higher than that of renovation while the return on the investment is much greater because the new hospital will permit UHC to be sufficiently sized and configured for the efficient delivery of high quality health care over the next forty to fifty years.

UHC has begun identifying opportunities for the reuse of its existing site subsequent to its move to the Replacement Facility. UHC's Board of Directors is in the process of obtaining proposals from commercial real estate brokers who specialize in the redevelopment of commercial properties. UHC will create an advisory committee that will include representatives from Harrison County, the City of Clarksburg, and the Harrison County Development Authority to guide this process so that the sale, reuse or other disposition of the existing UHC property and building will, to the extent possible, result in positive economic development for the area. At the present time, a definitive decision regarding the use of the existing UHC property has not been made. Accordingly, management is not able to estimate potential accelerated depreciation or impairment charges which may arise depending on the ultimate disposition decision.

Construction on the Replacement Facility is expected to begin during the summer of 2006 with completion expected to occur during the fall of 2009. The Replacement Facility's estimated cost is $280 million with approximately $30 million being spent on site preparation; $177 million on construction; $46 million on equipment and with the balance on financing costs.

The following table details UHC's staffed bed complement as of December 31, 2005 and for the Replacement Facility.

|  | **Staffed Beds** | **Staffed Beds Upon Project Completion** |
|---|---|---|
| **Service** | | |
| Medical and surgical | 213 | 217 |
| Intensive care | 20 | 28 |
| Pediatrics | 25 | 20 |
| Obstetrics/gynecology | 21 | 21 |
| Skilled nursing unit | 32 | 32 |
| **Total** | **311** | **318** |

## Management

The responsibility for the operations of UHC is delegated by the Board of Directors to the President, Bruce Carter. Selected biographical information is listed below for Mr. Carter and for other principal members of the Administrative Staff.

Bruce Carter, President/CEO, age 57. Mr. Carter has been President/Chief Executive Officer of UHC since 1987. Mr. Carter received a Masters Degree in Health and Hospital Administration in 1978 from Xavier University in Cincinnati, Ohio. Mr. Carter received a Bachelor of Arts in Political Science from Newark State College in 1976. From 1982 through 1987, Mr. Carter served as Administrator of Riverview Hospital in Noblesville, Indiana and from 1980 to 1982, he served as Associate Administrator of Lapeer General Hospital, Lapeer, Michigan. Mr. Carter is a member of the American College of Hospital Administrators, the West Virginia Hospital Association and the West Virginia Hospital Association Board of Trustees.

Mike Tillman, Vice President of Patient Services/COO, age 51. Mr. Tillman has been Vice-President - Patient Services/Chief Operating Officer since December 1993. Mr. Tillman received a Masters in Business Administration from the University of Baltimore, Merrick School of Business, Baltimore, Maryland in 1993, a Masters of Science from the University of Maryland at Baltimore, School of Nursing, Baltimore, Maryland in 1983 and a Bachelor of Science in Nursing from Towson State University, Towson, Maryland in 1977. From April 1993 to December 1993, Mr. Tillman served as a Vice-President of Church Hospital, Baltimore, Maryland and was its Director of Nursing from April 1989 to April 1993. From April 1986 to April 1989, Mr. Tillman served as Associate Director of Nursing at the George Washington University Medical Center, Washington, D.C. Mr. Tillman is a member of the American Organization of Nurse Executives and the West Virginia Organization of Nurse Executives.

Doug Coffman, Vice President of Finance/CFO, age 44. Mr. Coffman has been Vice President of Finance/Chief Financial Officer since 1999. From February 1993 to December 1998, Mr. Coffman was the Controller of UHC. From July 1985 through January 1993, Mr. Coffman was employed by Ernst & Young in their audit division. Mr. Coffman received a Masters of Business Administration from West Virginia Weslyan College in Buckhannon, West Virginia in 1999 and a Bachelor of Science from West Virginia University, Morgantown, West Virginia in 1985. Mr. Coffman passed the Certified Public Accountant exam in 1987. Mr. Coffman is a member of the Health Care Financial Manager's Association and the American Institute of Certified Public Accountants.

Edmund E. Collins, Vice President of Information Technology/CIO, age 34. Mr. Collins has been Vice President of Information Technology/Chief Information Officer since 2003. From June 2001 to November 2003, Mr. Collins was the Director of Information Technology for UHC. From February 2000 to June 2001 Mr. Collins was a Systems Engineer at United. Mr. Collins has a Bachelor of Science degree in Business Administration from Fairmont State University in Fairmont, WV and is in the process of completing a Master of Business Administration degree from the University of Colorado - Denver with 27 hours

completed to date. Mr. Collins is a Certified Professional in Healthcare Information Management Systems (CPHIMS) and is an active member of the Healthcare Information and Management Systems Society (HIMSS) and of the College of Healthcare Information Management Executives (CHIME).

Jeffrey S. Bolyard, General Counsel/Risk Manager, age 43. Mr. Bolyard has been General Counsel/Risk Manager since 2003. From March 2000 to November 2003, Mr. Bolyard practiced as a litigation attorney with a medical malpractice defense firm in Morgantown, West Virginia. From September 1997 to March 2000, Mr. Bolyard was a principal in a general practice law firm with offices in Morgantown and Kingwood, West Virginia. Mr. Bolyard litigated in an insurance defense practice in Clarksburg, West Virginia from January 1993 to August 1997. From July 1990 to January 1993, Mr. Bolyard engaged in commercial litigation with a 45 attorney firm in Columbus, Ohio. From August 1987 to July 1990, Mr. Bolyard served as a judicial clerk for the United States District Court for the Southern District of Ohio. Mr. Bolyard is a member of the West Virginia and Ohio (currently inactive) State Bars. He received his Juris Doctor degree from the University of Dayton (Ohio) in 1987 and a Bachelor of Arts from Cedarville (Ohio) College in 1984. He is currently on the Board of Directors of the West Virginia Society for Healthcare Risk Management, as well as being a member of the American Society for Healthcare Risk Management.

Geoff Marshall, Vice President Support Services, age 44. Mr. Marshall has been Vice President of Support Services for UHC since May of 1989. Prior to his current position Mr. Marshall held the position of Biomedical Manger at UHC from June 1985 until May of 1989. From June 1981 until June 1985 Mr. Marshall held various positions in the Biomedical Department specializing in Radiology Equipment Repair. Mr. Marshall received an Associate of Science Degree in Electrical Engineering from Fairmont State University in 1985. In August of 2000 Mr. Marshall passed the Certified Healthcare Facility Manager exam given by the American Hospital Association Certification Center and was awarded the CHFM Designation. Mr. Marshall is a member of the American Society for Healthcare Engineering and a member and past president of the West Virginia Society for Healthcare Engineers.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Medical Services and Staff**

As of December 2005, the entire UHC medical staff consisted of approximately 189 members. Members of the medical staff are assigned to either the Active or Courtesy/Consulting Staff categories. Active Staff appointments are limited to those members who use UHC as their principal place of practice. Appointees to the Active Staff may admit and attend patients, may vote and hold office, serve on Medical Staff committees as requested and are required to attend at least half of all Service Committee and Medical Staff meetings. Courtesy/Consulting Staff appointments are extended to these physicians who use UHC intermittently. Appointees to the Courtesy/Consulting Staff may admit and attend to up to 12 patients a year. Courtesy/Consulting Staff are not eligible to vote or hold office.

The following table summarizes by specialty the members of the Active and Consulting Staff of UHC as of December 2005.

| Specialty | Active Physicians | Courtesy/ Consulting Physicians | Total Physicians | Percent Board Certified | Average Age |
|---|---|---|---|---|---|
| Allergy & Immunology | 0 | 2 | 2 | 100% | 49 |
| Anesthesiology | 5 | 0 | 5 | 80 | 44 |
| Behavioral Med/Psychiatry | 5 | 1 | 6 | 50 | 43 |
| Cardiology | 6 | 0 | 6 | 100 | 44 |
| Dentistry | 3 | 0 | 3 | -- | 49 |
| Dentistry-Oral Surgery | 2 | 0 | 2 | 50 | 44 |
| Dermatology | 2 | 2 | 4 | 75 | 42 |
| Emergency Medicine | 20 | 0 | 20 | 55 | 38 |
| Endocrinology | 1 | 0 | 1 | 0 | 38 |
| Family Medicine | 25 | 16 | 41 | 78 | 41 |
| Gastroenterology | 2 | 0 | 2 | 50 | 53 |
| Medicine | 10 | 3 | 13 | 77 | 47 |
| Nephrology | 2 | 0 | 2 | 100 | 44 |
| Neurology | 3 | 0 | 3 | 100 | 45 |
| Neurosurgery | 2 | 0 | 2 | 100 | 60 |
| Obstetrics/Gynecology | 6 | 1 | 7 | 71 | 48 |
| Oncology/ Medical | 4 | 0 | 4 | 100 | 48 |
| Ophthalmology | 5 | 0 | 5 | 80 | 51 |
| Orthopedics | 4 | 0 | 4 | 100 | 53 |
| Otolaryngology | 2 | 0 | 2 | 50 | 53 |
| Pain Management | 2 | 0 | 2 | 100 | 44 |
| Pathology | 2 | 0 | 2 | 100 | 64 |
| Pediatrics | 7 | 0 | 7 | 100 | 45 |
| Physical Medicine & Rehab | 1 | 1 | 2 | 100 | 41 |
| Plastic Surgery | 1 | 0 | 1 | 100 | 60 |
| Radiology | 16 | 0 | 16 | 94 | 47 |
| Podiatry | 4 | 1 | 5 | 100 | 45 |
| Pulmonary Medicine | 4 | 0 | 4 | 100 | 43 |
| Radiation Oncology | 1 | 1 | 2 | 50 | 50 |
| Rheumatology | 1 | 1 | 1 | 100 | 47 |
| Surgery | 7 | 0 | 7 | 71 | 53 |
| Urology | 3 | 0 | 3 | 100 | 56 |
| Vascular Surgery | 2 | 0 | 2 | 100 | 47 |
| **Grand Total** | **160** | **29** | **189** | **80%** | **48** |

Source: UHC records.

**Utilization Statistics**

The following tables show, for the years indicated, certain operating statistics for UHC:

| | Fiscal Year Ending December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2005** | **2006** |
| Licensed Beds [2] | 375 | 375 | 375 | 375 | 375 |
| Staffed Beds [2] | 318 | 318 | 311 | 318 | 311 |
| Discharges [1] | 17,676 | 17,766 | 16,621 | 4,376 | 4,350 |
| Births | 852 | 911 | 911 | 211 | 220 |
| Patient Days [1] | 83,756 | 82,290 | 78,940 | 21,070 | 22,146 |
| Acute Average Length of Stay [3] | 4.7 | 4.7 | 4.9 | 5.1 | 5.1 |
| Surgical Operations | | | | | |
| Inpatient | 4,142 | 4,369 | 4,274 | 1,061 | 1,230 |
| Outpatient | 8,358 | 9,573 | 9,864 | 2,418 | 2,587 |
| Total | 12,500 | 13,942 | 14,138 | 3,479 | 3,817 |
| Outpatient Visits | | | | | |
| Emergency Room | 41,148 | 39,723 | 43,377 | 10,683 | 11,170 |
| Other | 313,465 | 334,795 | 322,830 | 80,284 | 86,998 |
| Total | 354,613 | 374,518 | 366,207 | 90,977 | 98,168 |

Source:  UHC records.
(1)   Includes acute care, observation, skilled nursing unit, and behavioral medicine discharges.  Excludes births.
(2)   Includes acute care, behavioral medicine, and skilled nursing unit (32 beds)
(3)   Includes just acute care and behavioral health

**Sources of Revenues**

UHC's gross patient charges result from healthcare services provided to its patient population. Third-party payors, including the federal government under the Medicare program and federal and state governments under Medicaid programs, HMOs, insurance companies, employers, PPOs under managed care programs, reimburse the Hospital for services rendered to their patients.  UHC historically has enjoyed good relationships with third-party payors.  In 2005, managed care/commercial payers, including Blue Cross, accounted for approximately 22.3% of UHC's total gross patient charges.  The sources of payment for services provided by the Hospital and the percentage of gross patient charges from each of these sources during the fiscal years ended December 31, 2003, 2004, 2005 and for the three months ended March 31, 2005 and 2006 are shown below:

**Percentage of Gross Patient Charges by Payor**

| | Fiscal Year Ending December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2005** | **2006** |
| Medicare | 53.0% | 51.8% | 51.3% | 52.0% | 50.4% |
| Medicaid | 11.8 | 12.8 | 13.4 | 13.1 | 13.2 |
| Other Government | 8.1 | 8.1 | 8.5 | 8.6 | 8.4 |
| Blue Cross | 8.0 | 9.3 | 9.9 | 9.2 | 9.7 |
| Managed Care/Commercial | 14.4 | 13.6 | 12.4 | 13.0 | 13.1 |
| Self-Pay | 4.7 | 4.4 | 4.5 | 4.1 | 5.2 |
| **Total** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Medicare payments for inpatient hospital stays are generally based upon a fixed rate per case for each eligible patient, and the payment amounts depend upon the patient's diagnosis and treatment.  In addition, Medicare reimburses UHC for certain defined "pass-through" costs.  Those primarily include costs directly associated with medical education programs.  The Medicaid program applies principles similar to those of the

Medicare program. See the discussion under "BONDHOLDERS' RISKS – FEDERAL LAWS AND REGULATIONS; Medicare and Medicaid Programs; General; Medicare; Medicaid" in the forepart of this Official Statement.

Many employers that indirectly bear the costs of medical care for their employees, as well as many health insurers and health benefit plans, have instituted coverage restrictions that limit the type of medical services covered and the providers whose services will be paid. Many third-party payors and employers have instituted pre-admission screening and utilization review programs to promote ambulatory care and early discharge, and to reduce the use of ancillary tests and services. Some are also creating economic incentives for their insured employees to reduce costs by requiring second opinions, outpatient testing, preventative health programs and economic incentives for choosing certain providers by limiting payment for non-approved provider services.

## SELECTED SUMMARY FINANCIAL INFORMATION FOR THE SYSTEM AND THE OBLIGATED GROUP

The following selected financial data for the fiscal years ended December 31, 2005, 2004 and 2003, are derived from financial statements of the System, WVUH and UHC. The following selected financial data of the System and WVUH for the year ended December 31, 2005 and the three-months ended March 31, 2006 and 2005 include the operations of WVUH – East. The selected financial data of the System and WVUH for years ended December 31, 2004 and 2003 exclude the operations of WVUH – East. The financial data for the three months ended March 31, 2005 and 2006 are derived from unaudited financial statements. The financial information includes all adjustments, consisting of normal recurring accruals, which the System, WVUH and UHC considers necessary for a fair presentation of the financial position and the results of operations for these periods. Operating results for the three months ended March 31, 2006 are not necessarily indicative of the results that may be expected for the entire fiscal year ending December 31, 2006. The data should be read in conjunction with the financial information and related notes included herein as Appendix B.

### West Virginia United Health System, Inc.
### Condensed Consolidated Statements of Operations
### ($ in thousands)

| | Fiscal Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | $2003^{(1)}$ | $2004^{(1)}$ | $2005^{(2)}$ | $2005^{(2)}$ | $2006^{(2)}$ |
| Net patient service revenue | $490,610 | $579,215 | $718,973 | $176,814 | $190,541 |
| Other revenue | 14,380 | 20,947 | 32,601 | 7,542 | 9,093 |
| Total revenues | 504,990 | 600,162 | 751,574 | 184,356 | 199,633 |
| Salaries, wages and benefits | 235,523 | 255,394 | 343,154 | 92,692 | 100,840 |
| Supplies and purchased services | 194,121 | 257,870 | 295,371 | 63,550 | 66,747 |
| Depreciation and amortization | 31,876 | 31,331 | 37,903 | 9,269 | 11,017 |
| Provision for bad debts | 30,093 | 31,940 | 49,307 | 11,031 | 12,572 |
| Interest | 5,733 | 6,104 | 7,393 | 1,228 | 1,765 |
| Total expenses | 497,346 | 582,639 | 733,128 | 177,770 | 192,941 |
| Income from operations | 7,644 | 17,523 | 18,446 | 6,586 | 6,692 |
| Non-operating revenues | 9,982 | 28,390 | 19,687 | 8,154 | 4,284 |
| Excess of revenues over expenses | $17,626 | $45,913 | $38,133 | $14,740 | $10,976 |

(1)  Fiscal years ending December, 31, 2003 and 2004 do not include the operations of the WVUH – East facilities.

(2)  Includes operations of the WVUH-East facilities which were acquired on January 1, 2005.

**West Virginia University Hospitals, Inc.**
**Condensed Consolidated Statements of Operations**
**($ in thousands)**

| | Fiscal Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2003 [1] | 2004 [1] | 2005 [2] | 2005 [2] | 2006 [2] |
| Net patient service revenue | $324,265 | $399,247 | $542,055 | $131,674 | $141,414 |
| Other revenue | 9,716 | 14,392 | 25,089 | 5,065 | 6,124 |
| Total Revenues | 333,981 | 413,639 | 567,144 | 136,739 | 147,538 |
| Salaries and wages | 115,940 | 126,383 | 193,978 | 56,155 | 61,287 |
| Employee benefits | 30,230 | 31,843 | 51,241 | 12,127 | 13,615 |
| Supplies and purchased services | 136,430 | 194,463 | 236,609 | 47,965 | 49,699 |
| Depreciation and amortization | 21,878 | 21,199 | 27,629 | 6,920 | 8,387 |
| Provision for bad debts | 18,743 | 20,959 | 37,310 | 8,171 | 9,177 |
| Interest | 5,120 | 5,657 | 7,101 | 1,389 | 1,715 |
| Total Expenses | 328,341 | 400,504 | 553,868 | 132,727 | 143,880 |
| Income from Operations | 5,640 | 13,135 | 13,276 | 4,012 | 3,658 |
| Non-operating revenues | 4,216 | 20,690 | 8,423 | 1,354 | 2,636 |
| Excess of revenues over expenses | $9,856 | $33,825 | $21,699 | $5,366 | $6,294 |

(1) Fiscal years ending December 31, 2003 and December 31, 2004 do not include operations of the WVUH – East facilities.
(2) Includes operations of the WVUH – East facilities which were acquired on January 1, 2005.

**WVUH, Inc./WVUH-East**
**Condensed Consolidating Statements of Operations**
**($ in thousands)**

**Fiscal Year Ended December 31, 2005**

| | WVUH | WVUH-East | Eliminations | Total |
|---|---|---|---|---|
| Net patient service revenue | $415,293 | $126,762 | $ ----- | $542,055 |
| Other revenue | 21,353 | 3,801 | (65) | 25,089 |
| Total Revenues | 436,646 | 130,563 | (65) | 567,144 |
| Salaries and wages | 141,303 | 52,675 | ----- | 193,978 |
| Employee benefits | 37,238 | 14,003 | ----- | 51,241 |
| Supplies and purchased services | 193,600 | 43,074 | (65) | 236,609 |
| Depreciation and amortization | 21,794 | 5,835 | ----- | 27,629 |
| Provision for bad debts | 23,188 | 14,122 | ----- | 37,310 |
| Interest | 5,811 | 1,290 | ----- | 7,101 |
| Total Expenses | 422,934 | 130,999 | (65) | 553,868 |
| Income (losses) from Operations | 13,712 | (436) | ----- | 13,276 |
| | | | ----- | |
| Non-operating revenues | 5,978 | 2,445 | ----- | 8,423 |
| Excess of revenues over expenses | $19,690 | $2,009 | $----- | $21,699 |

**United Hospital Center, Inc.**
**Condensed Consolidated Statements of Operations**
**($ in thousands)**

| | Fiscal Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2005 | 2006 |
| Net patient service revenue | $151,275 | $167,226 | $169,966 | $44,207 | $48,559 |
| Other revenue | 3,875 | 5,966 | 7,876 | 924 | 941 |
| Total Revenues | 155,150 | 173,192 | 177,842 | 45,131 | 49,500 |
| Salaries and wages | 61,630 | 68,158 | 70,168 | 17,742 | 18,812 |
| Employee benefits | 18,222 | 19,406 | 20,469 | 5,328 | 5,231 |
| Supplies and purchased services | 51,974 | 59,192 | 59,410 | 14,804 | 16,256 |
| Depreciation and amortization | 9,634 | 9,793 | 9,990 | 2,471 | 2,566 |
| Provision for bad debts | 10,749 | 10,631 | 11,797 | 2,608 | 3,346 |
| Interest | 552 | 407 | 266 | 79 | 44 |
| Total Expenses | 152,761 | 167,587 | 172,100 | 43,032 | 46,255 |
| Income from Operations | 2,389 | 5,605 | 5,742 | 2,099 | 3,245 |
| Non-operating revenues | 5,778 | 7,626 | 11,319 | 6,425 | 1,605 |
| Excess of revenues over expenses | $8,167 | $13,231 | $17,061 | $8,524 | $4,850 |

Note: The United Hospital Center, Inc. Statements of Operations exclude the discontinued operations of the United Retirement, Inc. (Maplewood) and The Heritage, Inc. subsidiaries.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Actual and Pro Forma Historical Debt Service Coverage**

The following chart sets forth the historical coverage of annual debt service on long-term indebtedness of the System. The Debt Service Coverage Ratio is based on income available for debt service during the fiscal years ended December 31, 2004 and 2005. The pro forma calculation sets forth the historical coverage of estimated maximum annual debt service on all outstanding long-term indebtedness of the System assuming issuance of the Series 2006 bonds in the principal amount of $232,205,000. **There can be no assurance that the System will generate income available for debt service in future years comparable to historical performance.**

|  | Fiscal Year Ended December 31, | |
|---|---|---|
|  | 2004[1] | 2005 |
| Excess of revenues over expenses | $45,913 | $38,895[2] |
| Depreciation and amortization expense | 31,331 | 37,903 |
| Interest expense | 6,104 | 7,393 |
| Income available for debt service | $83,348 | $84,191 |
| Actual debt service | $20,304 | $21,641 |
| Actual debt service coverage ratio | 4.1x | 3.9x |
| Pro forma estimated maximum annual debt service [3] | $28,516 | $28,516 |
| Pro forma debt service coverage ratio | 2.9x | 3.0x |

(1) Fiscal year ended December 31, 2004 does not include the operations of WVUH-East.

(2) Excludes loss on extinguishment of debt.

(3) MADS includes all outstanding debt, including capital leases and other miscellaneous short-term and long-term debt obligations.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS

**General and Historical**

WVUHS' statement of values emphasizes the importance of patients as the first priority, quality of care, commitment to education and research and the importance of every member of the team. The Obligated Group's statement of values also focuses on being cost-effective, improving the health of the people in the State and being receptive to change that enhances success. Network and system development are priorities for the organization as well as supporting strategic initiatives.

Over the years, WVUHS has experienced continual growth and has strategically invested in new facilities, programs, and services which have included: Ruby Memorial Hospital (1986); Physician Office Center (1990); Mary Babb Randolph Cancer Center (1990); Mountainview Regional Rehabilitation Center (1991); Blood and Marrow Transplant Program (1992); Ruby Day Surgery Center (1995); formation of West Virginia United Health System (1996); PET Scanner (1996); Chestnut Ridge Hospital (1998); Emergency Services Expansion (2003); gamma knife (2003); observation bed expansion (2004); Cheat Lake Physician Services (2004); City Hospital and Jefferson Memorial acquisition (2005); North/North East Project (2005) and Cancer Center Project (2006).

**Results of Operations – January 1, 2003 – December 31, 2005[1]**

Total revenue for 2005 was $751.6 million, up 49% from 2003 and 25% from 2004. Net patient service revenue generated from patient care activities, which comprised approximately 96% of total revenue in 2005, was $719.0 million, up 24% from 2004 and 47% from 2003 to 2005. The majority of the increase in revenue is attributable to the acquisition of WVUH-East as of January 1, 2005. The acquisition accounted for 86% of the increase in total revenue in 2005. Patient volumes for WVUHS as represented by inpatient discharges, including outpatient observations, have increased over the past two years, up 27% in 2005 from 2004 and 30% in 2005 from 2003. Inpatient surgeries increased 3% during 2004 and 22% during 2005 while outpatient surgeries increased 8% during 2004 and 45% during 2005.

Total expenses were $733.1 million in 2005, an increase of 26% from 2004 and 47% from 2003 to 2005. Salaries and wages in 2005, which accounted for approximately 47% of total expenses in 2005, increased 34% over 2004 and 46% from 2003 to 2005. Costs of supplies and purchased services grew 15% from 2004 to 2005 and 52% from 2003 to 2005. Provision for bad debt increased 54% between 2004 and 2005 and 64% from 2003 to 2005.

Income from operations, which is considered by management to be the best indicator of the financial performance of continuing operations, was $18.4 million for 2005, compared to $17.5 million in 2004 and $7.6 million in 2003. The improvement in operating performance from 2003 to 2005 was largely attributable to volume and revenue growth and good cost containment at WVUHS during the past two years.

WVUH (excluding WVUH-East) accounts for the majority of WVUHS' operations and comprised 58% of total revenue. WVUH's operating performance (excluding WVUH-East) over the last three years has been solid with operating margins improving from 1.7% in 2003 to 3.0% in 2005. Volume has increased steadily with discharges rising 4% in 2004 from 2003 and 3% in 2005 from 2004. Volume increases are due to continued physician recruitment and WVUHS' market position as the only tertiary care service provider in northern West Virginia.

UHC is the second largest component of WVUHS and comprised 24% of total revenues in 2005. UHC's operating performance has been solid and improved year after year since 2003. Despite a decline in volume in 2005, UHC was able to produce a 3.2% operating margin due to strong cost controls. Volume declines were due to several physician departures; however, those vacancies have been filled. Discharges in 2005 dropped 6% and inpatient surgeries declined by 2% however, outpatient surgeries increased 3%. UHC's revenues and expenses in 2005 were also impacted by the sale of certain non-core business lines, which resulted in a decrease in both revenues and expenses of approximately $5 million and $7 million, respectively.

WVUH-East had total revenue of $131 million in 2005 and accounted for the majority of the increase in WVUHS' revenue from 2003. WVUH-East's profitability was breakeven in 2005 and is expected to improve in future years due to the conversion of Jefferson into a critical access hospital.

With positive operating performance over the three-year period ended December 31, 2005 coupled with solid investment returns and the acquisition of WVUH-East, WVUHS' total net assets increased by $142 million over that period. A major factor influencing the change in net assets is the change in market value of investments. Non-operating revenues, representing primarily investment income, net realized gains and other-than-temporary losses, totaled $10.0 million in 2003, $28.4 million in 2004, and $19.7 million in 2005. In 2004 WVUH realized a gain of $19 million on investments. Unrealized appreciation (depreciation) on investments was $271,000 in 2005, ($3.5) million in 2004, and $27 million in 2003. At December 31, 2005, investment funds were allocated 41.5% to equities, 41.6% to fixed income, 14.7% to alternative investments, and 2.2% to cash and equivalents. Performance of the total fund was 5.29% in 2005.

(1) For the fiscal years ended December 31, 2003 and 2004, the results of operations do not include the operations of WVUH-East.

**Recent Results of Operations – January 1, 2006 – March 31, 2006**

Through the first quarter of 2006, WVUHS had total revenue of $199.6 million and total expenses of $192.9 million. This resulted in income from operations of $6.7 million or a 3.4% operating margin, which is ahead of budget, but was slightly lower than the operating margin in the first quarter of 2005. Each division of WVUHS is also ahead of budget with profitability gains driven by increased volume. WVUHS' net patient service revenue increased 7.8% to $190.5 million for the three month period compared to $176.8 million the same period prior year. This increase is largely due to volume increases and higher acuity. Total expenses have increased by 8.5% to $192.9 million from the same period prior year due to increases in utilization, professional fees, supplies, and salaries and wages.

Income from operations was $6.7 million through the three months ended March 31, 2006 compared to $6.6 million for the same period prior year. The total margin was 5.5% through year-to-date March 31, 2006. WVUHS is performing ahead of budget and each division's performance is also ahead of budget. WVUH consolidated, including WVUH-East, had a 2.5% operating margin, while UHC had a 6.6% operating margin in the first quarter of 2006.

For the three-month period ended March 31, 2006, total inpatient discharges are 1.5% above levels in fiscal year 2005 and total patient days are above the prior year by 2.1%. The average daily census for all services was 768 through the three months ended March 31, 2006, 3.1% above the prior year period. Inpatient surgeries of 3,804 was 6.4% ahead of the prior year period due to increased capacity with the completion of additional operating rooms at WVUH. Total outpatient visits are up by 10% compared to the same prior year period.

**Future Strategy**

WVUHS' leadership has established several key strategic initiatives centered on the goal of providing unquestioned clinical and service quality at a competitive cost. At the core of these initiatives is the goal to empower staff to focus on delivering the best care to patients. The strategic initiatives are focused in the following areas: a) patient satisfaction; b) employee satisfaction; c) quality and patient safety; d) financial performance; e) growing the business; f) clinical information systems.

The leadership of WVUHS has established specific objectives in these areas and is working actively with employees and medical staff to continue to develop the business, strengthen the culture, improve organizational performance, and continue to enhance the organization through System development.

WVUH-East is in the process of obtaining CON approval for various strategic capital projects including renovation and expansion to its facilities, construction of medical office buildings and acquisition of additional imaging equipment. A $50 million bond issue is expected in late 2006 or early 2007 to finance a portion of the project costs.

## NON-OBLIGATED SYSTEM PARTICIPANTS

This part of Appendix A presents information concerning subsidiaries of the System that are not members of the Obligated Group. *The only subsidiaries of the System that have any liability with respect to the Series 2006 Bonds are WVUH, UHC, City Hospital, Jefferson Memorial and CHF, as the only members of the Obligated Group.*

**Non-Obligated Participants**

Allied Health Services, Inc. ("Allied"). Allied is a for-profit corporation incorporated in the State of West Virginia. Allied is engaged in the business of brokering laboratory services and holding real estate for hospital purposes. The Child Development Center, which promotes the advancement of area children in the Morgantown, West Virginia area, and a retail pharmacy were moved from Allied to WVUH in 2004 to enhance operating efficiencies.

United Physicians Care, Inc. ("UPC"). UPC is a nonprofit corporation that operates several family practice clinics in north central West Virginia and western Maryland.

HPNS Services, Inc. ("HPNS"). HPNS is a taxable for profit stock company that is wholly owned by WVUHS. HPNS provides managed care and insurance contracting and related services to WVUHS and its subsidiaries and to various outside organizations.

United Summit Center, Inc. ("USC"). USC is a nonprofit corporation that provides outpatient community mental health services to residents of a seven county region in north central West Virginia.

United Health Foundation, Inc. ("UHF"). UHF is a nonprofit corporation that provides fundraising and support to other non-profit, health care related entities in north central West Virginia, primarily UHC.

United Retirement, Inc. ("United Retirement"). United Retirement, formerly known as Maplewood Community, Inc., is a nonprofit corporation that formerly provided senior living housing and assisted living facilities. United Retirement sold substantially all of its assets on March 1, 2006 and is in the process of liquidating.

The Heritage, Inc. ("Heritage"). The Heritage is a for-profit corporation that provides long-term nursing care services to the residents of north central West Virginia. Heritage has entered into an agreement to sell substantially all of its assets on June 1, 2006. Heritage will be liquidated after such sale is completed.

**APPENDIX B**

## AUDITED CONSOLIDATED FINANCIAL STATEMENTS AND OTHER FINANCIAL INFORMATION

West Virginia United Health System, Inc. and Subsidiaries
Year Ended December 31, 2005
With Report of Independent Auditors

West Virginia United Health System, Inc. and Subsidiaries

Audited Consolidated Financial Statements
and Other Financial Information

Year Ended December 31, 2005

# Contents

Report of Independent Auditors ...................................................................................................1

Audited Consolidated Financial Statements

Consolidated Balance Sheet...........................................................................................................3
Consolidated Statement of Operations and Changes in Unrestricted Net Assets...........................5
Consolidated Statement of Changes in Net Assets.........................................................................6
Consolidated Statement of Cash Flows .........................................................................................7
Notes to Consolidated Financial Statements .................................................................................8

Other Financial Information

Report of Independent Auditors on Other Financial Information ..................................................37
Consolidating Balance Sheet – Assets..........................................................................................38
Consolidating Balance Sheet – Liabilities.....................................................................................39
Consolidating Statement of Operations and Changes in Unrestricted Net Assets ........................40

**Ξ!! ERNST & YOUNG**

■ Ernst & Young LLP
2100 One PPG Place
Pittsburgh, PA 15222

■ Phone: (412) 644-7800
www.ey.com

## Report of Independent Auditors

The Board of Directors
West Virginia United Health System, Inc. and Subsidiaries

We have audited the accompanying consolidated balance sheet of West Virginia United Health System, Inc. and subsidiaries (System) at December 31, 2005, and the related consolidated statements of operations, changes in net assets, and cash flows for the year then ended. These financial statements are the responsibility of the System's management. Our responsibility is to express an opinion on these financial statements based on our audit. We did not audit the financial statements of United Summit Center and United Health Foundation (wholly owned subsidiaries of United Hospital Center, Inc. and subsidiaries), which statements reflect total assets of $14,757,000 as of December 31, 2005, and total revenues of $14,111,000 for the year then ended. Those statements were audited by other auditors whose report has been furnished to us, and our opinion, insofar as it relates to the amounts included for United Summit Center and United Health Foundation, is based solely on the report of the other auditors.

We conducted our audit in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the System's internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the System's internal control. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit and the reports of other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audit and the reports of other auditors, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of West Virginia United Health System, Inc. and subsidiaries at December 31, 2005, and the consolidated results of their operations, changes in net assets, and cash flows for the year then ended in conformity with accounting principles generally accepted in the United States.

1

We previously audited and reported on the consolidated financial statements of the System for the year ended December 31, 2004, prior to the restatement for the 2005 pooling of interests with WVUH-East discussed in Note 1 to the consolidated financial statements. The net assets of the System represented 89% of net assets included in the 2004 restated consolidated net assets. WVUH-East net assets included in the 2004 restated consolidated net assets were audited and reported on separately by other auditors before the restatement of the net assets as described in Note 1 for the pooling of interests. We have audited the combination of the net assets, after restatement for the 2005 pooling of interests. In our opinion, such consolidated statements have been properly combined, on the basis described in Note 1 of the notes to consolidated financial statements.

In addition to the restatement for the 2005 pooling of interests, we also audited the adjustment described in Note 1 that was applied to restate the prior net assets of WVUH-East. In our opinion, the adjustment is appropriate and has been properly applied.

*Ernst + Young LLP*

March 29, 2006

# West Virginia United Health System, Inc. and Subsidiaries

## Consolidated Balance Sheet

### December 31, 2005
*(In Thousands)*

**Assets**

| | | |
|---|---:|---:|
| Current assets: | | |
| Cash and cash equivalents | $ | 22,762 |
| Short-term investments | | 1,644 |
| Patient accounts receivable (net of allowance for | | |
| doubtful accounts of $43,057) | | 99,254 |
| Other receivables | | 6,902 |
| Inventories | | 11,921 |
| Prepaid expenses and other current assets | | 5,729 |
| Net estimated amounts due from third-party payors | | 7,627 |
| Assets whose use is limited required to satisfy | | |
| current obligations | | 23,167 |
| Joint venture investments | | 725 |
| Assets held for sale | | 16,599 |
| Total current assets | | 196,330 |
| | | |
| Assets whose use is limited: | | |
| Board-designated funds: | | |
| Funded depreciation | | 278,823 |
| Debt repayment fund | | 102,451 |
| Malpractice self-insurance trust fund | | 39,772 |
| UHF Foundation investments | | 3,832 |
| Funds held by bond trustee | | 56,449 |
| Other investments | | 439 |
| | | 481,766 |
| Less funds that are required to satisfy current obligations | | (23,167) |
| | | 458,599 |
| | | |
| Property, plant, and equipment, net | | 289,427 |
| Assets held by third parties | | 11,491 |
| Deferred financing costs, net | | 8,924 |
| Derivative financial instrument | | 100 |
| Other assets | | 9,819 |
| | $ | 974,690 |

3

**Liabilities and net assets**

Current liabilities:

| | | |
|---|---|---:|
| Accounts payable and accrued expenses | $ | 31,319 |
| Accrued wages and fringe benefits | | 33,552 |
| Current portion of bonds and notes payable | | 26,617 |
| Current portion of self-insurance liability | | 9,044 |
| Line of credit | | 3,192 |
| Net estimated amounts due to third-party payors | | 1,003 |
| Other current liabilities | | 1,188 |
| Liabilities held for sale | | 4,314 |
| Total current liabilities | | 110,229 |

Long-term obligations:

| | |
|---|---:|
| Long-term debt and capital leases payable, less current portion (net of unamortized net bond premium of $288) | 229,755 |
| Self-insurance liability | 23,909 |
| Derivative obligations | 3,352 |
| Other | 2,036 |
| Total liabilities | 369,281 |

Net assets:

| | |
|---|---:|
| Unrestricted | 595,510 |
| Temporarily restricted | 4,396 |
| Permanently restricted | 5,503 |
| Total net assets | 605,409 |

| | | |
|---|---|---:|
| | $ | 974,690 |

*See accompanying notes.*

4

# West Virginia United Health System, Inc. and Subsidiaries

## Consolidated Statement of Operations and Changes in Unrestricted Net Assets

### Year Ended December 31, 2005
*(In Thousands)*

| | | |
|---|---:|---:|
| **Unrestricted revenues, gains, and other support** | | |
| Net patient service revenue | $ | 718,973 |
| Other revenue, net | | 32,601 |
| Total unrestricted revenues, gains, and other support | | 751,574 |
| | | |
| **Expenses** | | |
| Salaries and wages | | 269,925 |
| Employee benefits | | 73,229 |
| Supplies and purchased services | | 295,371 |
| Depreciation and amortization | | 37,903 |
| Provision for bad debts | | 49,307 |
| Interest | | 7,393 |
| Total expenses | | 733,128 |
| | | |
| Income from operations | | 18,446 |
| | | |
| Nonoperating gains (losses): | | |
| Investment income and net realized gains, including | | |
| other than temporary losses of $570 | | 15,904 |
| Loss on early extinguishment of debt | | (762) |
| Loss on sale of fixed assets | | (455) |
| Gain on sale of dialysis unit | | 5,356 |
| Other | | (356) |
| Excess of revenues over expenses | | 38,133 |
| | | |
| Other changes in unrestricted net assets: | | |
| Unrealized appreciation on investments | | 271 |
| Change in fair value of derivatives | | 649 |
| Capital donations | | 132 |
| Change in minimum pension liability | | 549 |
| Other | | 68 |
| Increase in unrestricted net assets before | | |
| discontinued operations | | 39,802 |
| Results from discontinued operations | | (1,589) |
| Increase in unrestricted net assets | | 38,213 |
| | | |
| Unrestricted net assets, beginning of year – restated | | 557,297 |
| Unrestricted net assets, end of year | $ | 595,510 |

*See accompanying notes.*

# West Virginia United Health System, Inc. and Subsidiaries

## Consolidated Statement of Changes in Net Assets

### Year Ended December 31, 2005
*(In Thousands)*

| | | |
|---|---|---:|
| Unrestricted net assets: | | |
| Excess of revenues over expenses | $ | 38,133 |
| Unrealized appreciation on investments | | 271 |
| Change in fair value of derivatives | | 649 |
| Capital donations | | 132 |
| Change in minimum pension liability | | 549 |
| Other | | 68 |
| Increase in unrestricted net assets before | | |
| discontinued operations | | 39,802 |
| Results from discontinued operations | | (1,589) |
| Increase in unrestricted net assets | | 38,213 |
| | | |
| Temporarily restricted net assets: | | |
| Increase in temporarily restricted assets held by the | | |
| WVU Foundation | | 584 |
| Contributions, net | | 6 |
| Increase in temporarily restricted net assets | | 590 |
| | | |
| Permanently restricted net assets: | | |
| Increase in permanently restricted assets held | | |
| by the WVU Foundation | | 37 |
| Increase in permanently restricted assets held in trust | | 129 |
| | | 166 |
| | | |
| Increase in net assets | | 38,969 |
| Net assets, beginning of year – restated | | 566,440 |
| Net assets, end of year | $ | 605,409 |

*See accompanying notes.*

6

# West Virginia United Health System, Inc. and Subsidiaries

## Consolidated Statement of Cash Flows

### Year Ended December 31, 2005
### *(In Thousands)*

| | | |
|---|---:|---:|
| **Operating activities** | | |
| Increase in net assets | $ | 38,969 |
| Adjustments to reconcile increase in net assets to net cash | | |
| provided by operating activities: | | |
| Change in assets held by third parties | | (537) |
| Depreciation and amortization | | 37,903 |
| Loss on disposal of property and equipment | | 455 |
| Changes in fair value of derivatives | | (649) |
| Loss on early extinguishment of debt | | 762 |
| Gain on sale of dialysis unit | | (5,356) |
| Loss on assets held for sale | | 309 |
| Change in minimum pension liability | | (549) |
| Net realized and unrealized (gains) losses on investments, including | | |
| other than temporary losses | | (10,537) |
| Provision for bad debts | | 49,307 |
| Capital donations | | (132) |
| Changes in operating assets and liabilities: | | |
| Patients accounts receivable | | (55,597) |
| Other receivables | | 2,878 |
| Inventories | | (1,799) |
| Deferred financing costs and other assets | | (17,122) |
| Accounts payable, accrued expenses, and other current liabilities | | (2,111) |
| Accrued wages and fringe benefits | | 2,246 |
| Net estimated third-party payor settlements | | (1,993) |
| Self-insurance and other long-term liabilities | | (1,892) |
| Net cash provided by operating activities | | 34,555 |
| | | |
| **Investing activities** | | |
| Acquisition of property and equipment, net | | (56,877) |
| Proceeds from sale of dialysis unit | | 6,499 |
| Decrease in short-term investments, net | | 1,820 |
| Increase in assets whose use is limited, net | | (5,962) |
| Net cash used in investing activities | | (54,520) |
| | | |
| **Financing activities** | | |
| Repayment of line of credit and long-term obligations | | (11,623) |
| Payment of Series 1992 City Hospital bonds and other notes payable | | (24,170) |
| Capital donations | | 132 |
| Debt financing costs | | (2,460) |
| Proceeds from Series 2005 Bonds | | 60,000 |
| Net cash provided by financing activities | | 21,879 |
| | | |
| Increase in cash and cash equivalents | | 1,914 |
| Cash and cash equivalents at beginning of year | | 20,848 |
| Cash and cash equivalents at end of year | $ | 22,762 |

*See accompanying notes.*

## West Virginia United Health System, Inc. and Subsidiaries

## Notes to Consolidated Financial Statements

December 31, 2005

### 1. Organization

West Virginia United Health System, Inc. (System), a nonprofit corporation formed in April 1997, serves as the parent corporation to an affiliated group of health care providing entities which includes West Virginia University Hospitals, Inc. and subsidiaries (WVUH), United Hospital Center, Inc. and subsidiaries (UHC), Allied Health Services, Inc. (Allied), United Physicians Care, Inc. (UPC), and Health Partners Network Services, Inc. (HPNS).

West Virginia University (the University) commenced operations of a tertiary care teaching hospital in 1960 as a component of the Medical Center of the University. In 1984, the West Virginia legislature adopted legislation which authorized separation of the hospital operations from the University and establishment of a separate corporate entity. WVUH was incorporated as a nonstock, not-for-profit corporation and, by an agreement of transfer and lease dated July 1, 1984, assumed the operation of and responsibility for the hospital. The 454-bed hospital, located in Morgantown, West Virginia, serves as a major statewide and regional health care referral center and provides the principal clinical education and research site for the University.

On January 1, 2005, WVUH became the sole member of West Virginia University Hospitals – East, Inc. (WVUH-East), a West Virginia nonprofit corporation. WVUH-East serves as the parent corporation to an affiliated group of health care providing entities which includes City Hospital, Inc. (City Hospital), City Hospital Foundation, Inc. (City Foundation), Gateway Health Services Corporation (Gateway Services), Gateway Health Enterprises Corporation (Gateway Enterprises), Gateway Healthcare Properties, Inc. (Gateway Properties), The Charles Town General Hospital d/b/a Jefferson Memorial Hospital (JMH), Jefferson Health Care Foundation, Inc. (Jefferson Foundation), and Jefferson Health Enterprises, Inc. (Jefferson Enterprises).

The merger with WVUH was accounted for similar to a pooling of interests and the beginning net assets at January 1, 2005 (as restated), have been restated to include the accounts of WVUH-East.

|  | System As Previously Reported | WVUH-East (Restated) | Consolidated (Restated) |
|---|---|---|---|
| Unrestricted net assets | $ 499,581 | $ 57,716 | $ 557,297 |
| Temporarily and permanently restricted net assets | 4,330 | 4,813 | 9,143 |
| Total | $ 503,911 | $ 62,529 | $ 566,440 |

8

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

## 1. Organization (continued)

WVUH-East was audited by other auditors prior to January 1, 2005. Subsequent to the merger with WVUH, an accounting error was discovered related to contractual allowances and the allowance for doubtful accounts as of December 31, 2004. Accordingly, the WVUH-East January 1, 2005 net assets prior to the merger were reduced by recording a restatement adjustment of approximately $1,400,000.

City Hospital is a 144 bed not-for-profit acute care hospital located in Martinsburg, West Virginia, and provides health care services through its inpatient and outpatient care facilities to residents of the eastern panhandle of West Virginia and the surrounding communities. City Foundation provides support to City Hospital by conducting education activities, owning and operating medical buildings, and conducting fundraising activities.

Gateway Services supports its affiliates in performance of their functions and operates medical practices. Gateway Enterprises is a for-profit corporation that provides support to its affiliated companies through joint ventures that operate other health care related entities. Gateway Properties holds title to certain affiliate properties, collects rental income, and turns over the entire amount, less expenses, to City Foundation.

JMH is a 45-bed, not-for-profit acute care hospital located in Ranson, West Virginia, and provides health care services to the residents of the eastern panhandle of West Virginia and the surrounding communities. JMH was designated as a Critical Access Hospital (CAH) by the Centers for Medicare and Medicaid Services (CMS) effective December 15, 2005. As a CAH, JMH will be reimbursed at 101% of cost by the Medicare program and will receive full cost reimbursement by the Medicaid program. In addition, as a CAH, JMH will receive payments for unreimbursed cost for self-pay patients via the State of West Virginia Disproportionate Share program. Jefferson Foundation provides support to JMH by conducting fundraising activities. Jefferson Enterprises is a for-profit wholly owned subsidiary of JMH.

UHC is a 312-bed nonprofit community hospital offering a full range of general acute care, outpatient care, psychiatric care, and skilled nursing care services primarily to the residents of Harrison County and North Central West Virginia. United Hospital Center, Inc. also functions as a major referral center in North Central West Virginia's health care system. UHC's subsidiaries include Maplewood Communities, Inc. (Maplewood), a nonprofit organization that operates a senior living community in Harrison County, West Virginia; The Heritage, a long-term nursing care facility; United Summit Center, a behavioral health facility; and United Health Foundation (UHF), which raises funds to support UHC.

9

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

## 1. Organization (continued)

Allied is a for-profit corporation incorporated in the State of West Virginia. Allied is engaged in the business of providing laboratory services. Allied's child development center line of business was transferred to WVUH and became an operational unit of WVUH as of January 1, 2005.

UPC is a nonprofit corporation that operates several family practice clinics in northern West Virginia and eastern Maryland.

HPNS is a for-profit corporation that negotiates managed care contracts for affiliates.

## 2. Significant Accounting Policies

### Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the System and its subsidiaries. All material intercompany balances have been eliminated in consolidation.

### Cash and Cash Equivalents and Short-Term Investments

Cash and cash equivalents include cash on deposit and investments with maturities of three months or less when purchased. The market value of cash and cash equivalents approximates cost.

The System has cash deposits and short-term investments with various banks and financial institutions. The total amount of cash on deposit in these banks exceeds the federally insured limits at December 31, 2005.

### Inventories

Inventories are stated at the lower of first-in, first-out cost or market.

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

## 2. Significant Accounting Policies (continued)

### Investments

Investments in equity securities with readily determinable fair values and all investments in debt securities are classified as nontrading and are recorded at fair value in the balance sheet. Investments in hedge funds, private equity funds, and other limited partnerships are recorded at cost or the equity method of accounting depending on the System's ownership percentage. Investment income, including realized gains and losses determined by the weighted-average method and other than temporary losses, is included in excess of revenues over expenses. Unrealized gains and losses on investments, excluding other than temporary losses, are excluded from excess of revenues over expenses and are recorded as an other change in unrestricted net assets.

The System continually reviews nontrading investments for impairment conditions that indicate that an other than temporary decline in market value has occurred. In conducting this review, numerous factors are considered which, individually or in combination, indicate that a decline is other than temporary and that a reduction of the carrying value is required. These factors include specific information pertaining to an individual company or a particular industry and general market conditions that reflect prospects for the economy as a whole. Based on this review, other than temporary losses of approximately $570,000 were recorded in 2005.

Assets whose use is limited includes assets held by trustees under indenture agreements, United Health Foundation investments, and designated assets set aside by the Board of Directors for future capital improvements, debt payments, and malpractice insurance payments, over which the Board retains control and may at its discretion subsequently use for other purposes.

### Property, Plant, and Equipment

Property, plant, and equipment are carried at cost or fair market value at the date of gift for donated capital. The System provides for depreciation of plant and equipment on a straight-line method at rates designed to amortize the cost of these assets over their estimated useful lives. Depreciation expense includes amortization of assets held under capital leases.

### Deferred Financing Costs

Deferred financing costs consist of bond issuance costs that are being amortized using the straight-line method over the life of the related indebtedness.

11

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

## 2. Significant Accounting Policies (continued)

### Assets Held for Sale/Liabilities Held for Sale

In August 2005, UHC signed a letter of intent to sell the assets and certain related liabilities, including refundable occupancy fees and deferred entrance fees, of Maplewood. The sale price of $13,500,000 includes a $5,000,000 subordinated note, secured by a second deed of trust on the facility, to be received in five years. In connection with the sale, the buyer will also acquire certain short-term investments and will assume the refundable occupancy fees and deferred entrance fees liabilities of Maplewood. Approximately $2,600,000 and $2,500,000 of Maplewood revenue is included in discontinued operations in 2005 and 2004, respectively. The sale was effective on March 1, 2006, and the gain will be accounted for under the cost recovery method of accounting. See related discussion in Note 8. Long-Term Obligations.

In August 2005, UHC signed a letter of intent to sell the assets of Heritage for $1,500,000 in conjunction with the Maplewood sale. Approximately $2.8 million and $2.7 million of Heritage revenue is included in discontinued operations in 2005 and 2004, respectively. The sale is expected to close by June 1, 2006.

The assets and liabilities associated with the sales described above are reflected as assets and liabilities held for sale in the accompanying consolidated financial statements.

### Sale of Dialysis Unit

In August 2004, UHC signed a letter of intent to sell the business and assets of its two outpatient dialysis units for $6.5 million. The sale was closed February 1, 2005, and the related gain on sale of approximately $5.3 million was recorded in 2005.

### Asset Impairment

The System continually reviews the recoverability of the carrying value of long-lived assets as prescribed in Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* (the Statement). The System considers whether indicators of impairment are present and performs the required recoverability test as prescribed by the Statement. Write-downs due to impairment are charged to operations at the time the impairment is identified.

12

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

## 2. Significant Accounting Policies (continued)

### Self-Insurance Liability

The self-insurance liability represents estimated medical malpractice settlements and includes estimates of the ultimate costs for both reported claims and claims incurred but not reported. The System records a provision for estimated medical malpractice settlements based upon actuarially determined amounts. The System makes deposits to a revocable trust fund consistent with actuarial determinations.

### Net Patient Service Revenue

Patient accounts receivable and net patient revenue are primarily derived from patients who reside in the West Virginia, western Pennsylvania, western Maryland, and northern Virginia geographic areas. Net patient service revenue is reported at established rates in the period in which services are provided. The majority of the System's services are rendered to patients under Medicare, Blue Cross, Public Employees Insurance Agency (PEIA), and both West Virginia and Pennsylvania Medicaid programs. Services provided under these programs are reimbursed based on a combination of historical costs, prospectively determined rates, and a percentage of customary charges. The amounts received under these programs are less than the established hospital rates and the differences are reported as contractual allowances to arrive at net patient service revenue. Amounts received under these programs are subject to review and final determination by program intermediaries or their agents. At December 31, 2005, the System believes that a reasonable provision has been made in the accompanying financial statements for anticipated adjustments.

Pursuant to the provisions of the West Virginia Code, the West Virginia Health Care Authority (HCA or the Authority) has been empowered to regulate the System hospitals' billing rates from nongovernmental payors through limitation orders compiled from budgets and rate schedules submitted by the System hospitals on a periodic basis.

In 2004, the State of West Virginia received approval from CMS for its Medicaid State Plan Amendment 03-02 (SPA 03-02) that increases Medicaid reimbursement to qualified public safety net hospitals (including WVUH) for services to Medicaid-eligible patients. These supplemental payments may be made up to the difference between current reimbursement and the maximum permissible payments under Upper Payment Limit (UPL) regulations. The first payment was made in April 2004 and periodic payments have been made subsequent to that date. WVUH

13

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**2. Significant Accounting Policies (continued)**

received UPL payments of approximately $20,658,000 in 2005 that are included in net patient service revenue. There is risk that Congress may change federal policy in the future in a way that might limit or eliminate these enhanced Medicaid payments. The enhanced UPL payments are recorded in the period in which they are received. The laws and regulations governing the UPL program are complex and subject to interpretation. Furthermore, the enhanced UPL payments received are subject to review and retroactive adjustment. Management is unable to estimate the amount of any such adjustments.

Net revenues from the Medicare and Medicaid programs accounted for approximately 33% and 16%, respectively, of the System's net patient service revenue for the year ended December 31, 2005. Laws and regulations governing the Medicare and Medicaid programs are extremely complex and subject to interpretation. As a result, there is at least a reasonable possibility that recorded estimates will change by material amounts in the near term. Compliance with such laws and regulations can be subject to future government review and interpretation as well as significant regulatory action including fines, penalties, and exclusion from the Medicare and Medicaid programs. The System believes that it is in compliance with all applicable laws and regulations and is not aware of any pending or threatened investigations involving allegations of potential wrongdoing that would be material to the financial statements. While no such regulatory inquiries have been made, compliance with such laws and regulations can be subject to future government review and interpretation, as well as significant regulatory action, including fines, penalties, and exclusion from the Medicare and Medicaid programs.

Significant concentrations of net patient accounts receivable at December 31, 2005, include: Medicare – 19%, Blue Cross and Commercial – 14%, and Medicaid – 21%.

The System performs an evaluation of the collectibility of net revenues recorded and records an allowance for doubtful accounts based on probability of collection.

**Charity Care**

The System provides care to patients who meet certain criteria under its charity care policy without charge or at amounts less than its established rates. Because the System does not pursue collection of amounts determined to qualify as charity care, they are not reported in net patient service revenue.

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

## 2. Significant Accounting Policies (continued)

### Income Taxes

The System, WVUH (including all WVUH-East affiliated entities except WVUH-East parent corporation, Gateway Enterprises, and Jefferson Enterprises), UHC (including Maplewood, United Summit Center, and United Health Foundation), and UPC have received determinations from the Internal Revenue Service that they are exempt from federal income taxes under Section 501(a) of the Internal Revenue Code by reason of being an organization described in Section 501(c)(3). Section 501(c)(3) includes among others, those organizations operated exclusively for charitable purposes. These entities are also exempt from state income taxes under applicable state statutes. WVUH-East parent corporation has filed for an exemption from taxes and is awaiting a determination letter.

Income tax provisions of Allied, Heritage, HPNS, Gateway Enterprises, and Jefferson Enterprises are determined under Statement of Financial Accounting Standards No. 109, which requires use of the asset and liability approach to accounting for income taxes. Such income tax provisions are not material to the financial statements.

### Derivatives

WVUH and WVUH-East utilize derivative financial instruments to reduce interest rate risks, but do not hold or issue derivative financial instruments for trading purposes. WVUH and WVUH-East follow the provisions of SOP 02-2, *Accounting for Derivative Instruments and Hedging Activities by Not-for-Profit Health Care Organizations*, and the Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities* (SFAS 133). These statements establish accounting and reporting standards for derivative instruments and hedging activities. They require that an entity recognize all derivatives as either assets or liabilities and measure those instruments at fair value. The accounting for changes in fair value (i.e., unrealized gains or losses) of a derivative instrument depends on whether it has been designated and qualifies as part of a hedging relationship and, further, on the type of hedging relationship. The effective portion of the unrealized gain or loss on the derivative instruments qualifying for hedge treatment is reported as a change in unrestricted net assets and not as a component of excess of revenues over expenses. For derivatives not designated in a hedge relationship, the gain or loss is recognized as derivative gain/loss, and the change in fair value is recorded in excess of revenues over expenses. WVUH and WVUH-East have entered various interest rate swaps that qualify for hedge accounting treatment.

15

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

## 2. Significant Accounting Policies (continued)

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### Excess of Revenues Over Expenses

The consolidated statement of operations and changes in net assets include excess of revenues over expenses as a performance indicator. Included in excess of revenues over expenses are all changes in unrestricted net assets other than capital donations, minimum pension adjustments, changes in fair value of derivatives, and unrealized gains and losses on investments, excluding other than temporary losses.

### Operating Activities, Nonoperating Gains (Losses), and Discontinued Operations

Only those activities directly associated with the furtherance of the System's primary mission are considered to be operating activities. Other activities that result in gains or losses are considered to be nonoperating income (loss). Nonoperating income (loss) includes interest and other earnings or losses on investments (including other than temporary losses) and gains and losses on the sale of fixed assets. Discontinued operations include the results of operations for Heritage and Maplewood.

### Assets Held by Third Parties

The West Virginia University Foundation, Inc. (WVU Foundation) holds cash and securities which are available for WVUH's purposes, subject to donor restrictions. Temporarily restricted net assets are those whose use has been limited by donors to a specific time period or purpose, primarily for capital expenditures. Permanently restricted net assets have been restricted by donors to be maintained in perpetuity.

WVU Foundation releases assets from restriction and transfers the amounts to WVUH as amounts are expended according to the donor's intended purposes. Amounts released from restriction are recorded as revenue or donated capital.

16

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 2. Significant Accounting Policies (continued)

JMH is the beneficiary of several trusts, the assets of which are not in the possession of JMH. The carrying value of these assets is equal to the market value of the underlying trust assets, which approximates the present value of the future cash flows to be derived from these trust accounts. JMH records the change in fair value of these assets as a change in permanently restricted net assets.

The United Health Foundation is one of four designated beneficiaries of a charitable lead trust created under the Estate of Virginia R. Corrin. In accordance with the terms of her will, the United Health Foundation will receive a total of approximately $3,549,000 payable in 22 annual installments of approximately $161,000 which began in August of 1993. This bequest receivable is carried at the present value of the future cash flows to be received.

The United Health Foundation is one of five designated beneficiaries of a charitable trust created under the Estate of Alexander Bland Osborn. In accordance with the terms of his will, United Health Foundation will receive approximately $900,000 of the trust on November 16, 2008. Prior to that time, the net income earned from the trust is to be distributed quarterly to the beneficiaries. The trust assets are required to be invested in United States treasury obligations. United Health Foundation's portion of the trust, recorded as a bequest receivable, is approximately $900,000.

### United Health Foundation Temporarily Restricted Net Assets

Substantially all of the restricted net assets of the United Health Foundation, a subsidiary of UHC, relate to funds raised whose use is limited by donor to a specific time period or purpose.

### Asset Retirement Obligation

Financial Accounting Standards Board Interpretation No. 47, *Accounting for Conditional Asset Retirement Obligations* (FIN 47), clarified when an entity is required to recognize a liability for a conditional asset retirement obligation. The System has considered FIN 47, specifically as it relates to its legal obligations to perform asset retirement activities, such as asbestos removal, on its existing properties. Management of the System believes that there is an indeterminate settlement date for the asset retirement obligations because the range of time over which the System may settle the obligations is unknown and cannot be estimated. As a result, as of December 31, 2005, the System cannot reasonably estimate a liability related to these potential asset retirement activities.

17

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 3. Net Patient Service Revenue

The System maintains records to identify and monitor the level of charity care that it provides. These records include the amount of charges forgone for services furnished under its charity care policies. A summary of gross patient service revenues, charity care, and contractual allowances, in thousands, for the year ended December 31, 2005, is as follows:

| | |
|---|---:|
| Gross patient service revenues | $ 1,246,221 |
| Less: Provision for contractual allowances | (505,969) |
| Charity care | (34,860) |
| Add: Other adjustments and settlements | 13,581 |
| Net patient service revenue | $ 718,973 |

The State of West Virginia's disproportionate share plan reimburses hospitals in the state that provide Medicaid services and meet other eligibility criteria. Under the disproportionate share program, the System received approximately $10,981,000 in 2005, included in other adjustments and settlements in the consolidated statement of operations and changes in net assets. The System recognized approximately $1,605,000 of additional revenues in 2005 related to the effects of settling prior year estimated amounts due to third-party payors, which is also included in other adjustments and settlements.

The State of West Virginia Disproportionate Share Hospital State Plan was amended to provide for a settlement process among participating hospitals. The state has not completed a settlement process for the years subsequent to 1996. The Bureau for Medical Services of the State of West Virginia Department of Health and Human Resources has contracted with a third-party vendor to assist with the audit settlement process for the Disproportionate Share Hospital State (DSH) Plan. The laws and regulations governing the DSH settlement process are complex, involving statistical data from all participating hospitals, and subject to interpretation. Accordingly, WVUH and UHC are not able to estimate the possible loss or gain that could arise upon completion of the DSH settlement process. The results of the resolution of the settlement process could materially impact WVUH's and UHC's future results of operations or cash flows in a particular period.

Effective June 1, 1993, the legislature of the State of West Virginia enacted a broad-based health care related tax. This tax is based upon net patient service revenue of each hospital. The System incurred approximately $16,247,000 in 2005 related to this tax. This expense is included in the supplies and purchased services category in the consolidated statement of operations and changes in unrestricted net assets.

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 4. Assets Whose Use Is Limited

WVUH has an agreement with the WVU Foundation, an affiliate of the West Virginia University, to manage WVUH's board-designated funds. WVUH and WVU Foundation's assets are in commingled funds and jointly managed. The investment income and realized and unrealized losses are allocated to WVUH based upon its relative ownership of each fund.

WVUH-East's board-designated funds are managed by third-party investment managers.

The funds held by the bond trustee for WVUH and WVUH-East are managed and held by the Bank of New York and consist primarily of funds in the project fund and NW Pavilion Fund for the construction costs related to the WVUH northeast and northwest construction and renovation projects. The remaining balances of the project fund and NW Pavilion Fund of approximately $18,500,000 and $28,000,000, respectively, will be utilized to complete the northeast and northwest construction projects. Other funds held by the bond trustee are required under the bond indenture to be used for payments of principal and interest on the bonds.

As of December 31, 2005, the carrying value of assets managed by WVU Foundation and third parties, and held by Bank of New York on behalf of WVUH and WVUH-East, which aggregated approximately $348,108,000 in 2005, were invested as follows:

|  | Board-Designated Funds | Trustee-Held Funds |
|---|---|---|
| Cash and cash equivalents | 5% | 9% |
| Equity securities | 49% | –% |
| Fixed income (including corporate bonds and U.S. treasuries) | 28% | 91% |
| Alternative investments | 18% | –% |

WVUH's alternative investments represent ownership in limited partnerships that invest in hedge funds, real asset funds, private equity/venture capital funds, and distressed debt funds. Investments in the partnership representing less than 3% ownership are recorded at cost. Investments representing greater than 3% ownership are accounted for under the equity method. As of December 31, 2005, the total cost and carrying value of alternative investments was approximately $52,110,000 and $52,311,000, respectively. WVUH has commitments for the additional purchase of ownership in limited partnerships of $56,300,000 at December 31, 2005 over the next ten years.

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**4. Assets Whose Use Is Limited (continued)**

The fair values of assets whose use is limited for UHC, in thousands, at December 31, 2005, is as follows:

| | |
|---|---:|
| UHC Board-designated funds: | |
| Funded depreciation: | |
| Cash and short-term investment fund | $ 14,541 |
| U.S. government, corporate, and other obligations | 68,038 |
| Common stock and mutual funds | 33,362 |
| | 115,941 |
| | |
| UHC malpractice self-insurance trust fund: | |
| Cash and short-term investment fund | 772 |
| U.S. government, corporate, and other obligations | 5,465 |
| Common stock and mutual funds | 4,737 |
| | 10,974 |
| | |
| UHF Foundation investments: | |
| Cash and short-term investment fund | 318 |
| Common stock and mutual funds | 3,514 |
| | 3,832 |
| | |
| UHC funds held by bond trustee: | |
| Cash and short-term investment fund | 568 |
| U.S. government obligations | 1,390 |
| | 1,958 |
| Total UHC assets whose use is limited | 132,705 |
| | |
| Total WVUH assets whose use is limited | 348,108 |
| UPC assets whose use is limited | 953 |
| Less funds that are required to satisfy current obligations | (23,167) |
| | $ 458,599 |

20

# West Virginia United Health System, Inc. and Subsidiaries

## Notes to Consolidated Financial Statements (continued)

### 4. Assets Whose Use Is Limited (continued)

Investment income and net realized and unrealized gains from assets whose use is limited and cash and short-term investments, in thousands, are comprised of the following for the year ended December 31, 2005:

| | |
|---|---:|
| Nonoperating gains: | |
| Net investment income | $ 9,726 |
| Net realized gains, including other than temporary losses of $570 | 6,178 |
| | 15,904 |
| Other changes in unrestricted net assets: | |
| Unrealized appreciation on investments | 271 |
| | $ 16,175 |

The following table summarizes the fair value (in thousands) of securities included in assets whose use is limited by board-designation and trustee-held that have gross unrealized losses (the amount by which historical cost exceeds the fair value) as of December 31, 2005. These declines in value are determined to be temporary by the System. The schedule further segregates the securities that have been in a gross unrealized loss position as of December 31, 2005, for less than 12 months and those for 12 months or more. Management believes the gross unrealized losses of less than 12 months of $(838,000), representing a modest decline in fair value below cost, are reflective of current market fluctuations. Investment advisors expect recovery in the short-term future. These individual investments have projected recoveries in value in 2006. Management believes the gross unrealized losses of 12 months or longer of $(809,000), representing a decline of 2.5% below cost, are reflective of current interest rates or market conditions with projected recoveries of the underlying securities in 2006. The decline in values is determined by management to be temporary, and unrealized losses have not been reported as other-than-temporary losses as of December 31, 2005.

| | Less Than 12 Months | | 12 Months or Longer | | Total | |
|---|---|---|---|---|---|---|
| **Description of Securities** | **Fair Value** | **Unrealized Losses** | **Fair Value** | **Unrealized Losses** | **Fair Value** | **Unrealized Losses** |
| | | | *(In Thousands)* | | | |
| Fixed income | $ 15,474 | $ (228) | $ 21,093 | $ (278) | $ 36,567 | $ (506) |
| Inflation index bond fund | — | — | 1,797 | (108) | 1,797 | (108) |
| U.S. government obligations | 22,823 | (360) | 7,164 | (241) | 29,987 | (601) |
| Total fixed income funds | 38,297 | (588) | 30,054 | (627) | 68,351 | (1,215) |
| Common stock funds | 2,884 | (250) | 1,424 | (182) | 4,308 | (432) |
| Total temporarily impaired securities | $ 41,181 | $ (838) | $ 31,478 | $ (809) | $ 72,659 | $ (1,647) |

21

## West Virginia United Health System, Inc. and Subsidiaries

## Notes to Consolidated Financial Statements (continued)

**5. Joint Ventures**

Gateway Enterprises owns a 50% interest in Berkeley Haven Limited Partnership (CareHaven) and Canterbury of Shepherdstown Limited Partnership (Canterbury). These partnerships own and operate intermediate care nursing centers in Martinsburg and Shepherdstown, West Virginia. JMH owns a 50% interest in Markglen, Inc. d/b/a Shenandoah Health Village Center (Shenandoah). Shenandoah owns and operates a 78-bed nursing facility located in Charles Town, West Virginia. On December 30, 2005, Gateway Enterprises and JMH entered into an agreement to sell their ownership interests in CareHaven, Canterbury, and Shenandoah to Glenmark Associates, Inc. (Glenmark). Glenmark maintains a 50% ownership position and manages operations of each nursing facility. The sale is currently pending certificate of need approval by the West Virginia Health Care Authority. The purchase price of $4,100,000 was deposited into an escrow account on December 30, 2005. The sale is expected to close in the second or third quarter of 2006 with an anticipated net gain to the organization.

**6. Property, Plant, and Equipment**

Property, plant, and equipment and the related accumulated depreciation, in thousands, consist of the following at December 31, 2005:

| | |
|---|---:|
| Land and land improvements | $ 23,864 |
| Buildings | 219,359 |
| Equipment | 406,671 |
| Leasehold improvements | 1,386 |
| | 651,280 |
| Less accumulated depreciation | (371,554) |
| Add construction in progress | 9,701 |
| Property, plant, and equipment, net | $ 289,427 |

**7. Line of Credit**

City Foundation has a $2,000,000 line of credit with a bank at a variable rate of interest (2.42% plus one-month LIBOR at December 31, 2005). The balance outstanding at December 31, 2005, is $1,895,000 and is secured by funds on deposit with the lender and expires November 30, 2006. JMH has a line of credit with a bank that accrues interest at a variable rate (7.75% at December 31, 2005). The balance outstanding at December 31, 2005, is $1,297,000 and is secured by the JMH hospital building. No further draws are available under the JMH line of credit. The line must be fully repaid by February 2007.

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 7. Line of Credit (continued)

WVUH also has an available unsecured line of credit of $5,000,000 that accrues interest at 3.75%. There are no amounts outstanding as of December 31, 2005.

UHC has a $5,000,000 unsecured line of credit with a bank. There are no borrowings outstanding at December 31, 2005.

### 8. Long-Term Obligations

A summary of long-term obligations, in thousands, at December 31, 2005, follows:

| | |
|---|---:|
| WVUH and WVUH-East Series 2005 Bonds | $ 59,750 |
| WVUH Series 2003 Bonds | 133,640 |
| WVUH Series 1998 Bonds | 38,670 |
| UHC: Series 1998 revenue bonds, to be defeased in 2006. Interest ranges from a minimum of 4.40% to a maximum of 5.25%, collateralized by the pledge of Maplewood's gross receipts. | 18,360 |
| UHC: Huntington Banks note, monthly installments of $12, including interest of 3.74%, through January 2011 secured by real estate. | 663 |
| UHC: Bank One line of credit at 4.14% interest. Available credit line is $5,000 converted to five-year term loan in 2002. Secured by medical and various other equipment. | 1,350 |
| UHC: Bank One five-year term loan at 3.79% interest, secured by medical and other various equipment. | 2,337 |
| Allied: Wesbanco Bank, fixed interest rate (5.252%), payable in monthly installments of principal and interest of approximately $6 for 77 months; secured by the first lien leasehold deed of trust on subleases and first priority security interest in property of Allied. | 156 |

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**8. Long-Term Obligations (continued)**

| | |
|---|---:|
| Allied: Wesbanco Bank, fixed interest rate (5.102%), payable in monthly installments of principal and interest of approximately $13 for 68 months; guaranteed by WVUH. | 219 |
| JMH capital lease obligations, interest rates ranging from 2.70% to 11.87%, monthly payments ranging from $.2 to $9 through 2010, secured by equipment with a net book value of approximately $945. | 890 |
| Other notes payable: UHC and UPC | 49 |
| Total long-term obligations | 256,084 |
| Amounts representing net unamortized bond premium | 288 |
| | 256,372 |
| Less current portion of long-term obligations | (26,617) |
| Long-term obligations, excluding current installments | $ 229,755 |

**WVUH and WVUH-East**

On October 15, 1998, the Authority issued $44,345,000 of Series 1998 Bonds on behalf of WVUH to refinance and defease the remaining portion of Series 1986 Bonds. The Series 1998 Bonds have fixed interest rates between 3.75% and 5.00% per annum. The Serial Bonds of the 1998 issue have annual maturities beginning 2002 through 2013. The Term Bonds of the 1998 issue have maturities of June 1, 2015, 2018, and 2022.

On August 1, 2003, the Authority issued $139,730,000 of Series A, B, C, and D 2003 Bonds on behalf of WVUH to redeem Series 1993 and 2002 Bonds and to provide financing for new construction. The Series A serial bonds of the 2003 issue have fixed interest rates between 3.0% and 3.5% and have annual maturities beginning 2004 through 2010. The Series B, C, and D term bonds of the 2003 issue are 35-day auction rate certificates. Series B matures on June 1, 2016. Series C and D mature on June 1, 2033.

In connection with the Series 2003 B and C bonds, WVUH entered into two ISDA master agreements with UBS Financial Services, Inc. (UBS) on August 20, 2003, in order to hedge the LIBOR component of the interest rate on the auction rate bonds. The agreements comprise an interest rate cash flow swap in which WVUH pays a fixed interest rate to UBS and receives 70% of LIBOR from UBS. The Series B agreement has a notional value of $25,800,000 and

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 8. Long-Term Obligations (continued)

terminates on June 1, 2016. The Series C agreement has a notional value of $44,650,000 and terminates on June 1, 2033. Both swaps qualify for hedge accounting treatment under SFAS 133. The fair value of the swaps is approximately $(3,901,000) at January 1, 2005, and $(3,352,000) at December 31, 2005, and is recorded as a liability on the consolidated balance sheet. The accumulated derivative loss of $(3,352,000) has been excluded from excess of revenues over expenses. WVUH monitors the terms of these transactions and should the terms change at any time, an effectiveness test will be performed. Any material ineffective portion will be reclassified into the statement of operations at that time.

On January 27, 2005, the Authority issued $60,000,000 of Series A and B 2005 Bonds (2005 Bonds) on behalf of WVUH and WVUH-East to provide financing for new construction and to refinance WVUH-East debt. Debt refinanced included Berkley County Building Commission Hospital Revenue Bonds (City Hospital Series 1992 Bonds), West Virginia Hospital Finance Authority Variable Rate Demand Revenue Bonds (City Hospital Series 2002 Bonds), and Jefferson County Building Commission Hospital Revenue Bonds (JMH Series 2003 Bonds). A loss on defeasance of approximately $762,000 is recorded in the accompanying consolidated statement of operations and includes approximately $366,000 of unamortized deferred financing costs. The 2005 Bonds are auction rate certificates with seven-day auction periods. The Series A bonds have annual maturities beginning 2017 through 2035. The Series B bonds have annual maturities beginning 2005 through 2030.

In connection with the 2005 Bonds, WVUH-East entered into an ISDA master agreement with Merrill Lynch Capital Services (MLCS) on January 20, 2005, in order to hedge the cash flows on the auction rate bonds. The agreements comprise an interest rate cash flow swap in which WVUH-East pays a fixed interest rate to MLCS and receives 70% of LIBOR from MLCS. The agreement had an original notional value of $23,000,000, which reduces with the bond principal. The notional value as of December 31, 2005, is $22,800,000. The agreement terminates on June 1, 2030. The swap qualifies for hedge accounting treatment under SFAS 133. WVUH-East has recorded the fair value of the swap in the balance sheet and changes in fair value in the statement of changes in net assets. The fair value of the swap is approximately $100,000 at December 31, 2005, and is recorded as an asset on the balance sheet. The ineffective portion of the hedge was not material at December 31, 2005.

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 8. Long-Term Obligations (continued)

The Series 1998 Bonds pay interest semiannually on June 1 and December 1. The Series 2003 Bonds pay interest monthly. The Series 2005 Bonds pay interest weekly. Principal payments for the 1998, 2003, and 2005 bonds are due June 1. The bonds are secured by notes from WVUH and WVUH-East to the Authority. Under the terms of the notes, WVUH and WVUH-East are obligated to make payments to the bond trustee in amounts sufficient to pay principal and interest on the bonds.

The notes also require WVUH and WVUH-East to pledge, to the extent required, its available revenues with the exception of any grants, gifts, bequests, contributions, or donations specifically restricted by the donor. WVUH and WVUH-East purchased an insurance policy which guarantees the payment of the Series 1998, 2003, and 2005 Bonds in the event of default by WVUH and WVUH-East. The restrictive covenants of the Series 1998, 2003, and 2005 Bonds and the notes include, among other covenants, minimum coverages of insurance, net revenue requirements, average annual debt service requirements, limitations on additional debt, and annual reporting requirements.

### UHC

On March 1, 1998, the Harrison County Building Commission (West Virginia) issued $19,565,000 of Health Care Revenue Bonds, Series 1998 (Maplewood Retirement Community Project). The proceeds from the sale of the 1998 Bonds were loaned by the issuer to Maplewood under the terms of a revenue note requiring UHC to make payments sufficient to pay principal and interest on the 1998 bonds as they become due. Gross proceeds from the sale of the 1998 bonds as provided to UHC by the Revenue Note were used to construct the Maplewood facility and were applied to the funding of certain deposits as required with respect to the 1998 Series Bonds, and paying certain costs of issuing the 1998 Series Bonds. Interest on the bonds (Revenue Note) is payable semiannually on April 1 and October 1. Principal became payable beginning April 1, 2003. The 1998 revenue bonds were defeased in 2006 in conjunction with the sale of certain Maplewood assets.

The terms of the revenue note agreement require UHC to maintain certain deposits with a trustee. Such deposits are included with assets whose use is limited on the consolidated balance sheet. The revenue note agreement also contains various other restrictions relating to financial performance and operations.

26

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 8. Long-Term Obligations (continued)

In conjunction with the sale of Maplewood in March 2006, Maplewood/UHC defeased the $18,360,000 in outstanding Series 1998 Maplewood/UHC Obligated Group revenue bonds. In connection with the bond defeasance, UHC transferred $8,785,000 to Maplewood in order to complete the defeasance. In 2006, as a result of the sale of Maplewood and subsequent bond defeasance, Maplewood/UHC incurred a loss of $759,000 and was required to write off approximately $1,014,000 in unamortized deferred financing costs associated with the 1998 debt obligation. In addition to the initial down payment of $8,500,000, Maplewood/UHC received from the buyers a $5,000,000 subordinated note receivable due in 2010, secured by a second deed of trust on the property and facility of Maplewood and the personal guarantees of the two principal owners of the buyer. The note is subordinate to certain current obligations owed by Bridgeport Assisted Living, LLC, Bridgeport Senior Living, LLC, and Maplewood. The gain on sale of the assets approximating $2,006,000 will be recognized under the cost recovery method of accounting as payments are received under the note.

The future maturities, in thousands, of all long-term obligations of the System are as follows:

| | WVUH and WVUH-East Bonds | UHC Notes | Maplewood/ UHC Bonds | UPC and Allied Notes | JMH Capital Leases | Total |
|---|---|---|---|---|---|---|
| 2006 | $ 5,545 | $ 2,219 | $ 18,360 | $ 174 | $ 319 | $ 26,617 |
| 2007 | 5,685 | 1,472 | – | 145 | 264 | 7,566 |
| 2008 | 5,990 | 223 | – | 68 | 195 | 6,476 |
| 2009 | 6,135 | 138 | – | – | 93 | 6,366 |
| 2010 | 6,490 | 147 | – | – | 19 | 6,656 |
| Thereafter | 202,215 | 188 | – | – | – | 202,403 |
| | 232,060 | 4,387 | 18,360 | 387 | 890 | 256,084 |
| Add amounts representing net unamortized bond premium | 288 | – | – | – | – | 288 |
| Less current portion | (5,545) | (2,219) | (18,360) | (174) | (319) | (26,617) |
| Long-term obligations | $ 226,803 | $ 2,168 | $ – | $ 213 | $ 571 | $ 229,755 |

Total interest paid on all long-term obligations for the year ended December 31, 2005, was approximately $8,700,000. Approximately $1,301,000 of interest costs were capitalized during the year ended December 31, 2005 related to the WVUH construction projects.

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 9. Leases

Aggregate rental expense under operating lease agreements for equipment and space rental was approximately $5,200,000 for the year ended December 31, 2005. Future minimum lease payments under noncancelable operating leases for the next five years, in thousands, are as follows:

| | | |
|---|---|---|
| 2006 | $ | 4,623 |
| 2007 | | 4,737 |
| 2008 | | 4,810 |
| 2009 | | 4,802 |
| 2010 | | 4,847 |

### 10. Insurance

The System maintains a self-insurance program for professional liability and general liability. The program covers WVUH, UHC, and UPC with respect to claims occurring on or after October 1, 1986. The program also covers losses above $1,000,000 per occurrence (the state's indemnification limit) on WVUH's hospital-based physicians and residents. Prior to December 21, 1998, the program purchased occurrence excess insurance above amounts retained of $2,000,000 per occurrence/$6,000,000 annual aggregate. Effective December 21, 1998, the self-insured retention limits increased to $2,000,000 per occurrence/$7,500,000 annual aggregate with the annual aggregate limit shared between WVUH, UHC and UPC. For the period of January 21, 2002 through January 21, 2003, excess coverage was purchased from AIG on a claims-made basis above retention limits of $5,000,000 per claim/$12,000,000 annual aggregate (shared between WVUH, UHC and UPC). Beginning January 21, 2003, the System is fully self-insured for all claims.

Beginning November 29, 2005, the WVUH-East entities established a single self-insurance program for professional liability and general liability. A $10,000,000 commercial excess coverage policy was purchased. Prior to the establishment of the combined program, City Hospital and its related entities maintained a self-insurance program with a $10,000,000 excess coverage policy. JMH purchased coverage under a claims-made insurance policy with limits of $1,000,000 per claim/$3,000,000 annual aggregate. JMH's tail liability will be covered by the WVUH-East self-insurance program.

28

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 10. Insurance (continued)

WVUH's and WVUH-East's estimated liabilities for self-insurance of approximately $18,912,000 and $2,926,000, respectively, are discounted at 5% and 4%, respectively. UHC's and UPC's estimated liability of approximately $9,750,000 and $1,365,000, respectively, is undiscounted. The estimated liabilities include the estimate of the ultimate costs for claims reported to the System, as well as incidents that may have occurred but not been reported. Such incidents may or may not result in the assertion of additional claims. The liability for self-insurance is determined using statistical analyses by consulting actuaries and represents management's best estimate of the ultimate cost of all incidents, including loss adjustment expenses.

While the ultimate amount of claims incurred is dependent on future developments, in management's opinion, recorded reserves are adequate to cover the future payment of claims. However, it is reasonably possible that recorded reserves may not be adequate to cover the future payment of claims. Adjustments, if any, to estimates recorded resulting from ultimate claim payments will be reflected in operations in the periods in which such adjustments are known.

### 11. Employee Benefit Plans

#### WVUH and WVUH-East

WVUH and WVUH-East participate in various defined contribution plans which cover substantially all full-time employees. Employees are eligible to contribute, and WVUH and WVUH-East will match a percentage of their base pay up to a limit depending on the employee's years of service. Both employee and employer contributions are 100% vested upon entry into the plan.

Approximately 2% of WVUH's employees continue to be paid by the State of West Virginia. Those employees also participate in a defined contribution pension plan for state employees. WVUH reimburses the state for all costs of these employees, including salaries and wages, pension expense, and other related fringe benefits.

For the year ended December 31, 2005, WVUH's and WVUH-East's share of the defined contribution plans' costs for hospital full-time employees and hospital employees paid by the State of West Virginia was approximately $5,293,000.

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

## 11. Employee Benefit Plans (continued)

City Hospital has a noncontributory defined benefit pension plan covering substantially all its employees, which provides for the payment of contributions for participants to an insurance company under group contracts. The retirement plans provide benefits based on years of credited service. City Hospital's policy is to make contributions to the plan in amounts, as actuarially determined, to meet minimum funding Employee Retirement Income Security Act of 1974 (ERISA) requirements. Effective April 30, 2002, the plan was amended to freeze benefit accruals. No new participants were permitted to enter the plan after that date. City Hospital is reviewing the possibility of terminating its defined benefit pension plan in 2006. Accordingly, the pension obligation and prepaid pension are classified as current in the accompanying consolidated balance sheet in accrued wages and fringe benefits and prepaid expenses, respectively.

The actuarially computed prepaid benefit cost includes the following components at December 31, 2005:

| Change in projected benefit obligation | |
|---|---:|
| Benefit obligation at beginning of year | $ 14,047,747 |
| Service cost | 1,740 |
| Interest cost | 694,441 |
| Settlements | (1,118,288) |
| Actuarial loss (gain) | (14,829) |
| Benefits paid | (161,911) |
| Administration expenses paid | (1,507) |
| Benefit obligation at end of year | $ 13,447,393 |
| | |
| **Change in plan assets** | |
| Fair value of plan assets at beginning of year | $ 10,583,341 |
| Actual return on plan assets | 564,400 |
| Employer contributions | 600,000 |
| Benefits paid | (161,911) |
| Administrative expenses paid | (1,507) |
| Settlements | (1,118,288) |
| Fair value of plan assets at end of year | $ 10,466,035 |
| | |
| Funded status | $ (2,981,358) |
| Additional minimum liability | 3,358,580 |
| Prepaid benefit cost | $ 377,222 |

30

## West Virginia United Health System, Inc. and Subsidiaries

## Notes to Consolidated Financial Statements (continued)

### 11. Employee Benefit Plans (continued)

The actuarially computed net periodic pension costs included the following components at December 31, 2005:

| | | |
|---|---|---:|
| Service cost | $ | 1,740 |
| Interest cost | | 694,441 |
| Expected return on plan assets | | (543,380) |
| Recognized net actuarial loss | | 233,909 |
| Net periodic benefit cost | $ | 386,710 |

Weighted-average assumptions used in the accounting for net periodic pension costs and benefit obligations were:

| | 2005 |
|---|---:|
| Discount rate | 5.00% |
| Expected return on plan assets | 5.00% |
| Rate of compensation increase | N/A |

Management relies on past performance, economic indicators of future returns, actuarial assumptions, and investment advisors to determine a reasonable expected return on plan assets.

The composition of plan assets as of December 31, 2005, is as follows:

| | 2005 |
|---|---:|
| Equity securities | 55% |
| Debt securities | 44 |
| Other | 1 |
| | 100% |

The plan's investment policy is to invest cash eventually needed for trust obligations in short-term and intermediate fixed income instruments earning a market rate of interest without assuming undue risk to principal. A portion of the assets earmarked for longer-term obligations shall be invested in a manner consistent with that time frame, such as equity investments.

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**11. Employee Benefit Plans (continued)**

If the plan is not terminated in 2006, the following benefit payments, which reflect expected future service, as appropriate, are expected to be paid over the next ten years:

|  | Amount |
|---|---|
| Year ending December 31: | |
| 2006 | $ 222,411 |
| 2007 | 241,633 |
| 2008 | 263,452 |
| 2009 | 301,083 |
| 2010 | 323,256 |
| 2011 – 2015 | 2,235,431 |
| | $ 3,587,266 |

**UHC and UPC**

UHC and UPC provide defined contribution pension plans covering substantially all of its employees. Contributions to the plan are based on a variable percentage, ranging from 2.75% to 9.75% of the participating employees' compensation. Policy is to fund the amount accrued for pension costs. The amount charged to expense for the plan year ended December 31, 2005, totaled approximately $2,436,000.

UHC's and UPC's Tax Sheltered Annuity Thrift Plans (TSA Plans) are deferred compensation plans under Section 403(b) of the Internal Revenue Code. All full-time employees are eligible to participate in the TSA Plans. All employee elective deferrals made on behalf of such participant shall be invested in a tax deferred annuity contract or custodial account at the employee's direction and vest immediately. UHC and UPC do not contribute to the TSA Plans.

**12. Related-Party Transactions**

WVUH entered into an agreement with West Virginia University Medical Corporation (Medcorp), d/b/a University Health Associates (UHA), a wholly owned nonprofit subsidiary of West Virginia University, to form a health care provider network named Integrated Provider Network, Inc. (IPN), which began operations on January 1, 1995. The IPN subsequently entered into a provider relationship with The Health Plan of the Upper Ohio Valley, Inc. (The Health Plan). WVUH is at risk, along with UHA, for any losses incurred by the IPN. As of December 31, 2005, WVUH has a payable of approximately $591,000 to the IPN.

32

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 12. Related-Party Transactions (continued)

WVUH performs certain information technology and other services on behalf of UHA. These services totaled approximately $2,250,000 for the year ended December 31, 2005. Included in other receivables at December 31, 2005, is approximately $192,000 related to these services performed in the year ended December 31, 2005.

WVUH has an agreement with West Virginia University to provide a minimum of $4,000,000 per year in educational expenses for the University's interns and residents and an annual clinical teaching subsidy of not less than $6,000,000. WVUH also pays West Virginia University for certain expenses such as state employee salaries, medical director payments, and rents. Total payments, including support, teaching subsidies, and intern and resident costs, of approximately $52,636,000 were made to the University in 2005.

WVUH, Charleston Area Medical Center, and Cabell Huntington Hospital are members of HealthNet, Inc. (HNET). Each member's ownership percentage is 33-1/3%. HNET is a West Virginia nonprofit corporation, which the Internal Revenue Service has determined is recognized as exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code. HNET is an aeromedical transport service company. Members are required to support HNET to the extent that expenses exceed revenues. For the year ended December 31, 2005, HNET revenues exceeded expenses by approximately $2,116,000. The excess is distributed to the members during the following fiscal year. In 2005, WVUH received a distribution of approximately $275,000 related to the year ended December 31, 2004. HNET also reimbursed WVUH for operating expenses incurred on its behalf of approximately $1,919,000 in 2005.

### 13. Contingencies and Commitments

The System and its subsidiaries are involved in litigation, malpractice claims, and regulatory investigations arising in the normal course of business. Several of these cases involve potential significant amounts for which legal counsel is unable to render an opinion on the outcome or potential damages at the present time. In the opinion of management, resolution of those matters is not expected to have a material adverse effect on the financial position of the System. However, depending on the amount and timing of such resolution, an unfavorable resolution of some or all of these matters could materially affect the System's future results of operations or cash flows in a particular period.

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

### 13. Contingencies and Commitments (continued)

On April 1, 1988, WVUH and Medcorp, which operates the Physician Office Center (the Facility), adjacent to WVUH's facilities, entered into an Operating Credit Agreement (the Agreement). To finance the Facility, the West Virginia Hospital Finance Authority has issued $23,500,000 of tax-exempt Hospital Revenue Bonds. The Agreement requires WVUH "to loan or otherwise make funds available to Medcorp to the extent that the revenues of Medcorp are not sufficient to pay the operating expenses thereof during the period following completion of the Facility until the payment of the bonds in full." To date, WVUH has not been required to advance any funds on behalf of Medcorp relating to the Agreement.

WVUH has approved the installation of a new enhanced clinical information system. The expected cost to WVUH will be approximately $64,000,000 of capital and expense over a seven-year period. WVUH is currently negotiating contracts with the third-party vendor.

### 14. Functional Expenses

The System provides general health care services to residents within its geographic location. Expenses related to providing these services are as follows, in thousands, for the year ended December 31, 2005:

| | |
|---|---|
| Health care services | $ 661,888 |
| General and administrative | 71,240 |
| | $ 733,128 |

### 15. Fair Value of Financial Instruments

The following methods and assumptions were used in estimating the fair value disclosures for financial instruments:

*Cash and Cash Equivalents*: The carrying amount approximates fair value.

*Assets Whose Use Is Limited*: The fair value of assets whose use is limited is based on quoted market prices for marketable equities and fixed income securities. For alternative investments, including hedge funds, limited partnerships in real estate, real assets, and private equity, fair value is determined by a combination of underlying market value of investment holdings, valuations, and fund manager calculations.

34

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

#### 15. Fair Value of Financial Instruments (continued)

*Long-Term Obligations*: The fair value of fixed rate debt is estimated using quoted market prices or discounted cash flows analyses based on the System's incremental borrowing rate for debt instruments with comparable maturities. The carrying amounts of variable rate obligations approximate fair value.

The carrying amounts and the fair values of the System's financial instruments, in thousands, at December 31, 2005, are as follows:

|  | Carrying Amount | Fair Value |
|---|---|---|
| Cash and cash equivalents | $ 22,762 | $ 22,762 |
| Short-term investments | 1,644 | 1,644 |
| Assets whose use is limited: |  |  |
| Funded depreciation | 278,823 | 281,747 |
| Debt repayment fund | 102,451 | 104,681 |
| Malpractice self-insurance trust | 39,772 | 40,096 |
| Trustee-held funds | 56,449 | 56,449 |
| UHF Foundation and other investments | 4,271 | 4,271 |
| Long-term debt: |  |  |
| WVUH and WVUH-East Series 2005 Bonds | 59,750 | 59,750 |
| WVUH Series 2003 Bonds, net of unamortized premium of $575 | 134,215 | 133,816 |
| WVUH Series 1998 Bonds, net of unamortized discount of $287 | 38,383 | 39,659 |
| Maplewood Series 1998 Bonds | 18,360 | 19,513 |
| Notes payable | 4,774 | 4,774 |

West Virginia United Health System, Inc. and Subsidiaries

Notes to Consolidated Financial Statements (continued)

**16. Subsequent Events**

In March 2006, UHC received final approval of its certificate of need (CON) application with the HCA for a replacement hospital facility. The total cost of the new facility is currently estimated at approximately $282,500,000, with approximately $231,145,000 to be funded through a bond issuance. In connection with financing this construction project, UHC will become a member of the WVUH obligated group. The obligated group will include WVUH and its subsidiaries, City Hospital, City Hospital Foundation, and Jefferson Memorial Hospital, and UHC. Financing for this project is expected to be completed by June 30, 2006. Construction for this project is expected to begin in May 2006 and is expected to be completed in the fourth quarter of 2009. Management is currently evaluating various disposal options related to the existing facilities and fixed equipment. However, at the present time, a definitive decision has not been made. Accordingly, management is not able to estimate potential accelerated depreciation or impairment charges which may arise depending on the ultimate disposition decision.