# Other Financial Information

**ΞIJ ERNST & YOUNG**

■ Ernst & Young LLP
2100 One PPG Place
Pittsburgh, PA 15222

■ Phone: (412) 644-7800
www.ey.com

## Report of Independent Auditors
## on Other Financial Information

The Board of Directors
West Virginia United Health System, Inc. and Subsidiaries

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements of West Virginia United Health System, Inc. and subsidiaries taken as a whole. The consolidating balance sheet and consolidating statement of operations and changes in unrestricted net assets are presented for purposes of additional analysis and are not a required part of the consolidated financial statements of West Virginia United Health System, Inc. and subsidiaries. Such information has been subjected to the auditing procedures applied in our audit of the consolidated financial statements and, in our opinion, based on our audit and the report of other auditors, insofar as it relates to the information for United Summit Center and United Health Foundation included under United Hospital Center and subsidiaries, is fairly stated in all material respects in relation to the consolidated financial statements taken as a whole.

*Ernst + Young LLP*

March 29, 2006

# West Virginia United Health System, Inc. and Subsidiaries

## Consolidating Balance Sheet

### December 31, 2005

*(In Thousands)*

| | West Virginia United Health System | West Virginia University Hospitals and Subsidiaries | United Hospital Center and Subsidiaries | Allied Health Services | United Physicians Care | Health Partners Network Services | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| **Current assets:** | | | | | | | | |
| Cash and cash equivalents | $ 354 | $ 15,068 | $ 6,738 | $ 127 | $ 295 | $ 180 | $ — | $ 22,762 |
| Short-term investments | — | — | 1,644 | — | — | — | — | 1,644 |
| Patient accounts receivable (net of allowance for doubtful accounts of $43,057) | — | 75,819 | 23,034 | 136 | 265 | — | — | 99,254 |
| Other receivables | 801 | 7,330 | 1,262 | 250 | — | 123 | (2,864) | 6,902 |
| Inventories | — | 8,458 | 3,389 | — | 74 | — | — | 11,921 |
| Prepaid expenses and other current assets | 82 | 3,585 | 1,885 | 37 | 140 | — | — | 5,729 |
| Net estimated amounts due from third-party payors | — | 7,627 | — | — | — | — | — | 7,627 |
| Assets whose use is limited to satisfy current obligations | — | 12,298 | 10,869 | — | — | — | — | 23,167 |
| Joint venture investments | — | 725 | — | — | — | — | — | 725 |
| Assets held for sale | — | — | 16,599 | — | — | — | — | 16,599 |
| Total current assets | 1,237 | 130,910 | 65,420 | 550 | 774 | 303 | (2,864) | 196,330 |
| **Assets whose use is limited:** | | | | | | | | |
| **Board-designated funds:** | | | | | | | | |
| Funded depreciation | — | 162,882 | 115,941 | — | — | — | — | 278,823 |
| Debt repayment fund | — | 102,451 | — | — | — | — | — | 102,451 |
| Malpractice self-insurance trust fund | — | 27,845 | 10,974 | — | 953 | — | — | 39,772 |
| Foundation investments | — | — | 3,832 | — | — | — | — | 3,832 |
| Funds held by bond trustee | — | 54,491 | 1,958 | — | — | — | — | 56,449 |
| Other investments | — | 439 | — | — | — | — | — | 439 |
| | — | 348,108 | 132,705 | — | 953 | — | — | 481,766 |
| Less funds held by trustee that are required to satisfy current obligations | — | (12,298) | (10,869) | — | — | — | — | (23,167) |
| | — | 335,810 | 121,836 | — | 953 | — | — | 458,599 |
| Property, plant, and equipment, net | 160 | 221,823 | 65,985 | 1,301 | 150 | 8 | — | 289,427 |
| Assets held by third parties | — | 9,391 | 2,100 | — | — | — | — | 11,491 |
| Deferred financing costs, net | — | 8,112 | 812 | — | — | — | — | 8,924 |
| Derivative financial instrument | — | 100 | — | — | — | — | — | 100 |
| Other assets | 1,734 | 6,792 | 1,911 | 60 | — | — | (678) | 9,819 |
| Total assets | $ 3,131 | $ 712,938 | $ 258,064 | $ 1,911 | $ 1,877 | $ 311 | $ (3,542) | $ 974,690 |

West Virginia United Health System, Inc. and Subsidiaries

Consolidating Balance Sheet

December 31, 2005

| | West Virginia United Health System | West Virginia University Hospitals and Subsidiaries | United Hospital Center and Subsidiaries | Allied Health Services | United Physicians Care | Health Partners Network Services | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|---|
| | | | | (In Thousands) | | | | |
| **Liabilities and net assets** | | | | | | | | |
| Current liabilities: | | | | | | | | |
| Accounts payable and accrued expenses | $ 378 | $ 24,952 | $ 7,034 | $ 1,353 | $ 327 | $ 102 | $ (2,827) | $ 31,319 |
| Accrued wages and fringe benefits | 217 | 26,621 | 6,482 | 20 | 197 | 15 | (37) | 33,552 |
| Current portion of bonds and notes payable | — | 5,864 | 20,579 | 206 | 5 | — | — | 26,617 |
| Current portion of self-insurance liability | — | 6,753 | 2,291 | — | — | — | — | 9,044 |
| Line of credit | — | 3,192 | — | — | — | — | — | 3,192 |
| Net estimated amounts due to third-party payors | — | — | 877 | — | 126 | — | — | 1,003 |
| Other current liabilities | — | 881 | 307 | — | — | — | — | 1,188 |
| Liabilities held for sale | — | — | 4,314 | — | — | — | — | 4,314 |
| Total current liabilities | 595 | 68,263 | 41,884 | 1,579 | 655 | 117 | (2,864) | 110,229 |
| Long-term obligations: | | | | | | | | |
| Long-term debt and capital leases payable, less current portion (net of unamortized bond premium of $288) | — | 227,374 | 2,168 | 205 | 8 | — | — | 229,755 |
| Self-insurance liability | — | 15,085 | 7,459 | — | 1,365 | — | — | 23,909 |
| Derivative obligations | — | 3,352 | — | — | — | — | — | 3,352 |
| Other | 963 | 821 | 252 | — | — | — | — | 2,036 |
| Total liabilities | 1,558 | 314,895 | 51,763 | 1,784 | 2,028 | 117 | (2,864) | 369,281 |
| Net assets: | | | | | | | | |
| Unrestricted | 1,573 | 388,574 | 205,871 | 127 | (151) | 194 | (678) | 595,510 |
| Temporarily restricted | — | 3,966 | 430 | — | — | — | — | 4,396 |
| Permanently restricted | — | 5,503 | — | — | — | — | — | 5,503 |
| Total net assets | 1,573 | 398,043 | 206,301 | 127 | (151) | 194 | (678) | 605,409 |
| Total liabilities and net assets | $ 3,131 | $ 712,938 | $ 258,064 | $ 1,911 | $ 1,877 | $ 311 | $ (3,542) | $ 974,690 |

West Virginia United Health System, Inc. and Subsidiaries

Consolidating Statement of Operations and Changes in Unrestricted Net Assets

Year Ended December 31, 2005

| | West Virginia United Health System | West Virginia University Hospitals and Subsidiaries | United Hospital Center and Subsidiaries | Allied Health Services | United Physicians Care | Health Partners Network Services | Eliminations | Consolidated |
|---|---|---|---|---|---|---|---|---|
| | | | | *(In Thousands)* | | | | |
| Unrestricted revenues, gains, and other support: | | | | | | | | |
| Net patient service revenue | $ – | $ 542,055 | $ 169,966 | $ 2,015 | $ 4,937 | $ – | $ – | $ 718,973 |
| Other revenue, net | 3,903 | 25,089 | 7,876 | 159 | 163 | 888 | (5,477) | 32,601 |
| Total unrestricted revenues, gains, and other support | 3,903 | 567,144 | 177,842 | 2,174 | 5,100 | 888 | (5,477) | 751,574 |
| Expenses: | | | | | | | | |
| Salaries and wages | 1,974 | 193,978 | 70,168 | 337 | 3,225 | 450 | (207) | 269,925 |
| Employee benefits | 701 | 51,241 | 20,469 | 93 | 658 | 123 | (56) | 73,229 |
| Supplies and purchased services | 1,122 | 236,609 | 59,410 | 1,492 | 1,630 | 322 | (5,214) | 295,371 |
| Depreciation and amortization | 44 | 27,629 | 9,990 | 181 | 54 | 5 | – | 37,903 |
| Provision for bad debts | – | 37,310 | 11,797 | – | 200 | – | – | 49,307 |
| Interest | – | 7,101 | 266 | 32 | – | – | (6) | 7,393 |
| Total expenses | 3,841 | 553,868 | 172,100 | 2,135 | 5,767 | 900 | (5,483) | 733,128 |
| Income (loss) from operations | 62 | 13,276 | 5,742 | 39 | (667) | (12) | 6 | 18,446 |
| Nonoperating gains (losses) – principally investment income, net realized gains (losses), and other than temporary losses of $570 | 20 | 9,787 | 5,955 | 40 | 101 | 7 | (6) | 15,904 |
| Loss on early extinguishment of debt | – | (762) | – | – | – | – | – | (762) |
| (Loss) gain on sale of fixed assets | – | (452) | – | 2 | (5) | – | – | (455) |
| Sale of dialysis unit | – | – | 5,356 | – | – | – | – | 5,356 |
| Other, net | – | (150) | 8 | (212) | – | (2) | – | (356) |
| Excess of revenues over expenses (expenses) over revenues) | 82 | 21,699 | 17,061 | (131) | (571) | (7) | – | 38,133 |
| Other changes in unrestricted net assets: | | | | | | | | |
| Unrealized appreciation (depreciation) on investments | 28 | 2,160 | (1,861) | – | (56) | – | – | 271 |
| Change in fair value of derivatives | – | 649 | – | – | – | – | – | 649 |
| Capital donations | – | 134 | – | (2) | – | – | – | 132 |
| Change in minimum pension liability | – | 549 | – | – | – | – | – | 549 |
| Transfers from (to) affiliates | 1 | 87 | (792) | 340 | 364 | – | – | – |
| Other | – | – | – | 100 | (32) | – | – | 68 |
| Increase (decrease) in unrestricted net assets before discontinued operations | 111 | 25,278 | 14,408 | 307 | (295) | (7) | – | 39,802 |
| Results from discontinued operations | – | – | (1,589) | – | – | – | – | (1,589) |
| Increase (decrease) in unrestricted net assets | 111 | 25,278 | 12,819 | 307 | (295) | (7) | – | 38,213 |
| Unrestricted net assets (deficiency), beginning of year | 1,462 | 363,296 | 193,052 | (180) | 144 | 201 | (678) | 557,297 |
| Unrestricted net assets (deficiency), end of year | $ 1,573 | $ 388,574 | $ 205,871 | $ 127 | $ (151) | $ 194 | $ (678) | $ 595,510 |

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX C**

## DEFINITIONS OF CERTAIN TERMS AND
## SUMMARY OF PRINCIPAL DOCUMENTS

*Certain material features of the Master Indenture, the Bond Indenture, the Loan Agreement and the Supplemental Trust Indenture 2006-2 are discussed below in connection with the issuance of the 2006 Bonds (as used in this Appendix, the "2006 Bonds"). The discussion does not purport to be complete and is subject in all respects to the provisions of, and is qualified in its entirety by, reference to the Master Indenture, the Bond Indenture, the Loan Agreement and the Supplemental Trust Indenture 2006-2.*

### DEFINITIONS OF CERTAIN TERMS

*As used in this Preliminary Official Statement, the following terms, unless the context requires otherwise, will have the meaning as set forth below. Any capitalized terms not defined below will have the same meaning as set forth in the Master Indenture, the Bond Indenture, the Loan Agreement and the Supplemental Master Trust Indenture 2006-2, copies of which can be obtained by contacting the Bond Trustee.*

Act

"Act" means the West Virginia Hospital Finance Authority Act, Article 29B of Chapter 16 of the Code of West Virginia, 1931, as amended, as heretofore and hereafter amended or supplemented.

Acquisition Expense

"Acquisition Expense" has the meaning set forth in the preambles of the Bond Indenture.

Additional Payments

"Additional Payments" means the payments so designated and required to be made by the Obligated Group pursuant to Section 3.2 of the Loan Agreement.

Additional Master Notes

"Additional Master Notes" means the additional Notes authorized to be issued by the Obligated Group Agent pursuant to the Master Indenture.

Alternate Bank Rate

"Alternate Bank Rate" means, with respect to any Bank Bond, such interest rate or sequence of rates (which may be stated as a formula and may be determined by reference to a specified index or indices) as is specified in the Substitute Liquidity Agreement or Substitute Liquidity Facility then in effect pursuant to which such Bank Bond was purchased.

ARCs

"ARCs" shall have the meaning set forth in the definition thereof in Section 100 of Appendix E.

Auction Mode

"Auction Mode" means the Mode during which a Series of 2006 Bonds bear interest at the Auction Rate.

Auction Period or Auction Rate Period

"Auction Period" or "Auction Rate Period" means (i) with respect to ARCs in a seven-day mode, any of (A) a period, generally of seven days, beginning on and including a Monday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Sunday) and ending on and including the Sunday thereafter (unless such Sunday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day), (B) a period, generally of seven days, beginning on and including a Tuesday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Monday) and ending on and including the Monday thereafter (unless such Monday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day), (C) a period, generally of seven days, beginning on and including a Wednesday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Tuesday) and ending on and including the Tuesday thereafter (unless such Tuesday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day), (D) a period, generally of seven days, beginning on and including a Thursday (or a day following the last day of the prior Auction Period if the prior Auction Period does not end on a Wednesday) and ending on and including the Wednesday thereafter (unless such Wednesday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day) or (E) a period, generally of seven days, beginning on and including a Friday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Thursday) and ending on and including the Thursday thereafter (unless such Thursday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day), (ii) with respect to ARS in a 28-day mode, any of (A) a period, generally of 28 days, beginning on and including a Monday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Sunday) and ending on and including the fourth Sunday thereafter (unless such Sunday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day), (B) a period, generally of 28 days, beginning on and including a Tuesday (or a day following the last day of the prior Auction Period if the prior Auction Period does not end on a Monday) and ending on and including the fourth Monday thereafter (unless such Monday is not followed by a Business Day, in which case ending on and including the next succeeding day followed by a Business Day), (C) a period, generally of 28 days, beginning on and including a Wednesday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Tuesday) and ending on and

including the fourth Tuesday thereafter (unless such Tuesday is not followed by a Business Day, in which case ending on and including the next succeeding day followed by a Business Day), (D) a period, generally of 28 days, beginning on and including a Thursday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Wednesday) and ending on and including the fourth Wednesday thereafter (unless such Wednesday is not followed by a Business Day, in which case ending on and including the next succeeding day followed by a Business Day) or (E) a period, generally of 28 days, beginning on and including a Friday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Thursday) and ending on and including the fourth Thursday thereafter (unless such Thursday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day); and (iii) with respect to ARCs in a 35-day mode, any of (A) a period, generally of 35 days, beginning on and including a Monday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Sunday) and ending on and including the fifth Sunday thereafter (unless such Sunday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day), (B) a period, generally of 35 days, beginning on and including a Tuesday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Monday) and ending on and including the fifth Monday thereafter (unless such Monday is not followed by a Business Day, in which case ending on and including the next succeeding day followed by a Business Day), (C) a period, generally of 35 days, beginning on and including a Wednesday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Tuesday) and ending on and including the fifth Tuesday thereafter (unless such Tuesday is not followed by a Business Day, in which case ending on and including the next succeeding day followed by a Business Day), (D) a period, generally of 35 days, beginning on and including a Thursday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Wednesday) and ending on and including the fifth Wednesday thereafter (unless such Wednesday is not followed by a Business Day, in which case ending on and including the next succeeding day followed by a Business Day) or (E) a period, generally of 35 days, beginning on and including a Friday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Thursday) and ending on and including the fifth Thursday thereafter (unless such Thursday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day) and (iv) a Special Auction Period; provided, however, that the initial Auction Period with respect to the 2006 B Bonds, the 2006 C Bonds, and the 2006 D Bonds shall begin on and include the Closing Date, and that in the event of a Conversion of the 2006 B Bonds, the 2006 C Bonds, and the 2006 D Bonds from another Interest Rate Period to an ARC Interest Rate Period the initial Auction Period following such Conversion shall begin on and include the Conversion Date.

Auction Rate

"Auction Rate" means the rate of interest per annum on any Auction Date that results from the implementation of the Auction Procedures, and determined as described in Section 104 of Exhibit A to the Bond Indenture.

Auction Rate Adjustment Date

"Auction Rate Adjustment Date" means the first day of each Auction Rate Period.

Auction Rate Conversion Date

"Auction Rate Conversion Date" means the first available Conversion Date selected by the Obligated Group Agent upon conversion of a series of ARCs from a Variable Rate Period to an Auction Rate Period.

Authority

"Authority" means the West Virginia Hospital Finance Authority, a body corporate and governmental instrumentality of the State of West Virginia, and its successors and assigns.

Authorized Denomination

"Authorized Denomination" means (i) during any Variable Rate Period, $100,000 and $5,000 multiples in excess thereof, (ii) during any Auction Rate Period, $25,000 and integral multiples thereof and (iii) during any Fixed Rate Period, $5,000 and integral multiples thereof.

Authorized Representative

"Authorized Representative" means with respect to the Obligated Group Agent, its President, Vice President or any other person designated as an Authorized Representative of the Obligated Group by a Certificate of the Obligated Group Agent signed by its President or Vice President and filed with the Bond Trustee.

Bank

"Bank" means the Initial Bank for the period during which the initial Liquidity Facility and initial Liquidity Facility Agreement are in effect, and thereafter shall mean the Substitute Bank then obligated under the Substitute Liquidity Facility and Substitute Liquidity Agreement at the time in effect, all of which must be acceptable to the Bond Insurer.

Bank Bonds

"Bank Bonds" means Tendered Bonds purchased with moneys drawn under the Liquidity Facility pursuant to Article XI hereof and owned by or pledged to or for the benefit of the Bank or its permitted assignees in accordance with the Liquidity Facility Agreement or the Custody Agreement, if any, until such Bonds are remarketed by the Remarketing Agent pursuant to the

Remarketing Agreement or such Bonds lose their characterization as Bank Bonds pursuant to the Liquidity Facility Agreement.

## Bank Rate

"Bank Rate" means (a) when the Initial Liquidity Facility is in effect under the initial Liquidity Facility Agreement, the Bank Rate described in the initial Liquidity Facility Agreement and (b) when any Substitute Liquidity Facility is in effect, the then current Alternate Bank Rate. The foregoing notwithstanding at no time shall the Bank Rate be higher than the Maximum Rate.

## BMA Municipal Index

"BMA Municipal Index" means The Bond Market Association Municipal Swap Index as of the most recent date for which such index was published or such other weekly, high-grade index comprised of seven-day, tax-exempt weekly rate demand notes produced by Municipal Market Data, Inc., or its successor, or as otherwise designated by The Bond Market Association; provided, however, that, if such index is no longer produced by Municipal Market Data, Inc. or its successor, then "BMA Municipal Index" shall mean such other reasonably comparable index selected by the Obligated Group Agent and approved by the Bond Insurer.

## Bond Counsel

"Bond Counsel" means legal counsel of recognized national standing in the field of obligations the interest on which is excluded from gross income for federal income tax purposes, selected by the Obligated Group Agent, acceptable to the Authority, and not objected to by the Bond Trustee or the Credit Facility Provider.

## Bond Insurance Policy

"Bond Insurance Policy" or "Insurance Policy" means the financial guaranty insurance policy issued by the Bond Insurer insuring the payment when due of the principal of and interest on the 2006 Bonds as provided therein.

## Bond Indenture

"Bond Indenture" means the Bond Indenture, as originally executed or as it may from time to time be supplemented, modified or amended by any Supplemental Bond Indenture.

## Bond Insurer

"Bond Insurer" means Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance company, and its successors and assigns.

## Bond Purchase Date

"Bond Purchase Date" means the day on which a Tendered Bond becomes a Bank Bond.

Bond Purchase Fund

"Bond Purchase Fund" means the fund by that name established pursuant to Section 4.09 of the Bond Indenture.

Bond Trustee

"Bond Trustee" means The Bank of New York, a state banking corporation, duly organized and existing under the laws of the State of New York and duly authorized to exercise corporate trust powers, having a principal corporate trust office in New York, New York or its successor, as Bond Trustee hereunder as provided in Section 8.01 of the Bond Indenture.

Bonds

"Bonds" or "2006 Bonds" means, collectively, the 2006 A Bonds, the 2006 B Bonds, the 2006 C Bonds, and the 2006 D Bonds authorized and issued, and at any time Outstanding pursuant to, the Bond Indenture.

Business Day

"Business Day" other than with respect to ARCs means a day that is not a Saturday, Sunday or legal holiday on which banking institutions in the State of West Virginia, the State of New York or in any state in which the office of any Credit Facility Provider, the Remarketing Agent, the Tender Agent, the Auction Agent (if any), the Broker-Dealer (if any) or the Bond Trustee is located are authorized to remain closed or a day on which the New York Stock Exchange is closed.

Capitalized Interest Fund

"Capitalized Interest Fund" means the fund established under and to be used as set forth in Section 3.04 of the Bond Indenture.

Certificate, Statement, Request, Requisition and Order of the Authority or the Obligated Group Agent

"Certificate," "Statement," "Request," "Requisition" and "Order" of the Authority or the Obligated Group Agent, mean, respectively, a written certificate, statement, request, requisition or order signed in the name of the Authority by the Chairman, Vice Chairman or such other person as may be designated and authorized to sign for the Authority and designated by the Chairman or Vice Chairman in writing to the Bond Trustee, or in the name of the Obligated Group Agent by an Authorized Representative of the Obligated Group Agent. Any such instrument and supporting opinions or representations, if any, may, but need not, be combined in a single instrument with any other instrument, opinion or representation, and the two or more so combined shall be read and construed as a single instrument. If and to the extent required by Section 1.02 of the Bond Indenture, each such instrument shall include the statements provided for in Section 1.02 of the Bond Indenture.

Closing Date

"Closing Date" means June 8, 2006.

Code

"Code" means the Internal Revenue Code of 1986, as amended, or any successor statute thereto, and any regulations promulgated thereunder.

Collateral Document

"Collateral Document" means any written instrument other than the Loan Agreement, the Master Indenture, Supplemental Indenture 2006-2, the Bond Indenture and the 2006 Notes, whereby any property or interest or rights in property of any kind is granted, pledged, conveyed, assigned or transferred to the Authority or Bond Trustee, or both, as security for payment of the 2006 Bonds or performance by the Obligated Group of its obligations under the Master Documents and the Obligations.

Completion Date

"Completion Date" means the date specific in the Requisitions delivered pursuant to Section 3.04(C) of the Bond Indenture.

Continuing Disclosure Agreement

"Continuing Disclosure Agreement" means the Continuing Disclosure Agreement, dated as of June 8, 2006, between the Obligated Group Agent and the Bond Trustee, with respect to the 2006 Bonds, as amended or supplemented.

Conversion Date

"Conversion Date" means each Fixed Rate Conversion Date, Variable Rate Conversion Date and Auction Rate Conversion Date.

Costs of Issuance

"Costs of Issuance" means all items of expense directly or indirectly payable by or reimbursable to the Authority or the Obligated Group and related to the authorization, issuance, sale and delivery of the 2006 Bonds, including but not limited to costs of preparation and reproduction of documents, printing expenses, filing and recording fees, initial fees and charges of the Bond Trustee and its counsel, the Remarketing Agent, the Tender Agent, the Auction Agent (if any), the Broker-Dealer (if any) and their respective counsel, legal fees and charges, fees and disbursements of consultants and professionals, fees and charges for preparation, execution and safekeeping of the 2006 Bonds and any other cost, charge or fee in connection with the original issuance of the 2006 Bonds.

Costs of Issuance Fund

"Costs of Issuance Fund" means the fund by that name established pursuant to Section 3.03 of the Bond Indenture.

Credit Facility

"Credit Facility" means a letter of credit, including, if applicable, a confirming letter of credit, Insurance Policy or similar Credit Facility (other than one issued by the Obligated Group or any affiliate of a Member of the Obligated Group) issued by a commercial bank, savings institution, bond insurer or other financial institution, the senior unsecured debt securities or securities secured by guarantees of the Provider of which are rated at least "AA" (or the equivalent) by one or more of the Rating Agencies.

Credit Facility Provider

"Credit Facility Provider" means the Bond Insurer, the Liquidity Facility Provider and the commercial bank, savings institution, Bond Insurer or other financial institution issuing a Credit Facility.

Custody Agreement

"Custody Agreement" means a custody agreement or a pledge and security agreement (which may also be the Liquidity Facility Agreement), if any, entered into by the Bond Trustee, as custodian, and any Bank, and any and all amendments and supplements thereto, relating to Bank Bonds.

Daily Mode

"Daily Mode" means the Mode during which a Series of 2006 Bonds bear interest at the Daily Rate.

Daily Rate

"Daily Rate" means, with respect to the then effective Daily Rate Period, the lowest interest rate which, in the judgement of the Remarketing Agent, would enable a Series of 2006 Bonds to be remarketed at the principal amount thereof, plus accrued interest thereon, if any, on the Daily Rate Adjustment Date with respect thereto (or, if the Remarketing Agent for any reason fails to determine such rate, the rate determined in accordance with the provisions set forth in the Bond Indenture).

Daily Rate Adjustment Date

"Daily Rate Adjustment Date" means each Business Day.

### Daily Rate Conversion Date

"Daily Rate Conversion Date" means a date on which a Series of 2006 Bonds begins to bear interest at a Daily Rate for any Daily Rate Period which succeeds an Auction Rate Period or a Weekly Rate Period.

### Daily Rate Period

"Daily Rate Period" means any day which is a Business Day and any period commencing on a Business Day following and including all the consecutive days thereafter which are not Business Days.

### Debt Service Reserve Fund

"Debt Service Reserve Fund" means the fund by that name established pursuant to Section 5.07 of the Bond Indenture.

### Debt Service Reserve Fund Requirement

"Debt Service Reserve Fund Requirement" means the lesser of (i) the maximum amount of principal and interest which shall be payable during the current or any succeeding Bond Year on all 2006 Bonds then outstanding, (ii) an amount equal to 10% of the principal amount of proceeds of the 2006 Bonds as of the date of calculation, or (iii) an amount equal to 125% of the average annual debt service with respect to the 2006 Bonds as of the date of calculation, assuming for the purposes of (i) and (iii) that (A) the 2006 B Bonds and the 2006 C Bonds that are subject to the Interest Rate Agreement bear interest at the fixed rate payable by the Obligated Group pursuant to the Interest Rate Agreement if then still in effect; and (B) a series of ARCs if they are not then subject to the Interest Rate Agreement while in either the Auction Mode or the Weekly Mode bear interest equal to the greater of the average interest rate borne by such series of ARCs during the entire preceding bond year or The Bond Buyer Revenue Bond Index plus 50 basis points as of the date of calculation.

### Depository Participant

"Depository Participant" means a member of, or participant in, the Securities Depository.

### Electronic Means

"Electronic Means" means telecopy, telegraph, telex, facsimile transmission, email transmission or other similar electronic means of communication, including a telephonic communication confirmed by writing or written transmission.

### Eligible Bonds

"Eligible Bonds" means any 2006 Bonds other than 2006 Bonds owned by, for the account of, or on behalf of, the Authority or the Obligated Group.

Eligible Moneys

"Eligible Moneys" means (a) moneys (i) paid or deposited by the Obligated Group to or with the Bond Trustee, (ii) continuously held in any fund, account or subaccount established hereunder which is subject to the lien of the Bond Indenture and in which no other moneys which are not Eligible Moneys are held and (iii) which have so been on deposit with the Bond Trustee for at least 367 days from their receipt by the Bond Trustee, during and prior to which period no petition by or against the Authority, any member of the Obligated Group or any "affiliate" thereof (as defined in Title 11 of the United States Code) to which such moneys are attributable under any bankruptcy or similar law now or hereafter in effect shall have been filed and no bankruptcy or similar proceeding otherwise initiated (unless such petition or proceeding shall have been dismissed and such dismissal be final and not subject to appeal), together with investment earnings on such moneys; (b) moneys received by the Bond Trustee pursuant to the Liquidity Facility which are held in any fund, account or subaccount established hereunder in which no other moneys which are not Eligible Moneys are held, together with investment earnings on such moneys; (c) proceeds from the remarketing of any 2006 Bonds pursuant to the provisions of the Bond Indenture to any person other than the Authority, any member of the Obligated group, or any "affiliate" thereof (as defined in Title 11 of the United States Code); (d) proceeds from the issuance and sale of refunding bonds, together with the investment earnings on such proceeds, if there is delivered to the Bond Trustee at the time of issuance and sale of such bonds an opinion of nationally recognized bankruptcy counsel acceptable to the Bond Trustee, the Bond Insurer and each Rating Agency then maintaining a rating on a Series of 2006 Bonds bearing interest at a Variable Rate (which opinion may assume that no Bondholders are "insiders" within the meaning of Title 11 of the United States Code) to the effect that the use of such proceeds and investment earnings to pay the principal of, premium, if any, or interest on the 2006 Bonds would not be avoidable as preferential payments under Section 547 of the United States Bankruptcy Code recoverable under Section 550 of the United States Bankruptcy Code should the Authority, any member of the Obligated Group, or any "affiliate" thereof (as defined in Title 11 of the United States Code) become a debtor in a proceeding commenced thereunder; and (e) moneys which are derived from any other source, together with the investment earnings on such moneys, if the Bond Trustee has received an unqualified opinion of nationally recognized bankruptcy counsel acceptable to the Bond Trustee, the Bond Insurer and each Rating Agency then maintaining a rating on a Series of 2006 Bonds bearing interest at a Variable Rate (which opinion may assume that no Bondholders are "insiders" within the meaning of Title 11 of the United States Code) to the effect that payment of such amounts to bondholders would not be avoidable as preferential payments under Section 547 of the United States Bankruptcy Code recoverable under Section 550 of the United States Bankruptcy Code should the Authority, the any member of the Obligated Group, or any "affiliate" thereof (as defined in Title 11 of the United States Code) become a debtor in a proceeding commenced thereunder; provided that such proceeds, moneys or income shall not be deemed to be Eligible Moneys or available for payment of the 2006 Bonds if, among other things, an injunction, restraining order or stay is in effect preventing such proceeds, moneys or income from being applied to make such payment. For the purposes of this definition, the term "moneys" shall include cash and any investment securities including, without limitation, Government Obligations.

Event of Default

"Event of Default" means any of the events specified in Section 7.01 of the Bond Indenture.

Facilities or Hospital Facilities

"Facilities" or "Hospital Facilities" means United Hospital and WVUH and all buildings, land and equipment used now or in the future in the operations of any member of the Obligated Group that is a hospital.

Failed Tender Rate

"Failed Tender Rate" means a rate equal to the sum of the BMA Municipal Index plus 300 basis points, provided that in no event shall the Failed Tender Rate exceed the Maximum Rate.

Favorable Opinion of Bond Counsel

"Favorable Opinion of Bond Counsel" means, with respect to any action the occurrence of which requires such an opinion, an unqualified Opinion of Counsel, which shall be Bond Counsel, to the effect that such action is permitted under the Bond Indenture and will not, in and of itself, result in the inclusion of interest on the 2006 Bonds in gross income for federal income tax purposes (subject to the inclusion of any exceptions contained in the opinion delivered upon original issuance of the 2006 Bonds).

Fitch

"Fitch" means Fitch Ratings, a corporation organized and existing under the laws of the State of New York, its successors and their assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Obligated Group Agent by notice to the Authority, the Credit Facility Provider and the Bond Trustee.

Fixed Rate

"Fixed Rate" means the interest rate on a Series of 2006 Bonds determined pursuant to Section 2.08 of the Bond Indenture.

Fixed Rate Bonds

"Fixed Rate Bonds" means any series of the 2006 Bonds during the Fixed Rate Mode.

### Fixed Rate Conversion Date

"Fixed Rate Conversion Date" means the date on which a Series of 2006 Bonds are converted to bear interest at a Fixed Rate.

### Fixed Rate Mode

"Fixed Rate Mode" means the Mode during which a Series of 2006 Bonds bears interest at a Fixed Rate.

### Fixed Rate Period

"Fixed Rate Period" means an Interest Rate Period from a Fixed Rate Conversion Date to the final Maturity Date of the affected series of 2006 Bonds.

### Governing Body

"Governing Body" means the board of directors, the board of trustees or similar group in which the right to exercise the powers of corporate directors or trustees is vested or an executive committee of such board or any duly authorized committee of that board to which the relevant powers of that board have been lawfully delegated.

### Holder or Bondholder or Owner

"Holder" or "Bondholder," or "Owner" when used with respect to a 2006 Bond, means the Person in whose name such 2006 Bond is registered.

### Immediate Notice

"Immediate Notice" means notice by Electronic Means to such number or address as the addressee shall have directed in writing, promptly followed by written notice by first class mail postage prepaid to such address as the addressee shall have directed in writing; provided, however, that if any Person required to give an Immediate Notice shall not have been provided with the necessary information as to the Electronic Means mail address of an addressee then Immediate Notice shall mean notice by overnight courier service or by first class mail postage prepaid.

### Initial Swap Agreement

"Initial Swap Agreement" means the Interest Rate Agreement, dated the date thereof, between the Obligated Group Agent and the Swap Provider.

### Interest Component

"Interest Component" means the maximum amount stated in the Liquidity Facility (as reduced and reinstated from time to time in accordance with the terms thereof) which may be

drawn for the payment of the portion of the Tender Price or Repurchase Price of Tendered Bonds corresponding to interest accrued on the Tendered Bonds.

### Interest Coverage Period

"Interest Coverage Period" means the number of days which is used to determine the Interest Component.

### Interest Coverage Rate

"Interest Coverage Rate" means the rate which is used in the Liquidity Facility to calculate the maximum amount (as reduced and reinstated from time to time in accordance with the terms thereof) which is available for the payment of the portion of the Tender Price or Repurchase Price of Tendered Bonds corresponding to interest accrued on the Tendered Bonds, which shall be the rate specified in the Initial Liquidity Facility, and subsequent to the term of the Initial Liquidity Facility the rate per annum specified in any Substitute Liquidity Facility.

### Interest Fund

"Interest Fund" means the fund by that name established pursuant to Section 5.02 of the Bond Indenture.

### Interest Payment Date

"Interest Payment Date" means (1) (a) with respect to a Series of 2006 Bonds in the Daily Mode or Weekly Mode, the first Business Day of each calendar month occurring after the Weekly Rate Conversion Date with respect thereto, and (b) for any Bank Bond, the Bond Purchase Date and the Bond Sale Date therefor and the first Business Day of each calendar month which occurs between such dates, (2) with respect to a Series of 2006 Bonds in the Daily Mode, the fifth Business Day of each calendar month occurring after the Daily Rate Conversion Date with respect thereto (3) with respect to a Series of 2006 Bonds in or converted to the Fixed Rate Mode, the first December 1 or June 1 following the month in which the 2006 A Bonds are issued or in which the conversion to the Fixed Rate Mode occurs and each December 1 and June 1 thereafter; (4) the Fixed Rate Conversion Date; (5) with respect to a Series of ARCs, the Business Day following each Auction Period, and (6) the respective Maturity Dates of the 2006 Bonds.

### Interest Period

"Interest Period" means the period of time that an interest rate remains in effect, which period:

(1)     with respect to any Series of 2006 Bonds in an Auction Mode, shall be the Auction Period; and

(2)     with respect to any Series of 2006 Bonds in a Weekly Mode, shall be the Weekly Rate Period; and

(3)     with respect to a Series of 2006 Bonds in the Daily Mode, shall be Daily Rate Period; and

(4)     with respect to a Series of 2006 Bonds in a Fixed Rate Mode, shall be the period from the Fixed Rate Conversion Date with respect thereto until the final maturity thereof.

### Interest Rate Agreement

"Interest Rate Agreement" means, with respect to the 2006 B Bonds and the 2006 C Bonds, the ISDA Master Agreement between the Obligated Group Agent and the Swap Provider, as supplemented by Confirmations of Transactions dated as of May 22, 2006, entered into between the Obligated Group Agent and the UBS Securities LLC and any substitute or successor interest rate swap, interest rate cap or similar agreement acceptable to the Bond Insurer and the Rating Agencies.

### Interested Parties

"Interested Parties" means the Authority, the Obligated Group Agent, the Bond Trustee, the Tender Agent, the Credit Facility Provider, the Remarketing Agent, the Auction Agent (if any), the Broker-Dealer (if any), the Swap Provider (if any), and the Holders.

### Investment Securities

"Investment Securities" means investments in any of the following:

(1)     Cash (insured at all times by the Federal Deposit Insurance Corporation),

(2)     Obligations of, or obligations guaranteed as to principal and interest by, the U.S. or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the U.S. including:

> -U.S. treasury obligations
> -All direct or fully guaranteed obligations
> -Farmers Home Administration
> -General Services Administration
> -Guaranteed Title XI financing
> -Government National Mortgage Association (GNMA)
> -State and Local Government Series from the United States Department of Treasury, Bureau of Public Debt

(3)     Obligations of Government – Sponsored Agencies that are not backed by the full faith and credit of the U.S. Government:

C-14

-Federal Home Loan Mortgage Corp. (FHLMC) Debt obligations
-Farm Credit System (formerly: Federal Land Banks, Federal Intermediate
Credit Banks, and Banks for Cooperatives)
-Federal Home Loan Banks (FHL Banks)
-Federal National Mortgage Association (FNMA) Debt obligations
-Financing Corp. (FICO) Debt obligations
-Resolution Funding Corp. (REFCORP) Debt obligations
-U.S. Agency for International Development (U.S. A.I.D) Guaranteed
notes

(4)     Obligations of any of the following federal agencies which obligations
represent the full faith and credit of the United States of America, including:

-Export-Import Bank
-Rural Economic Community Development Administration
-U.S. Maritime Administration
-Small Business Administration
-U.S. Department of Housing & Urban Development (PHAs)
-Federal Housing Administration          ᛫
-Federal Financing Bank

(5)     Direct obligations of any of the following federal agencies which
obligations are not fully guaranteed by the full faith and credit of the United States of
America:

-Senior debt obligations issued by the Federal National Mortgage
Association (FNMA) or Federal Home Loan Mortgage Corporation
- (FHLMC).
-Obligations of the Resolution Funding Corporation (REFCORP).
-Senior debt obligations of the Federal Home Loan Bank System.
-Senior debt obligations of other Government Sponsored Agencies
approved by the Bond Insurer.

(6)     U.S. dollar denominated deposit accounts, federal funds and bankers'
acceptances with domestic commercial banks which have a rating on their short term
certificates of deposit at the time of purchase of "P-1" by Moody's and "A-1" or "A-1+"
by S&P and maturing not more than 360 calendar days after the date of purchase.
(Ratings on holding companies are not considered as the rating of the bank);

(7)     Commercial paper which is rated at the time of purchase in the single
highest classification, "P- 1" by Moody's and "A-1+" by S&P and which matures not
more than 270 calendar days after the date of purchase;

(8)     Investments in a money market fund rated at the time of purchase
"AAAm" or "AAAm-G" or better by S&P;

(9)     Pre-refunded Municipal Obligations defined as follows: any bonds or other obligations of any state of the United States of America or of any agency, instrumentality or local governmental unit of any such state which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(A)     which are rated at the time of purchase, based on an irrevocable escrow account or fund (the "escrow "), in the highest rating category of Moody's or S&P or any successors thereto; or

(B)     (i) which are fully secured as to principal and interest and redemption premium, if any, by an escrow consisting only of cash or obligations described in paragraph (2) above, which escrow may be applied only to the payment of such principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (ii) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate; and

(10)     Municipal obligations rated at the time of purchase "Aaa/AAA" or general obligations of States with a rating of "A2/A" or higher by both Moody's and S&P.

(11)     Investment Agreements approved in writing by the Bond Insurer (supported by appropriate opinions of counsel).

(12)     Other forms of investments (including repurchase agreements) approved in writing by the Bond Insurer.

The value of the above investments shall be determined as follows:

(A) For the purpose of determining the amount in any fund, all Securities Investment credited to such fund shall be valued at fair market value. The Trustee shall determine the fair market value based on accepted industry standards and from accepted industry providers. Accepted industry providers shall include but are not limited to pricing services provided by Financial Times Interactive Data Corporation, Merrill Lynch, Citigroup Global Markets Inc., Bear Stearns, or Lehman Brothers.

(B) As to certificates of deposit and bankers' acceptances: the face amount thereof, plus accrued interest thereon; and

(C) As to any investment not specified above: the value thereof established by prior agreement among the Authority, the Trustee, and the Bond Insurer.

## Liquidity Agreement Default

"Liquidity Agreement Default" means each "default" or "event of default," if any, under the initial Liquidity Facility or a Substitute Liquidity Facility the consequence of which is that the Bank may require a mandatory tender of a Series of 2006 Bonds pursuant to Section 11.05 of the Bond Indenture.

## Liquidity Facility

"Liquidity Facility" means the obligation of the Bank to provide funds for the purpose of purchasing Tendered Bonds which Liquidity Facility may be in the form of a line of credit, bond purchase agreement or letter of credit approved by the Bond Insurer, which approval shall not be unreasonably withheld.

## Liquidity Facility Agreement

"Liquidity Facility Agreement" means, initially, the line of credit agreement, bond purchase agreement or letter of credit agreement pursuant to which the Initial Bank agrees to issue the Initial Liquidity Facility as such agreement may from time to time be amended or supplemented, and thereafter means the agreement pursuant to which the Substitute Bank agrees to issue any Substitute Liquidity Facility at the time in effect, as such agreement may from time to time be amended or supplemented, which agreement must be acceptable to the Bond Insurer.

## Liquidity Facility Cancellation Date

"Liquidity Facility Cancellation Date" has the meaning attributed to it in Section 6.12(b) of the Bond Indenture.

## Liquidity Facility Failure Purchase Date

"Liquidity Facility Failure Purchase Date" means the first Interest Payment Date which is at least 90 days subsequent to the date on which a Special Default or Liquidity Facility Event of Default occurred.

## Liquidity Substitution Date

"Liquidity Substitution Date" means the day on which a Substitute Liquidity Facility becomes effective.

## Loan

"Loan" means the loan made by the Authority to the Obligated Group of the proceeds of the 2006 Bonds and the obligations of the Obligated Group to repay as evidenced by the 2006-1A Note with respect to the 2006 A Bonds, the 2006-1B Note with respect to the 2006 B Bonds, the 2006-1C Note with respect to the 2006 C Bonds, and the 2006-1D Note with respect to the 2006 D Bonds.

## Loan Agreement

"Loan Agreement" means that certain Loan Agreement, dated as of June 8, 2006 between the Authority and the Obligated Group Agent, as originally executed and as it may from time to time be supplemented, modified or amended in accordance with the terms thereof and of the Bond Indenture.

## Loan Default Event

"Loan Default Event" means any of the events specified in Section 6.1 of the Loan Agreement.

## Loan Repayments

"Loan Repayments" means the payments so designated and required to be made by the Obligated Group pursuant to Section 3.1 of the Loan Agreement.

## Mandatory Sinking Account Payment

"Mandatory Sinking Account Payment" means the amount required by Section 4.01 of the Bond Indenture to be paid by the Bond Trustee on any single date for the retirement of 2006 Bonds.

## Mandatorily Tendered Bonds

"Mandatorily Tendered Bonds" means a Series of 2006 Bonds required to be tendered for purchase on a Mandatory Tender Date.

## Mandatory Tender Date

"Mandatory Tender Date" means any date on which a Holder of a 2006 Bond is required to tender any 2006 Bond for purchase in accordance with Sections 11.03, 11.04, 11.05, 11.06 or 11.08 of the Bond Indenture.

## Master Documents

"Master Documents" means the Master Indenture, all Supplemental Indentures, the 2006 Notes, all Notes heretofore or hereafter issued, and the Loan Agreement.

## Master Indenture

"Master Indenture" means the Amended and Restated Master Trust Indenture, dated as of August 1, 2003, as amended and supplemented, between the Obligated Group and Huntington National Bank, as Master Trustee.

Master Trustee

"Master Trustee" means Huntington National Bank, or any successor as trustee under the Master Indenture.

Maturity Date

"Maturity Date" means with respect to the 2006 A Bonds, the following Maturity Dates (each June 1 in the indicated years) and Principal Amount:

| Maturity Date (June 1) | Principal Amount |
|---|---|
| 6/1/2015 | $1,480,000 |
| 6/1/2016 | 1,550,000 |
| 6/1/2017 | 1,630,000 |
| 6/1/2018 | 1,695,000 |
| 6/1/2019 | 1,780,000 |
| 6/1/2020 | 1,870,000 |
| 6/1/2022 | 4,020,000 |
| 6/1/2024 | 4,435,000 |
| 6/1/2026 | 4,875,000 |
| 6/1/2031 | 14,320,000 |
| 6/1/2034 | 10,300,000 |
| 6/1/2037 | 11,825,000 |
| 6/1/2041 | 18,830,000 |

and with respect to the ARCs, June 1, 2041, or with respect to any Series of 2006 Bonds upon conversion to the Fixed Rate Mode, such maturities determined pursuant to Section 4.11 of the Bond Indenture, provided however that while a Series of 2006 Bonds bear interest at the Auction Rate, if such June 1 is not an Interest Payment Date, the Maturity Date shall be the Interest Payment Date immediately preceding such June 1.

Maximum Auction Rate

"Maximum Auction Rate" means the lesser of 12% per annum and the maximum interest rate permitted by law.

Maximum Rate

"Maximum Rate" means (i) with respect to all 2006 Bonds other than Bank Bonds, and a Series of 2006 Bonds in the Auction Mode, the lesser of 12% per annum and the maximum interest rate permitted by law, and (ii) with respect to Bank Bonds, the lesser of 25% per annum and the maximum interest rate permitted by law.

Mode

"Mode" means, as the context may require, the Auction Mode, the Fixed Rate Mode, the Daily Mode or the Weekly Mode.

Moody's

"Moody's" means Moody's Investors Service, Inc., a corporation organized and existing under the laws of the State of Delaware, its successors and their assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Obligated Group Agent by notice to the Authority, the Credit Facility Provider and the Bond Trustee.

Obligated Group Agent

"Obligated Group Agent" means West Virginia University Hospitals, Inc., a nonprofit corporation duly organized and existing under the laws of the State of West Virginia, and any permitted successor to WVUH as Obligated Group Agent.

Obligated Group Bonds

"Obligated Group Bonds" means 2006 Bonds owned by or held for the benefit of the Obligated Group.

Obligated Group Purchase Account

"Obligated Group Purchase Account" means the account by that name within the Bond Purchase Fund established pursuant to Section 4.09 of the Bond Indenture.

Officer's Certificate

"Officer's Certificate" means a certificate signed by the chief executive officer or the chief financial officer of the Obligated Group Agent or other Person duly appointed to act on behalf of the Obligated Group Agent.

Opinion of Counsel

"Opinion of Counsel" means a written opinion of counsel (who may be counsel for the Obligated Group) selected by the Obligated Group and acceptable to the Authority and not objected to by the Bond Trustee and the Credit Facility Provider. If and to the extent required by the provisions of Section 1.02 of the Bond Indenture, each Opinion of Counsel shall include the statements provided for in Section 1.02 of the Bond Indenture.

Optional Redemption Account

"Optional Redemption Account" means the account by that name within the Redemption Fund established pursuant to Section 5.04 of the Bond Indenture.

Optional Tender Date

"Optional Tender Date" means the date specified by a Bondholder in a Tender Notice for purchase of any 2006 Bond during a Variable Rate Period in accordance with Section 11.02 of the Bond Indenture.

Optionally Tendered Bonds

"Optionally Tendered Bonds" means the 2006 Bonds tendered or deemed tendered for purchase on an Optional Tender Date.

Outstanding

"Outstanding," when used as of any particular time with reference to 2006 Bonds, means (subject to the provisions of Section 12.09 of the Bond Indenture) all 2006 Bonds theretofore, or thereupon being, authenticated and delivered by the Bond Trustee under the Bond Indenture except: (1) 2006 Bonds theretofore cancelled by the Bond Trustee or surrendered to the Bond Trustee for cancellation; (2) 2006 Bonds with respect to which all liability of the Authority shall have been discharged in accordance with Section 10.02 of the Bond Indenture, including 2006 Bonds (or portions of 2006 Bonds) referred to in Section 12.10 of the Bond Indenture; and (3) 2006 Bonds for the transfer or exchange of or in lieu of or in substitution for which other 2006 Bonds shall have been authenticated and delivered by the Bond Trustee pursuant to the Bond Indenture; provided, however, notwithstanding anything herein to the contrary, in the event that the principal and/or interest due on the 2006 Bonds shall be paid by the Bond Insurer pursuant to the Financial Guaranty Insurance Policy, the 2006 Bonds shall remain Outstanding for all purposes, not be defeased or otherwise satisfied and not be considered paid by the Obligated Group, and the assignment and pledge of the Trust Estate and all covenants, agreements and other obligations of the Obligated Group to the Holders shall continue to exist and shall run to the benefit of the Bond Insurer, and the Bond Insurer shall be subrogated to the rights of such Holders.

Person

"Person" means an individual, corporation, firm, association, partnership, trust, or other legal entity or group of entities, including a governmental entity or any agency or political subdivision thereof.

Principal Corporate Trust Office

"Principal Corporate Trust Office" means, for notice purposes: the office of the Bond Trustee at 385 Rifle Camp Road, 3rd Floor, West Patterson, New Jersey 07424; and for purposes of presentation of 2006 Bonds for payment or transfer, to the same address.

Principal Fund

"Principal Fund" means the fund by that name established pursuant to Section 5.03 of the Bond Indenture.

Principal Payment Date

"Principal Payment Date" means, with respect to a 2006 Bond, the date on which principal of such 2006 Bond becomes due and payable, either by maturity, redemption, acceleration or otherwise.

Proceeds

"Proceeds" means the first offering price of the 2006 Bonds.

Project

"Project" means the Acquisition Expense.

Project Fund

"Project Fund" means the fund by that name established pursuant to Section 3.04 of the Bond Indenture.

Proposed Fixed Rate Conversion Date

"Proposed Fixed Rate Conversion Date" means the date indicated in the written notice of the Obligated Group Agent given pursuant to Section 2.11 of the Bond Indenture on which the Obligated Group Agent intends to effect a conversion of the interest rate on a Series of 2006 Bonds to the Fixed Rate.

Purchase Price

"Purchase Price" means an amount equal to the principal amount of any 2006 Bonds purchased on a Conversion Date, plus accrued interest thereon, if any, to the Conversion Date.

Rate Determination Date

"Rate Determination Date," when used with respect to a Series of 2006 Bonds, means the date on which the interest rate(s) with respect to such Series of 2006 Bonds shall be determined, which, (i) in the case of the Fixed Rate Mode, shall be a date determined by the Remarketing

Agent which shall be at least one Business Day prior to the Fixed Rate Conversion Date; and (ii) in the case of Auction Rate Securities, shall be the Auction Date; (iii) in the case of the Weekly Mode shall be each Wednesday; and (iv) in the case of the Daily Mode, shall be each Business Day.

## Rate Period

"Rate Period" means a Fixed Rate Period, Auction Rate Period, Daily Rate Period or Weekly Rate Period.

## Rating Agencies

"Rating Agencies" means S&P, Moody's and Fitch.

## Rating Category

"Rating Category" means one of the general rating categories of the Rating Agencies without regard to any refinement or graduation of such rating category by numerical modifier or otherwise.

## Rebate Fund

"Rebate Fund" means the fund by that name established pursuant to Section 5.06 of the Bond Indenture.

## Record Date

"Record Date" means (i) with respect to a Series of 2006 Bonds in the Auction Mode, the applicable number of Business Days immediately preceding each Interest Payment Date, (ii) with respect to a Series of 2006 Bonds in a Fixed Rate Mode, the 15th day (whether or not a Business Day) of the month immediately preceding each Interest Payment Date, (iii) with respect to a Series of 2006 Bonds in the Weekly Mode, the Business Day immediately preceding an Interest Payment Date; and (iv) with respect to a Series of 2006 Bonds in the Daily Mode, the last Business Day of each calendar month, or in the case of the last Interest Payment Date in respect of a Series of 2006 Bonds in the Daily Mode, the Business Day immediately preceding such Interest Payment Date.

## Redemption Price

"Redemption Price" means, with respect to any 2006 Bond (or portion thereof), the price to be paid upon redemption as set forth in Article IV of the Bond Indenture.

Reimbursement Agreement

"Reimbursement Agreement" means any agreement between the Obligated Group Agent and a Credit Facility Provider pursuant to which a Credit Facility, as amended, supplemented or extended from time to time in accordance with the provisions thereof.

Remarketing Agent

"Remarketing Agent" means, initially UBS Securities LLC, and any successor remarketing agent appointed by the Obligated Group Agent in accordance with Section 4.11 of the Bond Indenture and not objected to by the Authority or the Bond Insurer.

Remarketing Agreement

"Remarketing Agreement" means that certain remarketing agreement between the Obligated Group Agent and the Remarketing Agent, as such agreement may from time to time be amended and supplemented, to remarket a Series of 2006 Bonds delivered or deemed to be delivered for purchase by the Holders thereof.

Remarketing Proceeds Account

"Remarketing Proceeds Account" means the account by that name within the Bond Purchase Fund established pursuant to Section 4.09 of the Bond Indenture.

Requisition

"Requisition" means a document signed by an Authorized Representative directing the Bond Trustee to make the payments described therein from the Cost of Issuance Fund, the Project Fund or the Capitalized Interest Fund, as the case may be.

Revenues

"Revenues" means all amounts received by the Authority or the Bond Trustee for the account of the Authority pursuant or with respect to the Loan Agreement and the 2006 Notes, including, without limiting the generality of the foregoing, Loan Repayments (including both timely and delinquent payments, any late charges, and whether paid from any source), and other income and receipts, in each case derived by or for the account of the Authority or the Bond Trustee, from the Obligated Group including without limitation all interest, profits or other income derived from the investment of amounts in any fund or account established pursuant to the Bond Indenture, but not including any administrative fees or expenses or any moneys required to be deposited in the Rebate Fund or the Bond Purchase Fund.

C-24

S&P

"S&P" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., a corporation organized and existing under the laws of the state of its organization, its successors and their assigns, or, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, any other nationally recognized securities rating agency designated by the Obligated Group Agent by notice to the Authority, the Credit Facility Provider and the Bond Trustee.

Securities Depository

"Securities Depository" means The Depository Trust Company and its successors and assigns, or any other securities depository selected as set forth in Section 2.07 of the Bond Indenture, which agrees to follow the procedures required to be followed by such securities depository in connection with the 2006 Bonds.

Series

"Series," or "series" when used with respect to the 2006 Bonds, means all the 2006 Bonds designated as being of the same series, authenticated and delivered in a simultaneous transaction, and any 2006 Bonds thereafter authenticated and delivered upon a transfer or exchange or in lieu of or in substitution for such 2006 Bonds as herein provided.

Special Default

"Special Default" means each "default" or "event of default," if any, under the initial Liquidity Facility Agreement or a Substitute Liquidity Agreement the consequence of which is that the obligation of the Bank to provide funds for the purchase of Tendered Bonds is either suspended or terminated without prior notice to Bondholders.

Special Record Date

"Special Record Date" means the date established by the Bond Trustee pursuant to Section 2.04(c) of the Bond Indenture as a record date for the payment of defaulted interest on the 2006 Bonds.

Special Redemption Account

"Special Redemption Account" means the account by that name within the Redemption Fund established pursuant to Section 5.04 of the Bond Indenture.

Special Default

"Special Default" means each "default" or "event of default," if any, under the initial Liquidity Facility Agreement or a Substitute Liquidity Agreement the consequence of which is that the obligation of the Bank to provide funds for the purchase of Tendered Bonds is either suspended or terminated without prior notice to Bondholders.

Stated Expiration Date

"Stated Expiration Date" means the stated date of expiration or termination of the Liquidity Facility, including any extensions thereof..

Subordinated Swap Notes

"Subordinated Swap Notes" means collectively the 2006-1F Subordinated Note and the 2006-1H Subordinated Note.

Substitute Bank

"Substitute Bank" means one or more commercial banks, trust companies or financial institutions obligated under any Substitute Liquidity Agreement and acceptable to the Bond Insurer.

Substitute Liquidity Agreement

"Substitute Liquidity Agreement" means any agreement (other than the initial Liquidity Facility Agreement) between the Obligated Group Agent and any Substitute Bank (which agreement shall be satisfactory in form and substance to the Bond Insurer) as it may from time to time be amended or supplemented, pursuant to which a Substitute Liquidity Facility shall be in effect.

Substitute Liquidity Facility

"Substitute Liquidity Facility" means a Liquidity Facility acceptable to the Bond Insurer and the Remarketing Agent provided by a Substitute Bank other than the Bank providing the Liquidity Facility on or prior to the Liquidity Substitution Date; however, none of the following shall be deemed a Substitute Liquidity Facility: (i) a change in the Liquidity Facility Agreement pursuant to which the Liquidity Facility is issued; (ii) a change in the number of days of interest or interest rate covered by the Liquidity Facility; and (iii) a renewal of the term of the existing Liquidity Facility if, in the case of such renewal, there is delivered to the Bond Trustee, the Bond Insurer and the Remarketing Agent an opinion of counsel for the Bank or the Substitute Bank regarding the enforceability of such Liquidity Facility in substantially the form delivered to the Bond Trustee upon execution and delivery of the initial Liquidity Facility Agreement.

Supplemental Bond Indenture

"Supplemental Bond Indenture" means any indenture hereafter duly authorized and entered into between the Authority and the Bond Trustee, supplementing, modifying or amending the Bond Indenture; but only if and to the extent that such Supplemental Bond Indenture is specifically authorized hereunder.

Supplemental Indenture 2006-2

"Supplemental Indenture 2006-2" means the Supplemental Master Trust Indenture 2006-2, dated as of the date hereof, between the Obligated Group Agent and the Master Trustee (a)

pursuant to which the 2006 Notes are issued; (b) to provide for certain covenants and agreements with the Bond Insurer; and (c) relating to the Interest Rate Agreement.

## Supplemental Indenture

"Supplemental Indenture" means any supplemental master trust indenture issued pursuant to the Master Indenture, including Supplemental Indenture 2006-2.

## Swap Notes

"Swap Notes" means collectively the 2006-1E Note and 2006-1G Note.

## Swap Provider

"Swap Provider" shall mean the counterparty to the Obligated Group pursuant to any Interest Rate Agreement and shall mean UBS AG with respect to the Initial Swap Agreement.

## Tax Compliance Certificate

"Tax Compliance Certificate" means the Tax Compliance Certificate of the Authority and the Obligated Group Agent, each dated the Closing Date and included in the transcript of which the Bond Indenture is a part.

## Tender Agent

"Tender Agent" means the tender agent appointed in accordance with Section 11.01 of the Bond Indenture.

## Tender Notice

"Tender Notice" means the notice from a 2006 Bondholder to the Bond Trustee of an Optional Tender Date in accordance with the provisions set forth in the Bond Indenture.

## Tender Price

"Tender Price" means 100% of the principal amount of any 2006 Bond plus, if an Optional Tender Date or Mandatory Tender Date is not an Interest Payment Date, interest accrued and unpaid thereon to, but not including, the Optional Tender Date or Mandatory Tender Date with respect to such 2006 Bond.

## Tendered Bonds

"Tendered Bonds" means Optionally Tendered Bonds and Mandatorily Tendered Bonds.

## Trust Estate

"Trust Estate" has the meaning set forth in the preambles of the Bond Indenture.

## Unassigned Rights

"Unassigned Rights" means the rights of the Authority to indemnification, payment and reimbursement of its fees and expenses, and to receive notices and grant approvals, consents and waivers.

## Underwriter

"Underwriter" means UBS Securities LLC.

## Unmatured Default

"Unmatured Default" means each "default" or "event of default," if any, under the initial Liquidity Facility Agreement or a Substitute Liquidity Agreement the consequence of which is that the obligation of the Bank to provide funds for the purchase of Tendered Bonds is suspended without prior notice to Bondholders.

## Unrelated Trade or Business

"Unrelated Trade or Business" means an activity which constitutes an "unrelated trade or business" within the meaning of Section 513(a) of the Code without regard to whether such activity results in unrelated trade or business income subject to taxation under Section 512(a) of the Code.

## Variable Mode

"Variable Mode" means either a Daily Mode or Weekly Mode, as the case may be.

## Variable Rate

"Variable Rate" means either a Daily Rate or a Weekly Rate, as the case may be.

## Variable Rate Adjustment Date

"Variable Rate Adjustment Date" means either a Daily Rate Adjustment Date or a Weekly Rate Adjustment Date, as the case may be.

## Variable Rate Conversion Date

"Variable Rate Conversion Date" means either a Daily Rate Conversion Date or a Weekly Rate Conversion Date, as the case may be.

### Variable Rate Period

"Variable Rate Period" means either a Daily Rate Period or a Weekly Rate Period, as the case may be.

### Weekly Mode

"Weekly Mode" means the Mode during which a series of 2006 Bonds bear interest at the Weekly Rate.

### Weekly Rate

"Weekly Rate" means, with respect to the then effective Weekly Rate Period, the lowest interest rate which, in the judgment of the Remarketing Agent, would enable a series of 2006 Bonds to be remarketed at the principal amount thereof, plus accrued interest thereon, if any, on the Weekly Rate Adjustment Date with respect thereto (or, if the Remarketing Agent for any reason fails to determine such rate, the rate determined in accordance with the provisions set forth in the Bond Indenture).

### Weekly Rate Adjustment Date

"Weekly Rate Adjustment Date" means the Business Day immediately preceding the first day of each Weekly Rate Period.

### Weekly Rate Conversion Date

"Weekly Rate Conversion Date" means a date on which a series of 2006 Bonds begins to bear interest at a Weekly Rate for any Weekly Rate Period which succeeds an Auction Rate Period or a Daily Rate Period.

### Weekly Rate Period

"Weekly Rate Period" means any weekly period from and commencing on Wednesday of any calendar week and including and ending on the Tuesday of the next calendar week; provided, however, that any Weekly Rate Period which does not follow another Weekly Rate Period shall commence on the Weekly Rate Conversion Date with respect thereto and end on the first or second Tuesday thereafter, at the discretion of the Remarketing Agent in order to most efficiently effect the conversion, and any Weekly Rate Period which is not followed by another Weekly Rate Period shall commence on the last or second to last Wednesday of a calendar month, at the discretion of the Remarketing Agent in order to most efficiently effect the conversion, and end on the day preceding the first Business Day of the next calendar month. Notwithstanding anything herein to the contrary, a Weekly Rate Period may commence and end on any day selected at the discretion of the Remarketing Agent.

### 2006 Bonds

"2006 Bonds" means, collectively, the 2006 A Bonds, the 2006 B Bonds, the 2006 C Bonds and the 2006 D Bonds.

2006 A Bonds

"2006 A Bonds" means the West Virginia Hospital Finance Authority West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series A, authorized by, and at any time Outstanding pursuant to, the Bond Indenture.

2006 B Bonds

"2006 B Bonds" means the West Virginia Hospital Finance Authority West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series B Auction Rate Certificates (ARCs [SM]), authorized by, and at any time Outstanding pursuant to, the Bond Indenture.

2006 C Bonds

"2006 C Bonds" means the West Virginia Hospital Finance Authority West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series C Auction Rate Certificates (ARCs [SM]), authorized by, and at any time Outstanding pursuant to, the Bond Indenture.

2006 D Bonds

"2006 D Bonds" means the West Virginia Hospital Finance Authority West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series D Auction Rate Certificates (ARCs [SM]), authorized by, and at any time Outstanding pursuant to, the Bond Indenture.

2006-1A Note

"2006-1A Note" means the 2006-1A Note issued by the Obligated Group in a principal amount equal to the principal amount of the 2006 A Bonds pursuant to Supplemental Indenture 2006-2, which Note evidences and secures the obligations of the Obligated Group with respect to the 2006 A Bonds under the Loan Agreement.

2006-1B Note

"2006-1B Note" means the 2006-1B Note issued by the Obligated Group in a principal amount equal to the principal amount of the 2006 B Bonds pursuant to Supplemental Indenture 2006-2, which Note evidences and secures the obligations of the Obligated Group with respect to the 2006 B Bonds under the Loan Agreement.

## 2006-1C Note

"2006-1C Note" means the 2006-1C Note issued by the Obligated Group in a principal amount equal to the principal amount of the 2006 C Bonds pursuant to Supplemental Indenture 2006-2, which Note evidences and secures the obligations of the Obligated Group with respect to the 2006 C Bonds under the Loan Agreement.

## 2006-1D Note

"2006-1D Note" means the 2006-1D Note issued by the Obligated Group in a principal amount equal to the principal amount of the 2006 D Bonds pursuant to Supplemental Indenture 2006-2, which Note evidences and secures the obligations of the Obligated Group with respect to the 2006 D Bonds under the Loan Agreement.

## 2006-1E Note

"2006-1E Note" means the 2006-1E Note issued by the Obligated Group in a notional amount equal to the principal amount of the 2006 B Bonds pursuant to Supplemental Indenture 2006-2, which Note evidences and secures the obligations of the Obligated Group with respect to the amounts regularly coming due and any termination payment (other than a Voluntary Termination Payment) due under the Interest Rate Agreement as it pertains to the 2006 B Bonds.

## 2006-1F Subordinated Note

"2006-1F Subordinated Note" means the 2006-1F Subordinated Note issued by the Obligated Group in the maximum notional amount of \$2,500,000, pursuant to Supplemental Indenture 2006-2, which Note evidences and secures the obligations of the Obligated Group with respect to a Voluntary Termination Payment due under the Interest Rate Agreement with respect to the 2006 B Bonds.

## 2006-1G Note

"2006-1G Note" means the 2006-1G Note issued by the Obligated Group in a notional amount equal to the principal amount of the 2006 C Bonds pursuant to Supplemental Indenture 2006-2, which Note evidences and secures the obligations of the Obligated Group with respect to the amounts regularly coming due and any termination payment (other than a Voluntary Termination Payment) due under the Interest Rate Agreement as it pertains to the 2006 C Bonds. (The 2006-1E Note and 2006-1G Note are collectively referred to as the "Swap Notes").

## 2006-1H Subordinated Note

"2006-1H Subordinated Note" means the 2006-1H Subordinated Note issued by the Obligated Group in the maximum notional amount of \$2,000,000, pursuant to Supplemental Indenture 2006-2, which Note evidences and secures the obligations of the Obligated Group with respect to a Voluntary Termination Payment due under the Interest Rate Agreement with respect

to the 2006 C Bonds. The 2006-1F Subordinated Note and the 2006-1H Subordinated Note are collectively referred to as the "Subordinated Swap Notes").

2006 Notes

"2006 Notes" means collectively the 2006-1A Note, the 2006-1B Note, the 2006-1C Note, and the 2006-1D Note; but does not include the Swap Notes and Subordinated Swap Notes.

## THE MASTER INDENTURE

*The following is a summary of certain provisions of the Master Indenture. Reference is made to the Master Indenture for the detailed provisions thereof.*

### Authorization and Issuance of Obligations

Obligations may be issued under the Master Indenture to (a) evidence Indebtedness, (b) evidence any repayment obligation under an Interest Rate Agreement, or (c) evidence a reimbursement obligation arising as a result of the issuance of a surety bond or other instrument guaranteeing or in effect guaranteeing any payments under an Interest Rate Agreement, as provided in the Master Indenture. So long as the requirements for the incurrence of Indebtedness imposed by the Master Indenture are met, the total principal amount of Obligations, the number of Obligations and the series of Obligations that may be created under the Master Indenture is not limited except as is set forth in the Master Indenture the Supplemental Master Indenture providing for the issuance of such Obligations. No obligations may be issued unless the provisions of the Master Indenture are followed.

### Covenants of the Obligated Group

*Payment of Principal, Premium and Interest.* Each Member unconditionally and irrevocably (subject to the right of such Member to cease its status as a Member of the Obligated Group pursuant to the terms and conditions of the Master Indenture), jointly and severally covenants that it will promptly pay the principal of, premium, if any, and interest on every Obligation issued under the Master Indenture at the place, on the dates and in the manner provided in the Master Indenture and in said Obligations according to the true intent and meaning thereof. Notwithstanding any schedule of payments upon the Obligations set forth in the Master Indenture or in the Obligations, each Member unconditionally and irrevocably (subject to the right of such Member to cease its status as a Member of the Obligated Group pursuant to the terms and conditions of the Master Indenture), jointly and severally agrees to make payments upon each Obligation and be liable therefor at the times and in the amounts (including principal, interest and premium, if any) equal to the amounts to be paid as interest, principal at maturity or by mandatory sinking fund redemption, or premium, if any, upon any Related Bonds from time to time Outstanding.

*Liens on Property.* No Lien on Property of any Member securing Indebtedness shall be classified a Permitted Encumbrance (as provided in clause (b) of the definition of Permitted Encumbrance), and therefore be permitted unless: (a) such Lien secures Non-Recourse

C-32

Indebtedness; or (b)(i) after giving effect to such Lien and all other Liens classified as Permitted Encumbrances under this subsection, the Book Value or, at the option of the Obligated Group Agent, the Current Value of the Property of the Obligated Group which is Encumbered is not more than 15% of the value of all of the Property of the Obligated Group (calculated on the same basis as the value of the Encumbered Property) and (ii) the conditions described in the Master Indenture are met for allowing the incurrence of one dollar of additional Funded Indebtedness.

*Insurance.* Each Member will maintain insurance (or self-insure if the Insurance Consultant or Insurance Consultants determines that such self-insurance meets the standards set forth in the Master Indenture and is prudent under the circumstance) with respect to its Property, the operation thereof and its business against such casualties, contingencies and risks (including but not limited to public liability and employee dishonesty) and in amounts not less than is customary in the case of corporations engaged in the same or similar activities and similarly situated and as is adequate to protect its Property and operations. The Obligated Group Agent will annually review the insurance (including self-insurance) each Member maintains as to whether such insurance is customary and adequate. In addition, the Obligated Group Agent shall at least once every three fiscal years (commencing with its fiscal year beginning January 1, 2004) cause a certificate of an Insurance Consultant or Insurance Consultants to be delivered to the Master Trustee which indicates that the insurance then being maintained by the Members is customary in the case of corporations engaged in the same or similar activities and similarly situated and is adequate to protect the Obligated Group's Property and operations. The Obligated Group Agent shall cause copies of its review, or the certificates of the Insurance Consultant or Insurance Consultants, as the case may be, to be delivered promptly to the Master Trustee, to each Related Bond Trustee and to each Related Issuer.

*Rates and Charges.* Each Member covenants and agrees to operate all of its Facilities on a revenue producing basis and to charge such fees and rates for its Facilities and services and to exercise such skill and diligence as to provide income from its Property together with other available funds sufficient to pay promptly all payments of principal and interest on its Indebtedness, all expenses of operation, maintenance and repair of its Property and all other payments required to be made by under the Master Indenture, to the extent permitted by law. Each Member further covenants and agrees that it will from time to time as often as necessary and to the extent permitted by law, revise its rates, fees and charges in such manner as may be necessary or proper to comply with the provisions of this Section.

The Members covenant and agree that they will cause the accountants certifying the report referred to in the Master Indenture to calculate the Historical Debt Service Coverage Ratio of the Obligated Group for the fiscal year covered by such report and to deliver a copy of such calculation to the Persons to whom such report is required to be delivered under such Master Indenture.

If in any fiscal year the Historical Debt Service Coverage Ratio of the Obligated Group is less than 1.10:1, the Master Trustee shall require the Obligated Group at its expense to retain a Consultant to make recommendations with respect to the rates, fees and charges of the Members and the Obligated Group's methods of operation and other factors affecting its financial condition in order to increase the Historical Debt Service Coverage Ratio to at least 1.10:1.

A copy of the Consultant's report and recommendations, if any, shall be filed with each Member, the Master Trustee, each Related Bond Trustee and each Related Issuer. Each Member shall follow each recommendation of the Consultant applicable to it and permitted by law. This Section shall not be construed to prohibit any Member from serving indigent patients to the extent required for such Member to continue its qualification as a Tax-Exempt Organization or from serving any other class or classes of patients without charge or at reduced rates so long as such service does not prevent the Obligated Group from satisfying the other requirements of this Section.

The foregoing provisions notwithstanding, if in any fiscal year the Historical Debt Service Coverage Ratio is less than 1.10:1, the Master Trustee shall not require the Obligated Group to retain a Consultant to make such recommendations if: (a) there is filed with the Master Trustee (who shall provide a copy to each Related Bond Trustee and Related Issuer) a written report addressed to them of a Consultant (which Consultant and report, including, without limitation, the scope, form, substance and other aspects of such report, are acceptable to the Master Trustee) which contains an opinion of such Consultant that applicable laws or regulations have prevented the Obligated Group from generating Income Available for Debt Service during such fiscal year in an amount sufficient to equal or exceed 110% of its Debt Service Requirement and such report is accompanied by a concurring opinion of Independent Counsel (which Counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) as to any conclusions of law supporting the opinion of such Consultant; (b) the report of such Consultant indicates that the rates charged by the Obligated Group are such that, in the opinion of the Consultant, the Obligated Group has generated the maximum amount of Revenues reasonably practicable given such laws or regulations; and (c) the Historical Debt Service Coverage Ratio of the Obligated Group for such fiscal year was no less than 1.00:1. The Obligated Group shall not be required to cause the Consultant's report referred to in the preceding sentence to be prepared more frequently than once every two fiscal years if at the end of the first of such two fiscal years the Obligated Group provides to the Master Trustee (who shall provide a copy to each Related Bond Trustee and Related Issuer) an opinion of Independent Counsel (which Counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) to the effect that the applicable laws and regulations underlying the Consultant's report delivered in respect of the previous fiscal year have not changed in any material way.

*Permitted Indebtedness.* Neither the Obligated Group nor any Member may incur any Indebtedness (whether or not incurred through the issuance of Obligations) other than:

(A) Funded Indebtedness, if prior to incurrence thereof or, if such Funded Indebtedness was incurred in accordance with another subsection of the Master Indenture and any Member wishes to have such Funded Indebtedness classified as having been issued under this subsection, prior to such classification, there is delivered to the Master Trustee:

(i) An Officer's Certificate from the Obligated Group Agent (which Officer's Certificate, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) stating that the Funded Indebtedness Ratio of the Obligated Group, after giving effect to the incurrence of

C-34

such Indebtedness and to the application of the proceeds thereof, does not exceed 0.67:1; or

(ii) An Officer's Certificate from the Obligated Group Agent (which Officer's Certificate, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) stating that the Historical Pro Forma Debt Service Coverage Ratio of the Obligated Group for the most recent fiscal year preceding the date of delivery of the report for which combined financial statements reported upon by independent certified public accountants are available was not less than 1.25:1; or

(iii) (a) An Officer's Certificate from the Obligated Group Agent (which Officer's Certificate, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) stating that the Historical Debt Service Coverage Ratio of the Obligated Group for the fiscal year next preceding the incurrence of such Funded Indebtedness for which combined financial statements reported upon by independent certified public accountants are available was not less than 1.10:1; and (b) (1) a written Consultant's report (which report, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) to the effect that the Projected Debt Service Coverage Ratio of the Obligated Group for each of the next two succeeding fiscal years or, if such Indebtedness is being incurred in connection with the financing of Facilities, the two fiscal years succeeding the projected completion date of such Facilities, is not less than 1.10:1, or (2) an Officer's Certificate from the Obligated Group Agent in a form acceptable to the Master Trustee to the effect that the Projected Debt Service Coverage Ratio of the Obligated Group for each of the next two succeeding fiscal years or, if such Indebtedness is being incurred in connection with the financing of Facilities, the two fiscal years succeeding the projected completion date of such Facilities, is not less than 1.20:1, provided that either of such reports shall include forecast balance sheets, statements of revenues and expenses and statements of cash flows for each of such two fiscal years and a statement of the relevant assumptions upon which such forecasted statements are based, which financial statements must indicate that sufficient revenues and cash flow could be generated to pay the operating expenses of the Obligated Group's proposed and existing Facilities and the debt service on the Obligated Group's other existing Indebtedness during such two fiscal years; provided that the requirements of the foregoing subsection (iii)(a) or (b), as the case may be, shall be deemed satisfied if (x) there is delivered to the Master Trustee the report of a Consultant (which report, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee and which contains the information required by the proviso to subsection (iii)(b) in the case of projections) which contains an opinion of such Consultant that applicable laws or regulations have prevented or will prevent the Obligated Group from generating the amount of Income Available for Debt Service required to be generated by subsection (iii)(a) or (b), as the case may be, as a prerequisite to the issuance of Funded Indebtedness, and, if requested by the Master Trustee, such report is accompanied

C-35

by a concurring opinion of Independent Counsel (which Counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) as to any conclusions of law supporting the opinion of such Consultant, (y) the report of the Consultant indicates that the rates charged or to be charged by the Obligated Group are or will be such that, in the opinion of such Consultant, the Obligated Group has generated or will generate the maximum amount of Revenues reasonably practicable given such laws or regulations, and (z) the Historical Maximum Annual Debt Service Coverage Ratio of the Obligated Group and the Projected Debt Service Coverage Ratio of the Obligated Group referred to in the applicable subsection are at least 1.00:1.

(B)     Completion Funded Indebtedness, without limitation.

(C)     Funded Indebtedness for the purpose of refunding (whether in advance or otherwise, including, without limitation, refunding through the issuance of Cross-over Refunding Indebtedness) any Outstanding Funded Indebtedness.

(D)     Short-Term Indebtedness (other than Short-Term Indebtedness incurred in accordance with subsection (E) below) in a total principal amount which at the time incurred does not, together with the principal amount of all other such Short-Term Indebtedness of the Obligated Group then Outstanding under this subsection (D) and the principal payable on all Funded Indebtedness during the next succeeding 12 months, excluding such principal to the extent that amounts are on deposit in an irrevocable escrow and such amounts (including, where appropriate, the earnings or other increments to accrue thereon) are required to be applied to pay such principal and such amounts so required to be applied are sufficient to pay such principal, exceed 25% of the Revenues of the Obligated Group for the most recent fiscal year for which combined financial statements reported upon by independent certified public accountants are available; provided, however, that for a period of 20 consecutive calendar days in each fiscal year the total amount of such Short-Term Indebtedness of the Obligated Group Outstanding under this subsection (D) shall be not more than 5% of the Revenues of the Obligated Group during the preceding fiscal year plus such additional amount as the Obligated Group Agent certifies in an Officer's Certificate is (a) attributable to Short-Term Indebtedness incurred to offset a temporary delay in the receipt of funds due from third party payors and (b) in the minimum amount reasonably practicable taking into account such delay. For the purposes of this subsection (D), Short-Term Indebtedness shall not include overdrafts to banks to the extent there are immediately available funds of the Obligated Group sufficient to pay such overdrafts and such overdrafts are incurred and corrected in the normal course of business.

(E)     Short-Term Indebtedness if:

(i)     There is in effect at the time the Short-Term Indebtedness provided for by this subsection (E) is incurred a binding commitment (including, without limitation, letters or lines of credit or insurance) which may be subject only to commercially reasonable contingencies, by a financial institution generally regarded as responsible, which commitment and institution are acceptable to the

C-36

Master Trustee and each Related Issuer, to provide financing sufficient to pay such Short-Term Indebtedness at its maturity; and

(ii)     The conditions described in subsection (A) above are met with respect to such Short-Term Indebtedness when it is assumed that such Short-Term Indebtedness is Funded Indebtedness maturing over 30 years from the date of issuance of the Short-Term Indebtedness, bears interest on the unpaid principal balance at the Projected Rate and is payable on a level annual debt service basis over a 30-year period.

(F)     Non-Recourse Indebtedness, without limitation.

(G)     Balloon Indebtedness if:

(i)(a)  there is in effect at the time such Balloon Indebtedness is incurred a binding commitment (including, without limitation, letters or lines of credit) which may be subject only to commercially reasonable contingencies by a financial institution generally regarded as responsible, which commitment and institution are acceptable to the Master Trustee and each Related Issuer, to provide financing sufficient to pay the principal amount of such Balloon Indebtedness coming due in each consecutive 12 month period in which 25% or more of the original principal amount of such Balloon Indebtedness comes due; and

(b)     the conditions set forth in subsection (A) above are met with respect to such Balloon Indebtedness when the assumptions set forth in subsection (E)(ii) above are made with respect to the portion of such Balloon Indebtedness becoming due during each such 12 month period; or

(ii)(a)  a Member establishes in an Officer's Certificate filed with the Master Trustee an amortization schedule for such Balloon Indebtedness, which amortization schedule shall provide for payments of principal and interest for each fiscal year that are not less than the amounts required to make any actual payments required to be made in such fiscal year by the terms of such Balloon Indebtedness;

(b) such Member agrees in such Officer's Certificate to deposit for each fiscal year with a bank or trust company (pursuant to an agreement between such Member and such bank or trust company, which agreement shall be satisfactory in form and substance to the Master Trustee) the amount of principal shown on such amortization schedule net of any amount of principal actually paid on such Balloon Indebtedness during such fiscal year (other than from amounts on deposit with such bank or trust company) which deposit shall be made prior to any such required actual payment during such fiscal year if the amounts so on deposit are intended to be the source of such actual payments; and

C-37

(c) the conditions described in subsection (A) above are met with respect to such Balloon Indebtedness when it is assumed that such Balloon Indebtedness is actually payable in accordance with such amortization schedule.

(H)     Put Indebtedness if the conditions set forth in subsection (A) above are met with respect to such Put Indebtedness when it is assumed that such Put Indebtedness bears interest at the Projected Rate and is payable on a level annual debt service basis over a 30-year period commencing with the next succeeding Put Date.

(I)     Guaranties by any Member of the payment by another Person of a sum certain; provided that the conditions set forth in the Master Indenture are satisfied if it is assumed that the Indebtedness guaranteed is Funded Indebtedness of such Member. In making the calculation required by this subsection (I) the Obligated Group's Income Available for Debt Service shall not be deemed to include any Revenues of the Primary Obligor and the debt service payable with respect to the Indebtedness guaranteed shall be calculated in accordance with the assumptions contained in the Master Indenture.

(J)     Liabilities for contributions to self-insurance or shared or pooled-risk insurance programs required or permitted to be maintained under the Master Indenture.

(K)     Commitment Indebtedness, without limitation.

(L)     Indebtedness consisting of accounts payable incurred in the ordinary course of business or other Indebtedness not incurred or assumed primarily to assure the repayment of money borrowed or credit extended which Indebtedness is incurred in the ordinary course of business.

(M)     Indebtedness the principal amount of which at the time incurred, together with the aggregate principal amount of all other Indebtedness then Outstanding which was issued pursuant to the provisions of this subsection (M) and which has not been subsequently reclassified as having been issued under subsection (A), (E), (G) or (H), does not exceed 10% of the Revenues of the Obligated Group for the latest preceding fiscal year for which combined financial statements reported upon by independent certified public accountants are available.

(N)     Indebtedness incurred in connection with a sale of accounts receivable with or without recourse on commercially reasonable terms by any Member consisting of an obligation to repurchase all or a portion of such accounts receivable upon certain conditions, provided that the principal amount of such Indebtedness permitted by the Master Indenture shall not exceed the aggregate face amount of such accounts receivable.

(O)     Subordinated Indebtedness, without limitation.

### Merger, Consolidation, Sale or Conveyance

Each Member agrees that it will not merge into, or consolidate with, one or more corporations that are not Members, or allow one or more of such non-Member corporations to

C-38

merge into it, or sell or convey all or substantially all of its Property to any Person who is not a Member, unless:

(ii)    Any successor corporation to such Member (including, without limitation, any purchaser of all or substantially all the Property of such Member) is a corporation organized and existing under the laws of the United States of America or a state thereof and shall execute and deliver to the Master Trustee an appropriate instrument, satisfactory to the Master Trustee, containing the agreement of such successor corporation to assume, jointly and severally, the due and punctual payment of the principal of, premium, if any, and interest on all Obligations according to their tenor and the due and punctual performance and observance of all the covenants and conditions of the Master Indenture to be kept and performed by such Member;

(iii)    Immediately after such merger or consolidation, or such sale or conveyance, no Member would be in default in the performance or observance of any covenant or condition of any Related Loan Document or the Master Indenture;

(iv)    Immediately after such merger or consolidation, or such sale or conveyance, the condition described in the Master Indenture would be met for the creation of a Lien on Property and the condition described in the Master Indenture would be met for the incurrence of one dollar of additional Funded Indebtedness, assuming that any Indebtedness of any successor or acquiring corporation is Indebtedness of such Member and that the Revenues and Expenses of the Member for such most recent fiscal year include the Revenues and Expenses of such other corporation; and

(v)    If all amounts due or to become due on all Related Bonds have not been fully paid to the holders thereof or fully provided for, there shall be delivered to the Master Trustee an opinion of nationally recognized municipal bond counsel (which counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) to the effect that under then existing law, the consummation of such merger, consolidation, sale or conveyance, whether or not contemplated on the original date of delivery of such Related Bonds, would not adversely affect the validity of such Related Bonds or the exemption otherwise available from federal income taxation of interest payable on such Related Bonds.

(b)    In case of any such consolidation, merger, sale or conveyance and upon any such assumption by the successor corporation, such successor corporation shall succeed to and be substituted for its predecessor, with the same effect as if it had been named in the Master Indenture as such Member. Any successor corporation to such Member thereupon may cause to be signed and may issue in its own name Obligations under the Master Indenture and the predecessor corporation shall be released from its obligations under the Master Indenture and under any Obligations, if such predecessor corporation shall have conveyed all Property owned by it (or all such Property shall be deemed conveyed by operation of law) to such successor corporation. All Obligations so issued by such successor corporation under the Master Indenture shall in all respects have the same legal rank and benefit under the Master Indenture as Obligations theretofore or thereafter issued in accordance with the terms of the Master Indenture

C-39

as though all of such Obligations had been issued under the Master Indenture by such prior Member without any such consolidation, merger, sale or conveyance having occurred.

(c)     In case of any such consolidation, merger, sale or conveyance such changes in phraseology and form (but not in substance) may be made in Obligations thereafter to be issued as may be appropriate.

The Master Trustee may rely upon an opinion of Independent Counsel as conclusive evidence that any such consolidation, merger, sale or conveyance, and any such assumption, complies with the provisions of the Master Indenture and that it is proper for the Master Trustee under the provisions of the Master Indenture to join in the execution of any instrument required to be executed and delivered by the Master Indenture.

**Entrance Into the Obligated Group**

Any Person may become a Member of the Obligated Group if:

(A)     Such Person is a corporation;

(B)     Such Person executes and delivers to the Master Trustee a Supplemental Master Indenture acceptable to the Master Trustee which shall be executed by the Master Trustee and each then current Member, containing (i) the agreement of such Person (a) to become a Member of the Obligated Group and thereby to become subject to compliance with all provisions of the Master Indenture and (b) unconditionally and irrevocably (subject to the right of such Person to cease its status as a Member of the Obligated Group pursuant to the terms and conditions of the Master Indenture) to jointly and severally make payments upon each Obligation at the times and in the amounts provided in each such Obligation and (ii) representations and warranties by such Person substantially similar to those set forth in the Master Indenture (other than those contained in the Master Indenture, if such Person is not a Tax-Exempt Organization), but with such modifications as are acceptable to the Master Trustee;

(C)     The Obligated Group Agent shall, by appropriate action of its Governing Body, have approved the admission of such Person to the Obligated Group and each of the Members shall have taken such action, if any, required to approve the admission of such Person to the Obligated Group;

(D)     The Master Trustee shall have received (1) a certificate of the Obligated Group Agent which demonstrates that, immediately upon such Person becoming a Member of the Obligated Group (a) the Members would not, as a result of such transaction, be in default in the performance or observance of any covenant or condition to be performed or observed by them under the Master Indenture, and (b) the Obligated Group could meet the conditions described in the Master Indenture for the incurrence of one dollar of additional Funded Indebtedness, (2) an opinion of Independent Counsel to the effect that (x) the instrument described in paragraph (B) above has been duly authorized, executed and delivered and constitutes a legal, valid and binding agreement of such Person, enforceable in accordance with its terms, subject to customary exceptions for bankruptcy, insolvency, fraudulent conveyance, and other laws generally affecting

C-40

enforcement of creditors' rights and application of general principles of equity and to the exceptions set forth in the Master Indenture and (y) the addition of such Person to the Obligated Group will not adversely affect the status as a Tax-Exempt Organization of any Member which otherwise has such status, (3) either a certificate of the Obligated Group Agent demonstrating that all amounts due or to become due on all Related Bonds have been paid to the holders thereof and provision for such payment has been made in such manner as to have resulted in the defeasance of all Related Bond Indentures, or an opinion of nationally recognized municipal bond counsel (which counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee), to the effect that under then existing law the consummation of such transaction, whether or not contemplated on the date of delivery of any such Related Bond, would not adversely affect the validity of any Related Bond or any exemption from federal income taxation of interest payable on such Related Bond otherwise entitled to such exemption; provided that in making the calculation called for by subsection (D)(l)(b) above, (i) there shall be excluded from Revenues any Revenues generated by Property of such Person transferred or otherwise disposed of by such Person since the beginning of the fiscal year during which such Person's entry into the Obligated Group occurs and (ii) there shall be excluded from Expenses any Expenses related to Property of such Person transferred or otherwise disposed of by such Person since the beginning of the fiscal year during which such Person's entry into the Obligated Group occurs and (4) certified copies of the actions of the Obligated Group Agent and each of the Members described in subsection (C) above; and

(E)     The Master Indenture is amended to add such Person as a Member.

Each successor, assignee, surviving, resulting or transferee corporation of a Member must agree to become, and satisfy the above-described conditions to becoming, a Member of the Obligated Group prior to any such succession, assignment or other change in such Member's corporate status.

## Cessation of Status as a Member of the Obligated Group

Each Member covenants that it will not take any action, corporate or otherwise, which would cause it or any successor thereto into which it is merged or consolidated to cease to be a Member of the Obligated Group under the terms of the Master Indenture, unless:

(A)     the Member proposing to withdraw from the Obligated Group is not a party to any Outstanding Obligation securing Related Loan Documents with respect to Related Bonds which remain Outstanding;

(B)     prior to cessation of such status, there is delivered to the Master Trustee an opinion of nationally recognized municipal bond counsel (which opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) to the effect that, under then existing law, the cessation by the Member of its status as a Member will not adversely affect the validity of any Related Bond or any exemption from federal income taxation of interest payable thereon to which such Bond would otherwise be entitled;

(C)     when it is assumed that such cessation results in a transfer of Property owned by the Member proposing to cease such status to a Person who is not a Member of the Obligated Group, the conditions precedent to such a transfer to an unrelated entity set forth in the Master Indenture have been complied with;

(D)     prior to and immediately after such cessation, no event of default exists under the Master Indenture and no event shall have occurred which with the passage of time or the giving of notice, or both, would become such an event of default;

(E)     prior to such cessation there is delivered to the Master Trustee an opinion of Independent Counsel (which Counsel and opinion, including, without limitation, the scope, form, substance and other aspects thereof, are acceptable to the Master Trustee) to the effect that the cessation by such Member of its status as a Member will not adversely affect the status as a Tax-Exempt Organization of any Member which otherwise has such status; and

(F)     prior to cessation of such status, each Member of the Obligated Group consents in writing to the withdrawal by such Member.

Upon such cessation in accordance with the foregoing provisions of the Master Indenture shall be amended to delete therefrom the name of such Person.

## Sale, Lease or Other Disposition of Property.

Each Member agrees that it will not, in any fiscal year, sell, lease or otherwise dispose (including, without limitation, any involuntary disposition) of Property which, together with all other Property transferred by Members exceeds the greater of $5,000,000 or 5% of the total value of the Property of the Obligated Group (calculated on the basis of the Book Value of the assets shown on the assets side of the balance sheet in the combined financial statements of the Obligated Group for the fiscal year next preceding the date of such sale, lease or other disposition for which combined financial statements of the Obligated Group reported on by independent certified public accountants are available or, if the Obligated Group Agent so elects, on the basis of Current Value), except for transfers or other dispositions in the ordinary course of business and except for transfers, sales or other dispositions of Property:

(A)     In return for other Property of equal or greater value and usefulness;

(B)     To any Person, if prior to such sale, lease or other disposition there is delivered to the Master Trustee an Officer's Certificate of a Member stating that, in the judgment of the signer, such Property has, or within the next succeeding 24 calendar months is reasonably expected to, become inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable or unnecessary and the sale, lease or other disposition thereof will not impair the structural soundness, efficiency or economic value of the remaining Property;

C-42

(C)     To another Member;

(D)     Upon fair and reasonable terms no less favorable to the Member than the Member would obtain in a comparable arm's-length transaction, if following such transfer the proceeds received by the transferor are applied to acquire Property or to repay the principal of Funded Indebtedness of any Member;

(E)     To any Person, if such Property consists solely of assets which are specifically restricted by the donor or grantor to a particular purpose which is inconsistent with their use for payment on the Obligations;

(F)     To any Person, if such transfer consists solely of cash and such transfer will not exceed 10% of Net Patient Service Revenues in any fiscal year; or

(G)     To any Person upon delivery to the Master Trustee of an Officer's Certificate of a Member (i) certifying that during the fiscal year immediately preceding the proposed disposition for which financial statements have been reported upon by independent certified public accountants, (a) the Historical Maximum Annual Debt Service Coverage Ratio of the Obligated Group, taking into account such disposition, would not have been less than 2.00:1 or (b) if the Historical Maximum Annual Debt Service Coverage Ratio is less than 2.00:1, the Historical Annual Maximum Debt Service Coverage Ratio would not have been reduced by more than 10% and (ii) demonstrating that, after taking into account such disposition, the conditions described in the Master Indenture are met for allowing the incurrence of one dollar of additional Funded Indebtedness.

The foregoing provisions of this Section notwithstanding, each Member further agrees that it will not sell, lease, donate or otherwise dispose of Property (a) which could reasonably be expected at the time of such sale, lease, donation or disposition to result in a reduction of the Historical Maximum Annual Debt Service Coverage Ratio for the Obligated Group such that the Master Trustee could or would be obligated to require the Obligated Group to retain a Consultant pursuant to the Master Indenture, or (b) if a Consultant has been retained in the circumstances described in the Master Indenture, such action, in the opinion of such Consultant, will have an adverse effect on the Income Available for Debt Service of the Obligated Group. The parties to the Master Indenture agree that except as otherwise permitted by the Master Indenture (including, without limitation, transfers to other Members and other transfers permitted as described under this Section) and except as otherwise required by law, it will not enter into any transaction, including, without limitation, the purchase, sale, exchange or transfer of Property, the rendering of any service, the making of any loan, the extension of any credit or any other transaction, with any Affiliate except pursuant to the reasonable requirements of such Member's activities and upon fair and reasonable terms no less favorable to it than would obtain in a comparable arm's-length transaction with a person not an Affiliate.

**Events of Default.**

Each of the following events is an "event of default" under the Master Indenture:

(A)    failure of the Obligated Group to pay any installment of interest or principal, or any premium, on any Obligation when the same shall become due and payable, whether at maturity, upon any date fixed for prepayment or redemption by acceleration or otherwise and the continuance of such failure for five days; or

(B)    failure of any Member to comply with, observe or perform any of the covenants, conditions, agreements or provisions hereof and to remedy such default within 30 days after written notice thereof to such Member and the Obligated Group Agent from the Master Trustee or the holders of at least 25% in aggregate principal amount of the Outstanding Obligations; provided, that if such default cannot with due diligence and dispatch be cured within 30 days but can be cured, the failure of the Member to remedy such default within such 30-day period shall not constitute a default under the Master Indenture if the Member shall immediately upon receipt of such notice commence with due diligence and dispatch the curing of such default and, having so commenced the curing of such default, shall thereafter prosecute and complete the same with due diligence and dispatch; or

(C)    any representation or warranty made by any Member in the Master Indenture or in any statement or certificate furnished to the Master Trustee or the purchaser of any Obligation in connection with the sale of any Obligation or furnished by any Member pursuant hereto proves untrue in any material respect as of the date of the issuance or making thereof and shall not be corrected or brought into compliance within 30 days after written notice thereof to the Obligated Group Agent by the Master Trustee or the holders of at least 25% in aggregate principal amount of the Outstanding Obligations; or

(D)    default in the payment of the principal of, premium, if any, or interest on any Indebtedness for borrowed money (other than Non-Recourse Indebtedness) of any Member, including, without limitation, any Indebtedness created by any Related Loan Document, within 5 days from the date the same shall become due, or an event of default as defined in any mortgage, indenture, loan agreement or other instrument under or pursuant to which there was issued or incurred, or by which there is secured, any such Indebtedness (including any Obligation) of any Member, and which default in payment or event of default entitles the holder thereof to declare or, in the case of any Obligation, to request that the Master Trustee declare, such Indebtedness due and payable prior to the date on which it would otherwise become due and payable; provided, however, that if such Indebtedness is not evidenced by an Obligation or issued, incurred or secured by or under a Related Loan Document, a default in payment shall not constitute an "event of default" under the Master Indenture unless the unpaid principal amount of such Indebtedness, together with the unpaid principal amount of all other Indebtedness so in default, exceeds 5% of the unrestricted net assets of the Obligated Group as shown on or derived from the then latest available audited combined financial statements of the Obligated Group; or

(E)    any judgment, writ or warrant of attachment or of any similar process shall be entered or filed against any Member or against any Property of any Member and remains unvacated, unpaid, unbonded, unstayed or uncontested in good faith for a period

of 30 days; provided, however, that none of the foregoing shall constitute an event of default unless the amount of such judgment, writ, warrant of attachment or similar process, together with the amount of all other such judgments, writs, warrants or similar processes so unvacated, unpaid, unbonded, unstayed or uncontested, exceeds 5% of the unrestricted net assets of the Obligated Group as shown on or derived from the then latest available audited combined financial statements of the Obligated Group; or

(F)     any Member admits insolvency or bankruptcy or its inability to pay its debts as they mature, or is generally not paying its debts as such debts become due, or makes an assignment for the benefit of creditors or applies for or consents to the appointment of a trustee, custodian or receiver for such Member, or for the major part of its Property; or

(G)     a trustee, custodian or receiver is appointed for any Member or for the major part of its Property and is not discharged within 30 days after such appointment; or

(H)     bankruptcy, dissolution, reorganization, arrangement, insolvency or liquidation proceedings, proceedings under Title 11 of the United States Code, as amended, or other proceedings for relief under any bankruptcy law or similar law for the relief of debtors are instituted by or against any Member (other than bankruptcy or similar proceedings instituted by any Member against third parties), and if instituted against any Member are allowed against such Member or are consented to or are not dismissed, stayed or otherwise nullified within 60 days after such institution; or

(I)     payment of any installment of interest or principal, or any premium, on any Related Bond shall not be made when the same shall become due and payable under the provisions of any Related Bond Indenture.

### Acceleration

If an event of default under the Master Indenture has occurred and is continuing, the Master Trustee may, and if requested by either the holders of not less than 25% in aggregate principal amount of Outstanding Obligations or the holder of any Accelerable Instrument under which Accelerable Instrument an event of default exists (which event of default permits the holder thereof to request that the Master Trustee declare such Indebtedness evidenced by an Obligation due and payable prior to the date on which it would otherwise become due and payable), shall, by notice in writing delivered to the Obligated Group Agent, declare the entire principal amount of all Obligations then Outstanding under the Master Indenture and the interest accrued thereon immediately due and payable, and the entire principal and such interest shall thereupon become immediately due and payable, subject, however, to the provisions thereof with respect to waivers of events of default.

### Remedies; Rights of Obligation Holders

Upon the occurrence and continuance of any event of default, the Master Trustee may pursue any available remedy including a suit, action or proceeding at law or in equity to enforce the payment of the principal of, premium, if any, and interest on the Obligations Outstanding

under the Master Indenture and any other sums due under the Master Indenture and may collect such sums in the manner provided by law out of the Property of any Member wherever situated.

If an event of default shall have occurred, and if it shall have been requested so to do by either the holders of 25% or more in aggregate principal amount of Obligations Outstanding or the holder of an Accelerable Instrument upon whose request pursuant to the Master Indenture the Master Trustee has accelerated the Obligations and if it shall have been indemnified as provided in the Master Indenture, the Master Trustee shall be obligated to exercise such one or more of the rights and powers conferred by this Section as the Master Trustee shall deem most expedient in the interests of the holders of Obligations; provided, however, that the Master Trustee shall have the right to decline to comply with any such request if the Master Trustee shall be advised by counsel (who may be its own counsel) that the action so requested may not lawfully be taken or the Master Trustee in good faith shall determine that such action would be unjustly prejudicial to the holders of Obligations not parties to such request.

No remedy by the terms of the Master Indenture conferred upon or reserved to the Master Trustee (or to the holders of Obligations) is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given to the Master Trustee or to the holders of Obligations issued under the Master Indenture, now or hereafter existing at law or in equity or by statute.

No delay or omission to exercise any right or power accruing upon any default or event of default shall impair any such right or power or shall be construed to be a waiver of any such default or event of default, or acquiescence therein; and every such right and power may be exercised from time to time and as often as may be deemed expedient.

No waiver of any default or event of default under the Master Indenture, whether by the Master Trustee or by the holders of Obligations, shall extend to or shall affect any subsequent default or event of default or shall impair any rights or remedies consequent thereon.

## Supplements and Amendments to the Master Indenture

Subject to the limitations set forth in the Master Indenture, the Members and the Master Trustee may, without the consent of, or notice to, any of the Obligation holders, amend or supplement the Master Indenture, for any one or more of the following purposes:

(A) To cure any ambiguity or defective provision in or omission from the Master Indenture in such manner as is not inconsistent with and does not impair the security of the Master Indenture or adversely affect the holder of any Obligation;

(B) To grant to or confer upon the Master Trustee for the benefit of the Obligation holders any additional rights, remedies, powers or authority that may lawfully be granted to or conferred upon the Obligation holders and the Master Trustee, or either of them, to add to the covenants of the Members for the benefit of the Obligation holders or to surrender any right or power conferred under the Master Indenture upon any Member;

(C) To assign and pledge under the Master Indenture any revenues, properties or collateral;

C-46

(D)     To evidence the succession of another corporation to the agreements of a Member or the Master Trustee, or the successor of any thereof under the Master Indenture;

(E)     To permit the qualification of the Master Indenture under the Trust Indenture Act of 1939, as then amended, or under any similar federal statute hereafter in effect or to permit the qualification of any Obligations for sale under the securities laws of any state of the United States;

(F)     To provide for the refunding or advance refunding of any Obligation;

(G)     To provide for the issuance of Obligations;

(H)     To reflect the addition to or withdrawal of a Member from the Obligated Group;

(I)     To provide for the issuance of Obligations with original issue discount, provided such issuance would not materially adversely affect the holders of Outstanding Obligations;

(J)     To permit an Obligation to be secured by security which is not extended to all Obligation holders;

(K)     To permit the issuance of Obligations which are not in the form of a promissory note; and

(L)     To make any other change which, in the opinion of the Master Trustee, does not materially adversely affect the holders of any of the Obligations and, in the opinion of each Related Bond Trustee, does not materially adversely affect the holders of the Related Bonds with respect to which it acts as trustee, including, without limitation, any modification, amendment or supplement to the Master Indenture or any indenture supplemental hereto in such a manner as to establish or maintain exemption of interest on any Related Bonds under a Related Bond Indenture from federal income taxation under applicable provisions of the Code.

Any Supplemental Master Indenture providing for the issuance of Obligations shall set forth the date thereof, the date or dates upon which principal of, premium, if any, and interest on such Obligations shall be payable, the other terms and conditions of such Obligations, the form of such Obligations and the conditions precedent to the delivery of such Obligations which shall include, among other things:

(ii)     delivery to the Master Trustee of all materials required to be delivered as a condition precedent to the incurrence of the Indebtedness evidenced by such Obligations;

(iii)     delivery to the Master Trustee of an opinion of Independent Counsel acceptable to the Master Trustee to the effect that all requirements and conditions to the issuance of such Obligations, if any, set forth in the Master Indenture and in the Supplemental Master Indenture have been complied with and satisfied; and

C-47

(iv)    delivery to the Master Trustee of an opinion of Independent Counsel acceptable to the Master Trustee to the effect that registration of such Obligations under the Securities Act of 1933, as amended, is not required, or, if such registration is required, that the Obligated Group has complied with all applicable provisions of said Act.

If at any time the Obligated Group Agent shall request the Master Trustee to enter into any Supplemental Master Indenture pursuant to subsection (L) above, the Master Trustee shall cause notice of the proposed execution of such Supplemental Master Indenture to be given to each Rating Agency then maintaining a rating on any Obligations or Related Bonds, in the manner provided in the Master Indenture at least 15 days prior to the execution of such Supplemental Master Indenture, which notice shall include a copy of the proposed Supplemental Master Indenture. If at any time the Obligated Group Agent shall request the Master Trustee to enter into any Supplemental Master Indenture pursuant to which an Obligation is issued in connection with an Interest Rate Agreement, the Master Trustee shall cause notice of the execution of such Supplemental Master Indenture to be given to each Rating Agency then maintaining a rating on any Obligation or Related Bonds, in the manner provided in the Master Indenture immediately succeeding the execution of such Supplemental Master Indenture, which notice shall include a copy of the Supplemental Master Indenture.

## Supplemental Master Indentures Requiring Consent of Obligation Holders.

In addition to Supplemental Master Indentures covered by the Master Indenture (as described above) and subject to the terms and provisions contained in this Section, and not otherwise, the holders of not less than 51% in aggregate principal amount of the Obligations which are Outstanding under the Master Indenture at the time of the execution of such Supplemental Master Indenture shall have the right, from time to time, anything contained in the Master Indenture to the contrary notwithstanding, to consent to and approve the execution by the Members and the Master Trustee of such Supplemental Master Indentures as shall be deemed necessary and desirable by the Members for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the Master Indenture or in any Supplemental Master Indenture; provided, however, that nothing contained in this Section or in the Master Indenture shall permit, or be construed as permitting, (a) an extension of the stated maturity or reduction in the principal amount of or reduction in the rate or extension of the time of paying of interest on or reduction of any premium payable on the redemption of, any Obligation, without the consent of the holder of such Obligation, (b) a reduction in the aforesaid aggregate principal amount of Obligations the holders of which are required to consent to any such Supplemental Master Indenture or any such amending or supplementing instruments, without the consent of the holders of all the Obligations at the time Outstanding which would be affected by the action to be taken, or (c) modification of the rights, duties or immunities of the Master Trustee, without the written consent of the Master Trustee.

If at any time the Obligated Group Agent shall request the Master Trustee to enter into any such Supplemental Master Indenture for any of the purposes describe in the preceding paragraph, the Master Trustee shall, upon being satisfactorily indemnified with respect to expenses, cause notice of the proposed execution of such Supplemental Master Indenture to be mailed by first class mail postage prepaid to each holder of an Obligation. Such notice shall briefly set forth the nature of the proposed Supplemental Master Indenture and shall state that copies thereof are on file at the principal corporate trust office of the Master Trustee for

inspection by all Obligation holders. The Master Trustee shall not, however, be subject to any liability to any Obligation holder by reason of its failure to mail such notice, and any such failure shall not affect the validity of such Supplemental Master Indenture when consented to and approved as provided in this Section. If the holders of not less than 51% in aggregate principal amount of the Obligations which are Outstanding under the Master Indenture at the time of the execution of any such Supplemental Master Indenture shall have consented to and approved the execution thereof as provided, in this Section no holder of any Obligation shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Master Trustee or the Members from executing the same or from taking any action pursuant to the provisions thereof. Upon the execution of any such Supplemental Master Indenture as in this Section permitted and provided, the Master Indenture shall be and be deemed to be modified and amended in accordance therewith.

For the purpose of obtaining the foregoing consents, the determination of who is deemed the holder of an Obligation held by a Related Bond Trustee shall be made in the manner provided in the Master Indenture.

## THE BOND INDENTURE

*The following is a summary of certain provisions of the Bond Indenture. Reference is made to the Bond Indenture for the detailed provisions thereof.*

### Funds; Disposition of Revenues

Issuance of the 2006 Bonds. At any time after the execution of the Bond Indenture, the Authority shall execute, by physical or facsimile signature, and the Trustee shall authenticate and, upon Request of the Authority, deliver the 2006 Bonds for each series in the aggregate principal amount of such series set forth in the Bond Indenture.

Application of Proceeds of the 2006 Bonds. The moneys from time to time on deposit in the Funds and Accounts specified below (except for the Bond Purchase Fund and the Rebate Fund) are subject to a lien and charge in favor of the owners of the 2006 Bonds until expended for the purposes for which such Funds and Accounts are created.

The proceeds (net of discount, if any) received from the sale of the 2006 Bonds shall be deposited in trust with the Bond Trustee and shall be allocated as follows:

      (A)    Deposit $759,900.70 to the credit of the Costs of Issuance Fund.

      (B)    Deposit $185,939,108.06 to the credit of the Project Fund.

      (C)    Deposit $39,089,404.33 to the credit of the Capitalized Interest Fund.

      (D)    Transfer the sum of $6,577,986.23 by wire transfer to the Bond Insurer in payment for the premium for the issuance of the Insurance Policy.

Establishment and Application of Costs of Issuance Fund. The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Costs of Issuance Fund." The moneys in the Costs of Issuance Fund shall be used and withdrawn by the Bond Trustee to pay the Costs of Issuance upon Requisition of the Obligated Group Agent stating the Person to whom payment is to be made, the amount to be paid, the purpose for which the obligation was incurred and that such payment is a proper charge against said fund. On June 8, 2007, or upon the earlier Request of the Obligated Group Agent, amounts, if any, remaining in the Costs of Issuance Fund shall be transferred to the Project Fund and the Costs of Issuance Fund shall thereafter be closed.

Establishment and Application of Project Fund.

      (A)    The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Project Fund." Within the Project Fund, the Bond Trustee shall establish, hold and maintain in trust a separate fund designated as the "Capitalized Interest Fund." The moneys in the Project Fund shall be used and withdrawn by the Bond Trustee to pay the costs of the acquisition and construction of the Project upon receipt of requisitions of the Obligated Group Agent therefor, and the moneys in the Capitalized Interest Fund shall be used and withdrawn by the Bond Trustee to pay capitalized interest on the 2006 Bonds. A portion of

the moneys deposited in the Project Fund will be expended immediately to reimburse the Obligated Group Agent for the cost of capital expenditures previously made. Any funds remaining in the Capitalized Interest Fund after July 1, 2010, shall be transferred to the Project Fund and used for the purposes of the Project Fund.

(B)     Before any payment from the Project Fund shall be made, the Obligated Group Agent shall file or cause to be filed with the Bond Trustee a Requisition stating (i) the item number of such payment; (ii) the name of the Person to whom each such payment is due, which may be a member of the Obligated Group in the case of reimbursement for Project costs theretofore paid by such member of the Obligated Group; (iii) the respective amounts to be paid; (iv) the purpose by general classification for which each obligation to be paid was incurred; (v) that obligations in the stated amounts have been incurred by the member of the Obligated Group and are presently due and payable and that each item thereof is a proper charge against the Project Fund and has not been previously paid from the Project Fund; and (vi) that there has not been filed with or served upon the Obligated Group any notice of claim of lien, or attachment upon, or claim affecting the right to receive payment of, any of the amounts payable to any of the persons named in such Requisition, that has not been released or will not be released simultaneously with the payment of such obligation, other than materialmen's or mechanics' liens accruing by mere operation of law.

Upon receipt of a Requisition, the Bond Trustee shall pay the amount set forth in such Requisition as directed by the terms thereof out of the Project Fund. The Bond Trustee shall rely fully on any such Requisition delivered pursuant to this Section and shall not be required to make any investigation in connection therewith. The Bond Trustee shall not make any such payment if it has received any written notice of claim of lien, attachment upon, or claim affecting the right to receive payment of, any of the monies to be so paid, that has not been released or will not be released simultaneously with such payment.

(C)     When the Project shall have been completed, there shall be delivered to the Bond Trustee a Certificate of the Obligated Group Agent stating the fact and date of such completion and stating that all of the costs thereof have been determined and paid (or that all of such costs have been paid less specified claims that are subject to dispute and for which a retention in the Project Fund is to be maintained in the full amount of such claims until such dispute is resolved). Upon the receipt of such Certificate, the Bond Trustee shall, as directed by said Certificate, transfer any remaining balance in such Project Fund, less the amount of any such retention, to the Optional Redemption Account and applied to the optional redemption of 2006 Bonds. Upon such transfer, the Project Fund shall be closed.

### Interest Fund.

(A)     The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Interest Fund." Moneys in the Interest Fund shall be held, disbursed, allocated and applied by the Bond Trustee only as provided in the Bond Indenture.

(B)     The Bond Trustee shall deposit the following Revenues in the Interest Fund when and as such Revenues are received:

(i)     the interest component of all Loan Repayments, including the interest component of all cash prepayments of Loan Repayments made pursuant to Section 3.1 of the Loan Agreement;

(ii)    all interest, profits and other income received from the investment of moneys in the Interest Fund;

(iii)   all payments made by the Counterparty to the Interest Rate Agreement; and

(iv)    any other Revenues not required to be deposited in any other fund or account established pursuant to the Bond Indenture.

(C)     The Trustee shall withdraw from the Debt Service Reserve Fund the amounts necessary to pay interest on the 2006 Bonds in the event the amounts on deposit in the Interest Fund on an Interest Payment Date are insufficient to pay such interest in full.

(D)     All amounts in the Interest Fund shall be used and withdrawn by the Bond Trustee, on a pro rata basis, solely for the purpose of paying the interest on the 2006 Bonds as the same becomes due and payable (including accrued interest on any 2006 Bonds purchased or redeemed prior to maturity pursuant to the Bond Indenture).

Principal Fund.

(A)     The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Principal Fund." The Bond Trustee shall establish, maintain and hold in trust within the Principal Fund a separate Mandatory Sinking Account. Moneys in the Principal Fund shall be held, disbursed, allocated and applied by the Bond Trustee only as provided in the Bond Indenture.

(B)     The Bond Trustee shall deposit the following Revenues in the Principal Fund when and as such Revenues are received:

(i)     the principal component of all Loan Repayments, but excluding the principal component of all cash prepayments of Loan Repayments made pursuant to Section 3.4 of the Loan Agreement, which shall be deposited in the Redemption Fund; and

(ii)    all interest, profits and other income received from the investment of moneys in the Principal Fund.

(C)     All amounts in the Principal Fund shall be used and withdrawn by the Bond Trustee solely to redeem the 2006 Bonds, or pay the 2006 Bonds at maturity, as provided herein.

C-52

(D)     On each Mandatory Sinking Account Payment date, the Bond Trustee shall apply the Mandatory Sinking Account Payment required on that date to the redemption (or payment at maturity, as the case may be) of 2006 Bonds, in the amounts and upon the notice and in the manner provided in the Bond Indenture; provided that, at any time prior to giving such notice of such redemption, the Bond Trustee shall, upon direction of the Obligated Group Agent, apply such moneys to the purchase of 2006 Bonds at public or private sale, as and when and at such prices (including brokerage and other charges, but excluding accrued interest, which is payable from the Interest Fund) as the Obligated Group Agent may direct, except that the purchase price (excluding accrued interest) shall not exceed the par amount of such 2006 Bonds. If, during the twelve-month period immediately preceding said Mandatory Sinking Account Payment date, the Bond Trustee has purchased 2006 Bonds with moneys in the Principal Fund, or, during said period and prior to giving said notice of redemption, the Obligated Group Agent has deposited 2006 Bonds with the Bond Trustee, or 2006 Bonds were at any time purchased or redeemed by the Bond Trustee from the Redemption Fund and allocable to said Mandatory Sinking Account Payment, such 2006 Bonds so purchased or deposited or redeemed shall be applied, to the extent of the full principal amount thereof, to reduce said Mandatory Sinking Account Payment. All 2006 Bonds purchased or deposited pursuant to this subsection shall be cancelled and destroyed by the Bond Trustee to or upon the order of the Obligated Group Agent. All 2006 Bonds purchased from the Principal Fund or deposited by the Obligated Group Agent with the Bond Trustee shall be allocated first to the next succeeding Mandatory Sinking Account Payment, then to the remaining Mandatory Sinking Account Payments as selected by the Obligated Group Agent.

(E)     The Bond Trustee shall withdraw from the Debt Service Reserve Fund the amounts necessary to pay principal on the 2006 Bonds in the event the amounts on deposit in the Principal Fund on a Principal Payment Date are insufficient to pay such principal in full.

Redemption Fund.

(A)     The Bond Trustee shall establish, maintain and hold in trust a separate fund designated as the "Redemption Fund". The Bond Trustee shall establish, maintain and hold in trust within the Redemption Fund a separate Optional Redemption Account and a separate Special Redemption Account.

(B)     The Bond Trustee shall deposit the following Revenues in the Optional Redemption Account when and as such Revenues are received:

(i)     except as provided in subsection (C) of this Section, the principal component of all cash prepayments of Loan Repayments made pursuant to Section 3.4(a) of the Loan Agreement; and

(ii)     all interest, profits and other income received from the investment of moneys in the Optional Redemption Account.

(C)     The Bond Trustee shall deposit the following Revenues in the Special Redemption Account when and as such Revenues are received:

(i)     the principal component of all cash prepayments of Loan Repayments made pursuant to Section 3.1 of the Loan Agreement which are specified in a Certificate of the Obligated Group Agent to have been derived from insurance or condemnation proceeds received with respect to the facilities a member of the Obligated Group; and

(ii)    all interest, profits and other income received from the investment of moneys in the Special Redemption Account.

(D)    All amounts deposited in the Optional Redemption Account and in the Special Redemption Account shall be used and withdrawn by the Bond Trustee solely for the purpose of redeeming 2006 Bonds, in the manner and upon the terms and conditions specified in the Bond Indenture, at the next succeeding date of redemption for which notice has not been given and at the Redemption Prices then applicable to redemptions from the Optional Redemption Account and the Special Redemption Account, respectively; provided that in the case of the Optional Redemption Account in lieu of redemption at such next succeeding date of redemption, or in combination therewith, amounts in such account may be transferred to the Principal Fund and credited against Loan Repayments in order of their due date as set forth in a Request of the Obligated Group Agent. All 2006 Bonds redeemed from the Redemption Fund shall be allocated to applicable Mandatory Sinking Account Payments in inverse order of their payment dates.

## Pledge and Assignment

(A)    Subject only to the provisions of the Bond Indenture permitting the application thereof for the purposes and on the terms and conditions set forth herein, all of the Revenues and any other amounts (including proceeds of the sale of 2006 Bonds) held in any fund or account established pursuant to the Bond Indenture (other than the Bond Purchase Fund and the Rebate Fund) are hereby pledged to secure the payment of the principal of and premium, if any, and interest on the 2006 Bonds, in accordance with their terms and the provisions of the Bond Indenture. Said pledge shall constitute a lien on and security interest in such assets and shall attach, be perfected and be valid and binding from and after delivery by the Bond Trustee of the 2006 Bonds, without any physical delivery thereof or further act.

(B)    The Authority hereby transfers in trust, grants a security interest in and assigns to the Bond Trustee, for the benefit of the Holders from time to time of the 2006 Bonds, all of the Revenues and other assets pledged in subsection (A) of this Section and all of the right, title and interest of the Authority in the Loan Agreement (except for (i) the right to receive any Additional Payments to the extent payable to the Authority under the Loan Agreement, (ii) any rights of the Authority to indemnification and rights of inspection and consent, and (iii) the obligation of the Obligated Group to make deposits pursuant to the Tax Compliance Certificate). The Bond Trustee shall be entitled to and shall collect and receive all of the Revenues, and any Revenues collected or received by the Authority shall be deemed to be held, and to have been collected or received, by the Authority as the agent of the Bond Trustee and shall forthwith be paid by the Authority to the Bond Trustee. Subject to the provisions of Section 7.06 of the Bond Indenture with respect to the control of remedial proceedings by the Bond Insurer, the Bond

Trustee also shall be entitled to and shall take all steps, actions and proceedings reasonably necessary in its judgment to enforce, either jointly with the Authority or separately, all of the rights of the Authority that have been assigned to the Bond Trustee and all of the obligations of the Obligated Group under the Loan Agreement other than for those items excepted in the parenthetical contained in the first sentence of this subsection. All Revenues deposited with the Bond Trustee shall be held, disbursed, allocated and applied by the Bond Trustee only as provided in the Bond Indenture. To the extent that the Bond Indenture confers any rights, remedy or claim under or by reason of the Bond Indenture, to the Bond Insurer and the Credit Facility Provider, such Person is hereby explicitly recognized as a third party beneficiary hereunder, so long as such Person is not in default under the Insurance Policy in the case of the Bond Insurer.

(C)     If on the first Business Day prior to the day of any month in which a Loan Repayment is required to be made, the Bond Trustee has not received the full amount of such Loan Repayment, the Bond Trustee shall immediately notify the Authority, the Obligated Group Agent, the Bond Insurer and the Credit Facility Provider of such insufficiency by Electronic Means and confirm such notification as soon as possible thereafter by written notice.

(D)     The Bond Trustee agrees to immediately deposit to the appropriate funds and accounts created under the Bond Indenture, any payments made to the Bond Trustee by the Counterparty (or any successor thereto or guarantor thereof) pursuant to the Interest Rate Agreement.

## Determination of Interest Rate

### Initial Interest Rates; Change of Mode

(A)     Each Series of ARCs shall initially be in the Auction Mode and shall bear interest at the Auction Rates established for 7-day Auction Periods.

(B)     A series of 2006 Bonds in the Auction Mode may be changed to the Fixed Rate Mode, Daily Mode or the Weekly Mode at the times and in the manner hereinafter provided. All 2006 Bonds of a specific series of ARCs, or 2006 D Bonds must, be in the same Mode and shall bear interest at the same interest rate. The Fixed Rate Mode for a series of 2006 Bonds shall be in effect until the Maturity Date of such series of 2006 Bonds, and may not be changed to any other Mode.

(C)     Defaulted Interest with respect to any 2006 Bond shall cease to be payable to the holder of such 2006 Bond on the relevant Record Date and shall be payable to the holder in whose name such Bond is registered at the close of business on the Special Record Date for the payment of such Defaulted Interest, which Special Record Date shall be fixed in the following manner. The Obligated Group Agent shall notify the Bond Trustee and the Bond Insurer in writing of the amount of Defaulted Interest proposed to be paid on each 2006 Bond and the date of the proposed payment (which date shall be such as will enable the Bond Trustee to comply with the second sentence hereafter), and shall deposit with the Bond Trustee at the time of such notice an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Bond Trustee

for such deposit prior to the date of the proposed payment. Money deposited with the Bond Trustee shall be held in trust for the benefit of the Holders of the 2006 Bonds entitled to such Defaulted Interest as provided in this Section. Following receipt of such funds the Bond Trustee shall fix a Special Record Date for the payment of such Defaulted Interest which shall be not more than 15 nor less than 10 days prior to the date of the proposed payment and not less than 10 days after the receipt by the Bond Trustee of the notice of the proposed payment. The Bond Trustee shall promptly notify the Obligated Group Agent of such Special Record Date and, in the name and at the expense of the Obligated Group, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage prepaid, not less than 10 days prior to such Special Record Date, to each holder of a 2006 Bond at the address of such holder as it appears on the Bond Register.

(D)     Each series of ARCs shall bear interest at Auction Rates established for Auction Periods until a Variable Rate Conversion Date, or Fixed Rate Conversion Date with respect to such series of ARCs. Upon conversion to a Variable Mode, a series of the ARCs that have been so converted shall bear interest at the lesser of (i) the Interest Coverage Rate or (ii) the Daily Rate or Weekly Rate, as the case may be. During an Auction Rate Period a series of 2006 Bonds in the Auction Mode shall bear interest at the Auction Rate. During the Fixed Rate Period, a series of the 2006 Bonds that have been issued or so converted shall bear interest at the Fixed Rate. Each Bank Bond shall bear interest at the Bank Rate. At no time shall the 2006 Bonds (including Bank Bonds and Bonds bearing interest at the Failed Tender Rate pursuant to Section 11.08 of the Bond Indenture) bear interest at a rate higher than the Maximum Rate.

(E) No Daily Rate Period or Weekly Rate Period shall be established which would cause the Interest Coverage Period of the Liquidity Facility to be less than the requirements of Section 6.11(B) of the Bond Indenture. No interest rate on a Bond entitled to the benefit of a Liquidity Facility shall be established which exceeds the Interest Coverage Rate.

Subsequent Interest Rates; Rate Periods.

The ARCs shall bear interest at Auction Rates established for Auction Periods until the Fixed Rate Conversion Date or a Variable Rate Conversion Date, as the case may be, for a series of 2006 Bonds.

Notwithstanding the foregoing, if during any period that a Series of ARCs is in an Auction Rate Period:

(i)     the ownership of such 2006 Bonds is no longer maintained in book-entry form by the Depository, the rate of interest on such 2006 Bonds for any Auction Period commencing after the delivery of certificates representing such 2006 Bonds pursuant to Section 2.07 of the Bond Indenture shall equal the Maximum Rate on the Business Day immediately preceding the first day of such Auction Period; or

(ii)     if a Payment Default occurs, Auctions will be suspended and the Auction Rate for the Auction Period commencing on or after such Payment Default and for each Auction Period thereafter to and including the Auction Period, if any, during which, or commencing less

C-56

than the Applicable Number of Business Days after, such Payment Default is cured will equal the Default Rate.

### Maturities, Sinking Fund Redemption and Interest Rates Upon Conversion of a Series of 2006 Bonds to Fixed Rate.

Prior to the conversion of a series of 2006 Bonds to a Fixed Rate, the Remarketing Agent shall deliver to the Bond Trustee, the Bond Insurer and the Liquidity Provider, and the Obligated Group a certificate which includes a schedule specifying the principal amount of converted 2006 Bonds which will mature on June 1 of the years specified in such schedule and the interest rate payable on the converted 2006 Bonds of each such maturity and a schedule specifying the principal amount of converted 2006 Bonds maturing June 1 of the years specified in such schedule to be called for mandatory Bond Sinking Fund redemption on June 1 of the years specified in such schedule. In determining the principal maturities, Mandatory Sinking Fund Account redemption payments and interest rates for converted 2006 Bonds, the Remarketing Agent shall use the following guidelines:

(i) The Remarketing Agent shall allocate the converted 2006 Bonds between serial bonds and term bonds in such manner as shall produce the lowest aggregate interest payable with respect to the converted 2006 Bonds; and

(ii) The Remarketing Agent shall set the interest rate on each converted 2006 Bond of a particular Maturity at the lowest interest rate that will enable such 2006 Bond upon conversion to be remarketed at par (plus any accrued interest) taking into account the Maturity Date of such 2006 Bond and Mandatory Sinking Fund payments to be made with respect to converted 2006 Bonds and Maturity Date. The foregoing notwithstanding, another method for providing for payment of principal on the 2006 Bonds after the Fixed Rate Conversion Date may be established by the Bond Trustee if there is delivered to the Bond Trustee and the Bond Insurer by the Obligated Group Agent an Opinion of Bond Counsel to the effect that utilization of such other method will not adversely affect the validity of any 2006 Bonds or any exclusion from federal income taxation to which the interest on the 2006 Bonds would otherwise be entitled.

(iii) Notwithstanding the foregoing, any change in the principal amount of converted 2006 Bonds either maturing or being called for mandatory redemption from the schedule of mandatory redemption for such series upon initial issuance is subject to the approval of the Bond Insurer.

### Redemption and Tender of 2006 Bonds

#### Terms of Redemption.

(A)  Optional Redemption of 2006 A Bonds. The 2006 A Bonds are subject to optional redemption by the Authority, at the direction of the Obligated Group Agent, on and after June 1, 2016, in whole on any date or in part on any Interest Payment Date (and, if in part, the Obligated Group Agent shall select the maturities of the Bonds to be redeemed in such order of maturity as the Obligated Group Agent shall specify and within the maturity by lot or by such other method as the Bond Trustee determines in its sole discretion to be fair and reasonable and in denominations of $5,000 and integral multiples thereof) at the redemption price of 100% of

the principal amount thereof, together with accrued interest, if any, to the date fixed for redemption.

(B)     Optional Redemption of 2006 Bonds in the Fixed Rate Mode.     (i) Optional Redemption of 2006 Bonds. A series of the 2006 Bonds converted to the Fixed Rate Mode is subject to redemption in whole on any date or in part on any Business Day (and if in part, in such order of maturity as the Obligated Group Agent shall specify and within a maturity by lot or by such other method as the Bond Trustee determines to be fair and reasonable and in Authorized Denominations) at the Redemption Prices together with accrued interest, if any, to the redemption dates all as set forth as follows:

| LENGTH OF INTEREST PERIOD | COMMENCEMENT OF REDEMPTION PERIOD | REDEMPTION PRICE |
|---|---|---|
| Greater than or equal to 11 years | Tenth anniversary of the commencement of Interest Period | 100% |
| Less than 11 years and greater than or equal to 8 years | Seventh anniversary of the commencement of Interest Period | 100% |
| Less than 8 years and greater than or equal to 5 years | Fifth anniversary of the commencement of Interest Period and thereafter | 100% |
| Less than 5 years | Auction Rate Certificates not subject to optional redemption | -- |

The Authority with the consent of the Obligated Group Agent, in connection with a change to the Fixed Rate Mode, may alter its rights to direct the redemption of any such 2006 Bond at prices and times different than the above schedule to conform to then current market conditions; provided that notice describing the alteration shall be submitted to the Bond Trustee and the Remarketing Agent, together with a Favorable Opinion of Bond Counsel, addressed to them.

(C)     Optional Redemption of 2006 Bonds in the Auction Mode or a Variable Mode. A series of 2006 Bonds in either the Auction Mode, or a Variable Mode is subject to redemption prior to their respective stated Maturity Dates (but only from Eligible Moneys in the case of a Series of 2006 Bonds in a Variable Mode when a Liquidity Facility is in effect), at the option of the Authority with the consent of the Obligated Group Agent, in whole or in part on any Interest Payment Date at a Redemption Price equal to the principal amount of such series of 2006 Bonds called for redemption, without premium, together with accrued interest, if any, to the redemption date; provided, however, in the event of a partial redemption of a series of 2006 Bonds bearing interest at an Auction Rate, (i) the aggregate principal amount of such 2006 Bonds to be redeemed is at least $100,000, (ii) the aggregate principal amount of the series 2006 Bonds not to be redeemed are in an Authorized Denomination for such Bonds, and (iii) the

aggregate principal amount of 2006 Bonds of such series bearing interest at an Auction Rate that will remain outstanding after such redemption is at least $10,000,000 unless a lesser principal amount is consented to by the applicable Broker-Dealers.

(D)     Optional Redemption From Insurance and Condemnation Proceeds. The 2006 Bonds are also subject to redemption prior to their respective stated Maturity Dates, at the option of the Authority with the consent of the Obligated Group Agent, as a whole on any date or in part on any Interest Payment Date, from moneys required to be deposited in the Special Redemption Account pursuant to the Loan Agreement, at a Redemption Price equal to the principal amount called for redemption, plus accrued interest, if any, to the date fixed for redemption, without premium.

(E)     Sinking Fund Redemption.     The 2006 Bonds are also subject to redemption prior to their stated Maturity Date, in part, from Mandatory Sinking Account Payments deposited in the Principal Fund pursuant to Section 5.03 of the Bond Indenture on June 1 of each of the years set forth below, (provided that while a series of the 2006 Bonds bear interest at an Auction Rate, if such June 1 is not an Interest Payment Date, the redemption shall occur on the Interest Payment Date immediately preceding such June 1) in the principal amounts set forth below, together with interest accrued thereon to the date fixed for redemption, without premium.

**2006 Series A Bonds**

**Term Bonds Maturing June 1, 2022**

| Redemption Date | Amount |
|---|---|
| 6/1/2021 | $1,960,000 |
| 6/1/2022 | 2,060,000* |

**Term Bonds Maturing June 1, 2024**

| Redemption Date | Amount |
|---|---|
| 6/1/2023 | $2,165,000 |
| 6/1/2024 | 2,270,000* |

**Term Bonds Maturing June 1, 2026**

| Redemption Date | Amount |
|---|---|
| 6/1/2025 | $2,385,000 |
| 6/1/2026 | 2,490,000* |

**Term Bonds Maturing June 1, 2031**

| Redemption Date | Amount |
|---|---|
| 6/1/2027 | $2,650,000 |
| 6/1/2028 | 2,730,000 |
| 6/1/2029 | 2,855,000 |
| 6/1/2030 | 2,995,000 |
| 6/1/2031 | 3,135,000* |

### Term Bonds Maturing June 1, 2034

| Redemption Date | Amount |
|---|---|
| 6/1/2032 | $3,285,000 |
| 6/1/2033 | 3,430,000 |
| 6/1/2034 | 3,585,000* |

### Term Bonds Maturing June 1, 2037

| Redemption Date | Amount |
|---|---|
| 6/1/2035 | $3,745,000 |
| 6/1/2036 | 3,940,000 |
| 6/1/2037 | 4,140,000* |

### Term Bonds Maturing June 1, 2041

| Redemption Date | Amount |
|---|---|
| 6/1/2038 | $4,355,000 |
| 6/1/2039 | 4,580,000 |
| 6/1/2040 | 4,820,000 |
| 6/1/2041 | 5,075,000* |

### 2006 Series B Bonds

| Redemption Date | Amount | Redemption Date | Amount |
|---|---|---|---|
| 6/1/2007 | | 6/1/2025 | 550,000 |
| 6/1/2008 | | 6/1/2026 | 600,000 |
| 6/1/2009 | | 6/1/2027 | 1,300,000 |
| 6/1/2010 | $2,825,000 | 6/1/2028 | 700,000 |
| 6/1/2011 | 2,450,000 | 6/1/2029 | 650,000 |
| 6/1/2012 | 3,075,000 | 6/1/2030 | 700,000 |
| 6/1/2013 | 2,975,000 | 6/1/2031 | 775,000 |
| 6/1/2014 | 3,325,000 | 6/1/2032 | 1,625,000 |
| 6/1/2015 | 2,050,000 | 6/1/2033 | 900,000 |
| 6/1/2016 | 1,450,000 | 6/1/2034 | 925,000 |
| 6/1/2017 | 2,475,000 | 6/1/2035 | 925,000 |
| 6/1/2018 | 2,300,000 | 6/1/2036 | 1,025,000 |
| 6/1/2019 | 2,425,000 | 6/1/2037 | 900,000 |
| 6/1/2020 | 450,000 | 6/1/2038 | 2,425,000 |
| 6/1/2021 | 1,000,000 | 6/1/2039 | 1,225,000 |
| 6/1/2022 | 525,000 | 6/1/2040 | 1,200,000 |
| 6/1/2023 | 550,000 | 6/1/2041 | 1,300,000* |
| 6/1/2024 | 550,000 | | |

## 2006 Series C Bonds

| Redemption Date | Amount | Redemption Date | Amount |
|---|---|---|---|
| 6/1/2007 | | 6/1/2025 | 1,050,000 |
| 6/1/2008 | | 6/1/2026 | 1,125,000 |
| 6/1/2009 | | 6/1/2027 | 1,175,000 |
| 6/1/2010 | $525,000 | 6/1/2028 | 1,250,000 |
| 6/1/2011 | 1,050,000 | 6/1/2029 | 1,325,000 |
| 6/1/2012 | 575,000 | 6/1/2030 | 1,400,000 |
| 6/1/2013 | 825,000 | 6/1/2031 | 1,450,000 |
| 6/1/2014 | 650,000 | 6/1/2032 | 1,550,000 |
| 6/1/2015 | 675,000 | 6/1/2033 | 3,550,000 |
| 6/1/2016 | 1,400,000 | 6/1/2034 | 1,675,000 |
| 6/1/2017 | 500,000 | 6/1/2035 | 1,800,000 |
| 6/1/2018 | 800,000 | 6/1/2036 | 1,875,000 |
| 6/1/2019 | 800,000 | 6/1/2037 | 2,025,000 |
| 6/1/2020 | 850,000 | 6/1/2038 | 2,075,000 |
| 6/1/2021 | 825,000 | 6/1/2039 | 5,050,000 |
| 6/1/2022 | 1,950,000 | 6/1/2040 | 2,300,000 |
| 6/1/2023 | 975,000 | 6/1/2041 | 2,350,000* |
| 6/1/2024 | 1,075,000 | | |

## 2006 Series D Bonds

| Redemption Date | Amount | Redemption Date | Amount |
|---|---|---|---|
| 6/1/2007 | | 6/1/2025 | 2,625,000 |
| 6/1/2008 | | 6/1/2026 | 2,675,000 |
| 6/1/2009 | | 6/1/2027 | 2,100,000 |
| 6/1/2010 | | 6/1/2028 | 2,825,000 |
| 6/1/2011 | | 6/1/2029 | 3,000,000 |
| 6/1/2012 | | 6/1/2030 | 3,075,000 |
| 6/1/2013 | | 6/1/2031 | 3,150,000 |
| 6/1/2014 | | 6/1/2032 | 2,425,000 |
| 6/1/2015 | | 6/1/2033 | 1,375,000 |
| 6/1/2016 | | 6/1/2034 | 3,475,000 |
| 6/1/2017 | | 6/1/2035 | 3,600,000 |
| 6/1/2018 | | 6/1/2036 | 3,675,000 |
| 6/1/2019 | | 6/1/2037 | 3,925,000 |
| 6/1/2020 | $2,125,000 | 6/1/2038 | 2,625,000 |
| 6/1/2021 | 1,775,000 | 6/1/2039 | 1,150,000 |
| 6/1/2022 | 1,275,000 | 6/1/2040 | 4,250,000 |
| 6/1/2023 | 2,375,000 | 6/1/2041 | 4,425,000* |
| 6/1/2024 | 2,450,000 | | |

*Final Maturity

(F) In lieu of redeeming 2006 Bonds of any series pursuant to this Section, the Bond Trustee may, at the request of the Obligated Group Agent, use such funds otherwise available hereunder for redemption of 2006 Bonds to purchase 2006 Bonds of such series in the open market at a price not exceeding the redemption price then applicable hereunder, such 2006 Bonds to be delivered to the Bond Trustee for the purpose of cancellation. It is understood that in the case of any such redemption or purchase of 2006 Bonds, the Authority shall receive credit against its required Mandatory Sinking Fund Payment for such series of 2006 Bonds in the same manner as would be applicable if such 2006 Bonds were optionally redeemed. Purchases pursuant to this paragraph shall be made first from Bank Bonds and thereafter from 2006 Bonds of such series with Rate Periods and Maturity Dates selected by the Obligated Group Agent. Purchases made pursuant to this paragraph shall be made with Eligible Moneys unless the purchase is of a 2006 Bond then bearing interest at the Bank Rate, a Fixed Rate or an Auction Rate.

(G) Any 2006 Bonds which are Bank Bonds or Obligated Group Bonds are subject to redemption in whole or in part (in an Authorized Denomination) prior to maturity at the direction of the Obligated Group Agent out of amounts prepaid on the 2006 Notes and deposited in the Redemption Fund, in whole or in part (and if in part, in an Authorized Denomination) on any Business Day while such 2006 Bonds are Bank Bonds or Obligated Group Bonds at a redemption price equal to 100% of the principal amount thereof plus accrued interest, if any, to the redemption date.

(H) Any 2006 Bonds that are Bank Bonds shall be subject to mandatory redemption on the dates and in the amounts specified in the Liquidity Facility Agreement in connection with a Bank Bond Redemption Event (as defined in the Liquidity Facility Agreement). Such redemption shall be at a price equal to the principal amount thereof plus accrued interest thereon to the redemption date and without premium. Bank Bonds shall be redeemed pursuant to the provisions of this paragraph without any notice from or direction by the Obligated Group Agent.

**Other Covenants**

Punctual Payment. The Authority shall punctually cause to be paid the principal of, Redemption Price, if any, and interest on the 2006 Bonds, in strict conformity with the terms of the 2006 Bonds and of the Bond Indenture, according to the true intent and meaning thereof, but only out of Revenues and other assets pledged for such payment as provided in the Bond Indenture.

Extension of Payment of 2006 Bonds. The Authority shall not directly or indirectly extend or assent to the extension of the maturity of any of the 2006 Bonds or the time of payment of any claims for interest by the purchase or funding of such 2006 Bonds or claims for interest or by any other arrangement and in case the maturity of any of the 2006 Bonds or the time of payment of any such claims for interest shall be extended, such 2006 Bonds or claims for interest shall not be entitled, in case of any default hereunder, to the benefits of the Bond Indenture, except subject to the prior payment in full of the principal of all of the 2006 Bonds then Outstanding and of all claims for interest thereon that shall not have been so extended.

Against Encumbrances. The Authority shall not create, or permit the creation of, any pledge, lien, charge or other encumbrance upon the Revenues and other assets pledged or

assigned under the Bond Indenture while any of the 2006 Bonds are Outstanding, except the pledge and assignment created by the Bond Indenture. Subject to this limitation, the Authority expressly reserves the right to enter into one or more other indentures for any of its corporate purposes, including other programs under the Act, and reserves the right to issue other obligations for such purposes.

#### Accounting Records and Financial Statements.

(A)    The Bond Trustee shall at all times keep, or cause to be kept, proper books of record and account, prepared in accordance with the Bond Trustee's accounting practices for books of record and account relating to similar trust accounts, in which complete and accurate entries shall be made of all transactions relating to the proceeds of 2006 Bonds, the Revenues, the Loan Agreement and all funds and accounts established pursuant to the Bond Indenture. Such books of record and account shall be available for inspection by the Authority, the Obligated Group Agent, the Bond Insurer, the Credit Facility Provider (if any) and any Bondholder, or his agent or representative duly authorized in writing, at reasonable hours and under reasonable circumstances.

(B)    The Bond Trustee shall file and furnish on or before the 15th day of each month to the Authority, the Bond Insurer, the Obligated Group Agent, the Credit Facility Provider (if any) and each Bondholder who shall have filed his or her name and address with the Bond Trustee for such purpose a complete financial statement (which need not be audited) covering receipts, disbursements, allocation and application of Revenues and any other moneys (including proceeds of 2006 Bonds) in any of the funds and accounts established pursuant to the Bond Indenture for the preceding month; provided, that the Bond Trustee shall not be required to deliver an accounting for any fund or account that (1) has a balance of $0.00 and (2) has not had any activity since the last reporting date.

#### Enforcement and Amendment of Loan Agreement.

(A)    Subject to the provisions of Section 7.06 of the Bond Indenture with respect to the control of remedial proceedings by the Bond Insurer, the Bond Trustee shall promptly collect all amounts due from the Obligated Group pursuant to the Loan Agreement, shall comply with all terms of the Loan Agreement applicable to it and shall diligently enforce, and take all steps, actions and proceedings reasonably necessary for the enforcement of all of the rights of the Authority assigned to it hereunder and all of the obligations of the Obligated Group relating thereto.

(B)    The Authority may amend, modify or terminate any of the terms of the Loan Agreement, or consent to any such amendment, modification or termination, with the written consent of the Bond Insurer, but without the consent of any other Interested Party or the owners of the 2006 Bonds.

Further Assurances.    The Authority will make, execute and deliver any and all such further indentures, instruments and assurances as may be reasonably necessary or proper to carry out the intention or to facilitate the performance of the Bond Indenture and for the better

assuring and confirming unto the Holders of the 2006 Bonds of the rights and benefits provided in the Bond Indenture.

## Events of Default

Events of Default. Any one or more of the following events shall be Events of Default:

(A) default in the due and punctual payment of the principal or Redemption Price of any 2006 Bond when and as the same shall become due and payable;

(B) default in the due and punctual payment of any installment of interest on any 2006 Bond when and as the same shall become due and payable;

(C) default by the Authority in the observance of any of the other covenants, agreements or conditions on its part in the Bond Indenture or in the 2006 Bonds contained, if such default shall have continued for a period of 60 days after written notice thereof, specifying such default and requiring the same to be remedied, shall have been given to the Authority by the Bond Trustee, or to the Authority and the Bond Trustee by the Bond Insurer or the Holders of not less than 25% in aggregate principal amount of the 2006 Bonds at the time Outstanding;

(D) a Loan Default Event;

(E) receipt by the Trustee of notice from the Credit Facility Provider that an Event of Default (as defined in the Reimbursement Agreement) has occurred under a Reimbursement Agreement and requesting acceleration of the 2006 Bonds pursuant to Section 7.02 of the Bond Indenture;

(F) an "event of default" as defined in Section 5.02 of the Master Indenture; or

(G) a default by the Authority with respect to any payment obligations relating to the 2006 Bonds or in the observance of any of the other covenants, agreements or conditions relating to the 2006 Bonds.

## Acceleration of Maturities

During the continuance of an Event of Default described in Section 7.01 (A), (B), (C) or (D) of the Bond Indenture, unless the principal of all the 2006 Bonds shall have already become due and payable, the Bond Trustee upon the written direction of the Bond Insurer or the Holders of not less than 66-2/3% in aggregate principal amount of the 2006 Bonds at the time Outstanding with the consent of the Bond Insurer, or upon the occurrence of an Event of Default described in Section 7.01(E) of the Bond Indenture, the Bond Trustee shall, promptly upon such occurrence, by notice in writing to the Authority, the Obligated Group Agent, Bond Insurer and the Credit Facility Provider (if any) declare the principal of all the 2006 Bonds then Outstanding and the interest accrued thereon, to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, anything in the Bond Indenture or in the 2006 Bonds contained to the contrary notwithstanding.

The preceding paragraph, however, is subject to the condition that if, at any time after the principal of the 2006 Bonds shall have been so declared due and payable, and before any judgment or decree for the payment of the moneys due shall have been obtained or entered as hereinafter provided, there shall have been deposited with the Bond Trustee a sum sufficient to pay all the principal of the 2006 Bonds matured prior to such declaration and all matured installments of interest upon all the 2006 Bonds, with interest on such overdue installments of principal as provided in the Loan Agreement, and the reasonable fees and expenses of the Bond Trustee, including reasonable fees and expenses of its attorneys, all amounts due the Bond Insurer and any and all other defaults known to the Bond Trustee (other than in the payment of principal of and interest on the 2006 Bonds due and payable solely by reason of such declaration) shall have been made good or cured to the satisfaction of the Bond Trustee and the Bond Insurer or provision deemed by the Bond Trustee and the Bond Insurer to be adequate shall have been made therefor, then, and in every such case, the Bond Insurer or the Holders of at least a majority in aggregate principal amount of the 2006 Bonds then Outstanding, with the written consent of the Bond Insurer, by written notice to the Authority and to the Bond Trustee, may, on behalf of the Holders of all the 2006 Bonds, rescind and annul such declaration and its consequences and waive such default; but no such rescission and annulment shall extend to or shall affect any subsequent default, or shall impair or exhaust any right or power consequent thereon.

When the Bond Trustee incurs expenses or renders services after the occurrence of an act of bankruptcy with respect to the Authority or any member of the Obligated Group, such expenses and the compensation for such services are intended to constitute expenses of administration under any federal or state bankruptcy, insolvency, arrangement, moratorium, reorganization or other debtor relief law.

**Institution of Legal Proceedings by Bond Trustee**

Subject to the provisions of Section 7.06 of the Bond Indenture, if an Event of Default shall occur and be continuing, the Bond Trustee in its discretion may, and upon the written request of the Bond Insurer and upon being indemnified to its satisfaction therefor shall proceed to protect or enforce its rights or the rights of the Holders of 2006 Bonds under the Bond Indenture and the Loan Agreement by any means permitted by law.

**Application of Revenues and Other Funds After Default**

If an Event of Default shall occur and be continuing, all Revenues and any other funds then held or thereafter received by the Bond Trustee under any of the provisions of the Bond Indenture (other than payments received from the Credit Facility Provider and moneys required to be deposited in the Rebate Fund and subject to the requirements of Section 12.10 of the Bond Indenture relating to the use of moneys held for particular 2006 Bonds) shall be applied by the Bond Trustee as follows and in the following order:

(A)     To the payment of any reasonable charges and expenses of the Bond Trustee (including reasonable fees and disbursements of its counsel) incurred in and about the performance of its powers and duties under the Bond Indenture;

(B)     To the payment of the principal or Redemption Price of and interest then due on the 2006 Bonds (upon presentation of the 2006 Bonds to be paid, and stamping thereon of

the payment if only partially paid, or surrender thereof if fully paid) subject to the provisions of the Bond Indenture (including Section 6.02 of the Bond Indenture), as follows:

(1)    Unless the principal of all of the 2006 Bonds shall have become or have been declared due and payable,

First:    To the payment to the Persons entitled thereto of all installments of interest then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment or installments maturing on the same date, then to the payment thereof ratably, according to the amounts due thereon, to the persons entitled thereto, without any discrimination or preference; and

Second:    To the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of any 2006 Bonds that shall have become due, whether at maturity or by call for redemption, with interest on the overdue principal at the rate borne by the respective 2006 Bonds, and, if the amount available shall not be sufficient to pay in full all the 2006 Bonds, together with such interest, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date to the persons entitled thereto, without any discrimination or preference.

(2)    If the principal of all of the 2006 Bonds shall have become or have been declared due and payable, to the payment of the principal and interest then due and unpaid upon the 2006 Bonds, with interest on the overdue principal at the rate borne by the 2006 Bonds, and if the amount available shall not be sufficient to pay in full the whole amount so due and unpaid, then to the payment thereof ratably, without preference or priority of principal over interest, or of interest over principal, or of any installment of interest over any other installment of interest, or of any 2006 Bond over any other Bond, according to the amounts due respectively for principal and interest, to the persons entitled thereto without any discrimination or preference.

**Bond Trustee to Represent Bondholders**

The Bond Trustee is hereby irrevocably appointed (and the successive respective Holders of the 2006 Bonds, by taking and holding the same, shall be conclusively deemed to have so appointed the Bond Trustee) as trustee and true and lawful attorney-in-fact of the Holders of the 2006 Bonds for the purpose of exercising and prosecuting on their behalf such rights and remedies as may be available to such Holders under the provisions of the 2006 Bonds, the Bond Indenture, the Loan Agreement and applicable provisions of any other law. Upon the occurrence and continuance of an Event of Default or other occasion giving rise to a right in the Bond Trustee to represent the Bondholders, subject to the right of the Bond Insurer to direct and continue all enforcement proceedings, the Bond Trustee in its discretion may, and upon the written request of the Holders of not less than 25% in aggregate principal amount of the 2006 Bonds then Outstanding, and upon being indemnified to its satisfaction therefor, shall, proceed to protect or enforce its rights or the rights of such Holders and the Credit Facility Provider by such

appropriate action, suit, mandamus or other proceedings as it shall deem most effectual to protect and enforce any such right, at law or in equity, either for the specific performance of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or for the enforcement of any other appropriate legal or equitable right or remedy vested in the Bond Trustee, in the Credit Facility Provider, or in such Holders and the Credit Facility Provider under the Bond Indenture, the Loan Agreement, the Act or any other law; and upon instituting such proceeding, the Bond Trustee shall be entitled, as a matter of right, to the appointment of a receiver of the Revenues and other assets pledged under the Bond Indenture, pending such proceedings. All rights of action under the Bond Indenture or the 2006 Bonds or otherwise may be prosecuted and enforced by the Bond Trustee without the possession of any of the 2006 Bonds or the production thereof in any proceeding relating thereto, and any such suit, action or proceeding instituted by the Bond Trustee shall be brought in the name of the Bond Trustee for the benefit and protection of all the Holders of such 2006 Bonds, subject to the provisions of the Bond Indenture (including Section 6.02 of the Bond Indenture).

**Bond Insurer's Direction of Proceedings**

Anything in the Bond Indenture to the contrary notwithstanding, upon the occurrence and continuance of an Event of Default as defined herein, the Bond Insurer shall be entitled to control and direct the enforcement of all rights and remedies granted to the Holders or the Trustee for the benefit of the Holders under the Bond Indenture, including, without limitation: (i) the right to accelerate the principal of the 2006 Bonds as described in the Bond Indenture, and (ii) the right to annul any declaration of acceleration, and the Bond Insurer shall also be entitled to approve all waivers of Events of Default.

**Limitation on Bondholders' Right to Sue**

No Holder of any 2006 Bond shall have the right to institute any suit, action or proceeding at law or in equity, for the protection or enforcement of any right or remedy under the Bond Indenture, the Loan Agreement or any other applicable law with respect to such 2006 Bond, unless (1) such Holder shall have given to the Bond Trustee written notice of the occurrence of an Event of Default; (2) the Holders of not less than 25% in aggregate principal amount of the 2006 Bonds then Outstanding shall have made written request upon the Bond Trustee to exercise the powers hereinbefore granted or to institute such suit, action or proceeding in its own name; (3) such Holder or said Holders shall have tendered to the Bond Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request; and (4) the Bond Trustee shall have refused or omitted to comply with such request for a period of 60 days after such written request shall have been received by, and said tender of indemnity shall have been made to, the Bond Trustee. The above provisions shall not apply as long as the Bond Insurer is not in default under the Insurance Policy.

Such notification, request, tender of indemnity and refusal or omission are hereby declared, in every case, to be conditions precedent to the exercise by any Holder of 2006 Bonds of any remedy hereunder or under law; it being understood and intended that no one or more Holders of 2006 Bonds shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Bond Indenture or the rights of any other Holders

of 2006 Bonds, or to enforce any right under the Bond Indenture, the Loan Agreement or other applicable law with respect to the 2006 Bonds, except in the manner herein provided, and that all proceedings at law or in equity to enforce any such right shall be instituted, had and maintained in the manner herein provided and for the benefit and protection of all Holders of the Outstanding 2006 Bonds, subject to the provisions of the Bond Indenture.

## Remedies Not Exclusive

No remedy herein conferred upon or reserved to the Bond Trustee, the Bond Insurer or the Credit Facility Provider (if any) or to the Holders of the 2006 Bonds is intended to be exclusive of any other remedy or remedies, and each and every such remedy, to the extent permitted by law, shall be cumulative and in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or otherwise.

## No Waiver of Default

No delay or omission of the Bond Trustee, the Bond Insurer, the Credit Facility Provider (if any) or of any Holder of the 2006 Bonds to exercise any right or power arising upon the occurrence of any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein.

## Notice to Bondholders of Default

The Bond Trustee shall promptly give written notice by first class mail to the Bondholders, the Bond Insurer and the Credit Facility Provider (if any) of the occurrence of an Event of Default, if the Bond Trustee has actual knowledge of such Event of Default.

## Amendments Permitted

(A) The Bond Indenture may be modified or amended from time to time and at any time by an indenture or indentures supplemental thereto, which the Authority and the Bond Trustee may enter into when the written consent of the Bond Insurer and the Credit Facility Provider (if any) shall have been filed with the Bond Trustee. No such modification or amendment shall (1) extend the maturity of any 2006 Bond, or reduce the amount of principal thereof, or change the method of computing the rate of interest thereon, or extend the time of payment of interest thereon, or extend the time of payment or reduce the amount of any Mandatory Sinking Account Payment, or reduce any premium payable upon the redemption thereof, without the consent of the Holder of each Bond so affected, or (2) permit the creation of any lien on the Revenues and other assets pledged under the Bond Indenture prior to or on a parity with the lien created by the Bond Indenture, or deprive the Holders of the 2006 Bonds of the lien created by the Bond Indenture on such Revenues and other assets (except as expressly provided in the Bond Indenture), without the consent of the Holders of all of the 2006 Bonds then Outstanding, or (3) modify any of the rights or obligations of the Bond Trustee.

(B) The Bond Indenture may also be modified or amended from time to time and at any time by an indenture or indentures supplemental hereto, which the Authority and the

C-68

Bond Trustee may enter into without the consent of any Interested Parties except the Bond Insurer, including, without limitation, for any one or more of the following purposes:

(1)     to add to the covenants and agreements of the Authority in the Bond Indenture contained other covenants and agreements thereafter to be observed, to pledge or assign additional security for the 2006 Bonds (or any portion thereof), or to surrender any right or power herein reserved to or conferred upon the Authority;

(2)     to make such provisions for the purpose of curing any ambiguity, inconsistency or omission, or of curing or correcting any defective provision, contained in the Bond Indenture, or in regard to matters or questions arising under the Bond Indenture, as the Authority may deem necessary or desirable and not inconsistent with the Bond Indenture;

(3)     to modify, amend or supplement the Bond Indenture in such manner as to permit the qualification hereof under the Trust Indenture Act of 1939, as amended, or the 2006 Bonds under the Securities Act of 1933, as amended, or any similar federal statute hereafter in effect, and to add such other terms, conditions and provisions as may be permitted by said act or similar federal statute;

(4)     to make the 2006 Bonds eligible for deposit with any securities depository;

(5)     to obtain a rating on the 2006 Bonds;

(6)     to conform to the terms and provisions of any Credit Facility.

(7)     any amendment, supplement or change to or modification of the Bond Indenture to remove the Trustee or Paying Agent and select and appoint any successor trustee or paying agent.

The Bond Trustee shall give notice of any such modification or amendment to each Rating Agency then rating the 2006 Bonds provided the Bond Trustee shall incur no liability for failure to do so.

(C)     The Bond Trustee may in its discretion, but shall not be obligated to, enter into any such Supplemental Bond Indenture authorized by subsections (A) or (B) of this Section that materially adversely affects the Bond Trustee's own rights, duties or immunities under the Bond Indenture or otherwise.

**Discharge of Bond Indenture**

The 2006 Bonds may be paid by the Authority in any of the following ways, provided that the Authority also pays or causes to be paid any other sums payable hereunder by the Authority:

(A)     by paying or causing to be paid the principal or Redemption Price of and interest on the 2006 Bonds, as and when the same become due and payable (from funds other than moneys paid pursuant to the Insurance Policy);

(B)     by depositing with the Bond Trustee, in trust, at or before maturity, money or securities in the necessary amount (as provided in Section 10.03 of the Bond Indenture) to pay or redeem all 2006 Bonds then Outstanding (from funds other than moneys paid pursuant to the Insurance Policy; or

(C)     by delivering to the Bond Trustee, for cancellation by it, all 2006 Bonds the Outstanding.

If the Authority shall also pay or cause to be paid all other sums payable hereunder by the Authority and no amounts are owing to the Bond Insurer or the Credit Facility Provider, if any, then and in that case, upon receipt by the Bond Trustee and the Bond Insurer or Credit Facility Provider (if any) of (i) an Opinion or Opinions of Counsel to the effect that the obligations under the Bond Indenture and the 2006 Bonds have been discharged and (ii) written evidence from each Rating Agency then rating the 2006 Bonds that defeasance will not result in the reduction of such ratings), the Bond Indenture and the pledge of Revenues and other assets made under the Bond Indenture and all covenants, agreements and other obligations of the Authority under the Bond Indenture shall cease, terminate, become void and be completely discharged and satisfied, and the 2006 Bonds will no longer be deemed to be outstanding under the Bond Indenture.

**Escheat**

Notwithstanding any provisions of the Bond Indenture, any moneys held by the Bond Trustee in trust for the payment of Redemption Price or the principal of, or interest on, any 2006 Bonds and remaining unclaimed for two years (or, if less, one day before such moneys would escheat to the State of West Virginia under then applicable West Virginia law) after the due date will be repaid to the Obligated Group.

**Money Held for Particular 2006 Bonds**

The money held by the Bond Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular 2006 Bonds (or portions of 2006 Bonds in the case of registered 2006 Bonds redeemed in part only) shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Holders of the 2006 Bonds entitled thereto, subject, however, to the provisions of Section 10.04 of the Bond Indenture.

## THE LOAN AGREEMENT

*The following is a summary of certain provisions of the Loan Agreement. Reference is made to the Loan Agreement for the detailed provisions thereof.*

### Loan of Proceeds; Payments of Principal, Premium and Interest

The Authority hereby lends and advances to the Obligated Group, and the Obligated Group hereby borrows and accepts from the Authority a loan in a principal amount equal to the aggregate principal amount of the 2006 Bonds and such proceeds will be applied in the manner set forth in the Loan Agreement and the Bond Indenture. In consideration of such loan to the Obligated Group, the Obligated Group Agent agrees to pay, or cause to be paid, "Loan Repayments" in an amount sufficient to enable the Bond Trustee to make the transfers and deposits required at the times and in the amounts required for deposit to the Funds and Accounts under the Bond Indenture. Each Loan Repayment shall be made in immediately available funds. The Obligated Group Agent agrees to make payments, or cause payments to be made, at the times and in the amounts required to be paid as principal or Redemption Price of and interest on the 2006 Bonds from time to time Outstanding under the Bond Indenture and other amounts required to be paid under the Bond Indenture (including but not limited to amounts necessary to establish, maintain and restore the Debt Service Reserve Fund to the Debt Service Reserve Fund Requirement as more particularly provided in the Loan Agreement), as the same shall become due whether at maturity, upon redemption, by declaration of acceleration or otherwise.

Except as otherwise expressly provided herein, all amounts payable hereunder by the Obligated Group to the Authority shall be paid to the Bond Trustee or other parties entitled thereto as assignee of the Authority, and the Loan Agreement and all right, title and interest of the Authority in any such payments are hereby assigned and pledged to the Bond Trustee so long as any 2006 Bonds remain Outstanding.

The Obligated Group Agent has issued and delivered the 2006 Notes under the Master Indenture to evidence and secure its obligations under the Loan Agreement.

### Additional Payments

In addition to Loan Repayments, the Obligated Group shall also pay to the Authority, the Bond Trustee, the Tender Agent, the Insurer, the Credit Facility Provider (if any), the Remarketing Agent (if any), the Auction Agent (if any) and the Broker-Dealer (if any), as the case may be, "Additional Payments," as follows:

(a)     All taxes and assessments of any type or character charged to the Authority or to the Bond Trustee affecting the amount available to the Authority or the Bond Trustee from payments to be received hereunder or in any way arising due to the transactions contemplated hereby (including taxes and assessments assessed or levied by any public agency or governmental authority of whatsoever character having power to levy taxes or assessments) but excluding franchise taxes based upon the capital and/or income of the Bond Trustee and taxes based upon or measured by the net income of the

C-71

Bond Trustee; provided, however, that the Obligated Group shall have the right to protest any such taxes or assessments and to require the Authority or the Bond Trustee, at the Obligated Group's expense, to protest and contest any such taxes or assessments levied upon them and that the Obligated Group Agent shall have the right to withhold payment of any such taxes or assessments pending disposition of any such protest or contest unless such withholding, protest or contest would adversely affect the rights or interests of the Authority or the Bond Trustee;

(b)     All reasonable fees, charges, expenses and indemnities of the Interested Parties as and when the same become due and payable;

(c)     The reasonable fees and expenses of such accountants, consultants, attorneys and other experts, if any, as may be engaged by the Authority or the Bond Trustee to prepare audits, financial statements, reports, opinions or provide such other services required under the Loan Agreement or the Bond Indenture;

(d)     An annual fee of the Authority as set forth in the Fee Schedule and Cost Allocations stated in the Legislative Rule filed in the Office of the Secretary of State of the State of West Virginia on May 29, 1991, as amended only through the date of delivery of the 2006 Bonds; and

(e)     All other reasonable and necessary fees and expenses attributable to the 2006 Bonds or the Loan Agreement, including without limitation all payments required pursuant to the Tax Compliance Certificate.

Such Additional Payments shall be billed to the Obligated Group by each of the Interested Parties to the extent that fees and expenses are not paid from sources other than the Obligated Group.

Anything the Loan Agreement to the contrary notwithstanding, the Additional Payments shall not be secured under the Master Indenture, and non-payment of any Additional Payments shall not constitute an event of default hereunder or under any other document relating to the 2006 Bonds; provided that, in no event shall the foregoing modify, limit or restrict in any manner the ability of any of the Interested Parties to recover the Additional Payments from the Obligated Group. Though required to be maintained as described herein, no payments with respect to the Interest Rate Agreement are the obligations of the Authority.

## Credits for Payments

The Obligated Group shall receive credit against its payments required under the Loan Agreement, in addition to any credits resulting from payment or repayment from other sources, as follows:

(a)     On installments of interest in an amount equal to moneys deposited in the Interest Fund, which amounts are available to pay interest on the 2006 Bonds, to the extent such amounts have not previously been credited against such payments;

C-72

(b)     On installments of principal in an amount equal to moneys deposited in the Principal Fund, which amounts are available to pay principal of the 2006 Bonds, to the extent such amounts have not previously been credited against such payments;

(c)     On installments of principal and interest in an amount equal to the principal amount of 2006 Bonds for the payment at maturity or redemption of which sufficient amounts (as determined by the Bond Indenture) in cash or Investment Securities described in clause (1) of the definition thereof are on deposit as provided in the Bond Indenture to the extent such amounts have not previously been credited against such payments, and the interest on such 2006 Bonds from and after the date fixed for payment at maturity or redemption thereof.  Such credits shall be made against the installments of principal and interest which would have been used, but for such call for redemption, to pay principal of and interest on such 2006 Bonds when due; and

(d)     On installments of principal and interest in an amount equal to the principal amount of 2006 Bonds acquired by the Obligated Group Agent and surrendered to the Bond Trustee for cancellation or purchased by the Bond Trustee on behalf of the Obligated Group and canceled, and the interest on such 2006 Bonds from and after the date interest thereon has been paid prior to cancellation.  Such credits shall be made against the installments of principal and interest which would have been used, but for such cancellation, to pay principal of and interest on such 2006 Bonds when due.

### Prepayment

(a)     The Obligated Group shall have the right, so long as all amounts which have become due hereunder have been paid, at any time or from time to time to prepay all or any part of the Loan Repayments, and the Bond Trustee shall accept such prepayments when the same are tendered.  Prepayments may be made by payments of cash, deposit of Investment Securities described in clause (1) of the definition thereof or surrender of 2006 Bonds. All such prepayments (and the additional payment of the applicable redemption premium) shall be deposited upon receipt in the Optional Redemption Account (or in such other Bond Trustee escrow account as may be specified by the Obligated Group Agent) and, at the request of and as determined by the Obligated Group Agent, credited against payments due hereunder or used for the redemption or purchase of 2006 Bonds in the manner and subject to the terms and conditions set forth in the Bond Indenture.

(b)     The Obligated Group shall also have the right at any time or from time to time to prepay all or any part of the Loan Repayments from moneys derived from condemnation awards or the proceeds of hazard insurance relating to the facilities of the Obligated Group, and the Bond Trustee shall accept such prepayments when the same are tendered.  Notwithstanding any such prepayment or surrender of 2006 Bonds, as long as any 2006 Bonds remain Outstanding or any Additional Payments required to be made hereunder remain unpaid, the Obligated Group shall not be relieved of its obligations hereunder.

**Payment of Purchase Price of 2006 Bonds**

(a) With the consent of the Bond Insurer, the Obligated Group agrees that it shall pay to the Tender Agent all amounts necessary for the purchase of 2006 Bonds and not deposited with the Tender Agent by the Remarketing Agent from the proceeds of the sale of such 2006 Bonds. Each such payment by the Obligated Group to the Tender Agent pursuant to the Loan Agreement shall be in immediately available funds and paid to the Tender Agent at its principal corporate trust office by 2:00 p.m. New York City time on each date upon which a payment is to be made pursuant to the Bond Indenture.

(b) If the 2006 Bonds are converted to bear interest at a Fixed Rate pursuant to the Bond Indenture, the obligations of the Obligated Group pursuant to the Loan Agreement with respect to such Series shall be terminated following change to the Fixed Rate Mode.

**Obligations Unconditional**

The obligations of the Obligated Group hereunder are absolute and unconditional, notwithstanding any other provision of the Loan Agreement or the Bond Indenture. Until the Loan Agreement is terminated and all payments hereunder are made, the Obligated Group:

(a) will pay all amounts required hereunder without abatement, deduction or setoff except as otherwise expressly provided in the Loan Agreement;

(b) will not suspend or discontinue any payments due hereunder for any reason whatsoever, including, without limitation, any right of setoff or counterclaim;

(c) will perform and observe all its other agreements contained in the Loan Agreement; and

(d) except as provided herein, will not terminate the Loan Agreement for any cause, including, without limiting the generality of the foregoing, damage, destruction or condemnation of the facilities financed with the proceeds of the 2006 Bonds or any part thereof, commercial frustration of purpose, any change in the tax or other laws of the United States of America or of the State of West Virginia, or any political subdivision of either thereof or any failure of the Authority to perform and observe any agreement, whether express or implied, or any duty, liability or obligation arising out of or connected with the Loan Agreement. Nothing contained in the Loan Agreement shall be construed to release the Authority from the performance of any of the agreements on its part contained herein, and in the event the Authority should fail to perform any such agreement on its part, the Obligated Group may institute such action against the Authority as the Obligated Group Agent may deem necessary to compel performance.

The rights of the Bond Trustee or any party or parties on behalf of whom the Bond Trustee is acting shall not be subject to any defense, setoff, counterclaim or recoupment whatsoever, whether arising out of any breach of any duty or obligation of the Authority or the

Bond Trustee owing to the Obligated Group, or by reason of any other indebtedness or liability at any time owing by the Authority or the Bond Trustee to the Obligated Group.

**Debt Service Reserve Fund**

(1)     If, at the end of any fiscal year, any of the following events occurs, the Obligated Group shall fund the Debt Service Reserve Fund for the 2006 Bonds held by the Bond Trustee in an amount equal to the Debt Service Reserve Fund Requirement.

(a)     The Obligated Group's Debt Service Coverage Ratio is less than 2.0 and Days of Unrestricted Cash on Hand are less than 175;

(b)     The Cushion Ratio for the Obligated Group is less than 1.75; or

(c)     The Obligated Group's Days of Unrestricted Cash on Hand is less than 90.

(2)     If the Debt Service Reserve Fund is required to be funded under subsection (1) above, the Obligated Group shall, commencing on the first day of the of the month next ensuing after the determination that funding is required has been, remit the Debt Service Reserve Fund Requirement to the Bond Trustee for deposit in the Debt Service Reserve Fund within 30 days.

(3)     The Debt Service Reserve Fund shall be terminated at the end of any fiscal year, and the funds returned to the Obligated Group immediately upon the Obligated Group Agent's delivery of an Officers Certificate to the Bond Insurer and the Bond Trustee to the effect that: (a) the Obligated Group is not in default under the 2006 Loan Agreement, and (b) each of the following conditions are met: (i) (A) the Obligated Group's Debt Service Coverage Ratio is 2.0 or greater, or, (B) if the Obligated Group's Debt Service Coverage Ratio is below 2.0, the Obligated Group's Days of Unrestricted Cash on Hand are greater than 175; (ii) the Cushion Ratio for the Obligated Group is 1.75 or greater; and (iii) the Days of Unrestricted Cash on Hand exceeds 90.

(4) Capitalized terms used in the Loan Agreement, but not otherwise defined in the Loan Agreement or the Bond Indenture shall have the meaning given such terms in Supplemental Indenture 2006-2.

**Interest Rate Agreement**

The Authority and the Obligated Group acknowledge and agree that (i) the Obligated Group Agent has entered into the Interest Rate Agreement (as defined in the Bond Indenture) in order to manage its interest rate risk relating to a portion of the 2006 D Bonds and in order to comply with certain provisions of the Code and the Tax Compliance Certificate, (ii) all payments of every description and the obligation to post or deposit collateral under the Interest Rate Agreement shall be the exclusive responsibility of the Obligated Group Agent, and

(iii) such obligations shall not be payable under the Loan Agreement, but rather under the Interest Rate Agreement. The right to receive payments from the Swap Provider under the Interest Rate Agreement shall be exclusive property of the Obligated Group. The Authority shall have no obligation for any payments or deposits of collateral or any property right in the receipts under the Interest Rate Agreement. In furtherance of its obligations to comply with the Tax Compliance Certificate, the Obligated Group Agent agrees that it will take such actions as shall be necessary to maintain the Interest Rate Agreement in full force and effect unless the Obligated Group Agent causes to be delivered to the Bond Trustee an Opinion of Bond Counsel indicating that any changes in the Interest Rate Agreement, including its termination, would not, in and of itself, cause the interest paid on the 2006 Bonds to not be excluded from gross income for purposes of federal income tax purposes.

## Events of Default

Each of the following events shall constitute and be referred to herein as a "Loan Default Event":

(a) Failure by the Obligated Group to pay in full any payment required hereunder, except any Additional Payments required hereunder, whether at maturity, upon a date fixed for prepayment, by declaration, upon tender of the 2006 Bonds (other than 2006 Bonds in the Auction Mode) for purchase pursuant to the Bond Indenture, or otherwise pursuant to the terms hereof or thereof;

(b) If any material representation or warranty made by the Obligated Group Agent herein or made by the Obligated Group Agent in any document, instrument or certificate furnished to the Bond Trustee or the Authority in connection with the issuance of the 2006 Bonds shall at any time prove to have been incorrect in any respect as of the time made;

(c) If the Obligated Group shall fail to observe or perform any other covenant, condition, agreement or provision in the Loan Agreement on its part to be observed or performed, or shall breach any warranty by the Obligated Group herein contained, for a period of 60 days after written notice, specifying such failure or breach and requesting that it be remedied, has been given to the Obligated Group Agent by the Authority or the Bond Trustee; except that, if such failure or breach cannot be remedied within such sixty-day period and if the Obligated Group has taken all action reasonably possible to remedy such failure or breach within such sixty-day period, such failure or breach shall not become a Loan Default Event for so long as the Obligated Group shall diligently proceed to remedy such failure or breach in accordance with and subject to any directions or limitations of time established by the Bond Trustee; or

(d) Any Event of Default as defined in and under the Bond Indenture.

C-76

**Remedies on Default**

If a Loan Default Event shall occur, then, and in each and every such case during the continuance of such Loan Default Event, the Bond Trustee on behalf of the Authority, but subject to the limitations in the Bond Indenture, including those relating to acceleration of principal of the 2006 Bonds and the requirement for control of remedies by the Bond Insurer, as to the enforcement of remedies, may take such action as it deems necessary or appropriate to collect amounts due hereunder, to enforce performance and observance of any obligation or agreement of the Obligated Group hereunder or to protect the interests securing the same, and may, without limiting the generality of the foregoing:

(a) Exercise any or all rights and remedies given hereby or available hereunder or given by or available under any other instrument of any kind securing the Obligated Group's performance hereunder;

(b) By written notice to the Obligated Group Agent declare all Loan Repayments and Additional Payments to be immediately due and payable under the Loan Agreement, whereupon the same shall become immediately due and payable; and

(c) Take other acts or steps as may be available under the Bond Indenture, as the registered owner of the 2006 Notes under the Master Indenture, or at law or in equity to collect the payment required hereunder then due, whether on the stated due date or by declaration of acceleration or otherwise, for damages or for specific performance or otherwise to enforce performance and observance of any obligation, agreement or covenant of the Obligated Group hereunder, subject, however, to the provisions of the Act.

**Covenants**

Under the Loan Agreement, the Obligated Group has made the following representations, among others:

Prohibited Uses. No portion of the proceeds of the 2006 Bonds will be used to finance or refinance any facility, place or building used or to be used primarily for sectarian instruction or study or as a place for devotional activities or religious worship.

Nonliability of the Authority. The Authority shall not be obligated to pay the principal of, premium, if any, and interest on the 2006 Bonds, except from payments received hereunder and under the 2006 Notes and other Revenues. Neither the faith and credit nor the taxing power of the State of West Virginia or any political subdivision thereof is pledged to the payment of the principal of, premium or interest on the 2006 Bonds.

The Obligated Group Agent hereby acknowledges that the Authority's sole source of moneys to repay the 2006 Bonds will be the payments made by the Obligated Group hereunder, under the 2006 Notes and other Revenues, together with amounts on deposit in, and investment income on, certain funds and accounts held by the Bond Trustee under the Bond

Indenture, and hereby agrees that if the payments to be made hereunder shall ever prove insufficient to pay all principal of, premium, if any, and interest on the 2006 Bonds as the same shall become due (whether by maturity, redemption, acceleration or otherwise), then upon notice from the Bond Trustee, the Obligated Group shall pay such amounts as are required from time to time to prevent any deficiency or default in the payment of such principal, premium or interest, including, but not limited to, any deficiency caused by acts, omissions, nonfeasance or malfeasance on the part of the Bond Trustee, the Obligated Group, the Authority or any third party.

Expenses.  The Obligated Group covenants and agrees to pay and to indemnify the Authority and the Bond Trustee against all costs and charges, including reasonable fees of attorneys, accountants, consultants and other experts, incurred in good faith and arising out of or in connection with the transactions contemplated hereby and by the Bond Indenture.

Tax Covenant.  The Obligated Group covenants and agrees that it will at all times do and perform all acts and things permitted by law and the Loan Agreement which are necessary or desirable in order to assure that interest paid on the 2006 Bonds will be excluded from gross income of the holders of the 2006 Bonds for federal income tax purposes and will take no action that would result in such interest not being excluded from gross income for federal income taxes.  Without limiting the generality of the foregoing, the Obligated Group agrees to comply with the provisions of the Tax Compliance Certificate.  This covenant shall survive payment in full or defeasance of the 2006 Bonds.

Indemnification, Immunity and Contribution.  (a) To the extent permitted by law, the Obligated Group releases the Authority and the Bond Trustee from and agrees that the Authority and the Bond Trustee shall not be liable for, and agrees to indemnify and hold the Authority and the Bond Trustee harmless from, any liability for, or expense (including but not limited to reasonable attorneys' fees) resulting from, or any loss or damage that may be occasioned by any cause whatsoever pertaining to the issuance, sale and delivery of the 2006 Bonds, the acceptance or administration of the trusts established pursuant to the Bond Indenture or the actions taken or to be taken by the Authority or the Bond Trustee under the Loan Agreement or the Bond Indenture, except the gross negligence or willful misconduct of the Authority or the Bond Trustee.  The parties intend that no general obligation or liability or charge against the general credit of the Authority shall occur by reason of making the Loan Agreement, the issuance of the 2006 Bonds or performing any act required of it by the Loan Agreement.  Nevertheless, if the Authority shall incur any such pecuniary liability, then in such event the Obligated Group shall indemnify and hold the Authority harmless by reason thereof, to the extent permitted by law, as provided herein, unless such liability results from the gross negligence or willful misconduct of the Authority.

(b)     No provision in the Loan Agreement or any obligation imposed upon the Authority, nor the breach of those provisions or obligations, will constitute or give rise to or impose upon the Authority a pecuniary liability or a charge upon its general credit or taxing power, if any.  No board member, employee, officer, director or agent of the Authority will be personally liable with respect to the Loan Agreement, the 2006 Bonds or any of the documents related thereto.

(c)     The Obligated Group will pay and will indemnify, defend and hold the Authority and the Bond Trustee, including any person at any time serving as a director, office, employee, agent or consultant of the Authority or the Bond Trustee or any person who controls the Authority or the Bond Trustee within the meaning of the Securities Act of 1933, as amended (collectively, the "Indemnified Parties") harmless from and against all claims, liabilities, losses, damages, costs, expenses (including reasonable attorneys' fees), suits and judgments of any kind arising out of:

> (1)     injury to or death of any person or damage to property in or upon any Hospital Facilities or the occupation, use, possession or condition of the Hospital Facilities or relating to the foregoing;

> (2)     any violation of any law, ordinance or regulation affecting the Hospital Facilities or the ownership, occupation, use, possession or condition of the Hospital Facilities;

> (3)     the issuance and sale of the 2006 Bonds, including the Official Statement used in connection with such sale;

> (4)     the execution and delivery of the Loan Agreement, the Bond Indenture, the Tax Compliance Certificate, the Bond Purchase Agreement or of any document required or in furtherance of the transactions contemplated by them; or

> (5)     the performance of any act required of any indemnitee under the Loan Agreement or under any provision of the Loan Agreement, the Bond Indenture, the Tax Compliance Certificate, the Official Statement or the Bond Purchase Agreement or of any document required or in furtherance of the transactions contemplated by them.

(d)     An Indemnified Party will promptly, upon receipt of notice of the existence of a claim or the commencement of a proceeding regarding which indemnity under the Loan Agreement may be sought, notify the Obligated Group Agent in writing. If a proceeding is commenced against the Indemnified Party, the Obligated Group Agent may participate in the proceeding and, to the extent it elects to do so, may assume the defense with counsel satisfactory to the Indemnified Party. If, however, the Indemnified Party is advised in an Opinion of Counsel that there may be legal defenses available to it which are different from or in addition to those available to the Obligated Group, or if the Obligated Group Agent fails to assume the defense of proceeding or to employ counsel for that purpose within a reasonable time after notice of commencement of the proceeding, the Obligated Group will not be entitled to assume the defense of the proceeding on behalf of the Indemnified Party, but will be responsible for the reasonable fees, costs and expenses of the Indemnified Party in conducting its defense.

(e)     No covenant or agreement contained in the Loan Agreement will be deemed to be the covenant or agreement of any board member, officer, attorney, agent or employee of the Authority or the Obligated Group in an individual capacity. No recourse will be had for any payment or any claim against any officer, board member, agent, attorney or employee of the Authority or the Obligated Group past, present, or future, or its successors or assigns, either directly or through the Authority, or any successor corporation, whether by virtue of any constitutional provision, statute or rule of law, or by the enforcement of any assessment or penalty, or otherwise, all liability of such board members, officers, agents, attorneys or employees being released as a condition of and as a consideration for the execution and delivery of the Loan Agreement.

(f)     In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in the Loan Agreement is for any reason held to be unavailable to the Indemnified Party, the Obligated Group shall contribute to the aggregate losses, liabilities, claims, damages and expenses of the nature contemplated by said indemnity agreement incurred by the Indemnified Party in such proportion as is appropriate to reflect the relative fault of the Obligated Group in connection with the claim or the commencement of a proceeding regarding which indemnity under the Loan Agreement may be sought; provided, however, that no person guilty of fraudulent misrepresentation shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

(g)     The indemnifications set forth herein shall survive the termination of the Bond Indenture and/or the resignation or removal of the Bond Trustee.

Right to Cause Conversion.   The Obligated Group Agent, with the advance written approval of the Bond Insurer, shall have the right, by notification by Electronic Means to the Interested Parties, to convert the ARCs to the Fixed Rate Mode or the Variable Mode. The Obligated Group Agent shall designate the proposed Conversion Date, which shall not be less than 30 days after the giving of such notice and shall provide Obligated Group Agent Funds as required by the Bond Indenture. The Obligated Group Agent shall have the right to rescind the conversion by notice by Electronic Means to the Interested Parties not less than 10 days prior to the proposed Conversion Date.

Liquidity Facility.   The Obligated Group covenants and agrees that, except as otherwise provided in the Bond Indenture, at all times while any 2006 Bonds bear interest at the Variable Rate ("Variable Rate Bonds"), the Obligated Group will maintain a Liquidity Facility in full force and effect in an amount not less than the principal amount of the Variable Rate Bonds outstanding which bear interest at the Variable Rate, plus an amount equal to interest thereon at the Interest Coverage Rate for the maximum number of days between scheduled Interest Payment Dates plus such additional number of days then required by each Rating Agency then maintaining a rating on the Variable Rate Bonds. In addition, the Obligated Group covenants and agrees that all times while any Variable Rate Bonds are outstanding, if the short term rating of the Bank shall be lowered by Moody's below the top short term rating category assigned by such rating agency (without giving effect to numeric or other qualifiers), then the Obligated Group, unless otherwise consented to in writing by the Bond Insurer, shall use its best efforts to obtain a Substitute Liquidity Facility within 90 days of the rating on the Bank being lowered.

C-80

Bond Trustee as Tender Agent. The Authority hereby agrees to appoint the Bond Trustee to act as Tender Agent in connection with tenders of the Variable Rate Bonds pursuant to the Bond Indenture. The Bond Trustee shall act as Tender Agent for the Obligated Group and shall not be deemed to be purchasing Variable Rate Bonds for its own account. The Bond Trustee shall act as Tender Agent only upon the terms and conditions set forth in the Bond Indenture. It is understood and agreed by the Authority and the Obligated Group that the Authority shall obtain the Bond Trustee's agreement to act as Tender Agent and that the Obligated Group shall be the beneficiary of such agreement. It is further recognized that provision for such Tender Agent will also benefit the holders of Variable Rate Bonds, the Bank and the Bond Insurer. Consequently, it is agreed that the Authority shall obtain the Bond Trustee's agreement that its obligations as Tender Agent shall be enforceable by (a) the Authority, (b) the Obligated Group Agent, (c) the holders of Variable Rate Bonds, (d) the Bank or (e) the Bond Insurer, as the case may be.

Continuing Disclosure. The Obligated Group covenants to comply with and carry out all of the provisions of the Continuing Disclosure Agreement with respect to the 2006 Bonds that complies with the provisions of Rule 15c2-12 promulgated by the Securities and Exchange Commission (as amended from time to time, the "Rule"), in form and substance satisfactory to the Participating Underwriters (as defined in the Rule). Notwithstanding any other provision of the Loan Agreement, failure of the Obligated Group Agent to enter into and comply with such Continuing Disclosure Agreement shall not be considered a Loan Default Event; however, the Authority may take such actions as may be necessary or desirable, including seeking specific performance by court order, to cause the Obligated Group Agent to comply with its obligations.

Project. (a) Hospital Facilities. A portion of the proceeds of the 2006 Bonds will be used to finance the costs of the Project. The Hospital Facilities which are included in the Project are described in the Loan Agreement. The Obligated Group Agent may modify the list of assets that constitute the Project by removing assets and adding assets if all of the following conditions are met:

(1)    the assets added constitute "hospital facilities" as defined in the Act;

(2)    the assets are within the description of assets in the notice of public hearing published April 27, 2006 with *The Bridgeport News*, and published May 3, 2006 with *The Clarksburg Exponent-Telegram* and *The Charleston Gazette*, and are located at the addresses set forth in the notice, or the Obligated Group Agent delivers to the Bond Trustee an Opinion of Bond Counsel that any deviation will not adversely affect the exclusion of the interest on the 2006 Bonds from the gross income of the recipients thereof;

(3)    the representation relating to the average economic life of the assets constituting the Project in the Tax Compliance Certificate remain correct following the substitution or the Obligated Group Agent delivers to the Bond Trustee an Opinion of Bond Counsel that any deviation will not

adversely affect the exclusion of the interest on the 2006 Bonds from the gross income of the recipients thereof; and

(4)     the Obligated Group Agent must deliver an Officer's Certificate to the Bond Trustee:

    (a)     listing the assets removed and the assets added,

    (b)     certifying that the statements in (1), (2) and (3) above are true with respect to the removals and additions, and

    (c)     demonstrating the calculation of the test described in the Tax Compliance Certificate.

The Authority makes no warranty, either express or implied, and offers no assurances that the Project is suitable for the Obligated Group's purposes or needs or that the proceeds derived from the sale of the 2006 Bonds are sufficient for all the purposes for which they are being issued.

(b) The Project. The Obligated Group Agent may request disbursements from the Project Fund to pay the costs of the Project. The Obligated Group Agent must (a) construct the Hospital Facilities constituting a portion of the Project with all reasonable dispatch and in accordance with all applicable building, zoning, planning, environmental, certificate of need and other similar governmental regulations; (b) pay all costs of the Project from funds made available under the Loan Agreement or otherwise; and (c) enforce the provisions of any contract, agreement, obligation, bond or other performance security with respect to the Project.

For those Hospital Facilities constituting a portion of the Project, the Obligated Group Agent must deliver to the Bond Trustee the disbursement request required by the Bond Indenture, and either (a) if required by law, a certificate of need for the Hospital Facilities for which disbursement is requested; (b) a certificate of the West Virginia Health Care Authority to the effect that a certificate of need is not required for the asset or (c) an Officer's Certificate to the effect that a certificate of need is not required for the asset. If the disbursement request is accompanied by either item (b) or (c), the Obligated Group Agent must also demonstrate in an Officer's Certificate that the requirements of Section 20 of Article 29A of Chapter 16 of the West Virginia Code, 1931, have been met, relating to consultation with the West Virginia Health Care Authority for projects for which a certificate of need is not necessary.

If the money in the Project Fund is not sufficient to pay all costs of the Project, subject to the provisions of the Loan Agreement relating to modifications to the Project, the Obligated Group must, nonetheless, complete the Project in order to fulfill the public purposes of the Act and must pay all costs of the completion from its own funds. The Obligated Group will not be entitled to any reimbursement for the completion costs from the Authority or the Bond Trustee; nor will it be entitled to any abatement, diminution or postponement of the Loan Repayments.

(c) <u>Completion Date</u>. The Completion Date of the Hospital Facilities portion of the Project must be evidenced to the Authority and the Bond Trustee by an Officer's Certificate stating:

- (1) the date on which the Hospital Facilities portion of the Project was substantially complete;

- (2) that all other Hospital Facilities necessary in connection with the Hospital Facilities portion of the Project have been acquired and constructed;

- (3) that the Hospital Facilities portion of the Project has been completed in such a manner as to conform with all zoning, planning, building, environmental, certificate of need and other similar governmental regulations to the extent that the same are applicable to the Project or any portion thereof; and

- (4) that all costs of the Hospital Facilities portion of the Project then due and payable have been paid.

Covenants as to Existence and Maintenance of Properties. Each member of the Obligated Group will maintain its corporate existence and its properties to the extent required by the Master Indenture.

Consolidation, Merger, Sale or Conveyance. No member of the Obligated Group will consolidate or merge with or sell or convey all or substantially all of its assets to another entity except as permitted by the provisions of the Master Indenture.

Preservation of Exempt Status. Each member of the Obligated Group agrees that: (a) it will neither perform nor fail to perform any acts, enter into any agreements, carry on or permit to be carried on any activities in its Hospital Facilities, or permit its Hospital Facilities to be used in or for, any trade or business, that adversely affects the basis for the exemption under Code Section 501(a), nor allow either of the Acquired Hospitals to do so; (b) it will not permit to be used, directly or indirectly, the Hospital Facilities or any of its facilities or any other property in any trade or business, the conduct of which would adversely affect the basis for the exemption under Code Section 501(a), nor allow either of the Acquired Hospitals to do so; and (c) it will neither perform nor fail to perform any acts, enter into any agreements, carry on or permit to be carried on any activities in its Hospital Facilities that would adversely affect the exclusion from gross income of interest on the 2006 Bonds), nor allow either of the Acquired Hospitals to do so.

Nondiscrimination. The Obligated Group Agent shall assure that all Hospital Facilities financed or refinanced pursuant to the Loan Agreement and through the proceeds of the 2006 Bonds will be open to all, regardless of race, religion, sex or creed, and that all contractors and subcontractors engaged in the construction of Hospital Facilities shall provide an equal opportunity for employment without discrimination as to race, religion, sex or creed.

Code Prohibition. The Obligated Group Agent represents that none of the proceeds of the Debt to be Refinanced were used and none of the proceeds of the 2006 Bonds will be used to provide any airplane, skybox or other private luxury box, or health club facility not substantially related to the exempt purposes of the members of the Obligated Group; any facility primarily used for gambling; or any store the principal business of which is the sale of alcoholic beverages for consumption off premises.

Other Uses of Proceeds. As required by the Authority as a condition to making the Loan to the Obligated Group as part of the Authority's governmental program, the Obligated Group Agent hereby covenants that it will not, and it will not permit any company affiliated with it over which it has control to, purchase any bonds issued by the Authority as part of its governmental program in an amount related to the amount of the Loan to Obligated Group by the Authority.

## SUMMARY OF AGREEMENT WITH BOND INSURER

*The following is a summary of certain provisions of Supplemental Master Trust Indenture 2006-2 (the "Supplement"), relating to the 2006 Bonds. All such summary statements do not purport to be complete and are subject and qualified in their entirety by reference to the Supplement.*

In connection with the issuance of the financial guaranty insurance policy (the "Policy"), by Ambac Assurance Corporation (the "Bond Insurer"), the Bond Insurer required that the Obligated Group agree to comply with certain covenants (the "Insurance Covenants"). The Insurance Covenants are contained in the Supplement.

The Insurance Covenants will apply only so long as (i) the 2006 Bonds are outstanding and (ii) the Bond Insurer is not in default of its obligations under the Policy. *In addition, the Insurance Covenants can be amended, waived, modified and enforced exclusively by the Bond Insurer and any such amendment, waiver, modification or enforcement does not require the consent or participation of the holders of the 2006 Bonds. Consequently, there can be no assurance that the Insurance Covenants will be in effect at any time.*

### Definitions

"Accounts" shall mean, collectively, all accounts (as defined in the UCC), accounts receivable, other receivables, contracts, contractual rights, tax refunds or other obligations or indebtedness owing to any Member of the Obligated Group of any kind or description, secured or unsecured, now or hereafter existing, whether or not arising out of or in connection with the payment for goods sold or leased, for services rendered, whether or not earned by performance, and all sums of money or other proceeds due or not earned by performance, and all sums of money or other proceeds due or becoming due thereon, together with all rights now or hereafter existing under guarantees and collateral security therefore and under leases and other contracts securing, guaranteeing or otherwise relating to any of the foregoing, including without limitation (a) all rights to receive any performance or any payments in money or in kind; (b) all right, title and interest in and to the goods, services or other property that give rise to or that secure any of

C-84

the foregoing, and insurance policies and proceeds thereof relating thereto; (c) all rights as an unpaid seller of goods and services including, without limitation, all rights or stoppage in transit, replevin, reclamation and resale; (d) all rights to receive any Medicare/Medicaid Receivables or any other federal programs or state and local governmental programs providing for the payment of or reimbursement for services rendered, and private insurance program (including, without limitation, Blue Cross and prepaid health organizations, including health maintenance organizations and preferred provider organizations), in each case only to the extent permitted under applicable law; (e) reversionary interest in pension and profit-sharing plans, and reversionary, beneficial and residual interest in trusts, credits with and any other claims against any Person; and (f) all ledger sheets, files, records and documents relating to any of the foregoing, including all computer records, programs, storage media and computer software used or required in connection therewith.

"Adjusted Operating Revenues" shall mean total operating and non-operating revenues, excluding net unrealized gains (losses) on the valuation of investments, but including payments of swap-related termination fees from a swap counterparty. Net unrealized derivative contract gains (losses) shall also be excluded from this calculation.

"Bank Accounts" shall mean all deposit accounts and shall include, without limitation, all checking, investment or deposit accounts (general or specific, time or demand, provisional or final) at any time maintained by any Member of the Obligated Group, including without limitation M/M Accounts, and all moneys, securities, instruments, and general intangibles deposited or held therein; provided, that Contributions on deposit or deposited therein and designated or specified by the granting authority, donor or maker thereof as being for specified purposes (other than payment of debt service on Indebtedness) and the income derived therefrom to the extent required by such designation or specification shall be excluded from Bank Accounts.

"Book Value," when used with respect to Property, Plant and Equipment of a Member, means the value of such Property, Plant and Equipment net of accumulated depreciation and amortization, as reflected in the most recent audited financial statements of such Member which have been prepared in accordance with generally accepted accounting principles, and, when used with respect to Property, Plant and Equipment of all Members, means the aggregate of the values of such Property, Plant and Equipment net of accumulated depreciation and amortization, as reflected in the most recent audited combined financial statements of the Obligated Group prepared in accordance with generally accepted accounting principles, provided that such aggregate shall be calculated in such a manner that no portion of the value of any Property, Plant and Equipment of any Member is included more than once.

"Capitalization" shall mean the sum of consolidated Indebtedness and unrestricted net assets of the Obligated Group less all obligations due from Affiliates that are not Members of the Obligated Group.

"Change in Control" shall mean the occurrence of one or both of the following events:

C-85

(a)     The Governing Body of any Member of the Obligated Group grants to any Person the right to appoint members of the Governing Body; or

(b)     A majority of the members of the Governing Body of any Member of the Obligated Group is employed or controlled by or affiliated with any one Person.

"Contract Rights" shall mean all rights of any Member of the Obligated Group in and to contracts to which the Member of the Obligated Group is now or shall become a party pursuant to which the Member of the Obligated Group has the right to perform medical and/or management services and receive payment, reimbursement, insurance proceeds or any other form or manner of compensation, including without limitation, the Medicare and Medicaid reimbursement agreements to which the Member of the Obligated Group is a party and any and all other agreements and/or arrangements between the Member of the Obligated Group and a governmental or quasi-governmental entity pursuant to which the Member of the Obligated Group provides such healthcare service and receives any form of payment, and any other agreements pursuant to which the Member of the Obligated Group provides healthcare services on a reimbursed, capitated or other form of payment arrangement.

"Days of Unrestricted Cash on Hand" shall mean the ratio of (i) Unrestricted Cash and Investments of the Obligated Group, as shown on the financial statements for the fiscal year, to (ii) the quotient of total Expenses of the Obligated Group, as shown on such financial statements, divided by 365. Testing at the six-month interval shall use six month interim numbers (instead of "financial statements for such fiscal year") and will be divided by 182 instead of 365.

"Depository Institution" shall mean any financial Institution that enters into a depository agreement with a Member of the Obligated Group and the Master Trustee.

"Funded Indebtedness Ratio" means the ratio consisting of (i) a numerator equal to the amount determined by dividing the Obligated Group's total Indebtedness by the Obligated Group's total Capitalization (as reflected in or derived from the most recent audited combined financial statements of the Obligated Group prepared in accordance with generally accepted accounting principles and without including any item more than once) and (ii) a denominator of one.

"General Intangible" shall mean the right to use all general intangibles (as such term is defined in Section 9-106 of the UCC) of the Member of the Obligated Group, including, without limitation, trademarks, copyrights, patents, contracts, licenses, and franchises, trade names, computer programs and other computer software, inventions, designs, trade secrets, goodwill, proprietary rights, customer lists, supplier contacts, sale orders, correspondence and advertising materials.

"Income Available for Debt Service" shall mean the excess of Revenues over Expenses determined in accordance with Generally Accepted Accounting Principles, provided, however, that no determination thereof shall take into account any extraordinary gains or losses, unrealized gains or losses resulting from the periodic valuation of investments, interest rate swap

C-86

agreements, or similar agreements. Income Available for Debt Service shall, however, include "other-than-temporary" impairment losses recorded pursuant to FAS 115.

"Medicaid" shall mean the Medicaid program as established pursuant to the Social Security Act (42 U.S.C. §1395 *et. seq.*) and related statutes, and any successor, replacement or related program.

"Medicare/Medicaid Receivables" shall mean all accounts and other rights to payment now or at any time hereafter owing, and all reimbursements now or hereafter due, whether directly or indirectly through and intermediary, from the Center for Medicare and Medicaid Services, the United States Department of Health and Human Services, and other governmental authority, or any other Person in connection with Medicare and Medicaid, the Civilian Health and Medical Program of the Uniform Services and the Civilian Health and Medical Program of the Veterans' Administration.

"M/M Account" shall mean a deposit account with a Depository Institution to which all payments with respect to Medicare/Medicaid Receivables are remitted.

"Related Rights" shall mean all chattel paper, documents' and/or instruments relating to the Accounts, the General Intangibles, the Gross Receipts, the Contract Rights, and the Bank Accounts and all rights now or hereafter existing in and to all security agreements, leases and other contracts securing or otherwise relating to the Accounts, the Gross Receipts, the Contract Rights or the General Intangibles or any such chattel papers, documents and/or instruments.

"Restricted Accounts" shall mean collectively, those accounts designated as Restricted Accounts in each of the Depository Agreements.

"Synthetic Debt" shall mean eight times (8x) the maximum annual synthetic lease payment in connection with an off-balance sheet lease for the purpose of acquiring or financing a capital asset.

"UCC" shall mean the Uniform Commercial Code in effect from time to time in the State of West Virginia.

## Amendments to Master Indenture Defined Terms

In addition to the other amendments made in the Supplemental Indenture, so long as the Policy is in effect and the Bond Insurer is not in default thereunder, the following definitions in the Original Master Indenture are hereby amended and restated to read as follows:

"Expenses" shall mean, for any period, the aggregate of all expenses calculated under generally accepted accounting principles, including, without limitation, any taxes, incurred by the Person or group of Persons involved during such period, minus (i) interest on Funded Indebtedness, (ii) depreciation and amortization, (iii) extraordinary losses as defined under generally accepted accounting principles, (iv) losses resulting from the extinguishment or refunding of indebtedness or from the sale, exchange or other disposition of capital assets other

C-87

than in the ordinary course of business, (v) losses resulting from any write-down, reappraisal, revaluation or impairment of capital assets (including, without limitation, intangibles), (vi) any unrealized loss resulting from or relating to changes in the value, including "other than temporary" declines in value, of investment securities or Interest Rate Agreements; and (vii) if such calculation is being made with respect to the Obligated Group, excluding any such expenses attributable to transactions between any Member and any other Member.

"Funded Indebtedness" shall have the meaning set forth in the Master Indenture, but shall also include all Short-Term Indebtedness and the current portion of Long Term Indebtedness.

"Indebtedness" on a consolidated basis when referring to Indebtedness of the Obligated Group, shall mean (i) all obligations of the Obligated Group for borrowed money or with respect to deposits or advances of any kind; (ii) all obligations of the Obligated Group evidenced by bonds, debentures, notes or similar instruments; (iii) all obligations of the Obligated Group upon which interest charges are customarily paid; (iv) all obligations of the Obligated Group under conditional sale or other title retention agreements relating to property acquired by the Obligated Group; (v) all obligations of the Obligated Group in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (vi) all Indebtedness of others secured by (or for which the holder of the Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on Property owned or acquired by the Obligated Group, whether or not the Indebtedness secured thereby has been assumed; (vii) all Guarantees by the Obligated Group of Indebtedness of others, excluding operating lease payment guarantees; (viii) all Capitalized Leases of the Obligated Group; (ix) all obligations, contingent or otherwise of the Obligated Group as an account party in respect to letters of credit and letters of guaranty; (x) all obligations, contingent or otherwise, of the Obligated Group in respect of bankers' acceptances; (xi) the short-term portion of Long-Term Indebtedness; and (xii) Short-Term Indebtedness. The Indebtedness of the Obligated Group shall include the Indebtedness of any other Person (including any partnership in which the Obligated Group or any Member thereof is a general partner) to the extent the Obligated Group is liable therefore as a result of the Obligated Group's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that the Obligated Group is not liable therefore. With the exception of synthetic or other equipment leases, Indebtedness shall include capital leases that are off balance sheet, synthetic or similar leases for the purpose of acquiring or financing a capital asset, and shall be valued at 8.00 times the annual lease payment.

"Projected Rate" shall mean the greater of the actual variable rate for the preceding 12-month period or the 30-year Revenue Bond Index.

**Gross Receipts Pledge**

So long as the 2006 Bonds are Outstanding (regardless of whether the Bond Insurer is in default under the Policy), as security for its obligation to make payments on the 2006 Notes, the Swap Note and other obligations heretofore or hereafter issued under the Master Indenture on a parity with the Series 2006 Notes and the Swap Note, the Obligated Group, by the Supplemental Indenture, hereby pledges, assigns, conveys, transfers, grants and ratifies to the Master Trustee a first priority security interest in, general lien upon and the right of set-off against the following described personal property of the Members of the Obligated Group, whether now owned or existing or hereafter acquired or arising and where ever located, of Supplemental Indenture 2003-1 to the Master Indenture is hereby amended and restated to reflect such pledge:

(1)     All of each Member's Gross Receipts, Accounts, Bank Accounts, General Intangibles, Contract Rights and all Related Rights;

(2)     Except as specifically provided in the Master Indenture, all moneys and securities held from time to time by the Master Trustee under the Master Indenture, including, without limitation, moneys and securities held in the funds and accounts established under the Master Indenture; and

· (3)     All proceeds, cash proceeds, cash equivalents, products, replacements, additions and improvements to substitutions for, and accessions of any and all property described in subsections (1) and (2) above.

**Springing Debt Service Reserve Fund.**

So long as the Policy is in effect and the Bond Insurer is not in default thereunder:

(1)     If, at the end of any fiscal year, any of the following events occur, the Obligated Group shall fund a Debt Service Reserve Fund for the 2006 Bonds with the Bond Trustee in an amount equal to the Reserve Fund Requirement (as defined in subsection (2) below):

(a)     The Obligated Group's Debt Service Coverage Ratio is less than 2.0 and Days of Unrestricted Cash on Hand are less than 175;

(b)     The Cushion Ratio for the Obligated Group is less than 1.75; or

(c)     The Obligated Group's Days of Unrestricted Cash on Hand is less than 90.

(2)     The Reserve Fund Requirement shall equal the **lesser of** (a) 10% of the principal amount of 2006 Bonds Outstanding; (b) the Maximum Annual Debt Service Requirement on the 2006 Bonds; or (c) 125% of average annual debt service on the 2006 Bonds. For 2006 Bonds with a variable rate of interest, the interest rate assumption for purposes of establishing the Reserve Fund Requirement shall be

equal to the **greater of** the average variable rate for the preceding fiscal year and The Bond Buyer Revenue Bond Index at the time such funding is required, plus 50 basis points.

(3)     If the Debt Service Reserve Fund is required to be funded under subsection (1) above, the Obligated Group shall fund such Debt Service Reserve Fund in thirty (30) days.

(4)     The Debt Service Reserve Fund shall be terminated at the end of any fiscal year, and the funds returned to the Obligated Group, if: (a) the Obligated Group is not in default under the 2006 Loan Agreement, and (b) each of the following conditions are met: (i) (A) the Obligated Group's Debt Service Coverage Ratio is 2.0 or greater, or, (B) if the Obligated Group's Debt Service Coverage Ratio is below 2.0, the Obligated Group's Days of Unrestricted Cash on Hand are greater than 175; (ii) the Cushion Ratio for the Obligated Group is 1.75 or greater; and (iii) Days of Unrestricted Cash on Hand exceeds 90.

## Permitted Encumbrances

So long as the Policy is in effect and the Bond Insurer is not in default thereunder, the Master Indenture shall be revised as follows:

> after giving effect to such Lien and all other Liens classified as Permitted Encumbrances under this subsection, those liens and encumbrances described in paragraphs (u), (w) and (x) of the definition of Permitted Encumbrances, the Book Value or, at the option of the Obligated Group Agent, the Current Value of the Property, Plant and Equipment of the Obligated Group which is Encumbered, together with any collateral posted by the Obligated Group as security for its obligation to make early termination payments under any Interest Rate Agreement is not more than 20% of the Book Value of all of all Property, Plant and Equipment of the Obligated Group, and no more than 15% of the Book Value of all Property, Plant and Equipment of the Obligated Group excluding any collateral posted by the Obligated Group as security for its obligation to make early termination payments under any Interest Rate Agreement (in each case calculated on the same basis as the value of the Encumbered Property); and

## Change in Control

For so long as the Policy is in effect and Bond Insurer is not in default thereunder, each Member of the Obligated Group shall preserve its corporate existence and, unless it receives the prior written consent of the Bond Insurer, shall continue to deliver essentially the same health care services it currently delivers; provided, however, that nothing herein contained shall be construed to obligate such Member to retain, preserve or keep in effect the rights, licenses or qualifications no longer used or, in the reasonable judgment of its Governing Body, useful in the conduct of its business. So long as the Policy is in effect and the Bond Insurer is not in default

thereunder, there shall not, without the Bond Insurer's prior written consent, be a Change in Control of any Member of the Obligated Group.

## Total Debt to Capitalization Ratio

So long as the Policy is in effect and the Bond Insurer is not in default thereunder, the Obligated Group covenants that the Funded Indebtedness Ratio of the Obligated Group will never be greater than 0.67:1. Compliance with such covenant shall be tested as required by the Supplemental Indenture and at the end of each fiscal year, based on audited annual financial statements when available (but no later than 120 days after fiscal year-end). If the Funded Indebtedness Ratio is greater than 0.67:1 as a result of factors other than the incurrence of Indebtedness, then such event shall not constitute an event of default under the Master Indenture if, by the end of the next succeeding fiscal year, the Funded Indebtedness Ratio is not more than 0.67:1.

## Permitted Indebtedness

For so long as the Bond Insurance Policy is in effect and the Bond Insurer is not in default thereunder:

(1) The Master Indenture is hereby amended and restated to read as follows:

(a) An Officer's Certificate from the Obligated Group Agent (which Officer's Certificate, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) stating that the Historical Debt Service Coverage Ratio of the Obligated Group for the fiscal year next preceding the incurrence of such Funded Indebtedness for which combined financial statements reported upon by independent certified public accountants are available was not less than 1.10:1; and (b) (1) a written Consultant's report (which report, including, without limitation, the scope, form, substance and other aspects thereof, is acceptable to the Master Trustee) to the effect that the Projected Debt Service Coverage Ratio of the Obligated Group for each of the next two succeeding fiscal years or, if such Indebtedness is being incurred in connection with the financing of Facilities, the two fiscal years succeeding the projected completion date of such Facilities, is not less than 1.10:1, or (2) an Officer's Certificate from the Obligated Group Agent in a form acceptable to the Master Trustee to the effect that the Projected Debt Service Coverage Ratio of the Obligated Group for each of the next two succeeding fiscal years or, if such Indebtedness is being incurred in connection with the financing of Facilities, the two fiscal years succeeding the projected completion date of such Facilities, is not less than 1.20:1, provided that either of such reports shall include forecast balance sheets, statements of revenues and expenses and statements of cash flows for each of such two fiscal years and a statement of the relevant assumptions upon which such forecasted statements are based, which financial statements must indicate that sufficient revenues and cash flow could be generated to pay the operating expenses of the Obligated Group's proposed and existing Facilities and the debt

service on the Obligated Group's other existing Indebtedness during such two fiscal years.

(2)     The Master Indentures is hereby amended and restated to add a new provision, as follows:

Notwithstanding any other provision of the Supplemental Indenture, Short-Term Indebtedness shall be limited to the **lesser of**, 25% of Revenues of the Obligated Group, or 20% of Unrestricted Cash and Investments of the Obligated Group.

(3)     The Master Indenture is hereby amended and restated to substitute "5%" for "10%."

(4)     The Master Indenture is hereby amended and restated to add a new paragraph, as follows:
Notwithstanding any other provision of the Supplemental Indenture, the combined Indebtedness incurred under the Supplemental Indenture shall not exceed 25% of Revenues of the Obligated Group, as of the date of calculation.

(5)     The definition of Permitted Encumbrances is hereby amended and restated to read as follows:

(u)     Liens on accounts receivable (including, but not limited to, those Liens arising as a result of the sale of such accounts receivable, with or without recourse, on commercially reasonable terms), provided that the principal mount of Indebtedness secured by such Lien does not exceed 15% of the total net accounts receivable;

### Unrestricted Cash and Investments Transfers and Loans to Entities Outside the Obligated Group

So long as the Bond Insurance Policy is in effect and the Bond Insurer is not in default thereunder, a Member of the Obligated Group may not dispose of, transfer or loan to any Person not a Member of the Obligated Group or invest in other than marketable or liquid securities (each, a "Disposition") any Unrestricted Cash or Investments unless (i) the aggregate of such Dispositions in the fiscal year does not exceed 10% of the Unrestricted Cash or Investments; (ii) the Days of Unrestricted Cash on Hand at least equals 90, each of (i) and (ii) calculated as of the date of the Disposition, after giving effect to the Disposition and based on the most recent audited financial statements available; (iii) no Event of Default or Event of Restriction has occurred and is continuing. The Original Master Indenture is hereby amended to conform to the foregoing.

### Covenants of Supplemental Indenture 2003-1

Except as otherwise modified or amended herein, for so long as the Policy is in effect and the Bond Insurer is not in default thereunder, the Bond Insurer shall be entitled to all

C-92

of the benefits of the covenants contained in Supplemental Indenture 2003-1 to the Master Indenture, as if set forth fully herein, and regardless of whether the 2003-1 Supplemental Indenture remains in effect.

**Bond Insurer Provisions**

So long as the Bond Insurance Policy is in effect and the Bond Insurer is not in default thereunder, the Obligated Group hereby agrees as follows:

(1) Any provision of the Supplemental Indenture expressly recognizing or granting rights in or to the Bond Insurer may not be amended in any manner which adversely affects the rights of the Bond Insurer hereunder without the prior written consent of the Bond Insurer. The Bond Insurer reserves the right to charge the Obligated Group a reasonable and customary fee for any consent or amendment to the Master Indenture while the Bond Insurance Policy is Outstanding.

(2) The Obligated Group Agent shall notify the Bond Insurer of any loss or change in chief executive officer, chief financial officer or chief operating officer of any Member within 30 days of such loss or change.

(3) The Obligated Group Agent shall notify the Bond Insurer within 10 days of any change in ownership, merger or change in the Obligated Group.

(4) The Obligated Group shall give to the Bond Insurer as promptly as practicable, but in no event later than five business days after the same shall first become known to the Obligated Group, notice of the occurrence of any Event of Default or of any event which, with the passage of time or the giving of notice, or both, would constitute an Event of Default.

(5) The Obligated Group Agent shall notify the Bond Insurer within 30 days of any litigation or investigation by a governmental entity that may have a material adverse effect on the Corporation or the Obligated Group's financial or operating status.

(6) The Obligated Group Agent shall provide annual audited financial statements of the Obligated Group, including combining schedules and management letters, to the Bond Insurer within 150 days (or such earlier time provided elsewhere in Master Indenture or the Bond Indenture) of the end of its fiscal year. The Obligated Group Agent shall complete the Bond Insurer's "Information Update Form for Health Care Issuers" and provide to the Bond Insurer upon request certain records and notices, including financial reports, operational statistics, non-default letters and strategic plans.

(7) The Obligated Group will permit the Bond Insurer to discuss the affairs, finances and accounts of the Obligated Group or any information the Bond Insurer may

reasonably request regarding the security for the 2006 Bonds, with appropriate officers of the Obligated Group. The Trustee or the Obligated Group, as appropriate, will permit the Bond Insurer to have access to the Project, and have access to and to make copies of all books and records relating to the 2006 Bonds at any reasonable time. The Bond Insurer shall have the right to direct an accounting at the Obligated Group's expense, and the Obligated Group's failure to comply with such direction within thirty (30) days after receipt of written notice of the direction of the Bond Insurer shall be deemed a default hereunder; provided, however, that if compliance cannot occur within such period, then such period will be extended so long as compliance is begun within such period and diligently pursued, but only if such extension would not materially adversely affect the interests of any registered owner of the 2006 Bonds.

(8)     Any reorganization or liquidation plan with respect to the Obligated Group must be acceptable to the Bond Insurer. In the event of any reorganization or liquidation, the Bond Insurer shall have the right to vote on behalf of all Holders who hold Bond Insurer-insured obligations absent a default by Bond Insurer under the applicable Financial Guaranty Insurance Policy insuring such obligations.

## Events of Default

So long as the Bond Insurance Policy is in effect and the Bond Insurer is not in default thereunder, neither the 2006 Notes nor the Related Bonds or any Related Loan Document may be accelerated except with the consent of or at the direction of the Bond Insurer.

## Bond Insurer and Swap Insurer as Third Party Beneficiary

To the extent that the Supplemental Indenture confers upon or gives or grants to the Bond Insurer or the Swap Insurer any right, remedy or claim, the Bond Insurer or the Swap Insurer, as the case may be, is hereby explicitly recognized as being a third-party beneficiary hereunder and may enforce any such right, remedy or claim conferred, given or granted hereunder.

## Subrogation Rights of Bond Insurer and Swap Insurer Upon Payment under Policy or Swap Insurance Policy

Upon any payment by the Bond Insurer under the Policy, the Bond Insurer shall be fully subrogated to the extent of all rights and remedies of the owners of the 2006 Bonds under the 2006 Related Bond Indenture which rights and remedies shall become the rights and remedies of the Bond Insurer. No payments by the Bond Insurer under the Policy shall operate to reduce the Obligated Group's obligations under the documents governing the 2006 Bonds (the "Bond Documents"), and such 2006 Bonds shall for all purposes remain Outstanding until such time as the Bond Insurer is paid in full for payments made by the Bond Insurer under the Policy (provided that any payments on the 2006 Bonds owned by the Bond Insurer as a Bondholder will be credited against payments otherwise due the Bond Insurer from the Obligated Group). Upon payment by the Swap Insurer under the Swap Insurance Policy, the Swap Insurer shall be fully subrogated to the rights of UBS to receive Scheduled Payments (as defined in the Swap

Insurance Policy) under the Master Agreement. The Obligated Group shall reimburse the Swap Insurer for all amounts paid under the Swap Insurance Policy and all costs of collection thereof and enforcement of the Master Agreement at the Insurer Payment Rate (as defined in the Swap Insurance Policy). No payments by the Swap Insurer under the Swap Insurance Policy shall operate to reduce the Obligated Group's obligations under the Master Agreement, and the Swap Note shall for all purposes remain Outstanding until such time as the Swap Insurer is paid in full for payments made by the Swap Insurer under the Swap Insurance Policy.

## Waiver or Consent to Amendment by the Bond Insurer

The Bond Insurer may, in its sole and exclusive discretion, agree to amend or waive any covenant or agreement contained in the Supplement by giving written notice of such amendment or waiver to the Corporation, as Obligated Group Agent. It is expressly understood and agreed that no such amendment or waiver shall be construed or deemed an amendment or a waiver of any terms or provisions of the Bond Documents or the Master Indenture or any other provision of the Supplemental Indenture. The Bond Insurer shall also have the exclusive right to consent to amendments to the Supplemental Indenture proposed by the Obligated Group, and, should the Bond Insurer consent, the Master Trustee shall execute the Supplement containing such amendment.

## Direction of Bond Trustee; Events of Default

The Bond Insurer shall be entitled to direct the Bond Trustee as Holder of the Series 2006 Notes in all actions, notices and directives taken under the Master Indenture, including such rights as the Holder of the Series 2006 Notes may have regarding declaring or noticing a breach to become an Event of Default. So long as the Bond Insurance Policy is in effect and the Bond Insurer is not in default thereunder, a failure to comply with the covenants set forth in the Supplemental Indenture and in the Master Indenture as amended and supplemented hereby shall constitute an Event of Default under the Master Indenture and, consequently, under the Related Loan Agreement and the Related Bond Indenture, the same as if they were set forth in full in the Master Indenture.

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX D**

# Ambac

## Financial Guaranty Insurance Policy

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

Obligor:                                                                Policy Number:

Obligations:                                                           Premium:

Ambac Assurance Corporation (Ambac), a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

**SEAL**
WISCONSIN

Secretary

Effective Date:

Authorized Representative

THE BANK OF NEW YORK acknowledges that it has agreed to perform the duties of Insurance Trustee under this Policy.

Form No.: 2B-0012 (1/01)

Authorized Officer of Insurance Trustee

D-1

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX E**

## SPECIAL PROVISIONS RELATING TO ARCs

### TABLE OF CONTENTS

Page

Section 100. Definitions ............................................................................................................. E-1
Section 101. Global Form; Securities Depository ...................................................................... E-7
Section 102. Interest on ARCs ................................................................................................... E-9
Section 103. Payments ................................................................................................................ E-9
Section 104. Auction Procedures ............................................................................................... E-10
Section 105. Certain Orders Not Permitted ............................................................................... E-17
Section 106. Payment of Service Charges, Notice of Default and Cures ................................. E-17
Section 107. Calculation of Rates ............................................................................................. E-18
Section 108. Computation of Interest ........................................................................................ E-18
Section 109. Notification of Rates, Amounts and Payment Dates ............................................ E-18
Section 110. Adjustment with Respect to ARC Provisions ...................................................... E-19
Section 111. Adjustment to Percentages ................................................................................... E-19
Section 112. Auction Agent ....................................................................................................... E-20
Section 113. Broker-Dealers ...................................................................................................... E-21
Section 114. Changes in Auction Periods or Auction Dates ..................................................... E-21
Section 115. Credit Ratings ........................................................................................................ E-23
Section 116. Notices ................................................................................................................... E-23
Section 117. Purchases of ARCs ................................................................................................ E-23
Section 118. Notice of Payment Default ..................................................................................... E-23
Section 119. Redemption Dates and Prices ............................................................................... E-24

[THIS PAGE INTENTIONALLY LEFT BLANK]

## SPECIAL PROVISIONS RELATING TO ARCs

**Section 100.  Definitions.**

In addition to the words and terms elsewhere defined in the Bond Indenture, the following words and terms as used in this Appendix and elsewhere in the Bond Indenture shall have the following meanings with respect to the 2006 Bonds of each series in an Auction Rate Period unless the context or use indicates another or different meaning or intent:

**"All-Hold Rate"** means, on any date of determination, for (i) an Auction Period of seven days or less, the interest rate per annum equal to 85% of the Index on such date; (ii) an Auction Period of 28- or 35-days, the interest rate per annum equal to 95% of the Index; or (iii) an Auction Period greater than 35 days, the interest rate per annum equal to 75% of the Index on such date, provided that in no event shall the All-Hold Rate be more than the Maximum Rate.

**"Applicable ARCs Rate"** has the meaning assigned to such term in Section 102.b of this Appendix E.

**"Applicable Number of Business Days"** means the greater of two Business Days or one Business Day plus the number of Business Days by which the Auction Date precedes the first day of the next succeeding Interest Period.

**"ARCs"** means the Bonds outstanding as Auction Rate Certificates prior to their conversion, if ever, to bear interest at Weekly Rates or a Fixed Rate.

**"Auction"** means each periodic implementation of the Auction Procedures.

**"Auction Agency Agreement"** means the Auction Agency Agreement, dated as of June 8, 2006, relating to the ARCs between the Trustee and the Auction Agent, and any similar agreement with a successor Auction Agent, in each case as from time to time amended or supplemented.

**"Auction Agent"** means any person appointed as such pursuant to Section 112 of this Appendix E.

**"Auction Agent Fee"** means the fee to be paid to the Auction Agent for the services rendered by it under the Auction Agency Agreement and the Broker-Dealer Agreement.

**"Auction Date"** means with respect to the 2006 B Bonds, June 19, 2006, with respect to the 2006 C Bonds, June 20, 2006, and with respect to the 2006 D Bonds, June 22, 2006, and thereafter the Business Day immediately preceding the first day of each Interest Period, other than:

each Interest Period commencing after the ownership of the ARCs is no longer maintained in book entry form by the Securities Depository;

each Interest Period commencing after the occurrence and during the continuance of a Payment Default; or

any Interest Period commencing less than the Applicable Number of Business Days after the cure or waiver of a Payment Default.

Notwithstanding the foregoing, the Auction Date for one or more Auction Periods may be changed pursuant to Section 114 of this Appendix E.

"**Auction Period**" means (i) with respect to ARCs in a seven-day mode, any of (A) a period, generally of seven days, beginning on and including a Monday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Sunday) and ending on and including the Sunday thereafter (unless such Sunday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day), (B) a period, generally of seven days, beginning on and including a Tuesday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Monday) and ending on and including the Monday thereafter (unless such Monday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day), (C) a period, generally of seven days, beginning on and including a Wednesday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Tuesday) and ending on and including the Tuesday thereafter (unless such Tuesday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day), (D) a period, generally of seven days, beginning on and including a Thursday (or a day following the last day of the prior Auction Period if the prior Auction Period does not end on a Wednesday) and ending on and including the Wednesday thereafter (unless such Wednesday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day) or (E) a period, generally of seven days, beginning on and including a Friday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Thursday) and ending on and including the Thursday thereafter (unless such Thursday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day), (ii) with respect to ARS in a 28-day mode, any of (A) a period, generally of 28 days, beginning on and including a Monday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Sunday) and ending on and including the fourth Sunday thereafter (unless such Sunday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day), (B) a period, generally of 28 days, beginning on and including a Tuesday (or a day following the last day of the prior Auction Period if the prior Auction Period does not end on a Monday) and ending on and including the fourth Monday thereafter (unless such Monday is not followed by a Business Day, in which case ending on and including the next succeeding day followed by a Business Day), (C) a period, generally of 28 days, beginning on and including a Wednesday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Tuesday) and ending on and including the fourth Tuesday thereafter (unless such Tuesday is not followed by a Business Day, in which case ending on and including the next succeeding day followed by a Business Day), (D) a period, generally of 28 days, beginning on and including a Thursday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Wednesday) and ending on and including the fourth Wednesday thereafter (unless such Wednesday is not followed by a Business Day, in which case ending on and including the next succeeding day followed by a Business Day) or (E) a period, generally of 28 days, beginning on and including a

Friday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Thursday) and ending on and including the fourth Thursday thereafter (unless such Thursday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day); and (iii) with respect to ARCs in a 35-day mode, any of (A) a period, generally of 35 days, beginning on and including a Monday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Sunday) and ending on and including the fifth Sunday thereafter (unless such Sunday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day), (B) a period, generally of 35 days, beginning on and including a Tuesday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Monday) and ending on and including the fifth Monday thereafter (unless such Monday is not followed by a Business Day, in which case ending on and including the next succeeding day followed by a Business Day), (C) a period, generally of 35 days, beginning on and including a Wednesday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Tuesday) and ending on and including the fifth Tuesday thereafter (unless such Tuesday is not followed by a Business Day, in which case ending on and including the next succeeding day followed by a Business Day), (D) a period, generally of 35 days, beginning on and including a Thursday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Wednesday) and ending on and including the fifth Wednesday thereafter (unless such Wednesday is not followed by a Business Day, in which case ending on and including the next succeeding day followed by a Business Day) or (E) a period, generally of 35 days, beginning on and including a Friday (or the day following the last day of the prior Auction Period if the prior Auction Period does not end on a Thursday) and ending on and including the fifth Thursday thereafter (unless such Thursday is not followed by a Business Day, in which case ending on and including the next succeeding day which is followed by a Business Day) and (iv) a Special Auction Period; provided, however, that the initial Auction Period with respect to the 2006 B Bonds, the 2006 C Bonds, and the 2006 D Bonds shall begin on and include the Closing Date, and that in the event of a Conversion of the 2006 B Bonds, the 2006 C Bonds, and the 2006 D Bonds from another Interest Rate Period to an ARC Interest Rate Period the initial Auction Period following such Conversion shall begin on and include the Conversion Date.

"**Auction Procedures**" means the procedures set forth in Section 104 of this Appendix E.

"**Auction Rate**" means the rate of interest per annum on any Auction Date that results from the implementation of the Auction Procedures, and determined as described in Section 104 of this Appendix E.

"**Authorized Denominations**" with respect to the ARCs means $25,000 and integral multiples thereof.

"**Available ARCs**" has the meaning assigned to such term in Section 104c.i.(1) of this Appendix E.

"**Bid**" has the meaning assigned to such term in Section 104a.i. of this Appendix E.

"**Bidder**" has the meaning assigned to such term in Section 104a.i. of this Appendix E.

"**Broker-Dealer**" means the broker-dealer with respect to the Broker-Dealer Agreement (UBS Securities LLC), or the Broker-Dealer Agreement (Ferris, Baker Watts, Incorporated), or any other broker or dealer (each as defined in the Securities Exchange Act), commercial bank or other entity permitted by law to perform the functions required of a Broker-Dealer set forth in the Auction Procedures that (i) is a Participant (or an affiliate of a Participant), (ii) has a capital surplus of at least $100,000,000, (iii) has been selected by WVUH (which approval shall not be unreasonably withheld) and (iv) has entered into a Broker-Dealer Agreement that remains effective.

"**Broker-Dealer Agreement**" means (a) as appropriate, the Broker-Dealer Agreement (UBS Securities LLC), the Broker-Dealer Agreement (Ferris, Baker Watts, Incorporated) and (b) each other agreement between the Auction Agent and a Broker-Dealer pursuant to which the Broker-Dealer agrees to participate in Auctions as set forth in the Auction Procedures, in each case as from time to time amended or supplemented.

"**Broker-Dealer Agreement (Ferris, Baker Watts, Incorporated)**" means (a) the Broker-Dealer Agreement, dated as of June 8, 2006, between the Auction Agent, WVUH and Ferris, Baker Watts, Incorporated.

"**Broker-Dealer Agreement (UBS Securities LLC)**" means (a) the Broker-Dealer Agreement, dated as of June 8, 2006, between the Auction Agent, WVUH and UBS Securities LLC.

"**Broker-Dealer Fee**" means the fee to be paid to the Broker-Dealer for the services rendered by them under the Broker-Dealer Agreement.

"**Business Day**" with respect to the ARCs means any day other than dates as may be agreed to in writing by the Auction Agent, the Broker-Dealer, and WVUH, a Saturday, Sunday and other day on which banks in the city of New York, New York or the New York Stock Exchange, the Trustee or the Auction Agent are authorized or permitted by law or executive order to close.

"**Commission**" means the Securities and Exchange Commission.

"**Date of Delivery**" means June 8, 2006.

"**Default Rate**" on any date of determination means the Maximum Rate.

"**DTC**" means The Depository Trust Company.

"**Existing Holder**" means (a) with respect to and for the purpose of dealing with the Auction Agent in connection with an Auction, a Person who is a Broker-Dealer listed in the Existing Holder Registry at the close of business on the Business Day immediately preceding the Auction Date for such Auction and (b) with respect to and for the purpose of dealing with the Broker-Dealer in connection with an Auction, a Person who is a qualified owner of ARCs.

"**Existing Holder Registry**" means the register maintained by the Auction Agent pursuant to Section 2.2(a)(i) of the Auction Agency Agreement.

"**Hold Order**" has the meaning set forth in Section 104a.i. of this Appendix E.

"**Index**" means, on any Auction Date with respect to the 2006 B Bonds, the 2006 C Bonds, and the 2006 D Bonds in any Auction Period of 35 days or less, the S&P Weekly Index on such date and, with respect to ARCs in any Auction Period of more than 35 days, the yield on United States Treasury securities on the date the Auction Period began which has a maturity which most closely matches the last day of the Auction Period. If such rate is unavailable, the Index for the 2006 B Bonds, the 2006 C Bonds, and the 2006 D Bonds means an index or rate agreed to by all Broker-Dealers and the Insurer. If for any reason on any Auction Date the Index shall not be determined as provided above, the Index shall mean the Index for the Auction Period ending on such Auction Date.

"**Initial Interest Payment Date**" means with respect to the 2006 B Bonds, June 20, 2006, with respect to the 2006 C Bonds, June 21, 2006, and with respect to the 2006 D Bonds, June 23, 2006.

"**Initial Interest Period**" means the period from and including the Date of Delivery to (but not including) the Initial Interest Payment Date.

"**Interest Amount**" with respect to the ARCs, means the amount of interest distributable in respect of each $1,000 in principal amount (taken, without rounding, to .0001 of one cent) of ARCs for any Interest Period or part thereof, as calculated in accordance with Section 108 of this Appendix E.

"**Interest Payment Date**" with respect to the ARCs means the day following the end of each Interest Period (provided, however, that if the duration of the Interest Period is one year or longer, then the Interest Payment Dates therefor shall be each June 1 and December 1 during such Interest Period and the day following the end of such Interest Period) and shall also mean the maturity date for the ARCs. If any such date is not a Business Day, the Interest Payment Date shall be the next succeeding Business Day.

"**Maximum Rate**" means the lesser of 12% or maximum legal rate.

"**One Month LIBOR Rate**" means, as of any date of determination, the offered rate (rounded up to the next highest 0.001%) for deposits in U.S. dollars for a one-month period which appears on the Telerate Page 3750 at approximately 11:00 a.m., London time, on such date, or if such date is not a date on which dealings in U.S. dollars are transacted in the London interbank market, then on the next preceding day on which such dealings were transacted in such market.

"**Order**" has the meaning assigned to such term in Section 104a.i. of this Appendix E.

"**Participant**" means a member or participant in the Securities Depository.

"**Payment Default**" means the failure by WVUH to make payment of interest on, premium, if any, and principal of the ARCs to Holders when due.

"**Potential Holder**" means, any Person (including an Existing Holder that is (a) a Broker-Dealer when dealing with the Auction Agent and (b) a potential beneficial owner when dealing with a Broker-Dealer) who may be interested in acquiring ARCs (or, in the case of an Existing Holder thereof, an additional principal amount of ARCs).

"**Record Date**" with respect to the ARCs means the Applicable Number of Business Days immediately preceding each Interest Payment Date.

"**Redemption Date**" means the date fixed for such redemption.

"**Securities Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Sell Order**" has the meaning assigned to such term in Section 104a.i. of this Appendix E.

"**Special Auction Period**" means, with respect to ARCs, (a) any period of less than 183 days which is not another Auction Period and which is divisible by seven and which begins on an Interest Payment Date and ends (i) in the case of ARCs with Auctions generally conducted on Fridays, on a Sunday unless such Sunday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day, (ii) in the case of ARCs with Auctions generally conducted on Mondays, on a Monday unless such Monday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day, (iii) in the case of ARCs with Auctions generally conducted on Tuesdays, on a Tuesday unless such Tuesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day, (iv) in the case of ARCs with Auctions generally conducted on Wednesdays, on a Wednesday unless such Wednesday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day, and (v) in the case of ARCs with Auctions generally conducted on Thursdays, on a Thursday unless such Thursday is not followed by a Business Day, in which case on the next succeeding day which is followed by a Business Day or (b) any period which is 183 days or longer which begins on an Interest Payment Date and ends not later than the day prior to the final scheduled maturity date of ARCs.

"**Submission Deadline**" shall mean 1:00 p.m., eastern time, on any Auction Date or such other time on any Auction Date by which the Broker-Dealers are required to submit Orders to the Auction Agent as specified by the Auction Agent from time to time.

"**Submission Processing Deadline**" shall mean the earlier of (i) 40 minutes after the Submission Deadline and (ii) the time when the Auction Agent begins to disseminate the results of the Auction to the Broker-Dealers.

"**Submission Processing Representation**" shall have the meaning specified in Section 2.4 of the Auction Agency Agreement.

**"Submitted Bid"** has the meaning assigned to such term in Section 104c.i. of this Appendix E.

**"Submitted Hold Order"** has the meaning assigned to such term in Section 104c.i. of this Appendix E.

**"Submitted Order"** has the meaning assigned to such term in Section 104c.i. of this Appendix E.

**"Submitted Sell Order"** has the meaning assigned to such term in Section 104c.i. of this Appendix E.

**"Sufficient Clearing Bids"** has the meaning assigned to such term in Section 104c.i.(2) of this Appendix E.

**"S&P Weekly Index"** means the Standard & Poor's Weekly High Grade Index which is composed of thirty-four MIG-1 rated municipal tax-exempt notes that are not subject to AMT and the coupon of each issue is adjusted to price that component on par and track the high-grade weekly tax-exempt levels.

**"Winning Bid Rate"** has the meaning assigned to such term in Section 104c.i.(3) of this Appendix E.

### Section 101. Global Form; Securities Depository.

a.      As provided in the Indenture, the 2006 B Bonds, the 2006 C Bonds, and the 2006 D Bonds shall be initially issued as ARCs. Except as otherwise provided in this Section 101, the ARCs, in the form of one Series 2006 B Bond, one Series 2006 C Bond, and one Series 2006 D Bond for each maturity of such Series, shall be registered in the name of the Securities Depository, and ownership thereof shall be maintained in book-entry form by the Securities Depository for the account of the Participants thereof. Initially, the ARCs shall be registered in the name of Cede & Co., as the nominee of DTC. Except as provided in Subsection c. of this Section 101, the ARCs may be transferred, in whole but not in part, only to DTC, or to a successor of DTC selected or approved by WVUH or to a nominee of such successor Securities Depository.

b.      None of the Authority, WVUH, the Trustee nor any of their respective affiliates shall have any responsibility or obligation with respect to:

i.      The accuracy of the records of the Securities Depository or any Participant with respect to any beneficial ownership interest in the ARCs;

ii.      the delivery to any Participant, any beneficial owner of the ARCs or any other Person, other than the Securities Depository, of any notice with respect to the ARCs; or

iii. the payment to any Participant, any beneficial owner of the ARCs or any other Person, other than the Securities Depository, of any amount with respect to the principal, premium, if any, or interest on the ARCs.

c. So long as the certificates for the ARCs are not issued pursuant to Subsection d. of this Section 101, the Authority, WVUH and the Trustee may treat the Securities Depository as, and deem the Securities Depository to be, the absolute owner of the ARCs for all purposes whatsoever, including without limitation:

i. the payment of principal, premium, if any, and interest on the ARCs;

ii. giving notices of redemption and other matters with respect to the ARCs;

iii. registering transfers with respect to the ARCs; and

iv. the selection of ARCs for redemption.

d. If at any time the Auction Agent has notified WVUH that the ARCs should not be maintained in book-entry form or the Securities Depository notifies WVUH and/or the Authority that it is unwilling or unable to continue as Securities Depository with respect to the ARCs, or if at any time the Securities Depository shall no longer be registered or in good standing under the Securities Exchange Act or other applicable statute or regulation and a successor Securities Depository is not appointed by WVUH within 90 days after WVUH and/or the Authority receives notice or becomes aware of such condition, as the case may be, then this Section shall no longer be applicable and the Authority shall execute (but need not prepare) and the Trustee shall authenticate and deliver certificates representing the ARCs as provided below. Certificates for the ARCs issued in exchange for a global certificate pursuant to this Subsection (c) shall be registered in such names and authorized denominations as the Securities Depository, pursuant to instructions from the Participants or otherwise, shall instruct the Authority and the Trustee in writing. Based on information provided by the Securities Depository, the Trustee shall promptly deliver such certificates representing the ARCs to the persons in whose names such ARCs are so registered on the Business Day immediately preceding the first day of an Interest Period.

e. So long as the ownership of the ARCs is maintained in book-entry form by the Securities Depository, an Existing Holder may sell, transfer or otherwise dispose of its beneficial interest in ARCs only pursuant to a Bid or Sell Order placed in any Auction or to or through a Broker-Dealer, provided that (i) in the case of all transfers other than pursuant to Auctions such Existing Holder, its Broker-Dealer or its Participant advises the Auction Agent of such transfer and (ii) a sale, transfer or other disposition of ARCs from a customer of a Broker-Dealer or another customer of that Broker-Dealer will not be deemed to be a sale, transfer or other disposition for purposes of this paragraph if such Broker-Dealer remains the Existing Holder of the ARCs so sold, transferred or disposed of immediately after such sale, transfer or disposition.

E-8

**Section 102. Interest on ARCs.**

        a.       Interest on the ARCs shall accrue for each Interest Period and shall be payable in arrears, commencing on the Initial Interest Payment Date and on each Interest Payment Date thereafter.

        b.       The rate of interest on the ARCs for the Initial Interest Period shall be the rate of interest per annum as shall be set forth in the Purchase Contract. The rate of interest on the ARCs for each subsequent Interest Period shall be the Auction Rate unless the Auction Rate exceeds the Maximum Rate, in which case, the rate of interest on the respective ARCs for such Interest Period shall be the Maximum Rate, or unless the Maximum Rate shall actually be lower than the All-Hold Rate, in which case the rate of interest on the respective ARCs for such Interest Period shall be the Maximum Rate; provided that if, on any Auction Date, an Auction is not held for any reason, then the rate of interest for the next succeeding Interest Period shall equal the Maximum Rate on such Auction Date; provided further, however, that if an Auction is scheduled to occur for the next Interest Period on a date that was reasonably expected to be a Business Day, but such Auction does not occur because such date is later not considered to be a Business Day, the Auction shall nevertheless be deemed to have occurred, and the applicable Auction Rate in effect for the next Interest Period will be the Auction Rate in effect for the preceding Interest Period. Notwithstanding the foregoing, if:

        i.       the ownership of the ARCs is no longer maintained in book-entry form by the Securities Depository, the rate of interest on the ARCs for any Interest Period commencing after the delivery of certificates representing ARCs pursuant to Section 101c. of this Appendix E shall equal the Maximum Rate on the Business Day immediately preceding the first day of such Interest Period; or

        ii.      if a Payment Default occurs, Auctions will be suspended and the Applicable ARCs Rate for the Interest Period commencing on or after such Payment Default and for each Interest Period thereafter to and including the Interest Period, if any, during which, or commencing less than the Applicable Number of Business Days after, such Payment Default is cured will equal the Default Rate.

        The rate per annum at which interest is payable on the ARCs for any Interest Period is herein referred to as the "Applicable ARCs Rate." Notwithstanding anything herein to the contrary, the Applicable ARCs Rate cannot exceed the Maximum Rate.

        c.       Notwithstanding anything herein to the contrary, if any ARC or portion thereof has been selected for redemption during the next succeeding Interest Period, said ARC or portion thereof, will not be included in the Auction preceding such Redemption Date, and said ARC or portion thereof, will continue to bear interest until the Redemption Date at the rate established for the Interest Period prior to said Auction.

**Section 103. Payments.**

        So long as the ARCs are registered in the name of the Securities Depository, or the nominee thereof, payment (other than at maturity) of interest and premium, if any, on, and of principal at redemption of, the ARCs shall be made to the Securities Depository by wire transfer

provided proper wire instructions are received.  Each Holder of ARCs, by such Holder's purchase of ARCs, appoints the Trustee as its agent in connection with the payment by such Holder of its share, if any, of the amounts payable to the Auction Agent and the Broker-Dealers pursuant to Section 106 of this Appendix E.

**Section 104.  Auction Procedures.**

Auctions shall be conducted on each Auction Date (other than the Auction Date immediately preceding (i) each Interest Period commencing after the ownership of the ARCs is no longer maintained in book-entry form by the Securities Depository; (ii) each Interest Period commencing after the occurrence and during the continuance of a Payment Default; or (iii) any Interest Period commencing less than the Applicable Number of Business Days after the cure of a Payment Default).  If there is an Auction Agent on such Auction Date, Auctions shall be conducted in the following manner:

  a. Orders by Existing Holders and Potential Holders.

    i. Prior to the Submission Deadline on each Auction Date:

     (1) each Existing Holder of ARCs may submit to a Broker-Dealer information as to:

      (a) the principal amount of Outstanding ARCs, if any, held by such Existing Holder which such Existing Holder desires to continue to hold without regard to the Auction Rate for the next succeeding Interest Period;

      (b) the principal amount of Outstanding ARCs, if any, which such Existing Holder offers to sell if the Auction Rate for the next succeeding Interest Period shall be less than the rate per annum specified by such Existing Holder; and/or

      (c) the principal amount of Outstanding ARCs, if any, held by such Existing Holder which such Existing Holder offers to sell without regard to the Auction Rate for the next succeeding Interest Period; and

     (2) one or more Broker-Dealers may contact Potential Holders to determine the principal amount of ARCs which each such Potential Holder offers to purchase if the Auction Rate for the next succeeding Interest Period shall not be less than the rate per annum specified by such Potential Holder.

    The communication to a Broker-Dealer of information referred to in clause (1)(a), (1)(b), (1)(c) or (2) of this paragraph i. is hereinafter referred to as an "Order" and collectively as "Orders" and each Existing Holder and each Potential Holder placing an Order is hereinafter referred to as a "Bidder" and collectively as "Bidders;" an Order containing the information referred to in (x) clause (1)(a) of this paragraph i. is hereinafter referred to as a "Hold Order" and collectively as "Hold Orders," (y) clause (1)(b) or (2) of this paragraph i. is hereinafter referred to as a "Bid" and collectively as "Bids" and (z) clause (1)(c) of this paragraph i. is hereinafter referred to as a "Sell Order" and collectively as "Sell Orders."

ii.    Subject to the provisions of Subsection b. of this Section 104,

(1)    a Bid by an Existing Holder shall constitute an irrevocable offer to sell:

(a)    the principal amount of Outstanding ARCs specified in such Bid if the Auction Rate determined as provided in this Section shall be less than the rate specified in such Bid; or

(b)    such principal amount or a lesser principal amount of Outstanding ARCs to be determined as set forth in clause (4) of paragraph i. of Subsection d. of this Section 104, if the Auction Rate determined as provided in this Section 104 shall be equal to the rate specified in such Bid; or

(c)    such principal amount or a lesser principal amount of Outstanding ARCs to be determined as set forth in clause (3) of paragraph ii. of Subsection d. of this Section 104 if the rate specified shall be higher than the Maximum Rate and Sufficient Clearing Bids have not been made.

(2)    a Sell Order by an Existing ⁴Holder shall constitute an irrevocable offer to sell:

(a)    the principal amount of Outstanding ARCs specified in such Sell Order, or

(b)    such principal amount or a lesser principal amount of Outstanding ARCs as set forth in clause (3) of paragraph ii. of Subsection d. of this Section 104 if Sufficient Clearing Bids have not been made.

(3)    a Bid by a Potential Holder shall constitute an irrevocable offer to purchase:

(a)    the principal amount of Outstanding ARCs specified in such Bid if the Auction Rate determined as provided in this Section shall be higher than the rate specified in such Bid; or

(b)    such principal amount or a lesser principal amount of Outstanding ARCs as set forth in clause (5) of paragraph i. of Subsection d. of this Section 104 if the Auction Rate determined as provided in this Section shall be equal to the rate specified in such Bid.

b.    Submissions by Broker-Dealers to the Auction Agent.

i.    Each Broker-Dealer shall submit in writing to the Auction Agent prior to the Submission Deadline (subject to paragraph f. of this Section) on each Auction Date all Orders obtained by such Broker-Dealer and shall specify with respect to each such Order:

(1)    the name of the Bidder placing such Order;

(2)    the aggregate principal amount of ARCs that are the subject of such Order;

(3)    to the extent that such Bidder is an Existing Holder:

(a)    the principal amount of ARCs, if any, subject to any Hold Order placed by such Existing Holder;

(b)    the principal amount of ARCs, if any, subject to any Bid placed by such Existing Holder and the rate specified in such Bid; and

(c)    the principal amount of ARCs, if any, subject to any Sell Order placed by such Existing Holder; and

(4)    to the extent such Bidder is a Potential Holder, the rate and amount specified in such Potential Holder's Bid.

ii.    If any rate specified in any Bid contains more than three figures to the right of the decimal point, the Auction Agent shall round such rate up to the next highest one thousandth (.001) of 1%.

iii.    If an Order or Orders covering all Outstanding ARCs held by any Existing Holder is not submitted to the Auction Agent prior to the Submission Deadline, the Auction Agent shall deem a Hold Order to have been submitted on behalf of such Existing Holder covering the principal amount of Outstanding ARCs held by such Existing Holder and not subject to an Order submitted to the Auction Agent.

iv.    None of the Authority, WVUH, the Trustee nor the Auction Agent shall be responsible for any failure of a Broker-Dealer to submit an Order to the Auction Agent on behalf of any Existing Holder or Potential Holder.

v.    If any Existing Holder submits through a Broker-Dealer to the Auction Agent one or more Orders covering in the aggregate more than the principal amount of Outstanding ARCs held by such Existing Holder, such Orders shall be considered valid as follows and in the following order of priority:

(1)    all Hold Orders shall be considered valid, but only up to and including in the aggregate the principal amount of ARCs held by such Existing Holder, and if the aggregate principal amount of ARCs subject to such Hold Orders exceeds the aggregate principal amount of ARCs held by such Existing Holder, the aggregate principal amount of ARCs subject to each such Hold Order shall be reduced pro rata to cover the aggregate principal amount of Outstanding ARCs held by such Existing Holder;

(2)    any Bid shall be considered valid up to and including the excess of the principal amount of Outstanding ARCs held by such Existing Holder over the aggregate principal amount of ARCs subject to any Hold Orders referred to in clause (1) of this paragraph v.;

E-12

(a)      if more than one Bid with the same rate is submitted on behalf of such Existing Holder and the aggregate principal amount of Outstanding ARCs subject to such Bids is greater than such excess, such Bids shall be considered valid up to and including the amount of such excess and the stated amount of ARCs subject to each Bid with the same rate shall be reduced pro rata to cover the stated amount of ARCs equal to such excess;

(b)      subject to subclause (a) of this clause (2), if more than one Bid with different rates is submitted on behalf of such Existing Holder, such Bids shall be considered valid first in the ascending order of their respective rates until the highest rate is reached at which such excess exists and then at such rate up to and including the amount of such excess; and

(c)      in any such event, the aggregate principal amount of Outstanding ARCs, if any, subject to Bids not valid under this clause (2) shall be treated as the subject of a Bid by a Potential Holder at the rate therein specified; and

(3)      all Sell Orders shall be considered valid up to and including the excess of the principal amount of Outstanding ARCs held by such Existing Holder over the aggregate principal amount of ARCs subject to valid Hold Orders referred to in clause (1) of this paragraph (v) and valid Bids referred to in clause (2) of this paragraph v.

vi.      If more than one Bid for ARCs is submitted on behalf of any Potential Holder, each Bid submitted shall be a separate Bid with the rate and principal amount therein specified.

vii.      Any Bid or Sell Order submitted by an Existing Holder covering an aggregate principal amount of ARCs not equal to an Authorized Denomination therefor shall be rejected and shall be deemed a Hold Order.  Any Bid submitted by a Potential Holder covering an aggregate principal amount of ARCs not equal to an Authorized Denomination therefor shall be rejected.

viii.      An Existing Holder that offers to purchase additional ARCs is, for purposes of such offer, treated as a Potential Holder.

ix.      Any Bid specifying a rate higher than the Maximum Rate will (a) be treated as a Sell Order if submitted by an Existing Holder and (b) not be accepted if submitted by a Potential Holder.

c.      Determination of Sufficient Clearing Bids, Auction Rate and Winning Bid Rate.

i.      Not earlier than the Submission Deadline on each Auction Date, the Auction Agent shall assemble all valid Orders submitted or deemed submitted to it by the Broker-Dealers (each such Order as submitted or deemed submitted by a Broker-Dealer being hereinafter referred to individually as a "Submitted Hold Order," a "Submitted Bid" or a "Submitted Sell Order," as the case may be, or as a "Submitted Order" and collectively as

"Submitted Hold Orders, "Submitted Bids" or "Submitted Sell Orders," as the case may be, or as "Submitted Orders") and shall determine:

(1)     the excess of the total principal amount of Outstanding ARCs over the sum of the aggregate principal amount of Outstanding ARCs subject to Submitted Hold Orders (such excess being hereinafter referred to as the "Available ARCs"); and

(2)     from such Submitted Orders whether:

(a)     the aggregate principal amount of Outstanding ARCs subject to Submitted Bids by Potential Holders specifying one or more rates equal to or lower than the Maximum Rate;

exceeds or is equal to the sum of:

(b)     the aggregate principal amount of Outstanding ARCs subject to Submitted Bids by Existing Holders specifying one or more rates higher than the Maximum Rate; and

(c)     the aggregate principal amount of Outstanding ARCs subject to Submitted Sell Orders

(in the event such excess or such equality exists, other than because the sum of the principal amounts of ARCs in subclauses (b) and (c) above is zero because all of the Outstanding ARCs are subject to Submitted Hold Orders, such Submitted Bids in subclause (a) above are hereinafter referred to collectively as "Sufficient Clearing Bids"), and

(3)     if Sufficient Clearing Bids have been made, the lowest rate specified in such Submitted Bids (which shall be the "Winning Bid Rate") such that if:

(a)     (aa) each such Submitted Bid from Existing Holders specifying such lowest rate and (bb) all other Submitted Bids from Existing Holders specifying lower rates were rejected, thus entitling such Existing Holders to continue to hold the principal amount of ARC's subject to such Submitted Bids; and

(b)     (aa) each such Submitted Bid from Potential Holders specifying such lowest rate and (bb) all other Submitted Bids from Potential Holders specifying lower rates were accepted,

the result would be that such Existing Holders described in subclause (a) above would continue to hold an aggregate principal amount of Outstanding ARCs which, when added to the aggregate principal amount of Outstanding ARCs to be purchased by such Potential Holders described in subclause (b) above, would equal not less than the Available ARCs.

ii.     Promptly after the Auction Agent has made the determinations pursuant to paragraph i. of this Subsection c., the Auction Agent shall advise the Trustee of the

Maximum Rate and the All-Hold Rate and the components thereof on the Auction Date and, based on such determinations, the Auction Rate for the next succeeding Interest Period (the "Auction Rate") as follows:

(1)     if Sufficient Clearing Bids have been made, that the Auction Rate for the next succeeding Interest Period shall be equal to the Winning Bid Rate so determined;

(2)     if Sufficient Clearing Bids have not been made (other than because all of the Outstanding ARCs are subject to Submitted Hold Orders), that the Auction Rate for the next succeeding Interest Period shall be equal to the Maximum Rate; or

(3)     if all Outstanding ARCs are subject to Submitted Hold Orders, that the Auction Rate for the next succeeding Interest Period shall be equal to the All-Hold Rate.

d.     Acceptance and Rejection of Submitted Bids and Submitted Sell Orders and Allocation of ARCs. Existing Holders shall continue to hold the principal amount of ARCs that are subject to Submitted Hold Orders, and, based on the determinations made pursuant to paragraph i. of Subsection d. of this Section 104, Submitted Bids and Submitted Sell Orders shall be accepted or rejected and the Auction Agent shall take such other action as set forth below:

i.     If Sufficient Clearing Bids have been made, all Submitted Sell Orders shall be accepted and, subject to the provisions of paragraph iv. of this Subsection d., Submitted Bids shall be accepted or rejected as follows in the following order of priority and all other Submitted Bids shall be rejected:

(1)     Existing Holders' Submitted Bids specifying any rate that is higher than the Winning Bid Rate shall be accepted, thus requiring each such Existing Holder to sell the aggregate principal amount of ARCs subject to such Submitted Bids;

(2)     Existing Holders' Submitted Bids specifying any rate that is lower than the Winning Bid Rate shall be rejected, thus entitling each such Existing Holder to continue to hold the aggregate principal amount of ARCs subject to such Submitted Bids;

(3)     Potential Holders' Submitted Bids specifying any rate that is lower than the Winning Bid Rate shall be accepted, thus requiring such Potential Holder to purchase the aggregate principal amount of ARCs subject to such Submitted Bids;

(4)     Each Existing Holder's Submitted Bid specifying a rate that is equal to the Winning Bid Rate shall be rejected, thus entitling such Existing Holder to continue to hold the aggregate principal amount of ARCs subject to such Submitted Bid, unless the aggregate principal amount of Outstanding ARCs subject to all such Submitted Bids shall be greater than the principal amount of ARCs (the "remaining principal amount") equal to the excess of the Available ARCs over the aggregate principal amount of ARCs subject to Submitted Bids described in clauses (2) and (3) of this paragraph i., in which event such Submitted Bid of such Existing Holder shall be rejected in part, and such Existing Holder shall be entitled to continue to hold the principal amount of ARCs subject to such Submitted Bid, but only in an

E-15

amount equal to the aggregate principal amount of ARCs obtained by multiplying the remaining principal amount by a fraction the numerator of which shall be the principal amount of Outstanding ARCs held by such Existing Holder subject to such Submitted Bid and the denominator of which shall be the sum of the principal amount of Outstanding ARCs subject to such Submitted Bids made by all such Existing Holders that specified a rate equal to the Winning Bid Rate; and

(5)   Each Potential Holder's Submitted Bid specifying a rate that is equal to the Winning Bid Rate shall be accepted but only in an amount equal to the principal amount of ARCs obtained by multiplying the excess of the aggregate principal amount of Available ARCs over the aggregate principal amount of ARCs subject to Submitted Bids described in clauses (2), (3) and (4) of this paragraph i. by a fraction the numerator of which shall be the aggregate principal amount of Outstanding ARCs subject to such Submitted Bid and the denominator of which shall be the sum of the principal amounts of Outstanding ARCs subject to Submitted Bids made by all such Potential Holders that specified a rate equal to the Winning Bid Rate.

ii.   If Sufficient Clearing Bids have not been made (other than because all of the Outstanding ARCs are subject to Submitted Hold Orders), subject to the provisions of paragraph iv. of this Subsection d., Submitted Orders shall be accepted or rejected as follows in the following order of priority and all other Submitted Bids shall be rejected:

(1)   Existing Holders' Submitted Bids specifying any rate that is equal to or lower than the Maximum Rate shall be rejected, thus entitling such Existing Holders to continue to hold the aggregate principal amount of ARCs subject to such Submitted Bids;

(2)   Potential Holders' Submitted Bids specifying any rate that is equal to or lower than the Maximum Rate shall be accepted, thus requiring each Potential Holder to purchase the aggregate principal amount of ARCs subject to such Submitted Bids, and

(3)   Each Existing Holder's Submitted Bid specifying any rate that is higher than the Maximum Rate and the Submitted Sell Order of each Existing Holder shall be accepted, thus entitling each Existing Holder that submitted any such Submitted Bid or Submitted Sell Order to sell the ARCs subject to such Submitted Bid or Submitted Sell Order, but in both cases only in an amount equal to the aggregate principal amount of ARCs obtained by multiplying the aggregate principal amount of ARCs subject to Submitted Bids described in clause (2) of this paragraph ii. by a fraction the numerator of which shall be the aggregate principal amount of Outstanding ARCs held by such Existing Holder subject to such Submitted Bid or Submitted Sell Order and the denominator of which shall be the aggregate principal amount of Outstanding ARCs subject to all such Submitted Bids and Submitted Sell Orders.

iii.   If all Outstanding ARCs are subject to Submitted Hold Orders, all Submitted Bids shall be rejected.

iv.   If, as a result of the procedures described in paragraph i. or ii. of this Subsection d., any Existing Holder would be entitled or required to sell, or any Potential Holder would be entitled or required to purchase, a principal amount of ARCs that is not equal to

E-16

an Authorized Denomination therefore, the Auction Agent shall, in such manner as it shall, in its sole discretion, determine, round up or down the principal amount of ARCs to be purchased or sold by any Existing Holder or Potential Holder so that the principal amount of ARCs purchased or sold by each Existing Holder or Potential Holder shall be equal to an Authorized Denomination therefor, if such allocation results in one or more of such Potential Holders not purchasing any ARCs.

e.    Based on the results of each Auction, the Auction Agent shall determine the aggregate principal amount of ARCs to be purchased and the aggregate principal amount of ARCs to be sold by Potential Holders and Existing Holders on whose behalf each Broker-Dealer submitted Bids or Sell Orders and, with respect to each Broker-Dealer, to the extent that such aggregate principal amount of ARCs to be sold differs from such aggregate principal amount of ARCs to be purchased, determine to which other Broker-Dealer or Broker-Dealers acting for one or more purchasers such Broker-Dealer shall deliver, or from which other Broker-Dealer or Broker-Dealers acting for one or more sellers such Broker-Dealer shall receive, as the case may be, ARCs.

f.    Broker-Dealers may submit an Order, after the Submission Deadline and prior to the Submission Processing Deadline if the Order was (i) received by the Broker-Dealer from Existing Owners or Potential Owners prior to the Submission Deadline or (ii) initiated internally by the Broker-Dealer for its own account prior to the Submission Deadline. Each Order submitted to the Auction Agent after the Submission Deadline and prior to the Submission Processing Deadline shall constitute a representation by the Broker-Dealer that such Order was (i) received from an Existing Owner or Potential Owner prior to the Submission Deadline or (ii) initiated internally by the Broker-Dealer for its own account prior to the Submission Deadline (the "Submission Processing Representation").

## Section 105. Certain Orders Not Permitted.

Neither the Authority, WVUH nor an Affiliate may submit an Order in any Auction. The Auction Agent shall have no duty or liability in monitoring or enforcing compliance with this Section 105.

## Section 106. Payment of Service Charges; Notice of Payment Defaults and Cures.

a.    WVUH shall pay to the Auction Agent (i) when due, an amount equal to the Auction Agent Fee as calculated in the Auction Agency Agreement and (ii) when due, an amount equal to the Broker-Dealer Fee as calculated in the Broker-Dealer Agreement.

b.    By 12:30 p.m., New York City time, on the Business Day immediately succeeding each Interest Payment Date, the Trustee will determine if a Payment Default has occurred. If a Payment Default has occurred, the Trustee shall notify the Auction Agent and Broker-Dealer by 1:00 p.m., New York City time, on said date. If a Payment Default has been cured, the Trustee shall so notify the Auction Agent and the Broker-Dealer by 5:00 p.m., New York City time, on the day such Payment Default is cured.

**Section 107. Calculation of the Rates.**

The Auction Agent shall calculate the All-Hold Rate on each Auction Date and, if applicable, shall calculate the Maximum Rate on each Auction Date. The determination by the Auction Agent of each of such rate will (in the absence of manifest error) be final and binding upon all Holders and upon all other parties. If the ownership of the ARCs is no longer maintained in book entry form by the Securities Depository, the Auction Agent shall calculate the Maximum Rate on the Business Day immediately preceding the first day of each Interest Period commencing after the delivery of certificates representing the ARCs pursuant to Subsection 101c. of this Appendix E. If a Payment Default shall have occurred, the Auction Agent shall calculate the Default Rate on the first day of (i) each Interest Period commencing after the occurrence and during the continuance of such Payment Default and (ii) any Interest Period commencing less than the Applicable Number of Business Days after the cure of any Payment Default.

**Section 108. Computation of Interest.**

The amount of interest distributable to Holders of ARCs in respect of each $25,000 in principal amount thereof for any Interest Period or part thereof shall be calculated by applying the Applicable ARCs Rate for such Interest Period or part thereof to the principal amount of $25,000, multiplying such product by the actual number of days in the Interest Period or part thereof concerned divided by 365 or 366, as applicable, and truncating the resultant figure to the nearest one cent. Interest on the ARCs shall be computed by the Trustee on the basis of a 365-day year for the number of days actually elapsed; except that for any such calculation with respect to an Interest Payment Date occurring after January 1 of a leap year through December 31 of such leap year, such interest (for any day occurring during such period) shall be computed on the basis of a 366-day year period. In the event an Interest Payment Date occurs in any Interest Period on a date other than the first day of such Interest Period, the Trustee, after confirming the calculation required above, shall calculate the portion of the Interest Amount payable on such Interest Payment Date and the portion payable on the next succeeding Interest Payment Date. The Trustee shall make the calculation required in this Section 108 not later than the close of business on each Auction Date.

**Section 109. Notification of Rates, Amounts and Payment Dates.**

a. The Trustee shall determine the aggregate amount of interest distributable on the next succeeding Interest Payment Date to the Holders of the ARCs. So long as the ownership of the ARCs is maintained in book-entry form by the Securities Depository, the Trustee shall advise the Securities Depository of each Record Date for the ARCs at least two Business Days prior thereto.

b. Promptly after the Date of Delivery and promptly after each determination of the rate of interest on ARCs and the Interest Amount and in any event at least three (3) days prior to each Interest Payment Date, the Trustee shall:

i. So long as no Payment Default has occurred and is continuing and the ownership of the ARCs is maintained in book-entry form by the Securities Depository,

confirm the Auction Agent's determination of (A) the date of such Interest Payment Date, (B) interest rate applicable to the ARCs for the related Interest Period and (C) the amount payable to the Auction Agent on that Interest Payment Date pursuant to Section 106 and notify the Auction Agent of any discrepancy therein; and

ii. Advise the Securities Depository, so long as the ownership of the ARCs is maintained in book-entry form by the Securities Depository, and WVUH of the Applicable ARCs Rate and the interest amount calculated in accordance with Section 108 above in respect of the next succeeding Interest Payment Date.

In the event that any day that is scheduled to be an Interest Payment Date shall be changed after the Trustee shall have given the notice referred to in clause (i) of the preceding sentence, not later than 9:15 a.m., New York City time, on the Business Day next preceding the earlier of the new Interest Payment Date or the old Interest Payment Date, the Trustee shall, by such means as the Trustee deems practicable, give notice of such change to WVUH and, so long as no Payment Default has occurred and is continuing and the ownership of the ARCs is maintained in book-entry form by the Securities Depository, the Auction Agent.

## Section 110. Adjustments with Respect to ARC Provisions.

Notwithstanding any other provision of the Indenture relating to ARCs, including without limitation the mandatory tender provisions and the definitions of terms used in this Appendix E (including without limitation the definitions of Applicable ARC Rate, Index, All-Hold Rate, Maximum Rate and Default Rate), the ARC provisions may be amended by the Issuer at the written request of the Borrower, (i) upon obtaining an opinion of Counsel that the same does not materially adversely affect the rights of the beneficial owners of the ARCs or (ii) by obtaining the consent of a majority of the beneficial owners of the ARCs and, in each case, delivering a Favorable Opinion of Bond Counsel. In the case of clause (ii) above, the Trustee shall mail notice of such amendment to the beneficial owners of the ARCs of which it has knowledge pursuant to Article IX, and if, on the first Auction Date occurring at least 20 days after the date on which the Trustee mailed such notice, Sufficient Clearing Bids have been received or all of the ARCs are subject to Submitted Hold Orders and if the Insurer has provided written consent by such Auction Date, the proposed amendment shall be deemed to have been consented to by the beneficial owners of the ARCs. Written notice of each such amendment shall be delivered by the Issuer to the Trustee, the Borrower, the Auction Agent, and each Broker-Dealer.

## Section 111. Adjustment in Percentages.

a. The Broker-Dealer shall adjust the percentage used in determining the All Hold Rate, if any such adjustment is necessary, in the judgment of the Broker-Dealer, to reflect any change in market condition. In making any such adjustment, the Broker-Dealer shall take the following factors, as in existence both before and after such change in market conditions, into account:

i. short term taxable and tax exempt market rates and indices of such short term rates;

ii. the market supply and demand for short term tax exempt securities;

iii.      yield curves for short term and long term tax exempt securities or obligations having a credit rating that is comparable to the ARCs;

iv.      general economic conditions; and

v.      economic and financial factors present in the securities industry that may affect or that may be relevant to the ARCs.

b.      The Broker-Dealer, with the written consent of the Obligated Group Agent, shall effectuate an adjustment in the percentage used in determining the All Hold Rate pursuant to Subsection a. of this Section 111 by delivering to the Authority, WVUH, the Trustee and the Auction Agent at least 10 days prior to the Auction Date·on which the Broker-Dealer desires to effect such change a Favorable Opinion of Bond Counsel and a certificate in substantially the form attached hereto as Attachment A, authorizing the adjustment of the percentage used in determining the All Hold Rate, which shall be specified in such certificate.

## Section 112. Auction Agent.

a.      Deutsche Bank Trust Company Americas shall serve as the initial Auction Agent for the ARCs. The Trustee is hereby directed to enter'into an agreement with the Auction Agent which shall provide as follows:  The Auction Agent shall be (i) a bank or trust company duly organized under the laws of the United States of America or any state or territory thereof having its principal place of business in the Borough of Manhattan, The City of New York, and having a combined capital stock, surplus and undivided profits of at least $30,000,000 or (ii) a member of the National Association of Securities Dealers, Inc., having·a capitalization of at least $30,000,000 and, in either case, authorized by law to perform all the duties imposed upon it hereunder and under the Auction Agency Agreement.  The Auction Agent may resign and be discharged of the duties and obligations created by the Indenture by giving at least 90 days written notice to WVUH and the Trustee (30 days written notice if the Auction Agent has not been paid its fee for more than 30 days after such fee is due).  The Auction Agent may be removed at any time by the Trustee if the Auction Agent is an entity other than the Trustee, acting at the written direction of (i) WVUH or (ii) the·Holders of 66-2/3% of the aggregate principal amount of the ARCs, by an·instrument signed by the Trustee and filed with the Auction Agent and WVUH upon at least 90 days notice; provided that, an agreement in substantially the form of the Auction Agency Agreement shall be entered into with a successor Auction Agent.  If the Auction Agent and the Trustee are the same entity, the Auction Agent may be removed as described above, with WVUH acting in lieu of the Trustee.

b.      In the event that the Auction Agent shall resign or be removed or dissolved, or if the property or affairs of the Auction Agent shall be taken under the control of any state or federal court or administrative body because of bankruptcy or insolvency, or for any other reason, WVUH shall use its best efforts to appoint a successor as Auction·Agent, and the Trustee at the written direction of WVUH shall thereupon enter into an Auction Agency Agreement with such successor.

c.      The Auction Agent shall be acting as agent for the Trustee and WVUH in connection with Auctions.  In the absence of bad faith or negligence on its part, the Auction

Agent shall not be liable for any action taken, suffered or omitted or for any error of judgment made by it in the performance of its duties under the Auction Agency Agreement and shall not be liable for any error of judgment made in good faith unless the Auction Agent shall have been negligent in ascertaining (or failing to ascertain) the pertinent facts necessary to make such judgment.

d. Notwithstanding that the Auction Agent is the agent of the Trustee hereunder and under the Auction Agency Agreement, the Trustee shall not be liable in any way for any action taken, suffered or omitted, or for any error of judgment made by the Auction Agent, whether in the performance of its duties under the Auction Agency Agreement or otherwise, subject to Section 3.4(b) of the Auction Agency Agreement. In addition, the Trustee shall not be responsible for the fees and expenses of the Auction Agent.

e. For any Auction Period during which there is no duly appointed Auction Agent, it will not be possible to hold Auctions, with the result that the interest rate on the ARCs shall be the Maximum Rate.

### Section 113. **Broker-Dealers.**

a. The Auction Agent shall enter into a Broker-Dealer Agreement with UBS Securities LLC, and Ferris, Baker Watts, Incorporated as the initial Broker-Dealers for the 2006 B Bonds, the 2006 C Bonds, and the 2006 D Bonds.

b. Any Broker-Dealer may be removed at any time by WVUH, but there shall, at all times, be at least one Broker-Dealer appointed and acting as such.

c. For any Auction Period during which there is no duly appointed Broker-Dealer, it will not be possible to hold Auctions, with the result that the interest rate on the ARCs shall be the Maximum Rate.

### Section 114. **Changes in Auction Periods or Auction Dates.**

a. Changes in Auction Period or Periods.

i. While any of the Bonds are Outstanding as ARCs, the Broker-Dealer:

(1) in order to conform with then current market practice with respect to similar securities, shall; or

(2) in order to accommodate economic and financial factors that may affect or be relevant to the length of the Auction Period and the interest rate borne by the ARCs and with the written consent of WVUH, may change, from time to time, the length of one or more Auction Periods (an "Auction Period Adjustment"). WVUH shall not consent to such change in the length of the Auction Period, if such consent is required as provided above, unless WVUH shall have received from the Broker-Dealer not less than three days nor more than 20 days prior to the effective date of such change a written request for consent together with a certificate demonstrating the need for change in reliance on such factors. The Broker-

Dealer shall initiate the Auction Period Adjustment by giving written notice to the Trustee, Auction Agent, WVUH and the Securities Depository at least 10 days prior to the Auction Date for such Auction Period.

        ii.      Any such changed Auction Period shall not be less than seven days.

        iii.     The Auction Period Adjustment shall not be allowed unless Sufficient Clearing Bids existed at both the Auction before the date on which the notice of the proposed change was given as provided in this Section 114 and the Auction immediately preceding the proposed change.

        iv.     The Auction Period Adjustment shall take effect only if (A) the Trustee receives, by 11:00 a.m., New York City time, on the Business Day before the Auction Date for the first such revised Auction Period, a certificate from the Auction Agent, authorizing the Auction Period Adjustment specified in such certificate, including the Broker-Dealers's consent to such revised Auction Period and (B) Sufficient Clearing Bids exist at the Auction on the Auction Date for such first revised Auction Period. If the condition referred to in (A) above is not met, the Applicable ARCs Rate for the next Auction Period shall be determined pursuant to the Auction Procedures and the Auction Period shall be the Auction Period determined without reference to the proposed change. If the condition referred to in (A) is met but the condition referred to in (B) above is not met, the Applicable ARCs Rate for the next Auction Period shall be the Maximum Rate and the Auction Period shall be the Auction Period determined without reference to the proposed change. In connection with any Auction Period Adjustment, the Auction Agent shall provide such further notice to such parties as is specified in the Auction Agency Agreement. [The Auction Agent's consent shall not be unreasonably withheld.]

        v.      If Auction Periods are changed as provided herein and if an Auction is scheduled to occur for the next Interest Period on a date that was reasonably expected to be a Business Day, but such Auction does not occur because such date is later not considered to be a Business Day, the Auction shall nevertheless be deemed to have occurred, and the Applicable ARCs Rate in effect for the next Interest Period will be the Auction Rate in effect for the preceding Interest Period and such Interest Period will generally be 7 days in duration, beginning on the calendar day following the date of the deemed Auction and ending on (and including) the applicable Auction Date (unless such Auction Date is not followed by a Business Day, in which case on the next succeeding Business Day). If the preceding Interest Period was other than generally 7 days in duration, the Auction Rate for the deemed Auction will instead be the rate of interest determined by the Auction Agent on equivalently rated auction securities with a comparable length of auction period.

        vi.     If the Auction Period Adjustment is either (A) from an Auction Period of one year or less to an Auction Period of more than one year or (B) from an Auction Period of more than one year to an Auction Period of one year or less, the Auction Rate Adjustment shall not occur unless the Trustee, the Bond Insurer and the Authority have been provided with a Favorable Opinion of Bond Counsel.

vii.    Any change in the Auction Period to an Auction Period that extends beyond 35 days shall require the written consent of the Bond Insurer.

b.    Changes in the Auction Dates. While any of the Bonds are outstanding as ARCs, the Broker-Dealer:

i.    in order to conform with then current market practice with respect to similar securities, shall; or

ii.    in order to accommodate economic and financial factors that may affect or be relevant to the day of the week constituting an Auction Date and the interest rate borne on the ARCs and with the written consent of WVUH and the Auction Agent, which shall not be unreasonably withheld, may specify an earlier Auction Date (but in no event more than five Business Days earlier) than the Auction Date that would otherwise be determined in accordance with the definition of "Auction Date" in Section 100 of this Appendix E with respect to one or more specified Auction Periods. WVUH shall not consent to such change in the Auction Date, if such consent is required in subparagraph (b)ii. above, unless WVUH shall have received from the Auction Agent not less than three days nor more than 20 days prior to the effective date of such change a written request for consent together within a certificate demonstrating the need for change in reliance on such factors. The Broker-Dealer shall provide notice of any determination to specify an earlier Auction Date for one or more Auction Periods by means of a written notice delivered at least 10 days prior to the proposed changed Auction Date to the Trustee, WVUH and the Securities Depository.

c.    In connection with any change described in this Section 114, the Auction Agent shall provide such further notice to such parties as is specified in Section 2.6 of the Auction Agency Agreement.

d.    No change shall be made to the Auction Period or Auction Date unless WVUH shall give notice thereof to any rating agency then rating the Bonds, and no change shall be made unless such change will not adversely affect the ratings on the Bonds.

**Section 115. Credit Ratings. [reserved]**

**Section 116. Notices.**

The Auction Agent shall provide the Trustee of any change in the Maximum Rate.

**Section 117. Purchases of ARCs.**

Neither the WVUH nor an Affiliate shall purchase or otherwise acquire ARCs unless such ARCs are redeemed or otherwise canceled on the day of any purchase.

**Section 118. Notice of Payment Default.**

a.    If WVUH determines that a Payment Default has occurred WVUH shall promptly notify the Trustee in writing thereof.

b. So long as the ownership of the ARCs is maintained in book-entry form by the Securities Depository, upon the occurrence of a Payment Default the Trustee shall promptly send a notice thereof to the Auction Agent by telecopy or electronic means.

c. So long as the ownership of the ARCs is maintained in book-entry form by the Securities Depository, the Trustee shall promptly send notice to the Auction Agent by telecopy or electronic means if a Payment Default is cured.

## Section 119. Redemption Dates and Prices.

The outstanding ARCs are subject to redemption in accordance with Article IV of the Indenture.

**APPENDIX F**

**[Form of Bond Counsel Opinion]**

June 8, 2006

West Virginia Hospital Finance Authority
One Players Club Drive
Charleston, WV

The Bank of New York, as Trustee
385 Rifle Camp Road, 3rd Floor
West Patterson, NJ 07424

West Virginia University Hospitals, Inc.
Medical Center Drive
PO Box 8059
Morgantown, WV 26506

UBS Securities LLC
1285 Avenue of the Americas
New York, NY 10019

Re:    $_____ West Virginia Hospital Finance Authority West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series A

$_____West Virginia Hospital Finance Authority West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series B Auction Rate Certificates (ARCs $^{(SM)}$)

$_____West Virginia Hospital Finance Authority West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series C Auction Rate Certificates (ARCs $^{(SM)}$)

$_____ West Virginia Hospital Finance Authority West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series D Auction Rate Certificates (ARCs $^{(SM)}$)

Ladies and Gentlemen:

We have served as bond counsel in connection with the issuance by the West Virginia Hospital Finance Authority (the "Authority") of its (i) $_____ West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series A (the "2006 A Bonds"); (ii) $_____ West Virginia United Health

West Virginia Hospital Finance Authority
West Virginia University Hospitals, Inc.
UBS Securities LLC
The Bank of New York

June 8, 2006
Page 2 of 6

System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series B Bonds Auction Rate Certificates (ARCs (SM)) (the "2006 B Bonds"); (iii) $_____ West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series C Auction Rate Certificates (ARCs (SM)) (the "2006 C Bonds"), and (iv) $_____ West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series D Auction Rate Certificates (ARCs (SM)) (the "2006 D Bonds," and together with the 2006 A Bonds, the 2006 B Bonds, and the 2006 C Bonds, the "2006 Bonds"). The 2006 Bonds will be issued pursuant to a Bond Indenture, dated as of June 1, 2006 (the "Bond Indenture"), between the Authority and The Bank of New York, New York, New York, as Bond Trustee (the "Bond Trustee"). The proceeds of the 2006 Bonds will be loaned to the Obligated Group pursuant to a Loan Agreement dated June 1, 2006 (the "Loan Agreement"), between the Authority and West Virginia University Hospitals, Inc., a West Virginia nonprofit corporation (the "Corporation"), as Obligated Group Agent. The obligations of the Obligated Group under the Loan Agreement are evidenced by the 2006-1A Note, the 2006-1B Note, the 2006-1C Note, and the 2006-1D Note (the "2006 Notes"), issued pursuant to an Amended and Restated Master Trust Indenture, dated as of August 1, 2003, as supplemented and amended (the "Master Trust Indenture"), between the Huntington National Bank, Inc. and the Corporation. The Corporation serves as Obligated Group Agent for the Obligated Group under the terms of the Master Trust Indenture. As of the date hereof, the Corporation, City Hospital Inc., a West Virginia nonprofit corporation, City Hospital Foundation, Inc., a West Virginia nonprofit corporation, The Charles Town General Hospital d/b/a/ Jefferson Memorial Hospital, a West Virginia nonprofit corporation, and United Hospital Center, Inc. ("UHC"), a West Virginia nonprofit corporation are the Members of the Obligated Group. New Members may join or current Members may withdraw from the Obligated Group under the terms and conditions set forth in the Master Trust Indenture.

The 2006 Bonds are special limited obligations of the Authority, payable solely from payments received by the Bond Trustee under the Bond Indenture, the Loan Agreement and the 2006 Notes. The 2006 Notes and all other Obligations issued or to be issued by the Obligated Group under the Master Trust Indenture are secured by a security interest in the Gross Receipts of the Members of the Obligated Group.

We have examined the law and such certified proceedings and other papers as we deem necessary to render this opinion. We have also examined an unauthenticated specimen Bond.

The Authority is a body corporate and governmental instrumentality created and existing under the laws of the State of West Virginia (the "State), particularly Chapter 16, Article 29A, of the Code of West Virginia, 1931, as amended (the "Act"), for certain purposes set forth

West Virginia Hospital Finance Authority
West Virginia University Hospitals, Inc.
UBS Securities LLC
The Bank of New York

June 8, 2006
Page 3 of 6

in the Act, including, inter alia, borrowing money and issuing bonds and other evidences of indebtedness to finance or refinance the costs of acquisition, construction, improvement and alteration of hospital facilities as defined in the Act. The 2006 Bonds are issued pursuant to the Act, and other applicable laws, and pursuant to a Resolution of the Authority adopted May 17, 2006 (the "Resolution"), authorizing the issuance of the 2006 Bonds. Proceeds of the 2006 Bonds are issued to (i) finance the acquisition, construction, and equipping of a new hospital facility (as defined in the Act) for UHC to be located in the City of Bridgeport, Harrison County, West Virginia, consisting of approximately 650,000 square feet, with a total of 318 beds, including 217 medical and surgical beds, 28 intensive care beds, 20 pediatric beds, 21 OB/GYN beds and 32 skilled nursing beds (the "Project"); (ii) pay interest on the 2006 Bonds for a period of approximately 36 months; and (iii) pay the costs of issuing the 2006 Bonds ("Issuance Costs"), including the cost of the premium for the financial guaranty insurance policy.

The Authority and the Corporation have executed a Tax Compliance Certificate, dated as of the date hereof (the "Tax Certificate"), which, among other things, sets forth restrictions on the investment and expenditure of the 2006 Bonds proceeds and earnings thereon, to ensure that the requirements of the Internal Revenue Code of 1986, as amended, and regulations promulgated pursuant thereto (collectively, the "Code"), necessary to establish and maintain the excludability from gross income for federal income tax purposes of the interest on the 2006 Bonds, are and will continue to be met.

We have not been engaged or undertaken to review the accuracy, completeness or sufficiency of the Official Statement or other offering material relating to the 2006 Bonds (except to the extent, if any, stated in the Official Statement) and we express no opinion relating thereto.

As to questions of fact material to our opinion, we have relied upon the representations of the Authority and other entities contained in the herein-described documents and certifications furnished to us by or on behalf of the Authority, without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1. The Authority is a body corporate and governmental instrumentality of the State with power to adopt the Resolution, to execute and deliver the Bond Indenture, the Loan Agreement and the Tax Certificate and to perform the agreements on its part contained therein and to issue the 2006 Bonds.

West Virginia Hospital Finance Authority
West Virginia University Hospitals, Inc.
UBS Securities LLC
The Bank of New York

June 8, 2006
Page 4 of 6

2. The Resolution, the Bond Indenture and the Loan Agreement have been duly adopted or authorized, executed and delivered by the Authority, are each in full force and effect, and are valid and binding upon the Authority and assuming due authorization, execution and delivery of the Bond Indenture and the Loan Agreement by the other parties thereto, are enforceable against the Authority in accordance with their terms (except to the extent that the enforceability thereof may be limited by the operation of bankruptcy, insolvency and similar laws affecting rights and remedies of creditors).

3. The Tax Certificate has been duly authorized, executed and delivered by the Authority and, assuming due authorization, execution and delivery by the other party thereto, constitutes the valid and binding agreement of the Authority, enforceable against the Authority in accordance with the terms thereof.

4. The Bond Indenture creates the valid pledge which it purports to create of the Revenues (as defined in the Bond Indenture), and other funds and accounts pledged to the payment of the 2006 Bonds under the Resolution and the Bond Indenture, subject to the terms thereof.

5. The 2006 Bonds have been duly authorized, executed and delivered by the Authority and, assuming proper authentication, are valid and binding special obligations of the Authority, payable solely from the sources provided therefor in the Resolution and the Bond Indenture.

6. In our opinion, based upon an analysis of existing laws, regulations, rulings and court decisions, and assuming, among other matters, the accuracy of certain representations and compliance with certain covenants, interest on the 2006 Bonds is excluded from gross income of the owners thereof for federal income tax purposes under Section 103 of the Code. We are of the further opinion that interest on the 2006 Bonds is not a specific preference item for purposes of the federal individual or corporate alternative minimum taxes, although such interest is included in adjusted current earnings when calculating corporate alternative minimum taxable income.

The Code imposes various restrictions, conditions and requirements relating to the exclusion from gross income for federal income tax purposes of interest on obligations such as the 2006 Bonds. The Authority and the Corporation have covenanted to comply with certain restrictions designed to ensure that interest on the 2006 Bonds will not be included in federal gross income. Failure to comply with these covenants may result in interest on the 2006 Bonds being included in gross income for federal income tax purposes, possibly from the date of

F-4

West Virginia Hospital Finance Authority
West Virginia University Hospitals, Inc.
UBS Securities LLC
The Bank of New York

June 8, 2006
Page 5 of 6

original issuance of the 2006 Bonds. We assume compliance with these covenants. We have not undertaken to determine (or to inform any person) whether any actions taken (or not taken) or events occurring (or not occurring) after the date of issuance of the 2006 Bonds may adversely affect the value of, or the tax status of interest on the 2006 Bonds.

Certain requirements and procedures contained or referred to in the Resolution, the Bond Indenture, the Loan Agreement and the Tax Certificate, and other relevant documents may be changed and certain actions may be taken or omitted under the circumstances and subject to the terms and conditions set forth in such documents. We express no opinion as to any Bond or the interest thereon if any such change occurs or action is taken or omitted upon the advice or approval of bond counsel other than this firm.

7.    Under the Act, the 2006 Bonds, and all interest and income thereon, shall be exempt from all taxation by the State of West Virginia and any county, municipality, political subdivision or agency thereof, except inheritance taxes.

We have also relied upon the opinion of Robert L. Brandfass, as counsel to the Obligated Group, contained in the Transcript of closing documents relating to the issuance and sale of the 2006 Bonds, as to all matters concerning the due authorization, execution and delivery by, and the binding effect upon and enforceability against, the Members of the Obligated Group, of the Loan Agreement and the 2006 Notes, that each Member of the Obligated Group is a 501(c)(3) organization within the meaning of the Code, and all other matters set forth therein.

The rights of the holders of the 2006 Bonds and the enforceability of the 2006 Bonds, the Bond Indenture, the Loan Agreement and the Tax Certificate and the liens and pledges set forth therein may be subject to and limited by bankruptcy laws and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that the enforcement thereof may also be subject to general principles of equity and to the exercise of judicial discretion.

Very truly yours,

Spilman Thomas & Battle, PLLC

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX G**

## CONTINUING DISCLOSURE AGREEMENT

This CONTINUING DISCLOSURE AGREEMENT (the "Agreement") dated as of June 8, 2006 from West Virginia University Hospitals, Inc. (the "Obligated Group Agent") to UBS Securities LLC and Ferris, Baker & Watts, Incorporated, as the initial purchasers (the "Purchasers") in connection with the offering by the West Virginia Hospital Finance Authority (the "Authority") of its (i) $78,610,000 West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series A (the "2006 A Bonds"), (ii) $46,150,000 West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) Auction Rate Certificates (ARCs$^{(sm)}$) 2006 Series B (the "2006 B Bonds"), (iii) $46,500,000 West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) Auction Rate Certificates (ARCs$^{(sm)}$) 2006 Series C (the "2006 C Bonds") and (iv) $60,375,000 West Virginia United Health System Obligated Group Hospital Revenue Bonds (United Hospital Center, Inc. Project) Auction Rate Certificates (ARCs$^{(sm)}$) 2006 Series D (the "2006 D Bonds," and, together with the 2006 A Bonds, the 2006 B Bonds and the 2006 C Bonds, sometimes hereinafter collectively referred to as the "2006 Bonds" ). Capitalized terms used in this Agreement shall have the respective meanings specified above or in Article IV hereof. The Obligated Group Agent certifies and agrees as follows:

## ARTICLE I

## The Undertaking

**Section 1.1.  Purpose.** This Agreement shall constitute a written undertaking for the benefit of the holders of the 2006 Bonds, and is being executed and delivered solely to assist the Purchasers in complying with subsection (b)(5) of the Rule, as hereinafter defined.

**Section 1.2.  Annual Financial Information.** (a) The Obligated Group Agent hereby agrees to provide or cause to be provided to the Dissemination Agent, not later than the Filing Date, and the Dissemination Agent shall provide to each NRMSIR, to any SID, and to the Bond Trustee, the Annual Financial Information, not later than ten (10) Business Days following the end of the Filing Date for that Fiscal Year. The Audited Financial Statements of the Obligated Group Agent to be provided as part of the Annual Financial Information will be prepared in accordance with GAAP. The Dissemination Agent shall also cause such information to be mailed to those holders of 2006 Bonds who have filed their names with the Dissemination Agent for such purpose within ten (10) Business Days following the end of the Filing Date for that Fiscal Year.

(b) If Unaudited Financial Statements have been provided to the Dissemination Agent as part of the provision of Annual Financial Information, the Obligated Group Agent shall provide to the Dissemination Agent the Audited Financial Statements for such Fiscal Year when available. The Dissemination Agent shall provide such Audited Financial Statements to each NRMSIR, to any

SID and the Bond Trustee within ten (10) Business Days of receipt thereof. The Dissemination Agent shall also cause such information to be mailed to those holders of 2006 Bonds who have filed their names with the Dissemination Agent for such purpose within ten (10) Business Days of receipt thereof.

(c)     If the Dissemination Agent has not received the Annual Financial Information for a Fiscal Year by the fifth Business Day prior to the Filing Date for that Fiscal Year, the Dissemination Agent shall provide a notice to the Obligated Group Agent not later than its close of business on the fifth Business Day prior to the Filing Date, substantially in the form of Exhibit A, by facsimile transmission (or other means similarly prompt). If the Dissemination Agent has not received the Annual Financial Information by its close of business on the Filing Date, the Dissemination Agent shall provide a notice to the Obligated Group Agent, not later than its close of business on the second succeeding Business Day following the Filing Date, substantially in the form of Exhibit B, by facsimile transmission (or other means similarly prompt). The Obligated Group Agent, in lieu of providing the information in accordance with this Section 1.2 hereof to the Dissemination Agent, may provide such information directly to each NRMSIR and any SID and provide written notice of such filing with the Dissemination Agent. The Dissemination Agent shall be entitled to rely conclusively upon any written evidence provided by the Obligated Group Agent regarding the provision of the Annual Financial Information directly to each NRMSIR or any SID. If, in any instance, the required information was not timely filed or the Obligated Group Agent fails to provide evidence, by 3:00 p.m., New York, New York time, by the fifth Business Day following the Filing Date, of its timely filing with each NRMSIR and any SID, the Dissemination Agent shall send or cause to be sent, but in any event not later than its close of business on the tenth Business Day following the Filing Date, a notice substantially in the form of Exhibit C, modified to reflect the pertinent facts, to each NRMSIR or to the MSRB, and to any SID by facsimile transmission (or other means similarly prompt). The Dissemination Agent shall not be liable to any person for the failure to provide a required notice in the form of Exhibit C.

(d)     The Obligated Group Agent acknowledges that it, and not the Bond Trustee nor the Dissemination Agent, is solely responsible for the accuracy, completeness, and timeliness of the Annual Financial Information and the notices required by Section 1.3 below. The Annual Financial Information shall be accompanied by a written certificate from the Obligated Group Agent, that the information provided to the Dissemination Agent pursuant to this Section 2 constitutes the Annual Financial Information that it purports to be and complies with this Continuing Disclosure Agreement and the Rule, and the Dissemination Agent shall be entitled to rely conclusively on such certificate.

(e)     Unless otherwise required by law and subject to technical and economic feasibility, the Obligated Group Agent and the Dissemination Agent shall employ such methods of information transmission in complying with this Section 1.2 and with Section 1.3 below as shall be requested or recommended by the designated recipients of the Annual Financial Information or of Material Events (as applicable).

**Section 1.3.    Notice of Material Events; Changes in Accounting Principles or Fiscal Year.** (a) The Obligated Group Agent agrees to provide or cause to be provided to each NRMSIR

or the MSRB, to the Dissemination Agent and to any SID, in a timely manner, (i) notice of any Material Event, and (ii) notice of any change in the GAAP applied in the preparation of the Audited Financial Statements of the Obligated Group Agent or any change in the dates on which the Fiscal Year of the Obligated Group Agent begins and ends.

(b)     The Dissemination Agent shall promptly notify the Obligated Group Agent upon becoming aware of the occurrence of any Material Event (other than a nonpayment related default, the giving of a notice of optional redemption of any 2006 Bonds or defeasance of the 2006 Bonds or any provision thereof).

(c)     If the Obligated Group Agent becomes aware of a Material Event, the Obligated Group Agent shall prepare and provide promptly to the Dissemination Agent a form of notice of that event and the Dissemination Agent shall file notice as promptly as reasonably possible, by facsimile transmission (or other means similarly prompt), with each NRMSIR, and any SID of that event in accordance with subsection 1.3(a). The Dissemination Agent shall provide notice to the Obligated Group Agent not later than the third Business Day after it files any such notice, identifying each person with which that notice was filed and the date it was sent to the addressee.

(d)     The Dissemination Agent shall mail to the Bond Trustee, by first class mail, postage prepaid, to its Notice Address a copy of any notice that is filed with it by the Obligated Group Agent in accordance with subsection 1.3(a), along with a request that the Bond Trustee mail a copy of any such notice by first class mail, postage prepaid to each holder of the 2006 Bonds.

**Section 1.4.  Additional Disclosure Obligation.**     The Obligated Group Agent acknowledges and understands that other state and federal laws, including but not limited to the Securities Act of 1933 and Rule 10b-5 promulgated under the Securities Exchange Act of 1934, may apply to the Obligated Group Agent and that, under some circumstances, additional disclosures or other action in addition to those required by this Agreement may be required to enable the Obligated Group Agent to fully discharge all of its duties and obligations under such laws. The Obligated Group Agent agrees to voluntarily comply with the requirements of Rule 15-c(2)(12).

**Section 1.5.   Additional Information.**  Nothing in this Agreement shall be deemed to prevent the Obligated Group Agent from disseminating any other information, using the means of dissemination set forth in this Agreement or any other means of communication, or including any other information in any Annual Financial Information or notice of Material Event hereunder, in addition to that, which is required by this Agreement. If the Obligated Group Agent chooses to do so, the Obligated Group Agent shall have no obligation under this Agreement to update such additional information or include it in any future Annual Financial Information or notice of a Material Event hereunder, in addition to that which is required by this Agreement.

**Section 1.6.   No Previous Non-Compliance.**  The Obligated Group Agent represents on behalf of WVUHS, itself and the other Members of the Obligated Group, that since January 1, 2000, WVUHS and each Member of the Obligated Group has not failed to comply in any material respect

with any previous undertaking in a written contract or agreement, as entered into by WVUHS or such Member, specified in paragraph (b)(5)(i) of the Rule.

**Section 1.7.    Filing with Municipal Advisory Council**. Any filing under this Agreement may be made solely by transmitting such filing to the Texas Municipal Advisory Council (the "MAC") as provided at http://www.disclosureusa.org unless the United States Securities and Exchange Commission has withdrawn the interpretive advice in its letter to the MAC dated September 7, 2004.

## ARTICLE II

### Operating Rules

**Section 2.1.    Reference to Other Documents**. It shall be sufficient for purposes of this Agreement if the Obligated Group Agent provides Annual Financial Information by specific reference to documents (i) either (I) provided to each NRMSIR existing at the time of such reference and the SID or (2) filed with the SEC, or (ii) if such document is an Official Statement, available from MSRB.

**Section 2.2.    Submission of Information**. Annual Financial Information may be provided in one document or multiple documents, and at one time or in part from time to time.

**Section 2.3.    Transmission of Information and Notices**. Unless otherwise required by law, the Obligated Group Agent shall employ such methods of information and notice transmission, as it shall so determine.

**Section 2.4.    Fiscal Year**. WVUHS and the Obligated Group's respective current fiscal years are the twelve-month period ending on December 31. The Obligated Group Agent shall promptly notify(i) each NRMSIR, (ii) the SID and (iii) the Purchasers of each change in the fiscal year of WVUHS or any Member of the Obligated Group.

## ARTICLE III

### Effective Date. Termination, Amendment and Enforcement

**Section 3.1.    Effective Date; Termination**. (a) This Agreement shall be effective upon the issuance of the 2006 Bonds.

(b)    The Obligated Group Agent's obligations under this Agreement shall terminate upon a legal defeasance, prior redemption or payment in full of all of the 2006 Bonds.

(c)    This Agreement, or any provision hereof, shall be null and void in the event that the Obligated Group Agent (1) delivers to the Purchasers an opinion of Counsel, addressed to the Obligated Group Agent and the Purchasers, to the effect that those portions of the Rule which

require this Agreement, or such provision, as the case may be, do not or no longer apply to the 2006 Bonds, whether because such portions of the Rule are invalid, have been repealed, or otherwise, as shall be specified in such opinion, and (2) delivers copies of such opinion to each NRMSIR and the SID).

**Section 3.2.** **Amendment.** (a) This Agreement may be amended, by written agreement of the parties, without the consent of the holders of the 2006 Bonds, if all of the following renditions are satisfied: (1) such amendment is made in connection with a change in circumstances that arises from a change in legal (including regulatory) requirements, a change in law (including rules or regulations) or in interpretations thereof, or a change in the identity, nature or status of the Obligated Group Agent or the type of business conducted thereby, (2) this Agreement as so amended would have complied with the requirements of the Rule as of the date of this Agreement, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances, (3) the Obligated Group Agent shall have delivered to the Purchasers an opinion of Counsel, addressed to the Obligated Group Agent and the Purchasers, to the same effect as set forth in clause (2) above, (4) the Obligated Group Agent shall have delivered to the Purchasers an opinion of Counsel or a determination by a person, in each case unaffiliated with the Obligated Group Agent (such as bond counsel or the Purchasers) and acceptable to the Obligated Group Agent, addressed to the Obligated Group Agent and the Purchasers, to the effect that the amendment does not materially impair the interest of the holders of the 2006 Bonds, and (5) the Obligated Group Agent shall have delivered copies of such opinion(s) and amendment to each NRMSIR and the SID.

(b) This Agreement may be amended, by written agreement of the parties, without the consent of the holders of the 2006 Bonds, if all of the following conditions are satisfied: (1) an amendment to the Rule is adopted, or a new or modified official interpretation of the Rule is issued, after the effective date of this Agreement which is applicable to this Agreement (2) the Obligated Group Agent shall have delivered to the Purchasers an opinion of Counsel, addressed to the Obligated Group Agent and the Purchasers, to the effect that performance by the Obligated Group Agent and Purchasers under this Agreement as so amended will not result in a violation of the Rule and that in the opinion of Counsel such change will not materially impair the owners of the 2006 Bonds, and (3) the Obligated Group Agent shall have delivered copies of such opinion and amendment to each NRMSIR and the SID.

(c) To the extent any amendment to this Agreement results in a change in the type of financial information or operating data provided pursuant to this Agreement, the first Annual Financial Information provided thereafter shall include a narrative explanation of the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

(d) If an amendment is made pursuant to Section 3.2(a) hereof to the accounting principles to be followed by the Obligated Group Agent in preparing its financial statements, the Annual Financial Information for the fiscal year in which the change is made shall provide written explanation of such change or changes.

**Section 3.3.** **Benefit; Third-Party Beneficiaries Enforcement.** (a) The provisions of this Agreement shall constitute a contract with and inure solely to the benefit of the holders from time to time of the 2006 Bonds, except that beneficial owners of the 2006 Bonds shall be third-party beneficiaries of this Agreement and shall be deemed to be holders of the 2006 Bonds for purposes of Section 3.3(b) hereof. The provisions of this Agreement shall create no rights in any person or entity except as provided in this subsection (a).

(b)     The obligations of the Obligated Group Agent to comply with the provisions of this Agreement shall be enforceable (i) in the case of enforcement of obligations to provide Annual Financial Information and Material Event notices, by any holder of Outstanding Bonds, or by the Purchasers on behalf of the holders of Outstanding Bonds, or (ii) in the case of challenges to the adequacy of the Annual Financial Information so provided, by the Purchasers on behalf of the holders of Outstanding Bonds; provided, however, that the Purchasers shall not be required to take any enforcement action except at the direction of the Holders of not less than 25% in aggregate principal amount of the 2006 Bonds at the time Outstanding who shall have provided the Purchasers with adequate security and indemnity. The Holders' and Purchasers' rights to enforce the provisions of this Agreement shall be limited solely to a right by action in mandamus or for specific performance, to compel performance of the Obligated Group Agent's obligations under this Agreement

(c)     Any failure by the Obligated Group Agent or the Purchasers to perform in accordance with this Agreement shall not constitute a default or an Event of Default under the resolution, the Bond Indenture or the 2006 Bonds, and the rights and remedies provided by the resolution or the 2006 Bonds upon the occurrence of a default or an Event of Default shall not apply to any such failure.

(d)     This Agreement shall be construed and interpreted in accordance with the laws of the State of West Virginia, and any suits and actions arising out of this Agreement shall be instituted in a court of competent jurisdiction in the State; provided, however, that to the extent this Agreement addresses matters of federal securities laws, including the rule, this Agreement shall be construed in accordance with such federal securities laws and official interpretations thereof.

**Section 3.4.** **Severability.** In case any section or provision of this Agreement, or any covenant, stipulation, obligation, agreement, act or action, or part thereof made, assumed, entered into, or taken thereunder or any application thereof, is for any reason held to be illegal or invalid, such illegality or invalidity shall not affect the remainder thereof or any other section or provision thereof or any other covenant, stipulation, obligation, agreement, act or action, or part thereof made, assumed, entered into, or taken thereunder (except to the extent that such remainder or section or provision or other covenant, stipulation, obligation, agreement, act or action, or part thereof is wholly dependent for its operation on the provision determined to be invalid), which shall be construed and enforced as if such illegal or invalid portion were not contained therein, nor shall such illegality or invalidity of any application thereof affect any legal and valid application thereof, and each such section, provision, covenant, stipulation, obligation, agreement, act or action, or part

thereof shall be deemed to be effective, operative, made, entered into or taken in the manner and to the full extent permitted by law.

    **Section 3.5.    Counterparts.**  This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

    **Section 3.6.    Governing Law.**  This Agreement shall be deemed to be an agreement made under the laws of the State of West Virginia and for all purposes shall be governed by and construed in accordance with the laws of the State of West Virginia.

## ARTICLE IV

### Definitions

    **Section 4.1.    Definitions.**  The following items used in this Agreement shall have the following respective meanings:

    "**Annual Financial Information**" means, with respect to the 2006 Bonds, collectively,

    (A)  (i)  information as shall be necessary in order to update financial information set forth with respect to the 2006 Bonds, the System and the Obligated Group in the Official Statement; and

        (ii)    the Audited Financial Statements for the preceding Fiscal Year (commencing with the Audited Financial Statements for the Fiscal Year ending December 31, 2006), and Unaudited Financial Statements for such Fiscal Year if such Audited Financial Statements are unavailable, pursuant to Section 2 hereof; and

    (B)    such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such financial and operating data listed in (A) above.

    Any or all of the items listed above may be included by specific reference to other documents which have been submitted to each NRMSIR and the SID, if any, or filed with the SEC.  If such document is an Official Statement, it must be available from the MSRB.

    In the event that any of the financial information or operating data constituting Annual Financial Information that no longer can be generated because the operations to which such information or data relate have been materially changed or discontinued, a statement to that effect shall be provided in lieu of such information.

    "**Audited Financial Statements**" means, with respect to the System, the annual financial statements of the System audited by such auditor as shall then be required or permitted by State law.  Audited Financial Statements shall be prepared in accordance with GAAP; provided, however, that the System may from time to time, if required by federal or State legal requirements, modify the

basis upon which its financial statements are prepared. Notice of any such modification shall include a reference to the specific federal or State law or regulation describing such accounting basis and shall be provided by the Issuer to the Dissemination Agent, who shall promptly deliver such notice to (i) either the MSRB or each NRMSIR, and (ii) the SID.

"**Bond Trustee**" means The Bank of New York, as trustee under the Bond Indenture dated June 1, 2006, by and between the West Virginia Hospital Finance Authority and the Bond Trustee, pursuant to which the 2006 Bonds were issued.

"**Business Day**" means any day other than a Saturday, Sunday or a day on which the Dissemination Agent is required, or authorized or not prohibited by law (including executive orders), to close and is closed.

"**Counsel**" means Spilman Battle & Thomas PLLC, Charleston, West Virginia, or other nationally recognized bond counsel or counsel expert in federal securities law.

"**Dissemination Agent**" means Digital Assurance Corporation, _____ _____ _____ _____ _____ acting in its capacity as Dissemination Agent hereunder, or such other agent designated by the Issuer to carry out the duties imposed on the Dissemination Agent designated in writing by the Issuer and which has filed a written acceptance with the Issuer and the Bond Trustee of such duties imposed hereunder.

"**Filing Date**" means the 180th day following the end of each Fiscal Year (or the next succeeding Business Day if that day is not a Business Day).

"**Fiscal Year**" means each fiscal year of the Obligated Party, commencing with the fiscal year ending on December 31, 2006.

"**GAAP**" means generally accepted accounting principles as prescribed from time to time for governmental units by the Governmental Accounting Standards Board, the Financial Accounting Standards Board, or any successor to the duties and responsibilities of either of them.

"**Indenture**" means the collectively, the Master Trust Indenture and the Bond Indenture.

"**Master Trust Indenture**" means the Amended and Restated Master Trust Indenture dated as of August 1, 2003, as supplemented, between the Obligated Group Agent and The Huntington National Bank, as Master Trustee.

"**Material Event**" means any of the following events with respect to the 2006 Bonds, whether relating to the Obligated Group Agent or otherwise, if material:

      (i)     principal and interest Payment delinquencies;

      (ii)    non-payment related defaults;

(iii)     unscheduled draws on debt service reserves reflecting financial difficulties;

(iv)     unscheduled draws on credit enhancements reflecting financial difficulties;

(v)     substitution of credit or liquidity providers, or their failure to perform;

(vi)     adverse tax opinions or events affecting the tax-exempt status of the 2006 Bonds;

(vii)     modifications of rights of holders of the 2006 Bonds;

(viii)     bond calls (except in the case of mandatory sinking fund redemption);

(ix)     defeasances;

(x)     release, substitution, or sale of property securing repayment of the 2006 Bonds;

(xi)     rating changes; and

(xii)     a change in the Fiscal Year of WVUHS or any Member of the Obligated Group.

"**MSRB**" means the Municipal Securities Rulemaking Board established pursuant to Section 15B(b)(1) of the Securities Exchange Act of 1934.

"**NRMSIR**" means, at any time, a then existing nationally recognized municipal securities information repository, as recognized from time to time by the SEC for the purposes referred to in the Rule. The NRMSIRs as of the date of this Agreement and the filing information relating to such NRMSIRs are as follows:

Bloomberg Municipal Repository
100 Business Park Drive
Skillman, NJ 08558
Tel: (609) 279-3225
Fax: (609) 279-5962
Internet: munis@Bloomberg.com

FT Interactive Data
Attn: NRMSIR
100 Williams Street
New York, NY 10038
Tel: (212) 771-6999
Fax: (212) 771-7391 (Primary Market Information)
Fax: (212) 771-7390 (Secondary Market Information)
Internet: NRMSIR@FTID.com

DPC Data, Inc.
One Executive Drive
Fort Lee, NJ 07024
Tel:    (201) 346-0701
Fax:    (201) 947-0107
Internet: nrmsir@dpcdata.com

Standard & Poor's Securities Evaluations, Inc.
55 Water Street, 45th Floor
New York, NY 10041
Tel: (212) 438-4595
Fax: (212) 438-3975
Internet: nrmsir_repository@sandp.com

**"Official Statement"** means "final official statement", as defined in paragraph (O)(3) of the Rule.

**"Rule"** means Rule 15c2-12 promulgated by the SEC under the Securities Exchange Act of 1934 (17 CFR Part 240, §240.15c2-12), as in effect on the date of issuance of the 2006 Bonds, including any official interpretations thereof issued either before or after such date which are applicable to this Agreement.

**"SEC"** means the United States Securities and Exchange Commission.

**"SID"** means, at any time, a then-existing state information depository, if any, as operated or designated as such by or on behalf of the State for the purposes referred to in the Rule. As of the date of issuance of the 2006 Bonds, there is no SID.

**"Unaudited Financial Statements"** means the same as Audited Financial Statements, except that they shall not have been audited and shall not have been reported on by independent certified public accountants.

The terms "obligated person" and "primary offering" have the respective meaning assigned in paragraph (f) of the Rule.

Any reference herein to the Issuer, the Chairman, Secretary-Treasurer or to any other officers thereof, or to other public boards, commissions, departments, institutions, agencies, bodies, entities or officers thereof, shall include those who or which succeed to their functions, duties or responsibilities pursuant to or by operation of law or who are lawfully performing their functions. Any reference to a Section, provision or chapter of federal or State laws and regulations, shall include such Section, provision, chapter, laws or regulations, as from time to time amended, modified, revised, supplemented, or superseded, provided that no such change in the laws or regulations shall be deemed applicable by reason of this provision if such change would in any way constitute an impairment of the rights of the Issuer, a holder or the Bond Trustee under the Bond Indenture or would alter the obligation to pay the principal of, premium, if any, or interest on the 2006 Bonds in the amount and manner, at all times, and from the sources provided in the 2006 Bonds and the Bond Indenture, except as otherwise permitted in the Bond Indenture.

## ARTICLE V

### Miscellaneous

**Section 5.1.** **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**Section 5.2.** **Severability.** If any one or more sections, clauses, sentences or parts hereof shall for any reason be questioned in any court of competent jurisdiction and shall be adjudged unconstitutional or invalid, such judgment shall not affect, impair or invalidate the remaining provisions hereof or thereof, or the 2006 Bonds, but shall be confuted to the specific sections, clauses, sentences and parts so adjudged.

IN WITNESS WHEREOF, the Obligated Group Agent has caused this Agreement to be executed by its duly authorized representative, all as of the date first above written.

WEST VIRGINIA UNIVERSITY HOSPITALS, INC.,
as Obligated Group Agent

By:_____ _____ _____

Its: _____ _____

ACKNOWLEDGED:       DIGITAL ASSURANCE CORPORATION,
as Dissemination Agent

By:_____ _____ _____

Its: _____ _____

**EXHIBIT A**

**West Virginia Hospital Finance Authority**
**West Virginia United Health System Obligated Group**
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project)**
**$_____ 2006 Series A (Fixed Rate)**
**$_____ 2006 Series B (Auction Rate Certificates (ARCs[(sm)]))**
**$_____ 2006 Series C (Auction Rate Certificates (ARCs[(sm)]))**
**$_____ 2006 Series D (Auction Rate Certificates (ARCs[(sm)]))**

**NOTICE OF REQUIREMENT TO FILE**
**ANNUAL FINANCIAL INFORMATION**

TO:     West Virginia University Hospitals, Inc.,
        as Obligated Group Agent

        The undersigned, as the Dissemination Agent under the Continuing Disclosure Agreement, dated as of June 8, 2006 (the "Agreement"), between West Virginia University Hospitals, Inc., UBS Securities LLC and Ferris, Baker Watts, Incorporated (the "Purchaser"), hereby notifies you (with each capitalized term used but not defined herein having the meaning assigned to it in the Agreement), that the Obligated Group Agent, as of the date of this notice, has not provided or caused to be provided to the undersigned the Annual Financial Information that is required under the Agreement to be so provided not later than _____. The Annual Financial Information is required under the Agreement to be provided or caused to be provided both to the undersigned and to each NRMSIR and any SID not later than that date.

                                        [Dissemination Agent]

Dated: _____        By: _____ _____
                                        Its _____ _____

## EXHIBIT B

**West Virginia Hospital Finance Authority**
**West Virginia United Health System Obligated Group**
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project)**
**$_____ 2006 Series A (Fixed Rate)**
**$_____ 2006 Series B (Auction Rate Certificates (ARCs[(sm)]))**
**$_____ 2006 Series C (Auction Rate Certificates (ARCs[(sm)]))**
**$_____ 2006 Series D (Auction Rate Certificates (ARCs[(sm)]))**

## NOTICE OF FAILURE TO FILE ANNUAL FINANCIAL INFORMATION

TO:   West Virginia University Hospitals, Inc.,
      as Obligated Group Agent

The undersigned, as the Dissemination Agent under the Continuing Disclosure Agreement, dated as of June 8, 2006 (the "Agreement"), between West Virginia University Hospitals, Inc., UBS Securities LLC and Ferris, Baker Watts, Incorporated, hereby notifies you (with each capitalized term used but not defined herein having the meaning assigned to it in the Agreement), that the Obligated Group Agent, as of the date of this notice, has not provided or caused to be provided to the undersigned the Annual Financial Information that was required under the Agreement to be so provided not later than **[insert Filing Date]**.

Please provide the required Annual Financial Information to the undersigned, or written evidence that such information has been provided to each NRMSIR and any SID and, if so, when it was provided. The Annual Financial Information or any such written evidence or statement must be received by the undersigned not later than 3:00 p.m., _____ time, on the fifth Business Day following the Filing Date. If the undersigned has not received written evidence by that time regarding the making and timeliness of the filing, a notice will be filed promptly thereafter with each NRMSIR, the MSRB and any SID, substantially in the form attached as Exhibit C to the Agreement.

[Dissemination Agent]

Dated: _____        By: _____
                                  Its _____

## EXHIBIT C

**West Virginia Hospital Finance Authority**
**West Virginia United Health System Obligated Group**
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project)**
**$_____ 2006 Series A (Fixed Rate)**
**$___ _____ 2006 Series B (Auction Rate Certificates (ARCs[(sm)])**
**$_____ _____ 2006 Series C (Auction Rate Certificates (ARCs[(sm)])**
**$_ _____ 2006 Series D (Auction Rate Certificates (ARCs[(sm)])**

TO:     [NRMSIRs, MSRB, SID][addresses attached as Schedule I hereto]

The undersigned, as the Dissemination Agent under the Continuing Disclosure Agreement, dated as of March 1, 2006 (the "Agreement"), between West Virginia University Hospitals, Inc., UBS Securities LLC and Ferris, Baker Watts, Incorporated, hereby notifies you (with each capitalized term used but not defined herein having the meaning assigned to it in the Agreement), that:

[1.     To our knowledge, the Obligated Group Agent, as of the date of this notice, has not provided or caused to be provided to the Dissemination Agent the Annual Financial Information for its Fiscal Year that ended ___ _____, _____, or provided any written evidence to the Dissemination Agent concerning the timeliness of its filing of that Annual Financial Information with each NRMSIR and any SID. That Annual Financial Information was required under the Agreement to be provided to the Dissemination Agent and by the Dissemination Agent to, each NRMSIR and any SID not later than _____.]

### OR

[1.     To our knowledge, the Obligated Group Agent failed to provide the Annual Financial Information in a timely manner. The Obligated Group Agent intends to provided or caused to be provided the Annual Financial Information that was required to be provided to each NRMSIR and any SID not later than _____, to [_____] on _____ _____.]

[2.     The Obligated Group has provided the attached statement concerning their failure to provide or cause to be provided the Annual Financial Information in accordance with the Agreement. The Dissemination Agent does not assume any responsibility for the accuracy or completeness of that statement and has not and will not undertake any investigation to determine its accuracy or completeness.]

[Dissemination Agent]

Dated: _____ _____          By: _____
                                   Its _____

cc: [Authorized Disclosure Representative]

[THIS PAGE INTENTIONALLY LEFT BLANK]