# Exhibit F

$30,525,000
**WEST VIRGINIA HOSPITAL FINANCE AUTHORITY**
Hospital Revenue Bonds
(West Virginia University Hospitals, Inc.) 2005 Series A
Auction Rate Certificates (ARCs$^{(SM)}$)

$29,475,000
**WEST VIRGINIA HOSPITAL FINANCE AUTHORITY**
Hospital Revenue Bonds
(West Virginia University Hospitals Inc.) 2005 Series B
Auction Rate Certificates (ARCs$^{(SM)}$)

## PURCHASE CONTRACT

January 26, 2005

West Virginia Hospital Finance Authority
Charleston, West Virginia

Ladies and Gentlemen:

    We, the undersigned, on our own behalf, and on behalf of Ferris, Baker Watts, Incorporated, as representative of the underwriters (collectively, the "Underwriter"), hereby offer to enter into this Purchase Contract with you (the "Authority"), for the purchase by the Underwriter and sale by you of the Bonds specified below. This offer is made subject to acceptance by the Authority and approval by West Virginia University Hospitals, Inc., a West Virginia non-profit corporation as Obligated Group Agent (the "Obligated Group Agent"), prior to 5:00 P.M., New York Time, on the date hereof, and upon such acceptance and approval, as evidenced by signatures in the spaces provided therefor below, this Purchase Contract shall be in full force and effect in accordance with its terms and shall be binding upon the Authority, the Underwriter and the Obligated Group Agent. If this offer is not so accepted and approved, it is subject to withdrawal by the Underwriter upon written notice delivered to the Authority at any time prior to such acceptance and approval.

CH-1188021v2

1.      Upon the terms and conditions and upon the basis of the representations set forth herein and in the Letter of Representation, dated the date hereof, and executed and delivered by the Obligated Group Agent, which Letter of Representation is attached hereto as Exhibit A (the "Letter of Representation"), the Underwriter hereby agrees to purchase from the Authority and the Authority hereby agrees to sell to the Underwriter all (but not less than all) of the Authority's aggregate $60,000,000 Hospital Revenue Bonds (West Virginia University Hospitals, Inc.) Auction Rate Certificates (ARCs$^{(sm)}$) (the "Bonds"), in two separate series, designated "2005 Series A Bonds," and "2005 Series B Bonds" to be dated their respective dates of delivery at an aggregate purchase price of $59,715,000 (representing par value less an underwriting discount of $285,000). The Bonds will mature in the principal amounts and bear interest at the rates as set forth on the cover page of the Official Statement referred to in Section 3 hereof. The Underwriter hereby further agrees to the terms of the Letter of Representation.

The Bonds shall be as described in, and shall be issued and secured under and pursuant to a Bond Indenture, dated as of January 1, 2005 (the "Bond Indenture"), by and between the Authority and The Bank of New York, New York, New York (the "Bond Trustee"). In connection with the issuance of the Bonds, the Authority and the Obligated Group Agent will enter into a Loan Agreement, to be dated as of January 1, 2005 (the "Loan Agreement"). Pursuant to the Loan Agreement, the Obligated Group is required to make payments to the Bond Trustee at such times and sufficient in amount to pay the principal of, redemption premium, if any, purchase price and interest on the Bonds (the "Obligated Group Payments").

The obligations of the Obligated Group under the Loan Agreement will be evidenced and secured by promissory notes 2005A-1 and 2005B-1 to be issued (collectively, the "Notes") pursuant to an Amended and Restated Master Trust Indenture dated as of August 1, 2003 (the "Original Master Indenture"), as supplemented by Supplemental Master Trust Indenture No. 2003-1, Supplemental Master Trust Indenture No. 2005-1 and Supplemental Master Trust Indenture No. 2005-2 ("Supplemental Master Trust Indenture No. 2003-1," "Supplemental Master Trust Indenture No. 2005-1" and "Supplemental Master Trust Indenture No. 2005-2" and, together with the Original Master Indenture, sometimes hereinafter collectively referred to as the "Master Indenture"), between the Obligated Group Agent and The Huntington National Bank, Columbus, Ohio, as master trustee (the "Master Trustee"). Under the Master Indenture, all Notes are secured by a security interest in the Gross Receipts (as defined in the Master Indenture).

The Bonds will be secured on a parity as to lien and source of payment with the Authority's (i) Hospital Refunding Revenue Bonds (West Virginia University Hospitals, Inc.) Series 1998 (the "1998 Bonds"), (ii) $23,530,000 Hospital Refunding Revenue Bonds (West Virginia University Hospitals, Inc.) 2003 Series A (the "2003 A Bonds"), (iii) $25,800,000 Hospital Revenue Refunding Bonds (West Virginia University Hospitals, Inc.) 2003 Series B Auction Rate Certificate (ARCs$^{(sm)}$) (the "2003 B Bonds"), (iv) $44,650,000 Hospital Revenue Refunding and Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series C Auction Rate Certificate (ARCs$^{(sm)}$) (the "2003 C Bonds"), and (v) $45,750,000 Hospital Revenue Improvement Bonds (West Virginia University Hospitals, Inc.) 2003 Series D Auction Rate Certificate (ARCs$^{(sm)}$) (the "2003 D Bonds," and, together with the 2003 A Bonds, the 2003 B Bonds and the 2003 C Bonds, sometimes hereinafter collectively referred to as the "2003 Authority Bonds").

The scheduled payment of principal of and interest on the Bonds when due will be guaranteed under a bond insurance policy to be issued by Ambac Assurance Corporation. concurrently with the delivery of the Bonds.

The Underwriter agrees to make a bona fide public offering of the Bonds at the initial offering price as set forth above.

2. The Underwriter hereby represents that it has been duly authorized to execute this Purchase Contract and to perform other functions, as herein set forth. Any authority, discretion or other power conferred upon the Underwriter under any of the provisions of this Purchase Contract shall be exercised by the Underwriter, and the payment for, acceptance of, and delivery and execution of any receipt for, the Bonds and any other instruments upon or in connection with the Closing (hereinafter defined) hereunder by the Underwriter shall be valid and sufficient for all purposes provided that any such action by the Underwriter shall not impose any obligation or liability upon it other than as may arise as expressly set forth in this Purchase Contract.

3. The Authority and the Obligated Group Agent, by their acceptance and approval of this Purchase Contract ratify the use and distribution by the Underwriter prior to the date hereof of the preliminary official statement relating to the public offer, sale and distribution of the Bonds dated January 14, 2005 (including the cover page and all appendices thereto (the "Preliminary Official Statement"). The Authority has delivered or caused to be delivered to the Underwriter on the date hereof a form of the official statement relating to the Bonds dated the date hereof, marked to show changes from the Preliminary Official Statement, which the Authority deems final for purposes of Rule 15c2-12 promulgated under the Securities Exchange Act of 1934, as amended ("Rule 15c2-12"), except for information permitted to be omitted therefrom by Rule 15c2-12; provided, however, that the foregoing representation as to the finality of such form of official statement does not include a representation as to the finality of the statements and information contained therein concerning the Obligated Group and its Affiliates. The Authority hereby agrees to deliver or cause to be delivered to the Underwriter promptly after acceptance hereof, copies of the final official statement, dated the date hereof, relating to the Bonds (including all information previously permitted to have been omitted by Rule 15c2-12 and any amendments or supplements thereto in connection with the offer, sale and distribution of the Bonds as have been approved by the Authority and the Underwriter) (the "Official Statement") approved on behalf of the Authority by its Chairman (or such other authorized officers as we shall have approved). By its approval of this Purchase Contract, the Obligated Group Agent deems final, for the purposes of Rule 15c2-12, all information relating to the Obligated Group and its Affiliates contained in the form of the Official Statement delivered to the Underwriter on this date. The Authority hereby authorizes the Obligated Group Agent to, and the Obligated Group Agent shall, cause to be delivered to the Underwriter, within seven (7) business days of the date hereof, definitive copies of the Official Statement in such quantity as the Underwriter shall request.

The Official Statement has been prepared pursuant to, and approved for distribution by, a resolution of the Authority and resolutions of the Members of the Obligated Group. The Authority authorizes the use of copies of the Official Statement, the Bond Indenture, the Master

Indenture and the Loan Agreement in connection with the public offering and sale of the Bonds, and the Obligated Group Agent, by its approval hereof authorizes use of copies of the Official Statement, the Bond Indenture and the Loan Agreement with the public offering and sale of the Bonds. The Bonds, the Bond Indenture, the Master Indenture, the Loan Agreement, the Official Statement, this Purchase Contract, the Letter of Representation, the Continuing Disclosure Agreement, the Escrow Agreement, dated as of January 1, 2005 (the "1992 Escrow Agreement"), between the Berkeley County Building Commission and J.P. Morgan Trust Company, National Association (successor-in-interest to Charleston National Bank) (the "1992 Escrow Agent"), the .Escrow Deposit Agreement dated as of January 1, 2005 (the "2002 Escrow Agreement") between the Authority and United Bank, Inc., (the "2002 Escrow Agent") and the Escrow Deposit Agreement dated as of January 1, 2005 (the "2003 Escrow Agreement," and, together with the 1992 Escrow Agreement and the 2002 Escrow Agreement, sometimes hereinafter collectively referred to as the "Escrow Agreements") between the Jefferson County Building Commission and United Bank, Inc., ("the 2003 Escrow Agent"), the Bond Insurance Policy and the Tax Compliance Certificate are hereinafter called the "Bond Documents."

    4.     The Authority represents to and agrees with the Underwriter that:

        (a)    the Authority is a body corporate and governmental instrumentality duly created and validly existing under the laws of the State of West Virginia, including particularly Article 29A of Chapter 16 of the Code of West Virginia, 1931, as amended (the "Act") with power and authority to issue the Bonds under the Act;

        (b)    by official action of the Authority prior to or concurrently with the acceptance hereof, the Authority has duly authorized the distribution of the Preliminary Official Statement and approved the Official Statement and authorized its execution and distribution, and has duly authorized and approved the execution and delivery of, and the performance by the Authority of the obligations on its part contained in, the Bond Documents to which the Authority is a party (the "Authority Bond Documents") and the transaction contemplated thereby;

        (c)    the execution and delivery of the Authority Bond Documents, and compliance with the provisions on the Authority's part contained therein, will not conflict with or constitute a breach of or default under any law, administrative regulation, judgment, decree, loan agreement, indenture, bond, note, resolution, agreement or other instrument to which the Authority is a party or is otherwise subject, nor will any such execution, delivery, adoption or compliance result in the creation or imposition of any lien, charge or other security interest or encumbrance of any nature whatsoever upon any of the properties or assets of the Authority under the terms of any such law, administrative regulation, judgment, decree, loan agreement, indenture, bond, note, resolution, agreement or other instrument, except as provided in the Authority Bond Documents;

        (d)    the Authority is not in material breach of or default under any applicable law or administrative regulation of the State of West Virginia or the United States (except with respect to federal or state securities or Blue Sky laws in connection with the distribution of

the Bonds by the Underwriter as to which the Authority makes no representations), or any applicable judgment or decree or any loan agreement, indenture, bond, note, resolution, agreement or other instrument to which the Authority is a party or is otherwise subject, and no event has occurred and is continuing which, with the passage of time or the giving of notice, or both, would constitute a default or an event of default under any such instrument which breach or default would have a material adverse effect on the Bonds;

(e) there is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, governmental agency, public board or body, pending or, to the best of its knowledge, threatened against the Authority affecting the existence of the Authority or the titles of its officers to their respective offices or seeking to prohibit, restrain or enjoin the issuance, execution, sale or delivery of the Bonds or the collection by the Authority of revenues pledged or to be pledged to pay the principal of, and premium, if any, and interest on the Bonds, or the pledge thereof, or in any way contesting or affecting the validity or enforceability of the Authority Bond Documents, or contesting the powers of the Authority or its authority to issue, enter into, adopt or perform its obligations under any of the foregoing, or contesting in any way the completeness or accuracy of the Preliminary Official Statement or the Official Statement, or any amendment or supplement thereto, wherein an unfavorable decision, ruling or finding would materially adversely affect the validity or enforceability of the Authority Bond Documents;

(f) no consent, approval, authorization or other action by any governmental or regulatory authority having jurisdiction over the Authority that has not been obtained is or will be required for the issuance, execution, sale and delivery of the Bonds or the consummation by the Authority of the other transactions contemplated by Authority Bond Documents, except such as may be required under state securities or Blue Sky laws in connection with the distribution of the Bonds by the Underwriter;

(g) the Authority will furnish such information, execute such instruments and take such other action in cooperation with the Underwriter as the Underwriter may reasonably request in order (1) to qualify the Bonds for offer and sale under the Blue Sky or other securities laws and regulations of such states and other jurisdictions of the United States as the Underwriter may designate and (2) to determine the eligibility of the Bonds for investment under the laws of such states and other jurisdictions, and will use its best efforts to continue such qualification in effect so long as required for distribution of the Bonds; provided, however, that in no event shall the Authority be required to take any action which would subject it to general service of process in any jurisdiction in which it is not now so subject;

(h) if between the date of this Purchase Contract and the Closing Date the Authority is notified by the Obligated Group Agent pursuant to Paragraph (q) of the Letter of Representation or, following the Closing Date if the Authority is notified by the Obligated Group Agent pursuant to Paragraph (r) thereof, and is requested to amend, supplement or otherwise change the Official Statement, the Authority hereby directs the Obligated Group Agent, and the Obligated Group Agent hereby agrees, to amend or

supplement the Official Statement, at the request of the Underwriter and in a form and in a manner approved by the Underwriter subject to the consent of the Authority, such consent not to be unreasonably withheld, provided all expenses thereby incurred will be paid by the Obligated Group; and

(i) after the Closing, for so long as the Underwriter is obligated by Rule 15c2-12 to deliver final Official Statements to prospective purchasers, if any event relating to or affecting the Authority shall occur as a result of which it is necessary, in the opinion of counsel for the Underwriter, to amend or supplement the Official Statement in order to make the Official Statement not misleading in the light of the circumstances existing at the time it is delivered to a prospective purchaser, the Authority will inform the Underwriter of such event and cooperate in the preparation and furnishing to the Underwriter (at the expense of the Obligated Group Agent for the duration of the underwriting period, which period shall not exceed 90 days from the Date of Closing, and thereafter at the expense of the Underwriter) a reasonable number of copies of an amendment of or supplement to the Official Statement (in form and substance satisfactory to counsel for the Underwriter and to Bond Counsel) which will amend or supplement the Official Statement so that it will not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances existing at the time the Official Statement is delivered to a prospective purchaser, not misleading. For the purposes of this paragraph and only for so long as required by this paragraph, the Authority will furnish such information with respect to itself as the Underwriter may from time to time reasonably request. The Underwriter hereby agrees that it will deposit or cause to be deposited with a nationally recognized municipal securities information repository a copy of the Official Statement at or prior to the time contemplated by Rule 15c2-12(b)(4).

The execution and delivery of this Purchase Contract by the Authority shall constitute a representation by the Authority to the Obligated Group Agent and to the Underwriter that the representations and warranties contained in this Paragraph 4 are true as of the date hereof; provided that no member of the governing body of the Authority shall be individually liable for the breach of any representation or warranty made by the Authority in this Paragraph 4.

5. The Underwriter's obligations under this Purchase Contract are and shall be subject to the receipt on or prior to the date of the Official Statement of letters from Ernst & Young LLP and Arnett & Foster, PLLC, dated the date of delivery of the Bonds (the "Closing Date"), addressed to the Obligated Group Agent and the Underwriter and in form and substance satisfactory to the Underwriter.

6. At 10:00 o'clock A.M., New York time, on January 27, 2005, or at such other time, or on such earlier or later date as we mutually agree upon (such time being herein called the "Closing" and such date being herein called the "Closing Date"), the Authority will deliver or cause to be delivered to The Depository Trust Company, New York, New York, on behalf of the Underwriter, the Bonds (or shall otherwise be held by the Registrar in the event of a "FAST" closing). The Bonds shall be in the form of a single fully registered bond for each maturity, without coupons, registered in the name of Cede & Co., as nominee of The Depository Trust Company.

The Bonds so delivered shall contain CUSIP identification numbers. All expenses of the issuance of such CUSIP identification numbers shall be paid by the Underwriter. The Underwriter will accept delivery of the Bonds and pay the purchase price thereof as set forth in Paragraph 1 hereof in immediately available funds payable to the order of the Bond Trustee for the account of the Authority. The Bonds will be made available for inspection by the Underwriter at the offices of The Depository Trust Company in New York, New York one business day prior to the Closing Date. If required by the policies of DTC, the Authority also agrees that it shall deliver to The Depository Trust Company the letter of representation, in the form required by The Depository Trust Company (the "DTC Letter of Representation"), at the time required by The Depository Trust Company.

7. The Underwriter hereby enters into this Purchase Contract in reliance upon the representations and warranties of the Authority contained herein and the representations and warranties of the Obligated Group Agent contained in the Letter of Representation and in reliance upon the representations and warranties to be contained in the documents and instruments to be delivered on the Closing Date and upon the performance by the Authority, subject to the Obligated Group Agent performing its duties hereunder, and by the Obligated Group Agent of its respective obligations, hereunder and under the Letter of Representation. Accordingly, the Underwriter's obligations under this Purchase Contract to purchase, to accept delivery of and to pay for the Bonds shall be conditioned upon the performance by the Authority, subject to the Obligated Group Agent performing its duties hereunder, and by the Obligated Group Agent of its respective obligations to be performed hereunder and under the Letter of Representation and under such documents and instruments at or prior to the Closing Date, and shall also be subject to the following additional conditions:

(a) the representations and warranties of the Authority contained herein and the representations and warranties of the Obligated Group Agent contained in the Letter of Representation shall be true, complete and correct on the date hereof and as of the Closing Date, as if made on and at the Closing Date;

(b) as of the Closing Date, Bond Documents shall be in full force and effect and shall be in the forms previously furnished to us except for such changes as may have been agreed to in writing by us; and there shall be in full force and effect such resolutions as, in the opinion of Spilman Thomas & Battle, PLLC, Charleston, West Virginia ("Bond Counsel"), shall be necessary in connection with the transactions contemplated hereby;

(c) the Underwriter shall have the right to cancel its obligations to purchase the Bonds if between the date hereof and the Closing Date, (i) legislation shall have been enacted by the Congress of the United States or the legislature of the State of West Virginia or shall have been reported out of committee of either body or be pending in a committee of either body, or shall have been recommended to the Congress of the United States or otherwise endorsed for passage (by press release, other form of notice or otherwise) by the President of the United States, the Treasury Department of the United States, the Internal Revenue Service or the Chairman or ranking minority member of the Committee on Finance of the United States Senate or the Committee on Ways and Means of the United

States House of Representatives, or legislation shall have been proposed for consideration by either such Committee or by the staff of the Joint Committee on Taxation of the Congress of the United States, or legislation shall have been favorably reported for passage to either House of the Congress of the United States by a Committee of such House to which such legislation has been referred for consideration, or a decision shall have been rendered by a court of the United States or of the State of West Virginia or the United States Tax Court, or a ruling shall have been made or a regulation or temporary regulation shall have been proposed or made or any other release or announcement shall have been made by the Treasury Department of the United States or the Internal Revenue Service, with respect to federal or State of West Virginia taxation upon revenues or other income of the general character to be derived by the Authority or a Member of the Obligated Group or upon interest received on obligations of the general character of the Bonds, which in the reasonable judgment of the Underwriter, materially adversely affects the market for the Bonds, or (ii) there shall exist any event which, in the reasonable judgment of the Underwriter, either (a) makes untrue or incorrect in any material respect as of such time any statement or information contained in the Official Statement or (b) is not reflected in the Official Statement but should be reflected therein in order to make the statements and information contained therein not misleading, or (iii) in the reasonable judgment of the Underwriter, the market price or marketability of the Bonds or the ability of the Underwriter to enforce contracts for the sale of the Bonds shall have been materially adversely affected by an amendment of or a supplement to the Official Statement, notwithstanding the Underwriter's approval of such amendment or supplement prior to its distribution, or (iv) there shall have occurred any outbreak of hostilities or other national or international calamity or crisis, the effect of such outbreak, calamity or crisis on the financial markets of the United States being such as, in the reasonable judgment of the Underwriter, would make it impracticable for the Underwriter to market or enforce contracts for the sale of the Bonds, or (v) there shall be in force a general suspension of trading on the New York Stock Exchange or minimum or maximum prices for trading shall have been fixed and be in force, or maximum ranges for prices for securities shall have been required and be in force on the New York Stock Exchange, whether by virtue of a determination by that Exchange or by order of the Securities and Exchange Commission or any other governmental authority having jurisdiction, or (vi) a general banking moratorium shall have been declared by either federal, West Virginia or New York authorities having jurisdiction and be in force, or (vii) there shall be any material adverse change in the affairs of the Authority or a Member of the Obligated Group which, in the reasonable judgment of the Underwriter, affects materially and adversely the market price or the marketability of the Bonds or the ability of the Underwriter to enforce contracts for the sale of the Bonds, or (viii) there shall be established any new restriction on transactions in securities materially affecting the free market for securities (including the imposition of any limitation on interest rates) or the extension of credit by, or the charge to the net capital requirements of, underwriters established by the New York Stock Exchange, the Securities and Exchange Commission, any other federal or state agency or the Congress of the United States, or by Executive Order, or (ix) a decision of any federal or state court or a ruling or regulation (final, temporary or proposed) of the Securities and Exchange Commission or other governmental agency shall have been made or issued that would (A) make the Bonds or any securities of the Authority or of any similar

body subject to the registration requirements of the Securities Act of 1933, as amended, or (B) require the qualification of an indenture in respect of the Bonds or any such securities under the Trust Indenture Act of 1939, as amended, or (x) there shall occur an adverse change in the credit ratings assigned by Moody's Investors Service, Inc. ("Moody's") or Standard & Poor's Rating Services, a division of the McGraw Hill Companies, Inc. ("S & P");

(d) at or prior to the Closing Date, we shall receive the following documents, in each case satisfactory in form and substance to us and our counsel:

(1) the unqualified approving opinion, dated as of the Closing Date, of Bond Counsel, substantially in the form set forth in the Official Statement, accompanied by a supplementary opinion of Bond Counsel, dated as of the Closing Date, substantially in the form attached hereto as Exhibit B;

(2) the opinion of Bowles Rice McDavid Graff & Love, PLLC, Charleston, West Virginia, Counsel for the Authority, dated as of the Closing Date, substantially in the form attached hereto as Exhibit C;

(3) the opinion of Robert L. Brandfass, Esquire counsel to the Obligated Group, dated as of the Closing Date, substantially in the form attached hereto as Exhibit D;

(4) the opinion of Goodwin & Goodwin, LLP, counsel for the Underwriter, dated as of the Closing Date, substantially in the form attached hereto as Exhibit E;

(5) the opinion of Counsel for the Bond Trustee, dated as of the Closing Date, to the effect that (a) the Bond Trustee has the corporate trust authority to act as trustee, paying agent and bond registrar for and in connection with the Bonds and has requisite trust powers to carry out its duties under the Bond Indenture; and (b) the Bond Indenture has been duly and validly authorized, executed and delivered by the Bond Trustee, and assuming due authorization, execution and delivery thereof by the Authority, the Bond Indenture constitutes a valid and legally binding obligation of the Bond Trustee, enforceable in accordance with its terms, except to the extent that the enforceability and the binding effect (but not the validity) thereof may be limited by (i) bankruptcy, reorganization, insolvency, moratorium or other laws affecting creditors' rights generally, from time to time in effect and (ii) to general principles of equity;

(6) the opinion of Counsel for the Master Trustee, dated as of the Closing Date, to the effect that (a) the master Trustee has the corporate trust authority to act as master trustee for and in connection with the Bonds and has requisite trust powers to carry out its duties under the Master Indenture; and (b) the Master Indenture has been duly and validly authorized, executed and delivered by the Master Trustee, and assuming due authorization, execution and delivery thereof by the Authority, the Master Indenture constitutes a valid and legally binding obligation of the Bond Trustee, enforceable in

accordance with its terms, except to the extent that the enforceability and the binding effect (but not the validity) thereof may be limited by (i) bankruptcy, reorganization, insolvency, moratorium or other laws affecting creditors' rights generally, from time to time in effect and (ii) to general principles of equity;

(7) a certificate or certificates, dated as of the Closing Date, signed by an authorized officer of the Authority and in form and substance satisfactory to us, to the effect that, (i) the Authority is a body corporate and governmental instrumentality of the State of West Virginia, duly created and validly existing under the laws of the State of West Virginia, with the lawful power and authority set forth in the Act to issue the Bonds under the Act, (ii) the Bonds have been duly authorized, executed, issued and delivered and constitute valid and binding limited obligations of the Authority of the character permitted to be issued by the Act, in conformity with, and entitled to the benefit and security of, the Bond Indenture, and (iii) to the best knowledge of the officer of the Authority executing said certificate, no litigation, proceeding, or investigation, at law or in equity, before or by any court, any governmental agency or any public board or body is pending or threatened (a) to restrain or enjoin the issuance or delivery of any of the Bonds or the collection by the Authority of revenues pledged under the Bond Indenture, (b) in any way contesting or affecting the authority of the Authority for the issuance of the Bonds or the validity of the Authority Bond Documents, or (c) in any way contesting the existence or powers of the Authority;

(8) provision by each Member of the Obligated Group of a certificate signed by the Secretary, Treasurer or such other officer as is acceptable to the Underwriter, dated as of the Closing Date, to the effect that (a) since December 31, 2003 (September 30, 2004, with respect to Jefferson Memorial Hospital), no material adverse change has occurred in the financial position or results of operations of a Member of the Obligated Group other than as set forth in the Official Statement; (b) other than material liabilities incurred in the ordinary course of its business, the Member has not, since December 31, 2003 (September 30, 2004, with respect to Jefferson Memorial Hospital), incurred any material liability other than as set forth in or contemplated by the Official Statement; (c) no litigation, proceeding, or investigation, at law or in equity, before or by any court, any governmental agency, or any public board or body is pending or threatened (i) to restrain or enjoin the issuance or delivery of any of the Bonds or the collection of revenues pledged under the Bond Indenture, (ii) in any way contesting or affecting the authority for the issuance of the Bonds or the validity of the Bond Documents to which the Member is a party (the "Obligated Group Bond Documents"), or (iii) in any way contesting the corporate existence or powers of the any Member of the Obligated Group; (d) no proceedings are pending or threatened (i) in any way contesting or affecting the status of the Member as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), or (ii) to subject any income (except for taxation of unrelated business income under Section 511 of the Code) of the Member to federal income taxation; (e) no event affecting the Member or any matter described in the Official Statement has occurred since the date of the Official Statement which either makes untrue or incorrect in any material respect as of the Closing Date any material statement or information contained

in the Official Statement or is not reflected in the Official Statement but should be reflected therein in order to make the material statements and information therein not misleading; and (f) the representations and warranties of the Member contained in the Letter of Representation are true and correct in all material respects as of the Closing Date;

    (9) two executed copies of each of the Bond Documents;

    (10) a certificate of the Bond Trustee and the Master Trustee, respectively to the effect that all conditions precedent contained in the Bond Indenture and the Master Indenture, as applicable, for the issuance of the Bonds have been met, and, with respect to the Bond Indenture, the Bonds are entitled to the benefit and security of the Bond Indenture, and, with respect to the Master Indenture and the Notes are entitled to the benefit and security of the Master Indenture.

    (11) two definitive copies of the Official Statement, executed on behalf of the Obligated Group by the Chief Executive Officer of the Obligated Group Agent and on behalf of the Authority by its Chairman;

    (12) a copy of the executed and effective Bond Insurance Policy insuring timely payment of the principal of and interest on the Bonds, such policy to be substantially in the form attached to the Official Statement as Appendix D (the "Bond Insurance Policy");

    (13) two copies of the resolution of the Authority, certified by the Secretary-Treasurer of the Authority, authorizing the execution and delivery of the Bonds, the Bond Indenture, the Loan Agreement, the Escrow Agreements and this Purchase Contract and authorizing the distribution of the Preliminary Official Statement and the execution and distribution of the Official Statement;

    (14) copies, certified by the Secretary or Assistant Secretary of the Board of Directors of the Members of the Obligated Group to be true and correct copies, of the resolutions of the Board of Directors of the Members of the Obligated Group authorizing certain officers of the Obligated Group Agent to approve the Preliminary Official Statement and the distribution thereof, to approve the execution of its approval of and distribution of the Official Statement, to approve and authorize the execution and delivery of the Obligated Group Bond Documents, and their respective approvals of this Purchase Contract, and to approve the transactions contemplated by the Obligated Group Bond Documents;

    (15) copies, certified by the Secretary of State of the State of West Virginia to be true and correct copies, of the Articles of Incorporation, including all amendments thereto through the Closing Date, of each Member of the Obligated Group together with a certificate of Good Standing of the Secretary of State of recent date for each Member of the Obligated Group;

(16)  copies, certified by the Secretary or Assistant Secretary of the Board of Directors of the By-Laws, including any amendments thereto through the Closing Date, of each Member of the Obligated Group;

(17)  a copy of the determination letter(s) of the Internal Revenue Service of the United States Department of the Treasury to the effect that each Member of the Obligated Group is exempt from federal income taxation pursuant to Section 501(a) of the Code as an organizations described in Section 501(c)(3) of the Code and is not a "private foundation" as defined under Section 509(a) of the Code;

(18)  evidence to the effect that the requirements of the Code have been satisfied by the filing of Internal Revenue Service Form 8038 entitled "Information Return for Private Activity Bond Issues";

(19)  evidence satisfactory to the Underwriter of the ratings on the Bonds of "Aaa" by Moody's and "AAA" by S & P, and evidence satisfactory to the Underwriter of an underlying rating on the Bonds by Moody's of "A1" and "A+" by S & P.

(20)  a copy of the verification report of independent accountants verifying the mathematical accuracy of (a) the mathematical computations of the adequacy of the maturing principal of and interest on the Escrow Deposits and the Cash Portion (as such terms are defined in the respective Escrow Agreements) to pay, when due, the advance refunding requirements and (b) the mathematical computations supporting the conclusion of Bond Counsel that the Bonds are not "arbitrage bonds" under the Code and the regulations promulgated thereunder.

(21)  certificates and opinions required by the Master Indenture for the issuance thereunder of the Notes;

(22)  certificates of insurance consultants, which may be the Obligated Group's respective insurance brokers or actuaries, satisfactory to the Underwriter, dated the date of the Closing, to the effect that the insurance coverage of the Members of the Obligated Group complies with the applicable requirements of the Master Indenture and the descriptions thereof set forth in the Official Statement; and

(23)  such additional legal opinions, consents, certificates, proceedings, instruments and other documents as we, counsel for the Underwriter or Bond Counsel may reasonably request to evidence compliance by the Authority and the Obligated Group Agent with legal requirements, the truth and accuracy, as of the Closing Date, of the representations of the Authority herein and of the Obligated Group Agent, in the Letter of Representation and the due performance or satisfaction by the Authority and the Obligated Group Agent at or prior to such time of all agreements then to be performed and all conditions then to be satisfied by the Authority and the Obligated Group Agent.

If either the Authority or the Obligated Group Agent shall be unable to satisfy the conditions to the Underwriter's obligations contained in this Purchase Contract or if the Underwriter's obligations shall be terminated for any reason permitted herein, this Contract Purchase shall terminate and neither the Underwriter nor the Authority shall have any further obligation hereunder.

8. All expenses and costs of the Authority incident to the performance of its obligations in connection with the authorization, issuance and sale of the Bonds to the Underwriter, including but not limited to the cost of printing of the Bonds (and full execution thereof), the Preliminary Official Statement, the Official Statement, fees of the rating agencies, and the fees and expenses of the counsel to the Bond Trustee, Bond Counsel, counsel to the Authority and counsel to the Obligated Group, shall be paid by the Obligated Group Agent. All expenses to be paid by the Obligated Group Agent pursuant to this Purchase Contract may be paid from Bond proceeds to the extent permitted by the Bond Indenture and the Code. Except as indicated above, all out-of-pocket expenses of the Underwriter, including travel and other expenses and the fees and expenses of their counsel, shall be paid by the Underwriter.

9. This Purchase Contract may be executed in any number of counterparts, each of which so executed and delivered shall constitute an original and all together shall constitute but one and the same instrument.

10. Any notice or other communication to be given under this Purchase Contract may be given by delivering the same in writing as follows:

| | |
|---|---|
| Authority: | West Virginia Hospital Finance Authority<br>One Players Club Drive<br>Charleston, West Virginia 25311<br>Attention: Chairman |
| Obligated Group Agent: | West Virginia University Hospitals, Inc.<br>Medical Center Drive<br>P.O. Box 8059<br>Morgantown, West Virginia 26506<br>Attention:    Chief Financial Officer |
| Underwriter: | UBS Financial Services Inc.<br>Municipal Securities Group<br>1285 Avenue of the Americas<br>New York, New York 10019-6028<br>Attention: Mr. Rondy Jennings |

The approval of the Underwriter when required hereunder or the determination of their satisfaction as to any document referred to herein shall be in writing signed by UBS Financial Services Inc. and delivered to you.

11. This Purchase Contract is made solely for the benefit of the Authority, the Obligated Group Agent and the Underwriter (including the successors or assigns of the Underwriter) and no other person, partnership, association or corporation shall acquire or have any right hereunder or by virtue hereof. All representations and agreements of the Authority in this Purchase Contract shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Underwriter and shall survive the delivery of and payment for the Bonds. This Purchase Contract shall be governed by the laws of the State of West Virginia.

Please confirm that the foregoing correctly sets forth the agreement between us.

UBS FINANCIAL SERVICES INC., on behalf of itself and Ferris, Baker Watts, Incorporated

By: *Hillary Demby*

Its: First Vice President

By: *Barbara Shudd*

Its: First Vice President

Accepted and Agreed to:

WEST VIRGINIA HOSPITAL FINANCE AUTHORITY

By: _____
        Chairman

Approved:

WEST VIRGINIA UNIVERSITY HOSPITALS, INC., as Obligated Group Agent

By: *Bruce McClymonds*

Its *President*