# Exhibit I

# BROKER-DEALER AGREEMENT

between

## DEUTSCHE BANK TRUST COMPANY AMERICAS,
### as Auction Agent

and

## WEST VIRGINIA UNIVERSITY HOSPITALS, INC.,
### as Obligated Group Agent

and

## UBS SECURITIES LLC,
### as Broker-Dealer

Dated as of June 8, 2006

### WEST VIRGINIA HOSPITAL FINANCE AUTHORITY
**West Virginia United Health System Obligated Group
Hospital Revenue Bonds
(United Hospital Center, Inc. Project)
consisting of:**

**$46,150,000 2006 Series B Auction Rate Certificates (ARCs<sup>(sm)</sup>)**
**$46,500,000 2006 Series C Auction Rate Certificates (ARCs<sup>(sm)</sup>)**
**$60,375,000 2006 Series D Auction Rate Certificates (ARCs<sup>(sm)</sup>)**

MO336231.5

# BROKER-DEALER AGREEMENT

## TABLE OF CONTENTS

1. **Definitions and Rules of Construction** ................................................................ 2

    1.1.    Terms Defined by Reference to the Bond Indenture
           and Auction Agency Agreement .............................................. 2

    1.2.    Terms Defined Herein ................................................................. 2

    1.3.    Rules of Construction ................................................................. 3

2. **The Auction** ........................................................................................................ 3

    2.1.    Purpose:  Incorporation by Reference of Auction Procedures
           and Settlement Procedures ......................................................... 3

    2.2.    Preparation for Each Auction .................................................... 4

    2.3.    Auction Schedule:  Method of Submission of Orders ............... 5

    2.4.    Notices ....................................................................................... 6

    2.5.    Broker-Dealer Fee ..................................................................... 7

    2.6.    Settlement ................................................................................. 8

3. **The Auction Agent** ........................................................................................... 8

    3.1.    Duties and Responsibilities ........................................................ 8

    3.2.    Rights of the Auction Agent ...................................................... 9

4. **Furnishing of Offering Materials** ................................................................ 10

    4.1.    Furnishing of Information .......................................................... 10

    4.2.    Supplements and Amendments to Official Statement ............... 10

**5.**    **Miscellaneous** ................................................................................ 11

    5.1.   Indemnification and Contribution ......................................... 11

    5.2.   Termination or Suspension .................................................. 13

    5.3.   Participant in Depository ..................................................... 15

    5.4.   Communications .................................................................. 15

    5.5.   Entire Agreement ................................................................ 16

    5.6.   Benefits ............................................................................... 16

    5.7.   Amendment; Waiver ........................................................... 16

    5.8.   Successors and Assigns ....................................................... 16

    5.9.   Severability ......................................................................... 17

    5.10.   Execution in Counterparts ................................................. 17

    5.11.   Governing Law .................................................................. 17

**Signatures** ...................................................................................... S-1

**Exhibit A - Settlement Procedures** ...................................... EX-A-1

**Exhibit B - Order Form** ....................................................... EX-B-1

**Exhibit C - Transfer Form** ................................................... EX-C-1

**Exhibit D - Notice of Failure to Deliver** ............................. EX-D-1

**Exhibit E – Change in Statutory Corporate Tax Rate** ...................................... EX-E-1

## BROKER-DEALER AGREEMENT

This **BROKER-DEALER AGREEMENT**, dated as of June 8, 2006 (this **"Agreement"**), by and among **DEUTSCHE BANK TRUST COMPANY AMERICAS** (together with its successors and assigns, the **"Auction Agent"**) not in its individual capacity but solely as agent of The Bank of New York (the **"Bond Trustee"**), as trustee under the Bond Trust Indenture dated as of June 1, 2006 (the **"Bond Indenture"**), between the West Virginia Hospital Finance Authority (the **"Authority"**) and the Bond Trustee, pursuant to authority granted to the Auction Agent in the Auction Agency Agreement, dated as of June 8, 2006 (the **"Auction Agency Agreement"**), among the Bond Trustee, the Auction Agent, and **WEST VIRGINIA UNIVERSITY HOSPITALS, INC.** (the **"Institution"**), as Obligated Group Agent under an Amended and Restated Master Trust Indenture, as supplemented, dated as of August 1, 2003, by and between the Institution and The Huntington National Bank, as Master Trustee, and **UBS SECURITIES LLC** (together with its successors and assigns hereinafter referred to as **"BD"**).

## W I T N E S S E T H:

**WHEREAS**, the Authority is issuing its $46,150,000 aggregate principal amount West Virginia United Health System Obligated Group Hospital Revenue Bonds, (United Hospital Center, Inc. Project) 2006 Series B (Auction Rate Certificates (ARCs $^{(sm)}$), $46,500,000 aggregate principal amount West Virginia United Health System Obligated Group Hospital Revenue Bonds, (United Hospital Center, Inc. Project) 2006 Series C (Auction Rate Certificates (ARCs $^{(sm)}$), and $60,375,000 aggregate principal amount West Virginia United Health System Obligated Group Hospital Revenue Bonds, (United Hospital Center, Inc. Project) 2006 Series D (Auction Rate Certificates (ARCs $^{(sm)}$) (collectively, the "Bonds"), and loaning the proceeds thereof to the Institution;

**WHEREAS,** the Bonds will initially be issued as Auction Rate Certificates ("ARCs");

**WHEREAS, Exhibit A** to the Bond Indenture (the "ARCs Provisions") provides that the interest rate on the ARCs for each Interest Period after the Initial Interest Period shall, except under certain conditions, equal the Auction Rate which the Auction Agent advises results from implementation of the Auction Procedures;

**WHEREAS,** pursuant to **Section 2.1** of the Auction Agency Agreement, the Auction Agent has entered into this Agreement; and

**WHEREAS,** the Auction Procedures require the participation of one or more Broker-Dealers.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Auction Agent, as agent of the Bond Trustee, the Institution and BD agree as follows:

MO336231.5                                                    1

1.      **Definitions and Rules of Construction.**

      1.1      **Terms Defined by Reference to the Bond Indenture and Auction Agency Agreement**.  Capitalized terms not defined herein shall have the respective meanings specified in or pursuant to the Bond Indenture and the Auction Agency Agreement.

      1.2      **Terms Defined Herein**.  As used herein and in the Settlement Procedures (as defined below), the following terms shall have the following meanings, unless the context otherwise requires:

      (a)      "**Auction**" shall have the meaning specified in **Section 2.1**.

      (b)      "**Auction Agency Agreement**" shall mean the Auction Agency Agreement, dated as of June 8, 2006 by and among the Bond Trustee, the Auction Agent relating to the ARCs and the Institution.

      (c)      "**Auction Procedures**" shall mean the Auction Procedures that are set forth in **Section 104** of the ARCs Provisions.

      (d)      "**Authorized Officer**" means Director, Vice President, Assistant Vice President, Associate of the Auction Agent assigned to its Trust and Securities Services and every other officer or employee of the Auction Agent designated as an Authorized Officer for purposes of this Agreement in a communication to BD.

      (e)      "**BD Officer**" shall mean each officer or employee of BD designated as a "BD Officer" for purposes of this Agreement in a communication to the Auction Agent.

      (f)      "**Broker-Dealer Agreement**" shall mean this Agreement and any substantially similar agreement between the Auction Agent and a Broker-Dealer.

      (g)      "**Holder**" means an Existing Holder as registered on the Existing Holder Registry maintained by the Auction Agent pursuant to **Section 2.2(a)(i)** of the Auction Agency Agreement.

      (h)      "**Maximum Rate**" means with respect to Bonds in the Auction Rate Period, the lesser of twelve percent (12%) per annum and the maximum rate permitted by law.

      (i)      "**Official Statement**" shall mean the Official Statement of the Authority, dated May 31, 2006, relating to the Bonds.

      (j)      "**Participant**" shall mean a member of or participant in the Securities Depository.

      (k)      "**Preliminary Official Statement**" shall mean the Preliminary Official Statement of the Authority, dated May 23, 2006 relating to the Bonds.

(l)    "**Securities Depository**" shall mean Cede & Co., as nominee of The Depository Trust Company and its successors and assigns and any other securities depository selected or approved by the Institution.

(m)    "**Settlement Procedures**" shall mean the Settlement Procedures attached hereto as **Exhibit A**.

(n)    "**Submission Deadline**" shall mean 1:00 p.m., Eastern time, on any Auction Date or such other time on any Auction Date by which the Broker-Dealers are permitted to submit Orders to the Auction Agent.

(o)    "**Submission Processing Deadline**" shall mean the earlier of (i) 40 minutes after the Submission Deadline and (ii) the time when the Auction Agent begins to disseminate the results of the Auction to the Broker-Dealers.

(p)    "**Submission Processing Representation**" shall have the meaning specified in Section 2.3(e) hereof.

**1.3    Rules of Construction.**  Unless the context or use indicates another or different meaning or intent, the following rules shall apply to the construction of this Agreement:

(a)    Words importing the singular number shall include the plural number and vice versa.

(b)    The captions and headings herein are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

(c)    The words "hereof," "herein," "hereto," and other words of similar import refer to this Agreement as a whole.

(d)    All references herein to a particular time of day shall be to New York City time.

**2.    The Auction.**

**2.1    Purpose:  Incorporation by Reference of Auction Procedures and Settlement Procedures.**

(a)    On each Auction Date, the provisions of the Auction Procedures will be followed by the Auction Agent for the purpose of determining the Applicable ARCs Rate for the next Interest Period.  Each periodic operation of such procedures is hereinafter referred to as an "Auction."

(b)     Without prejudice to **Section 3.1(a)**, all of the provisions contained in the Auction Procedures and the Settlement Procedures are incorporated herein by reference in their entirety and shall be deemed to be a part of this Agreement to the same extent as if such provisions were fully set forth herein.

(c)     BD agrees to act as, and assumes the obligations of and limitations and restrictions placed upon, a Broker-Dealer under this Agreement.  BD understands that other persons meeting the requirements specified in the definition of "Broker-Dealer" contained in **Section 100** of the ARCs Provisions may, with the prior written consent of the Institution, execute Broker-Dealer Agreements and participate as Broker-Dealers in Auctions.

(d)     BD and other Broker-Dealers may participate in Auctions for their own accounts.  However, the Auction Agent may by notice to BD and all other Broker-Dealers prohibit all Broker-Dealers from submitting Bids in Auctions for their own accounts, provided that Broker-Dealers may continue to submit Hold Orders and Sell Orders.  The Auction Agent shall have no duty or liability with respect to monitoring or enforcing the requirements of this Section.

(e)     BD agrees to assume the obligations of, and limitations and restrictions placed upon, a Broker-Dealer under **Section 113** of the ARCs Provisions.

### 2.2     Preparation for Each Auction.

(a)     Not later than **10:30 a.m.** on each Auction Date for the ARCs, the Auction Agent shall advise BD by telephone of the All-Hold Rate and the Maximum Rate.

(b)     In the event that the Auction Date for any Auction shall be changed after the Auction Agent has given the notice referred to in clause (8) of paragraph (a) of the Settlement Procedures, the Auction Agent, by such means as the Auction Agent deems practicable, shall give notice of such change to BD not later than the earliest of (i) **9:15 a.m.** on the new Auction Date, (ii) **9:15 a.m.** on the originally scheduled Auction Date, and (iii) **9:15 a.m.** on the next Interest Payment Date.  Thereafter, BD shall promptly notify customers of BD that BD believes are Existing Holders of such change in the Auction Date.

(c)     The Auction Agent from time to time may request BD to provide it with the aggregate principal amounts of ARCs specifically held by each such BD as an Existing Holder. BD shall comply with any such request, and the Auction Agent shall treat as confidential any such information, including information received as to the identity of Existing Holders and Potential Holders in any Auction, and shall not disclose any such information so provided to any person other than the Bond Trustee, the Institution and BD, provided that the Auction Agent reserves the right to disclose any such information as confidential information to its internal and external accountants, auditors and counsel, its regulators and examiners, and any other person if the Auction Agent has been advised by counsel that the failure to disclose such information would be unlawful or if the failure to do so would expose the Auction Agent to any loss, liability, claim or damage for which the Auction Agent shall not have been previously adequately indemnified.

4

### 2.3    Auction Schedule:  Method of Submission of Orders.

(a)    The Auction Agent shall conduct Auctions for the ARCs in accordance with the schedule set forth below.  Such schedule may be changed at any time by the Auction Agent with the consent of BD and the Bond Trustee, which consent shall not be unreasonably withheld or delayed.  The Auction Agent shall give notice of any such change to BD.  Such notice shall be given prior to the close of business on the Business Day next preceding the first Auction Date on which such change shall be effective.

| Time | Event |
|---|---|
| By **10:30 a.m.** | The Auction Agent advises the Bond Trustee and the Broker-Dealers of the Maximum Rate and the All-Hold Rate. |
| **9:30 a.m. – 1:00 p.m.** | Broker-Dealers assemble information received from each Bidder (Existing Owners and any Potential Owners) and any internally initiated Broker-Dealers' Bids in accordance with Auction Procedures and communicates such assembled information to Auction Agent by **1:00 p.m.** |
| Not earlier than **1:00 p.m.** | The Auction Agent makes determinations pursuant to **Section 104(d)(i)** of the ARCs Provisions. |
| Not later than Submission Processing Deadline | Auction Agent accepts any Orders submitted subject to a Submission Processing Representation and makes determinations pursuant to **Section 104(c)(i)** of the ARCs Provisions. |
| Not later than **3:00 p.m.** | Auction Agent advises the Broker-Dealers, the Bond Trustee and the Institution of the results of the Auction as provided in **Section 104(c)(ii)** of the ARCs Provisions and of the Auction Rate for the next Interest Period.  Submitted Bids and Submitted Sell Orders are accepted and rejected in whole or in part, and principal amounts of ARCs are allocated as provided in **Sections 104(d) and 104(e)** of the ARCs Provisions.  Auction Agent gives notice of Auction results as set forth in **Section 2.4(a)** hereof. |

(b)    BD shall submit Orders to the Auction Agent in writing in substantially the form attached hereto as **Exhibit B**.  BD shall submit separate Orders to the Auction Agent for each Potential Holder or Existing Holder on whose behalf BD is submitting an Order and

shall not net or aggregate the Orders of Potential Holders or Existing Holders on whose behalf BD is submitting Orders.

(c)    BD shall deliver to the Auction Agent (i) a written notice, substantially in the form attached hereto as **Exhibit C**, of transfers of ARCs, made through BD by an Existing Holder to another person other than pursuant to an Auction, and (ii) a written notice, substantially in the form attached hereto as **Exhibit D**, of the failure of any ARCs to be transferred to or by any person that purchased or sold ARCs through BD pursuant to an Auction. The Auction Agent is not required to accept any notice delivered pursuant to the terms of the foregoing sentence with respect to an Auction unless it is received by the Auction Agent by **3:00 p.m.** on the Business Day next preceding the applicable Auction Date.

(d)    BD agrees to handle its customers' Orders in accordance with its duties under applicable securities laws and rules.

(e)    Broker-Dealers may submit an Order after the Submission Deadline and prior to the Submission Processing Deadline if the Order was (i) received by the Broker-Dealer from Existing Owners or Potential Owners prior to the Submission Deadline or (ii) initiated internally by the Broker-Dealer for its own account prior to the Submission Deadline. Each Order submitted to the Auction Agent after the Submission Deadline and prior to the Submission Processing Deadline shall constitute a representation by the Broker-Dealer that such Order was (i) received from an Existing Owner or Potential Owner prior to the Submission Deadline or (ii) initiated internally by the Broker-Dealer for its own account prior to the Submission Deadline (the "Submission Processing Representation").

### 2.4    Notices.

(a)    On each Auction Date, the Auction Agent shall notify BD by telephone of the results of the Auction as set forth in **paragraph (a)** of the Settlement Procedures. If requested by BD, the Auction Agent shall as soon as practicable following any such request, notify BD in writing, if previously so requested, of the disposition of all Orders submitted by BD in the Auction held on such Auction Date.

(b)    BD shall notify each Existing Holder or Potential Holder on whose behalf BD has submitted an Order as set forth in **paragraph (b)** of the Settlement Procedures and take such other action as is required of BD pursuant to the Settlement Procedures.

(c)    The Auction Agent shall deliver to BD, after receipt, all notices and certificates which the Auction Agent is required to deliver to BD pursuant to **Section 2** of the Auction Agency Agreement, at the times and in the manner set forth in the Auction Agency Agreement.

2.5     **Broker-Dealer Fee.**

(a)     The initial Broker-Dealer Fee Rate shall equal .25 of 1% per annum. The Broker-Dealer Fee, as described below, for the ARC shall be paid by the Institution and represents compensation for the services of each Broker-Dealer in facilitating Auctions for the benefit of the beneficial owners of the ARCs. The Broker-Dealer Fee Rate may be adjusted from time to time with the approval of the Institution upon a written request of the Broker-Dealers delivered to the Institution.

(b)     While the ARCs are in an Auction Period other than a Daily Auction Period on each ARC Interest Payment Date following each Auction Date, each Broker-Dealer shall be entitled to receive an amount equal to the product of (x) .25 of 1% multiplied by (y)(A) if an Auction was held on such Auction Date, the sum of the aggregate principal amount of ARCs that were (1) the subject of a valid Hold Order of an Existing Owner submitted by such Broker-Dealer, (2) the subject of a Submitted Bid of an Existing Owner submitted by such Broker-Dealer and continued to be held by such Existing Owner as a result of such Auction, (3) the subject of a Submitted Bid of a Potential Owner submitted by such Broker-Dealer and were purchased by such Potential Owner as a result of such Auction and (4) deemed to be the subject of a Hold Order by an Existing Owner that were acquired by such Existing Owner from such Broker-Dealer or (B) if any Auction was not held on such Auction Date, the aggregate principal amount of Outstanding ARCs that were acquired by an Existing Owner through such Broker-Dealer, multiplied by (z) a fraction, the numerator of which is the actual number of days in the Auction Period next succeeding such Auction Date and the denominator of which is 360.

(c)     If the ARCs are in a Daily Auction Period, each Broker-Dealer shall be entitled to receive on each ARC Interest Payment Date an amount equal to the sum calculated for each Auction Period in the preceding ARCs Interest Period of the product of (x) .25 of 1% multiplied by (y) the aggregate principal amount ARCs for each Auction Period that were (1) the subject of a valid Hold Order submitted by such Broker-Dealer, (2) the subject of a Submitted Bid of an Existing Owner submitted by such Broker-Dealer and continued to be held by such Existing Owner as a result of such Auction, (3) the subject of a Submitted Bid of a Potential Owner submitted by such Broker-Dealer and were purchased by such Potential Owner as a result of such Auction, (4) deemed to be the subject of a Hold Order by an Existing Owner that were acquired by such Existing Owner from such Broker-Dealer and (5) if an Auction was not held for any Auction Period, the aggregate principal amount Outstanding ARC that were acquired by an Existing Owner through such Broker-Dealer, multiplied by (z) a fraction, the numerator of which is the actual number of days elapsed during the Auction Period and denominator of which is 360.

(d)     The Broker-Dealer Fee shall be calculated by the Auction Agent, which shall be conclusive absent manifest error. Such amounts shall be communicated by the Auction Agent to the Institution and by 4:00 p.m., New York time, on the Business Day immediately preceding each ARC Interest Payment Date. On or before 10:00 a.m. on each ARC Interest Payment Date, the Institution shall pay to the Bond Trustee the amount due to the Broker-Dealer. By noon on each ARC Interest Payment Date, the Bond Trustee shall deliver to the Auction Agent the amount constituting the Broker-Dealer Fee, by wire transfer of immediately available funds to such account

as the Auction Agent may designate.  The amount constituting the Broker-Dealer Fee shall be held by the Auction Agent on behalf of the Broker-Dealer and, immediately upon receipt of such Broker-Dealer Fee, the Auction Agent shall deliver such Broker-Dealer Fee to the Broker-Dealer pursuant to the written instructions of the Broker-Dealer.  If any Existing Owner who acquired ARCs through a Broker-Dealer transfers any such ARCs to another Person other than through an Auction, the Broker-Dealer for the ARCs so transferred shall continue to be the Broker-Dealer with respect to such ARC, provided, however,  that if the transfer was effected by, or if the transferee is, another Person who has met the requirements specified in the definition of "Broker-Dealer" contained in the ARCs and executed a Broker-Dealer Agreement, such Person shall be the Broker-Dealer for such ARCs.

### 2.6    Settlement.

(a)    If any Existing Holder on whose behalf BD has submitted a Bid or Sell Order for ARCs that was accepted in whole or in part fails to instruct its Participant to deliver the ARCs subject to such Bid or Sell Order against payment therefor, BD shall instruct such Participant to deliver such ARCs against payment therefor and BD may deliver to the Potential Holder on whose behalf BD submitted a Bid that was accepted in whole or in part a principal amount of the ARCs that is less than the principal amount of the ARCs specified in such Bid to be purchased by such Potential Holder.  Notwithstanding the foregoing terms of this **Section 2.6(a)**, any delivery or non-delivery of ARCs that represents any departure from the results of an Auction, as determined by the Auction Agent, shall be of no effect unless and until the Auction Agent shall have been notified of such delivery or non-delivery in accordance with the terms of **Section 2.3(c)**.  The Auction Agent shall have no duty or liability with respect to monitoring or enforcing requirements of this **Section 2.6(a)**.

(b)    Neither the Auction Agent, the Bond Trustee nor the Institution shall have any responsibility or liability with respect to the failure of an Existing Holder, a Potential Holder or a Participant or any of them to deliver ARCs or to pay for ARCs sold or purchased pursuant to the Auction Procedures or otherwise.

### 3.    The Auction Agent.

### 3.1    Duties and Responsibilities.

(a)    The Auction Agent is acting solely as a non-fiduciary agent for the Bond Trustee hereunder and owes no fiduciary duties to any Person by reason of this Agreement.

(b)    Notwithstanding **Section 3.1(a)** above, the Auction Agent undertakes to perform such duties and only such duties as are specifically set forth in this Agreement and the Auction Agency Agreement, and no implied covenants or obligations shall be read into this Agreement against the Auction Agent by reason of anything set forth in the Official Statement or any other offering material employed in connection with the offer and sale of the ARCs, or otherwise.

MO336231.5                                    8

(c)     In the absence of willful misconduct or negligence on its part, the Auction Agent shall not be liable for any action taken, suffered, or omitted or for any error of judgment made by it in the performance of its duties under this Agreement.  The Auction Agent shall not be liable for any error of judgment made in good faith unless the Auction Agent shall have been negligent in ascertaining (or failing to ascertain) the pertinent facts necessary to make such judgment.

(d)     The Auction Agent shall have no obligation or liability with respect to the registration or exemption therefrom of the ARCs (or any beneficial ownership interest therein) under any federal or state securities laws or in respect of any transfer of the ARCs (or any beneficial ownership interest therein) pursuant to the terms of this Broker-Dealer Agreement, the Auction Agency Agreement, the Bond Indenture, any other document contemplated by any of the foregoing, or otherwise, including, but not limited to, compliance with such laws in regard to any such transfer.

### 3.2    Rights of the Auction Agent.

(a)     The Auction Agent may conclusively rely and shall be fully protected in acting or refraining from acting upon any communication authorized by this Agreement and upon any written instruction, notice, request, direction, consent, report, certificate, share certificate or other instrument, paper or document believed by it to be genuine.  The Auction Agent shall not be liable for acting or refraining from acting upon any telephone communication, including, but not limited to, communications made by a telephoto telecopier, authorized by this Agreement which the Auction Agent believes in good faith to have been given by the Bond Trustee, the Institution or by a Broker-Dealer or by their designated agents or representatives.  The Auction Agent may record telephone communications with the Broker-Dealers.

(b)     The Auction Agent may consult with counsel of its own choice, and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)     The Auction Agent shall not be required to advance, expend or risk its own funds or otherwise incur or become exposed to financial liability in the performance of its duties hereunder.

(d)     The Auction Agent may perform its duties and exercise its rights hereunder either directly or by or through agents or attorneys and shall not be responsible for any misconduct or negligence on the part of, or for the supervision of, any agent or attorney appointed by it with due care hereunder.

(e)     The Auction Agent makes no representation as to the validity, adequacy or accuracy of this Agreement, the Auction Agency Agreement, the ARCs or any Official Statement or other offering material used in connection with the offer and sale of the ARCs.  The Auction Agent shall have no obligation or liability in respect of the registration or exemption therefrom of the ARCs under federal or state securities laws or in respect of the sufficiency of the

conformity of any transfer of ARCs to the terms of the Auction Agency Agreement, any Broker-Dealer Agreement or any other documents contemplated therein or thereby.

(f)    The Auction Agent shall not be responsible or liable for any failure or delay in the performance of its obligation under this Broker-Dealer Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; wars; similar military disturbances; sabotage and terrorism; epidemic; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications services; accidents; labor disputes; acts of civil or military authority or governmental action; it being understood that the Auction Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

## 4.    Furnishing of Offering Materials.

### 4.1.    Furnishing of Information.

The Institution agrees to furnish, or cause to be furnished, BD with as many copies as BD may reasonably request, of the Official Statement, as the same may be supplemented or amended from time to time, and such other information with respect to the Institution and its properties, the Bond Indenture, the Loan Agreement and the Bonds as BD shall reasonably request from time to time.

### 4.2.    Supplements and Amendments to Official Statement.

If, at any time during the term of this Agreement, any event or condition known to the Institution relating to or affecting the Institution or its properties, the Bonds, the Bond Indenture, the Loan Agreement or the documents or transactions contemplated thereby, shall occur which in the reasonable judgment of the Institution or the Broker-Dealer might affect the accuracy, correctness or completeness of any statement of a material fact contained in the Official Statement, as it shall be haven supplemented or amended from time to time pursuant to this Section or included in any report or notice filed by the Institution (each, a "Disclosure Statement") pursuant to the Disclosure Covenants or any similar undertaking entered into by the Institution pursuant to the requirements of Rule 15c2-12 of the Securities and Exchange Commission (each, a "Continuing Disclosure Undertaking"), which in the reasonable judgment of the Institution or the Broker-Dealer might result in the Official Statement, as so supplemented or amended with the information furnished from time to time pursuant to this Section or by any Disclosure Statement filed by the Institution pursuant to any Continuing Disclosure Undertaking, containing any untrue, incorrect or misleading statement of a material fact or omitting to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading, (i) the Institution will promptly notify BD of the circumstances and details of such event, (ii) if, in the opinion of BD, such event or condition requires the preparation and publication of an amendment or supplement to the Official Statement, the Institution at its expense will promptly prepare or cause to be prepared an appropriate amendment or supplement thereto, in a form and manner approved by BD, so that the statements in the Official Statement, as so amended

or supplemented with the information furnished from time to time pursuant to this Section or by any Disclosure Statement filed by the Institution pursuant to any Continuing Disclosure Undertaking, will not contain any untrue, incorrect or misleading statement or a material fact or omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading, and (iii) the Institution shall take all necessary action to approve such supplement or amendment.

      **5.**      **Miscellaneous.**

            **5.1.**      **Indemnification and Contribution.**

            (a)      The Institution agrees to indemnify and hold harmless BD, the directors, officers, employees and agents of BD and each person who controls BD within the meaning of either the Securities Act of 1933 (the "Securities Act") or the Exchange Act of 1934 (the "Exchange Act") against any and all losses, claims, damages or liabilities, joint or several, to which they or any of them may become subject under the Securities Act, the Exchange Act or other Federal or state statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in the Preliminary Official Statement, the Official Statement or a Disclosure Statement (or in any supplement or amendment thereto), or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and agrees to reimburse each such indemnified party, as incurred, for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Institution will not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made in the Preliminary Official Statement, the Official Statement or Disclosure Statement, or in any amendment thereof or supplement thereto, in reliance upon and in conformity with written information furnished to the Institution by or on behalf of BD specifically for inclusion therein. This indemnity agreement will be in addition to any liability which the Institution may otherwise have.

            (b)      BD agrees to indemnify and hold harmless the Institution, each of its officials, directors, officers and employees, and each person who controls the Institution within the meaning of either the Securities Act or the Exchange Act, to the same extent as the foregoing indemnity from the Institution to BD, but only with reference to written information relating to BD furnished to the Institution by BD specifically for inclusion in the Preliminary Official Statement, the Official Statement or Disclosure Statement (or in any amendment or supplement thereto). This indemnity agreement will be in addition to any liability which BD may otherwise have. The Institution acknowledges that the statements set forth in (i) the last paragraph of the cover page regarding the delivery of the ARCs and (ii) the second paragraph on the page immediately preceding the Table of Contents concerning stabilization constitute the only information furnished in writing by or on behalf of the BD for inclusion in the Preliminary Official Statement or the Official Statement (or in any amendment or supplement thereto).

MO336231.5           11

(c)     Promptly after receipt by an indemnified party under this Section 5.1 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 5.1, notify the indemnifying party in writing of the commencement thereof, but the failure so to notify the indemnifying party (i) will not relieve it from liability under paragraph (a) or (b) above unless and to the extent it did not otherwise learn of such action and such failure results in the forfeiture by the indemnifying party of substantial rights and defenses; and (ii) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation provided in paragraph (a) or (b) above. The indemnifying party shall be entitled to appoint counsel of the indemnifying party's choice at the indemnifying party's expense to represent the indemnified party in any action for which indemnification is sought (in which case the indemnifying party shall not thereafter be responsible for the fees and expenses of any separate counsel retained by the indemnified party or parties except as set forth below); provided, however, that such counsel shall be satisfactory to the indemnified party. Notwithstanding the indemnifying party's election to appoint counsel to represent the indemnified party in an action, the indemnified party shall have the right to employ separate counsel (including local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with a conflict of interest; (ii) the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party; (iii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action; or (iv) the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party. An indemnifying party will not, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding.

(d)     In the event that the indemnity provided in paragraph (a) or (b) of this Section 5.1 is unavailable to or insufficient to hold harmless an indemnified party for any reason, the Institution and BD agree to contribute to the aggregate losses, claims, damages and liabilities (including legal or other expenses reasonably incurred in connection with investigating or defending same) (collectively "Losses") to which the Institution and BD may be subject in such proportion as is appropriate to reflect the relative benefits received by the Institution on the one hand and by BD on the other from the offering of the ARCs. If the allocation provided by the immediately preceding sentence is unavailable for any reason, the Institution and BD shall contribute in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Institution on the one hand and of BD on the other in connection with the statements or omissions which resulted in such Losses, as well as any other relevant equitable considerations. In no case shall BD be responsible for any amount in excess of the commission applicable to ARCs for which BD has

acted as Broker-Dealer. Benefits received by the Institution shall be deemed to be equal to the total net proceeds from the offering (before deducting expenses) received by it, and benefits received by BD shall be deemed to be equal to the commissions applicable to ARCs for which BD has acted as Broker-Dealer. Relative fault shall be determined by reference to, among other things, whether any untrue or any alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information provided by the Institution on the one hand or BD on the other, the intent of the parties and their relative knowledge, information and opportunity to correct or prevent such untrue statement or omission. the Institution and BD agree that it would not be just and equitable if contribution were determined by pro rata allocation or any other method of allocation which does not take account of the equitable considerations referred to above. Notwithstanding the provisions of this paragraph (d), no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. For purposes of this Section 5.1, each person who controls BD within the meaning of either the Securities Act or the Exchange Act and each director, officer, employee and agent of BD shall have the same rights to contribution as BD, and each person who controls the Institution within the meaning of either the Securities Act or the Exchange Act and each official, director, officer and employee of the Institution shall have the same rights to contribution as the Institution, subject in each case to the applicable terms and conditions of this paragraph (d).

### 5.2.    Termination or Suspension.

(a)      Any party may terminate this Agreement at any time upon 30 days prior notice to the other party and the Bond Trustee and the Institution. This Agreement shall automatically terminate upon (i) the day next succeeding the Conversion Date to a Daily Rate, Weekly Rate, Short-Term Rate, Long-Term Rate or Fixed Rate, (ii) the date on which payment in full of the Bonds shall have been made or provided for in accordance with the Bond Indenture or (iii) the delivery of certificates representing the ARCs pursuant to Section 101 of the ARCs Provisions or upon termination of the Auction Agency Agreement.

(b)      In addition to the provisions set forth in paragraph (a) of this Section, BD may terminate or suspend its obligations under this Agreement at any time by notifying the Institution, the Bond Trustee and the Auction Agent in writing or by telegram, telex or other electronic communication of its election to do so, if:

(i)      Legislation shall be introduced by committee, by amendment or otherwise, in, or be enacted by, the House of Representatives or the Senate of the Congress of the United States of America, or a decision by a court of the United States of America shall be rendered, or a stop order, ruling, regulation or official statement by, or on behalf of, the United States Securities and Exchange Commission or other governmental agency having jurisdiction of the subject matter shall be made or proposed, to the effect that the offering or sale of obligations of the general character of the Bonds is or

would be in violation of any provision of the Securities Act of 1933, as amended and as then in effect, or the Securities Exchange Act of 1934, as amended and as then in effect, or the Trust Indenture Act of 1939, as amended and as then in effect, or with the purpose or effect of otherwise prohibiting the offering or sale of obligations of the general character of the Bonds, or the Bonds;

(ii)    Any information shall have become known, which, in the reasonable opinion of the BD, makes untrue, incorrect or misleading in any material respect any statement or information contained in the Official Statement, as the information contained therein has been supplemented or amended by other information furnished in accordance with Section 4 hereof, or causes the Official Statement, as so supplemented or amended, to contain an untrue, incorrect or misleading statement of a material fact or to omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading;

(iii)    Additional material restrictions not in force as of the date hereof shall have been imposed upon trading in securities generally by any governmental authority purporting to have jurisdiction regarding the trading of the Bonds or by any national securities exchange;

(iv)    Any governmental authority shall impose, as to the Bonds, or obligations of the general character of the Bonds, any material restrictions not now in force, or increase materially those now in force;

(v)    Any rating of the Bonds shall have been downgraded or withdrawn by any securities rating agency, or the Bonds fail to be rated by a national securities rating agency; or

(vi)    There has occurred any outbreak of hostilities or escalation or resumption of existing hostilities or any local, national or international calamity or crisis or there is a declaration of a national emergency or war by the United States, the effect of which on the financial markets of the United States, in the reasonable judgment of BD is such as to materially and adversely affect the market price or the marketability of the Bonds.

**5.3.    Participant in Depository.**  Either (i) BD is, and shall remain for the term of this Agreement, a member of, or Participant in, the DTC, or (ii) BD shall designate a Participant to act on BD's behalf for purposes of this Agreement.  If BD wishes to designate a different Participant to act on its behalf, BD shall give the Auction Agent at least **two (2)** Business Day's prior notice thereof.

**5.4.    Communications.**  Except for (i) communications authorized to be made by telephone pursuant to this Agreement or the Auction Procedures and (ii) communications in connection with the Auctions (other than those expressly required to be in writing), all notices, requests and other communications to any party hereunder shall be in writing (including facsimile or similar writing) and shall be given to such party, addressed to it, at its address or facsimile number set forth below:

| | |
|---|---|
| If to BD, addressed: | UBS Securities LLC |
| | 1285 Avenue of the Americas |
| | 15th Floor |
| | New York, New York 10019 |
| | Attention:  Municipal Short Term Underwriting Desk |
| | Telephone No.:  212-713-4692 |
| | Fax No.:  212-713-3797 |
| | |
| If to the Auction Agent, addressed: | Deutsche Bank Trust Company Americas |
| | Trust & Securities Services |
| | 60 Wall Street, 27th floor |
| | New York, NY 10005 |
| | Attention: Auction Rate Securities |
| | Telephone No:  212-250-6645 |
| | Fax No.:  212- 797-8600 |
| | |
| If to the Institution, addressed: | West Virginia University Hospitals, Inc. |
| | Medical Center Drive |
| | P.O. Box 8059 |
| | Morgantown, WV 26505 |
| | Attention:  David Salsberry, Vice President and CFO |
| | Telephone No.: (304) 598-4554 |
| | Fax No. (304) 598-4124 |

and

United Hospital Center
3 Hospital Plaza
P.O. Box 1680
Clarksburg, WV 26302-1680
Attention: Doug Coffman, Vice President and CFO
Telephone No.: (304) 624-2851
Fax No.: (304) 624-2909

If to the Bond Insurer,
addressed:

Ambac Assurance Corporation
One State Street Plaza
New York, NY 10004
Attention: Healthcare Surveillance
Re: Policy No. 23468BE (2006 Bonds)/Policy No.
     SW0228BE (Master Agreement)
Telephone No.: (212) 668-0340
Fax No.: (212) 509-9190

or such other address or facsimile number as such party may hereafter specify for such purpose by notice to the other party. Each such notice, request or communication shall be effective when delivered at the address specified herein. Communications shall be given on behalf of BD by a BD Officer and on behalf of the Auction Agent by an Authorized Officer. BD may record telephone communications with the Auction Agent.

**5.5.    Entire Agreement.** This Agreement contains the entire agreement between the parties relating to the subject matter hereof, and there are no other representations, endorsements, promises, agreements or understandings, oral, written or inferred, between the parties relating to the subject matter hereof.

**5.6.    Benefits.** Nothing in this Agreement, express or implied, shall give to any person, other than the Bond Trustee, the Auction Agent, the Institution and BD and their respective successors and assigns, any benefit of any legal or equitable right, remedy or claim under this Agreement. The Institution is an intended third-party beneficiary of the obligations of the Auction Agent and BD hereunder, and such obligations create a duty in the Auction Agent and BD to the Institution to perform such obligations, and the Institution shall have the right to enforce such duty.

**5.7.    Amendment; Waiver.**

(a)    This Agreement shall not be deemed or construed to be modified, amended, rescinded, cancelled or waived, in whole or in part, except by a written instrument signed by a duly authorized representative of the parties hereto.

(b)    Failure of either party to this Agreement to exercise any right or remedy hereunder in the event of a breach of this Agreement by the other party shall not constitute a waiver of any such right or remedy with respect to any subsequent breach.

MO336231.5                                       16

(c)    The Auction Agent may, but shall have no obligation to execute any amendment or waiver which affects its rights, powers, immunities or indemnities hereunder.

**5.8.    Successors and Assigns.**  This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the respective successors and permitted assigns of each of BD and the Auction Agent.  This Agreement may not be assigned by any party hereto absent the prior written consent of the other party; provided, however, that this Agreement may be assigned by the Auction Agent to a successor Auction Agent selected by the Institution without the consent of BD.

**5.9.    Severability.**  If any clause, provision or section of this Agreement shall be ruled invalid or unenforceable by any court of competent jurisdiction, the invalidity or unenforceability of such clause, provision or section shall not affect any remaining clause, provision or section hereof.

**5.10.    Execution in Counterparts.**  This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**5.11.    Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.  The parties agree that all actions and proceedings arising out of this Broker-Dealer Agreement and any of the transactions contemplated hereby shall be brought in the County of New York and, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such County.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized representatives as of the date first above written.

**DEUTSCHE BANK TRUST COMPANY
AMERICAS,** as Auction Agent

By: _____
      Title:  Authorized Representative

By: _____
      Title:  Authorized Representative

**WEST VIRGINIA UNIVERSITY
HOSPITALS, INC.,** as Obligated Group Agent

By: _____
      Authorized Representative

**UBS SECURITIES LLC,** as Broker-Dealer

By: _____
      Authorized Representative

By: _____
      Authorized Representative

MO336231.6                     S-1

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized representatives as of the date first above written.

**DEUTSCHE BANK TRUST COMPANY AMERICAS,** as Auction Agent

By: _____
      Title:  Authorized Representative

By: _____
      Title:  Authorized Representative

**WEST VIRGINIA UNIVERSITY HOSPITALS, INC.,** as Obligated Group Agent

By: _____
      Authorized Representative

**UBS SECURITIES LLC,** as Broker-Dealer

By: _____
      Authorized Representative

By: _____
      Authorized Representative

MO336231.5

S-1

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized representatives as of the date first above written.

**DEUTSCHE BANK TRUST COMPANY AMERICAS**, as Auction Agent

By: _____
       Title:   Authorized Representative

By: _____
       Title:   Authorized Representative

**WEST VIRGINIA UNIVERSITY HOSPITALS, INC.**, as Obligated Group Agent

By: _____
       Authorized Representative

**UBS SECURITIES LLC**, as Broker-Dealer

By: _____
       Authorized Representative

By: _____
       Authorized Representative

**EXHIBIT A**

**SETTLEMENT PROCEDURES**

Capitalized terms used herein shall have the respective meanings specified in the Bond Indenture and the Broker-Dealer Agreement.

(a)     Not later than **3:00 p.m.** on each Auction Date, the Auction Agent is required to notify by telephone the Broker-Dealers that participated in the Auction held on such Auction Date and submitted an Order on behalf of any Existing Holder or Potential Holder of:

(1)     the Auction Rate fixed for the next Interest Period;

(2)     whether there were Sufficient Clearing Bids in such Auction;

(3)     if such Broker-Dealer (a "Seller's Broker-Dealer") submitted a Bid or a Sell Order on behalf of an Existing Holder, whether such Bid or Sell Order was accepted or rejected, in whole or in part, and the principal amount of ARCs, if any, to be sold by such Existing Holder;

(4)     if such Broker-Dealer (a "Buyer's Broker-Dealer") submitted a Bid on behalf of a Potential Holder, whether such Bid was accepted or rejected, in whole or in part, and the principal amount of ARCs, if any, to be purchased by such Potential Holder;

(5)     if the aggregate principal amount of ARCs to be sold by all Existing Holders on whose behalf such Broker-Dealer submitted Bids or Sell Orders exceeds the aggregate principal amount of ARCs to be purchased by all Potential Holders on whose behalf such Broker-Dealer submitted a Bid, the name or names of one or more other Buyer's Broker-Dealers (and the Participant, if any, of each such other Buyer's Broker-Dealer) acting for one or more purchasers of such excess principal amount of ARCs and the principal amount of ARCs to be purchased from one or more Existing Holders on whose behalf such Broker-Dealer acted by one or more Potential Holders on whose behalf each of such other Buyer's Broker-Dealers acted;

(6)     if the principal amount of ARCs to be purchased by all Potential Holders on whose behalf such Broker-Dealer submitted a Bid exceeds the amount of ARCs to be sold by all Existing Holders on whose behalf such Broker-Dealer submitted a Bid or a Sell Order, the name or names of one or more Seller's Broker-Dealers (and the Participant, if any, of each such Seller's Broker-Dealer) acting for one or more sellers of such excess principal amount of ARCs and the principal amount of ARCs to be sold to one or more Potential Holders on whose behalf such Broker-Dealer acted by one or more Existing Holders on whose behalf each of such Seller's Broker-Dealers acted;

   (7) unless previously provided, a list of all Applicable ARCs Rates and related Interest Periods (or portions thereof) since the last Interest Payment Date; and

   (8) the Auction Date for the next succeeding Auction.

  (b) On each Auction Date, each Broker-Dealer that submitted an Order on behalf of any Existing Holder or Potential Holder shall:

   (1) advise each Existing Holder and Potential Holder on whose behalf such Broker-Dealer submitted a Bid or Sell Order in the Auction on such Auction Date whether such Bid or Sell Order was accepted or rejected, in whole or in part;

   (2) in the case of a Broker-Dealer that is a Buyer's Broker-Dealer, advise each Potential Holder on whose behalf such Broker-Dealer submitted a Bid that was accepted, in whole or in part, to instruct such Potential Holder's Participant to pay to such Broker-Dealer (or its Participant) through the Securities Depository the amount necessary to purchase the principal amount of ARCs to be purchased pursuant to such Bid against receipt of such ARCs (including, with respect to the ARCs in a Daily Auction Period, accrued interest if the purchase date is not an ARC Interest Payment Date for such ARCs);

   (3) in the case of a Broker-Dealer that is a Seller's Broker-Dealer, instruct each Existing Holder on whose behalf such Broker-Dealer submitted a Sell Order that was accepted, in whole or in part, or a Bid that was accepted, in whole or in part, to instruct such Existing Holder's Participant to deliver to such Broker-Dealer (or its Participant) through DTC the principal amount of ARCs to be sold pursuant to such Bid or Sell Order against payment therefor;

   (4) advise each Existing Holder on whose behalf such Broker-Dealer submitted an Order and each Potential Holder on whose behalf such Broker-Dealer submitted a Bid of the Auction Rate for the next Interest Period or, in the case of ARCs in a Daily Auction Period, the Auction Rate for the current Auction Period;

   (5) advise each Existing Holder on whose behalf such Broker-Dealer submitted an Order of the next Auction Date; and

   (6) advise each Potential Holder on whose behalf such Broker-Dealer submitted a Bid that was accepted, in whole or in part, of the next Auction Date.

(c)     On the basis of the information provided to it pursuant to **paragraph (a)** above, each Broker-Dealer that submitted a Bid or Sell Order in an Auction is required to allocate any funds received by it pursuant to **paragraph (b)(2)** above, and any ARCs received by it pursuant to **paragraph (b)(3)** above, among the Potential Holders, if any, on whose behalf such Broker-Dealer Submitted Bids, the Existing Holders, if any, on whose behalf such Broker-Dealer submitted Bids or Sell Orders in such Auction, and any Broker-Dealers identified to it by the Auction Agent following such Auction pursuant to **paragraph (a)(5)** or **(a)(6)** above.

(d)     On each Auction Date:

    (1)     each Potential Holder and Existing Holder with an Order in the Auction on such Auction Date shall instruct its Participant as provided in **paragraph (b)(2)** or **(b)(3)** above, as the case may be;

    (2)     each Seller's Broker-Dealer that is not a Participant in DTC shall instruct its Participant to (A) pay through DTC to the Participant of the Existing Holder delivering ARCs to such Broker-Dealer following such Auction pursuant to **paragraph (b)(3)** above the amount necessary, including accrued interest, if any, to purchase such ARCs against receipt of such ARCs, and (B) deliver such ARCs through DTC to a Buyer's Broker-Dealer (or its Participant) identified to such Seller's Broker-Dealer pursuant to **paragraph (a)(5)** above against payment therefor; and

    (3)     each Buyer's Broker-Dealer that is not a Participant in DTC shall instruct its Participant to (A) pay through DTC to a Seller's Broker-Dealer (or its Participant) identified following such Auction pursuant to **paragraph (a)(6)** above the amount necessary, including accrued interest, if any, to purchase the ARCs to be purchased pursuant to **paragraph (b)(2)** above against receipt of such ARCs, and (B) deliver such ARCs through DTC to the Participant of the purchaser thereof against payment therefor.

(e)     On the first Business Day of the Interest Period next succeeding each Auction Date:

    (1)     each Participant for a Bidder in the Auction on such Auction Date referred to in **paragraph (d)(1)** above shall instruct DTC to execute the transactions described under **paragraph (b)(2)** or **(b)(3)** above for such Auction, and DTC shall execute such transactions;

    (2)     each Seller's Broker-Dealer or its Participant shall instruct DTC to execute the transactions described in **paragraph (d)(2)** above for such Auction, and DTC shall execute such transactions; and

    (3)     each Buyer's Broker-Dealer or its Participant shall instruct DTC to execute the transactions described in **paragraph (d)(3)** above for such Auction, and DTC shall execute such transactions.

EX-A-3

(f)      If an Existing Holder selling ARCs in an Auction fails to deliver such ARCs (by authorized book-entry), a Broker-Dealer may deliver to the Potential Holder on behalf of which it submitted a Bid that was accepted a principal amount of ARCs that is less than the principal amount of ARCs that otherwise was to be purchased by such Potential Holder (but only in Authorized Denominations).   In such event, the principal amount of ARCs to be so delivered shall be determined solely by such Broker-Dealer (but only in Authorized Denominations). Delivery of such lesser principal amount of ARCs shall constitute good delivery.  Notwithstanding the foregoing terms of this **paragraph (f),** any delivery or nondelivery of ARCs, which shall represent any departure from the results of an Auction, as determined by the Auction Agent, shall be of no effect unless and until the Auction Agent shall have been notified of such delivery or nondelivery in accordance with the provisions of the Auction Agency Agreement and the Broker-Dealer Agreement.

EX-A-4

**EXHIBIT B1**

**ORDER FORM**

(Submit only one Order on this Order Form)

**West Virginia Finance Authority**
**West Virginia United Health System Obligated Group**
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project) 2006 Series B**
**Auction Rate Certificates (ARCs**(sm)**)**

**EXHIBIT B2**

**ORDER FORM**

(Submit only one Order on this Order Form)

**West Virginia Finance Authority**
**West Virginia United Health System Obligated Group**
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project) 2006 Series C**
**Auction Rate Certificates (ARCs[sm])**

EX-B2-1

**EXHIBIT B3**

**ORDER FORM**

(Submit only one Order on this Order Form)

**West Virginia Finance Authority**
**West Virginia United Health System Obligated Group**
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project) 2006 Series D**
**Auction Rate Certificates (ARCs[sm])**

**EXHIBIT C1**

**TRANSFER FORM**

(To be used only for transfers made other than pursuant to an Auction)

**West Virginia Finance Authority**
**West Virginia United Health System Obligated Group**
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project) 2006 Series B**
**Auction Rate Certificates (ARCs<sup>(sm)</sup>)**

We are (check one):

_____ the Existing Holder named below; or

_____ the Broker-Dealer for such Existing Holder; or

_____ the Participant for such Existing Holder.

We hereby notify you that such Existing Holder has transferred $_____
West Virginia Finance Authority Hospital Revenue Bonds (United Hospital Center, Inc. Project)
2006 Series B, Auction Rate Certificates (ARCs<sup>(sm)</sup>).

_____
(Name of Existing Holder)

_____
(Name of Existing Broker-Dealer)

_____
(Name of Participant)

By: _____
        Name:
        Title:

EXHIBIT C2

TRANSFER FORM

(To be used only for transfers made other than pursuant to an Auction)

**West Virginia Finance Authority**
**West Virginia United Health System Obligated Group**
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project) 2006 Series C**
**Auction Rate Certificates (ARCs$^{(sm)}$)**

We are (check one):

_____ the Existing Holder named below; or

_____ the Broker-Dealer for such Existing Holder; or

_____ the Participant for such Existing Holder.

We hereby notify you that such Existing Holder has transferred $_____
West Virginia Finance Authority Hospital Revenue Bonds (United Hospital Center, Inc. Project)
2006 Series C, Auction Rate Certificates (ARCs$^{(sm)}$).

_____
(Name of Existing Holder)

_____
(Name of Existing Broker-Dealer)

_____
(Name of Participant)

By: _____
    Name:
    Title:

**EXHIBIT C3**

**TRANSFER FORM**

(To be used only for transfers made other than pursuant to an Auction)

**West Virginia Finance Authority**
**West Virginia United Health System Obligated Group**
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project) 2006 Series D**
**Auction Rate Certificates (ARCs$^{(sm)}$**

We are (check one):

_____ the Existing Holder named below; or

_____ the Broker-Dealer for such Existing Holder; or

_____ the Participant for such Existing Holder.

We hereby notify you that such Existing Holder has transferred $_____
West Virginia Finance Authority Hospital Revenue Bonds (United Hospital Center, Inc. Project)
2006 Series C, Auction Rate Certificates (ARCs$^{(sm)}$).

_____
(Name of Existing Holder)

_____
(Name of Existing Broker-Dealer)

_____
(Name of Participant)

By: _____
    Name:
    Title:

EX-C3-1

EXHIBIT D1

NOTICE OF FAILURE TO DELIVER

(To be used only for failures to deliver ARCs sold pursuant to an Auction)

**West Virginia Finance Authority**
**West Virginia United Health System Obligated Group**
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project) 2006 Series B**
**Auction Rate Certificates (ARCs(sm)**

Complete either I or II

I.    We are a Broker-Dealer for _____ (the "Purchaser"), which purchased $_____* of West Virginia Finance Authority Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series B, Auction Rate Certificates (ARCs(sm) in the Auction held on _____ from the seller of such ARCs.

II.   We are a Broker-Dealer for _____ (the "Seller"), which sold $_____* of the ARCs in the Auction held on _____ to the purchaser of such ARCs.

We hereby notify you that (check one):

_____ the Seller failed to deliver such ARCs to the Purchaser

_____ the Purchaser failed to make payment to the Seller upon delivery of such ARCs

_____
(Name of Broker-Dealer)

By: _____
Name:
Title:

* ARCs may only be transferred in units of $25,000.

EX-D1-1

**EXHIBIT D2**

**NOTICE OF FAILURE TO DELIVER**

(To be used only for failures to deliver ARCs sold pursuant to an Auction)

**West Virginia Finance Authority**
**West Virginia United Health System Obligated Group**
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project) 2006 Series C**
**Auction Rate Certificates (ARCs$^{(sm)}$)**

Complete either I or II

    I.    We are a Broker-Dealer for _____ (the "Purchaser"), which purchased $_____* of West Virginia Finance Authority Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series C, Auction Rate Certificates (ARCs$^{(sm)}$ in the Auction held on _____ from the seller of such ARCs.

    II.    We are a Broker-Dealer for _____ (the "Seller"), which sold $_____* of the ARCs in the Auction held on _____ to the purchaser of such ARCs.

We hereby notify you that (check one):

    _____ the Seller failed to deliver such ARCs to the Purchaser

    _____ the Purchaser failed to make payment to the Seller upon delivery of such ARCs

                       _____
                         (Name of Broker-Dealer)

                       By: _____
                       Name:
                       Title:

* ARCs may only be transferred in units of $25,000.

MO336231.5                      EX-D2-1

**EXHIBIT D3**

**NOTICE OF FAILURE TO DELIVER**

(To be used only for failures to deliver ARCs sold pursuant to an Auction)

**West Virginia Finance Authority**
**West Virginia United Health System Obligated Group**
**Hospital Revenue Bonds**
**(United Hospital Center, Inc. Project) 2006 Series D**
**Auction Rate Certificates (ARCs$^{(sm)}$)**

Complete either I or II

     I.    We are a Broker-Dealer for _____ (the "Purchaser"), which purchased $_____* of West Virginia Finance Authority Hospital Revenue Bonds (United Hospital Center, Inc. Project) 2006 Series C, Auction Rate Certificates (ARCs$^{(sm)}$ in the Auction held on _____ from the seller of such ARCs.

     II.    We are a Broker-Dealer for _____ (the "Seller"), which sold $_____* of the ARCs in the Auction held on _____ to the purchaser of such ARCs.

We hereby notify you that (check one):

     _____ the Seller failed to deliver such ARCs to the Purchaser

     _____ the Purchaser failed to make payment to the Seller upon delivery of such ARCs

                         _____
                         (Name of Broker-Dealer)

                       By: _____
                       Name:
                       Title:

* ARCs may only be transferred in units of $25,000.

                    

**EXHIBIT E**

**(ARCs)**

**CHANGE IN STATUTORY CORPORATE TAX RATE**

Pursuant to **Section 2.1(f)** of the Broke-Dealer Agreement and the Bond Indenture, you are hereby advised that the Statutory Corporate Tax Rate for all Auctions commencing after _____ \_\_\_, 20\_\_, has been changed.  The new Statutory Corporate Tax Rate as from _____ shall be _____.  Terms used herein and not defined herein have their respective meanings set forth in the Bond Indenture.

Dated: _____, 20\_\_\_

**UBS SECURITIES LLC**


By: _____
         Name:
         Title:

EX-E-1